## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RELIANT PHARMACEUTICALS, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>PAR PHARMACEUTICAL, INC. )<br><br>Defendant. ) | Civil Action No. 06-774-JJF |

## DECLARATION OF CHRISTINE WILLGOOS
## IN SUPPORT OF RELIANT'S MOTION FOR
## DISQUALIFICATION OF FROMMER LAWRENCE & HAUG LLP

I am an associate at Kirkland & Ellis LLP, counsel for Reliant Pharmaceuticals, Inc. ("Reliant"). I submit this declaration in support of Reliant's Motion for Disqualification of Frommer Lawrence & Haug LLP.

1.        Attached as Exhibit 1 is a true and correct copy of a November 7, 2006 letter from Steven I. Engel of Par Pharmaceutical, Inc. ("Par") to Dr. Ernest Mario of Reliant.

2.        Attached as Exhibit 2 is a true and correct copy of a January 10, 2007 letter from Steven I. Engel of Par to Dr. Ernest Mario of Reliant.

3.        Attached as Exhibit 3 is a true and correct copy of a December 20, 2006 e-mail from Christine Willgoos to Edgar Haug, copied to Andrew Wasson (attachment omitted).

4.        Attached as Exhibit 4 is a true and correct copy of a December 29, 2006 letter from Gerald J. Flattmann, Jr. to Edgar Haug.

5.        Attached as Exhibit 5 is a true and correct copy of a January 17, 2007 letter from Egdar Haug to Gerald J. Flattmann, Jr.

6.      Attached as Exhibit 6 is a true and correct copy of a January 25, 2007 letter from Gerald J. Flattmann, Jr. to Edgar Haug.

7.      Attached as Exhibit 4 is a true and correct copy of a February 12, 2007 letter from Gerald J. Flattmann, Jr. to Edgar Haug.

8.      Attached as Exhibit 8 is a true and correct copy of a February 12, 2007 letter from Egdar Haug to Gerald J. Flattmann, Jr.

9.      Attached as Exhibit 9 is a true and correct copy of a December 20, 2006 e-mail from Nicole Abruzio of Frommer Lawrence & Haug ("FLH"), copying Arthur Hoag and Andrew Wasson of FLH, to Christine Willgoos.

10.     Attached as Exhibit 10 is a true and correct copy of a February 9, 2007 e-mail from John Meyer of Young Conaway Stargatt & Taylor, copying Daniel Brown, Edgar Haug, Josy Ingersoll, Omar Jabri, Karen Pascale and James Stronski, to Jack Blumenfeld, Steven Cherny, John Desmarais, Gerald J. Flattmann, Jr., Maryellen Noreika and Christine Willgoos (attachment omitted).

11.     Attached as Exhibit 11 is a true and correct copy of the article by Elaine Chow, *Fulwider Pays $8M To Settle Misconduct Claims*, published in IP Law 360 on January 3, 2007.

12.     Attached as Exhibit 12 is true and correct copy of a December 18, 2006 letter from Edgar Haug to Christine Willgoos.

13.     Attached as Exhibit 13 is a true and correct copy of ABA Model Rule Of Professional Conduct 1.9, Duties To Former Clients, and ABA Comments to that Rule.

14.      Attached as Exhibit 14 is a true and correct copy of ABA Model Rule Of Professional Conduct 1.10, Imputation Of Conflicts Of Interest.

15.      Attached as Exhibit 15 is a true and correct copy of Defendant Par Pharmaceutical, Inc.'s First Set Of Interrogatories To Plaintiff, served March 23, 2007.

16.      Attached as Exhibit 16 is a true and correct copy of Defendant Par Pharmaceutical, Inc.'s First Set Of Requests For The Production Of Documents And Things To Plaintiff, served March 23, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Christine Willgoos

April 30, 2007
New York, New York.

3

# EXHIBIT 1



Par Pharmaceutical Companies, Inc.
300 Tice Boulevard
Woodcliff Lake, NJ 07677
tel  201 802 4000
fax  201 802 4600
www.parpharm.com

November 7, 2006

**CONFIDENTIAL**

VIA REGISTERED EXPRESS MAIL
RETURN RECEIPT REQUESTED

Dr. Ernest Mario
Chief Executive Officer & Chairman
Reliant Pharmaceuticals
110 Allen Road
Liberty Corner, NJ 07938

Re:    Rythmol® SR; route of administration: oral; strength: 325mg
       United States Patent No. 5,681,588
       Notice of Paragraph IV Certification

Dear Sir:

This is a notice of certification letter on behalf of Par Pharmaceutical, Inc., ("Par") pursuant to 505(j)(2)(B)(ii) of the Federal Food, and Drug Cosmetic Act ("the Act") and 21 U.S.C. § 355(j)(2)(B)(ii) and § 314.95 of Title 21 of the Code of Federal Regulations:

1.  An Abbreviated New Drug Application ("ANDA") that contains data from bioavailability or bioequivalence studies has been submitted under § 505(j) of the Act for the drug with respect to which the certification is made to obtain approval to engage in the commercial manufacture, use, or sale of Propafenone HCl SR capsules before the expiration of U.S. Patent No. 5,681,588. The Food and Drug Administration ("FDA") has received this application.

2.  The established name of Par's proposed drug product is Propafenone HCl SR Capsules. Reliant Pharmaceuticals, Inc. markets Propafenone HCl under the brand name Rythmol® SR.

3.  The active ingredient, strength, and dosage forms of the proposed drug product are: Propafenone HCl; 325 mg; and capsule for oral administration.

Normal.dot



4. The ANDA indicates that Par intends to market the product before the expiration of: U.S. Patent No. 5,681,588 ("the '588 patent"), which expires on October 28, 2014. The '588 Patent is listed in *Approved Drug Products with Therapeutic Equivalence Evaluations* (the "Orange Book") for Rythmol® SR (Propafenone HCl, 225 mg, 325 mg and 425 mg), extended release capsules for oral administration.

5. An Offer of Confidential Access to Par's ANDA, pursuant to 21 U.S.C. §355(j)(5)(C)(i)(III), accompanies this notice as a separate enclosure.

Attached is a detailed statement of the factual and legal bases of Par's patent certification. This information is supplied for the sole purpose of complying with the above-referenced statutes and regulations. Neither Par nor its attorneys waive any attorney-client privilege or work-product immunity concerning the subject matter of this communication.

Sincerely,

Steven I. Engel, M.S., Pharm.D.
Vice President, Regulatory Affairs
PAR Pharmaceutical, Inc.
300 Tice Boulevard, 3rd Floor
Woodcliff Lake, NJ 07677
U.S.A.

Encl.: Detailed Statement of the Factual and Legal Basis of Par's Paragraph IV Patent Certification and Offer of Confidential Access

Duplicate with enclosure via FEDEX

Normal.dot

## DETAILED STATEMENT OF FACTUAL AND LEGAL BASIS FOR PAR'S OPINION THAT THE '588 PATENT IS INVALID, UNENFORCEABLE AND WILL NOT BE INFRINGED

## I.    INTRODUCTION AND SUMMARY

Reliant Pharmaceuticals ("Reliant") is the listed holder of NDA No. 21-416 for Propafenone HCl extended release capsules (325 mg) sold under the brand name Rythmol® SR. Rythmol® SR is indicated to prolong the time to recurrence of symptomatic atrial fibrillation in patients, without structural heart disease. Par proposes to manufacture, as set forth in its ANDA, 325 mg extended release capsules of propafenone HCl. Par's proposed generic propafenone HCl sustained release capsules will not infringe U.S. Patent No. 5,681,588, the only Orange Book patent listed with respect to Rythmol® SR. Also, this patent is invalid and unenforceable.

Par's proposed product does not infringe the '588 patent (either literally or under the doctrine of equivalents) because Par's proposed formulation: (1) Par's proposed formulation does not use microtablets; (2) Par's proposed formulation does not employ cylindrically-shaped components; (3) Par's proposed formulation uses an amount of propafenone which falls below the range claimed in the patent; and (4) Par's proposed formulation uses a release delaying substance.

Furthermore, the claims of the '588 patent are invalid under 35 U.S.C. §102(b) and 35 U.S.C. §103 over U.S. Patent No. 4,797,287 ("Pich"). Broadly, Pich discloses cylindrical microtablets containing propafenone and exemplifies propafenone content up to 80%. The '588 patent is also invalid under 35 U.S.C. §103(a) over Pich in view of U.S. Patent No. 4,954,347 ("Kristen"). Finally, the '588 patent is unenforceable because the assignee (and its employees) knew about Pich, a highly material reference, but did not disclose it to the PTO during the prosecution of the '588 patent.

## II.    LEGAL STANDARDS FOR INFRINGEMENT

### A.    Infringement Generally

Under 35 U.S.C. § 271(e)(2), "[i]t shall be an act of infringement to submit—(A) an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent." "35 U.S.C. § 271(e)(2)(A) simply provides an 'artificial' act of infringement that creates case–or–controversy jurisdiction to enable the resolution of an infringement dispute before the ANDA applicant has actually made or marketed the product. Once jurisdiction is established, however, the substantive determination whether actual infringement or inducement

00409689.DOC

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 2

will take place is determined by traditional patent infringement analysis." *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003).

The patentee has the burden of proving infringement by a preponderance of the evidence. *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1341 (Fed. Cir. 2005). Infringement may be literal or under the doctrine of equivalents. In each case the infringement analysis is a two-step process. *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1340 (Fed. Cir. 2005). First, the scope of the claims must be determined. The Supreme Court has held that this first step, sometimes referred to as claim interpretation, is an issue of law exclusively within the province of the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996) ("*Markman II*"); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1453 (Fed. Cir. 1998) (en banc). Thus, claim construction necessarily precedes a determination of whether the claims read on an accused product for infringement purposes. *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed. Cir. 1990); *SmithKline Diagnostics, Inc. v. Helena Labs Corp.*, 859 F.2d 878, 882 (Fed. Cir. 1988).

The second step involves comparing the properly construed claims to the accused product to determine whether those claims "read on" the accused subject matter, *i.e.*, whether all of the claim limitations are present in the accused device, either literally or by a substantial equivalent. *Johnson Worldwide Assocs. Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999); *Renishaw PLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1247 (Fed. Cir. 1998); *Cybor*, 138 F.3d at 1453. This second step is a factual determination and is thus submitted to a jury if the case is not tried to the court. *Markman II*, 517 U.S. at 384 (citing *Winans v. Denmead*, 56 U.S. 330, 338 (1854)).

## 1.    Claim Interpretation

Generally, claims are given their ordinary and customary meaning to a person skilled in the art, at the time of invention. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Claim interpretation involves consideration of the language of the patent claim itself, the specification, other claims, the prosecution history, extrinsic evidence concerning scientific principles, and the meaning of technical terms. *Id.* at 1314; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979-80 (Fed. Cir. 1995), *aff'd en banc*, 517 U.S. 370 (1996) ("*Markman I*"). Courts may admit extrinsic evidence, if necessary, as long as the extrinsic evidence is consistent with the intrinsic record. *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 996 (Fed. Cir. 2006). Extrinsic evidence is any evidence that is external to the patent and prosecution history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles. *Vitronics*, 90 F.3d at 1584.

The specification should be referred to when construing the limitations of patent claims. Indeed, usually, it is dispositive of the meaning of a term, and has been called "the single best

00409689.DOC

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 3

guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. Thus, the specification may act as a sort of dictionary, which explains the claimed subject matter and may define terms used in the claims. *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1153 (Fed. Cir. 1997); *Markman I*, 52 F.3d at 979. Where the specification contains nothing to indicate that phrases are to be given anything other than their ordinary meanings, then those are the meanings the court must give them. *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1384 (Fed. Cir. 1998) (citing *Vitronics*, 90 F.3d at 1582); *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed. Cir. 1984). That is, a technical term used in a patent document is given the same meaning that it would be given by persons experienced in the field of the patent, unless it is apparent from the patent and prosecution history that the patentee used the term with a different meaning. *CVI/Beta Ventures*, 112 F.3d at 1153 (quoting *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996)). Thus, "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *CVI/Beta Ventures*, 112 F.3d at 1153 (quoting *Vitronics*, 90 F.3d at 1582).

### 2.     Literal Infringement

After claim interpretation, a determination is made whether the claims cover the accused products or methods. *Johnson Worldwide Assocs.*, 175 F.3d at 988. To infringe a claim, the accused product or method must include every limitation of the claim, either literally or by a substantial equivalent. *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 397 (Fed. Cir. 1994).

To demonstrate literal infringement, a plaintiff must prove that the allegedly infringing product or method embodies every element of the asserted claim(s). *Dolly, Inc.*, 16 F.3d at 397; *Townsend Eng 'g Co. v. Hitec Co.*, 829 F.2d 1086, 1090 (Fed. Cir. 1987). This follows from the principle that "[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997); *see Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985) (stating it is "well settled that each element of a claim is material and essential"). Thus, "[i]f even one limitation is missing or not met as claimed, there is no literal infringement." *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998).

### 3.     The Doctrine of Equivalents

Even if a product or process does not literally infringe, there can still be infringement if there is "equivalence" between the elements of the accused product or process and the elements of the patent's claims. *Warner-Jenkinson*, 520 U.S. 17, 21 (1997) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950)); *We Care, Inc. v. Ultra-Mark Int'l Corp.*, 930 F.2d 1567, 1571 n.3 (Fed. Cir. 1991). Infringement by equivalents requires that "the

00409689.DOC

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 4

accused product or process contain elements identical or equivalent to each claimed element of the patented invention." *Warner-Jenkinson*, 520 U.S. at 40.

To be equivalent, the patentee must prove that the accused product "differs from what is literally claimed only insubstantially, and it performs substantially the same function in substantially the same way to achieve substantially the same result." *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1444 (Fed. Cir. 1997); *Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996); *see Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1518 (Fed. Cir. 1995), *rev'd on other grounds*, 520 U.S. 17 (1997) (affirming the viability of the "insubstantial differences" test). The nature of the differences is assessed according to whether a person with ordinary skill in the relevant art would find the differences to be substantial. *Hilton Davis*, 62 F.3d at 1519.

### 4.    Limits on the Doctrine of Equivalents

There are limitations on the application of the doctrine of equivalents. Among other limitations, both the prior art and prosecution history estoppel limit the range of equivalents. *Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1579 (Fed. Cir. 1993), *clarified on other grounds*, 15 F.3d 1076 (Fed. Cir. 1994); *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934 n.1 (Fed. Cir. 1987) (en banc). "The doctrine of equivalents cannot be used to erase "meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." *Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1562 (Fed. Cir. 1994).

#### a.    Prosecution History Estoppel

Prosecution history estoppel applies when the applicant surrenders subject matter by either argument or amendment. Arguments, even without amendment, made during prosecution to obtain allowance of the claims at issue give rise to estoppel when such assertions clearly and unmistakably surrender subject matter, even when such arguments were not necessary to distinguish prior art. *Sextant Avionique, S.A. v. Analog Devices, Inc.*, 172 F.3d 817, 828, n.3 (Fed. Cir. 1999) (citing *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 952 (Fed. Cir. 1993) and *Texas Instruments Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1174-75 (Fed. Cir. 1993)); *Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1458 (Fed. Cir. 1998) (citing the same).

During the prosecution of a patent, "a narrowing amendment made to satisfy any requirement of the Patent Act may give rise to an estoppel." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 736 (2002). For example, prosecution history estoppel is not limited to amendments made to avoid the prior art, but rather includes amendments made to comply with 35 U.S.C. § 112:

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 5

> A patentee who narrows a claim as a condition for obtaining a
> patent disavows his claim to the broader subject matter, whether
> the amendment was made to avoid the prior art or to comply with
> § 112. We must regard the patentee as having conceded an
> inability to claim the broader subject matter or at least as having
> abandoned his right to appeal a rejection. In either case estoppel
> may apply.

*Id.* at 737. Thus, when prosecution history estoppel applies, the patentee may only allege literal
infringement.

### b.     Prior Art as a Limitation

Even if the accused product performs substantially the same overall function or work, in
substantially the same way, to obtain substantially the same overall result as the claimed
invention, there can be no infringement if the asserted scope of equivalency of what is literally
claimed would encompass the prior art. *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.,*
904 F.2d 677, 683 (Fed. Cir. 1990). The patentee bears the burden of proving that the
hypothetical claim does not "ensnare the prior art." *Id.* at 685. In this inquiry, the prior art can be
found to anticipate or render obvious the claimed invention.

In *Wilson*, the patentee alleged the accused product infringed its patent, which covered
the pattern of dimples on a golf ball, under the doctrine of equivalents. The Federal Court of
Appeals disagreed, holding "there can be infringement if the asserted scope of equivalency of
what is literally claimed would encompass the prior art." *Id.* at 683. The Court explained that
"the doctrine of equivalents does not involve expansion of the *claims.*" *Id.* at 684 (emphasis in
original). To hold otherwise, the court reasoned, "would allow the patentee to preempt a product
that was in the public domain prior to invention." Thus, "[a] patentee should not be able to
obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained
from the PTO by literal claims." *Id.* at 684.

To guide courts in this determination, the court proposed that courts consider the likely
result of a "hypothetical claim" broad enough in scope to *literally* cover the accused product. If
this hypothetical claim would not have been allowed by the PTO over the prior art, "it would be
improper to permit the patentee to obtain that coverage in an infringement suit under the doctrine
of equivalents." *Id.* at 684. Even so, the hypothetical claim analysis is not mandatory. *Conroy v.
Reebok Int'l,* 14 F.3d 1570, 1577 (Fed. Cir. 1994) (noting that the crux of the analysis is
preventing the patentee from obtaining scope later that he or she could not have obtained during
prosecution); *see also International Visual Corp. v. Crown Metal Mfg. Co.,* 991 F.2d 768, 772
(Fed. Cir. 1993).

00409689.DOC

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 6

The Federal Circuit has re-affirmed this reasoning in a series of subsequent cases. *Streamfeeder, LLC v. Sure-Feed Systems Inc.*, 175 F.3d 974 (Fed. Cir. 1999); *Marquip Inc. v. Fosber America, Inc.*, 198 F.3d 1363 (Fed. Cir. 1999). In *Streamfeeder*, the court noted that in hypothetical claim analysis "one cannot, in the course of litigation and outside of the PTO, cut and trim, expanding here and narrowing there, to arrive at a claim that encompasses an accused device, but avoids the prior art." 175 F.3d at 983. Thus, the patentee is prohibited from both broadening the scope of the claims under the doctrine of equivalents while simultaneously narrowing the scope of the claims to avoid encompassing the prior art.

### c.    The Dedication Disclosure Rule

The doctrine of equivalents cannot reach an element disclosed in an alternative embodiment of the invention in the specification but deliberately not claimed. *See Johnson & Johnston Assocs. v. R.E. Serv. Co.*, 285 F.3d 1046 (Fed. Cir. 2002).

> [W]hen a patent drafter discloses but declines to claim subject matter, as in this case, this action dedicates that unclaimed subject matter to the public. Application of the doctrine of equivalents to recapture subject matter deliberately left unclaimed would "conflict with the primacy of the claims in defining the scope of the patentee's exclusive right."

*Id.* at 1054. The court in *Johnson* also grounded their holding partly in the policy that, "a patentee cannot narrowly claim an invention to avoid prosecution scrutiny by the PTO, and then, after patent issuance, use the doctrine of equivalents to establish infringement because the specification discloses equivalents." *Id.*

### d.    The "All Elements" Rule

One further limitation of the doctrine of equivalents is the "all elements rule" which requires that "each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997). It follows from this rule that, "an element of an accused product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate that element in its entirety." *Freedman Seating Co., v. America Seating Co.*, 420 F.3d 1350 (Fed. Cir. 2005). According to the Federal Circuit, there is no "set formulation" for this determination, however, courts must consider "the totality of the circumstances." *Id.* at 1359. Several factors are appropriate for consideration, including "the simplicity of the structure, the specificity and narrowness of the claim, and the forseeability of variations at the time of filing the claim with the PTO." *Id.* at 1360. For example, in *Moore U.S.A., Inc. v. Standard Register, Co.*, 229 F.3d 1091 (Fed. Cir. 2000), the Federal Circuit stated

00409689.DOC

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 7

that, "to allow what is undisputedly a minority (*i.e.*, 47.8%) to be equivalent to a majority would vitiate the requirement that the 'first and second longitudinal strips of adhesive . . . extend the majority of the lengths of said longitudinal marginal portions'." *Id.* at 1106; *see generally Tronzo v. Biomet*, 156 F.3d 1154 (Fed. Cir. 1998) (claims reciting a clear geometric shape of generally conical were vitiated by attempting to cover a hemispherical cup by the doctrine of equivalents).

### e.    Specific Exclusion

Further, "by defining the claim in a way that clearly excluded certain subject matter" a patent implicitly disclaims the excluded subject matter and will bar the doctrine of equivalents. *SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1346 (Fed. Cir. 2001). In particular, structural limitations like shapes have been accorded a narrow scope of equivalents:

> A claim that contains a detailed recitation of structure is properly accorded correspondingly limited recourse to the doctrine of equivalents. *See Tanabe Seiyaku Co. v. United States ITC*, 109 F.3d 726, 732 (Fed. Cir. 1997) ("The sharply restricted nature of the claims has much to do with the scope we accord to the doctrine of equivalents."). That principle has special application in a case such as this one, where the claim recites a particular shape for the basal portion of the abutment that clearly excludes distinctly different and even opposite shapes.

*Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 955 (Fed. Cir. 2006). In *Bicon*, reciting a specific shape in the claims specifically excluded other shapes. *Id.* In particular, the patentee's characterization of its abutment having a "convex, frusto-spherical shape" excluded abutments which were concave and frustro-conical because these shapes were contrary to, or inconsistent with, the claim language. *Id.* at 955-956.

### f.    Other Limits

In addition, arguments emphasizing the criticality of a claim element may give rise to a surrender of all competitive products that do not contain the critical element. *See Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.*, 170 F.3d 1373, 1378-79 (Fed. Cir. 1999) (finding all compositions that do not contain a component described as critical during prosecution and interpreted as indispensable were surrendered during prosecution).

Moreover, there can be no infringement under the doctrine of equivalents if a claim limitation is totally missing from the accused device. *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1539 (Fed. Cir. 1991) (citing *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 798 (Fed. Cir. 1990)). "The doctrine of equivalents is not a license to ignore claim

00409689.DOC

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 8

limitations." *Dolly,* 16 F.3d at 398. That is, a "court cannot convert a multilimitation claim to one with fewer limitations to support a finding of equivalency." *Id.* at 399.

## III.    LEGAL STANDARDS FOR INVALIDITY

### A.    Anticipation Under 35 U.S.C. 102(b) - Prior Art

Section 102(b) provides a complete bar to the patentability of any invention that has been "patented or described in a printed publication in this or a foreign country… more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (2000). A single reference must teach each and every limitation of the claimed invention, either expressly or inherently, in order to anticipate under 35 U.S.C. § 102(b). *EMI Group N. Am., Inc. v. Cypress Semiconductor Corp.,* 268 F.3d 1342, 1350 (Fed. Cir. 2001). Proof of invalidity is facilitated when prior art not considered during prosecution is material to the issue of validity. *See Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed. Cir. 1983).

### B.    The Law of Obviousness Under 35 U.S.C. § 103

For a patent to be valid, the claimed invention must be nonobvious over the prior art to a person having ordinary skill in the art of the invention. Section 103(a) provides in part:

A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

An important consideration is "the need to adhere to the statute, i.e., to hold that an invention would or would not have been obvious, as a whole, when it was made, to a person of 'ordinary skill in the art' – not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art." *Envtl. Designs Ltd., v. Union Oil Co.,* 713 F.2d 693, 697 (Fed. Cir. 1983); *Custom Accessories Inc. v. Jeffrey-Allan Indus.,* 807 F.2d 955, 962 (Fed. Cir. 1986).

Several factors guide a court's assessment of obviousness including:

(1)    the scope and content of the prior art;

(2)    the differences between the prior art and the claims at issue;

(3)    the level of the ordinary skill in the art; and

(4)    whatever objective evidence may be present.

00409689.DOC

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 9

*Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966).

When evaluating the scope and content of the prior art, the question under § 103 is not merely what the references expressly teach but what they would have suggested to one of ordinary skill in the art at the time the invention was made. *Merck & Co. Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989). To invalidate a patent under § 103 using a combination of prior art, there must be some reason, suggestion or motivation found in the prior art whereby a person of ordinary skill would make the combination. *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1351 (Fed. Cir. 1998). The motivation to combine can come from the knowledge of those skilled in the art, from the prior art reference itself, or from the nature of the problem to be solved. *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1356 (Fed. Cir. 2000); *Pro-Mold and Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996) (holding that such suggestion may "come from the nature of a problem to be solved, leading inventors to look to references relating to possible solutions to that problem"). It is not necessary for the motivation to be found explicitly in the prior art: "[t]here is flexibility in our obviousness jurisprudence because a motivation may be found *implicitly* in the prior art. We do not have a rigid test that requires an actual teaching to combine before concluding that one or ordinary skill in the art would know to combine references." (emphasis in original). *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, at *10 (Fed. Cir. 2006). The ultimate determination of obviousness when evaluating the prior art does not require absolute predictability of success. All that is required is a reasonable expectation of success. *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000).

Other considerations may be helpful in determining whether an invention is obvious. *See Stratoflex, Inc.*, 713 F.2d at 1538. These secondary considerations include evidence of commercial success, long felt but unsolved needs, failure of others, initial skepticism of experts, praise from experts, copying by an infringer, near simultaneous invention by others, and licenses under the examined patent. *See In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998). However, these factors are not considered unless there is a showing of a nexus between the invention and the secondary consideration to ensure that the secondary consideration is not ascribable to other irrelevant factors. *Ryko Mfg. Co. v. Nu-Star Inc.*, 950 F.2d 714, 719 (Fed. Cir. 1991).

Each claim in an issued patent carries an independent presumption of validity. The ultimate question of obviousness is a question of law, which must be supported by clear and convincing evidence. The challenger to the validity of a patent must establish by clear and convincing evidence the facts supporting invalidity. *Ultra-Tex Surfaces v. Hill Bros. Chem. Co.*, 204 F.3d 1360, 1367 (Fed. Cir. 2000). Proof of invalidity is facilitated when prior art not considered during prosecution is material to the issue of validity. *See Stratoflex, Inc.*, 713 F.2d at 1534.

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 10

### C.    Inequitable Conduct

A breach of an applicant's duty of candor to the Patent Office during the procurement of a patent is considered "inequitable conduct." A successful defense on inequitable conduct must show by clear and convincing evidence, "affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Alza Corp. v. Mylan Labs., Inc.*, 391 F.3d 1365, 1373 (Fed. Cir. 2004). Thus, the first inquiry is whether the patentee's act is material. *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1362-63 (Fed. Cir. 2003). Next, it is necessary to determine if the requisite intent to mislead was present. *Id.* There is a balance between materiality and intent: the more material the reference is, the smaller the burden necessary to show an intent to deceive (and *vice versa*). *Purdue Pharma LP v. Endo Pharma. Inc.*, 438 F.3d 1123, 1128-29 (Fed. Cir. 2006).

A duty of candor and good faith is required to the Patent and Trademark Office by the inventor, the attorney or agent preparing and prosecuting the application, and every other individual substantively involved in the prosecution of the application. 37 C.F.R. § 1.56(c). This duty also applies to those substantively involved individuals who are associated with the asisngee. *Id.* Moreover, a corporate assignee does not cleanse itself of all culpability for misrepresentations or omissions during the prosecution of the patent application filed on its behalf by purposefully keeping its officers in the dark concerning the application's contents and placing the entire burden for proper disclosure on an inventor not versed in patent law or the relevant facts. *See Digital Equipment Corp. v. Diamond*, 653 F.2d 701 (Fed. Cir. 1981).

### IV.    THE '588 PATENT IS NOT INFRINGED AND IS INVALID

### A.    The '588 Patent

The '588 Patent matured from application serial number 08/525,749 ("the '749 application"), filed on October 10, 1995, which claims priority from PCT/EP94/00949, filed March 24, 1994. PCT/EP94/00949, in turn, claims priority from German application P4310963.2 which was filed on April 3, 1993. The German application was originally filed by BASF Aktiengesellschaft. The '588 patent issued to Kolter et al. on October 28, 1997 and is assigned to Knoll Aktiengesellschaft of Ludwigshafen, Germany. The '588 Patent expires on October 28, 2014.

In the "Background of the Invention" section, the patentee admits that multiple unit delayed release dosage forms were preferable to single unit dosage forms because "the units are distributed uniformly along the gastrointestinal tract and can also pass through the closed pylorus." Col. 1, lines 46-48. The patentee also admits that multiple unit delayed dosage forms contained amounts of active ingredient that were up to 60-80%. The patentee alleges that "small matrix" pellets were produced, but "only with very low doses of medicinal substances." For

00409689.DOC

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 11

example, the patentee cites EP 22 17 32 (Oren et al.), WO 92/04013 (Bongiovanni et al.), and GB 2 176 999 (Davis et al.) as having low doses of active ingredient. The patentee admits that Oren et al. discloses, "delayed release tablets" having "60-80% active ingredient." Col. 1, line 59. Another example in Bongiovanni discloses 76.7% ibuprofen content. In the Detailed Description of the Preferred Embodiments, the patentee asserts "A bolus tablet with commercial dosages of 150-300 mg and an active ingredient above 80% cannot be produced under production conditions." Col. 2, lines 31-33.

The specification alleges that employing microtablets according to the invention overcomes the drawbacks of the prior art. The specification describes that microtablet production has four steps, used with conventional pharmaceutical equipment: "granulation, drying, mixing, tabletting." Col. 3, line 51. According to the patentee, "[t]he tabletting takes place in a suitable tabletting machine equipped with multiple microtablet punches. The resulting microtablets have a cylindrical shape with flat or convex surface [sic]." (emphasis added) Col. 4, lines 19-22. In Example 1, the patentee discloses, "[t]he microtablets were produced in a rotary tabletting machine equipped with multiple microtablet punches." Col. 5, lines 25-26. Further, each example (other than the comparative example) refers back to Example 1 for the method of microtablet production.

WO 92/04013 was cited as an example that "disclose[s] small matrix delayed release tablets which likewise contain relatively large amounts of release-delaying ancillary substances." The patentee then notes that "Patent Application EP 22 17 32 claims delayed release tablets of active ingredients with low solubility, which contain 60-80% active ingredient in addition to at least 4 auxiliaries" and that such formulations are highly dependent on "granulation process and equipment" used. With respect to compressibility, the patentee notes that "propafenone HCl is extremely difficult to compress. A bolus tablet with commercial doses of 150-300 mg and an active ingredient content above 80% cannot be produced under production conditions. . . such high contents of active ingredients of this type in tablets have not previously been reached." Patentee admits that it considers propafenone delayed release tablet formulations of 80% or less active ingredient content to be part of the prior art. Col. 2, lines 30-41.

The patentee further noted that its microtablets achieve the object of the invention "because it has been found, surprisingly, that it is possible in the present case to produce delayed release tablets without release-delaying ancillary substances." Patentee also pointed out a number of problems that hydrophilic release-delaying polymers can cause: sticking or adhesion to the GI tract (patentee referenced WO 92/04013 as a formulation that might exhibit this problem), requirement of use of organic solvents to prevent swelling (patentee pointed out that this problem which can be "entirely" dispensed within the invention), and sensitivity to changes in humidity during storage.

The '588 patent has six claims, only the first claim is independent:

00409689.DOC

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 12

1. A cylindrical delayed release microtablet with a convex or flat upper side and lower side of β-phenylpropiophenone derivatives of the formula I as active ingredient



I

where R is n-propyl or 1,1-dimethylpropyl, and their pharmacologically acceptable salts, wherein

a) the height and diameter are, independently of one another, 1-3 mm,

b) the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet,

c) the active ingredient density is greater than 1,

d) the release of active ingredient in the USP paddle method at 50 rpm is 80% as a maximum after 3 hours and as a minimum after 24 hours,

e) the release rate is virtually independent of the pressure when compressing the tablets, and

f) the tablet contains no release-delaying ancillary substance but 0.1-5% by weight of a lubricant and 0-18.9% by weight of other conventional ancillary substances.

2. A tablet as claimed in claim 1, which in vivo results in a pronounced plasma level plateau with a PTF<75% and whose bioavailability does not depend on the intake of food.

3. A tablet as claimed in claim 1, wherein the active ingredient is propafenone hydrochloride.

00409689.DOC

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 13



4. A tablet as claimed in claim 1, wherein the height and diameter are approximately the same.

5. A gelatin capsule which contains 3-200 tablets as claimed in claim 1 with identical or different release rates.

6. A process for producing cylindrical delayed release microtablets as claimed in claim 1, which comprises a homogeneous mixture of 81-99.9% by weight of the granulated active ingredient with a particle size below 1 mm, 0.1-5% by weight of a lubricant and 0-18.9% by weight of other conventional ancillary substances which do not delay release being compressed in a cylindrical mold with a height and diameter each of 1-3 mm and being removed from the mold.

**B.    The Prosecution History of the '588 Patent**

During prosecution, the applicant submitted a preliminary amendment that made changes to the specification and removed multiple dependent claims. In the first Office Action, the Examiner rejected claims 1-6 under 35 U.S.C. §103 and 35 U.S.C. §112. With regard to the rejection under §103, the Examiner determined that the claims were unpatentable over Davidson (U.S. Patent No. 3,951,821) in view of Franke (U.S. Patent No. 4,945,114). The Examiner noted that the claims read on "a cylindrical delayed release tablet with an active agent" and that Davidson teaches "a delayed release microtubule...and active agent." Office Action, mailed October 17, 1996 at 3 (citation omitted). The Examiner noted Franke discloses the use of propafenone. The Examiner concluded that the motivation to combine the references "is provided by the fact that both cited references read on a tablet comprising an active agent. The intended purpose is to provide a delayed release specific active agent tablet." *Id.*

The Examiner also determined that the claims were unpatentable under 35 U.S.C. §112. Office Action, mailed October 17, 1996 at 2. As originally filed, claim 1 recited "from 81 to 99.9% of the weight of the microtablet, but not taking into account the weight of any coating which is present." The Examiner found that this was indefinite. The Examiner indicated that if the amount of coating was important, then the claims should be rewritten to reflect the percentage of coating present. In response, the applicant deleted the coating part of the limitation.

The applicant responded that their microtablet had surprisingly improved delayed release characteristics and that such results are "especially surprising" because their formulation contained "no other release delaying additives." Response, dated January 9, 1997 at 3. The applicant also alleged that 90% of other medicaments with similar water solubilites were

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 14

released within one hour if they were formulated according to the invention (data not included). Other "surprising" results included that release rate was virtually independent of pressure. *Id.* With respect to the prior art references, applicant pointed out that Davidson actually "is specifically looking toward instant release and speeding up the disintegration of tablets." *Id.* at 4. The applicant conjectured: "if one were to modify Davidson by the teachings of Franke et al, one would obtain a propafenone hydrochloride tablet" resulting in "relatively instant release, certainly within five minutes or less, as taught by Davidson." *Id.* at 5. The applicant concluded that there is "no suggestion within either reference" that propafenone "would have surprising delayed release characteristics when compressed into the tablet form" disclosed in the application, and there would be "no expectation by one of ordinary skill in the art" of obtaining the "delayed relatively uniform release...in a microtablet having the required size, shape and other characteristics as required by the present claims." *Id.* 6.

The notice of allowance was mailed on April 1, 1997, and the applicant filed a supplemental amendment substituting a new abstract for the abstract that was filed with the application. A supplemental notice of allowability was mailed on June 25, 1997. The patent issued on October 28, 1997.

### C.    Par's Proposed Propafenone HCl Capsule (325 mg) Does Not Infringe the '588 Patent

Par's proposed propafenone HCl product does not infringe claim 1 of the '588 patent, either literally or under the doctrine of equivalents, because it does not embody every element of claim 1 of the '588 patent. Par's proposed formulation does not infringe claim 1 for at least four reasons: (1) Par's proposed formulation does not use microtablets; (2) Par's proposed formulation does not employ cylindrically-shaped components; (3) Par's proposed formulation uses an amount of propafenone which falls below the range claimed in the patent; and (4) Par's proposed formulation uses a release delaying substance. Claims 2-6 depend from claim 1 and therefore also do not infringe, either literally or under the doctrine of equivalents.

### 1.    Par's Proposed Product Does Not Infringe the Microtablet Limitation.

Par will not infringe claim 1 because it will not produce a formulation containing a "microtablet", literally, or by equivalents.[1] The term "microtablet" is a compound word which can be broken into two parts: "micro" and "tablet." The prefix "micro" is derived from the Greek "mikros" which means small. According to *Remington's Pharmaceutical Sciences*, "[t]ablets may be defined as solid pharmaceutical dosage forms containing drug substances with

---

[1] It is well settled that the preamble is limiting if it recites structure. *See* MPEP §2111.02(I) ("Any terminology in the preamble that limits the structure of the claimed invention must be treated as a claim limitation.")

00409689.DOC

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 15

or without suitable diluents and prepared either by compression or molding methods." *Id.* at 1553 (16th Ed. 1980). "Although tablets are more frequently discoid in shape, they also may be round, oval, oblong, cylindrical, or triangular." *Id.* Thus, according to *Remington's*, tablets must be dosage forms which are compressed into a regular shape. The specification of the '588 patent supports this position. For example, the patentee states, "[t]he tabletting takes place in a suitable tabletting machine equipped with multiple microtablet punches. The resulting microtablets have **a cylindrical shape with flat or convex surface [sic]**." (emphasis added) Col. 4, lines 19-22. In this way, the patentee clearly and unmistakably disavowed all other multiple unit dosage forms. Par's formulation will not use microtablets, because Par will not produce a formulation containing a small dosage form compressed into a regular shape. Par instead intends to produce non-cylindrical irregularly shaped beadlets through randomly milling a slug. Thus, Par's formulation will contain a broad distribution of particles with no one regular shape rather than a regularly-shaped microtablet. As a result, Par does not meet the microtablet limitation and thus will not literally infringe the claim.

Par's proposed formulation will also not infringe the microtablet limitation under the doctrine of equivalents. According to the Federal Circuit, "by defining the claim in a way that clearly excluded certain subject matter" a patent can implicitly disclaim the excluded subject matter and will bar the doctrine of equivalents. *SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1346 (Fed. Cir. 2001). Here, the doctrine of equivalents is not available because such subject matter has been specifically excluded by the patentee. Further, the irregularly-shaped beadlets that Par proposes to manufacture are not equivalent to a microtablet because there are substantial differences between them. *See Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1518 (Fed. Cir. 1995), *rev'd on other grounds*, 520 U.S. 17 (1997). A microtablet, as described in the specification, is a product of specially-outfitted pharmaceutical machinery designed to produce materials to exacting specifications. It is substantially different than the irregularly-shaped granule generated by a random milling process.

    2.    **Par's Proposed Product Does Not Infringe the Shape Limitation.**

Par's proposed formulation does not infringe the requirement that the microtablet have a cylindrical shape with a convex or flat upper side and lower side, either literally or under the doctrine of equivalents. Par will not produce microtablets with any uniform shape. Thus, Par will not literally infringe the claim because it will not produce microtablets having this very specific shape.

Par will also not infringe under the doctrine of equivalents because the narrow claiming excluded other equivalents. According to the Federal Circuit, "A claim that contains a detailed recitation of structure is properly accorded correspondingly limited recourse to the doctrine of equivalents." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 955 (Fed. Cir. 2006). In *Bicon*, a claim that recited a particular shape clearly excluded distinctly different or even opposite shapes.

00409689.DOC

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 16

Here, because the claim specifically recites a microtablet that has a cylindrical shape with a convex or flat upper side and lower side, all other shapes have been specifically excluded from the doctrine of equivalents. Since Par's product does not even propose to use a specific uniform shape, Par's product cannot infringe under the doctrine of equivalents.

It should also be noted that the doctrine of claim vitiation may also come into play. In *Tronzo v. Biomet*, 156 F.3d 1154 (Fed. Cir. 1998) the court held that expanding the claims reciting a "generally conical outer surface" to reach defendant's hemispherical cup would violate the "all-elements rule" because it would write the "conical" limitation out of the claims. *Id.* at 1160. The court reasoned that if evidence showed that any structure would be equivalent then it would read the "generally conical" limitation out of the claims. *Id.*

Par's proposed dosage form will also not infringe under the doctrine of equivalents because it is substantially different from the claimed microtablets. Microtabletting is a specialized technology that uses rotary compression machines specially equipped for the task of controlling the geometric parameters to produce a very specific, uniform shape. Par's proposed process will not use such machinery, and Par's dosage form will not contain components of any particular shape.

3.    **Par's Proposed Product Does Not Infringe the Active Ingredient Limitation**

Par's proposed product will not infringe claim 1, either literally or under the doctrine of equivalents, because it will contain less active ingredient than what is required by the claims. Claim 1 requires that, "the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet." Par's proposed formulation will only contain 79.00% active ingredient. Therefore, Par's proposed product will not literally infringe the claim.

What is more, the patentee disclaims subject matter concerning microtablets with an active ingredient content below 81% by weight. The '588 patent specification, in a section describing the "preferred embodiments," acknowledges that the prior art's upper limit for tablets with a high concentration of active ingredient is 80%. By contrast, the "preferred embodiment" for the claimed invention is between 85 and 99.5% active ingredient content by weight. Col., lines. Indeed, according to the specification, "[s]uch high contents of active ingredients of this type in tablets have not previously been reached." Col. 2, lines 39-41. By identifying and distinguishing the claimed invention from the prior art in this way, the patentee implicitly disclaims formulations that include an active ingredient content below 81%.

Third, there can be no infringement under the doctrine of equivalents because the doctrine of equivalents is limited by the prior art. Under *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 683 (Fed. Cir. 1990), a patentee cannot use the doctrine of

16

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 17

equivalents to extend claim scope passed what would have been allowed in prosecution over the prior art. Therefore, if a hypothetical claim broad enough in scope to literally read on the accused device, the doctrine of equivalents cannot be used. *Id.* As will be discussed in greater detail below, U.S. Patent No. 4,797,287 ("the '287 patent" or "Pich") discloses subject matter rendering the hypothetical range obvious. Pich describes a cylindrical microtablet containing propafenone with an active ingredient content of 80% of the weight of the microtablet. (Example 5, Col. 7). As a consequence, the hypothetical claim encompassing Par's propafenone drug (intended to contain 79.00%) would also "ensnare" the prior art (disclosing microtablets containing 80% propafenone), and thus would preclude infringement under the doctrine of equivalents.

    **4.    Par's Proposed Product Does Not Infringe the Ancillary Substance Limitation.**

Par's proposed product will not infringe claim 1 because it will contain a release-delaying ancillary substance. Claim 1 requires that, "the tablet contains **no** release-delaying ancillary substance," (emphasis added). The claim is unequivocal. The microtablet as protected by the claims can contain **no** release-delaying ancillary substance. In this instance the patentee clearly and unmistakably disavowed all subject matter where the microtablet contains any release-delaying ancillary substances. Par's proposed dosage form will contain ethylcellulose, a well known release-delaying ancillary.[2] Therefore, Par will not literally infringe claim 1.

Par will also not infringe the claims under the doctrine of equivalents. The patentee specifically identified and distinguished pieces of prior art containing release delaying ancillary substances. Col. 1, lines 54-63. In this way, the patentee specifically excluded any release delaying ancillary substance from the scope of equivalents. Further, the Federal Circuit has repeatedly held that it is impermissible to extend the doctrine of equivalents to encompass subject matter that is inconsistent with the claims, as defined by the patentee. *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.,* 149 F.3d 1309, 1317 (Fed. Cir. 1998). Here, it would defy logic to conclude that Par's proposed use of ethylcellulose, a well known release-delaying auxiliary, was equivalent to the claims which require no release delaying auxiliaries. The patentee chose to limit the claims with strong language and the patentee is not allowed to expand the claims impermissibly post-issuance.

---

[2] *E.g.* "Modified release tablet formulations may also be produced using ethylcellulose as a matrix former." Handbook of Pharmaceutical Excipients, 186, (2d Ed. 1994).

00409689.DOC

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 18


**D.     The '588 Patent is Invalid**

    **1.     The '588 Patent is Invalid for in Anticipation over U.S. Patent No. 4,797,287 ("Pich")**

       The '588 patent is anticipated and invalid over art which was not provided to the Examiner during prosecution. U.S. Patent No. 4,797,287 ("Pich"), assigned to BASF, is directed to cylindrical microtablets, containing a very large weight percentage of various active ingredients. Among the actives exemplified is propafenone.[3]  Pich was issued on June 10, 1989, more than one year before the effective filing date of the '588 patent (March 24, 1994). Pich, despite its relevance, was not provided to the examiner during prosecution.

       Pich discloses, "[w]e have found that this object is achieved by a process for the production of cylindrical microtablets which have a convex upper face and a convex lower face and whose cylinder diameter and height, independently of one another, are each from 1.0 to 2.5 mm, preferably from 2.0 to 2.3 mm." *Id.*  In particular, Pich exemplifies propafenone. Example 5, col. 7.  With regard to the active ingredient content, Pich states, "[f]or example, it is possible to produce microtablets having a high content of substances which are difficult to press." Col. 4, line 29-31.  Several paragraphs later, Pich specifically refers to such a "high content": "[p]ancreatin can be pressed to give tablets having a content of 99.5%." Col. 4, 52-53.  The microtablets described in Example 5 also contain no release-delaying ancillary substances. *See* Example 5, col. 7.  The lack of explanation in the specification makes it difficult to interpret the "active ingredient density" limitation, but it appears that the examples of Pich would have densities well over 1.  Finally, the release rate of the active from the microtablets and the compression characteristics recited in the claims would necessarily be disclosed in Pich because Pich otherwise describes the exact composition of the microtablets disclosed in the Orange Book patent.  Therefore, since every limitation is disclosed, either explicitly or inherently by one reference (Pich), each claim of the '588 patent is invalid because it is anticipated under 35 U.S.C. §102(b).


    **2.     The '588 Patent is Invalid for Obviousness in View of U.S. Patent No. 4,797,287 ("Pich")**

       The '588 patent is obvious and invalid over art which was not provided to the Examiner during prosecution.  U.S. Patent No. 4,797,287 ("Pich"), assigned to BASF, is directed to cylindrical microtablets, containing a very large weight percentage of various active ingredients. Among the actives exemplified is propafenone.

---

[3] Knoll AG, the assignee of the '588 patent, was a wholly-owned subsidiary of BASF at the time the '588 patent was filed.

00409689.DOC

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 19

The Pich reference is directed to "[c]ylindrical microtablets which have a convex upper face…and whose cylinder diameter and height independently of one another are each from 1.0 to 2.5 mm." '287 Patent, abstract. Pich explains that these "novel microtablets can be used for a very large variety of purposes…[of which] the most important and very particularly preferred field of use is the pharmaceutical sector." Col. 4, lines 6-15. The specification discloses specifically how to make such a microtablet with propafenone as an active ingredient. *See* Example 5. In this example, the propafenone content is 80%.[4] *Id.* at lines 29-31. The microtablet of Example 5 does not contain any release-delaying substances.

Moreover, it is well-settled that obviousness arises when the claimed range and the prior art range do not fully overlap, but the differences between the ranges are minor. *See Haynes Int'l Inc. v. Jessup Steel Co.*, 8 F.3d 1573, 1577, n.3 (Fed. Cir. 1993) (holding when the difference between the claimed invention and the prior art is the range or value of a particular variable, then a *prima facie* rejection is properly established when the difference in range or value is minor). In *Titanium*, a case with facts closely related to the facts at issue, the court held that an alloy containing 0.8% nickel, 0.3% molybdenum, and up to 0.1% maximum iron was *prima facie* obvious in view of a reference disclosing alloys containing 0.75% nickel, 0.25% molybdenum, balance titanium and 0.94% nickel, 0.31% molybdenum. *Id.* at 783. One of ordinary skill in the art would clearly recognize that 80% is tantamount to 81%.[5]

The patentee will also be unable to present convincing evidence of nonobviousness. One important secondary consideration, evidence of commercial success, "is not significantly probative" in this case because "others were legally barred from commercially testing the [the product covered by the Orange Book patent]" because market entry by others is precluded. *Merck v. Teva*, 395 F.3d 1365, 1377 (Fed. Cir. 2005).

In view of the prior art, when all of the factors are considered, there is clear and convincing evidence that the claim 1 of the '588 patent would have been obvious to one of ordinary skill in the art. What is more, the additional limitations of dependent claims 2-6 are rendered obvious in light of Pich because they are explicitly or inherently disclosed.

E.    **The '588 Patent is Unenforceable for Inequitable Conduct**

A breach of an applicant's duty of candor to the Patent Office during the procurement of a patent is considered "inequitable conduct." A successful defense on inequitable conduct must

---

[4] Example 5 suggests utilizing propafenone as an active ingredient, providing, as an example, the composition of the microtablet as containing: 1600 g propafenone, 250 g microcrystalline cellulose, 100 g lactose, 40 g talc, and 10 g magnesium stearate. These materials were then converted into microtablet form. The total percentage of propafenone in this example is 80% (1600 / 2000 = .80). '588 Patent, Col.7, lines 48-54

[5] Pich exemplifies the microtablet as having 80% active ingredient content in Example 5, however, as shown above, the specification does not so limit the active ingredient content in the microtablets to only 80%. Pich references "high content" throughout the specification and one example contains active ingredient of 99.5%.

00409689.DOC

Dr. Ernest Mario
Reliant Pharmaceuticals
November 7, 2006
Page 20

show by clear and convincing evidence, "affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Alza Corp v. Mylan Labs., Inc.*, 391 F.3d 1365, 1373 (Fed. Cir. 2004). Thus, the first inquiry is whether the patentee's act is material. *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1362-63 (Fed. Cir. 2003). Next, it is necessary to determine if the requisite intent to mislead was present. *Id.* There is a balance between materiality and intent: the more material the reference is, the smaller the burden necessary to show an intent to deceive (and *vice versa*). *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350 (Fed. Cir. 1984); *see also Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1191 (Fed. Cir. 2006) (finding summary judgment for inequitable conduct appropriate if there has been a failure to supply highly material information and the applicant knew of the information, the applicant knew or should have known of the material of the information, and the applicant has provided no credible explanation for withholding the information.)

Here, highly material prior art was never disclosed with the intent to deceive the Patent Office. As discussed in the foregoing, Pich is highly material prior art that reads on the claims of the '588 patent. Pich describes cylindrical microtablets containing, in one example, 80% propafenone. Pich was not, however, disclosed to the PTO examiner. BASF Aktiengesellschaft, the assignee of record during the prosecution of the '287 patent, was also the corporate parent of Knoll Aktiengesellshaft, the assignee of record during the prosecution of the '588 patent. There is clear evidence that Knoll knew about Pich at the time that the '588 patent was filed. Even though BASF is the assignee of record, court documents indicate that **Knoll** and McNeil entered into a license agreement in 1988 with Pich as its very subject matter. *McNeilab, Inc. v. Scandipharm, Inc.*, 862 F. Supp. 1351, 1353 (E.D. Pa. 1994). The license stated, "KAG hereby grants to McNeil a right and license to use the Know-How relating to the Product and the Patent Rights to make, use and sell the Product within the Territory. Such right and license shall be exclusive." *Id.* at 1353-1354. Thus, it is clear that Knoll was aware of Pich because Knoll granted McNeil a license to use that patent. Since Pich is very relevant (it discloses propafenone microtablets with the same characteristics of the claimed invention), the burden to show intent is commensurately reduced. Therefore, the '588 patent is unenforceable because Knoll failed to disclose material prior art during the prosecution of the '588 patent.

## V.      CONCLUSION

The marketing of Par's proposed Propafenone HCl extended release tablet, in the United States will not infringe any claims of the '588 patent. Moreover, all of the claims of the '588 patent are invalid and unenforceable.

Par expressly reserves the right to develop and make other arguments or affirmative claims, and to assert any defenses relating to non-infringement, invalidity and/or unenforceability of the claims of the '588 patent should grounds become apparent in the future.

00409689.DOC

# OFFER OF CONFIDENTIAL ACCESS AND CONFIDENTIALITY AGREEMENT

# PURSUANT TO 21 U.S.C. § 355(J)(5)(C)(I)(III)

THIS OFFER OF CONFIDENTIAL ACCESS AND CONFIDENTIALITY AGREEMENT ("Agreement") by and between Par Pharmaceutical, Inc., a Delaware corporation having a place of business at 300 Tice Boulevard, 3rd Floor, Woodcliff Lake, NJ 07677 ("Par"), and Reliant Pharmaceuticals, Inc. a Delaware corporation having a place of business at 110 Allen Road, Liberty Corner, NJ 07938 ("Reliant"), is made effective upon a request by Reliant for access to Par's Abbreviated New Drug Application for Propafenone HCl ("Par's ANDA").

## W I T N E S S E T H :

WHEREAS, in accordance with § 505(j)(5)(C)(i)(III) of the Federal Food, Drug and Cosmetic Act as amended by Title XI of the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Par offers to make certain "Information" (as defined below) concerning its ANDA available to Reliant subject to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the foregoing premises and the furnishing of Information by Par, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1.  **DEFINITIONS**

(a)    "Information" means any and all information that the Providing Party (as hereafter defined) or its Representatives provides or furnishes to the Receiving Party (as hereafter defined) or its Representatives, regardless of whether: (i) such Information is specifically marked or designated as "confidential" or "proprietary," (ii) such Information is patentable, copyrightable or otherwise protected by law, or (iii) such Information is furnished verbally, in writing or in electronic form. "Information" includes, but is not limited to, any and all notes, memoranda, analyses, compilations, studies or other documents (whether in hard copy or electronic media)

CONFIDENTIAL

prepared by either party which contain or otherwise reflect such Information, and any and all copies, extracts or other reproductions of any of the same.

(b)    Notwithstanding the foregoing, the term "Information" does not include information that: (i) is or becomes available to the public through no wrongful act of the Receiving Party or its Representatives; (ii) is known to the Receiving Party on the date of this Agreement, as evidenced by written records of the Receiving Party existing on said date; (iii) is received from a third party who has the right to disclose the same to the Receiving Party; (iv) is in the rightful possession of the Receiving Party free of any obligation of confidentiality; or (v) is independently developed by the Receiving Party without reference to, or misuse of, Information furnished by the Providing Party.

(c)    "Providing Party" means the party furnishing Information, and includes its subsidiary and affiliated entities.

(d)    "Receiving Party" means the party receiving Information, and includes its subsidiary and affiliated entities.

(e)    "Representatives" means any party's employees, agents or other representatives, including advisors, attorneys, accountants, financial advisors and potential financing sources.

2.    CONFIDENTIALITY

(a)    The information is being provided for the sole and limited purpose of allowing Reliant to evaluate whether to file a patent infringement suit under the Hatch-Waxman Act relating to U.S. Patent No. 5,681,588 (the "Listed Patent"), which is the subject of Par's ANDA certification pursuant to § 505(j)(2)(A)(vii)(IV).

2

CONFIDENTIAL

(b)        Persons to whom Reliant is entitled to provide access to the Information under

this Agreement are restricted to (i) outside counsel engaged or employed by the Receiving Party

to represent them and the staff of such outside counsel, including paralegal, secretarial and

clerical personnel who are engaged in assisting such counsel, provided that such outside counsel

has been identified to the Providing Party in writing, (ii) no more than 2 in-house counsel or

members of the Intellectual Property Department—who have no patent prosecution

responsibilities and who are identified to Par; and (iii) independent consultants and experts

assisting in the evaluation of the Information for the Receiving Party and any employees and

assistants under the control of such consultant or expert.

(c)        Persons provided access to the Information shall: (i) agree to keep Information

furnished to them by the Providing Party or Reliant strictly confidential and not disclose it to

unauthorized employees or agents of Reliant to any third party; (ii) take all reasonable

precautions to safeguard such Information against unauthorized disclosure; (iii) agree to be

bound by the provisions of this Agreement and the Providing Party's enforcement of this

Agreement against it; and (iv) not take any action inconsistent with the Providing Party's

ownership of such Information.

(d)        Except to the extent required by law, regulations,  or judicial process and in

accordance with paragraph 4 below, the Receiving Party shall not disclose to any third person or

entity other than those provided for in paragraph 2(b): (i) the Providing Party's Information, (ii)

the fact that such Information was disclosed to the Receiving Party, or (iii) the fact that an

evaluation is taking place with respect to the Information, including the status thereof, unless

exempted from one or more of these prohibitions by the express prior written consent or

authorization of the Providing Party.

(e)        The Receiving Party shall not copy, reproduce, or reduce to writing any part of the Information furnished to it by the Providing Party except as is reasonably necessary to accomplish the purpose of the Agreement.

(f)        The Receiving Party shall be responsible for any breach of this Agreement by its officers, directors, employees or other Representatives, and shall take all reasonable measures to restrain such persons from the unauthorized use or disclosure of the Information.

## 3.    USE OF INFORMATION

The Receiving Party shall use the Information solely for the limited purpose of evaluating whether to file a suit alleging infringement of the Listed Patents and for no other purpose.

## 4.    GOVERNMENTAL REQUESTS FOR DISCLOSURE

In the event that the Receiving Party or any of its Representatives receives a request or is required by applicable law to disclose to a court or government agency of competent jurisdiction all or any part of the Providing Party's Information, the Receiving Party or its Representatives shall promptly notify the Providing Party of the request, and shall to the extent requested, consult with and assist the Providing Party in seeking a protective order or other appropriate protective remedy.  If such order or other remedy is not obtained or the Providing Party waives compliance with the terms hereof, the Receiving Party or its Representatives, as the case may be, shall disclose only that portion of the Information which, in the reasonable and good faith opinion of its counsel, is legally required to be disclosed, and shall exercise their respective best efforts to assure that confidential treatment will be accorded such Information by the persons or entities receiving it.  The Providing Party shall be given a reasonable opportunity to review the Information prior to its disclosure.

CONFIDENTIAL

**5.    NO REPRESENTATION, COMMITMENT, LICENSE OR WAIVER**

(a)    The Providing Party makes no representation or warranty of any kind, whether express or implied, about the accuracy or completeness of the Information.  Neither the Providing Party, nor any of its officers, directors, shareholders, employees or Representatives shall have any liability to the Receiving Party or to any other person or entity resulting from use of the Information.

(b)    No failure or delay by the Providing Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**6.    RETURN OF INFORMATION**

(a)    If the Receiving Party does not file suit against Par alleging infringement of the Listed Patent within forty-five (45) days of receipt of the Notice and Detailed Statements (the "45-day period") to which this offer pertains, the Receiving Party shall cause persons entitled to access to the Information thirty (30) days after the expiration of the 45-day period, to destroy or return to Par the portions of the ANDA provided and all notes, analyses, studies or other documents to the extent that they contain information in the ANDA, and the Receiving Party shall notify Par that this has been done.

(b)    If the Receiving Party files suit against Par alleging infringement of the Listed Patent within the 45-day period:

(1)    While the litigation is pending, the portions of the ANDA provided and all notes, analyses, studies or other documents to the extent that they contain information in the ANDA, shall be treated as Information under the highest level of confidentiality under any protective order entered in the action brought against Par.  Until such a protective order is entered, and

CONFIDENTIAL

becomes applicable to such applicable Information, the terms of this Offer of Confidential Access continue to apply;

(2)     Unless otherwise provided in a protective order in an infringement action as identified in paragraph 6(b)(1), the Receiving Party shall cause persons entitled to access to the Information to destroy or return to Par the portions of the ANDA provided and all notes, analyses, studies or other documents prepared to the extent that they contain information in the ANDA, within thirty (30) days after the final determination of the action brought against Par.

## 7.     INJUNCTIVE RELIEF

The parties agree that money damages will not be a sufficient remedy for any breach of this Agreement by the Receiving Party or its Representatives, and that the Providing Party is entitled to injunctive relief and specific performance as remedies for any such breach. Such remedies shall not be deemed to be the exclusive remedies for a breach of this Agreement but shall be in addition to all other remedies available at law or in equity.

## 8.     TERM; TERMINATION

This Agreement shall be effective upon execution of this Agreement by Par and Reliant for providing access to Par's ANDA, and shall remain in effect until such time as the Information is returned or destroyed pursuant to Paragraph 6 above. The Agreement may be renewed upon such terms as may be agreed upon by the parties. Upon termination of this Agreement, the Receiving Party shall fulfill its obligations to return the Providing Party's Information pursuant to above paragraph 6 of this Agreement. The Receiving Party's obligations of confidentiality pursuant to above paragraph 2 shall survive the termination of this Agreement.

CONFIDENTIAL

9.    **SEVERABILITY**

The invalidity or unenforceability of any provision of this Agreement shall not affect the

validity or enforceability of any other provision, all of which shall remain in full force and effect.

10.    **ASSIGNMENT**

This Agreement shall not be assigned without the prior written consent of the Providing

Party.

11.    **GOVERNING LAW**

This Agreement shall be construed in accordance with the laws of the State of New York,

without regard to conflict of laws principles.

12.    **HEADINGS**

The section headings in this Agreement are for convenience only, and shall not alter or

affect the meaning or interpretation of any provision of this Agreement.

13.    **COUNTERPARTS**

This Agreement may be executed in one or more counterparts, all of which shall be

considered one and the same Agreement.

**CONFIDENTIAL**

## 14.   COMMUNICATIONS

Delivery of any counterpart signature page of this Agreement, written communication or notice hereunder by facsimile shall be equally as effective as delivery of a manually executed original of such counterpart signature page, communication or notice.  Any party delivering a counterpart signature page, written communication or notice hereunder by facsimile shall also deliver a confirmatory hand-signed original.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed upon a request by Reliant for access to Par's ANDA.

By: _Michelle Bonomi-Huvala_

Name: _Michelle Bonomi-Huvala_

Title: _Sr. Director, Regulatory Affairs_

Date: _11/07/2006_

PAR PHARMACEUTICAL, INC.


By: _____

Name: _____

Title: _____

Date: _____

RELIANT PHARMACEUTICALS, INC.

8

EXHIBIT 2



Par Pharmaceutical Companies, Inc.
300 Tice Boulevard
Woodcliff Lake, NJ 07677
tel  201 802 4000
fax  201 802 4600
www.parpharm.com

January 10, 2007

**CONFIDENTIAL**

**VIA REGISTERED EXPRESS MAIL**
**RETURN RECEIPT REQUESTED**

Dr. Ernest Mario
Chief Executive Officer & Chairman
Reliant Pharmaceuticals
110 Allen Road
Liberty Corner, NJ 07938

Re:     Rythmol® SR; route of administration: oral; strength: 225 mg, 325 mg, 425 mg
        United States Patent No. 5,681,588
        Notice of Paragraph IV Certification

Dear Sir:

This is a notice of certification letter on behalf of Par Pharmaceutical, Inc., ("Par") pursuant to
505(j)(2)(B)(ii) of the Federal Food, and Drug Cosmetic Act ("the Act") and 21 U.S.C.
§ 355(j)(2)(B)(ii) and § 314.95 of Title 21 of the Code of Federal Regulations:

1.  An Abbreviated New Drug Application ("ANDA") that contains data from
    bioavailability or bioequivalence studies has been submitted under § 505(j) of the
    Act for the drug with respect to which the certification is made to obtain approval
    to engage in the commercial manufacture, use, or sale of Propafenone HCl SR
    capsules before the expiration of U.S. Patent No. 5,681,588.  The Food and Drug
    Administration ("FDA") has received this application.

2.  The ANDA #78-540.

3.  The established name of Par's proposed drug product is Propafenone HCl SR
    Capsules.  Reliant Pharmaceuticals, Inc. markets Propafenone HCl under the
    brand name Rythmol® SR.

1



Dr. Ernest Mario
Reliant Pharmaceuticals, LLC
January 10, 2007
Page 2

4. The active ingredient, strengths, and dosage forms of the proposed drug product are: Propafenone HCl; 225 mg, 325 mg & 425 mg; and capsule for oral administration.

5. The ANDA indicates that Par intends to market the product before the expiration of: U.S. Patent No. 5,681,588 ("the '588 patent"), which expires on October 28, 2014. The '588 Patent is listed in *Approved Drug Products with Therapeutic Equivalence Evaluations* (the "Orange Book") for Rythmol® SR (Propafenone HCl, 225 mg, 325 mg & 425 mg), extended release capsules for oral administration.

6. An Offer of Confidential Access to Par's ANDA, pursuant to 21 U.S.C. §355(j)(5)(C)(i)(III), accompanies this notice as a separate enclosure.

Attached is a detailed statement of the factual and legal bases of Par's patent certification. This information is supplied for the sole purpose of complying with the above-referenced statutes and regulations. Neither Par nor its attorneys waive any attorney-client privilege or work-product immunity concerning the subject matter of this communication.

Sincerely,

Steven I. Engel, M.S., Pharm.D.
Vice President, Regulatory Affairs
Business Development and Licensing
PAR Pharmaceutical, Inc.
300 Tice Boulevard
Woodcliff Lake, NJ  07677
U.S.A.

Encl.:  Detailed Statement of the Factual and Legal Basis of Par's Paragraph IV Patent Certification and Offer of Confidential Access

Duplicate with enclosure via FEDEX

2



<u>**DETAILED STATEMENT OF FACTUAL AND LEGAL BASIS FOR**</u>
<u>**PAR'S OPINION THAT THE '588 PATENT IS INVALID, UNENFORCEABLE AND**</u>
<u>**WILL NOT BE INFRINGED**</u>

## I.    INTRODUCTION AND SUMMARY

Reliant Pharmaceuticals ("Reliant") is the listed holder of NDA No. 21-416 for Propafenone HCl extended release capsules (225 mg, 325 mg & 425 mg) sold under the brand name Rythmol® SR.  Rythmol® SR is indicated to prolong the time to recurrence of symptomatic atrial fibrillation in patients, without structural heart disease.  Par proposes to manufacture, as set forth in its ANDA, 225 mg, 325 mg & 425 mg extended release capsules of propafenone HCl.  Par's proposed generic propafenone HCl sustained release capsules will not infringe U.S. Patent No. 5,681,588, the only Orange Book patent listed with respect to Rythmol® SR.  Also, this patent is invalid and unenforceable.

Par's proposed product does not infringe the '588 patent (either literally or under the doctrine of equivalents) because Par's proposed formulation: (1) Par's proposed formulation does not use microtablets; (2) Par's proposed formulation does not employ cylindrically-shaped components; (3) Par's proposed formulation uses an amount of propafenone which falls below the range claimed in the patent; and (4) Par's proposed formulation uses a release delaying substance.

Furthermore, the claims of the '588 patent are invalid under 35 U.S.C. §102(b) and 35 U.S.C. §103 over U.S. Patent No. 4,797,287 ("Pich").  Broadly, Pich discloses cylindrical microtablets containing propafenone and exemplifies propafenone content up to 80%.  The '588 patent is also invalid under 35 U.S.C. §103(a) over Pich in view of U.S. Patent No. 4,954,347 ("Kristen").  Finally, the '588 patent is unenforceable because the assignee (and its employees) knew about Pich, a highly material reference, but did not disclose it to the PTO during the prosecution of the '588 patent.

## II.    LEGAL STANDARDS FOR INFRINGEMENT

### A.    Infringement Generally

Under 35 U.S.C. § 271(e)(2), "[i]t shall be an act of infringement to submit—(A) an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent."  "35 U.S.C. § 271(e)(2)(A) simply provides an 'artificial' act of infringement that creates case–or–controversy jurisdiction to enable the resolution of an infringement dispute before the ANDA applicant has actually made or marketed the product.  Once jurisdiction is

**⟩PAR**
PHARMACEUTICAL

Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 2

established, however, the substantive determination whether actual infringement or inducement will take place is determined by traditional patent infringement analysis." *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003).

The patentee has the burden of proving infringement by a preponderance of the evidence. *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1341 (Fed. Cir. 2005). Infringement may be literal or under the doctrine of equivalents. In each case the infringement analysis is a two-step process. *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1340 (Fed. Cir. 2005). First, the scope of the claims must be determined. The Supreme Court has held that this first step, sometimes referred to as claim interpretation, is an issue of law exclusively within the province of the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996) ("*Markman II*"); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1453 (Fed. Cir. 1998) (en banc). Thus, claim construction necessarily precedes a determination of whether the claims read on an accused product for infringement purposes. *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed. Cir. 1990); *SmithKline Diagnostics, Inc. v. Helena Labs Corp.*, 859 F.2d 878, 882 (Fed. Cir. 1988).

The second step involves comparing the properly construed claims to the accused product to determine whether those claims "read on" the accused subject matter, *i.e.*, whether all of the claim limitations are present in the accused device, either literally or by a substantial equivalent. *Johnson Worldwide Assocs. Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999); *Renishaw PLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1247 (Fed. Cir. 1998); *Cybor*, 138 F.3d at 1453. This second step is a factual determination and is thus submitted to a jury if the case is not tried to the court. *Markman II*, 517 U.S. at 384 (citing *Winans v. Denmead*, 56 U.S. 330, 338 (1854)).

**1.      Claim Interpretation**

Generally, claims are given their ordinary and customary meaning to a person skilled in the art, at the time of invention. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Claim interpretation involves consideration of the language of the patent claim itself, the specification, other claims, the prosecution history, extrinsic evidence concerning scientific principles, and the meaning of technical terms. *Id.* at 1314; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979-80 (Fed. Cir. 1995), *aff'd en banc*, 517 U.S. 370 (1996) ("*Markman I*"). Courts may admit extrinsic evidence, if necessary, as long as the extrinsic evidence is consistent with the intrinsic record. *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 996 (Fed. Cir.



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 3

2006). Extrinsic evidence is any evidence that is external to the patent and prosecution history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles. *Vitronics*, 90 F.3d at 1584.

The specification should be referred to when construing the limitations of patent claims. Indeed, usually, it is dispositive of the meaning of a term, and has been called "the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. Thus, the specification may act as a sort of dictionary, which explains the claimed subject matter and may define terms used in the claims. *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1153 (Fed. Cir. 1997); *Markman I*, 52 F.3d at 979. Where the specification contains nothing to indicate that phrases are to be given anything other than their ordinary meanings, then those are the meanings the court must give them. *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1384 (Fed. Cir. 1998) (citing *Vitronics*, 90 F.3d at 1582); *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed. Cir. 1984). That is, a technical term used in a patent document is given the same meaning that it would be given by persons experienced in the field of the patent, unless it is apparent from the patent and prosecution history that the patentee used the term with a different meaning. *CVI/Beta Ventures*, 112 F.3d at 1153 (quoting *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996)). Thus, "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *CVI/Beta Ventures*, 112 F.3d at 1153 (quoting *Vitronics*, 90 F.3d at 1582).

## 2.    Literal Infringement

After claim interpretation, a determination is made whether the claims cover the accused products or methods. *Johnson Worldwide Assocs.*, 175 F.3d at 988. To infringe a claim, the accused product or method must include every limitation of the claim, either literally or by a substantial equivalent. *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 397 (Fed. Cir. 1994).

To demonstrate literal infringement, a plaintiff must prove that the allegedly infringing product or method embodies every element of the asserted claim(s). *Dolly, Inc.*, 16 F.3d at 397; *Townsend Eng 'g Co. v. Hitec Co.*, 829 F.2d 1086, 1090 (Fed. Cir. 1987). This follows from the principle that "[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997); *see Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985) (stating it is "well settled that each element of a claim is material and essential"). Thus, "[i]f even one



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 4

limitation is missing or not met as claimed, there is no literal infringement." *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998).

### 3.    The Doctrine of Equivalents

Even if a product or process does not literally infringe, there can still be infringement if there is "equivalence" between the elements of the accused product or process and the elements of the patent's claims. *Warner-Jenkinson*, 520 U.S. 17, 21 (1997) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950)); *We Care, Inc. v. Ultra-Mark Int'l Corp.*, 930 F.2d 1567, 1571 n.3 (Fed. Cir. 1991). Infringement by equivalents requires that "the accused product or process contain elements identical or equivalent to each claimed element of the patented invention." *Warner-Jenkinson*, 520 U.S. at 40.

To be equivalent, the patentee must prove that the accused product "differs from what is literally claimed only insubstantially, and it performs substantially the same function in substantially the same way to achieve substantially the same result." *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1444 (Fed. Cir. 1997); *Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996); *see Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1518 (Fed. Cir. 1995), *rev'd on other grounds*, 520 U.S. 17 (1997) (affirming the viability of the "insubstantial differences" test). The nature of the differences is assessed according to whether a person with ordinary skill in the relevant art would find the differences to be substantial. *Hilton Davis*, 62 F.3d at 1519.

### 4.    Limits on the Doctrine of Equivalents

There are limitations on the application of the doctrine of equivalents. Among other limitations, both the prior art and prosecution history estoppel limit the range of equivalents. *Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1579 (Fed. Cir. 1993), *clarified on other grounds*, 15 F.3d 1076 (Fed. Cir. 1994); *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934 n.1 (Fed. Cir. 1987) (en banc). "The doctrine of equivalents cannot be used to erase "meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." *Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1562 (Fed. Cir. 1994).



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 5

### a.  Prosecution History Estoppel

Prosecution history estoppel applies when the applicant surrenders subject matter by either argument or amendment.  Arguments, even without amendment, made during prosecution to obtain allowance of the claims at issue give rise to estoppel when such assertions clearly and unmistakably surrender subject matter, even when such arguments were not necessary to distinguish prior art. *Sextant Avionique, S.A. v. Analog Devices, Inc.,* 172 F.3d 817, 828, n.3 (Fed. Cir. 1999) (citing *Hoganas AB v. Dresser Indus., Inc.,* 9 F.3d 948, 952 (Fed. Cir. 1993) and *Texas Instruments Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1174-75 (Fed. Cir. 1993)); *Litton Sys., Inc. v. Honeywell, Inc.,* 140 F.3d 1449, 1458 (Fed. Cir. 1998) (citing the same).

During the prosecution of a patent, "a narrowing amendment made to satisfy any requirement of the Patent Act may give rise to an estoppel." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 535 U.S. 722, 736 (2002).  For example, prosecution history estoppel is not limited to amendments made to avoid the prior art, but rather includes amendments made to comply with 35 U.S.C. § 112:

> A patentee who narrows a claim as a condition for obtaining a patent disavows his claim to the broader subject matter, whether the amendment was made to avoid the prior art or to comply with § 112.  We must regard the patentee as having conceded an inability to claim the broader subject matter or at least as having abandoned his right to appeal a rejection.  In either case estoppel may apply.

*Id.* at 737.  Thus, when prosecution history estoppel applies, the patentee may only allege literal infringement.

### b.  Prior Art as a Limitation

Even if the accused product performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention, there can be no infringement if the asserted scope of equivalency of what is literally claimed would encompass the prior art. *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.,* 904 F.2d 677, 683 (Fed. Cir. 1990).  The patentee bears the burden of proving that the



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 6

hypothetical claim does not "ensnare the prior art." *Id.* at 685. In this inquiry, the prior art can be found to anticipate or render obvious the claimed invention.

In *Wilson*, the patentee alleged the accused product infringed its patent, which covered the pattern of dimples on a golf ball, under the doctrine of equivalents. The Federal Court of Appeals disagreed, holding "there can be infringement if the asserted scope of equivalency of what is literally claimed would encompass the prior art." *Id.* at 683. The Court explained that "the doctrine of equivalents does not involve expansion of the *claims.*" *Id.* at 684 (emphasis in original). To hold otherwise, the court reasoned, "would allow the patentee to preempt a product that was in the public domain prior to invention." Thus, "[a] patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the PTO by literal claims." *Id.* at 684.

To guide courts in this determination, the court proposed that courts consider the likely result of a "hypothetical claim" broad enough in scope to *literally* cover the accused product. If this hypothetical claim would not have been allowed by the PTO over the prior art, "it would be improper to permit the patentee to obtain that coverage in an infringement suit under the doctrine of equivalents." *Id.* at 684. Even so, the hypothetical claim analysis is not mandatory. *Conroy v. Reebok Int'l*, 14 F.3d 1570, 1577 (Fed. Cir. 1994) (noting that the crux of the analysis is preventing the patentee from obtaining scope later that he or she could not have obtained during prosecution); *see also International Visual Corp. v. Crown Metal Mfg. Co.*, 991 F.2d 768, 772 (Fed. Cir. 1993).

The Federal Circuit has re-affirmed this reasoning in a series of subsequent cases. *Streamfeeder, LLC v. Sure-Feed Systems Inc.* 175 F.3d 974 (Fed. Cir. 1999); *Marquip Inc. v. Fosber America, Inc.*, 198 F.3d 1363 (Fed. Cir. 1999). In *Streamfeeder*, the court noted that in hypothetical claim analysis "one cannot, in the course of litigation and outside of the PTO, cut and trim, expanding here and narrowing there, to arrive at a claim that encompasses an accused device, but avoids the prior art." 175 F.3d at 983. Thus, the patentee is prohibited from both broadening the scope of the claims under the doctrine of equivalents while simultaneously narrowing the scope of the claims to avoid encompassing the prior art.



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 7

### c.     The Dedication Disclosure Rule

The doctrine of equivalents cannot reach an element disclosed in an alternative embodiment of the invention in the specification but deliberately not claimed. *See Johnson & Johnston Assocs. v. R.E. Serv. Co.*, 285 F.3d 1046 (Fed. Cir. 2002).

> [W]hen a patent drafter discloses but declines to claim subject matter, as in this case, this action dedicates that unclaimed subject matter to the public. Application of the doctrine of equivalents to recapture subject matter deliberately left unclaimed would "conflict with the primacy of the claims in defining the scope of the patentee's exclusive right."

*Id.* at 1054.  The court in *Johnson* also grounded their holding partly in the policy that, "a patentee cannot narrowly claim an invention to avoid prosecution scrutiny by the PTO, and then, after patent issuance, use the doctrine of equivalents to establish infringement because the specification discloses equivalents." *Id.*

### d.     The "All Elements" Rule

One further limitation of the doctrine of equivalents is the "all elements rule" which requires that "each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).  It follows from this rule that, "an element of an accused product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate that element in its entirety." *Freedman Seating Co., v. America Seating Co.*, 420 F.3d 1350 (Fed. Cir. 2005).  According to the Federal Circuit, there is no "set formulation" for this determination, however, courts must consider "the totality of the circumstances." *Id.* at 1359.  Several factors are appropriate for consideration, including "the simplicity of the structure, the specificity and narrowness of the claim, and the forseeability of variations at the time of filing the claim with the PTO." *Id.* at 1360.  For example, in *Moore U.S.A., Inc. v. Standard Register, Co.*, 229 F.3d 1091 (Fed. Cir. 2000), the Federal Circuit stated that, "to allow what is undisputedly a minority (*i.e.*, 47.8%) to be equivalent to a majority would vitiate the requirement that the 'first and second longitudinal strips of adhesive . . . extend the majority of the lengths of said longitudinal marginal portions'." *Id.* at 1106; *see generally Tronzo v. Biomet*, 156 F.3d 1154 (Fed. Cir. 1998) (claims reciting a clear geometric shape of



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 8

generally conical were vitiated by attempting to cover a hemispherical cup by the doctrine of equivalents).

### e.     Specific Exclusion

Further, "by defining the claim in a way that clearly excluded certain subject matter" a patent implicitly disclaims the excluded subject matter and will bar the doctrine of equivalents. *SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1346 (Fed. Cir. 2001). In particular, structural limitations like shapes have been accorded a narrow scope of equivalents:

> A claim that contains a detailed recitation of structure is properly accorded correspondingly limited recourse to the doctrine of equivalents. *See Tanabe Seiyaku Co. v. United States ITC*, 109 F.3d 726, 732 (Fed. Cir. 1997) ("The sharply restricted nature of the claims has much to do with the scope we accord to the doctrine of equivalents."). That principle has special application in a case such as this one, where the claim recites a particular shape for the basal portion of the abutment that clearly excludes distinctly different and even opposite shapes.

*Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 955 (Fed. Cir. 2006). In *Bicon*, reciting a specific shape in the claims specifically excluded other shapes. *Id.* In particular, the patentee's characterization of its abutment having a "convex, frusto-spherical shape" excluded abutments which were concave and frustro-conical because these shapes were contrary to, or inconsistent with, the claim language. *Id.* at 955-956.

### f.     Other Limits

In addition, arguments emphasizing the criticality of a claim element may give rise to a surrender of all competitive products that do not contain the critical element. *See Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.*, 170 F.3d 1373, 1378-79 (Fed. Cir. 1999) (finding all compositions that do not contain a component described as critical during prosecution and interpreted as indispensable were surrendered during prosecution).

Moreover, there can be no infringement under the doctrine of equivalents if a claim limitation is totally missing from the accused device. *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1539 (Fed. Cir. 1991) (citing *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 9

792, 798 (Fed. Cir. 1990)). "The doctrine of equivalents is not a license to ignore claim limitations." *Dolly*, 16 F.3d at 398. That is, a "court cannot convert a multilimitation claim to one with fewer limitations to support a finding of equivalency." *Id.* at 399.

## III.    LEGAL STANDARDS FOR INVALIDITY

### A.    Anticipation Under 35 U.S.C. 102(b) - Prior Art

Section 102(b) provides a complete bar to the patentability of any invention that has been "patented or described in a printed publication in this or a foreign country… more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (2000). A single reference must teach each and every limitation of the claimed invention, either expressly or inherently, in order to anticipate under 35 U.S.C. § 102(b). *EMI Group N. Am., Inc. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, 1350 (Fed. Cir. 2001). Proof of invalidity is facilitated when prior art not considered during prosecution is material to the issue of validity. *See Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed. Cir. 1983).

### B.    The Law of Obviousness Under 35 U.S.C. § 103

For a patent to be valid, the claimed invention must be nonobvious over the prior art to a person having ordinary skill in the art of the invention. Section 103(a) provides in part:

A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

An important consideration is "the need to adhere to the statute, i.e., to hold that an invention would or would not have been obvious, as a whole, when it was made, to a person of 'ordinary skill in the art' – not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art." *Envtl. Designs Ltd., v. Union Oil Co.*, 713 F.2d 693, 697 (Fed. Cir. 1983); *Custom Accessories Inc. v. Jeffrey-Allan Indus.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

Several factors guide a court's assessment of obviousness including:

(1)    the scope and content of the prior art;



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 10

    (2)    the differences between the prior art and the claims at issue;

    (3)    the level of the ordinary skill in the art; and

    (4)    whatever objective evidence may be present.

*Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966).

When evaluating the scope and content of the prior art, the question under § 103 is not merely what the references expressly teach but what they would have suggested to one of ordinary skill in the art at the time the invention was made. *Merck & Co. Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989). To invalidate a patent under § 103 using a combination of prior art, there must be some reason, suggestion or motivation found in the prior art whereby a person of ordinary skill would make the combination. *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1351 (Fed. Cir. 1998). The motivation to combine can come from the knowledge of those skilled in the art, from the prior art reference itself, or from the nature of the problem to be solved. *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1356 (Fed. Cir. 2000); *Pro-Mold and Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996) (holding that such suggestion may "come from the nature of a problem to be solved, leading inventors to look to references relating to possible solutions to that problem"). It is not necessary for the motivation to be found explicitly in the prior art: "[t]here is flexibility in our obviousness jurisprudence because a motivation may be found <u>implicitly</u> in the prior art. We do not have a rigid test that requires an actual teaching to combine before concluding that one or ordinary skill in the art would know to combine references." (emphasis in original). *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, at *10 (Fed. Cir. 2006). The ultimate determination of obviousness when evaluating the prior art does not require absolute predictability of success. All that is required is a reasonable expectation of success. *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000).

Other considerations may be helpful in determining whether an invention is obvious. *See Stratoflex, Inc.*, 713 F.2d at 1538. These secondary considerations include evidence of commercial success, long felt but unsolved needs, failure of others, initial skepticism of experts, praise from experts, copying by an infringer, near simultaneous invention by others, and licenses under the examined patent. *See In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998). However, these factors are not considered unless there is a showing of a nexus between the invention and the secondary consideration to ensure that the secondary consideration is not ascribable to other irrelevant factors. *Ryko Mfg. Co. v. Nu-Star Inc.*, 950 F.2d 714, 719 (Fed. Cir. 1991).



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 11

Each claim in an issued patent carries an independent presumption of validity. The ultimate question of obviousness is a question of law, which must be supported by clear and convincing evidence. The challenger to the validity of a patent must establish by clear and convincing evidence the facts supporting invalidity. *Ultra-Tex Surfaces v. Hill Bros. Chem. Co.*, 204 F.3d 1360, 1367 (Fed. Cir. 2000). Proof of invalidity is facilitated when prior art not considered during prosecution is material to the issue of validity. *See Stratoflex, Inc.*, 713 F.2d at 1534.

### C. Inequitable Conduct

A breach of an applicant's duty of candor to the Patent Office during the procurement of a patent is considered "inequitable conduct." A successful defense on inequitable conduct must show by clear and convincing evidence, "affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Alza Corp. v. Mylan Labs., Inc.*, 391 F.3d 1365, 1373 (Fed. Cir. 2004). Thus, the first inquiry is whether the patentee's act is material. *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1362-63 (Fed. Cir. 2003). Next, it is necessary to determine if the requisite intent to mislead was present. *Id.* There is a balance between materiality and intent: the more material the reference is, the smaller the burden necessary to show an intent to deceive (and *vice versa*). *Purdue Pharma LP v. Endo Pharma. Inc.*, 438 F.3d 1123, 1128-29 (Fed. Cir. 2006).

A duty of candor and good faith is required to the Patent and Trademark Office by the inventor, the attorney or agent preparing and prosecuting the application, and every other individual substantively involved in the prosecution of the application. 37 C.F.R. § 1.56(c). This duty also applies to those substantively involved individuals who are associated with the asisngee. *Id.* Moreover, a corporate assignee does not cleanse itself of all culpability for misrepresentations or omissions during the prosecution of the patent application filed on its behalf by purposefully keeping its officers in the dark concerning the application's contents and placing the entire burden for proper disclosure on an inventor not versed in patent law or the relevant facts. *See Digital Equipment Corp. v. Diamond*, 653 F.2d 701 (Fed. Cir. 1981).



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 12

## IV.    THE '588 PATENT IS NOT INFRINGED AND IS INVALID

### A.    The '588 Patent

The '588 Patent matured from application serial number 08/525,749 ("the '749 application"), filed on October 10, 1995, which claims priority from PCT/EP94/00949, filed March 24, 1994.  PCT/EP94/00949, in turn, claims priority from German application P4310963.2 which was filed on April 3, 1993.  The German application was originally filed by BASF Aktiengesellschaft.  The '588 patent issued to Kolter et al. on October 28, 1997 and is assigned to Knoll Aktiengesellschaft of Ludwigshafen, Germany.  The '588 Patent expires on October 28, 2014.

In the "Background of the Invention" section, the patentee admits that multiple unit delayed release dosage forms were preferable to single unit dosage forms because "the units are distributed uniformly along the gastrointestinal tract and can also pass through the closed pylorus." Col. 1, lines 46-48.  The patentee also admits that multiple unit delayed dosage forms contained amounts of active ingredient that were up to 60-80%.  The patentee alleges that "small matrix" pellets were produced, but "only with very low doses of medicinal substances."  For example, the patentee cites EP 22 17 32 (Oren et al.), WO 92/04013 (Bongiovanni et al.), and GB 2 176 999 (Davis et al.) as having low doses of active ingredient.  The patentee admits that Oren et al. discloses, "delayed release tablets" having "60-80% active ingredient." Col. 1, line 59.  Another example in Bongiovanni discloses 76.7% ibuprofen content.  In the Detailed Description of the Preferred Embodiments, the patentee asserts "A bolus tablet with commercial dosages of 150-300 mg and an active ingredient above 80% cannot be produced under production conditions." Col. 2, lines 31-33.

The specification alleges that employing microtablets according to the invention overcomes the drawbacks of the prior art.  The specification describes that microtablet production has four steps, used with conventional pharmaceutical equipment: "granulation, drying, mixing, tabletting." Col. 3, line 51.  According to the patentee, "[t]he tabletting takes place in a suitable tabletting machine equipped with multiple microtablet punches.  The resulting microtablets have a cylindrical shape with flat or convex surface [sic]." (emphasis added) Col. 4, lines 19-22.  In Example 1, the patentee discloses, "[t]he microtablets were produced in a rotary tabletting machine equipped with multiple microtablet punches." Col. 5, lines 25-26.  Further, each example (other than the comparative example) refers back to Example 1 for the method of microtablet production.



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 13

   WO 92/04013 was cited as an example that "disclose[s] small matrix delayed release tablets which likewise contain relatively large amounts of release-delaying ancillary substances." The patentee then notes that "Patent Application EP 22 17 32 claims delayed release tablets of active ingredients with low solubility, which contain 60-80% active ingredient in addition to at least 4 auxiliaries" and that such formulations are highly dependent on "granulation process and equipment" used. With respect to compressibility, the patentee notes that "propafenone HCl is extremely difficult to compress. A bolus tablet with commercial doses of 150-300 mg and an active ingredient content above 80% cannot be produced under production conditions. . . such high contents of active ingredients of this type in tablets have not previously been reached." Patentee admits that it considers propafenone delayed release tablet formulations of 80% or less active ingredient content to be part of the prior art. Col. 2, lines 30-41.

   The patentee further noted that its microtablets achieve the object of the invention "because it has been found, surprisingly, that it is possible in the present case to produce delayed release tablets without release-delaying ancillary substances." Patentee also pointed out a number of problems that hydrophilic release-delaying polymers can cause: sticking or adhesion to the GI tract (patentee referenced WO 92/04013 as a formulation that might exhibit this problem), requirement of use of organic solvents to prevent swelling (patentee pointed out that this problem which can be "entirely" dispensed within the invention), and sensitivity to changes in humidity during storage.

   The '588 patent has six claims, only the first claim is independent:

   1. A cylindrical delayed release microtablet with a convex or flat upper side and lower side of β-phenylpropiophenone derivatives of the formula I as active ingredient

$$\text{I}$$

   where R is n-propyl or 1,1-dimethylpropyl, and their pharmacologically acceptable salts, wherein

13



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 14

a) the height and diameter are, independently of one another, 1-3 mm,

b) the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet,

c) the active ingredient density is greater than 1,

d) the release of active ingredient in the USP paddle method at 50 rpm is 80% as a maximum after 3 hours and as a minimum after 24 hours,

e) the release rate is virtually independent of the pressure when compressing the tablets, and

f) the tablet contains no release-delaying ancillary substance but 0.1-5% by weight of a lubricant and 0-18.9% by weight of other conventional ancillary substances.

2. A tablet as claimed in claim 1, which in vivo results in a pronounced plasma level plateau with a PTF<75% and whose bioavailability does not depend on the intake of food.

3. A tablet as claimed in claim 1, wherein the active ingredient is propafenone hydrocholoride.

4. A tablet as claimed in claim 1, wherein the height and diameter are approximately the same.

5. A gelatin capsule which contains 3-200 tablets as claimed in claim 1 with identical or different release rates.

6. A process for producing cylindrical delayed release microtablets as claimed in claim 1, which comprises a homogeneous mixture of 81-99.9% by weight of the granulated active ingredient with a

14

**PAR**
PHARMACEUTICAL

Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 15

particle size below 1 mm, 0.1-5% by weight of a lubricant and 0-
18.9% by weight of other conventional ancillary substances which
do not delay release being compressed in a cylindrical mold with a
height and diameter each of 1-3 mm and being removed from the
mold.

**B.     The Prosecution History of the '588 Patent**

During prosecution, the applicant submitted a preliminary amendment that made changes
to the specification and removed multiple dependent claims.  In the first Office Action, the
Examiner rejected claims 1-6 under 35 U.S.C. §103 and 35 U.S.C. §112.  With regard to the
rejection under §103, the Examiner determined that the claims were unpatentable over Davidson
(U.S. Patent No. 3,951,821) in view of Franke (U.S. Patent No. 4,945,114).  The Examiner noted
that the claims read on "a cylindrical delayed release tablet with an active agent" and that
Davidson teaches "a delayed release microtubule…and active agent."  Office Action, mailed
October 17, 1996 at 3 (citation omitted).  The Examiner noted Franke discloses the use of
propafenone.  The Examiner concluded that the motivation to combine the references "is
provided by the fact that both cited references read on a tablet comprising an active agent.  The
intended purpose is to provide a delayed release specific active agent tablet." *Id.*

The Examiner also determined that the claims were unpatentable under 35 U.S.C. §112.
Office Action, mailed October 17, 1996 at 2.  As originally filed, claim 1 recited "from 81 to
99.9% of the weight of the microtablet, but not taking into account the weight of any coating
which is present."  The Examiner found that this was indefinite.  The Examiner indicated that if
the amount of coating was important, then the claims should be rewritten to reflect the
percentage of coating present.  In response, the applicant deleted the coating part of the
limitation.

The applicant responded that their microtablet had surprisingly improved delayed release
characteristics and that such results are "especially surprising" because their formulation
contained "no other release delaying additives."  Response, dated January 9, 1997 at 3.  The
applicant also alleged that 90% of other medicaments with similar water solubilites were
released within one hour if they were formulated according to the invention (data not included).
Other "surprising" results included that release rate was virtually independent of pressure. *Id.*
With respect to the prior art references, applicant pointed out that Davidson actually "is
specifically looking toward instant release and speeding up the disintegration of tablets." *Id.* at

15



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 16

4. The applicant conjectured: "if one were to modify Davidson by the teachings of Franke et al, one would obtain a propafenone hydrochloride tablet" resulting in "relatively instant release, certainly within five minutes or less, as taught by Davidson." *Id.* at 5. The applicant concluded that there is "no suggestion within either reference" that propafenone "would have surprising delayed release characteristics when compressed into the tablet form" disclosed in the application, and there would be "no expectation by one of ordinary skill in the art" of obtaining the "delayed relatively uniform release...in a microtablet having the required size, shape and other characteristics as required by the present claims." *Id.* at 6.

The notice of allowance was mailed on April 1, 1997, and the applicant filed a supplemental amendment substituting a new abstract for the abstract that was filed with the application. A supplemental notice of allowability was mailed on June 25, 1997. The patent issued on October 28, 1997.

### C.     Par's Proposed Propafenone HCl Capsule (225 mg, 325 mg & 425 mg) Does Not Infringe the '588 Patent

Par's proposed propafenone HCl product does not infringe claim 1 of the '588 patent, either literally or under the doctrine of equivalents, because it does not embody every element of claim 1 of the '588 patent. Par's proposed formulation does not infringe claim 1 for at least four reasons: (1) Par's proposed formulation does not use microtablets; (2) Par's proposed formulation does not employ cylindrically-shaped components; (3) Par's proposed formulation uses an amount of propafenone which falls below the range claimed in the patent; and (4) Par's proposed formulation uses a release delaying substance. Claims 2-6 depend from claim 1 and therefore also do not infringe, either literally or under the doctrine of equivalents.

#### 1.     Par's Proposed Product Does Not Infringe the Microtablet Limitation.

Par will not infringe claim 1 because it will not produce a formulation containing a "microtablet", literally, or by equivalents.[1] The term "microtablet" is a compound word which can be broken into two parts: "micro" and "tablet." The prefix "micro" is derived from the Greek, "mikros" which means small. According to *Remington's Pharmaceutical Sciences,*

---

[1] It is well settled that the preamble is limiting if it recites structure. *See* MPEP §2111.02(I) ("Any terminology in the preamble that limits the structure of the claimed invention must be treated as a claim limitation.")



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 17

"[t]ablets may be defined as solid pharmaceutical dosage forms containing drug substances with or without suitable diluents and prepared either by compression or molding methods." *Id.* at 1553 (16th Ed. 1980). "Although tablets are more frequently discoid in shape, they also may be round, oval, oblong, cylindrical, or triangular." *Id.* Thus, according to *Remington's*, tablets must be dosage forms which are compressed into a regular shape. The specification of the '588 patent supports this position. For example, the patentee states, "[t]he tabletting takes place in a suitable tabletting machine equipped with multiple microtablet punches. The resulting microtablets have **a cylindrical shape with flat or convex surface** [sic]." (emphasis added) Col. 4, lines 19-22. In this way, the patentee clearly and unmistakably disavowed all other multiple unit dosage forms. Par's formulation will not use microtablets, because Par will not produce a formulation containing a small dosage form compressed into a regular shape. Par instead intends to produce non-cylindrical irregularly shaped beadlets through randomly milling a slug. Thus, Par's formulation will contain a broad distribution of particles with no one regular shape rather than a regularly-shaped microtablet. As a result, Par does not meet the microtablet limitation and thus will not literally infringe the claim.

Par's proposed formulation will also not infringe the microtablet limitation under the doctrine of equivalents. According to the Federal Circuit, "by defining the claim in a way that clearly excluded certain subject matter" a patent can implicitly disclaim the excluded subject matter and will bar the doctrine of equivalents. *SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1346 (Fed. Cir. 2001). Here, the doctrine of equivalents is not available because such subject matter has been specifically excluded by the patentee. Further, the irregularly-shaped beadlets that Par proposes to manufacture are not equivalent to a microtablet because there are substantial differences between them. *See Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1518 (Fed. Cir. 1995), *rev'd on other grounds*, 520 U.S. 17 (1997). A microtablet, as described in the specification, is a product of specially-outfitted pharmaceutical machinery designed to produce materials to exacting specifications. It is substantially different than the irregularly-shaped granule generated by a random milling process.

### 2.    Par's Proposed Product Does Not Infringe the Shape Limitation.

Par's proposed formulation does not infringe the requirement that the microtablet have a cylindrical shape with a convex or flat upper side and lower side, either literally or under the doctrine of equivalents. Par will not produce microtablets with **any** uniform shape. Thus, Par will not literally infringe the claim because it will not produce microtablets having this very specific shape.



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 18

Par will also not infringe under the doctrine of equivalents because the narrow claiming excluded other equivalents. According to the Federal Circuit, "A claim that contains a detailed recitation of structure is properly accorded correspondingly limited recourse to the doctrine of equivalents." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 955 (Fed. Cir. 2006). In *Bicon*, a claim that recited a particular shape clearly excluded distinctly different or even opposite shapes. Here, because the claim specifically recites a microtablet that has a cylindrical shape with a convex or flat upper side and lower side, all other shapes have been specifically excluded from the doctrine of equivalents. Since Par's product does not even propose to use a specific uniform shape, Par's product cannot infringe under the doctrine of equivalents.

It should also be noted that the doctrine of claim vitiation may also come into play. In *Tronzo v. Biomet*, 156 F.3d 1154 (Fed. Cir. 1998) the court held that expanding the claims reciting a "generally conical outer surface" to reach defendant's hemispherical cup would violate the "all-elements rule" because it would write the "conical" limitation out of the claims. *Id.* at 1160. The court reasoned that if evidence showed that any structure would be equivalent then it would read the "generally conical" limitation out of the claims. *Id.*

Par's proposed dosage form will also not infringe under the doctrine of equivalents because it is substantially different from the claimed microtablets. Microtabletting is a specialized technology that uses rotary compression machines specially equipped for the task of controlling the geometric parameters to produce a very specific, uniform shape. Par's proposed process will not use such machinery, and Par's dosage form will not contain components of any particular shape.

### 3.    Par's Proposed Product Does Not Infringe the Active Ingredient Limitation

Par's proposed product will not infringe claim 1, either literally or under the doctrine of equivalents, because it will contain less active ingredient than what is required by the claims. Claim 1 requires that, "the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet." Par's proposed formulation will only contain 79.00% active ingredient. Therefore, Par's proposed product will not literally infringe the claim.

What is more, the patentee disclaims subject matter concerning microtablets with an active ingredient content below 81% by weight. The '588 patent specification, in a section



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 19

describing the "preferred embodiments," acknowledges that the prior art's upper limit for tablets with a high concentration of active ingredient is 80%. By contrast, the "preferred embodiment" for the claimed invention is between 85 and 99.5% active ingredient content by weight. Col., lines. Indeed, according to the specification, "[s]uch high contents of active ingredients of this type in tablets have not previously been reached." Col. 2, lines 39-41. By identifying and distinguishing the claimed invention from the prior art in this way, the patentee implicitly disclaims formulations that include an active ingredient content below 81%.

Third, there can be no infringement under the doctrine of equivalents because the doctrine of equivalents is limited by the prior art. Under *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 683 (Fed. Cir. 1990), a patentee cannot use the doctrine of equivalents to extend claim scope passed what would have been allowed in prosecution over the prior art. Therefore, if a hypothetical claim broad enough in scope to literally read on the accused device, the doctrine of equivalents cannot be used. *Id.* As will be discussed in greater detail below, U.S. Patent No. 4,797,287 ("the '287 patent" or "Pich") discloses subject matter rendering the hypothetical range obvious. Pich describes a cylindrical microtablet containing propafenone with an active ingredient content of 80% of the weight of the microtablet. (Example 5, Col. 7). As a consequence, the hypothetical claim encompassing Par's propafenone drug (intended to contain 79.00%) would also "ensnare" the prior art (disclosing microtablets containing 80% propafenone), and thus would preclude infringement under the doctrine of equivalents.

### 4. Par's Proposed Product Does Not Infringe the Ancillary Substance Limitation.

Par's proposed product will not infringe claim 1 because it will contain a release-delaying ancillary substance. Claim 1 requires that, "the tablet contains **no** release-delaying ancillary substance." (emphasis added). The claim is unequivocal. The microtablet as protected by the claims can contain **no** release-delaying ancillary substance. In this instance the patentee clearly and unmistakably disavowed all subject matter where the microtablet contains any release-delaying ancillary substances. Par's proposed dosage form will contain ethylcellulose, a well known release-delaying ancillary.[2] Therefore, Par will not literally infringe claim 1.

---

[2] *E.g.* "Modified release tablet formulations may also be produced using ethylcellulose as a matrix former." Handbook of Pharmaceutical Excipients, 186, (2d Ed. 1994).



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 20

Par will also not infringe the claims under the doctrine of equivalents. The patentee specifically identified and distinguished pieces of prior art containing release delaying ancillary substances. Col. 1, lines 54-63. In this way, the patentee specifically excluded any release delaying ancillary substance from the scope of equivalents. Further, the Federal Circuit has repeatedly held that it is impermissible to extend the doctrine of equivalents to encompass subject matter that is inconsistent with the claims, as defined by the patentee. *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1317 (Fed. Cir. 1998). Here, it would defy logic to conclude that Par's proposed use of ethylcellulose, a well known release-delaying auxiliary, was equivalent to the claims which require **no** release delaying auxiliaries. The patentee chose to limit the claims with strong language and the patentee is not allowed to expand the claims impermissibly post-issuance.

**D.     The '588 Patent is Invalid**

**1.     The '588 Patent is Invalid for in Anticipation over U.S. Patent No. 4,797,287 ("Pich")**

The '588 patent is anticipated and invalid over art which was not provided to the Examiner during prosecution. U.S. Patent No. 4,797,287 ("Pich"), assigned to BASF, is directed to cylindrical microtablets, containing a very large weight percentage of various active ingredients. Among the actives exemplified is propafenone.[3] Pich was issued on June 10, 1989, more than one year before the effective filing date of the '588 patent (March 24, 1994). Pich, despite its relevance, was not provided to the examiner during prosecution.

Pich discloses, "[w]e have found that this object is achieved by a process for the production of cylindrical microtablets which have a convex upper face and a convex lower face and whose cylinder diameter and height, independently of one another, are each from 1.0 to 2.5 mm, preferably from 2.0 to 2.3 mm." *Id.* In particular, Pich exemplifies propafenone. Example 5, col. 7. With regard to the active ingredient content, Pich states, "[f]or example, it is possible to produce microtablets having a high content of substances which are difficult to press." Col. 4, line 29-31. Several paragraphs later, Pich specifically refers to such a "high content": "[p]ancreatin can be pressed to give tablets having a content of 99.5%." Col. 4, 52-53. The microtablets described in Example 5 also contain no release-delaying ancillary substances. *See* Example 5, col. 7. The lack of explanation in the specification makes it difficult to interpret the

---

[3] Knoll AG, the assignee of the '588 patent, was a wholly-owned subsidiary of BASF at the time the '588 patent was filed.



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 21

"active ingredient density" limitation, but it appears that the examples of Pich would have densities well over 1. Finally, the release rate of the active from the microtablets and the compression characteristics recited in the claims would necessarily be disclosed in Pich because Pich otherwise describes the exact composition of the microtablets disclosed in the Orange Book patent. Therefore, since every limitation is disclosed, either explicitly or inherently by one reference (Pich), each claim of the '588 patent is invalid because it is anticipated under 35 U.S.C. §102(b).

> **2.    The '588 Patent is Invalid for Obviousness in View of U.S. Patent No. 4,797,287 ("Pich")**

The '588 patent is obvious and invalid over art which was not provided to the Examiner during prosecution. U.S. Patent No. 4,797,287 ("Pich"), assigned to BASF, is directed to cylindrical microtablets, containing a very large weight percentage of various active ingredients. Among the actives exemplified is propafenone.

The Pich reference is directed to "[c]ylindrical microtablets which have a convex upper face…and whose cylinder diameter and height independently of one another are each from 1.0 to 2.5 mm." '287 Patent, abstract. Pich explains that these "novel microtablets can be used for a very large variety of purposes…[of which] the most important and very particularly preferred field of use is the pharmaceutical sector." Col. 4, lines 6-15. The specification discloses specifically how to make such a microtablet with propafenone as an active ingredient. *See* Example 5. In this example, the propafenone content is 80%.[4] *Id.* at lines 29-31. The microtablet of Example 5 does not contain any release-delaying substances.

Moreover, it is well-settled that obviousness arises when the claimed range and the prior art range do not fully overlap, but the differences between the ranges are minor. *See Haynes Int'l Inc. v. Jessup Steel Co.*, 8 F.3d 1573, 1577, n.3 (Fed. Cir. 1993) (holding when the difference between the claimed invention and the prior art is the range or value of a particular variable, then a *prima facie* rejection is properly established when the difference in range or value is minor). In *Titanium*, a case with facts closely related to the facts at issue, the court held

---

[4] Example 5 suggests utilizing propafenone as an active ingredient, providing, as an example, the composition of the microtablet as containing: 1600 g propafenone, 250 g microcrystalline cellulose, 100 g lactose, 40 g talc, and 10 g magnesium stearate. These materials were then converted into microtablet form. The total percentage of propafenone in this example is 80% (1600 / 2000 = .80). '588 Patent, Col.7, lines 48-54



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 22

that an alloy containing 0.8% nickel, 0.3% molybdenum, and up to 0.1% maximum iron was *prima facie* obvious in view of a reference disclosing alloys containing 0.75% nickel, 0.25% molybdenum, balance titanium and 0.94% nickel, 0.31% molybdenum. *Id.* at 783. One of ordinary skill in the art would clearly recognize that 80% is tantamount to 81%.[5]

The patentee will also be unable to present convincing evidence of nonobviousness. One important secondary consideration, evidence of commercial success, "is not significantly probative" in this case because "others were legally barred from commercially testing the [the product covered by the Orange Book patent]" because market entry by others is precluded. *Merck v. Teva*, 395 F.3d 1365, 1377 (Fed. Cir. 2005).

In view of the prior art, when all of the factors are considered, there is clear and convincing evidence that the claim 1 of the '588 patent would have been obvious to one of ordinary skill in the art. What is more, the additional limitations of dependent claims 2-6 are rendered obvious in light of Pich because they are explicitly or inherently disclosed.

**E.    The '588 Patent is Unenforceable for Inequitable Conduct**

A breach of an applicant's duty of candor to the Patent Office during the procurement of a patent is considered "inequitable conduct." A successful defense on inequitable conduct must show by clear and convincing evidence, "affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Alza Corp v. Mylan Labs., Inc.*, 391 F.3d 1365, 1373 (Fed. Cir. 2004). Thus, the first inquiry is whether the patentee's act is material. *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1362-63 (Fed. Cir. 2003). Next, it is necessary to determine if the requisite intent to mislead was present. *Id.* There is a balance between materiality and intent: the more material the reference is, the smaller the burden necessary to show an intent to deceive (and *vice versa*). *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350 (Fed. Cir. 1984); *see also Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1191 (Fed. Cir. 2006) (finding summary judgment for inequitable conduct appropriate if there has been a failure to supply highly material information and the applicant knew of the information, the applicant knew or should have known of the material of the information, and the applicant has provided no credible explanation for withholding the information.)

---

[5] Pich exemplifies the microtablet as having 80% active ingredient content in Example 5, however, as shown above, the specification does not so limit the active ingredient content in the microtablets to only 80%. Pich references "high content" throughout the specification and one example contains active ingredient of 99.5%.



Dr. Ernest Mario
Reliant Pharmaceuticals
January 10, 2007
Page 23

Here, highly material prior art was never disclosed with the intent to deceive the Patent Office. As discussed in the foregoing, Pich is highly material prior art that reads on the claims of the '588 patent. Pich describes cylindrical microtablets containing, in one example, 80% propafenone. Pich was not, however, disclosed to the PTO examiner. BASF Aktiengesellschaft, the assignee of record during the prosecution of the '287 patent, was also the corporate parent of Knoll Aktiengesellshaft, the assignee of record during the prosecution of the '588 patent. There is clear evidence that Knoll knew about Pich at the time that the '588 patent was filed. Even though BASF is the assignee of record, court documents indicate that **Knoll** and McNeil entered into a license agreement in 1988 with Pich as its very subject matter. *McNeilab, Inc. v. Scandipharm, Inc.*, 862 F. Supp. 1351, 1353 (E.D. Pa. 1994). The license stated, "KAG hereby grants to McNeil a right and license to use the Know-How relating to the Product and the Patent Rights to make, use and sell the Product within the Territory. Such right and license shall be exclusive." *Id.* at 1353-1354. Thus, it is clear that Knoll was aware of Pich because Knoll granted McNeil a license to use that patent. Since Pich is very relevant (it discloses propafenone microtablets with the same characteristics of the claimed invention), the burden to show intent is commensurately reduced. Therefore, the '588 patent is unenforceable because Knoll failed to disclose material prior art during the prosecution of the '588 patent.

## V.    CONCLUSION

The marketing of Par's proposed Propafenone HCl extended release tablet, in the United States will not infringe any claims of the '588 patent. Moreover, all of the claims of the '588 patent are invalid and unenforceable.

Par expressly reserves the right to develop and make other arguments or affirmative claims, and to assert any defenses relating to non-infringement, invalidity and/or unenforceability of the claims of the '588 patent should grounds become apparent in the future.

23

EXHIBIT 3

| | | |
|---|---|---|
| Christine Willgoos/New York/Kirkland-Ellis | To | ehaug@flhlaw.com |
| 12/20/2006 04:12 PM | cc | awasson@flhlaw.com |
| | bcc | |
| | Subject | Reliant Complaint |

Ed –

As requested by your associate, Andrew Wasson, attached please find a courtesy copy of the Complaint filed yesterday by Reliant Pharmaceuticals, Inc. against Par.

Regards,

Christine Willgoos
Kirkland & Ellis LLP
Citigroup Center
153 E. 53rd Street
New York, New York 10022-4611
Direct phone:  (212) 446-4964
Direct fax:  (212) 446-6460



06-774 Reliant v Par Complaint.pdf

# EXHIBIT 4

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

212 446-4800

www.kirkland.com

Gerald J. Flattmann, Jr.
To Call Writer Directly:
212 446-4720
gflattmann@kirkland.com

Facsimile:
212 446-4900

Dir. Fax: 212 446-4900

December 29, 2006

**VIA FACSIMILE AND EMAIL**
**(212) 588-0500**

Edgar Haug, Esq.
Frommer Lawrence & Haug
745 Fifth Avenue
New York, New York 10151

Re:  *Reliant Pharmaceuticals, Inc. v. Par Pharmaceutical, Inc.*
Civil Action No. 06-774 (D. Del.)

Dear Ed:

Based on your December 18, 2006 letter to Christine Willgoos, it appears that your firm has been acting on behalf of Par Pharmaceutical, Inc. in the above-referenced action.

As you are no doubt aware, Reliant had a long-standing attorney-client relationship with Frommer, Lawrence and Haug. For example, your firm represented Reliant in connection with intellectual property related matters in Reliant's 2003 acquisition of Rythmol® and U.S. Patent No. 5,681,588, the patent-in-suit here. Accordingly, it appears to us that your firm is conflicted from representing Par in this substantially related action. Please confirm that your firm will withdraw as Par's counsel or explain why you believe your firm is not ethically required to do so.

Sincerely,

Gerald J. Flattmann, Jr.

GJF/cmh

Chicago         London         Los Angeles         Munich         San Francisco         Washington, D.C.

# EXHIBIT 5

01/17/2007 18:05 FAX  212 4464900        KIRKLAND & ELLIS LLP              002/003
01/17/2007 17:57 FAX  2125880500 4       FROMMER LAWRENCE & HAUG           002/003



# FROMMER LAWRENCE & HAUG LLP

New York                              www.flhlaw.com
745 Fifth Avenue
New York, NY 10151                    Washington, DC
Telephone: (212) 588-0800
Fax: (212) 588-0500                   Tokyo

January 17, 2007

**Edgar H. Haug**
EHaug@flhlaw.com

### VIA FACSIMILE 212 446 4900

Gerald J. Flattmann, Jr., Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611

Re:    Reliant Pharmaceuticals, Inc. v. Par Pharmaceutical, Inc.

Dear Gerald:

We have reviewed and evaluated the matters raised in your December 29, 2006 letter. Based upon that review, we have concluded that Frommer Lawrence & Haug LLP's representation of Par Pharmaceutical, Inc. in connection with the pending litigation does not conflict with our Firm's obligations to our former client, Reliant.

The statement in your letter that Reliant had a "long-standing attorney-client relationship" with our Firm is incorrect. Reliant was not a client before 2002 when Andrew Berdon joined the Firm as a non-equity partner and the representation ended abruptly when Mr. Berdon left the Firm approximately two years later. Immediately upon the departure of Mr. Berdon from our Firm, Reliant instructed us to cease all further work and to transfer all files to Mr. Berdon's new firm, which we did.

Your statement that the Firm represented Reliant "in connection with intellectual property matters in Reliant's 2003 acquisition of Rythmol® and U.S. Patent No. 5,681,588" is also incorrect. The firm did not represent Reliant in making that acquisition. Rather, it appears that our Firm may, at most, have gathered certain publicly available information for Reliant and engaged in a *de minimus* review of certain already-drafted contract language. We do not believe that our Firm ever received any confidential information from Reliant regarding the matter. In any event, all firm knowledge regarding communications with your client departed when Mr. Berdon left the Firm three years ago.

It is also clear that our Firm never provided an opinion regarding infringement or validity of the '588 patent, which would be the sole matters at issue in your client's suit against Par.

00422112

01/17/2007 18:05 FAX  212 4464900        KIRKLAND & ELLIS LLP                    ☑003/003
01/17/2007 11:31 FAX  2123860500 4       FROMMER LAWRENCE & HAUG                 ☑003/003

Gerald J. Flattmann, Jr., Esq.
Kirkland & Ellis LLP
January 17, 2007
Page 2

Accordingly, we believe that:

    1) our firm did not engage in active, substantive representation of your client with
       respect to the patent-in-suit in this matter.

    2) that we have not represented your client on any matters substantially related to the
       issues in this case, and

    3) that there is no legal or ethical impediment to our representation of Par in this matter.

If you have any additional information that you would like us to consider, please provide such
information, and any supporting documentation to us immediately.

Sincerely,

*Edgar H. Haug*

Edgar H. Haug

00422112

# EXHIBIT 6

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

(212) 446-4800

www.kirkland.com

Facsimile:
(212) 446-4900

January 25, 2007

**VIA FACSIMILE AND EMAIL**
    **(212) 588-0500**

Edgar Haug, Esq.
Frommer Lawrence & Haug
745 Fifth Avenue
New York, New York 10151

Re:    *Reliant Pharmaceuticals, Inc. v. Par Pharmaceutical, Inc.*
       Civil Action No. 06-774-JJF (D. Del.)

Dear Ed:

I write in response to your January 17, 2007 letter. Reliant maintains its objection to your firm's representation of Par and again requests your prompt withdrawal as counsel.

Respectfully, we believe that your letter understates the extent of your firm's involvement in Reliant's acquisition of the patent and product at issue here. Your firm did much more than gather publicly available information and "engage in a *de minimis* review" of contract language. For example, Frommer conducted an analysis of the patents Reliant was seeking to acquire, conducted patent searches, reviewed and revised the draft license and assignment agreement between Abbott and Reliant, had communications with the FDA on Reliant's behalf, and provided advice regarding its due diligence on the acquisition. These activities were conducted for the purpose of providing legal advice to Reliant regarding the acquisition of Rythmol® SR, and its related patent portfolio, including the '588 patent. Thus, your firm's proposed representation of Par is substantially related to work done for Reliant on the very same product and patent at issue here.

Your statement that you "do not believe that [your] Firm ever received any confidential information from Reliant" is mistaken. Reliant forwarded confidential information to Frommer regarding the potential agreement from Abbott, including, for example, the draft Asset Purchase Agreement and confidential background information on Rythmol® SR, including patent protection.

Moreover, your statement that "all firm knowledge regarding communications with [Reliant] departed when Mr. Berdon left the firm" is both incorrect and irrelevant. Mr.

Chicago        Hong Kong        London        Los Angeles        Munich        San Francisco        Washington, D.C.

## KIRKLAND & ELLIS LLP

Edgar Haug, Esq.
January 25, 2007
Page 2

Berdon's departure from your firm does not discharge the firm's ethical obligation to its clients and former clients. Even more significantly, it was not only Mr. Berdon who provided Reliant with legal advice regarding Reliant's acquisition of Rythmol® SR and the patent in suit. At least two current firm partners, Arthur Hoag and Dan Brown were involved in the analysis and legal advice given to Reliant.

Accordingly, please confirm that your firm will withdraw as Par's counsel.

Sincerely,

Gerald J. Flattmann, Jr.

GJF/cmh

EXHIBIT 7

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

(212) 446-4800

www.kirkland.com

Gerald J. Flattmann, Jr.
To Call Writer Directly:
212 446-4720
gflattmann@kirkland.com

Facsimile:
(212) 446-4900

Dir. Fax: 212 446-4900

February 12, 2007

**VIA FACSIMILE AND EMAIL**
**(212) 588-0500**

Edgar Haug, Esq.
Frommer Lawrence & Haug
745 Fifth Avenue
New York, New York 10151

Re:    *Reliant Pharmaceuticals, Inc. v. Par Pharmaceutical, Inc.*
Civil Action No. 06-774 (D. Del.)

Dear Ed:

Based on your appearance on behalf of Par in its February 9, 2007 Answer and Counterclaims and your related motions for admission *pro hac vice*, it appears that your firm intends to represent Par despite the serious concerns raised in our letters of December 29, 2006 and January 25, 2007. In view of the facts concerning your firm's prior representation of Reliant regarding its acquisition of Rythmol® SR and the patent-in-suit, we do not see how your firm can do so consistent with the Rules of Professional Responsibility. Accordingly, we intend to file a motion to disqualify your firm from representing Par in this action. Please let us know promptly whether you will voluntarily withdraw from representing Par so as to obviate the need for such a motion.

Sincerely,

Gerald J. Flattmann, Jr.

cc:    Jack B. Blumenfeld, Esq. (via email)
       Josy W. Ingersoll, Esq. (via email)

Chicago        Hong Kong        London        Los Angeles        Munich        San Francisco        Washington, D.C.

# EXHIBIT 8

02/12/2007 17:39 FAX 212 4464900    KIRKLAND & ELLIS LLP    ☑ 003/003
                                    FROMMER LAWRENCE & HAUG    ☑ 002/002

 FROMMER LAWRENCE & HAUG LLP

New York
745 Fifth Avenue
New York, NY 10151
Telephone: (212) 588-0800
Fax: (212) 588-0500

www.flhlaw.com

Washington, DC
Tokyo

February 12, 2007

Edgar H. Haug
EHaug@flhlaw.com

<u>VIA FACSIMILE 212 446 4900</u>

Gerald J. Flattmann, Jr., Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611

Re:    <u>Reliant Pharmaceuticals, Inc. v. Par Pharmaceutical, Inc.</u>

Dear Gerald:

We have reviewed and evaluated your January 25, 2007 letter and your demand that our firm withdraw from its representation of our client, Par Pharmaceutical, Inc. Based upon our review, our conclusion remains that this firm's representation of Par in the pending litigation does not conflict with our Firm's obligations to our former client, Reliant.

We believe that both your characterization of this firm's prior work for Reliant and your assertion of a substantial relationship with this litigation are incorrect. Moreover, your assertion that this firm received relevant Reliant confidential information lacks any support or specificity. You also provide no evidence to support the assertion that "[a]t least two current firm partners, Arthur Hoag and Dan Brown were involved in the analysis and legal advice given to Reliant" or that the legal advice you reference is substantially related to this case. Moreover, it appears that Mr. Brown has at no time worked on any Reliant matter of any kind.

We continue to believe that there is no legal or ethical impediment to our representation of Par in this matter. The conclusory nature of your assertions —and failure to provide any supporting documentation in response to our direct request—bolsters our conclusion that no conflict exists. It also suggests to us a tactically-motivated effort to disqualify this firm.

Sincerely,

Edgar H. Haug

K Ptletter Edr 12 2007 (0ff429578).DOC

EXHIBIT 9



"Arbuiso, Nicole"
<NArbuiso@flhlaw.com>

12/20/2006 01:50 PM

To    <cwillgoos@kirkland.com>

cc    "Hoag, Arthur" <AHoag@flhlaw.com>, "Wasson, Andrew"
      <AWasson@flhlaw.com>

Subject    Emailing: willgoos letter.pdf


<<willgoos letter.pdf>>
The message is ready to be sent with the following file or link attachments:

willgoos letter.pdf


Note: To protect against computer viruses, e-mail programs may prevent sending
or receiving certain types of file attachments.  Check your e-mail security
settings to determine how attachments are handled.

willgoos letter.pdf

**FLH** **FROMMER LAWRENCE & HAUG** LLP

New York                    www.flhlaw.com
745 Fifth Avenue
New York, NY 10151          Washington, DC
Telephone: (212) 588-0800   Tokyo
Fax: (212) 588-0500

December 18, 2006                              **Edgar H. Haug**
                                              EHaug@flhlaw.com

*VIA FACSIMILE*

Christine Willgoos
Kirland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611

Re:    Propafenone Hydrochloride
       Extended Release Capsules,
       325 mg
       FLH File No. 540572-7123

Dear Ms. Willgoos:

       We represent Par Pharmaceutical, Inc. and are writing in response to the two letters sent
to Mr. Engel of Par Pharmaceutical, Inc. dated November 22, 2006 -- one from yourself, and one
from Mr. Jabbour of Reliant Pharmaceuticals.  We have been asked to respond to those letters.
In accordance with Par's Offer of Confidential Access, we anticipate sending you relevant
portions of the ANDA for Propafenone Hydrochloride Extended Release Capsules, 325 mg.

Sincerely,

Edgar H. Haug

00417883.DOC

EXHIBIT 10



"Meyer, John"
<jmeyer@ycst.com>
02/09/2007 05:56 PM

To "Blumenfeld, Jack" <jblumenfeld@mnat.com>, "Cherry,
Steven" <steven.cherry@lw.com>, "Desmarais, John"
<jdesmarais@kirkland.com>, "Flattmann, Gerald"
<gflattmann@kirkland.com>, "Noreika, Maryellen"
<mnoreika@mnat.com>, "Willgoos, Christine"
<cwillgoos@kirkland.com>

cc "Brown, Daniel G." <dbrown@flhlaw.com>, "Haug, Edgar H."
<ehaug@flhlaw.com>, "Ingersoll, Josy"
<jingersoll@ycst.com>, "Jabri, Omar" <ojabri@flhlaw.com>,
"Pascale, Karen" <kpascale@ycst.com>, "Stronski, James
K." <jstronski@flhlaw.com>

Subject Case 1:06-cv-00774-JJF Reliant Pharmaceuticals Inc. v. Par
Pharmaceuticals Inc. Answer to Amended Complaint

Attached please find a service copy of the following:

ANSWER to Amended Complaint with Jury Demand, COUNTERCLAIM against Reliant
Pharmaceuticals Inc. by Par Pharmaceuticals Inc..(Ingersoll, Josy)

John M. Meyer
Legal Assistant
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Phone: 302-571-6678
Facsimile: 302-576-3383
jmeyer@ycst.com

**From:** ded_nefreply@ded.uscourts.gov [mailto:ded_nefreply@ded.uscourts.gov]
**Sent:** Friday, February 09, 2007 5:49 PM
**To:** ded_ecf@ded.uscourts.gov
**Subject:** Activity in Case 1:06-cv-00774-JJF Reliant Pharmaceuticals Inc. v. Par Pharmaceuticals
Inc. Answer to Amended Complaint

This is an automatic e-mail message generated by the CM/ECF system. Please DO
NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents

once without charge. To avoid later charges, download a copy of each document during this first viewing.

### U.S. District Court

### District of Delaware

### Notice of Electronic Filing

The following transaction was entered by Ingersoll, Josy on 2/9/2007 at 5:48 PM EST and filed on 2/9/2007

| | |
|---|---|
| **Case Name:** | Reliant Pharmaceuticals Inc. v. Par Pharmaceuticals Inc. |
| **Case Number:** | 1:06-cv-774 |
| **Filer:** | Par Pharmaceuticals Inc. |
| **Document Number:** | 11 |

**Docket Text:**
ANSWER to Amended Complaint with Jury Demand, COUNTERCLAIM against Reliant Pharmaceuticals Inc. by Par Pharmaceuticals Inc..(Ingersoll, Josy)

**1:06-cv-774 Notice has been electronically mailed to:**

Jack B. Blumenfeld    jbbefiling@mnat.com

Gerald J. Flattmann , Jr    gflattmann@kirkland.com, wadams@kirkland.com

Josy W. Ingersoll    jingersoll@ycst.com, cglover@ycst.com, corpcal@ycst.com, corporate@ycst.com

**1:06-cv-774 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=2/9/2007] [FileNumber=341707-0]
[8e33f4551e2c20fd04af692d78ae6a1519a5799c378ce56f3b16ff92d2f37988b4927
48146521b441c6df7b0aa960365c3e709310d937cdc520d67e289aace7c]]



{5778183_1}_ANSWER to Amended Complaint with Jury Demand, COUNTERCLAIM against Reliant Pharmaceuticals Inc. by Par Pharmaceuticals Inc..(Ingers

EXHIBIT 11



Portfolio Media, Inc. | 648 Broadway, Suite 200 | New York, NY 10012 | www.law360.com

Phone: +1 212 537 6331 | Fax: +1 212 537 6371 | customerservice@portfoliomedia.com

## Fulwider Pays $8M To Settle Misconduct Claims

By **Elaine Chow**, elaine.chow@portfoliomedia.com

*Wednesday, January 03, 2007* --- Patent law firm Fulwider Patton Lee & Utecht LLP has settled with ICU Medical Inc. three years after the health care company sued the firm for allegedly breaching its attorney-client obligations.

Fulwider, which did not admit any liability or wrongdoing, will pay ICU $8 million to resolve the lawsuit the company filed in the Superior Court of California, Orange County.

The allegations stem from Fulwider's involvement with ICU's industry competitors. According to ICU's complaint, Fulwider suddenly terminated its representation of ICU in 1999 and continued to represent ICU competitors Medex Inc. and Alaris Medical Systems Inc.

"We allege that during the course of its representation of us and continuing thereafter, Fulwider engaged in various matters for our direct competitors, including Alaris and others, and committed other acts of negligence and breaches of the attorney-client relationship," ICU said.

The complaint includes assertions that Fulwider, after analyzing ICU's patent prosecution and litigation strategies regarding its needle-free intravenous valve connector, CLAVE, went on to prepare and file numerous patents covering Alaris' competing SmartSite product.

ICU later took Alaris to court in 2004 over the SmartSite product, saying it infringed on four of ICU's CLAVE patents.

The lawsuit also claimed Fulwider convinced ICU that it was in the device maker's best interest to settle a trade secrets case against a former-ICU employee who was selling the rights to the company's products. The firm also allegedly advised ICU to waive its misappropriation claims regarding the products.

Months after ICU waived its misappropriation claims, Fulwider negotiated a settlement between the former-ICU employee and Alaris, which granted Alaris certain licenses to certain ICU products, thus allowing "ICU's settlement of the trade secrets litigation [to] directly [benefit] its competitors," the complaint said.

In 1999, Fulwider's involvement with ICU's competitors was revealed after Medex sued ICU for patent infringement over the CLAVE product. According to the suit, ICU informed Medex of Fulwider's opinion that CLAVE didn't



infringe on Medex' patents.

When Medex complained to Fulwider about the firm's involvement with ICU while representing Medex in other matters, Fulwider quickly terminated its representation of ICU and continued to represent Medex.

"Fulwider abused the trust and confidence of ICU...by, among other things, entering into representation that conflicted with its representation of ICU, injured ICU, and utilized the confidential information of ICU regarding its patents," the complaint alleged.

ICU Medical is represented by Kohut & Kohut LLP.

The suit is ICU Medical Inc. v. Fulwider Patton Lee & Utecht LLP, case no. 04cc09340 in the Superior Court of the State of California for the County of Orange.

EXHIBIT 12

**FLH** FROMMER LAWRENCE & HAUG LLP

New York
745 Fifth Avenue
New York, NY 10151
Telephone: (212) 588-0800
Fax: (212) 588-0500

www.flhlaw.com

Washington, DC
Tokyo

December 18, 2006

**Edgar H. Haug**
EHaug@flhlaw.com

*VIA FACSIMILE*

Christine Willgoos
Kirland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611

Re:    Propafenone Hydrochloride
       Extended Release Capsules,
       325 mg
       FLH File No. 540572-7123

Dear Ms. Willgoos:

    We represent Par Pharmaceutical, Inc. and are writing in response to the two letters sent to Mr. Engel of Par Pharmaceutical, Inc. dated November 22, 2006 -- one from yourself, and one from Mr. Jabbour of Reliant Pharmaceuticals. We have been asked to respond to those letters. In accordance with Par's Offer of Confidential Access, we anticipate sending you relevant portions of the ANDA for Propafenone Hydrochloride Extended Release Capsules, 325 mg.

Sincerely,

Edgar H. Haug

00417883.DOC

EXHIBIT 13



# American Bar Association
## Defending Liberty, Pursuing Justice

**ABA**

**Member Login**

| ABA Home |
| Join |
| Web Store |
| About the ABA |

**CPR Home**

Membership

Calendar

Publications & Videos

Reports & Initiatives

Lawyer Ethics & Professionalism

Lawyer Regulation

Judicial Ethics & Regulation

Client Protection

Consumer Resources

Contact Information

Site Map

**Search:** [            ] Web Site [Go]    Advanced Search    Print This | E-mail This
Topics A-Z

# Center *for* Professional Responsibility

## Model Rules of Professional Conduct

### *Client-Lawyer Relationship*
### Rule 1.9 Duties To Former Clients

(a) A lawyer who has formerly represented a client in a matter shall not thereafte represent another person in the same or a substantially related matter in which tha person's interests are materially adverse to the interests of the former client unless t former client gives informed consent, confirmed in writing.

(b) A lawyer shall not knowingly represent a person in the same or a substantially re matter in which a firm with which the lawyer formerly was associated had prev represented a client

    (1) whose interests are materially adverse to that person; and

    (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter;

unless the former client gives informed consent, confirmed in writing.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

    (1) use information relating to the representation to the disadvantage of th former client except as these Rules would permit or require with respect to client, or when the information has become generally known; or

    (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

Comment | Table of Contents | Next Rule

Back to Top

---

TOPICS A-Z    WEB STORE    ABA CALENDAR    CONTACT
ABA



Defending Liberty
Pursuing Justice

American Bar Association | 321 N. Clark St. | Chicago, IL 60610 | 800.285.2221
ABA Copyright Statement  ABA Privacy Statement  Web Site Feedback

1 of 1

Print View of http://www.abanet.org/cpr/mrpc/rule_1_9_comm.html at 0...    http://www.abanet.org/abanet/common/print/newprintview.cfm?ref=http...



**Defending Liberty**
**Pursuing Justice**

**Print This Page** | Close Window

 Center *for* Professional Responsibility

## Model Rules of Professional Conduct

### *Client-Lawyer Relationship*
### Rule 1.9 Duties To Former Clients - Comment

[1] After termination of a client-lawyer relationship, a lawyer has certain continuing duties with respect to confidentiality and conflicts of interest and thus may not represent another client except in conformity with this Rule. Under this Rule, for example, a lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the former client. So also a lawyer who has prosecuted an accused person could not properly represent the accused in a subsequent civil action against the government concerning the same transaction. Nor could a lawyer who has represented multiple clients in a matter represent one of the clients against the others in the same or a substantially related matter after a dispute arose among the clients in that matter, unless all affected clients give informed consent. See Comment [9]. Current and former government lawyers must comply with this Rule to the extent required by Rule 1.11.

[2] The scope of a "matter" for purposes of this Rule depends on the facts of a particular situation transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests in that transaction clearly is prohibited. On the other hand, a lawyer wl recurrently handled a type of problem for a former client is not precluded from later representing another client in a factually distinct problem of that type even though the subsequent representation involves ; position adverse to the prior client. Similar considerations can apply to the reassignment of military lawyers between defense and prosecution functions within the same military jurisdictions. The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.

[3] Matters are "substantially related" for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter. For example, a lawyer who has represented a businessperson and learned extensive private financial information about that person may not then represent that person's spouse i seeking a divorce. Similarly, a lawyer who has previously represented a client in securing environmental permits to build a shopping center would be precluded from representing neighbors seeking to oppos rezoning of the property on the basis of environmental considerations; however, the lawyer would not be precluded, on the grounds of substantial relationship, from defending a tenant of the completed shopping center in resisting eviction for nonpayment of rent. Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying. Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may

be relevant in determining whether two representations are substantially related. In the case of a organizational client, general knowledge of the client?s policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a representation that are relevant to the matter in question ordinarily will preclude such a representation. A former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter. A conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services.

**Lawyers Moving Between Firms**

[4] When lawyers have been associated within a firm but then end their association, the question of whether a lawyer should undertake representation is more complicated. There are several comp considerations. First, the client previously represented by the former firm must be reasonably assured that the principle of loyalty to the client is not compromised. Second, the rule should not be so broadly cast as to preclude other persons from having reasonable choice of legal counsel. Third, the rule should not unreasonably hamper lawyers from forming new associations and taking on new clients after having left a previous association. In this connection, it should be recognized that today many lawyers practice in firms, that many lawyers to some degree limit their practice to one field or another, and that many move from one association to another several times in their careers. If the concept of imputation were applied with unqualified rigor, the result would be radical curtailment of the opportunity of lawyers to move from one practice setting to another and of the opportunity of clients to change counsel.

[5] Paragraph (b) operates to disqualify the lawyer only when the lawyer involved has actual knowledge of information protected by Rules 1.6 and 1.9(c). Thus, if a lawyer while with one firm acquired no knowledge or information relating to a particular client of the firm, and that lawyer later joined another firm, neither the lawyer individually nor the second firm is disqualified from representing another client in the same or a related matter even though the interests of the two clients conflict. See Rule 1.10(b) for the restrictions on a firm once a lawyer has terminated association with the firm.

[6] Application of paragraph (b) depends on a situation's particular facts, aided by inferences, deductions or working presumptions that reasonably may be made about the way in which lawyers work together. A lawyer may have general access to files of all clients of a law firm and may regularly participate in discussions of their affairs; it should be inferred that such a lawyer in fact is privy to all information about all the firm's clients. In contrast, another lawyer may have access to the files of only a limited number of clients and participate in discussions of the affairs of no other clients; in the absence of information to the contrary, it should be inferred that such a lawyer in fact is privy to information about the clients actually served but not those of other clients. In such an inquiry, the burden of proof should rest upon the firm whose disqualification is sought.

[7] Independent of the question of disqualification of a firm, a lawyer changing professional association has a continuing duty to preserve confidentiality of information about a client formerly represented. See Rules 1.6 and 1.9(c).

[8] Paragraph (c) provides that information acquired by the lawyer in the course of representing a client may not subsequently be used or revealed by the lawyer to the disadvantage of the client. However, the fact that a lawyer has once served a client does not preclude the lawyer from using generally know information about that client when later representing another client.

[9] The provisions of this Rule are for the protection of former clients and can be waived if the client gives informed consent, which consent must be confirmed in writing under paragraphs (a) and (b). See Rule 1.0(e). With regard to the effectiveness of an advance waiver, see Comment [22] to Rule 1.7. With

Print View of http://www.abanet.org/cpr/mrpc/rule_1_9_comm.html at 0...    http://www.abanet.org/abanet/common/print/newprintview.cfm?ref=http...

regard to disqualification of a firm with which a lawyer is or was formerly associated, see Rule 1.10.

Back to Rule | Table of Contents | Next Comment

**This page was printed from:** http://www.abanet.org/cpr/mrpc/rule_1_9_comm.html

Close Window

© 2007.  American Bar Association. All Rights Reserved.  ABA Privacy Statement

EXHIBIT 14

Case 1:06-cv-00774-JJF    Document 32-4    Filed 05/02/2007    Page 15 of 49



**Defending Liberty
Pursuing Justice**

 Center *for* Professional Responsibility

# Model Rules of Professional Conduct

### *Client-Lawyer Relationship*
### Rule 1.10 Imputation Of Conflicts Of Interest: General Rule

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materia limiting the representation of the client by the remaining lawyers in the firm.

(b) When a lawyer has terminated an association with a firm, the firm is not prohibited from there representing a person with interests materially adverse to those of a client represented by the forme associated lawyer and not currently represented by the firm, unless:

>   (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and

>   (2) any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(c) that material to the matter.

(c) A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in Rule 1.7.

(d) The disqualification of lawyers associated in a firm with former or current government lawyers is governed by Rule 1.11.

Comment | Table of Contents | Next Rule

**This page was printed from:** http://www.abanet.org/cpr/mrpc/rule_1_10.html

Close Window

© 2007. American Bar Association. All Rights Reserved. ABA Privacy Statement

EXHIBIT 15

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

RELIANT PHARMACEUTICALS, INC.,          :
                                        :
         Plaintiff,                     :
                                        :
              v.                        :   C.A. No. 06-774-JJF
                                        :
PAR PHARMACEUTICAL, INC.,               :
                                        :
         Defendant.                     :
                                        :
                                        :
                                        :

DEFENDANT PAR PHARMACEUTICAL, INC.'S
FIRST SET OF INTERROGATORIES TO PLAINTIFF

        In accordance with Rules 26 and 33 of the Federal Rules of Civil Procedure, defendant

Par Pharmaceutical, Inc. ("Par") requests that plaintiff Reliant Pharmaceuticals, Inc. ("Reliant")

answer the following interrogatories within thirty (30) days of service.

DEFINITIONS AND INSTRUCTIONS

        1.      The form of the responses to Par's discovery requests must comply with Rules 26

through 37 of the Federal Rules of Civil Procedure, as applicable.

        2.      Par's discovery requests are deemed to seek responses as of the date they are

served.  Any additional responsive information, documents, or things that become known to

Reliant up to and including the time of trial will be furnished to Par within a reasonable time

after becoming known.  Moreover, if Reliant acquires any information, documents, or things that

require an answer to be enlarged, diminished, or otherwise modified, such information,

documents, or things will be supplied to Par within a reasonable time after they are acquired.

        3.      The phrases "the '588 patent" or "patent in suit" means United States Patent No.

066039.1001

5,681,588 entitled "Delayed Release Microtablets of β-Phenylpropiophenone Derivatives," which issued on October 28, 1997.

4.    The phrase "the '287 patent" means United States Patent No. 4,797,287 entitled "Cylindrical Microtablets," which issued on January 10, 1989.

5.    The term "inventions" includes every alleged invention or discovery disclosed or claimed in the '588 patent.  By using the term "inventions," Par does not admit that the '588 patent is valid or that the '588 patent discloses or claims a patentable invention.

6.    The terms "infringe" and "infringement" includes literal infringement, infringement under the doctrine of equivalents, direct infringement, contributory infringement, and induced infringement.

7.    The term "Reliant" or "plaintiff" includes Reliant Pharmaceuticals, Inc., any predecessor or successor company or individual, and any corporation or other business entity (whether or not a separate legal entity) subsidiary to, or affiliated with Reliant, as well as all present and former principals, partners, directors, owners, officers, members, employees, agents, representatives, consultants, and attorneys of Reliant or any affiliated corporation or business entity and any other persons under the control of Reliant.

8.    The term "FDA" means the United States Food and Drug Administration.

9.    The term "PTO" means the United States Patent and Trademark Office.

10.    The term "ANDA 78-540" means the Abbreviated New Drug Application No. 78-540 and any amendments thereto.

11.    The term "NDA 21-416" means the New Drug Application No. 21-416 and any amendments thereto.

12.    The term "Orange Book" means the publication entitled "Approved Drug

Products with Therapeutic Equivalence Evaluations."

    13.    The term "Rythmol® SR" means the propafenone HCl extended-release capsules sold by Reliant under the federally registered trademark Rythmol® SR.

    14.    The terms "you," "your," and "plaintiff" means and refer to Reliant.

    15.    The term "document" will have the comprehensive meaning, in the broadest sense available pursuant to Rule 34(a) of the Federal Rules of Civil Procedure, and will include each handwritten, typed, printed or otherwise recorded material, whether an original or a copy of an original bearing any notation or marking not appearing on the original (including but not limited to notes and underscoring), in the possession, custody, or control of Reliant, including but not limited to electronically-stored information, letters, cables, wires, messages, telexes, telecopies, memoranda, inter-office and intra-corporate communications, reports, notes, minutes, bulletins, circulars, pamphlets, instructions, work assignments, notebooks, drafts, work sheets, appraisals, advertisements, catalogs, brochures, flyers, invoices, purchase orders, acknowledgements, price lists, proposals, quotations, solicitations, and bids; drawings, diagrams, blueprints, plans, sketches, charts, graphs, tracings, photographs, audio tapes, videotapes, and motion pictures; printouts, recordings, tapes, disks, ROMs, PROMs, EPROMs, data compilations, electronically stored information, and other information from computers or other data storage and retrieval systems; trademark registrations, copyright registrations, and registration applications; patents and patent applications; assignments, deeds, contracts, agreements, licenses, and other official documents and legal instruments; newspapers, magazines, books, periodicals, and other published material of any kind; annual reports, reports to shareholders or owners, and minutes or reports of meetings of owners or directors or executive boards or committees; summaries of negotiations or meetings; quality control, operating, service, repair, or maintenance manuals;

technical specifications or requirements; advertising and promotional material as well as sales literature; labels and packaging; press releases and new product releases; engineering notebooks and data; ledgers, journals, bills, checks, receipts, vouchers, statements, orders, records and files; address books, appointment books, telephone logs, calendars, diaries, and desk pads; affidavits, declarations, and transcripts of testimony; and other writings and recordings (as defined in Fed. R. Evid. 1001) of whatever nature; including copies and mechanical or photocopy reproductions of any or all of the foregoing items. Where such copies or reproductions contain any marking not appearing on the original or are altered from the original, then such copies or reproductions will be considered to be separate original documents.

16.     The term "thing" means any physical specimen or tangible item including, but not limited to, samples, prototypes, mock-ups, test equipment, production equipment, tools, dies, molds, models, three-dimensional illustrations of physical or chemical phenomena and montages of physical items.

17.     The term "concerning" means, where appropriate, comprising, containing, constituting, consisting of, embodying, evidencing, pertaining to, describing, discussing, reflecting, relating to, referring to, supporting, contradicting, tending to prove or disprove, or identifying.

18.     The term "communication" refers to any exchange or transfer of information between two or more persons or entities, whether written, oral, or in any other form.

19.     The terms "possession," "custody," and "control" are used in a comprehensive sense and refer to possession, custody, or control by any one or a combination of the following persons or organizations:

(a)     Reliant;

(b)     Any corporation or other entity controlled by or affiliated with

Reliant or controlling Reliant as its wholly-owned subsidiary;

(c)    Any principal, officer, employee, agent, representative, or consultant of or for Reliant or any such controlled or affiliated corporation or entity; and

(d)    Counsel for Reliant or any such controlled or affiliated corporation or entity.

20.    The term "person" means any natural person.

21.    The term "organization" means any legal or business entity including, but not limited to, public and/or private corporations, partnerships, and proprietorships, as well as other legal business entities, e.g., agencies, associations, forms, and trusts, whether domestic or foreign.

22.    The term "prior art" encompasses by way of example and without limitation the subject matter described in each and every subdivision of 35 U.S.C. § 102 and 35 U.S.C. § 103.

23.    The terms "and" or "or" will both be read in the conjunctive and in the disjunctive wherever they appear, and neither of these words will be interpreted to limit the scope of a discovery request.  The use of a verb in any tense will be construed as the use of the verb in all other tenses, and the singular form will be deemed to include the plural and vice-versa.

24.    The term "date" means the exact date, month, and year if ascertainable; if not, then the closest approximation that can be made thereto in terms of months and years, seasons, or relation to other events and matter.

25.    The term "describe" means to provide a narrative statement or description, phrased in specifics, of the facts or matters to which the interrogatory refers, including, but not limited to, an identification of all persons, communications, acts, transactions, events, agreements, recommendations, and documents used, necessary or desirable to make such statement or description complete.

26. The term "state" means to express the particulars in writing or set down and set forth in detail.

27. The term "identify" in the case of a document means to state:

    (a)    The document's title and date, if any, as well as a brief description of its subject matter;

    (b)    The type or nature of the document (e.g., letter, memorandum, telegram, chart, laboratory report, etc.) and the number of pages in it;

    (c)    The identity of any person who prepared the document (and, if different, the identity of any person who signed the document);

    (d)    The date the document was drafted;

    (e)    The identity of any person who received a copy of the document (whether an addressee or otherwise);

    (f)    The present whereabouts of the document and the identity of its custodian; and

    (g)    All other means of identifying the document with sufficient particularity to support a request for production under Rule 34 of the Federal Rules of Civil Procedure.

28. The term "identify" in the case of a thing means to state:

    (a)    A brief description of the thing, including any product numbers, part numbers, model numbers, catalog numbers, style numbers, code numbers, brand names, trade names, trademarks, commercial or governmental designations, and any other identifying markings, features, or characteristics;

    (b)    The present whereabouts of the thing;

    (c)    The identity of the person having possession, custody, or control of the thing; and

    (d)    All other means of identifying the thing with sufficient particularity to support a request for production under Rule 34 of the Federal Rules of Civil Procedure.

29. The term "identify" in the case of a person or individual means to state:

    (a)    Home and business addresses (present or last known);

(b)    The full name; and

(c)    The time period and nature of each of his or her present and prior employment positions or affiliations with Reliant, if any.

30.    The term "identify" in the case of an organization means to state:

(a)    The organization's full name;

(b)    The organization's type (e.g., public or private corporation, partnership, etc.);

(c)    The last known street and post office addresses of its principal place of business;

(d)    The date(s) and state(s) or country(ies) of incorporation;

(e)    The identity of each of its principals, officers, directors, partners, or members; and

(f)    The date of dissolution, if applicable.

31.    The term "identify" in the case of a chemical compound (e.g., propafenone HCl extended-release capsules) or a method of using a chemical compound, means to state:

(a)    The description and composition of the drug product (e.g., propafenone HCl extended-release capsules);

(b)    The purpose of the use (e.g., method of, or use for, antiarrhythmia);

(c)    The patient population that the use is directed to (e.g., patients suffering with arrhythmia); and

(d)    The amount of the chemical compound (e.g., propafenone HCl extended-release capsules) taken by the patient and the frequency taken.

32.    If Reliant objects to producing and withholds from production any information, documents, or things requested herein on grounds of attorney-client privilege, work-product immunity or otherwise, Par requests that Reliant provide within thirty (30) days of service of these discovery requests a privilege log identifying the specific grounds upon which the objection is based and the particular request(s) objected to, and identifying any withheld

documents, things, or portions thereof as follows:

    (a)    Its date of creation;

    (b)    The identity of all persons who prepared and/or signed the document or thing;

    (c)    The general nature of the document or thing (i.e., whether it is a letter, chart, pamphlet, memorandum, etc.);

    (d)    A summary of its contents, or the general subject matter of the document or thing;

    (e)    Its present location and the identity of its current custodian;

    (f)    A listing of all persons, including but not limited to the addressee, to whom copies of the document or thing have been disclosed, including the date and means of disclosure; and

    (g)    The nature of the privilege or other rule of law relied upon to withhold the document or thing and the facts supporting Reliant's assertion thereof.

    33.    If any documents or things requested to be produced herein have been lost, discarded, destroyed, or are otherwise unavailable for any reason, they should be identified as completely as possible, by stating without limitation: the pertinent information requested in the preceding paragraph, the date of disposal, the manner of disposal, the reason for disposal, any person, firm, or corporation who has possession, custody, or control of a partial or complete copy of such document, and the identity of all persons who participated in the destruction or discarding or who have knowledge of the data and circumstances surrounding the destruction or discarding of the document or thing.

    34.    Par requests that any purportedly privileged document containing nonprivileged matter be produced with the purportedly privileged portion excised.

    35.    If Reliant cannot state with finality its answer to an interrogatory, Reliant is requested to so indicate and to answer such interrogatory to the best of its ability in view of the

present state of discovery.

36.    In responding to Par's discovery requests, if Reliant claims any ambiguity in interpreting either a request, a definition, or an instruction, Reliant must not use that ambiguity claim as a basis for refusing to respond, but will instead set forth as part of its response to the request the language deemed to be ambiguous and the interpretation that it has chosen to use in responding to the request.

## INTERROGATORIES

### Interrogatory No. 1

Identify each person who has knowledge or information concerning the conception, testing, analysis, investigation, examination, research, formulation, development, measurement, analysis, inspection, manufacture, production, marketing, sale, distribution, or regulatory history of any invention in the '588 patent or any product according to NDA 21-416, including but not limited to each person who has knowledge or information about any amendments, supplements, additions, or annual reports for NDA 21-416.

### Interrogatory No. 2

Identify each person who has knowledge or information concerning any testing, analysis, investigation, inspection, examination, or measurement of (i) any product according to ANDA 78-540, (ii) any method of using a product according to ANDA 78-540, or (iii) any other product, or method of using any other product, accused of infringing the '588 patent.

### Interrogatory No. 3

Describe (by way of a claim chart) the bases for Reliant's infringement assertions at the time it filed the Complaint and, if different, at the present time, as follows:  Identify each claim of the '588 patent that Reliant contends any product according to ANDA 78-540 has infringed or

is infringing either directly or indirectly, state whether such alleged infringement is literal or under the doctrine of equivalents, and describe the complete factual basis and evidentiary support for the presence of each element of each asserted claim either literally or by way of a substantial equivalent and identify the three individuals most knowledgeable about the information requested in this interrogatory.

**Interrogatory No. 4**

Describe (by way of a claim chart) Reliant's construction of the claims of the '588 patent, as follows: For each claim of the '588 patent that Reliant contends any product according to ANDA 78-540 has infringed or is infringing either literally or under the doctrine of equivalents, state Reliant's interpretation of each claim limitation, identify all evidence intrinsic to the '588 patent that supports Reliant's interpretation, and identify all evidence extrinsic to the '588 patent that either supports or refutes Reliant's interpretation. For each claim term, phrase, and element that Reliant asserts should be assigned its ordinary meaning, state that meaning, specify all bases for Reliant's assertion, identify all supporting evidence, and identify the three individuals most knowledgeable about the information requested in this interrogatory.

**Interrogatory No. 5**

For each claim in the '588 patent, specify the dates on which the claimed subject matter was (i) conceived, (ii) reduced to practice, (iii) first described in a document, and (iv) first disclosed to a person other than the inventors; (v) first sold; (vi) first offered for sale; (vii) first described in a printed publication anywhere in the world; and (viii) first publicly used in the United States. Identify all supporting documents, samples, investigations, tests, measurements, analyses, opinions, and testimony supporting each date, and identify the three individuals most knowledgeable about the information requested in this interrogatory.

**Interrogatory No. 6**

Describe the technical area(s) to which the '588 patent pertains including, but not limited to, a description of the level of schooling, experience, expertise, and relevant technical skill that a person having ordinary skill in the art would have had at the time the claimed invention was made. Identify the three individuals most knowledgeable about the information requested in this interrogatory.

**Interrogatory No. 7**

Describe fully and with particularity all objective evidence of nonobviousness (secondary indicia of nonobviousness) concerning the claimed inventions of the '588 patent; specify all facts and all evidence supporting Reliant's contention that a nexus exists between the objective evidence of nonobviousness and the claimed subject matter; identify all supporting documents, samples, investigations, tests, measurements, analyses, opinions, and testimony; and identify the three people most knowledgeable about the information requested in this interrogatory.

**Interrogatory No. 8**

Identify all validity, infringement, or prior art searches or investigations that have ever been conducted by or on behalf of Reliant relating to the '588 patent including, but not limited to, who conducted the search or investigation, when it occurred, an identification of what was discovered in such search(es) or investigation(s), who received that information, when the search(es) were done, and any documents memorializing the search or investigation, conclusion, findings or documents relating thereto. Identify the three individuals most knowledgeable about the information requested in this interrogatory.

**Interrogatory No. 9**

Identify each person who had knowledge or information concerning the '287 patent prior

to October 28, 1997, including, but not limited to, (i) the named inventors of the '588 patent; (ii)

the attorneys and individuals associated with or representing Knoll Aktiengesellshaft during the

prosecution of the '588 patent; (iii) the attorneys and individuals associated with or representing

BASF Aktiengesellschaft during the prosecution of the '287 patent; (iv) individuals now

employed, or at one time employed, by Reliant; (v) and any other persons associated with the

filing and the prosecution of U.S. Patent Application Serial No. 08/525,749.


| | |
|---|---|
| | _(signature)_ |
| Of Counsel | Josy W. Ingersoll (No. 1088)<br>Karen L. Pascale (No. 2903)<br>Karen E. Keller (No. 4489) |
| Edgar H. Haug<br>James K. Stronski<br>John G. Taylor<br>**FROMMER LAWRENCE & HAUG LLP**<br>745 Fifth Avenue<br>New York, New York 10151<br>Tel: (212) 588-0800<br>Fax: (212) 588-0500 | **YOUNG CONAWAY STARGATT & TAYLOR LLP**<br>The Brandywine Building<br>1000 West St., 17th Floor<br>P.O. Box 391<br>Wilmington, Delaware 19899-0391<br>Tel: (302) 571-6600<br>Fax: (302) 571-1253 |
| Dated:  March 23, 2007 | Attorneys for Par Pharmaceutical, Inc. |

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on March 23, 2007, copies of the foregoing document were served upon the following counsel in the manner indicated:

### BY ELECTRONIC MAIL AND HAND DELIVERY

Jack B. Blumenfeld [jblumenfeld@mnat.com]
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200

### BY ELECTRONIC MAIL

John Desmarais [jdesmarais@kirkland.com]
Gerald J. Flattmann, Jr. [gflattmann@kirkland.com]
Christine Willgoos [cwillgoos@kirkland.com]
KIRKLAND & ELLIS LLP
Citigroup Center
153 E. 53rd Street
New York, NY 10022
(212) 446-4800

Steven C. Cherny [steven.cherny@lw.com]
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834
(212) 906-1200

YOUNG CONAWAY STARGATT & TAYLOR LLP

Karen E. Keller (#4489) [kkeller@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391

*Attorneys for Defendant-Counterclaimant,*
*Par Pharmaceutical, Inc.*

EXHIBIT 16

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RELIANT PHARMACEUTICALS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No. 06-774-JJF |
| v. | : | |
| | : | |
| PAR PHARMACEUTICAL, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |

### DEFENDANT PAR PHARMACEUTICAL, INC.'S FIRST SET OF REQUESTS
### FOR THE PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFF

In accordance with Rules 26 and 34 of the Federal Rules of Civil Procedure, defendant Par Pharmaceutical, Inc. ("Par") requests that plaintiff Reliant Pharmaceuticals, Inc. ("Reliant") respond to the following production requests and produce the requested documents and things within thirty (30) days of service. Reliant shall produce the requested documents and things at the offices of Frommer Lawrence & Haug LLP, 745 Fifth Avenue, New York, New York 10151. The Definitions and Instructions in Par's First Set of Interrogatories to Plaintiff are incorporated herein by reference.

## PRODUCTION REQUESTS

### Production Request No. 1

Each document or thing identified in any of Reliant's responses to interrogatories served by Par in this action; each document relied on by Reliant in responding to interrogatories served by Par in this action; and each document or thing the identification of which is requested in interrogatories served by Par in this action.

### Production Request No. 2

Each document or thing concerning a conception of any alleged invention claimed in U.S. Patent No. 5,681,588 ("the '588 patent").

### Production Request No. 3

Each document or thing concerning an initial disclosure of any alleged invention claimed in the '588 patent.

### Production Request No. 4

Each document or thing concerning a reduction to practice of any alleged invention claimed in the '588 patent.

### Production Request No. 5

Each document or thing concerning the research, development, formulation, or testing of an invention claimed in the '588 patent, including but not limited to research notebooks, laboratory notebooks, correspondence, invention disclosures, analyses, studies, experiments, reports, sketches, interview reports or summaries, clinical data, descriptions of tests or studies, and results or conclusions reached from such tests or studies.

**Production Request No. 6**

Each document or thing concerning any data, test results, tables, formulations, compositions, or pharmaceutical preparations disclosed in the '588 patent.

**Production Request No. 7**

Each document or thing concerning the first use, sale, or offer for sale of any alleged invention claimed in the '588 patent.

**Production Request No. 8**

Each document or thing concerning a novelty, patentability, validity, infringement, or state-of-the-art search or study that pertains to the '588 patent or U.S. Patent Application Serial No. 08/525,749.

**Production Request No. 9**

Each document or thing including, but not limited to, patents and publications, found or discovered as a result of a novelty, patentability, validity, infringement, or state-of-the-art search or study pertaining to the '588 patent or U.S. Patent Application Serial No. 08/525,749.

**Production Request No. 10**

Each document or thing concerning a transfer, grant, conveyance, assignment, or license of any interest in or right under the '588 patent, including but not limited to any contracts, agreements, understandings, notes, memoranda, letters, e-mails, messages, facsimiles, telecopies, and other correspondence as well as any enclosures or attachments.

**Production Request No. 11**

Each document or thing concerning a transfer, grant, conveyance, assignment, or license of any interest or right under U.S. Patent No. 4,797,287 ("the '287 patent"), including but not limited to any contracts, agreements, understandings, notes, memoranda, letters, e-mails,

messages, facsimiles, telecopies, and other correspondence as well as any enclosures or attachments.

**Production Request No. 12**

Each document or thing concerning the '287 patent, including, but not limited to any contracts, agreements, understandings, notes, memoranda, analyses, studies, letters, e-mails, messages, facsimiles, telecopies, and other correspondence as well as any enclosures or attachments currently, or at one time in the possession of (i) the inventors of the '588 patent; (ii) all attorneys and individuals associated with or representing Knoll Aktiengesellshaft during the prosecution of the '588 patent; (iii) all attorneys and individuals associated with or representing BASF Aktiengesellschaft during the prosecution of the '287 patent; (iv) individuals now employed, or at one time employed by Reliant; (v) and any other persons associated with the filing and the prosecution of U.S. Patent Application Serial No. 08/525,749.

**Production Request No. 13**

Each document or thing concerning a license, release, covenant not to sue, or immunity from suit under the '588 patent, including but not limited to any contracts, agreements, understandings, notes, memoranda, letters, e-mails, messages, facsimiles, telecopies, and other correspondence as well as any enclosures or attachments.

**Production Request No. 14**

Each document or thing concerning an attempt by Reliant to license the '588 patent.

**Production Request No. 15**

Each document or thing concerning a threat to sue or a charge of infringement under the '588 patent including, but not limited to, letters threatening suit or charging infringement and notes or memos concerning telephone conversations in which infringement was alleged.

**Production Request No. 16**

      Each document or thing concerning the decision to sue Par or any other person or organization for infringement of the '588 patent, including any notes, memoranda, results of investigations or analyses, letters, e-mails, messages, facsimiles, telecopies, or other communications as well as any enclosures or attachments to any communications.

**Production Request No. 17**

      Each document or thing concerning the decision to not sue a person or organization for infringement of the '588 patent, including any notes, memoranda, results of investigations or analyses, letters, e-mails, messages, facsimiles, telecopies, or other communications as well as any enclosures or attachments to any communications.

**Production Request No. 18**

      Each document or thing concerning a meeting, conference, or telephone conversation during which the decision to sue Par was discussed or mentioned, including but not limited to meetings of Reliant's officers or directors.

**Production Request No. 19**

      Each document or thing concerning a Par product, brochure, manual, magazine, description, investigation, analysis, meeting, conference, correspondence, or telephone conversation regarding the decision to sue Par.

**Production Request No. 20**

      Each document or thing concerning any press release concerning this action.

**Production Request No. 21**

      Each document or thing concerning any press release concerning the '588 patent.

**Production Request No. 22**

Each document or thing concerning any press release concerning any action in which infringement of the '588 patent was alleged.

**Production Request No. 23**

Each document or thing concerning the preparation or prosecution of any foreign counterpart of the '588 patent.

**Production Request No. 24**

Any patent, publication, or other document identified by any third party who has ever questioned or disputed the validity or the enforceability of the '588 patent or any foreign counterpart.

**Production Request No. 25**

Each document or thing concerning U.S. Patent Application Serial No. 08/525,749.

**Production Request No. 26**

Each document or thing concerning the preparation or prosecution of U.S. Patent Application Serial No. 08/525,749, and including but not limited to official actions, responses, and references cited during prosecution.

**Production Request No. 27**

      All drafts of any declarations or other documents submitted to the PTO during the prosecution of U.S. Patent Application Serial No. 08/525,749.

**Production Request No. 28**

      Any patent, publication, or other prior art that was cited, referred to, or relied upon during the prosecution of U.S. Patent Application Serial No. 08/525,749.

**Production Request No. 29**

      Each United States Patent Application relating to propafenone HCl extended-release capsules or methods of using propafenone HCl extended-release capsules, other than U.S. Patent Application Serial No. 08/525,749, including but not limited to:

- complete copies of each file history;

- any initial or preliminary draft of any such patent application;

- drafts of any declarations or other documents submitted to the U.S. Patent Office;

- any patent, publication, or other prior art that was cited, referred to, or relied upon during the prosecution of such patent applications; and

- the preparation or prosecution of any foreign counterpart of any such patent application.

**Production Request No. 30**

      Each document or thing concerning an analysis, investigation, inspection, examination, measurement, or test of any product, or use of any product, alleged to infringe the '588 patent, including but not limited to any product according to ANDA 78-540.

**Production Request No. 31**

      Each document or thing concerning any product alleged to infringe the '588 patent, including but not limited to any product according to ANDA 78-540.

**Production Request No. 32**

Each document or thing concerning any communication, understanding, or agreement between Reliant and any third party regarding the validity, infringement, or enforceability of the '588 patent or any foreign counterpart.

**Production Request No. 33**

Each document or thing concerning the research, formulation, development, testing, manufacture, production, marketing, sale, distribution, or regulatory approval of Rythmol® SR.

**Production Request No. 34**

A complete copy of NDA 21-416, including but not limited to all amendments, supplements, additions, and annual reports.

**Production Request No. 35**

A copy of the Chemistry, Manufacturing and Controls section of NDA 21-416.

**Production Request No. 36**

Each document or thing concerning the preparation or filing of NDA 21-416.

**Production Request No. 37**

Each document or thing concerning a communication or contact with FDA concerning NDA 21-416.

**Production Request No. 38**

Each document or thing concerning the research, formulation, development, testing, manufacture, production, marketing, sale, distribution, or regulatory approval of any product according to NDA 21-416.

**Production Request No. 39**

Each document or thing concerning a notice under 21 U.S.C. § 355(j)(2)(B) or 21 C.F.R. § 314.95 that mentions the '588 patent.

**Production Request No. 40**

Each document or thing concerning any testing procedure, protocol, or method for testing any product claimed in the '588 patent, including but not limited to any product according to NDA 21-416.

**Production Request No. 41**

Each document or thing concerning any investigation, report, opinion, study, or analysis, whether formal or informal, that relates or refers to the infringement or noninfringement of any claim in the '588 patent.

**Production Request No. 42**

Each document or thing concerning any investigation, report, opinion, study, or analysis, whether formal or informal, that relates or refers to the validity or invalidity of any claim in the '588 patent.

**Production Request No. 43**

Each document or thing concerning any investigation, report, opinion, study, or analysis, whether formal or informal, that relates or refers to the enforceability or unenforceability of any claim in the '588 patent.

**Production Request No. 44**

Each document or thing concerning the scope of any claim in the '588 patent.

**Production Request No. 45**

Each document or thing concerning the meaning of any term, phrase, limitation, or element in any claim in the '588 patent.

**Production Request No. 46**

Each document or thing concerning the level of ordinary skill in the art to which the '588 patent pertains, including but not limited to patents and publications.

**Production Request No. 47**

Each document or thing concerning the relevant art for the '588 patent, including but not limited to patents and publications.

**Production Request No. 48**

Each document or thing concerning the relevant technical field for the '588 patent, including but not limited to patents and publications.

**Production Request No. 49**

Each document or thing concerning any motivation, or lack thereof, to combine any prior-art teachings to yield an invention claimed in the '588 patent.

**Production Request No. 50**

Each document or thing that Reliant may rely on to establish that any of the following secondary indicia of nonobviousness apply to the '588 patent:

- commercial success;
- commercial acquiescence;
- copying;
- long-felt need;
- failure of others;
- professional approval.

**Production Request No. 51**

Each document or thing concerning whether the claims of the '588 patent cover Rythmol® SR.

**Production Request No. 52**

Each document or thing concerning any data or other information showing sales of or

prescriptions for Rythmol® SR or propafenone HCl extended-release capsules related

medications, including but not limited to:

(a)     National Drug and Therapeutic Index (NDTI) data;

(b)     Xponent data and/or Xponent PlanTrak data;

(c)     Formulary Focus data;

(d)     IMS data;

(e)     Scott-Levin data;

(f)     Calls, Samples, and Details data;

(g)     Integrated Promotional Services (IPS) data;

(h)     Early View data.

**Production Request No. 53**

Each document or thing concerning any of the following:

(a)     the total amount of revenue from sales of Rythmol® SR;

(b)     the amount of revenue each month from sales of Rythmol® SR;

(c)     the total gross profit and/or net profit from sales of Rythmol® SR;

(d)     the gross profit and/or net profit each month from sales of Rythmol® SR;

(e)     the total amount spent on marketing or advertising or sales promotion for
        Rythmol® SR;

(f)     the amount spent each month on marketing or advertising or sales
        promotion for Rythmol® SR.

**Production Request No. 54**

Any report, summary, compilation, or abstract concerning Rythmol® SR prescriptions,

sales, revenues, or profits.

**Production Request No. 55**

Each document or thing concerning the marketing, advertising, or sales promotion of Rythmol® SR.

**Production Request No. 56**

All notes, memoranda, and other written records of communications (including "call notes") between Reliant or its agents and any managed-care organization, pharmacy-benefit manager, physician, nurse, pharmacist, or other medical or medical-office personnel concerning Rythmol® SR.

**Production Request No. 57**

All marketing, sales, or promotional materials concerning Rythmol® SR, including but not limited to:

    (a)    all display booth panels;

    (b)    all detail pieces or aids used by and/or provided to sales representatives or detail personnel, including but not limited to ad slicks, flash cards, and shelf-talkers;

    (c)    all telemarketing scripts, tele-detailing scripts, selling scripts, detailing scripts and/or verbatims used by and/or provided to sales representatives or detail personnel;

    (d)    all materials provided to physicians, managed-care organizations, pharmacy-benefit managers, pharmacists, and/or consumers;

    (e)    all advertisements appearing in journals, magazines, and/or newspapers;

    (f)    all physician-education materials;

    (g)    all patient-education materials;

    (h)    copies of any articles published by third-parties (sometimes referred to as reprints) used by and/or provided to sales representatives or detail personnel;

    (i)    all press releases, new product releases, catalogs, catalog sheets, price lists, and brochures.

**Production Request No. 58**

Each document or thing concerning the marketing of Rythmol® SR, including but not limited to:

    (a)    all tactical plans, strategic plans, marketing plans, distribution plans, and launch plans;

    (b)    all manuals, presentations, product monographs, brochures, and other sales-training materials provided to or used to train sales representatives or detail personnel;

    (c)    all market-research materials (including but not limited to surveys conducted by or on behalf of Reliant, scripts used, and results obtained);

    (d)    all communications between or among any persons at corporate headquarters, persons in district or regional offices, and sales representatives or detail personnel;

    (e)    all notes, handouts, slides, and other presentation materials used at any plan-of-action (POA), launch, and/or other meeting, including but not limited to any launch binders;

    (f)    all product forecasts and sales forecasts;

    (g)    all launch budgets and marketing budgets;

    (h)    all field bulletins from Reliant to its sale representatives or detail personnel.

**Production Request No. 59**

Each document comparing or contrasting any claim in the '588 patent with any prior art, including, but not limited to the '287 patent.

**Production Request No. 60**

Each document comparing or contrasting any claim in the '588 patent with any product according to ANDA 78-540.

**Production Request No. 61**

Each document comparing or contrasting any claim in the '588 patent with any product according to NDA 21-416.

**Production Request No. 62**

    Each document or thing concerning the best mode known to the inventors for practicing the inventions claimed in the '588 patent, as of the filing date for each patent.

**Production Request No. 63**

    Each opinion of counsel concerning the '588 patent.

**Production Request No. 64**

    Each document or thing that Reliant may rely on at a hearing or trial of this action.

**Production Request No. 65**

    Each document or thing provided to an expert, consultant, or third-party by Reliant or its agent(s) in connection with this action.

**Production Request No. 66**

    Each communication to or from an expert, consultant, or third-party concerning the '588 patent, the '287 patent, the relevant prior art, Par, Rythmol® SR, or this action.

**Production Request No. 67**

    Each document or thing concerning the infringement or noninfringement of the '588 patent.

**Production Request No. 68**

    Each document or thing evidencing, supporting, contradicting, tending to prove or disprove, or bearing upon any of the allegations in the Amended Complaint.

**Production Request No. 69**

    Each document or thing concerning the use of Par's product alleged to infringe a claim of the '588 patent.

**Production Request No. 70**

Each document or thing concerning the validity or invalidity of the '588 patent, including but not limited to patents and publications.

**Production Request No. 71**

Each document or thing concerning the enforceability or unenforceability of the '588 patent, including but not limited to patents and publications.

**Production Request No. 72**

Each document concerning delaying generic competition in the market for propafenone HCl extended-release capsules.

**Production Request No. 73**

Each document or thing concerning any aspect of the United States market or segment thereof for any product, service, method, or combination thereof that Reliant contends embodies the subject matter claimed in the '588 patent, including but not limited to the identification of competitors and their offerings, market potential, market size, market shares, market segments, and current or anticipated trends affecting demand.

**Production Request No. 74**

Each document concerning any valuation of the '588 patent.

**Production Request No. 75**

Each document concerning the organizational relationship of Reliant, including all parent divisions, subsidiaries or affiliates.

**Production Request No. 76**

Documents sufficient to establish the organizational responsibilities of each person at Reliant who has or had at any time any involvement in the research, formulation, development,

testing, manufacture, production, marketing, sale, distribution, or regulatory approval of any product according to NDA 21-416.

**Production Request No. 77**

Documents sufficient to establish Reliant's organizational structure for research, formulation, development, testing, manufacture, production, marketing, sale, distribution, and regulatory approval of pharmaceutical products.

**Production Request No. 78**

Each document concerning Reliant's practice, policy, or procedure for the retention of documents and/or classes or categories of documents, including but not limited to e-mail communications, spreadsheets, presentation materials, and word-processing materials; and if applicable, each document or thing concerning these subjects for each division/unit/subgroup within Reliant for which there is a different practice, policy, or procedure.

**Production Request No. 79**

A copy of each page that is or has been posted on any of the following websites:

- www.Reliant.com

- www.reliantrx.com/health/rythmol.html

**Production Request No. 80**

Any English translation of any foreign-language document requested in Par's production

requests.

Of Counsel

Edgar H. Haug
James K. Stronski
John G. Taylor
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, New York 10151
Tel: (212) 588-0800
Fax: (212) 588-0500

Dated: March 23, 2007

Josy W. Ingersoll (No. 1088)
Karen L. Pascale (No. 2903)
Karen E. Keller (No. 4489)
YOUNG CONAWAY STARGATT & TAYLOR LLP
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Tel: (302) 571-6600
Fax: (302) 571-1253

Attorneys for Par Pharmaceutical, Inc.

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on March 23, 2007, copies of the

foregoing document were served upon the following counsel in the manner indicated:

### BY ELECTRONIC MAIL AND HAND DELIVERY

Jack B. Blumenfeld [jblumenfeld@mnat.com]
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200

### BY ELECTRONIC MAIL

John Desmarais [jdesmarais@kirkland.com]
Gerald J. Flattmann, Jr. [gflattmann@kirkland.com]
Christine Willgoos [cwillgoos@kirkland.com]
KIRKLAND & ELLIS LLP
Citigroup Center
153 E. 53rd Street
New York, NY 10022
(212) 446-4800

Steven C. Cherny [steven.cherny@lw.com]
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834
(212) 906-1200

YOUNG CONAWAY STARGATT & TAYLOR LLP

Karen E. Keller (#4489) [kkeller@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391

*Attorneys for Defendant-Counterclaimant,*
*Par Pharmaceutical, Inc.*

DB02:5864587.1                                                          066039.1001

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2007, I electronically filed the foregoing with the

Clerk of the Court using CM/ECF, which will send notification of such filing to:.

Josy W. Ingersoll, Esquire
Young, Conaway, Stargatt & Taylor

I further certify that I caused to be served copies of the foregoing document on

May 2, 2007 upon the following in the manner indicated:

Josy W. Ingersoll, Esquire                                *VIA ELECTRONIC MAIL*
Karen L. Pascale, Esquire                                  *and HAND DELIVERY*
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street
17th Floor
Wilmington, DE  19801

Edgar H. Haug, Esquire                                    *VIA ELECTRONIC MAIL*
Frommer Lawrence & Haug LLP                       *and FEDERAL EXPRESS*
745 Fifth Avenue
New York, NY  10151


                                        */s/ Maryellen Noreika*
                                        Maryellen Noreika (I.D. No. 3208)