REDACTED VERSION – PUBLICLY FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                      :
RELIANT PHARMACEUTICALS, INC.,        :
                                      :
       Plaintiff,                     :
                                      :
       v.                             :   Civil Action No. 06-774-JJF
                                      :
PAR PHARMACEUTICAL, INC.,             :   *** FILED UNDER SEAL***
                                      :
       Defendant.                     :   Contains Confidential Information
                                      :
------------------------------------------------------------x
```

## PAR PHARMACEUTICAL, INC.'S ANSWERING BRIEF IN OPPOSITION TO RELIANT PHARMACEUTICALS, INC.'S MOTION TO DISQUALIFY THE LAW FIRM OF FROMMER LAWRENCE & HAUG LLP

YOUNG CONAWAY STARGATT & TAYLOR LLP
Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (# 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Phone: 302-571-6600

- and -

STILLMAN, FRIEDMAN & SHECHTMAN, P.C.
John B. Harris
Mary Margulis-Ohnuma
425 Park Avenue
New York, NY 10022
(212) 223-0200

*Attorneys for Defendant, Par Pharmaceutical, Inc.*

May 9, 2007

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ...........................................................................iii

NATURE AND STAGE OF THE PROCEEDING............................................ 1

PRELIMINARY STATEMENT ...................................................................... 1

SUMMARY OF ARGUMENT ......................................................................... 3

STATEMENT OF FACTS ............................................................................... 5

    A.    The Firm's Relationship With Reliant ........................................... 5

    B.    The Firm's Work Relating to the
          Abbott Transaction ......................................................................... 6

    C.    The FLH Lawyers Working on This Litigation ........................... 11

    D.    Alleged Access to Confidential Information................................. 12

ARGUMENT................................................................................................... 16

    I.    A MOTION TO DISQUALIFY MUST BE DENIED WHERE
        THE MOVING PARTY CANNOT CLEARLY SHOW THAT
        THERE IS A DANGER THAT RELEVANT CONFIDENCES
        WILL BE USED TO THE FORMER CLIENT'S DETRIMENT.............16

    II.    THE SCOPE OF THE PRIOR REPRESENTATION WAS
         LIMITED, INVOLVED MINISTERIAL TASKS, AND WAS
         UNRELATED TO THE CURRENT REPRESENTATION, SUCH
         THAT NO CLIENT COMMUNICATIONS RELEVANT TO
         THIS CASE WOULD HAVE BEEN EXCHANGED .............................20

         A.    Mere Superficial Similarity Does Not Justify
             Disqualification..........................................................................20

         B.    The Cases Cited by Reliant Are Inapposite ....................................23

    III.    EVEN IF RELIANT CAN SHOW THAT IT COMMUNICATED
         CONFIDENTIAL INFORMATION TO A FORMER PARTNER
         OF FLH, DISQUALIFICATION OF FLH IS UNWARRANTED
         BECAUSE THAT ATTORNEY HAS LONG SINCE LEFT THE
         FIRM...................................................................................................27

i

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

IV.    EVEN IF THE COURT FINDS THAT SOME OF THE
       REMAINING FLH ATTORNEYS SHOULD BE
       DISQUALIFIED, THE FIRM SHOULD NOT BE
       DISQUALIFIED BECAUSE AN INFORMATION WALL IS IN
       PLACE.....................................................................................................33

CONCLUSION..............................................................................................................36

DB02:5966622.1

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

## TABLE OF AUTHORITIES

**PAGES**

**Cases**

Akerly v. Red Barn System, Inc., 551 F.2d 539 (3d Cir. 1977) ........................................18

Amgen, Inc. v. Elanex Pharmaceuticals, Inc.,
    160 F.R.D. 134 (W.D.Wash. 1994) ............................................................27

Analytica, Inc. v. NPD Research, Inc., 708 F.2d 1263 (7th Cir. 1983)............................25

Bowman v. Bank of Delaware, Case No. 87-44,
    1988 WL 54669 (D. Del. 1988) ..............................................................19

Buckley v. Airshield Corp., 908 F.Supp. 299 (D. Md. 1995)........................................27

Carbo Ceramics, Inc. v. Norton-Alcoa Proppants,
    155 F.R.D. 158 (N.D. Tex. 1994), ............................................................31

Cohen v. Oasin, 844 F.Supp. 1065 (E.D. Pa. 1994) ...........................................17

Commonwealth Ins. Co. v. Graphix Hot Line, Inc.,
    808 F.Supp. 1200 (E.D. Pa. 1992) ........................................................20, 21

Conley v. Chaffinch, 431 F.Supp. 2d. 494 (D. Del. 2006) ....................................16, 17, 18

Deemer Steel Casting Co. v. East Coast Erectors, Inc.,
    Case No. 10593, 1990 WL 143840 (Del.Ch. Sept. 28, 1990) ....................................32

Duncan v. Merrill Lynch,
    646 F.2d 1020 (5th Cir. 1981) ..............................................................22

Elan Transdermal Ltd. v. Cygnus Therapeutic Systems,
    809 F.Supp. 1383 (N.D. Cal. 1992) ......................................................32, 33

General Electric Co. v. Valeron Corp., 608 F.2d 265 (6th Cir. 1979)..............................27

Goldberg v. Warner/Chapell Music, Inc.,
    125 Cal.App.4th 752, 23 Cal.Rptr.3d 116 (Cal.Ct.App. 2005) ..............................30, 32

Hempstead Video, Inc. v. Incorporated Village of Valley Stream,
    409 F.3d 127 (2d Cir. 2005).................................................................32

Human Electronics, Inc. v. Emerson Radio Corp.,
    375 F.Supp. 2d 102 (N.D.N.Y. 2004) ........................................................34

iii

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

INA Underwriters v. Nalibotsky, 594 F.Supp. 1199 (E.D. Pa. 1984) ...............................22

INA Underwriters Insurance Co. v. Rubin, 635 F.Supp. 1 (E.D. Pa. 1983) .....................35

In re Corn Derivatives Antitrust Litigation, 748 F.2d 157 (3d Cir. 1984).........................24

In re Del-Val Financial Corp. Sec. Litig., 158 F.R.D. 270 (S.D.N.Y. 1994) ...................34

Integrated Health Services of Cliff Manor, Inc. v. THCI Co., LLC,
    327 B.R. 200 (D. Del. 2005).......................................................17, 18, 20, 21

Jack Eckerd Corp. v. Dart Group Corp,
    621 F.Supp. 725 (D. Del. 1985) ................................................................25

Lambert v. Chase Manhattan Bank, N.A.,
    Case No. 93-5298, 1996 WL 66130 (S.D.N.Y. Feb. 15, 1996).....................................34

Lemaire v. Texaco, Inc., 496 F.Supp. 1308 (E.D. Tex. 1980)...........................................35

Monon Corp. v. Wabash National Corp.,
    764 F.Supp. 1320 (N.D. Ind. 1991) ..............................................................26

Nemours Foundation v. Gilbane, Aetna, Federal Ins. Co.,
    632 F.Supp. 418 (D. Del. 1986)...............................................................18, 32, 33, 35

Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.,
    607 F.2d 186 (7th Cir. 1979) ....................................................................30

Papyrus Technology Corp. v. New York Stock Exchange, Inc.,
    325 F.Supp. 2d 270 (S.D.N.Y. 2004) ..........................................................34

Pennwalt Corp. v. Plough, Inc., 85 F.R.D. 264 (D. Del. 1980) .........................................18

Plant Genetic Systems v. Ciba Seeds,
    933 F.Supp. 514 (M.D.N.C. 1996) ..............................................................23

Richard v. Southern Pacific Transp. Co.,
    735 F.Supp. 206 (E.D. La. 1990).................................................................31

Richardson v. Hamilton International Corp.,
    469 F.2d 1382 (3d Cir. 1972).......................................................................25

Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington,
    652 F.Supp. 1281 D. Del. 1987) .....................................18, 21, 22, 23

Solow v. W.R. Grace & Co., 83 N.Y.2d 303 (1994) ........................................................29

DB02:5966622.1

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

St. Barnabas Hospital v. New York City Health and Hospitals Corp.,
   7 A.D.3d 83 (N.Y.A.D. 1 Dept. 2004)...........................................................................30

Strategene v. Invitrogen Corp., 225 F.Supp. 2d 608 (D. Md. 2002) ................................27

Sun Studs, Inc. v. Applied Theory Associates, Inc.,
   772 F.2d 1557 (Fed.Cir. 1985)....................................................................................26

Unisys Corp. v. Amperif Corp.,
   Case No. 92-1966, 1992 WL 210243 (E.D. Pa. Aug. 20, 1992) ...........................30, 31

United States v. Gordon, 334 F.Supp. 2d 581 (D. Del. 2004) ..........................................25

United States v. Miller, 624 F.2d 1198 (3d Cir. 1980) .....................................................17

**Rules**

Local Rule 83.6(d)(2)..........................................................................................................17

Model Rules of Prof'l Conduct Rule 1.6 (2002)...............................................................29

Model Rules of Prof'l Conduct R. 1.9 (2002) ..................................................................17

Model Rules of Prof'l Conduct Rule 1.9(a) (2002) .....................................................17, 27

Model Rules of Prof'l Conduct Rule 1.9(c) (2002) ..........................................................29

Model Rules of Prof'l Conduct Rule 1.10 (2002)........................................................27, 28

Model Rules of Prof'l Conduct Rule 1.10(b) (2002)....................................................4, 28

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

## NATURE AND STAGE OF THE PROCEEDING

This is an action for patent infringement. Defendant Par Pharmaceutical, Inc. ("Par") respectfully submits this answering brief in opposition to the motion of plaintiff Reliant Pharmaceuticals, Inc. ("Reliant") to disqualify the law firm of Frommer Lawrence & Haug LLP ("FLH" or "the Firm") from serving as counsel to Par in this case. As set forth in detail below and in the declarations accompanying this brief, FLH's limited, non-substantive involvement in a 2003 transaction pursuant to which Reliant acquired the patent at issue in this case does not require FLH's disqualification.

## PRELIMINARY STATEMENT

Courts in this Circuit have frequently cautioned that motions to disqualify may be used tactically to deprive a party of its counsel of choice -- and not out of a legitimate concern that confidential information will be used to the movant's detriment. In this case, Reliant's manipulative use of the disqualification motion is palpable for several reasons:

1.      FLH has not represented Reliant for more than three years. Reliant became a FLH client after Andrew Berdon joined the Firm as a non-equity partner in early 2002. Reliant relied on Mr. Berdon as its principal contact at FLH. When Mr. Berdon moved to a new firm in early 2004, Reliant immediately transferred all its matters and files to his new firm.

2.      Although Reliant claims that it "retained" FLH in connection with its acquisition of the drug product Rythmol® and various patents from Abbott GmbH & Co. K.G. ("Abbott") in June 2003, it fails to disclose that it was actually represented in the transaction by another law firm. FLH played no role in the negotiations, transaction

1

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

terms, or pre-contract assessment of the value of the patents to be acquired, including U.S. Patent No. 5,681,588 ("the '588 patent") at issue here.

3.    Mr. Berdon never opened a matter for the Abbott transaction, as was the Firm's practice when it was retained on a substantive project. No one at the Firm billed any time at all on any aspect of the Abbott transaction until Mr. Berdon billed 30 minutes at the very end of September 2003 -- three months after Reliant alleges it retained FLH in connection with the transaction.

4.    Far from the active involvement in the transaction suggested by Reliant, FLH personnel -- lawyers and non-lawyers, including the departed Mr. Berdon -- billed less than 20 total hours to aspects of the Abbott transaction, none of which were substantially related to the issues in the present litigation. The billed time consisted of reviewing an already-drafted asset purchase agreement (whose terms are not at issue in this dispute) and conducting limited searches of public resources to identify patents that reference the active pharmaceutical ingredient in Rythmol®. The remaining Firm personnel who billed time on the project provide declarations with this opposition categorically stating that they never received any confidential information regarding the '588 patent.

5.    Citing the "understanding" of its former legal affairs officer, Reliant asserts that FLH cannot challenge the '588 patent on Par's behalf because an FLH lawyer's "opinion" and advice regarding the patent's value, validity, enforceability and potential for "design around" supposedly induced Reliant to acquire the patent in 2003. However, that FLH lawyer, Daniel Brown, swears that he undertook no such study and gave no opinion regarding the value, validity, enforceability and potential for "design

2

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

around" of any of the patents Reliant acquired, let alone the patent at issue here. If Mr. Brown ever dealt with Mr. Lerner on any subject (which he does not recall doing), it could not have related to any confidential information or conveyed information upon which Reliant could have relied. Indeed, Mr. Brown never billed any time to a Reliant matter.

      6.    As a precaution against even the theoretical possibility that FLH personnel who allegedly worked on the Abbott transaction might inadvertently disclose confidential information to the litigation team on this case -- notwithstanding that each unequivocally avers not to have received any Reliant confidential information -- the litigation team has been effectively walled off from those who did any work on the Abbott transaction.

      These facts put the lie to the underpinnings of the Reliant motion. Cases from this district and the Third Circuit make clear that disqualification motions are viewed with disfavor and are granted only where the moving party carries its burden of clearly showing that the continued representation would be impermissible.

## SUMMARY OF ARGUMENT

      This is the kind of tactically-motivated disqualification motion—made to delay and to deprive Par of its counsel of choice—that this Court strongly disfavors. The motion rests on a hollow foundation of conclusory mischaracterizations about FLH's alleged role on behalf of Reliant in a transaction in which Reliant was represented by another law firm. Those mischaracterizations plainly do not square with the record before this Court, and this motion should be denied on three independent grounds.

3

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

First, Reliant's conclusory allegations that a conflict of interest may exist are insufficient as a matter of law. (Point I)

Second, Reliant is a former client from many years ago that cannot prove a substantial relationship between the less than 20 hours FLH spent reviewing a contract and gathering publicly available data in 2003 and the complex issues concerning whether a Par formulation (that did not exist in 2003) infringes a valid and enforceable claim of the '588 patent. (Point II)

Third, there is no danger that any alleged confidential information disclosed by Reliant in 2003 could be used to its disadvantage given: (a) the lack of a substantial relationship between the work the Firm did for Reliant in connection with the Abbott transaction and the present litigation; (b) Mr. Berdon's long absence from the Firm; (c) the absence of evidence that any current FLH employee ever received confidential information from Reliant; (d) the affirmative proof that no Reliant confidential information remains at FLH; and (e) the creation of an information wall between any lawyer alleged to have been involved in the Abbott transaction (notwithstanding their lack of any Reliant confidential information) and the litigation team. This situation is governed by Model Rule of Professional Conduct 1.10(b), which establishes that a firm may represent a party against an ex-client where, as here, the attorney responsible for that ex-client has left the firm and taken his files with him. (Point III)

On March 28, 2007, the Court entered a Rule 16 Scheduling Order, requiring, among other things, the exchange and completion of contention interrogatories, identification of fact witnesses, and document production by August 24, 2007. (D.I. 27.)

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

Par has served written discovery and produced its Abbreviated New Drug Application ("ANDA") and drug samples. Par respectfully asks that this motion be denied promptly to avoid any further delay in discovery and to preclude plaintiff from using the pendency of this motion to seek an extension of the current schedule.

## STATEMENT OF FACTS

### A.    Firm's Relationship with Reliant

Frommer Lawrence & Haug LLP is a law firm of more than 50 lawyers with offices in New York City, Washington, D.C., and Tokyo, Japan. It frequently represents clients in intellectual property related matters, including the prosecution and defense of actions involving the validity, enforceability and infringement of patents. And it is a leading firm in the field of pharmaceutical litigation. Par, a generic drug manufacturer, has been a client of FLH in numerous matters since

                                   (Declaration of Edgar H. Haug, dated May 9, 2007, at ¶ 4 ("Haug Dec.").)

Reliant first became a client of FLH in early 2002 shortly after Andrew Berdon joined the Firm as a non-equity partner. (Haug Dec. at ¶ 5.) Mr. Berdon was the partner responsible for the Reliant representation and the principal client contact. (Id. at ¶ 8.) FLH's representation of Reliant ceased in all respects when Mr. Berdon left the Firm in February 2004. At that time, in addition to stopping work on any pending matters, the Firm was directed to transfer all Reliant files to Mr. Berdon's new firm, which it did. (Id. at ¶ 7.) The Firm has not done any work for Reliant in the more than three years since Mr. Berdon's departure. (Id.)

REDACTED

DB02:5966622.1

*FILED UNDER SEAL*

During the time Mr. Berdon was at FLH, the Firm opened a total of

separate matters for Reliant, although

Included among these matters were    **REDACTED**

(Haug Dec.

at ¶ 8.)  The            matters received a "7000" billing designation and involved,

among other things,                      (Id.; Declaration of Ali

Berkin, dated May 8, 2007, at ¶ 11 ("Berkin Dec.").)  None of these

matters involved the subject matter of this litigation, i.e., the drug Rythmol®, the

'588 patent, or the propafenone drug compound. (Haug Dec. at ¶ 8.)  The Firm's other

Reliant matters were general and miscellaneous matters, including a "general"

designation for subjects not meriting the creation of a separate matter ("1000").  (Haug

Dec. at ¶ 8;  Berkin Dec. at ¶ 11.)

B.      The Firm's Work Relating to the Abbott Transaction

Reliant asserts that it "retained" FLH in June 2003 to represent it in some

fashion in connection with an asset purchase agreement with Abbott, pursuant to which

Reliant acquired the rights to certain patents. (Lerner Dec. at ¶ 9.)  A review of the Firm's

records shows that Mr. Berdon did not open a new matter for this transaction, in June or

anytime later.  (Haug Dec. at ¶ 9.)  Nor did he run a conflict check, which would have

been standard procedure if the Firm was retained to play a substantive role in such a

transaction. (Id.)

The Firm's billing records show that, contrary to the claim by Reliant that

FLH was retained in connection with an Abbott transaction in June 2003, the first time

6

entry by any FLH employee concerning the transaction was not until **three months later,** when Mr. Berdon billed 30 minutes on September 29, 2003 to the "1000" general matter for his review of undefined "Rythmol information" and communications with two non-FLH persons. (Haug Dec. at ¶ 10 and Exhibit 2 thereto.)

After the initial 30 minutes spent on September 29, 2003, FLH records show that it was three weeks before anyone at the Firm spent any time on the Abbott acquisition matter. (Haug Dec. at ¶ 12.) From October 20-23, Mr. Berdon spent a total of 8.25 hours reviewing and revising sections of an Abbott asset purchase agreement and a patent assignment, reviewing Abbott and other undefined patents, and investigating an unspecified FDA patent listing issue. (Haug Dec. at ¶ 12 and Exhibit 3 thereto.) In this time period, a FLH associate, Arthur Hoag, spent 2.5 hours reviewing the asset purchase agreement and discussing it with Mr. Berdon. (Id.) That is the total amount of FLH attorney time incurred on the matter.

Given that the transaction with Abbott is alleged to have had its genesis at least as early as June 2003, it is plain that: (a) another law firm or firms were the transactional counsel to Reliant in the matter;[1] (b) FLH played no role in the negotiations or the decision-making that led to Reliant's pursuit of the Rythmol® drug product and related patents; and (c) FLH played no role in the original drafting of the asset purchase

---

[1]     According to the website of the Securities and Exchange Commission where Reliant filings are available, it appears that the law firm of Latham & Watkins represented Reliant in the transaction with Abbott concerning Rythmol®. (Haug Dec. at ¶ 11.) Latham & Watkins also entered an appearance on behalf of Reliance in this case. See Motion and Order for Admission Pro Hac Vice for Steve Cherny of Latham & Watkins, dated January 30, 2007. (D.I. 9; Haug Dec. at ¶ 11.) The Court can take judicial notice that Latham & Watkins is a multi-national law firm capable of rendering sophisticated intellectual property advice. See http://www.lw.com/practices.aspx?page=practicedetail&practice=61.

DB02:5966622.1                                                          ***FILED UNDER SEAL***

REDACTED VERSION – PUBLICLY FILED

agreement. All but 30 minutes of time billed by FLH occurred within seven days of the date of the alleged closing of the transaction -- a time well after Reliant had already chosen to strike a deal based on its own analysis.

Mr. Hoag's review of the Reliant-Abbott agreement came at the request of Mr. Berdon. (Declaration of Arthur Hoag, dated May 8, 2007, at ¶ 4 ("Hoag Dec.")) He was asked to review an already-drafted agreement for the purpose of making sure that the intent of the deal -- to transfer the ownership of identified patents -- was accomplished. He had no prior knowledge or information that the deal was in the works. Mr. Hoag was not provided with any information about the specific patents at issue, nor was he asked to provide any opinion or analysis of whether the patents were valuable, valid or enforceable. Mr. Hoag received no information relevant to the validity, enforceability, or infringement of the '588 patent. After his review of the agreement, Mr. Hoag spoke with Mr. Berdon exclusively regarding contract language. (Id. at ¶¶ 4, 5, and 7.) Mr. Hoag has confirmed that, to this day, he has no Reliant confidential information. (Id. at ¶¶ 4, 7, and 9.)

The other time billed by FLH was by a non-lawyer scientific advisor, Ali Berkin, who was asked by Mr. Berdon to conduct a preliminary investigation into patents or patent applications that reference the term propafenone, the active pharmaceutical ingredient in Rythmol®, in combination with the terms "Abbott," "Knoll" and "BASF." (Berkin Dec. at ¶ 4.) Mr. Berkin was not provided with any information regarding any particular formulation, but rather was asked merely to obtain the public data generated by this search. (Id.) Mr. Berkin has confirmed that, to this day, he has no Reliant confidential information. (Id. at ¶ 15.)

8

*FILED UNDER SEAL*

Between October 21 and October 28, Mr. Berkin spent less than 8 hours conducting the limited search requested of him. His search involved searching publicly available resources, including the U.S. Food and Drug Administration's ("FDA") "Orange Book" and two computer databases, STN and Dialog, that provided the same basic patent information that one could obtain from the U.S. Patent and Trademark Office's ("PTO") website. (Id. at ¶¶ 6, 7, and 10.) On October 21, Mr. Berkin wrote Mr. Berdon a three paragraph memorandum summarizing the data from the public record about Rythmol® and Rythmol SR®. (Id. at ¶ 8.) The memorandum did not discuss any patents. (Id.) Mr. Berkin attached to the memorandum a chart listing the patents identified in his database search, which he roughly divided into three tiers based on whether a patent might be relevant to Rythmol® (i.e., whether the patent includes claims for a propafenone sustained-release drug product). On October 28, 2003, Mr. Berkin supplemented the chart by adding publicly available information regarding the expiration dates of the patents listed on the chart and confirmed the identity of the assignee of one of the patents. (Id. at ¶¶ 8, 10)

Mr. Berkin, who has no legal education, did not conduct a study or provide an opinion regarding the validity, enforceability or the potential to "design around" the '588 patent or any other patent. (Id. at ¶ 12.) The chart he provided to Mr. Berdon was neither intended to provide -- nor did it provide -- such information. Indeed, Mr. Berkin's search was not even based on a particular patent. Rather, it was based on Rythmol's® active ingredient --propafenone -- and the assignees, Abbott, Knoll and BASF. At most, what Reliant gained from the chart was a compendium of publicly-available patents and patent applications assigned to either Abbott, Knoll or BASF that

9

*FILED UNDER SEAL*

referenced the drug propafenone. The **identification** of those patents was not based on any confidential or proprietary information, but merely the product of a search of public information concerning a single drug compound. (Id.)

Nor did any other person at FLH conduct any analysis, study or opinion of the patent in question. In that regard, Reliant's former in-house lawyer declares his "understanding" that an FLH lawyer, Daniel Brown, acting under the supervision of Mr. Berdon, conducted an analysis "concerning infringement issues such as the potential ability to design around" the Rythmol® patents. (Lerner Dec. at ¶ 13.) Mr. Lerner asserts that Reliant relied upon Mr. Brown's advice and his alleged investigation regarding the "scope, validity, infringement and enforceability" of the '588 patent in deciding to acquire Rythmol® and its related patents. (Id. at ¶16.)

Mr. Brown avers that he never conducted any such analysis or investigation at any time for Reliant. (Declaration of Daniel Brown, dated May 8, 2007, at ¶ 3 ("Brown Dec.").) Indeed, during the entire two-year period when Reliant was a FLH client, Mr. Brown did not bill **even one minute** to that client. This is consistent with Mr. Berdon's time records, which fail to reference Mr. Brown in connection with any of the work Mr. Berdon did in connection with the Abbott transaction. (Id.; Haug Dec. Exhibits 2, 3.) The opinion and analysis Mr. Lerner claims he understood Mr. Brown to have provided regarding the value, scope, validity, enforceability, and infringement of the '588 patent would have been very time-consuming, detailed and certainly in writing. (Brown Dec. at ¶ 4.) To the extent that Mr. Brown ever had any communication with Mr. Lerner on any subject (which Mr. Brown does not recall having), such communication would have been in passing, could not conceivably have

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

involved Mr. Brown's receipt of any confidential information, and would not have included anything approaching advice upon which a client could have relied. (Brown Dec. at ¶ 6.) Mr. Brown has confirmed that, to this day, he has no Reliant confidential information. (Brown Dec. at ¶ 5.)

Finally, Reliant identifies three other current FLH partners -- Thomas Kowalski, Jeffrey Hovden and Charles Raubicheck -- as having worked on Reliant matters. (Pl. Mem. at 3.) None of them, however, did any work relating to the Abbott transaction or received any information, confidential or otherwise, that is substantially related to the issues raised in this litigation. (Declarations of Thomas Kowalski, Jeffrey Hovden and Charles Raubicheck at ¶¶ 2, 3.)

C.     The FLH Lawyers Working on This Litigation

None of the FLH working on this litigation -- Edgar Haug, James Stronski, John Taylor, and Omar Jabri -- are alleged to have played any role at all in the Abbott transaction. Indeed, of the three, only Mr. Haug had any involvement on any matter with Reliant while it was an FLH client. (Haug Dec. at ¶¶ 5, 6; Declarations of James Stronski, John Taylor and Omar Jabri, dated May 8, 2007, at ¶ 3.) In the two years Reliant was a client of the Firm, Mr. Haug billed a total of just under 7 hours to Reliant -- all in early 2002 in connection with a study of a drug completely unrelated to the subject matter of the present litigation. (Haug Dec. at ¶ 5.) Indeed, the Firm never represented Reliant in connection with                and neither Mr. Haug nor any other attorney of the Firm ever                (Id.)

None of the litigation team has ever received, nor do they have knowledge of, any information, confidential or otherwise, that was provided to the Firm by Reliant

REDACTED

*FILED UNDER SEAL*

regarding Rythmol®, the acquired patents, or the legal issues raised in the present litigation. (Haug Dec. at ¶ 6; Stronski Dec. at ¶ 3; Taylor Dec. at ¶ 3; Jabri Dec. at ¶ 3.) Likewise, Par's retention of FLH was unrelated to any aspect of the past Reliant representation, of which Par was unaware at the time of the retention. (Haug Dec. at ¶ 24.)

In order to make sure that there is no conceivable taint from its brief and limited involvement, the Firm has erected an Information Wall screening the remaining persons at the Firm who had anything to do with the Abbott transaction (Messrs. Hoag and Berkin) from involvement in, or access to, this case. (Haug Dec. at ¶ 17 and Exhibits 4, 5 thereto; Hoag Dec. at ¶ 9; Berkin Dec. at ¶ 15.) In addition, although Mr. Brown appears to have had no involvement in any Reliant matter at any time, the Firm has also established an Information Wall between him and the lawyers handling this case. (Haug Dec. at ¶ 17; Brown Dec. at ¶ 7.)

D.    Alleged Access to Confidential Information

Reliant alleges that the legal advice described in its disqualification motion was given by FLH "primarily in the form of oral communications and e-mail." (Lerner Dec. at ¶ 9) Reliant does not attach the alleged e-mails because it claims that they are privileged.    (Id.)    Nor did Reliant provide any descriptions of these communications of the type one would normally include in a privilege log (e.g., date, sender, recipients, subject line, etc.)[2] Accordingly, FLH has no information regarding the nature or contents of the confidential and privileged information and advice alleged to

---

[2]    Reliant should not be permitted to obtain a litigation advantage by relying, in reply, on information not submitted with its moving papers.

REDACTED VERSION – PUBLICLY FILED

have been exchanged between the Firm and Reliant. (Haug Dec. at ¶ 14.) Messrs. Hoag, Berkin, and Brown have no recollection of communicating directly with Reliant -- orally or by e-mail -- concerning the Reliant-Abbott transaction. (Hoag Dec. at ¶ 7; Berkin Dec. at ¶ 14; Brown Dec. at ¶ 5.) It is certain that no member of the litigation team is aware of any e-mails and oral communications that may have been exchanged. (Haug Dec. at ¶ 19; Stronski Dec. at ¶ 3; Taylor Dec. at ¶ 3; Jabri Dec. at ¶ 3.)

During the period June through October 2003, when e-mails between FLH and Reliant could have been exchanged, the Firm did not archive its e-mails on backup disks as it does today. (Haug Dec. at ¶ 20.) Moreover, when Mr. Berdon left FLH, his Firm e-mail account was discontinued and all of his e-mails were deleted from the e-mail system. (Id.) Accordingly, the Firm does not have copies of, or access to, any e-mails in which Mr. Berdon could have provided advice on any subject, let alone regarding the '588 patent. (Id.)

When Mr. Berdon left and Reliant withdrew all of its work from the Firm, the Firm removed all documents from its network that had been created in any Reliant matter and copied them onto a CD-ROM. (Haug Dec. at ¶ 21.) As part of the Firm's investigation into Reliant's disqualification allegations in this matter, it searched both the CD-ROM and its active network files for any documents created, worked on, or opened during June through October 2003. (Id.) The Firm located a total of four documents. They include: (1) an unexecuted copy of a two-page Assignment of Patents between Abbott and Reliant; (2) the transcript of an STN public database search of publicly-available patents and patent applications conducted on October 21, 2003 by Ali Berkin; (3) a Dialog database search of publicly-available patents and patent applications that was

13

*FILED UNDER SEAL*

conducted on October 28, 2003 by Ali Berkin; and (4) an October 21, 2003 memorandum and patent chart based on these searches and prepared by Ali Berkin. (Id.)

Reliant argues that the risk that FLH will use Reliant confidential information against it is demonstrated by discovery requests served by Par that seek, *inter alia*, information and documents relating to prior art searches and investigations concerning the '588 patent, validity and enforceability of the '588 patent, and comparisons of the '588 patent with the Pich '287 patent. (Pl. Mem. at 14.) Reliant contends that the responses to these discovery requests will implicate privileged work product done by FLH that Reliant has a right to withhold from production, but which FLH already has a result of its attorney-client relationship with Reliant. (Id.) Tellingly, Reliant does not allege that any such work product exists, let alone that any such work product was prepared using Reliant confidential information. The only document prepared by anyone at FLH, and of which FLH is aware, that references any Rythmol® patent is the October 21, 2003 memorandum and patent chart prepared by non-lawyer Ali Berkin. As described above, that document was prepared based on searches on publicly-available databases (without using any confidential information from Reliant), and the document contains no analysis of the validity, enforceability, infringement, or ability to design around the '588 patent. Indeed, the document would appear to be not relevant because it is based on searches that related only to a list of publicly-available patents that reference the active ingredient in Rythmol®, not to the '588 patent or any analysis of that patent. If Reliant has any work product from FLH that was created using Reliant confidential information and that is substantially related to issues in this action, it should have specifically identified it on the equivalent of a privilege log.

14

*FILED UNDER SEAL*

The Firm also does not have in its possession e-mails between the Firm and Mr. Lerner or what Reliant describes as a "confidential Abbott Descriptive Memorandum" obtained pursuant to a confidential "access agreement" with Abbott. (Lerner Dec. at ¶ 11.) This document was said to have been sent to an unidentified person at FLH on June 27, 2003. Reliant does not attach this document, but instead states conclusorily that it contains confidential information concerning "scientific and clinical drug properties, patent protection, expected FDA exclusivities," etc. (Id.) A review of the Firm's time records does not indicate that anyone at the Firm ever received this document or reviewed it (particularly insofar as no time at all is billed until late September). (Haug Dec. at ¶ 14.) In any event, the Firm does not have the document and its contents are unknown to anyone at the Firm. (Id.)

Finally, Par will be considerably prejudiced if the Firm is disqualified. The Firm has represented Par in connection with this matter since at least as early as not only through the course of the present litigation, but also during the regulatory phase, including the preparation and submission of Par's ANDA with FDA. (Haug Dec. at ¶ 24.) The Firm has also invested a substantial amount of time and effort on Par's behalf developing defenses of non-infringement for Par's formulation, invalidity, and unenforceability of the '588 patent, which it believes will ultimately be successful. (Id.) Moreover, a strong, long-standing working relationship has developed between Par and the Firm over a number of years. (Id.) The Firm has opened matters for Par since                         including                         **REDACTED**

(Id.) Disqualification of the Firm would substantially prejudice Par in the

15

*FILED UNDER SEAL*

present litigation in terms of the time, effort, and expense that would be required to get another Firm up to speed on the facts and issues of this case. (Id.)

## ARGUMENT

### POINT I

#### A MOTION TO DISQUALIFY MUST BE DENIED WHERE THE MOVING PARTY CANNOT CLEARLY SHOW THAT THERE IS A DANGER THAT RELEVANT CONFIDENCES WILL BE USED TO THE FORMER CLIENT'S DETRIMENT

In considering the legal and ethical issues relating to Reliant's motion, Par respectfully directs the Court's attention to the accompanying Declaration of Bruce Green, a law professor at Fordham University School of Law and an expert on legal ethics. (Declaration of Bruce A. Green, dated May 8, 2007 ("Green Dec.").) Mr. Green presents the view that, based on the evidence presented on this motion, the Model Rules of Professional Conduct applicable in Delaware and the Code of Professional Responsibility in New York do not warrant the disqualification of FLH. (Green Dec. ¶¶ 1, 11, 18, 19 and 22.) The discussion below is meant to address the legal issues in tandem with the positions set forth by Professor Green.

While the Third Circuit and other federal courts have long recognized that a court's inherent power to supervise the professional conduct of attorneys includes the authority to disqualify an attorney, Conley v. Chaffinch, 431 F.Supp. 2d. 494, 496 (D. Del. 2006) (citing United States v. Miller, 624 F.2d 1198, 1201 (3d Cir. 1980)), the law is clear that "motions to disqualify are generally disfavored." Id.; see also Integrated Health Services of Cliff Manor, Inc. v. THCI Co., LLC, 327 B.R. 200, 204 (D. Del. 2005). As a result, "[t]he party seeking disqualification must **clearly show** that continued representation would be impermissible," and, as such, "vague and unsupported

16

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

allegations are not sufficient to meet this standard." Conley, 431 F.Supp. 2d at 496 (citing Cohen v. Oasin, 844 F.Supp. 1065, 1067 (E.D. Pa. 1994)) (emphasis added).

Under Local Rule 83.6(d)(2), the District of Delaware has adopted the Model Rules of Professional Conduct. Rule 1.9(a) provides, in relevant part: "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." Model Rules of Prof'l Conduct R. 1.9 (2002). Thus, the standard applicable to the instant motion is the "substantial relationship" test. See Conley, 431 F.Supp. 2d at 496; see also Integrated Health Services, 327 B.R. at 206.

In determining whether a substantial relationship exists, the court must analyze whether confidential information might have been gained in the first representation that may be used to the detriment of the former client in the subsequent action. In determining whether a substantial relationship exists such that Rule 1.9(a) has been violated, a court must "undertake a painstaking analysis of the facts" and answer three questions:

> (1) What is the nature and scope of the prior representation at issue;
>
> (2) what is the nature of the present lawsuit [against] the former client; and
>
> (3) in the course of the prior representation, might the client have disclosed to [his] attorney confidences which could be relevant to the present action and, in particular, could any such confidences be detrimental to the former client in the current litigation?

*FILED UNDER SEAL*

Conley, 431 F.Supp.2d at 496-97 (citing Satellite Financial Planning Corp. v. First Nat'l Bank of Wilmington, 652 F.Supp. 1281, 1282-83 (D. Del. 1987)); see also Integrated Health Services, 327 B.R. at 206-07 (same).

Although Reliant claims there is a "low" threshold for determining the existence of a substantial relationship (Pl. Mem. at 7), this assertion is contradicted by rulings of this Court:

> The rule prohibiting representation of a new client against a former client is not a per se rule.... Only if the moving party proves the requisite substantial relationship should a lawyer be disqualified. A movant for disqualification must have evidence to buttress his claim of conflict because a litigant should, as much as possible, be able to use the counsel of his choice.... Also, because disqualification motions have increasingly been used as one weapon in the litigation arsenal, courts ... approach such motions with cautious scrutiny.

Satellite Financial, 652 F.Supp. at 1283; see also Integrated Health Services, 327 B.R. at 209 (cautioning courts not to hypothesize conceivable but unlikely situations in which confidential information might have been disclosed that could be relevant to the present suit); Nemours Foundation v. Gilbane, Aetna, Federal Ins. Co., , 632 F.Supp. 418, 423 (D. Del. 1986) (citing Pennwalt Corp. v. Plough, Inc., 85 F.R.D. 264, 269 (D. Del. 1980) and Akerly v. Red Barn System, Inc., 551 F.2d 539, 543 (3d Cir. 1977)) (noting that "[t]he Third Circuit has long refused to adopt a per se rule in questions of disqualification," and that "[r]esolving the question of whether to disqualify counsel cannot be accomplished through mechanical means, but requires a careful balancing of the goals and objectives of professional conduct ... [and] [t]he chosen mode of analysis is to carefully sift all the facts and circumstances"); Bowman v. Bank of Delaware, Case No. 87-44, 1988 WL 54669, at *3 (D. Del. 1988) ("[a] litigant should, absent a genuine

18

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

conflict of interest, be able to choose his counsel [and] [t]he Court must be wary so as to prevent motions to disqualify from being used as just another weapon in the litigation arsenal").

Reliant cannot satisfy the requirement for showing the likelihood that confidences were disclosed. Indeed, their principal hypothesis -- that FLH partner Daniel Brown worked on and delivered to Reliant an opinion reflecting his study of the validity, enforceability, and potential for design around of the '588 patent -- is contrary to the facts. Even apart from Mr. Brown's statement that no such opinion was ever provided (let alone prepared), the invoices sent to Reliant reveal no time at all spent by Mr. Brown (or anyone else) on such an opinion. In fact, the record contains nothing to indicate that any lawyer at the Firm ever received any information concerning the '588 patent that was confidential or that could be used to Reliant's detriment. The reality is that the Firm spent less than 20 hours (much of it non-lawyer time) on the Abbott transaction, which had been fully negotiated before the Firm had any involvement, and none of that time was devoted to an "opinion" or "study" that Reliant claims disqualifies FLH. All this militates against the likelihood that any relevant confidences were provided.

19

FILED UNDER SEAL

REDACTED VERSION – PUBLICLY FILED

## POINT II

### THE SCOPE OF THE PRIOR REPRESENTATION WAS LIMITED, INVOLVED MINISTERIAL TASKS, AND WAS UNRELATED TO THE CURRENT REPRESENTATION, SUCH THAT NO CLIENT COMMUNICATIONS RELEVANT TO THIS CASE WOULD HAVE BEEN EXCHANGED

A.    Mere Superficial Similarity Does Not Justify Disqualification

Reliant makes the superficial argument that there is necessarily a substantial relationship between the Firm's 2003 work on the Abbott transaction in which the '588 patent was acquired and the instant infringement action involving that patent. Reliant misleadingly does so without acknowledging any of the facts set forth in FLH's opposing affidavits, which establish that the minimal work performed by the Firm occurred **after** Reliant had already negotiated and documented the purchase of the '588 patent **through other counsel** and that, contrary to Reliant's claim, FLH **never** conducted a study or provided an opinion regarding the validity, enforceability, or design around potential of the '588 patent.

When considering the nature and scope of the prior representation, "courts should focus upon the reasons for the retention of counsel and the tasks which the attorney [or firm] was employed to perform." Integrated Health Services, 327 B.R. at 207 (citing Commonwealth Ins. Co. v. Graphix Hot Line, Inc., 808 F.Supp. 1200, 1204 (E.D. Pa. 1992)) And in evaluating the nature of the present litigation, a court should "evaluate the issues raised... and the underlying facts." Id. at 208. Finally, in determining whether confidences might have been disclosed in the prior representation that could be relevant to the latter representation, a court should consider whether the movant and counsel "ought to have discussed the relevant facts [of the present litigation]

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

or whether it would not have been unusual for the lawyer and client to have discussed the relevant facts." Id. at 209 (citing Satellite Financial, 652 F.Supp. at 1284).

In Integrated Health Services, the court found that the Arent Fox law firm had advised a plaintiff-in-bankruptcy about regulatory obligations associated with the transfer of stock of plaintiff's subsidiaries (which operated nursing homes) to another entity and had assisted in drafting the applications and filings needed for the transfer. See 37 B.R. at 203. As part of the transaction, the bankruptcy court ordered the plaintiff to enter into a master lease agreement with the owner of the properties on which the nursing homes operated. After Arent Fox's representation ended, the plaintiff sued the property owner seeking to void the master lease and Arent Fox appeared on behalf of the owner. Id. at 203-04. The court denied disqualification because Arent Fox's prior representation was "discreet" and limited, and though the landlord-tenant issues raised in the second representation could be said to arise from the prior stock transfer representation, the court viewed it as a distinct matter. Id. at 208. Given the different nature of the representations, the court held that the possibility that confidential information could be meaningfully used against the plaintiff was "conceivable but unlikely." Id. at 209.

Similarly, in Satellite Financial, the plaintiff moved to disqualify the defendant's law firm because that law firm had previously prepared documents to incorporate the plaintiff, including obtaining directors' consents and information for the certificate of incorporation. The litigation in which disqualification was sought involved allegations of fraud, breach of contract and tortious interference involving plaintiff's dispute with a bank. See 652 F.Supp. at 1284. The court found that the scope of prior representation was "discrete" and that the law firm's work consisted mainly of

21

FILED UNDER SEAL

"ministerial tasks." Id. The court considered whether a client and lawyer "ought to have discussed the relevant facts or whether it would not have been unusual for the lawyer and client to have discussed the relevant facts," and concluded that, "given the discrete nature of ... [the lawyer and law firm's] service to [plaintiff] ... it would have been unusual for any confidential communications relevant to the instant lawsuit to have been communicated to [the lawyer]." Id.

Significantly, the Satellite Financial court observed that a "substantial relationship" will not often be found where the prior representation "was in an **advisory** capacity rather than in a litigation capacity." Id. (emphasis added). In assessing whether confidences had been communicated in the former representation that could be used to the former client's detriment in the latter proceeding, the court warned that it "should not allow its imagination to run free with a view to hypothesizing conceivable but unlikely situations in which confidential information 'might' have been disclosed which would be relevant to the present suit." Id. (citing INA Underwriters v. Nalibotsky, 594 F.Supp. 1199, 1206 (E.D. Pa. 1984)). And, in finding that no "substantial relationship" existed, the court noted that:

> Mere facial similarity between prior and present representation is insufficient to justify disqualification.... [T]he focus of the district court's inquiry should be on the precise nature of the relationship between the present and former representation.... Merely pointing to a superficial resemblance between the present and prior representation will not substitute for the careful comparison demanded by our cases.

Id. at 1285 (citing Duncan v. Merrill Lynch, 646 F.2d 1020, 1029 (5th Cir. 1981).

FLH's limited representation of ex-client Reliant involved the same type of "ministerial tasks" -- all performed in an advisory role -- as in Satellite Financial.

*FILED UNDER SEAL*

While the overall representation of Reliant spanned a two-year period, almost all of the less than 20 hours spent by the Firm on the Abbott transaction occurred over a period of two days. That work had nothing to do with any study or analysis of the '588 patent or the issues raised in this case. Although it could be said that the issues of the validity, enforceability, and infringement of the '588 patent arise only because Reliant purchased the patent in 2003, even assuming that FLH played some minor role in reviewing the contractual language concerning the purchase, such a "superficial resemblance" does not justify disqualification, nor does it establish that the communication of confidential information was anything more than hypothetical.

B.    The Cases Cited by Reliant Are Inapposite

Most of the cases cited by Reliant in support of FLH's disqualification miss the mark badly. Reliant's citation to Plant Genetic Systems v. Ciba Seeds, 933 F.Supp. 514 (M.D.N.C. 1996), however, well illustrates why disqualification is not appropriate here. In that case, the court denied defendant's motion to disqualify plaintiff's counsel and, in finding that the prior and subsequent representations were not "substantially related," the court noted that:

> [S]ubstantially related" has been interpreted to mean "identical" or "essentially the same." ... The "substantially related" test requires a "virtual congruence of issues," and the relationship between the issues in the prior case must be "patently clear."

Id. at 518. The court in Plant Genetic Systems found that, although the law firm previously represented the defendant in prosecuting a patent involving a process of electromechanical bombardment, the patent-in-suit was distinct and unrelated. This was so even though the law firm was presumptively privy to confidential information in the

23

*FILED UNDER SEAL*

prior patent prosecution. FLH was **never** involved in any way in prosecuting the '588 patent or opining on its value for Reliant.

Most of the cases cited by Reliant involve attorneys who represented two parties concurrently and then sought to side with one against the other, thereby "switching sides" in the same or related litigation. As a threshold matter, these cases are facially distinguishable because FLH did not jointly represent Par and Reliant and it is not choosing one over the other. Nor can Reliant establish that FLH was ever involved in evaluating the value, validity or enforceability of the '588 patent and, accordingly, FLH's representation of Par in challenging the patent does not constitute "switching sides."

For example, in In re Corn Derivatives Antitrust Litigation, 748 F.2d 157 (3d Cir. 1984), a law firm represented two plaintiffs in an antitrust action that settled before trial. The law firm thereafter withdrew as counsel to one of the plaintiffs and sought to represent the other in challenging the order approving the settlement. The court noted that "[a] client has an expectation that the attorney will diligently pursue his goals until the matter is completely resolved," and that "[i]n litigation, an attorney may not abandon his client and take a[n] adverse position in the same case." Id. at 161. In finding that disqualification was appropriate, the court noted the law firm's lengthy representation of both parties and the advantage obtained based on counsel's "extensive familiarity with the factual and legal issues involved … [and that] it would be unfair … to permit [the law firm] to use against its former client the information about the strengths and weaknesses of the case gained from the joint representation." Id. at 162.

Here, in contrast, FLH represented Reliant for only two years, Reliant voluntarily terminated the relationship, and the Abbott transaction matter was long

DB02:5966622.1    *FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

completed by the time the Firm was retained by Par. FLH never represented Reliant in litigation. Moreover, Par's retention of FLH was based on its general expertise and their long history together -- not because Par sought to profit from FLH's alleged knowledge of Rythmol® dating back to 2003. Indeed, Par was unaware of FLH's representation of Reliant at the time of the retention. (Haug Dec. at ¶ 24.)

Other cases Reliant cites are similarly inapposite. <u>See United States v. Gordon</u>, 334 F.Supp. 2d 581 (D. Del. 2004) (attorney who concurrently represented two parties in prior matter could not manipulate the process by dropping one client in order to sue it on behalf of the other); <u>Richardson v. Hamilton International Corp.</u>, 469 F.2d 1382 (3d Cir. 1972) (attorney who represented a corporation during an SEC investigation -- and who spent considerable time interviewing its officers and directors and examining their personal files, and who had access to confidential information about the corporation's finances, corporate structure and operations -- could not later bring shareholder class action against that client).[3]

---

[3]    In <u>Jack Eckerd Corp. v. Dart Group Corp.</u>, 621 F.Supp. 725 (D. Del. 1985), a law firm represented a corporation regarding potential regulatory problems, learned financial information about the corporation and wrote a sophisticated memorandum on avoiding Investment Company Act treatment. It was disqualified from subsequently claiming, on behalf of an adversary, that the corporation violated federal securities laws and was improperly seeking to gain control of the adversary. The court stated that "only a cursory perusal of the memorandum leads one to conclude that it could easily be construed as a **blueprint** for opposing any takeover attempt." <u>Id.</u> at 730 (emphasis added). No such "blueprint" is claimed to exist in this case. Likewise, in <u>Analytica, Inc. v. NPD Research, Inc.</u>, 708 F.2d 1263 (7th Cir. 1983), the court affirmed disqualification of a law firm in an antitrust action against a former client where the prior representation necessarily exposed the firm to confidential information issues such as profitability, sales prospects and general market strength that were at the heart of the antitrust claim. Reliant does not even attempt to express what confidential information FLH could have been exposed to regarding the '588 patent's validity or enforceability, or infringement by Par's formulation.

25

*FILED UNDER SEAL*

Reliant's claim that FLH's 2003 representation of Reliant and its 2007 defense of Par are diametrically opposed is based on a series of false premises. FLH did **not** counsel Reliant regarding the wisdom of purchasing the patents from Abbott. FLH did **not** provide an opinion as to whether the patents that Reliant had agreed to purchase were valid, enforceable, or easy to design around. FLH performed no evaluation of the patents acquired, and received none of the detailed information regarding the patents (such as in their file histories) necessary to competently evaluate such patents or to form a conclusion on the validity, enforceability or scope of such patents. Were this a dispute between Reliant and Abbott regarding the terms of the 2003 contract and whether patent rights had been transferred effectively to Reliant, perhaps the limited time FLH spent reviewing the asset purchase agreement would conflict it from representing Abbott in a breach of contract case. But FLH did nothing in 2003 that is in any way inconsistent with its positions on behalf of Par in this patent case today and FLH learned nothing confidential in 2003 that could be of any use in this action regarding infringement by Par's formulation or the validity or enforceability of the '588 patent in 2007.

For these reasons, the several non-Third Circuit cases that Reliant cites precluding a lawyer from attacking a patent he prosecuted for a former client also are inapposite. See e.g., Monon Corp. v. Wabash National Corp., 764 F.Supp. 1320 (N.D. Ind. 1991) (lawyer who helped former client determine patentability of invention and drafted claims for patent application was disqualified from subsequently representing adverse party contesting patentability of same invention); Sun Studs. Inc. v. Applied Theory Associates. Inc., 772 F.2d 1557 (Fed. Cir. 1985) (law firm disqualified where firm prosecuted patent to issuance, then attacked patent's validity in subsequent

*FILED UNDER SEAL*

proceeding); Buckley v. Airshield Corp., 908 F.Supp. 299 (D. Md. 1995) (where lawyer and his former firm represented client in patent infringement action, lawyer could not represent another client in challenging validity of same patent he once sought to protect); Amgen. Inc. v. Elanex Pharmaceuticals. Inc., 160 F.R.D. 134 (W.D. Wash. 1994) (disqualification appropriate where law firm represented opposing party in litigation involving same patent); General Electric Co. v. Valeron Corp., 608 F.2d 265 (6th Cir. 1979) (where lawyer was corporation's patent lawyer for several years and prepared drafts of several patent applications, lawyer could not later represent adverse party in patent infringement action against former client); Strategene v. Invitrogen Corp., 225 F.Supp. 2d 608 (D.Md. 2002) (lawyer and new firm disqualified from representing defendant in patent infringement action where lawyer previously represented plaintiff in preparing patent application on predecessor patent).

## POINT III

### EVEN IF RELIANT CAN SHOW THAT IT COMMUNICATED CONFIDENTIAL INFORMATION TO A FORMER PARTNER OF FLH, DISQUALIFICATION OF FLH IS UNWARRANTED BECAUSE THAT ATTORNEY HAS LONG SINCE LEFT THE FIRM

Reliant makes the unremarkable point that Rule 1.9(a) of the Model Rules of Professional Conduct -- which prohibits a lawyer from representing a client in a matter that is the same or substantially related to a matter in which that client's interests are materially adverse to a former client without the former client's written consent -- applies not only to a single attorney, but to all members of the law firm with which that attorney is associated. (See Pl. Mem. at 7.) However, Reliant overlooks a key corollary: under Model Rule 1.10, where the lawyer who received the alleged confidences has left a firm and no remaining attorney has knowledge of or access to confidential information,

27

REDACTED VERSION – PUBLICLY FILED

disqualification is not required. Rule 1.10(b) states, in relevant part: "When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless ... the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; **and** ... any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(c) that is material to the matter." Model Rules of Prof'l Conduct R. 1.10 (2002) (emphasis added).

Here, Reliant was not a client of FLH until 2002 when Mr. Berdon joined the Firm. There is no dispute that Mr. Berdon was its principal contact and the *sine qua non* for its becoming an FLH client. This conclusion is reinforced by the fact that the moment Mr. Berdon left the firm in early 2004, Reliant instructed FLH to transfer all of its matters and files to Mr. Berdon at his new firm. (Haug Dec. at ¶ 7.)[4] Significantly, Reliant makes no claim that it communicated directly with anyone other than Mr. Berdon regarding the Abbot transaction (or any of the underlying patents), and the Firm's time records similarly reflect the absence of any contacts on the matter between Reliant and any other Firm personnel. Under these circumstances, where Mr. Berdon has been absent from the firm for more than 3 years and no one remaining at the Firm had access to any confidential information, disqualification is both unnecessary and unwarranted.

---

[4]    Reliant half-heartedly claims that it retained FLH based on its understanding that Edgar L. Haug would handle any litigations. (Lerner Dec. at ¶ 5.) Mr. Haug billed a total of under 7 hours to Reliant while Reliant was a Firm client, and was wholly uninvolved with (and unaware of) the Abbott transaction. (Haug Dec. at ¶ 5.) Moreover, Reliant discontinued its association with FLH when Mr. Berdon left despite Mr. Haug's continued presence at the Firm. (Haug Dec. at ¶ 7.)

DB02:5966622.1                    *FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

This principle is reflected in <u>Solow v. W.R. Grace & Co.,</u> 83 N.Y.2d 303 (1994),[5]

in which the New York Court of Appeals found that a law firm was **not** *per se*

disqualified because a former partner of the firm had been retained in a related litigation

by an adverse party. In that case, the former partner involved in the matter, as well as the

associate and paralegals who assisted her, had all left the firm prior to the instant

representation, and the remaining attorneys who had worked on the matter had

"negligible" roles in the previous representation (neither of the two partners to whom the

former partner had reported billed any time to the matter, and an attorney who had been a

first-year associate at the time of the previous representation billed only 30 minutes to the

matter). Moreover, the client file contained only published articles and held no

confidential or proprietary information of the former client, and the former partner swore

that her representation consisted of preparing an expert witness for trial based on her

review of public documents. The court noted that:

> while the presumption of knowledge among attorneys in a
> firm is irrebuttable so long as the attorney who worked on
> the prior matter remains at a firm, the presumption that
> those remaining are aware of client confidences in cases
> they themselves did not handle is rebuttable after the
> affected attorney leaves....

<u>Id.</u> at 308. The <u>Solow</u> court found that the subject law firm should be allowed to rebut

the presumption of disqualification by establishing that the firm's remaining attorneys

possessed no confidences or secrets of the former client. <u>See id.</u> at 313.

Similarly, in <u>St. Barnabas Hospital v. New York City Health and Hospitals Corp.,</u>

7 A.D.3d 83 (N.Y.A.D. 1 Dept. 2004), the subject law firm was not disqualified where

---

[5]    New York cases dealing directly with this issue are an apt guide for the court,
especially in light of the fact that FLH and its attorneys are subject to the New York
Code of Professional Responsibility.

*FILED UNDER SEAL*

the attorneys who had personally handled the representation of the former client had
subsequently left the firm and where any documents that were shared with the firm were
likely to be subject to discovery in the instant action.[6]  In arriving at this conclusion, the
court noted that, as here, there was no overlap in the firm's staffing of the matter for the
former client and the matter for the current client.  Id. at 96; see also Goldberg v.
Warner/Chappell Music, Inc., 125 Cal.App. 4th 752, 23 Cal.Rptr.3d 116 (Cal.Ct.App.
2005) (attorney-client relationship between movant and former member of firm existed,
but firm's imputed disqualification unnecessary in view of lawyer's departure: "[t]here is
no fear of him talking about the case in the lunch room, or having his files seen by other
members of the firm, as he is no longer there... Once an attorney departs the firm ... a
blanket rule to prevent future breaches of confidentiality is not necessary ... [and] [t]he
court need no longer rely on the fiction of imputed knowledge to safeguard client
confidentiality");  Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories,
Inc., 607 F.2d 186 (7th Cir. 1979) (law firm need not be disqualified where attorney who
had worked on prior representation had left firm and taken client and client's files with
him; presumption that lawyer shared confidences with his associates while at firm was
effectively rebutted where remaining members of firm submitted affidavits stating that
they did not receive any relevant confidential information from tainted attorney); Unisys
Corp. v. Amperif Corp., Case No. 92-1966, 1992 WL 210243 (E.D. Pa. Aug. 20, 1992)
(law firm not disqualified where former representation on labor issues was unrelated to
current patent infringement action, and where lawyers who had worked on matter for

---

[6]     The court in  St. Barnabas Hospital also noted that the moving party in that case had
        knowingly waived the conflict. Id. at 95.

*FILED UNDER SEAL*

former client had all left firm and movant did not meet its burden of showing that (a) it had imparted confidential information to a law firm attorney, (b) that information was material to current litigation, and (c) attorney who received confidential information was still at law firm); Richard v. Southern Pacific Transp. Co., 735 F.Supp. 206 (E.D. La. 1990) (motion for disqualification of law firm denied where lawyers who had handled former client's matters had left firm and no remaining attorneys had relevant confidential information, even though both current and former representations were occupational hearing loss cases brought against defendant railroad); Carbo Ceramics, Inc. v. Norton-Alcoa Proppants, 155 F.R.D. 158, 164 (N.D. Tex. 1994) (in accepting representations of remaining lawyers that no confidences were imparted by lawyer who left firm, court noted, "a person who makes statements under oath or penalty of perjury is presumed to tell the truth").

FLH has submitted affidavits from two discreet groups of its personnel. Its litigation team on this case -- Messrs. Haug, Stronski, Taylor and Jabri -- aver that they had no involvement whatsoever in the 2003 representation and have not been privy to any Reliant confidences regarding the patent at issue. Similarly, the remaining FLH personnel who had any involvement with the Abbott deal -- then-associate Arthur Hoag and non-lawyer Ali Berkin -- attest that they had no direct dealings with Reliant and received no confidential information, either from Reliant or Mr. Berdon. Neither Mr. Hoag nor Mr. Berkin is part of the litigation team and both have been effectively screened from this matter.[7]

---

[7]    FLH partner Daniel Brown is alleged by Reliant to have given advice to Reliant. Although Mr. Brown denies any knowledge of Reliant information (or dealings with

REDACTED VERSION – PUBLICLY FILED

Given the central role played by Mr. Berdon and the lack of involvement of any other FLH attorney in the Abbott matter (with the exception of Arthur Hoag, who spent a total of 2 ½ hours reviewing some discrete language of a contract whose terms are not at issue in this case), there is no cause for concern that anything allegedly disclosed by Reliant could be used to its detriment. The only specific document mentioned -- the Abbott "descriptive memorandum" regarding the patents, which was allegedly provided to Reliant while it was considering the transaction and allegedly passed on to someone at FLH in June 2003 -- is not sufficiently described to establish that it is confidential. In any event, the document was never seen by anyone remaining at FLH and is not accessible to the Firm, even had it ever been known to Mr. Berdon.[8]

---

Reliant at all) and billed no time to providing such advice, he too has been excluded from the litigation team and screened from involvement. (Brown Dec. at ¶ 7.)

[8]    Reliant relies on <u>Elan Transdermal Ltd. v. Cygnus Therapeutic Systems</u>, 809 F.Supp. 1383 (N.D. Cal. 1992) to suggest that a firm must be disqualified even though the purportedly tainted attorney has left.    (Pl.    Mem. at 14n.7.) That case is distinguishable on several grounds. First, the movant asserted that, under California law, the presumption of shared confidences between a lawyer and his law firm is **irrebuttable**. Under the applicable law here (both Delaware and New York), the presumption is **rebuttable**, <u>see e.g.</u>, <u>Nemours</u>, 632 F.Supp. at 428 (presumption of shared confidences is rebuttable); <u>Deemer Steel Casting Co. v. East Coast Erectors, Inc.</u>, Case No. 10593, 1990 WL 143840, at *3 (Del.Ch. Sept. 28, 1990) (same); <u>Hempstead Video, Inc. v. Incorporated Village of Valley Stream</u>, 409 F.3d 127 (2d Cir. 2005) (notes growing trend of allowing rebuttal of presumption of shared confidences (citing multiple cases)); <u>see also</u> <u>Goldberg</u>, 125 Cal.App. 4th at 765 (opining that <u>Elan</u> misconstrued California law in holding that the presumption of shared confidences is conclusive). Second, in <u>Elan</u>, the purportedly tainted attorneys had shared a small office with remaining firm attorneys, and the court noted that "[t]he presumption of shared confidences is based on the common-sense notion that people who work in close quarters talk with each other … about their work." <u>Elan</u>, 809 F.Supp. at 1390. Third, <u>Elan</u> noted that 29 different attorneys at the law firm worked on various matters for the former client over a 4 ½ year period. Here, Reliant identifies only a small handful of current FLH attorneys who did work for Reliant over a much shorter period, and identifies only two remaining attorneys, Hoag and (erroneously) Brown who are supposed to have worked in some manner on the purchase of the patents.

*FILED UNDER SEAL*

## POINT IV

### EVEN IF THE COURT FINDS THAT SOME OF THE REMAINING FLH ATTORNEYS SHOULD BE DISQUALIFIED, THE FIRM SHOULD NOT BE DISQUALIFIED BECAUSE AN INFORMATION WALL IS IN PLACE

Reliant's argument that the two attorneys (Hoag and Brown) who allegedly assisted in giving advice on the Abbott patents acquisition possess confidential knowledge relevant to this suit (Pl. Mem. at 14) is factually flawed. They should not be disqualified. But even were it otherwise, FLH's erection of an information wall separating those allegedly involved in the 2003 transaction from the litigation team is a legally permissible mechanism to safeguard against inadvertent disclosure of confidences (assuming, *arguendo*, their existence).

Importantly, the billing records show that no current FLH lawyer played any substantive role in the Abbott transaction. Case law in this and other districts holds that where an attorney's role was marginal, his disqualification should not be imputed to the law firm. Rather, courts have frequently endorsed as effective a screening process to seal off the possibly tainted attorney from the rest of the firm. See e.g., Nemours, 632 F.Supp. at 428-29 (where attorney worked on matter on opposing side before joining firm, the firm was not disqualified where he retained no documents to refresh his recollection, the information he was privy to was primarily non-confidential, and an effective screening mechanism was in place; "attorney's degree of prior involvement, whether he controlled strategy, whether he was an associate or partner, and whether he shared legal fees from his firm's representation are all important factors in evaluating the effectiveness" of "cone [of silence]"); see also Lambert v. Chase Manhattan Bank, N.A., Case No. 93-5298, 1996 WL 66130, at *1 (S.D.N.Y. Feb. 15, 1996) (even where attorney worked 800 hours on matter at old firm, his new firm was not disqualified from

33

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

representing adverse client where screening procedure was in place to wall off tainted attorney from attorneys working on matter, over a year had passed since attorney left the old firm, and the attorney had worked on document review and participated in depositions and was "not a strategy-maker"); In re Del-Val Financial Corp. Sec. Litig., 158 F.R.D. 270, 274 (S.D.N.Y. 1994) (law firm was not disqualified where attorney who moved from a firm that previously represented the former client brought no confidential documents with him to new firm, was only involved in a "peripheral sense" with the matter for the former client, did not recall any confidential information, and where an effective screening procedure was implemented to prevent communication between moving attorney and attorneys working on the matter for current client); Papyrus Technology Corp. v. New York Stock Exchange, Inc., 325 F.Supp. 2d 270, 279 (S.D.N.Y. 2004) (Frommer, Lawrence & Haug was not disqualified where its associate had previously worked for a firm that represented the adverse party, but where the associate's own involvement was "minuscule," and effective screening procedures had been implemented separating purportedly tainted attorney from current litigation)[9]; Human Electronics, Inc. v. Emerson Radio Corp., 375 F.Supp. 2d 102, 113 (N.D.N.Y. 2004) (where an attorney might have been privy to confidential information of former client at old firm, an effective screen was put in place such that individual lawyer's disqualification was not imputed to law firm); INA Underwriters Insurance Co. v. Rubin, 635 F.Supp. 1 (E.D. Pa. 1983) (court refused to apply irrebuttable presumption of shared confidences to disqualify firm where disqualified attorney could be screened off).

---

[9]    The court in Papyrus specifically noted that, while some courts have been less willing to approve small-firm screens -- i.e., for fifteen or twenty person law firms -- the 50-member FLH firm had nonetheless erected an effective screen.

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

Thus, even if Mr. Hoag's very limited involvement in the Abbott transaction could be viewed as grounds for his disqualification, this disqualification need not be imputed to FLH because an effective screen has been put in place. (Hoag Dec. at ¶ 9.)  As recognized by this Court in Nemours, the doctrine of imputed disqualification should not be applied with "rigid formalism."  Nemours, 632 F.Supp. at 425.  Instead, a pragmatic approach is needed, one which "balances the expectations of confidentiality of a former client against the importance of allowing a client the representation of his choice and promoting the mobility of attorneys ... from one private law firm to another."  Id.; see also Lemaire v. Texaco, Inc., 496 F.Supp. 1308, 1310 (E.D. Tex. 1980) (where attorney switched law firms after having represented one party in lawsuit to limited extent of filing initial pleadings and new firm represented opposite side in same litigation, court accepted screening process to avoid imputing disqualification to entire firm; any appearance of impropriety was greatly outweighed by plaintiff's right to have counsel of their choice).

DB02:5966622.1

*FILED UNDER SEAL*

REDACTED VERSION – PUBLICLY FILED

## CONCLUSION

For the foregoing reasons, Reliant's motion to disqualify FLH should be denied.

YOUNG CONAWAY STARGATT & TAYLOR LLP

May 9, 2007

*Karen L. Pascale*

Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (# 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Phone: 302-571-6600

- and -

STILLMAN, FRIEDMAN & SHECHTMAN, P.C.
John B. Harris
Mary Margulis-Ohnuma
425 Park Avenue
New York, NY 10022
(212) 223-0200

*Attorneys for Defendant, Par Pharmaceutical, Inc.*

36

REDACTED VERSION – PUBLICLY FILED

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on May 9, 2007, I caused to be electronically filed a true and correct copy of the foregoing sealed document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jack B. Blumenfeld [jbbefiling@mnat.com]
> Maryellen Noreika [menefiling@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200

I further certify that on May 9, 2007, I caused a copy of the foregoing sealed document to be served on the above-listed counsel and on the following non-registered participants in the manner indicated:

> ### By E-Mail and Hand Delivery
>
> Jack B. Blumenfeld [jblumenfeld@mnat.com]
> Maryellen Noreika [mnoreika@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200
>
> ### By E-Mail and FedEx
>
> John Desmarais [jdesmarais@kirkland.com]
> Gerald J. Flattmann, Jr. [gflattmann@kirkland.com]
> Christine Willgoos [cwillgoos@kirkland.com]
> KIRKLAND & ELLIS LLP
> Citigroup Center
> 153 E. 53rd Street
> New York, NY 10022
> (212) 446-4800

REDACTED VERSION – PUBLICLY FILED

Steven C. Cherny [steven.cherny@lw.com]
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY  10022-4834
(212) 906-1200

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391

*Attorneys for Defendant-Counterclaimant,*
*Par Pharmaceutical, Inc.*

2

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on May 16, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jack B. Blumenfeld [jblumenfeld@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200

I further certify that on May 16, 2007, I caused a copy of the foregoing document to be served on the above-listed counsel and on the following non-registered participants in the manner indicated:

> ### By E-Mail and Hand Delivery
>
> Jack B. Blumenfeld [jblumenfeld@mnat.com]
> Maryellen Noreika [mnoreika@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200
>
> ### By E-Mail
>
> John Desmarais [jdesmarais@kirkland.com]
> Gerald J. Flattmann, Jr. [gflattmann@kirkland.com]
> Christine Willgoos [cwillgoos@kirkland.com]
> KIRKLAND & ELLIS LLP
> Citigroup Center
> 153 E. 53rd Street
> New York, NY 10022
> (212) 446-4800

Steven C. Cherny [steven.cherny@lw.com]
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834
(212) 906-1200

YOUNG CONAWAY STARGATT & TAYLOR LLP

*Karen L. Pascale*

Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391

*Attorneys for Defendant-Counterclaimant,*
*Par Pharmaceutical, Inc.*