## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
                                                           :
RELIANT PHARMACEUTICALS, INC.,                             :
                                                           :
        Plaintiff,                                         :
                                                           :
        v.                                                 :   Civil Action No. 06-774-JJF
                                                           :
PAR PHARMACEUTICAL, INC.,                                  :   REDACTED – PUBLIC VERSION
                                                           :
        Defendant.                                         :
                                                           :
-----------------------------------------------------------x
```

## PAR PHARMACEUTICAL, INC.'S ANSWERING BRIEF IN OPPOSITION TO RELIANT PHARMACEUTICALS, INC.'S RENEWED MOTION TO DISQUALIFY THE LAW FIRM OF FROMMER LAWRENCE & HAUG LLP

YOUNG CONAWAY STARGATT & TAYLOR LLP
Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Phone:  302-571-6600

- and -

STILLMAN, FRIEDMAN & SHECHTMAN, P.C.
John B. Harris
Mary Margulis-Ohnuma
425 Park Avenue
New York, NY 10022
(212) 223-0200

*Attorneys for Defendant, Par Pharmaceutical, Inc.*

September 21, 2007

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................ iii

NATURE AND STAGE OF THE PROCEEDING ....................................................... 1

PRELIMINARY STATEMENT .............................................................................. 1

SUMMARY OF ARGUMENT ............................................................................... 3

STATEMENT OF FACTS ..................................................................................... 5

    A.    Background of Reliant's Renewed Disqualification Motion ................................... 5

    B.    FLH and Its Relationships With Reliant and Par ..................................................... 6

    C.    The Firm's Work Relating to the Abbott Transaction ............................................. 7

        1.    Claims Relating to Daniel Brown ................................................................ 8

        2.    Claims Relating to Arthur Hoag ................................................................ 10

        3.    Claims Relating to Ali Berkin .................................................................... 12

        4.    Claims Relating to Andrew Berdon ............................................................ 14

    D.    The Construction of an Information Wall ............................................................. 19

ARGUMENT ..................................................................................................... 23

POINT I    A MOTION TO DISQUALIFY MUST BE DENIED WHERE THE MOVING PARTY CANNOT CLEARLY SHOW THAT THERE IS A DANGER THAT RELEVANT CONFIDENCES WILL BE USED TO THE FORMER CLIENT'S DETRIMENT ......................................... 23

POINT II    THE SCOPE OF THE PRIOR REPRESENTATION WAS LIMITED, INVOLVED MINISTERIAL TASKS, AND WAS UNRELATED TO THE CURRENT REPRESENTATION, SUCH THAT NO CLIENT COMMUNICATIONS RELEVANT TO THIS CASE WOULD HAVE BEEN EXCHANGED ...................................... 27

    A.    Mere Superficial Similarity Does Not Justify Disqualification ............................ 27

    B.    The Cases Cited by Reliant Are Inapposite ......................................................... 32

POINT III    EVEN IF RELIANT CAN SHOW THAT IT COMMUNICATED
             CONFIDENTIALINFORMATION TO A FORMER PARTNER OF
             FLH, DISQUALIFICATION OF FLH IS UNWARRANTED
             BECAUSE THAT ATTORNEY HAS LONG SINCE LEFT THE
             FIRM ...................................................................................................................34

POINT IV    EVEN IF THE COURT FINDS THAT SOME OF THE
             REMAINING FLH ATTORNEYS SHOULD BE DISQUALIFIED,
             THE FIRM SHOULD NOT BE DISQUALIFIED BECAUSE AN
             INFORMATION WALL IS IN PLACE................................................................37

CONCLUSION...............................................................................................................40

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

Alza Corp. v. Mylan Labs., Inc.,
    391 F.3d 1365 (Fed. Cir. 2004) ........................................................................... 30

Amgen, Inc. v. Elanex Pharmaceuticals, Inc.,
    160 F.R.D. 134 (W.D. Wash. 1994) .................................................................... 33

Bowman v. Bank of Delaware,
    Case No. 87-44, 1988 WL 54669 (D. Del. 1988) ............................................... 25

Buckley v. Airshield Corp.,
    908 F.Supp. 299 (D. Md. 1995) ........................................................................... 33

Carbo Ceramics, Inc. v. Norton-Alcoa Proppants,
    155 F.R.D. 158 (N.D. Tex. 1994) ........................................................................ 36

Conley v. Chaffinch,
    431 F.Supp. 2d. 494 (D. Del. 2006) ............................................................... 24, 25

Cybor Corp. v. FAS Techs., Inc.,
    138 F.3d 1448 (Fed. Cir. 1998) ........................................................................... 28

Deemer Steel Casting Co. v. East Coast Erectors, Inc.,
    Case No. 10593, 1990 WL 143840 (Del.Ch. Sept. 28, 1990) ............................ 36

Donohoe v. Consolidated Operating & Production Corp.,
    691 F.Supp. 109 (N.D.Ill. 1988) ......................................................................... 39

Duncan v. Merrill Lynch,
    646 F.2d 1020 (5th Cir. 1981) ............................................................................. 32

Elan Transdermal Ltd. v. Cygnus Therapeutic Systems,
    809 F.Supp. 1383 (N.D.Cal. 1992) ..................................................................... 36

EMI Group N. Am., Inc. v. Cypress Semiconductor Corp.,
    268 F.3d 1342 (Fed. Cir. 2001) ........................................................................... 29

EZ Paintr Corp. v. Padco, Inc.,
    746 F.2d 1459 (Fed. Cir. 1984) ........................................................................... 38

General Electric Co. v. Valeron Corp.,
    608 F.2d 265 (6th Cir. 1979) ............................................................................... 33

Glaxo Group, Ltd. v. TorPharm, Inc.,
    153 F.3d 1366  (Fed.Cir.1998)..................................................................................30

Glaxo, Inc. v. Novopharm, Ltd.,
    110 F.3d 1562 (Fed.Cir.1997)..................................................................................29

Goldberg v. Warner/Chapell Music, Inc.,
    125 Cal.App. 4th 752, 23 Cal.Rptr.3d 116 (Cal.Ct.App. 2005) ........................................36

INA Underwriters v. Nalibotsky,
    594 F.Supp. 1199 (E.D. Pa. 1984) ............................................................................32, 39

In re Corn Derivatives Antitrust Litigation,
    748 F.2d 157 (3d Cir. 1984)......................................................................................32

Integrated Health Services of Cliff Manor, Inc. v. THCI Co., LLC,
    327 B.R. 200 (D. Del. 2005)..........................................................................24, 25, 30, 31

Jack Eckerd Corp. v. Dart Group Corp.,
    621 F.Supp. 725 (D. Del. 1985).................................................................................33

Johnson Worldwide Assocs. Inc. v. Zebco Corp.,
    175 F.3d 985 (Fed. Cir. 1998)...................................................................................28

Lambert v. Chase Manhattan Bank, N.A.,
    Case No. 93-5298, 1996 WL 66130 (S.D.N.Y. Feb. 15, 1996)........................................38

Markman v. Westview Instruments, Inc.,
    517 U.S. 370 (1996)................................................................................................28

McNeilab, Inc. v. Scandipharm, Inc.,
    862 F. Supp. 1351 (E.D.Pa. 1994) .............................................................................30

Nemours Foundation v. Gilbane, Aetna, Federal Ins. Co.,
    632 F.Supp. 418 (D. Del. 1986)......................................................................25, 36, 37, 38

Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.,
    607 F.2d 186 (7th Cir. 1979) ....................................................................................36

Phillips v. AWH Corp.,
    415 F.3d 1303 (Fed. Cir. 2005)..................................................................................28

Queen's Quest Condominium Council v. Sea Coast Builders, Inc.,
    605 A.2d 580 (Del. Super. Ct., Sussex Co., 1992) ..........................................................38

Satellite Financial Planning Corp. v. First Nat'l Bank of Wilmington,
    652 F.Supp. 1281 (D. Del. 1987)...............................................................................25, 31

Solow v. W.R. Grace & Co.,
   83 N.Y.2d 303 (1994) ..................................................................................................35

Strategene v. Invitrogen Corp.,
   225 F.Supp. 2d 608 (D.Md. 2002) ..............................................................................34

Unisys Corp. v. Amperif Corp.,
   Case No. 92-1966, 1992 WL 210243 (E.D. Pa. Aug. 20, 1992) ......................................36

United States v. Gordon,
   334 F.Supp. 2d 581 (D. Del. 2004) ...............................................................................33

Vitronics Corp. v. Conceptronic, Inc.,
   90 F.3d 1576 (Fed. Cir. 1996) ......................................................................................28

Warner-Lambert Co. v. Apotex Co.,
   316 F.3d 1348 Fed.Cir.2003) .......................................................................................29

Warner-Lambert Co. v. Teva Pharms. USA, Inc.,
   418 F.3d 1326 (Fed. Cir. 2005) ....................................................................................28

Zenith Laboratories, Inc. v. Bristol-Myers Squibb Co.,
   19 F.3d 1418 (Fed.Cir.1994)........................................................................................30


**Statutes**

35 U.S.C. § 102(b) .............................................................................................................29

35 U.S.C. § 103(a) .............................................................................................................29

U.S.C. § 271(e)(2)(A) .......................................................................................................28


**Rules**

Local Rule 83.6(d)(2)........................................................................................................24

Model Rules of Prof'l Conduct Rule 1.9(a) ........................................................................24, 34

Model Rules of Prof'l Conduct Rule 1.10 ..........................................................................4, 34

## NATURE AND STAGE OF THE PROCEEDING

This action relates to the alleged infringement of a single United States patent. Defendant Par Pharmaceutical, Inc. ("Par") submits this answering brief in opposition to the renewed motion of plaintiff Reliant Pharmaceuticals, Inc. ("Reliant") to disqualify the law firm of Frommer Lawrence & Haug LLP ("FLH" or "the Firm") from serving as counsel to Par in this case. Reliant's earlier motion to disqualify FLH was denied on July 25, 2007 with leave to renew after Reliant conducted discovery on disputed issues. As set forth in detail below and in the declarations submitted with this brief, FLH continues to oppose Reliant's tactical disqualification motion with evidence that its limited role in a 2003 transaction pursuant to which Reliant acquired the patent at issue in this case -- work that in no way related to the patent's validity, enforceability or its potential infringement at issue here -- does not require FLH's disqualification.

## PRELIMINARY STATEMENT

As it did in its earlier briefs, Reliant now repeats the rote claim that FLH must be disqualified from representing Par because it acquired confidential information during its representation of Reliant four years ago that supposedly goes to the heart of this proceeding: whether U.S. Patent No. 5,681,588 (the "'588 patent") is valid and enforceable, and whether Par is infringing it. And, as in its earlier briefs, Reliant's arguments rely on a jumble of misdirection, exaggeration and rhetoric that cannot obscure the reality that, because FLH did no substantive work on these issues and no current FLH employee has (or ever had) relevant, confidential knowledge, Reliant will suffer no harm if FLH is permitted to continue its long-standing representation of Par.

1

The evidence of what FLH actually did four years ago in connection with Reliant's acquisition of Rythmol®-- in the total of less than 20 hours billed by the Firm's personnel, legal and non-legal -- pointedly contradicts Reliant's claim that FLH must be disqualified because its work then mirrors its work for Par now.  In fact, as each of the FLH witnesses Reliant recently deposed swore under oath, FLH issued no opinions and undertook no analysis regarding the validity and enforceability of the '588 patent or its potential infringement and learned nothing in its representation of Reliant that bears on any disputed issue in the case.  This evidence, and the mischaracterizations in Reliant's papers, only confirms the powerful inference that Reliant makes this renewed motion in order to deprive Par of its long-time counsel and to delay resolution of this case, not because there is a risk of FLH using any Reliant confidential information against it in this litigation.

Here, the record shows that the attorney-client relationship between FLH and Reliant was virtually exclusively through a single, long-departed FLH attorney, Andrew Berdon, with whom FLH has had no substantive contact in the more than three years since he took Reliant and its files to his new law firm.  Mr. Berdon's knowledge or advice (even were it in some fashion relevant to this case, which the documents Reliant has produced only to outside counsel make doubtful) cannot under the circumstances be ascribed to the Firm.  It is for that reason that Reliant clings to the fiction that FLH rendered an opinion on the '588 patent when no such "opinion" exists in any form and when no substantive work on such an opinion ever occurred (as Reliant has always known from the invoices it received from FLH at the time).  Most remarkable is Reliant's continued claim that FLH partner Daniel Brown is at the heart of the conflict when, in fact, he never billed time to Reliant, never corresponded with Reliant, has no Reliant documents, is "cc-ed" on a single e-mail and stated under oath at his deposition that he can recall

2

no dealings at any time with Reliant or having Reliant information, confidential or otherwise. The risk to Reliant posed by Mr. Brown's presence at FLH is non-existent, even without the safeguard imposed by the existing Information Wall.[1]

Notwithstanding the pages of rhetoric Reliant devotes to the supposedly grave harm it will suffer if FLH is not disqualified from representing Par in this case, and its annexing a stack of irrelevant documents in the hope that sheer volume will somehow bolster its arguments, Reliant never identifies a specific confidential fact that anyone at FLH ever learned from Reliant that would bear on any issue relevant in this patent infringement case.  Far from providing opinions regarding the validity, enforceability or potential infringement of the '588 patent Reliant was acquiring as part of its purchase of Rythmol® in 2003, the record makes clear that the FLH employees at issue -- Arthur Hoag, Daniel Brown and non-lawyer Ali Berkin -- played no role at all in considering the validity or potential value of that patent.

## SUMMARY OF ARGUMENT

FLH possesses no confidential information from Reliant that is material to the issues in this case -- the validity and enforceability of the '588 patent and the claimed infringement by Par.  Nor, despite its strained attempts to exaggerate the work performed by Messrs. Brown, Hoag and Berkin, has Reliant demonstrated that FLH rendered any legal opinions to Reliant on issues related to the '588 patent.  (Point I)  To the contrary, the limited work performed in FLH's

---

[1]  Emblematic of the misleading character of Reliant's papers is its claim that Mr. Brown's denial of knowledge was "flatly contradict[ed]" by FLH lead counsel Edgar L. Haug, who in his May 9, 2007 declaration supposedly "recounts a telephone conversation" involving Mr. Brown in 2003 in which the potential design around of the '588 patent was discussed.  (Op. Brf. at 26.)  Far from "admitting" the truth of this statement, Mr. Haug's declaration makes clear that this information was purely hearsay from a call placed by Mr. Berdon in December 2006 (apparently at Reliant's behest), that Mr. Haug has no idea what was said and that -- based on his investigation -- FLH never provided Reliant with the "opinion" Reliant alleges.  Declaration of Edgar L. Haug, dated May 9, 2007, at ¶ 23 ("Haug Dec.").

less-than-20 hours of work for Reliant in 2003 are not substantially related to the issues presented in this proceeding. (Point II) Even if it were otherwise, it is now clear from the record that the lawyer who dealt exclusively with Reliant -- Andrew Berdon -- left the Firm 3 ½ years ago, leaving no material institutional knowledge that could taint FLH's representation of Par. See Model Rule 1.10. (Point III) Moreover, promptly upon learning of Reliant's concerns, FLH imposed an Information Wall between the lawyers who worked for Reliant in 2003 (including Mr. Brown) and the FLH trial team in this matter. This mechanism should give Reliant additional comfort that relevant confidential information (even if any of the individuals had it) will not be transmitted to the trial team. (Point IV)

Finally, given the lack of evidence that FLH provided any opinion regarding the value or scope of the '588 patent, the absence of any identified material Par confidences, and the status of this case, Par will be considerably prejudiced if the Firm is disqualified. The Firm has represented Par in connection with this matter ███████████████ (Haug Dec. at ¶ 24.) The Firm has invested a substantial amount of time and effort on Par's behalf developing defenses of non-infringement for Par's formulation, and invalidity and unenforceability of the '588 patent. (Id.) Moreover, a strong, long-standing working relationship has developed between Par and the Firm over a number of years. (Id.) The Firm has opened ███ new matters for Par ██████████████████████ including ████████████████████████ ████████████████████████████████████████████████████ (Id.) Disqualification of the Firm would substantially prejudice Par in the present litigation in terms of the time, effort, and expense that would be required to get another firm up to speed on the facts and issues of this case. (Id.)

4

## STATEMENT OF FACTS

### A.    Background of Reliant's Renewed Disqualification Motion

In its July 25, 2007 decision, this Court noted the existence of factual issues in the papers submitted by the parties on the prior motion to disqualify and dismissed it subject to renewal, if plaintiff chose to do so, following mutually agreed upon discovery.  The Court also allowed the case to continue to proceed on the merits, noting that it was persuaded that "the precautions put in place by Defendant are sufficient, at this juncture, to protect Plaintiff."  Thereafter, Reliant propounded interrogatories to Par and took the depositions of the three current FLH employees, Daniel Brown, Ali Berkin and Arthur Hoag, whom Reliant claims were substantively involved in the Reliant representation giving rise to the alleged conflict.  Par took no discovery from Reliant. However, pursuant to a limited use, "Non-Waiver Agreement," Reliant agreed to produce to outside counsel for FLH and Par certain documents not contained in FLH's files that Reliant had alluded to in the previous rounds of briefing, but had not provided to Par or to the Court in full. Pursuant to the Non-Waiver Agreement, these documents have not been disclosed to the FLH litigation team.  On September 10, 2007, Reliant chose to renew its motion to disqualify. Declaration of John B. Harris, dated September 21, 2007 at ¶ 3 ("Harris Dec.".)

Because this motion is substantially similar to the motion filed by Reliant several months ago and because the key issue of whether an identity of relevant issues exists between FLH's representation of Reliant four years ago and its current representation of Par has not materially changed, we herewith re-submit the declarations filed with the Court on the prior motion from a wide range of FLH personnel and a legal ethics expert, as well as a supplemental declaration from Par's counsel on this disqualification motion recounting recent events surrounding the motion practice.

**B.**    **FLH and Its Relationships With Reliant and Par**

Frommer Lawrence & Haug LLP is a law firm of more than 50 lawyers with offices in New York City, Washington, D.C., and Tokyo, Japan.  It frequently represents clients in intellectual property related matters, including the prosecution and defense of actions involving the validity, enforceability and infringement of patents.  It is a leading firm in the field of pharmaceutical litigation.  Par, a generic drug manufacturer, has been a client of FLH in numerous matters since ▮▮▮▮▮▮, shortly after the Firm was founded.  (Haug Dec. at ¶ 4.)

Reliant first became a client of FLH in early 2002 shortly after Andrew Berdon joined the Firm as a non-equity partner.  (Haug Dec. at ¶ 5.)  Mr. Berdon was the partner responsible for the Reliant representation and the principal client contact.  (Id. at ¶ 8.)  FLH's representation of Reliant ceased in all respects when Mr. Berdon left the Firm in February 2004.  At that time, in addition to stopping work on any pending matters, the Firm was directed to transfer all Reliant files to Mr. Berdon's new firm, which it did.  (Id. at ¶ 7.)  The Firm has not done any work for Reliant in the more than three years since Mr. Berdon's departure.  (Id.)

During the time Mr. Berdon was at FLH, the Firm opened a total of ▮ separate matters for Reliant, although ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (Haug Dec. at ¶ 8.)  The ▮▮▮▮▮▮ matters received a "7000" billing designation and involved, among other things, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Id.; Declaration of Ali Berkin, dated May 8, 2007, at ¶ 11 ("Berkin Dec.").)  None of these ▮▮▮ ▮▮▮▮▮▮▮▮ matters involved the subject matter of this litigation, i.e., the drug Rythmol®, the '588 patent, or the propafenone drug compound.  (Haug Dec. at ¶ 8.)  The Firm's other

Reliant matters were general and miscellaneous matters, including a "general" designation for subjects not meriting the creation of a separate matter ("1000"). (Haug Dec. at ¶ 8; Berkin Dec. at ¶ 11.)

### C.    The Firm's Work Relating to the Abbott Transaction

Although Reliant asserts that it "retained" FLH in June 2003 to represent it in some fashion in connection with a transaction with Abbott GmbH & Co. K.G. ("Abbott") to purchase the drug product Rythmol®, the Firm's records shows that Mr. Berdon did not open a new matter for this transaction, in June or anytime later. (Haug Dec. at ¶ 9.) Nor did he run a conflict check, which would have been standard procedure if the Firm was retained to play a substantive role in such a transaction. (Id.) Indeed, as the contemporaneous billing records to Reliant reflect, the first time entry by any FLH employee concerning the transaction was not until September 29, 2003 when Mr. Berdon billed 30 minutes to the "1000" general matter for his review of undefined "Rythmol information" and communications with two non-FLH persons. (Haug Dec. at ¶ 10 and Exhibit 2 thereto.) Thus, notwithstanding Reliant's arguments that Mr. Berdon and others performed services for Reliant from June to September, these attorneys each regarded their services as so *de minimis* and insubstantial that no one (including the long-departed Mr. Berdon) saw fit to record or bill their time.

After the initial 30 minutes spent on September 29, 2003, FLH records show that it was three weeks before anyone at the Firm spent any time on the Abbott acquisition matter. (Haug Dec. at ¶ 12.) From October 20-23, Mr. Berdon spent a total of 8.25 hours ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
(Haug Dec. at ¶ 12 and Exhibit 3 thereto.) In this time period, an FLH associate, Arthur Hoag,

spent 2.5 hours reviewing the asset purchase agreement and discussing it with Mr. Berdon. (Id.) That is the total amount of FLH attorney time incurred on the matter.

Given that the transaction with Abbott is alleged to have had its genesis at least as early as June 2003, it is plain that: (a) another law firm or firms were the transactional counsel to Reliant in the matter;[2] (b) FLH played no role in the negotiations or the decision-making that led to Reliant's pursuit of the Rythmol® drug product and related patents; and (c) FLH played no role in the original drafting of the asset purchase agreement. All but 30 minutes of time billed by FLH occurred within seven days of the date of the alleged closing of the transaction -- a time well after Reliant had performed its own analysis.

### 1.    Claims Relating to Daniel Brown

Reliant continues to base its disqualification claim on the "understanding" of its former legal affairs officer, Michael Lerner, that FLH partner Daniel Brown provided an oral "opinion" and advice regarding the '588 patent's value, validity, enforceability and potential for "design around," which supposedly induced Reliant to acquire that patent from Abbott. (Declaration of Michael Lerner, dated March 9, 2007, at ¶¶ 7, 13, 16.) Even in their third set of papers on the disqualification issue, and even with the benefit of discovery of FLH documents and personnel, Reliant still provides only generalized conclusions regarding FLH's work -- with no substance as to what this supposed "opinion" was, when it was rendered, or how knowledge of whatever Mr. Brown said might now benefit Par in this litigation.

---

[2]    According to the Reliant filings on the Securities and Exchange Commission website, Latham & Watkins represented Reliant in the transaction with Abbott concerning Rythmol®. (Haug Dec. at ¶ 11.) Latham & Watkins also entered an appearance on behalf of Reliant in this case. See Motion and Order for Admission Pro Hac Vice for Steve Cherny of Latham & Watkins, dated January 30, 2007. (D.I. 9; Haug Dec. at ¶ 11.)

What is clear is that Mr. Brown swears in an affidavit, and indicated under oath at a deposition, that he undertook no such study and gave no opinion regarding the value, validity, enforceability and potential for "design around" of any of the patents Reliant acquired, let alone the '588 patent at issue here. (Declaration of Daniel Brown, dated May 7, 2007, at ¶ 3) ("Brown Dec.".) If Mr. Brown ever dealt with Mr. Lerner on any subject (which he does not recall doing), it could not have been based on any Reliant confidential information or conveyed information upon which Reliant could have relied. (Id. at ¶ 6.) Reliant concedes that whatever "opinion" Mr. Brown allegedly provided was not in writing and that Mr. Brown never billed a penny for what would indisputably have been a labor and fact-intensive inquiry. (Id. at ¶¶ 3-4.)

Reliant is relegated to the insinuation that the time records contemporaneously provided to it by FLH do not accurately reflect the time spent by Mr. Brown and others. It offers no reason why Mr. Brown would not have billed or recorded any time at all to the task of developing and rendering the claimed legal opinion.[3] Rather, Reliant notes that Mr. Brown is copied on a single e-mail from Mr. Berdon to Reliant in which Mr. Berdon mentions that Mr. Brown is "working up" something on an unspecified patent (Declaration of Shane Cortesi, dated September 10, 2007, at Ex. 8 ("Cortesi Dec.")) and Mr. Berdon later refers vaguely in a September 12, 2003 e-mail to his "belief" that he and Mr. Brown previously provided a "verbal brief" regarding the coverage of an unidentified patent (Cortesi Dec. Ex. 11.)

These two e-mails do not demonstrate that FLH in fact rendered the opinion Reliant claims or that Mr. Brown's testimony that he did no substantive work is false. Indeed, any suggestion that these e-mails imply that FLH actually rendered an opinion on the '588 patent's

---

[3]    Mr. Berdon was responsible for billing Reliant and had no motive at all to fail to record significant time spent by himself or others. Mr. Berdon has not submitted an affidavit on Reliant's behalf, although he advised Mr. Haug of Reliant's intentions to seek the firm's disqualification in December 2006. (Haug Dec. ¶ 23.)

validity or the potential to design around it is belied by the facts, all of which Reliant has known since before filing its original motion, including: (1) the absence of any time billed or recorded on such a project; (2) Mr. Berdon's statement to Reliant in the same September 12 e-mail that FLH was reluctant to give ███████████████████████████████████ (Cortesi Dec. Ex. 11); (3) Mr. Berdon's statement that the Firm would not provide an opinion or analysis on a patent-related question posed by Reliant because ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████ (Cortesi Dec. Ex. 8); (4) Mr. Brown's testimony that he recalls having no Reliant information regarding the patent, shared no such information with anyone, and "worked up" nothing regarding the '588 patent (Brown Dec. at ¶¶ 3-5); (5) the absence of any documents or other indication that Mr. Brown researched or rendered an "opinion" or performed substantive work for Reliant; and (6) Mr. Brown's lack of activity in sending even a single e-mail or document to Reliant.

Reliant's claims regarding the other current FLH personnel are similarly unpersuasive.

## 2.    Claims Relating to Arthur Hoag

Arthur Hoag, then an associate, billed 2.5 hours on a single day -- October 21, 2003 -- to a review of the representations and warranties in the Abbott agreement. He made a number of editing suggestions to strengthen the contractual language. See Cortesi Dec. Exs. 15 and 16. Noting that Mr. Hoag's contract review included suggestions that Reliant get stronger representations from Abbott regarding aspects of the patents being transferred (which included the '588 patent), Reliant leaps to the fallacious claim that he was therefore actually involved with, and knowledgeable about, the validity of the patents itself. (See Reliant's Opening Brief (D.I. 89) ("Op. Brf.") at 22.) To the contrary, there is no claim -- nor can there be -- that Mr.

10

Hoag ever received or reviewed anything beyond a draft purchase agreement that merely listed the '588 patent as one of the items of intellectual property being transferred. As Mr. Hoag has testified, no information (confidential or otherwise) was conveyed to him about the patent when he was asked to review the contractual language. (Harris Dec. Ex. B at 27:11-19: "I provided advice about what one would generally include or be concerned about in a limited capacity for the transfer of interest in any patent … It could have applied to any patent at all".)  Whatever the ultimate representations and warranties contained in the Abbott-Reliant contract, and however Mr. Hoag's 2.5 hours of work affected them, those terms are **in no way at issue** in this case.

Notwithstanding Mr. Hoag's testimony that he was uninvolved until late October, Reliant now claims that it "understood" that Mr. Hoag was representing it "in evaluating the Rythmol[®] intellectual property" as early as June 2003.  This claim arises exclusively from what Reliant describes as "an agenda for a meeting with Abbott" to take place on June 30 and July 1 in Illinois containing Mr. Hoag's name as "IP counsel." (Op. Brf. at 6; Cortesi Dec. Ex. 3.)  Reliant offers no evidence regarding who created this document, when it was created, or who at Reliant had this supposed "understanding." There is no claim that Mr. Hoag actually attended the meeting and Reliant introduces no evidence to contradict Mr. Hoag's statements that (1) he was unaware of any such meeting, did not attend it, and had no knowledge of how he came to be listed on a purported agenda (Harris Dec. Ex. B at 29-30);  (2) he was never in communication with anyone at Reliant regarding the Abbott transaction (Declaration of Arthur Hoag, dated May 8, 2007 at ¶ 7 ("Hoag Dec.")); and that  (3) his work did not extend beyond his 2.5 hour review on October 21, 2003 of the draft contract. (Id. at ¶ 6.)

It is hardly surprising that Mr. Hoag had no idea until Reliant advised Par of a claimed conflict that he had played even this tangential role in connection with the acquisition of the '588

11

patent. (Harris Dec. Ex. B at 19: "I had no knowledge of Rythmol or '588 etc. from my representation of Reliant, nor do I today from my representation of Reliant".) Given his lack of awareness of the '588 patent in 2003, the work he later performed for Par regarding the '588 patent before the implementation of the Information Wall was in no way influenced by his brief review of portions of the draft contract in 2003.

### 3.    Claims Relating to Ali Berkin

The evidence shows that Ali Berkin, a non-lawyer scientific advisor, was asked on or about October 21, 2003 by Mr. Berdon to conduct a preliminary database investigation into ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Berkin Dec. at ¶ 4.) Mr. Berkin was not provided with any information regarding any particular formulation, but rather was asked merely to obtain the public data generated by this search. (Id.)

Between October 21 and October 28, Mr. Berkin spent less than 8 hours conducting the limited search requested of him. His search involved searching publicly-available resources, including the U.S. Food and Drug Administration's ("FDA") "Orange Book" and two computer databases, STN and Dialog, that provided the same basic patent information that could be obtained from the U.S. Patent and Trademark Office's ("PTO") website. (Id. at ¶¶ 6, 7, and 10.) On October 21, Mr. Berkin wrote Mr. Berdon a three paragraph memorandum summarizing the data from the public record about Rythmol® and Rythmol SR®. (Id. at ¶ 8.; Cortesi Dec. Ex. 30) (Id.) Mr. Berkin attached to the memorandum a chart listing the patents identified in his database search, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ On October 28, 2003, Mr. Berkin supplemented

the chart by adding publicly available information regarding the expiration dates of the patents on the chart and confirmed the identity of the assignee of one of the patents. (Id. at ¶¶ 8, 10)

There is no evidence that the memorandum or the chart was ever provided to Reliant. In any event, there can be no colorable claim that Mr. Berkin conducted any study or provided an opinion regarding the validity, enforceability or the potential to "design around" the '588 patent or any other patent. (Id. at ¶ 12.) The chart he provided to Mr. Berdon was neither intended to provide -- nor did it provide -- such information. ██████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████ The **identification** of those patents was not based on any confidential information, but was merely the product of a search of public information concerning a single drug compound. (Id.)

Accordingly, Reliant's claim in its memorandum that the Berkin memo reflects the same patent validity analysis that Par would perform in challenging the '588 patent is erroneous. (Op. Brf. at 10.) Nor is Reliant correct in asserting that some impropriety exists because the '287 Pich patent is listed as ████████ in the Berkin memo, but is cited by Par in this proceeding as relevant to the validity of the '588 patent. (Op. Brf. at 9.) The Berkin memo, of limited scope and created for an unrelated purpose, does not reflect the Firm's conclusions regarding the validity, enforceability or scope of the '588 patent, and Reliant cannot credibly argue otherwise.

Finally, in the course of his public research, Mr. Berkin noticed ██████████████████ ██████████████████████ which he advised Mr. Berdon. However, there is no issue raised in this case regarding the timing or effect of any Orange Book listing.

13

4.    **Claims Relating to Andrew Berdon**

Andrew Berdon was responsible in all respects for the Reliant client relationship and, predictably given the nature of their relationship, Reliant and all of its legal matters followed Mr. Berdon when he left FLH in February 2004. (Haug Dec. at ¶ 3.) Between June and October 2003, when e-mails between Mr. Berdon and Reliant were exchanged, the Firm did not archive its e-mails on backup disks as it does today. (Id. at ¶ 20.) Moreover, when Mr. Berdon left FLH, his Firm e-mail account was discontinued and all of his e-mails were deleted from the e-mail system. (Id.) Accordingly, the Firm does not have copies of, or access to, any documents in which Mr. Berdon provided advice on the Abbott deal, let alone regarding the '588 patent. (Id.)

When Mr. Berdon left and Reliant withdrew its work from the Firm, the Firm removed all documents from its network that had been created in any Reliant matter and copied them onto a CD-ROM. (Haug Dec. at ¶ 21.) As part of the Firm's investigation into Reliant's disqualification allegations in this matter, it searched both the CD-ROM and its network files for documents created, worked on, or opened in a Reliant matter between June and October 2003. (Id.) FLH located four documents relating to Reliant's acquisition of Rythmol®. They included: (1) an unexecuted copy of a two-page Assignment of Patents between Abbott and Reliant reviewed by Mr. Hoag;  (2) the transcript of the STN database search of publicly-available patents and patent applications conducted on October 21, 2003 by Mr. Berkin; (3) a Dialog database search of publicly-available patents and patent applications conducted on October 28, 2003 by Mr. Berkin; and (4) the October 21, 2003 memo and chart based on these searches and prepared by Mr. Berkin. (Id.)[4]

---

[4]    Mr. Hoag subsequently located a small number of e-mails he had received from or sent to Mr. Berdon on October 21, 2003 regarding the representations and warranties in the draft

14

Accordingly, FLH does not have in its possession information regarding what services Mr. Berdon may have individually provided to Reliant. For these reasons, to avoid any conceivable taint to the trial team, we address Mr. Berdon's activities (and the documents produced by stipulation to outside counsel only) in the following confidential section that has not been made available to, or discussed with, the FLH trial team:

**[BEGIN REDACTED SECTION UNDER AUGUST 27, 2007 STIPULATION]**



---

contract with Abbott. Those documents were produced to Reliant, were not made available to the FLH trial team and are Exhibit 34 to the Cortesi Declaration.

5









**[END REDACTED SECTION UNDER AUGUST 27, 2007 STIPULATION]**

D.    <u>The Construction of an Information Wall</u>

None of the FLH attorneys working on this litigation -- Edgar Haug, James Stronski, John Taylor, and Omar Jabri -- are alleged to have played any role in the Abbott transaction. Indeed, only Mr. Haug had involvement on any matter with Reliant while it was an FLH client. (Haug Dec. at ¶¶ 5, 6;  Declarations of James Stronski, John Taylor and Omar Jabri, dated May 8, 2007, at ¶ 3.)  In the two years Reliant was a client of the Firm, Mr. Haug billed a total of under 7 hours to Reliant -- all in early 2002 in connection with a study of an unrelated drug. (Haug Dec. at ¶ 5.)  Indeed, the Firm never represented Reliant in connection with any litigation or acted as litigation counsel on its behalf.  (<u>Id.</u>)

None of the litigation team has ever received, nor do they have knowledge of, any information, confidential or otherwise, that was provided to the Firm by Reliant regarding Rythmol®, the acquired patents, or the legal issues raised in the present litigation.  (Haug Dec. at ¶ 6;  Stronski Dec. at ¶ 3;  Taylor Dec. at ¶ 3; Jabri Dec. at ¶ 3.)  Likewise, Par's retention of

19

FLH was unrelated to any aspect of the past Reliant representation, of which Par was unaware at the time of the retention. (Haug Dec. at ¶ 24.)

In order to make sure that there is no conceivable taint from its brief and limited involvement of Reliant, promptly upon learning of Reliant's concerns, the Firm erected an Information Wall screening the remaining persons at the Firm who had anything to do with the Abbott transaction (Messrs. Hoag and Berkin) from involvement in, or access to, this case. (Haug Dec. at ¶ 17 and Exhibits 4, 5 thereto; Hoag Dec. at ¶ 9; Berkin Dec. at ¶ 15.) In addition, although Mr. Brown had no apparent involvement in any Reliant matter at any time, the Firm also established an Information Wall between him and the lawyers handling this case. (Haug Dec. at ¶ 17; Brown Dec. at ¶ 7.)

Reliant notes that FLH's representation of Par in connection with the '588 patent began before the construction of the Information Wall and that Messrs. Brown, Berkin and Hoag all worked on the matter for Par before the Wall was constructed (and, of course, before FLH knew of the existence of a claimed conflict). As this Court noted in its prior Opinion, the Information Wall -- which Reliant does not challenge, in concept or practice -- is sufficient to protect Reliant on a going forward basis. This is particularly true in light of the limited work performed by these individuals for Reliant in 2003 and the absence of any relevant confidential information that can properly be ascribed to them.

Reliant strains to create a link between the work done by these individuals for Reliant and the work done for Par, arguing that the work done for Reliant "mirrors" the work done for Par. (Op. Brf. at 12.) This mischaracterization is based on the fallacy that, because Mr. Berkin prepared a "memorandum" and a "chart" as part of his representation of each, he must have been doing the identical work. In so arguing, Reliant ignores Mr. Berkin's sworn assertions that his

20

work for Par involved patent invalidity and that his limited work for Reliant did not (Berkin Dec. at ¶¶ 3, 7; Harris Dec. Ex. C. at 80-81); that the memoranda and charts he prepared for the two clients were for unrelated purposes (id., Berkin Dec at ¶ 8-9); and that he was unaware of any confidential information from Reliant regarding the '588 patent. (Berkin Dec. at ¶¶ 4,12.) Reliant does not even attempt to justify its brazen "mirror image" claim regarding Mr. Hoag's work, tacitly acknowledging that his work for Par on the notice letter and ANDA production has no conceivable relationship to his 2 ½ hour review of language in the Reliant-Abbott contract. As to Mr. Brown, the claim of mirror-image work is illusory because no evidence exists that he performed any work for Reliant, let alone the kind of work he did for Par (such as reviewing its potential formulation, which did not even exist at the time of FLH's Reliant representation).

Finally, Reliant argues that disqualification is merited because FLH has failed to safeguard its confidences, boldly proclaiming that FLH and its counsel have "flat-out" refused to treat Reliant documents as privileged (Op. Brf. at 34) and refused to "acknowledge that any information given to or generated on behalf of Reliant in the course of [FLH's] former representation is privileged and confidential." (Op. Brf. at 3) These accusations are apparently intended to make FLH appear to be cavalier or reckless. Sadly, as set forth in the Harris Declaration, the reckless allegations are on Reliant's part.

On August 27, 2007, the parties entered into a "Stipulation of Non-Waiver and Confidentiality Agreement" under which Reliant produced to outside counsel documents reflecting certain communications with FLH that Reliant had previously withheld (although many of them had been used in redacted form in Reliant's reply papers on the original motion). (Cortesi Dec. Ex. 1.) Reliant had withheld the documents based on its fear that disclosure to outside counsel (rather than FLH itself) might effect a waiver of a privilege. By the same token,

21

it asserted that if FLH accepted the documents, it would impute to the Firm information FLH did not then possess. (Harris Dec. at ¶ 6 and Ex. A.)  Accordingly, the Stipulation provided that disclosure to outside counsel would not waive the privilege, that the documents would not be shown to the FLH trial team, and that acceptance of the documents would not be a ground to disqualify FLH.  FLH has followed the Stipulation to the letter.  (Harris Dec. at ¶ 6.)

At the depositions of FLH personnel, when Reliant began to inquire about documents produced under the Stipulation, counsel for **FLH** suggested that the transcript of the testimony about these documents and the documents themselves be separately bound to avoid inadvertent disclosure to the FLH trial team.  Reliant's counsel agreed.  However, after the testimony was completed, Reliant's counsel designated not only what had been agreed to, but sought to separately bind (and impose the heightened confidentiality requirement) on testimony regarding the four documents (including Mr. Berkin's memorandum of his public record search) produced long before August 27 **by FLH to Reliant**.  (Harris Dec. at ¶¶ 7-8.)  Reliant took this position even though FLH has conceded that these documents were in its files, were known to the trial team during the investigation of the conflict, and were referenced in FLH's prior papers.  (See Haug Dec. at ¶ 21 listing the documents FLH located.)

In response to these belated designations -- made under a Stipulation that on its face did not apply -- FLH's counsel objected to treating the FLH-produced documents under the heightened confidentiality standard that applied to documents to which FLH did **not** have access.  Cortesi Dec.. Ex. 37.[8]  Reliant now twists this position into the claim that FLH claims Mr. Berkin's memo is "not privileged" (Op. Brf. at 16), citing as evidence FLH's counsel's

---

[8]    FLH's also questioned, in passing, whether all of the Reliant documents produced under the Non-Waiver Agreement involved material properly kept from the FLH trial team, but advised Reliant he would respect its designations.  (Harris Dec. at ¶ 10 n.1.)

comments at the Hoag deposition that there was no need to treat it with **heightened confidentiality** (outside counsel's eyes only). (Cortesi Dec. Ex. 25 at 35-36.) As the transcript reflects, FLH's counsel specifically offered to have the document treated as "confidential" pursuant to the appropriate confidentiality agreement (id.), a statement obviously inconsistent with Reliant's allegation of disrespect for its rights. Reliant also misconstrues the law, inasmuch as disclosure, broadly or narrowly, within FLH does not affect the privilege.

Despite these concerns of overbreadth, FLH's counsel has acceded to the Reliant designations and has disclosed none of the designated testimony to the FLH trial team. The FLH trial team has not been made privy to any document provided under the Non-Waiver Agreement, no confidential documents have been released to any third parties and FLH has made no statements indicating its intention to treat its confidential communications with Reliant as anything but privileged. (Harris Dec. at ¶ 13.)[9]

## ARGUMENT

### POINT I

#### A MOTION TO DISQUALIFY MUST BE DENIED WHERE THE MOVING PARTY CANNOT CLEARLY SHOW THAT THERE IS A DANGER THAT RELEVANT CONFIDENCES WILL BE USED TO THE FORMER CLIENT'S DETRIMENT

In considering the legal and ethical issues relating to Reliant's motion, Par again respectfully directs the Court's attention to the accompanying Declaration of Bruce Green, a law professor at Fordham University School of Law and an expert on legal ethics. (Declaration of

---

[9] Similarly erroneous is the argument that FLH has set a double standard because it has refused to produce Mr. Berkin's work product for Par because it is privileged, but does not claim "privilege" over his work product for Reliant. (Op. Brf. at 16, 33). Obviously, the documents created by Mr. Berkin for Reliant do not lose their privilege in the hands of either Reliant or FLH.

Bruce A. Green, dated May 8, 2007 ("Green Dec.").)  Mr. Green asserts that, based on the evidence presented on this motion, the Model Rules of Professional Conduct applicable in Delaware and the Code of Professional Responsibility in New York do not warrant the disqualification of FLH.  (Green Dec. ¶¶ 1, 11, 18, 19 and 22.)  The discussion below is meant to address the legal issues in tandem with the positions set forth by Professor Green.

While the Third Circuit and other federal courts recognize that a court's inherent power to supervise the professional conduct of attorneys includes the authority to disqualify an attorney, "motions to disqualify are generally disfavored." Conley v. Chaffinch, 431 F.Supp. 2d. 494, 496 (D. Del. 2006) (citation omitted); see also Integrated Health Services of Cliff Manor, Inc. v. THCI Co., LLC, 327 B.R. 200, 204 (D. Del. 2005).  As a result, "[t]he party seeking disqualification must **clearly show** that continued representation would be impermissible," and, as such, "vague and unsupported allegations are not sufficient to meet this standard." Conley, 431 F.Supp. 2d at 496 (citation omitted) (emphasis added).

Under Local Rule 83.6(d)(2), the District of Delaware has adopted the Model Rules of Professional Conduct.  Rule 1.9(a) provides, in relevant part: "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." Thus, the standard applicable to the instant motion is the "substantial relationship" test. See Conley, 431 F.Supp. 2d at 496; see also Integrated Health Services, 327 B.R. at 206.

In determining whether a substantial relationship exists, a court must analyze whether confidential information, gained in the first representation, may be used to the detriment of the former client in the subsequent action.  Before concluding that this rule has been violated, a court

24

must "undertake a painstaking analysis of the facts" and answer three questions:

> (1) What is the nature and scope of the prior representation at issue;
>
> (2) What is the nature of the present lawsuit [against] the former client; and
>
> (3) In the course of the prior representation, might the client have disclosed to [his] attorney confidences which could be relevant to the present action and, in particular, could any such confidences be detrimental to the former client in the current litigation?

Conley, 431 F.Supp.2d at 496-97 (citation omitted)   This Court has imposed a significant

threshold for determining the existence of a substantial relationship:

> The rule prohibiting representation of a new client against a former client is not a per se rule.... Only if the moving party proves the requisite substantial relationship should a lawyer be disqualified. A movant for disqualification must have evidence to buttress his claim of conflict because a litigant should, as much as possible, be able to use the counsel of his choice.... Also, because disqualification motions have increasingly been used as one weapon in the litigation arsenal, courts ... approach such motions with cautious scrutiny.

Satellite Financial Planning Corp. v. First Nat'l Bank of Wilmington, 652 F.Supp. 1281, 1283

(D. Del. 1987); see also Integrated Health Services, 327 B.R. at 209 (cautioning courts not to

hypothesize conceivable but unlikely situations in which confidential information might have

been disclosed that could be relevant to the present suit); Nemours Foundation v. Gilbane, Aetna,

Federal Ins. Co., 632 F.Supp. 418, 423 (D. Del. 1986) (citations omitted) (noting that the Third

Circuit has long refused to adopt a per se rule in questions of disqualification," and that whether

to disqualify counsel requires careful balancing of the goals and objectives of professional

conduct and a careful analysis of all the facts and circumstances");   Bowman v. Bank of

Delaware, Case No. 87-44, 1988 WL 54669, at *3 (D. Del. 1988) (absent a genuine conflict of

interest, litigant should be able to choose his own counsel; courts should be wary of use of

motions to disqualify "as just another weapon in the litigation arsenal").

Reliant cannot show that relevant confidences were likely disclosed. Indeed, as set forth above, its principal hypothesis -- that FLH partner Daniel Brown worked on and delivered to Reliant an opinion reflecting his study of the validity, enforceability, and potential for design around of the '588 patent -- is contrary to the facts. Mr. Brown confirmed at his deposition his prior affidavit testimony that he neither provided nor prepared such an opinion. The invoices sent to Reliant reveal no time at all spent by Mr. Brown (or anyone else) on such an opinion.[10]

Reliant's argument boils down to the claim that Mr. Brown rendered an oral opinion regarding the '588 patent's validity, enforceability and potential design around, but inexplicably recorded no time and created no work product for such a comprehensive analysis that -- if performed -- would have taken many hours and required detailed research. The date and alleged details of this alleged opinion is also a mystery. Although Reliant notes that Mr. Brown is copied by Mr. Berdon on a single e-mail regarding Mr. Brown's supposed "working up" of an unidentified patent and cites Mr. Berdon's September 2003 e-mail to Reliant that he "believes" he and Mr. Brown provided a "verbal brief" on the coverage of an unidentified patent, Reliant cannot deny that Mr. Berdon also made clear to Reliant in September 2003 that the Firm was unwilling to provide ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ (Cortesi Dec. Ex. 11.) (emphasis added) Similarly, Mr. Berdon's earlier response to a question from Reliant regarding a design around issue shows that the Firm did **not** provide an opinion, but offered at most to do a ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

---

[10]   As noted above, the lengths to which Reliant resorts to concoct a ground for disqualification are illustrated by the claim in its brief that FLH partner Edgar Haug **admitted** in his May 2007 affidavit that Mr. Brown had a substantive phone conversation about the validity, enforceability and design around of the '588 patent with Reliant's counsel sometime in 2003. (Op. Brf. at 26.) As even a cursory review of Mr. Haug's affidavit reveals, he "admitted" no such thing, but specifically said he had no knowledge of it other than the hearsay comment of Mr. Berdon. (Haug Dec. at ¶ 23.)

████████████████████████  (Id. at Ex. 8.) (emphasis supplied)   There is no

evidence that Mr. Brown, Mr. Berdon or anyone else at FLH ever performed even that

████████████████████████████████████████[11]

      FLH spent less than 20 hours (much of it non-lawyer time) on the Abbott transaction, and

none of that time was devoted to the "opinion" or "study" on patent validity, enforceability or

design around that Reliant claims disqualifies FLH.  Mr. Hoag's 2.5 hours of work on a single

day was exclusively devoted to review of contractual terms that are not at issue, and there is no

evidence that he ever received or reviewed anything substantive regarding the '588 patent, as he

has averred.  Mr. Berkin's non-legal work was similarly limited to a public records search on a

topic unrelated to the validity, enforceability or potential design around of the patent at bar.

These facts militate against the likelihood that any relevant confidences were provided.

**POINT II**

**THE SCOPE OF THE PRIOR REPRESENTATION WAS LIMITED, INVOLVED
MINISTERIAL TASKS, AND WAS UNRELATED TO THE CURRENT
REPRESENTATION, SUCH THAT NO CLIENT COMMUNICATIONS RELEVANT
TO THIS CASE WOULD HAVE BEEN EXCHANGED**

**A.    Mere Superficial Similarity Does Not Justify Disqualification**

      The issues in this case are clear:   (1) Whether Reliant's '588 patent is valid and

enforceable; and (2) Whether Par's proposed propafenone capsule products infringe any valid

claims of the '588 patent.   Indeed, as Reliant concedes in its Amended Complaint, it is Par's

certification in its ANDA that its proposed products do not infringe the '588 patent and that the

patent is invalid and unenforceable that forms the sole statutory, jurisdictional basis for Reliant's

---

[11]    As noted above, Reliant in its memorandum misleadingly suggests that Mr. Berdon provided
substantive advice regarding the difficulty of a design around. (Op. Brf. at 6-8.)  In fact, Mr.
Berdon makes clear that he was merely repeating the view of a Reliant employee with whom
he spoke and was not opining himself.  (Cortesi Dec. Ex. 12.)

commencement of this suit.  See Amended Complaint (D.I. 8) at ¶¶ 9, 10; 35 U.S.C. § 271(e)(2)(A).  There is no issue in this case as to whether the '588 patent was properly assigned to Reliant by Abbott or what the terms and conditions of that transfer are, i.e., the sole matter that Mr. Hoag worked on for Reliant.

The infringement analysis is a two-step process.  Warner-Lambert Co. v. Teva Pharms. USA, Inc. 418 F.3d 1326, 1340 (Fed. Cir. 2005).  The first step involves the interpretation, or construction, of the language of the claims of the patent-in-suit.  Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996); Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448 (Fed. Cir. 1998) (en banc).  The second step involves a comparison of the properly construed claims of the patent-in-suit to the accused product to determine whether all of the limitations of one of the claims of the patent-in-suit are present in the accused product, either literally or by substantial equivalence.  Johnson Worldwide Assocs. Inc. v. Zebco Corp., 175 F.3d 985, 988 (Fed. Cir. 1998).  Guidance as to the construction of claim language comes from the publicly-available patent and prosecution history (intrinsic evidence), and evidence external to the patent and its prosecution history, such as publicly-available dictionaries, treatises and articles, and inventor and expert testimony (extrinsic evidence).  See Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582, 1584 (Fed. Cir. 1996).

Reliant has not alleged that it ever provided anyone at FLH with any confidential information bearing on the construction of the claims of the '588 patent or that it provided any confidential information relevant to a comparison of the '588 patent claims to Par's proposed products, which did not even exist at the time Reliant acquired the '588 patent.  Whether Rythmol® is covered by the claims of the '588 patent (or any other patent) is not relevant to the

28

issue of whether Par's proposed products infringe the '588 patent.

Regarding invalidity, the issues in this case are whether: (1) a single prior art patent or printed "publication" teaches each limitation in the claims of the '588 patent, invalidating the claims as "anticipated" (see 35 U.S.C. § 102(b); EMI Group N. Am., Inc. v. Cypress Semiconductor Corp., 268 F.3d 1342, 1350 (Fed. Cir. 2001)); or (2) a combination of prior art references render the claims of the '588 patent obvious to one of ordinary skill in the art. See 35 U.S.C. § 103(a). By definition, only publicly-available information is relevant to this invalidity analysis because only patents, other "publications," or public uses or sales may anticipate or render a patent obvious. 35 U.S.C. §§ 102(b), 103(a). Reliant does not allege that it disclosed in confidence to anyone at FLH any prior art reference, or any other information, that would bear on the validity of the '588 patent. And whether Reliant's Rythmol® is covered by the '588 patent, or any other prior art reference, is irrelevant to determining if the '588 patent is valid.

Although Reliant argues without evidentiary support that Mr. Berdon received a confidential document from Reliant detailing the manufacturing and formulation of Rythmol® and otherwise became aware of confidential information regarding the product from the Abbott descriptive memorandum he is alleged to have received in June 2003, the fact is that the production of Rythmol® is ultimately irrelevant to the infringement analysis in this case. The question of infringement focuses on what the ANDA applicant will likely market if its application is approved, an act that has not yet occurred. Glaxo, Inc. v. Novopharm, Ltd., 110 F.3d 1562, 1569-1570 (Fed.Cir.1997); see also Warner-Lambert Co. v. Apotex Co., 316 F.3d 1348, 1365-1366 (Fed.Cir.2003) (citing Glaxo for its holding that "the patentee still carries the burden to prove that the product a generic drug maker ultimately will put on the market would likely infringe the patent"). Accordingly, "it is error for a court to compare in its infringement

29

analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent." Zenith Laboratories, Inc. v. Bristol-Myers Squibb Co., 19 F.3d 1418, 1423 (Fed.Cir.1994). See also Glaxo Group, Ltd. v. TorPharm, Inc., 153 F.3d 1366, 1373 (Fed.Cir.1998).

Regarding unenforceability, the issue is whether the patent applicants engaged in inequitable conduct by failing to disclose material prior art to the PTO during prosecution of the '588 patent. Alza Corp. v. Mylan Labs., Inc., 391 F.3d 1365, 1373 (Fed. Cir. 2004). The facts upon which Par bases its unenforceability defense -- that the assignee of record of the '588 patent at the time of its prosecution was aware of a highly material prior art patent that it failed to disclose -- were learned from the decision in McNeilab, Inc. v. Scandipharm, Inc., 862 F. Supp. 1351, 1353 (E.D.Pa. 1994). Reliant does not allege that information relevant to the unenforceability analysis was disclosed while FLH worked for Reliant on the Rythmol® acquisition. Nor does it credibly allege that FLH undertook an enforceability analysis.

That Mr. Hoag and Mr. Berdon provided comments on the provisions of the contract by which Reliant acquired the '588 patent does not change the analysis. The draft contract merely lists the '588 patent as one of the items being acquired and provides no specific assessment of its value, utility, coverage or enforceability. The terms of the Abbott-Reliant agreement are not at issue since the '588 patent's validity and Par's supposed infringement of it exist regardless of anything contained in the document transferring ownership.

When considering the nature and scope of the prior representation, courts must focus on why counsel was retained and what counsel did. Integrated Health Services, 327 B.R. at 207 (citation omitted). A court should also consider whether the movant and the affected counsel "ought to have discussed the relevant facts [of the present litigation] or whether it would not

have been unusual for the lawyer and client to have discussed the relevant facts." Id. at 209 (citing Satellite Financial, 652 F.Supp. at 1284).

In Integrated Health Sèrvices, the court found that the Arent Fox law firm had advised a plaintiff-in-bankruptcy about regulatory obligations associated with the transfer of stock of plaintiff's subsidiaries (which operated nursing homes) to another entity and had assisted in drafting the applications and filings needed for the transfer. See 37 B.R. at 203. As part of the transaction, the bankruptcy court ordered the plaintiff to enter into a master lease agreement with the owner of the properties on which the nursing homes operated. After Arent Fox's representation ended, the plaintiff sued the property owner seeking to void the master lease and Arent Fox appeared on behalf of the owner. Id. at 203-04. The court denied disqualification because Arent Fox's prior representation was discrete and limited and, though the landlord-tenant issues raised in the second representation could be said to arise from the prior stock transfer representation, the court viewed it as a distinct matter. Id. at 208.

Similarly, in Satellite Financial, the plaintiff moved to disqualify the defendant's law firm because that firm had previously prepared documents to incorporate the plaintiff, including obtaining directors' consents. The litigation in which disqualification was sought involved plaintiff's dispute with a bank. See 652 F.Supp. at 1284. The court found that the scope of prior representation was "discrete," that the law firm's work was limited and mainly ministerial and that it would have been unusual for confidential communications relevant to the suit to have been communicated Id. Significantly, the Satellite Financial court observed that a "substantial relationship" will not often be found where the prior representation "was in an **advisory** capacity rather than in a litigation capacity." Id. (emphasis added). The court warned that it "should not allow its imagination to run free with a view to hypothesizing conceivable but unlikely situations

in which confidential information 'might' have been disclosed which would be relevant to the present suit." Id. (citing INA Underwriters v. Nalibotsky, 594 F.Supp. 1199, 1206 (E.D. Pa. 1984)). Finding that no "substantial relationship" existed, the court noted that:

> Mere facial similarity between prior and present representation is insufficient to justify disqualification.... [T]he focus of the district court's inquiry should be on the precise nature of the relationship between the present and former representation.... Merely pointing to a superficial resemblance between the present and prior representation will not substitute for the careful comparison demanded by our cases.

Id. at 1285 (citing Duncan v. Merrill Lynch, 646 F.2d 1020, 1029 (5th Cir. 1981).

FLH's representation of Reliant involved the same type of limited, advisory role, as evidence by Mr. Berdon's decision not to open a new matter and the fact that most of the Firm's 20 hours of time occurred over two days in late October 2003. The work the Firm actually performed did not involve any study or analysis of the '588 patent or the issues raised in this case. Although it could be said that the validity, enforceability, and infringement of the '588 patent arise only because Reliant purchased the patent in 2003, FLH's role in that acquisition bears only a "superficial resemblance" to its representation of Par and does not merit disqualification.

### B.    The Cases Cited by Reliant Are Inapposite

Most of the cases cited by Reliant involve attorneys who represented two parties concurrently and then sought to side with one against the other, thereby "switching sides" in the same or related litigation. These cases are facially distinguishable because FLH did not jointly represent Par and Reliant and it is not choosing one over the other. For example, in In re Corn Derivatives Antitrust Litigation, 748 F.2d 157 (3d Cir. 1984), a law firm represented two plaintiffs in an lawsuit that settled before trial. The firm then withdrew as counsel to one of the plaintiffs and sought to represent the other in challenging the order approving the settlement.

Noting the client's reasonable expectation that its attorney would diligently pursue its goals until the lawsuit was completely resolved, the court observed that "[i]n litigation, an attorney may not abandon his client and take a[n] adverse position in the same case." Id. at 161. The court found the firm's lengthy representation of both parties and the advantage gained by one over the other because of the firm's extensive familiarity with the facts and law, all gained during from the joint representation, required disqualification. Id. at 162.

Here, FLH represented Reliant for only two years, Reliant voluntarily terminated the relationship when it followed Mr. Berdon to a new firm, and the Abbott transaction matter was fully completed by the time the Firm was retained by Par. FLH never represented Reliant in litigation. Moreover, Par's retention of FLH was based on its general expertise and their long history together -- not because Par sought to profit from FLH's alleged knowledge of Rythmol® dating back to 2003. Indeed, Par was unaware of FLH's representation of Reliant at the time of the retention. (Haug Dec. at ¶ 24.) Finally, Par is not challenging the validity of the assignment of the '588 patent to Reliant or any other aspect of the Abbott-Reliant contract.

Other cases Reliant cites are similarly inapposite. See, e.g., United States v. Gordon, 334 F.Supp.2d 581 (D. Del. 2004) (attorney who concurrently represented two parties could not drop one in order to sue it on behalf of the other); Jack Eckerd Corp. v. Dart Group Corp., 621 F.Supp. 725. 730 (D. Del. 1985) (where firm learned financial information about corporation and wrote a sophisticated memorandum advising on how to avoid securities issues, it could not subsequently represent adversary taking a contrary position on those issues).[12]

---

[12]    To the same effect are Buckley v. Airshield Corp., 908 F.Supp. 299 (D. Md. 1995) (lawyer could not challenge validity of same patent he once sought to protect); Amgen, Inc. v. Elanex Pharmaceuticals, Inc., 160 F.R.D. 134 (W.D. Wash. 1994) (law firm represented opposing party in litigation involving same patent); General Electric Co. v. Valeron Corp., 608 F.2d 265 (6th Cir. 1979) (where lawyer was corporation's patent lawyer for several

## POINT III

## EVEN IF RELIANT CAN SHOW THAT IT COMMUNICATED CONFIDENTIAL INFORMATION TO A FORMER PARTNER OF FLH, DISQUALIFICATION OF FLH IS UNWARRANTED BECAUSE <u>THAT ATTORNEY HAS LONG SINCE LEFT THE FIRM</u>

As it did it in its prior briefs, Reliant argues that Model Rule 1.9(a) -- which prohibits a lawyer from representing, absent consent, a client in a matter that is the same or substantially related to a matter in which that client's interests are materially adverse to a former client -- applies to all members of the lawyer's firm.  (Op. Brf. at 7.)  However, Reliant mentions only in passing a key corollary to this rule:  under Model Rule of Prof'l Conduct 1.10 (2002), where the lawyer who received the alleged confidences has left a firm and no remaining attorney has knowledge of or access to confidential information, disqualification is not required.  Rule 1.10(b) states, in relevant part:

> When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless ... the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; **and** ... any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(c) that is material to the matter."  (emphasis added).

Conspicuously absent from Reliant's brief discussion of Model Rule 1.10 is any allegation that FLH has confidential Reliant information that is "material" to this case.  (<u>See</u> Op. Brf. at 31-32.)

Reliant was not a client of FLH until 2002 when Mr. Berdon joined the Firm.  There is no dispute that Mr. Berdon was its principal contact and the *sine qua non* for its becoming an FLH

---

years and prepared drafts of several patent applications, lawyer could not later represent adverse party in patent infringement action against former client); <u>Strategene v. Invitrogen Corp.</u>, 225 F.Supp. 2d 608 (D.Md. 2002) (lawyer and new firm disqualified from representing defendant in patent infringement action where lawyer previously represented plaintiff in preparing patent application on predecessor patent).

client.  This conclusion is reinforced by the fact that the moment Mr. Berdon left the firm in early 2004, Reliant instructed FLH to transfer all of its matters and files to Mr. Berdon at his new firm.  (Haug Dec. at ¶ 7.)[13]  Significantly, Reliant makes no claim that it communicated directly with anyone other than Mr. Berdon regarding the Abbott transaction (or any of the patents), and both the Firm's invoices and the recent deposition testimony similarly reflect the absence of any contacts on the matter between Reliant and other Firm personnel.  Under these circumstances, where Mr. Berdon has been absent from the firm for more than 3 1/2  years and no one still at FLH has relevant confidential information, disqualification is unnecessary and unwarranted.

This principle is reflected in <u>Solow v. W.R. Grace & Co.</u>, 83 N.Y.2d 303 (1994), in which the court found that a law firm was **not** *per se* disqualified because a former partner of the firm had been retained in a related litigation by an adverse party.  In that case, the former partner and her assistants all left the firm before the adverse representation began, and the remaining attorneys played a "negligible" role in the previous representation  Moreover, the client file contained only published articles and held no confidential or proprietary information of the former client.  The court noted that "the presumption that those remaining in the firm are aware of client confidences in cases they themselves did not handle is rebuttable after the affected attorney leaves." <u>Id.</u> at 308.  The <u>Solow</u> court found that the subject law firm should be allowed to rebut the presumption of disqualification by establishing that the firm's remaining attorneys possessed no confidences or secrets of the former client. <u>See id.</u> at 313.

---

[13]  Reliant half-heartedly claims that it retained FLH based on its understanding that Edgar L. Haug would handle future litigations.  (Lerner Dec. at ¶ 5.)  However, Mr. Haug billed less than 7 hours to Reliant, never handled any litigation for it, and was wholly uninvolved with (and unaware of) the Abbott transaction.  (Haug Dec. at ¶ 5.)  Moreover, Reliant discontinued its association with FLH when Mr. Berdon left despite Mr. Haug's continued presence at the Firm.  (Haug Dec. at ¶ 7.)

Similarly, in Goldberg v. Warner/Chapell Music, Inc., 125 Cal.App. 4th 752, 23 Cal.Rptr.3d 116 (Cal.Ct.App. 2005), although an attorney-client relationship had existed between the movant and a former member of the law firm, the firm's imputed disqualification was unnecessary because the lawyer's departure meant that the case would not be discussed or the lawyer's files available. "Once an attorney departs the firm … the court need no longer rely on the fiction of imputed knowledge to safeguard client confidentiality"); Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc., 607 F.2d 186 (7th Cir. 1979) (firm not disqualified where principally involved attorney had left firm and taken client and client's files with him; presumption of shared confidences was effectively rebutted by affidavits stating that that remaining lawyers did not receive or know of relevant confidential information); Unisys Corp. v. Amperif Corp., Case No. 92-1966, 1992 WL 210243 (E.D. Pa. Aug. 20, 1992) (law firm not disqualified where lawyers who had worked for former client had left firm and movant did not establish that remaining lawyers had material, confidential information); Carbo Ceramics, Inc. v. Norton-Alcoa Proppants, 155 F.R.D. 158, 164 (N.D. Tex. 1994) (accepting representation of remaining lawyers that they were aware of no confidences from departed lawyer).[14]

FLH's litigation team on this case -- Messrs. Haug, Stronski, Taylor and Jabri -- aver that they had no involvement whatsoever in the 2003 representation and have not been privy to any Reliant confidences regarding the patent at issue. Similarly, the remaining FLH personnel who had any involvement with the Abbott deal -- Arthur Hoag and Ali Berkin -- attest that they had no direct dealings with Reliant, received no relevant confidential information, either from Reliant

---

[14] Elan Transdermal Ltd. v. Cygnus Therapeutic Systems, 809 F.Supp. 1383 (N.D.Cal. 1992) is inapposite because it applied an **irrebuttable** presumption of shared confidences between a lawyer and his firm. Both Delaware and New York apply a **rebuttable** presumption. See e.g., Nemours, , 632 F.Supp. 418, 428 (D.Del. 1986); Deemer Steel Casting Co. v. East Coast Erectors, Inc., Case No. 10593, 1990 WL 143840, at *3 (Del.Ch. Sept. 28, 1990).

or Mr. Berdon, and merely performed discreet tasks unrelated to the validity, enforceability or potential for design around of the '588 patent at Mr. Berdon's request. As to Daniel Brown, there is no reason to believe that he rendered any substantive services to Reliant or that he is untruthful in denying any knowledge or recollection of any Reliant information. Notwithstanding their lack of confidential information, Mr. Hoag, Mr. Berkin and Mr. Brown are not part of the current FLH litigation team and have been effectively screened.

Given the central role played by Mr. Berdon and his departure from the Firm, there is no cause for concern that anything allegedly disclosed by Reliant to him could be used by FLH to Reliant's detriment. The limited documents available at FLH (the Berkin memo, his public records research, and portions of the asset purchase agreement) do not give rise to any reasonable concern that information in these documents can be used to Reliant's detriment. Similarly, the production of other documents by Reliant was pursuant to a non-waiver agreement, insuring that these documents are not made available to the FLH trial team and that there is no conceivable taint from these documents (virtually all of which Mr. Berdon alone appears ever to have seen).

### POINT IV

**EVEN IF THE COURT FINDS THAT SOME OF THE REMAINING FLH ATTORNEYS SHOULD BE DISQUALIFIED, THE FIRM SHOULD NOT BE DISQUALIFIED BECAUSE AN INFORMATION WALL IS IN PLACE**

FLH's erection in early 2007 of an Information Wall separating the personnel allegedly involved in the 2003 representation transaction from the FLH litigation team is a legally permissible mechanism to safeguard against inadvertent disclosure of relevant confidences (assuming, *arguendo*, they may exist notwithstanding the facts set forth above). Courts have frequently endorsed as effective a screening process to seal off the possibly tainted attorney from the rest of the firm, especially where the lawyer's involvement was marginal See e.g., Nemours

Foundation v. Gilbane, Aetna, Federal Ins. Co., 632 F.Supp. 418, 428-29 (D.Del. 1986); see also

Lambert v. Chase Manhattan Bank, N.A., Case No. 93-5298, 1996 WL 66130, at *1 (S.D.N.Y.

Feb. 15, 1996).    The doctrine of imputed disqualification should not be applied with "rigid

formalism." Nemours, 632 F.Supp. at 425.

      Reliant attempts to discredit FLH's Information Wall by arguing that it was erected

approximately a year after the Par representation began. (Op. Brf. at 30.)  Although Reliant is

correct in recognizing that the Information Wall was not in place at the outset, neither the Firm

nor any of the affected lawyers were aware of a potential conflict or of any confidential Reliant

information.  (See Hoag Dec. ¶ 7; Brown Dec. at ¶ 5.)  Reliant's cases rejecting screens rest

squarely on their facts. See Queen's Quest Condominium Council v. Sea Coast Builders, Inc.,

605 A.2d 580, 582 (Del. Super. Ct., Sussex Co., 1992) (attorney who switched firms in the

middle of a case was disqualified notwithstanding belated construction of information wall); EZ

Paintr Corp. v. Padco, Inc., 746 F.2d 1459, 1462 (Fed. Cir. 1984) (Although attorneys who

moved from plaintiff's small firm to defendant's in mid-litigation claimed they received no

confidential information, plaintiff's affirmative contradictory evidence undermined efficacy of

information wall erected three months after the attorneys joined firm and after disqualification

motion filed).  By contrast, here there is: (a) no "switching sides" in a litigation;  (b) as a larger

firm, the presumption of shared confidences at FLH is more easily rebutted; (c) there is no

evidence that the lawyers had specific relevant confidential information; (d) there is a significant

temporal gap, both between the representations and between the departure of the principally

involved lawyer and the commencement of the adverse representation; and (e) the Information

Wall was imposed promptly after the alleged conflict was discovered and before the

disqualification motion

In <u>INA Underwriters</u>, also cited by Reliant, the court actually held that disqualification was **not** warranted because there was no "substantial relationship" between the two representations and the alleged relevant confidential information was hypothetical. <u>Donohoe v. Consolidated Operating & Production Corp.</u>, 691 F.Supp. 109 (N.D.Ill. 1988) actually involves the **non-disqualification** of a law firm that belatedly recognized a possible conflict. In <u>Donohoe</u>, plaintiff's counsel previously worked for a firm that had once represented one of the defendants, but did not recognize the potential conflict for a year. In deeming disqualification unnecessary, the court found that the alleged confidential information "would be of extremely attenuated value to [plaintiff's counsel's] new clients" and the potential harm to the defendant in the litigation was small." (<u>Id.</u> at 119.) As here, the <u>Donohoe</u> court said disqualification would "provide defendants with a major tactical advantage over plaintiffs" based on limited confidential information obtained years earlier. (<u>Id.</u>)

Here, given the departure of Mr. Berdon, the fact that no new matter for Reliant regarding the Abbott transaction was ever opened, and the lack of analysis of the '588 patent by the remaining FLH personnel, it is unsurprising that FLH was unaware of the possibility that its prior work for Reliant would bear on its representation of Par. Once FLH learned of the potential conflict -- and before the disqualification motion -- it erected the Information Wall. As in <u>Donohoe</u>, any possible damage to Reliant is nil given the lack of knowledge possessed by FLH personnel. Disqualification is unwarranted on that basis.

Finally, Reliant's suggestion that FLH has refused to "acknowledge that any information given to or generated on behalf of Reliant in the course of its former representation is privileged or confidential" (Op. Brf. at 3) and that it should be disqualified for this impropriety is yet another brazen misstatement. As set forth in the accompanying Harris Declaration, FLH has

never refused to acknowledge that Reliant has rights as a client to assert that information is privileged or confidential.   Rather, Reliant twists FLH's understandable objection to its overbroad designation of documents subject to the heightened confidentiality of "outside counsel's eyes only" into the brazen claim that FLH has no respect for privilege.  This spurious allegation, whether the product of intentional misdirection or jumbled logic, merely reinforces the inference that Reliant seeks to achieve a litigation advantage through misstatement, exaggeration and misdirection.  Its tactics should be summarily rejected.[15]

## CONCLUSION

For the foregoing reasons, Reliant's renewed motion to disqualify FLH should be denied.

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

September 21, 2007

Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (# 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Phone:  302-571-6600

- and -

STILLMAN, FRIEDMAN & SHECHTMAN, P.C.
John B. Harris
Mary Margulis-Ohnuma
425 Park Avenue
New York, NY 10022
(212) 223-0200

*Attorneys for Defendant, Par Pharmaceutical, Inc.*

---

[15]   Tipping its hand to the true motives behind this motion, Reliant even has the temerity to assert that -- if disqualification is granted -- FLH should be precluded from transferring any of its work product to new counsel (Op. Brf. at 34 n.19), thus insuring even more delay in the resolution of this case.

40

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on September 28, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jack B. Blumenfeld [jbbefiling@mnat.com]
> Maryellen Noreika [menefiling@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200

I further certify that on September 28, 2007, I caused a copy of the foregoing document to be served on the above-listed counsel and on the following non-registered participants in the manner indicated:

> ### *By E-Mail*
>
> Jack B. Blumenfeld [jblumenfeld@mnat.com]
> Maryellen Noreika [mnoreika@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200
>
> ### *By E-Mail*
>
> John Desmarais [jdesmarais@kirkland.com]
> Gerald J. Flattmann, Jr. [gflattmann@kirkland.com]
> Christine Willgoos [cwillgoos@kirkland.com]
> KIRKLAND & ELLIS LLP
> Citigroup Center
> 153 E. 53rd Street
> New York, NY 10022
> (212) 446-4800

Steven C. Cherny [steven.cherny@lw.com]
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834
(212) 906-1200

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391

*Attorneys for Defendant-Counterclaimant,*
*Par Pharmaceutical, Inc.*

2