# Young Conaway Stargatt & Taylor, LLP

Karen L. Pascale
Direct Dial: (302) 571-5001
Direct Fax: (302) 576-3516
kpascale@ycst.com

The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

P.O. Box 391
Wilmington, Delaware 19899-0391

(302) 571-6600
(302) 571-1253 Fax
(800) 253-2234 (DE Only)
www.youngconaway.com

January 7, 2008

**BY E-FILING AND HAND DELIVERY**

The Honorable Joseph J. Farnan, Jr.
United States District Court
844 King Street
Wilmington, DE 19801

     Re:   *Reliant Pharmaceuticals, Inc. v. Par Pharmaceutical, Inc.,*
             C.A. No. 06-774-JJF

Dear Judge Farnan:

     I write on behalf of Par Pharmaceutical, Inc. ("Par") in response to the January 3, 2008 letter submitted on behalf of Reliant Pharmaceuticals, Inc. ("Reliant") concerning Reliant's motion to disqualify Par's lead counsel, Frommer Lawrence & Haug LLP. *See* D.I. 139. That letter quotes one of 21 categories of possible inquiry listed in a Rule 30(b)(6) deposition notice served by Par—which category concerned Reliant's acquisition of the drug and the patent in suit— to argue that this listing proves the existence of a substantial relationship requiring disqualification because it concerns, according to Reliant, "matters on which FLH previously represented Reliant and gave it legal advice." Reliant's flawed argument is based on a misunderstanding of the category itself and the relevance of that category to the pending motion.

     The intent of this category is to cover commercial issues. Reliant relies on alleged secondary indicia of non-obviousness[1] and has put in issue, among other things, the commercial success and advantages of its product over other products in the relevant market. In this context, Par should be entitled to explore the commercial considerations with which Reliant was presented in 2003 when it decided to purchase this product and the patent in suit from Abbott Laboratories. For example, were there market estimates that Reliant considered for what it could reasonably expect from this product and have such estimates been met or exceeded? The purpose of the category at issue here is to explore and test these kind of commercial expectations for this product, and the bases for any such expectations, all of which Reliant has put in issue. The category does not concern — nor does Par intend to inquire about —the subject matter or work product of any attorney or material protected by privilege.[2]

---

[1]   Reliant's Supplemental Response to Interrogatory 7 discloses that, in support of non-obviousness, it relies on alleged commercial success, copying, failure of others, long felt need and acquiescence in the market.

[2]   To rehash its disqualification arguments, Reliant tactically chooses to raise this single deposition notice category with the Court instead of first raising its concerns regarding the breadth of this category with Par. Reliant's letter also quotes Par's opposition papers, which state that the agreement whereby Reliant acquired the product and patent at issue are not at issue in this case, and Reliant suggests wrongly that the deposition notice category is inconsistent with this language. Had Reliant served an objection to the breadth of the category or otherwise raised the issue, Par could have then clarified that what it seeks concerns the commercial

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Joseph J. Farnan, Jr.
January 7, 2008
Page 2

Reliant's letter adds nothing to the record on the pending motion, which amply supports denial for reasons set forth in Par's opposition. Indeed, the motion was denied once by order of this Court on July 25, 2007 with leave to re-plead following limited, agreed discovery. Reliant re-filed it following discovery and Par believes that the record amply supports its denial again.

Denial of the motion is further supported by a recent and persuasive opinion from the District of New Jersey involving similar issues. *See Warner Chilcott Company, Inc. v. Watson Pharmaceuticals, Inc. and Watson Laboratories, Inc.*, Civil Action No. 06-3491 (HAA) (D.N.J. January 2, 2008) (Ex. 1). The *Warner Chilcott* court considered a motion to disqualify defendant's lead counsel in a patent infringement case on the ground that counsel had been involved in due diligence of publicly available information and allegedly "orally" opined as to the patent's validity and enforceability on behalf of the then-parent corporation of Warner Chilcott. At issue there was whether a substantial relationship existed between the prior due diligence work and the issues in the case. That court held that, although both representations concerned a review of the same patent, the movant had failed to establish that the two matters involved the same issues and were thus substantially related. Notably, the *Warner Chilcott* Court explained:

> At a very high level, both representations involve the '394 patent. Using a mid-level view, both deal, at least in some respects, with review of the '394 patent. Yet as one drills down more deeply, the correct level of analysis focuses more narrowly upon the issue of whether the prior representation addressed the validity and enforceability of the '394 patent. This, after all, is the issue currently being litigated, and it therefore defines the crux of the analysis.

(Ex. 1, at 8). Applying this analysis, the *Warner Chilcott* court denied the motion to disqualify, rejecting the very arguments that Reliant makes here: that, despite the absence of any written opinion on validity and enforceability and the absence of any legal time or work product evidencing such an opinion, the law firm rendered an "oral" opinion on these complex and detailed issues.

We respectfully submit that this well-reasoned decision of the District of New Jersey is persuasive and that a similar ruling denying disqualification is justified on the record in this case.

Respectfully submitted,

Karen L. Pascale (No. 2903)

---

considerations and information available to Reliant at the time of its acquisition (commercial considerations as to which Reliant does not and cannot suggest that FLH rendered advice). Par does not dispute that Reliant acquired the Rythmol® SR product and patent in suit, and that agreement itself is not at issue in this case.

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Joseph J. Farnan, Jr.
January 7, 2008
Page 3

cc:    Clerk of the Court (by hand delivery)
       Jack B. Blumenfeld, Esquire (by CM/ECF and hand delivery)
       Gerald J. Flattmann, Jr., Esquire (by e-mail)
       Edgar H. Haug, Esquire (by e-mail)
       John B. Harris, Esquire (by e-mail)

# EXHIBIT
# 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WARNER CHILCOTT COMPANY, INC. :
           :
   Plaintiff,    :
           :
v.           :
           :
WATSON PHARMACEUTICALS, INC. :
and WATSON LABORATORIES, INC., :
           :
   Defendants.   :
           :

Civil Action No. 06-3491 (HAA)


**OPINION AND ORDER**

   Pending before this Court is Plaintiff Warner Chilcott's ("Plaintiff" or "Warner Chilcott")

motion to disqualify the law firm of Kenyon & Kenyon ("Kenyon") from representing

Defendants Watson Pharmaceuticals and Watson Laboratories, Inc. (collectively, "Watson" or

"Defendants") in the present Hatch-Waxman action. Having considered the parties' written

submissions and oral arguments, and for the reasons set forth below, Plaintiff's motion is

**DENIED.**


**I.  Background**

   On July 28, 2006, Warner Chilcott filed a complaint against Watson alleging patent

infringement, to which Watson asserted the affirmative defense of invalidity. On March 27,

2007, this Court held an initial scheduling conference with the parties and entered a pretrial

scheduling order. During that conference, however, Plaintiff apprised the Court of its concern

over Kenyon's representation of Defendants. Plaintiff voiced an initial objection to this

representation based upon a purported conflict of interest created by Kenyon's past

representation of Galen PLC (formerly Warner Chilcott's parent company and currently its sister

company). This Court ordered the parties to exchange all necessary discovery – related solely to the conflict-of-interest issue – after which Plaintiff could elect to file a motion to disqualify. Approximately two months later, having received correspondence from Plaintiff requesting leave to file the present motion, this Court entered a full briefing schedule.

With regard to the remainder of discovery, the parties agreed during a September 26, 2007 telephone conference to proceed, agreeing that discovery would not be a problem even in light of the pending motion to disqualify. But on October 25, 2007, Plaintiff reversed position, asking the Court to stay discovery pending resolution of the present motion. Over Defendants' objection and in an abundance of caution, this Court agreed to stay discovery but ordered third parties to proceed with the collection of documents such that the discovery process would not come to a complete halt.

Finally, having read the written submissions, the Court heard oral argument from the parties on November 30, 2007.


## II.    The Law

Pursuant to Local Civil Rule 103.1(a), the United States District Court for New Jersey has adopted New Jersey law to address questions of professional ethics. Thus, the New Jersey Rules of Professional Conduct govern the present motion to disqualify.

Motions to disqualify are viewed with disfavor because disqualification is a drastic remedy with broad repercussions. *Carlyle Towers Condominium Ass'n v. Crossland Sav.*, 944 F. Supp. 341, 345 (D.N.J. 1996). Thus, as many courts have recognized, the balancing of the need to maintain ethical standards against a client's right to choose the legal representation of his or

-2-

her choice is one that requires a fact-intensive analysis and careful application of the law. *Steel v. General Motors Corp.*, 912 F. Supp. 724, 733 (D.N.J. 1995). Given its drastic nature, a party seeking disqualification must meet a high standard of proof. *Rohm & Haas Co. v. American Cyanamid Co.*, 187 F. Supp. 2d 221, 226-27 (D.N.J. 2001). But in the end, in New Jersey, any doubt as to the propriety of an attorney's representation of a client must be resolved in favor of disqualification. *Steel*, 912 F. Supp. at 733.

Here, the parties agree that New Jersey Rule of Professional Conduct 1.9(a) sets forth the relevant test for disqualification. It consists of a three-part test, requiring:

1) the existence of a past attorney-client relationship between the moving party and the law firm sought to be disqualified;

2) material adversity between the interests of the law firm's current client and those of the moving party; and

3) substantial similarity between the current and former representations.

While the parties agree as to the elements of the test, they are predictably at odds as to its application. Thus, the Court shall proceed by evaluating the parties' arguments with regard to each prong of Rule 1.9(a)'s three-part test.

III.   **Analysis**

   1.   **Existence Of An Attorney-Client Relationship**

   The first prong of RPC 1.9(a) requires the existence of a past attorney-client relationship between the moving party and the law firm sought to be disqualified. In this case, given that Warner Chilcott did not exist prior to 2004 and given that the attorney-client relationship in

question existed between Galen PLC and Kenyon, Defendants assert that Plaintiff has not carried its burden as to this prong. Plaintiffs counter with a detailed discussion of Warner Chilcott's corporate history and the related law regarding attorney-client relationships. Before addressing the parties' arguments on the merits, the Court finds it useful to outline Warner Chilcott's corporate history, as explained in full during oral argument.

In 2002-2003 Galen Holding PLC ("Galen PLC") and its wholly-owned subsidiary Galen (Chemicals) Ltd. ("Galen Chemicals") acquired several assets from Pfizer ("Pfizer assets"). The Pfizer assets included many different oral contraceptive products as well as the associated patents to those products. The '394 patent, the subject of the current litigation, was one such acquired patent, though the parties dispute the extent to which it actually had a product with which it was associated. Kenyon advised the Galen entities on the entire transaction. Upon completion of the transaction, the Pfizer assets resided with Galen Chemicals.

In July 2004, Galen PLC formed another wholly-owned subsidiary, Warner Chilcott Company ("Warner Chilcott"), and proceeded to transfer the purchased Pfizer assets from Galen Chemicals to it. At about the same time, Galen PLC changed its name to Warner Chilcott PLC. Then, in January 2005, all of the above-referenced entities (Galen PLC, Galen Chemicals, and Warner Chilcott) were taken private by Warner Chilcott Ltd., during which Warner Chilcott PLC (f/k/a Galen PLC) again changed its name, this time to Chilcott UK Ltd. Upon completion of this acquisition, all of Chilcott UK Ltd.'s assets were acquired by Warner Chilcott Ltd. Finally, in July 2006, another reorganization occurred in which Chilcott UK Ltd. moved from a vertical parent-subsidiary relationship with Warner Chilcott to a horizontal sister-company relationship. Thus, after all of the name changes, reorganizations, and reshufflings, the picture today is as

follows: Warner Chilcott Ltd. is the parent company of three sister companies: Galen Chemicals,

Chilcott UK Ltd. (f/k/a Galen PLC) and Warner Chilcott. The Pfizer assets have remained with

Warner Chilcott ever since the July 2004 transfer.

Upon these facts, Watson emphasizes the fact that Warner Chilcott did not exist in 2002

or 2003 and the entities that did exist – Galen PLC and Galen Chemicals (whom Kenyon

advised) – no longer own the Pfizer assets. Moreover, Galen PLC is no longer even a parent

company to Warner Chilcott (it is now a sister company). Thus, argues Watson, the attorney-

client relationship required by RPC 1.9(a) does not exist.

Plaintiff traces the movement of the attorney-client privilege across the various entities

and asserts that for the purposes of the present motion, Warner Chilcott may rely upon it. This

Court agrees. When new management takes control of a company, the authority to assert and

waive a corporation's attorney-client privilege passes as well. *Commodity Futures Trading

Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985). In this case, Warner Chilcott Ltd. acquired all

of the assets of Galen PLC, including the relevant attorney-client privilege, when it took the

company private. (Reply Br. at 2). Warner Chilcott, as a subsidiary entity, can now assert the

privilege of its parent company so long as the two share a sufficient identity of interests. Here,

the two companies share the same legal department and the same CEO. (Second Hara Dec. ¶ 7).

Thus, any injury to Plaintiff would surely flow to its parent company and vice-versa. *Baxter

Diagnostics Inc. v. AVL Scientific Corp.*, 798 F. Supp. 612, 616 (N.D. Cal. 1992). As such,

Warner Chilcott can rely upon the privilege.

None of the cases that Defendants cite in response are on point with regard to the

attorney-client analysis in this case. *Telectronics Proprietary Ltd. v. Medtronic, Inc.,* 836 F.2d

1332, 1337 (Fed. Cir. 1988), involved the attempt to claim the attorney-client relationship based on a patent assignment to a complete stranger. Unlike *Telectronics*, the parties in this case are all controlled by the same parent company and are therefore related either as sister companies or as parent-subsidiaries. Thus, *Telectronics* does not apply. Additionally, Defendant cites *Pennwalt v. Plough*, 85 F.R.D. 264 (D. Del. 1980), in which the Court denied a motion to disqualify where plaintiff's counsel had represented defendant's sister corporation in a separate antitrust suit. The Court denied the motion based upon the lack of a substantial relationship between the prior and current matters and did not rely upon the attorney-client relationship prong in its decision. Thus, it too is inapplicable here.

Finally, the Court finds that Defendants' formalistic reading of the attorney-client relationship, as applied to a motion to disqualify, is not the law and does not govern this analysis. In analyzing an attorney disqualification issue, the court should not look at whether the relationship at issue is "in all respects that of attorney and client, but whether there exists sufficient aspects of an attorney-client relationship for purposes of triggering inquiry into the potential conflict." *Ramada Franchise System, Inc. v. Hotel of Gainesville Assoc.*, 988 F. Supp. 1460, 1463 (N.D. Ga. 1997); *see also Glueck v. Jonathan Logan, Inc.*, 653 F.3d 746, 749 (2d Cir. 1981). Where the entities implicated are as closely related as the ones here, this Court follows the lead of the *Ramada* court and declines to adopt a technical and formal attorney-client analysis. Rather, upon a practical examination of the facts, an attorney-client relationship does exist for the purpose of analyzing the present motion to disqualify.

2.    **Material Adversity**

Neither party seriously contests this prong of the analysis. Warner Chilcott, the moving

party, alleges Watson's infringement of the '394 patent. Watson denies this allegation and submits that the '394 patent is invalid. The parties interests are therefore clearly adverse and therefore this prong is easily satisfied.[1]

### 3.    Substantial Relationship

The final piece of the three-part analysis focuses upon the similarity between the current and former representations. Under this prong, the Court must find a substantial relationship between Kenyon's prior work for the Galen entities and its current representation of Watson. Unsurprisingly, the bulk of the parties' arguments, both in writing and orally, focused upon this part of the analysis.

The term "substantially related" is broadly construed in New Jersey. *Steel v. General Motors Corp.*, 912 F. Supp. 724, 736 (D.N.J. 1995). The standard asks whether "the adversity between the interests of the former and current clients" has created "a climate for the disclosure of relevant confidential information" and whether "the issues between the former and present matters are practically the same." *Id.*, quoting *Kaselaan & D'Angelo Associates, Inc. v. D'Angelo*, 144 F.R.D. 235, 243-44 (D.N.J. 1992). Once the Court finds a substantial relationship, it need not delve into the question of whether or not the attorney in question actually acquired confidential information from his prior client; rather, at that point the rule calls for *per se* disqualification. "Where the moving party has established that the matters are substantially related, the court will presume that the attorney has acquired confidential information from the former client relevant to the current proceeding." *Delso v. Trustees for the Retirement Plan for the Hourly Employees of Merck & Co., Inc.*, 2007 WL 766349, at *5 (D.N.J. March 6, 2007)

---

[1] During oral argument, neither party addressed this prong of the analysis.

quoting *Reardon v. Marlayne, Inc.*, 83 N.J. 460, 469 (1980). Finally, a court should "disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule. It should consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions." *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980).

Before delving into the facts of the prior representation, it is necessary to define the scope of the analysis. After all, there are many different levels upon which this Court could answer the question of substantial similarity. At a very high level, both representations involve the '394 patent. Using a mid-level view, both deal, at least in some respects, with review of the '394 patent. Yet as one drills down more deeply, the correct level of analysis focuses more narrowly upon the issue of whether the prior representation addressed the validity and enforceability of the '394 patent. This, after all, is the issue currently being litigated, and it therefore defines the crux of the analysis.

Regarding the question of whether Kenyon in its prior work for Galen PLC specifically addressed the validity of the '394 patent, the parties are diametrically opposed. Izumi Hara, currently Warner Chilcott's General Counsel and previously the Deputy General Counsel at Galen PLC, states that "as part of its representation, Kenyon was to and did review the '394 patent." (Opening Br., Hara Dec., ¶ 10). At oral argument, Plaintiff's counsel confirmed that "Galen's general counsel...expected Kenyon to advise them on the validity, infringement, and enforceability...of the '394 patent." (Nov. 13, 2007 Tr. at 13). On the other hand, Michael Bryner, Kenyon's senior associate assigned to the Pfizer matter, states unequivocally: "I was not

-8-

asked to develop an opinion on the validity, enforceability, or scope of U.S. Patent 5,552,394, and I did not investigate the validity, enforceability, or scope of the '394 patent." (Opp. Br., Bryner Dec. ¶ 4). Deborah Somerville, the lead Kenyon partner on the Pfizer matter, corroborates Mr. Bryner's statement, saying, "Neither I nor anyone acting at my direction investigated the validity, enforceability, or scope of the '394 patent as part of our work for Galen." (Opp. Br., Somerville Dec. ¶ 4). Given multiple sworn affidavits essentially making contradictory statements, this Court turns to the documentary evidence before it to reach an answer.

Warner Chilcott, as the party moving to disqualify, bears the burden of proof. And as part of that proof, it submits billing entries and emails contending that Kenyon considered the scope and substance of the '394 patent claims. Warner Chilcott also submits evidence contending that Kenyon had access to and took advantage of the Pfizer data room – a room that served as a repository of Pfizer's confidential documents regarding the assets in question. At the end of the day, however, the host of evidence submitted by Warner Chilcott lacks a memo, document, or billing entry in which any member of the Kenyon team opined upon the validity or enforceability of the '394 patent. This Court must presume that before submitting its motion to disqualify, Warner Chilcott scoured its records in search of a document or memo in which Kenyon offered up such an analysis. Yet no such document has been presented. Rather, the Court is left to infer and speculate as to what Kenyon may have done with respect to the '394 patent.

During oral argument, Plaintiff attempted to remedy this evidentiary deficiency by asserting on multiple occasions that any report as to validity and enforceability was given orally

rather than in writing. (Nov. 13, 2007 Tr. at 19) ("Those materials were undoubtedly given orally and not in here [on paper]...[C]ertainly someone purchasing these products would have wanted to know that, and you can be sure that information was confirmed or conveyed orally..."). Yet none of the billing entries, affidavits, or other documents attached to Plaintiff's opening and reply briefs make this same contention. Not one of them mentions reviewing or analyzing the enforceability and/or validity of the '394 patent nor is there a mention of any sort of an oral report.

　　　　Aside from the assertion of an oral report, Plaintiff's counsel offered another angle by which to approach the validity question, arguing that "you look at the prosecution history when you're analyzing validity, infringement, enforceability." (Nov. 13, 2007 Tr. at 21). Thus, Plaintiff claims that the fact that Kenyon pulled the prosecution history of the '394 patent indicates that it was performing some type of a validity analysis. Kenyon, in response, offers a perfectly logical reason to why it pulled the patent's file wrapper – it did so to provide a summary of the patent's factual history. (Nov. 13, 2007 Tr. at 40-41). Again, nothing in the record suggests otherwise, and this Court is not willing to disqualify counsel based upon the leap of logic inherent to a claim that an examination of a patent's publicly-available file wrapper is tantamount to an analysis of its validity.

　　　　Finally, Warner Chilcott argues in its reply brief that "Galen did not pay Kenyon in excess of $138,000 for a meaningless exercise." (Reply Br. at 8). Fair enough. But that argument begs the very question as to why there is no documentary evidence before this Court of any analysis regarding the enforceability of the '394 patent. Surely Galen did not pay $138,000 dollars for Kenyon to deliver an oral report as to its findings. The fact of the matter is that while

Warner Chilcott's evidence suggests that Kenyon did review the '394 patent, it does not go so far as to indicate that Kenyon opined upon the patent's validity or enforceability. Rather, Kenyon pulled publicly available documents – such as the file wrapper – and summarized them for Galen. The bulk of Kenyon's work focused upon the other Pfizer products, with very little work focusing upon the '394 patent. Kenyon, for its part, does not deny having anything to do with the '394 patent during its prior representation. The fact of the matter, is, however, that the substantial similarity analysis hinges upon whether or not prior work was done with regard to the validity and enforceability of the '394 patent. And at this point in the analysis, the record simply falls short.

Given the evidence before it, this Court cannot conclude that the past and present representations were "practically the same." Nor is the Court convinced that the adversity between the two parties has created a climate for the disclosure of confidential information. Simply put, there is no evidence that Kenyon ever acquired any confidential information with regard to the '394 patent. The Pfizer data room, of which Plaintiffs talk at length, contained confidential Pfizer documents that would be available in discovery to any party challenging the validity of the '394 patent. All in all, given the above facts and analysis, the two representations are not substantially similar and therefore Warner Chilcott fails to fulfill the requirements of RPC 1.9(a).

## IV.    Conclusion

At the end of the day, attorney disqualification is a disfavored remedy and the corresponding burden of proof is high. While any doubts are to be resolved in favor of

disqualification, Warner Chilcott has fallen short of meeting its initial burden of proof.  Thus,

this Court finds that Kenyon's prior work for Galen PLC is not substantially similar to the work

comprising its current representation of Watson.  Accordingly, Plaintiff's motion to disqualify is

**DENIED.**

> **SO ORDERED.**

/s/ Esther Salas _____
**Esther Salas**
**UNITED STATES MAGISTRATE JUDGE**

-12-