# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

_____

| | |
|---|---|
| RELIANT PHARMACEUTICALS, INC., | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PAR PHARMACEUTICAL, INC. | ) |
| | ) |
| Defendant. | ) |

C.A. No. 06-774 (JJF)

_____

## PLAINTIFF RELIANT PHARMACEUTICALS, INC.'S
## OPENING CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com
*Attorneys for Plaintiff*

*Of Counsel:*

John M. Desmarais
Gerald J. Flattmann, Jr.
Christine Willgoos
KIRKLAND & ELLIS LLP
Citigroup Center
153 E. 53rd Street
New York, NY 10022
(212) 446-4800

March 5, 2008

TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS ....................................................1

SUMMARY OF ARGUMENT ................................................................................1

ARGUMENT ......................................................................................................2

I.      LEGAL STANDARD FOR CONSTRUING CLAIMS ................................2

II.     RELIANT'S RYTHMOL® SR DRUG PRODUCT ...................................4

III.    BACKGROUND OF THE CLAIMED INVENTION ...................................5
        A.      The Field Of The Invention ...............................................5
                1.      Tablet Formulation...................................................5
                2.      Delayed Release Tablets ..........................................6
        B.      The '588 Patent .................................................................8

IV.     RELIANT'S PROPOSED CLAIM CONSTRUCTIONS ................................9
        A.      "Delayed Release Microtablet"...........................................9
        B.      "Cylindrical" ...................................................................11
        C.      "Convex Or Flat Upper Side And Lower Side"....................13
        D.      "The Tablet Contains No Release-Delaying Ancillary Substance"....................13
        E.      "Lubricant" ......................................................................16
        F.      "Other Conventional Ancillary Substances" .......................18
        G.      "Release Rate Is Virtually Independent Of The Pressure When
                Compressing The Tablets".................................................19
        H.      "Active Ingredient Density" ..............................................21
        I.      "A Pronounced Plasma Level Plateau With A PTF<75%" .................22
        J.      "Bioavailability Does Not Depend On The Intake Of Food" ...............23
        K.      "Cylindrical Mold" ...........................................................24

V.      CONCLUSION...............................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*,
    460 F.3d 1349 (Fed. Cir. 2006)........................................................................ 4

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996)........................................................................................ 4

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004)........................................................................ 3

*Netword, LLC v. Centraal Corp.*,
    242 F.3d 1347 (Fed. Cir. 2001)........................................................................ 3

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)................................................................ 2, 3, 4

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999)........................................................................ 2

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996).......................................................................... 3

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Reliant Pharmaceuticals, Inc. ("Reliant") brought this suit against Par Pharmaceutical, Inc. ("Par") for infringement of U.S. Patent No. 5,681,588 ("the '588 patent") entitled "Delayed Release Microtablet of β-Phenylpropiophenone Derivatives."  D.I. 1, 8. Reliant's Amended Complaint alleges, *inter alia*, that Par's generic propafenone extended release products described in ANDA 78-540 infringe the '588 patent.  D.I. 8.  Par has asserted defenses and counterclaims of non-infringement, invalidity and unenforceability of the '588 patent.  D.I. 11.

Fact discovery is ongoing.  The parties have exchanged interrogatories and document requests and responses.  Document production is substantially complete.  Pursuant to the March 28, 2007 Scheduling Order, fact discovery is to be completed by March 7, 2008.  D.I. 27.  However, depositions are ongoing and have been scheduled throughout March. Accordingly, subject to the Court's approval, the parties have agreed to continue fact discovery through at least April 7, 2008.

The parties exchanged lists of claim terms for construction on February 20, 2008.

## SUMMARY OF ARGUMENT

The terms of a patent claim are properly construed according to their ordinary and customary meaning -- the meaning that one of skill in the art at the time of the invention would ascribe to them.  In determining the meaning of claim terms, a court must look to the words of the claims, the specification of the patent, and the history before the U.S. Patent and Trademark Office ("Patent Office").  Reliant seeks claim constructions for 11 claim terms of the '588 patent. Reliant's proposed constructions comport with the ordinary and customary meanings that would be ascribed to the terms by one of ordinary skill in the art upon reading the patent.

Each of Reliant's proposed claim constructions is supported by the plain meaning of the terms, the specification of the '588 patent, and the prosecution history of the patent. In addition, Reliant provides declarations from pharmaceutical formulation experts, Drs. Jeffrey Hubbell and Christopher Rhodes, that confirm that Reliant's proposed constructions reflect the understanding of one of ordinary skill in the art at the time of the invention. Accordingly, Reliant requests that the Court adopt Reliant's proposed claim constructions as set forth herein.

## ARGUMENT

### I.      LEGAL STANDARD FOR CONSTRUING CLAIMS

The metes and bounds of a patent are defined by the claims. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude'") (internal citations omitted). Thus, "[t]he starting point for any claim construction must be the claims themselves." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999).

The legal principles governing claim construction were recently summarized and clarified by the *en banc* Federal Circuit in *Phillips v. AWH Corp. See id.* The Court explained that claim terms "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *See id.* at 1312-13 (internal quotations omitted). To determine this meaning, "the court starts the decision making process by reviewing the same resources as would that person, *viz.*, the patent specification and the prosecution history." *See id.* at 1313. Thus, claim construction rests primarily on three sources of intrinsic evidence — the claims, the specification, and the prosecution history.

2

In many cases, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *See id.* at 1314. When the ordinary meaning of the claim terms is readily apparent, claim construction may involve "little more than the application of the widely accepted meaning of commonly understood words." *Id.* "In such circumstances, general purpose dictionaries may be helpful." *Id.*

The claims "do not stand alone," however, and "must be read in view of the specification, of which they are a part." *See id.* at 1315 (internal quotations omitted). The specification is highly relevant to the claim construction analysis. *Id.* The specification will often provide "the single best guide to the meaning of a disputed term." *See id.*; *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996). One reason for this is that "[t]he claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose." *See Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001); *see also Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1347 (Fed. Cir. 2004) ("Although it is improper to read a limitation from the specification into the claims, '[c]laims must be read in view of the specification, of which they are a part'") (internal citations omitted). Moreover, a patentee may use the specification to define the patent's use of specific claim terms. *See Phillips*, 415 F.3d at 1316 ("[O]ur cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs.").

Similarly, the prosecution history of the patent should be considered in defining claim terms. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *See id.* at 1317.

3

In addition, expert testimony may serve an important role in claim construction proceedings, and is particularly appropriate when dealing with complex technologies or those outside of the Court's expertise. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 387 (1996). The Federal Circuit recently restated the important role experts may play in claim construction:

> [E]xtrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology . . . to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of ordinary skill in the art, or to establish that a particular term in the patent or prior art has a particular meaning in the pertinent field.

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1362 (Fed. Cir. 2006) (*citing Phillips*, 415 F.3d at 1318).

## II. RELIANT'S RYTHMOL® SR DRUG PRODUCT

Reliant markets in the United States a sustained release (delayed release) formulation of propafenone hydrochloride under the trade name Rythmol® SR. Rythmol® SR is an antiarrhythmic drug for the treatment of irregular heartbeat (arrhythmia). It is approved by the U.S. Food and Drug Administration (FDA) and indicated to prolong the time to recurrence of symptomatic atrial fibrillation in patients without structural heart damage. Ex. 1.

Unlike generic versions of instant release propafenone hydrochloride, Rythmol® SR is formulated as a sustained release (delayed release) drug. Accordingly, Rythmol® SR may be administered every twelve hours. Rythmol® SR may be taken with or without food. Ex. 1.

Rythmol® SR is covered by the claims of the '588 patent. Ex. 2.

## III.     BACKGROUND OF THE CLAIMED INVENTION

### A.     The Field Of The Invention

#### 1.     Tablet Formulation

The most commonly used orally administered drug products are solid pharmaceuticals in the form of compressed tablets. Tablets consist of therapeutic drug (often referred to as active pharmaceutical ingredient or "API") and non-pharmacologically active materials called excipients.[1] Rhodes Decl. at ¶ 18.[2]

Tablets are manufactured by compaction on a tablet press of a powder or granular mix of API and excipients. The compaction force applied on the tablet press squeezes out most of the air in the powder or granular mix and forces the solid particles into very close proximity to one another so that in some instances they join together. Rhodes Decl. at ¶ 19.

Excipients may have many functions, including to improve the processing, storage or use of the product. For example, although some APIs are inherently readily compressible and can be easily fabricated into tablets, many drugs do not compress easily unless they are mixed with substantial amounts of excipients that function as compaction aids (fillers). This is disadvantageous because such tablets may require large amounts of filler, resulting in a large tablet that is not easy to swallow. Rhodes Decl. at ¶¶ 18, 20.

Most compressed tablets also contain an excipient that functions as a lubricant, commonly magnesium stearate. Lubricants act by reducing the frictional forces between the

---

[1]   In the '588 patent, non-pharmacologically active materials are generally referred to as "ancillary substances" rather than as excipients. The terms "excipients" and "ancillary substances" are used interchangeably herein.

[2]   "Rhodes Decl." as used herein refers to the Declaration of Dr. Christopher T. Rhodes In Support Of Reliant Pharmaceuticals, Inc.'s Opening Claim Construction Brief.

tablet and the press tooling and thereby prevent the tablet from adhering to the tooling.  In the absence of a lubricant, when the tablet press enters the ejection mode and delivers the finished tablets into the product delivery chute, a significant proportion of the tablets may adhere to the tooling and thus be incomplete.  In an extreme case the press will simply cease operation because the force required to eject the tablets is excessive.  Rhodes Decl. at ¶ 21.

Another type of excipient often included in tablet formulations is a binder.  This material assists in maintaining the physical integrity of the tablet so that it is less likely to break up either on ejection from the press or during storage or transport stress.  Rhodes Decl. at ¶ 22.

Once a tablet is ingested by the patient, it is essential that the drug be released into the lumen of the gastrointestinal tract (GI) from where it can then enter the bloodstream.  The release of drug from a tablet in the conditions likely to exist within the GI tract is thus an element of quality assurance testing for tablets.  This release is evaluated using standard United States Pharmacopia (USP) dissolution tests.  Normally, the dissolution of drug from tablets is dependent upon the amount of force used in the compression event.  In general, the greater the compression force used, the harder the tablet.  An increase in tablet hardness usually slows down dissolution of drug.  Rhodes Decl. at ¶ 23.

### 2.    Delayed Release Tablets

Tablets may be classified as immediate release or delayed release.  In an immediate release tablet there is no design element included to control or delay the rate of drug release.  For such tablets, the majority of the drug dose is released quickly, for example, within 30 minutes.  Delayed release tablets are designed so that the drug is released within the GI tract over a period of several hours.  This prolongs the process of absorption so that blood levels of the drug can remain at therapeutic concentrations for an extended period of time.  Rhodes Decl. at ¶ 24.

Delayed release drug products offer patients a number of significant advantages. First, the dosing frequency can be reduced. For example, a drug with an immediate release (non-delayed) formulation that has to be administered three or four times daily may only require administration once or twice a day when provided as a delayed release product. This reduction in dosing frequency is convenient to the patient and also improves patient compliance, an important part of drug therapy. Rhodes Decl. at ¶ 25.

Another advantage of delayed release drug products is that the concentration of drug in the blood over time is steady. For example, when a drug product is provided as an immediate release tablet three times a day the surge of drug rapidly released into the GI tract often results in a high concentration of drug in the bloodstream (*i.e.,* a peak). This concentration decreases with time as the drug is removed from the bloodstream by the liver or kidneys. As a result of this drug clearance, the concentration of drug in the bloodstream immediately before the next dose is administered may be very low (*i.e.,* a trough). The drug peaks may be associated with an increased incidence or severity of undesirable side effects; the drug troughs may be associated with lack of therapeutic response because the blood concentrations of drug are too low. In contrast, a well-designed delayed release product may exhibit relatively stable blood concentrations of drug without the occurrence of either peaks or troughs. This can result in improved efficacy and reduced toxicity. The fluctuation in blood levels can be quantified by the peak to trough fluctuation index, PTF. Rhodes Decl. at ¶ 26.

There are two primary means to formulate a delayed drug release, use of a matrix or coating. Rhodes Decl. at ¶ 27; Hubbell Decl. at ¶ 19. [3] In a matrix system, the active

---

[3] "Hubbell Decl." as used herein refers to the Declaration of Dr. Jeffrey A. Hubbell In Support Of Reliant Pharmaceuticals, Inc.'s Opening Claim Construction Brief.

pharmaceutical drug is embedded in excipients which enclose the drug and provide a structure so that dissolution can be retarded.  This approach requires a substantial amount of excipients and thus can result in a tablet which is unacceptably large.  Rhodes Decl. at ¶ 28; Hubbell Decl. at ¶ 21.  The control of dissolution from tablets by coatings so as to obtain delayed release products is also common.  By judicious selection of the components of the coating, it is possible to provide a barrier so that release of drug from the tablet into the lumen of the GI tract occurs at a controlled rate over the desired period of time.  Rhodes Decl. at ¶ 29; Hubbell Decl. at ¶ 20.

The use of coatings and matrices to delay release of active drug from tablets was well known in the art at the time of invention of the '588 patent.  Indeed, these methods were at that time, and still are, the two most common methods by which to formulate a delayed release drug product.  Rhodes Decl. at ¶ 30.

**B.    The '588 Patent**

The '588 patent is directed to solid oral dosage forms of β-phenylpropiophenone derivatives, specifically to delayed release microtablets, with a high content and density of active ingredient and a delayed release which is independent of the compressive force, with no release-delaying ancillary substances.  Ex. 3 at Col 1:9-14.

Surprisingly, the inventors of the '588 patent discovered that compaction of a high content and density of β-phenylpropiophenone derivatives, including propafenone hydrochloride, when formed into microtablets with particular shape and size, resulted in delayed release of the API without the addition of release-delaying coatings or matrices.  Ex. 3 at Col. 2:11-22.  This discovery was contrary to the prior art, which taught that non-film-coated tablets required large amounts of ancillary substances to form matrices in order to delay release of an API.  Ex. 3 at Col. 1: 20-45.

In addition, the inventors found that the delayed release microtablet of the invention has significant advantages over the prior art:  the release rate of the API is virtually independent of the compaction pressure used to make the microtablets, the *in vivo* plasma blood level fluctuations are consistently less with the microtablets than with the film-coated bolus form of the drug, and the absence of a release-delaying matrix or coating makes for easier production, manufacture and storage of the pharmaceutical formulation.  Ex. 3 at Col. 2:30-41, Cols. 2:46-3:33, Fig. 11.

The claimed delayed release microtablet of the '588 patent embodies these surprising discoveries.

## IV.    RELIANT'S PROPOSED CLAIM CONSTRUCTIONS

### A.    "Delayed Release Microtablet"

Reliant requests that the term "delayed release microtablet"[4] be defined as "a small unit of solid medicament prepared by compaction in which the release of active ingredient after 3 hours is not more than 80% and after 24 hours is not less than 80%."  This definition is consistent with the plain meaning of the word microtablet, is set forth in Claim 1, and is supported by the specification and file history of the '588 patent.  In short, one of skill in the art would understand that the term "delayed release microtablet" means a small unit of medicament with the delayed release properties set forth in the claim.

---

[4]    Par proposes to construe this preamble term as two separate terms, "delayed release" and "microtablet."  However, in the context of the invention, these terms are not properly separable.  The inventions of the patent are directed to delayed release microtablets that have specific properties and characteristics, and accordingly, "delayed release microtablet" is properly construed as a single claim term.  No "microtablet" other than a delayed release microtablet is described or claimed by the patent.  As will be clear in Par's brief, Par's attempt to parse the term is merely a means to improperly import limitations into the term that are not present in the claims of the '588 patent.

The ordinary plain meaning of the term "microtablet" can be easily understood by virtue of its components "micro" and "tablet." "Micro" means small. Rhodes Decl. at ¶ 42; Hubbell Decl. at ¶ 25. A "tablet" is a solid medicament containing a drug substance that is prepared by compaction. Rhodes Decl. at ¶ 43, Ex. D; Hubbell Decl. at ¶ 25, Ex. B. Thus, a microtablet, pursuant to its plain, ordinary meaning, is a small unit of solid medicament prepared by compaction. Rhodes Decl. at ¶ 44; Hubbell Decl. at ¶ 25.

The microtablet of the invention is a "delayed release microtablet." The delayed release characteristic is specifically defined in Claim 1 of the patent: "the release of active ingredient in the USP paddle method at 50 rpm is 80% as a maximum after 3 hours and as a minimum after 24 hours." Ex. 3 at Claim 1(d); s*ee also* Rhodes Decl. at ¶¶ 46-47; Hubbell Decl. at ¶ 26.

The specification of the '588 patent sets forth a description of a "delayed release microtablet" that is consistent with Reliant's proposed claim construction and with Claim 1 of the patent. For example, the patent discloses that "the release of active ingredient after 3, preferably 5, hours is not more than 80[%] and after 24, preferably 15, hours is not less than 80%." Ex. 3 at Col. 2:55-57; *see also* Rhodes Decl. at ¶¶ 47-48; Hubbell Decl. at ¶ 27. Moreover, the examples and figures of the patent specification demonstrate delayed release microtablets have a release rate of active ingredient that after 3 hours is not more than 80% and after 24 hours is not less than 80%. *See* Ex. 3 Figs. 1-11 and Examples 1-8.

The file history also supports the construction of a "delayed release microtablet" as proposed by Reliant. In particular, the patent applicants described their invention in the file history consistently with the specification and claims of the patent. For example, the applicants stated:

>Yet another surprising result achieved by the present invention is that other medicinal substances having a similar water solubility to that of propafenone hydrochloride (one of the compounds encompassed by the present formula I) are 90% released after one hour, when produced in the same type of microtablet. ***However, the present microtablets provide no more than 80% release after 3 hours and no less than 80% release after 24 hours***.

Ex. 5 at 5 (emphasis added); *see also id.* at 4 ("[T]he present invention . . . is drawn to a delayed release microtablet which is required by the claim to have no more than 80% release of the active ingredient after 3 hours and no less than 80% after 24 hours.").

Moreover, as set forth in the accompanying declarations of pharmaceutical experts Dr. Hubbell and Dr. Rhodes, one of skill in the art reading the patent would understand that the delayed release microtablet of the invention is "a small unit of solid medicament prepared by compaction in which the release of active ingredient after 3 hours is not more than 80% and after 24 hours is not less than 80%."  Rhodes Decl. at ¶ 50; Hubbell Decl. at ¶ 24.

**B.**     **"Cylindrical"**

Reliant requests that the term "cylindrical" be defined as "a three-dimensional shape which includes a flat or convex surface in which the height and diameter are, independently of one another, 1-3 mm."  This definition is consistent with the plain meaning of the word cylindrical as that term is used in Claim 1 and is supported by the specification and file history of the '588 patent.  Moreover, one of ordinary skill in the art would understand from reading the patent claims and specification that the term "cylindrical" means a three-dimensional shape which includes a flat or convex surface and in which the height and diameter are, independently of one another, 1-3 mm.

The patent claims and the specification are consistent with Reliant's proposed construction of the claim term "cylindrical."  Claim 1 of the patent discloses a "delayed release microtablet with a convex or flat upper side and lower side …wherein (a) the height and

diameter are, independently of one another, 1-3 mm." Thus, it is plain from the claim itself that "cylindrical" must embrace and include these structural features. Rhodes at ¶¶ 58-59; Hubbell Decl. at ¶ 31.

Similarly, the specification discloses that "[t]he microtablets according to the invention are cylindrical **with** a flat or convex upper side and lower side and **with** a diameter and height which are preferably approximately equal and, independently of one another, from 1 to 3, preferably 1.5 to 2.5 mm." Ex. 3 at Col. 2:42-46 (emphasis added). The specification further states that "[t]he resulting microtablets have a cylindrical shape **with** [a] flat or convex surface." Ex. 3 at Col. 4:19-22 (emphasis added). Hubbell Decl. at ¶ 32.

The use of the claim term "cylindrical" in the file history is consistent with the patent specification. For example, during prosecution, the applicants stated that "the cylindrical delayed release microtablet of the present invention is required to have a height and diameter that are each, independently, 1-3 mm." Ex. 5 at 2.

Moreover, one of skill in the art, in reading the '588 patent, would understand that the term "cylindrical" as used in the patent is defined as a three-dimensional shape having the height and diameter limitations set forth in Claim 1. Rhodes Decl. at ¶ 59; Hubbell Decl. at ¶ 30.

Accordingly, one of skill in the art would use the patent claim itself as the best guide to determine what is meant by the claim term. Rhodes Decl. at ¶¶ 52, 58; Hubbell Decl. at ¶ 31. In addition, the skilled artisan would have knowledge of other pharmaceutical formulations which are comprised of non-circular "cylindrical" tablets having convex or flat surfaces. Rhodes Decl. at ¶ 57. Thus, one of skill in the art would understand the claim term "cylindrical" to mean a three-dimensional shape which includes a flat or convex surface in which the height and

diameter are, independently of one another, 1-3 mm.  Rhodes Decl. at ¶ 59; Hubbell Decl. at ¶ 30.

### C.    "Convex Or Flat Upper Side And Lower Side"

Reliant requests that the claim term "convex or flat upper side and lower side" be defined as "each of the upper side and lower side have a surface that is without marked projections or depressions ('flat') or is curved or rounded outward ('convex')."

The plain, ordinary meaning of "flat" is "having a surface that is without marked projections or depressions."  Ex. 4.  The plain, ordinary meaning of convex is "curved or rounded outward."  Ex. 4.  *See also* Rhodes Decl. at ¶¶ 61-62; Hubbell Decl. at ¶ 35.

The patent specification and file history are consistent with the ordinary meaning of the term "convex or flat upper side and lower side."  *See, e.g.,* Ex. 3 at Col. 4:20-22 ("The resulting microtablets have a cylindrical shape with [a] flat or convex surface.").  *See also* Ex. 5 at 5 ("Applicants have shown in the present application that by preparing the microtablets of the present invention to meet the size, shape and active ingredient content requirements, one obtains a microtablet having remarkable delayed release characteristics.").  Rhodes Decl. at ¶ 63; Hubbell Decl. at ¶ 36.

One of skill in the art would understand this claim term to have its plain and ordinary meaning, such that each of the upper side and lower side have a surface that is without marked projections or depressions (*i.e.* "flat") or is curved or rounded outward (*i.e.* "convex"). Rhodes Decl. at ¶ 64; Hubbell Decl. at ¶ 34.

### D.    "The Tablet Contains No Release-Delaying Ancillary Substance"

Reliant requests that the Court construe the claim term "the tablet contains no release-delaying ancillary substance" to mean "the tablet contains no excipient that forms a release-delaying coating or matrix."  This proposed construction comports with the plain

meaning of the claim term, the specification and file history of the '588 patent, and the understanding of one of ordinary skill in the art.

The plain, ordinary meaning of the phrase "ancillary substance" to one of skill in the art is something other than the active ingredient, *i.e.*, an excipient.  Rhodes Decl. at ¶¶ 18 n.1, 66; Hubbell Decl. at ¶ 39.

Claim 1 of the patent recites that the delayed release microtablet of the invention contains the active pharmaceutical ingredient, lubricants or other conventional ancillary substances, and no release-delaying ancillary substance.  This is consistent with the specification, which teaches that the active pharmaceutical ingredient itself, in the claimed formulation, provides substantially all of the release-delaying characteristics of the microtablet.  *See* Ex. 3 at Col. 1:9-14, Col. 2:34-38.  *See also* Rhodes Decl. at ¶¶ 66-69; Hubbell Decl. at ¶ 43.

The patent specification expressly distinguishes this unique property of the invention with the prior art use of release-delaying matrices and coatings:  "In the prior art the release of active ingredient from tablets is delayed either by a release-delaying matrix in which the active ingredient is embedded, or by a release-delaying coating through which the digestive fluid diffuses in and the active ingredient diffuses out."  Ex. 3 at Col. 1:20-24.  In contrast to these prior art coatings and matrices, the patent teaches that the small size and high content and density of active ingredient of the claimed microtablets control the release rate of the active drug substance.  Ex. 3 at Col. 2:11-15, Col. 4:65-67.  Thus, the specification expressly distinguishes the prior art release-delaying matrices and coatings from the claimed invention.  Those release-delaying coatings and matrices are the release-delaying ancillary substances of the prior art forbidden by the claimed invention.  *See* Ex. 3 at Col. 1:20-24.  Accordingly, the claim term "the tablet contains no release-delaying ancillary substance" means that "the tablet contains no

14

excipient that forms a release-delaying coating or matrix." *See* Rhodes Decl. at ¶ 57, 72; Hubbell Decl. at ¶¶ 41-42.

This construction of "the tablet contains no release-delaying ancillary substance" is buttressed by the remaining language of Claim 1. In particular, that claim permits the microtablet to contain "0-18.9% by weight of ***other conventional ancillary substances***." Ex. 3 at Col. 8:43-44 (emphasis added). In other words, the presence of other conventional ancillary substances is permitted as long as those substances do not make up the release-delaying matrices or coatings of the prior art. *See* Rhodes Decl. at ¶ 67-68; Hubbell Decl. at ¶¶ 41-43.

The file history of the '588 patent is consistent with the language of the claims and the specification. For example, the applicants represented to the Patent Office that the delayed release microtablet of the invention "is required to have a height and diameter that are each, independently, 1-3 mm, must contain the active ingredient in the range from 81-99.9% of the weight of the microtablet, and have an active ingredient density that is greater than 1." Ex. 5 at 2. The applicants then made clear that these characteristics of the claimed microtablets give the active ingredient its unique release-delaying properties, which were comparable to "other delayed release formats":

> Applicants have found that by preparing a microtablet having the required size and shape, active ingredient content and active ingredient density, containing the β-phenylpropiophenone derivative of formula I as its active ingredient, ***it is possible to provide a microtablet that has surprisingly improved delayed release characteristics compared to other delayed release formats***. This is especially surprising in view of the fact that the present microtablet contains no other release-delaying additives.

Ex. 5 at 2-3 (emphasis added). The only "other delayed release formats" described and distinguished from the claimed invention in the patent specification are release-delaying coatings and matrices. *See* Ex. 3 at Col. 1:20-24; Rhodes Decl. at ¶ 73; Hubbell Decl. at ¶ 44.

The specification and file wrapper are also consistent with the understanding of those of ordinary skill in the art.  One of skill in the art at the time of invention would have had knowledge of the substances commonly used to delay release of an active ingredient from a solid dosage form such as a tablet or microtablet.  Rhodes Decl. at ¶ 68; Hubbell Decl. at ¶ 42.  In particular, one of skill in the art would have known that the generally accepted release-delaying ancillary substances at the time of invention were release-delaying matrices and release-delaying coatings.  Rhodes Decl. at ¶ 68; Hubbell Decl. at ¶ 42.  In addition, one of skill in the art would have understood that many ancillary substances, including, for example, binders, lubricants, wetting agents, fillers and adhesives, might have some minimal effect on the release rate of an active pharmaceutical ingredient, but that such substances are not generally considered "release-delaying" agents.  Rhodes Decl. at ¶ 75; Hubbell Decl. at ¶ 42.  Moreover, in reading the patent specification and claims, one of skill in the art would have understood that the delayed release microtablets of the invention could encompass a microtablet that included ancillary substances such as binders, adhesives, fillers, wet granulators, etc., as long as no release-delaying coatings or matrices were employed.  Rhodes Decl. at ¶¶ 70-72; Hubbell Decl. at ¶ 43.  Indeed, as demonstrated in Section IV.F below, these are the "other conventional ancillary substances" expressly permitted by Claim 1.

Thus, in the context of the claims, specification, and prosecution history of the '588 patent, one of skill in the art would have understood the term "the tablet contains no release-delaying ancillary substance" to mean that the tablet contains no excipient that forms a release-delaying coating or matrix.  Rhodes Decl. at ¶ 76; Hubbell Decl. at ¶¶ 38, 45.

**E.     "Lubricant"**

Reliant requests that the Court construe "lubricant" to mean "a pharmaceutical ingredient that reduces friction and prevents tablet adhesion, *e.g.*, talc or magnesium stearate."

This construction is supported by the plain, ordinary meaning of the word and the specification of the '588 patent.[5]

Lubricants are well known to serve a variety of purposes in the formulation of tablets, and talc, magnesium stearate, and calcium stearate are common examples of lubricants. For example, Remington's Pharmaceutical Sciences provides:

> Lubricants have a number of functions in tablet manufacture. They prevent adhesion of the tablet material to the surface of the dies and punches, reduce interparticle friction, facilitate the ejection of the tablets from the die cavity and may improve the rate of flow of the tablet granulation. Commonly used lubricants include talc, magnesium stearate, . . . stearic acid, [and] hydrogenated vegetable oils.

Rhodes Decl. at ¶ 78, Ex. B; Hubbell Decl. at ¶ 48, Ex. F.

The '588 patent specification is consistent with this plain and ordinary meaning of lubricant. The specification provides: "After the granules have been dried to the defined water content, 0.1-5, preferably 0.3-2, % by weight of a lubricant for the tabletting are mixed in homogenously. It is likewise possible to use for this purpose all conventional substances, such as talc, magnesium stearate, calcium stearate, stearic acid, calcium behenate, glycerin palmitostearate, sodium acetate, polyethylene glycol, sodium stearate[,] fumarate." Ex. 3 at Col. 4:7-13. Each example in the '588 patent describes the use of a lubricant, namely magnesium stearate, to prepare the delayed release microtablets of the invention. *See* Ex. 3 at Cols. 5-7. Accordingly, the term "lubricant," as used in the '588 patent, means a pharmaceutical ingredient that reduces friction and prevents tablet adhesion, *e.g.*, talc or magnesium stearate. Rhodes Decl. at ¶ 79; Hubbell Decl. at ¶ 49.

---

5  There is no discussion of the claim term "lubricant" set forth in the file history of the '588 patent.

Reliant's proposed construction of "lubricant" comports with the understanding of those of skill in the art.  Rhodes Decl. at ¶ 80; Hubbell Decl. at ¶ 47.

### F.    "Other Conventional Ancillary Substances"

Reliant requests that the Court construe the term "other conventional ancillary substances" to mean "commonly used pharmaceutical ingredients other than an active pharmaceutical ingredient, a lubricant, or a 'release-delaying ancillary substance' as defined above, *e.g.,* binders, adhesives, colorants, stabilizers, fillers, wetting agents, and flow regulators." Reliant's proposed construction is consistent with the plain meaning of the term, the patent specification and file history, and the understanding of one of ordinary skill in the art.

The plain ordinary meaning of the term "ancillary substance" as used in pharmaceutical formulation is a pharmaceutical ingredient other than the active drug product. Rhodes Decl. at ¶ 82; Hubbell Decl. at ¶ 52.  Conventional ancillary substances include, for example, binders, fillers, release-delaying matrices and coatings, and adhesives.  Rhodes Decl. at ¶ 83.

The meaning of the claim term "other conventional ancillary substances" as used in the '588 patent is consistent with the plain and ordinary meaning of these words.  This meaning can be readily determined in the context of the patent claims and specification.  In particular, Claim 1 recites that the delayed release microtablet may be comprised of an active pharmaceutical ingredient, lubricants and other conventional ancillary substances, and does not contain a release-delaying ancillary substance.  As set forth above in Section IV.D, "release-delaying ancillary substance," as used in the '588 patent, means a release-delaying matrix or coating.  Accordingly, the term "other conventional ancillary substances" means "commonly used pharmaceutical ingredients other than an active pharmaceutical ingredient, a lubricant, or a 'release-delaying ancillary substance.'"  Rhodes Decl. at ¶ 84; Hubbell Decl. at ¶ 51.

The patent specification provides non-limiting examples of "other conventional ancillary substances," including colorants, stabilizers, fillers, wetting agents, and flow regulators. Ex. 3 at Col. 4:16-18.  Such substances would be known to anyone skilled in the art to be commonly used as neither active pharmaceutical ingredients, lubricants, nor release-delaying substances.  Rhodes Decl. at ¶ 85; Hubbell Decl. at ¶ 54.

Accordingly, one of skill in the art would understand the claim term "other conventional ancillary substances" to mean "commonly used pharmaceutical ingredients other than an active pharmaceutical ingredient, a lubricant, or a 'release-delaying ancillary substance' as defined above, *e.g.,* binders, adhesives, colorants, stabilizers, fillers, wetting agents, and flow regulators."  Rhodes Decl. at ¶ 86; Hubbell Decl. at ¶ 51.

**G.    "Release Rate Is Virtually Independent Of The Pressure When Compressing The Tablets"**

Reliant requests that the Court construe the claim term "release rate is virtually independent of the pressure when compressing the tablets" to mean that "within the ordinary range of compression used in the formulation of pharmaceutical tablets, the effect of the pressure when compressing the tablets on the release rate of the active pharmaceutical ingredient can be neglected for practical purposes."  Reliant's proposed construction comports with the ordinary meaning of the words of the term, *i.e.,* that the release rate does not depend to any significant extent on the compaction pressure.  Rhodes Decl. at ¶ 88; Hubbell Decl. at ¶ 56.

The specification of the '588 patent provides a clear definition of the phrase.  It discloses:  "It was furthermore not predictable that the release of active ingredient is, in contrast to usual experience, virtually independent of the pressure when compressing the tablets.... 'Virtually independent' means that the effect can be neglected for practical purposes."  Ex. 3 at Col. 2:47-51.  *See also* Rhodes Decl. at ¶ 89; Hubbell Decl. at ¶ 57.  The specification likewise

makes clear that the phrase refers to tablet pressures that are within the ordinary range of compression used in the formulation of pharmaceutical tablets.  For example, the tablet pressures included in Figure 9 are within the ordinary range of compression for making pharmaceutical tablets.  Rhodes Decl. at ¶ 90; Hubbell Decl. at ¶ 57.  Moreover, the patent discloses the problem of the prior art that fluctuation of compressive forces when tabletting results in varying release rates of the active ingredient from the final dosage form.  Ex. 3 at Col. 2:64-3:8.  Accordingly, one of the objects of the invention was to "overcome the disadvantages of the prior art, *i.e.,* to develop propafenone and diprafenone tablets with . . . release of active ingredient which is independent of the compressive force and uniform over a lengthy period."  Ex. 3 at Col. 2:11-16; Rhodes Decl. at ¶ 90.

The prosecution history reiterates the meaning of the claim term and makes clear that the claimed microtablets do not have a wide range of release rates depending on the compressive force used:

> A further surprising result achieved with the present microtablet formulation is that the release of the active ingredient is virtually independent of the pressure used to compress the tablet and independent of the pH.  These results are unexpected in view of the fact that it is generally accepted that increases in the compressive force used in tablet production provides a slowing of the release of active ingredient.… A common problem with this feature is that fluctuations in the compressive force in a single machine can result in tablets being produced that have a wide range of delay release times.

Ex. 5 at 3.  *See also* Rhodes Decl. at ¶ 91; Hubbell Decl. at ¶ 58.

In sum, one of skill in the art would understand  the claim term "release rate is virtually independent of the pressure when compressing the tablets" to mean that "within the ordinary range of compression used in the formulation of pharmaceutical tablets, the effect of the

pressure when compressing the tablets on the release rate of the active pharmaceutical ingredient can be neglected for practical purposes."  Rhodes Decl. at ¶ 92; Hubbell Decl. at ¶ 56.

### H.    "Active Ingredient Density"

Reliant requests that the Court construe "active ingredient density" to refer to the density of the active ingredient in the delayed release microtablet.  This definition comports with the ordinary meaning of the term, as well as its use in the context of the patent claims, specification and file history.  Moreover, one of skill in the art reading the '588 patent would understand that the term "active ingredient density" refers to the active ingredient density of the microtablet.

The ordinary meaning of the claim term "active ingredient density" is simply the density of the active ingredient.  Rhodes Decl. at ¶ 94.  In the context of the '588 patent claims, the phrase "active ingredient density" refers specifically to the active ingredient density of the microtablet.  For example, Claim 1 recites:  "A cylindrical delayed release microtablet . . . wherein . . . (c) the active ingredient density is greater than 1."  Thus, the context of the claim makes clear that "active ingredient density" refers to a characteristic of the delayed release microtablet of the invention.  Rhodes Decl. at ¶ 95; Hubbell Decl. at ¶ 62.

The specification further demonstrates that "active ingredient density" is an attribute of the microtablet.  For example, the specification provides:  "The present invention relates to cylindrical microtablets of β-phenylpropiophenone derivatives with a high content and density of active ingredient."  Ex. 3 at Col. 1:9-12, *see also* Col. 2:11-16 ("It is an object of the present invention … to develop propafenone and diprafenone tablets with a small size, high content and density of active ingredient.").  Thus, the '588 specification makes clear that "active ingredient density" refers to delayed release microtablets with a particular density of active ingredient.  Rhodes Decl. at ¶ 96; Hubbell Decl. at ¶ 63.

21

The prosecution history also demonstrates that "active ingredient density" is an attribute of the delayed release microtablets. For example, the applicants represented that "the cylindrical delayed release microtablet of the present invention is required to … have an active ingredient density that is greater than 1." Ex. 5 at 2, *see also* 2-3 ("Applicants have found that by preparing a microtablet having the required size and shape, active ingredient content and active ingredient density, containing the β-phenylpropiophenone derivative of formula I as its active ingredient, it is possible to provide a microtablet that has surprisingly improved delayed release characteristics compared to other delayed release formats."). Rhodes Decl. at ¶ 97; Hubbell Decl. at ¶ 64.

Consistent with the ordinary meaning and the claims, specification and file history of the '588 patent, one of ordinary skill in the art would understand that "active ingredient density" refers to active ingredient density of the microtablet. Rhodes Decl. at ¶ 98; Hubbell Decl. at ¶ 61.

## I.    "A Pronounced Plasma Level Plateau With A PTF<75%"

Reliant requests that the Court construe "a pronounced plasma level plateau with a PTF<75%" to mean "a plasma level plateau with a peak to trough fluctuation of less than 75%, where peak to trough fluctuation is defined as $PTF(\%) = \dfrac{C_{\max} - C_{\min}}{\dfrac{AUC}{\Delta t}} \times 100$." This construction is supported by the plain, ordinary meaning of the term and the specification.

The plain, ordinary meaning of the term "PTF" is peak to trough fluctuation. Hubbell Decl. at ¶ 68. PTF is defined by the formula $PTF(\%) = \dfrac{C_{\max} - C_{\min}}{\dfrac{AUC}{\Delta t}} \times 100$. Rhodes Decl. at ¶ 100.

The specification provides this same definition of PTF and notes that a pronounced blood level plateau was evidenced by the PTF:

> Despite the short half-life, a pronounced blood level plateau develops (FIG. 11). The fluctuations in the blood level are considerably less with the microtablets. This is evident from the $t_{75\%}$ (period in the dosage interval during which the plasma levels are at least 75% of the maximum level), which is 8 to 9 hours with the microtablets according to the invention compared with 5 to 6 hours with the bolus delayed release form, and from the PTF…
>
> $$PTF(\%) = \frac{\dfrac{C_{max} - C_{min}}{AUC}}{\Delta t} \times 100$$
>
> for the AUC…which has a value for the microtablets which is only about half that for the bolus forms, in particular less than 75[%], preferably less than 60%.

*See* Ex. 3 at 2:60-3:13 (citations omitted), Fig. 11. *See also* Rhodes Decl. at ¶ 101; Hubbell Decl. at ¶ 69.

Accordingly, one of skill in the art would understand the phrase "a pronounced plasma level plateau with a PTF<75%" to mean a plasma level plateau with a peak to trough fluctuation of less than 75%, where PTF is defined by the formula set forth in the specification. Rhodes Decl. at ¶ 102; Hubbell Decl. at ¶ 67.

## J.    "Bioavailability Does Not Depend On The Intake Of Food"

Reliant requests that the Court construe the claim term "bioavailability does not depend on the intake of food" to mean "bioavailability of the active pharmaceutical ingredient is unaffected by food intake for practical purposes."

Reliant's proposed construction comports with the plain meaning of the claim term. In addition, the specification of the '588 patent states that "the bioavailability of this form [i.e., the delayed release microtablet of the invention] is unaffected by food intake in contrast to the bolus delayed release form. The AUC found for the bolus delayed release form is 50%

higher when fasting." *See* Ex. 3 at Col. 3:17-21. *See also* Hubbell Decl. at ¶ 72. In addition, Table 1 of the patent notes that upon repeated administration of the microtablets of Example 1, the AUC and $t_{75\%}$ was not different in the fasting and non-fasting states and the peak to trough fluctuations (PTF) were 52% in the fasting state and 56% in the non-fasting state. *See* Ex. 3 at Table 1; Rhodes Decl. at ¶ 104.

Thus, one of skill in the art would understand this claim term to mean that the bioavailability of the active pharmaceutical ingredient is unaffected by food intake for practical purposes. Rhodes Decl. at ¶ 105; Hubbell Decl. at ¶ 71.

## K.     "Cylindrical Mold"

Reliant requests that the Court construe the claim term "cylindrical mold" to mean "die and punch in which a formulation is formed into a 'cylindrical' shape." This proposed construction comports with the plain meaning of the claim term, the specification of the '588 patent, and the understanding of one of skill in the art.[6]

The meaning of the term "cylindrical" within the claim term "cylindrical mold" is consistent with the construction of that term set forth in Section IV.B above, *i.e.* a three-dimensional shape which includes a flat or convex surface in which the height and diameter are, independently of one another, 1-3 mm. The ordinary plain meaning of the term "mold" to one of skill in the art is part of the tooling for production of solid dosage form of drugs, *i.e.,* a punch and die in which a formulation is shaped. Rhodes Decl. at ¶ 108; Hubbell Decl. at ¶ 75.

The specification of the patent is consistent with this ordinary meaning. For example, the patent discloses a non-limiting example of tooling for making the delayed release

_____

6   There is no discussion of the term "cylindrical mold" contained in the file history of the '588 patent.

microtablets of the invention comprising "a suitable tabletting machine equipped with multiple microtablet punches." Ex. 3 at Col. 4:19-20. *See also* Rhodes Decl. at ¶ 109; Hubbell Decl. at ¶ 76.

Consistent with the plain meaning of the term and the patent specification, one of ordinary skill in the art would have understood the term "cylindrical mold," as used in the '588 patent, to mean "die and punch in which a formulation is formed into a 'cylindrical' shape." Rhodes Decl. at ¶ 110; Hubbell Decl. at ¶ 74.

## V.    CONCLUSION

For all of the foregoing reasons, Reliant requests that the claim terms of the '588 patent be construed as follows:

(1)    Delayed release microtablet:  a small unit of solid medicament prepared by compaction in which the release of active ingredient after 3 hours is not more than 80% and after 24 hours is not less than 80%;

(2)    Cylindrical:  a three-dimensional shape which includes a flat or convex surface in which the height and diameter are, independently of one another, 1-3 mm;

(3)    Convex or flat upper side and lower side:  each of the upper side and lower side have a surface that is without marked projections or depressions ("flat") or is curved or rounded outward ("convex");

(4)    The tablet contains no release-delaying ancillary substance:  the tablet contains no excipient that forms a release-delaying coating or matrix;

(5)    Lubricant:  a pharmaceutical ingredient that reduces friction and prevents tablet adhesion, *e.g.*, talc or magnesium stearate;

(6)    Other conventional ancillary substances:  commonly used pharmaceutical ingredients other than an active pharmaceutical ingredient, a lubricant, or a "release-delaying ancillary substance" as defined above, *e.g.,* binders, adhesives, colorants, stabilizers, fillers, wetting agents, and flow regulators;

(7)    Release rate is virtually independent of the pressure when compressing the tablets:  within the ordinary range of compression used in the formulation of pharmaceutical tablets, the effect of the pressure when compressing the tablets on the release rate of the active pharmaceutical ingredient can be neglected for practical purposes;

(8)    Active ingredient density:  the density of the active ingredient in the delayed release microtablet;

(9)    A pronounced plasma level plateau with a PTF<75%:  a plasma level plateau with a peak to trough fluctuation of less than 75%, where peak to trough fluctuation is defined as $PTF(\%) = \dfrac{C_{\max} - C_{\min}}{\dfrac{AUC}{\Delta t}} \times 100$ ;

(10)    Bioavailability does not depend on the intake of food:  bioavailability of the active pharmaceutical ingredient is unaffected by food intake for practical purposes; and

(11)    Cylindrical mold:  die and punch in which a formulation is formed into a "cylindrical" shape (as defined above).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnorieka@mnat.com
  *Attorneys for Plaintiff*

*Of Counsel:*

John M. Desmarais
Gerald J. Flattmann, Jr.
Christine Willgoos
KIRKLAND & ELLIS LLP
Citigroup Center
153 E. 53rd Street
New York, NY  10022
(212) 446-4800

March 5, 2008
1762995.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 5, 2008 I electronically filed the foregoing with the

Clerk of the Court using CM/ECF, which will send notification of such filing to:

> Josy W. Ingersoll, Esquire
> YOUNG, CONAWAY, STARGATT & TAYLOR

I further certify that I caused to be served copies of the foregoing document on

March 5, 2008 upon the following in the manner indicated:

Josy W. Ingersoll, Esquire                          *VIA ELECTRONIC MAIL*
YOUNG, CONAWAY, STARGATT & TAYLOR        *and HAND DELIVERY*
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

John G. Taylor, Esquire                              *VIA ELECTRONIC MAIL*
James K. Stronski, Esquire
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, NY  10151

> */s/ Jack B. Blumenfeld*
> _____
> Jack B. Blumenfeld (#1014)

# Exhibit 1

## RYTHMOL® SR
(propafenone hydrochloride) extended release
## CAPSULES

**DESCRIPTION**

RYTHMOL SR (propafenone hydrochloride) is an antiarrhythmic drug supplied in extended-release capsules of 225, 325 and 425 mg for oral administration.

The structural formula of propafenone HCl is given below:



2'-(2-Hydroxy-3-(propylamino)-propoxy)-3-phenylpropiophenone hydrochloride

$C_{21}H_{27}NO_3 \cdot HCl$    M.W. = 377.92

Propafenone HCl has some structural similarities to beta-blocking agents. Propafenone HCl occurs as colorless crystals or white crystalline powder with a very bitter taste. It is slightly soluble in water (20°C), chloroform and ethanol. Rythmol SR are capsules filled with cylindrical-shaped 2 × 2 mm microtablets containing propafenone and the following inactive ingredients: antifoam, gelatin, hypromellose, red iron oxide, magnesium stearate, shellac, sodium lauryl sulfate, sodium dodecyl sulfate, soy lecithin and titanium dioxide.

**CLINICAL PHARMACOLOGY**

**Mechanism of Action**

Propafenone is a Class 1C antiarrhythmic drug with local anesthetic effects, and a direct stabilizing action on myocardial membranes. The electrophysiological effect of propafenone manifests itself in a reduction of upstroke velocity (Phase 0) of the monophasic action potential. In Purkinje fibers, and to a lesser extent myocardial fibers, propafenone reduces the fast inward current carried by sodium ions. Diastolic excitability threshold is increased and effective refractory period prolonged. Propafenone reduces spontaneous automaticity and depresses triggered activity.

Studies in anesthetized dogs and isolated organ preparations show that propafenone has beta-sympatholytic activity at about 1/50 the potency of propranolol. Clinical studies employing isoproterenol challenge and exercise testing after single doses of propafenone indicate a beta-adrenergic blocking potency (per mg) about 1/40 that of propranolol in man. In clinical trials with the immediate-release formulation, resting heart rate decreases of about 8% were noted at the higher end of the therapeutic plasma concentration range. At very high concentrations in vitro, propafenone can inhibit the slow inward current carried by calcium, but this calcium antagonist effect probably does not contribute to antiarrhythmic efficacy. Moreover, propafenone inhibits a variety of cardiac potassium currents in in vitro studies (i.e. the transient outward, the delayed rectifier, and the inward rectifier current). Propafenone has local anesthetic activity approximately equal to procaine. Compared to propafenone, the main metabolite, 5-hydroxypropafenone, has similar sodium and calcium channel activity, but about 10 times less beta-blocking activity (N-depropylpropafenone has weaker sodium channel activity but equivalent affinity to beta-receptors).

**Electrophysiology**

Electrophysiology studies in patients with ventricular tachycardia (VT) have shown that propafenone prolongs atrioventricular (AV) conduction while having little or no effect on sinus node function. Both atrioventricular (AV) nodal conduction time (AH interval) and His-Purkinje conduction time (HV interval) are prolonged. Propafenone has little or no effect on the atrial functional refractory period, but AV nodal functional and effective refractory periods are prolonged. In patients with Wolff-Parkinson-White (WPW) syndrome, RYTHMOL immediate-release tablets reduce conduction and increase the effective refractory period of the accessory pathway in both directions (see ADVERSE REACTIONS/ Electrocardiogram).

**Hemodynamics:**

Studies in humans have shown that propafenone exerts a negative inotropic effect on the myocardium. Cardiac catheterization studies in patients with moderately impaired ventricular function (mean $CI = 2.61$ L/min/m²), utilizing intravenous propafenone infusions (loading dose of 2 mg/kg over 10 min + followed by 2 mg/min for 30 min) that gave mean plasma concentrations of 3.0 μg/mL (a dose that produces plasma levels of propafenone greater than does recommended oral dosing), showed significant increases in pulmonary capillary wedge pressure, systemic and pulmonary vascular resistance and depression of cardiac output and cardiac index.

**Pharmacokinetics and Metabolism:**

**Absorption/Bioavailability:** Maximal plasma levels of propafenone are reached between three to eight hours following the administration of RYTHMOL SR. Propafenone is subject to extensive and saturable presystemic biotransformation which results in a dose and dosage form dependent absolute bioavailability; e.g., a 150 mg immediate release tablet had an absolute bioavailability of 3.4%, while a 300 mg immediate release tablet had an absolute bioavailability of 10.6%. Absorption from a 300 mg solution dose was rapid, with an absolute bioavailability of 21.4%. At still larger doses, above those recommended, bioavailability of propafenone from immediate release tablets increased further.

Relative bioavailability assessments have been performed between RYTHMOL SR capsules and RYTHMOL immediate release tablets. In extensive metabolizers, the bioavailability of propafenone from the SR formulation was less than that of the immediate release formulation as the more gradual release of propafenone from the prolonged-release preparations resulted in an increase in overall first pass metabolism (see Metabolism). As a result of the increased first pass effect, higher daily doses of propafenone were required from the SR formulation relative to the immediate release formulation, to obtain similar exposure to propafenone. The relative bioavailability of propafenone from the 325 twice daily regimen of RYTHMOL SR approximates that of RYTHMOL immediate release 150 mg three times daily regimen. Mean exposure to 5-hydroxypropafenone was about 20-25% higher after SR capsule administration than after immediate-release tablet administration.

Food increased the exposure to propafenone 4-fold after single dose administration of 425 mg of RYTHMOL SR. However, in the multiple dose study (425 mg dose BID), the difference between the fed and fasted state was not significant.

**Distribution:** Following intravenous administration of propafenone, plasma levels decline in a bi-phasic manner consistent with a two compartment pharmacokinetic model. The average distribution half-life corresponding to the first phase was about five minutes. The volume of the central compartment was about 88 liters (1.1 L/kg) and the total volume of distribution about 252 liters.

In serum, propafenone is greater than 95% bound to proteins within the concentration range of 0.5 - 2 μg/mL. Protein binding decreases to about 86% in patients with severe hepatic dysfunction.

**Metabolism:** There are two genetically determined patterns of propafenone metabolism. In over 90% of patients, the drug is rapidly and extensively metabolized with an elimination half-life from 2-10 hours. These patients metabolize propafenone into two active metabolites: 5-hydroxypropafenone which is formed by CYP2D6 and N-desropylpropafenone (norpropafenone) which is formed by both CYP3A4 and CYP1A2 in less than 10% of patients, metabolism of propafenone is slower because the 5-hydroxy metabolite is not formed or is minimally formed. In these patients, the estimated propafenone elimination half-life ranges from 10-32 hours. Decreased ability to form the 5-hydroxy metabolite of propafenone is associated with a diminished ability to metabolize debrisoquine and a variety of other drugs such as encainide, metoprolol, and dextromethorphan whose metabolism is mediated by the CYP2D6 isozyme. In these patients, the N-depropylpropafenone metabolite occurs in quantities comparable to the levels occurring in extensive metabolizers.

As a consequence of the observed differences in metabolism, administration of RYTHMOL SR to slow and extensive metabolizers results in significant differences in plasma concentrations of propafenone, with slow metabolizers achieving concentrations about twice those of the extensive metabolizers at daily doses of 850 mg/day. At low doses the differences are greater, with slow metabolizers attaining concentrations about three to four times higher than extensive metabolizers. In extensive metabolizers, saturation of the hydroxylation pathway (CYP2D6) results in greater-than-linear increases in plasma levels following administration of RYTHMOL SR capsules. In slow metabolizers, propafenone pharmacokinetics are linear. Because the difference decreases at high doses and is mitigated by the lack of the active 5-hydroxy metabolite in the slow metabolizers, and because steady-state conditions are achieved after four to five days of dosing in all patients, the recommended dosing regimen of RYTHMOL SR is the same for all patients. The larger inter-subject variability in blood levels requires that the dose of the drug be titrated carefully in patients with close attention paid to clinical and ECG evidence of toxicity (see DOSAGE and ADMINISTRATION).

The 5-hydroxypropafenone and norpropafenone metabolites have electrophysiologic properties similar to propafenone in vitro. In man after administration of RYTHMOL SR, the 5-hydroxypropafenone metabolite is usually present in concentrations less than 40% of propafenone. The norpropafenone metabolite is usually present in concentrations less than 10% of propafenone.

**Inter-Subject Variability:**

With propafenone, there is a considerable degree of inter-subject variability in pharmacokinetics which is in large part to the first pass hepatic effect and non-linear pharmacokinetics in extensive metabolizers. A higher degree of inter-subject variability in pharmacokinetic parameters of propafenone was observed following both single and multiple dose administration of RYTHMOL SR capsules. Inter-subject variability appears to be substantially less in the poor metabolizer group than in the extensive metabolizer group, suggesting that a large portion of the variability is intrinsic to CYP2D6 polymorphism rather than to the formulation.

The clearance of propafenone is reduced and the elimination half-life increased in patients with significant hepatic dysfunction (see PRECAUTIONS). Decreased liver function also increases the bioavailability of propafenone. Absolute bioavailability assessments have not been determined for the RYTHMOL SR capsule formulation. Absolute bioavailability of RYTHMOL immediate release tablets has been demonstrated to be inversely related to indocyanine green clearance, reaching 60-70% at clearances of 7 mL/min and below.

**Stereochemistry:**

RYTHMOL is a racemic mixture. The R- and S-enantiomers of propafenone display stereoselective disposition characteristics. In vitro and in vivo studies have shown that the R-isomer of propafenone is cleared faster than the S-isomer via the 5-hydroxylation pathway (CYP2D6). This results in a higher ratio of S-propafenone to R-propafenone at steady state. Both enantiomers have equivalent potency to block sodium channels; however, the S-enantiomer is a more potent β-antagonist than the R-enantiomer. Following administration of RYTHMOL immediate release tablets or RYTHMOL SR capsules, the S/R ratio for the area under the plasma concentration-time curve was about 1.7. The S/R ratio of propafenone obtained after administration of 225, 325 and 425 mg RYTHMOL SR are independent of dose. In addition, no difference in the average values of the S/R ratios is evident between genotypes or over time.

**Clinical Trials:**

RYTHMOL SR has been evaluated in patients with a history of electrocardiographically documented recurrent episodes of symptomatic atrial fibrillation in two randomized, double-blind, placebo controlled trials.

RAFT: In one US multicenter study (Rythmol SR Atrial Fibrillation Trial, RAFT), three doses of RYTHMOL SR (225 mg BID, 325 mg BID and 425 mg BID) and placebo were compared in 523 symptomatic, but symptomatic, episodic atrial fibrillation. The patient population in this trial was 59% male with a mean age of 63 years, 91% White and 6% Black. The patients had a median history of atrial fibrillation of 13 months, and documented symptomatic atrial fibrillation within 12 months of study entry. Over 90% were White Class I, and 21% had a prior electrical cardioversion. At baseline, 24% were treated with calcium channel blockers, 37% with beta blockers, and 35% with digoxin. Symptomatic arrhythmias after randomization were documented by transtelephonic electrocardiogram and centrally read and adjudicated by a blinded adverse event committee. RYTHMOL SR administered for up to 39 weeks was shown to prolong significantly the time to the first recurrence of symptomatic atrial arrhythmia, predominately atrial fibrillation, than Day 1 of randomization (primary efficacy variable) compared to placebo. The effect of RYTHMOL SR on mortality has not been determined (see black box WARNINGS).

### Table 1: Analysis of tachycardia-free period (days) from Day 1 randomization

| Parameter | RYTHMOL SR Dose 225 mg BID (N = 126) | RYTHMOL SR Dose 325 mg BID (N = 135) | RYTHMOL SR Dose 425 mg BID (N = 130) | Placebo (N = 126) |
|---|---|---|---|---|
| Patients complying with terminating event | 58 (52) | 56 (41) | 41 (30) | 87 (69) |
| **Comparison of tachycardia-free periods** | | | | |
| Kaplan-Meier Median | 112 | 291 | -* | 41 |
| Range | 0 – 285 | 0 – 293 | 0 – 300 | 0 – 289 |
| p-Value (Log-rank test) | 0.014 | < 0.0001 | < 0.0001 | --- |
| Hazard Ratio compared to placebo | 0.45 | 0.40 | 0.35 | --- |
| 95% CI for Hazard Ratio | (0.40, 0.93) | (0.31, 0.61) | (0.24, 0.51) | --- |

* Fewer than 50% of the patients had events. The median time is not calculable.

† Terminating events comprised 91% atrial fibrillation, 5% atrial flutter, and 4% PSVT.

There was a dose response for RYTHMOL SR for the tachycardia-free period as shown in the proportional hazard analysis and the Kaplan-Meier curves presented in Figure 1.

**Figure 1: RAFT Kaplan-Meier Analysis for the Tachycardia-free period from Day 1 of randomization**



In additional studies, RYTHMOL SR (225 mg BID, 325 mg BID, and 425 mg BID) was also shown to prolong time to the first recurrence of symptomatic atrial fibrillation from Day 1 (steady-state pharmacokinetics were attained). The antiarrhythmic effect of RYTHMOL SR was not influenced by age, gender, history of cardioversion, duration of atrial fibrillation, frequency of atrial fibrillation or use of medication that lowers heart rate. Similarly, the antiarrhythmic effect of RYTHMOL SR was not influenced by the individual use of calcium channel blockers, beta-blockers or digoxin. Too few non-White patients were enrolled to assess the influence of race on effects of RYTHMOL SR (propafenone hydrochloride).

No difference in the average heart rate during the first recurrence of symptomatic arrhythmia between RYTHMOL SR and placebo was observed.

**ERAFT:** In a European multicenter trial (European Rythmonorm SR Atrial Fibrillation Trial (ERAFT)), two doses of RYTHMOL SR (325 mg BID and 425 mg BID) and placebo were compared in 293 patients. The patient population in this trial was 61% male, 100% White with a mean age of 61 years. Patients had a median duration of atrial fibrillation of 3.3 years, and 61% were taking medications that lowered heart rate. At baseline, 15% of the patients were treated with calcium channel blockers (verapamil and diltiazem), 42% with beta-blockers and 8% with digoxin. During a qualifying period of up to 28 days, patients had to have one ECG-documented incident of symptomatic atrial fibrillation. The double-blind treatment phase consisted of a four day loading period followed by a 91-day efficacy period. Symptomatic arrhythmias were documented by electrocardiogram monitoring.

In ERAFT, RYTHMOL SR was shown to prolong the time to the first recurrence of symptomatic atrial arrhythmia from Day 1 of randomization (primary efficacy analysis). The proportional hazard analysis revealed that both RYTHMOL SR doses were superior to placebo. The antiarrhythmic effect of propafenone SR was not influenced by age, gender, duration of atrial fibrillation, frequency of atrial fibrillation or use of medication that lowers heart rate. It was also not influenced by the individual use of calcium channel blockers, beta-blockers or digoxin. Too few non-White patients were enrolled to assess the influence of race on the effects of RYTHMOL SR. There was a slight increase in the incidence of controlled diagnosed asymptomatic atrial fibrillation or atrial flutter in each of the two RYTHMOL SR treatment groups compared to placebo.

**INDICATIONS AND USAGE**

RYTHMOL SR is indicated to prolong the time to recurrence of symptomatic atrial fibrillation in patients without structural heart disease.

The use of RYTHMOL SR in patients with permanent atrial fibrillation or in patients exclusively with atrial flutter or PSVT has not been evaluated. RYTHMOL SR should not be used to control ventricular rate during atrial fibrillation.

The effect of RYTHMOL SR on mortality has not been determined (see black box WARNINGS).

**CONTRAINDICATIONS**

RYTHMOL SR is contraindicated in the presence of congestive heart failure, cardiogenic shock, sinoatrial, atrioventricular and intraventricular disorders of impulse generation or conduction (e.g., sick sinus node syndrome, atrioventricular block) in the absence of an artificial pacemaker, bradycardia, marked hypotension, bronchospastic disorders, electrolyte imbalance, or hypersensitivity to the drug.

**WARNINGS**

**Mortality**

In the National Heart, Lung and Blood Institute's Cardiac Arrhythmia Suppression Trial (CAST), a long-term, multi-center, randomized, double-blind study in patients with asymptomatic non-life-threatening ventricular arrhythmias who had a myocardial infarction more than six days but less than two years previously, an increased rate of death or reversed cardiac arrest rate (7.7%; 56/730) was seen in patients treated with encainide or flecainide (Class 1C antiarrhythmics) compared with that seen in patients assigned to placebo (3.0%; 22/725). The average duration of treatment with encainide or flecainide in this study was ten months.

The applicability of the CAST results to other populations (e.g., those without overt structural infarction) or other antiarrhythmic drugs is uncertain, but at present, it is prudent to consider any 1C antiarrhythmic to have a significant risk in patients with structural heart disease. Given the lack of any evidence that these drugs improve survival, antiarrhythmic agents should generally be avoided in patients with non-life-threatening ventricular arrhythmias, even if the patients are experiencing unpleasant, but not life-threatening, symptoms or signs.

**Proarrhythmic Effects:**

Propafenone has caused new or worsened arrhythmias. Such proarrhythmic effects include sudden death and potentially life-threatening ventricular arrhythmias such as ventricular fibrillation, ventricular tachycardia, asystole and Torsade de Pointes. It may also worsen premature ventricular contractions or supraventricular arrhythmias, and it may prolong the QT interval. It is therefore essential that each patient given propafenone SR be evaluated electrocardiographically prior to and during therapy to determine whether the response to RYTHMOL SR supports continued treatment. Because propafenone prolongs the QRS interval in the electrocardiogram, changes in the QT interval are difficult to interpret.

In a 474 patient U.S. uncontrolled, open label multicenter trial using the immediate release formulation in patients with symptomatic SVT, 1.9%

(9/474) of these patients experienced ventricular tachycardia (VT) or ventricular fibrillation (VF) during the study. However, in four of the nine patients, the ventricular tachycardia was of atrial origin. Six of the nine patients that developed ventricular arrhythmias did so within 14 days of onset of therapy. About 2.3% (11/474) of all patients had recurrence of SVT during the study which could have been a change in the patients' arrhythmia behavior or could represent a proarrhythmic event. Case reports in patients treated with RYTHMOL for atrial fibrillation/flutter have included increased PVCs, VT, VF, Torsade de Pointes, asystole, and death.

In the RAFT study, there were five deaths, three in the pooled RYTHMOL SR group (0.8%) and two in the placebo group (1.6%). In the overall RYTHMOL SR and RYTHMOL immediate release database of eight studies, the mortality rate was 2.5% per year on RYTHMOL and 4.0% per year on placebo. Concurrent use of propafenone with other antiarrhythmic agents has not been well studied.

**Use with Drugs that Prolong the QT Interval and Antiarrhythmic Agents:**

The use of RYTHMOL SR (propafenone hydrochloride) in conjunction with other drugs that prolong the QT interval has not been extensively studied and is not recommended. Such drugs may include many antiarrhythmics, some phenothiazines, cisapride, bepridil, tricyclic antidepressants and oral macrolides. Class Ia and III antiarrhythmic agents should be reserved for at least five half-lives prior to dosing with RYTHMOL SR. The use of propafenone with Class Ia and III antiarrhythmic agents (including quinidine and amiodarone) is not recommended. There is only limited experience with the concomitant use of Class Ia or Ic antiarrhythmics.

**Nonallergic Bronchospasm (e.g., chronic bronchitis, emphysema):** Patients with bronchospastic disease should not, in general, receive propafenone or other agents with beta-adrenergic-blocking activity.

**Congestive Heart Failure:**

Propafenone exerts a negative inotropic activity on the myocardium as well as beta-blockade effects and may provoke overt congestive heart failure. In the U.S. trial (RAFT) in patients with symptomatic atrial fibrillation, congestive heart failure was reported in four of (1.6%) patients receiving RYTHMOL SR (all doses), compared to one (0.8%) patient receiving placebo. Proarrhythmic effects are more likely to occur when propafenone is administered to patients with congestive heart failure (NYHA III and IV) or severe myocardial ischemia (see CONTRAINDICATIONS).

**Conduction Disturbances:**

Propafenone causes dose-related fast degree AV block. Average PR interval prolongation and increases in QRS duration are also dose-related. Propafenone should not be given to patients with atrioventricular and intraventricular conduction defects in the absence of a pacemaker (see CONTRAINDICATIONS).

In a U.S. trial (RAFT) in 523 patients with a history of symptomatic atrial fibrillation treated with RYTHMOL SR, electrocardiograms obtained in response to symptoms were associated with no patients having sinus rhythm with Mobitz Type I (Wenckebach) second degree AV block, sinus rhythm with Mobitz Type II second degree AV block, or third degree AV block. Sinus bradycardia (rate <50 beats/min) was reported with the same frequency with RYTHMOL SR and placebo.

**Effects on Pacemaker Threshold:**

Propafenone may alter both pacing and sensing thresholds of artificial pacemakers. Pacemakers should be monitored and programmed accordingly during therapy.

**Hematologic Disturbances:**

Agranulocytosis (fever, chills, weakness, and neutropenia) has been reported in patients receiving propafenone. Generally, the agranulocytosis occurred within the first two months of propafenone therapy and upon discontinuation of therapy, the white count usually normalized by 14 days. Unexplained fever and/or decrease in white count, particularly during the initial three months of therapy, warrant consideration of possible agranulocytosis or granulocytopenia. Patients should be instructed to report promptly the development of any signs of infection such as fever, sore throat, or chills.

**PRECAUTIONS**

**Hepatic Dysfunction:**

Propafenone is highly metabolized by the liver and should, therefore, be administered cautiously to patients with impaired hepatic function. Severe liver dysfunction increases the bioavailability of propafenone to approximately 70% compared to 3-40% in patients with normal liver function when given RYTHMOL immediate release tablets. In eight patients with moderate to severe liver disease administered RYTHMOL immediate release tablets, the mean half-life was approximately nine hours. No studies are currently available comparing bioavailability of propafenone from RYTHMOL SR in patients with normal and impaired hepatic function. Increased bioavailability of propafenone in these patients may result in excessive accumulation. Careful monitoring for excessive pharmacological effects (see OVERDOSAGE) should be performed for patients with impaired hepatic function.

**Renal Dysfunction:**

Approximately 50% of propafenone metabolites are excreted in the urine following administration of RYTHMOL immediate release tablets. No studies have been performed to assess the percentage of metabolites eliminated in the urine following the administration of RYTHMOL SR capsules.

Until further data are available, RYTHMOL SR should be administered cautiously to patients with impaired renal function. These patients should be carefully monitored for signs of overdosage (see OVERDOSAGE).

**Information for Patients:**

**Medications and Supplements:** Assessment of patients' medication history should include all over-the-counter, prescription and herbal/natural preparations with emphasis on preparations that may affect the pharmacodynamics or kinetics of RYTHMOL SR (see WARNINGS: Use with Drugs that Prolong QT Interval and Antiarrhythmic Agents). Patients should be instructed to notify their health care providers of any change in over-the-counter, prescription and supplement use. If a patient is hospitalized or is prescribed new medications for any condition, the patient must inform the health care provider of ongoing RYTHMOL SR therapy. Patients should also check with their health care providers prior to taking a new over-the-counter medicine.

**Electrolyte Imbalance:** If patients experience symptoms that may be associated with altered electrolyte balance, such as excessive or prolonged diarrhea, sweating, vomiting, or loss of appetite or thirst, these conditions should be immediately reported to their health care provider.

**Dosing Schedule:** Patients should be instructed NOT to double the next dose if a dose is missed. The next dose should be taken at the usual time.

## RYTHMOL® SR
(propafenone hydrochloride) extended release
**CAPSULES**

**Elevated ANA Titers:**
Positive ANA titers have been reported in patients receiving propafenone. They have been reversible upon cessation of treatment and may disappear even in the face of continued propafenone therapy. These laboratory findings were usually not associated with clinical symptoms, but there is one published case of drug-induced lupus erythematosus (positive rechallenge); it resolved completely upon discontinuation of therapy. Patients who develop an abnormal ANA test should be carefully evaluated and, if persistent or worsening elevation of ANA titers is detected, consideration should be given to discontinuing therapy.

**Impaired Spermatogenesis:**
Reversible disorders of spermatogenesis have been demonstrated in monkeys, dogs and rabbits after high dose intravenous administration of propafenone. Evaluation of the effects of short-term RYTHMOL administration on spermatogenesis in 11 normal subjects suggested that propafenone produced a reversible, short-term drop (within normal range) in sperm count. Subsequent evaluations in 11 patients receiving RYTHMOL chronically have found no effect of propafenone on sperm count.

**Neuromuscular Dysfunction:**
Exacerbation of myasthenia gravis has been reported during RYTHMOL immediate release tablet therapy.

**Drug Interactions**
Propafenone is metabolized by CYP2D6 (major pathway) and CYP1A2 and CYP3A4. Drugs that inhibit CYP2D6 (such as desipramine, paroxetine, ritonavir, sertraline), CYP1A2 (such as amiodarone), and CYP3A4 (such as ketoconazole, ritonavir, saquinavir, erythromycin, and grapefruit juice) can be expected to cause increased plasma levels of propafenone. Appropriate monitoring is recommended when RYTHMOL SR is used together with such drugs. In addition, propafenone is an inhibitor of CYP2D6. Coadministration of propafenone with drugs metabolized by CYP2D6 (such as desipramine, imipramine, haloperidol, venlafaxine) might lead to increased plasma concentrations of these drugs. The effect of propafenone on the P-Glycoprotein transporter has not been studied.

**Quinidine:** Small doses of quinidine completely inhibit the CYP2D6 hydroxylation metabolic pathway, making all patients, in effect, slow metabolizers (see CLINICAL PHARMACOLOGY). Concomitant administration of quinidine (50 mg TID) with 150 mg immediate release propafenone TID decreased the clearance of propafenone by 60% in EM, making them PM. Steady-state plasma concentrations increased by more than 2-fold for propafenone, and decreased 50% for 5-OH-propafenone. A 100 mg dose of quinidine increased steady state concentrations of propafenone 3-fold. Concomitant use of propafenone and quinidine is not recommended.

**Digoxin:** Concomitant use of propafenone and digoxin increased steady-state serum digoxin exposure (AUC) in patients by 60 to 270%, and decreased the clearance of digoxin by 31 to 67%. Plasma digoxin levels of patients receiving propafenone should be monitored and digoxin dosage adjusted as needed.

**Lidocaine:** No significant effects on the pharmacokinetics of propafenone or lidocaine have been seen following their concomitant use in patients. However, concomitant use of propafenone and lidocaine have been reported to increase the risks of central nervous system side effects of lidocaine.

**Beta-Antagonists:** Concomitant use of propafenone and propranolol in healthy subjects increased propranolol plasma concentrations at steady state by 113%. In 4 patients, administration of metoprolol with propafenone increased the metoprolol plasma concentrations at steady state by 100-400%. The pharmacokinetics of propafenone was not affected by the coadministration of either propranolol or metoprolol. In clinical trials using propafenone immediate release tablets, patients who were receiving beta-blockers concurrently did not experience an increased incidence of side effects.

**Warfarin:** The concomitant administration of propafenone and warfarin increased warfarin plasma concentrations at steady state by 39% in healthy volunteers and prolonged the prothrombin time in patients taking warfarin. Adjustment of the warfarin dose should be guided by monitoring of the prothrombin time.

**Cimetidine:** Concomitant administration of propafenone immediate release tablets and cimetidine in 12 healthy subjects resulted in a 20% increase in steady-state plasma concentrations of propafenone.

**Rifampin:** Concomitant administration of rifampin and propafenone in extensive metabolizers decreased the plasma concentrations of propafenone by 67% with a corresponding decrease of 5OH-propafenone by 65%. The concentrations of norpropafenone increased by 30%. In poor metabolizers, there was a 50% decrease in propafenone plasma concentrations and increased the AUC and Cmax of norpropafenone by 74 and 20%, respectively. Urinary excretion of propafenone and its metabolites decreased significantly. Similar results were noted in elderly patients: both the AUC and Cmax propafenone decreased by 84%, with a corresponding decrease in AUC and Cmax of 5OH-propafenone by 69 and 57%.

**Fluoxetine:** Concomitant administration of propafenone and fluoxetine in extensive metabolizers increased the S propafenone Cmax and AUC by 39 and 50% and the R propafenone Cmax and AUC by 71 and 50%.

**Amiodarone:** Concomitant administration of propafenone and amiodarone can affect conduction and repolarization and is not recommended.

**Post Marketing Reports:** Orlistat may limit the fraction of propafenone available for absorption. In post marketing reports, abrupt cessation of orlistat in patients stabilized on propafenone has resulted in severe adverse events including convulsions, atrioventricular block and acute circulatory failure.

**Renal and Hepatic Toxicity in Animals:**
Renal changes have been observed in the rat following six months of oral administration of propafenone HCl at doses of 180 and 360 mg/kg/day (about two and four times, respectively, the maximum recommended human daily dose [MRHD] on a mg/m² basis). Both inflammatory and non-inflammatory changes in the renal tubules, with accompanying interstitial nephritis, were observed. These changes were reversible, as they were not found in rats allowed to recover for six weeks. Fatty degenerative changes of the liver were found in rats following larger durations of administration of propafenone HCl at a dose of 270 mg/kg/day (about three times the MRHD on a mg/m² basis). There were no renal or hepatic changes at 90 mg/kg/day (equivalent to the MRHD on a mg/m² basis).

**Carcinogenesis, Mutagenesis, Impairment of Fertility:**
Lifetime maximally tolerated oral dose studies in mice (up to 360 mg/kg/day, about twice the maximum recommended human oral daily dose [MRHD] on a mg/m² basis) and rats (up to 270 mg/kg/day, about three times the MRHD on a mg/m² basis) provided no evidence of a carcinogenic potential for propafenone HCl.

---

## RYTHMOL® SR
(propafenone hydrochloride) extended release
**CAPSULES**

Propafenone HCl tested negative for mutagenicity in the Ames (salmonella) test and in the in vivo mouse dominant lethal test. It tested negative for clastogenicity in the human lymphocyte chromosome aberration assay in vitro and in rat and Chinese hamster micronucleus tests, and other in vivo tests for chromosomal aberrations in rat bone marrow and Chinese hamster bone marrow and spermatogonia.

Propafenone HCl, administered intravenously to rabbits, dogs, and monkeys, has been shown to decrease spermatogenesis. These effects were reversible, were not found following oral dosing of propafenone HCl, were seen at lethal or near lethal dose levels and were not seen in rats treated either orally or intravenously (see **PRECAUTIONS, Impaired Spermatogenesis**). Treatment of male rabbits for up to 10 weeks prior to mating at an oral dose of 120 mg/kg/day (about 2.4 times the MRHD on a mg/m² basis) or an intravenous dose of 3.5 mg/kg/day (a spermatogenesis-impairing dose) did not result in impaired fertility. Nor was there evidence of impaired fertility when propafenone HCl was administered to male rabbits and female rats at doses levels up to 270 mg/kg/day (about 3 times the MRHD on a mg/m² basis).

**Pregnancy:**
**Teratogenic Effects: Pregnancy Category C:** Propafenone HCl has been shown to be embryotoxic (decreased survival) in rabbits and rats when given in oral maternally toxic doses of 150 mg/kg/day (about three times the maximum recommended human dose [MRHD] on a mg/m² basis) and 600 mg/kg/day (about six times the MRHD on a mg/m² basis), respectively. Although maternally tolerated doses (up to 270 mg/kg/day, about three times the MRHD on a mg/m² basis) produced no evidence of embryotoxicity in rats, post-implantation loss was elevated in all rabbit treatment groups (doses as low as 15 mg/kg/day, about 1/3 the MRHD on a mg/m² basis). There are no adequate and well-controlled studies in pregnant women. RYTHMOL SR (propafenone hydrochloride) should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.

**Non-teratogenic Effects:** In a study in which female rats received daily oral doses of propafenone HCl from mid-gestation through weaning of their offspring, doses as low as 90 mg/kg/day (equivalent to the MRHD on a mg/m² basis) produced increases in maternal deaths. Doses of 360 or more mg/kg/day (four or more times the MRHD on a mg/m² basis) resulted in reductions in neonatal survival, body weight gain and physiological development.

**Labor and Delivery:**
It is not known whether the use of propafenone during labor or delivery has immediate or delayed adverse effects on the fetus, or whether it prolongs the duration of labor or increases the need for forceps delivery or other obstetrical intervention.

**Nursing Mothers:**
Propafenone is excreted in human milk. Caution should be exercised when RYTHMOL SR is administered to a nursing mother.

**Pediatric Use:**
The safety and effectiveness of propafenone in pediatric patients have not been established.

**Geriatric Use:**
Of the total number of subjects in Phase III clinical studies of RYTHMOL SR (propafenone hydrochloride) 45.7 percent were 65 and over, while 15.7 percent were 75 and over. No overall differences in safety or effectiveness were observed between these subjects and younger subjects, but greater sensitivity of some older individuals at higher doses cannot be ruled out. The effect of age on the pharmacokinetics and pharmacodynamics of propafenone has not been studied.

**ADVERSE REACTIONS**
The data described below reflect exposure to RYTHMOL SR 225 mg BID in 126 patients, to RYTHMOL SR 325 mg BID in 135 patients, to RYTHMOL SR 425 mg BID in 136 patients, and to placebo in 126 patients for up to 39 weeks in a placebo-controlled trial (RAFT) conducted in the US. The most commonly reported adverse events in the trial included dizziness, chest pain, palpitations, taste disturbance, dyspnea, nausea, constipation, anxiety, fatigue, upper respiratory tract infection, influenza, first degree heart block and vomiting. The frequency of discontinuation due to adverse events was highest during the first 14 days of treatment. The majority of the patients with serious adverse events who withdrew or were discontinued recovered without sequelae.

Adverse events occurring in 2% or more of the patients in any of the RAFT propafenone SR treatment groups and more common in propafenone than placebo are shown in Table 2. Adverse events that are common in the population and those not plausibly related to drug therapy are listed in Table 2.

### Table 2: Most common adverse events (2.0% in any RAFT propafenone SR treatment group and more common on propafenone than on placebo)

| | RYTHMOL SR | | | Placebo |
|---|---|---|---|---|
| MedDRA Body System/Preferred Term | 225 mg BID (N = 126) n (%) | 325 mg BID (N = 135) n (%) | 425 mg BID (N = 136) n (%) | (N = 126) n (%) |
| Mean exposure (days) | 124 | 140 | 141 | 94 |
| **Cardiac disorders** | | | | |
| Angina pectoris | 0 (0) | 0 (0) | 3 (2) | 0 (0) |
| Atrial flutter | 3 (2) | 2 (1) | 0 (0) | 1 (1) |
| AV block first degree | 3 (2) | 3 (2) | 4 (3) | 0 (0) |
| Bradycardia | 4 (3) | 4 (3) | 6 (4) | 1 (1) |
| Cardiac failure congestive | 0 (0) | 1 (1) | 3 (2) | 1 (1) |
| Cardiac murmur | 2 (2) | 3 (2) | 6 (4) | 0 (0) |
| Edema | 5 (4) | 5 (4) | 6 (4) | 1 (1) |
| **Ear disorders** | | | | |
| Vision blurred | 1 (1) | 1 (1) | 5 (4) | 0 (0) |
| **Gastrointestinal disorders** | | | | |
| Constipation | 10 (8) | 19 (14) | 16 (12) | 3 (2) |
| Diarrhea | 2 (2) | 3 (2) | 5 (4) | 2 (2) |
| Dry mouth | 1 (1) | 1 (1) | 5 (4) | 1 (1) |
| Flatulence | 3 (2) | 3 (2) | 1 (1) | 0 (0) |
| Nausea | 11 (9) | 15 (11) | 29 (21) | 20 (16) |
| Vomiting | 4 (3) | 4 (3) | 4 (3) | 1 (1) |
| **General disorder and administrative site** | | | | |
| Fatigue | 14 (11) | 17 (13) | 17 (13) | 7 (6) |
| Weakness | 4 (3) | 6 (4) | 4 (3) | 1 (1) |
| **Infections and infestations** | | | | |
| Upper respiratory tract infection | 11 (9) | 16 (12) | 11 (8) | 7 (6) |

---

## RYTHMOL® SR
(propafenone hydrochloride) extended release
**CAPSULES**

### Table 2 Continued: Most common adverse events (2.0% in any RAFT propafenone SR treatment group and more common on propafenone than on placebo)

| | RYTHMOL SR | | | Placebo |
|---|---|---|---|---|
| MedDRA Body System/Preferred Term | 225 mg BID n (%) | 325 mg BID n (%) | 425 mg BID n (%) | n (%) |
| Mean exposure (days) | 124 | 140 | 141 | 91 |
| **Investigations** | | | | |
| Blood alkaline phosphatase increased | 0 (0) | 0 (0) | 4 (3) | 0 (0) |
| Cardioactive drug level above therapeutic | 1 (1) | 1 (1) | 3 (2) | 1 (1) |
| Hematuria | 2 (2) | 3 (2) | 4 (3) | 3 (2) |
| **Musculoskeletal, connective tissue and bone** | | | | |
| Muscle weakness | 1 (1) | 5 (4) | 1 (1) | 0 (0) |
| **Nervous system disorders** | | | | |
| Dizziness (excluding vertigo) | 29 (23) | 28 (21) | 29 (21) | 18 (14) |
| Headache | 8 (6) | 8 (6) | 9 (7) | 17 (13) |
| Taste disturbance | 7 (6) | 18 (13) | 30 (22) | 1 (1) |
| Tremor | 2 (2) | 2 (2) | 3 (2) | 0 (0) |
| Somnolence | 1 (1) | 1 (1) | 4 (3) | 0 (0) |
| **Psychiatric disorders** | | | | |
| Anxiety | 12 (10) | 17 (13) | 16 (12) | 13 (10) |
| Insomnia | 3 (2) | 3 (2) | 4 (3) | 2 (2) |
| **Respiratory, thoracic and mediastinal disorder** | | | | |
| Dyspnea | 16 (13) | 23 (17) | 17 (13) | 9 (7) |
| Rales | 2 (2) | 1 (1) | 3 (2) | 0 (0) |
| Wheezing | 0 (0) | 3 (2) | 0 (0) | 1 (1) |
| **Skin & subcutaneous tissue disorders** | | | | |
| Pruritus | 3 (2) | 3 (2) | 5 (4) | 0 (0) |

No clinically important differences in incidence of adverse reactions were noted by age, or gender. Too few non-White patients were enrolled to assess adverse events according to race. Adverse events occurring in 2% or more of the patients in any of the ERAFT propafenone SR treatment groups and not listed in Table 2 include the following: bundle branch block left, bundle branch block right, conduction disorders, sinus bradycardia, and hypertension.

Other adverse events reported with propafenone clinical trials not already listed in Table 2 include the following adverse events by body and preferred terms.

BLOOD AND LYMPHATIC SYSTEM DISORDERS: Anemia, lymphadenopathy, spleen disorder, thrombocytopenia.
CARDIAC DISORDERS: Angina unstable, arrhythmia, atrial tachycardia, atrioventricular block, bundle branch block, branch block left, bundle branch block right, cardiac arrest, cardiac disorder, conduction disorder, coronary artery disease, extrasystoles, myocardial infarction, nodal arrhythmia, palpitations, pericarditis, sinoatrial block, sinus arrest, sinus arrhythmia, sinus bradycardia, supraventricular extrasystoles, supraventricular tachycardia, ventricular arrhythmia, ventricular extrasystoles, ventricular hypertrophy.
EAR AND LABYRINTH DISORDERS: Hearing impaired, tinnitus, vertigo.
EYE DISORDERS: Eye hemorrhage, eye inflammation, eyelid ptosis, miosis, retinal disorder, visual acuity reduced.
GASTROINTESTINAL DISORDERS: Abdominal distension, abdominal pain, dry throat, duodenitis, dyspepsia, dysphagia, eructation, gastritis, gastroesophageal reflux disease, gingival bleeding, glossitis, glossodynia, gum pain, halitosis, intestinal obstruction, malaena, mouth ulceration, pancreatitis, peptic ulcer, rectal bleeding, sore throat.
GENERAL DISORDERS AND ADMINISTRATION SITE CONDITIONS: Chest pain, feeling hot, hemorrhage, malaise, pain, pyrexia.
HEPATO-BILIARY DISORDERS: Hepatomegaly.
INVESTIGATIONS: Abnormal electrocardiogram, abnormal heart sounds, abnormal liver function tests, abnormal pulse, carotid bruit, decreased blood chloride, decreased blood pressure, increased blood sodium, decreased hemoglobin, decreased neutrophil count, decreased platelet count, decreased prothrombin level, decreased red blood cell count, decreased weight, electrocardiogram QT prolonged, glycosuria present, heart rate irregular, increased alanine aminotransferase, increased aspartate aminotransferase, increased blood bilirubin, increased blood cholesterol, increased blood creatinine, increased blood glucose, increased blood lactate dehydrogenase, increased blood pressure, increased blood prolactin, increased blood triglycerides, increased blood urea, increased blood uric acid, increased eosinophil count, increased gamma-glutamyltransferase, increased monocyte count, increased prostatic specific antigen, increased prothrombin level, increased weight, increased white blood cell count, leukocyte count, proteinuria present.
METABOLISM AND NUTRITION DISORDERS: Anorexia, dehydration, diabetes mellitus, gout, hypercholesterolemia, hyperglycemia, hyperlipidemia, hypokalemia.
MUSCULOSKELETAL, CONNECTIVE TISSUE AND BONE DISORDERS: Arthritis, bursitis, collagen-vascular disease, costochondritis, joint disorder, muscle cramps, muscle spasms, myalgia, neck pain, pain in jaw, sciatica, tendonitis.
NERVOUS SYSTEM DISORDERS: Amnesia, ataxia, balance impaired, brain damage, cerebrovascular accident, dementia, gait abnormal, hypertonia, hypoesthesia, insomnia, paralysis, paresthesia, peripheral neuropathy, speech disorder, syncope, tongue hypoesthesia.
PSYCHIATRIC DISORDERS: Decreased libido, emotional disturbance, mental disorder, neurosis, nightmare, sleep disorder.
RENAL AND URINARY DISORDERS: Dysuria, nocturia, oliguria, pyuria, renal failure, urinary casts, urinary frequency, urinary incontinence, urinary retention, urine abnormal.
REPRODUCTIVE SYSTEM AND BREAST DISORDERS: Breast pain, impotence, prostatism.
RESPIRATORY, THORACIC AND MEDIASTINAL DISORDERS: Atelectasis, breath sounds decreased, chronic obstructive airways disease, cough, epistaxis, hemoptysis, lung disorder, pleural effusion, pulmonary congestion, rales, respiratory failure, rhinitis, throat tightness.
SKIN AND SUBCUTANEOUS TISSUE DISORDERS: Alopecia, dermatitis, dry skin, erythema, nail abnormality, petechiae, pruritis, sweating increased, urticaria.
VASCULAR DISORDERS: Arterial embolism limb, deep limb venous thrombosis, flushing, hematoma, hypertension, hypertensive crisis, hypotension, labile blood pressure, pallor, peripheral coldness, peripheral vascular disease, thrombosis.

**Laboratory:**
**Electrocardiograms:** Propafenone prolongs the PR and QRS intervals in patients with atrial and ventricular arrhythmias. Prolongation of the QRS interval makes it difficult to interpret the effect of propafenone on the QT interval.

---

## RYTHMOL® SR
(propafenone hydrochloride) extended release
**CAPSULES**

### Table 3: Mean Change in 12-Lead Electrocardiogram Results (RAFT)

| | RYTHMOL SR BID dosing | | | Placebo |
|---|---|---|---|---|
| | 225 mg n=126 | 325 mg n=126 | 425 mg n=126 | n=126 |
| PR (msec) | 9±22 | 12±23 | 21±24 | 1±16 |
| QRS (msec) | 4±14 | 6±15 | 9±15 | -2±12 |
| QTc* (msec) | 2±30 | 5±36 | 6±37 | 5±35 |

*Calculated using Bazett's correction factor.

### Table 4: Number of patients according to the range of maximum QTc change compared to baseline over the study in each dose group (RAFT study)

| Range of maximum QTc change | RYTHMOL SR | | | Placebo |
|---|---|---|---|---|
| | 225 mg BID N=119 n (%) | 325 mg BID N=129 n (%) | 425 mg BID N=129 n (%) | N=120 n (%) |
| >20% | 11 (9%) | 6 (5%) | 3 (2%) | 5 (4%) |
| 10-20% | 19 (16%) | 28 (22%) | 32 (26%) | 24 (20%) |
| ≤16% | 89 (83%) | 95 (74%) | 81 (72%) | 91 (76%) |

**OVERDOSAGE**
The symptoms of overdosage may include hypotension, somnolence, bradycardia, intra-atrial and intraventricular conduction disturbances, and rarely convulsions and high grade ventricular arrhythmias. Defibrillation as well as infusion of dopamine and isoproterenol have been effective in controlling abnormal ventricular rhythm and blood pressure. Convulsions have been alleviated with intravenous diazepam. General supportive measures such as mechanical respiratory assistance and external cardiac massage may be necessary.

The hemodialysis of propafenone in patients with an overdose is expected to be of limited value in the removal of propafenone as a result of both its high protein binding (>95%) and large volume of distribution.

**DOSAGE AND ADMINISTRATION**
The dose of RYTHMOL SR must be individually titrated on the basis of response and tolerance. Therapy should be initiated with RYTHMOL SR 225 mg given every twelve hours. Dosage may be increased at a minimum of five day interval to 325 mg given every twelve hours. If additional therapeutic effect is needed, the dose of RYTHMOL SR may be increased to 425 mg given every twelve hours.

In patients with hepatic impairment or having significant widening of the QRS complex or second or third degree AV block, dose reduction should be considered.

RYTHMOL SR can be taken with or without food. Do not crush or further divide the contents of the capsule.

**HOW SUPPLIED**
RYTHMOL SR (propafenone HCl) capsules are supplied as white, opaque, hard gelatin capsules containing either 225 mg, 325 mg, or 425 mg of propafenone HCl and imprinted in red with ℞ Reliant and strength. The 325 mg strength is also imprinted with a single red band around 3/4 of the circumference of the body; the 425 mg strength is imprinted with three bands around 3/4 of the circumference of the body.

| Capsule Strength | BG count bottle NDC |
|---|---|
| 225 mg | 65726-261-15 |
| 325 mg | 65726-252-15 |
| 425 mg | 65726-263-15 |

**Storage:**
Store at 25°C (77°F); excursions permitted to 15°-30°C (59°-86°F) [see USP Controlled Room Temperature]. Dispense in a tight container as defined in the USP.

**Rx only**
Revised: December, 2005

All Rights Reserved.

RYTHMOL is a registered trademark of G. Petrik used under license by Abbott Laboratories

Product of Switzerland
Distributed by:
Reliant Pharmaceuticals, Inc.
Liberty Corner, NJ 07938

 **Reliant**
PHARMACEUTICALS, INC.

Address Medical Inquiries to:
Reliant Medical Inquiries
c/o PPD
2655 Meridian Parkway
Durham, NC 27713-2203
or Call: 877-311-7515

2613F-03
32611003                                    PRINTED IN USA

# Exhibit 2

**Search results from the "OB_Rx" table for query on "021416."**

| | |
|---|---|
| Active Ingredient: | PROPAFENONE HYDROCHLORIDE |
| Dosage Form;Route: | CAPSULE, EXTENDED RELEASE; ORAL |
| Proprietary Name: | RYTHMOL SR |
| Applicant: | RELIANT PHARMS |
| Strength: | 225MG |
| Application Number: | 021416 |
| Product Number: | 001 |
| Approval Date: | Sep 4, 2003 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | |
| Patent and Exclusivity Info for this product: View | |

| | |
|---|---|
| Active Ingredient: | PROPAFENONE HYDROCHLORIDE |
| Dosage Form;Route: | CAPSULE, EXTENDED RELEASE; ORAL |
| Proprietary Name: | RYTHMOL SR |
| Applicant: | RELIANT PHARMS |
| Strength: | 325MG |
| Application Number: | 021416 |
| Product Number: | 002 |
| Approval Date: | Sep 4, 2003 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | |
| Patent and Exclusivity Info for this product: View | |

| | |
|---|---|
| Active Ingredient: | PROPAFENONE HYDROCHLORIDE |
| Dosage Form;Route: | CAPSULE, EXTENDED RELEASE; ORAL |
| Proprietary Name: | RYTHMOL SR |
| Applicant: | RELIANT PHARMS |
| Strength: | 425MG |
| Application Number: | 021416 |
| Product Number: | 003 |
| Approval Date: | Sep 4, 2003 |
| Reference Listed Drug | Yes |
| RX/OTC/DISCN: | RX |
| TE Code: | |
| Patent and Exclusivity Info for this product: View | |

Return to Electronic Orange Book Home Page

FDA/Center for Drug Evaluation and Research
Office of Generic Drugs

Division of Labeling and Program Support
Update Frequency:

  Orange Book Data - **Monthly**

  Generic Drug Product Information & Patent Information - **Daily**

  Orange Book Data Updated Through January, 2008

  Patent and Generic Drug Product Data Last Updated: March 04, 2008

Patent and Exclusivity Search Results from query on Appl No 021416 Product 001 in the OB_Rx list.

## Patent Data

| Appl No | Prod No | Patent No | Patent Expiration | Drug Substance Claim | Drug Product Claim | Patent Use Code |
|---------|---------|-----------|-------------------|---------------------|--------------------|-----------------|
| 021416 | 001 | 5681588 | OCT 28,2014 | | | |

## Exclusivity Data

### There is no unexpired exclusivity for this product.

Additional information:

1. Patents are published upon receipt by the Orange Book Staff and may not reflect the official receipt date as described in 21 CFR 314.53(d)(5).
2. Patents submitted on FDA Form 3542 and listed after August 18, 2003 will have one to three patent codes indicating specific patent claims as submitted by the sponsor and are detailed in the above table.
3. Patents listed prior to August 18, 2003 are flagged with method of use claims only as applicable and submitted by the sponsor. These patents may not be flagged with respect to other claims which may apply
4. *PED and PED represent pediatric exclusivity. Patents with pediatric exclusivity granted after August 18, 2003 will be indicated with *PED as was done prior to August 18, 2003. Patents with *PED added after August 18, 2003 will not contain any information relative to the patent itself other than the *PED extension. Information related specifically to the patent will be conveyed on the original patent only.
5. U.S. Patent Nos. RE 36481 and RE 36520 were relisted for Zocor (NDA 19-766) pursuant to the decision and related order in Ranbaxy Labs. v.Leavitt, No. 05-1838 (D.D.C. April 30, 2006). The '481 and '520 patents remained listed in Approved Drug Products with Therapeutic Equivalence Evaluations until any applicable periods of exclusivity pursuant to section 505(j)(5)(B)(iv) of the Federal Food, Drug, and Cosmetic Act were triggered and run. For additional information on this matter, please refer to Docket Nos. 2005P-0008 and 2005P-0046. Patents were subsequently delisted in the December 2006 Orange Book update as the exclusivity periods have triggered and run to expiration.
6. Patent number 4904769 listed on all products of NDA 20482 Precose (Acarbose) was requested to be delisted by the sponsor on 4/16/2007. This patent has remained listed because, under Section 505(j)(5)(D)(i) of the Act, a first applicant may retain eligibility for 180-day exclusivity based on a paragraph IV certification to this patent for a certain period.

View a list of all patent use codes
View a list of all exclusivity codes

Return to Electronic Orange Book Home Page

FDA/Center for Drug Evaluation and Research
Office of Generic Drugs
Division of Labeling and Program Support
Update Frequency:
    Orange Book Data - **Monthly**

Generic Drug Product Information & Patent Information - **Daily**
Orange Book Data Updated Through January, 2008
Patent and Generic Drug Product Data Last Updated: March 04, 2008

# Exhibit 3

US005681588A

## United States Patent [19]

### Kolter et al.

[11]    **Patent Number:**        **5,681,588**

[45]    **Date of Patent:**        **Oct. 28, 1997**

[54] **DELAYED RELEASE MICROTABLET OF β-PHENYLPROPIOPHENONE DERIVATIVES**

[75] Inventors: **Karl Kolter**, Limburgerhof; **Helmut Fricke**, Mutterstadt; **Volker Buehler**, Karlsruhe; **Herbert Mueller-Peltzer**, Heidelberg, all of Germany

[73] Assignee: **Knoll Aktiengesellschaft**, Ludwigshafen, Germany

[21] Appl. No.: **525,749**

[22] PCT Filed:    **Mar. 24, 1994**

[86] PCT No.:    **PCT/EP94/00949**

§ 371 Date:    **Oct. 3, 1995**

§ 102(e) Date:    **Oct. 3, 1995**

[87] PCT Pub. No.:    **WO94/22434**

PCT Pub. Date: **Oct. 3, 1994**

[30]        **Foreign Application Priority Data**

Apr. 3, 1993  [DE]    Germany ........................... 43 10 963.2

[51] Int. Cl.⁶ ........................................ A61K 9/20

[52] U.S. Cl. ..................... 424/464; 424/469; 424/461; 424/468; 424/458

[58] Field of Search ..................... 424/464, 456; 252/1; 514/652

[56]        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,951,821 | 4/1976 | Davidson | ..................................... 252/1 |
| 4,474,986 | 10/1984 | Lietz | ..................................... 564/349 |
| 4,945,114 | 7/1990 | Franke | ..................................... 514/652 |
| 4,954,347 | 9/1990 | Kristen et al. | ..................................... 424/456 |

Primary Examiner—Thurman K. Page
Assistant Examiner—William E. Benston, Jr.
Attorney, Agent, or Firm—Oblon, Spivak, McClelland, Maier & Neustadt, P.C.

[57]        **ABSTRACT**

A cylindrical delayed release tablet with a convex or flat upper side and lower side is provided, along with a method for its production and a gelatin capsule containing 3–200 tablets of the same having identical or different release rates, wherein the tablet if made of β-phenylpropiophenone derivatives of the formula I as active ingredient



where R is n-propyl or 1,1-dimethylpropyl, and their pharmacologically acceptable salts, wherein the tablet has a height and diameter that are both, independently of one another, 1–3 mm, the active ingredient content is in the range from 81–99.9% of the weight of the microtablet, (but not taking into account the weight of any coating which is present, the active ingredient density is greater than 1, the release of active ingredient in the USP paddle method at 50 rpm is 80% as a maximum after 3 hours and as a minimum after 24 hours, the release rate is virtually independent of the pressure when compressing the tablets, and the tablet contains no release-delaying ancillary substance but can contain 0.1–5% by weight of a lubricant and 0–18.9% by weight of other conventional ancillary substances.

**6 Claims, 11 Drawing Sheets**



*FIG. 1*



*FIG.2*



FIG.3



*FIG. 4*



*FIG. 5*



*FIG. 6*



*FIG. 7*



*FIG. 8*



*FIG. 9*



*FIG. 10*



*FIG. 11*

5,681,588

**1**

## DELAYED RELEASE MICROTABLET OF β-PHENYLPROPIOPHENONE DERIVATIVES

This application is a 35USC371 of PCT/EP94/00949 filed Mar. 24, 1994.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to cylindrical microtablets of β-phenylpropiophenone derivatives with a high content and density of active ingredient and a delayed release which is independent of the compressive force, with no release-delaying ancillary substances.

2. Discussion of the Background

Reference to β-phenylpropiophenone derivatives hereinbefore and hereinafter always includes and particularly means their physiologically acceptable salts, preferably the hydrochloride.

In the prior art the release of active ingredient from tablets is delayed either by a release-delaying matrix in which the active ingredient is embedded, or by a release-delaying coating through which the digestive fluid diffuses in and the active ingredient diffuses out.

Both principles have considerable disadvantages. For example, matrix tablets contain relatively large amounts of ancillary substances so that the volume of the tablet for a given dose of active ingredient is relatively large, which is unpleasant for the patient. On the other hand, film-coated tablets are elaborate to produce and, in particular, mechanically sensitive. The slightest damage to the lacquer film leads to the risk of sudden release of the entire content of active ingredient (dose dumping), which is extremely undesirable (local and temporal overdose with adverse side effects; short total action time).

Both matrix and film-coated delayed release tablets normally have diameters of about 6 to 12 mm or more and are therefore unable to pass through the closed pylorus. The release and absorption of their total content of active ingredient concentrated at one site in the gastrointestinal tract depends on the conditions prevailing at this site, which results in wide interindividual and intraindividual variation in the plasma level.

This variation is less with multiple unit delayed release forms because the units are distributed uniformly along the gastrointestinal tract and can also pass through the closed pylorus. Usually employed as multiple unit forms are pellets with a diffusion lacquer packed into hard gelatin capsules. It is possible to produce matrix pellets only with very low doses of medicinal substances because, owing to the large surface area, even more matrix substance would be required than for the bolus delayed d release tablet.

For example, the Patent Applications GB 2 176 999 and WO 92/04013 disclose small matrix delayed release tablets which likewise contain relatively large amounts of release-delaying ancillary substances. The Patent Application EP 22 17 32 claims delayed release tablets of active ingredients with low solubility, which contain 60–80% active ingredient in addition to at least four auxiliaries. The release from these bolus forms is, as described in the patent, highly dependent on the granulation process and the equipment used for manufacture.

It is furthermore generally known that an increase in the compressive force in tablet production is associated with a slowing of the release of active ingredient. This applies both to fast release tablets and to delayed release tablets (Patent

**2**

Application WO 92/00064). Since the compressive forces fluctuate, despite the most up to date machine engineering, the resulting release rates vary. An additional factor is the variation between batches in the compression properties, which derives from the variability in the granules to be compressed. Differences in the particle size, porosity, surface structure, wettability etc. may have a large effect on the compression properties and the delaying of release.

### SUMMARY OF THE INVENTION

It is an object of the present invention to overcome the disadvantages of the prior art, ie. to develop propafenone and diprafenone tablets with a small size, high content and density of active ingredient and release of active ingredient which is independent of the compressive force and uniform over a lengthy period.

We have found that this object is achieved by the microtablets of the present invention. This is because it has been found, surprisingly, that it is possible in the present case to produce delayed release tablets without release-delaying ancillary substances. This is all the more surprising because other medicinal substances with a water solubility similar to that of propafenone hydrochloride (0.7%), for example cimetidine hydrochloride or paracetamol, are 90% released in 1 hour from the same preparation.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

By comparison with other substances, propafenone HCl is extremely difficult to compress. A bolus tablet with commercial dosages of 150–300 mg and an active ingredient content above 80% cannot be produced under production conditions. By contrast, the microtablets according to the invention can, surprisingly, be produced at a relatively high machine speed without problems concerning friability and hardness, and specifically with active ingredient contents in the range from 81 to 99.9, preferably 85 to 99.5, % by weight and with an active ingredient density above 1. Such high contents of active ingredients of this type in tablets have not previously been reached.

The microtablets according to the invention are cylindrical with a flat or convex upper side and lower side and with a diameter and height which are preferably approximately equal and, independently of one another, from 1 to 3, preferably 1.5 to 2.5 mm.

It was furthermore not predictable that the release of active ingredient is, in contrast to usual experience, virtually independent of the pressure when compressing the tablets and, moreover, over a wide range of pH of the medium. "Virtually independent" means that the effect can be neglected for practical purposes. This ensures release at a constant rate. It is adjusted via the size of the tablet and possibly by additives which increase the release rate so that the release of active ingredient after 3, preferably 5, hours is not more than 80 and after 24, preferably 15, hours is not less than 80%. Surprisingly, the microtablets according to the invention also display distinct advantages in vivo unlike conventional delayed release forms such as a bolus delayed release form with similar in vitro release. Despite the short half-life, a pronounced blood level plateau develops (FIG. 11). The fluctuations in the blood level are considerably less with the microtablets. This is evident from the $t_{75\%}$ (period in the dosage interval during which the plasma levels are at least 75% of the maximum level), which is 8 to 9 hours with the microtablets according to the invention compared with 5 to 6 hours with the bolus delayed release form, and from the

5,681,588

**3**

PTF (peak to trough fluctuation; cf. H. P. Koch and W. A. Ritschel, Synopsis der Biopharmazie und Pharmakokinetik, Ecomed-Verlagsgesellschaft mbH, Landsberg und München, 1986)

$$PTF\ (\%) = \frac{C_{max} - C_{min}}{\frac{AUC}{\Delta t}} \times 100$$

for the AUC. cf. J. K. Aronson et al., Europ. J. of Clinical Pharmacology 35 (1988), 1–7.

which has a value for the microtablets which is only about half that for the bolus forms, in particular less than 75, preferably less than 60, %. The microtablets accordingly increase therapeutic safety because excessive peaks of plasma levels and the side effects caused thereby do not occur, the plasma level does not fall below the minimum effective level, and the bioavailability of this form is unaffected by food intake, in contrast to the bolus delayed release form.

The AUC found for the bolus delayed release form is 50% higher when fasting.

In general, the microtablets show smaller intra- and inter-individual differences by comparison with the bolus delayed release form.

The microtablets according to the invention furthermore have the advantage that when introduced into gastric or intestinal fluid they show no tendency to stick or adhere. This ensures that they pass as individual articles through the gastrointestinal tract and, moreover, do not become attached to the wall of the stomach or intestine and induce irritation. Sticking or adhesion properties of this type are displayed, for example, by small articles with hydrophilic release-delaying polymers (cf. WO 92/04013).

The production of delayed release forms with hydrophilic release-delaying polymers often requires the use of organic solvents during granulation so that swelling does not start even during this process. It is possible entirely to dispense with this in the production of the microtablets according to the invention.

Presentations with hydrophilic release-delaying polymers additionally have the disadvantage that, because of the tendency to sorption and swelling, they are sensitive to a change in humidity during storage. These formulations are damaged by high humidities in particular. The microtablets according to the invention are stable even at relatively high humidities because of the insensitivity of the materials used. Even after storage at 93% rel. humidity for 21 days the water uptake is less than 1%, and no visible change is detectable.

The microtablets according to the invention are produced in conventional pharmaceutical equipment by the following steps: granulation, drying, mixing, tabletting.

The particle size of the active ingredient is, within the conventional pharmaceutical range, of only minor or no importance in the production of the microtablets according to the invention, against all expectations. This means that it is possible to convert propafenone hydrochloride and diprafenone hydrochloride of different particle sizes into products of the same quality.

Granulation and drying are preferably carried out in a fluidized bed. However, the agglomeration can also be carried out in a horizontal or vertical mixer.

After the wet granules have been passed through a screen of suitable mesh width they are dried either in a circulating air dryer or in a fluidized bed. The particle size of the granules should be below 1 mm, preferably below 0.8 mm.

It is possible to employ all conventional binders or adhesives for the agglomeration, eg. polyvinylpyrrolidone,

**4**

vinylpyrrolidone/vinyl acetate copolymers, gelatin, hydroxypropylmethylcellulose, hydroxypropylcellulose, polymers of methacrylic acid and its esters. It is possible to dispense with the use of a binder by using a solution of active ingredient as granulation liquid. Water without additives is preferred as granulation liquid.

After the granules have been dried to the defined water content, 0.1–5, preferably 0.3–2, % by weight of a lubricant for the tabletting are mixed in homogeneously. It is likewise possible to use for this purpose all conventional lubricant substances such as talc, magnesium stearate, calcium stearate, stearic acid, calcium behenate, glycerin palmitostearate, sodium acetate, polyethylene glycol, sodium stearate [sic] fumarate. In addition, up to 18.9% by weight of other conventional ancillary substances can be added, for example colorants, stabilizers, fillers, wetting agents, flow regulators but no release-delaying agents.

The tabletting takes place in a suitable tabletting machine equipped with multiple microtablet punches. The resulting microtablets have a cylindrical shape with flat or convex surface [sic]. The height and the diameter can be varied independently of one another. It is often expedient, to increase the apparent density and improve flowability, to match the height of the microtablets to the diameter.

Another element in the control of release besides the size of the microtablets is the addition of wetting agents which increase the rate of dissolution. Wetting agents which can be used are, on the one hand, surfactants such as polyoxyethylene fatty acid esters, polyoxyethylene fatty alcohol ethers, fatty acid salts, bile acid salts, alkyl sulfates or ethylene oxide/propylene oxide block copolymers or, on the other hand, genuinely water-soluble substances such as polyethylene glycols, urea, sodium chloride, sorbitol, mannitol, glycine, nicotinamide, or salts of citric acid, tartaric acid or phosphoric acid. In this case the rate of release increases in parallel with the rise in the wetting agent concentration.

The wetting agent can have been incorporated into the granules or else be subsequently mixed in together with the lubricant. This is, of course, possible only with solid wetting agents. The wetting agent concentration is 0.1–15, as a rule 1–10. % of the total mass.

To increase the rate of erosion of the active ingredient from the tablet surface, and thus the release of active ingredient, it is also possible to use disintegrants in concentrations of 0.001–0.5, preferably 0.01–0.1, %, which are far below the conventional concentrations.

As a rule, the microtablets can be packed into gelatin capsules directly using conventional filling machines. It may occasionally be advantageous for the microtablets, before the packing, to be provided with a readily soluble film coating which does not influence the release.

In addition, it is in many cases expedient to combine delayed release with instant release or not so delayed release microtablets. This results in release of an initial dose at once, followed by the slow release of the maintenance dose. Modern capsule filling machines are able to meter two products into one capsule without problems.

The instant release microtablet differs from the delayed release microtablet in that it contains conventional amounts of disintegrant, swelling agent, pore former, which bring about rapid disintegration of the microtablet into small fragments and rapid dissolution of the active ingredient.

The microtablets of the examples always had a diameter and height each of 2 mm, and the density of active ingredient was always more than 1.

5,681,588

**5**

EXAMPLES

Example 1 (FIG. 1)

Propafenone delayed release microtablets

| Composition | |
| --- | --- |
| Propafenone HCl | 6.25 mg (96%) |
| Hydroxypropylmethylcellulose | 0.20 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.50 mg |

30kg of propafenone HCl were granulated with 10 kg of a 10% strength hydroxypropylmethylcellulose solution (Pharmacoat® 603) and dried in a fluidized bed granulator. The granules were passed through a screen of suitable mesh width and then mixed in a plowshare mixer with the stated amount of magnesium stearate.

The microtablets were produced in a rotary tabletting machine equipped with multiple microtablet punches.

The number of microtablets corresponding to the dose to be administered was packed into hard gelatin capsules using a suitable capsule filling machine.

TABLE 1

Results of studies on volunteers with propafenone HCl microtablets of Example 1 and a bolus delayed release form according to the comparative test (n = 18, dose: 400 mg of propafenone HCl, repeated administration)

| | | Microtablets | | Bolus delayed release form | |
| --- | --- | --- | --- | --- | --- |
| | | fasting | non-fasting | fasting | non-fasting |
| AUC | ng · h / ml | 5 500 | 5 500 | 6 900 | 4 700 |
| $t_{75\%}$ | (h) | 8–9 | 8–9 | 5–6 | 5–6 |
| PTF | (%) | 52 | 56 | 88 | 106 |

n = number of volunteers
ng = nanogram
h = hours

Example 2 (FIG. 2)

Propafenone delayed release microtablets

| Composition | |
| --- | --- |
| Propafenone HCl | 5.92 mg (91%) |
| Hydroxypropylmethylcellulose | 0.20 mg |
| Poloxamer 188 (USP) | 0.33 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.5 mg |

Production took place as in Example 1. The required amount of poloxamer 188 together with the magnesium stearate were mixed with the granules in a plowshare mixer.

**6**

Example 3 (FIG. 3)

Propafenone delayed release microtablets

| Composition | |
| --- | --- |
| Propafenone HCl | 5.61 mg (86%) |
| Hydroxypropylmethylcellulose | 0.19 mg |
| Poloxamer 188 | 0.65 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.5 mg |

Production took place as in Example 2.

Example 4 (FIG. 4)

Propafenone delayed release microtablets

| Composition | |
| --- | --- |
| Propafenone HCl | 6.0 mg (86%) |
| Hydroxypropylmethylcellulose | 0.2 mg |
| Calcium hydrogen phosphate | 0.613 mg |
| Monoglyceride (Myvatex ®) | 0.15 mg |
| Crosslinked polyvinylpyrrolidone | 0.007 mg |
| Magnesium stearate | 0.03 mg |
| Total weight | 7.0 mg |

Production took place as in Example 2.

Example 5 (FIG. 5)

Propafenone delayed release microtablets

| Composition | |
| --- | --- |
| Propafenone HCl | 5.70 mg (81%) |
| Gelatin | 0.18 mg |
| Calcium hydrogen phosphate | 0.38 mg |
| NaCl | 0.70 mg |
| Magnesium stearate | 0.04 mg |
| Total weight | 7.0 mg |

Production took place as in Example 1. A 10% strength gelatin solution was used as granulating agent. The amount of NaCl was mixed in with the magnesium stearate.

Example 6 (FIG. 6)

Propafenone delayed release microtablets

| Composition | |
| --- | --- |
| Propafenone HCl | 5.83 mg (83%) |
| Hydroxypropylmethylcellulose | 0.17 mg |
| β-Cyclodextrin | 0.9 mg |
| Magnesium stearate | 0.1 mg |
| Total weight | 7.0 mg |

Production took place as in Example 2.

Example 7 (FIG. 7)

Gelatin capsules with propafenone delayed release microtablets and propafenone instant release microtablets

To achieve a higher initial release, 14 instant release microtablets and 55 delayed release microtablets were

5,681,588

**7**

packed into hard gelatin capsules in a suitable capsule filling machine.

| Composition of the instant release microtablets | |
|---|---|
| Propafenone HCl | 6.05 mg (93%) |
| Hydroxypropylmethylcellulose | 0.20 mg |
| Sodium carboxymethylstarch | 0.20 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.5 mg |

The instant release microtablets were produced as in Example 2.

The delayed release microtablets were produced as in Example 1.

### Example 8 (FIG. 8)
Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 6.48 mg (99.7%) |
| Magnesium stearate | 0.02 mg |
| Total weight | 6.50 mg |

Propafenone hydrochloride and magnesium stearate were mixed in a plowshare mixer and subsequently compressed to microtablets.

The in vitro release plots (FIGS. 1 to 10) were determined using a USP paddle apparatus with 0.08 molar HCl in the first two hours and then phosphate buffer pH 6.8. The paddle rotated at 50 rpm.

Comparative test
Propafenone delayed release bolus film-coated tablet

| Composition | |
|---|---|
| Propafenone HCl | 450.0 mg |
| Sodium alginate | 112.0 mg |
| Microcrystalline cellulose type PH 101 | 37.0 mg |
| Copolymers of acrylic and methacrylic esters with a small content of quaternary ammonium groups (Eudragit ® RS) | 15.0 mg |
| Gelatin | 55.0 mg |
| Magnesium stearate | 3.5 mg |
| Microcrystalline cellulose type PH 102 | 12.5 mg |
| Readily soluble film coating | 15.0 mg |
| Total weight | 700.0 mg |

Propafenone hydrochloride, sodium alginate, microcrystalline cellulose (type PH 101) and Eudragit RS were mixed in a vertical mixer and granulated with 20% strength gelatin solution. The wet granules were dried in a fluidized bed dryer with inlet air at 60° C. After passing through a screen of suitable mesh width, magnesium stearate and microcrystalline cellulose (type PH 102) were admixed in a horizontal mixer and subsequently the mixture was compressed to oblong tablets (dimensions 18×8.7 mm) in a rotary tabletting machine. The readily soluble coating was applied in a horizontal coater.

**8**

Determination of in vitro release in a paddle apparatus at 50 rpm produced the following results (in %):

| | |
|---|---|
| 1st hour | 3.8 |
| 2nd hour | 5.5 |
| 3rd hour | 23.7 |
| 4th hour | 43.0 |
| 6th hour | 75.4 |
| 8th hour | 89.5 |

The in vitro release from the delayed release bolus film-coated tablet is thus similar to that of the delayed release microtablets according to the invention. Nevertheless, the in vivo release is entirely different and, in fact, better according to the invention, cf. drug levels shown in FIG. 11.

We claim:

1. A cylindrical delayed release microtablet with a convex or flat upper side and lower side of β-phenylpropiophenone derivatives of the formula I as active ingredient



where R is n-propyl or 1,1-dimethylpropyl, and their pharmacologically acceptable salts, wherein

   a) the height and diameter are, independently of one another, 1–3 mm,

   b) the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet,

   c) the active ingredient density is greater than 1,

   d) the release of active ingredient in the USP paddle method at 50 rpm is 80% as a maximum after 3 hours and as a minimum after 24 hours,

   e) the release rate is virtually independent of the pressure when compressing the tablets, and

   f) the tablet contains no release-delaying ancillary substance but 0.1–5% by weight of a lubricant and 0–18.9% by weight of other conventional ancillary substances.

2. A tablet as claimed in claim 1, which in vivo results in a pronounced plasma level plateau with a PTF<75% and whose bioavailability does not depend on the intake of food.

3. A tablet as claimed in claim 1, wherein the active ingredient is propafenone hydrochloride.

4. A tablet as claimed in claim 1, wherein the height and diameter are approximately the same.

5. A gelatin capsule which contains 3–200 tablets as claimed in claim 1 with identical or different release rates.

6. A process for producing cylindrical delayed release microtablets as claimed in claim 1, which comprises a homogeneous mixture of 81–99.9% by weight of the granulated active ingredient with a particle size below 1 mm, 0.1–5% by weight of a lubricant and 0–18.9% by weight of other conventional ancillary substances which do not delay release being compressed in a cylindrical mold with a height and diameter each of 1–3 mm and being removed from the mold.

*  *  *  *  *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  :  5,681,588
DATED       :  October 28, 1997
INVENTOR(S) :  Karl KOLTER et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the title page, Item [87], the PCT Pub. Date should read:

-- Oct. 13, 1994 --

Signed and Sealed this

Tenth Day of February, 1998

Attest:

*BRUCE LEHMAN*

Attesting Officer

*Commissioner of Patents and Trademarks*

# Exhibit 4

# Webster's Encyclopedic Unabridged Dictionary of the English Language

RECEIVED LIBRARY

JAN 12 2003

KIRKLAND & ELLIS LLP
NEW YORK OFFICE

**PORTLAND HOUSE • NEW YORK**

ACKNOWLEDGMENTS AND PERMISSIONS:

The "A Dictionary of the English Language" section of this book *(Webster's Encyclopedic Unabridged Dictionary)* is based on the first edition of *The Random House Dictionary of the English Language, the Unabridged Edition*, copyright © 1983.

*Atlas of the World,* copyright © 1984 by John Bartholomew & Son Limited. Reprinted by arrangement with John Bartholomew & Son Limited.

*A Manual of Style,* copyright © 1986 by Crown Publishers, Inc. Excerpted and reprinted by arrangement with Crown Publishers, Inc.

Krevisky, Joseph and Jordan L. Linfield—*The Bad Speller's Dictionary*, copyright © 1967, 1963 by Innovation Press. Reprinted by arrangement with Random House, Inc.

Stein, Jess, Ed.—*Rhyming Dictionary*, copyright © 1960 by Random House, Inc. Reprinted by arrangement with Random House, Inc.

Weiman, Ralph—*Living Language ™ Common Usage Dictionary, French-English/English-French,* copyright 1946, 1955, © 1968, 1974, 1983, 1985 by Crown Publishers, Inc. Reprinted by arrangement with Crown Publishers, Inc.

Martin, Genevieve A. and Theodor Bertram—*Living Language ™ Common Usage Dictionary, German-English/English-German,* copyright © 1956, 1985 by Crown Publishers, Inc. Reprinted by arrangement with Crown Publishers, Inc.

Martin, Genevieve A. and Mario Ciatti—*Living Language ™ Common Usage Dictionary, Italian-English/English-Italian,* copyright © 1956, 1985 by Crown Publishers, Inc. Reprinted by arrangement with Crown Publishers, Inc.

Weiman, Ralph and O. A. Succar—*Living Language ™ Common Usage Dictionary, Spanish-English/English-Spanish,* copyright 1946, © 1955, 1968, 1974, 1983, 1985 by Crown Publishers, Inc. Reprinted by arrangement with Crown Publishers, Inc.

*Webster's Crossword Puzzle Dictionary,* 1986 edition, copyright © 1963 by Fawcett Publications, Inc. and copyright © 1964 by Ottenheimer Publishers, Inc. Reprinted by arrangement with Ottenheimer Publishers, Inc.

Copyright © 1989 by dilithium Press, Ltd.
All rights reserved.

This 1989 edition is published by Portland House, a division of dilithium Press, Ltd., distributed by Crown Publishers, Inc., 225 Park Avenue South, New York, New York 10003.

Printed and Bound in the United States of America

Library of Congress Cataloging-in-Publication Data
Webster's encyclopedic unabridged dictionary of the English language.
    1. English language—Dictionaries.
PE1625.W46   1989
423—dc19                    89-3785
                            CIP
ISBN 0-517-68781-X

h g f e d c b

**con·ver·sa·tion·al** (kon′vər säʹzhə nᵊl), adj. 1. of, pertaining to, or characteristic of conversation: a conversational tone of voice. 2. able or ready to converse; given to conversation. [CONVERSATION + -AL] —con·ver·saʹtion·al·ly, adv.
—Syn. 1. See colloquial.

**con·ver·sa·tion·al·ist** (kon′vər säʹzhə nᵊlist), n. a person who enjoys and contributes to good conversation; an interesting person in conversation. [CONVERSATIONAL + -IST]

**con′versa′tional quality,** (in public speaking) a manner of utterance that resembles the spontaneity and informality of direct conversation.

**conversa′tion chair′,** an English chair of the 18th century designed to be straddled facing the back of the chair with the elbows resting on the crest rail: an English imitation of the voyeuse.

**conversa′tion piece′,** 1. group portraiture representing more or less fashionable people either in an interior or landscape setting. 2. any object that arouses comment because of some striking or unusual quality.

**con·ver·sa·zi·o·ne** (kon′ver sä tsyōʹne; Eng. kon′vər·sät′sē ōʹnē), n., pl. -ni-o·ne (-tsyōʹnē), Eng. -zi·o·nes. Italian. a social gathering for conversation, esp. on literary or scholarly subjects. [lit., conversation]

**con·verse¹** (v. kən vûrsʹ; n. konʹvûrs), v., -versed, -vers·ing, n. —v.i. 1. to talk informally with another or others; exchange views, opinions, etc., by talking. 2. Obs. a. to maintain a familiar association (usually fol. by with). b. to have sexual intercourse (usually fol. by with). c. to commune spiritually (usually fol. by with). —n. 3. familiar discourse or talk; conversation. 4. Obs. spiritual communion. [ME converse(n) < L conversārī to associate with. See CON-, VERSED] —con·versʹer, n.
—Syn. 1. talk, chat, discuss. See speak.

**con·verse²** (adj. kən vûrsʹ, konʹvûrs; n. konʹvûrs), adj. 1. opposite or contrary in direction, action, sequence, etc.; turned around. —n. 2. something that is the opposite or contrary of another. 3. Logic. a proposition obtained from another proposition by conversion. b. the relation between two terms, one of which is related to the other in a given manner, as "younger than" to "older than." 4. a group of words correlative with a preceding group but having a significant pair of terms interchanged, as "hot in winter but cold in summer" and "cold in winter but hot in summer." [< L converso(us) turned around, ptp. of convertere; see CONVERT] —con·verseʹly (or kən vûrsʹ-), adv.

**Con·verse** (konʹvûrs), n. Frederick Shepherd (shepʹərd), 1871–1940, U.S. composer.

**con·ver·sion** (kən vûrʹzhən, -shən), n. 1. act or state of converting; state of being converted. 2. change in character, form, or function. 3. spiritual change from sinfulness to righteousness, as in a religious, political party, viewpoint, etc., to another. 4. a change of attitude, emotion, or viewpoint from one of indifference, disbelief, or antagonism to one of acceptance, faith, or enthusiastic support, esp. such a change in a person's religion. 5. a physical transformation from one material or state to another: conversion of coal, water, and air into nylon. 7. a change from one form to another: conversion of securities into cash; conversion of francs into dollars. 8. a physical, structural, or design change or transformation from one state or condition to another, esp. to effect a change in function: conversion of the basement into a rumpus room; conversion of a freighter into a passenger liner. 9. a substitution of one component to another so as to effect a change: conversion from oil heat to gas heat. 10. Math. a change in the form or units of an expression. 11. Logic. the transposition of the subject and predicate of a proposition, as "No good man is unhappy" becomes by conversion "No unhappy man is good." 12. Law. a. unauthorized assumption and exercise of rights of ownership over personal property belonging to another. b. change from realty into personalty, or vice versa, as in the sale or purchase of land, mining coal, etc. 13. Football. a score made on a try for point after touchdown by place-kicking or drop-kicking the ball over the bar between the goal posts or by completing a pass in or running the ball into the end zone. 14. Psychoanal. the process by which a repressed psychic event, idea, feeling, memory, or impulse is represented by a bodily change or symptom, thus simulating a physical illness or its symptoms. 16. Physics. the production of radioactive material in a process in which one nuclear fuel is converted into a second nuclear fuel by the capture of neutrons. Cf. breeding (def. 6). 16. Computer Technol. a. a change from one code or symbolic system to another, as a change in number base. b. a change from one physical or recording system to another, as from paper tape to punch cards. [ME conversio(n) < L conversio(n-) (s. of conversiō) complete change. See CONVERSE², -ION] —con·verʹsion·al, con·verʹsion·ar·y (-zhə ner′ē, -shə-), adj.

**conver′sion ra′tio,** Physics (in a reactor) the number of fissionable atoms produced by each fissionable atom that is destroyed.

**conver′sion ta′ble,** a tabular arrangement of the equivalent values of the weight or measure units of different systems.

**con·vert·ass** (kon′vûr′tass), n., pl. -si (-sī, -sē). Eccles. a lay brother. [< L, fr. pp. of convertere; see CONVERT]

**con·vert** (v. kən vûrtʹ; n. konʹvûrt), v.t. 1. to change (something) into something of different form or properties; transmute. 2. Chem. to cause (a substance) to undergo a chemical change: to convert sugar into alcohol. 3. to cause to adopt a different religion, party, opinion, etc.: When the war came along, he was converted from a pacifist to a jingoist. 4. to change in character; cause to turn from an evil life to a righteous one: to convert a criminal. 5. to turn to another or a particular use or purpose; divert from one proper or intended use: They converted the study into a nursery when the baby was born. 6. to modify or adapt so to make it serve a different function: to convert an underwear factory to the manufacture of army uniforms.

stock, because of the greater value of the latter. 13. Computer Technol. to subject to conversion. —v.i. 14. to become converted. 15. Football. to make a conversion. —n. 16. one who has been converted, as to a religion or an opinion. [ME convert(en) < L convertere to change completely, equiv. to con- CON- + vertere to turn round] —con·verʹtive, adj.
—Syn. 1a. transform. 3. proselytize. 16. proselyte, neophyte, disciple.

**con·vert·ed** (kən vûrʹtid), adj. 1. noting a specified type of person who has been converted from religion, beliefs, or attitudes characteristic of that type: The mission school was run by converted natives. The most pious man there was a converted thief. 2. noting anything, formerly of the type specified, that has been converted to something else: His yacht is a converted destroyer escort. [CONVERT + -ED²]

**con′verted steel′,** Metall. See cement steel.

**con·vert·er** (kən vûrʹtər), n. 1. one who or that which converts. 2. one engaged in converting textile fabrics, esp. cotton cloths, from the raw state into the finished product ready for the market, as by bleaching, dyeing, etc. 3. Elect. a device that converts alternating current to direct current or vice versa. Cf. synchronous converter. 4. Metall. a chamber or vessel through which an oxidizing blast of air is forced, as in making steel by the Bessemer process or in refining matte. 6. Physics. a reactor for converting one kind of fuel into another kind. Also, con·verʹtor. [CONVERT + -ER¹]

**con·vert·i·ble** (kən vûrʹtə bəl), adj. 1. capable of being converted. 2. having a folding top, as an automobile, pleasure boat, etc. —n. 3. an automobile or boat having such a top. [ME < ML convertibil(is). See CONVERT -IBLE] —con·vert′i·bilʹi·ty, con·vertʹi·ble·ness, n. —con·vertʹi·bly, adv.

**con·vex** (in. kon vûr/tin), n. Biochem. See serum prothrombin accelerator. [CONVERT + -IN²]

**con·vert·i·plane** (kən vûrʹtə plān′), n. a plane capable of both vertical flight like a helicopter and fast forward speed like a conventional airplane. Also, con·vert′a·plane′. [< convert(ible) + -i- + -PLANE¹]

**con·vert·ite** (kon′vər tītʹ), n. Archaic. 1. a convert. 2. a reformed prostitute. [CONVERT + -ITE¹]

**con·vex** (adj. kon vek′ sē, kon-; n. kon′veks), adj. 1. having a surface that is curved or rounded outward. Cf. concave (def. 1). 2. Math. a. (of a polygon) having all interior angles less than or equal to 180°. b. (of a set) having the property that for each pair of points in the set the line joining the points is wholly contained in the set. —n. 3. a convex surface, part, or thing. [< L convex(us) vaulted, arched, rounded (appar. var. ptp. of convehere), equiv. to con- con- + veh-(ptp. s. of vehere to carry) + -tus, var. of -tus ptp. suffix] —con·vexʹly, con·vex·ed·ly (kən vekʹsid lē), adv. —con·vexʹ·ness, n.

**con·vex leaf′l,** Math. the smallest convex set containing a given set; the intersection of all convex sets that contain a given set.



A, Convex or
plano-convex lens;
B, Concavo-convex
lens; C, Convexo-
convex lens

**con·vex·i·ty** (kon vekʹsē tē), n., pl. -ties for 2. 1. the state of being convex. 2. a convex surface or thing. [< L convex(itas). See CONVEX, -ITY]

**con·vex·o-,** a combining form of convex: convexoconcave.

**con·vex·o-con·cave** (kon vek′sō kon kāvʹ), adj. 1. convex on one side and concave on the other. 2. Optics. pertaining to or noting a lens in which the convex face has a greater radius of curvature than the concave face. [CONVEXO + CONCAVE]

**con·vex·o-con·vex** (kon vek′sō kon veksʹ), adj. convex on both sides; biconvex. [CONVEXO + CONVEX]

**con·vex·o-plane** (kon vek′sō plānʹ), adj. plano-convex. [CONVEXO + PLANE¹]

**con·vey** (kən vāʹ), v.t. 1. to carry, bring, or take from one place to another; transport; bear. 2. to lead or conduct, as a channel or medium; transmit. 3. to communicate; impart; make known. 4. Law. to transfer; pass the title to. 5. Archaic. steal; purloin. 6. Obs. to take away secretly. [ME convey(en) < AF conveie(r) < VL *conviāre, equiv. to con- con- + -viāre, deriv. of via way; see VIA] —con·veyʹa·ble, adj.
—Syn. 1. bring. See carry.

**con·vey·ance** (kən vāʹəns), n. 1. the act of conveying; transmission; communication. 2. a means of transporting, esp. a vehicle, as a carriage, automobile, etc. 3. Law. a. the transfer of property from one person to another. b. the instrument or document by which this is effected. [CONVEY + -ANCE]

**con·vey·anc·er** (kən vāʹən sər), n. a person engaged in conveyancing. [CONVEYANCE + -ER¹]

**con·vey·anc·ing** (kən vāʹən sing), n. the branch of law practice consisting of examining titles, giving opinions as to their validity, and drawing of deeds, etc., for the conveyance of property from one person to another. [CONVEYANCE + -ING¹]

**con·vey·or** (kən vāʹər), n. 1. one who or that which conveys. 2. Mach. an endless chain or belt adapted for carrying objects or materials. Also, con·veyʹer. [CONVEY + -OR²]

**convey′or belt′,** Mach. an endless belt or chain, set of rollers, etc., for carrying materials or objects short distances, as from one part of a building to another.

**convey′or chain′,** Mach. an endless chain used as a conveyor.

**con·vey·or·ize** (kən vāʹə rīz′), v.t., -ized, -iz·ing. to equip (a factory or the like) with conveyor belts. [CONVEYOR + -IZE] —con·vey′or·i·zaʹtion, n. —con·veyʹor·iz·er, n.

**con·vict** (v., adj. kən viktʹ; n. konʹvikt), v.t. 1. to prove or declare guilty of an offense, esp. after a legal trial: to convict a prisoner of felony. 2. to impress with a sense of guilt. —n. 3. a person proved or declared guilty of an offense. 4. a person serving a prison sentence. —adj. 5. Archaic. convicted. [ME convict(us) (pp.) < L convict(us) proved guilty (pp. of convincere), equiv. to con- con- + vic- (pp. s. of vincere to overcome) + -tus ptp. suffix] —con·vict′a·ble, con·vict′i·ble, adj. —con·vicʹtive, adj. —con·vic′tive·ly, adv.

**con·vict·fish** (kon′vikt fish′), n., pl. -fish·es, (esp. collectively) -fish. See painted greening. [CONVICT + FISH, so called from the fancied resemblance of its stripings to a convict's uniform]

**con·vic·tion** (kən vikʹshən), n. 1. the act of convicting. 2. the state of being convicted. 3. the act of convincing. 4. the state of being convinced. 5. a fixed or firm belief. [late ME < L convictiō(n-), (s. of convictiō) proof (of guilt). See CONVICT, -ION] —con·vicʹtion·al, adj.
—Syn. 5. See belief. —Ant. 4. doubt, uncertainty.

**con·vince** (kən vinsʹ), v.t., -vinced, -vinc·ing. 1. to persuade by argument or proof; cause to believe in the truth of what is alleged (often fol. by of): to convince a man of his errors. 2. Obs. to prove or find guilty. 3. Obs. overcome; vanquish. [< L convince(re) (to) prove (something) false or true, (somebody) right or wrong, equiv. to con- con- + vincere to overcome] —con·vin′ced·ly, adv. —con·vin′ced·ness, n. —con·vin′cer, n. —con·vin′ci·ble, adj. —con·vin′cing·ly, adv. —con·vin′cing·ness, n.
—Syn. 1. satisfy. See persuade.

**con·vive** (kon′viv; Fr. kôn vēvʹ), n., pl. -vives (-vīvz; Fr. -vēvʹ). an eating companion; fellow diner. [< F < L convie(a) one who lives with another, fellow table-companion, equiv. to con- con- + viv- (s. of vivere to live) (cf. VIVE)] —con·vivʹi·al (kən vivʹē əl), adj. 1. fond of feasting, drinking, and merry company; jovial. 2. of or befitting a feast; festive. 3. friendly; agreeable: convivial atmosphere. [< LL convivial(is) festal, equiv. to L convivi(um) feast (convivere to feast with, equiv. to con- con- + vivere to live well + -ium n. suffix) + -al(is)] —con·viv′i·al·i·ty, con·viv′i·al·ly, adv.

**con·vo·ca·tion** (kon′vō kāʹshən), n. 1. the act of convoking. 2. the state of being convoked. 3. a group of people gathered in answer to a summons; assembly. 4. Ch. of Eng. one of the two provincial synods or assemblies of the clergy. 5. Prot. Episc. Ch. a. an assembly of the clergy of part of a diocese. b. the area represented as such an assembly. [ME convocatio(n) < L convocātiō(n-) (s. of convocātiō). See CONVOKE, -ION] —con·vo·caʹtion·al, adj. —Syn. 3. See convention.

**con·vo·ca·tor** (kon′vō kāʹtər), n. 1. one who convokes. a. meeting. 2. one who takes part in a convocation. [< ML, equiv. to convocā(re) (see CONVOKE) + -tor]

**con·voke** (kən vōkʹ), v.t., -voked, -vok·ing. to call together; summon to meet; assemble by summons. [< L convocā(re), equiv. to con- con- + vocāre to call] —con·vokʹer, n.

**con·vo·lute** (kon′və lōōtʹ), adj., n., -lut·ed, -lut·ing, adj. —adj., n.t. 1. to coil up; form into a twisted shape. —adj. 2. coiled up together or with one part over another. 3. Bot. coiled up longitudinally so that one margin is within the coil and the other without, as the petals of cotton. [< L convolūt(us) rolled up, equiv. to con- con- + volūt(us) (ptp. of volvere) + -tus] —con′vo·lute′ly, adv.

**con·vo·lut·ed** (kon′və lōō′tid), adj. 1. twisted; coiled. 2. complicated; intricately involved: a convoluted way of presenting an argument. [CONVOLUTE + -ED²] —con′vo·lut′ed·ly, adv. —con′vo·lut′ed·ness, n.

**con·vo·lu·tion** (kon′və lōōʹshən), n. 1. a rolled up or coiled condition. 2. a rolling or coiling together. 3. a turn of anything coiled; whorl; sinuosity. 4. Anat. one of the sinuous folds or ridges of the surface of the brain. [See CONVOLUTE] —con′vo·luʹtion·al, con′vo·luʹtion·ar·y (-shə ner′ē, -shə-), adj.

**con·volve** (kən volvʹ), v.t., v.i., -volved, -volv·ing. to roll or wind together; coil; twist. [< L convolve(re), equiv. to con- con- + volvere to roll, turn, twist] —con·volve′ment, n.

**con·vol·vu·la·ceous** (kan vol′vyə lāʹshəs), adj. belonging to the Convolvulaceae, or morning-glory family of plants, including the convolvuluses, ipomoeas, etc. [CONVOLVUL(US) + -ACEOUS]

**con·vol·vu·lus** (kan volʹvyə ləs), n., pl. -lus·es, -li (-līʹ). any plant of the genus Convolvulus, which comprises erect, twining, or prostrate herbs having trumpet-shaped flowers. Cf. morning-glory. [< NL, L bindweed, equiv. to convolve(re) (s) + -ulus -ULE]

**con·voy** (v. konʹvoi, kən voiʹ; n. konʹvoi), v.t. 1. to accompany or escort, usually for protection. A destroyer convoyed the merchant ship. —n. 2. the act of convoying. 3. the protection provided by an escort, as an armed force, warship, etc., that escorts, esp. for protection. 5. a ship, fleet, supply of vehicles, etc., accompanied by a protecting escort. 6. any group of military vehicles traveling together under the same orders. 7. Obs. a drag or friction brake, as for a wagon. [ME convoy(en) < MF convoie(r), AF conveie(r) to CONVEY] —Syn. 1. See accompany.

**con·vul·sant** (kən vulʹsənt), adj. 1. causing convulsions; convulsive. —n. 2. a convulsant agent. [CONVULSE + -ANT]

**con·vulse** (kən vulsʹ), v.t., -vulsed, -vuls·ing. 1. to shake violently; agitate. 2. to cause to shake violently with laughter, anger, pain, etc. 3. to cause to suffer violent, spasmodic contractions of the muscles. [< L convuls(us) shattered, torn loose (ptp. of convellere), equiv. to con- con- + vul- (ptp. s. of vellere to pull, tear) + -sus] —con·vulsʹi·ble, adj.

**con·vul·sion** (kən vulʹshən), n. 1. Pathol. contortion of the body caused by violent, involuntary muscular contractions of the extremities, trunk, and head. 2. violent agitation or disturbance; commotion. 3. an outburst of great, uncontrollable laughter. [< medieval L convulsio(n-), (s. of convulsiō). See CONVULSE, -ION]

**con·vul·sion·ar·y** (kən vulʹshə ner′ē), adj., n., pl. -ar·ies. —adj. 1. of or characterized by convulsions. —n. 2. a person who has convulsions, esp. as a result of religious experience. [CONVULSION + -ARY]

**con·vul·sive** (kən vulʹsiv), adj. 1. of the nature of or characterized by convulsions or spasms. 2. producing or accompanied by convulsion: convulsive rage. [< medieval L convulsi(vus). See CONVULSE, -IVE] —con·vulʹsive·ly, adv. —con·vulʹsive·ness, n. —Syn. 1. spasmodic.

**Con·way** (konʹwā), n. 1. a town in central Arkansas. 9791 (1960). 2. a town in E South Carolina. 8563 (1960). 3. a boy's given name.

**cy·clone fur·nace,** a furnace burning liquid or pulverized fuel in a whirling air column.

**cy·clo·ole·fin** (sī′klō ōl′ə fin, sik′lō-), n. Chem. any of the homologous series of unsaturated, alicyclic hydrocarbons containing one double bond in the ring and having the general formula, $C_nH_{2n-2}$. [CYCLO- + OLEFIN]

**cy·clo·par·af·fin** (sī′klō par′ə fin, sik′lō-), n. Chem. any of the homologous series of saturated, alicyclic hydrocarbons having the general formula, $C_nH_{2n}$. [CYCLO- + PARAFFIN]

**cy·clo·pe·an** (sī′klə pē′ən), adj. 1. of or characteristic of the Cyclops. 2. (sometimes l.c.) gigantic; vast. 3. (usually l.c.) Archit., Building Trades. formed with, or containing, large, undressed stones: a cyclopean wall. [< L Cyclōpē(us) (< Gk Kyklōpeios, equiv. to Kyklōp(s) CYCLOPS + -eios -EOUS) + -AN]

**cy·clo·pe′an con·crete,** concrete containing stones weighing 100 pounds or more.

**cy·clo·pe·di·a** (sī′klə pē′dē ə), n. an encyclopedia. Also, cy·clo·pae·di·a. [by aphesis] —cy′clo·pe′dist, cy′clo·pae′dist, n.

**cy·clo·pe·dic** (sī′klə pē′dik), adj. like a cyclopedia in character or contents; broad and varied; exhaustive. Also, cy·clo·pae′dic. [aph. var. of ENCYCLOPEDIC] —cy′clo·pe′di·cal·ly, cy′clo·pae′di·cal·ly, adv.

**cy·clo·pen·ta·di·ene** (sī′klə pen′tə dī′ēn, sik′lə-), n. Chem. a colorless liquid, $C_5H_6$, derived by the distillation of coal tar: used chiefly in the manufacture of insecticides and resins. [CYCLO- + pentadiene; see PENTA-, -DIENE]

**cy·clo·pen·tane** (sī′klə pen′tān, sik′lə-), n. Chem. a colorless, water-insoluble liquid, $C_5H_{10}$, obtained from petroleum and used chiefly as a solvent. Also called pentamethylene. [CYCLO- + PENTANE]

**cy·clo·pi·a** (sī klō′pē ə), n. Med. a congenital defect characterized by fusion of the orbits into a single cavity containing one eye. Also called synophthalmia. [< NL < Gk Kyklōp(s) CYCLOPS + -ia -IA]

**cy·clo·ple·gi·a** (sī′klə plē′jē ə, -jə, sik′lə-), n. Pathol. paralysis of the intraocular muscles. [CYCLO- + -PLEGIA]

**cy·clo·pro·pane** (sī′klə prō′pān, sik′lə-), n. Chem., Pharm. a colorless, flammable gas, $C_3H_6$, used in organic synthesis and in medicine as an anesthetic. Also called trimethylene. [CYCLO- + PROPANE]

**Cy·clops** (sī′klops), n., pl. Cy·clo·pes (sī klō′pēz). 1. Class. Myth. a member of a family of giants having a single round eye in the middle of the forehead. 2. (l.c.) a fresh-water copepod of the genus Cyclops, having a median eye in the front of the head. [< Gk Kýklōps, lit., round-eye, equiv. to kýkl(os) a circle, round + ōps EYE]

**cy·clo·ram·a** (sī′klə ram′ə, -rä′mə), n. 1. a pictorial representation, in perspective, of a landscape, battle, etc., on the inner wall of a cylindrical room or hall, the spectators occupying a position in the center. 2. Theat. a curved wall or drop at the back of a stage, used for creating an illusion of unlimited space or distance in the background of exterior scenes or for obtaining lighting effects. [CYCLO- + (PA (NO)RAMA view] —cy′clo·ram′ic, adj.

**cy·clo·sil·i·cate** (sī′klə sil′ə kit, -kāt′), n. Mineral. any silicate involving more than two tetrahedral $SiO_2$ groups in a ring. Cf. inosilicate, nesosilicate, sorosilicate, tektosilicate. [CYCLO- + SILICATE]

**cy·clo·sis** (sī klō′sis), n., pl. -ses (-sēz). Biol. the movement of protoplasm within a cell. [< Gk kýklōsis an encircling. See CYCLO-, -OSIS]

**cy·clo·stom·a·tous** (sī′klə stom′ə təs, -stō′mə-, sik′lə-), adj. 1. having a circular mouth. 2. belonging or pertaining to the Cyclostomata. Also, cy·clo·sto·mate (sī′klə stō′māt, -stom′it). [CYCLO- + STOMATOUS]

**cy·clo·stome** (sī′klə stōm′, sik′lə-), adj. 1. belonging or pertaining to the Cyclostomata, a subclass of eellike, aquatic, agnathous vertebrates comprising the lampreys and hagfishes. 2. having a circular mouth. —n. 3. a cyclostome vertebrate; a lamprey or hagfish. [CYCLO- + -STOME]

**cy·clo·stroph·ic** (sī′klə strof′ik, sik′lə-), adj. Meteorol. pertaining to atmospheric motion in which the centripetal acceleration exactly balances the horizontal pressure force. [CYCLO- + LGk stroph(ikós) turned, equiv. to Gk stroph- (s. of strephein to turn) + -ikos -IC; see STROPHE]

**cy·clo·style** (sī′klə stīl′, sik′lə-), n. 1. a manifolding device consisting of a kind of pen with a small toothed wheel at the end which cuts minute holes in a specially prepared paper stretched over a smooth surface: used to produce a stencil from which copies are printed. 2. Archit. a circular colonnade or columned building open at the center. [formerly trademark] —cy′clo·styl′ar, adj.

**cy·clo·thy·mi·a** (sī′klə thī′mē ə, sik′lə-), n. Psychiatry. a mild, manic-depressive psychosis involving recurring cycles of exhilaration and depression. [CYCLO- + -thymia < Gk thŷm(ós) spirit + -ia -IA] —cy′clo·thy′mic, adj.

**cy·clo·thy·mi·ac** (sī′klə thī′mē ak′, sik′lə-), n. a person affected with cyclothymia. [CYCLOTHYMI(A) + -AC]

**cy·clo·tome** (sī′klə tōm′, sik′lə-), n. Surg. a type of scalpel for performing a cyclotomy. [CYCLO- + -TOME]

**cy·clo·tom·ic** (sī′klə tom′ik, sik′lə-), adj. 1. of or pertaining to cyclotomy. 2. Math. (of a polynomial) irreducible and of the form $x^{n-1} + x^{n-2} + ... - 1$, where $p$ is a prime number. [CYCLOTOM(Y) + -IC]

**cy·clot·o·my** (sī klot′ə mē), n., pl. -mies. 1. Surg. incision of the ciliary muscle. 2. Geom. the process of dividing a circle into a specific number of equal parts. [CYCLO- + -TOMY]

**cy·clo·tri·meth·yl·ene·tri·ni·tra·mine** (sī′klə trī meth′ə lēn′trī nī′trə mēn′, -nī tram′in, sik′lō-), n. Chem. See RDX. [CYCLO- + TRI- + METHYLENE + TRI- + NITR- + AMINE]

**cy·clo·tron** (sī′klə tron′, sik′lə-), n. Physics. an accelerator in which particles are propelled in spiral paths by the use of a constant magnetic field. [CYCLO- + (ELEC)TRON]

**Cyc·nus** (sik′nəs), n. Class. Myth. 1. any of several men transformed into swans. 2. a son of Ares killed in a duel with Hercules.

**Cy·da·ri·as** (sī dä′rē əs), n. a girl's given name.

**Cy·der** (sī′dər), n. cider.

**Cy·dip·pe** (sī dip′ē), n. Class. Myth. a priestess of Juno at Argos and the mother of Biton and Cleobis.

**Cyd·nus** (sid′nəs), n. a river in SE Asia Minor, in Cilicia.

**cy·e·sis** (sī ē′sis), n., pl. -ses (-sēz). pregnancy. [< Gk kýēsis pregnancy, equiv. to kyē- (var. s. of kyéin to be pregnant) + -sis -SIS]

**cy·gnet** (sig′nit), n. a young swan. [late ME signet (< L cygn(us), var. of cycnus (< Gk kýknos swan) + -ET]

**Cyg·nus** (sig′nəs), n., gen. **-ni** (-nī). Astron. the Swan, a northern constellation southwest of Draco, containing the bright star Deneb. [< L: swan; see CYGNET]

**cyl·ce** (sil), n. Pathol. hydrocele. [obs. L cela, var. of CYCLE]

**cyl,** cylinder.

**cyl·in·der** (sil′in dər), n. 1. Geom. a surface or solid bounded by two parallel planes and generated by a straight line moving parallel to the given planes and having a curve bounded by the planes and lying in a plane perpendicular or oblique to the given planes. 2. any cylinderlike object or part, whether solid or hollow. 3. the rotating part of a revolver, containing the chambers for the cartridges. 4. (in a pump) a cylindrical chamber in which a piston slides to move or compress a fluid. 5. (in an engine) a cylindrical chamber in which the pressure of a gas or liquid moves a sliding piston. 6. (in certain printing presses) a rotating cylinder which produces the impression and under which a flat form to be printed from passes. 7. a solid cylinder, one carrying a curved form or plate to be printed from, which rotate against each other in opposite directions. 8. (in certain locks) a cylindrical device for retaining the bolt until tumblers have been pushed out of its way. 9. (in a screw or cylindrical gear) an imaginary cylindrical form, concentric to the axis, defining the pitch or the inner or outer ends of the threads or teeth. 10. Archeol. a cylindrical or somewhat barrel-shaped stone or clay object bearing a cuneiform inscription or a carved design, worn by the Babylonian, Assyrian, and kindred peoples as a seal amulet. —v.t. 11. to furnish with a cylinder or cylinders. 12. to subject to the action of a cylinder or cylinders. [< L cylindr(us) (< Gk kýlindros roller, cylinder, akin to kylíndein to roll)] —cyl′in·der·like′, adj.

**cylinder desk,** a desk having a cylinder front, usually a tambour but occasionally of solid wood.

**cylinder escape·ment,** Horol. an escapement in which an escape wheel, having teeth with a wedgelike section set around the rim at right angles, engages with an oscillating, hollow, semicylindrical part on the balance staff.

**cylinder front,** Furniture. a front cover for a desk or the like, consisting either of a solid piece or of a tambour sliding up and back in quadrantal grooves.

**cylinder glass,** a sheet of glass formed originally in the shape of a cylinder and then divided lengthwise and flattened. Also called broad glass.

**cylinder head,** 1. (in a reciprocating engine or pump) a detachable plate or cover on the end opposite to that from which the piston rod or connecting rod projects.

**cylinder press,** a printing press in which paper is impressed by a cylinder against type on a flat plane.

**cyl·in·dra·ceous** (sil′in drā′shəs), adj. resembling a cylinder. [CYLIND(ER) + -ACEOUS]

**cy·lin·dri·cal** (si lin′dri kəl), adj. 1. having the form of a cylinder; relating to, or having the form of a cylinder. Also, cy·lin′dric. [< NL cylindric(us) (< Gk kylindrikós; see CYLINDER, -IC) + -AL] —cy·lin′dri·cal·ly, adv. —cy·lin·dric′i·ty (sil′in dris′i tē), n.

**cy·lin′drical coeffi′cient,** Naval Archit. See longitudinal coefficient.

**cylin′drical coor′dinates,** Math. a system of coordinates for locating a point in space by its polar coordinates and its perpendicular distance to the polar plane.

**cyl·in·drite** (sil′in drīt′, si lin′-), n. a mineral, a complex sulfide of lead, tin, and antimony, occurring in cylindrical form. [CYLIND(ER) + -ITE1]

**cyl·in·droid** (sil′in droid′), n. 1. a solid having the form of a cylinder. esp. one with an elliptical, as opposed to a circular, cross section. —adj. 2. resembling a cylinder. [< Gk kylindroeid(ēs) cylinderlike. See CYLINDER, -OID]

**cyl·in·dro·ma** (sil′in drō′mə), n. Pathol. a type of epithelial tumor containing small plugs or cylinders of connective tissue, usually involving salivary glands, bronchi, or skin. [< NL < Gk kýlindr(os) CYLINDER + -(S)OMA -OMA] —cyl·in·drom·a·tous (sil′in drom′ə təs), adj.

**cy·lix** (sī′liks, sil′iks), n., pl. cyl·i·ces (sil′ə sēz′). kylix.

**Cyr·il·lic** (si ril′ik), adj. Class. Myth. a nymph who nursed Hermes.

**Cyl·le·ni·an** (si lē′nē ən), adj. of or pertaining to Mount Cyllene in Arcadia, Greece, or to the god Hermes, reputed to have been born there. [< L Cyllēni(us) (< Gk Kyllḗnios, equiv. to Kyllḗn(ē) in Arcadia + -ios -EOUS) + -AN]

**Cyl·vi·a** (sil′vē ə), n. a girl's given name. Also, Sylvia.

**Cym,** Cymric.

**cy·ma** (sī′mə), n., pl. -mae (-mē), -mas. 1. Archit. either of two moldings having a partly convex and partly concave curve for an outline: used esp. in classical architecture. Cf. cyma recta, cyma reversa. 2. a cyme. [< NL < Gk kŷma something swollen, a wave, wavy molding, sprout, equiv. to kýe(in) (to) be pregnant, swollen with child + -ma nt. suffix]

**cy·ma·tse** (sī mä′sē), n. a pewter wine jar having a spout, a fixed handle on the side opposite the spout, and a bail for carrying. Also, cimaise, cemaise. [< F < L cȳmat(ium) an ogee; see CYMATIUM]

**cy·mar** (si mär′), n. simar (def. 1).

**Cy·mar** (sī′mär′), n. Archit. a cyma whose part projects beyond the convex part. See this under molding. [< NL lit., straight cyma]

**cy·ma re·ver·sa** (ri vûr′sə), n. a cyma whose convex part projects beyond the concave part. Also called Lesbian cyma, Lesbian cymatium. See this under molding. [< NL: lit., reversed cyma]

**cy·ma·ti·on** (si mā′shē on′), n., pl. -ti·a (-shē ə). cymatium.

**cy·ma·ti·um** (si mā′shē əm, -tē-), n., pl. -ti·a (-shē ə). Archit. 1. the uppermost member of a classical cornice or of a cornice of similar form: usually a cyma recta in classical examples. Cf. sima1. 2. echinus (def. 2c). [< L < Gk kȳmátion, equiv. to kȳmat- (s. of kŷma; see CYMA) + -ion dim. suffix]

**cym·bal** (sim′bəl), n. a concave plate of brass or bronze which produces a sharp, ringing sound when struck: played either in pairs, by being struck together, or singly, by being struck with a drumstick or the like. [ME; OE cimbal < ML, var. of cymbalum < L < Gk kýmbalon, var. of kýmbos, kýmbē hollow object] —cym′bal·er, cym′bal·ist, n. —cym′bal·like′, adj.

**cym·ba·lom** (sim′bə ləm), n. a complex either of Hungarian dulcimers. [< Hung címbalom < L cembalo < L cymbalum cymbal.]

**Cym·be·line** (sim′bə lēn′), n. a girl's given name.

**cym·bi·form** (sim′bə fôrm′), adj. Bot., Zool. boat-shaped. [< L cymb(a) (< Gk kýmbē hollow object) + -i -FORM]

**cy·mene** (sī′mēn), n. Chem. a colorless, volatile, flammable hydrocarbon, constituting the fraction boiling at about $0°C$, obtained in distilling crude petroleum and containing a large percentage of butane. [CYM(ENE) + 0- + -GENE]

**cy·mo·graph** (sī′mə graf′, -gräf′), n. kymograph. —cy·mo·graph·ic (sī′mə graf′ik), adj.

**cy·moid** (sī′moid), adj. 1. resembling a cyma. 2. resembling a cyme. [CYME + -OID]

**cy·mom·e·ter** (sī mom′i tər), n. Elect. Obs. an instrument for measuring electromagnetic waves. [CYMO- + -METER]

**cy·mo·phane** (sī′mə fān′), n. Mineral. chrysoberyl. [CYMO- + -PHANE]

**cy·mose** (sī′mōs, sī mōs′), adj. Bot. 1. bearing a cyme or cymes. 2. of or the nature of a cyme. [< L cȳmōs(us) full of shoots. See CYME, -OSE1] —cy′mose·ly, adv.

**cy·mot·ri·chous** (sī mo′trə kəs), adj. having wavy hair. [CYMO- + TRICH(O)- + -OUS] —cy·mot′ri·chy, n.

**cym·ric** (kim′rik, sim′-), adj. 1. of or pertaining to the Cymry. —n. 2. Welsh (def. 3). Also, Kymric.

**Cym·ry** (kim′rē), n. (construed as pl.) the Welsh, or the branch of the Celtic race to which the Welsh belong, comprising also the Cornish people and the Bretons. Also, Kymry. [< Welsh Cymry Welshmen, pl. of Cymro, prob. repr. OWelsh Combroi compatriot, equiv. to com-com- + *brog- (Welsh bro district, region); akin to L margo margin; see MARK1]

**Cyn** (sin), n. a girl's given name. Form of Cynthia.

**Cyn·a·ra** (sin′ər ə), n. a girl's given name.

**cy·na·wulf** (kin′ə woolf′), n. fl. early 9th century A.D., Anglo-Saxon poet. Also, Cynewulf, Kynewulf.

**cyn·ic** (sin′ik), n. 1. a person who believes that only selfishness motivates human actions and who disbelieves in or minimizes selfless acts or the altruistic points of view. 2. (cap.) one of a sect of Greek philosophers, 4th century B.C., who advocated the doctrines that virtue is the only good, that the essence of virtue is self-control, and that surrender to any external influence is beneath the dignity of man. —adj. 3. cynical. 4. (cap.) Astron. Cynical of or pertaining to the Cynics or their doctrines. 5. Astron. Rare. of or pertaining to the Dog Star. 6. Med. Rare. resembling the actions of a dog: cynic spasm. [< L Cynic(us) < Gk Kynikós Cynic, lit., doglike, currish, equiv. to kyn- (s. of kýon) dog + -ikos -IC]

**cyn·i·cal** (sin′i kəl), adj. 1. like or characteristic of a cynic; distrusting or disparaging the motives of others. 2. showing contempt for accepted standards of honesty or morality by one's actions, esp. by actions that exploit the scruples of others. 3. (cap.) cynic (def. 4). —cyn′i·cal·ly, adv. —cyn′i·cal·ness, n.

—Syn. 1. distrustful, disbelieving, sneering, contemptuous, derisive. CYNICAL, PESSIMISTIC, SARCASTIC, SATIRICAL imply holding a low opinion of mankind. CYNICAL suggests a disbelief in the sincerity of human motives: cynical about honesty. PESSIMISTIC implies a more habitual disposition to look on the dark side of things, and to believe that the worst will happen: pessimistic as to the future. SARCASTIC refers to sneering or making cutting gibes: sarcastic about a profession of faith. SATIRICAL suggests exposing scorn or ridicule by stating the opposite of what one means: satirical about the way in which actions differ. —Ant. 1. optimistic.

*Phonet. a.* a rapid flip of the tongue tip against the upper teeth or alveolar ridge, as in the *r*-sound in a common British pronunciation of *very*, or the *t*-sound in the common American pronunciation of *water.* b. a trill. c. a flipping out of the lower lip from a position of pressure against the upper teeth so as to produce an audible pop, as in emphatic utterances containing *r*-sounds or *r*-sounds. [ME *flappe* a blow, slap, *flappe(n)* (to) hit, slap; cf. D *flap, flappen*] —**flap′less,** *adj.*

**flap-doo-dle** (flap′dōōd′l), *n. Informal.* nonsense; bosh. [?]

**flap′ door′,** *n.* 1. Also called **falling door,** a door hinged at the bottom so as to fall downward and outward. 2. a door placed horizontally or on a shallow incline, as an exterior cellar door.

**flap-drag-on** (flap′drag′ən), *n.* 1. an old game in which the players snatch raisins, plums, etc., out of burning brandy, and eat them. 2. the object so caught and eaten. [FLAP + DRAGON]

**flap-e-ron** (flap′ə ron′), *n. Aeron.* a control surface functioning both as a flap and as an aileron. [FLAP + (AIL)ERON]

**flap-jack** (flap′jak′), *n.* griddlecake. [FLAP + JACK[1]]

**flap-per** (flap′ər), *n.* 1. something broad and flat for striking with, or for making a noise by striking. 2. a broad, flat, hinged or hanging piece; flap. 3. a young bird just learning to fly. 4. a young woman, esp. one who, during the decade following World War I, behaved in a manner free from traditional social or moral restraints. 5. *Slang.* the hand. [FLAP + -ER[1]] —**flap′per-ism,** *n.* —**flap′per-ish,** *adj.*

**flap-py** (flap′ē), *adj., -pi-er, -pi-est.* slack or loose, so as to flap readily. [FLAP + -Y[1]]

**flaps** (flaps), *n.* (construed as *sing.*) *Vet. Pathol.* swelling of the lips of a horse. [FLAP (n.) + -S[3]]

**flap′ valve′.** See clack valve.

**flare** (flâr), *v., flared, flar-ing, n.* —*v.i.* 1. to burn with an unsteady, swaying flame, as a torch or candle in the wind. 2. to blaze with a sudden burst of flame (often fol. by *up*): *The fire flared up as the paper caught on.* 3. to start up or burst out in sudden, fierce activity, passion, etc. (sometimes fol. by *up* or *out*): *His anger flared when his motives were questioned.* 4. to shine or glow. 5. to spread gradually outward, as the end of a trumpet, the bottom of a wide skirt, the sides of a ship, etc. —*v.t.* 6. to cause (a candle, torch, etc.) to burn with a swaying flame. 7. to display conspicuously or ostentatiously. 8. to signal by flares of fire or light. 9. to cause (something) to spread gradually outward in form. 10. *Metall.* to heat (a high-zinc brass) to such a high temperature that the zinc vapors begin to burn. 11. flare out or up, *Informal.* to vent one's anger; become suddenly enraged: *He flared out at us for no apparent reason. She flared up easily.* —*n.* 12. a flaring or swaying flame or light, as of torches in the wind. 13. a sudden blaze or burst of flame. 14. a bright blaze of fire or light used as a signal, a means of illumination or guidance, etc. 15. a device or substance used to produce such a blaze of fire or light. 16. a sudden burst, as of zeal or of temper. 17. a gradual spread outward in form; outward curvature: *the flare of a skirt.* 18. something that spreads out. 19. *Optics.* unwanted light reaching the image plane of an optical instrument, resulting from extraneous reflections, scattering by lenses, and the like. 20. *Photog.* a fogged appearance given to an image by reflection within a camera lens or within the camera itself. *Optic. meaning:* spread out, said of hair, a ship's sides, etc.; cf. OE *flēre* infine of the spreading sides at the end of the nose) —**Syn. 1.** flame. 13. flash.

**flare-back** (flâr′bak′), *n.* 1. a blast of flame that sometimes issues from the breech of a large gun or cannon when it is opened after firing. 2. a brief, unexpected recurrence: *a flareback of winter in May.* [n. use of *v. phrase flare back*]

**flare-up** (flâr′up′), *n.* 1. a sudden flaring up of flame or light. 2. a sudden outburst of anger. 3. a sudden outbreak of violence, disease, or other condition thought to be quelled, checked, or inactive. [n. use of *v. phrase flare up*]

**flar-ing** (flâr′ing), *adj.* 1. blazing; flaming. 2. glaringly bright or showy. 3. spreading gradually outward in form: *a flaring skirt.* [FLARE + -ING[2]] —**flar′ing-ly,** *adv.*

**flash** (flash), *n.* 1. a brief, sudden burst of bright light: *a flash of lightning.* 2. a sudden, brief outburst or display of joy, wit, etc. 3. a very brief moment; instant: *I'll be back in a flash.* 4. flashlight (def. 1). 5. ostentatious display; gaudy showiness. 6. Also called **news flash.** *Journalism.* a brief dispatch sent by a wire service, usually transmitting preliminary news of an important story or development. Cf. **bulletin** (def. 2). 7. *Photog.* a bright artificial light thrown briefly upon a subject during an exposure. b. See **flash lamp.** 8. the sudden flame or fumes heat produced by a bomb or other explosive device. 9. a device as a lock or sluice, for confining and releasing water to send a boat down a shallow stream. 10. *Metall.* a. a ridge of metal left on a casting by a seam between parts of the mold. b. a ridge formed at the edge of a forging or weld where excess metal has been squeezed out. 11. *Poker.* a hand containing all five suits in a game played with a five-suit pack. 12. *Archaic.* an artificially induced rush of water for sending a boat down a shallow stream. 13. *Obs.* the cant or jargon of thieves, vagabonds, etc. 14. flash in the pan, a brief, intense effort that produces no significant result. b. a person who makes such an effort; one who enjoys short-lived success: *She was a flash in the pan who had one hit record and then disappeared from show business.* —*v.i.* 15. to break forth into sudden flame or light; esp. transiently or intermittently: *a buoy flashing in the distance.* 16. to speak or behave with sudden anger, outrage, or the like (often fol. by *out*): *I couldn't help flashing out at such a stupid remark. He flashed crimson with rage at her rudeness.* 17. to gleam. 18. to burst suddenly into view or perception: *The answer flashed into his mind.* 19. to move like a flash. 20. to break into sudden action. 21. *Archaic.* to make a flash or sudden display. 22. *Archaic.* to dash or splash, as the waves.

—*v.t.* 23. to emit or send forth (fire or light) in sudden flashes. 24. to cause to flash, as powder by ignition or a sword by waving. 25. to change (water) instantly into steam by causing it to strike a hot surface. 26. to send forth like a flash. 27. to communicate instantaneously, as by telegraph. 28. *Informal.* to make an ostentatious display of: *He forever flashing a large roll of bills.* 29. to increase the flow of water in (a river, channel, etc.). 30. *Glassmaking.* a. to coat (plain glass or a glass object) with a layer of colored, opalescent, or white glass. b. to apply (such a layer). c. to color or make (glass) opaque by reheating. 31. *Building Trades.* to protect with flashing. 32. to reduce the permanent magnetism of (a vessel) by wrapping a cable horizontally around the vessel and energizing the cable. 33. *Cards.* to expose (a card) in the process of dealing. 34. *Archaic.* to dash or splash (water).

—*adj.* 35. showy or ostentatious. 36. counterfeit or sham. 37. of or belonging to sporting men; sporty. 38. belonging to or connected with thieves, vagabonds, etc., or their cant or jargon. 39. sudden and brief: *a flash storm.* 40. caused by or used as protection against flash: *a number of flash injuries; to wear flash clothing.* [ME *flasshe(n)* (to) sprinkle; ? b. FLY[1] and WASH] —**flash′er,** *n.* —**flash′ing-ly,** *adv.*

—**Syn. 1.** flare, gleam, glare. 3. twinkling, wink. 17. scintillate. FLASH, GLANCE, GLINT, GLITTER mean to send forth a sudden gleam (or gleams) of bright light. To FLASH is to send forth light with a sudden, transient brilliancy: *A shooting star flashed briefly.* To GLANCE is to emit a brilliant flash of light as a reflection from a smooth surface: *Sunlight glanced from the glass windshield.* GLINT suggests a hard bright gleam of reflected light as from something polished or burnished: *Light glints from inter or from burnished copper.* To GLITTER is to reflect intermittent flashes of light from a hard surface: *Ice glitters in the moonlight.* 35. flashy, gaudy, tawdry, pretentious, superficial. 36. false, fake.

**flash-back** (flash′bak′), *n.* 1. a scene representing an earlier event inserted into a current situation depicted in a novel, motion picture, play, etc. [n. use of *v. phrase flash back*]

**flash-board** (flash′bôrd′, -bōrd′), *n. Civ. Eng.* a board, or one of a series of boards, as on a milldam, used to increase the depth of the impounded water. [FLASH + BOARD]

**flash′ bulb′,** *Photog.* 1. a glass bulb, filled with oxygen and aluminum or zirconium wire or foil, which, when ignited electrically, burns with a brilliant flash to provide momentary illumination of a subject. 2. Also called **flashtube,** flash tube, an electronic flash lamp consisting of a glass or quartz tube filled with xenon or krypton and having an electrode at each end. Also, **flash′bulb′.**

**flash′ burn′,** a burn produced by brief exposure to intense, radiant heat, as from an explosion.

**flash′ card′,** a card having words, numerals, or pictures on it, designed for gaining a rapid response from pupils when held up briefly by a teacher, used esp. in reading, arithmetic, or vocabulary drills.

**flash-cube** (flash′kyōōb′), *n. Photog.* a cube, for attaching to a camera, that contains a flash bulb in each vertical side and rotates automatically for taking four pictures in rapid succession. [FLASH + CUBE]

**flash′ flood′,** a sudden and destructive rush of water down a narrow gully or over a sloping surface, caused by heavy rainfall. —**Syn.** See flood.

**flash′ gun′,** *Photog.* a device that simultaneously discharges a flash bulb and operates a camera shutter.

**flash-ing** (flash′ing), *n.* 1. *Building Trades.* pieces of sheet metal or the like used to cover and protect certain joints and angles, as where a roof comes in contact with a wall or chimney. 2. act of creating an artificial flood in a conduit or stream, as in a sewer for cleansing it. [FLASH + -ING[1]]

**flash′ing point′,** *Physical Chem.* See flash point.

**flash′ lamp′,** *Photog.* a lamp for providing momentary illumination for the subject of a photograph. Also, **flash′lamp′.**

**flash-light** (flash′līt′), *n.* 1. a small, portable electric lamp powered by dry batteries or a tiny generator. 2. a flash of light, or a light that flashes. 3. any source of artificial light as used in flash photography. [FLASH + LIGHT]

**flash-lock** (flash′lok′), *n.* stanch[1] (def. 5).

**flash-o-ver** (flash′ō′vər), *n. Elect.* —*n.* 1. a disruptive discharge around or over the surface of a solid or liquid insulator. —*v.t.* 2. to establish a flashover. [orig. n. use of *v. phrase flash over*]

**flash′ photog′raphy,** photography using a momentary flash of artificial light as a source of illumination. Also called **photoflash photography.**

**flash′ pic′ture,** a photograph made with a flash lamp or flashcube.

**flash′ point′,** *Physical Chem.* the lowest temperature at which a liquid in a specified apparatus will give off sufficient vapor to ignite momentarily on application of a flame. Also, **flashing point.**

**flash-tube** (flash′tōōb′, -tyōōb′), *n. Photog.* See flash bulb (def. 2). Also, **flash′ tube′.** [FLASH + TUBE]

**flash-y** (flash′ē), *adj., flash-i-er, flash-i-est.* 1. sparkling or brilliant, esp. in a superficial way or for the moment: *a flashy performance.* 2. pretentiously smart; showy; gaudy: *flashy clothes.* 3. *Archaic.* flashing with light. [FLASH + -Y[1]] —**flash′i-ly,** *adv.* —**flash′i-ness,** *n.*

—**Syn. 2.** See gaudy[1].

**flask** (flask, fläsk), *n.* 1. a bottle-shaped container made of glass, metal, etc.: *a flask of brandy.* 2. an iron container for shaping mercury, holding a standard commercial unit of 76 pounds. 3. *Foundry.* a container into which sand is rammed around a pattern to form a mold. [ME; OE *flasce, flaxe; cf.* FLAGON]

**flas′ko** (flask, fläsk), *n. Ordn.* 1. the armored plates making up the sides of a gun-carriage trail. 2. *Obs.* the bed of a gun carriage. [< dial. F *flasque* cheek of a gun carriage < LL *flasca* FLASK[1]]

**flask-et** (flas′kit, fläs′-), *n.* 1. a small flask. 2. a long, shallow basket. [ME *flasket* < OF *flasquet,* dim. of *flasque* FLASK[1]]

**flat** (flat), *adj., flat-ter, flat-test, n., adv., flat-ted, flat-ing, adv.* —*adj.* 1. horizontally level: *a flat roof.* 2.

level, even, or without inequalities of surface, as land, table tops, etc. 3. having a surface that is without marked projections or depressions: *a broad, flat face.* 4. lying horizontally and at full length, as a person: *He was flat on the canvas after the knockdown.* 5. lying wholly on or against something: *The flat stones laid against a wall.* 6. thrown down, laid low, or level with the ground, as fallen trees or buildings. 7. having a generally level shape or appearance; not deep or thick: *a flat plate.* 8. (of the heel of a shoe) low and broad. 9. spread out, as an unrolled map, the open hand, etc. 10. deflated; collapsed: *a flat tire.* 11. without qualification; absolute, downright, or positive: *a flat denial.* 12. without modification or variation: *a flat price; a flat rate.* 13. *Informal.* lacking money; broke: *I'd lend you the dollar but I'm absolutely flat myself.* 14. without vitality or animation; lifeless; dull: *flat writing.* 15. having lost its flavor, sharpness, or life, as wine, food, etc.; stale. 16. (of a beverage) having lost its effervescence: *flat beer.* 17. without flavor; not spiced: *flat cooking.* 18. prosaic, banal, or insipid: *a flat style.* 19. pointless, as a remark, joke, etc. 20. commercially dull, as trade or the market. 21. *Painting,* a. not having the illusion of volume or depth. b. lacking gradations of tone or color: *flat background.* c. without gloss; mat. 22. not clear, sharp, or ringing, as sound, a voice, etc. 23. lacking resonance and variation in pitch; monotonous: *a flat delivery of the speech.* 24. *Music.* a. (of a tone) lowered a half step in pitch: *B flat.* b. below an intended pitch, as a note; too low (opposed to *sharp*). 25. *Gram.* derived without change in form, as English *to brush* from the noun *brush* and adverbs which do not add *-ly* to the adjective form as *fast, cheap, slow,* etc. 26. *Phonet.* lenis; voiced. 27. *Naut.* (of a sail) a. cut with little or no belly, b. trimmed as nearly fore-and-aft as possible, for sailing to windward. 28. flat a, the a-sound (a) of *glad, bat,* or *at.* 29. flat aft, *Naut.* so that fore-and-aft sails present as flat a surface as possible, as in sailing close to the wind: *Haul the sheets flat aft!* 30. flat on one's back, confined to bed because of illness or other physical disorder: *He's been flat on his back for two weeks now with influenza.* —*n.* 31. something flat. 32. Often, flats. a shoe, esp. a woman's shoe, with a flat heel or no heel. 33. a flat surface, side, or part of anything: *the flat of a blade; He struck her with the flat of his hand.* 34. flat or level ground; a flat area: *salt flats.* 35. a marsh, shoal, or shallow. 36. *Music.* a. (in musical notation) the character ♭, which when attached to a note or to a staff greek lowers its significance one chromatic half step. b. a tone one chromatic half step below another: *The flat of B is B flat.* c. (on keyboard instruments, with reference to any given note) the key next below or to the left. 37. *Theat.* a piece of scenery consisting of a wooden frame, usually rectangular, covered with lightweight board or fabric. 38. a broad, thin book, chiefly for children: *a juvenile flat.* 39. *Informal.* a deflated automobile tire. 40. *Archit.* a flat roof or deck. 41. Also called **platform.** *Naut.* a. a partial deck between two full decks. b. a low, flat barge or lighter. 42. *Shipbuilding.* a. a broad, flat piece of iron or steel for overlapping and joining two plates at their edges. b. a straight timber in a frame or other assembly of generally curved timbers. 43. an iron or steel bar of rectangular section. 44. *Textiles.* one of a series of laths covered with card clothing, used in conjunction with the cylinder in carding. 45. *Photog.* a. a device for holding a negative or positive flat for reproduction by photoengraving. b. one or more negatives or positives in position to be reproduced. 46. *Hort.* a shallow box used for rooting seeds and cuttings. 47. *Football,* the area of the field immediately inside of or outside of an offensive end, close behind or at the line of scrimmage. 48. flats, *Informal.* flat races between horses. Cf. flat race.

—*v.t.* 49. to make flat. 50. *Music.* to lower (a pitch). esp. one half step.

—*v.i.* 51. to become flat. 52. flat in, *Naut.* to pull the clew of (a fore-and-aft sail) as nearly amidships as possible; flatten in.

—*adv.* 53. in a flat position; horizontally; levelly. 54. in a flat manner; positively;-absolutely. 55. completely; utterly: *flat broke.* 56. exactly; precisely: *He raced around the track in two minutes flat.* 57. *Music.* below the true pitch: *to sing flat.* 58. *Finance.* without interest. 59. flat flat, to fail to produce the desired effect; fail completely: *Their attempt at photography fell flat.* [ME < Scand; cf. Icel *flat(r)*, Sw *flat*; akin to OE *flet* floor. See FLAT[2]] —**flat′ly,** *adv.* —**flat′ness,** *n.*

—**Syn. 1.** plane. See level. 4. low, supine, prostrate, prone. 11. outright, peremptory, categorical. 14. boring, spiritless, prosaic. 17. vapid, unsavory. —**Ant. 1, 4.** upright, vertical. 14. spirited. 17. savory.

**flat[2]** (flat), *n.* 1. an apartment or suite of rooms on one floor, forming a residence, as for a family. 2. *Brit.* a floor or story of a building. [var. of *obs. flet,* OE *flet* house, hall; akin to FLAT[1]]

**flat′ arch′,** an arch having a more or less flat intrados and extrados with voussoirs radiating from a center below the arch. See illus. under arch. Also called **jack arch.**

**flat′ back′,** a book spine presenting a completely flat surface. 2. a book bound with such a spine.

**flat′-bed cyl′inder press′** (flat′bed′), a printing press in which a flat bed holding the printing form moves against a revolving cylinder which carries the paper.

**flat-bed press′.** See cylinder press.

**flat-boat** (flat′bōt′), *n.* a large, flat-bottomed boat for use in shallow water, esp. on rivers. [FLAT + BOAT]

**flat-bot-tomed** (flat′bot′əmd), *adj.* (of boats) having a flat bottom.

**flat-brod** (flat′bred′), *n.* a thin, waferlike rye bread baked esp. in Scandinavian countries. Also, **flat-brod** (flat′brōd′). [trans. of Norw *flatbrōd*]

**flat′ bug′,** any of numerous flattened hemipterous insects of the family *Aradidae* that live under bark and feed on fungi. Also called fungus bug.

**flat-car** (flat′kär′), *n.* U.S. a railroad car consisting of a platform without sides or top. [FLAT[1] + CAR[1]]

**flat-fish** (flat′fish′), *n., pl. (esp. collectively)-fish, (esp. referring to two or more kinds or species)-fish-es.* any

CONCISE ETYMOLOGY KEY: <, descended or derived from; >, whence; b., blend of, blended; c., cognate with; deriv., derivative; equiv., equivalent; imit., imitative; m., modification of; obl., oblique; r., replacing; s., stem; sp., spelling; trans., translation; ?, origin unknown, perhaps; *, hypothetical. See the full key inside the front cover.

# Exhibit 5

524-2396-0X PCT

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF:

KARL KOLTER ET AL.           : GROUP ART UNIT: 1502

SERIAL NO.  08/525,749

FILED: OCTOBER 3, 1995        : EXAMINER:  BENSTON

FOR:  DELAYED RELEASE MICRO-
      TABLET OF BETA-PHENYL-
      PROPIOPHENONE DERIVATIVES

AMENDMENT AND REQUEST FOR RECONSIDERATION

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C.   20231

SIR:

    Responsive to the Official Action of October 17, 1996,
Applicants respectfully request reconsideration of the above-
identified application in view of the following amendments and
remarks.

IN THE CLAIMS

    Claim 1, lines 9-10 (not counting the structure of
formula I) delete "but not taking into account the weight of
any coating which is present,".

REMARKS

    Claims 1-6 are active in this application.  The above
amendment is supported by Claim 1 as originally filed and the
specification.  No new matter has been added by these
amendments.

    The present invention relates to a cylindrical delayed

release microtablet having a convex or flat upper side and
lower side, which contains a β-phenylpropiophenone derivative
of formula I



    I

where R is n-propyl or 1, 1-dimethylpropyl, and its
pharmaceutically acceptable salts.  In particular, the
cylindrical delayed release microtablet of the present
invention is required to have a height and diameter that are
each, independently, 1-3 mm, must contain the active
ingredient in the range from 81-99.9% of the weight of the
microtablet, and have an active ingredient density that is
greater than 1.  Further, the microtablet of the present
invention must have a release rate which is virtually
independent of the pressure when compressing the tablets and
contains no release-delaying ancillary substance but can
contain specified amounts of a lubricant or other conventional
ancillary substances.  The release of the active ingredient in
the present microtablet according to the U.S.P. paddle method
at 50 rpm is required to be a maximum of 80% after 3 hours and
a minimum of 80% after 24 hours.

    Applicants have found that by preparing a microtablet
having the required size and shape, active ingredient content
and active ingredient density, containing the β-phenylpropio-

- 2 -

phenone derivative of formula I as its active ingredient, it is possible to provide a microtablet that has surprisingly improved delayed release characteristics compared to other delayed release formats.  This is especially surprising in view of the fact that the present microtablet contains no other release delaying additives.

A further surprising result achieved with the present microtablet formulation is that the release of the active ingredient is virtually independent of the pressure used to compress the tablet and independent of the pH.  These results are unexpected in view of the fact that it is generally accepted that increases in the compressive force used in tablet production provides a slowing of the release of active ingredient (see specification at page 2 beginning at line 14). A common problem with this feature is that fluctuations in the compressive force in a single machine can result in tablets being produced that have a wide range of delay release times. Yet another surprising result achieved by the present invention is that other medicinal substances having a similar water solubility to that of propafenone hydrochloride (one of the compounds encompassed by the present formula I) are 90% released after one hour, when produced in the same type of microtablet.  However, the present microtablets provide no more than 80% release after 3 hours and no less than 80% release after 24 hours.

The claims stand rejected under 35 U.S.C. §103 over <u>Davidson</u> in view of <u>Franke</u>.  <u>Davidson</u> discloses a

- 3 -

disintegrating agent for tablets which improves the
disintegration of tablets by incorporating therein a plurality
of small tubules (see abstract). The Examiner appears to have
misinterpreted the thrust of the Davidson invention, since
Davidson is specifically looking toward *instant* release and
*speeding up the disintegration* of tablets by inserting the
tubules described therein. In fact, as shown in the examples
of Davidson, the tablets prepared by insertion of their
tubules have disintegration times (i.e., release times) of no
more than about 5 minutes. In fact, the longest release time
disclosed by Davidson is 17 minutes for tablets without the
tubules (see column 7, lines 22-23).

This patent cannot suggest the present invention, which
is drawn to a delayed release microtablet which is required by
the claim to have no more than 80% release of the active
ingredient after 3 hours and no less than 80% after 24 hours.
While it is true that the present invention can contain a
disintegrant, the claims still require that the release of
active ingredient be delayed to meet the requirements of part
(d) of Claim 1. Thus any disintegrant used in the present
invention cannot remove that requirement of the claims.
Davidson cannot suggest such a microtablet.

The Examiner has used the Franke et al reference to
suggest modifying the Davidson composition by the use of
propafenone hydrochloride. While it is true that Franke et al
disclose propafenone, there is no disclosure nor suggestion of
a microtablet having the required delayed release

- 4 -

characteristics of the present invention nor the required shape, size or active ingredient content.

If one were to modify _Davidson_ by the teachings of _Franke et al_, one would obtain a propafenone hydrochloride tablet containing the disintegration tubules of _Davidson_. The expected result of such a composition would be relatively instant release, certainly within five minutes or less, as taught by _Davidson_.

This is not the present invention. Applicants have shown in the present application that by preparing the microtablets of the present invention to meet the size, shape and active ingredient content requirements, one obtains a microtablet having remarkable delayed release characteristics. This is especially surprising in view of the behavior of other medicinal substances having water solubilities similar to that of propafenone hydrochloride as described at page 2, lines 34-41 of the present application. Such medicinal substances having a similar water solubility to that of propafenone hydrochloride, when prepared in the same type of microtablet as in the present invention, end up showing a 90% release after one hour. Why would one of ordinary skill in the art expect the compounds of formula I of the present invention to give such surprisingly delayed release when prepared in the microtablet form required by the present invention, especially in view of the rapid release which is seen with other compounds having similar water solubilities?

The references cited by the Examiner simply do not

- 5 -

present a <u>prima facie</u> case of obviousness, since the combination of the references would only be expected to result in an instant release tablet containing propafenone hydrochloride.  There is no suggestion within either reference that the compounds of formula I of the present invention would have surprisingly delayed release characteristics when compressed into the tablet form required by the present invention.  There could be no expectation by one of ordinary skill in the art of the delayed relatively uniform release of active ingredient using the compounds of Formula I of the present invention in a microtablet having the required size, shape and other characteristics as required by the present claims.  Accordingly, the references cannot render the present invention obvious and the rejection should be withdrawn.

The claims further stand rejected under 35 U.S.C. §112, second paragraph.  This rejection has been obviated by the above amendment.

Applicants submit that the application is now in
condition for allowance, and early notification of such action
is earnestly solicited.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Attorney of Record
Registration No. 24,618

J. Derek Mason, Ph.D.
Registration No. 35,270

Crystal Square Five - Fourth Floor
1755 South Jefferson Davis Highway
Arlington, VA    22202
(703) 413-3000
NFO:JDM/smi

I:\DJM\05242396.am

- 7 -