**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

RELIANT PHARMACEUTICALS, INC.,

Plaintiff,

v.

PAR PHARMACEUTICAL, INC.,

Defendant.

Civil Action No. 06-774-JJF

**DECLARATION OF DR. CHRISTOPER T. RHODES**
**IN SUPPORT OF RELIANT PHARMACEUTICALS, INC.'S**
**OPENING CLAIM CONSTRUCTION BRIEF**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiff*

*Of Counsel:*

John Desmarais
Gerald J. Flattmann, Jr.
Christine Willgoos
KIRKLAND & ELLIS, LLP
Citigroup Center
153 E. 53rd Street
New York, NY 10022
(212) 446-4800

March 5, 2008

I, Christopher T. Rhodes, declare and state as follows:

1.    I have been retained as an expert consultant in this case by counsel for Reliant Pharmaceuticals, Inc. ("Reliant") in connection with the matter *Reliant Pharmaceuticals, Inc. v. Par Pharmaceutical, Inc.*, Civil Action No. 06-774-JJF.

## I.    BACKGROUND AND QUALIFICATIONS

2.    I have been involved in the pharmaceutical sciences in academia and consultancy for private industry, and assisting government agencies with respect to the design and evaluation of drug products, for over 30 years.  I obtained my B. Pharm. (Honors) and Ph.D. in Pharmacy from the Faculty of Medicine of the University of London in 1961 and 1964, respectively.  From 1964 to 1965, I was Smith Kline and French Post-Doctoral Research Associate at Purdue University, where I worked on the development of extended-release drug products.  This work was patented.

3.    I served as Senior Lecturer (and subsequently as Principal Lecturer) at Portsmouth School of Pharmacy from 1965 to 1972.  In the academic year of 1969 to 1970, I was Canadian Medical Research Council, Visiting Professor at the University of British Colombia. From 1972 to 1975, I was Associate Professor at The State University of New York at Buffalo.  I was appointed Professor and Chair of the Department of Pharmacy at the University of Rhode Island ("URI") in 1975.  From 1992 to 2007, I served as part-time Professor at URI.  In July 2007, I was appointed Professor Emeritus at URI.

4.    My university teaching duties included responsibility for undergraduate and graduate courses in Biopharmaceutics, Industrial Pharmacy, and Physical Pharmacy.  Also, as part of my university activities, I directed a research group comprising visiting faculty, doctoral fellows, graduate students, and technicians.  I have acted as Major Professor for more than 50

graduate students.  My research activities have been focused to a considerable extent on the

design, evaluation, and regulatory approval of solid oral dosage forms.

5.       I am the author or co-author of about 240 scientific or professional papers.  I am

also the co-editor of five books, including the first four editions of *Modern Pharmaceutics* and

the third edition of *Drug Stability*.  I am a Fellow of the Academy of Pharmaceutical Sciences

and a Founding Fellow of the American Association of Pharmaceutical Scientists.  I have acted

as a reviewer for a number of journals, including the *Journal of Pharmaceutical Sciences* and the

*International Journal of Pharmaceutics*.  I served as Assistant Editor of the *Canadian Journal of

Pharmaceutical Sciences* and was the founding editor of *Drug Development and Industrial

Pharmacy*.  I have given lectures and courses at locations in North America, the European

Union, and Asia.  I have acted as Chair for a National Institute of Health Committee for research,

grant, and contract proposals.  I have been accepted as a special employee, approved by the Food

and Drug Administration ("FDA"), working for that agency on the evaluation of compounded

drug products.  Additionally, I have served on two FDA expert advisory committees (generic and

compounded drugs).  For 15 years, from 1985 to 2000,  I served as a member of the Committee

of Revision of the United States Pharmacopoeia ("USP") (Dissolution, Stability, Excipients, and

Bioavailability Committees).  In June 2000, I gave invited testimony to a U.S. Senate

subcommittee on drug product quality.

6.       My evaluation of drug products has included in vivo studies, both

pharmacokinetic and  pharmacodynamic.  At different times I have been involved in clinical

trials of humans as a participant, principal investigator, auditor, or consultant.  I have acted as an

FDA-approved auditor for bioavailability studies.  Also, I have consulted for pharmaceutical

companies on the design and interpretation of clinical studies intended to monitor both safety and

efficacy. My work as an expert witness has included testimony on the causation and monitoring of adverse events for drug products. Between 1992 and 2007 I held an adjunct appointment at Roger Williams Hospital, which is linked to Brown University Medical School. My expertise in examining membrane flux phenomena was recognized by my appointment, in subsequent years as Vice Chair and Chair of a Gordon Research Conference on membrane transport.

7. In addition to my university-related activities, I have provided confidential consulting services to pharmaceutical companies and other entities in the United States, Canada, Australia, and the European Union. Also, I have consulted for government and international organizations, including the Government of Bermuda, the World Bank, the Population Council, the U.S. Internal Revenue Service, and the U.S. Army Chemical Warfare Defense Command. Among the topics for which my advice has been sought are design, evaluation, production, troubleshooting, and regulatory approval of drug products, including extended-release products.

8. I have been admitted as an expert witness on drug products by courts in the U.S., Canada, U.K., Australia, Korea, and Israel.

9. My curriculum vitae, attached as Exhibit A, sets forth my educational and professional experience. Included in my curriculum vitae is a list of all publications that I have authored within the preceding 10 years. There are no additional publications since 2002.

## II. BASES FOR OPINION

10. In forming the opinions set forth in this declaration, I relied upon my education, background and experience in the area of design, evaluation and production of pharmaceutical products.

11.     I have reviewed U.S. Patent No. 5,681,588 ("the '588 patent") and its associated file history.  In addition, I have consulted general purpose and pharmaceutical dictionaries, treatises and other scientific literature as set forth herein.

12.     I understand that Reliant has alleged that Par Pharmaceutical, Inc.'s ("Par's") generic propafenone drug products described in ANDA 78-540 infringe at least Claims 1-5 of the '588 patent.

13.     I understand that the parties disagree about the meaning of some of the claim terms used in the '588 patent, and that the purpose of my declaration is to assist the Court in understanding and defining those claim terms.

14.     I understand that the Court reads the claims of the patent from the viewpoint of "one of ordinary skill in the art."  I understand that this person is someone with the requisite training and education, but is not an expert in the relevant field of the invention.

15.     It is my belief that the person skilled in the art to whom the patent is addressed would have a first degree in pharmacy (B.S., M.S., or Pharm. D.) and at least two years post-graduation experience working on the formulation and evaluation of compressed tablets, including delayed release products.  Alternatively, the skilled artisan would have a first degree in some discipline peripheral to pharmacy, such as chemical engineering or biology.  These individuals would have at least four years post-graduation experience working on the formulation and evaluation of compressed tablets, including delayed release products. Individuals without a first degree in pharmacy will have compensated for deficiency in their educational background by attendance at appropriate courses or by a program of careful study on such topics as industrial pharmacy, pharmacokinetics and drug regulatory affairs.

16. I understand that the relevant date for defining the claim terms of the '588 patent is the earliest filing date of the patent specification, *i.e.*, April 3, 1993. My opinions are directed to what one of ordinary skill in the art would have known or understood as of that date.

17. In addition to the opinions and subject matter identified in this declaration, I may offer additional testimony or a declaration in response or rebuttal to any expert opinions offered by Par in support of its proposed claim constructions.

## II. BACKGROUND OF THE '588 PATENT

### A. Formulation of Tablets

18. In North America and Western Europe, the most commonly used orally administered drug products are compressed tablets. Tablets consist of drug (often referred to as active pharmaceutical ingredient or "API") and non-pharmacologically active materials, normally referred to as excipients.[1] Excipients function to improve the processing, storage or use of the product. In the '588 patent, excipients are described as ancillary substances.

19. Compression of the tablet formulation, which consists of either a mixture of powders or granular material is effected on a tablet press. The compaction force applied on the tablet press squeezes out most of the air in the powder or granular mix and forces the solid particles into very close proximity to one another so that in some instances they join together. The tablet produced on a tablet press may be subsequently subjected to additional manufacturing steps, such as applying a coat.

20. Unfortunately, although some APIs are inherently readily compressible and thus can be easily fabricated into tablets, many drugs do not compress easily into tablets unless they

[1] In the '588 patent, non-pharmacologically active materials are generally referred to as "ancillary substances" rather than as excipients. In my experience, excipients is the more commonly used term. Accordingly, throughout this declaration, the terms "excipients" and "ancillary substances" are used interchangeably.

are mixed with substantial amounts of excipients that function as compaction aids (fillers). The disadvantage of this type of excipient is that if, for example, the compaction aid to drug ratio is 5:1 then we may produce a rather large tablet that is not easy to swallow.

21. Most compressed tablets also contain a lubricant, commonly magnesium stearate. Lubricants act by reducing the frictional forces between the tablet and the press tooling. In the absence of a lubricant, parts of the tablet may adhere to the tooling. As a result, when the tablet press enters the ejection mode and delivers the finished tablets into the product delivery chute, a significant proportion of the tablets will be incomplete. In an extreme case the press will simply cease operation because the force required to eject the tablets is excessive.

22. Another type of excipient often included in a tablet is a binder. This material assists in maintaining the physical integrity of the tablet so that it is less likely to break up either on injection from the press or during storage and transport stress. Ex. B, Edward Rudnic & Joseph B. Schwartz, *Oral Solid Dosage Forms, in Remington's Pharmaceutical Sciences* 1633, 1635 (Alfonso R. Gennaro ed., 18th ed. 1990).

23. Once a tablet is ingested by the patient it is essential that the drug be released into the lumen of the gastrointestinal tract (GI) from where it can then enter the bloodstream. The release of drug from a tablet in the conditions likely to exist within the GI tract is thus an element of the quality assurance testing for tablets. This release is evaluated using official USP[2] dissolution tests. Normally, the dissolution of drug from tablets is dependent upon the amount of force used in the compression event. In general, the greater the compression force used, the harder the tablet. An increase in tablet hardness usually slows down dissolution of drug.

---

2 USP (United States Pharmacopia) is the compendium recognized by the Congress as providing official standards for drug substance, drug products and some test methods such as those used in dissolution testing.

**B.    Delayed Release Tablets**

24.    Tablets may be classified as immediate release or delayed release.  In an immediate release tablet there is no design element included to control or delay the rate of drug release.  For such tablets, we might expect that an appropriate dissolution test would indicate that most of the drug was released within a short period of time, for example, 30 minutes.  However, there can be considerable advantage in developing tablets for which the dissolution is deliberately delayed so the drug is released within the GI tract over a period of several hours.  This prolongs the process of absorption so that blood levels of the drug can remain at therapeutic concentrations for an extended period of time.

25.    Delayed release drug products offer patients a number of significant advantages.  First, the dosing frequency can be reduced.  For example, a drug with an immediate release (non-delayed) formulation that has to be administered three or four times daily may only require administration once or twice a day when provided as a delayed release product.  This reduction in dosing frequency is convenient to the patient and also improves patient compliance.  For example, if a patient has to take a tablet at lunch time or when they are at work, they quite often forget.  In fact, we have good reason to believe that in many instances therapeutic failure in drug treatment is not caused by any inadequacy of the drug but simply that the patient failed to follow the dosing instructions.

26.    Another advantage of delayed release drug products is that the so-called "peaks and troughs" in the blood concentration time curves for the drug are greatly reduced.  For example, when a drug product is provided as an immediate release tablet three times a day the surge of drug rapidly released into the GI tract often results in a quite high concentration of drug in the bloodstream (*i.e.,* a peak).  This concentration decreases with time as the drug is removed from the bloodstream, most likely by renal or hepatic action.  As a result of this clearance of

drug, the concentration of drug in the bloodstream immediately before the next dose is administered may be very low (*i.e.*, a trough). The peaks may be associated with an increased incidence or severity of undesirable side effects; the troughs may be associated with lack of therapeutic response because the blood concentrations of drug are too low. In contrast, a well-designed delayed release product may exhibit relatively stable blood concentrations of drug without the occurrence of either peaks or troughs. This can result in improved efficacy and reduced toxicity. The fluctuation in blood levels can be quantified by the peak to trough fluctuation index, PTF.

27. Although much ingenuity has been shown by pharmaceutical scientists in designing delayed release tablets that have a control of drug dissolution so that dosing frequency can be reduced, there are two general methods normally used to delay drug release, namely matrix or coating control.

28. In a matrix system, the active pharmaceutical drug is embedded in excipients which enclose the drug and provide a structure so that dissolution can be retarded. This approach requires a substantial amount of excipients and thus can result in a tablet which is unacceptably large.

29. The control of dissolution from tablets by coatings so as to obtain delayed release products is also common. By judicious selection of the components of the coating, it is possible to provide a barrier so that release of drug from the tablet into the lumen of the GI tract occurs at a controlled rate over the desired period of time.

30. The use of coatings and matrices to delay release of active drug from tablets were well known in the art at the time of invention of the '588 patent. Indeed, these methods were at

that time, and still are, the two most common methods by which to formulate a delayed release product.

**C. The Invention Of The '588 Patent**

31. The problem which the '588 inventors address was to develop an orally administered delayed release drug delivery system for β-phenylpropiofenone derivatives, including propafenone. Ex. C at Col. 1:9-13. In order to provide an acceptable size of dosage form it was essential that the product have a high percentage of active pharmaceutical drug. To reduce the volume of the dosage form it was desirable that the density of the drug in the individual units of the dosage form should be greater than 1. Further, it was desirable that the release rate (dissolution) of drug should be virtually independent of compressive force and uniform over a lengthy period of time. In order to achieve these goals, it was also necessary to exclude the use of certain excipients, such as release-delaying film coatings or matrices, that would control the release of drug. Ex. C at Col. 2:11-26.

32. The '588 patent teaches that the above problems can be solved by making microtablets and subsequently filling the microtablets into conventional gelatin capsules. On ingestion by the patient the microtablets are released into the lumen of the GI tract once the capsule shell has disrupted. (This normally occurs quite rapidly). As is pointed out in the patent, the use of multiple unit delayed release dosage forms (*i.e.* microtablets) has considerable advantages over normal size tablets. Ex. C at Col. 1:36-53.

33. Although the β-phenylpropiphenone derivatives of the invention have poor inherent compression properties, the '588 patent teaches that the compaction of the drug into a microtablet of a certain shape, size and density allows successful compression with an active ingredient content of 81 to 99.9% of drug. The claimed formulation does not contain any

release-delaying excipient (*i.e.*, ancillary substance) and the dissolution of the microtablet is virtually independent of compressive force.  Ex. C at Col. 2:29-30.

34.     The microtablets of the invention are delayed release microtablets, that is, they have a slow dissolution rate that is achieved without using release delaying excipients such as coatings or matrices.  The dissolution of drug from the claimed microtablets is delayed such that no more than 80% of the drug is released after three hours and at least 80% is released after 24 hours.  Also, the patent teaches that dissolution can be adjusted by the size of the tablet and possibly adding excipients, such as disintegrants, to speed up the dissolution.  Ex. C at Col. 2:53-57.

35.     *In vivo* studies in human subjects show that the drug product of the claimed microtablets have a blood concentration time curve that has an extensive plateau.  The absence of peaks and troughs is shown by PTF values of less than 75%.  Ex. C at Fig. 11.

36.     The '588 patent also discloses that the bioavailability of the drug (the rate and extent to which the drug enters the patient's bloodstream) does not depend on the presence or absence of food.  Ex. C at 3:13-19.  Thus, the mode of administration is flexible with respect to meals.

37.     The patent discloses that the process used for the formulation in the '588 patent is not applicable to drugs of similar water solubility.  Ex. C at Col. 2:22-26.  Thus, the teachings described in the patent may be entirely specific to β-phenylpropiphenone derivatives.

## III.    CLAIM TERMS FOR CONSTRUCTION

38.     Counsel for Reliant has requested that I provide my opinion on how I think a person of skill in the art would interpret certain terms of the '588 patent claims.

39.     I understand that in considering claim construction I should first examine the intrinsic evidence in the claims, the specification and the file history.  In all of the claim

construction presented below, the conclusions I reach are, I believe, fully in compliance with data in the claims, specification and file history of the '588 patent.

**A. "Delayed-release microtablet"**

40. Counsel for Reliant has asked me to inform an opinion as to how a person of ordinary skill in the art would understand the phrase "delayed release microtablet" as it is used in claims of the '588 patent.

41. In my opinion, one of skill in the art would understand the phrase "delayed release microtablet" to mean a small unit of solid medicament prepared by compaction methods in which the release of active ingredient after 3 hours is not more than 80% and after 24 hours is not less than 80%.

42. In my opinion, the term "microtablet" means a small tablet. The plain, ordinary meaning of "micro" is small and the specification refers to "microtablets" having an independent diameter and height of "from 1 to 3, preferably 1.5 to 2.5 mm." Ex. C at Col. 2:45-46. Tablets of this dimension would be considered small by one of ordinary skill.

43. As set forth in a pharmaceutical treatise I edited, "tablets may be defined as unit forms of solid medicaments prepared by compaction." *See* Ex. D, Keith Marshall and Edward M. Rudnic, *Tablet Dosage Forms, in Modern Pharmaceutics* 355, 355 (Gilbert S. Banker & Christopher T. Rhodes eds., 2d ed. 1990).

44. Thus, the ordinary meaning of "tablet" to one of ordinary skill is a small unit of solid pharmaceutical dosage form prepared by compaction methods.

45. I have also reviewed the specification and prosecution history of the '588 patent and it is my opinion that the patentees used the term "microtablet" consistent with its ordinary meaning.

46. The microtablets of the invention are "delayed release microtablet(s)."

47. Claim 1 makes clear that "delayed release microtablet" means a tablet that exhibits a "release of active ingredient in the USP paddle method at 50 rpm [of] 80% as a maximum after 3 hours and as a minimum after 24 hours."

48. These same release parameters are set forth at several places in the specification. *See*, *e.g.*, Ex. C at Abstract, Col. 2:53-57.

49. Similarly, the Applicants stated during prosecution that "the present microtablets provide no more than 80% release after 3 hours and no less than 80% release after 24 hours." Ex. E at 3. *See also id.* at 4 ("[T]he present invention . . . is drawn to a delayed release microtablet which is required by the claim to have no more than 80% release of the active ingredient after 3 hours and no less than 80% after 24 hours").

50. Thus, the phrase ***"delayed release microtablet"*** means ***a small unit of solid medicament prepared by compaction methods in which the release of active ingredient after 3 hours is not more than 80% and after 24 hours is not less than 80%.***

**B. "Cylindrical"**

51. I understand that the parties have asked the Court to define the claim term "cylindrical." It is my opinion that those of ordinary skill would understand that the term "cylindrical," as used in the '588 patent, means "a three-dimensional shape which includes a flat or convex surface in which the height and diameter are, independently of one another, 1-3 mm."

52. The term "cylindrical" in Claim 1 and Claim 6 is a modifier with respect to a description of the delayed release microtablet. The preamble of Claim 1 states: "a cylindrical delayed release microtablet with a convex or flat upper side and lower side."

53. The skilled artisan would recognize that the term "cylindrical," in the context of the patent, is being used in an <u>approximate</u>, not a rigid, sense. The definition of a cylinder is "a surface or solid bounded by two parallel planes and generated by a line drawing a closed curve

perpendicular to the two given planes." Ex. F. This definition requires that the upper and lower surfaces of a cylinder must be flat. Further, the patentees have specifically allowed for the upper and lower sides to be flat or convex. Thus it is apparent that the patentees were not using the term cylindrical in an exact mathematical sense.

54. The term convex means a surface that is "curved or rounded outward." Ex. F. The skilled artisan would be well aware that many tablets are rounded outward on both their upper and lower sides.

55. The term flat means "having a surface that is without marked projections or depressions." Ex. F. Thus, if a surface is flat, it can be fully defined by using only two dimensions. Again, the skilled artisan would be aware that some tablets have flat (non-protruding, non-recessive) upper and lower surfaces.

56. Further, the skilled artisan having experience of the type of tooling normally used in the manufacture of compressed tablets would know that tablets with convex upper and lower surfaces are common. In my experience compressed tablets with flat upper and lower surfaces are also known in the art, but are less common than those with convex surfaces.

57. It can be noted from the above dictionary definition of a cylinder that the cross section of a cylinder does not have to be circular. Any closed surface will satisfy the definition of a cylinder. Again, the skilled artisan would be well aware that non-circular tablet press tooling is widely used. For example, the Pfizer prescription drug product Lipitor®, a tablet that is very widely used for the control of serum lipid values, has an elliptical cross section. Also, the over-the-counter Tylenol® caplets, another very large sales volume product, are manufactured on tablet presses that use tooling such that the cross section of the tablet is essentially rectangular with rounded corners. Both Lipitor® and Tylenol® have convex upper and lower surfaces.

58. Also, the skilled artisan, in reading the '588 patent, would understand that Claim 1 indicates that the dimensions of the delayed release microtablet can be varied independently of one another between 1 and 3 mm and that the upper and lower surfaces of the microtablets can be convex or planar. The skilled artisan would appreciate that a precise definition of the shape of the microtablet is not required in order for the reader to benefit from the teachings of the invention.

59. Thus, the skilled artisan would interpret the term ***"cylindrical"*** as it appears in Claim 1 and Claim 6 of the invention described in the 588 patent, to mean ***a three-dimensional shape which includes a flat or convex surface and has dimensions (that are independently of one another) of between 1 and 3 mm***.

**C. "Convex or flat upper side and lower side"**

60. It is my opinion that those of ordinary skill would understand that the phrase "convex or flat upper side and lower side," as it appears in Claim 1, means that each of the upper side and lower side have a surface that is without marked projections or depressions ("flat") or is curved or rounded outward ("convex").

61. The plain, ordinary meaning of "flat" is "having a surface that is without marked projections or depressions." Ex. F.

62. The plain, ordinary meaning of convex is a "curved or rounded outward surface." Ex. F.

63. I have reviewed the specification and the prosecution history and, in my opinion, each is consistent with the plain, ordinary meaning of the terms "convex" and "flat."

64. Thus, one of ordinary skill in the art at the time of the invention would interpret ***"convex or flat upper side and lower side"*** to mean that ***each of the upper side and lower side***

***have a surface that is without marked projections or depressions ("flat") or is curved or rounded outward ("convex")***.

**D. "The tablet contains no release-delaying ancillary substance"**

65. It is my opinion that those of ordinary skill would understand that the phrase "tablet contains no release-delaying ancillary substance," as that phrase appears in the '588 patent, means the tablet contains no excipient that forms a release delaying coating or matrix.

66. In the pharmaceutical arts, an "ancillary substance" generally refers to something other than the active ingredient in the formulation. Thus, in the context of the patent claims, "the tablet contains no release delaying ancillary substance," it is apparent that the active pharmaceutical ingredient contributes substantially all of the release delaying properties of the delayed release microtablets of the invention.

67. According to Claim 1, the claimed tablet contains an active ingredient of the defined formula, a lubricant, other conventional ancillary substances, and no release-delaying ancillary substance. *See* Ex. C at Claim 1. This composition is consistent with the specification, which, for example, provides: "In the prior art the release of active ingredient from tablets is delayed either by a release-delaying matrix in which the active ingredient is embedded, or by a release-delaying coating through which the digestive fluid diffuses in and the active ingredient diffuses out." Ex. C at Col. 1:20-24. The patent then goes on to describe several "considerable disadvantage[s]" of matrix dosage forms and coatings. Ex. C at Col. 1:25-43.

68. One of ordinary skill would understand that release delaying substances are almost always in one of two forms for tablet dosage forms: a matrix or a coating. This was the case in 1993 and remains so today. Thus, one of ordinary skill in the art at the time of invention would have understood that the patentees were distinguishing the invention from prior art delayed release matrices and coatings.

69. The remainder of the '588 specification continues this theme. For example, the specification indicates that the patentees prepared a "delayed release bolus film-coated tablet" containing propafenone as a comparative example and showed that it was inferior to the claimed delayed release microtablet. The specification reports: "The *in vitro* release from the delayed release bolus film-coated tablet [was] similar to that of the delayed release microtablets according to the invention. Nevertheless, the *in vivo* release is entirely different and, in fact, better according to the invention, cf. drug levels shown in FIG. 11." *See* Ex. C at Col. 8:11-16.

70. In addition, the wording of Claim 1, part (f) makes it clear that the patentees allowed for the inclusion in the microtablets of excipients such as lubricants and binders. The specification states: "It is possible to employ all conventional binders or adhesives." Ex. C at Col. 3:66-67. Further, I note that Examples 1-8 in the patent all contain magnesium stearate as lubricant. Since magnesium stearate is a hydrophobic (low-water-solubility material) it will tend, to some extent, to retard dissolution from the microtablets. *See* Ex. G, L.V. Allen & P.E. Luner, *Magnesium Stearate, in Handbook of Pharmaceutical Excipients* 280, 281 (Ainley Wade & Paul J. Weller eds., 2d ed. 1994) ("Magnesium stearate is hydrophobic and may retard the dissolution of drug from a solid dosage form."). The Handbook of Pharmaceutical Excipients is an internationally recognized treatise published jointly by the American Pharmaceutical Association and the Royal Pharmaceutical Society of Great Britain. Thus, although magnesium stearate is added to the examples of the '588 patent to act as a lubricant, there will inevitably be some effect on slowing dissolution.

71. Similarly, I note that Examples 1, 2, 3, 4, 6, and 7 of the '588 patent contain hydroxypropylmethylcellulose (HPMC). *See* Ex. C. The Handbook of Pharmaceutical Excipients reveals that HPMC is used both as a binder and as a matrix for extended-release

tablets, as well as for other uses such as a delayed release film coating. Ex. G, R.J. Harwood & J.L. Johnson, *Hydroxypropyl Methylcellulose, in Handbook of Pharmaceutical Excipients* 229, 230. In the examples given in the '588 patent, HPMC is functioning as a binder rather than a tablet matrix. However, even as a binder it is probable that in performing its adhesive function to provide structural integrity to the microtablet, it will inevitably, to some extent at least, retard dissolution.

72. Thus, it is clear that the patent distinguishes excipients (ancillary substances), such as lubricants and binders, from release-delaying substances such as coatings and matrices. In my opinion, the term "no release-delaying ancillary substance" means that the delayed release microtablets of the invention contain only excipients that serve some primary purpose other than to retard dissolution.

73. The prosecution history of the '588 patent is consistent with the specification in distinguishing delayed-release excipients in the form of matrices and coatings from other ancillary substances. For example, during prosecution, the patent applicants stated: "Applicants have found that by preparing a microtablet having the required size and shape, active ingredient content and active ingredient density, containing the β-phenylpropiophenone derivative of formula I as its active ingredient, it is possible to provide a microtablet that has surprisingly improved delayed release characteristics compared to other delayed release formats." Ex. E at 2-3. Thus, the prosecution history teaches that size and shape of the microtablet along with active ingredient content and density provide the delayed release characteristics observed for the microtablet, without the addition of matrices or coatings.

74. Thus, the specification and prosecution history make clear that the microtablets are different than the other delayed release formats, namely matrices and coatings. One of skill

in the art at the time of the invention would appreciate this distinction since the generally accepted release delaying ancillary substances used in tablets at the time of the invention were matrices and coatings.

75. At the time of the invention, one of skill in the art would also appreciate that many ancillary substances, including, for example, binders, lubricants, wetting agents, fillers and adhesives, might have some affect on the release rate of an active pharmaceutical ingredient, but that such substances are not generally considered “release-delaying” agents. In reading the patent specification and claims, one of skill in the art would understand that the delayed release microtablets of the invention could encompass a microtablet that included ancillary substances such as binders, adhesives, fillers, wet granulators, etc., as long as no release delaying coatings or matrices were employed.

76. Thus, one of skill in the art would have understood the term ***“the tablet contains no release delaying ancillary substance”*** to mean that ***the tablet contains no excipient that forms a release delaying coating or matrix.***

**E. “Lubricant”**

77. In my opinion, one of ordinary skill would understand the term “lubricant” to mean a pharmaceutical ingredient that reduces friction and thus prevents adhesion of a tablet to tooling surfaces, *e.g.*, talc or magnesium stearate.

78. Lubricants serve a variety of purposes in preparing pharmaceutical tablets. Talc, magnesium stearate, and calcium stearate are commonly used lubricants in tablet formulation. According to Remington’s Pharmaceutical Sciences:

> Lubricants have a number of functions in tablet manufacture. They prevent adhesion of the tablet material to the surface of the dies and punches, reduce interparticle friction, facilitate the ejection of the tablets from the die cavity, and may improve the rate of flow of the tablet granulation. Commonly used lubricants

> include talc, magnesium stearate, calcium stearate, stearic acid, hydrogenated vegetable oils, and polyethylene glycol (PEG).

Ex. B, Edward Rudnic & Joseph B. Schwartz, *Oral Solid Dosage Forms, in Remington's Pharmaceutical Sciences* 1633, 1636 -37 (Alfonso R. Gennaro ed., 18th ed. 1990).

79. The specification of the '588 patent is consistent with the plain meaning of lubricant. The specification provides: "After the granules have been dried to the defined water content, 0.1-5, preferably 0.3-2, % by weight of a lubricant for the tabletting are mixed in homogenously. It is likewise possible to use for this purpose all conventional substances such as talc, magnesium stearate, calcium stearate, stearic acid, calcium behenate, glycerin palmitostearate, sodium acetate, polyethylene glycol, sodium stearate [sic] fumarate." Ex. C at Col. 4:7-13.

80. Thus, one of ordinary skill would understand that the term **"lubricant"** as it is used in the claims of the '588 patent means ***a pharmaceutical ingredient that reduces friction and prevents tablet adhesion, e.g., talc or magnesium stearate***.

**F. "Other conventional ancillary substances"**

81. In my opinion, one of ordinary skill would understand "other conventional ancillary substances," which appears in Claims 1 and 6, means commonly used pharmaceutical ingredients other than an active pharmaceutical ingredient, a lubricant, or a release delaying ancillary substance as defined above, *e.g.,* binders, adhesives, colorants, stabilizers, fillers, wetting agents, and flow regulators.

82. For the reasons stated in Paragraph 66 above, one of skill in the art would understand that "ancillary substance" refers to a substance in the tablet other than the active ingredient.

83. “Conventional” in the pharmaceutical arts means common or accepted. Thus, conventional ancillary substances include excipients such as binders, fillers, release-delaying matrices and coatings, and adhesives.

84. The meaning of “other conventional ancillary substances” is determined by its context within the claims and specification of the ‘588 patent. Claim 1, for example, states that the delayed release microtablets comprise (a) an active ingredient, (b) a lubricant, (c) other conventional ancillary substances and (d) no release delaying ancillary substance. Thus, “other conventional ancillary substances” in the context of the claim means something other than the active ingredient, lubricant, or “release delaying ancillary substance.”

85. The patent specification provides several examples of “other conventional ancillary substances,” such as binders, colorants, stabilizers, fillers, wetting agents, and flow regulators. *See* Ex. C at Cols. 3:66-4:3, 4:16-18. These materials are known to those skilled in the art to be used as neither active pharmaceutical ingredients, lubricants, nor release-delaying substances.

86. Thus, one of skill in the art would understand ***“other conventional ancillary substances”*** to mean ***commonly used pharmaceutical ingredients other than an active pharmaceutical ingredient, a lubricant, or a release delaying ancillary substance as defined above, e.g., binders, adhesives, colorants, stabilizers, fillers, wetting agents, and flow regulators***.

**G. “Release rate is virtually independent of the pressure when compressing the tablets”**

87. In my opinion, one of ordinary skill in the art would understand that “release rate is virtually independent of the pressure when compressing the tablets,” as that term is used in the ‘588 patent, means that within the ordinary range of compression used in the formulation of

pharmaceutical tablets, the effect of the pressure when compressing the tablets on the release rate of the active pharmaceutical ingredient can be neglected for practical purposes.

88. The plain, ordinary meaning of the term "release rate is virtually independent of the pressure when compressing the tablets" means that the release rate of the active ingredient does not depend to any significant extent on the compaction pressure.

89. The specification of the '588 patent similarly provides: "It was furthermore not predictable that the release of active ingredient is, in contrast to usual experience, virtually independent of the pressure when compressing the tablets….'Virtually independent' means that the effect can be neglected for practical purposes." *See* Ex. C at Col. 2:47-51.

90. The specification also shows that the phrase is referring to tablet pressures that are within the ordinary range of compression used in the formulation of pharmaceutical tablets. *See, e.g.,* Ex. C at Fig. 9. The patent discloses the problem, present in the prior art, that fluctuation of compressive forces when tabletting resulted in varying release rates of the active ingredient from the final dosage form. Ex. C at Col. 2:64-3:8 Accordingly, one of the objects of the invention was to "overcome the disadvantages of the prior art, *i.e.* to develop propafenone and diprafenone tablets with . . . release of active ingredient which is independent of the compressive force and uniform over a lengthy period." Ex. C at Col. 2:11-16.

91. The prosecution history reinforces this meaning of "release rate is virtually independent of the pressure when compressing the tablets" and makes clear that the claimed microtablets are advantageous in that they do not have a wide fluctuation in release times depending on the amount of compression used. During prosecution, the patent applicants stated:

> A further surprising result achieved with the present microtablet formulation is that the release of the active ingredient is virtually independent of the pressure used to compress the tablet and independent of the pH. These results are unexpected in view of the

> fact that it is generally accepted that increases in the compressive force used in tablet production provides a slowing of the release of active ingredient (see specification at page 2 beginning at line 14). A common problem with this feature is that fluctuations in the compressive force in a single machine can result in tablets being produced that have a wide range of delay release times.

Ex. E at 3.

92. Thus, one of ordinary skill in the art would understand that ***"release rate is virtually independent of the pressure when compressing the tablets"*** means that ***within the ordinary range of compression used in the formulation of pharmaceutical tablets, the effect of the pressure when compressing the tablets on the release rate of the active pharmaceutical ingredient can be neglected for practical purposes***.

**H. "Active ingredient density"**

93. In my opinion, one of ordinary skill in the art would understand that "active ingredient density," as that term is used in the '588 patent claims, means the density of the active ingredient in the delayed release microtablet.

94. The ordinary, meaning of "active ingredient density" is the density of the active ingredient.

95. In the '588 patent, the context of Claim 1 makes clear that the phrase "active ingredient density" refers specifically to the active ingredient density of the microtablets. Indeed, Claim 1 reads: "A cylindrical delayed release microtablet . . . wherein . . . (c) the active ingredient density is greater than 1." Thus, the context of Claim 1 shows that "active ingredient density" is a characteristic of the delayed release microtablet.

96. A review of the specification also shows that "active ingredient density" is referring to a characteristic of the microtablet. The specification provides: "It is an object of the present invention … to develop propafenone and diprafenone tablets with a small size, high

content and density of active ingredient." *See* Ex. C at Col. 2:11-16, *see also* Col. 1:9-12 ("The present invention relates to cylindrical microtablets of β-phenylpropiophenone derivatives with a high content and density of active ingredient.").

97. The file history of the '588 patent further supports that "active ingredient density" is a characteristic of the delayed release microtablet. For example, during prosecution, the applicants stated that "the cylindrical delayed release microtablet of the present invention is required to … have an active ingredient density that is greater than 1." Ex. E at 2. *See also id.* at 2-3 ("Applicants have found that by preparing a microtablet having the required size and shape, active ingredient content and active ingredient density, containing the β-phenylpropiophenone derivative…it is possible to provide a microtablet that has surprisingly improved delayed release characteristics compared to other delayed release formats.").

98. Thus, one of skill in the art would understand that ***"active ingredient density"*** means ***the density of the active ingredient in the delayed release microtablet***.

**I. "A pronounced plasma level plateau with a PTF<75%"**

99. In my opinion, the phrase "a pronounced plasma level plateau with a PTF<75%," as it appears in Claim 2, means "a plasma level plateau with a peak to trough fluctuation of less than 75%, where peak to trough fluctuation is defined as $PTF(\%) = \frac{C_{\max} - C_{\min}}{\frac{AUC}{\Delta t}} \times 100$."

100. "PTF," or peak to trough fluctuation, is a commonly known pharmacokinetic parameter. As known to those of skill in the art, PTF is defined by the formula

$$PTF(\%) = \frac{C_{\max} - C_{\min}}{\frac{AUC}{\Delta t}} \times 100 .$$

101. The '588 specification provides this same calculation for PTF and indicates that, in a pharmacokinetic study using the delayed release microtablets of the invention, the patentees observed a pronounced blood level plateau in patients as evidenced by the PTF. The specification provides:

> Despite the short half-life, a pronounced blood level plateau develops (FIG. 11). The fluctuations in the blood level are considerably less with the microtablets. This is evident from the $t_{75\%}$ (period in the dosage interval during which the plasma levels are at least 75% of the maximum level), which is 8 to 9 hours with the microtablets according to the invention compared with 5 to 6 hours with the bolus delayed release form, and from the PTF (peak to trough fluctuation; cf. H. P. Koch and W. A. Ritschel, Synopsis der Biopharmazie und Pharmakokinetik, Ecomed-Verlagsgesellschaft mbH, Landsberg und Munchen, 1986)
>
> $$PTF(\%) = \frac{C_{max} - C_{min}}{\frac{AUC}{\Delta t}} \times 100$$
>
> for the AUC, cf. J. K. Aronson et al., Europ. J. of Clinical Pharmacology 35 (1988), 1-7.
>
> which has a value for the microtablets which is only about half that for the bolus forms, in particular less than 75, preferably less than 60%.

Ex. C at Cols. 2:60-3:13.

102. Thus, one of ordinary skill would understand the phrase "***a pronounced plasma level with a PTF<75%***" to mean ***a plasma level plateau with a peak to trough fluctuation of less than 75%, where peak to trough fluctuation is calculated using the formula set forth in the specification***.

**J. "Bioavailability does not depend on the intake of food"**

103. In my opinion, the term "bioavailability does not depend on the intake of food," which appears in Claim 2 of the '588 patent, means to one of ordinary skill in the art that

bioavailability of the active pharmaceutical ingredient is unaffected by food intake for practical purposes.

104. The specification of the '588 patent discusses the advantages of the claimed microtablets and states that "the bioavailability of this form [i.e., the delayed release microtablet] is unaffected by food intake, in contrast to the bolus delayed release form." Ex. C at Col. 3:17-19. The specification continues that "the AUC found for the bolus delayed release form is 50% higher when fasting." *Id.* at Col. 3:20-21. Additionally, Table 1 reports the results of a study using repeated administration of the delayed release microtablets of Example 1 and a bolus delayed release form. As shown in that table, upon repeated administration of the microtablets, the AUC and $t_{75\%}$ were not different in the fasting and non-fasting states and the peak to trough fluctuations were 52% in the fasting state and 56% in the non-fasting state. *See* Ex. C at Table 1.

105. Thus, in my opinion, one of ordinary skill would understand ***"bioavailability does not depend on the intake of food"*** to mean that the ***bioavailability of the active pharmaceutical ingredient is unaffected by food intake for practical purposes***.

**K. "Cylindrical mold"**

106. In my opinion, the phrase "cylindrical mold" as that term appears in Claim 6 of the '588 patent means a die and punch in which a formulation is formed into a "cylindrical" shape.

107. I have previously commented on the term "cylindrical." *See* Section III.B above.

108. The ordinary meaning of mold to one of ordinary skill means something that is part of tooling for the production of solid dosage forms containing pharmaceuticals, in other words, a punch and die in which a substance is shaped.

109. The specification is consistent with this ordinary meaning. The '588 patent discusses making the delayed release microtablets using, for example, "a suitable tabletting machine equipped with multiple microtablet punches." *See* Ex. C at 4:19-20.

110. Thus, in my opinion, the phrase ***"cylindrical mold"*** means ***a die and punch in which a formulation is formed into a "cylindrical" shape.***

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 4th day of March 2008 in Narragansett, Rhode Island.

Christopher T. Rhodes, Ph.D.

**CERTIFICATE OF SERVICE**

I hereby certify that on March 5, 2008 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to:

Josy W. Ingersoll, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR

I further certify that I caused to be served copies of the foregoing document on March 5, 2008 upon the following in the manner indicated:

Josy W. Ingersoll, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

*VIA ELECTRONIC MAIL and HAND DELIVERY*

John G. Taylor, Esquire
James K. Stronski, Esquire
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, NY 10151

*VIA ELECTRONIC MAIL*

/s/ Jack B. Blumenfeld

Jack B. Blumenfeld (#1014)

# Exhibit A

Dr. Christopher T. Rhodes

Dr. C. T. Rhodes obtained his B.Pharm. (Hons) and Ph.D. degrees from the University of London. Subsequent to obtaining a post-doctoral research fellowship at Purdue University, he had appointments at Portsmouth University. The University of British Columbia, State University of New York at Buffalo and the University of Rhode Island.

Professor Rhodes has published approximately two hundred and fifty publications on a variety of pharmaceutical topics associated with the design and evaluation of drug delivery systems and devices. Working with Mr. R. E. Hone he edited "Automated Analysis of Drugs and Other Substances of Pharmaceutical Interest" which was published by Medical Butterworth in 1973. In association with Dr. G. S. Banker he edited "Modern Pharmaceutics" published by Dekker in 1979, 1990, 1995, and 2002. Dr. Rhodes worked with Dr. Bruce Shearer of the Population Council and Mr. S. M. Keeney to edit the book "The Purchase, Shipment, Storage and Distribution of Contraceptives in Developing Countries" under contract for the World Bank. Working with Dr. Donald C. Monkhouse, Dr. Rhodes edited Drug Products for Clinical Trials, published by Dekker in 1997. Dr. Rhodes worked with Dr. Jens T. Carstensen to edit the third edition of Drug Stability Principles and Practices published by Dekker in 2000. In 1972 Dr. Rhodes became founding Editor of Drug Development and Industrial Pharmacy.

Dr. Rhodes provides consulting services to government, industry and other entities on the formulation and analysis of drug products and devices and on clinical and regulatory aspects of their use. Dr. Rhodes has testified as an expert witness in courts in the United States, Canada, Australia, Israel, and Korea. He has also testified at a US Senate sub-committee hearing on drugs. Professor Rhodes is a Fellow of the American Association of Pharmaceutical Scientists. He served for fifteen years as a member of the United States Pharmacopoeia Committee of Revision (USP). He has also served as a member of the Federal Food and Drug Administration Advisory Committee on Generic Drugs and the FDA Advisory Committee on Compounded Drugs. His services as a consultant have been used by the Internal Revenue Service, the US Army, Chemical Warfare Defense Command, the Federal Food and Drug Administration, The Population Council and many companies in North America and the European Union.

# CURRICULUM VITAE

NAME: Christopher Thomas Rhodes

PLACE OF BIRTH: London, England

ADDRESS: 28 Prospect Avenue
Narragansett, Rhode Island 02882
voice (401) 782-3705 FAX (401) 782-9837
and
Peace Dale
Goodrich HR9 6JA England
voice (0)1600-890139/ fax (0)1600-891229

PRESENT POSITION: Professor of Applied Pharmaceutical Sciences
University of Rhode Island
Kingston, Rhode Island 02881-0809
voice (401) 874-5020 fax (401) 874-2516
and
President
PharmaCon Inc.
voice (401) 782-3705 fax (401) 782- 9837

EDUCATION AND EMPLOYMENT:

1956-57 Assistant Chemist in a London Public Analyst's Laboratory working on the analysis of Food and Drugs.

1957-64 Undergraduate Student and then Research Assistant at Chelsea College, University of London. Dr. Rhodes obtained the B. Pharm. (Honors) degree in 1961 and his Ph.D. in 1964.

1964-65 Smith, Kline and French Research Associate in Industrial Pharmacy at the Department of Physical and Industrial Pharmacy, School of Pharmacy and Pharmacal Sciences, Lafayette, Indiana. At Purdue, Dr. Rhodes worked with Dr. G. S. Banker, Head of the Department of Physical and Industrial Pharmacy on the application of physicochemical principles to new methods of preparing sustained action pharmaceuticals. This work involved both in vitro and in vivo testing. The techniques developed have been patented.

1965 - 72 Senior Lecturer and then Principal Lecturer and Head of the Physical Pharmacy Section, School of Pharmacy, Portsmouth University, England. Dr. Rhodes was responsible for developing new courses in Physical Pharmacy and Medical Laboratory Technology. As course organizer for the then new Higher National Certificate in Medical Laboratory

Technology, Dr. Rhodes visited a number of hospitals and industrial pathology laboratories in order to develop liaisons in continuing education in this area. Teaching duties included courses in physical pharmacy, biopharmaceutics and mathematics, and the administration of the Physical Pharmacy Section involved in the allocation of teaching and other duties to ten academic, research, and technical staff. The control of the budget of the Section was also Dr. Rhodes' responsibility. Five research students gained higher degrees as a result of working under his direction. Dr. Rhodes was a member of Havant Town Council 1968-69.

1969 - 70 Canadian Medical Research Council Visiting Scientist at the Faculty of Pharmaceutical Sciences, University of British Columbia. Dr. Rhodes was the first pharmacist to be given such an award. While at the University of British Columbia, he was Assistant Scientific Editor of the Canadian Journal of Pharmaceutical Sciences.

1972 - 75 Associate Professor in the Department of Pharmaceutics, State University of New York at Buffalo. Dr. Rhodes introduced new graduate and undergraduate courses at Buffalo. He directed both graduate and undergraduate research students. University service included membership of the University Senate, the University Assembly, the Faculty of Health Sciences Institutional Funds Committee, and the Dean of the School of Pharmacy's ad hoc Committee on the Curriculum. In 1974, Dr. Rhodes was appointed founding editor of Drug Development Communications, (since retitled Drug Development and Industrial Pharmacy).

1975 - 2004 Professor in the College of Pharmacy of the University of Rhode Island. Dr. Rhodes has energetically developed basic scientific, regulatory and clinical research.

In addition to working on College Committees, Dr. Rhodes has been a member of the following University-wide Committees: Committee to Improve the Campus Environment (Chairman); Faculty Center Membership Committee; American Association of University Professors Grievance Committee (chairman); Campus Planning and Coordinating Committee; Faculty Senate Curricula Affairs Committee. Dr. Rhodes is a member of the Scientific Staff of Roger Williams Hospital, Providence.

PROFESSIONAL ACTIVITIES:

Dr. Rhodes is a registered pharmacist in the European Union, and he is keenly interested in developments in the practice of pharmacy. He is particularly concerned with the relationship between University degree courses in pharmacy and pharmacy practice.

Dr. Rhodes is a member of the Royal Pharmaceutical Society of Great Britain. He is a Fellow of the American Association of Pharmaceutical Scientists, Kappa Psi Pharmaceutical Fraternity, a Fellow of the Academy of Pharmaceutical Sciences, a member of A.Ph.A., A.A.C.P. and Phi Lambda Sigma Pharmacy Leadership Honor Society. Dr. Rhodes has an international reputation in a number of areas of pharmaceutical research relevant to the design of both in vitro and in vivo evaluation of dosage forms and matters pertaining to their regulatory approval. He has successfully directed over thirty Ph.D. students and eleven M.S. students. Dr. Rhodes has been invited to present the results of his research to a number of national and international meetings (see attached list).

Financial support has been obtained from: Smith, Kline and French, Inc.; the Science Research Council; Smith, Kline and French Trust; The Medical Research Council of Canada; the National Institutes of Health; Coulters; Leiners Encapsulation; Vick; Penwalt; Ortho; Searle; the Center for Professional Advancement; Edward Mendell, Inc.; Canada Packers; Exxon Corporate Research; The World Bank; The Population Council; General Aniline Film; California and Hawaiian Sugar Company, Buckeye Cellulose, Paco, Takeda, Ingredient Technology Corp., Travenol, Ciba-Geigy, Miles, The United States Pharmacopoeia, Vick, Upjohn, Cyprus Mining and Minerals, Squibb, the I.R.S., Thames Pharmaceuticals, Massasoit Inc., American Hoechst, ICI America, Applied Analytical Industries, Bristol Myers, Squibb, Smith Kline Beecham, Gattefosse, Colorcon, Charles Ross and Son, Acis, Roquette, Hoffman-LaRoche, Biogen, and GSK.

Dr. Rhodes has edited five books. He acts as reviewer for a number of journals concerned with clinical, regulatory and scientific aspects of drugs. He has been admitted as an expert witness by courts in the U.S., Korea, Israel, Canada and Australia.

INVITED SEMINARS, VISITS, ETC.:

| | |
|---|---|
| 1968, May | - Invited research paper, Coulter Counter Users Conference, London. |
| 1969, May | - Invited research paper, Coulter Counter Users Conference, London. |
| 1971, September | - Invited review paper, International Conference on Automation in Chemical Analysis, London. |
| September | - Invited review paper, International Pharmaceutical Conference, Washington. |
| 1972, May | - Lecturer for the Center for Professional Advancement (C.P.A.) course "Granulation and Tabletting", New Jersey. |
| 1973, May | - Director for C.P.A. course "Practical Pharmaceutical Formulation", New Jersey. |
| May | - Research consultancy, Exxon Research, Edison, New Jersey. |
| July | - Lecturer for C.P.A. course "Granulation and Tabletting", New Jersey. |
| August | - Director (with Dr. Lewis Dittert) of C.P.A. course "Bioavailability of Drugs", New Jersey. |
| 1974, January | - American Medical Association Expert Committee on Total Parenteral Nutrition, Washington. |
| February | - School of Pharmacy, University of Maryland, research seminars. |
| February | - Seminar on automated analysis of drugs at Health Protection Branch, Ottawa. |
| March | - Director (with Lewis Dittert) for a C.P.A. course "Bioavailability of Drugs and Clinical Pharmacokinetics", New Jersey. |

| | |
|---|---|
| 1974, March | - Address "The Future of Pharmacy", Kappa Psi Convention, Buffalo. |
| March | - Research Consultancy, G.D. Searle, Chicago. |
| March | - Seminar on suspension research, Eli Lilly, Indianapolis. |
| April | - Seminar on formulation and clinical pharmacy, Rockland, New York, branch of the A.C.S. |
| May | - Director (with Dr. Ho-Leung Fung) for a C.P.A. course "Drug Stability and Shelf Life", New Jersey. |
| June | - Seminar on Formulation, Hoffmann-La Roche, Nutley, New Jersey. |
| June | - Director C.P.A. course "Pharmaceutical Formulation and processing", New Jersey. |
| July | - Educational consultancy, Florida A & M University, Tallahassee. |
| August | - Invited review paper, A.Ph.A. Convention, Chicago. |
| October | - Invited review paper, Eastern Regional meeting, Industrial Pharmaceutical Technology Section of the Academy of Pharmaceutical Sciences, Philadelphia. |
| October | - Research consultancy, Squibb, New Jersey. |
| October | - Director (with Dr. Walter Conway) for a C.P.A. course "Analysis of Drugs", New Jersey. |
| October | - Formulation consultancy, K.V. Pharmacal, St. Louis. |
| November | - Seminar on biopharmaceutical aspects of formulation, National Association of Pharmaceutical manufacturers, St. John's University, New York. |

| | | |
|---|---|---|
| | November | - Director (with Dr. Ho-Leung Fung) for a C.P.A. course "Drug Stability and Shelf Life", New Jersey. |
| 1974, | December | - Seminar on drug membrane transport, University of Bradford. |
| | December | - Director for C.P.A. course "Modern Pharmaceutical Formulation", London, England. |
| 1975, | January | - Evaluator for Technicon research awards. |
| | March | - Research consultance, M.S.D., West Point. |
| | May | - Seminar on direct compression, Toronto |
| | May | - Director (with Dr. Lewis Dittert) for a C.P.A. course "Drug Bioavailability and Clinical Pharmacokinetics", New Jersey. |
| | May | - Processing consultancy, Republic Drug, Buffalo. |
| | June | - Director for a C.P.A. course, "Drug Stability and Shelf-Life", London, England. |
| | July | - Vice-Chairman Gordon Research Conference, "Transport Phenomena in Biological and Synthetic membranes." |
| | October | - Presented an address "Clinical Pharmacy and Pharm. D. Plans at the University of Rhode Island", to A.A.C.P. District 1 meeting. Waterville Valley. |
| | October | - Presented a seminar titled "Pharmaceutical Research - some personal experiences" to the Hoechst-Rousel International Research meeting, Pocono Manor. |
| | December | - Presented a research seminar at Pfizer, Groton, CT. |
| 1976, | January | - Evaluator for Technician Research Awards. |

| | | |
|---|---|---|
| | April | - Presented two papers at A.Ph.A. Academy of Sciences meeting in New Orleans. |
| | April | - Presented a research seminar at the School of Pharmacy, University of Connecticut. |
| 1976, | July | - Presented a research seminar "The use of liquid membrane devices for the treatment of drug overdose", McNeil laboratories, Fort Washington. |
| | September | - Presented a review "Use of water soluble polymers in pharmacy" at the International Conference on Polymers, Cardiff, Wales. |
| | September | - Presented a research seminar "Contemporary trends in formulation", Merck, Sharpe and Dohme, Hodderston, England. |
| | September | - Presented a research seminar at Cyanamid of Great Britain, Gossport, England. |
| | November | - Director of C.P.A. course "Practical Pharmaceutical Formulation", New Jersey. |
| 1977, | January | - Gave lecture "Modern Pharmaceutics" to the Montreal Discussion Group. |
| | March | - Installed new executive of the Rhode Island Society of Hospital Pharmacists. |
| | April | - Director (with Dr. Ho-Leung Fund) of a C.P.A. course "Drug Product Stability and Shelf Life", New Jersey. |
| | April | - Director (with Dr. Ho-Leung Fung) of a C.P.A. course "Stabilite de produits pharmaceutiques", Montreal Canada. |
| | April | - A.Ph.A. Convention New York City, author of two papers. |
| | May | - Director (with Dr. Lewis Dittert) of a C.P.A. course "Bioavailability and Pharmacokinetics", New Jersey. |

| | | |
|---|---|---|
| | May | - Research Consultancy Canada Packers, Toronto. |
| | November | - Presented an invited review "The Biomedical Use of Liquid membranes" at the A.Ph.A. Phoenix meeting. |
| 1978, | January | - Gave three lectures "Evaluation of Tablets" at the Industrial Pharmaceutical Technology Arden House Conference. |
| | January | - Lectured at Purdue University School of Pharmacy and Pharmacal Sciences, "Liquid Membranes as Potential Methods for the Treatment of Drug Overdose." |
| | April | - Presented a review on "Validation Procedures" at the Mendell West Coast Tablet Technology Conference, Los Angeles. |
| | May | - Course Director (with Dr. Ho-Leung Fung) of a C.P.A. course "Drug Product Stability and Shelf Life." |
| | May | - Appointed pharmaceutical consultant by the World Bank and the Population Council for a project concerned with optimizing: purchase, storage, and distribution of contraceptive devices and drugs in Third World countries. |
| | August | - Presented a research seminar at Merck, Sharpe and Dohme, West Point. |
| | September | - Educational consultancy, Howard University. |
| | November | - Visited the Ministry of Overseas Development, London, The International Planned Parenthood, London and Scheering A.G., West Berlin, in connection with research on contraceptive use. |
| 1979, | January | - Presented a research seminar at Lederle, Pearl River. |
| | February | - Presented a research seminar on liquid membranes at Exxon Corporate Research, Linden, New Jersey. |
| | March | - Presented a lecture "Trends in the Pharmaceutical Industry" to the Toronto Pharmaceutical Discussion Group. |

| | | |
|---|---|---|
| | April | - Presented an invited symposium review "Physical stability of pharmaceutical products at the A.Ph.A. Anaheim Convention. |
| | May | - Presented a seminar on validation to Ayerst Laboratories, Rouses Point, New York. |
| 1979, | May | - Presented a seminar on validation to Lederle Laboratories, Pearl River, New York. |
| | June | - Course Director of C.P.A. course on Drug Product Stability. |
| | | - Gave a lecture on packing of pharmaceuticals at C.P.A. |
| | | - Gave expert testimony to the Southern District of New York Federal Court in the case of Premo Drug vs. U.S.A. |
| | | - Appointed Member of the Academy of Pharmaceutical Sciences Regulations and Standards Committee 1979-1980. |
| | August | - Presented a seminar on physical stability of drugs products at Sandoz, New Jersey. |
| | October | - Gave lectures on drug product stability and QC/QA at C.P.A. courses in Amsterdam, the Netherlands. |
| | December | - Organized a course titled Total Product Integrity at Plough Inc., Memphis, Tennessee. |
| 1980, | January | - Course Director CPA Course on Pharmaceutical Formulations. |
| | February | - Expert testimony for the New Jersey Drug Utilization Review Council on clinical and scientific aspects of tolbutamide. |
| | March | - Member of the panel of experts selected by the Proprietary Association to discuss Self-Medication at the Conference held in Washington on that topic. |
| | April | - A.Ph.A. Convention, presented two papers. |

- Gave expert testimony on scientific and clinical aspects of aspirin use in F.T.C. vs Sterling Drug Co.

- Elected a member of the Committee of Revision for U.S.P. XXI.

May - Faculty member on C.P.A. courses on Pharmaceutical QC/QA.

1980, June - Gave expert testimony on various drugs in the case of U.S.A. vs. Premo Pharmaceutical laboratories, Inc., in Federal Court in New Jersey.

July - Appeared on NBC-TV program "The Health Field" to discuss pharmacy education and practice.

- C.P.A. Course Director "Bioavailability of Drugs", East Brunswick, New Jersey.

October - Faculty member on C.P.A. course on Aerosois, East Brunswick, New Jersey.

- Research consultancy, Lederle, Pearl River, New York.

October - Lectured on "Research in the Pharmaceutical Industry" at the Eastern Regional Meeting of the Industrial Pharmaceutical Technology Section of the Academy of Pharmaceutical Sciences at Cherry Hills, New Jersey.

1981, February - Presented "Preclearance of Generics" at the International Industrial Pharmacy Conference, Austin, Texas.

- Gave expert testimony before the Delaware Drug Advisory Board, Wilmington, Delaware.

March - Research Consultancy GAF Corp., Wayne, New Jersey.

- Presented a paper, "Standards for Generics" at the First European Conference on Biopharmaceutics and Pharmacokinetics at Clermont-Ferrand, France.

- Gave a lecture, "Validation" at Abbott, Queensborough, England.

- Presented a lecture "Generics and Bioequivalence" at Cyanamid of Great Britain, Gosport, England.

April - Course Director C.F.P.A. course "Bioavailability of Drugs", at the University of Amsterdam, The Netherlands.

1981, April - Gave a lecture "Drug transport in liquid membranes" at the University of Amsterdam.

- Lectured "Research in a smaller company", Reid-Provident, Atlanta, Georgia.

- Gave two lectures on Quality Control at a C.F.P.A. course, East Brunswick, New Jersey.

- Research consultancy, Lederle, Pearl River, New York.

May - Presented a lecture "Pharmaceutical Formulation" Buckeye Cellulose, Memphis, Tennessee.

May - Lectured on "Scientific Journalism" Sterling, Albany, New York.

- Returned as an expert witness in a case involving drug product stability by the FDA.

June - Visited Chelsea Laboratories, New York to inspect facilities and discuss formulation and bioavailability.

- Visited F.D.A. Biopharmaceutics Laboratory, Washington, DC to discuss a joint research on Pharmaceutical products.

- Course Director, Institute of Applied Pharmaceutical Sciences IAPS (part of the Center for Professional Advancement) course on Drug Product Stability and Shelf Life.

- Attended U.S.P. Committee of Revision meeting in Rockville, MD.

- Attended a meeting at the Bureau of Drugs F.D.A. Rockville, MD to discuss formulation and bioavailability.

August - Visited F.D.A. Rockville, MD to discuss formulation.

- Visited Bermuda to discuss pharmacy education with the Minister of Health and Pharmaceutical Society of Bermuda.

1981, September - Attended U.S.P. Committee of Revision meeting in Rockville, MD.

- Chaired session on automation of pharmaceutical production at the Interphex Conference New York City.

- Visited Bioresearch Pittsburgh to discuss bioavailability testing.

October - I.A.P.S. Course Director, Drug Product Stability and Shelf Life Geneva, Switzerland.

- Lectured on Direct Compression Tablet Formulation to the Chemical Institute of Canada, Toronto.

- Attended A.P.S. meeting Orlando, Florida; co-author of three papers.

1982, January - I.A.P.S. Course Director "Bioavailability of Drugs", East Brunswick, New Jersey.

February - Attended meeting of the Committee of Revision of U.S.P. at Rockville, MD.

- Visited Reid-Provident labs, Atlanta, Georgia for a meeting of the Scientific Advisors' Board.

- Attended "Drug and Allied Trades Dinner" in New York City.

March - Attended U.S.P. Committee of Revision meeting, Rockville, MD.

- Co-Director of University of Wisconsin course on drug product stability at Madison, Wisconsin.

- Research Consultancy, Lederle Labs, Pearl River, New York.

April - Visited Searle, Puerto Rico, to inspect plant in connection with the case between Searle and I.R.S.

- Research Consultancy Analytical Research, Richmond, Virginia.

1982, April - Gave two plenary lectures at the British Pharmaceutical Technology Conference.

May - Visited Rachelle Labs, Long Beach, California.

May - Visited G.D. Searle, Skogie, Illinois to inspect facilities.

- Visited Kalipharma, Elizabeth, New Jersey to inspect facilities.

June - Lectured on aerosol stability IAPS/CFPA, East Brunswick, New Jersey.

- Gave expert testimony for the government in Washington, DC in the case of I.R.S. vs. G.D. Searle.

- Lectured on pharmaceutical QC/QA in Toronto, Canada.

September - Visited New York City to give a deposition on Provera.

- Chaired a session on DNA at Pharm Tech Conference New York City.

October - Attended INFO 82 EXPO, New York City.

- Presented a research seminar at Pfizer, Groton, CT.

- Research discussions, Lederle, Pearl River, New York.

November - Lectured on Bioavailability in Amsterdam, The Netherlands.

December - Visited the University of Houston, Texas to discuss clinical research.

1983, February - Lectured on tamper resistant packaging at IAPS, East Brunswick, New Jersey.

February - Scientific Advisory Board, Reid-Provident, Charleston, South Carolina.

1983, May - Gave an invited lecture on tablet formulation at the Society of Manufacturing Engineers Conference, Philadelphia, Pennsylvania.

August - Visited Boehringer-Ingelheim, Danbury, Connecticut for discussion on research.

September - Attended INTERPHEX 83 Conference, New York City.

October - Lectured on computers in pharmacy, Amsterdam, The Netherlands.

November - Visited Vick Research, Shelton, Connecticut to discuss research.

- Visited Squibb, Princeton, New Jersey to give a research seminar.

- co-author of three papers at the A.Ph.A. Academy meeting, Miami, Florida.

1984, February - Scientific Advisory Board, Reid-Provident, Charleston, South Carolina.

- Visited Chelsea Laboratories, Inwood, New York to discuss bioavailability.

March - Gave testimony to the New Jersey Drug Utilization Review Board.

September - Presented lectures in Jakarta, Indonesia on Quality Control.

November - Lectured on Validation Amsterdam, the Netherlands.

- Presented a seminar on Design of Drug Delivery System at U.S. Army Aberdeen Proving Ground, Maryland base.

1985, February - Lectured on Pharmaceutical Standards to the New Jersey Discussion Group.

March - Gave a seminar "Pharmaceutical Uses of Cyclodextrins" to the North Eastern University School of Pharmacy.

1985, March - Gave a seminar on Cyclodextrins at Purdue University.

May - Presented an invited paper to the Society of Manufacturing Engineers, Philadelphia Conference, on the Instrumented Tablet Press.

September - Lectured on Validation to the Pharmaceutical Discussion Group, Toronto, Canada.

October - Lectured on Research at Albany College of Pharmacy.

- Gave a seminar "The Instrumented Tablet Press" at the University of Texas, Austin.

November - Gave a seminar "Tablet Formulation" at Travenol Laboratories, Skokie, Illinois.

- Educational consultant, University of Nigeria.

December - Lectured on Bioavailability Testing, CFPA, East Brunswick, NJ.

- Gave a seminar "The Instrumented Tablet Press" at Ciba-Geigy, Summit, NJ.

| | |
|---|---|
| 1986, May | - Appointed expert witness in a case involving the FDA and Gamma Diagnostic Laboratories. |
| June | - Lectured on Tablet formulation at the Takeda Conference, Newport Beach, CA. |
| August | - Lectured on the Instrumented tablet press at Sterling Drug, Rensselaer, NY. |
| September | - Professional reviewer University of Nigeria and North Eastern University. |
| October | - Testified at FDA hearing on Bioequivalence. |
| November | - Lectured on pharmaceutical QC/QA and CFPA East Brunswick, NJ. |
| 1986, December | - US Army Conference at Aberdeen Proving Grounds, MD on Macromolecules in Microcapsules. |
| | - Professional reviewer Philadelphia College of Pharmacy and Science. |
| 1987, February | - Lectured on Pharmaceutical QC/QA at the Toronto Pharmaceutical Discussion Group. |
| March | - Presented a research seminar at Squibb East Brunswick, NJ. |
| May | - Lectured on pharmaceutical QC/QA at CFPA, Amsterdam, The Netherlands. |
| May | - Lectured on Shelf Life at CFPA, New Brunswick, NJ. |
| November | - Lectured on Shelf Life at CFPA, New Brunswick, NJ. |
| December | - Lectured on Drug Product Stability to the Toronto Pharmaceutical Discussion Group. |

1988, March - Presented a paper on tablet lubrication at the Medi Mark Conference.

May - Member of invited discussion panel on macromolecules and pharmaceutical standards at the Swedish Academy of Pharmaceutical Sciences Conference.

June - Lectured on Shelf Life at CFPA, Amsterdam, The Netherlands

July - Conference Coordinator INTERPHEX USA 88 Conference.

October - Presented research seminar at FDA, Rockville, MD.

October - Lectured on Bioavailability at CFPA, Amsterdam, The Netherlands.

October - Gave an invited paper on Analysis of Protein Drugs at the FACSS Boston Conference.

1988, December - Lectured on Pharmaceutics Formulation at the Pharmaceutical Discussion Group in Montreal, Canada.

December - Lectured on stability of protein drugs at CFPA, East Brunswick, NJ.

1989, January - Testified before the FDA Advisory Committee on Maternal and Family Health concerning safety and efficacy of congugated Estrogens USP in Rockville, Maryland.

- Presented a course on writing SOP writing in Toronto and Montreal.

- Presented a research seminar at Richardson Vicks, Shelton, CT.

- Lectured on Drug Product Stability at Beecham's, Piscataway, NJ.

May - Lectured Stability of Drugs in London, England.

June - Course Director CFPA course on Proteins.

September - Lectured on emulsions to the Pharmaceutical Discussion Group in Toronto and Montreal (Jointly with Dr. Lausier).

- Attend USP Conference on Proteins.

October - Invited speaker on Period Effects at the Bio 89 Conference in Toronto.

- Testified in federal court in Boston as an expert witness for 3M Corporation.

November - Invited speaker on SOP's at the Roche (Canada) Conference in Toronto.

- AAPS Conference Atlanta, Georgia, Author five papers.

- CFPA course leader for a course on Drug Product Stability.

1989, November - Gave one day course on Bioavailability of Vick in Shelton, CT (with Dr. Rosenbaum).

1990, February - Gave plenary lecture "Rational Standards for Macromolecules" at the Swedish Academy of Pharmaceutical Sciences International Conference in Gottenburg.

May - Testified before the FDA Advisory Panel on maternal and child Health on Conjugated Estrogens.

- Lectured on Stability of Protein Drugs at DVPA in Amsterdam.

June - Lectured on Formulation at Applied analytical Industries, Wilmington, NC.

July - Appointed by APhA to be a member of the Steering Committee for the second edition of the Handbook of Pharmaceutical Excipients.

October          - Gave a seminar on Rational Standards for Pharmaceuticals at
                 Roche, NJ.

                 - Lectured on Drug Product Stability to the Pharmaceutical
                 Discussion Group in Toronto, Canada.

                 - Lectured on Emulsion Formulation (with Dean Lausier) at Vick,
                 Shelton, CT.

November         - Author of five papers at the AAPS Las Vegas Meeting.

December         - Lectured on Stability at CFPA New Jersey.

                 - Presented an invited paper on "Bioequivalence of Veterinary
                 Drug Products" at the Food and Drug Law Institute Conference
                 in Washington, DC.

January          - Attended USP/BP/EP/JP Conference on Harmonization in
                 Orlando, Florida.

1991, February   - Lectured on bioavailability at Applied Analytical Laboratories in
                 Wilmington, NC.

March            - Gave a presentation on Drug Product Stability at the Pittsburgh
                 Conference.

April            - Presented a seminar on SOP's to the Toronto Discussion Group.

May              - Course Director for a course on Protein Stability in Amsterdam.

June             - CFPA Course Director on Drug Product Stability.

August           - Visited Roquette Freres SA Lille to discuss cyclodextrin
research.

September        - Chairman on an NIH/NCI review committee.

                 - Course Director for a CFPA course on Bioavailability, East
                 Brunswick, NJ.

October - Lectured on Drug Product Stability to Glaxo Canada in Toronto.

- Lectured on Drug Product Stability at Proctor and Gamble, Cincinnati, Ohio.

November - Lectured on Drug Product Stability at Richardson Vicks, Shelton, CT.

1992, January - Invited presentation on pharmaceutical standards NAPM meeting, Rockville, MD.

March - CFPA Conference on Shelf Life

April - Invited seminar on Bioequivalence at Miles, New Haven, CT

- presented a paper on the Thermodynamics of interaction between drugs and cyclodextrious. Presented a view of protein.

April - stability at Hybritech, CA

1992, June - visited the Royal Pharmaceutical Society of Great Britain and discussed progress on the Handbook of Pharmaceutical Excipients.

- CFPA Europe Protein Stability Conference.

- USP open conference on Bioavailability.

July - presented an invited seminar on optimization at Hoffmann-LaRoche, Nutley, NJ.

September - CFPA Europe Bioavailability conference.

- Presented an invited review on stability at the Pharm Tech Conference, East Brunswick, NJ.

- attended USP conference on conjugated estrogens.

October - Testified as an expert witness in Federal Court in Newark in a case involving FDA and Barr laboratories.

- Presented a seminar (with Mrs. Lori Underhill) at Applied Analytical Industries, Wilmington, NC.

November - Presented an invited seminar on GMP at LuChem, Shreveport, LA.

December - Attended the Toronto SOP conference.

1993, January

February - Served on FDA Expert Advisory Committee on Generic Drugs.

March - Visited Norton Laboratories to discuss research.

- Course Director CFPA Course on Drug Product Stability.

- Lectured on Drug Product Stability to Danbury Pharmacal.

1993, March - Lectured to the Pharmaceutical Discussions Group in Toronto, Canada on SOP's.

April - Lectured on Drug Product Stability at Theratech, Salt Lake City.

- Visited the Welcome Foundation, Dartford England and lectured on the Barr Case.

May - Lectured on Protein Drugs at Applied Analytical Industries, Wilmington, NC.

- Lectured at Miles New Haven, CT on granulation.

- Lectured on Drug Product Stability at Eurand, Vandalia, Ohio.

June - Lectured on Protein Drugs at CFPA Conference in Amsterdam, The Netherlands.

- Visited Arthur D. Little, Inc. in London, England to discuss pharmaceutical research.

- Served on special FDA Advisory Committee on Expiration Dating and Controlled Room Temperature, Rockville, MD.

- Visited Whitehall Laboratories to lecture on chiral drugs.

July - Visited USP Headquarters Rockville, MD for a USP Committee meeting on Bioavailability.

September - Attended FDA Generic Drugs Expert Advisory Committee in Rocville, MD.

- Presented a paper on the Barr Case at a PDA meeting in Bethesda, MD.

October - Course Director CFPA Course on Drug Product Stability, East Brunswick, NJ.

- Chairman International Pharmaceutical Uses of Cyclodextrins Conference, East Brunswick, NJ.

1993, October - Attended FDA Generic Drugs Expert Advisory Committee, Rockville, MD.

November - Attended AAPS meeting Orlando, Florida Author of four papers.

- Presented (in association with Dr. Rosenbaum) a two day course on Bioavailability for Lederle Pearl River, NY.

- Presented a seminar at Hoffmann-LaRoche in Nutley, NJ on Drug Product Stability.

December - Lectured at PDA meeting in Bethesda, MD on cGMP.

- Visited AAI at Wilmington, NC to discuss formulation.

1994, January - attended FDA Generic Drugs Expert Advisory Committee, Rockville,MD

- USP International Excipients Conference, St. Petersburg,FL.

February - Plenary address at the Swedish Academy of Pharmaceutical Sciences, Gottenburg, Sweden

April - Testified in federal court in Baltimore as an expert witness in cGMP

May - Lectured on Expiration Dating, Amsterdam, The Netherlands

June - Testified for Astra in a patent case in Seoul, Korea

September - Attended FDA Generic Drug Expert Advisory Committee, Rockville,MD

- USP Headquarters meeting

October - Presented an invited lecture to the Parenteral Society in Brighton, England.

1995, March - Director CFPA Course on Drug Product Stability

July - FDA Expert Advisory Committee on Generic Drugs

August - USP Stability Subcommittee

September - FDA Expert Advisory Committee on Generic Drugs

October - Visited IRS San Jose, CA to consult on Research Tax Credits

- Lectured on Physical Stability Tests at Bayer (Abimal Health) Kansas City.

1996, January - July

- Sabbatical leave, visits to Israel, the Netherlands, England and various places in the United States.

August - Director of CFPA course on Protein Stabilization

September - Visited Rockville, MD for consultancy to IRS
- Director with Dr. William Crouthamel of a CFPA course on Bioavailability

October - Testified before the Commissioner of Patents in Tel Aviv in a case concerning an Astra extended release patent.

- Director for a CFPA course on Drug Products Stability

November - Presented a course on Drug Product Stability at Roche, Nutley, NJ Presented a course on Drug Product Stability at Proctor and Gamble, Egham, England.

1997, January - Assisted in an SEC mandated due diligence study of a veterinary pharmaceutical company.

February - CFPA Shelf Life course, New Jersey

- Testified as an Expert Witness on regulatory aspects of Axxen v. American Home products in Portland, Oregon.

- CFPA Shelf Life course, Amsterdam, The Netherlands.

March - Testified in Austin Texas on Narow Therapeutic Range Drugs.

April - Testified in Treaton, New Jersey on Narrow Therapeutic Range Drugs.

May - Lectured on Protein Drugs at CFPA Amsterdam.
- Testified on Narrow Therapeutic Range Drugs in Raleigh, North Carolina.

June - Invited speaker on Auditing Research Data at the AAI Conference in Morris Plains, NJ.

| | |
|---|---|
| July | - Consulted with Janssen in Titusville, NJ on dissolution and bioavailability. |
| August | - Invited lecture on Blend Testing at SmithKline Beecham, Harlow, England. |
| | - USP Stability Committee, Rockville, MD. |
| September | - Invited lecture at McNeil, Fort Washington, PA |
| | - USP Bioavailability and Dissolution Committee Rockville, MD. |
| | - Department Seminar on Uncommon AE's as Exemplified by Amiodarone, |
| | - CFPA Bioavailability course New Brunswick, NJ. |
| | - Assisted in an SEC mandated due diligence study involving a health products supplies company. |
| | - Invited lectures on drug product stability, Medeva, Rochester, NY |
| October | - Invited lecture on Auditing QC/QA and Research data at Serrono, Randolf MA |
| | - Assisted in an SEC mandated due diligence study of a vitamin company. |
| November | - Editorial Board meeting for DDIP in Boston, MA |
| | - Testified at the Illinois Technical Advisory Council on bioequivalency of Warfarin. |
| December | - CFPA Shelf Life course Amsterdam, The Netherlands. |
| | - Testified at the Federal Food and Drug Administration, Rockville, MD on Bioequivalency Specifications. |

1998, February - Invited speaker at the AAI Validation Conference in Wilmington, NC on "audits of Abberant Data"

April - Testified in Canadian Federal Court in Toronto in the case of Welcome v. Novopharm

May - Lectured on Drug Product Stability at the CFPA European Course in Amsterdam, The Netherlands

June - Lectured on Stability of Proteins at the CFPA European Course in Amsterdam, The Netherlands
- Visited Rockville, MD to work as a USP Government Special employee on topics concerning the safety and efficacy of certain drugs.

September - Lectured on Stability of Proteins at the CFPA European Course in Amsterdam, The Netherlands
- Visited Rockville, MD to work as a USP Government Special employee on topics concerning the safety and efficacy of certain drugs.

October - FDA Expert Advisory Committee of Drug Compounding, Rockville, MD
- Gave Seminar to the Department of Applied Pharmaceutical Sciences on Regulatory Aspects of L-Thyroxene.

November - Invited speaker at AAPS meeting in San Francisco on Narrow Therapeutic Range Drugs.

December - Course Director – CFPA Drug Product Stability Course.

1999, March - Testified in Federal Court in Sydney Australia for Astra in an Omeprazole Patent Case

April - FDA Expert Advisory Committee Meeting in Rockville, MD

May - Course Director CFPA Drug Product Stability Course in Amsterdam, the Netherlands.

| | | |
|---|---|---|
| 1999, | October | - Lectured on Stability of Drug Products at Glaxo Welcome in Toronto, Canada. |
| | October | - Drug Information Association Conference, Toronto, Canada Talk on USP and Bioequivalency |
| | October | - Eastern Pharmaceutical Technology Association Conference, Hanover, NJ talk on Expert Witness Activities. |
| 2000, | May | - Course Director CFPA Drug Product Stability Course. The Hague, The Netherlands |
| | June | - Invited testimony to the US Senate Committee on Health, Education Labor and Pensions on Scientific and Regulatory Aspects of Parallel Imports |
| | September | - Testified for the plaintiff in MacDonald v. Thrift Drug (Adverse event, Trazodone) |
| | October | - Course Director CFPA Drug Product Stability Course, New Jersey |
| | November | - Invited one day course on Dissolution at Ferring Malmo, Sweden |
| 2001, | January | - Testified in Key vs. Andrx in federal court Miami (patent case) |
| | May | - Course Director CFPA Drug Product Stability, The Hague, The Netherlands |
| | June | - Visited Advanced Pharma Inc, to advise on the development and regulatory approval of new drug products |
| | July | - Visit Celtech to advise on development and regulatory approval of new drug products. |
| | August | - Visited Advancis to advise on the development and regulatory approval of new drug products |
| | November | - Gave an invited talk to the FDA Advisory Committee on Pharmaceutical Sciences "Effects of Physical Instability on Safety and Efficacy" at FDA Headquarters in Rockville, Maryland |
| 2002, | April | - Course Director for CFPA Drug Product Stability course, New Brunswick, NJ |
| | June | - Visited London for discussions on OTC drug products |
| | November | - Reappointed as a member of the FDA Expert Advisors Committee on Compounded Drugs |

# PUBLICATIONS

Papers

1. Potentiometric measurements in solutions of non-ionic surfactants, J. Pharm. Pharmac., 15U 233 (1963). M. Donbrow and C.T. Rhodes.

2. Potentiometric studies of the solubilization or organic acids and amines by a nonionic surfact. proc. F.I.P. Conference, Munster (1963). M. Donbrow and C.T. Rhodes

3. Potentiometric studies on solubilization in non-ionic micellar solutions. part I. J. Chem. Soc., Sup. 2, 6166 (1964). M. Donbrow and C.T. Rhodes.

4. Thermodynamics of micellization of N-alkyl betaines. Trans. Farad. Soc., 61, 1043 (1965). P. Molyneux, C.T. Rhodes, and J. Swarbrick.

5. Auto-oxidation of linoleic acid in micellar solution. J. Pharm. Sci., 54, 903 (1965). J. Swarbrick and C.T. Rhodes.

6. Solubilization of preservatives. J. Pharm. Pharmac., 17 258 (1965). M. Donbrow and C.T. Rhodes.

7. Application of the potentiometric method to the study of solubilization by ionic surfactants. J. Pharm. Sci., 54, 1096 (1965). C.T. Rhodes and M. Donbrow.

8. Solubilization of benzoic acid by systems containing varying proportions of benzene and a non-ionic surfactant. J. Pharm. Sci., 54 1130 (1965). C.T. Rhodes and M. Donbrow.

9. Spectroscopic examination of the solubilization of benzoic acid a non-ionic surfactant. J. Pharm. Pharmac., 18 424 (1966). M. Donbrow and C.T. Rhodes.

10. The formation of hydroperoxides by linoleic acid in systems containing non-ionic surfactants. Canad. J. Pharm. Sci., 2 16 (1967). C.T. Rhodes.

11. Potentiometric studies in non-ionic micellar solutions Part II. J. Chem. Soc., 561 (1967). M. Donbrow, P. Molyneux and C.T. Rhodes.

12. Particle size of commercial griseofulvin with reference to official standards. J. Pharm. Sci., 56, 838 (1967). B.A. Matthews and C.T. Rhodes.

13. Effect of temperature upon solubilization by a series of non-ionic surfactants. J. Pharm. Sci., 57, 79 (1968). K. J. Humphreys and C.T. Rhodes.

14. Use of the Coulter counter and digital computer for the evaluation of stability ratios in flocculating monodisperse systems. J. Pharm. Sci., 57, 557 (1968). B.A. Matthews and C.T. Rhodes.

15. Some studies of flocculation phenomena in pharmaceutical suspensions, J. Pharm. Sci., 57, 569 (1968). B.A. Matthews and C.T. Rhodes.

16. Stability of diosgenin. J. Pharm. Sci., 57, 602 (1968). G. Blunden and C.T. Rhodes.

17. The use of the Coulter counter for investigation the coagulation kinetics of mixed monodisperse particulate systems. J. Coll. and Interface Sci., 28, 71 (1968). B.A. Matthews and C.T. Rhodes.

18. The effect of a non-ionic surfactant upon the antifungal activity of benzoic acid. J. Pharm. Pharmac., 20 4S (1968). K.J. Humphreys, G. Richardson and C.T. Rhodes.

19. The polarography of cephalosporin C derivatives. J. Pharm. Pharmac., 20, 45S (1968). I.F. Jones, J.E. page and C.T. Rhodes.

20. Coagulation and flocculation in suspensions of griseofulvin and polystyrene latex. J. Pharm. Pharmac., 20, 204S (1968). B.A. Matthews and C.T. Rhodes.

21. The spectrophotometric analysis of phenylephrine in the presence of polymeric materials. Canad. J. Pharm. Sci., 3 69 (1968). H. Goodman, C.T. Rhodes, A.M. Knevel and G.S. Banker.

22. Physical properties of norgestrel. Canad. J. Pharm. Sci., 4 8 (1969). P.M. Short, E.T. Abbs and C.T. Rhodes.

23.  Analysis of pharmaceutical particle size data obtained with the Coulter counter. Die Pharmazie, 6, 319 (1969). P.M. Short, S.V. Lincoln and C.T. Rhodes.

24.  The use of a comparative analysis of sedimentation and brownian motion as a guide to suspension formulation. Pharm. Acta Helv., 45, 52 (1969). B.A. Matthews and C.T. Rhodes.

25.  Studies of the coagulation kinetics of mixed suspensions. J. Coll. and Interface Scil, 32, 332 (1970). B.A. Matthews and C.T. Rhodes.

26.  Some observations on the use of the Coulter counter model B in coagulation studies. J. Coll. and Interface Sci., 32, 339 (1970). B.A. Matthews and C.T. Rhodes.

27.  Effect of pH on the micellar properties of a non-ionic surfactant. J. Pharm. Sci., 59, 387 (1970). J.R. Bloor, J.C. Morrison and C.T. Rhodes.

28.  Physical stability of sulfaguanidine suspensions. J. Pharm. Sci., 59, 518 (1970). R.D.C. Jones, B.A. Matthews and C.T. Rhodes.

29.  Use of Derjaguin, Landau, Vervey and Overbeek theory to interpret pharmaceutical suspension stability. J. Pharm. Sci., 59 521 (1970). B.A. Matthews and C.T. Rhodes.

30.  Effect of non-ionic surfactants on the transport of testosterone across cellulose acetate membranes. J. Pharm. Sci., 59, 995 (1970). P.M. Short, E.T. Abbs and C.T. Rhodes.

31.  Aggregation mechanisms in pharmaceutical suspensions. J. Pharm. Sci., 59, 1360 (1970). B.A. Matthews and C.T. Rhodes.

32.  Automated colorimetric assay of norgestrel. Steroids, 16, 217 (1970). P.M. Short and C.T. Rhodes.

33.  Molecular scale drug entrapment as a precise method of controlled drug release II. J. Pharm. Sci, 59, 1578 (1970). C.T. Rhodes, K. Wai and G.S. Banker.

34. Molecular scale drug entrapment as a precise method of controlled drug release III. J. Pharm. Sci., 59, 1581 (1970). C.T. Rhodes, K. Wai, and G.S. Banker.

35. Some pharmaceutical aspects of polymer science. Canad. J. Pharm. Sci., 5, 61 (1970). C.T. Rhodes and G.S. Banker.

36. Interaction of testosterone with surfactants. Canad. J. Pharm. Sci., 5, 61 (1970). C. T. Rhodes and N.H. Choulis.

37. Solubilization of testosterone by n-alkyl polyxethylene surfactants. Die Pharmazie, 10, 623 (1971). K.J. Simons and C.T. Rhodes.

38. Automation in pharmaceutical analysis. Process Biochemistry 27, 9 (1972). R.E. Hone and C.T. Rhodes.

39. A comparative evaluation of some alginates as tablet disintegrants. Pharm. Acta Helv., 47, 41 (1972). K.A. Khan and C.T. Rhodes.

40. Effect of surfactants on diffusion of drugs across membranes. Nature, 236, 44 (1972). M.P. Short and C.T. Rhodes.

41. Effectiveness of some tablet disintegrants on an insoluble direct compression base. Pharm. Acta Helv., 47, 153 (1972). K.A. Khan and C.T. Rhodes.

42. Effect of a nonionic surfactant on the bactericidal activity of cetylpyridinium chloride. J. Pharm. Sci., 61, 1163 (1972). J.W. Bradshaw, C.T. Rhodes and G. Richardson.

43. Calculation of the thermodynamic parameters controlling micellization, micellar binding and solubilization. Kolliid Z, Und Z. for Polymere, 250, 886 (1972). P. Molyneux and C.T. Rhodes.

44. Some studies of the diffusion of steroids across a cellulose acetate membrane. Kolloid Z. Und Z. fur Polymer, 250, 602 (1972). M.P. Short and C.T. Rhodes.

45. Dissolution of hydrocortisone, J. Pharm. Sci., 61, 1732 (1972).

46. Effect of compaction pressure on the dissolution efficiency of some direct compression systems. Pharm. Acta Helv., 47, 594 (1972). K.A. Kahn and C.T. Rhodes.

47. The production of tablets by direct compression. Canad J. Pharm. Sci., 8, 1 (1973). K.A. Kahn and C.T. Rhodes.

48. Automated fluorimetric assay of norgestrel. Canad. J. Pharm. Sci., 8, 26 (1973). M. P. Short and C.T. Rhodes.

49. A limitation of the fine mesh cage in dissolution apparatus for tablets. Canad. J. Pharm. Sci., 8, 29 (1973). K.A. Khan and C.T. Rhodes.

50. Kinetic assay of single nitroglycerin tablets. J. Pharm. Sci., 62, 696 (1973). H.L. Fung, P. Dalecki, E. Tse and C.T. Rhodes.

51. A study of the formulation of steroidal suspensions. Canad. J. Pharm. Sci., 8, 46 (1973). M.P. Short and C.T. Rhodes.

52. Efficiency of disintegrants in tablet formulations. Manufacturing Chemist, September, 48 (1973). K.A. Khan and C.T. Rhodes.

53. Biopharmaceutical aspects of the design of steroidal dosage forms. Die Pharmazie, 28, 509 (1973). M.P. Short and C.T. Rhodes.

54. Effect of testosterone and amphetamine on the free energy of micellization of three nonionic surfactants. Canad. J. Pharm. Sci., 8, 93 (1973).

55. Effect of disintegrant concentration on disintegration and compression characteristics of two insoluble direct compression systems. Canad. J. Pharm. Sci., 8, 77, (1973). K.A. Khan and C.T. Rhodes.

56. The place of automated analysis in the pharmacy curriculum. Am. J. Pharm. Ed., 37, 638 (1973). R.E. Hone and C.T. Rhodes.

57. Physico-chemical methods of controlling drug release and absorption, Pharma International, 5, 9 (1973). C.T. Rhodes.

58.    Automated analysis of drugs in body fluids, Drug metabolism Reviews, 2, 231 (1973).  C.T. Rhodes and R.E. Hone.

59.    The meaning and limitation of the term biological availability.  Canad. J. Pharm. Sci., 9 30 (1974).  J.N. Moss and C.T. Rhodes.

60.    Design of tests for content uniformity.  Canad. J. Pharm. Sci., 9, 62 (1974).  S. Pocock and C.T. Rhodes.

61.    Studies of thermodynamics of dissolution, solubilization and micellar binding of salicylamide by a nonionic surfactant.  Acta Pharm. Suecica, 11, 275 (1974).  M.Z. Biber and C.T. Rhodes.

62.    An overview of automated pharmaceutical analysis in Automation in Analytical Chemistry 163, Technicon 1974.  C.T. Rhodes and R.E. Hone.

63.    Modification of Trinder's method for the assay of salicylates in body fluids.  Clin. Chem. Acta, 54, 135 (1974).  M. Z. Biber and C.T. Rhodes.

64.    Development of a stable sublingual nitroglycerin tablet I; Interaction of nitroglycerin with selected macromolecules.  J. Pharm. Sci., 63, 1810 (1974).  H.L. Fung, S.K. Yap and C.T. Rhodes.

65.    Further studies of the effect of compaction pressure on the dissolution efficiency of direct compression systems.  Pharm. Acta Helv., 49, 258 (1974).

66.    Preparation of intravenous nitroglycerin solutions.  Am. J. Hosp. Pharm., 22, 139 (1975).  K.A. Khan and C.T. Rhodes.

67.    Disintegration properties of calcium phosphate dibasic dihydrate tablets.  J. Pharm. Sci., 64, 166 (1975).  K.A. Kahn and C.T. Rhodes.

68.    Effect of compaction on particle size.  J. Pharm. Sci., 64, 444 (1975).  K.A. Kahn and C.T. Rhodes.

69.    Water sorption properties of tablet disintegrants.  J. Pharm. Sci., 64, 447 (1975).  K. A. Kahn and C.T. Rhodes.

70.    Kinetic assay of nitric esters.  Anal. Chem., 47, 1185 (1975).  S.K. Yap, C.T.
       Rhodes and H.L. Fung.

71.    The disintegration behavior of three direct compression formulations containing
       microcrystalline cellulose.  Canad. J. Pharm., 10, 62 (1975).  K.A. Kahn and C.T.
       Rhodes.

72.    Clinical pharmacokinetics.  Pharm. J. 498 (1975).  C.T. Rhodes.

73.    Evaluation of different viscosity grades of sodium carboxymethylcellulose as
       tablet disintegrants.  Pharm. Acta. Helv., 50, 99 (1975).  K.A. Khan and C.T.
       Rhodes.

74.    Studies of equations derived for application to dissolution from heterodisperse
       micronized suspensions.  Colloid and Polymer Science, 253, 544 (1975).  M.P.
       Short, W.P. Sharkey and C.T. Rhodes.

75.    Clinical pharmacy at American universities, some personal observations.  Pharm.
       J. 295, 396 (1975).  C.T. Rhodes.

76.    Factors affecting the kinetic assay of nitroglyerin in dosage forms.  Am. J. Hosp.
       Pharm., 32, 1039 (1975).  S.K. Yap, C.T. Rhodes and H.L. Fung.

77.    Formulation of griseofulvin tablets.  Drug. Devel. Comm., 1 553 (1975).  K.A.
       Khan and C.T. Rhodes.

78.    Compressional properties of some directly compressed griseofulvin tablet
       formulations.  Drug Devel. Comm., 2, 77 (1976).  K.A. Khan and C.T. Rhodes.

79.    Development of a stable sublingual nitroglycerine tablet II:  Formulation and
       evaluation of tablets containing povidone.  J. Pharm. Sci., 65, 558 (1976).  H.L.
       Fung, S.K. Yap and C.T. Rhodes.

80.    Improved transport apparatus for examining diffusion of drugs across isolated
       tissues and synthetic membranes.  J. Pharm. Sci., 65, 558 (1976).  H.L. Fung, S.K.
       Yap and C.T. Rhodes.

81.    Comparative pharmacologic evaluation of different sublingual nitroglycerin formulations. Drug Devel. Comm., 2, 193 (1976). S.K. Yap, A. Massumi, L.H. Golden, C.T. Rhodes and H.L. Fung.

82.    Comparative evaluation of some direct compression diluents. Pharm. Acta. Helv., 51, 23 (1976). K.A. Kahn and C.T. Rhodes.

83.    Micellar size, shape and hydration of long chain polyoxyethylene surfactants. J. Colloid and Interface Sci., 54, 348 (1976). D.I.D. El Eini, B.W. Barry and C.T. Rhodes.

84.    The use of magnesium lauryl sulfate in an insoluble direct compression tablet mix. Pharm. Acta. Helv., 51, 71 (1976). K. Osseeky and C.T. Rhodes.

85.    Suspending agents. Pharm. J., 217, 104 (1976). C.T. Rhodes.

86.    Potential Use of Liquid Membranes for the Emergency Treatment of Drug Overdose. Drug Devel. Comm., 2, 405 (1976). J.W. Frankenfeld, G.C. Fuller and C.T. Rhodes.

87.    Pharmacokinetics of Salicylic Acid. Arch Dermatol., 112, 1610 (1976). J.W. Cooper, C.T. Rhodes and B.K. Birmingham.

88.    Compressional Properties of Dicalcium Phosphate Dihydrate and Calcium Phosphate Carbonate Complex. Pharm. Acta. Helv., 51, 128 (1976). K.A. Khan and C.T. Rhodes.

89.    Clinical Pharmacy at Rhode Island. J. Clin. Pharm., 2, 1 (1976). C.T. Rhodes.

90.    Effect of Variation in Compaction Force on the Tablet Properties of Six Direct Compression Formulations. J. Pharm. Sci., 65, 1835 (1976). K.A. Khan and C.T. Rhodes.

91.    Testing for Bioequivalence. Pharm. J., 218, 418 (1977). C.T. Rhodes.

92.    Effect of storage at specified temperature and humidity on the properties of three directly compressible tablet formulations. J. Pharm. Sci., 65, 1746 (1976). S.T. Horhota, J. Burgio, L. Lonski and C.T. Rhodes.

93.    Compression Force and Tablet Disintegration and Dissolution. J. Pharm. Sci., 66, IV (1977). K.A. Khan and C.T. Rhodes.

94.    Solubility and Ionization Characteristics of Phenytoin. J. Pharm. Sci., 66, 994 (1977). P.A. Schwartz, C.T. Rhodes and J.W. Cooper.

95.    Effect of the Addition of Calcium Phosphato-Carbonate Complex on the Tabletting Properties of Dicalcium Phosphate Dihydrate. Canad. J. Pharm. Sci., 12, 121 (1977). K.A. Khan and C.T. Rhodes.

96.    Pharmaceutics of Solids and Solid Dosage Forms (Book Review). J. Pharm. Sci., 66, 1513 (1977). C.T. Rhodes.

97.    Aging of Tablets made with Dibasic Calcium Phosphate Dihydrate as Matrix. J. Pharm. Sci., 66, 1637 (1977). J.M. Lausier, C.W. Chiang, H.A. Zompa and C.T. Rhodes.

98.    Government Drug Benefit Programs and the Maximum Allowable Cost Controversy. Pharm. J. 219, 547 (1977). C.T. Rhodes and N.A. Campbell.

99.    Compressional Properties of Some Directly Compressed Formulations Containing Dibasic Calcium Phosphate Dihydrate. Pharm. Acta. Helv., 52, 226 (1977). K.A. Kahn and C.T. Rhodes.

100.    A.Ph.A. Bioavailability monograph Acetaminophen in "The Bioavailability of Drug Products", published by the A.Ph.A., 1978. C.A. Hunt, S. Stavchansky, C.T. Rhodes and M. Winter.

101.    Potential of Liquid membranes for Drug Overdose Treatment. J. Pharm. Sci., 67, 63 (1978). C.H. Chiang, G.C. Fuller, J.W. Frankenfeld and C.T. Rhodes.

102.    Recording powder flow meters and their use in pharmaceutical technology. Drug Development and Industrial Pharmacy, 5, 151 (1979). R.P. Jordan and C.T. Rhodes.

103.    The possible use of autoclaving microemulsions for sterlization. Drug Development and Industrial Pharmacy, 5, 169 (1979). A. Panaggio, C.T. Rhodes and L.R. Worthen.

104.    Percutaneous absorption of salicylic acid in rabbits.  Drug Development and Industrial Pharmacy, 5, 29 (1979).  B.K. Birmingham, C.T. Rhodes, and D.S. Greene.

105.    Systemic absorption of salicylic acid. Intl. J. Der., B.K. Birmingham, C.T. Rhodes and D.S. Greene.

106.    Physical stability of pharmaceutical products.  Drug Development and Industrial Pharmacy, 5, 573 (1979).  C.T. Rhodes.

107.    Comparative aging of tablets made with dibasic calcium phosphate dihydrate and spray dried lactose, Drug Development and Industrial Pharmacy, 5, 589 (1979). E.M. Rudnic and C.T. Rhodes.

108.    Self medication:  The New Era (Condensations of papers and discussions) published by the Proprietary Association (1980).

109.    Further studies of the potential of recording powder flow meters, Drug Development and Industrial Pharmacy, 6, 279 (1980). E.M. Rudnic, R.N. Chilamkurti and C.T. Rhodes.

110.    Studies of the utility of cross linked PVPP as a tablet disintegrant, Drug Development and Industrial Pharmacy, 6, 291 (1980). E.M. Rudnic, R.N. Chilamkurti, J. M. Lausier and C.T. Rhodes.

111.    Transport across liquid membranes:  Effect of molecular structure, J. Appl. Biochem., 2, 17 (1980).  R.N. Chilamkurti and C.T. Rhodes.

112.    Transport across liquid membranes:  Effect of formulation variables, J. Appl. Biochem., 2, 11 (1980).  T.T. Yang and C.T. Rhodes.

113.    Where have all the industrial programs in schools of pharmacy gone?  IAPS Notes II 1 (1980).

114.    Effect of sodium oleate on salicylic acid binding to human serum albumin, J. Pharm. Sci., 69, 1345 (1980).  P.A. Schwartz, D.S. Greene and C.T. Rhodes.

115.   Effect of variation of plasma oleic acid concentration on relative concentration of free and protein bound warfarin, J. Pharm. Sci., 70, 114 (1981). P.A. Schwartz, D.S. Greene and C.T. Rhodes.

116.   Qui custodet ipsos custodes?  (Guest Editorial) Pharm. Tech., 5, 2 (1981). C.T. Rhodes.

117.   Some effects of relatively low levels of eight disintegrants on a direct compression system, Drug Development and Industrial Pharmacy, 7, 347 (1981). E.M. Rudnic, C.T. Rhodes, J.F. Bavitz and J.B. Schwartz.

118.   The Operation of Pharmaceutical Research, Pharm. Tech., 5, 30 (1981).  C.T. Rhodes.

119.   Evaluation of Emcosoy as a Disintegrant in Vitamin Tablets, Proc. Pharm. Tech. Conference 172 (1981). D.S. Desaie, C.T. Rhodes and J.L. Kanig.

120.   Evaluation of Tablet Disintegrants, proc. Pharm. Tech. Conference, 168 (1981). C. T. Rhodes.

121.   Effect of Free Fatty Acid Concentration on Furosemide Binding to Human Serum Albumin, Pharmacology, 22, 364 (1981).  P.A. Schwartz, C.T. Rhodes and D.S. Greene.

122.   Biopharmaceutics and Pharmacokinetic Considerations in Defining Therapeutic Equivalence of Different Sources of the Same Drug Substance. proc. 1st European Conference of Biopharmaceutics and Pharmacokinetics, 1, 80 (1981). C.T. Rhodes and D.S. Greene.

123.   Use of Continuous Ultra Filtration of Drug-Protein Interactions:  analysis Using a Constrained Model, Proc. 1st European Conference of Biopharmaceutics and Pharmacokinetics, 1, 373 (1981). D.S. Greene and C.T. Rhodes.

124.   What's in a Vitamin Besides the Vitamin?  Health Foods Business, 60 (1981). C.T. Rhodes.

125.   Vitamin Bioavailability, Health Foods business, 64 (1981). C.T. Rhodes.

126.    Some Studies of Compression Properties Tablet matrices Using a Computerized
        Instrumented Press, Drug Devel. and Industrial Pharmacy, 8, 53 (1982). R.N.
        Chilamkurti, C.T. Rhodes and J.B. Schwartz.

127.    Evaluation of mechanisms of Disintegrant Action, Drug Devel. and Industrial
        Pharmacy, 8, 63 (1982). E.M. Rudnic, C.T. Rhodes, S. Welch and P. Bernardo.

128.    Studies of Instrumented press data, Drug Devel, and Industrial Pharmacy, 9, 271
        (1983).  C.T. Rhodes.

129.    Compression properties of formulations containing matrix and drug, Pharm. Acta.
        Helv., 58, 146 (1983). J.B. Schwartz, R.N. Chilamkurti and C.T. Rhodes.

130.    Effect of Molecular structure on disintegrant activity in tablets made by direct
        compression.  Drug Development and Industrial Pharmacy, 9, 258 (1983).  E.M.
        Rudnic, J.L. Kanig and C.T. Rhodes.

131.    Mixed tablet matrices.  Pharm. Acta. Helv., 59, 37 (1984). J.B. Schwartz, A.N.
        Panaggio and C.T. Rhodes.

132.    Studies of tablet aging.  Pharm. Acta. Helv., 59, 149 (1984). C. Ondari, V.K.
        Prasad, V.P. Shah and C.T. Rhodes.

133.    Instrumentation of a granulator.  Drug Development and Industrial Pharmacy, 10,
        305 (1984). R. Srinavas, S.R. Ghanta and C.T. Rhodes.

134.    Effect of molecular structure on disintegrant action in tablets made by wet
        granulation.  J. Pharm. Sci., 74, 647-651 (1985), J. Kanig, E.M. Rudnic and C.T.
        Rhodes.

135.    An investigation of some limitations of the simple kinetic model for defining drug
        transport in liquid membranes.  Drug Development and Industrial Pharmacy, 10,
        637 (1984).  A. Panaggio and C.T. Rhodes.

136.    An investigation of the reuse of liquid membranes and the use of multi-drug
        donor phase in solute transports.  Drug Development and Industrial Pharmacy, 10,
        637 (1984).  A. Panaggio and C.T. Rhodes.

137.  Studies of the interaction of betacyclodextrin with ampicillin, methicillin and phenytoin. Drug Development and Industrial Pharmacy, 10, 601 (1984). P. Hsyu, R.P. Hegde, B.K. Birmingham and C.T. Rhodes.

138.  Optimization of preblending in random mixing. Drug Development and Industrial Pharmacy, 10, 1017 (1984). J.T. Carstensen and C.T. Rhodes.

139.  An overview of the use of the kinetics in evaluation of the stability of pharmaceutical systems. Drug Development and Industrial Pharmacy, 10, 1163 (1984). C.T. Rhodes.

140.  Market stress tests, Drug Development and Industrial Pharmacy, 10, 1497 (1984). C.T. Rhodes.

141.  The use of an instrumented tablet press for studies of compaction, Pharmacy International, 45-50 (1985). J.R. Hoblitzell and C.T. Rhodes.

142.  Studies of the measurement of dynamic angle of repose, J. Pharm. Sci., 74, 11 (1985). R.P. Hegde, S. Welch, J. Rheingold and C.T. Rhodes.

143.  Effect of Moderate stress storage conditions on the dissolution progile of enteric coated aspirin tablets. Pharm. Acta. Helv. 60, 28 (1985). J. Hoblitzell, K.B. Thakkar and C.T. Rhodes.

144.  Preparation of phenytoin ß cyclodextrin complex. Pharm. Acta. Helv. 6 53 (1985). R. Hegde and C.T. Rhodes.

145.  Effect of molecular structure variation on the disintegrant action of sodium starch glycolate. J. Pharm. Sci., 74, 647 (1985). E.M. Rudnic, J.L. Kanig and C.T. Rhodes.

146.  Monoclonal antibodies as drugs or devices: Practical and regulatory aspects, Drug Development and Industrial Pharmacy, 12, 107-227 (1986), S.K. Edmond, L.T. Grady, A.S. Outschoon and C.T. Rhodes.

147.  Preliminary investigations on the parity of tablet compression data from different instrumented tablet process, Drug Development and Industrial Pharmacy, 12, 507-525 (1986), J.R. Hoblitzell and C.T. Rhodes.

148.    Cyclic Testing in Stability programs, Drug Development and Industrial Pharmacy, 12, 1219 (1986), J.T. Carstensen and C.T. Rhodes.

149.    Some studies of the effect of processing variables as the properties of granules and tablets made by wet granulation, S.R. Ghanta, R. Srinavas and C.T. Rhodes, Pharm. Acta Helv. 61U 191 (1986).

150.    Possible strategies for the formulation of antineoplastic drugs, Drug Development and Industrial Pharmacy, 12, 1041-1106 (1986), Tracy Chen, J.M. Lausier and C.T. Rhodes.

151.    Scientific and Regulatory Aspects of macromolecular Drugs and Devices. M.D. Giddins, R. Dabbah, L.T. Grady and C.T. Rhodes, Drug Development and Industrial Pharmacy, 13, 873 (1987).

152.    Relationship between compression profile and physical properties of lithium carbonate formulations, Drug Development and Industrial Pharmacy, 14, 53 (1988). M. C. Dedhiya, C.W. Woodruff, F.A. Menard and C.T. Rhodes.

153.    Studies of the effect of temperature and ring size on the complexation of Phenytoin with cyclodextrins, F.A. Menard, M.G. Dedhiya and C.T. Rhodes, Pharm. Acta Helv. 63, 303 (1988).

154.    Rational storage time policy in pre NDA stability programs, J.T. Carstensen and C.T. Rhodes, Drug Development and Industrial Pharmacy, 14, 1785 (1988).

155.    Comparative evaluation of several direct compression sugars II, C.O. Ondari, C.E. Kean and C.T. Rhodes, Drug Development and Industrial Pharmacy, 14, 1517 (1988).

156.    Potential pharmaceutical applications of a new Beta cyclodextrin derivative, F.A. Menard, M.G. Dedhiya and C.T. Rhodes, Drug Development and Industrial Pharmacy, 14, 1529 (1988).

157.    Dissolution testing of ibuprofen tablets, A.J. Romero, L.T. Grady and C.T. Rhodes, Drug Development and Industrial Pharmacy, 14, 1549 (1988).

158. Determination of Thermodynamic Parameters of Complexation using a Non-linear Regression Model, F.A. Menard, M.G. Dedhiya and C.T. Rhodes, Pharma Acta Helv. 64, 3 (1989).

159. The effect of moisture on powder flow and on compaction and physical stability of tablets, S. Dawoodbhai and C.T. Rhodes, Drug Development and Industrial Pharmacy, 15, 1577 (1989).

160. Drug Delivery for the Elderly: Problems and Responses, M.K. Kottke, C.T. Rhodes and L.T. Grady, Drug Development and Industrial Pharmacy, 15, 1635 (1989).

161. Specific high affinity colchicine binding monoclonal antibodies: Development and characterization of the antibodies, S.K. Edmond-Rouan, I.G. Otterness, A.C. Cunningham and C.T. Rhodes. Hybridoma. 8 4 435-438 (1989).

162. Physico-chemical aspects of the complexation of some drugs with cyclodextrins, F.A. Menard, M.G. Dedhiya and C.T. Rhodes, DDIP 16 91-114 (1990).

163. Area under curve calculations in bioequivalence studies, S.E. Rosenbaum, C.T. Rhodes and C. Bon DDIP 16, 157-164 (1990).

164. Determination of a relationship between force-displacement and force-time compression curves, J.R. Hoblitzell and C.T. Rhodes, DDIP 16, 201-230 (1990).

165. Instrumented tablet press studies on the effect of some formulation and processing variables on the compaction process, J.R. Hoblitzell and C.T. Rhodes, DDIP, 16 469-508 (1990).

166. The development of USP Dissolution and Drug Release Standard, Cohen, Hubert, Leeson, Rhodes, Robinson, Roseman and Shefter, Pharmaceutical Research 7, 983 (1990).

167. Characterization of macromolecular pharmaceutical excipients - an overview. C.T. Rhodes, Acta Pharm Nord. 2, 272 (1990).

168. Use and limitations of the truncated area under the curve in bioequivalence testing, A.J. Romero, C. Bon, Elizabeth Johnson, S.E. Rosenbaum and C.T.

Rhodes, Clinical Research Practices and Drug Regulatory Affairs 8, 123-151 (1990).

169. Problems encountered by the elderly in the use of conventional dosage forms. M. K. Kottke, G. Stetsko, S.E. Rosenbaum and C.T. Rhodes, J. Geriatric Drug Therapy 5, 77-92 (1990).

170. Reversal of Colchicine-induced mitotic arrest in Chinese Hamster Cells with a Colchicine specific monoclonal antibody. S.K. Edmond-Rouan, I.G. Otterness, A.C. Cunningham and C.T. Rhodes, Am J Pathol. 137 779-787 (1990).

171. Influence of difference sources on the processing and biopharmaceutical properties of high dose ibuprofen formulations, A.J. Romero, G. Lukas and C.T. Rhodes, Pharm Acta Helv. (65) 5 (1991).

172. The design of analytical methods for use in topical epidermal growth factor product development, M. DiBiase and C.T. Rhodes, J. Pharm. Pharmac. (43) 553-558 (1991).

173. Investigations of epidermal growth factor in semi-solid formulations, M. DiBiase and C.T. Rhodes, Pharm Acta Helv. 66 165-169 (1991).

174. Limitations of presently available in-vitro release data for the prediction of in vivo performance. M.K. Kottke and C.T. Rhodes, Drug Development and Industrial Pharmacy 17 1157 (1991).

176. Optimization of tablet formulations containing talc. S. Dawoodbhai, E.R. Suryanrayan and C.T. Rhodes, Drug Development and Industrial Pharmacy 17 1343 (1991).

177. Preferences of women for intravaginal drug medication, A. Joglekar, C.T. Rhodes, M. Danish, Drug Development and Industrial Pharmacy 17, 2103 (1991).

178. A radioimmunassay for colchicine using a highly specific high affinity monoclonal antibody, S.K.E. Rouan, I.G. Otterness, D.J. Gans and C.T. Rhodes, Drug Development and Industrial Pharmacy 17 2391, (1991).

179. The Spray Drying of Pharmaceuticals, J. Broadhead, SK Ruan, and C.T. Rhodes, DDIP 18 1169-1206 (1992).

180.  Bioequivalence studies for veterinary drug products, C.T. Rhodes, Clin Res & Reg Affairs 9 1 (1992).

181.  Intravaginal Drug Delivery, A.A. Deshpande, C.T. Rhodes, and M. Danish, DDIP 18 1225-1280 (1992).

182.  Comparison of disintegrant and binder activities of three corn starch products, M.K. Kottke, H. R. Chueh, and C.T. Rhodes, DDIP, 18 2207 (1992)

183.  Mucuadhesive drug delivery systems, R. Jimenez-Castellanos, H. Zia, and C.T. Rhodes, DDIP, 19 143 (1993)

184.  Cyclic temperature stress testing of pharmaceutics, J.T. Carstensen and C.T. Rhodes, DDIP, 19 401 (1993)

185.  Assessment of an in vitro method to measure the bioadhesiveness of tablets, M. Rosa Jimenez-Castellanos and C.T. Rhodes Int. J. Pharmaceutics 89 223-228 (1993)

186.  Efforts de formulation du stereoisomere theorpeutique de libuprofene, J. Pharm Belg, A.J. Romero and C.T. Rhodes, 48 27-32 (1993)

187.  Failure Investigations for Pharmaceuticals, Clinical Research and Regulatory Affairs, C.T. Rhodes, 10 65 (1993).

188.  Stereochemical aspects of the molecular pharmaceutics of ibuprofen, A.J. Romero and C.T. Rhodes, J. Pharm Pharmacol 45 258-262 (1993)

189.  Comparative evaluation of two pharmaceutical binders in the wet granulation of HCTZ, C.W. Symecko, A.J. Romero, and C.T. Rhodes, DDIP 19 1131 (1993)

190.  Rational Policies for Stability Testing J.T. Carstensen and C.T. Rhodes *Clin. Research and Drug Regulatory Affairs* 10 177-185 (1993).

191.  Monitoring crystal modifications in systems containing ibuprofen. A.J. Romero, L.Savastano, and C.T. Rhodes,   International J. Pharmaceutics 99 125 (1993)

192. An investigation of a granulation process, G Sienkiewitz, J.M. Lausier, and C.T. Rhodes, *Pharmaceutical Research* 10 167 (1993)

193. Sampling in Blending Validation, J.T. Carstensen and C.T. Rhodes, *Drug Development and Industrial Pharmacy* 19 2699 (1993)

194. Pellicule Formation in Gelatin Capsules, J.T. Carstensen and C.T. Rhodes, *Drug Development and Industrial Pharmacy*, 19 2709 (1993)

195. Effect of the addition mode of the polymer on the release and adhesion of sotalol tablets, M.R. Jimenez-Castelanos, H. Zia, and C.T. Rhodes, *Pharma Sciences* 4 101-106 (1994)

196. Alternatives to animal testing in USP-NF: present and future, L.R. Underhill, R.Dabbah, L.T. Grady, and C.T. Rhodes, *DDIP* 20 165-216 (1994)

197. Design and testing in vitro of a bioadhesive and floating drug delivery system for oral application, M.R. Jimenez-Castellanos, H.Zia, and C.T. Rhodes, *Int. J. Pharmaceutics* 105 65-70 (1994)

198. The effect of process and formulation variables on the properties of spray dired B-galactosidase, J. Broadhead S.K. Edmund-Rouan I Hall and C.T. Rhodes., *J. Pharm. Pharmac.* 46 458-467 (1994).

199. Separation of liposomes by a gel filtration chromatographic technique., Sriram Vemuri and C.T. Rhodes *Pharm Acta Helv.*, 69 107 (1994).

200. Development and characterization of a liposome preparation by a pH - gradient method. Sriram Vemuri and C.T. Rhodes, *J. Pharm. Pharmac* 46 778 (1994).

201. Bioequivalence Evaluation-Possible Future Developments. C.T. Rhodes, *Clin Res and Drug Reg Affairs.*, 11 181-192 (1994).

202. The Sustained Release Coating of Solid Dosage Forms-A Historical Review. G. Van Savage and C. T. Rhodes, *D.D.I.P.* 21 93-118 (1994).

203. Artificial Neural Networks-Implication for Pharmaceutical Sciences. A.S. Achanta, J.G. Kowalski and C.T. Rhodes, *D.D.I.P.* 21 119-156 (1995).

204. Pharmaceutical Uses of Near IR Spectroscopy. K.M. Morisseau and C.T. Rhodes, *D.D.I.P.* 21 1071-1090 (1995).

205. Binder Functionality in Tabletted Systems. C.W. Symecko and C.T. Rhodes, *D.D.I.P.* 21 1091-1114 (1995).

206. Encapsulation of a Water Soluble Drug in a Liposome Preparation: Removal of Free Drug by Washing. S. Vemuri and C.T. Rhodes, *D.D.I.P.* 21 1329-1338 (1995).

207. Development and Validation of a Drug Release Rate Method for a Water Soluble Drug in a Liposome Formulation. S. Vemuri and C.T. Rhodes, *D.D.I.P.* 21 1353-1364 (1995).

208. Optimization of Sotalol Floating and Bioadhesive Extended Release Tablet Formulation. H.R. Chuch, H. Zia and C.T. Rhodes, *D.D.I.P.* 21 1725-1748 (1995).

209. Generic Substitution. Does Interchangeability Mean Equality of all Functionally Relevant Standards? C.T. Rhodes, *Clinical Research and Drug Regulatory Affairs* 12, 267-272, (1995).

210. Regulatory and Clinical Aspects of the Resurgence of Compounding by Pharmacists, L.A. Underhill, N.A. Campbell and C.T. Rhodes, *Drug Development and Industrial Pharmacy*, 22, 659-666 (1996).

211. Some Observations on Tax Policy for Pharmaceutical Research, C.T. Rhodes, *Clinical Research and Regulatory Affairs* 13, 77-88 (1996).

212. The Deposition of Spray-Dried B-Galactosidase from Dry Powder Inhaler Devices, J. Broadhead, S.K. Edond-Rouan and C.T. Rhodes, *Drug Development and Industrial Pharmacy*, 22, 813-822 (1996).

213. Formulation and Evaluation of Epidermal Growth Factor, M.D. DiBiase and C.T. Rhodes, *Drug Development and Industrial Pharmacy*, 22, 823-831 (1996).

214. Paracetamol Not Mundane, C.T. Rhodes, *Pharm.J.*, August 17, 1996.

215. Spheronization of Theophyline - Aviced combinations using fluidized-bed rotogranulation technique
G. Sienkiewitz, R. Pereira, E.M. Rudnic, J.M. Lausier and C.T. Rhodes
DDIP 23 173-182 (1997).

216. The effect of compaction force and type of pregelahnized starch on the dissolution of acetaminophen
C.W. Symecko and C.T. Rhodes
DDIP 23 229-238 (1997)

217. Near-Infrared spectroscopy as a non-destructive alternative to conventional tablet hardness testing.
K. Morriseau and C.T. Rhodes
Pharm. Res 14 108-111 (1997).

218. Development of hot wax coating methods
DDIP 23 441-450 (1997)
A.S. Achanta, P.S. Adusmilion, KW. James and C.T. Rhodes

219. Acceptable limits in bio-equivalence studies
Clin. Res. and Drug Reg Affairs 14 127-138 (1997)
C.T. Rhodes

220. Some regulatory and other aspects of the interaction between Universities and the Pharmaceutical Industries
Clin. Res and Drug Reg. Affairs 14 165-172 (1997)
C.T. Rhodes

221. Development of a Novel Controlled - Release System for Gastric Retention.
Pharm. Res. 14 826-829 (1997).
A.A. Deshpande, N.H. Shah, C.T. Rhodes and W. Malick

222. Proven and Potential Uses of Near-Infrared Spectroscopy for the Evaluation of Tablets.
Pharm. Tech (Tableting Yearbook) 6-12 (1997)
K.M. Morisseau and C.T. Rhodes

223. Evaluation of films used in development of a novel controlled-release system for gastric retention.

Int. J. Pharmaceutics, 159 251-258 (1997).
AA Deshpande, NH Shah, C.T. Rhodes and W. Malick

224.    Investigation of relatively rare adverse drug events as exemplified by
        amiodarone-induced optic neuropathy.
        Clinical Research and Drug Regulatory Affairs, 15 1-24 (1998)

225.    Controlled Drug Delivery by Biodegradable Poly(Ester) devices
        DDIP 24 703-728 (1998).
        J. Jain, N.H. Shah, A.W. Malick and C.T. Rhodes

226.    Regulatory Aspects of the formulation and evaluation of L-thyroxene tablets.
        Clin. Res. And Drug Reg. Affairs, 15 180-185 (1998).
        C.T. Rhodes

227.    Coatings for controlled release drug delivery systems
        DDIP 24 1139-1153 (1998)
        C.T. Rhodes and S.C. Porter

228.    Some observations on current and possible future developments in bioequivalency
        testing.
        DDIP 25 555-562 (1999)
        C.T. Rhodes

229.    Trends in stability testing
        DDIP 25 857-867 (1999)
        B. Kommanboyina and C.T. Rhodes

230.    Storage conditions for serum deslorelin
        DDIP 25 1041-1044 (1999)
        L. Underhill , R.C. Rhodes, III and C.T. Rhodes

231.    Determination of Micro-pH is Solid Drug Delivery Systems, C.T. Rhodes, DDIP,
        25 1221-1222 (1999).

232.    Tablet evaluation using Near-IR Spectroscopy, K. Morisseau and C.T. Rhodes,
        Volume 19, Encyclopedia of Pharmaceutical Technology 357-370 (2000)
        Published by Marcel Dekker, Inc.

233. Effects of temperature excursions on mean kinetic temperature and shelf life, B. Kommanboyina and C.T. Rhodes, DDIP, 25 1301-1306 (1999).

234. Some studies of the stability of compounded cefazolin ophthalmic solution, B. Kommanaboyina, R.F. Lindauer, C.T. Rhodes and L.T. Grady, *Int. J. Pharm. Comp.*, 4 146-149 (2000).

235. Anticonvulsant hypersensitivity syndrome, *Clin. Res. And Reg. Affairs* 17 27-34 (2000) J. Allen and C.T. Rhodes.

236. Thermodynamic Analysis of water interaction with excipient films, *DDIP*, 27 227-240 (2001) A.S. Achanta, P.S. Adusmilli, K.W. James and C.T. Rhodes.

237. Hot-melt coating: Water sorption behavior of excipient films, *DDIP*, 27 241-250 (2001) A.S. Achanta, P.S. Adusmilli, K.W. James and C.T. Rhodes.

238. Some implications of the phenylpropanolamine problem, *Clin. Res. and Drug Reg. Affairs*, 18 1-16 (2001).

239. Trazadone and priapism, *Clin. Res. and Drug Reg. Affairs*, 18 47-52 (2001).

240. Evaluation of proposed OTC switch for Lovostatin (with A. Achanta), *Clin. Res. and Drug Reg. Affairs*, 18 83-101 (2001).

241. The Metaproterenol switch in the USA (with A. Achanta), *Reg Affairs Journal*, 12 641-644 (2001).

242. Attitudes and Opinions Toward Regulatory Aspects of Non-Prescription Medicines, *Reg. Affairs Journal*, 13 393-400 (2002). A. Achanta, C. Willey and C.T. Rhodes.

243. Examination of Proposed OTC Status for Non-Sedating Antihistamines (with A.S. Achanta), *Clin. Res. And Drug Reg. Affairs*, 19 1-12 (2002).

Chapters

Drug Delivery Systems Effects of Pharmacokinetics on Designs Evaluations in Production in
Pharmacokinetics
Second Edition
Edited by Weiling and Tse
Published by Marcel Dekker, Inc. 1995

Stability data and preapproval inspections, C.T. Rhodes, in Preparing for FDA Pre-approval Inspections,
Edited by Martin D. Hynes
Published by Marcel Dekker, Inc. (1998)

Books

1.    Automated methods for the analysis of drugs -- and other substances of
       pharmaceutical interested.  C.T. Rhodes and R.E. Hone (editors); Medical
       Butterworths, London, published 1974.

2.    Modern Pharmaceutics -- dosage form design and evaluation.  G.S. Banker and
       C.T. Rhodes (editors); Marcel Dekker, Inc. 1980.

3.    The purchase, shipment, storage and distribution of contraceptives in developing
       countries.  B.S. Schearer, S.A. Keaney and C.T. Rhodes.  The Population
       Council, NY. Prepared under contract with the World Bank.

4.    Second Edition of Modern Pharmaceutics published in 1989.

5.    Third Edition of Modern Pharmaceutics published in 1995.

6.    Drug Products for Clinical Trials
       Donald C. Monkhouse and C.T. Rhodes
       Marcel Dekker, Inc. 1997

7.    Drug Stability (Third Edition)
       Jens T. Carstensen and C.T. Rhodes
       Marcel Dekker, Inc. 2000

8.    Fourth Edition of Modern Pharmaceutics published in 2002.

# Exhibit B

# Remington's Pharmaceutical Sciences

Eighteenth Edition



18TH EDITION

# Remington's

**ALFONSO R GENNARO**
*Editor, and Chairman of the Editorial Board*

# Pharmaceutical Sciences

1990

MACK PUBLISHING COMPANY
Easton, Pennsylvania 18042

RS91
.R384
1990

Entered according to Act of Congress, in the year 1885 by Joseph P Remington, in the Office of the Librarian of Congress, at Washington DC

Copyright 1889, 1894, 1905, 1907, 1917, by Joseph P Remington

Copyright 1926, 1936, by Joseph P Remington Estate

Copyright 1948, 1951, by The Philadelphia College of Pharmacy and Science

Copyright © 1956, 1960, 1965, 1970, 1975, 1980, 1985, 1990, by The Philadelphia College of Pharmacy and Science

*All Rights Reserved*

Library of Congress Catalog Card No. 60-53334

ISBN 0-912734-04-3

The
UNIVERSITY
OF CHICAGO
LIBRARY

*The use of structural formulas from USAN and the USP Dictionary of Drug Names is by permission of The USP Convention. The Convention is not responsible for any inaccuracy contained herein.*

NOTICE—*This text is not intended to represent, nor shall it be interpreted to be, the equivalent of or a substitute for the official United States Pharmacopeia (USP) and/or the National Formulary (NF). In the event of any difference or discrepancy between the current official USP or NF standards of strength, quality, purity, packaging and labeling for drugs and representations of them herein, the context and effect of the official compendia shall prevail.*

*Printed in the United States of America by the Mack Printing Company, Easton, Pennsylvania*

CHAPTER 89

# Oral Solid Dosage Forms

**Edward Rudnic, PhD**
Director, Formulation Development
Schering-Plough Research
Miami, FL 33169

**Joseph B Schwartz, PhD**
Tice Professor of Pharmaceutics
Philadelphia College of Pharmacy and Science
Philadelphia, PA 19104

Drug substances most frequently are administered orally by means of solid dosage forms such as tablets and capsules. Large-scale production methods used for their preparation, as described later in the chapter, require the presence of other materials in addition to the active ingredients. Additives also may be included in the formulations to enhance the physical appearance, improve stability and aid in disintegration after administration. These supposedly inert ingredients, as well as the production methods employed, have been shown in some cases to influence the release of the drug substances.[1] Therefore care must be taken in the selection and evaluation of additives and preparation methods to ensure that the physiological availability and therapeutic efficacy of the active ingredient will not be diminished.

In a limited number of cases it has been shown that the drug substance's solubility and other physical characteristics have influenced its physiological availability from a solid dosage form. These characteristics include its particle size, whether it is amorphous or crystalline, whether it is solvated or nonsolvated and its polymorphic form. After clinically effective formulations are obtained, variations among dosage units of a given batch, as well as batch-to-batch differences, are reduced to a minimum through proper in-process controls and good manufacturing practices. The recognition of the importance of validation both for equipment and processes has greatly enhanced assurance in the reproducibility of formulations. It is in these areas that significant progress has been made with the realization that large-scale production of a satisfactory tablet or capsule depends not only on the availability of a clinically effective formulation but also on the raw materials, facilities, personnel, validated processes and equipment, packaging and the controls used during and after preparation (Fig 89-1).

Fig 89-1. Tablet press operators checking batch record in conformance with Current Good Manufacturing Practices (courtesy, Lilly).

## Tablets

Tablets may be defined as solid pharmaceutical dosage forms containing drug substances with or without suitable diluents and prepared either by compression or molding methods. They have been in widespread use since the latter part of the 19th century and their popularity continues. The term *compressed tablet* is believed to have been used first by John Wyeth and Brother of Philadelphia. During this same period, molded tablets were introduced to be used as "hypodermic" tablets for the extemporaneous preparation of solutions for injection. Tablets remain popular as a dosage form because of the advantages afforded both to the manufacturer (eg, simplicity and economy of preparation, stability and convenience in packaging, shipping and dispensing) and the patient (eg, accuracy of dosage, compactness, portability, blandness of taste and ease of administration).

Although the basic mechanical approach for their manufacture has remained the same, tablet technology has undergone great improvement. Efforts are being made continually to understand more clearly the physical characteristics of tablet compression and the factors affecting the availability of the drug substance from the dosage form after oral administration. Compression equipment continues to improve both as to production speed and the uniformity of tablets compressed. Recent advances in tablet technology have been reviewed.[8–13]

Although tablets frequently are more discoid in shape, they also may be round, oval, oblong, cylindrical or triangular. They may differ greatly in size and weight depending on the amount of drug substance present and the intended method of administration. They are divided into two general classes, whether they are made by compression or molding. Compressed tablets usually are prepared by large-scale production methods while molded tablets generally involve small-scale operations. The various tablet types and abbreviations used in referring to them are listed below.

### Compressed Tablets (CT)

These tablets are formed by compression and contain no special coating. They are made from powdered, crystalline or granular materials, alone or in combination with binders, disintegrants, lubricants, diluents and in many cases, colorants.

**Sugar-Coated Tablets (SCT)**—These are compressed tablets containing a sugar coating. Such coatings may be colored and are beneficial in covering up drug substances possessing objectionable tastes or odors, and in protecting materials sensitive to oxidation.

**Film-Coated Tablets (FCT)**—These are compressed tablets which are covered with a thin layer or film of a water-soluble material. A number of polymeric substances with film-forming properties may be used. Film coating imparts the same general characteristics as sugar coating with the added advantage of a greatly reduced time period required for the coating operation.

**Enteric-Coated Tablets (ECT)**—These are compressed tablets coated with substances that resist solution in gastric fluid but disintegrate in the intestine. Enteric coatings can be used for tablets containing drug substances which are inactivated or destroyed in the stomach, for those which irritate the mucosa or as a means of delayed release of the medication.

**Multiple Compressed Tablets (MCT)**—These are compressed tablets made by more than one compression cycle.

*Layered Tablets*—Such tablets are prepared by compressing additional tablet granulation on a previously compressed granulation. The operation may be repeated to produce multilayered tablets of two or three layers. Special tablet presses are required to make layered tablets such as the Versa press (*Stokes/Pennwalt*).

*Press-Coated Tablets*—Such tablets, also referred to as dry-coated, are prepared by feeding previously compressed tablets into a special tableting machine and compressing another granulation layer around the preformed tablets. They have all the advantages of compressed tablets, ie, slotting, monogramming, speed of disintegration, etc, while retaining the attributes of sugar-coated tablets in masking the taste of the drug substance in the core tablets. An example of a press-coated tablet press is the *Manesty* Drycota. Press-coated tablets also can be used to separate incompatible drug substances; in addition, they can provide a means to give an enteric coating to the core tablets. Both types of multiple-compressed tablets have been used widely in the design of prolonged-action dosage forms.

**Controlled-Release Tablets**—Compressed tablets can be formulated to release the drug slowly over a prolonged period of time. Hence, these dosage forms have been referred to as "Prolonged-Release" or "Sustained-Release" dosage forms as well. These tablets (as well as capsule versions) can be categorized into three types: (1) those which respond to some physiological condition to release the drug, such as enteric coatings; (2) those that release the drug in a relatively steady, controlled manner and (3) those that combine combinations of mechanisms to release "pulses" of drug, such as repeat-action tablets. The performance of these systems are described in more detail in Chapter 91.

**Tablets for Solution**—Compressed tablets to be used for preparing solutions or imparting given characteristics to solutions must be labeled to indicate that they are not to be swallowed. Examples of these tablets are Halazone Tablets for Solution and Potassium Permanganate Tablets for Solution.

**Effervescent Tablets**—In addition to the drug substance, these contain sodium bicarbonate and an organic acid such as tartaric or citric. In the presence of water, these additives react liberating carbon dioxide which acts as a distintegrator and produces effervescence. Except for small quantities of lubricants present, effervescent tablets are soluble.

**Compressed Suppositories or Inserts**—Occasionally, vaginal suppositories, such as Metronidazole Tablets, are prepared by compression. Tablets for this use usually contain lactose as the diluent. In this case, as well as for any tablet intended for administration other than by swallowing, the label must indicate the manner in which it is to be used.

**Buccal and Sublingual Tablets**—These are small, flat, oval tablets. Tablets intended for buccal administration by inserting into the buccal pouch may dissolve or erode slowly; therefore, they are formulated and compressed with sufficient pressure to give a hard tablet. Progesterone Tablets may be administered in this way.

Some newer approaches use tablets that melt at body temperatures. The matrix of the tablet is solidified while the drug is in solution. After melting, the drug is automatically in solution and available for absorption, thus eliminating dissolution as a rate-limiting step in the absorption of poorly soluble compounds. Sublingual tablets, such as those containing nitroglycerin, isoproterenol hydrochloride or erythrityl tetranitrate, are placed under the tongue. Sublingual tablets dissolve rapidly and the drug substances are absorbed readily by this form of administration.

### Molded Tablets or Tablet Triturates (TT)

Tablet triturates usually are made from moist material using a triturate mold which gives them the shape of cut sections of a cylinder. Such tablets must be completely and rapidly soluble. The problem arising from compression of these tablets is the failure to find a lubricant that is completely water-soluble.

**Dispensing Tablets (DT)**—These tablets provide a convenient quantity of potent drug that can be incorporated readily into powders and liquids, thus circumventing the necessity to weigh small quantities. These tablets are supplied primarily as a convenience for extemporaneous compounding and should never be dispensed as a dosage form.

**Hypodermic Tablets (HT)**—Hypodermic tablets are soft, readily soluble tablets and originally were used for the preparation of solutions to be injected. Since stable parenteral solutions are now available for most drug substances, there is no justification for the use of hypodermic tablets for injection. Their use in this manner should be discouraged since the resulting solutions are not sterile. Large quantities of these tablets continue to be made but for oral administration. No hypodermic tablets have ever been recognized by the official compendia.

## *Compressed Tablets (CT)*

In order for medicinal substances, with or without diluents, to be made into solid dosage forms with pressure, using available equipment, it is necessary that the material, either in crystalline or powdered form, possess a number of physical characteristics. These characteristics include the ability to flow freely, cohesiveness and lubrication. Other ingredients such as disintegrants designed to break the tablet up in gastrointestinal fluids, and controlled-release polymers designed to slow down drug release, ideally should possess these characteristics, or not interfere with the desirable performance traits of the other excipients. Since most materials have none or only some of these properties, methods of tablet formulation and preparation have been developed to impart these desirable characteristics to the material which is to be compressed into tablets.

The basic mechanical unit in all tablet-compression equipment includes a lower punch which fits into a die from the bottom and an upper punch, having a head of the same shape and dimensions, which enters the die cavity from the top after the tableting material fills the die cavity. See Fig 89-2. The tablet is formed by pressure applied on the punches and subsequently is ejected from the die. The weight of the tablet is determined by the volume of the material which fills the die cavity. Therefore, the ability of the granulation to flow freely into the die is important in insuring a uniform fill, as well as the continuous movement of the granulation from the source of supply or feed hopper. If the tablet granulation does not possess cohesive properties, the tablet after compression will crumble and fall apart on handling. As the punches must move freely within the die and the tablet must be ejected readily from the punch faces, the material must have a degree of lubrication to minimize friction and allow for the removal of the compressed tablets.

There are three general methods of tablet preparation: the wet-granulation method, the dry-granulation method and direct compression. The method of preparation and

Fig 89-2. Basic mechanical unit for tablet compression: lower punch, die and upper punch (courtesy, Vector/Colton).

the added ingredients are selected in order to give the tablet formulation the desirable physical characteristics allowing the rapid compression of tablets. After compression the tablets must have a number of additional attributes such as appearance, hardness, disintegration ability, appropriate dissolution characteristics and uniformity which also are influenced both by the method of preparation and by the added materials present in the formulation. In the preparation of compressed tablets the formulator also must be cognizant of the effect which the ingredients and methods of preparation may have on the availability of the active ingredients and hence the therapeutic efficacy of the dosage form. In response to a request by physicians to change a dicumarol tablet in order that it might be broken more easily, a Canadian company reformulated to make a large tablet with a score. Subsequent use of the tablet containing the same amount of drug substance as the previous tablet, resulted in complaints that larger-than-usual doses were needed to produce the same therapeutic response. On the other hand, literature reports indicate that the reformulation of a commercial digoxin tablet resulted in a tablet, although containing the same quantity of drug substance, that gave the desired clinical response at half its original dose. Methods and principles that can be used to assess the effects of excipients and additives on drug absorption have been reviewed.[2,14,15] See Chapters 36, 75 and 76.

## Tablet Ingredients

In addition to the active or therapeutic ingredient, tablets contain a number of inert materials. The latter are known as additives or *excipients*. They may be classified according to the part they play in the finished tablet. The first group contains those which help to impart satisfactory processing and compression characteristics to the formulation. These include diluents, binders and glidants and lubricants. The second group of added substances helps to give additional desirable physical characteristics to the finished tablet. Included in this group are disintegrants, colors, and in the case of chewable tablets, flavors and sweetening agents, and in the case of controlled-release tablets, polymers or waxes or other solubility-retarding materials.

Although the term *inert* has been applied to these added materials, it is becoming increasingly apparent that there is an important relationship between the properties of the excipients and the dosage forms containing them. Preformulation studies demonstrate their influence on stability, bioavailability and the processes by which the dosage forms are prepared. The need for acquiring more information and use standards for excipients has been recognized in a joint venture of the Academy of Pharmaceutical Sciences and the Council of the Pharmaceutical Society of Great Britain. The result is called the *Handbook of Pharmaceutical Excipients*. This reference is now distributed widely throughout the world.[16]

### *Diluents*

Frequently the single dose of the active ingredient is small and an inert substance is added to increase the bulk in order to make the tablet a practical size for compression. Compressed tablets of dexamethasone contain 0.75 mg steroid per tablet; hence, it is obvious that another material must be added to make tableting possible. Diluents used for this purpose include dicalcium phosphate, calcium sulfate, lactose, cellulose, kaolin, mannitol, sodium chloride, dry starch and powdered sugar. Certain diluents, such as mannitol, lactose, sorbitol, sucrose and inositol, when present in sufficient quantity, can impart properties to some compressed tablets that permit disintegration in the mouth by chewing. Such tablets commonly are called *chewable tablets*. Upon chewing, properly prepared tablets will disintegrate smoothly at a satisfactory rate, have a pleasant taste and feel and leave no unpleasant aftertaste in the mouth. Diluents used as excipients for direct compression formulas have been subjected to prior processing to give them flowability and compressibility. These are discussed under *Direct Compression*, page 1645.

Most formulators of immediate-release tablets tend to use consistently only one or two diluents selected from the above group in their tablet formulations. Usually, these have been selected on the basis of experience and cost factors. However, in the formulation of new therapeutic agents the compatibility of the diluent with the drug must be considered. For example, calcium salts used as diluents for the broad-spectrum antibiotic tetracycline have been shown to interfere with the drug's absorption from the gastrointestinal tract. When drug substances have low water solubility, it is recommended that water-soluble diluents be used to avoid possible bioavailability problems. Highly adsorbent substances, eg, bentonite and kaolin, are to be avoided in making tablets of drugs used clinically in small dosage, such as the cardiac glycosides, alkaloids and the synthetic estrogens. These drug substances may be adsorbed to the point where they are not completely available after administration. The combination of amine bases with lactose, or amine salts with lactose in the presence of an alkaline lubricant, results in tablets which discolor on aging.

Microcrystalline cellulose (Avicel) usually is used as an excipient in direct compression formulas. However, its presence in 5 to 15% concentrations in wet granulations has been shown to be beneficial in the granulation and drying processes in minimizing case-hardening of the tablets and in reducing tablet mottling.

Many ingredients are used for several different purposes, even within the same formulation. For example, corn starch can be used in paste form as a binder. When added in drug or suspension form, it is a good disintegrant. Even though these two uses are to achieve opposite goals, some tablet formulas use corn starch in both ways. In some controlled-release formulas, the polymer hydroxypropylmethylcellulose (HPMC) is used both as an aid to prolong the release from the tablet, as well as a film-former in the tablet coating. Therefore, most excipients used in formulating tablets and capsules have many uses, and a thorough understanding of their properties and limitations is necessary in order to use them rationally.

### *Binders*

Agents used to impart cohesive qualities to the powdered material are referred to as binders or granulators. They impart a cohesiveness to the tablet formulation which insures the tablet remaining intact after compression, as well as improving the free-flowing qualities by the formulation of granules of desired hardness and size. Materials commonly used as binders include starch, gelatin and sugars as sucrose, glucose, dextrose, molasses and lactose. Natural and synthetic gums which have been used include acacia, sodium alginate, extract of Irish moss, panwar gum, ghatti gum, mucilage of isapol husks, carboxymethylcellulose, methylcellulose, polyvinylpyrrolidone, Veegum and larch arabogalactan. Other agents which may be considered binders under certain circumstances are polyethylene glycol, ethylcellulose, waxes, water and alcohol.

The quantity of binder used has considerable influence on the characteristics of the compressed tablets. The use of too much binder or too strong a binder will make a hard tablet which will not disintegrate easily and which will cause excessive wear of punches and dies. Differences in binders used

for CT Tolbutamide resulted in differences in hypoglycemic effects observed clinically. Materials which have no cohesive qualities of their own will require a stronger binder than those with these qualities. Alcohol and water are not binders in the true sense of the word, but because of their solvent action on some ingredients such as lactose, starch and celluloses, they change the powdered material to granules and the residual moisture retained enables the materials to adhere together when compressed.

Binders are used both as a solution and in a dry form depending on the other ingredients in the formulation and the method of preparation. However, several "pregelatinized" starches available are intended to be added in the dry form so that water alone can be used as the granulating solution. The same amount of binder in solution will be more effective than if it were dispersed in a dry form and moistened with the solvent. By the latter procedure the binding agent is not as effective in reaching and wetting each of the particles within the mass of powders. Each of the particles in a powder blend has a coating of adsorbed air on its surface, and it is this film which must be penetrated before the powders can be wetted by the binder solution. After wetting, a certain period of time is necessary to dissolve the binder completely and make it completely available for use. Since powders differ with respect to the ease with which they can be wetted, and their rate of solubilization, it is preferable to incorporate the binding agent in solution. By this technique it often is possible to gain effective binding with a lower concentration of binder.

The direct compression method for preparing tablets (see page 1645) requires a material that not only is free-flowing but also sufficiently cohesive to act as a binder. This use has been described for a number of materials including microcrystalline cellulose, microcrystalline dextrose, amylose and polyvinylpyrrolidone. It has been postulated that microcrystalline cellulose is a special form of cellulose fibril in which the individual crystallites are held together largely by hydrogen bonding. The disintegration of tablets containing the cellulose occurs by breaking the intercrystallite bonds by the disintegrating medium.

**Starch Paste**—Corn starch is used widely as a binder. The concentration may vary from 10 to 20%. It usually is prepared as it is to be used by dispersing corn starch in sufficient cold purified water to make a 10% *w/w* solution and warming in a water bath with continuous stirring until a translucent paste forms. It has been observed that during paste formation, not all of the starch is hydrolyzed. Starch paste then, is not only useful as a binder, but also as a method to incorporate some disintegrant inside the granules.

**Gelatin Solution**—Gelatin generally is used as a 10 to 20% solution; gelatin solutions should be prepared freshly as needed and used while warm or they will solidify. The gelatin is added to cold purified water and allowed to stand until it is hydrated. It is then warmed in water bath to dissolve the gelatin and the solution is made up to the final volume on a weight basis to give the concentration desired.

**Cellulosic Solutions**—Various cellulosics have been used as binders in solution form. Hydroxypropylmethylcellulose (HPMC) has been used widely in this regard. Typical of a number of cellulosics, HPMC is more soluble in cold water than hot. It also is more dispersable in hot water than cold. Hence, in order to obtain a good, smooth gel that is free from lumps or "fisheyes," it is necessary to add the HPMC in hot, almost boiling water and, under agitation, cool the mixture down as quickly as possible, as low as possible. Other water-soluble cellulosics such as hydroxyethylcellulose (HEC) and hydroxypropylcellulose (HPC) have been used successfully in solution as binders.

Not all cellulosics are soluble in water. Ethylcellulose can be used effectively when dissolved in alcohol, or as a dry binder which then is wetted with alcohol. It is used as a binder for materials that are moisture-sensitive.

**PVP**—Polyvinylpyrrolidone can be used as an aqueous or alcoholic solution and this versatility has increased its popularity. Concentrations range from 2% and vary considerably.

It will be noted that binder solutions usually are made up to weight rather than volume. This is to enable the formulator to determine the weight of the solids which have been added to the tablet granulation in the binding solution. This becomes part of the total weight of the granulation and must be taken into consideration in determining the weight of the compressed tablet which will contain the stated amount of the therapeutic agent. As can be seen by the list of binders in this chapter, most modern binders used in solution are polymeric in form. Because of this, the flow or spreadability of these solutions becomes important when selecting the appropriate granulating equipment. The rheology of polymeric solutions is a fascinating subject in and of itself, and should be considered for these materials.

### *Lubricants*

Lubricants have a number of functions in tablet manufacture. They prevent adhesion of the tablet material to the surface of the dies and punches, reduce interparticle friction, facilitate the ejection of the tablets from the die cavity and may improve the rate of flow of the tablet granulation. Commonly used lubricants include talc, magnesium stearate, calcium stearate, stearic acid, hydrogenated vegetable oils and polyethylene glycol (PEG). Most lubricants, with the exception of talc, are used in concentrations less than 1%. When used alone, talc may require concentrations as high as 5%. Lubricants are in most cases hydrophobic materials. Poor selection or excessive amounts can result in "waterproofing" the tablets, resulting in poor tablet disintegration and/or delayed dissolution of the drug substance.

The addition of the proper lubricant is highly desirable if the material to be tableted tends to stick to the punches and dies. Immediately after compression most tablets have the tendency to expand and will bind and stick to the side of the die. The choice of the proper lubricant effectively will overcome this.

The method of adding a lubricant to a granulation is important if the material is to perform its function satisfactorily. The lubricant should be divided finely by passing it through a 60- to 100-mesh nylon cloth onto the granulation. In production this is called "bolting" the lubricant. After adding the lubricant the granulation is tumbled or mixed gently to distribute the lubricant without coating the particles too well or breaking them down to finer particles. Some recent research has concluded that the order of mixing of lubricants and other excipients can have a profound effect on the performance of the final dosage form. Thus, attention to the mixing process itself is just as important as the selection of lubricant materials.

These process variable can be seen in the prolonged blending of a lubricant in a granulation. Overblending materially can affect the hardness, disintegration time and dissolution performance for the resultant tablets.

The quantity of lubricant varies, being as low as 0.1%, and in some cases as high as 5%. Lubricants have been added to the granulating agents in the form of suspensions or emulsions. This technique serves to reduce the number of operational procedures and thus reduce the processing time.

In selecting a lubricant, proper attention must be given to its compatibility with the drug agent. Perhaps the most widely investigated drug is acetylsalicylic acid. Different talcs varied significantly the stability of aspirin. Talc with a

high calcium content and a high loss on ignition was associated with increased aspirin decomposition. From a stability standpoint, the relative acceptability of tablet lubricants for combination with aspirin was found to decrease in the following order: hydrogenated vegetable oil, stearic acid, talc and aluminum stearate.

The primary problem in the preparation of a water-soluble tablet is the selection of a satisfactory lubricant. Soluble lubricants reported to be effective include sodium benzoate, a mixture of sodium benzoate and sodium acetate, sodium chloride, leucine and Carbowax 4000. However, it has been suggested that formulations used to prepare water-soluble tablets may represent a number of compromises between compression efficiency and water solubility. While magnesium stearate is one of the most widely used lubricants, its hydrophobic properties can retard disintegration and dissolution. To overcome these waterproofing characteristics sodium lauryl sulfate sometimes is included. One compound found to have the lubricating properties of magnesium stearate without its disadvantages is magnesium lauryl sulfate. Its safety for use in pharmaceuticals has not been established yet.

### *Glidants*

A glidant is a substance which improves the flow characteristics of a powder mixture. These materials always are added in the dry state just prior to compression (ie, during the lubrication step). Colloidal silicon dioxide [Cab-o-sil (*Cabot*); Quso (*Phila Quartz*)] is the most commonly used glidant and generally is used in low concentrations of 1% or less. Talc (asbestos-free) also is used and may serve the dual purpose as lubricant/glidant.

It is especially important to optimize the order of addition and the mixing process for these materials in order to maximize their effect and to make sure that their influence on the lubricant(s) is minimized.

### *Disintegrants*

A disintegrant is a substance, or a mixture of substances, added to a tablet to facilitate its breakup or disintegration after administration. The active ingredient must be released from the tablet matrix as efficiently as possible to allow for its rapid dissolution. Materials serving as disintegrants have been classified chemically as starches, clays, celluloses, algins, gums and crosslinked polymers.

The oldest and still the most popular disintegrants are corn and potato starch which have been well-dried and powdered. Starch has a great affinity for water and swells when moistened, thus facilitating the rupture of the tablet matrix. However, others have suggested that its disintegrating action in tablets is due to capillary action rather than swelling; the spherical shape of the starch grains increases the porosity of the tablet, thus promoting capillary action. Starch, 5%, is suggested, but if more rapid disintegration is desired, this amount may be increased to 10 or 15%. Although it might be expected that disintegration time would decrease as the percentage of starch in the tablet increased, this does not appear to be the case for tolbutamide tablets. In this instance, there appears to be a critical starch concentration for different granulations of the chemical. When their disintegration effect is desired, starches are added to the powder blends in the dry state.

A new group of materials known as "super disintegrants" have gained in popularity as disintegrating agents. The name comes from the low levels (2 to 4%) at which they are completely effective. Croscarmelose, crospovidone and sodium starch glycolate represent examples of a cross-linked cellulose, a cross-linked polymer and a cross-linked starch, respectively.

The development of these disintegrants fostered new theories about the various mechanisms by which disintegrants work. Sodium starch glycolate swells seven- to twelvefold in less than 30 sec. Croscarmelose swells four- to eightfold in less than 10 sec. The starch swells equally in all three dimensions while the cellulose swells only in two dimensions, leaving fiber length essentially the same. Since croscarmelose is the more efficient disintegrating agent, it is postulated that the rate, force and extent of swelling play an important role in those disintegrants that work by swelling. Cross-linked PVP swells little, but returns to its original boundaries quickly after compression. Wicking, or capillary action, also is postulated to be a major factor in the ability of cross-linked PVP to function.[18-20]

In addition to the starches a large variety of materials have been used and are reported to be effective as disintegrants. This group includes Veegum HV, methylcellulose, agar, bentonite, cellulose and wood products, natural sponge, cation-exchange resins, alginic acid, guar gum, citrus pulp and carboxymethylcellulose.[17] Sodium lauryl sulfate in combination with starch also has been demonstrated to be an effective disintegrant. In some cases the apparent effectiveness of surfactants in improving tablet disintegration is postulated as being due to an increase in the rate of wetting.

The disintegrating agent usually is mixed with the active ingredients and diluents prior to granulation. In some cases it may be advantageous to divide the starch into two portions: one part is added to the powdered formula prior to granulation, and the remainder is mixed with the lubricant and added prior to compression. Incorporated in this manner the starch serves a double purpose; the portion added to the lubricant rapidly breaks down the tablet to granules, and the starch mixed with the active ingredients disintegrates the granules into smaller particles. Veegum has been shown to be more effective as a disintegrator in sulfathiazole tablets when most of the quantity is added after granulation and only a small amount before granulation. Likewise, the montmorillonite clays were found to be good tablet disintegrants when added to prepared granulations as powder. They are much less effective as disintegrants when incorporated within the granules.

Factors other than the presence of disintegrants can affect significantly the disintegration time of compressed tablets. The binder, tablet hardness and the lubricant have been shown to influence the disintegration time. Thus, when the formulator is faced with a problem concerning the disintegration of a compressed tablet, the answer may not lie in the selection and quantity of the disintegrating agent alone.

The evolution of carbon dioxide is also an effective way to cause the disintegration of compressed tablets. Tablets containing a mixture of sodium bicarbonate and an acidulant such as tartaric or citric acid will effervesce when added to water. Sufficient acid is added to produce a neutral or slightly acidic reaction when disintegration in water is rapid and complete. One drawback to the use of the effervescent type of disintegrator is that such tablets must be kept in a dry atmosphere at all times during manufacture, storage and packaging. Soluble, effervescent tablets provide a popular form for dispensing aspirin and noncaloric sweetening agents.

### *Coloring Agents*

Colors in compressed tablets serve functions other than making the dosage form more esthetic in appearance. Color helps the manufacturer to control the product during its preparation, as well as serving as a means of identification to the user. The wide diversity in the use of colors in solid dosage forms makes it possible to use color as an important category in the identification code developed by the AMA to

**Table I—Colors Approved for Use in the US in Oral Dosage Forms[a,b]**

| Color | Other names | Color Index (CI 1971) | Use restriction (US) |
|---|---|---|---|
| FD & C Red 40 | Allura red | 16035 | FDA certification on each lot of dye |
| D & C Red 33 | Acid fuchsin D<br>Naphtalone red B | 17200 | ADI 0–0.75 mg. |
| D & C Red 36 | | | ADI 0–1.0 mg |
| Canthaxanthinin | Food orange 8 | 40850 | None |
| D & C Red 22 | Eosin Y | 45380 | FDA certification on each lot of dye |
| D & C Red 28 | Phloxine B | 45410 | FDA certification on each lot of dye |
| D & C Red 3 | Erythrosine | 45430 | FDA certification on each lot of dye |
| Cochineal extract | Natural red 4<br>Carmine | 75470 | None |
| Iron oxide—red | — | 77491 | ADI 0–5 mg elemental iron |
| FD & C Yellow 6 | Sunset yellow FCF<br>Yellow orange 5 | 15985 | None |
| FD & C Yellow 5 | Tartrazine | 19140 | Label declaration and FDA certification on each lot of dye |
| D & C Yellow 10 | Quinoline yellow WS | 47005 | Requires FDA certification on each lot of dye |
| Beta-carotene | — | 40800 | |
| Iron oxide—yellow | — | 77492 | ADI 0–5 mg elemental iron |
| FD & C Blue 1 | Brilliant blue FCF | 42090 | FDA certification on each lot of dye |
| FD & C Blue 2 | Indigotine<br>Indigo carmine | 73015 | None |
| FD & C Green 3 | Fast green FCF | 42035 | FDA certification on each lot of dye |
| Iron oxide—black | — | 77499 | ADI 0–5 mg elemental iron |
| Caramel | Burnt sugar | — | None |
| Titanium dioxide | — | 77891 | None |

[a] Abbreviations: ADI—Acceptable Daily Intake (per kg body weight)
CI—Color index numbers of 1971 (US)
D & C—Drug and Cosmetic Dyes (US)
FD & C—Food, Drug and Cosmetic Dyes (US)
FDA—Food and Drug Administration (US)

[b] As of February, 1988 and subject to revision.

establish the identity of an unknown compressed tablet in situations arising from poisoning.

All colorants used in pharmaceuticals must be approved and certified by the FDA. For several decades colorants have been subjected to rigid toxicity standards and, as the result, a number of colorants have been removed from an approved list of FD&C colors or "delisted." Several have been listed as well. The colorants currently approved in the US are listed in Table I. Each country has its own list of approved colorants and formulators must consider this in designing products for the international market.[21]

Any of the approved certified water-soluble FD&C dyes, mixtures of the same or their corresponding lakes may be used to color tablets. A color lake is the combination by adsorption of a water-soluble dye to a hydrous oxide of a heavy metal resulting in an insoluble form of the dye. In some instances multiple dyes are used to give a purposefully heterogeneous coloring in form of speckling to compressed tablets. The dyes available do not meet all the criteria required for the ideal pharmaceutical colorants. The photosensitivity of several of the commonly used colorants and their lakes has been investigated, as well as the protection afforded by a number of glasses used in packaging tablets. Another approach for improving the photostability of dyes has been in the use of ultraviolet-absorbing chemicals in the tablet formulations with the dyes. The Di-Pac line (*Amstar*) is a series of commercially available colored, direct-compression sugars.

The most common method of adding color to a tablet formulation is to dissolve the dye in the binding solution prior to the granulating process. Another approach is to adsorb the dye on starch or calcium sulfate from its aqueous solution; the resultant powder is dried and blended with the other ingredients. If the insoluble lakes are used, they may be blended with the other dry ingredients. Frequently during drying, colors in wet granulations migrate, resulting in an uneven distribution of the color in the granulation. After compression the tablets will have a mottled appearance due to the uneven distribution of the color. Migration of colors may be reduced by drying the granulation slowly at low temperatures and stirring the granulation while it is drying. The affinity of several water-soluble anionic certified dyes for natural starches has been demonstrated; in these cases this affinity should aid in preventing color migration. Other additives have been shown to act as dye migration inhibitors. Tragacanth (1%), acacia (3%), attapulgite (5%) and talc (7%) were effective in inhibiting the migration of FD&C Blue No 1 in lactose. In using dye lakes the problem of color migration is avoided since the lakes are insoluble. Prevention of mottling can be helped also by the use of lubricants and other additives which have been colored similarly to the granulation prior to their use. The problem of mottling becomes more pronounced as the concentration of the colorants increases. Color mottling is an undesirable characteristic common to many commercial tablets.

### *Flavoring Agents*

In addition to the sweetness which may be afforded by the diluent of the chewable tablet, eg, mannitol or lactose, artificial sweetening agents may be included. Formerly, the cyclamates, either alone or in combination with saccharin, were used widely. With the banning of the cyclamates and the indefinite status of saccharin new natural sweeteners are being sought. Aspartame (*Searle*), recently made available, has found applications for pharmaceutical formulations. Sweeteners other than the sugars have the advantage of reducing the bulk volume considering the quantity of sucrose required to produce the same degree of sweetness. Being present in small quantities, they do not affect markedly the physical characteristics of the tablet granulation.

## Tablet Characteristics

Compressed tablets may be characterized or described by a number of specifications. These include the diameter size,

# Exhibit C

US005681588A

# United States Patent [19]

Kolter et al.

[11] Patent Number: 5,681,588

[45] Date of Patent: Oct. 28, 1997

[54] **DELAYED RELEASE MICROTABLET OF β-PHENYLPROPIOPHENONE DERIVATIVES**

[75] Inventors: **Karl Kolter**, Limburgerhof; **Helmut Fricke**, Mutterstadt; **Volker Buehler**, Karlsruhe; **Herbert Mueller-Peltzer**, Heidelberg, all of Germany

[73] Assignee: **Knoll Aktiengesellschaft**, Ludwigshafen, Germany

[21] Appl. No.: **525,749**

[22] PCT Filed: **Mar. 24, 1994**

[86] PCT No.: **PCT/EP94/00949**

§ 371 Date: **Oct. 3, 1995**

§ 102(e) Date: **Oct. 3, 1995**

[87] PCT Pub. No.: **WO94/22434**

PCT Pub. Date: **Oct. 3, 1994**

[30] **Foreign Application Priority Data**

Apr. 3, 1993 [DE] Germany .......................... 43 10 963.2

[51] **Int. Cl.**[6] .......................... **A61K 9/20**

[52] **U.S. Cl.** .......................... **424/464**; 424/469; 424/461; 424/468; 424/458

[58] **Field of Search** .......................... 424/464, 456; 252/1; 514/652

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,951,821 | 4/1976 | Davidson | 252/1 |
| 4,474,986 | 10/1984 | Lietz | 564/349 |
| 4,945,114 | 7/1990 | Franke | 514/652 |
| 4,954,347 | 9/1990 | Kristen et al. | 424/456 |

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—William E. Benston, Jr.
*Attorney, Agent, or Firm*—Oblon, Spivak, McClelland, Maier & Neustadt, P.C.

[57] **ABSTRACT**

A cylindrical delayed release tablet with a convex or flat upper side and lower side is provided, along with a method for its production and a gelatin capsule containing 3–200 tablets of the same having identical or different release rates, wherein the tablet if made of β-phenylpropiophenone derivatives of the formula I as active ingredient

$$\text{C}_6\text{H}_4(\text{C(=O)}-\text{CH}_2-\text{CH}_2-\text{C}_6\text{H}_5)(\text{O}-\text{CH}_2-\text{CHOH}-\text{CH}_2-\text{NHR}) \quad \text{I}$$

where R is n-propyl or 1,1-dimethylpropyl, and their pharmacologically acceptable salts, wherein the tablet has a height and diameter that are both, independently of one another, 1–3 mm, the active ingredient content is in the range from 81–99.9% of the weight of the microtablet, (but not taking into account the weight of any coating which is present, the active ingredient density is greater than 1, the release of active ingredient in the USP paddle method at 50 rpm is 80% as a maximum after 3 hours and as a minimum after 24 hours, the release rate is virtually independent of the pressure when compressing the tablets, and the tablet contains no release-delaying ancillary substance but can contain 0.1–5% by weight of a lubricant and 0–18.9% by weight of other conventional ancillary substances.

**6 Claims, 11 Drawing Sheets**



EXAMPLE 1
% ACTIVE INGREDIENT
100
90
80
70
60
50
40
30
20
10
0
0
1
2
3
4
5
6
7
8
HOURS (h)

*FIG. 1*



EXAMPLE 2
100
90
80
70
60
50
40
30
20
10
0
% ACTIVE INGREDIENT
0
1
2
3
4
5
6
7
8
HOURS (h)

FIG. 2



EXAMPLE 3
% ACTIVE INGREDIENT
0
10
20
30
40
50
60
70
80
90
100
0
1
2
3
4
5
6
7
8
HOURS (h)

*FIG. 3*



EXAMPLE 4
% ACTIVE INGREDIENT
100
90
80
70
60
50
40
30
20
10
0
0
1
2
3
4
5
6
7
8
HOURS (h)

*FIG. 4*



EXAMPLE 5
% ACTIVE INGREDIENT
100
90
80
70
60
50
40
30
20
10
0
0
1
2
3
4
5
6
7
8
HOURS (h)

*FIG. 5*



EXAMPLE 6
100
90
80
70
60
50
40
30
20
10
0
% ACTIVE INGREDIENT
0
1
2
3
4
5
6
7
8
HOURS (h)

*FIG. 6*



EXAMPLE 7
% ACTIVE INGREDIENT
100
90
80
70
60
50
40
30
20
10
0
0
1
2
3
4
5
6
7
8
HOURS (h)

*FIG. 7*



EXAMPLE 8
% ACTIVE INGREDIENT
100
90
80
70
60
50
40
30
20
10
0
0
1
2
3
4
5
6
7
8
HOURS (h)

*FIG. 8*



100
90
80
70
60
% ACTIVE INGREDIENT
50
40
30
20
10
0
0
1
2
3
4
5
6
7
8
9
10
HOURS (h)
P1: 305N
P2: 648N
P3: 829N
P4: 1315N

FIG. 9



% ACTIVE INGREDIENT
110
100
90
80
70
60
50
40
30
20
10
0
HOURS (h)
0
2
4
6
8
10
12
14
16
18
20
22
24
pH 1.2
pH 3.0
pH 4.5
pH 6.0
pH 6.8
pH 7.5

*FIG. 10*



2x300mg FILM-COATED TABLET, RYTMONORM® 300mg, n=7
2x450mg SLOW-RELEASE FILM-COATED TABLET (BOLUS FORM) ACCORDING TO A COMPARATIVE TEST, n=7
2x400mg MICROTABLETS OF EXAMPLE 1, n=18
C (ng/ml)
1000
900
800
700
600
500
400
300
200
100
0
2
4
6
8
10
12
TIME (h) AFTER ADMINISTRATION

*FIG. 11*

# DELAYED RELEASE MICROTABLET OF β-PHENYLPROPIOPHENONE DERIVATIVES

This application is a 35USC371 of PCT/EP94/00949 filed Mar. 24, 1994.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to cylindrical microtablets of β-phenylpropiophenone derivatives with a high content and density of active ingredient and a delayed release which is independent of the compressive force, with no release-delaying ancillary substances.

2. Discussion of the Background

Reference to β-phenylpropiophenone derivatives hereinbefore and hereinafter always includes and particularly means their physiologically acceptable salts, preferably the hydrochloride.

In the prior art the release of active ingredient from tablets is delayed either by a release-delaying matrix in which the active ingredient is embedded, or by a release-delaying coating through which the digestive fluid diffuses in and the active ingredient diffuses out.

Both principles have considerable disadvantages. For example, matrix tablets contain relatively large amounts of ancillary substances so that the volume of the tablet for a given dose of active ingredient is relatively large, which is unpleasant for the patient. On the other hand, film-coated tablets are elaborate to produce and, in particular, mechanically sensitive. The slightest damage to the lacquer film leads to the risk of sudden release of the entire content of active ingredient (dose dumping), which is extremely undesirable (local and temporal overdose with adverse side effects; short total action time).

Both matrix and film-coated delayed release tablets normally have diameters of about 6 to 12 mm or more and are therefore unable to pass through the closed pylorus. The release and absorption of their total content of active ingredient concentrated at one site in the gastrointestinal tract depends on the conditions prevailing at this site, which results in wide interindividual and intraindividual variation in the plasma level.

This variation is less with multiple unit delayed release forms because the units are distributed uniformly along the gastrointestinal tract and can also pass through the closed pylorus. Usually employed as multiple unit forms are pellets with a diffusion lacquer packed into hard gelatin capsules. It is possible to produce matrix pellets only with very low doses of medicinal substances because, owing to the large surface area, even more matrix substance would be required than for the bolus delayed d release tablet.

For example, the Patent Applications GB 2 176 999 and WO 92/04013 disclose small matrix delayed release tablets which likewise contain relatively large amounts of release-delaying ancillary substances. The Patent Application EP 22 17 32 claims delayed release tablets of active ingredients with low solubility, which contain 60–80% active ingredient in addition to at least four auxiliaries. The release from these bolus forms is, as described in the patent, highly dependent on the granulation process and the equipment used for manufacture.

It is furthermore generally known that an increase in the compressive force in tablet production is associated with a slowing of the release of active ingredient. This applies both to fast release tablets and to delayed release tablets (Patent

Application WO 92/00064). Since the compressive forces fluctuate, despite the most up to date machine engineering, the resulting release rates vary. An additional factor is the variation between batches in the compression properties, which derives from the variability in the granules to be compressed. Differences in the particle size, porosity, surface structure, wettability etc. may have a large effect on the compression properties and the delaying of release.

## SUMMARY OF THE INVENTION

It is an object of the present invention to overcome the disadvantages of the prior art, ie. to develop propafenone and diprafenone tablets with a small size, high content and density of active ingredient and release of active ingredient which is independent of the compressive force and uniform over a lengthy period.

We have found that this object is achieved by the microtablets of the present invention. This is because it has been found, surprisingly, that it is possible in the present case to produce delayed release tablets without release-delaying ancillary substances. This is all the more surprising because other medicinal substances with a water solubility similar to that of propafenone hydrochloride (0.7%), for example cimetidine hydrochloride or paracetamol, are 90% released in 1 hour from the same preparation.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

By comparison with other substances, propafenone HCl is extremely difficult to compress. A bolus tablet with commercial dosages of 150–300 mg and an active ingredient content above 80% cannot be produced under production conditions. By contrast, the microtablets according to the invention can, surprisingly, be produced at a relatively high machine speed without problems concerning friability and hardness, and specifically with active ingredient contents in the range from 81 to 99.9, preferably 85 to 99.5, % by weight and with an active ingredient density above 1. Such high contents of active ingredients of this type in tablets have not previously been reached.

The microtablets according to the invention are cylindrical with a flat or convex upper side and lower side and with a diameter and height which are preferably approximately equal and, independently of one another, from 1 to 3, preferably 1.5 to 2.5 mm.

It was furthermore not predictable that the release of active ingredient is, in contrast to usual experience, virtually independent of the pressure when compressing the tablets and, moreover, over a wide range of pH of the medium. "Virtually independent" means that the effect can be neglected for practical purposes. This ensures release at a constant rate. It is adjusted via the size of the tablet and possibly by additives which increase the release rate so that the release of active ingredient after 3, preferably 5, hours is not more than 80 and after 24, preferably 15, hours is not less than 80%. Surprisingly, the microtablets according to the invention also display distinct advantages in vivo unlike conventional delayed release forms such as a bolus delayed release form with similar in vitro release. Despite the short half-life, a pronounced blood level plateau develops (FIG. 11). The fluctuations in the blood level are considerably less with the microtablets. This is evident from the $t_{75\%}$ (period in the dosage interval during which the plasma levels are at least 75% of the maximum level), which is 8 to 9 hours with the microtablets according to the invention compared with 5 to 6 hours with the bolus delayed release form, and from the

PTF (peak to trough fluctuation; cf. H. P. Koch and W. A. Ritschel, Synopsis der Biopharmazie und Pharmakokinetik, Ecomed-Verlagsgesellschaft mbH, Landsberg und M ünchen, 1986)

$$PTF\,(\%)=\frac{C_{max}-C_{min}}{\frac{AUC}{\Delta t}}\times 100$$

for the AUC, cf. J. K. Aronson et al., Europ. J. of Clinical Pharmacology 35 (1988), 1–7.
which has a value for the microtablets which is only about half that for the bolus forms, in particular less than 75, preferably less than 60, %. The microtablets accordingly increase therapeutic safety because excessive peaks of plasma levels and the side effects caused thereby do not occur, the plasma level does not fall below the minimum effective level, and the bioavailability of this form is unaffected by food intake, in contrast to the bolus delayed release form.

The AUC found for the bolus delayed release form is 50% higher when fasting.

In general, the microtablets show smaller intra- and inter-individual differences by comparison with the bolus delayed release form.

The microtablets according to the invention furthermore have the advantage that when introduced into gastric or intestinal fluid they show no tendency to stick or adhere. This ensures that they pass as individual articles through the gastrointestinal tract and, moreover, do not become attached to the wall of the stomach or intestine and induce irritation. Sticking or adhesion properties of this type are displayed, for example, by small articles with hydrophilic release-delaying polymers (cf. WO 92/04013).

The production of delayed release forms with hydrophilic release-delaying polymers often requires the use of organic solvents during granulation so that swelling does not start even during this process. It is possible entirely to dispense with this in the production of the microtablets according to the invention.

Presentations with hydrophilic release-delaying polymers additionally have the disadvantage that, because of the tendency to sorption and swelling, they are sensitive to a change in humidity during storage. These formulations are damaged by high humidities in particular. The microtablets according to the invention are stable even at relatively high humidities because of the insensitivity of the materials used. Even after storage at 93% rel. humidity for 21 days the water uptake is less than 1%, and no visible change is detectable.

The microtablets according to the invention are produced in conventional pharmaceutical equipment by the following steps: granulation, drying, mixing, tabletting.

The particle size of the active ingredient is, within the conventional pharmaceutical range, of only minor or no importance in the production of the microtablets according to the invention, against all expectations. This means that it is possible to convert propafenone hydrochloride and diprafenone hydrochloride of different particle sizes into products of the same quality.

Granulation and drying are preferably carried out in a fluidized bed. However, the agglomeration can also be carried out in a horizontal or vertical mixer.

After the wet granules have been passed through a screen of suitable mesh width they are dried either in a circulating air dryer or in a fluidized bed. The particle size of the granules should be below 1 mm, preferably below 0.8 mm.

It is possible to employ all conventional binders or adhesives for the agglomeration, eg. polyvinylpyrrolidone,

vinylpyrrolidone/vinyl acetate copolymers, gelatin, hydroxypropylmethylcellulose, hydroxypropylcellulose, polymers of methacrylic acid and its esters. It is possible to dispense with the use of a binder by using a solution of active ingredient as granulation liquid. Water without additives is preferred as granulation liquid.

After the granules have been dried to the defined water content, 0.1–5, preferably 0.3–2, % by weight of a lubricant for the tabletting are mixed in homogeneously. It is likewise possible to use for this purpose all conventional substances such as talc, magnesium stearate, calcium stearate, stearic acid, calcium behenate, glycerin palmitostearate, sodium acetate, polyethylene glycol, sodium stearate [sic] fumarate. In addition, up to 18.9% by weight of other conventional ancillary substances can be added, for example colorants, stabilizers, fillers, wetting agents, flow regulators but no release-delaying agents.

The tabletting takes place in a suitable tabletting machine equipped with multiple microtablet punches. The resulting microtablets have a cylindrical shape with flat or convex surface [sic]. The height and the diameter can be varied independently of one another. It is often expedient, to increase the apparent density and improve flowability, to match the height of the microtablets to the diameter.

Another element in the control of release besides the size of the microtablets is the addition of wetting agents which increase the rate of dissolution. Wetting agents which can be used are, on the one hand, surfactants such as polyoxyethylene fatty acid esters, polyoxyethylene fatty alcohol ethers, fatty acid salts, bile acid salts, alkyl sulfates or ethylene oxide/propylene oxide block copolymers or, on the other hand, genuinely water-soluble substances such as polyethylene glycols, urea, sodium chloride, sorbitol, mannitol, glycine, nicotinamide, or salts of citric acid, tartaric acid or phosphoric acid. In this case the rate of release increases in parallel with the rise in the wetting agent concentration.

The wetting agent can have been incorporated into the granules or else be subsequently mixed in together with the lubricant. This is, of course, possible only with solid wetting agents. The wetting agent concentration is 0.1–15, as a rule 1–10, % of the total mass.

To increase the rate of erosion of the active ingredient from the tablet surface, and thus the release of active ingredient, it is also possible to use disintegrants in concentrations of 0.001–0.5, preferably 0.01–0.1, %, which are far below the conventional concentrations.

As a rule, the microtablets can be packed into gelatin capsules directly using conventional filling machines. It may occasionally be advantageous for the microtablets, before the packing, to be provided with a readily soluble film coating which does not influence the release.

In addition, it is in many cases expedient to combine delayed release with instant release or not so delayed release microtablets. This results in release of an initial dose at once, followed by the slow release of the maintenance dose. Modern capsule filling machines are able to meter two products into one capsule without problems.

The instant release microtablet differs from the delayed release microtablet in that it contains conventional amounts of disintegrant, swelling agent, pore former, which bring about rapid disintegration of the microtablet into small fragments and rapid dissolution of the active ingredient.

The microtablets of the examples always had a diameter and height each of 2 mm, and the density of active ingredient was always more than 1.

## EXAMPLES

### Example 1 (FIG. 1)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 6.25 mg (96%) |
| Hydroxypropylmethylcellulose | 0.20 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.50 mg |

30kg of propafenone HCl were granulated with 10 kg of a 10% strength hydroxypropylmethylcellulose solution (Pharmacoat® 603) and dried in a fluidized bed granulator. The granules were passed through a screen of suitable mesh width and then mixed in a plowshare mixer with the stated amount of magnesium stearate.

The microtablets were produced in a rotary tabletting machine equipped with multiple microtablet punches.

The number of microtablets corresponding to the dose to be administered was packed into hard gelatin capsules using a suitable capsule filling machine.

TABLE 1

Results of studies on volunteers with propafenone HCl microtablets of Example 1 and a bolus delayed release form according to the comparative test (n = 18, dose: 400 mg of propafenone HCl, repeated administration)

| | | Microtablets | | Bolus delayed release form | |
|---|---|---|---|---|---|
| | | fasting | non-fasting | fasting | non-fasting |
| AUC | $\frac{ng \cdot h}{ml}$ | 5 500 | 5 500 | 6 900 | 4 700 |
| $t_{75\%}$ | (h) | 8–9 | 8–9 | 5–6 | 5–6 |
| PTF | (%) | 52 | 56 | 88 | 106 |

n = number of volunteers
ng = nanogram
h = hours

### Example 2 (FIG. 2)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 5.92 mg (91%) |
| Hydroxypropylmethylcellulose | 0.20 mg |
| Poloxamer 188 (USP) | 0.33 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.5 mg |

Production took place as in Example 1. The required amount of poloxamer 188 together with the magnesium stearate were mixed with the granules in a plowshare mixer.

### Example 3 (FIG. 3)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 5.61 mg (86%) |
| Hydroxypropylmethylcellulose | 0.19 mg |
| Poloxamer 188 | 0.65 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.5 mg |

Production took place as in Example 2.

### Example 4 (FIG. 4)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 6.0 mg (86%) |
| Hydroxypropylmethylcellulose | 0.2 mg |
| Calcium hydrogen phosphate | 0.613 mg |
| Monoglyceride (Myvatox ®) | 0.15 mg |
| Crosslinked polyvinylpyrrolidone | 0.007 mg |
| Magnesium stearate | 0.03 mg |
| Total weight | 7.0 mg |

Production took place as in Example 2.

### Example 5 (FIG. 5)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 5.70 mg (81%) |
| Gelatin | 0.18 mg |
| Calcium hydrogen phosphate | 0.38 mg |
| NaCl | 0.70 mg |
| Magnesium stearate | 0.04 mg |
| Total weight | 7.0 mg |

Production took place as in Example 1. A 10% strength gelatin solution was used as granulating agent. The amount of NaCl was mixed in with the magnesium stearate.

### Example 6 (FIG. 6)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 5.83 mg (83%) |
| Hydroxypropylmethylcellulose | 0.17 mg |
| β-Cyclodextrin | 0.9 mg |
| Magnesium stearate | 0.1 mg |
| Total weight | 7.0 mg |

Production took place as in Example 2.

### Example 7 (FIG. 7)

Gelatin capsules with propafenone delayed release microtablets and propafenone instant release microtablets

To achieve a higher initial release, 14 instant release microtablets and 55 delayed release microtablets were

packed into hard gelatin capsules in a suitable capsule filling machine.

| Composition of the instant release microtablets | |
|---|---|
| Propafenone HCl | 6.05 mg (93%) |
| Hydroxypropylmethylcellulose | 0.20 mg |
| Sodium carboxymethylstarch | 0.20 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.5 mg |

The instant release microtablets were produced as in Example 2.

The delayed release microtablets were produced as in Example 1.

Example 8 (FIG. 8)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 6.48 mg (99.7%) |
| Magnesium stearate | 0.02 mg |
| Total weight | 6.50 mg |

Propafenone hydrochloride and magnesium stearate were mixed in a plowshare mixer and subsequently compressed to microtablets.

The in vitro release plots (FIGS. 1 to 10) were determined using a USP paddle apparatus with 0.08 molar HCl in the first two hours and then phosphate buffer pH 6.8. The paddle rotated at 50 rpm.

Comparative test

Propafenone delayed release bolus film-coated tablet

| Composition | |
|---|---|
| Propafenone HCl | 450.0 mg |
| Sodium alginate | 112.0 mg |
| Microcrystalline cellulose type PH 101 | 37.0 mg |
| Copolymers of acrylic and methacrylic esters with a small content of quaternary ammonium groups (Eudragit® RS) | 15.0 mg |
| Gelatin | 55.0 mg |
| Magnesium stearate | 3.5 mg |
| Microcrystalline cellulose type PH 102 | 12.5 mg |
| Readily soluble film coating | 15.0 mg |
| Total weight | 700.0 mg |

Propafenone hydrochloride, sodium alginate, microcrystalline cellulose (type PH 101) and Eudragit RS were mixed in a vertical mixer and granulated with 20% strength gelatin solution. The wet granules were dried in a fluidized bed dryer with inlet air at 60° C. After passing through a screen of suitable mesh width, magnesium stearate and microcrystalline cellulose (type PH 102) were admixed in a horizontal mixer and subsequently the mixture was compressed to oblong tablets (dimensions 18×8.7 mm) in a rotary tabletting machine. The readily soluble coating was applied in a horizontal coater.

Determination of in vitro release in a paddle apparatus at 50 rpm produced the following results (in %):

| | |
|---|---|
| 1st hour | 3.8 |
| 2nd hour | 5.5 |
| 3rd hour | 23.7 |
| 4th hour | 43.0 |
| 6th hour | 75.4 |
| 8th hour | 89.5 |

The in vitro release from the delayed release bolus film-coated tablet is thus similar to that of the delayed release microtablets according to the invention. Nevertheless, the in vivo release is entirely different and, in fact, better according to the invention, cf. drug levels shown in FIG. 11.

We claim:

1. A cylindrical delayed release microtablet with a convex or flat upper side and lower side of β-phenylpropiophenone derivatives of the formula I as active ingredient

$$\text{I: } C_6H_4(\text{—CO—}CH_2\text{—}CH_2\text{—}C_6H_5)(\text{—O—}CH_2\text{—CHOH—}CH_2\text{—NHR})$$

where R is n-propyl or 1,1-dimethylpropyl, and their pharmacologically acceptable salts, wherein

a) the height and diameter are, independently of one another, 1–3 mm,

b) the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet,

c) the active ingredient density is greater than 1,

d) the release of active ingredient in the USP paddle method at 50 rpm is 80% as a maximum after 3 hours and as a minimum after 24 hours,

e) the release rate is virtually independent of the pressure when compressing the tablets, and

f) the tablet contains no release-delaying ancillary substance but 0.1–5% by weight of a lubricant and 0–18.9% by weight of other conventional ancillary substances.

2. A tablet as claimed in claim 1, which in vivo results in a pronounced plasma level plateau with a PTF<75% and whose bioavailability does not depend on the intake of food.

3. A tablet as claimed in claim 1, wherein the active ingredient is propafenone hydrochloride.

4. A tablet as claimed in claim 1, wherein the height and diameter are approximately the same.

5. A gelatin capsule which contains 3–200 tablets as claimed in claim 1 with identical or different release rates.

6. A process for producing cylindrical delayed release microtablets as claimed in claim 1, which comprises a homogeneous mixture of 81–99.9% by weight of the granulated active ingredient with a particle size below 1 mm, 0.1–5% by weight of a lubricant and 0–18.9% by weight of other conventional ancillary substances which do not delay release being compressed in a cylindrical mold with a height and diameter each of 1–3 mm and being removed from the mold.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 5,681,588
DATED : October 28, 1997
INVENTOR(S) : Karl KOLTER et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the title page, Item [87], the PCT Pub. Date should read:

-- Oct. 13, 1994 --

Signed and Sealed this

Tenth Day of February, 1998

Attest:

BRUCE LEHMAN

*Attesting Officer* *Commissioner of Patents and Trademarks*

# Exhibit D

# Modern Pharmaceutics

*Second Edition, Revised and Expanded*

edited by

**GILBERT S. BANKER**
University of Minnesota
Minneapolis, Minnesota

**CHRISTOPHER T. RHODES**
University of Rhode Island
Kingston, Rhode Island

MARCEL DEKKER, INC.                    New York and Basel

Library of Congress Cataloging-in-Publication Data

Modern pharmaceutics.

    (Drugs and the pharmaceutical sciences ; v. 40)
    Includes bibliographical references.
    1. Drugs--Dosage forms.   2. Biopharmaceutics.
3. Pharmacokinetics.  4. Pharmaceutical industry--Quality
control.  I. Banker, Gilbert S.  II. Rhodes,
Christopher T.  III. Series.
RS200.M63    1989       615'.1        89-23365
ISBN 0-8247-7499-X

COPYRIGHT © 1990 by MARCEL DEKKER, INC.  ALL RIGHTS RESERVED

Neither this book nor any part may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, microfilming, and recording, or by any information storage and retrieval system, without permission in writing from the publisher.

MARCEL DEKKER, INC.
270 Madison Avenue, New York, New York 10016

PRINTED IN THE UNITED STATES OF AMERICA

# 10

# Tablet Dosage Forms

KEITH MARSHALL
*Smith Kline & French Laboratories, King of Prussia, Pennsylvania*

EDWARD M. RUDNIC
*Schering-Plough Corporation, Miami, Florida*

## I. INTRODUCTION

Solid oral dosage forms are medication delivery systems presented as solid-dose units readily administered by mouth. The group includes tablets, capsules, cachets, and pills, as well as bulk or unit-dose powders and granules. The group constitutes the most popular form of presentation, and tablets and capsules account for the greatest number of preparations in this category. The prime reasons for this popularity include: ease of accurate (yet versatile) dosage, good physical and chemical stability, competitive unit production costs, and an elegant distinctive appearance resulting in a high level of patient acceptability. Among the potential disadvantages are irritant effects on the gastrointestinal mucosa by some solids and the possibility of bioavailability problems caused by the fact that both disintegration (in most cases) and dissolution must take place before the drug is available for absorption.

### A. Types of Tablet Dosage Forms

*Compressed Tablets*

The most common solid dosage forms in contemporary practice are tablets, which may be defined as unit forms of solid medicaments prepared by compaction. Most consist of a mixture of powders which has been compacted in a die to produce a single rigid body. We may distinguish several categories of tablets depending on their mode of use. The most common types are those intended to be swallowed whole and to disintegrate and release their medicaments in the gastrointestinal tract (GIT). A less common type of tablet is that formulated to allow dissolution or dispersion in water prior to administration. Ideally for this type of tablet all ingredients should be soluble, but frequently a fine suspension has to be accepted. Many are formulated to be effervescent and their main advantages include more rapid release of medicament and reduced chance of causing gastric irritation.

Some tablets are designed to be masticated (chewed) and used where local action or absorption from the buccal cavity is desired, or to enhance dispersion prior to swallowing. Alternatively they may be intended to dissolve slowly in the mouth, e.g., lozenges, and used where a local action in the upper GIT is required, or to facilitate buccal absorption. A few tablets are designed to be placed under the tongue (sublingual) and to release their medicament rapidly with resultant quick onset of action. Buccal or sublingual absorption can be used for drugs liable to extensive hepatic metabolism by the so-called first-pass effect; thus, sublingual tablets are used for such drugs as testosterone and nitroglycerin.

There are now many types of tablet formulations which provide for the release of the medicament to be delayed or allow a controlled rate of availability. Some of these preparations are highly sophisticated and are rightly referred to as complete "drug delivery systems."

*Coated Tablets*

Many tablets are now coated because this can disguise or minimize the unpleasant taste of certain medicaments, protect the ingredients against decomposition, and enhance the appearance. Some coating techniques permit an even wider range of dosage regimens and can overcome inherent incompatibility. For example, a coat can be applied which will be resistant to the gastric juices but which is readily broken down in the lower GI tract. These "enteric" coatings can protect medicaments against decomposition in the acid environment of the stomach and transport them to the area of the GIT from which they are absorbed. This provides a further type of delayed-release product.

Traditionally the coating process involved the building up of a surface layer of materials, mainly sucrose, by applying a syrup to the tablets as they rotated in a pan and then hastening the drying process by blowing in hot air. This procedure was repeated until a coating of the required thickness and appearance was achieved and could take several days. Mainly for this reason the trend is towards more rapid coating methods involving the spray application of thin film of material onto the tablet surface and rapidly drying it. The coating usually consists of organic polymer plus plasticizer dissolved in an organic solvent mixture or in aqueous solution or dispersion. Although the process can be carried out in a pan, alternative techniques using air suspension equipment are becoming increasingly popular.

Tableting machinery has also developed to a stage where it is possible to compress a coat of material around a tablet "core." Similar presses can produce multilayered tablets with different ingredients in each layer and very distinctive appearance. More importantly, potentially incompatible ingredients can be copresented by such manipulations. For technical reasons, this process has been slow to be widely commercialized.

### B. Desirable Properties of Raw Materials

Most formulations will be composed of one or more medicaments plus excipients of the various types to be considered in the following sections. Irrespective of the type of tablet, certain general criteria for these raw materials can be indicated. For accurate reproducible dosage it is essential that each component be uniformly dispersed within the mixture and any tendency for component segregation be minimized. In addition, the processing operations demand that the mixture have certain minimum flow characteristics, but must be cohesive when compressed.

categories. More specifically "preformulation" groups, whose prime role is the physicochemical characterization of starting materials and their interactions, are now acting as a preliminary to any formulation work.

As the complexity of drug delivery systems and the pressure to quickly optimize formulations increases, so do the demands for sophisticated scientific methodology in this area. Already optimum formulations are being predicted by computer evaluation of a whole spectrum of experimental data [22]. Chapter 20 on optimization techniques describes this approach in some detail.

For a variety of reasons including cost, potential variability, regulatory concern and supply difficulties, there is a natural desire to keep the number of ingredients in a formulation to the minimum, and this is a sound maxim. However, because some excipients, while being superior in their main role, possess undesirable additional properties, judicious choice of synergistic mixtures with respect to a desired characteristic might result in a product of optimum overall performance. Such possibilities are considered in the more detailed treatment of excipients which follows. The question of drug-excipient interactions is normally addressed during preformulation screening, by preparation of intimate powder mixes of drug and commonly used adjuvants [23], or preferably compacted prototype formulae. The work of Chowhan and his colleagues [24] is typical of desirable studies and clearly indicates their value.

## II. DESIGN AND FORMULATION OF COMPRESSED TABLETS

### A. General Considerations

Pharmaceutical compressed tablets are prepared by placing an appropriate powder mix or granulation in a metal die on a tablet press. At the base of the die is a lower punch, and above the die is an upper punch. When the upper punch is forced down upon the powder mix (single punch press) or when the upper and lower punches squeeze together (rotary press) the powder mix or granulation is forced into a tablet.

Perhaps the most significant factor in the tableting process arises from the need to produce tablets of uniform weight and achieve this by feeding constant volumes of homogeneous material to the dies. Such an approach is necessary because direct weighing, at rates commensurate with modern tablet press operation, is impossible. This requirement immediately places demands on the physical characteristics of the feed and on press design itself. In the case of the former, the precompression step of granulation is one of the major ways of minimizing difficulties from this source.

We must remember also the great paradox in pharmaceutical tableting, namely, the need to manufacture a compact of sufficient mechanical strength to withstand the rigors of processing and packaging, yet capable of reproducible breakdown on administration so as to release the drug. The mechanisms involved in this dispersion of conventional tablets constitutes in most cases bursting apart of the compacted structure by aqueous fluids penetrating the fine residual pore structure of the tablet and coming into contact with components which either swell or release gases.

The selected precompression treatment (if any) markedly affects the formulation of tablets, determining in particular whether a mixture of powdered ingredients is to be used directly or whether an intervening moist granulation step is to be introduced. This is the first decision to be made and will be influenced by many factors including the stability of the medicament to heat and moisture, the flow properties of the mixed ingredients,

and any tendency to segregate. At the present time two additional conflicting general considerations tend to play a major role in the choice: these are reluctance to change methods employed traditionally by the company versus the economic advantages of omission of a complete stage in the production sequence. As a result of these factors, plus the increasing complications due to legislative demands, the tendency is that for existing products moist granulation methods predominate, whereas the trend for new ones is to utilize direct compression procedures. In moist granulation the components of the formulations are mixed with a granulating liquid such as water or ethanol to produce granules which will readily compress to give tablets. In direct compression there is no granulation stage. The ingredients are simply dry-mixed and then compressed. However, with many newer systems, some formulators have found that moist-granulated products are more robust, and can accommodate more variability in raw materials. Thus for some companies, the trend is toward formulating products for moist-granulation.

### B. Tablets Designed for Rapid Release of Drugs

Conventional solid dosage forms can be divided into two classes: those which disintegrate and those that don't. Disintegrating dosage forms release their medicaments by breaking down the physical integrity of the dosage form, usually with the aid of solid disintegrating agents or gas-releasing effervescent agents. Nondisintegrating dosage forms are usually made of soluble drugs and excipients which will rapidly dissolve in the mouth or gastrointestinal tract.

In recent years, the advent of new prolonged-release dosage forms has caused some pharmaceutical scientists to regard conventional disintegrating dosage forms as "noncontrolled-release." This term is a misnomer since with the aid of modern tablet disintegrants and other excipients the disintegration of these dosage forms can be controlled, both quantitatively and qualitatively. There are certainly many drugs which when administered, need to achieve therapeutic levels quickly. Analgesics, most antibiotics and drugs for the acute treatment of angina pectoris are prime examples. These dosage forms need to be designed so that the drug is liberated from the dosage form in such a way that dissolution of the drug is maximized. Very often this means that disintegration of the tablet must be followed by granular disintegration (see Fig. 3) in order to promote rapid dissolution and hence absorption.

The ingredients or excipients used to make compressed tablets are many. They can be classified by their use or function as in Table 1. However, not all formulations need contain all of the types of ingredients listed in that table. Certain of these excipients, such as the antioxidants and wetting agents are clearly used only in situations where they are expressly needed to assure the stability or solubility of the active ingredient. Other ingredients, such as the dissolution modifiers are used primarily in controlled-release formulations, which will be discussed in detail later. In fact, the fewer ingredients in a formulation generally means fewer potential problems. Hence many formulators adhere to the motto, "Keep it simple..."

Because of the nature of modern pharmaceutical systems, pharmaceutical scientists have had to be more and more investigative of the materials they use. This interest has identified several uses for many materials, and these uses can be concentration dependent. For example, in Table 2 are listed

# Exhibit E

524-2396-0X PCT

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF:

KARL KOLTER ET AL. : GROUP ART UNIT: 1502

SERIAL NO. 08/525,749

FILED: OCTOBER 3, 1995 : EXAMINER: BENSTON

FOR: DELAYED RELEASE MICRO-TABLET OF BETA-PHENYL-PROPIOPHENONE DERIVATIVES

JAN - 9 1997

JAN 10 1997

AMENDMENT AND REQUEST FOR RECONSIDERATION

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C. 20231

SIR:

Responsive to the Official Action of October 17, 1996, Applicants respectfully request reconsideration of the above-identified application in view of the following amendments and remarks.

IN THE CLAIMS

Claim 1, lines 9-10 (not counting the structure of formula I) delete "but not taking into account the weight of any coating which is present,".

REMARKS

Claims 1-6 are active in this application. The above amendment is supported by Claim 1 as originally filed and the specification. No new matter has been added by these amendments.

The present invention relates to a cylindrical delayed

release microtablet having a convex or flat upper side and lower side, which contains a β-phenylpropiophenone derivative of formula I

$$\text{C(=O)}-CH_2-CH_2-C_6H_5 \qquad O-CH_2-CHOH-CH_2-NHR$$

I

where R is n-propyl or 1, 1-dimethylpropyl, and its pharmaceutically acceptable salts. In particular, the cylindrical delayed release microtablet of the present invention is required to have a height and diameter that are each, independently, 1-3 mm, must contain the active ingredient in the range from 81-99.9% of the weight of the microtablet, and have an active ingredient density that is greater than 1. Further, the microtablet of the present invention must have a release rate which is virtually independent of the pressure when compressing the tablets and contains no release-delaying ancillary substance but can contain specified amounts of a lubricant or other conventional ancillary substances. The release of the active ingredient in the present microtablet according to the U.S.P. paddle method at 50 rpm is required to be a maximum of 80% after 3 hours and a minimum of 80% after 24 hours.

Applicants have found that by preparing a microtablet having the required size and shape, active ingredient content and active ingredient density, containing the β-phenylpropio-

phenone derivative of formula I as its active ingredient, it is possible to provide a microtablet that has surprisingly improved delayed release characteristics compared to other delayed release formats. This is especially surprising in view of the fact that the present microtablet contains no other release delaying additives.

A further surprising result achieved with the present microtablet formulation is that the release of the active ingredient is virtually independent of the pressure used to compress the tablet and independent of the pH. These results are unexpected in view of the fact that it is generally accepted that increases in the compressive force used in tablet production provides a slowing of the release of active ingredient (see specification at page 2 beginning at line 14). A common problem with this feature is that fluctuations in the compressive force in a single machine can result in tablets being produced that have a wide range of delay release times. Yet another surprising result achieved by the present invention is that other medicinal substances having a similar water solubility to that of propafenone hydrochloride (one of the compounds encompassed by the present formula I) are 90% released after one hour, when produced in the same type of microtablet. However, the present microtablets provide no more than 80% release after 3 hours and no less than 80% release after 24 hours.

The claims stand rejected under 35 U.S.C. §103 over Davidson in view of Franke. Davidson discloses a

disintegrating agent for tablets which improves the disintegration of tablets by incorporating therein a plurality of small tubules (see abstract). The Examiner appears to have misinterpreted the thrust of the Davidson invention, since Davidson is specifically looking toward *instant* release and *speeding up the disintegration* of tablets by inserting the tubules described therein. In fact, as shown in the examples of Davidson, the tablets prepared by insertion of their tubules have disintegration times (i.e., release times) of no more than about 5 minutes. In fact, the longest release time disclosed by Davidson is 17 minutes for tablets without the tubules (see column 7, lines 22-23).

This patent cannot suggest the present invention, which is drawn to a delayed release microtablet which is required by the claim to have no more than 80% release of the active ingredient after 3 hours and no less than 80% after 24 hours. While it is true that the present invention can contain a disintegrant, the claims still require that the release of active ingredient be delayed to meet the requirements of part (d) of Claim 1. Thus any disintegrant used in the present invention cannot remove that requirement of the claims. Davidson cannot suggest such a microtablet.

The Examiner has used the Franke et al reference to suggest modifying the Davidson composition by the use of propafenone hydrochloride. While it is true that Franke et al disclose propafenone, there is no disclosure nor suggestion of a microtablet having the required delayed release

characteristics of the present invention nor the required shape, size or active ingredient content.

If one were to modify Davidson by the teachings of Franke et al, one would obtain a propafenone hydrochloride tablet containing the disintegration tubules of Davidson. The expected result of such a composition would be relatively instant release, certainly within five minutes or less, as taught by Davidson.

This is not the present invention. Applicants have shown in the present application that by preparing the microtablets of the present invention to meet the size, shape and active ingredient content requirements, one obtains a microtablet having remarkable delayed release characteristics. This is especially surprising in view of the behavior of other medicinal substances having water solubilities similar to that of propafenone hydrochloride as described at page 2, lines 34-41 of the present application. Such medicinal substances having a similar water solubility to that of propafenone hydrochloride, when prepared in the same type of microtablet as in the present invention, end up showing a 90% release after one hour. Why would one of ordinary skill in the art expect the compounds of formula I of the present invention to give such surprisingly delayed release when prepared in the microtablet form required by the present invention, especially in view of the rapid release which is seen with other compounds having similar water solubilities?

The references cited by the Examiner simply do not

present a <u>prima facie</u> case of obviousness, since the
combination of the references would only be expected to result
in an instant release tablet containing propafenone
hydrochloride.  There is no suggestion within either reference
that the compounds of formula I of the present invention would
have surprisingly delayed release characteristics when
compressed into the tablet form required by the present
invention.  There could be no expectation by one of ordinary
skill in the art of the delayed relatively uniform release of
active ingredient using the compounds of Formula I of the
present invention in a microtablet having the required size,
shape and other characteristics as required by the present
claims.  Accordingly, the references cannot render the present
invention obvious and the rejection should be withdrawn.

The claims further stand rejected under 35 U.S.C. §112,
second paragraph.  This rejection has been obviated by the
above amendment.

Applicants submit that the application is now in condition for allowance, and early notification of such action is earnestly solicited.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Attorney of Record
Registration No. 24,618

J. Derek Mason, Ph.D.
Registration No. 35,270

Crystal Square Five - Fourth Floor
1755 South Jefferson Davis Highway
Arlington, VA 22202
(703) 413-3000
NFO:JDM/smi

I:\DJM\05242396.am

# Exhibit F

THE RANDOM HOUSE

# College Dictionary

**Laurence Urdang**
Editor in Chief

**Stuart Berg Flexner**
Managing Editor

Based on
**The Random House Dictionary of the English Language**
The Unabridged Edition

Jess Stein
Editor in Chief

Laurence Urdang
Managing Editor

Copyright © 1972, 1969, 1968 by Random House, Inc.

All rights reserved under International and Pan-American Copyright Conventions. No part of this book may be reproduced in any form or by any means, electronic or mechanical, including photocopying, without permission in writing from the publisher. All inquiries should be addressed to Random House, Inc., 201 E. 50th Street, New York, N.Y. 10022.

Based on *The Random House Dictionary of the English Language–The Unabridged Edition* Copyright © 1971, 1970, 1969, 1967, 1966 by Random House, Inc.

PUBLISHED IN THE UNITED STATES OF AMERICA BY RANDOM HOUSE, INC., NEW YORK AND SIMULTANEOUSLY IN CANADA BY RANDOM HOUSE OF CANADA LIMITED, TORONTO

A number of entered words which we have reason to believe constitute trademarks have been designated as such. However, neither the presence nor the absence of such designation should be regarded as affecting the legal status of any trademark.

*Chart of Periodic Table of the Elements*, Copyright © 1964 by E. H. Sargent & Co.

*Table of Common Proofreader's Marks*, Copyright 1950, © 1956 by Alfred A. Knopf, Inc.

o. n/hn

Library of Congress Catalog Card Number: 68-19699

Manufactured in the United States of America

Type set by R. R. Donnelley & Sons Company
Printed and bound by Rand McNally and Company

ized meeting, esp. for religious worship. 2. a place of meeting or assembly, esp. a Nonconformist meeting house. 3. *Obs.* a meeting or assembly. [ME < L *conventicul(um)* (place of) assembly] —con·ven′ti·cler, *n.* —con·ven·tic·u·lar (kon′ven tik′yə lər), *adj.*

**con·ven·tion** (kən ven′shən), *n.* 1. a meeting or formal assembly, as of representatives or delegates, for discussion of and action on particular matters of common concern. 2. *U.S. Politics.* a representative party assembly to nominate candidates and adopt platforms and party rules. 3. an agreement, compact, or contract. 4. an international agreement, esp. one dealing with a specific matter. 5. general agreement or consent; accepted usage. 6. conventionalism. 7. a rule, method, etc., established by general consent or usage; custom. [late ME *convencio(u)n* < L *conventiōn-* (s. of *conventiō*) agreement, lit., a coming together]

**con·ven·tion·al** (kən ven′shə nəl), *adj.* 1. conforming or adhering to accepted standards, as of conduct or taste. 2. pertaining to convention or general agreement; established by general consent or accepted usage: *conventional symbols.* 3. ordinary; *conventional phraseology.* 4. (of figurative art) represented in a generalized or simplified manner. 5. of or pertaining to a convention, agreement, or compact. 6. *Law.* resting on consent. 7. of or pertaining to a convention or assembly. [< LL *conventiōnāl(is)*] —con·ven′tion·al·ist, *n.* —con·ven′tion·al·ly, *adv.* —Syn. 1. See formal¹. 2. usual, habitual, customary.

**con·ven·tion·al·ise** (kən ven′shə nəlīz′), *v.t.*, -ised, -is·ing. *Chiefly Brit.* conventionalize. —con·ven′tion·al·i·sa′tion, *n.*

**con·ven·tion·al·ism** (kən ven′shə nəliz′əm), *n.* 1. adherence to or advocacy of conventional attitudes or practices. 2. a conventional expression, attitude, etc. 3. *Philos.* the view that fundamental principles are validated by definition, agreement, or convention.

**con·ven·tion·al·i·ty** (kən ven′shə nal′i tē), *n.*, *pl.* -ties for 3, 4. 1. conventional quality or character. 2. adherence to convention. 3. a conventional practice, principle, form, etc. 4. conventionalities, conventional rules of behavior.

**con·ven·tion·al·ize** (kən ven′shə nəlīz′), *v.t.*, -ized, -iz·ing. 1. to make conventional. 2. *Art.* to represent in a conventional manner. Also, *esp. Brit.*, conventionalise. —con·ven′tion·al·i·za′tion, *n.*

**con·ven·tio·neer** (kən ven′shə nēr′), *n.* a person who attends a convention.

**con·ven·tu·al** (kən ven′cho͞o əl), *adj.* 1. of, belonging to, or characteristic of a convent. —*n.* 2. a member of a convent or monastery. [late ME < ML *conventuāl(is)* = *conventu(s)* CONVENT + *-ālis* -AL¹] —con·ven′tu·al·ly, *adj.*

**con·verge** (kən vûrj′), *v.*, -verged, -verg·ing. —*v.i.* 1. to tend to meet in a point or line; incline toward each other, as lines that are not parallel. 2. to tend to a common result, conclusion, etc. —*v.t.* 3. to cause to converge. [< LL *converge(re)* (to) incline together]

**con·ver·gence** (kən vûr′jəns), *n.* 1. an act or instance of converging. 2. a convergent state or quality. 3. the degree to which or point at which lines, objects, etc., converge. 4. *Physiol.* a coordinated turning of the eyes to bear upon a near point. 5. *Meteorol.* a. the contraction of a vector field. b. a measure of this. c. a net flow of air into a given region. Cf. divergence (def. 2). 6. *Biol.* similarity of form or structure caused by environment rather than heredity. Also, con·ver′gen·cy (for defs. 1–3).

**con·ver·gent** (kən vûr′jənt), *adj.* characterized by convergence; tending to come together; merging. [< ML *convergent-* (s. of *convergēns*, prp. of *convergere*)] —con·ver′gent·ly, *adv.*

**conver′gent evolu′tion**, the appearance of apparently similar structures in organisms of different lines of descent.

**con·vers·a·ble** (kən vûr′sə bəl), *adj.* 1. easy and pleasant to talk with; agreeable. 2. able or disposed to converse. 3. pertaining to or proper for conversation. [< ML *conversābil(is)*] —con·vers′a·ble·ness, *n.* —con·vers′a·bly, *adv.*

**con·ver·sant** (kən vûr′sənt, kon′vər-), *adj.* 1. familiar by use or study (usually fol. by *with*): *to be conversant with Spanish history.* 2. intimately associated; acquainted. [ME *conversa(u)nt* < L *conversant-* (s. of *conversāns*), prp. of *conversārī* to associate with] —con·ver′sance, con·ver′san·cy, *n.* —con·ver′sant·ly, *adv.* —Syn. 1. versed, practiced.

**con·ver·sa·tion** (kon′vər sā′shən), *n.* 1. oral communication between persons; talk; colloquy. 2. an instance of this. 3. association or social intercourse. 4. See criminal conversation. 5. the ability to talk socially with others. 6. *Archaic.* behavior or manner of living. 7. *Obs.* close familiarity. [ME *conversacio(u)n* < L *conversātiōn-* (s. of *conversātiō*) society, intercourse = *conversāt(us)* associated with (ptp. of *conversārī*; see CONVERSE¹, -ATE¹) + *-iōn-* -ION]

**con·ver·sa·tion·al** (kon′vər sā′shə nəl), *adj.* 1. of, pertaining to, or characteristic of conversation: *a conversational tone of voice.* 2. able or ready to converse. —con′ver·sa′tion·al·ly, *adv.* —Syn. 1. See colloquial.

**con·ver·sa·tion·al·ist** (kon′vər sā′shə nəlist), *n.* a person who enjoys and contributes to good conversation.

**conversa′tion piece′**, 1. *Fine Arts.* group portraiture representing fashionable people either in an interior or landscape setting. 2. any object that arouses comment because of some striking quality.

***con·ver·sa·zio·ne*** (kōn′ver sä tsyô′ne; *Eng.* kon′vər sät′sē ō′nē), *n.*, *pl.* -zio·ni (-tsyô′nē), *Eng.* -zi·o·nes. *Italian.* a social gathering for conversation, esp. on literary or scholarly subjects. [lit., conversation]

**con·verse¹** (*v.* kən vûrs′; *n.* kon′vûrs), *v.*, -versed, -vers·ing, *n.* —*v.i.* 1. to talk informally with another or others. 2. *Obs.* a. to maintain a familiar association (usually fol. by *with*). b. to have sexual intercourse (usually fol. by *with*). c. to commune spiritually (usually fol. by *with*). —*n.* 3. familiar discourse or talk; conversation. 4. *Obs.* spiritual communion. [ME *converse(n)* < L *conversārī* to associate with. See CON-, VERSE] —con·vers′er, *n.* —Syn. 1. talk, chat, discuss. See speak.

**con·verse²** (*adj.* kən vûrs′, kon′vûrs; *n.* kon′vûrs), *adj.* 1. opposite or contrary in direction, action, sequence, etc.; turned around. —*n.* 2. something that is the opposite or contrary of another. 3. *Logic.* a proposition obtained from another proposition by conversion. 4. a group of words correlative with a preceding group but having a significant pair of terms interchanged, as "hot in winter but cold in summer" and "cold in winter but hot in summer." [< L *convers(us)* turned around, ptp. of *convertere*; see CONVERT] —con·verse·ly (kən vûrs′lē, kon′vûrs-), *adv.*

**con·ver·sion** (kən vûr′zhən, -shən), *n.* 1. the act of converting. 2. the state or process of being converted. 3. an alteration of form, substance, etc. 4. an adaptation to different means or uses. 5. a change in a person's beliefs or attitudes. 6. the act of obtaining equivalent value, as of money or units of measurement, in an exchange or calculation. 7. *Math.* a change in the form or units of an expression. 8. *Logic.* the transposition of the subject and predicate of a proposition. 9. *Law.* a. unauthorized assumption and exercise of rights of ownership over personal property belonging to another. b. change from realty into personalty, or vice versa. 10. *Football.* a score made on a try for point after touchdown. 11. *Psychoanal.* the process by which a repressed idea, feeling, etc., is represented by a bodily change, as a simulated physical illness. 12. *Physics.* the production of radioactive material in a process in which one nuclear fuel is converted into a second nuclear fuel by the capture of neutrons. Cf. breeding (def. 6). 13. *Computer Technol.* a. a change from one code or symbolic system to another. b. a change from one physical or recording system to another. [ME *conversio(u)n* < L *conversiōn-* (s. of *conversiō*) a complete change. See CONVERSE², -ION] —con·ver′sion·al, con·ver·sion·ar·y (kən vûr′zhə ner′ē, -shə-), *adj.*

**conver′sion ta′ble**, a tabular arrangement of the equivalent values of the weight or measure units.

**con·vert** (*v.* kən vûrt′; *n.* kon′vûrt), *v.t.* 1. to change (something) into a different form, substance, etc.; transmute; transform. 2. to cause to acquire different beliefs, attitudes, etc., esp. ones believed to be better. 3. to adapt to different means or uses (usually fol. by *to* or *into*): *to convert a bedroom into a den.* 4. to obtain an equivalent value for in an exchange or calculation, as money or units of measurement. 5. to appropriate wrongfully to one's own use. 6. to invert or transpose. 7. *Law.* a. to assume unlawful rights of ownership of (personal property). b. to change from realty to personalty, or vice versa. 8. *Logic.* to transpose the subject and predicate of (a proposition) by conversion. 9. *Finance.* to exchange voluntarily (a bond or preferred stock) into another security, usually common stock. —*v.i.* 10. to become converted. 11. *Football.* to make a conversion. —*n.* 12. a person who has been converted, as to a religion or an opinion. [ME *converte(n)* < L *convert(ere)* (to) change completely = *con-* CON- + *vertere* to turn round] —con·ver′tive, *adj.* —Syn. 2. proselytize. 12. proselyte, neophyte, disciple.

**con·vert·er** (kən vûr′tər), *n.* 1. a person or thing that converts. 2. a person who converts textile fabrics, esp. cotton cloths into finished products, as by bleaching and dyeing. 3. *Elect.* a device that converts alternating current to direct current, or vice versa. 4. *Metall.* a chamber or vessel through which an oxidizing blast of air is forced, as in the Bessemer process. 5. *Physics.* a reactor for converting one kind of fuel into another kind. Also, con·ver′tor.

**con·vert·i·ble** (kən vûr′tə bəl), *adj.* 1. capable of being converted. 2. having a folding top, as an automobile or pleasure boat. —*n.* 3. an automobile or boat having such a top. [ME < ML *convertibil(is)*] —con·vert′i·bil′i·ty, con·vert′i·ble·ness, *n.* —con·vert′i·bly, *adv.*

**con·vert·i·plane** (kən vûr′tə plān′), *n.* a plane designed to change its configuration, permitting both vertical and short conventional take-off and landing, and high-speed flight. Also, con·ver′ta·plane′, con·ver′to·plane′.

**con·vert·ite** (kon′vər tīt′), *n.* *Archaic.* a convert.

**con·vex** (*adj.* kon veks′, kən-, kon′veks; *n.* kon′veks), *adj.* 1. having a surface that is curved or rounded outward. Cf. concave (def. 1). 2. *Math.* (of a polygon) having all interior angles less than or equal to 180°. —*n.* 3. a convex surface, part, or thing. [< L *convex(us)* = *con-* CON- + *vec-*, var. of *vac-* bend + *-sus* ptp. suffix] —con·vex′ly, *adv.*

A B C

A, Convex or plano-convex lens; B, Convexo-concave lens; C, Convexo-convex lens

**con·vex·i·ty** (kən vek′si tē), *n.*, *pl.* -ties for 2. 1. the state of being convex. 2. a convex surface or thing. [< L *convexitās*]

**convexo-**, a combining form of convex: *convexo-concave.*

**con·vex·o-con·cave** (kən vek′sō kon kāv′), *adj.* 1. convex on one side and concave on the other. 2. *Optics.* pertaining to or noting a lens in which the convex face has a greater degree of curvature than the concave face. Cf. concavo-convex.

**con·vex·o-con·vex** (kən vek′sō kon veks′), *adj.* convex on both sides; biconvex.

**con·vex·o-plane** (kən vek′sō plān′), *adj.* plano-convex.

**con·vey** (kən vā′), *v.t.* 1. to carry, bring, or take from one place to another. 2. to lead or conduct, as a channel or medium. 3. to impart, as information. 4. *Law.* to transfer; pass the title to. 5. *Archaic.* steal; purloin. 6. *Obs.* to take away secretly. [ME *convey(en)* < AF *conveie(r)* < VL **conviāre* = *con-* CON- + *viāre* < *via* way; see VIA] —con·vey′a·ble, *adj.* —Syn. 1. bring. See carry.

**con·vey·ance** (kən vā′əns), *n.* 1. the act of conveying. 2. a means of transporting, esp. a vehicle. 3. *Law.* a. the transfer of property from one person to another. b. the instrument or document by which this is effected.

**con·vey·anc·er** (kən vā′ən sər), *n.* a person engaged in conveyancing.

**con·vey·anc·ing** (kən vā′ən siṅg), *n.* the branch of law practice consisting of examining titles, drawing deeds, etc., for the conveyance of property.

**con·vey·or** (kən vā′ər), *n.* 1. a person or thing that conveys. 2. *Mach.* an endless chain or belt, set of rollers, etc., for carrying materials. Also, con·vey′er.

**convey′or belt′**, *Mach.* a conveyor consisting of an endless belt or chain.

**con·vict** (*v.*, *adj.* kən vikt′; *n.* kon′vikt), *v.t.* 1. to prove or declare guilty of an offense, esp. after a legal trial. 2. to impress with a sense of guilt. —*n.* 3. a person proved or de-

cyclorama 332 cyprini

in the front of the head. [< Gk Kýklōps, lit., round eye = kykl(os) a circle, round + ōps eye]

**cy·clo·ram·a** (sī′klə ram′ə, -rä′mə), n. Theat. a curved backdrop or rear wall of a stage, for creating an illusion of unlimited space or for obtaining uniform lighting effects. [cycl- + Gk (h)órama view] —cy′clo·ram′ic, adj.

**cy·clo·stom·a·tous** (sī′klə stom′ə təs, -stō′mə-, sik′lə-), adj. 1. having a circular mouth. 2. belonging or pertaining to the cyclostomes. Also, cy·clos·to·mate (sī klos′tə mit, -māt′).

**cy·clo·stome** (sī′klə stōm′, sik′lə-), adj. 1. belonging or pertaining to the Cyclostomata, a subclass of eellike, aquatic, agnathous vertebrates comprising the lampreys and hagfishes. 2. having a circular mouth. —n. 3. a cyclostome vertebrate; a lamprey or hagfish.

**cy·clo·style** (sī′klə stīl′, sik′lə-), n. a manifolding device consisting of a pen with a small toothed wheel at one end, that forms a stencil by cutting minute holes in a specially prepared paper stretched over a smooth surface. [formerly trademark] —cy′clo·sty′lar, adj.

**cy·clo·thy·mi·a** (sī′klə thī′mē ə, sik′lə-), n. Psychiatry. a mild, manic-depressive psychosis involving recurring cycles of exhilaration and depression. [cyclo- + -thymia < Gk thym(ós) spirit + -ia -ia] —cy′clo·thy′mic, adj. —cy′clo·thy′mi·ac, n.

**cy·clo·tron** (sī′klə tron′, sik′lə-), n. Physics. an accelerator in which particles move in a spiral path under the influence of an alternating voltage and a magnetic field.

**cy·der** (sī′dər), n. Brit. cider.

**Cyd·nus** (sid′nəs), n. a river in SE Asia Minor, in Cilicia.

**cyg·net** (sig′nit), n. a young swan. [late ME signet < L cygn(us), var. of cycnus (< Gk kýknos swan); see -et]

**Cyg·nus** (sig′nəs), n., gen. -ni (-nī). Astron. the Swan, a northern constellation southwest of Draco, containing the bright star Deneb. [< L: swan]

**cyl.,** cylinder.

**cyl·in·der** (sil′in dər), n. 1. Geom. a surface or solid bounded by two parallel planes and generated by a line tracing a closed curve perpendicular to the given planes; a surface congruent with and perpendicular to two closed curves. 2. any cylinderlike object or part, whether solid or hollow. 3. the rotating part of a revolver, containing the chambers for the cartridges. 4. (in a pump) a cylindrical chamber in which a piston slides to move or compress a fluid. 5. (in an engine) a cylindrical chamber in which the pressure of a gas or liquid moves a sliding piston. 6. (in certain printing presses) a. a rotating cylinder that produces the impression and under which passes a flat form to be printed. b. either of two cylinders, one carrying a curved form or plate to be printed from, that rotate against each other in opposite directions. 7. Archaeol. a cylindrical or somewhat barrel-shaped object of stone or clay bearing a cuneiform inscription or a carved design. —v.t. 8. to furnish with a cylinder or cylinders. 9. to subject to the action of a cylinder or cylinders. [< L cylindr(us) < Gk kýlindros roller, cylinder, akin to kylíndein to roll] —cyl′in·der·like′, adj.

Cylinder (Right circular)

**cyl′inder head′,** (in a reciprocating engine or pump) the end of a cylinder opposite to that from which the piston rod or connecting rod projects.

**cyl′inder press′,** a printing press in which paper is impressed by a cylinder against type on a flat plane.

**cy·lin·dri·cal** (si lin′dri kəl), adj. of, pertaining to, or having the form of a cylinder. Also, cy·lin′dric. [< NL cylindric(us) (< Gk kylindrikós; see cylinder, -ic) + -al¹] —cy·lin·dri·cal·i·ty (si lin′dri kal′i tē), cy·lin′dri·cal·ness, n. —cy·lin′dri·cal·ly, adv.

**cyl·in·droid** (sil′in droid′), n. 1. a solid having the form of a cylinder, esp. one with an elliptical, as opposed to a circular, cross section. —adj. 2. resembling a cylinder. [< Gk kylindroeid(ḗs)]

**cy·lix** (sī′liks, sil′iks), n., pl. cyl·i·ces (sil′ə sēz′). kylix.

**Cyl·le·ne** (si lē′nē), n. 1. Class. Myth. a nymph who nursed Hermes. 2. a mountain in S Greece. 7789 ft.

**Cyl·le·ni·an** (si lē′nē ən), adj. of or pertaining to Mount Cyllene in Arcadia, Greece, or to the god Hermes, reputed to have been born there.

**Cym.,** Cymric.

**cy·ma** (sī′mə), n., pl. -mae (-mē), -mas. 1. Archit. either of two moldings having a partly convex and partly concave curve for an outline: used esp. in classical architecture. 2. Bot. a cyme. [< NL < Gk kŷma something swollen, a wave, wavy molding, sprout = ký(ein) (to) be pregnant, swollen with child + -ma n. suffix]

**cy′ma rec′ta** (rek′tə), Archit. a cyma whose concave part projects beyond the convex part. See illus. at molding. [< NL: straight cyma]

**cy′ma re·ver′sa** (ri vûr′sə), Archit. a cyma whose convex part projects beyond the concave part. See illus. at molding. [< NL: reversed cyma]

**cy·ma·ti·um** (si mā′shē əm), n., pl. -ti·a (-shē ə). Archit. the uppermost member of a classical cornice or of a cornice of similar form: usually a cyma recta in classical examples. [< L < Gk kymátion = kýmat- (s. of kŷma wave; see cyma) + -ion dim. suffix]

Cymbals

**cym·bal** (sim′bəl), n. a concave plate of brass or bronze that produces a sharp, ringing sound when struck: played either in pairs, by being struck together, or singly, by being struck with a drumstick or the like. [ME; OE cymbala < ML, var. of cymbalum < L < Gk kýmbalon, var. of kýmbos, kýmbē hollow object] —cym′bal·er, cym′bal·eer′, cym′bal·ist, n. —cym′bal·like′, adj.

**cyme** (sīm), n. 1. an inflorescence in which the primary axis bears a single terminal flower that develops first, the inflorescence being continued by secondary, tertiary, and other axes. 2. a flat or convex inflorescence of this type. [< L cyma cabbage sprout < Gk kŷma; see cyma]

**cy·mene** (sī′mēn), n. Chem. a colorless, pleasant-smelling benzene derivative, $CH_3C_6H_4CH(CH_3)_2$, occurring in the volatile oil of the common cumin, Cuminum cyminum, existing in three forms, the ortho, meta, and para isomers. Cf. para-cymene. [< Gk kým(inon) cumin + -ene]

**cymo-,** a learned borrowing from Greek meaning "wave," used in the formation of compound words: cymograph. [< Gk kymo-, comb. form of kŷma wave]

**cy·mo·gene** (sī′mə jēn′), n. Chem. a mixture of very volatile, flammable hydrocarbons, constituting the fraction boiling at about 0°C, obtained in distilling crude petroleum and containing a large percentage of butane. [cym(ene) + -o- + -gene]

**cy·mo·graph** (sī′mə graf′, -gräf′), n. kymograph. —cy′mo·graph·ic (sī′mə graf′ik), adj.

**cy·moid** (sī′moid), adj. 1. resembling a cyma. 2. resembling a cyme.

**cy·mo·phane** (sī′mə fān′), n. Mineral. chrysoberyl.

**cy·mose** (sī′mōs, sī mōs′), adj. Bot. 1. bearing a cyme or cymes. 2. of or of the nature of a cyme. [< L cymōs(us) full of shoots] —cy′mose·ly, adv.

**Cym·ric** (kim′rik, sim′-), adj. 1. of or pertaining to the Cymry. —n. 2. Welsh (def. 3). Also, Kymric.

**Cym·ry** (kim′rē), n. (construed as pl.) the Welsh, or the branch of the Celtic race to which the Welsh belong, comprising also the Cornish people and the Bretons. Also, Kymry. [< Welsh Cymry Welshmen, pl. of Cymro, prob. repr. OWelsh *combrox compatriot = com- com- + *bro- (Welsh bro district, region); akin to L margo margin: see mark¹]

**Cyn·e·wulf** (kin′ə wo͝olf′), n. fl. early 9th century A.D., Anglo-Saxon poet. Also, Cynwulf, Kynewulf.

**cyn·ic** (sin′ik), n. 1. a person who believes that only selfishness motivates human actions and who disbelieves in or minimizes selfless acts or disinterested points of view. 2. (cap.) one of a sect of Greek philosophers of the 4th century B.C., who advocated the doctrines that virtue is the only good, that the essence of virtue is self-control, and that surrender to any external influence is beneath the dignity of man. —adj. 3. cynical. 4. (cap.) Also, Cynical. of or pertaining to the Cynics or their doctrines. [< L Cynic(us) < Gk Kynikós Cynic, lit., doglike, currish = kyn- (s. of kýōn) dog + -ikos -ic]

**cyn·i·cal** (sin′i kəl), adj. 1. like or characteristic of a cynic; distrusting or disparaging the motives of others. 2. showing contempt for accepted standards of honesty or morality by one's actions, esp. by actions that exploit the scruples of others. 3. (cap.) cynic (def. 4). —cyn′i·cal·ly, adv. —cyn′i·cal·ness, n.

—Syn. 1. distrustful, disbelieving, sneering, contemptuous, derisive. Cynical, pessimistic, sarcastic, satirical imply holding a low opinion of mankind. Cynical suggests a disbelief in the sincerity of human motives: cynical about honesty. Pessimistic implies a more or less habitual disposition to look on the dark side of things, and to believe that the worst will happen: pessimistic about the future. Sarcastic refers to sneering or making cutting gibes: sarcastic about a profession of faith. Satirical suggests expressing scorn or ridicule by saying the opposite of what one means: satirical about the way in which actions differ. —Ant. 1. optimistic.

**cyn·i·cism** (sin′i siz′əm), n. 1. cynical disposition, character, or belief. 2. a cynical remark. 3. (cap.) any of the doctrines or practices of the Cynics.

**cy·no·sure** (sī′nə sho͝or′, sin′ə-), n. 1. something that strongly attracts attention by its brilliance, interest, etc.: the cynosure of all eyes. 2. something serving for guidance or direction. 3. (cap.) Astron. Obs. a. See Ursa Minor. b. Polaris. [< L Cynosūra < Gk Kynósoura the constellation Ursa Minor = kynós dog's (gen. of kýōn) + ourá tail] —cy′no·sur′al, adj.

**Cyn·thi·a** (sin′thē ə), n. 1. Artemis: so called from her birth on Mount Cynthus, on Delos. 2. Literary. the moon, the emblem of Artemis.

**Cyn·wulf** (kin′wo͝olf), n. Cynewulf.

**cy·per·a·ceous** (sī′pə rā′shəs, sip′ə-), adj. belonging or pertaining to the Cyperaceae, or sedge family of plants. [< NL Cyper(us) the typical genus (L: kind of rush < Gk kýpeiros a marsh plant) + -aceous]

**cy·pher** (sī′fər), n., v.t., v.i. Chiefly Brit. cipher.

**cy pres** (sē′ prā′), Law. 1. as near as possible. 2. the doctrine, applied esp. to cases of charitable trusts, that allows the nearest practicable condition to be substituted for an illegal or impossible one. Also, cy′pres′. [< AF: lit., as near (c. F si près)]

**cy·press¹** (sī′prəs), n. 1. any of several evergreen coniferous trees of the genus Cupressus, having dark-green, scalelike, overlapping leaves. 2. any of various other coniferous trees allied to the true cypress, as the bald cypress. 3. any of various unrelated plants resembling the true cypress. [ME. OE cypresse < LL cypress(us), appar. b. L cupressus and cyparissus < Gk kypárissos; r. ME cipres < OF]

**cy·press²** (sī′prəs), n. Obs. a fine, thin fabric resembling lawn or crepe, formerly much used in black for mourning garments and trimmings. Also, cyprus. [ME cipre(s), cyprus, after Cyprus]

**cy′press vine′,** a convolvulaceous plant, Quamoclit pennata, having finely parted leaves and scarlet or white, tubular flowers.

**Cyp·ri·an** (sip′rē ən), n. Saint (Thascius Caecilius Cyprianus), A.D. c200–258, early church father, bishop, and martyr.

**Cyp·ri·an** (sip′rē ən), adj. 1. noting or pertaining to the worship of Aphrodite or to conduct inspired by Aphrodite. 2. lewd; licentious. 3. Cypriote. —n. 4. Cypriote. 5. a lewd person, esp. a prostitute. 6. the Cyprian, Aphrodite: so called because her cult was centered on Cyprus. [< L Cypri(us) of Cyprus (< Gk Kýprios < Kýpros Cyprus) + -an]

**cy·pri·nid** (si prī′nid, sip′rə nid), n. 1. any fish belonging to the Cyprinidae, or minnow family. —adj. 2. carplike in

during an exposure. 8. the sudden flame or intense heat produced by a bomb or other explosive device. 9. *Archaic.* an artificially induced rush of water for sending a boat down a shallow stream. 10. *Obs.* the cant or jargon of thieves, vagabonds, etc. 11. **flash in the pan,** a. a brief, intense effort that produces no permanent result. b. a person who makes such an effort; one who enjoys short-lived success. —*v.i.* 12. to break forth into sudden flame or light, esp. transiently or intermittently. 13. to speak or behave with sudden anger, outrage, or the like (often fol. by *out*): *to flash out at a stupid remark.* 14. to gleam. 15. to burst suddenly into view or perception. 16. to move like a flash. 17. to break into sudden action. 18. *Archaic.* to make a flash or sudden display. 19. *Archaic.* to dash or splash, as the sea or waves.
—*v.t.* 20. to emit or send forth (fire or light) in sudden flashes. 21. to cause to flash, as powder by ignition or a sword by waving. 22. to send forth like a flash. 23. to transmit or communicate instantaneously, as by telegraph. 24. *Informal.* to make an ostentatious display of. 25. to increase the flow of water in (a river, channel, etc.). 26. *Glassmaking.* a. to coat (plain glass or a glass object) with a layer of colored, opalescent, or white glass. b. to apply (such a layer). c. to color or make (glass) opaque by reheating. 27. *Building Trades.* to protect with flashing.
—*adj.* 28. showy or ostentatious. 29. of or belonging to sporting men; sporty. 30. sudden and brief: *a flash storm.* 31. caused by or used as protection against flash: *flash injuries; flash clothing.* 32. *Informal.* belonging to or connected with thieves, vagabonds, etc., or their cant or jargon. [ME *flashe(n)* (to) sprinkle; ? b. FLY[1] and WASH] —**flash/ing·ly,** *adv.* —**flash/er,** *n.*
—**Syn.** 1. flare, gleam, glare. 3. twinkling, wink. 14. scintillate. FLASH, GLANCE, GLINT, GLITTER mean to send forth a sudden gleam (or gleams) of bright light. To FLASH is to send forth light with a sudden, transient brilliancy: *A shooting star flashed briefly.* To GLANCE is to emit a brilliant flash of light as a reflection from a smooth surface: *Sunlight glanced from the windshield.* To GLINT is to reflect a bright gleam of light as from something polished or burnished: *Light glints from burnished copper.* To GLITTER is to reflect intermittent flashes of light from a hard surface: *Ice glitters in the moonlight.* 28. flashy, gaudy, tawdry, pretentious, superficial.

**flash·back** (flash/bak/), *n.* a scene representing an earlier event inserted into a current situation depicted in a novel, motion picture, play, etc.

**flash/ bulb/,** *Photog.* 1. a glass bulb, burning with a brilliant flash when ignited electrically, for momentarily illuminating a subject. 2. Also called **flashtube, flash tube.** an electronic flash lamp having a tube containing xenon or krypton. Also, **flash/bulb/.**

**flash/ card/,** a card bearing words, numerals, or pictures, designed for gaining a rapid response from pupils when held up briefly by a teacher, as in a drill.

**flash·cube** (flash/kyōōb/), *n.* *Photog.* a cube, for attaching to a camera, that contains a flash bulb in each vertical side and rotates automatically for taking four flash pictures in rapid succession. Also, **flash/ cube/.**

**flash/ flood/,** a sudden and destructive rush of water down a narrow gully or over a sloping surface.

**flash/ gun/,** *Photog.* a device that simultaneously discharges a flash bulb and operates a camera shutter.

**flash·ing** (flash/ing), *n.* 1. *Building Trades.* sheet metal or the like used to cover and protect certain joints and angles, as where a roof comes in contact with a wall. 2. the act of creating an artificial flood in a conduit or stream, as in a sewer for cleansing it.

**flash/ lamp/,** *Photog.* a special lamp for providing momentary illumination for the subject of a photograph. Also, **flash/lamp/.**

**flash·light** (flash/līt/), *n.* 1. a small, portable electric lamp powered by dry batteries or a tiny generator. 2. a flash of light, or a light that flashes. 3. any source of artificial light as used in flash photography.

**flash·o·ver** (flash/ō/vər), *n.* *Elect.* a disruptive discharge around or over the surface of a solid or liquid insulator.

**flash/ pho·tog/ra·phy,** photography using a momentary flash of artificial light as a source of illumination. Also called **photoflash photography.**

**flash/ point/,** *Physical Chem.* the lowest temperature at which a liquid will give off sufficient vapor to ignite on application of a flame. Also called **flash/ing point/.**

**flash·tube** (flash/tōōb/, -tyōōb/), *n.* *Photog.* See **flash bulb** (def. 2). Also, **flash/ tube/.**

**flash·y** (flash/ē), *adj.* **flash·i·er, flash·i·est.** 1. briefly and superficially sparkling or brilliant: *a flashy performance.* 2. pretentiously smart; showy; gaudy: *flashy clothes.* 3. *Archaic.* flashing with light. —**flash/i·ly,** *adv.* —**flash/i·ness,** *n.* —**Syn.** 2. See **gaudy**[1].

**flask** (flask, fläsk), *n.* 1. a bottle, usually of glass, having a rounded body and a narrow neck, used to hold wine, oil, etc. 2. a flat metal or glass bottle for carrying in the pocket: *a flask full of brandy.* 3. the quantity contained in a flask. 4. *Foundry.* a container into which sand is rammed around a pattern to form a mold. [ME; OE *flasce, flaxe*; cf. FLAGON]

**flask·et** (flas/kit, flä/skit), *n.* 1. a small flask. 2. a long, shallow basket. [ME *flaskett* < OF *flasquet,* dim. of *flasque* FLASK]

**flat**[1] (flat), *adj.,* **flat·ter, flat·test,** *n., v.,* **flat·ted, flat·ting,** *adv.* —*adj.* 1. horizontally level. 2. level, even, or without inequalities of surface, as land, tabletops, etc. 3. having a surface that is without marked projections or depressions. 4. lying horizontally and at full length, as a person. 5. lying wholly on or against something. 6. thrown down, laid low, or level with the ground, as fallen trees or buildings. 7. having a generally level shape or appearance; not deep or thick. 8. spread out, as an unrolled map, the open hand, etc. 9. deflated; collapsed: *a flat tire.* 10. without qualification; absolute, downright, or positive: *a flat denial.* 11. without modification or variation: *a flat price; a flat rate.* 12. without vitality or animation; lifeless; dull. 13. having lost its flavor, sharpness, or life, as wine or food; stale. 14. (of a beverage) having lost its effervescence. 15. pointless, as a remark or joke. 16. commercially dull, as trade or the market. 17. *Painting.* a. not having the illusion of volume or depth. b. lacking gradations of tone or color. c. without gloss; mat. 18. not clear, sharp, or ringing, as sound, a voice, etc. 19. lacking resonance and variation in pitch; monotonous. 20. *Music.* a. (of a tone) lowered a half step in pitch: *B flat.* b. below an intended pitch, as a note; too low (opposed to *sharp*). 21. *Gram.* derived without change in form, as English *to brush* from the noun *brush* and adverbs which do not add *-ly* to the adjective form as *fast, cheap, slow,* etc. 22. *Phonet.* lenis; voiced. 23. **flat a,** the *a*-sound (a) of *glad, bat,* or *act.*
—*n.* 24. something flat. 25. Often, **flats.** a shoe, esp. a woman's shoe, with a flat heel or no heel. 26. a flat surface, side, or part of anything: *the flat of his hand.* 27. flat or level ground; a flat area: *salt flats.* 28. a marsh, shoal, or shallow. 29. *Music.* a. (in musical notation) the character ♭, which when attached to a note or to a staff degree lowers its significance one chromatic half step. b. a tone one chromatic half step below another. 30. *Theat.* a piece of scenery consisting of a wooden frame, usually rectangular, covered with lightweight board or fabric. 31. a broad, thin book, chiefly for children: *a juvenile flat.* 32. *Informal.* a deflated automobile tire. 33. Also called **platform.** *Naut.* a. a partial deck between two full decks. b. a low, flat barge or lighter. 34. an iron or steel bar of rectangular section. 35. *Hort.* a shallow box used for rooting seeds and cuttings. 36. *Football.* the area of the field immediately inside of or outside of an offensive end, close behind or at the line of scrimmage.
—*v.t.* 37. to make flat. 38. *Music.* to lower (a pitch), esp. one half step.
—*v.i.* 39. to become flat. 40. **flat in,** *Naut.* to pull the clew of (a fore-and-aft sail) as nearly amidships as possible. Also, **flatten in.**
—*adv.* 41. in a flat position; horizontally; levelly. 42. in a flat manner; positively; absolutely. 43. completely; utterly: *flat broke.* 44. exactly; precisely. 45. *Music.* below the true pitch: *to sing flat.* 46. *Finance.* without interest. 47. **fall flat,** to fail to produce the desired effect; fail completely. [ME < Scand; cf. Icel *flat(r),* Sw *flat;* akin to OE *flet* floor (see FLAT[2]), Gk *platys* (see PLATE[1], PLATY-)] —**flat/ly,** *adv.* —**flat/ness,** *n.*
—**Syn.** 1. plane. See **level.** 4. supine, prostrate, prone. 10. categorical. 12. boring, spiritless, prosaic, insipid. 13. vapid, unsavory. —**Ant.** 1, 4. upright, vertical.

**flat**[2] (flat), *n.* an apartment or suite of rooms on one floor, forming a residence, as for a family. [var. of obs. *flet,* OE: floor, house, hall; akin to FLAT[1]]

**flat/-bed press/** (flat/bed/). See **cylinder press.**

**flat·boat** (flat/bōt/), *n.* a large flat-bottomed boat for use in shallow water, esp. for use on rivers.

**flat·car** (flat/kär/), *n.* *U.S.* a railroad car without sides or top; platform car.

**flat·fish** (flat/fish/), *n., pl.* (*esp. collectively*) **-fish,** (*esp. referring to two or more kinds or species*) **-fish·es.** any fish of the order *Heterosomata* (*Pleuronectiformes*), including the halibut, sole, flounder, etc., having a greatly compressed body, with both eyes on the upper side in the adult, and swimming on one side.

**flat·foot** (flat/fōōt/ *or, for 1,* -fōōt/), *n., pl.* **-feet** for 1, **-foots** for 2. 1. *Pathol.* a. a condition in which the arch of the foot is flattened so that the entire sole rests upon the ground. b. a foot with such an arch. 2. *Slang.* a policeman.

**flat·foot·ed** (flat/fōōt/id), *adj.* 1. having flatfeet. 2. **catch one flatfooted,** *Informal.* to catch one off his guard; surprise: *The amount of the dinner check caught us flatfooted.* —**flat/-foot/ed·ly,** *adv.* —**flat/-foot/ed·ness,** *n.*

**flat·head** (flat/hed/), *n., pl.* (*esp. collectively*) **-head,** (*esp. referring to two or more kinds or species*) **-heads.** any of several scorpaenoid fishes of the family *Platycephalidae,* found chiefly in the Indo-Pacific region, where they are used for food. [FLAT[1] + HEAD, so called from physical appearance]

**Flat·head** (flat/hed/), *n.* 1. a member of a tribe of Salishan Indians of northwest Montana. 2. a Chinook Indian. [so called from their supposed practice of flattening their children's heads]

**flat·i·ron** (flat/ī/ərn), *n.* 1. an iron with a flat bottom, heated for use in pressing clothes, cloth, etc. 2. *Geol.* a triangular-shaped hogback that resembles a flatiron resting on its base.

**flat/ knot/.** See **reef knot.**

**flat·ling** (flat/ling), *adv.* Also, **flat/lings.** *Brit. Dial.* 1. in a flat position; with the flat side, as of a sword. 2. flatly or positively. —*adj.* 3. *Obs.* dealt with the flat side. [ME]

**flat/ sil/ver,** flatware (def. 1).

**flat·ten** (flat/ən), *v.t.* 1. to make flat. —*v.i.* 2. to become flat. 3. **flatten in,** *Naut.* See **flat**[1] (def. 40). 4. **flatten out,** *Aeron.* to fly into a horizontal position, as after a dive. —**flat/ten·er,** *n.*

**flat·ter**[1] (flat/ər), *v.t.* 1. to try to please by complimentary speech or attention. 2. to compliment insincerely. 3. to praise effusively or excessively. 4. to represent favorably; gratify by falsification: *The portrait flatters her.* 5. to show to advantage: *The black dress flattered her figure.* 6. to play upon the vanity or susceptibilities of; cajole, wheedle, or beguile. 7. to please or gratify by compliments or attentions. 8. to feel satisfaction with (oneself) esp. with reference to an accomplishment, act, or occasion. 9. to beguile with hope; encourage prematurely, falsely, etc. —*v.i.* 10. to use flattery. [ME *flat(t)er(en)* (to) float, flutter, fawn upon, OE *floterian* to float, flutter; for sense development, cf. FLICKER[1], Icel *flathra;* not connected with F *flatter* to flatter] —**flat/ter·a·ble,** *adj.* —**flat/ter·er,** *n.* —**flat/ter·ing·ly,** *adv.*

**flat·ter**[2] (flat/ər), *n.* 1. a person or thing that makes something flat. 2. a flat-faced blacksmith's tool, laid on a forging and struck with a hammer to smooth the surface of the forging. 3. a drawplate with a flat orifice for drawing flat metal strips, as for watch springs. [FLAT[1] + -ER[1]]

**flat·ter·y** (flat/ə rē), *n., pl.* **-ter·ies** for 2. 1. the act of flattering. 2. a flattering compliment or speech; excessive, insincere praise. [ME *flaterie* < MF = *flat(er)* (to) flatter + *-erie* -ERY]

**flat·ting** (flat/ing), *n.* the act of a person or thing that makes flat, as in the manufacture of sheet metal, flat paint, etc.

**flat·tish** (flat/ish), *adj.* somewhat flat.

**flat·top** (flat/top/), *n.* *U.S. Navy Informal.* an aircraft carrier. Also, **flat/-top/.**

# Exhibit G

# Handbook of PHARMACEUTICAL EXCIPIENTS

## Second Edition

*Edited by*

**Ainley Wade** and **Paul J Weller**

**American Pharmaceutical Association**
**Washington**

**The Pharmaceutical Press**
**London**

**1994**

© Copyright 1986, 1994 by the American Pharmaceutical Association, 2215 Constitution Avenue NW, Washington, DC 20037-2985, USA, and The Pharmaceutical Press, Royal Pharmaceutical Society of Great Britain, 1 Lambeth High Street, London, SE1 7JN, England.

A catalogue record for this book is available from the British Library.

Library of Congress Catalog Card Number: 94–79492.

International Standard Book Number (ISBN) in the UK: 0 85369 305 6
International Standard Book Number (ISBN) in the USA: 0 91730 66 8

No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage or retrieval system, without prior written permission from the joint publishers.

Typeset in Great Britain by Alden Multimedia, Northampton.
Printed and bound in Great Britain by

# Hydroxypropyl Methylcellulose

## 1. Nonproprietary Names

BP: Hypromellose
PhEur: Methylhydroxypropylcellulosum
USP: Hydroxypropyl methylcellulose

## 2. Synonyms

Cellulose, hydroxypropyl methyl ether; *Culminal MHPC*; E464; HPMC; *Methocel*; methylcellulose propylene glycol ether; methyl hydroxypropylcellulose; *Metolose*; *Pharmacoat*.

## 3. Chemical Name and CAS Registry Number

Cellulose, 2-Hydroxypropyl methyl ether
[9004-65-3]

## 4. Empirical Formula Molecular Weight

The PhEur 1992 describes hydroxypropyl methylcellulose as a partly *O*-methylated and *O*-(2-hydroxypropylated) cellulose. It is available in several grades which vary in viscosity and extent of substitution. Grades may be distinguished by appending a number indicative of the apparent viscosity, in mPa s, of a 2% w/w aqueous solution at 20°C. Hydroxypropyl methylcellulose defined in the USP XXII specifies the substitution type by appending a four digit number to the nonproprietary name, e.g. hydroxypropyl methylcellulose 1828. The first two digits refer to the approximate percentage content of the methoxy group ($OCH_3$). The second two digits refer to the approximate percentage content of the hydroxypropoxy group ($OCH_2CHOHCH_3$), calculated on a dried basis. Molecular weight is approximately 10 000-1 500 000.

## 5. Structural Formula

CH₂OR, OR, O, OR, OR, O, OR, CH₂OR, n

Where R is H, $CH_3$ or $[CH_3CH(OH)CH_2]$.

## 6. Functional Category

Coating agent; film-former; stabilizing agent; suspending agent; tablet binder; viscosity-increasing agent.

## 7. Applications in Pharmaceutical Formulation or Technology

Hydroxypropyl methylcellulose is widely used in oral and topical pharmaceutical formulations.

In oral products, hydroxypropyl methylcellulose is primarily used as a tablet binder,[1] in film-coating[2-7] and as an extended release tablet matrix.[8-12] Concentrations of between 2-5% w/w may be used as a binder in either wet or dry granulation processes. High viscosity grades may be used to retard the release of water-soluble drugs from a matrix.

Depending upon the viscosity grade, concentrations between 2-10% w/w are used as film-forming solutions to film-coat tablets. Lower viscosity grades are used in aqueous film-coating solutions while higher viscosity grades are used with organic solvents.

Hydroxypropyl methylcellulose is also used as a suspending and thickening agent in topical formulations, particularly ophthalmic preparations. Compared with methylcellulose, hydroxypropyl methylcellulose produces solutions of greater clarity, with fewer undispersed fibres present, and is therefore preferred in formulations for ophthalmic use. Concentrations of between 0.45-1.0% w/w may be added as a thickening agent to vehicles for eye-drops and artificial tear solutions.

Hydroxypropyl methylcellulose is also used as an emulsifier, suspending agent and stabilizing agent in topical gels and ointments. As a protective colloid, it can prevent droplets and particles from coalescing or agglomerating, thus inhibiting the formation of sediments.

In addition, hydroxypropyl methylcellulose is used as an adhesive in plastic bandages and as a wetting agent for hard contact lenses. It is also widely used in cosmetics and food products.

## 8. Description

Hydroxypropyl methylcellulose is an odorless and tasteless, white or creamy-white colored fibrous or granular powder.

## 9. Pharmacopeial Specifications

| Test | PhEur 1992 | USP XXII (Suppl 2) |
|---|---|---|
| Identification | + | + |
| Appearance of solution | + | — |
| pH (1% w/w solution) | 5.5-8.0 | — |
| Apparent viscosity | + | + |
| Loss on drying | ⩽ 10.0% | ⩽ 5.0% |
| Residue on ignition | | |
| for viscosity grade > 50 mPa s | — | ⩽ 1.5% |
| for viscosity grade ⩽ 50 mPa s | — | ⩽ 3.0% |
| for type 1828 of all viscosities | — | ⩽ 5.0% |
| Sulfated ash | ⩽ 1.0% | — |
| Arsenic | — | ⩽ 3 ppm |
| Chlorides | ⩽ 0.5% | — |
| Heavy metals | ⩽ 20 ppm | ⩽ 0.001% |
| Methoxy content | | |
| Type 1828 | — | 16.5-20.0% |
| Type 2208 | — | 19.0-24.0% |
| Type 2906 | — | 27.0-30.0% |
| Type 2910 | — | 28.0-30.0% |
| Hydroxypropoxy content | | |
| Type 1828 | — | 23.0-32.0% |
| Type 2208 | — | 4.0-12.0% |
| Type 2906 | — | 4.0-7.5% |
| Type 2910 | — | 7.0-12.0% |

## 10. Typical Properties

*Acidity/alkalinity:*
pH = 5.5-8.0 for a 1% w/w aqueous solution.

**SEM: 1**

Excipient: Hydroxypropyl methylcellulose
Manufacturer: Shin-Etsu Chemical Co Ltd
Lot No.: 83214
Magnification: 60x
Voltage: 10kV

**SEM: 2**

Excipient: Hydroxypropyl methylcellulose
Manufacturer: Shin-Etsu Chemical Co Ltd
Lot No.: 83214
Magnification: 600x
Voltage: 10kV

*Ash*: 1.5-3.0%, depending upon the grade.
*Autoignition temperature*: 360°C
*Density (tapped)*: 0.50-0.70 g/cm$^3$ for *Pharmacoat.*
*Melting point*: browns at 190-200°C; chars at 225-230°C. Glass transition temperature is 170-180°C.
*Moisture content*: hydroxypropyl methylcellulose absorbs moisture from the atmosphere, the amount of water absorbed depending upon the initial moisture content and the temperature and relative humidity of the surrounding air. *See also* HPE Data.
*Solubility*: soluble in cold water, forming a viscous colloidal solution; practically insoluble in chloroform, ethanol (95%) and ether, but soluble in mixtures of ethanol and dichloromethane, and mixtures of methanol and dichloromethane. Certain grades of hydroxypropyl methylcellulose are soluble in aqueous acetone solutions, mixtures of dichloromethane and propan-2-ol, and other organic solvents. *See also* Section 11.
*Specific gravity*: 1.26
*Viscosity (dynamic)*: a wide range of viscosity types are commercially available. Aqueous solutions are most commonly prepared although hydroxypropyl methylcellulose may also be dissolved in aqueous alcohols such as ethanol and propan-2-ol provided the alcohol content is less than 50% w/w. Dichloromethane and ethanol mixtures may also be used to prepare viscous hydroxypropyl methylcellulose solutions. Solutions prepared using organic solvents tend to be more viscous; increasing concentration also produces more viscous solutions, *see* Table I.
To prepare an aqueous solution, it is recommended that hydroxypropyl methylcellulose is dispersed and thoroughly hydrated in about 20-30% of the required amount of water. The water should be vigorously stirred and heated to 80-90°C then the remaining hydroxypropyl methylcellulose added. Cold water should then be added to produce the required volume.
When a water-miscible organic solvent such as ethanol, glycol, or mixtures of ethanol and dichloromethane is used, the hydroxypropyl methylcellulose should first be dispersed into the organic solvent, at a ratio of 5-8 parts of solvent to 1 part of hydroxypropyl methylcellulose. Cold water is then added to produce the required volume.

**Table I: Dynamic viscosity (mPa s) of *Pharmacoat 603* (Shin-Etsu Chemical Co Ltd) solutions in various solvents at 20°C.**

| Solvent | Viscosity (mPa s) at 20°C Concentration (% w/w) | | | |
|---|---|---|---|---|
| | 2 | 6 | 10 | 14 |
| Dichloromethane: ethanol (50:50) | 4 | 28 | 150 | 580 |
| Ethanol: water (50:50) | 8 | 32 | 120 | 350 |
| Water | 3 | 15 | 45 | 100 |

**HPE Laboratory Project Data**

| | Method | Lab # | Results |
|---|---|---|---|
| Moisture content | MC-20 | 15 | 2.10% [a] |
| Moisture content | MC-20 | 15 | 3.10% [b] |
| Moisture content | EMC-1 | 15 | *See* Fig. 1. [a] |

Supplier: a. Dow Chemical Company; b. Aqualon.

## 11. Stability and Storage Conditions

Hydroxypropyl methylcellulose powder is a stable material although it is hygroscopic after drying.



**Fig. 1: Equilibrium moisture content of hydroxypropyl methylcellulose, *Methocel E15* (Dow Chemical Company, Lot No.: QP0502-801-E).**

Solutions are stable between pH 3-11. Increasing temperature reduces the viscosity of solutions. Hydroxypropyl methylcellulose undergoes a reversible sol to gel transformation upon heating and cooling respectively. The gel point is 50-90°C, depending upon the grade of material.
Aqueous solutions are comparatively enzyme-resistant, providing good viscosity stability during long-term storage.[13] However, aqueous solutions are liable to microbial spoilage and should be preserved with an antimicrobial preservative. When used as a viscosity-increasing agent in ophthalmic solutions, benzalkonium chloride is commonly used for this purpose. Aqueous solutions may also be sterilized by autoclaving; the coagulated polymer must be redispersed on cooling by shaking.
Hydroxypropyl methylcellulose powder should be stored in a well-closed container, in a cool, dry, place.

## 12. Incompatibilities

Hydroxypropyl methylcellulose is incompatible with some oxidizing agents. Since it is nonionic, hydroxypropyl methylcellulose will not complex with metallic salts and ionic organics to form insoluble precipitates.

## 13. Method of Manufacture

A purified form of cellulose, obtained from cotton waste or wood pulp, is reacted with sodium hydroxide solution to produce a swollen alkali cellulose which is chemically more reactive than untreated cellulose. The alkali cellulose is then treated with chloromethane and propylene oxide to produce methylhydroxypropyl ethers of cellulose. The fibrous reaction product is then purified and ground to a fine, uniform powder or granules.

## 14. Safety

Hydroxypropyl methylcellulose is widely used as an excipient in oral and topical pharmaceutical formulations. It is also used extensively in cosmetics and food products.

Hydroxypropyl methylcellulose is generally regarded as a nontoxic and nonirritant material although excessive oral consumption may have a laxative effect.[14] The WHO has not specified an acceptable daily intake for hydroxypropyl methylcellulose since the levels consumed were not considered to represent a hazard to health.[15]
$LD_{50}$ (mouse, IP): 5 g/kg[16]
$LD_{50}$ (rat, IP): 5.2 g/kg

## 15. Handling Precautions

Observe normal precautions appropriate to the circumstances and quantity of material handled. Hydroxypropyl methylcellulose dust may be irritant to the eyes and eye protection is recommended. Excessive dust generation should be avoided to minimize the risks of explosions. Hydroxypropyl methylcellulose is combustible.

## 16. Regulatory Status

GRAS listed. Accepted as a food additive in Europe. Included in the FDA Inactive Ingredients Guide (ophthalmic preparations, oral capsules, suspensions, syrups and tablets, topical and vaginal preparations). Included in nonparenteral medicines licensed in the UK.

## 17. Pharmacopeias

Br, Eur, Fr, Gr, It, Jpn, Neth, Port, Swiss and US.

## 18. Related Substances

Hydroxyethyl Cellulose; Hydroxypropyl Cellulose; Hydroxypropyl Methylcellulose Phthalate.

## 19. Comments

Powdered or granular, surface-treated grades of hydroxypropyl methylcellulose are also available which are dispersible in cold water. The dissolution rate of these materials can be controlled by a shift in pH and they are thus useful for slow-release or enteric coated formulations.

## 20. Specific References

1. Chowhan ZT. Role of binders in moisture-induced hardness increase in compressed tablets and its effect on *in vitro* disintegration and dissolution. J Pharm Sci 1980; 69: 1-4.
2. Rowe RC. The adhesion of film coatings to tablet surfaces - the effect of some direct compression excipients and lubricants. J Pharm Pharmacol 1977; 29: 723-726.
3. Rowe RC. The molecular weight and molecular weight distribution of hydroxypropyl methylcellulose used in the film coating of tablets. J Pharm Pharmacol 1980; 32: 116-119.
4. Banker G, Peck G, Jan S, Pirakitikulr P. Evaluation of hydroxypropyl cellulose and hydroxypropyl methyl cellulose as aqueous based film coatings. Drug Dev Ind Pharm 1981; 7: 693-716.
5. Okhamafe AO, York P. Moisture permeation mechanism of some aqueous-based film coats. J Pharm Pharmacol 1982; 34(Suppl): 53P.
6. Alderman DA, Schulz GJ. Method of making a granular, cold water dispersible coating composition for tablets. US Patent 4816298, 1989.
7. Patell MK. Taste masking pharmaceutical agents. US Patent 4916161, 1990.
8. Hardy JG, Kennerley JW, Taylor MJ, Wilson CG, Davis SS. Release rates from sustained-release buccal tablets in man. J Pharm Pharmacol 1982; 34(Suppl): 91P.

Case 1:06-cv-00774-JJF Document 195-3 Filed 03/05/2008 Page 46 of 49

9. Hogan JE. Hydroxypropylmethylcellulose sustained release technology. Drug Dev Ind Pharm 1989; 15: 975-999.
10. Shah AC, Britten NJ, Olanoff LS, Badalamenti JN. Gel-matrix systems exhibiting bimodal controlled release for oral delivery. J Controlled Release 1989; 9: 169-175.
11. Wilson HC, Cuff GW. Sustained release of isomazole from matrix tablets administered to dogs. J Pharm Sci 1989; 78: 582-584.
12. Dahl TC, Calderwood T, Bormeth A, Trimble K, Piepmeier E. Influence of physicochemical properties of hydroxypropyl methylcellulose on naproxen release from sustained release matrix tablets. J Controlled Release 1990; 14: 1-10.
13. Banker G, Peck G, Williams E, Taylor D, Pirakitikulr P. Microbiological considerations of polymer solutions used in aqueous film coating. Drug Dev Ind Pharm 1982; 8: 41-51.
14. Final report on the safety assessment of hydroxyethylcellulose, hydroxypropylcellulose, methylcellulose, hydroxypropyl methylcellulose and cellulose gum. J Am Coll Toxicol 1986; 5(3): 1-60.
15. FAO/WHO. Evaluation of certain food additives and contaminants: thirty-fifth report of the joint FAO/WHO expert committee on food additives. Tech Rep Ser Wld Hlth Org 1990; No. 789.
16. Sweet DV, editor. Registry of toxic effects of chemical substances. Cincinnati: US Department of Health, 1987.

## 21. General References

Dow Chemical Company. Technical literature: *Methocel*, 1993.

Doelker E. Cellulose derivatives. Adv Polymer Sci 1993; 107: 199-265.

Malamataris S, Karidas T, Goidas P. Effect of particle size and sorbed moisture on the compression behavior of some hydroxypropyl methylcellulose (HPMC) polymers. Int J Pharmaceutics 1994; 103: 205-215.

Papadimitriou E, Buckton G, Efentakis M. Probing the mechanisms of swelling of hydroxypropylmethylcellulose matrices. Int J Pharmaceutics 1993; 98: 57-62.

Parab PV, Nayak MP, Ritschel WA. Influence of hydroxypropyl methylcellulose and of manufacturing technique on *in vitro* performance of selected antacids. Drug Dev Ind Pharm 1985; 11: 169-185.

Radebaugh GW, Murtha JL, Julian TN, Bondi JN. Methods for evaluating the puncture and shear properties of pharmaceutical polymeric films. Int J Pharmaceutics 1988; 45: 39-46.

Rowe RC. Materials used in the film coating of oral dosage forms. In: Florence AT, editor. Critical reports on applied chemistry, volume 6: materials used in pharmaceutical formulation. Oxford: Blackwell Scientific Publications, 1984: 1-36.

Sebert P, Andrianoff N, Rollet M. Effect of gamma irradiation on hydroxypropylmethylcellulose powders: consequences on physical, rheological and pharmacotechnical properties. Int J Pharmaceutics 1993; 99: 37-42.

Shin-Etsu Chemical Co Ltd. Technical literature: *Metolose*, 1977.

Shin-Etsu Chemical Co Ltd. Technical literature: *Pharmacoat* hydroxypropyl methylcellulose, 1990.

Wan LSC, Heng PWS, Wong LF. The effect of hydroxypropylmethylcellulose on water penetration into a matrix system. Int J Pharmaceutics 1991; 73: 111-116.

## 22. Authors

USA: RJ Harwood, JL Johnson.

# Magnesium Stearate

## 1. Nonproprietary Names

BP: Magnesium stearate
PhEur: Magnesii stearas
USPNF: Magnesium stearate

## 2. Synonyms

E572; *HyQual*; magnesium octadecanoate; stearic acid magnesium salt.

## 3. Chemical Name and CAS Registry Number

Octadecanoic acid magnesium salt [557-04-0]

## 4. Empirical Formula / Molecular Weight

| Empirical Formula | Molecular Weight |
|---|---|
| $C_{36}H_{70}MgO_4$ | 591.27 (for pure material) |

The USPNF XVII describes magnesium stearate as a compound of magnesium with a mixture of solid organic acids obtained from fats and consists chiefly of variable proportions of magnesium stearate and magnesium palmitate ($C_{32}H_{62}MgO_4$). The BP 1993 and PhEur 1983 describe magnesium stearate as consisting mainly of magnesium stearate with variable proportions of magnesium palmitate and magnesium oleate ($C_{36}H_{66}MgO_4$).

## 5. Structural Formula

$[CH_3(CH_2)_{16}COO]_2Mg$

## 6. Functional Category

Tablet and capsule lubricant.

## 7. Applications in Pharmaceutical Formulation or Technology

Magnesium stearate is widely used in cosmetics, foods and pharmaceutical formulations. It is primarily used as a lubricant in capsule and tablet manufacture at concentrations between 0.25-5.0%.

## 8. Description

Magnesium stearate is a fine, white, precipitated or milled, impalpable powder of low bulk density, having a faint, characteristic odor and taste. The powder is greasy to the touch and readily adheres to the skin.

## 9. Pharmacopeial Specifications

| Test | PhEur 1983 | USPNF XVII (Suppl 9) |
|---|---|---|
| Identification | + | + |
| Microbial limits | — | + |
| Acidity or alkalinity | + | — |
| Color of solution | + | — |
| Acid value of the fatty acids | 195-210 | — |
| Clarity and color of solution of the fatty acids | + | — |
| Loss on drying | ⩽ 6.0% | ⩽ 4.0% |
| Heavy metals | ⩽ 20 ppm | — |
| Lead | — | ⩽ 0.001% |
| Organic volatile impurities | — | + |
| Chloride | ⩽ 250 ppm | — |
| Sulfate | ⩽ 0.5% | — |
| Assay (dried basis, as Mg) | 3.8-5.0% | — |
| Assay (as MgO) | — | 6.8-8.3% |

**SEM: 1**
Excipient: Magnesium stearate
Magnification: 600x

**SEM: 2**
Excipient: Magnesium stearate
Magnification: 2400x

## 10. Typical Properties

*Compressibility*: *see* HPE Data.
*Density*: 1.03-1.08 g/cm$^3$, *see also* HPE Data.
*Density (tapped)*: 0.30 g/cm$^3$, *see also* HPE Data.
*Flash point*: 250°C
*Flowability*: poorly flowing, cohesive powder.
*Melting point*: 88.5°C
*Moisture content*: *see* HPE Data.
*Polymorphism*: a trihydrate, acicular form and a dihydrate, lamellar form have been isolated, with the latter possessing the better lubricating properties.
*Solubility*: practically insoluble in ethanol, ethanol (95%), ether and water; slightly soluble in warm benzene and warm ethanol (95%). *See also* HPE Data.
*Specific surface area*: 2.45-16.0 m$^2$/g.

**HPE Laboratory Data**

| | Method | Lab # | Results |
|---|---|---|---|
| Compressibility | | | |
| at 63.5-235 MPa | COM-1 | 21 | No compacts [a] |
| at 500 MPa | COM-7 | 12 | Lamination [b] |
| Density | DE-1 | 7 | 1.06-1.1 g/cm$^3$ [b] |
| Density (bulk & tapped) | BTD-2 | 1 | B: 0.143 g/cm$^3$ [b] |
| | | | T: 0.224 g/cm$^3$ [b] |
| Density (bulk & tapped) | BTD-7 | 14 | B: 0.160 g/cm$^3$ [b] |
| | | | T: 0.180 g/cm$^3$ [b] |
| Moisture content | EMC-1 | 5 | *See* Fig. 1. [c] |
| Moisture content | MC-12 | 1 | 3.85% [b] |
| Moisture content | MC-12 | 5 | 3.00% [c] |
| Solubility | | | |
| Ethanol (95%) at 25°C | SOL-1 | 1 | 0.160 mg/mL [b] |
| *n*-Hexane at 25°C | SOL-1 | 1 | 0.018 mg/mL [b] |
| Water at 25°C | SOL-1 | 1 | 0.040 mg/mL [b] |

Supplier:
a. Witco Corporation;
b. Mallinckrodt Speciality Chemicals Co;
c. Penick (Lot No.: 338-NB5-003).

**Fig. 1: Equilibrium moisture content of magnesium stearate.**

## 11. Stability and Storage Conditions

Magnesium stearate is stable and should be stored in a well-closed container in a cool, dry place.

## 12. Incompatibilities

Incompatible with strong acids, alkalis and iron salts. Avoid mixing with strong oxidizing materials.

## 13. Method of Manufacture

Magnesium stearate is prepared either by the interaction of aqueous solutions of magnesium chloride with sodium stearate, or by the interaction of magnesium oxide, hydroxide or carbonate with stearic acid at elevated temperatures.

## 14. Safety

Magnesium stearate is widely used as a pharmaceutical excipient and is generally regarded as being nontoxic following oral administration. However, oral consumption of large quantities may result in some laxative effect or mucosal irritation. Inhalation of magnesium stearate powder is harmful and has resulted in fatalities, *see also* Section 15.

## 15. Handling Precautions

Observe normal precautions appropriate to the circumstances and quantity of material handled. Eye protection and gloves are recommended. Magnesium stearate should be handled in a well-ventilated environment; a respirator is recommended.

## 16. Regulatory Status

GRAS listed. Accepted as a food additive in Europe. Included in the FDA Inactive Ingredients Guide (oral capsules and tablets). Included in nonparenteral medicines licensed in the UK.

## 17. Pharmacopeias

Aust, Belg, Br, Braz, Chin, Cz, Eur, Fr, Ger, Hung, Ind, It, Jpn, Mex, Neth, Nord, Port, Rom, Swiss, Yug and USPNF.

## 18. Related Substances

Calcium Stearate; Stearic Acid; Zinc Stearate.

## 19. Comments

Magnesium stearate is hydrophobic and may retard the dissolution of a drug from a solid dosage form; the lowest possible concentration is therefore used in such formulations.[1-6] Since there may be variation between batches of magnesium stearate, it has not been possible to conclusively correlate the dissolution rate retardation with the observed lubricity.[7] The physical properties of different batches of magnesium stearate, such as specific surface area, have however been correlated with lubricant efficacy.[8-11]
There is evidence to suggest that the hydrophobic nature of magnesium stearate can vary from batch to batch due to the presence of water-soluble, surface-active impurities such as sodium stearate. Batches containing very low concentrations of these impurities have been shown to retard the dissolution of a drug to a greater extent than when using batches which contain higher levels of impurities.
An increase in the coefficient of variation of mixing and a decrease in the dissolution rate has been observed following blending of magnesium stearate with a tablet granulation. Tablet dissolution rate and crushing strength decreased as the time of blending increased; magnesium stearate may also

increase tablet friability. Blending times with magnesium stearate should thus be carefully controlled.[12-26]

## 20. Specific References

1. Levy G, Gumtow RH. Effect of certain formulation factors on dissolution rate of the active ingredient III: tablet lubricants. J Pharm Sci 1963; 52: 1139-1144.
2. Ganderton D. The effect of distribution of magnesium stearate on the penetration of a tablet by water. J Pharm Pharmacol 1969; 21: 9S-18S.
3. Caldwell HC. Dissolution of lithium and magnesium from lithium carbonate capsules containing magnesium stearate. J Pharm Sci 1974; 63: 770-773.
4. Chowhan ZT, Amaro AA, Chow YP. Tablet-to-tablet dissolution variability and its relationship to the homogeneity of a water soluble drug. Drug Dev Ind Pharm 1982; 8: 145-168.
5. Lerk CF, Bolhuis GK, Smallenbroek AJ, Zuurman K. Interaction of tablet disintegrants and magnesium stearate during mixing II: effect on dissolution rate. Pharm Acta Helv 1982; 57: 282-286.
6. Hussain MSH, York P, Timmins P. Effect of commercial and high purity magnesium stearates on in-vitro dissolution of paracetamol DC tablets. Int J Pharmaceutics 1992; 78: 203-207.
7. Billany MR, Richards JH. Batch variation of magnesium stearate and its effect on the dissolution rate of salicylic acid from solid dosage forms. Drug Dev Ind Pharm 1982; 8: 497-511.
8. Frattini C, Simioni L. Should magnesium stearate be assessed in the formulation of solid dosage forms by weight or by surface area? Drug Dev Ind Pharm 1984; 10: 1117-1130.
9. Bos CE, Vromans H, Lerck CF. Lubricant sensitivity in relation to bulk density for granulations based on starch or cellulose. Int J Pharmaceutics 1991; 67: 39-49.
10. Phadke DS, Eichorst JL. Evaluation of particle size distribution and specific surface area of magnesium stearate. Drug Dev Ind Pharm 1991; 17: 901-906.
11. Steffens KJ, Koglin J. The magnesium stearate problem. Mfg Chem 1993; 64(12): 16, 17, 19.
12. Ragnarsson G, Hölzer AW, Sjögren J. The influence of mixing time and colloidal silica on the lubricating properties of magnesium stearate. Int J Pharmaceutics 1979; 3: 127-131.
13. Bolhuis GK, Lerk CF, Broersma P. Mixing action and evaluation of tablet lubricants in direct compression. Drug Dev Ind Pharm 1980; 6: 15-33.
14. Bossert J, Stamm A. Effect of mixing on the lubrication of crystalline lactose by magnesium stearate. Drug Dev Ind Pharm 1980; 6: 573-589.
15. Bolhuis GK, Smallenbroek AJ, Lerk CF. Interaction of tablet disintegrants and magnesium stearate during mixing I: effect on tablet disintegration. J Pharm Sci 1981; 70: 1328-1330.
16. Sheikh-Salem M, Fell JT. The influence of magnesium stearate on time dependent strength changes in tablets. Drug Dev Ind Pharm 1981; 7: 669-674.
17. Stewart PJ. Influence of magnesium stearate on the homogeneity of a prednisone granule ordered mix. Drug Dev Ind Pharm 1981; 7: 485-495.
18. Jarosz PJ, Parrott EL. Effect of tablet lubricants on axial and radial work of failure. Drug Dev Ind Pharm 1982; 8: 445-453.
19. Mitrevej KT, Augsburger LL. Adhesion of tablets in a rotary tablet press II: effects of blending time, running time, and lubricant concentration. Drug Dev Ind Pharm 1982; 8: 237-282.
20. Khan KA, Musikabhumma P, Rubinstein MH. The effect of mixing time of magnesium stearate on the tableting properties of dried microcrystalline cellulose. Pharm Acta Helv 1983; 58: 109-111.
21. Johansson ME. Investigations of the mixing time dependence of the lubricating properties of granular and powdered magnesium stearate. Acta Pharm Suec 1985; 22: 343-350.
22. Johansson ME. Influence of the granulation technique and starting material properties on the lubricating effect of granular magnesium stearate. J Pharm Pharmacol 1985; 37: 681-685.
23. Chowhan ZT, Chi LH. Drug-excipient interactions resulting from powder mixing III: solid state properties and their effect on drug dissolution. J Pharm Sci 1986; 75: 534-541.
24. Chowhan ZT, Chi LH. Drug-excipient interactions resulting from powder mixing IV: role of lubricants and their effect on in vitro dissolution. J Pharm Sci 1986; 75: 542-545.
25. Johansson ME, Nicklasson M. Influence of mixing time, particle size and colloidal silica on the surface coverage and lubrication of magnesium stearate. In: Rubinstein MH, editor. Pharmaceutical technology: tableting technology. Chichester: Ellis Horwood, 1987: 43-50.
26. Wang LH, Chowhan ZT. Drug-excipient interactions resulting from powder mixing V: role of sodium lauryl sulfate. Int J Pharmaceutics 1990; 60: 61-78.

## 21. General References

Bohidar NR, Restaino FA, Schwartz JB. Selecting key pharmaceutical formulation factors by regression analysis. Drug Dev Ind Pharm 1979; 5: 175-216.

Butcher AE, Jones TM. Some physical characteristics of magnesium stearate J Pharm Pharmacol 1972; 24: 1P-9P.

Dansereau R, Peck GE. The effect of the variability in the physical and chemical properties of magnesium stearate on the properties of compressed tablets. Drug Dev Ind Pharm 1987; 13: 975-999.

Ertel KD, Carstensen JT. Chemical, physical, and lubricant properties of magnesium stearate. J Pharm Sci 1988; 77: 625-629.

Ford JL, Rubinstein MH. An investigation into some pharmaceutical interactions by differential scanning calorimetry. Drug Dev Ind Pharm 1981; 7: 675-682.

Johansson ME. Granular magnesium stearate as a lubricant in tablet formulations. Int J Pharmaceutics 1984; 21: 307-315.

Jones TM. The effect of glidant addition on the flowability of bulk particulate solids. J Soc Cosmet Chem 1970; 21: 483-500.

Leinonen UI, Jalonen HU, Vihervaara PA, Laine ESU. Physical and lubrication properties of magnesium stearate. J Pharm Sci 1992; 81: 1194-1198.

Miller TA, York P, Jones TM. Manufacture and characterisation of magnesium stearate and palmitate powders of high purity. J Pharm Pharmacol 1982; 34: 8P.

Pilpel N. Metal stearates in pharmaceuticals and cosmetics. Mfg Chem Aerosol News 1971; 42(10): 37-40.

## 22. Authors

USA: LV Allen, PE Luner.