# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| RELIANT PHARMACEUTICALS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 06-774-JJF |
| | : | |
| PAR PHARMACEUTICAL, INC., | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT PAR PHARMACEUTICAL, INC.'S
## OPENING CLAIM CONSTRUCTION BRIEF

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Tel: (302) 571-6600

- and -

**FROMMER LAWRENCE & HAUG LLP**
Edgar H. Haug
James K. Stronski
John G. Taylor
745 Fifth Avenue
New York, New York 10151
Tel: (212) 588-0800

*Attorneys for Defendant Par Pharmaceutical, Inc.*

March 5, 2008

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................1

II.   NATURE AND STAGE OF THE PROCEEDING.............................................2

III.  SUMMARY OF ARGUMENT ...........................................................................3

IV.   STATEMENT OF FACTS ..................................................................................3

    A.    Procedural Background...............................................................................3

    B.    Propafenone Hydrochloride and Arrhythmia.............................................4

    C.    The '588 Patent and Its Prosecution History ............................................5

        1.    The '588 Patent .............................................................................5

        2.    Prosecution History of the '588 Patent ........................................6

V.    ARGUMENT ......................................................................................................7

    A.    Claim Construction Principles ...................................................................7

    B.    Contrary to Reliant's Contention, the Terms in the Phrase "A
           cylindrical delayed release microtablet with a convex or flat upper
           side and lower side" Are Claim Limitations and Not Mere
           Preamble ...................................................................................................10

        1.    The Law on Claim Preamble .....................................................10

        2.    The Terms in the Phrase "A cylindrical delayed release
                microtablet with a convex or flat upper side and lower side"
                Are Claim Limitations Because They Recite Essential
                Structure, Provide an Antecedent Basis for Subsequent
                Limitations, and Are Necessary to Give Life to the Claim........................13

    C.    Par's Proposed Claim Constructions Should Be Adopted Because
           They Comport with Well-Established Claim Construction
            Principles..................................................................................................15

        1.    The Term "cylindrical" in Claims 1 and 6................................15

        2.    The Phrase "delayed release" in Claims 1 and 6 ......................16

        3.    The Term "microtablet" in Claims 1 and 6................................18

        4.    The Phrase "a convex or flat upper side and lower side" in
                 Claim 1..................................................................................................19

5.  The Phrase "the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet" in Claim 1...................................................................20

    a.  "The active ingredient" .................................................21

    b.  "Content is in the range from 81 to 99.9% of the weight of the microtablet" ..........................................21

6.  The Phrase "the active ingredient density is greater than 1" in Claim 1....................................................................23

7.  The Phrase "release rate is virtually independent of the pressure when compressing the tablets" in Claim 1 ...................24

8.  The Phrase "the tablet contains no release-delaying ancillary substance" in Claim 1 ...............................................25

9.  The Term "lubricant" in Claims 1 and 6....................................28

10. The Phrase "other conventional ancillary substances" in Claims 1 and 6 ....................................................................28

11. The Phrase "a pronounced plasma level plateau with a PTF<75%" in Claim 2 ...............................................................29

12. The Phrase "bioavailability does not depend on the intake of food" in Claim 2 ...................................................................31

13. The Phrase "cylindrical mold" in Claim 6................................32

VI. CONCLUSION...............................................................................33

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.,*
    98 F.3d 1563 (Fed. Cir. 1996) ........................................................................ 11

*Bell Communications Research v. Vitalink Communications Corp.,*
    55 F.3d 615 (Fed. Cir. 1995) .......................................................................... 12

*Bicon, Inc. v. Straumann Co.,*
    441 F.3d 945 (Fed. Cir. 2006) ............................................................... 11, 12, 13

*Biovail Labs. Int'l SRL v. Impax Labs.,*
    433 F. Supp. 2d 501 (E.D. Pa. 2006) .............................................................. 27

*Bristol-Myers Squibb Co. v. Royce Lab., Inc.,*
    69 F.3d 1130 (Fed. Cir. 1995) .......................................................................... 3

*C.R. Bard, Inc. v. U.S. Surgical Corp.,*
    388 F.3d 858 (Fed. Cir. 2004) ......................................................................... 8

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,*
    289 F.3d 801 (Fed. Cir. 2002) .................................................................. 10, 11

*Cephalon, Inc. v. Barr Labs., Inc.,*
    389 F. Supp. 2d 602 (D. Del. 2005) ................................................................ 19

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,*
    868 F.2d 1251 (Fed. Cir. 1989) ...................................................................... 11

*Cybor Corp. v. FAS Techs., Inc.,*
    138 F.3d 1448 (Fed. Cir. 1998) ........................................................................ 7

*Dayco Prods., Inc. v. Total Containment, Inc.,*
    329 F.3d 1358 (Fed. Cir. 2003) ...................................................................... 32

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,*
    849 F.2d 1430 (Fed. Cir. 1988) ....................................................................... 9

*Housey Pharms., Inc. v. AstraZeneca UK Ltd.,*
    366 F.3d 1348 (Fed. Cir. 2004) ....................................................................... 9

*In re Dossel,*
    115 F.3d 942 (Fed. Cir. 1997) ......................................................................... 8

*In re Paulsen,*
    30 F.3d 1475 (Fed. Cir. 1994) ......................................................................... 9

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
  381 F.3d 1111 (Fed. Cir. 2004).................................................................. 8

*Jack Guttman, Inc. v. Kopykake Enters., Inc.,*
  302 F.3d 1352 (Fed. Cir. 2002).............................................................. 9, 24

*Jansen v. Rexall Sundown, Inc.,*
  342 F.3d 1329 (Fed. Cir. 2003)................................................................ 11

*Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.,*
  285 F.3d 1046 (Fed. Cir. 2002)................................................................ 12

*Markman v. Westview Instrs., Inc.,*
  52 F.3d 967 (Fed. Cir. 1995)......................................................... 7, 8, 9, 10

Monsanto Co. v. Syngenta Seeds, Inc.,
  503 F.3d 1352 (Fed. Cir. 2007)................................................................. 5

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005).......................................................... passim

*Phonometrics, Inc. v. N. Telecom Inc.,*
  133 F.3d 1459 (Fed. Cir. 1998)................................................................. 9

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,*
  182 F.3d 1298 (Fed. Cir. 1999)........................................................... 10, 15

*Rapoport v. Dement,*
  254 F.3d 1053 (Fed. Cir. 2001)................................................................ 11

*Rowe v. Dror,*
  112 F.3d 473 (Fed. Cir. 1997)................................................................. 11

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
  299 F.3d 1313 (Fed. Cir. 2002)................................................................. 9

*U.S. Philips Corp. v. Iwasaki Elec. Co. Ltd.,*
  505 F.3d 1371 (Fed. Cir. 2007)................................................................ 22

*Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.,*
  412 F. 3d 1319 (Fed. Cir. 2005)............................................................... 27

*Vitronics Corp. v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996)............................................................. 8, 10

*W.E. Hall Co. v. Atlanta Corrugating, LLC,*
  370 F.3d 1343 (Fed. Cir. 2004)................................................................. 9

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
    239 F.3d 1225 (Fed. Cir. 2001)..................................................................... 9

**<u>Statutes</u>**

21 U.S.C. § 355 (1994) ................................................................................... 3

21 U.S.C. § 355(j)(5)(B)(iii) .......................................................................... 3

21 U.S.C. § 355(j)(5)(B)(iii)(I) ...................................................................... 4

28 U.S.C. § 1292(a)(1) ................................................................................... 3

35 U.S.C. § 103 ......................................................................................... 6, 13

35 U.S.C. § 112, ¶¶ 1-2 ................................................................................. 8

35 U.S.C. § 371 ............................................................................................. 6

U.S.C. § 271(d)-(h) ....................................................................................... 3

**<u>Rules</u>**

Fed. R. Civ. P. 65 .......................................................................................... 3

## I.    INTRODUCTION

Plaintiff Reliant Pharmaceuticals, Inc. ("Reliant") and defendant Par Pharmaceutical, Inc.

("Par") have identified 13 claim terms or phrases that require construction.  The claim terms and

Par's proposed constructions are set forth below.

| CLAIM TERMS AND PHRASES | PAR'S PROPOSED CONSTRUCTIONS |
|---|---|
| "cylindrical" | having the form of a cylinder, i.e., the solid figure traced out when a rectangle rotates around one of its sides as the axis of rotation, with two parallel circles of equal size at the ends |
| "delayed release" | prolonged diffusion of an active ingredient |
| "microtablet" | a small compressed solid dosage form of precise shape and dimensions |
| "a convex or flat upper side and lower side" | the two ends of the cylindrical microtablet are either both curved or rounded outward, like the exterior of a sphere, or both have a continuous horizontal surface without peaks or depressions |
| "the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet" | the amount of propafenone, diprafenoene, or their pharmacologically acceptable salts contained in the claimed microtablet is no less than 81% and no more than 99.9% by weight of the total weight of the microtablet |
| "the active ingredient density is greater than 1" | the propafenone, diprafenone, or their pharmacologically acceptable salts used to make the claimed microtablet has a bulk density greater than 1 gram per cubic centimeter (or gram per milliliter) |
| "release rate is virtually independent of the pressure when compressing the tablets" | the effect of differences in force per area exerted to form the claimed microtablet on the percent diffusion of the active ingredient from the microtablet over time can be neglected for practical purposes |
| "the tablet contains no release-delaying ancillary substances" | the claimed microtablet includes no amount of any chemical element or compound other than the active ingredient that prolongs the diffusion of the active ingredient to any degree |
| "lubricant" | a chemical element or compound that lessens or prevents friction and that does not prolong the diffusion of the active ingredient to any degree |
| "other conventional ancillary substances" | any commonly used pharmaceutical chemical element or compound, other than a lubricant or the active ingredient, that does not prolong the diffusion of the active ingredient to any degree |
| "a pronounced plasma level plateau with a PTF<75%" | a markedly level concentration of the active ingredient in the blood plasma, with a less than 75% fluctuation between the maximum and minimum blood plasma concentrations during the relevant time interval, measured as $(C_{max} - C_{min})$ divided by $(AUC/\Delta t)$ times 100 |

| CLAIM TERMS AND PHRASES | PAR'S PROPOSED CONSTRUCTIONS |
|---|---|
| "bioavailability does not depend on the intake of food" | the ingestion of food has no effect on the rate and amount of the active ingredient in the claimed microtablet that reaches the blood |
| "cylindrical mold" | a cavity for forming a substance into the shape of a cylinder, a solid figure traced out when a rectangle rotates around one of its sides as the axis of rotation, with two parallel circles of equal size at the ends |

Because Par's proposed definitions adhere to the well-established principles of claim construction, this Court should accept Par's definitions.

## II.    NATURE AND STAGE OF THE PROCEEDING

Reliant filed this action for infringement of U.S. Patent No. 5,681,588 ("the '588 Patent") (Par Ex. 1)[1] against Par on December 19, 2006. (D.I. 1.)  The action is based on Par's submission to the U.S. Food and Drug Administration ("FDA") of Abbreviated New Drug Application ("ANDA") No. 78-540, which seeks approval to market a generic version of Reliant's propafenone hydrochloride ("HCl") extended-release product, an anti-arrhythmic medication sold under the brand name Rythmol® SR.  At issue in this case is whether the product described in Par's ANDA would, if marketed, infringe the '588 patent and whether the '588 patent is valid and enforceable.

This case is currently in the late stages of fact discovery.  The parties have exchanged document requests, interrogatories and requests for admissions, and have served their respective responses.  The parties are in the midst of taking fact depositions.  A Markman hearing has been scheduled for April 2, 2008 (D.I. 64) and all dispositive motions must be filed by June 27, 2008. (D.I. 27.)[2]

---

[1] "Par Ex. __" refers to the exhibits contained in Par's Appendix of Exhibits in Support of Claim Construction dated March 5, 2008, submitted herewith.

[2] The March 28, 2007 Rule 16 Scheduling Order provided for opening expert reports to be served on March 31, 2008.  (D.I. 27.)  The March 28 Order further provided however, that if the Court has not issued a Markman ruling

## III.    SUMMARY OF ARGUMENT

A patent's claims serve an important notice function and define the patentee's right to exclude. This Court should construe the claim terms at issue to determine their legally operative meaning and scope. As set forth in detail below, the plain language of the claims of the '588 patent, its written description, and its prosecution history, informed by and consistent with dictionaries, treatises and the knowledge of the person of ordinary skill in the art, compel the constructions proposed by Par. Accordingly, the Court should adopt Par's claim constructions.

## IV.    STATEMENT OF FACTS

### A.    Procedural Background

Par submitted its ANDA to the FDA pursuant to procedures established by the Hatch-Waxman Act.[3] Because Par certified in its ANDA that the '588 patent is invalid, unenforceable and/or not infringed, Reliant, simply by filing suit, invoked a provision of the Act that prohibits the FDA from approving Par's ANDA for a period of 30 months. *See* 21 U.S.C. § 355(j)(5)(B)(iii). This 30-month stay of FDA approval has been likened to an injunction because the FDA may not approve the ANDA—and the applicant may not lawfully market its generic product—during that time. *See Bristol-Myers Squibb Co. v. Royce Lab., Inc.*, 69 F.3d 1130, 1131-32 (Fed. Cir. 1995). Unlike an injunction, however, no substantive or procedural safeguards act to curb abuse. For instance, the ANDA applicant has no right to a hearing, an interlocutory appeal, or security, as it would with a preliminary injunction. *See* 28 U.S.C. § 1292(a)(1); Fed. R. Civ. P. 65. The FDA may, however, approve an ANDA before the 30-

---

by March 24, 2008, the parties shall meet and confer regarding due dates for opening expert reports, rebuttal expert reports, and close of expert discovery. *Id.* Because the Court's subsequent July 17, 2007 Order scheduled the Markman hearing for April 2, 2008 (i.e., after March 24, 2008) (D.I. 64), the parties have met and conferred regarding an expert discovery schedule. The parties have not reached agreement on a schedule for expert discovery.

[3] The Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355 (1994) and 35 U.S.C. § 271(d)-(h) (1995)). That legislation is often called the Hatch-Waxman Act.

month period expires if a court decides that the patent is invalid or not infringed. *See* 21 U.S.C.

§ 355(j)(5)(B)(iii)(I). In sum, Par seeks to make a generic propafenone HCl extended-release

capsule product available to the public, and Reliant, by filing this suit, is preventing Par from

doing so.

###### B.    Propafenone Hydrochloride and Arrhythmia

Propafenone HCl is an antiarrhythmic agent. (Par Exs. 3 at 7886, and 4.) As such, it

tends to prevent or relieve cardiac arrhythmia, or irregularity in rhythm of the heartbeat either in

time or force. *Merriam-Webster's Collegiate Dictionary* (10th Ed. 1994) (Par Ex. 5 at p. 50.)

The FDA-approved product labeling for Reliant's Rhythmol® SR product states that it is

indicated "to prolong the time to recurrence of symptomatic a trial fibrillation in patients without

structural heart disease." (Par Ex. 4 at 7.) Propafenone HCl is an old drug substance that has

been known since 1971. (Par Ex. 3 at 7886.) Propafenone's antiarrhythmic effect has been

known at least since 1978. (Par Ex. 6 at 1261.) The immediate release formulation was

approved by the FDA for sale in the United States market in late 1989, under the brand name

Rythmol®. (Par Ex. 7.) Knoll Pharmaceuticals, United States was the owner of the New Drug

Application for immediate release Rythmol®. (Par Ex. 8.) Immediate release Rythmol® is taken

three times per day, while Rythmol® SR is taken twice a day. (Par Ex. 4 at 3.)

Some time before June 19, 1984, Claus Pich and Thomas Moest—working in BASF

AG's laboratory in Ludwigshafen, Germany—made a "cylindrical microtablet" of propafenone.

(Par Exs. 9 and 10 at col. 7, ll. 45 - col. 8, ll. 17, and at col. 7, ll. 52 - col. 8, ll. 17, respectively.)

This is disclosed in United States Patent Nos. 4,797,287 and 4,828,843, which claim priority to a

German application filed on June 19, 1984. (Par Exs. 9 and 10 at cover pages.) Although

disclosed, the propafenone microtablet was not claimed in either of these patents. (Par Exs. 9

and 10.) Instead, in 1993, Karl Kolter and three of his colleagues—working in the laboratory of

BASF's pharmaceutical division, Knoll AG[4], also in Ludwigshafen, Germany—began applying

for patents claiming "cylindrical microtablets" of propafenone, diprafeneone[5], and their

pharmacologically acceptable salts. (Par Ex. 1 at cover page.) Kolter et al. obtained such patents

internationally. In the United States, they obtained the '588 patent. *Id.*

    **C.**       **The '588 Patent and Its Prosecution History**

           **1.**       **The '588 Patent**

The '588 patent, entitled "Delayed Release Microtablet of β-Phenylpropiophenone

Derivatives," issued on October 28, 1997 to Karl Kolter, et al., who assigned all of their rights in

the patent to Knoll AG. (Par Ex. 1.) The '588 patent includes one independent claim and five

dependent claims.[6]

Claim 1—the '588 patent's only independent claim—reads as follows:

> 1.      A cylindrical delayed release microtablet with a convex or flat
> upper side and lower side of β-phenylpropiophenone derivatives of
> the formula I as active ingredient



> where R is n-propyl or 1,1-dimethylpropyl, and their
> pharmacologically acceptable salts, wherein
>
> a)     the height and diameter are, independently of one another,
> 1-3 mm,

---

[4] *See* Reliant Pharmaceuticals, Inc.'s Brief in Opposition to Par Pharmaceutical, Inc.'s Motion to Compel Discovery of Foreign Inventors dated January 8, 2008 at 2. (D.I. 141.)

[5] Diprafenone is a compound related to propafenone. *See supra* Part V.C.5.a (active ingredient content).

[6] An independent claim by itself defines an invention and does not refer to another claim. A dependent claim refers to and includes all the limitations of the associated independent claim. 37 C.F.R. § 1.75(c). An accused product that does not infringe an independent claim cannot infringe any claims that depend from the independent claim. *See Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007).

b)    the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet,

c)    the active ingredient density is greater than 1,

d)    the release of active ingredient in the USP paddle method at 50 rpm is 80% as a maximum after 3 hours and as a minimum after 24 hours,

e)    the release rate is virtually independent of the pressure when compressing the tablets, and

f)    the tablet contains no release-delaying ancillary substance but 0.1-5% by weight of a lubricant and 0-18.9% by weight of other conventional ancillary substances.

(Par Ex. 1, col. 8, ll. 18 – 44.)

### 2.    Prosecution History of the '588 Patent

The United States application for the '588 patent stems from an international Patent Cooperation Treaty ("PCT") application filed on March 24, 1994, which claimed priority to a German patent application filed on April 3, 1993.  (Par Ex. 1 cover page and col. 1, ll. 4-5; *see also* 35 U.S.C. § 371.)

The PCT application entered national phase in the United States on October 3, 1995. There were six claims, with only claim 1 being independent.  Assistant Examiner, William E. Benston, Jr. rejected all the claims in the sole Office Action mailed on October 17, 1996.  (Par Ex. 2 at PA 193-196).[7]  The examiner rejected all six claims for obviousness under 35 U.S.C. § 103 based on the teachings of two prior art references, Davidson and Franke.  *Id.* at PA 195.  The examiner believed that the Davidson reference disclosed a "delayed release microtubule."  *Id.* The examiner concluded that this, combined with the Franke reference, which taught propafenone, rendered the claims obvious.  *Id.* at PA 195-196.

---

[7] For the Court's ease of reference, Par has numbered the pages of the certified copy of the '588 patent's prosecution history with "PA" as a prefix.)  A table of contents for the prosecution history is provided at Par Ex. 2A.

The applicants amended and requested reconsideration on January 9, 1997. (Par Ex. 2 at

PA 224-230.) In response to the § 103 rejection, the applicants noted that Davidson's

microtubules are designed to speed up, rather than delay, the release of the active ingredient. *Id.*

at PA 226-228. The applicants explained that the cylindrical microtablet of their invention

achieves delayed release through the "required shape, size, and active ingredient content," and

surprisingly, without any release delaying ancillary substance. *Id.* at PA 227-228.

The '588 patent issued on October 28, 1997 without any further Office Action. *Id.* at PA

271.

## V.      ARGUMENT

### A.      Claim Construction Principles

Because patent claims define the invention and delimit a patentee's right to exclude, a

district court construes patent claims as a matter of law to determine their meaning and scope.

*Markman v. Westview Instrs., Inc.*, 52 F.3d 967, 976, 980 (Fed. Cir. 1995) (en banc), *aff'd*

517 U.S. 370 (1996); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1455 (Fed. Cir. 1998)

(en banc).

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit, sitting

en banc, discussed claim-construction principles in detail and provided guidance for district

courts to follow when construing claims. *Phillips* noted that there is no "magic formula" for

conducting claim construction and instead identified a hierarchy for using intrinsic and extrinsic

evidence to discern the meaning of claim language. 415 F.3d at 1324. It said that "the claims

themselves provide substantial guidance...." *Id.* at 1314. It then stated that a court may "rely

heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1317. It

later indicated that the prosecution history may be "less useful" for claim-construction purposes

than the written description. *Id.* It then explained that extrinsic evidence is "less significant than

the intrinsic record for determining 'the legally operative meaning of claim language.'" *Id.*

(quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)).

A district court should construe claim language to discern the meaning it would have to a

person of ordinary skill in the art at the time of the invention. *Innova/Pure Water, Inc. v. Safari*

*Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). Broadly speaking, guidance as

to the meaning of claim language comes from two sources: intrinsic evidence and extrinsic

evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581-83 (Fed. Cir. 1996). The

intrinsic evidence consists of two components: the patent and its prosecution history. *Id.* at 1582.

A patent contains two parts: first, the drawings (if any) and the text forming the patent's body,

called the written description; second, the claims.[8] The prosecution history—the rest of the

intrinsic evidence—contains the record of the proceedings before the Patent Office and includes

the prior art cited during examination and arguments, amendments and explanations made by the

applicants to obtain allowance of the patent. *Phillips*, 415 F.3d at 1317; *Vitronics*, 90 F.3d

at 1582. Extrinsic evidence consists of all evidence external to the patent and its prosecution

history, such as dictionaries, treatises, inventor testimony, and expert testimony. *Markman*,

52 F.3d at 980.

A patent's claims define the invention and the patentee's right to exclude. *Innova*,

381 F.3d at 1115. Accordingly, a district court should look to the words of the claims

themselves to ascertain the scope of the patented invention. *Vitronics*, 90 F.3d at 1582. And a

court should generally assign claim language the ordinary and customary meaning it would have

to a person of ordinary skill in the art at the time of the invention, i.e., as of the effective filing

---

[8] Although a patent's specification includes both the written description and the claims, the word "specification"
often—used colloquially—refers to the patent's body other than the claims. *See In re Dossel*, 115 F.3d 942,
944-45 (Fed. Cir. 1997); 35 U.S.C. § 112, ¶¶ 1-2.

date of the patent application. *Phillips*, 415 F.3d at 1313; *see Housey Pharms., Inc. v. AstraZeneca UK Ltd.*, 366 F.3d 1348, 1352 (Fed. Cir. 2004).

Claim construction requires examination of the patent's written description. *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1464 (Fed. Cir. 1998). The ordinary meaning of claim language is the meaning it would have to those skilled in the art after reading the entire patent, including the written description. *Phillips*, 415 F.3d at 1313. While the written description should be considered, "it is improper to read limitations from the written description into a claim." *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1237 (Fed. Cir. 2001).

A patentee may, however, act as a lexicographer by clearly setting forth in the written description an explicit definition for a claim term. *See, e.g., Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1360 (Fed. Cir. 2002). But the patentee must demonstrate intent to deviate from a term's ordinary and customary meaning by expressing a different meaning in the written description "with reasonable clarity, deliberateness, and precision." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325, 1327 (Fed. Cir. 2002) (quoting *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994)). Vague or ambiguous statements in the written description do not suffice to alter a term's ordinary meaning. *W.E. Hall Co. v. Atlanta Corrugating, LLC*, 370 F.3d 1343, 1353 (Fed. Cir. 2004).

Claim construction also requires consideration of the patent's prosecution history. *Markman*, 52 F.3d at 980. Statements made by the applicant during prosecution in support of patentability may supply evidence of the meaning of disputed claim language. *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1438 (Fed. Cir. 1988).

A district court may consider extrinsic evidence to assist it in understanding scientific principles and the technology at the time of the invention. *See Markman*, 52 F.3d at 980. And a court may employ extrinsic evidence for claim-construction purposes. *Phillips*, 415 F.3d at 1317. But a court should not use extrinsic evidence to vary or contradict the meaning of claim language where the intrinsic evidence determines the meaning. *Vitronics*, 90 F.3d at 1583-85.

Because dictionaries and treatises—although categorized as extrinsic evidence—provide insight into the ordinary and customary meaning of claim language, the Federal Circuit noted that they are "often useful" in claim interpretation. *Phillips*, 415 F.3d at 1322. In *Phillips*, the Federal Circuit confirmed that a district court may freely consult a dictionary "at any time" in order to understand the technology or construe claim language as long as the dictionary definition does not contradict the definition derived from the intrinsic evidence. *Id.*

**B.    Contrary to Reliant's Contention, the Terms in the Phrase "A cylindrical delayed release microtablet with a convex or flat upper side and lower side" Are Claim Limitations and Not Mere Preamble**

**1.    The Law on Claim Preamble**

The preamble of a claim is "an introductory phrase that may summarize the invention, its relation to the prior art, or its intended use or properties." 3-8 Chisum on Patents § 8.06[b][i]. The language in a claim preamble may limit the claim's scope, or function as a non-limiting statement of intended use or effect. *Id.* This analysis is done on a case-by-case basis for which there is no "litmus test." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).

Generally, a preamble will be limiting if it is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). The preamble should be read in the context of the claim as a whole, and if necessary

the specification, and/or the prosecution history. *See Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1572-73 (Fed. Cir. 1996).

Although there is not one definitive test for evaluating whether a preamble limits a claim, certain "guideposts" have evolved over time. *Catalina*, 289 F.3d at 808. For example, the preamble limits the claim scope when:

- it includes terms which limit the structure of the invention. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989).

- it is essential for understanding limitations in the claim body. *See Pitney Bowes*, 182 F.3d at 1306.

- limitations in the body depend on a phrase in the preamble for antecedent basis. *See Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003); *see also Rapoport v. Dement*, 254 F.3d 1053, 1059 (Fed. Cir. 2001)

- the applicant clearly relies on the preamble during prosecution to distinguish their invention from the prior art. *See Catalina*, 289 F.3d at 808-809 (summarizing the case law).

Of particular importance in this case is the well-established principle that a preamble will be limiting if it recites essential structure. *See Bicon, Inc. v. Straumann Co.,* 441 F.3d 945, 952 (Fed. Cir. 2006); *see also Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997) ("[w]here a patentee uses the claim preamble to recite structural limitations of his claimed invention, the PTO and courts give effect to that usage").

The Federal Circuit's decision in *Bicon* is particularly illustrative of this principle. In *Bicon*, the Federal Circuit considered the construction of a patent that claimed an apparatus used with dental implants. The district court concluded that the lengthy preamble was an integral part of the claim and limited the claim. *Id.* at 949. The Federal Circuit affirmed the district court's holding, reasoning that because the preamble recited structural features of the claimed abutment (e.g., a "fructo-spherical basal surface portion and a conical surface portion"), the claim drafter chose to "use *both* the preamble and the body to define the subject matter of the claimed

invention." *Bicon*, 441 F.3d at 952 (quoting *Bell Communications Research v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995)) (emphasis in original).

The Federal Circuit noted that failing to read the preamble as a claim limitation would "render the scope of the claim ambiguous." *Bicon*, 441 F.3d at 950. Such an outcome is contrary to the purpose of a patent claim—to "define the precise scope of a claimed invention," thereby "giving notice both to the examiner at the U.S. Patent and Trademark Office during prosecution, and to the public at large, including potential competitors, after the patent has issued." *Id.* (quoting *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) (en banc)). In other words:

> Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous, leaving examiners and the public to guess about which claim language the drafter deems necessary to his claimed invention and which language is merely superfluous, nonlimiting elaboration. For that reason, claims are interpreted with an eye toward giving effect to all terms in the claim.

*Bicon*, 441 F.3d at 950 (citations omitted).

The Court further reasoned that failing to read the preamble as a limitation would render the remaining claim limitations meaningless. *Id.* at 951. Not only would that be contrary to the principle that claim language should not treated as meaningless, but it would be contrary to the specification, which described the features of the claimed abutment in detail. *Id.* Thus, the Court concluded that the preamble recited essential elements of the invention pertaining to the structure of the abutment, signifying that the "the claim drafter chose to use both the preamble and the body of the claim to define the subject matter of the claimed invention." *Id.* at 952-53.

> **2.    The Terms in the Phrase "A cylindrical delayed release microtablet with a convex or flat upper side and lower side" Are Claim Limitations Because They Recite Essential Structure, Provide an Antecedent Basis for Subsequent Limitations, and Are Necessary to Give Life to the Claim**

The preamble phrase "A cylindrical delayed release microtablet with a convex or flat upper side and lower side" limits the scope of claim 1. In its supplemental response to Par's interrogatory seeking Reliant's infringement contentions, Reliant stated that this phrase is mere preamble, and "not a claim limitation." (Par Ex. 11 at 1 app. A.) The prosecution history and the claim itself reveal, however, that the terms in this phrase are claim limitations because they provide an essential structure to the claim, provide an antecedent basis for limitations in the claim body, and give life to the claims of the patent.

As in *Bicon*, the preamble in claim 1 is limiting because it provides essential structure to the claim. During prosecution of the '588 patent, the examiner rejected all of the claims under 35 U.S.C. § 103 as being unpatentable as obvious in view of the prior art disclosures. In response to the rejection, the applicants distinguished their microtablet invention from the prior art by emphasizing its precise shape and delayed release characteristics. The applicants first noted that the "present invention relates to a cylindrical delayed release microtablet having a convex or flat upper side and lower side,..." (Par Ex. 2 at PA 224-225.)

Significantly, the applicants disclaimed all other forms of tablets not containing the precise size, shape, active ingredient, and delayed release characteristics of the claimed invention. The applicants emphasized that "by preparing a **microtablet** having the **required size and shape**, active ingredient content and active ingredient density . . . it is possible to provide a **microtablet** that has **surprisingly** improved **delayed release** characteristics compared to other **delayed release** formats." *Id.* at PA 225-226 (emphasis added). This result is "especially

surprising in view of the fact that the present **microtablet** contains no other **release delaying** additives." *Id.* at PA 226 (emphasis added).

The applicants iterated yet three more times that the microtablet's shape and delayed release characteristics are requirements of their invention: "there is no disclosure nor suggestion of a **microtablet** having the required **delayed release** characteristics of the present invention nor the **required shape**, size or active ingredient content." *Id.* at PA 227-228 (emphasis added). "Applicants have shown in the present application that by preparing the **microtablets** of the present invention to meet the size, **shape** and active ingredient content **requirements**, one obtains a **microtablet** having remarkable **delayed release** characteristics." *Id.* at PA 228 (emphasis added). Further, there "could be no expectation by one of ordinary skill in the art of the **delayed** relatively uniform **release** of active ingredient . . . in a **microtablet** having the **required** size, **shape**, and other characteristics as required by the present claims." *Id.* at PA 229 (emphasis added).

The "required size" of the microtablet of the invention appears as element (a), namely "the height and diameter are, independently of one another, 1-3 mm." As for the "required shape," claim 1 provides in the above preamble phrase that the microtablet should be "cylindrical … with a convex or flat upper face and lower face." Notably, this phrase appears nowhere else in claim 1—only in the preamble—and claim 1 has no other description of any shape. Similarly, the phrase "delayed release" appears only in the preamble. Accordingly, the preamble in claim 1 does not merely describe a function or intended use, but defines the essential elements of the invention of the '588 patent.

"Microtablet" also must be considered a claim limitation because it provides an antecedent basis for limitations in the body and gives life to the claim in that it is "intimately

meshed with the ensuing language in the claim." *Pitney Bowes*, 182 F.3d at 1306. Elements (e) and (f) of claim 1 and dependent claims 2 - 5 all use the term "tablet" to refer back to the term "microtablet"—which first appears in the preamble. (Par Ex. 1 at col. 8. ll. 40-53.) Thus, any reference to "tablet" in the body of claim 1, or the dependent claims, can only be understood in the context of the preamble term "microtablet." *Id.* (holding that a term in the preamble was "necessary to give life, meaning, and vitality" to the claim because the term "generated shapes" in the claim body "can only be understood in the context of the preamble statement 'producing on a photoreceptor an image of shapes made up of spots'").

Accordingly, the terms "cylindrical," "delayed release," "microtablet," and "convex or flat upper side and lower side" are all claim limitations and must be construed.

### C.    Par's Proposed Claim Constructions Should Be Adopted Because They Comport with Well-Established Claim Construction Principles

#### 1.    The Term "cylindrical" in Claims 1 and 6

The term "cylindrical" has its conventional meaning and means ***having the form of a cylinder, i.e., the solid figure traced out when a rectangle rotates around one of its sides as the axis of rotation, with two parallel circles of equal size at the ends***. The plain and ordinary meanings of "cylindrical" and "cylinder" compel this construction. The '588 patent uses "cylindrical" throughout the written description. The inventors of the '588 patent, however, did not define this term expressly or by implication. In such instances dictionary definitions are useful to understand the plain and ordinary meaning of words. *Phillips*, 415 F.3d at 1314.

*Merriam Webster's Collegiate Dictionary* (10th Ed. 1994) defines "cylindrical" as "relating to or having the form or properties of a cylinder." (Par Ex. 5 at 288.) "Cylinder" is defined as "the solid figure traced out when a rectangle rotates around one of its sides as the axis of rotation." (Par Ex. 12 at 239.) *The American Heritage Science Dictionary* (2005) defines

"cylinder" as a "three dimensional surface or solid object bounded by a curved surface and two parallel circles of equal size at the ends. The curved surface is formed by all the line segments joining corresponding points of the two parallel circles." (Par Ex. 13 at 159.)

Accordingly, the term "cylindrical" means *having the form of a cylinder, i.e., the solid figure traced out when a rectangle rotates around one of its sides as the axis of rotation, with two parallel circles of equal size at the ends*.

### 2.    The Phrase "delayed release" in Claims 1 and 6

The phrase "delayed release" means *prolonged diffusion of an active ingredient*. The '588 patent does not define "delayed release" explicitly. As explained below, however, the person of ordinary skill in the art would have understood from statements made in the patent's written description that in the context of the '588 patent, the inventors used the phrase in such a way that the individual terms "delayed" and "release" have their conventional meanings.

*Webster's 10th* defines "delay" to mean "put off, postpone," and is synonymous with "retard, slow, slacken, detain." (Par Ex. 5 at 305.) *Hawley's Condensed Chemical Dictionary*, 12th ed., 1993, Van Nostrand Reinhold, New York, NY ("*Hawley's 12th*") defines "release," in the pharmaceutical context, to mean "the gradual diffusion of an active ingredient." (Par Ex. 14 at 999.)

These definitions are consistent with the inventors' use of the term "delayed release" in the written description of the '588 patent. The '588 patent states that the "object of the present invention" is to provide tablets in which the release of the active ingredient is "uniform **over a lengthy period**." (Par Ex. 1 at col. 2, ll. 10 – 16 (emphasis added).)

The '588 patent also refers to inventions in the prior art that the inventors define as "delayed release": "the Patent Applications GB 2 176 999 and WO 92/04013 disclose small

matrix **delayed release** tablets which likewise contain relatively large amounts of release-delaying ancillary substances." (Par Ex. 1 at col. 1, ll. 54 – 57 (emphasis added).)

The first prior art reference, Patent Application GB 2 176 999, is entitled "Multiparticulate sustained release medicament." (Par Ex. 15.) Notably, this patent application uses the term "sustained release" to describe a reduced, steady release of the active ingredient through the biosystem. *Id.* at p. 1, ll. 52 - 59, p. 4, ll. 38 - 40, 43 - 63. According to *Webster's 10th*, "sustain" means to "to keep up, **prolong**." (Par Ex. 5 at 1188 (emphasis added).) The word "prolong" means to "lengthen in time, [or] to lengthen in extent, scope, or range," and is synonymous with "extend." (Par Ex. 5 at 933.)

Similarly, the second prior art reference, WO 92/04013, is directed to "Multiparticulate sustained release matrix system." (Par Ex. 16.) This international application is directed to "small tablets, each having **a prolonged** and controlled release,…" *Id.* at p. 1, ll. 3 – 4 (emphasis added). It discloses "a multiplicity of minitablets providing **prolonged** and regular release of the active ingredient,…" Id. at p. 5, ll. 2 – 4 (emphasis added). Moreover, the invention comprises "a matrix from which in use the active medicament has a **prolonged** and regular release." *Id.* at p. 8, ll. 6 - 8 (emphasis added). The '588 patent's inventors referred to this disclosure as "delayed release."

In the written description, the '588 patent applicants referred to a third "delayed release" prior art reference: "The Patent Application EP 22 17 32 claims **delayed release** tablets of active ingredients with low solubility, …." (Par Ex. 1 at col. 1, ll. 57 - 59; *see also* Par Ex. 17, European Patent Application No. 0221732 (emphasis added).) Here also, the invention "relates to a sustained release pharmaceutical formulation in tablet unit dosage form which provides **prolonged** plasma levels of an active agent,…" (*Id.* at p. 1, ll. 19-23 (emphasis added).)

In view of the dictionary definitions of "delay" and "release" and the '588 patent applicants' use of the phrase "delayed release" and the prior art that they cite to, the phrase "delayed release" means ***prolonged diffusion of an active ingredient***.

### 3.    The Term "microtablet" in Claims 1 and 6

The term "microtablet" has its plain and ordinary meaning and means ***a small compressed solid dosage form of precise shape and dimensions***.

The '588 patent does not explicitly define the term "microtablet" and nothing in the '588 patent demonstrates a clear intent by the inventors to deviate from the plain meaning of the term. Accordingly, its plain and ordinary meaning applies.  The word "microtablet" is made up of the prefix "micro" and the word "tablet."  "Micro" is defined as "small: minute," "requiring or involving microscopy," and "one-millionth ($10^{-6}$): microliter."  (Par Ex. 5 at 734.)  "Tablet" is defined as a "solid pharmaceutical dosage form[ ] containing drug substance with or without suitable diluents and prepared either by compression or molding methods."  (Par Ex. 18 at 1633.) Remington's Pharmaceutical Sciences (18th ed. 1990).  The patent claims and written description make clear that the claimed microtablets are compressed in a punch or mold.  (*See, e.g.*, Par Ex. 1 at col. 8, ll. ("compressing the tablets"); col. 4, ll. 19-20 ("tabletting machine equipped with multiple microtablet punches"); col. 8, l. 60 ("compressed in a cylindrical mold").)

A person of ordinary skill would have appreciated that "microtablets" compressed in a punch or mold would take on the precise shape and dimensions of the punch or mold. Accordingly, the term "microtablet" would be understood by a person of ordinary skill to mean ***a small compressed solid dosage form of precise shape and dimensions***.

The '588 patent is wholly consistent with this definition and it should be adopted here. The '588 patent describes customary methods of making microtablets by using compression and

punches or molds, each in the shape of the microtablet.  It states: "[t]he tabletting takes place in a suitable tabletting machine equipped with multiple microtablet punches. The resulting microtablets have a cylindrical shape with flat or convex surface [sic]."  (Par Ex. 1 at col. 4, ll. 19-22.)  The patent further teaches that "[t]he microtablets were produced in a rotary tabletting machine equipped with multiple microtablet punches." *Id.* at col. 5, ll. 25-26.  It also describes microtablets in claim 6, which claims a process for making microtablets: "A process for producing cylindrical delayed release microtablets as claimed in claim 1, which comprises a homogeneous mixture .... being compressed in a cylindrical mold with a height and diameter each of 1-3 mm and being removed from the mold." *Id.* at col. 8, ll. 54-62.

The patent discloses only processes for making *a small compressed solid dosage form of precise shape and dimensions.*  And it lacks any disclosure to support the definition of "microtablet" to include, for example, ground or milled granules of compressed solid material that would be characterized by rough, uneven surfaces and non-uniform shape and dimensions. While the process-related patent disclosure should not be read into any product claims, such as claim 1, this is the kind of disclosure that a person of ordinary skill would rely upon to further confirm that the patent claims nothing other than "microtablets" having the above-stated plain meaning. *See Cephalon, Inc. v. Barr Labs., Inc.*, 389 F. Supp. 2d 602 (D. Del. 2005) (Farnan, J.) (quoting *Phillips v. AWH Corp.*, 514 F.3d at 1313) (the "specification is usually 'dispositive; it is the single best guide to the meaning of a disputed term.'").

### 4.    The Phrase "a convex or flat upper side and lower side" in Claim 1

The phrase "a convex or flat upper side and lower side" means *the two ends of the cylindrical microtablet are either both curved or rounded outward, like the exterior of a sphere, or both have a continuous horizontal surface without peaks or depressions.*  This

construction comports with the plain meanings of the words "convex," "flat," "upper side," and "lower side" and the rules of grammar.

The '588 patent does not define "convex" or "flat." The plain meaning of "convex" is "curved or rounded like the exterior of a sphere or circle". (Par Ex. 5 at 254.) "Flat" means "having a continuous horizontal surface, being or characterized by a horizontal line or tracing without peaks or depressions." *Id.* at 443.

The '588 patent also does not define "upper side and lower side." The phrase "a convex or flat upper side and lower side" refers and further describes the "cylindrical ... microtablet" language that precedes it in claim 1. In this context, "upper side" and "lower side" can only mean the two ends of the cylinder, as defined above. *See supra* Part V.C.1. Thus, "upper side and lower side" means *the two ends of the cylindrical microtablet*.

Moreover, "upper side and lower side" is a plural noun (Par Ex. 19 at 34) that is modified by the adjective "convex" **or** the adjective "flat." In other words, the phrase "a convex or flat upper side and lower side" should be read as a *convex upper side and lower side or a flat upper side and lower side*.

Accordingly, the phrase "a convex or flat upper side and lower side" means *the two ends of the cylindrical microtablet are both curved or rounded outward, like the exterior of a sphere, or both have a continuous horizontal surface without peaks or depressions*.

### 5.    The Phrase "the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet" in Claim 1

The phrase "active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet" means *the amount of propafenone, diprafenoene, or their pharmacologically acceptable salts contained in the claimed microtablet is no less than 81% and no more than 99.9% by weight of the total weight of the microtablet*.

a.    "The active ingredient"

Claim 1 itself defines the "active ingredient":

> "1.    A cylindrical delayed release microtablet with a convex or flat
> upper side and lower side of β-phenylpropiophenone derivatives of
> the formula I as **active ingredient**



I

> where R is n-propyl or 1,1-dimethylpropyl, and their pharmacologically
> acceptable salts, wherein…"

(Par Ex. 1 at col. 8, ll. 18 – 29 (emphasis added).)  Conveniently, when R is n-propyl, the

compound is known as "propafenone," and when R is 1,1-dimethylpropyl, the compound is

known as "diprafenone."  Rossen Koytchev, *Diprafenone: A New Antiarrhythmic Drug Related*

*to Propafenone*, 15 Cardiovascular Drug Reviews 224 (1997) (Par Ex. 20.)  Thus, "active

ingredient" in the context of the '588 patent means ***propafenone, diprafenone, or their***

***pharmacologically acceptable salts.***

b.    "Content is in the range from 81 to 99.9%
of the weight of the microtablet"

The '588 patent does not define the phrase "content is in the range from 81 to 99.9% of

the weight of the microtablet" expressly or by implication, nor does it define the individual terms

"content" or "range."  Accordingly, these terms and phrases have their conventional meanings.

"Content" is defined as "the amount of specified material contained."  (Par Ex. 5 at 250.)

"Range" is defined as "the limits of a series: the distance or extent between possible extremes."

*Id.* at 967.  Thus, in the phrase "range from 81 to 99.9%," 81% and 99.9% represent the extreme

limits of the range.  In other words, *the amount of the specified material contained in the claimed microtablet is no less than 81% and no more than 99.9% by weight of the total weight of the microtablet*.

This construction is consistent with Federal Circuit case law construing range language in patent claims.  *See, e.g., U.S. Philips Corp. v. Iwasaki Elec. Co. Ltd.*, 505 F.3d 1371, 1376 (Fed. Cir. 2007) (the phrase "a quantity between [ ] and [ ]" means "a construction that implies a specific range .... *It does not imply a range between two values which are themselves ranges*") (citation omitted) (emphasis added).

A construction wherein 81% and 99.9% represent the precise lower and upper limit of the range, respectively, is also supported by the patent's written description.  The '588 patent applicants did not modify the range of "81 to 99.9%" in claim 1 by adding, for example, "approximately" or "about," although such words were amply used in the claims and written description to indicate "more or less."  (*See e.g.*, Par Ex. 1 at col. 1, ll. 37 – 38 ("Both matrix and film-coated delayed release tablets normally have diameters of **about** 6 to 12 mm **or more** ...") (emphasis added); col. 2, ll. 42-45 ("The microtablets according to the invention are cylindrical with a flat or convex upper side and lower side and with a diameter and height which are preferably **approximately** equal ...") (emphasis added); col. 8, ll. 50 – 51 ("4. A tablet as claimed in claim 1, wherein the height and diameter are **approximately** the same.") (emphasis added); col. 2, ll. 67 - col. 3, ll. 13 ("the PTF (peak to trough fluctuation;...)... which has a value for the microtablets which is only **about** half that for the bolus forms,...") (emphasis added).) Thus, it is clear that the applicants intended 81% and 99.9% to be precise end points for the claimed range.

Accordingly, the phrase "active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet" means *the amount of propafenone, diprafenoene, or their pharmacologically acceptable salts contained in the claimed microtablet is no less than 81% and no more than 99.9% by weight of the total weight of the microtablet.*

### 6.    The Phrase "the active ingredient density is greater than 1" in Claim 1

The phrase "the active ingredient density is greater than 1" has its conventional meaning and means that *the propafenone, diprafenone, or their pharmacologically acceptable salts used to make the claimed microtablet has a bulk density greater than 1 gram per cubic centimeter (or gram per milliliter).*

As discussed above, claim 1 itself defines "active ingredient" as *propafenone, diprafenone, or their pharmacologically acceptable salts.*

Although the '588 patent uses the terms "density" and "active ingredient density" throughout the written description, it does not define the terms. In these instances, the plain and ordinary meaning controls and dictionary definitions can be helpful to understand the plain and ordinary meanings of terms. *The Dictionary of Pharmacy* (1986) defines "density" as "mass per unit volume; cgs units are gram (g) per $cm^3$." (Par Ex. 21 at 86.) *Hawley's 12[th]* states "density" as the mass of a substance per unit volume, having the units of mass over volume. For solids, mass per unit volume is expressed in grams per cubic centimeter. (Par Ex. 14 at 354.) A cubic centimeter is equal to a milliliter. Accordingly, "density" is *mass per unit volume expressed in grams per cubic centimeter (or grams per milliliter).*

Additionally, there are subtypes of "density" when referring to powders, like propafenone HCl, including bulk density, apparent density, and relative density. The '588 patent does not specify which subtype of "density" is referred to in claim 1. One of ordinary skill in the art,

however, would understand that the "density" referred to in claim 1 of the patent means "bulk density." *The Dictionary of Pharmacy* (1986) defines "bulk density" as density "which includes the volume of all void spaces as in a powder." (Par Ex. 21 at 86.) It is common for suppliers of pharmaceutical raw materials to include the bulk density of the materials in the certificates of analysis they provide to their customers. (*See, e.g.,* Par Ex. 22 at PAR000162.) Moreover, in a chapter concerning the process of compressing tablets in a commonly-cited treatise on tabletting, Eugene L. Parrott, Chapter 4: Compression, *Pharmaceutical Dosage Forms – Tablets*, vol. 2 (2d ed. 1990), the author refers to the materials to be compressed in terms of bulk density. (Par Ex. 23 at 201.)

Accordingly, the phrase "the active ingredient density is greater than 1" means that *the propafenone, diprafenone, or their pharmacologically acceptable salts used to make the claimed microtablet has a bulk density greater than 1 gram per cubic centimeter (or gram per milliliter)*.

### 7. The Phrase "release rate is virtually independent of the pressure when compressing the tablets" in Claim 1

The phrase "release rate is virtually independent of the pressure when compressing the tablets" means that *the effect of differences in force per area exerted to form the claimed microtablet on the percent diffusion of the active ingredient from the microtablet over time can be neglected for practical purposes*.

The '588 patent expressly defines the phrase "virtually independent" as "the effect can be neglected for practical purposes." (Par Ex. 1 at col. 2, ll. 51 – 52.) A patentee may act as a lexicographer by clearly setting forth in the written description an explicit definition for a claim term. *See, e.g., Jack Guttman, Inc.*, 302 F.3d at 1360. Thus, "virtually independent" means "can be neglected for practical purposes."

The '588 patent does not define the phrase "release rate" explicitly or by implication. Accordingly, the plain and ordinary meaning of this phrase applies. As discussed above, the term "release" in the pharmaceutical context means *the gradual diffusion of an active ingredient*. *See supra* Part IV.C.2. "Rate" is defined as "a quantity, amount, or degree of something measured per unit of something else." (Par Ex. 5 at 969.) In written description of the '588 patent, all of the figures show "% Active Ingredient" released versus time. (Par Ex. 1 at sheets 1 – 11.) Thus, in the context of the '588 patent, "release rate" means *the percentage diffusion of the active ingredient over time*.

The '588 patent also does not define the phrase "pressure when compressing the tablets," or any of its component terms, explicitly or by implication. Accordingly, the plain and ordinary meanings of these terms apply. "Pressure" is defined as "the force or thrust exerted over a surface divided by its area." (Par Ex. 5 at 923.) "Compress" means "to press or squeeze together." (Par Ex. 5 at 237.) "The tablets" refers to the "microtablet" recited in the claim 1 preamble. Thus, the phrase "pressure when compressing the tablets" means *the force per area exerted to form the claimed microtablets*.

Accordingly, the phrase "release rate is virtually independent of the pressure when compressing the tablets" means that *the effect of differences in force per area exerted to form the claimed microtablet on the percent diffusion of the active ingredient from the microtablet over time can be neglected for practical purposes*.

### 8.    The Phrase "the tablet contains no release-delaying ancillary substance" in Claim 1

The phrase "the tablet contains no release-delaying ancillary substance" has its conventional meaning and means that *the claimed microtablet includes no amount of any chemical element or compound other than the active ingredient that prolongs the diffusion of*

*the active ingredient to any degree.* The '588 patent does not expressly define this phrase, or any of the individual terms contained therein. The '588 patent also does not demonstrate a clear intent to deviate from the plain and ordinary meaning of the phrase. Accordingly, the plain and ordinary meaning controls.

"Release-delaying" is related to the phrase "delayed release" which appears in the claim 1 preamble and in claim 6. As discussed above, the term "delayed release" means *prolonged diffusion of an active ingredient. See supra* Part IV.C.2. The phrase "release-delaying" is the phrasal adjective form of "delayed release" made using a hyphen. Accordingly, "release-delaying" means *diffusion-prolonging*.

"Ancillary" means "auxiliary, supplementary" (Par Ex. 5 at 43), while "substance," in the pharmaceutical context, means "any chemical element or compound." (Par Ex. 14 at 1098.) Claim 1 separately identifies the active ingredient in the claimed invention. (Par Ex. 1 at col. 8, ll. 18-29.) Thus, "ancillary substance" in claim 1 plainly refers to *any chemical element or compound other than the active ingredient*.

Accordingly, the phrase "release-delaying ancillary substance" means *any chemical element or compound other than the active ingredient that prolongs the diffusion of the active ingredient*.

The "tablet" refers back to "microtablet" recited in the claim 1 preamble. *Webster's 10th* defines "no" to mean "not any" and "in no respect or degree." (Par Ex. 5 at 786.) This is the ordinary meaning of this most basic of terms in the English language. The term "contain" means "to include." (Par Ex. 12 at 210.)

Accordingly, one of ordinary skill in the art considering the patent claims and written description would understand that the phrase "the tablet contains no release-delaying ancillary

substance" has its conventional meaning and means that *the claimed microtablet includes no amount of any chemical element or compound other than the active ingredient that prolongs the diffusion of the active ingredient to any degree*.

 This construction is consistent with case law concerning "negative limitations" such as the term "no" and the repeated statements by the applicants that their claimed invention is patentable because it "surprisingly" achieves delayed release characteristics without any release-delaying ancillary substances.  Element (f), by requiring that the microtablet "contain[ ] no release-delaying ancillary substance," introduces a "'negative limitation[]' that define[s] the claimed invention by what it is not."  *See Biovail Labs. Int'l SRL v. Impax Labs.*, 433 F. Supp. 2d 501, 519 n.19 (E.D. Pa. 2006) (quoting *Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F. 3d 1319, 1321-23 (Fed. Cir. 2005) (applying ordinary dictionary meaning in construing "free of" as "not having or using"; "lacking").  This negative limitation should be accorded its intended purpose.

 Moreover, the '588 patent applicants repeatedly touted that their invention unexpectedly achieves delayed release without any substance that provides that function:

> [I]t has been found, **surprisingly**, that it is possible in the present case to produce delayed release tablets **without release-delaying ancillary substances**.

(Par Ex. 1 at col. 2, ll. 18-22 (emphasis added).)

> Applicants have found that by preparing a microtablet having the required size and shape, active ingredient content and active ingredient density, containing the β –phenylpropio-phenone derivative of formula I as its active ingredient, it is possible to provide a microtablet that has **surprisingly improved delayed release** characteristics compared to other delayed release formats. This is especially surprising in view of the fact that the present microtablet contains **no other release delaying additives**.

(Par Ex. 2 at PA 225-226 (emphasis added).)

The present invention relates to cylindrical microtablets of β-phenylpropiophenone derivatives with a high content and density of active ingredient and a delayed release which is independent of the compressive force, **with no release-delaying ancillary substances**.

(Par Ex. 1 at col. 1, ll. 10-14 (emphasis added).)

Consequently, the microtablets according to the invention can not contain **any** release-delaying substance.

### 9.    The Term "lubricant" in Claims 1 and 6

The term "lubricant" in the context of claims 1 and 6 of the '588 patent, means *a chemical element or compound that lessens or prevents friction and that does not prolong the diffusion of the active ingredient to any degree*. The '588 patent does not expressly define the term "lubricant." Accordingly, the plain and ordinary meaning controls.

*Webster's 10th* defines "lubricant" as "something that lessens or prevents friction or difficulty." (Par Ex. 5 at 691-92.) Additionally, element (f) of claim 1 states that "the tablet contains no release-delaying ancillary substance **but** 0.1-5 % by weight of a lubricant …" (Par Ex. 1 at col. 8, ll. 41-42 (emphasis added).) This demonstrates a clear intent by the inventors to distinguish "lubricant" from a "release-delaying ancillary substance."

Accordingly, combining the conventional meaning of "lubricant" with the definition of "no release-delaying ancillary substance" discussed above, one of ordinary skill in the art would understand the claim term "lubricant" to mean *a chemical element or compound that lessens or prevents friction and that does not prolong the diffusion of the active ingredient to any degree*.

### 10.    The Phrase "other conventional ancillary substances" in Claims 1 and 6

The phrase "other conventional ancillary substances" in Claims 1 and 6 means *any commonly used pharmaceutical chemical element or compound, other than a lubricant or the active ingredient, that does not prolong the diffusion of the active ingredient to any degree*.

The '588 patent does not expressly define the phrase "other conventional ancillary substances," although it does include a non-exclusive list of examples.[9]  Accordingly, the plain and ordinary meaning controls.

"Conventional" is defined as "customary." (Par Ex. 12 at 213.)  As discussed above, "ancillary substance" means *any chemical element or compound other than the active ingredient.*  *See supra* Part IV.C.8.  Additionally, element (f) of claim 1 states that "the tablet contains no release-delaying ancillary substance **but** 0.1-5% by weight of a lubricant **and** 0-18.9% by weight of other conventional ancillary substances." (Par Ex. 1 at col. 8, ll. 41-44 (emphasis added).)  This demonstrates a clear intent by the inventors to distinguish "other conventional ancillary substances" from a "release-delaying ancillary substance" and a "lubricant."

Accordingly, combining the conventional meaning of "other conventional ancillary substances" with the definition of "no release-delaying ancillary substance" discussed above, *see supra* Part IV.C.8., one of ordinary skill in the art would understand the claim term "other conventional ancillary substance" to mean *any commonly used pharmaceutical chemical element or compound, other than a lubricant or the active ingredient, that does not prolong the diffusion of the active ingredient to any degree.*

### 11.    The Phrase "a pronounced plasma level plateau with a PTF<75%" in Claim 2

The phrase "a pronounced plasma level plateau with a PTF<75%" means *a markedly level concentration of the active ingredient in the blood plasma, with a less than 75% fluctuation between the maximum and minimum blood plasma concentrations during the relevant time interval, measured as $(C_{max} - C_{min})$ divided by $(AUC/\Delta t)$ times 100.*

---

[9]  The '588 patent lists as examples of "other conventional ancillary substances" "colorants, stabilizers, fillers, wetting agents, flow regulators but no release-delaying agents, among others." (Par Ex. 1 at col. 4, ll. 14-17.)

The '588 patent does not expressly define "pronounced plasma level plateau." In these instances, a dictionary or treatise is often useful to assist in understanding the common meaning of words. "Pronounced" is defined as "very noticeable" or "strongly marked." (Par Ex. 12 at 800.) "Plasma" is defined as "the fluid part especially of blood, lymph, or milk that is distinguished from suspended material and that in blood differs from serum essentially in containing the precursor substance of fibrin in addition to the constituents of serum." (Par Ex. 24 at 553.) "Plateau" is defined as "a roughly level section in a graph." (Par Ex. 12 at 769.)

The '588 patent uses the term "pronounced **blood** level plateau" when referring to the **propafenone concentration levels** over the 12-hour interval depicted in Figure 11 for microtablets, and notes that "[t]he fluctuations in the **blood level** are considerably less with the microtablets." (Par Ex. 1 at col. 2, ll. 60-63 and Figure 11 (emphasis added).) Thus, "plasma level" refers to the concentration of active ingredient in the blood plasma.

Thus, the person of ordinary skill in the art would understand that "pronounced plasma level plateau" means *a markedly level concentration of the active ingredient in the blood plasma*.

The '588 patent expressly defines "PTF" or "peak to trough fluctuation" in the specification:

$$PTF\,(\%) = \frac{C_{max} - C_{min}}{\dfrac{AUC}{\Delta t}} \, x \, 100$$

where:       $C_{max}$ = the maximum concentration of the active ingredient in the blood plasma;
             $C_{min}$ = the minimum concentration of the active ingredient in the blood plasma;
             AUC = the Area Under the Curve; and
             $\Delta t$ = time interval

(Par Ex. 1 at col. 3, ll. 1 – 11.)  Claim 2 requires that the ratio, $(C_{max} - C_{min})$ divided by $(AUC/\Delta t)$, times 100, be less than 75 %.

Accordingly, combining the plain meaning of the claim terms and disclosures in the '588 patent's written description, "a pronounced plasma level plateau with a PTF<75%" means *a markedly level concentration of the active ingredient in the blood plasma, with a less than 75% fluctuation between the maximum and minimum blood plasma concentrations during the relevant time interval, measured as $(C_{max} - C_{min})$ divided by $(AUC/\Delta t)$ times 100*.

### 12.    The Phrase "bioavailability does not depend on the intake of food" in Claim 2

The phrase "bioavailability does not depend on the intake of food" means that *the ingestion of food has no effect on the rate and amount of the active ingredient in the claimed microtablet that reaches the blood*.

The '588 patent does not define this claim phrase expressly.  In these instances, a dictionary or treatise is often useful to assist in understanding the common meaning of words.  "Biovailability" is defined as "a measurement of the rate and extent (amount) of therapeutically active drug that reaches the general circulation."  (Par Ex. 25 at 193.)  "Intake of food" has its plain meaning.  "Intake" means "a taking in" or "the amount taken in."  (Par Ex. 5 at 607.)  Used in connection with "food," one of ordinary skill in the art would understand that "intake" means ingestion.  Thus, "intake of food" means *ingestion of food*.

The '588 patent states that bioavailability of the microtablet dosage form is "unaffected by food intake."  (Par Ex. 1 at col. 3, ll. 17 – 21.)  Table 1 shows a comparison of the AUC (i.e., a measurement of the amount of active ingredient in the blood) for microtablets with that of a

bolus[10] delayed release form for subjects in fasting and non-fasting states. Table 1 shows that

the AUC for microtablets was 5500 (ng·h)/ml for both fasting and non-fasting subjects. Thus,

this data confirms that "bioavailability does not depend on the intake of food" means that fasting

and non-fasting states (i.e., the ingestion of food) have no effect on bioavailability.

Accordingly, the phrase "bioavailability does not depend on the intake of food" means

that *the ingestion of food has no effect on the rate and amount of the active ingredient in the*

*claimed microtablet that reaches the blood*.

### 13.    The Phrase "cylindrical mold" in Claim 6

The phrase "cylindrical mold" has its conventional meaning and means *a cavity for*

*forming a substance into the shape of a cylinder, a solid figure traced out when a rectangle*

*rotates around one of its sides as the axis of rotation, with two parallel circles of equal size at*

*the ends*.

The '588 patent does not define the terms "cylindrical mold" expressly or by implication.

In these instances, the plain and ordinary meaning controls. Because there is nothing in the '588

patent that indicates that the term "cylindrical" has a different meaning in claim 6 than it does in

claim 1, "cylindrical" in the phrase "cylindrical mold" means *having the form of a cylinder, i.e.,*

*the solid figure traced out when a rectangle rotates around one of its sides as the axis of*

*rotation, with two parallel circles of equal size at the ends*. *See Dayco Prods., Inc. v. Total*

*Containment, Inc.*, 329 F.3d 1358, 1371 (Fed. Cir. 2003) ("if a claim term appears in more than

one claim it should be construed the same in each.").

---

[10] The '588 patent does not expressly define this term. In Webster's Medical Desk Dictionary, the term "bolus" is
defined as "a large pill." Webster's Medical Desk Dictionary at 82 (1986).

The term "mold" is not defined in the '588 patent's written description expressly or by implication. Thus, the conventional meaning applies. "Mold" is defined as "a cavity in which a substance is shaped." (Par Ex. 5 at 749.)

Accordingly, the ordinary meaning of the phrase "cylindrical mold" is *a cavity for forming a substance into the shape of a cylinder, a solid figure traced out when a rectangle rotates around one of its sides as the axis of rotation, with two parallel circles of equal size at the ends*.

## VI.    CONCLUSION

For the foregoing reasons, Par respectfully requests that the Court enter an order construing the terms and phrases of the '588 patent as proposed by Par.

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

March 5, 2008

Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Tel.: (302) 571-6600
Fax: (302) 571-1253

- and -

FROMMER LAWRENCE & HAUG LLP
Edgar H. Haug
James K. Stronski
John G. Taylor
745 Fifth Avenue
New York, New York 10151
Tel: (212) 588-0800
Fax: (212) 588-0500
*Attorneys for Defendant, Par Pharmaceutical, Inc.*

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on March 5, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jack B. Blumenfeld [jbbefiling@mnat.com]
> Maryellen Noreika [menefiling@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200

I further certify that on March 5, 2008, I caused a copy of the foregoing document to be served on the above-listed counsel and on the following non-registered participants in the manner indicated:

> ### *By E-Mail and Hand Delivery*
>
> Jack B. Blumenfeld [jblumenfeld@mnat.com]
> Maryellen Noreika [mnoreika@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200
>
> ### *By E-Mail*
>
> John Desmarais [jdesmarais@kirkland.com]
> Gerald J. Flattmann, Jr. [gflattmann@kirkland.com]
> Christine Willgoos [cwillgoos@kirkland.com]
> William T. Vuk [wvuk@kirkland.com]
> KIRKLAND & ELLIS LLP
> Citigroup Center
> 153 E. 53rd Street
> New York, NY 10022
> (212) 446-4800

Steven C. Cherny [steven.cherny@lw.com]
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY  10022-4834
(212) 906-1200

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391

*Attorneys for Defendant-Counterclaimant,*
*Par Pharmaceutical, Inc.*

2