**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| RELIANT PHARMACEUTICALS, INC., | : | |
| | : | |
| Plaintiff, | : | C.A. No. 06-774-JJF |
| | : | |
| v. | : | |
| | : | |
| PAR PHARMACEUTICAL, INC., | : | |
| | : | |
| Defendant. | : | |

## PAR'S APPENDIX OF EXHIBITS
## IN SUPPORT OF CLAIM CONSTRUCTION

### Volume 1 with Exhibits 1 through 2

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Tel: (302) 571-6600

- and -

**FROMMER LAWRENCE & HAUG LLP**
Edgar H. Haug
James K. Stronski
John G. Taylor
745 Fifth Avenue
New York, New York 10151
Tel: (212) 588-0800

*Attorneys for Defendant Par Pharmaceutical, Inc.*

March 5, 2008

00527871.DOC

## TABLE OF CONTENTS

Exhibit 1:     U.S. Patent No. 5,681,588

Exhibit 2A:    Table of Contents to Prosecution History for U.S. Patent No. 5,681,588

Exhibit 2:     Prosecution History for U.S. Patent No. 5,681,588

Exhibit 3:     Excerpt from *The Merck Index* (13th ed. 2001)

Exhibit 4:     Pages from Drugs@FDA website regarding approved labeling for Rythmol® SR New Drug Application No. 021416

Exhibit 5:     Excerpt from *Merriam-Webster's Collegiate Dictionary* (10th Ed. 1994)

Exhibit 6:     O.A. Beck & H. Hochrein, *Indications and Risks of Antiarrythmia Treatment with Propafenone*, 103 Deut. Med. Wochenschr. 1261 (1978) (abstract translation)

Exhibit 7:     Pages from Drugs@FDA website regarding Label and Approval History for Rythmol® New Drug Application No. 019151

Exhibit 8:     Letter from the FDA to Knoll Pharmaceutical Co., dated December 23, 1997

Exhibit 9:     U.S. Patent No. 4,797,287

Exhibit 10:    U.S. Patent No. 4,828,843

Exhibit 11:    Plaintiff Reliant's Supplemental Responses to Par's First Set of Interrogatories dated September 24, 2007 *[CONFIDENTIAL]*

Exhibit 12:    Excerpt from *New Webster's Dictionary and Thesaurus of the English Language* (1993)

Exhibit 13:    Excerpt from *The American Heritage Science Dictionary* (2005)

Exhibit 14:    Excerpt from *Hawley's Condensed Chemical Dictionary* (12th ed. 1993)

Exhibit 15:    U.K. Patent Application GB 2 176 999A

Exhibit 16:    International Patent Application  WO 92/04013

Exhibit 17:    European Patent Application No. 022 17 32

Exhibit 18:    Excerpt from *Remington's Pharmaceutical Sciences* (18th ed. 1990)

Exhibit 19:    Excerpt from *The New Fowler's Modern English Usage* (3d ed. 1996)

Exhibit 20:    Rossen Koytchev, *Diprafenone: A New Antiarrhythmic Drug Related to Propafenone*, 15 Cardiovascular Drug Reviews 224 (1997)

Exhibit 21:    Excerpt from *Dictionary of Pharmacy* (1986)

Exhibit 22:    Procos Certificate of Analysis, PAR000161 - 63 *[CONFIDENTIAL]*

Exhibit 23:    Eugene L. Parrott, Chapter 4: Compression, *Pharmaceutical Dosage Forms – Tablets*, vol. 2 (2d ed. 1990)

Exhibit 24:    Excerpt from *Webster's Medical Desk Dictionary* (1986)

Exhibit 25:    Excerpt from Leon Shargel & Andrew B.C. Yu, *Applied Biopharmaceutics and Pharmacokinetics* (3d ed. 1993)

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on March 5, 2008, I caused to be

electronically filed a true and correct copy of the foregoing document with the Clerk of the Court

using CM/ECF, which will send notification that such filing is available for viewing and

downloading to the following counsel of record:

> Jack B. Blumenfeld [jbbefiling@mnat.com]
> Maryellen Noreika [menefiling@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200

I further certify that on March 5, 2008, I caused a copy of the foregoing document to be

served on the above-listed counsel and on the following non-registered participants in the

manner indicated:

> ### By E-Mail and Hand Delivery
>
> Jack B. Blumenfeld [jblumenfeld@mnat.com]
> Maryellen Noreika [mnoreika@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200
>
> ### By E-Mail
>
> John Desmarais [jdesmarais@kirkland.com]
> Gerald J. Flattmann, Jr. [gflattmann@kirkland.com]
> Christine Willgoos [cwillgoos@kirkland.com]
> William T. Vuk [wvuk@kirkland.com]
> KIRKLAND & ELLIS LLP
> Citigroup Center
> 153 E. 53rd Street
> New York, NY 10022
> (212) 446-4800

Steven C. Cherny [steven.cherny@lw.com]
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834
(212) 906-1200

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*
_____
Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391

*Attorneys for Defendant-Counterclaimant,*
*Par Pharmaceutical, Inc.*

2

# EXHIBIT 1



U 7313183

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

February 15, 2008

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *5,681,588*

ISSUE DATE: *October 28, 1997*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. SWAIN
Certifying Officer

US005681588A

# United States Patent [19]

## Kolter et al.

[11] Patent Number: 5,681,588

[45] Date of Patent: Oct. 28, 1997

[54] **DELAYED RELEASE MICROTABLET OF β-PHENYLPROPIOPHENONE DERIVATIVES**

[75] Inventors: **Karl Kolter**, Limburgerhof; **Helmut Fricke**, Mutterstadt; **Volker Buehler**, Karlsruhe; **Herbert Moeller-Peltzer**, Heidelberg, all of Germany

[73] Assignee: **Knoll Aktiengesellschaft**, Ludwigshafen, Germany

[21] Appl. No.: **525,749**

[22] PCT Filed: **Mar. 24, 1994**

[86] PCT No.: **PCT/EP94/00949**

§ 371 Date: **Oct. 3, 1995**

§ 102(e) Date: **Oct. 3, 1995**

[87] PCT Pub. No.: **WO94/22434**

PCT Pub. Date: **Oct. 3, 1994**

[30]        **Foreign Application Priority Data**

Apr. 3, 1993 [DE] Germany ............... 43 10 963.2

[51] Int. Cl.$^6$ ..................................... **A61K 9/20**

[52] U.S. Cl. ............... **424/464; 424/469; 424/461; 424/468; 424/458**

[58] Field of Search .................. 424/464, 456; 252/1; 514/652

[56]                **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,951,821 | 4/1976 | Davidson | 252/1 |
| 4,474,986 | 10/1984 | Lietz | 564/349 |
| 4,945,114 | 7/1990 | Franke | 514/652 |
| 4,954,347 | 9/1990 | Küsten et al. | 424/456 |

Primary Examiner—Thurman K. Page
Assistant Examiner—William E. Benston, Jr.
Attorney, Agent, or Firm—Oblon, Spivak, McClelland, Maier & Neustadt, P.C.

[57]                    **ABSTRACT**

A cylindrical delayed release tablet with a convex or flat upper side and lower side is provided, along with a method for its production and a gelatin capsule containing 3–200 tablets of the same having identical or different release rates. wherein the tablet if made of β-phenylpropiophenone derivatives of the formula I as active ingredient



where R is n-propyl or 1,1-dimethylpropyl, and their pharmacologically acceptable salts, wherein the tablet has a height and diameter that are both, independently of one another, 1–3 mm. the active ingredient content is in the range from 81–99.9% of the weight of the microtablet, (but not taking into account the weight of any coating which is present. the active ingredient density is greater than 1, the release of active ingredient in the USP paddle method at 50 rpm is 80% as a maximum after 3 hours and as a minimum after 24 hours, the release rate is virtually independent of the pressure when compressing the tablets, and the tablet contains no release-delaying ancillary substance but can contain 0.1–5% by weight of a lubricant and 0–18.9% by weight of other conventional ancillary substances.

**6 Claims, 11 Drawing Sheets**

EXAMPLE 1

% ACTIVE INGREDIENT vs HOURS (h)



**FIG. 1**

Copy provided by USPTO from the PIRS Image Database on 02/14/2008

**U.S. Patent**     Oct. 28, 1997     Sheet 2 of 11     **5,681,588**



FIG.2



*FIG. 3*

Copy provided by USPTO from the PIRS Image Database on 02/14/2008



*FIG. 4*

**U.S. Patent**     Oct. 28, 1997     Sheet 5 of 11     **5,681,588**



**FIG. 5**

Copy provided by USPTO from the PIRS Image Database on 02/14/2008

U.S. Patent        Oct. 28, 1997        Sheet 6 of 11        5,681,588



FIG. 6

Copy provided by USPTO from the PIRS Image Database on 02/14/2008

Case 1:06-cv-00774-JJF    Document 198-2    Filed 03/05/2008    Page 10 of 19



FIG. 7

Copy provided by USPTO from the PIRS Image Database on 02/14/2008



FIG.8

Copy provided by USPTO from the PIRS Image Database on 02/14/2008



*FIG. 9*

Copy provided by USPTO from the PIRS Image Database on 02/14/2008



FIG. 10



FIG. 11

Copy provided by USPTO from the PIRS Image Database on 02/14/2008

5,681,588

1

# DELAYED RELEASE MICROTABLET OF β-PHENYLPROPIOPHENONE DERIVATIVES

This application is a 35USC371 of PCT/EP94/00949 filed Mar. 24, 1994.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to cylindrical microtablets of β-phenylpropiophenone derivatives with a high content and density of active ingredient and a delayed release which is independent of the compressive force, with no release-delaying ancillary substances.

### 2. Discussion of the Background

Reference to β-phenylpropiophenone derivatives hereinbefore and hereinafter always includes and particularly means their physiologically acceptable salts, preferably the hydrochloride.

In the prior art the release of active ingredient from tablets is delayed either by a release-delaying matrix in which the active ingredient is embedded, or by a release-delaying coating through which the digestive fluid diffuses in and the active ingredient diffuses out.

Both principles have considerable disadvantages. For example, matrix tablets contain relatively large amounts of ancillary substances so that the volume of the tablet for a given dose of active ingredient is relatively large, which is unpleasant for the patient. On the other hand, film-coated tablets are elaborate to produce and, in particular, mechanically sensitive. The slightest damage to the lacquer film leads to the risk of sudden release of the entire content of active ingredient (dose dumping), which is extremely undesirable (local and temporal overdose with adverse side effects; short total action time).

Both matrix and film-coated delayed release tablets normally have diameters of about 6 to 12 mm or more and are therefore unable to pass through the closed pylorus. The release and absorption of their total content of active ingredient is concentrated at one site in the gastrointestinal tract depends on the conditions prevailing at this site, which results in wide interindividual and intraindividual variation in the plasma level.

This variation is less with multiple unit delayed release forms because the units are distributed uniformly along the gastrointestinal tract and can also pass through the closed pylorus. Usually employed as multiple unit forms are pellets with a diffusion lacquer packed into hard gelatin capsules. It is possible to produce matrix pellets only with very low doses of medicinal substances because, owing to the large surface area, even more matrix substance would be required than for the bolus delayed d release tablet.

For example, the Patent Applications GB 2 176 999 and WO 92/04013 disclose small matrix delayed release tablets which likewise contain relatively large amounts of release-delaying ancillary substances. The Patent Application EP 22 17 32 claims delayed release tablets of active ingredients with low solubility, which contain 60–80% active ingredient in addition to at least four auxiliaries. The release from these bolus forms is, as described in the patent, highly dependent on the granulation process and the equipment used for manufacture.

It is furthermore generally known that an increase in the compressive force in tablet production is associated with a slowing of the release of active ingredient. This applies both to fast release tablets and to delayed release tablets (Patent

2

Application WO 92/00064). Since the compressive forces fluctuate, despite the most up to date machine engineering, the resulting release rates vary. An additional factor is the variation between batches in the compression properties, which derives from the variability in the granules to be compressed. Differences in the particle size, porosity, surface structure, wettability etc. may have a large effect on the compression properties and the delaying of release.

## SUMMARY OF THE INVENTION

It is an object of the present invention to overcome the disadvantages of the prior art, ie. to develop propafenone and diprafenone tablets with a small-size, high content and density of active ingredient and release of active ingredient which is independent of the compressive force and uniform over a lengthy period.

We have found that this object is achieved by the microtablets of the present invention. This is because it has been found, surprisingly, that it is possible in the present case to produce delayed release tablets without release-delaying ancillary substances. This is all the more surprising because other medicinal substances with a water solubility similar to that of propafenone hydrochloride (0.7%), for example cimetidine hydrochloride or paracetamol, are 90% released in 1 hour from the same preparation.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

By comparison with other substances, propafenone HCl is extremely difficult to compress. A bolus tablet with commercial dosages of 150–300 mg and an active ingredient content above 80% cannot be produced under production conditions. By contrast, the microtablets according to the invention can, surprisingly, be produced at a relatively high machine speed without problems concerning friability and hardness, and specifically with active ingredient contents in the range from 81 to 99.9, preferably 85 to 99.5, % by weight and with an active ingredient density above 1. Such high contents of active ingredients of this type in tablets have not previously been reached.

The microtablets according to the invention are cylindrical with a flat or convex upper side and lower side and with a diameter and height which are preferably approximately equal and, independently of one another, from 1 to 3, preferably 1.5 to 2.5 mm.

It was furthermore not predictable that the release of active ingredient is, in contrast to usual experience, virtually independent of the pressure when compressing the tablets and, moreover, over a wide range of pH of the medium. "Virtually independent" means that the effect can be neglected for practical purposes. This ensures release at a constant rate. It is adjusted via the size of the tablet and possibly by additives which increase the release rate so that the release of active ingredient after 3, preferably 5, hours is not more than 80 and after 24, preferably 15, hours is not less than 80%. Surprisingly, the microtablets according to the invention also display distinct advantages in vivo unlike conventional delayed release forms such as a bolus delayed release form with similar in vitro release. Despite the short half-life, a pronounced blood level plateau develops (FIG. 11). The fluctuations in the blood level are considerably less with the microtablets. This is evident from the $t_{75\%}$ (period in the dosage interval during which the plasma levels are at least 75% of the maximum level), which is 8 to 9 hours with the microtablets according to the invention compared with 5 to 6 hours with the bolus delayed release form, and from the

Copy provided by USPTO from the PIRS Image Database on 02/14/2008

5,681,588

3

PTF (peak to trough fluctuation; cf. H. P. Koch and W. A. Ritschel, Synopsis der Biopharmazie und Pharmakokinetik, Ecomed-Verlagsgesellschaft mbH, Landsberg und München, 1986)

$$PTF (\%) = \frac{C_{max} - C_{min}}{\frac{AUC}{\Delta t}} \times 100$$

for the AUC, cf. J. K. Aronson et al., Europ. J. of Clinical Pharmacology 35 (1988), 1–7.

which has a value for the microtablets which is only about half that for the bolus forms, in particular less than 75, preferably less than 60, %. The microtablets accordingly increase therapeutic safety because excessive peaks of plasma levels and the side effects caused thereby do not occur, the plasma level does not fall below the minimum effective level, and the bioavailability of this form is unaffected by food intake, in contrast to the bolus delayed release form.

The AUC found for the bolus delayed release form is 50% higher when fasting.

In general, the microtablets show smaller intra- and inter-individual differences by comparison with the bolus delayed release form.

The microtablets according to the invention furthermore have the advantage that when introduced into gastric or intestinal fluid they show no tendency to stick or adhere. This ensures that they pass as individual articles through the gastrointestinal tract and, moreover, do not become attached to the wall of the stomach or intestine and induce irritation. Sticking or adhesion properties of this type are displayed, for example, by small articles with hydrophilic release-delaying polymers (cf. WO 92/04013).

The production of delayed release forms with hydrophilic release-delaying polymers often requires the use of organic solvents during granulation so that swelling does not start even during this process. It is possible entirely to dispense with this in the production of the microtablets according to the invention.

Presentations with hydrophilic release-delaying polymers additionally have the disadvantage that, because of the tendency to sorption and swelling, they are sensitive to a change in humidity during storage. These formulations are damaged by high humidities in particular. The microtablets according to the invention are stable even at relatively high humidities because of the insensitivity of the materials used. Even after storage at 93% rel. humidity for 21 days the water uptake is less than 1%, and no visible change is detectable.

The microtablets according to the invention are produced in conventional pharmaceutical equipment by the following steps: granulation, drying, mixing, tabletting.

The particle size of the active ingredient is, within the conventional pharmaceutical range, of only minor or no importance in the production of the microtablets according to the invention, against all expectations. This means that it is possible to convert propafenone hydrochloride and diprafenone hydrochloride of different particle size into products of the same quality.

Granulation and drying are preferably carried out in a fluidized bed. However, the agglomeration can also be carried out in a horizontal or vertical mixer.

After the wet granules have been passed through a screen of suitable mesh width they are dried either in a circulating air dryer or in a fluidized bed. The particle size of the granules should be below 1 mm, preferably below 0.8 mm.

It is possible to employ all conventional binders or adhesives for the agglomeration, eg. polyvinylpyrrolidone,

4

vinylpyrrolidone/vinyl acetate copolymers, gelatin, hydroxypropylmethylcellulose, hydroxypropylcellulose, polymers of methacrylic acid and its esters. It is possible to dispense with the use of a binder by using a solution of active ingredient as granulation liquid. Water without additives is preferred as granulation liquid.

After the granules have been dried to the defined water content, 0.1–5, preferably 0.3–2, % by weight of a lubricant for the tabletting are mixed in homogeneously. It is likewise possible to use for this purpose all conventional substances such as talc, magnesium stearate, calcium stearate, stearic acid, calcium behenate, glycerin palmitostearate, sodium acetate, polyethylene glycol, sodium stearate [sic] fumarate. In addition, up to 18.9% by weight of other conventional ancillary substances can be added, for example colorants, stabilizers, fillers, wetting agents, flow regulators but no release-delaying agents.

The tabletting takes place in a suitable tabletting machine equipped with multiple microtablet punches. The resulting microtablets have a cylindrical shape with flat or convex surface [sic]. The height and the diameter can be varied independently of one another. It is often expedient, to increase the apparent density and improve flowability, to match the height of the microtablets to the diameter.

Another element in the control of release besides the size of the microtablets is the addition of wetting agents which increase the rate of dissolution. Wetting agents which can be used are, on the one hand, surfactants such as polyoxyethylene fatty acid esters, polyoxyethylene fatty alcohol ethers, fatty acid salts, bile acid salts, alkyl sulfates or ethylene oxide/propylene oxide block copolymers or, on the other hand, genuinely water-soluble substances such as polyethylene glycols, urea, sodium chloride, sorbitol, mannitol, glycine, nicotinamide, or salts of citric acid, tartaric acid or phosphoric acid. In this case the rate of release increases in parallel with the rise in the wetting agent concentration.

The wetting agent can have been incorporated into the granules or else be subsequently mixed in together with the lubricant. This is, of course, possible only with solid wetting agents. The wetting agent concentration is 0.1–15, as a rule 1–10, % of the total mass.

To increase the rate of erosion of the active ingredient from the tablet surface, and thus the release of active ingredient, it is also possible to use disintegrants in concentrations of 0.001–0.5, preferably 0.01–0.1, %, which are far below the conventional concentrations.

As a rule, the microtablets can be packed into gelatin capsules directly using conventional filling machines. It may occasionally be advantageous for the microtablets, before the packing, to be provided with a readily soluble film coating which does not influence the release.

In addition, it is in many cases expedient to combine delayed-release with instant-release or not so delayed release microtablets. This results in release of an initial dose at once, followed by the slow release of the maintenance dose. Modern capsule filling machines are able to meter two products into one capsule without problems.

The instant release microtablet differs from the delayed release microtablet in that it contains conventional amounts of disintegrant, swelling agent, pore former, which bring about rapid disintegration of the microtablet into small fragments and rapid dissolution of the active ingredient.

The microtablets of the examples always had a diameter and height each of 2 mm, and the density of active ingredient was always more than 1.

Copy provided by USPTO from the PIRS Image Database on 02/14/2008

5,681,588

**5**

## EXAMPLES

### Example 1 (FIG. 1)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 6.25 mg (96%) |
| Hydroxypropylmethylcellulose | 0.20 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.50 mg |

30kg of propafenone HCl were granulated with 10 kg of a 10% strength hydroxypropylmethylcellulose solution (Pharmacoat® 603) and dried in a fluidized bed granulator. The granules were passed through a screen of suitable mesh width and then mixed in a plowshare mixer with the stated amount of magnesium stearate.

The microtablets were produced in a rotary tabletting machine equipped with multiple microtablet punches.

The number of microtablets corresponding to the dose to be administered was packed into hard gelatin capsules using a suitable capsule filling machine.

#### TABLE 1

Results of studies on volunteers with propafenone HCl microtablets of Example 1 and a bolus delayed release form according to the invention in comparative test (n = 18, dose: 400 mg of propafenone HCl, repeated administration)

| | Microtablets | | Bolus delayed release form | |
|---|---|---|---|---|
| | fasting | non-fasting | fasting | non-fasting |
| AUC ng · h / ml | 5 500 | 5 500 | 6 900 | 4 700 |
| t_max (h) | 8–9 | 8–9 | 5–6 | 5–6 |
| PTF (%) | 52 | 56 | 88 | 106 |

n = number of volunteers
ng = nanogram
h = hours

### Example 2 (FIG. 2)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 5.92 mg (91%) |
| Hydroxypropylmethylcellulose | 0.20 mg |
| Poloxamer 188 (USP) | 0.33 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.5 mg |

Production took place as in Example 1. The required amount of poloxamer 188 together with the magnesium stearate were mixed with the granules in a plowshare mixer.

**6**

### Example 3 (FIG. 3)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 5.61 mg (86%) |
| Hydroxypropylmethylcellulose | 0.19 mg |
| Poloxamer 188 | 0.65 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.5 mg |

Production took place as in Example 2.

### Example 4 (FIG. 4)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 6.0 mg (86%) |
| Hydroxypropylmethylcellulose | 0.2 mg |
| Calcium hydrogen phosphate | 0.513 mg |
| Monoglyceride (Myvatex ®) | 0.15 mg |
| Crosslinked polyvinylpyrrolidone | 0.007 mg |
| Magnesium stearate | 0.03 mg |
| Total weight | 7.0 mg |

Production took place as in Example 2.

### Example 5 (FIG. 5)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 5.70 mg (81%) |
| Gelatin | 0.18 mg |
| Calcium hydrogen phosphate | 0.38 mg |
| NaCl | 0.70 mg |
| Magnesium stearate | 0.04 mg |
| Total weight | 7.0 mg |

Production took place as in Example 1. A 10% strength gelatin solution was used as granulating agent. The amount of NaCl was mixed in with the magnesium stearate.

### Example 6 (FIG. 6)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 5.83 mg (83%) |
| Hydroxypropylmethylcellulose | 0.17 mg |
| β-Cyclodextrin | 0.9 mg |
| Magnesium stearate | 0.1 mg |
| Total weight | 7.0 mg |

Production took place as in Example 2.

### Example 7 (FIG. 7)

Gelatin capsules with propafenone delayed release microtablets and propafenone instant release microtablets

To achieve a higher initial release, 14 instant release microtablets and 55 delayed release microtablets were

Copy provided by USPTO from the PIRS Image Database on 02/14/2008

5,681,588

7

packed into hard gelatin capsules in a suitable capsule filling machine.

| Composition of the instant release microtablets | |
|---|---|
| Propafenone HCl | 6.05 mg (93%) |
| Hydroxypropylmethylcellulose | 0.20 mg |
| Sodium carboxymethylstarch | 0.20 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.5 mg |

The instant release microtablets were produced as in Example 2.

The delayed release microtablets were produced as in Example 1.

### Example 8 (FIG. 8)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 6.48 mg (99.7%) |
| Magnesium stearate | 0.02 mg |
| Total weight | 6.50 mg |

Propafenone hydrochloride and magnesium stearate were mixed in a plowshare mixer and subsequently compressed to microtablets.

The in vitro release plots (FIGS. 1 to 10) were determined using a USP paddle apparatus with 0.08 molar HCl in the first two hours and then phosphate buffer pH 6.8. The paddle rotated at 50 rpm.

Comparative test

Propafenone delayed release bolus film-coated tablet

| Composition | |
|---|---|
| Propafenone HCl | 450.0 mg |
| Sodium alginate | 112.0 mg |
| Microcrystalline cellulose type PH 101 | 37.0 mg |
| Copolymers of acrylic and methacrylic esters with a small content of quaternary ammonium groups (Eudragit® RS) | 15.0 mg |
| Gelatin | 55.0 mg |
| Magnesium stearate | 3.5 mg |
| Microcrystalline cellulose type PH 102 | 12.5 mg |
| Readily soluble film coating | 15.0 mg |
| Total weight | 700.0 mg |

Propafenone hydrochloride, sodium alginate, microcrystalline cellulose (type PH 101) and Eudragit RS were mixed in a vertical mixer and granulated with 20% strength gelatin solution. The wet granules were dried in a fluidized bed dryer with inlet air at 60° C. After passing through a screen of suitable mesh width, magnesium stearate and microcrystalline cellulose (type PH 102) were admixed in a horizontal mixer and subsequently the mixture was compressed to oblong tablets (dimensions 18×8.7 mm) in a rotary tabletting machine. The readily soluble coating was applied in a horizontal coater.

8

Determination of in vitro release in a paddle apparatus at 50 rpm produced the following results (in %):

| | |
|---|---|
| 1st hour | 3.8 |
| 2nd hour | 5.5 |
| 3rd hour | 23.7 |
| 4th hour | 43.0 |
| 6th hour | 75.4 |
| 8th hour | 89.5 |

The in vitro release from the delayed release bolus film-coated tablet is thus similar to that of the delayed release microtablets according to the invention. Nevertheless, the in vivo release is entirely different and, in fact, better according to the invention, cf. drug levels shown in FIG. 11.

We claim:

1. A cylindrical delayed release microtablet with a convex or flat upper side and lower side of β-phenylpropiophenone derivatives of the formula I as active ingredient



where R is n-propyl or 1,1-dimethylpropyl, and their pharmacologically acceptable salts, wherein

a) the height and diameter are, independently of one another, 1–3 mm,

b) the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet,

c) the active ingredient density is greater than 1,

d) the release of active ingredient in the USP paddle method at 50 rpm is 80% as a maximum after 3 hours and as a minimum after 24 hours,

e) the release rate is virtually independent of the pressure when compressing the tablets, and

f) the tablet contains no release-delaying ancillary substance but 0.1–5% by weight of a lubricant and 0–18.9% by weight of other conventional ancillary substances.

2. A tablet as claimed in claim 1, which in vivo results in a pronounced plasma level plateau with a PTF<75% and whose bioavailability does not depend on the intake of food.

3. A tablet as claimed in claim 1, wherein the active ingredient is propafenone hydrochloride.

4. A tablet as claimed in claim 1, wherein the height and diameter are approximately the same.

5. A gelatin capsule which contains 3–200 tablets as claimed in claim 1 with identical or different release rates.

6. A process for producing cylindrical delayed release microtablets as claimed in claim 1, which comprises a homogeneous mixture of 81–99.9% by weight of the granulated active ingredient with a particle size below 1 mm, 0.1–5% by weight of a lubricant and 0–18.9% by weight of other conventional ancillary substances which do not delay release being compressed in a cylindrical mold with a height and diameter each of 1–3 mm and being removed from the mold.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  :  5,681,588
DATED       :  October 28, 1997
INVENTOR(S) :  Karl KOLTER et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the title page, Item [87], the PCT Pub. Date should read:

-- Oct. 13, 1994 --

Signed and Sealed this

Tenth Day of February, 1998

*Attest:*

**BRUCE LEHMAN**

*Attesting Officer*          *Commissioner of Patents and Trademarks*

# EXHIBIT 2- PART 1



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

December 29, 2007

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:

APPLICATION NUMBER: *08/525,749*
FILING DATE: *October 03, 1995*
PATENT NUMBER: *5,681,588*
ISSUE DATE: *October 28, 1997*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office



M. BASSFORD
Certifying Officer

08/525749
464    Subclass
464    Class
ISSUE CLASSIFICATION

5681588
5681588

| UTILITY SERIAL NUMBER | PATENT DATE | PATENT NUMBER |
|---|---|---|
| 08/525749 | OCT 2 8 1997 | |

| SERIAL NUMBER 08/525,749 | FILING DATE 10/03/95 | CLASS 424 | SUBCLASS 464 | GROUP ART UNIT 1502 | EXAMINER Benston |

APPLICANTS: KARL KOLTER, LIMBURGERHOF, FED REP GERMANY; HELMUT FRICKE, MUTTERSTADT, FED REP GERMANY; VOLKER BUEHLER, KARLSRUHE, FED REP GERMANY; HERBERT MUELLER-PELTZER, HEIDELBERG, FED REP GERMANY.

**CONTINUING DATA*********************
VERIFIED  THIS APPLN IS A 371 OF  PCT/EP94/00949  03/24/94

**FOREIGN/PCT APPLICATIONS************
VERIFIED  FED REP GERMANY  P 43 10 963.2  04/03/93

CERTIFICATE
FEB 1 0 1998
OF CORRECTION

| Foreign priority claimed 35 USC 119 conditions met | ☐ yes ☐ no | AS FILED | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|---|
| Verified and Acknowledged | Examiner's initials | | DEX | 11 | 6 | 1 | $880.00 | 524-2396-DXP |

ADDRESS: OBLON SPIVAK MCCLELLAND MAIER & NEUSTADT
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON VA  22202

TITLE: DELAYED RELEASE MICROTABLET OF BETA-PHENYLPROPIOPHENONE DERIVATIVES

U.S. DEPT. OF COMM./PAT. & TM—PTO-436L

PARTS OF APPLICATION
FILED SEPARATELY

NOTICE OF ALLOWANCE MAILED
4-1-97
Assistant Examiner  William E. Benston, Jr.

CLAIMS ALLOWED
Total Claims 6  Print Claim

ISSUE FEE
Amount Due 1290.00  Date Paid 6/20/97

THURMAN K. PAGE
SUPERVISORY PATENT EXAMINER
ART UNIT 152
Primary Examiner

DRAWING
Sheets Drwg. 11  Figs. Drwg.

ISSUE BATCH NUMBER  139

Label Area

PREPARED FOR ISSUE

WARNING: The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

form PTO-436A
(rev. 8/92)

ISSUE FEE IN

(FACE)



**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

**AccuRoute** ™
*Intelligent* Document Routing

# Generic Scan to N:\Corporate\JMEYE

ED(KSSR-TRTTXTDK-RHWB-PRPY-AXED-AFWKASTRNAPK)

| | |
|---|---|
| Created By: | jmeyer@ycst.com |
| Created On: | 4/12/2007 11:51:42 AM |
| Expires On: | (no expiration) |
| Single Use? | No |

**Distribution**
e-Mail:

**Filing:**
   FileShare, \\fs02\images\Corporate\JMEYE\, Generic Scan.pdf  PDF

**Print:**

**Fax:**

ED(KSSR-TRTTXTDK-RHWB-PRPY-AXED-AFWKASTRNAPK)

**Place this routing sheet on top of your paper document, place in feeder and then
1) select scanner button 2) select the AccuRoute folder 3) press green start button**

# EXHIBIT 2- PART 1



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

December 29, 2007

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:

APPLICATION NUMBER: *08/525,749*
FILING DATE: *October 03, 1995*
PATENT NUMBER: *5,681,588*
ISSUE DATE: *October 28, 1997*

By Authority of the

Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office

M. BASSFORD
Certifying Officer

08/525749

464 | Subclass
Class
ISSUE CLASSIFICATION

OB

5681588

5681588

UTILITY
SERIAL
NUMBER 08/525749

PATENT DATE
OCT 2 8 1997

PATENT
NUMBER

| SERIAL NUMBER 08/525,749 | FILING DATE 10/03/95 | CLASS 424 | SUBCLASS 464 | GROUP ART UNIT 1502 | EXAMINER |

KARL KOLTER, LIMBURGERHOF, FED REP GERMANY; HELMUT FRICKE, MUTTERSTADT, FED REP GERMANY; VOLKER BUEHLER, KARLSRUHE, FED REP GERMANY; HERBERT MUELLER-PELTZER, HEIDELBERG, FED REP GERMANY.

**CONTINUING DATA********************
VERIFIED    THIS APPLN IS A 371 OF PCT/EP94/00949  03/24/94

**FOREIGN/PCT APPLICATIONS**********
VERIFIED    FED REP GERMANY    P 43 10 963.2    04/03/93

CERTIFICATE
FEB 1 0 1998
OF CORRECTION

| Foreign priority claimed 35 USC 119 conditions met | ☐ yes ☐ no ☐ yes ☐ no | AS FILED | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
| Verified and Acknowledged | Examiner's initials | | DEX | 11 | 6 | 1 | $880.00 | 524-2396-DXP |

OBLON SPIVAK MCCLELLAND MAIER & NEUSTADT
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON VA  22202

DELAYED RELEASE MICROTABLET OF BETA-PHENYLPROPIOPHENONE DERIVATIVES

U.S. DEPT. OF COMM./PAT. & TM— PTO-436L (rev)

PARTS OF APPLICATION
FILED SEPARATELY

NOTICE OF ALLOWANCE MAILED

4-1-97

William E. Benston, Jr
Assistant Examiner

Thurman K. Page
SUPERVISORY PATENT EXAMINER
ART UNIT 152
Primary Examiner

PREPARED FOR ISSUE

| ISSUE FEE |
| Amount Due | Date Paid |
| 1290.00 | 6 20 97 |

Label
Area

CLAIMS ALLOWED
Total Claims | Print Claim
6

DRAWING
Sheets Drwg. | Figs. Drwg.
11

ISSUE BATCH NUMBER
139

WARNING: The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

fm PTO-436A
(rev. 8/92)

ISSUE FEE IN FILE

(FACE)

PA 002

| BAR CODE LABEL | U.S. PATENT APPLICATION | | |
|---|---|---|---|

| SERIAL NUMBER | FILING DATE | CLASS | GROUP ART UNIT |
|---|---|---|---|
| 08/525,749 | 10/03/95 | 424 | 1502 |

APPLICANT

KARL KOLTER, SACHESNWEG, FED REP GERMANY; HELMUT FRICKE, PFALZRING,
FED REP GERMANY; VOLKER BUEHLER, LIEBIGSTRASSE, FED REP GERMANY; HERBERT
MUELLER-PELTZER, UFERSTRASSE, FED REP GERMANY.

**CONTINUING DATA*********************
VERIFIED      THIS APPLN IS A 371 OF   PCT/EP94/00949  03/24/94

**FOREIGN/PCT APPLICATIONS************
VERIFIED      FED REP GERMANY    P 43 10 963.2    04/03/93

| STATE OR COUNTRY | SHEETS DRAWING | TOTAL CLAIMS | INDEPENDENT CLAIMS | FILING FEE RECEIVED | ATTORNEY DOCKET NO. |
|---|---|---|---|---|---|
| DEX | 11 | 6 | 1 | $880.00 | 524-2396-OXP |

ADDRESS

OBLON SPIVAK MCCLELLAND MAIER & NEUSTADT
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON VA  22202

TITLE

DELAYED RELEASE MICROTABLET OF BETA-PHENYLOPROPIOPHENONE DERIVATIVES

This is to certify that annexed hereto is a true copy from the records of the United States
Patent and Trademark Office of the application which is identified above.

By authority of the
COMMISSIONER OF PATENTS AND TRADEMARKS

Date _____     Certifying Officer _____

PATENT APPLICATION SERIAL NO. 08/525749

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

PTO-1556
(5/87)

DOCKET NO.  524-2396-0X PCT.

IN RE APPLICATION OF:  Karl KOLTER et al.  21 Rec'd PCT/PT  03 OCT 1995

SERIAL NO.:         New U.S. PCT Application

FILED:              Concurrently Herewith

INTERNATIONAL
APPLICATION NO:     PCT/EP94/00949

INTERNATIONAL
FILING DATE:        24 March 1994

FOR:  DELAYED RELEASE MICROTABLET OF 2-PHENYLPROPIOPHENONE DERIVATIVES

ASSISTANT COMMISSIONER OF PATENTS
WASHINGTON, D.C. 20231

Sir:

Transmitted herewith is an amendment in the above-identified application.

☒    No additional fee is required.

☐    Small entity status of this application under 37 C.F.R. §1.9 and §1.27 has been
     established by a verified statement previously submitted.

☐    Small entity status of this application under 37 C.F.R. §1.9 and §1.27 has been
     established by a verified statement submitted herewith.

☒    Additional documents filed herewith: Specification/Claims/Abstract; Transmittal Letter;
     Declaration; 11 Sheets of Informal Drawings; Notice of Priority; PCT/IB/304; PCT/IB/308;
     Preliminary Amendment; Check for $880.00; Deposit Account Order Form

The fee has been calculated as shown below.

| (Col. 1) | | (Col. 2) | (Col. 3) | | SHALL ENTITY | | OTHER THAN A SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS REMAINING AFTER | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE | ADDITIONAL FEE | RATE | ADDITIONAL FEE |
| TOTAL | 6 | MINUS | ** 20 | = 0 | X11 = | $ | 22 = | $ 0.00 |
| INDEP | 1 | MINUS | *** 3 | = 0 | X37 = | $ | X74 = | $ 0.00 |
| ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | | +115= | $ | +250= | $ |
| | | | | | TOTAL | $ | TOTAL | $ 0.00 |

____  A check in the amount of $_____ is attached.

XX    Please charge any additional fees for the papers being filed herewith and for
      which no check is enclosed herewith, or credit any overpayment to deposit
      Account No. 15-0030.  A duplicate copy of this sheet is enclosed.

XX    If these papers are not considered timely filed by the Patent and Trademark
      Office, then a petition is hereby made under 37 C.F.R. §1.136, and any
      additional fees required under 37 C.F.R. §1.136 for any necessary extension
      of time may be charged to deposit Account No. 15-0030.  A duplicate copy of
      this sheet is enclosed.

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Attorney of Record
Registration No.  24,618

Fourth Floor
1755 Jefferson Davis Highway
Arlington, Virginia  22202
(703) 413-3000

Timothy R. Schwartz
Registration No. 32,171

*If the entry in Column 2 is less than the entry in Column 1 write "0" in Column 3.
**If the "Highest Number Previously paid for" IN THIS SPACE is less than 20 write "20" in this space.
***If the "Highest Number Previously paid for" IN THIS SPACE is less than 3 write "3" in this space.

7/93

PA 005

| FORM (REV 5) **69 Rec'd PCT/PTO  03 OCT 1995** U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | ATTORNEY'S DOCKET NUMBER .24-2396-0X PCT |
|---|---|
| TRANSMITTAL LETTER TO THE UNITED STATES DESIGNATED/ELECTED OFFICE (DO/EO/US) CONCERNING A FILING UNDER 35 U.S.C. 371 | U.S. APPLICATION NO. (If known, see 37 CFR 1.5) 08/525749 |

| INTERNATIONAL APPLICATION NO. PCT/EP94/00949 | INTERNATIONAL FILING DATE 24 March 1994 | PRIORITY DATE CLAIMED 3 April 1993 |
|---|---|---|

TITLE OF INVENTION
DELAYED RELEASE MICROTABLET OF B-PHENYLPROPIOPHENONE DERIVATIVES

APPLICANT(S) FOR DO/EO/US
Karl KOLTER et al.

Applicant herewith submits to the United States Designated/Elected Office (DO/EO/US) the following items and other information:

1. [X]  This is a **FIRST** submission of items concerning a filing under 35 U.S.C. 371.
2. [ ]  This is a **SECOND or SUBSEQUENT** submission of items concerning a filing under 35 U.S.C. 371.
3. [X]  This express request to begin national examination procedures (35 U.S.C. 371(f)) at any time rather than delay examination until the expiration of the applicable time limit set in 35 U.S.C. 371(b) and PCT Articles 22 and 39(1).
4. [X]  A proper Demand for International Preliminary Examination was made by the 19th month from the earliest claimed priority date.
5. [X]  A copy of the International Application as filed (35 U.S.C. 371(c)(2)).
    a. [ ]  is transmitted herewith (required only if not transmitted by the International Bureau).
    b. [X]  has been transmitted by the International Bureau.
    c. [ ]  is not required, as the application was filed in the United States Receiving Office (RO/US)
6. [X]  A translation of the International Application into English (35 U.S.C. 371(c)(2)).
7. [X]  Amendments to the claims of the International Application under PCT Article 19 (35 U.S.C. 371(c)(3))
    a. [ ]  are transmitted herewith (required only if not transmitted by the International Bureau).
    b. [ ]  have been transmitted by the International Bureau.
    c. [ ]  have not been made; however, the time limit for making such amendments has NOT expired.
    d. [X]  have not been made and will not be made.
8. [ ]  A translation of the amendments to the claims under PCT Article 19 (35 U.S.C. 371(c)(3)).
9. [X]  An oath or declaration of the inventor(s) (35 U.S.C. 371(c)(4)).
10. [ ]  A translation of the annexes to the International Preliminary Examination Report under PCT Article 36 (35 U.S.C. 371(c)(5)).

Items 11. to 16. below concern other document(s) or information included:
11. [ ]  An Information Disclosure Statement under 37 CFR 1.97 and 1.98.
12. [ ]  An assignment document for recording. A separate cover sheet in compliance with 37 CFR 3.28 and 3.31 is included.
13. [X]  A FIRST preliminary amendment.
    [ ]  A SECOND or SUBSEQUENT preliminary amendment.
14. [ ]  A substitute specification.
15. [ ]  A change of power of attorney and/or address letter.
16. [X]  Other items or information:

                Priority Request
                PCT/IB/304
                PCT/IB/308

| PCT/EP94/00949 | 524-2396-0X PCT

17. ☐ The following fees are subm

**BASIC NATIONAL FEE (37 CFR 1.492(a)(1)-(5)):**

CALCULATIONS PTO USE ONLY

Search Report has been prepared by the EPO or JPO...................... $880.00

International preliminary examination fee paid to USPTO (37 CFR 1.482) .......... $680.00

No international preliminary examination fee paid to USPTO (37 CFR 1.482) but international search fee paid to USPTO (37 CFR 1.445(a)(2)).. $750.00

Neither international preliminary examination fee (37 CFR 1.482) nor international search fee (37 CFR 1.445(a)(2)) paid to USPTO.......... $1010.00

International preliminary examination fee paid to USPTO (37 CFR 1.482) and all claims satisfied provisions of PCT Article 33(2)-(4)............ $94.00

$880.00

| **ENTER APPROPRIATE BASIC FEE AMOUNT** = | $880.00 |

Surcharge of $130.00 for furnishing the oath or declaration later than ☐ 20 ☐ 30 months from the earliest claimed priority date (37 CFR 1.492(e)). | $

| CLAIMS | NUMBER FILED | NUMBER EXTRA | RATE | |
|---|---|---|---|---|
| Total claims | 6 | −20 = | 0 | X $22.00 | $ 0.00 |
| Independent claims | 1 | −3 = | 0 | X $78.00 | $ 0.00 |
| MULTIPLE DEPENDENT CLAIM(S) (if applicable) | | | + $250.00 | $ |

| **TOTAL OF ABOVE CALCULATIONS** = | $880.00 |

Reduction by 1/2 for filing by small entity, if applicable. Verified Small Entity Statement must also be filed (Note 37 CFR 1.9, 1.27, 1.28). | $

| **SUBTOTAL** = | $ 880.00 |

Processing fee of $130.00 for furnishing the English translation later than ☐ 20 ☐ 30 months from the earliest claimed priority date (37 CFR 1.492(f)). + | $

| **TOTAL NATIONAL FEE** = | $ 880.00 |

Fee for recording the enclosed assignment (37 CFR 1.21(h)). The assignment must be accompanied by an appropriate cover sheet (37 CFR 3.28, 3.31). $40.00 per property + | $

| **TOTAL FEES ENCLOSED** = | $ 880.00 |
| | Amount to be refunded | $ |
| | charged | $ |

a. ☒  A check in the amount of $ 880.00 to cover the above fees is enclosed.

b. ☐  Please charge my Deposit Account No. _____ in the amount of $ _____ to cover the above fees.
   A duplicate copy of this sheet is enclosed.

c. ☒  The Commissioner is hereby authorized to charge any additional fees which may be required, or credit any overpayment to Deposit Account No. 15-0030 . A duplicate copy of this sheet is enclosed.

**NOTE:** Where an appropriate time limit under 37 CFR 1.494 or 1.495 has not been met, a petition to revive (37 CFR 1.137(a) or (b)) must be filed and granted to restore the application to pending status.

Timothy R. Schwartz
Registration No. 32,171 SIGNATURE

Norman F. Oblon
NAME

24,618
REGISTRATION NUMBER

SEND ALL CORRESPONDENCE TO:

OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.
1755 Jefferson Davis Highway, Fourth Floor
Crystal Square Five
Arlington, Virginia 22202
(703) 413-3000

Form PTO-1390 (REV 10-94)   page 2 of 2

PA 007

*08/525,749*

## ABSTRACT OF THE DISCLOSURE

A cylindrical delayed release tablet with a convex or flat upper side and lower side is provided, along with a method for its production and a gelatin capsule containing 3-200 tablets of the same having identical or different release rates, wherein the tablet if made of β-phenylpropiophenone derivatives of the formula I as active ingredient



I

where R is n-propyl or 1,1-dimethylpropyl, and their pharmacologically acceptable salts, wherein the tablet has a height and diameter that are both, independently of one another, 1-3 mm, the active ingredient content is in the range from 81-99.9% of the weight of the microtablet, (but not taking into account the weight of any coating which is present, the active ingredient density is greater than 1, the release of active ingredient in the USP paddle method at 50 rpm is 80% as a maximum after 3 hours and as a minimum after 24 hours, the release rate is virtually independent of the pressure when compressing the tablets, and the tablet contains no release-delaying ancillary substance but can contain 0.1-5% by weight of a lubricant and 0-18.9% by weight of other conventional ancillary substances.

0480/01123

08/525749

TITLE OF THE INVENTION     03 OCT 1995

This application is a 35USC371 of PCT/EP94/00949 filed 03/24/94.

Delayed release microtablet of β-phenylpropiophenone derivatives

Field of the Invention

BACKGROUND OF THE INVENTION

The present invention relates to cylindrical microtablets of
5 β-phenylpropiophenone derivatives with a high content and density
of active ingredient and a delayed release which is independent
of the compressive force, with no release-delaying ancillary
substances.

Discussion of the Background

10 Reference to β-phenylpropiophenone derivatives hereinbefore and
hereinafter always includes and particularly means their physio-
logically acceptable salts, preferably the hydrochloride.

In the prior art the release of active ingredient from tablets is
15 delayed either by a release-delaying matrix in which the active
ingredient is embedded, or by a release-delaying coating through
which the digestive fluid diffuses in and the active ingredient
diffuses out.

20 Both principles have considerable disadvantages. For example,
matrix tablets contain relatively large amounts of ancillary sub-
stances so that the volume of the tablet for a given dose of
active ingredient is relatively large, which is unpleasant for
the patient. On the other hand, film-coated tablets are elaborate
25 to produce and, in particular, mechanically sensitive. The
slightest damage to the lacquer film leads to the risk of sudden
release of the entire content of active ingredient (dose dump-
ing), which is extremely undesirable (local and temporal overdose
with adverse side effects; short total action time).
30
Both matrix and film-coated delayed release tablets normally have
diameters of about 6 to 12 mm or more and are therefore unable to
pass through the closed pylorus. The release and absorption of
their total content of active ingredient concentrated at one site
35 in the gastrointestinal tract depends on the conditions prevail-
ing at this site, which results in wide interindividual and in-
traindividual variation in the plasma level.

This variation is less with multiple unit delayed release forms
40 because the units are distributed uniformly along the
gastrointestinal tract and can also pass through the closed
pylorus. Usually employed as multiple unit forms are pellets with
a diffusion lacquer packed into hard gelatin capsules. It is pos-
sible to produce matrix pellets only with very low doses of
45 medicinal substances because, owing to the large surface area,

0480/01123

2

even more matrix substance would be required than for the bolus
delayed release tablet.

For example, the Patent Applications GB 2 176 999 and WO 92/04013
5 disclose small matrix delayed release tablets which likewise con-
tain relatively large amounts of release-delaying ancillary sub-
stances. The Patent Application EP 22 17 32 claims delayed re-
lease tablets of active ingredients with low solubility, which
contain 60-80% active ingredient in addition to at least four
10 auxiliaries. The release from these bolus forms is, as described
in the patent, highly dependent on the granulation process and
the equipment used for manufacture.

It is furthermore generally known that an increase in the com-
15 pressive force in tablet production is associated with a slowing
of the release of active ingredient. This applies both to fast
release tablets and to delayed release tablets (Patent Applica-
tion WO 92/00064). Since the compressive forces fluctuate,
despite the most up to date machine engineering, the resulting
20 release rates vary. An additional factor is the variation between
batches in the compression properties, which derives from the
variability in the granules to be compressed. Differences in the
particle size, porosity, surface structure, wettability etc. may
have a large effect on the compression properties and the delay-
25 ing of release. SUMMARY OF THE INVENTION

It is an object of the present invention to overcome the disad-
vantages of the prior art, ie. to develop propafenone and
diprafenone tablets with a small size, high content and density
30 of active ingredient and release of active ingredient which is
independent of the compressive force and uniform over a lengthy
period.

We have found that this object is achieved by the microtablets as
of the present invention
35 claimed in claims 1 to 4. This is because it has been found, sur-
prisingly, that it is possible in the present case to produce
delayed release tablets without release-delaying ancillary sub-
stances. This is all the more surprising because other medicinal
substances with a water solubility similar to that of propafenone
40 hydrochloride (0.7%), for example cimetidine hydrochloride or pa-
racetamol, are 90% released in 1 hour from the same preparation.
DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT:
By comparison with other substances, propafenone HCl is extremely
difficult to compress. A bolus tablet with commercial dosages of
45 150-300 mg and an active ingredient content above 80% cannot be
produced under production conditions. By contrast, the microta-
blets according to the invention can, surprisingly, be produced

0480/01123

3

at a relatively high machine speed without problems concerning
friability and hardness, and specifically with active ingredient
contents in the range from 81 to 99.9, preferably 85 to 99.5, %
by weight and with an active ingredient density above 1. Such
5   high contents of active ingredients of this type in tablets have
not previously been reached.

The microtablets according to the invention are cylindrical with
a flat or convex upper side and lower side and with a diameter
10  and height which are preferably approximately equal and, indepen-
dently of one another, from 1 to 3, preferably 1.5 to 2.5 mm.

It was furthermore not predictable that the release of active in-
gredient is, in contrast to usual experience, virtually indepen-
15  dent of the pressure when compressing the tablets and, moreover,
over a wide range of pH of the medium. "Virtually independent"
means that the effect can be neglected for practical purposes.
This ensures release at a constant rate. It is adjusted via the
size of the tablet and possibly by additives which increase the
20  release rate so that the release of active ingredient after 3,
preferably 5, hours is not more than 80 and after 24, preferably
15, hours is not less than 80%. Surprisingly, the microtablets
according to the invention also display distinct advantages in
vivo unlike conventional delayed release forms such as a bolus
25  delayed release form with similar in vitro release. Despite the
short half-life, a pronounced blood level plateau develops (Fig.
11). The fluctuations in the blood level are considerably less
with the microtablets. This is evident from the $t_{75\%}$ (period in
the dosage interval during which the plasma levels are at least
30  75% of the maximum level), which is 8 to 9 hours with the micro-
tablets according to the invention compared with 5 to 6 hours
with the bolus delayed release form, and from the PTF (peak to
trough fluctuation; cf. H. P. Koch and W. A. Ritschel, Synopsis
der Biopharmazie und Pharmakokinetik, Ecomed-Verlagsgesellschaft
35  mbH, Landsberg und München, 1986)

$$PTF\ (\%) = \frac{C_{max} - C_{min}}{\dfrac{AUC}{\Delta t}} \times 100$$

for the AUC, cf.
J.K. Aronson et al.,
Europ. J. of Clinical
Pharmacology 35 (1988),
40                                                                1-7.

which has a value for the microtablets which is only about half
that for the bolus forms, in particular less than 75, preferably
45  less than 60, %. The microtablets accordingly increase
therapeutic safety because excessive peaks of plasma levels and
the side effects caused thereby do not occur, the plasma level

0480/01123

4

does not fall below the minimum effective level, and the
bioavailability of this form is unaffected by food intake, in
contrast to the bolus delayed release form.

5 The AUC found for the bolus delayed release form is 50% higher
when fasting.

In general, the microtablets show smaller intra- and inter-
individual differences by comparison with the bolus delayed
10 release form.

The microtablets according to the invention furthermore have the
advantage that when introduced into gastric or intestinal fluid
they show no tendency to stick or adhere. This ensures that they
15 pass as individual articles through the gastrointestinal tract
and, moreover, do not become attached to the wall of the stomach
or intestine and induce irritation. Sticking or adhesion
properties of this type are displayed, for example, by small
articles with hydrophilic release-delaying polymers (cf.
20 WO 92/04013).

The production of delayed release forms with hydrophilic
release-delaying polymers often requires the use of organic
solvents during granulation so that swelling does not start even
25 during this process. It is possible entirely to dispense with
this in the production of the microtablets according to the
invention.

Presentations with hydrophilic release-delaying polymers
30 additionally have the disadvantage that, because of the tendency
to sorption and swelling, they are sensitive to a change in
humidity during storage. These formulations are damaged by high
humidities in particular. The microtablets according to the
invention are stable even at relatively high humidities because
35 of the insensitivity of the materials used. Even after storage at
93% rel. humidity for 21 days the water uptake is less than 1%,
and no visible change is detectable.

The microtablets according to the invention are produced in
40 conventional pharmaceutical equipment by the following steps:
granulation, drying, mixing, tabletting.

The particle size of the active ingredient is, within the
conventional pharmaceutical range, of only minor or no importance
45 in the production of the microtablets according to the invention,
against all expectations. This means that it is possible to

PA 012

0480/01123

5

convert propafenone hydrochloride and diprafenone hydrochloride
of different particle sizes into products of the same quality.

Granulation and drying are preferably carried out in a fluidized
5   bed. However, the agglomeration can also be carried out in a
horizontal or vertical mixer.

After the wet granules have been passed through a screen of
suitable mesh width they are dried either in a circulating air
10   dryer or in a fluidized bed. The particle size of the granules
should be below 1 mm, preferably below 0.8 mm.

It is possible to employ all conventional binders or adhesives
for the agglomeration, eg. polyvinylpyrrolidone, vinyl-
15   pyrrolidone/vinyl acetate copolymers, gelatin, hydroxypropyl-
methylcellulose, hydroxypropylcellulose, polymers of methacrylic
acid and its esters. It is possible to dispense with the use of a
binder by using a solution of active ingredient as granulation
liquid. Water without additives is preferred as granulation
20   liquid.

After the granules have been dried to the defined water content,
0.1-5; preferably 0.3-2, % by weight of a lubricant for the
tabletting are mixed in homogeneously. It is likewise possible to
25   use for this purpose all conventional substances such as talc,
magnesium stearate, calcium stearate, stearic acid, calcium
behenate, glycerin palmitostearate, sodium acetate, polyethylene
glycol, sodium stearate [sic] fumarate. In addition, up to 18.9%
by weight of other conventional ancillary substances can be
30   added, for example colorants, stabilizers, fillers, wetting
agents, flow regulators but no release—delaying agents.

The tabletting takes place in a suitable tabletting machine
equipped with multiple microtablet punches. The resulting
35   microtablets have a cylindrical shape with flat or convex surface
[sic]. The height and the diameter can be varied independently of
one another. It is often expedient, to increase the apparent
density and improve flowability, to match the height of the
microtablets to the diameter.
40

Another element in the control of release besides the size of the
microtablets is the addition of wetting agents which increase the
rate of dissolution. Wetting agents which can be used are, on the
one hand, surfactants such as polyoxyethylene fatty acid esters,
45   polyoxyethylene fatty alcohol ethers, fatty acid salts, bile acid
salts, alkyl sulfates or ethylene oxide/propylene oxide block
copolymers or, on the other hand, genuinely water—soluble

0480/01123

6

substances such as polyethylene glycols, urea, sodium chloride, sorbitol, mannitol, glycine, nicotinamide, or salts of citric acid, tartaric acid or phosphoric acid. In this case the rate of release increases in parallel with the rise in the wetting agent
5 concentration.

The wetting agent can have been incorporated into the granules or else be subsequently mixed in together with the lubricant. This is, of course, possible only with solid wetting agents. The
10 wetting agent concentration is 0.1-15, as a rule 1-10, % of the total mass.

To increase the rate of erosion of the active ingredient from the tablet surface, and thus the release of active ingredient, it is
15 also possible to use disintegrants in concentrations of 0.001-0.5, preferably 0.01-0.1, %, which are far below the conventional concentrations.

As a rule, the microtablets can be packed into gelatin capsules
20 directly using conventional filling machines. It may occasionally be advantageous for the microtablets, before the packing, to be provided with a readily soluble film coating which does not influence the release.

25 In addition, it is in many cases expedient to combine delayed release with instant release or not so delayed release microtablets. This results in release of an initial dose at once, followed by the slow release of the maintenance dose. Modern capsule filling machines are able to meter two products into one
30 capsule without problems.

The instant release microtablet differs from the delayed release microtablet in that it contains conventional amounts of disintegrant, swelling agent, pore former, which bring about
35 rapid disintegration of the microtablet into small fragments and rapid dissolution of the active ingredient.

The microtablets of the examples always had a diameter and height each of 2 mm, and the density of active ingredient was always
40 more than 1.

45

0480/01123

7

Examples

Example 1 (Fig. 1)
Propafenone delayed release microtablets

5

Composition

| | |
|---|---|
| Propafenone HCl | 6.25 mg (96%) |
| Hydroxypropylmethylcellulose | 0.20 mg |
| 10 Magnesium stearate | 0.05 mg |
| Total weight | 6.50 mg |

30kg of propafenone HCl were granulated with 10 kg of a 10%
strength hydroxypropylmethylcellulose solution (Pharmacoat® 603)
15 and dried in a fluidized bed granulator. The granules were passed
through a screen of suitable mesh width and then mixed in a
plowshare mixer with the stated amount of magnesium stearate.

The microtablets were produced in a rotary tabletting machine
20 equipped with multiple microtablet punches.

The number of microtablets corresponding to the dose to be
administered was packed into hard gelatin capsules using a
suitable capsule filling machine.

25

Table 1

Results of studies on volunteers with propafenone HCl
microtablets of Example 1 and a bolus delayed release form
30 according to the comparative test (n = 18, dose: 400 mg of
propafenone HCl, repeated administration)

| | Microtablets | | Bolus delayed release form | |
|---|---|---|---|---|
| | fasting | non-fasting | fasting | non-fasting |
| AUC $\frac{ng \cdot h}{ml}$ | 5 500 | 5 500 | 6 900 | 4 700 |
| $t_{75\%}$ (h) | 8-9 | 8-9 | 5-6 | 5-6 |
| PTF (%) | 52 | 56 | 88 | 106 |

n = number of volunteers
ng = nanogram
h = hours

45

PA 015

0480/01123

8

Example 2 (Fig. 2)
Propafenone delayed release microtablets

Composition

5

| | |
|---|---|
| Propafenone HCl | 5.92 mg (91%) |
| Hydroxypropylmethylcellulose | 0.20 mg |
| Poloxamer 188 (USP) | 0.33 mg |
| Magnesium stearate | 0.05 mg |
| 10 Total weight | 6.5 mg |

Production took place as in Example 1. The required amount of
poloxamer 188 together with the magnesium stearate were mixed
with the granules in a plowshare mixer.

15

Example 3 (Fig. 3)
Propafenone delayed release microtablets

Composition

20

| | |
|---|---|
| Propafenone HCl | 5.61 mg (86%) |
| Hydroxypropylmethylcellulose | 0.19 mg |
| Poloxamer 188 | 0.65 mg |
| Magnesium stearate | 0.05 mg |
| 25 Total weight | 6.5 mg |

Production took place as in Example 2.

Example 4 (Fig. 4)
30 Propafenone delayed release microtablets

Composition

| | | |
|---|---|---|
| Propafenone HCl | 6.0 | mg (86%) |
| 35 Hydroxypropylmethylcellulose | 0.2 | mg |
| Calcium hydrogen phosphate | 0.613 | mg |
| Monoglyceride (Myvatox®) | 0.15 | mg |
| Crosslinked polyvinylpyrrolidone | 0.007 | mg |
| Magnesium stearate | 0.03 | mg |
| 40 Total weight | 7.0 | mg |

Production took place as in Example 2.

45

0480/01123

9

Example 5 (Fig. 5)
Propafenone delayed release microtablets

Composition

5

| Propafenone HCl | 5.70 mg (81%) |
| Gelatin | 0.18 mg |
| Calcium hydrogen phosphate | 0.38 mg |
| NaCl | 0.70 mg |
| 10 Magnesium stearate | 0.04 mg |
| Total weight | 7.0 mg |

Production took place as in Example 1. A 10% strength gelatin
solution was used as granulating agent. The amount of NaCl was
15 mixed in with the magnesium stearate.

Example 6 (Fig. 6)
Propafenone delayed release microtablets

20 Composition

| Propafenone HCl | 5.83 mg (83%) |
| Hydroxypropylmethylcellulose | 0.17 mg |
| β−Cyclodextrin | 0.9  mg |
| 25 Magnesium stearate | 0.1  mg |
| Total weight | 7.0 mg |

Production took place as in Example 2.

30 Example 7 (Fig. 7)
Gelatin capsules with propafenone delayed release microtablets
and propafenone instant release microtablets

To achieve a higher initial release, 14 instant release microta-
35 blets and 55 delayed release microtablets were packed into hard
gelatin capsules in a suitable capsule filling machine.

Composition of the instant release microtablets

| 40 Propafenone HCl | 6.05 mg (93%) |
| Hydroxypropylmethylcellulose | 0.20 mg |
| Sodium carboxymethylstarch | 0.20 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.5  mg |
| 45 | |

0480/01123

10

The instant release microtablets were produced as in Example 2.
The delayed release microtablets were produced as in Example 1.

Example 8 (Fig. 8)
5   Propafenone delayed release microtablets

Composition

Propafenone HCl                6.48 mg (99.7%)
10  Magnesium stearate          0.02 mg
Total weight                  6.50 mg

Propafenone hydrochloride and magnesium stearate were mixed in a
plowshare mixer and subsequently compressed to microtablets.
15
The in vitro release plots (Figs. 1 to 10) were determined using
a USP paddle apparatus with 0.08 molar HCl in the first two hours
and then phosphate buffer pH 6.8. The paddle rotated at 50 rpm.

20  Comparative test

Propafenone delayed release bolus film-coated tablet

Composition
25
Propafenone HCl                450.0 mg
Sodium alginate                112.0 mg
Microcrystalline cellulose
type PH 101                     37.0 mg
30 Copolymers of acrylic and
methacrylic esters with a small
content of quaternary ammonium
groups (Eudragit® RS)           15.0 mg
Gelatin                         55.0 mg
35 Magnesium stearate             3.5 mg
Microcrystalline cellulose
type PH 102                     12.5 mg
Readily soluble film coating    15.0 mg
Total weight                   700.0 mg
40
Propafenone hydrochloride, sodium alginate, microcrystalline cel-
lulose (type PH 101) and Eudragit RS were mixed in a vertical
mixer and granulated with 20% strength gelatin solution. The wet
granules were dried in a fluidized bed dryer with inlet air at
45 60°C. After passing through a screen of suitable mesh width, mag-
nesium stearate and microcrystalline cellulose (type PH 102) were
admixed in a horizontal mixer and subsequently the mixture was

0480/01123

11

compressed to oblong tablets (dimensions 18 x 8.7 mm) in a rotary
tabletting machine. The readily soluble coating was applied in a
horizontal coater.

5  Determination of in vitro release in a paddle apparatus at 50 rpm
produced the following results (in %):

| | | |
|---|---|---|
| 1st hour | 3.8 |
| 2nd hour | 5.5 |
| 10 3rd hour | 23.7 |
| 4th hour | 43.0 |
| 6th hour | 75.4 |
| 8th hour | 89.5 |

15 The in vitro release from the delayed release bolus film-coated
tablet is thus similar to that of the delayed release micro-
tablets according to the invention. Nevertheless, the in vivo re-
lease is entirely different and, in fact, better according to the
invention, cf. drug levels shown in Fig. 11.
20

25

30

35

40

45

0480/01123

12

We claim:

1.   A cylindrical delayed release microtablet with a convex or
     flat upper side and lower side of β-phenylpropiophenone de-
     rivatives of the formula I as active ingredient



     where R is n-propyl or 1,1-dimethylpropyl, and their pharma-
     cologically acceptable salts, wherein

     a)   the height and diameter are, independently of one
          another, 1-3 mm,

     b)   the active ingredient content is in the range from 81 to
          99.9% of the weight of the microtablet, ~~but not taking
          into account the weight of any coating which is present~~,

     c)   the active ingredient density is greater than 1,

     d)   the release of active ingredient in the USP paddle method
          at 50 rpm is 80% as a maximum after 3 hours and as a
          minimum after 24 hours,

     e)   the release rate is virtually independent of the pressure
          when compressing the tablets, and

     f)   the tablet contains no release-delaying ancillary sub-
          stance but 0.1-5% by weight of a lubricant and 0-18.9% by
          weight of other conventional ancillary substances.

2.   A tablet as claimed in claim 1, which in vivo results in a
     pronounced plasma level plateau with a PTF < 75% and whose
     bioavailability does not depend on the intake of food.

3.   A tablet as claimed in claim 1 ~~or 2~~, wherein the active in-
     gredient is propafenone hydrochloride.

4.   A tablet as claimed in ~~any of~~ claim~~s~~ 1 ~~to 3~~, wherein the
     height and diameter are approximately the same.

0480/01123

13

5.  A gelatin capsule which contains 3-200 tablets as claimed in
~~any of~~ claims 1 ~~to 4~~ with identical or different release
rates.

6.  A process for producing cylindrical delayed release micro-
tablets as claimed in claim 1, which comprises a homogeneous
mixture of 81-99.9% by weight of the granulated active in-
gredient with a particle size below 1 mm, 0.1-5% by weight of
a lubricant and 0-18.9% by weight of other conventional an-
cillary substances which do not delay release being com-
pressed in a cylindrical mold with a height and diameter each
of 1-3 mm and being removed from the mold.

Fig.

0480/01123

14

*525,749*

Abstract of the Disclosure: A cylindrical delayed release tablet
with a convex or flat upper side and lower side of β-phenylpropio-
phenone derivatives of the formula I as active ingredient



where R is n-propyl or 1,1-dimethylpropyl, and their pharmaco-
logically acceptable salts, wherein

a) the height and diameter are, independently of one another,
   1-3 mm,

b) the active ingredient content is in the range from 81-99.9%
   of the weight of the microtablet, but not taking into account
   the weight of any coating which is present,

c) the active ingredient density is greater than 1,

d) the release of active ingredient in the USP paddle method at
   50 rpm is 80% as a maximum after 3 hours and as a minimum
   after 24 hours,

e) the release rate is virtually independent of the pressure
   when compressing the tablets, and

f) the tablet contains no release-delaying ancillary substance
   but 0.1-5% by weight of a lubricant and 0-18.9% by weight of
   other conventional ancillary substances,

and a gelatin capsule which contains 3-200 tablets of this type
with identical or different release rates, and the process for
producing the tablets.

# Declaration, Power of Attorney

Page 1 of 3

O. Z. 0480/01123

We (I), the undersigned inventor(s), hereby declare that:

My residence, post office address and citizenship are as stated below next to my name,

We (I) believe that we are (I am) the original, first, and joint (sole) inventor(s) of the subject matter which is claimed and for which a patent is sought on the invention entitled

Delayed release microtablet of ß-phenylpropiophenone derivatives

the specification of which

[ ] is attached hereto.

[ ] was filed on _____ as

Application Serial No. _____

and amended on _____ .

[X] was filed as PCT international application

Number _____ PCT/EP 94/00949 _____

on _____ March 24, 1994 _____

and was amended under PCT Article 19

on _____ (if applicable).

We (I) hereby state that we (I) have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

We (I) acknowledge the duty to disclose information material to the examination of this application in accordance with Section 1.56(a) of Title 37 Code of Federal Regulations.

We (I) hereby claim foreign priority benefits under Section 119 of Title 35 United States Code, of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

| Application No. | Country | Day/Month/Year | Priority Claimed |
|---|---|---|---|
| P 43 10 963.2 | Federal Republic of Germany | 3rd April 1993 | [x] Yes [ ] No |

US (Oblon) Form 01 11/91

PA 023

Declaration

Page 2 of 3

O. Z. 0480/01123

We (I) hereby claim the benefit under Section 120 of Title 35 United States Code, of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Section 112 of Title 35 United States Code, we (I) acknowledge the duty to disclose material information as defined in Section 1.56 (a) of Title 37 Code of Federal Regulations, which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

| Application Serial No. | Filing Date | Status (pending, patented, abandoned) |
|---|---|---|
| PCT/EP 94/00949 | March 24, 1994 | |
| Argentina 327834 | March 30, 1994 | pending |
| Chile 94/000466 | March 31, 1994 | pending |
| Croatia P 940198A | March 25, 1994 | pending |
| Indonesia P-940404 | March 31, 1994 | pending |
| Israel 109097 | March 23, 1994 | pending |
| Mexico 942311 | March 29, 1994 | pending |
| Thailand 021990 | April 1, 1994 | pending |
| Taiwan 83102550 | March 23, 1994 | pending |
| South Africa 94/02293 | March 31, 1994 | pending |

And we (I) hereby appoint: Norman F. Oblon, Registration Number 24,618; Marvin J. Spivak, Registration Number 24,913; C. Irvin McClelland, Registration Number 21,124; Gregory J. Maier, Registration Number 25,599; Arthur I. Neustadt, Registration Number 24,854; Robert C. Miller, Registration Number 25,357; Richard D. Kelly, Registration Number 27,757; James D. Hamilton, Registration Number 28,421; Eckhard H. Kuesters, Registration Number 28,870; Robert T. Pous, Registration Number 29,099; Charles L. Gholz, Registration Number 26,395; Vincent J. Sunderdick, Registration Number 29,004; William E. Beaumont, Registration Number 30,996; Steven B. Kelber, Registration Number 30,073; Stuart D. Dwork, Registration Number 31,103; Robert F. Gnuse, Registration Number 27,295; Jean–Paul Lavalleye, Registration Number 31,451; William B. Walker, Registration Number 22,498; Timothy R. Schwartz, Registration Number 32,171; Stephen G. Baxter, Registration Number 32,884; Gilberto M. Villacorta, Registration Number 34,038; and John H. O. Clark, Registration Number 17,373, our (my) attorneys, with full powers of substitution and revocation, to prosecute this application and to transact all business in the Patent Office connected therewith; and we (I) hereby request that all correspondence regarding this application be sent to the firm of OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P. C., whose Post Office Address is: Fourth Floor, 1755 Jefferson Davis Highway, Arlington, Virginia 22202.

We (I) declare that all statements made herein of our (my) own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

US (Oblon) Form 01 11/91

Declaration

Page 3 of 3

O.Z. 0480/01123

*Karl Kolter*
NAME OF FIRST OR SOLE INVENTOR

Signature of Inventor

Date     February 17, 1994

Residence: *Sachsenweg 12*
*67117 Limburgerhof*
*Federal Republic of Germany*

Citizen of:     *Germany*
Post Office Address: *same as residence*

---

*Helmut Fricke*
NAME OF SECOND JOINT INVENTOR

Signature of Inventor

Date     *17.2.94*

February 17, 1994

Residence: *Pfalzring 159*
*67112 Mutterstadt*
*Federal Republic of Germany*

Citizen of:     *Germany*
Post Office Address: *same as residence*

---

*Volker Buehler*
NAME OF THIRD JOINT INVENTOR

Signature of Inventor

Date     *February 17, 1994*

February 17, 1994

Residence: *Liebigstrasse 2*
*76135 Karlsruhe*
*Federal Republic of Germany*

Citizen of:     *Germany*
Post Office Address: *same as residence*

---

*Herbert Mueller-Peltzer*
NAME OF FOURTH JOINT INVENTOR

Signature of Inventor

Date     February 17, 1994

Residence: *Uferstrasse 36*
*69120 Heidelberg*
*Federal Republic of Germany*

Citizen of:     *Germany*
Post Office Address: *same as residence*

US (Oldca) Form 01 11/91

08/525749

Rec'd PCT/PTO     03 OCT 1995

PA 026



OBLON ET AL (703) 413-3000
DOCKET #524-2596-... SHEET / OF "

1/11

08/525749

**FIG.1**

Release from slow-release propafenone microtablets of Example 1
400 mg in capsules





PRINT OF DRAWINGS
AS ORIGINALLY FILED

08/525749

## FIG.2



Release from slow-release propafenone microtablets of Example 2
400 mg in capsules

PA 028



FIG.3

3/11

08/525749



Release from slow-release propafenone microtablets of Example 3
400 mg in capsules

PA 029



PRINT OF DRAWINGS
AS ORIGINALLY FILED

OBLON ET AL (703) 413-3000
DOCKET #724-2376-OWR SHEET 4 C

4/11

08/525749

FIG.4

Release from slow-release propafenone microtablets of Example 4
300 mg in capsules





PRINT OF DRAWINGS
AS ORIGINALLY FILED

OBLON ET AL (703) 413-3000
DOCKET #324-2396-04/SHEET 5

08/525749

# FIG.5

5/11



Release from slow-release propafenone microtablets of Example 5
400 mg in capsules

PA 031



PRINT OF DRAWINGS
AS ORIGINALLY FILED

OBLON ET AL (703) 413-3000
DOCKET #524-2396-CON/SHEET/

08/525749

## FIG.6

6/11

Release from slow-release propafenone microtablets of Example 6
300 mg in capsules





FIG.7

08/525749

7/11



Release from slow-release propafenone microtablets of Example 7
425 mg in capsules



PRINT OF DRAWINGS
AS ORIGINALLY FILED

OBLON ET AL (703) 413-3000
DOCKET #524-3336-OX/SHEET 8

08/525749

## FIG.8

8/11



Release from slow-release propafenone microtablets of Example 8
325 mg in capsules

PA 034



PRINT OF DRAWINGS
AS ORIGINALLY FILED

08/525749

# FIG.9

9/11

Release from slow-release propafenone microtablets of Example 1, produced with
different compressive forces
325 mg in capsules





FIG.10                    10/11                    08/525749



PRINT OF DRAWINGS
AS ORIGINALLY FILED

OBLON ET AL (703) 413-3000
DOCKET # 524-2300

08/525749

FIG.11

11/11



Plasma levels after repeated administration 2 x a day of various dosage
forms of propafenone HCl

Time (h) after administration

-■- 2 x 300 mg    FILM-COATED TABLET, Rytmonorm® 300 mg, n=7
-◆- 2 x 450 mg    SLOW-RELEASE FILM-COATED TABLET (BOLUS FORM) according to a
                  comparative test, n=7
-+- 2 x 400 mg    MICROTABLETS of Example 1, n=18

PA 037

0480/1123    OBLON ET AL (703) 413-3000
DOCKET #524-2896 OX SHEET / OF //    08/525749

# FIG.1

1/11

Release from slow-release propafenone microtablets of Example 1
400 mg in capsules



Fig 1~11

53 Rec'd PCT/PTO     03 OCT 1995

PA 039

0480/1123    OBLON ET AL (703) 413-3000
DOCKET 0524-0396-OYK SHEET 2 OF 11

# FIG.2

2/11

08/525749



Release from slow-release propafenone microtablets of Example 2
400 mg in capsules



PA 040

53 Rec'd PCT/PTO    03 OCT 1995

PA 041

0480/1123     OBLON ET AL (703) 413-3000
DOCKET #524-3384-ox FG SHEET 3 OF 1     08/525749

## FIG.3

3/11

Release from slow-release propafenone microtablets of Example 3
400 mg in capsules



PA 042

83 Rec'd PCT/PTO    03 OCT 1995

PA 043

0480/1123    OBLON ET AL (703) 413-3000
DOCKET #224-2396-OWR SHEET 4 OF 11    08/525749

FIG.4    4/11

Release from slow-release propafenone microtablets of Example 4
300 mg in capsules



≀8 Rec'd PCT/PTO     03 OCT 1995

PA 045

0480/1123

OBLON ET AL (703) 413-3000
DOCKET #52H-2386-01061 SHEET 5 OF

08/525749

## FIG.5

5/11



Release from slow-release propafenone microtablets of Example 5
400 mg in capsules



PA 046

58 Rec'd PCT/PTO    03 OCT 1995

PA 047



0480/1123

OBLON ET AL (703) 413-3000
DOCKET # 5242896-OXA SHEET (2 0I

08/525749

## FIG.6

6/11



Release from slow-release propafenone microtablets of Example 6
300 mg in capsules

PA 048

33 Rec'd PCT/PTO    03 OCT 1995

PA 049

0480/1123          OBLON ET AL (703) 413-3000
                   DOCKET #524-3386-OVA, SHEET 7 OF 1          08/525749

## FIG.7                                    7/11



Release from slow-release propafenone microtablets of Example 7
425 mg in capsules

PA 050

s3 Rec'd PCT/PTO     03 OCT 1995

PA 051

0480/1123          OBLON ET AL (703) 413-3000
                   DOCKET #524-3390-OV SHEET _7_ OF _L_          08/525749

# FIG.8

8/11

Release from slow-release propafenone microtablets of Example 8
325 mg in capsules



53 Rec'd PCT/PTO    03 OCT 1995

PA 053

## FIG.9

9/11



Release from slow-release propafenone microtablets of Example 1, produced with different compressive forces
325 mg in capsules



PA 054

53 Rec'd PCT/PTO    03 OCT 1995

PA 055



0480/1123

FIG.10                    10/11

08/525749



Release from slow-release propafenone microtablets of Example 1
325 mg at various pH values

PA 056

OBLON ET AL (703) 413-3000
DOCKET ≠ 524-2396-CM SHEET/ 1 OF/1

08/525749

FIG.11

**Plasma levels after repeated administration 2 x a day of various dosage forms of propafenone HCl**



-⊟- 2 x 300 mg     FILM-COATED TABLET, Rytmonorm® 300 mg, n=7
-◇- 2 x 450 mg     SLOW-RELEASE FILM-COATED TABLET (BOLUS FORM) according to a
-*- 2 x 400 mg     MICROTABLETS of Example 1, n=18          comparative test, n=7

PA 057

3 Rec'd PCT/PTO     03 OCT 1995

PA 058



PRINT OF DRAWINGS
AS ORIGINALLY FILED

OBLON ET AL 000 415-3000
DOCKET 524-3996 SHEET 1 OF 11

08/525749

FIG.1

424/464

1/11



Release from slow-release propafenone microtablets of Example 1
400 mg in capsules

PA 059



FIG.2

08/525749

2/11



Release from slow-release propafenone microtablets of Example 2
400 mg in capsules

PA 060

PRINT OF DRAWINGS
AS ORIGINALLY FILED

OBLON ET AL (703) 413-3000
DOCKET #524-2516-ox P SHEET 3

08/525749

## FIG.3

3/11



Release from slow-release propafenone microtablets of Example 3
400 mg in capsules

PA 061



PRINT OF DRAWINGS
AS ORIGINALLY FILED

OBLON ET AL (703) 413-3000
DOCKET N 624-2930/OWR SHEET 4/ C

08/525749

FIG.4

4/11

Release from slow-release propafenone microtablets of Example 4
300 mg in capsules



PA 062



PRINT OF DRAWINGS
AS ORIGINALLY FILED

OBLON ET AL (703) 413-3000
DOCKET #324-2396-00/SHEET 5

5/11

08/525749

FIG.5



Release from slow-release propafenone microtablets of Example 5
400 mg in capsules



PRINT OF DRAWINGS
AS ORIGINALLY FILED

OBLON ET AL (703) 413-3000
DOCKET # 52463394-ON SHEET(1)

08/525749

FIG.6                                     6/11

Release from slow-release propafenone microtablets of Example 6
300 mg in capsules



PA 064



PRINT OF DRAWINGS
AS ORIGINALLY FILED

08/525749

FIG.7

7/11



Release from slow-release propafenone microtablets of Example 7
425 mg in capsules



PRINT OF DRAWINGS
AS ORIGINALLY FILED

OBLON ET AL (703) 413-3000
DOCKET #524-330 OWA/SHEET 9:

08/525749

## FIG.8

8/11

Release from slow-release propafenone microtablets of Example 8
325 mg in capsules





PRINT OF DRAWINGS
AS ORIGINALLY FILED

OBLON ET AL (703) 413-3000
DOCKET

08/525749

FIG.9                                          9/11

Release from slow-release propafenone microtablets of Example 1, produced with
different compressive forces
325 mg in capsules





FIG.10                          10/11                08/525749



Release from slow-release propafenone microtablets of Example 1
325 mg at various pH values

PRINT OF DRAWINGS
AS ORIGINALLY FILED
04601123

OBLON ET AL (703) 413-3000
DOCKET # _____

08/525749

FIG.11                                        11/11

Plasma levels after repeated administration 2 x a day of various dosage
forms of propafenone HCl



Time (h) after administration

-⊕- 2 x 300 mg    FILM-COATED TABLET, Rytmonorm® 300 mg, n=7
-♦- 2 x 450 mg    SLOW-RELEASE FILM-COATED TABLET (BOLUS FORM) according to a
-✴- 2 x 400 mg    MICROTABLETS of Example 1, n=18    comparative test, n=

PA 069

**PATENT APPLICATION FEE DETERMINATION RECORD**
Effective October 1, 1994

Application or Docket Number

08/525749

## CLAIMS AS FILED - PART I

| FOR | (Column 1) NUMBER FILED | (Column 2) NUMBER EXTRA | SMALL ENTITY RATE | FEE | OR | OTHER THAN SMALL ENTITY RATE | FEE |
|---|---|---|---|---|---|---|---|
| BASIC FEE | | | | 365.00 | OR | | 730.00 |
| TOTAL CLAIMS | minus 20 = | * | x$11= | | OR | x$22= | |
| INDEPENDENT CLAIMS | minus 3 = | | x$38= | | OR | x$76= | |
| MULTIPLE DEPENDENT CLAIM PRESENT | | | +120= | | OR | +240= | |
| | | | TOTAL | | OR | TOTAL | |

* If the difference in column 1 is less than zero, enter "0" in column 2

## CLAIMS AS AMENDED - PART II

| | | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | SMALL ENTITY RATE | ADDITIONAL FEE | OR | OTHER THAN SMALL ENTITY RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|---|
| **AMENDMENT A** | Total | * | Minus | ** | = | x$11= | | OR | x$22= | |
| | Independent | * | Minus | *** | = | x$38= | | OR | x$76= | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | +120= | | OR | +240= | |
| | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

| | | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | RATE | ADDITIONAL FEE | OR | RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|---|
| **AMENDMENT B** | Total | * | Minus | ** | = | x$11= | | OR | x$22= | |
| | Independent | * | Minus | *** | = | x$38= | | OR | x$76= | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | +120= | | OR | +240= | |
| | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

| | | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | RATE | ADDITIONAL FEE | OR | RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|---|
| **AMENDMENT C** | Total | * | Minus | ** | = | x$11= | | OR | x$22= | |
| | Independent | * | Minus | *** | = | x$38= | | OR | x$76= | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | +120= | | OR | +240= | |
| | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20."
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3."
The Highest Number Previously Paid For (Total or Independent) is the highest number found in the appropriate box in column 1.

FORM PTO-875
(Rev. 10/94)

Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE

PA 070





PA 072

*DO/EO BIBLIOGRAPHIC DATA ENTRY*

```
SERIAL NUMBER:        08 / 525749          RECEIPT DATE:         10 / 03 / 95
IA NUMBER: PCT/ EP94 / 00949               IA FILING DATE:       03 / 24 / 94
FAMILY NAME:          KOLTER               DELAY WAIVED (Y/N):              Y
GIVEN NAME:           KARL                 DEMAND RECEIVED (Y/N):           Y
PRIORITY CLAIMED (Y/N):      Y             PRIORITY DATE:        04 / 03 / 93
NO BASIC FEE (Y/N):          N             US DESIGNATED ONLY (Y/N):        N
ATTORNEY DOCKET NUMBER:      524-2396-OX   COUNTRY:              EPX
CORRESPONDENCE NAME/ADDRESS:
    OBLON, SPIVAK ET AL
    1755 JEFFERSON DAVIS HIGHWAY, 4TH FLOOR
    CRYSTAL SQUARE FIVE
    ARLINGTON, VA 22202


APPLICATION TITLES:
    DELAYED RELEASE MICROTABLET OF B-PHENYLPROPIOPHENONE DERIVATIVES



                    TAB TO LAST POSITION, PUSH SEND
```



UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| US APPLICATION NO. | FIRST NAMED APPLICANT | ATTY. DOCKET NO. |
|---|---|---|
| 08/525,749 | KOLTER | K 524-2396-OK |

| | INTERNATIONAL APPLICATION NO. |
|---|---|
| | PCT/EP94/00949 |

OBLON, SPIVAK ET AL     5611
1755 JEFFERSON DAVIS HIGHWAY, 4TH FLOOR
CRYSTAL SQUARE FIVE
ARLINGTON, VA 22202

| U.S. FILING DATE | PRIORITY DATE |
|---|---|
| 03/24/94 | 04/03/93 |

DATE MAILED:  11/09/95

### NOTIFICATION OF ACCEPTANCE OF APPLICATION UNDER 35 U.S.C. 371 AND 37 CFR 1.494 OR 1.495

1. The applicant is hereby advised that the United States Patent and Trademark Office in its capacity as ☐ a Designated Office (37 CFR 1.494), ☒ an Elected Office (37 CFR 1.495), has determined that the above identified international application has met the requirements of 35 U.S.C. 371, and is ACCEPTED for national patentability examination in the United States Patent and Trademark Office.

2. The United States Application Number assigned to the application is shown above and the relevant dates are:

    0 3 OCT 1995                          0 3 OCT 1995

    ---------------------                 ---------------------
    35 U.S.C. 102(e) DATE                 DATE OF RECEIPT OF
                                          35 U.S.C. 371 REQUIREMENTS

3. ☒ A request for immediate examination under 35 U.S.C. 371(f) was received on   0 3 OCT 1995   and the application will be examined in turn.

4. The following items have been received:
    ☒ U.S. Basic National Fee.
    ☒ Copy of the international application in:
        ☒ a non-English language.
        ☐ English;
    ☒ Translation of the international application into English.
    ☒ Oath or Declaration of inventors(s) for DO/EO/US.
    ☒ Copy of Article 19 amendments.  ☐ Translation of Article 19 amendments into English.
        The Article 19 amendments  ☐ have  ☐ have not been entered.
    ☒ The International Preliminary Examination Report in English and its Annexes, if any.
    ☐ Translation of Annexes to the International Preliminary Examination Report into English.
        The Annexes  ☐ have  ☒ have not been entered.
    ☒ Preliminary amendment(s) filed  0 3 OCT 1995  and _____
    ☒ Information Disclosure Statement(s) filed _____ and _____.
    ☐ Assignment document.
    ☐ Power of Attorney and /or Change of Address.
    ☐ Substitute specification filed _____.
    ☐ Verified Statement Claiming Small Entity Status.
    ☐ Priority Document.
    ☒ Copy of the Search Report ☒ and copies of the references cited therein.
    ☐ Other:

A Filing Receipt (PTO-103X) will be issued for the present application in due course. Once the Filing Receipt has been received, send all correspondence to the Group Art Unit designated thereon.

Applicant is reminded that any communication to the United States Patent and Trademark Office must be mailed to the address given in the heading and include the U.S. application no. shown above. (37 CFR 1.5)

Vonda M. Wallace
Paralegal Specialist

Telephone: (703) 305-3736

FORM PCT/DO/EO/903 (May 1993)

U.S. Appl. No. _525 749_    International Appl. No. _EP94/949_

Application filed by: ☐ 20 months    ☑ 30 months

INTERNATIONAL APPLICATION PAPERS IN THE APPLICATION FILE:
☑ International application (RECORD COPY)      ☐ Request form PCT/RO/101
☐ Article 19 amendments                         ☐ PCT/IB/302
☑ PCT/IB/331                                     ☑ PCT/ISA/210-Search Report
☑ PCT/IPEA/409 IPER (PCT/IPEA/416 on front)     ☑ Search Report references
☑ Annexes to 409                                ☐ Other _____
☑ Priority document(s) No. _1_
☐ INTERNATIONAL APPLICATION ON DOUBLE SIDED PAPER (COPIES MADE)

RECEIPTS FROM THE APPLICANT: (other than checked above)
☑ Basic National Fee (paid or authorized to charge)   ☑ Preliminary amendment(s) filed
Translation of international application as filed:        _____
☑ Description                                          _____
☑ Claims
☑ Words in the drawing figure(s)        ☐ Information Disclosure Statement
☐ Article 19 amendments                 ☐ Assignment document
☐ Annexes to 409                        ☐ Power of attorney/Change of address
☑ Oath / Declaration                    ☐ Substitute specification
☐ DNA diskette                          ☐ Verified small status claim
                                         ☐ Other _____

Notes:


| 35 U.S.C. 371 - Receipt of Request (PTO-1390) | 0 3 OCT 1995 | WIPO Publication |
| Date acceptable oath / declaration received | 0 3 OCT 1995 | Publication No. WO _94/32434_ |
| Date complete 35 U.S.C 371 requirements met | | |
| 102(e) Date | 0 3 OCT 1995 | Publication Date _30 Oct. 94_ |
| | 0 3 OCT 1995 | |
| Date of completion of DO/EO 906 - Notification of Missing 102(e) Requirements | | Publication Language _German_ |
| Date of completion of DO/EO 907 - Notification of Acceptance for 102(e) date | | |
| Date of completion of DO/EO 911 - Application accepted under 35 U.S.C. 1.11 | | Not Published ☐ U.S. only |
| Date of completion of DO/EO 905 - Notification of Missing Requirements | | Designated ☐ EP request |
| Date of completion of DO/EO 916 - Notification of Defective Response | | Screening done by: |
| Date of completion of DO/EO 903 - Notification of Acceptance _02 NOV-95_ | | Phyllis M. Lawrence Legal Instru. Examine. |

DOCKET NO.  524-2396-0X PCT

IN RE APPLICATION OF:  Karl KOLTER et al.

SERIAL NO.:    New U.S. PCT Application

FILED:    Concurrently Herewith

INTERNATIONAL
APPLICATION NO:   PCT/EP94/00949

INTERNATIONAL
FILING DATE:    24 March 1994

FOR: DELAYED RELEASE MICROTABLET OF ß-PHENYLPROPIOPHENONE DERIVATIVES

21 Rec'd PCT    03 OCT 1995

ASSISTANT COMMISSIONER OF PATENTS
WASHINGTON, D.C. 20231

Sir:

Transmitted herewith is an amendment in the above-identified application.

☒    No additional fee is required.

☐    Small entity status of this application under 37 C.F.R. §1.9 and §1.27 has been established by a verified statement previously submitted.

☐    Small entity status of this application under 37 C.F.R. §1.9 and §1.27 has been established by a verified statement submitted herewith.

☒    Additional documents filed herewith: Specification/Claims/Abstract; Transmittal Letter; Declaration; 11 Sheets of Informal Drawings; Notice of Priority; PCT/IB/304; PCT/IB/308; Preliminary Amendment; Check for $880.00; Deposit Account Order Form

The fee has been calculated as shown below.

| (Col. 1) | | (Col. 2) | (Col. 3) | | SMALL ENTITY | | OTHER THAN A SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS REMAINING AFTER | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE | ADDITIONAL FEE | RATE | ADDITIONAL FEE |
| TOTAL | 6 | MINUS | ** 20 | = 0 | X11 = | $ | · 22 = | $ 0.00 |
| INDEP | 1 | MINUS | *** 3 | = 0 | X37 = | $ | X74 = | $ 0.00 |
| ☐ | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM. | | | | +115= | $ | +230= | $ |
| | | | | | TOTAL | $ | TOTAL | $ 0.00 |

___    A check in the amount of $_____ is attached.

XX    Please charge any additional fees for the papers being filed herewith and for which no check is enclosed herewith, or credit any overpayment to deposit Account No. 15-0030.  A duplicate copy of this sheet is enclosed.

XX    If these papers are not considered timely filed by the Patent and Trademark Office, then a petition is hereby made under 37 C.F.R. §1.136, and any additional fees required under 37 C.F.R. §1.136 for any necessary extension of time may be charged to deposit Account No. 15-0030.  A duplicate copy of this sheet is enclosed.

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Attorney of Record
Registration No.  24,618

Fourth Floor
1755 Jefferson Davis Highway
Arlington, Virginia  22202
(703) 413-3000

Timothy R. Schwartz
Registration No. 32,171

*If the entry in Column 2 is less than the entry in Column 1 write "0" in Column 3.
**If the "Highest Number Previously paid for" IN THIS SPACE is less than 20 write "20" in this space.
***If the "Highest Number Previously paid for" IN THIS SPACE is less than 3 write "3" in this space.

7/93

FORM PTO-1390
(REV.5-93)

21 Rec'd PCT/PTO 03 OCT 1995

ATTORNEY'S DOCKET NUMBER

| TRANSMITTAL LETTER TO THE UNITED STATES DESIGNATED/ELECTED OFFICE (DO/EO/US) CONCERNING A FILING UNDER 35 U.S.C. 371 | 524-2396-OX |
|---|---|
| | U.S. APPLICATION NO. (if known, see 37 CFR 1.5) |

| INTERNATIONAL APPLICATION NO. PCT/EP94/00949 | INTERNATIONAL FILING DATE 24 March 1994 | PRIORITY DATE CLAIMED 3 April 1993 |
|---|---|---|

TITLE OF INVENTION
DELAYED RELEASE MICROTABLET OF B-PHENYLPROPIOPHENONE DERIVATIVES

APPLICANT(S) FOR DO/EO/US
Karl KOLTER et al.

Applicant herewith submits to the United States Designated/Elected Office (DO/EO/US) the following items and other information:

1. ☒ This is a **FIRST** submission of items concerning a filing under 35 U.S.C. 371.
2. ☐ This is a **SECOND or SUBSEQUENT** submission of items concerning a filing under 35 U.S.C. 371.
3. ☒ This express request to begin national examination procedures (35 U.S.C. 371(f)) at any time rather than delay examination until the expiration of the applicable time limit set in 35 U.S.C. 371(b) and PCT Articles 22 and 39(1).
4. ☒ A proper Demand for International Preliminary Examination was made by the 19th month from the earliest claimed priority date.
5. ☒ A copy of the International Application as filed (35 U.S.C. 371(c)(2))
    a. ☐ is transmitted herewith (required only if not transmitted by the International Bureau).
    b. ☒ has been transmitted by the International Bureau.
    c. ☐ is not required, as the application was filed in the United States Receiving Office (RO/US)
6. ☒ A translation of the International Application into English (35 U.S.C. 371(c)(2)).

7. ☒ Amendments to the claims of the International Application under PCT Article 19 (35 U.S.C. 371(c)(3))
    a. ☐ are transmitted herewith (required only if not transmitted by the International Bureau).
    b. ☐ have been transmitted by the International Bureau.
    c. ☐ have not been made; however, the time limit for making such amendments has NOT expired.
    d. ☒ have not been made and will not be made.

8. ☐ A translation of the Amendments to the claims under PCT Article 19 (35 U.S.C. 371(c)(3)).

9. ☒ An oath or declaration of the inventor(s) (35 U.S.C. 371(c)(4)).

10. ☐ A translation of the annexes to the International Preliminary Examination Report under PCT Article 36 (35 U.S.C. 371(c)(5)).

Items 11. to 16. below concern other document(s) or information included:

11. ☐ An Information Disclosure Statement under 37 CFR 1.97 and 1.98.

12. ☐ An assignment document for recording. A separate cover sheet in compliance with 37 CFR 3.28 and 3.31 is included.

13. ☒ A FIRST preliminary amendment.
    ☐ A SECOND or SUBSEQUENT preliminary amendment.

14. ☐ A substitute specification.

15. ☐ A change of power of attorney and/or address letter.

16. ☒ Other items or information:

        Priority Request
        PCT/IB/304
        PCT/IB/308

PCT/EP94/00949

SZA-7396-DX PCT

| | CALCULATIONS | PTO USE ONLY |
|---|---|---|

17. The following fees are submitted:

**BASIC NATIONAL FEE (FR 1.492(a)(1)-(5)):**
Search Report has been prepared by the EPO or JPO................ $880.00

$880.00

International preliminary examination fee paid to USPTO (37 CFR 1.482)
---------------------------------------------------------------- $680.00

No international preliminary examination fee paid to USPTO (37 CFR 1.482)
but international search fee paid to USPTO (37 CFR 1.445(a)(2)).. $750.00

Neither international preliminary examination fee (37 CFR 1.482) nor
international search fee (37 CFR 1.445(a)(2)) paid to USPTO........ $1010.00

International preliminary examination fee paid to USPTO (37 CFR 1.482)
and all claims satisfied provisions of PCT Article 33(2)-(4)............ $94.00

**ENTER APPROPRIATE BASIC FEE AMOUNT  =**   $880.00

Surcharge of $130.00 for furnishing the oath or declaration later than ☐ 20 ☐ 30
months from the earliest claimed priority date (37 CFR 1.492(e)).   $

| CLAIMS | NUMBER FILED | NUMBER EXTRA | RATE | | |
|---|---|---|---|---|---|
| Total claims | 6  -20 = | 0 | X $22.00 | $ 0.00 | |
| Independent claims | 1  -3 = | 0 | X $78.00 | $ 0.00 | |
| MULTIPLE DEPENDENT CLAIM(S) (if applicable) | | | + $250.00 | $ | |

**TOTAL OF ABOVE CALCULATIONS   =**  $880.00

Reduction by 1/2 for filing by small entity, if applicable.  Verified Small Entity Statement
must also be filed (Note 37 CFR 1.9, 1.27, 1.28).   $

**SUBTOTAL   =**  $ 880.00

Processing fee of $130.00 for furnishing the English translation later than ☐ 20 ☐ 30
months from the earliest claimed priority date (37 CFR 1.492(f)).  +  $

**TOTAL NATIONAL FEE   =**  $ 880.00

Fee for recording the enclosed assignment (37 CFR 1.21(h)).  The assignment must be
accompanied by an appropriate cover sheet (37 CFR 3.28, 3.31).  $40.00 per property  +  $

**TOTAL FEES ENCLOSED   =**  $ 880.00

| | Amount to be: | |
|---|---|---|
| | refunded | $ |
| | charged | $ |

a. ☒  A check in the amount of $ 880.00   to cover the above fees is enclosed.

b. ☐  Please charge my Deposit Account No. _____ in the amount of $_____ to cover the above fees.
      A duplicate copy of this sheet is enclosed.

c. ☒  The Commissioner is hereby authorized to charge any additional fees which may be required, or credit any
      overpayment to Deposit Account No.  15-0030 .   A duplicate copy of this sheet is enclosed.

**NOTE:** Where an appropriate time limit under 37 CFR 1.494 or 1.495 has not been met, a petition to revive (37 CFR
1.137(a) or (b)) must be filed and granted to restore the application to pending status.

Timothy R. Schwartz
Registration No. 32,171

SIGNATURE
Norman F. Oblon

NAME
24,618

REGISTRATION NUMBER

SEND ALL CORRESPONDENCE TO:

OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.
1755 Jefferson Davis Highway, Fourth Floor
Crystal Square Five
Arlington, Virginia 22202
(703) 413-3000

Form PTO-1390 (REV 10-94)  page 2 of 2

PA 078

**PCT**

WELTORGANISATION FÜR GEISTIGES EIGENTUM
Internationales Büro

INTERNATIONALE ANMELDUNG VERÖFFENTLICHT NACH DEM VERTRAG ÜBER DIE
INTERNATIONALE ZUSAMMENARBEIT AUF DEM GEBIET DES PATENTWESENS (PCT)

| (51) Internationale Patentklassifikation 5 : | | (11) Internationale Veröffentlichungsnummer: WO 94/22434 |
|---|---|---|
| A61K 31/135, 9/20, 9/48 | A1 | (43) Internationales Veröffentlichungsdatum: 13. Oktober 1994 (13.10.94) |

(21) Internationales Aktenzeichen: PCT/EP94/00949

(22) Internationales Anmeldedatum: 24. März 1994 (24.03.94)

(30) Prioritätsdaten:
P 43 10 963.2    3. April 1993 (03.04.93)    DE

(71) Anmelder (für alle Bestimmungsstaaten ausser US): KNOLL AKTIENGESELLSCHAFT [DE/DE]; Knollstrasse, D-67061 Ludwigshafen (DE).

(72) Erfinder; und
(75) Erfinder/Anmelder (nur für US): KOLTER, Karl [DE/DE]; Sachsenweg 12, D-67117 Limburgerhof (DE). FRICKE, Helmut [DE/DE]; Pfalzring 159, D-67112 Mutterstadt (DE). BÜHLER, Volker [DE/DE]; Liebigstrasse 2, D-76135 Karlsruhe (DE). MÜLLER-PELTZER, Herbert [DE/DE]; Uferstrasse 36, D-69120 Heidelberg (DE).

(74) Anwalt: KARG, Jochen; BASF Aktiengesellschaft, D-67056 Ludwigshafen (DE).

(81) Bestimmungsstaaten: AU, BR, BY, CA, CN, CZ, FI, HU, JP, KR, KZ, NO, NZ, PL, RU, SI, UA, US, europäisches Patent (AT, BE, CH, DE, DK, ES, FR, GB, GR, IE, IT, LU, MC, NL, PT, SE).

Veröffentlicht
*Mit internationalem Recherchenbericht.*

(54) Title: RETARDED-ACTION MICROTABLET MADE OF β-PHENYLPROPIOPHENONE DERIVATIVES

(54) Bezeichnung: RETARDMIKROTABLETTE VON β-PHENYLPROPIOPHENONDERIVATEN

(57) Abstract

The invention concerns cylindrical retarded-action tablets having convex or planar upper and lower surfaces and made of β-phenylpropiophenone derivatives of formula (I) acting as the active ingredient, in which R = n-propyl or 1,1-dimethylpropyl, and pharmacologically acceptable salts of such derivatives, a) tablet height and diameter, independently of each other, being 1 to 3 mm; b) the concentration of the active ingredient lying in the range from 81 to 99.9 % by wt. relative to the weight of the microtablet, neglecting the weight of any coating present; c) the density of the active ingredient being greater than 1; d) at least 80 % of the active ingredient being released between 3 hours and 24 hours when tested using the USP paddle model at 50 rpm; e) the rate of release being virtually independent of the pressure used to compress the tablet; f) the tablet containing no retarding-action auxiliaries but 0.1 to 5 % by wt. of a lubricant and 0 to 18.9 % by wt. of other usual auxiliaries. The invention also concerns a gelatin capsule containing 3 to 200 such tablets with the same or different release rates, plus a method of producing the tablets.

(57) Zusammenfassung

Zylindrische Retardtabletten mit konvexer oder planer Ober- und Unterseite von β-Phenylpropiophenonderivaten der Formel (I) als Wirkstoff mit R = n-Propyl oder 1,1-Dimethylpropyl und deren pharmakologisch unbedenklichen Salzen, wobei a) Höhe und Durchmesser unabhängig voneinander 1 bis 3 mm betragen, b) der Wirkstoffgehalt im Bereich von 81 bis 99,9 Gew.-% der Mikrotablette liegt, jedoch ohne Berücksichtigung des Gewichts eines gegebenenfalls vorhandenen Überzugs, c) die Wirkstoffdichte höher als 1 ist, d) im Paddle Modell nach USP bei 50 rpm nach 3 Stunden höchstens und 24 Stunden mindestens 80 % des Wirkstoffs freigesetzt sind, e) die Freisetzungsgeschwindigkeit praktisch unabhängig vom Druck beim Pressen der Tabletten ist, und f) die Tablette keinen retardierenden Hilfsstoff, aber 0,1 bis 5 Gew.-% eines Gleitmittels und 0 bis 18,9 Gew.-% anderer üblicher Hilfsstoffe enthält, und eine Gelatinekapsel, die 3 bis 200 derartiger Tabletten mit gleicher oder unterschiedlicher Freisetzungsrate enthält, sowie das Verfahren zur Herstellung der Tabletten.

*LEDIGLICH ZUR INFORMATION*

Codes zur Identifizierung von PCT-Vertragsstaaten auf den Kopfbögen der Schriften, die internationale Anmeldungen gemäss dem PCT veröffentlichen.

| | | | | | |
|---|---|---|---|---|---|
| AT | Österreich | GA | Gabon | MR | Mauretanien |
| AU | Australien | GB | Vereinigtes Königreich | MW | Malawi |
| BB | Barbados | GE | Georgien | NE | Niger |
| BE | Belgien | GN | Guinea | NL | Niederlande |
| BF | Burkina Faso | GR | Griechenland | NO | Norwegen |
| BG | Bulgarien | HU | Ungarn | NZ | Neuseeland |
| BJ | Benin | IE | Irland | PL | Polen |
| BR | Brasilien | IT | Italien | PT | Portugal |
| BY | Belarus | JP | Japan | RO | Rumänien |
| CA | Kanada | KE | Kenya | RU | Russische Föderation |
| CF | Zentrale Afrikanische Republik | KG | Kirgistan | SD | Sudan |
| CG | Kongo | KP | Demokratische Volksrepublik Korea | SE | Schweden |
| CH | Schweiz | KR | Republik Korea | SI | Slowenien |
| CI | Côte d'Ivoire | KZ | Kasachstan | SK | Slowakei |
| CM | Kamerun | LI | Liechtenstein | SN | Senegal |
| CN | China | LK | Sri Lanka | TD | Tschad |
| CS | Tschechoslowakei | LU | Luxemburg | TG | Togo |
| CZ | Tschechische Republik | LV | Lettland | TJ | Tadschikistan |
| DE | Deutschland | MC | Monaco | TT | Trinidad und Tobago |
| DK | Dänemark | MD | Republik Moldau | UA | Ukraine |
| ES | Spanien | MG | Madagaskar | US | Vereinigte Staaten von Amerika |
| FI | Finnland | ML | Mali | UZ | Usbekistan |
| FR | Frankreich | MN | Mongolei | VN | Vietnam |

WO 94/22434                                      PCT/EP94/00949

Retardmikrotablette von ß-Phenylpropiophenonderivaten

Beschreibung

5

Die Erfindung betrifft zylindrische Mikrotabletten von ß-Phenyl-
propiophenonderivaten mit hohem Wirkstoffgehalt, hoher Wirkstoff-
dichte und retardierter und pressdruckunabhängiger Freisetzung
ohne retardierende Hilfsstoffe.

10

Wenn oben und im folgenden von ß-Phenylpropiophenonderivaten die
Rede ist, so sind stets auch und besonders deren physiologisch
unbedenklichen Salze, vorzugsweise das Hydrochlorid, gemeint.

15  Gemäß dem Stand der Technik wird die Wirkstofffreigabe von
Tabletten entweder durch eine retardierende Matrix, in die der
Wirkstoff eingebettet ist, oder durch einen retardierenden Über-
zug, durch den Verdauungsflüssigkeit ein- und der Wirkstoff aus-
diffundiert, verzögert.

20

Beide Prinzipien haben erhebliche Nachteile. Z.B. enthalten
Matrixtabletten relativ große Mengen Hilfsstoffe, so daß das
Tablettenvolumen bei gegebener Wirkstoffdosis relativ groß ist,
was für den Patient unangenehm ist. Andererseits sind Film-
25  tabletten aufwendig in der Herstellung und vor allem mechanisch
empfindlich. Bei geringster Beschädigung des Lackfilms besteht
die Gefahr einer plötzlichen Freisetzung des gesamten Wirkstoff-
gehaltes ("dose dumping"), was höchst unerwünscht ist (örtliche
und zeitliche Überdosis mit schädlichen Nebenwirkungen; kurze
30  Gesamtwirkzeit).

Sowohl Matrix- wie Film-Retardtabletten haben normalerweise
Durchmesser von etwa 6 bis 12 mm und mehr und können daher den
geschlossenen Pylorus nicht passieren. Die Freisetzung und
35  Resorption ihres gesamten, auf eine Stelle im Magen-Darm-Trakt
konzentrierten Wirkstoffgehaltes ist von den an dieser Stelle
herrschenden Bedingungen abhängig, was eine starke interindivi-
duelle und intraindividuelle Streuung des Plasmaspiegels zur
Folge hat.

40

Diese Streuung ist bei den "Multiple-Unit"-Retardformen kleiner,
da sich die "Units" gleichmäßig über den Magen- und Darmtrakt
verteilen und auch den geschlossenen Pylorus passieren können.
Als Multiple-Unit-Formen kommen in der Regel Pellets mit einem
45  Diffusionslack, abgefüllt in Gelatine-Steckkapseln, zum Einsatz.
Die Herstellung von Matrix-Pellets ist nur bei sehr niedrig
dosierten Arzneistoffen möglich, da aufgrund der großen Ober-

2

fläche noch mehr Matrixsubstanz als bei der Bolus-Retardtablette
benötigt würde.

Beispielsweise aus den Patentanmeldungen GB 2 176 999 und
5 WO 92/04013 sind kleine Matrix-Retardtabletten bekannt, die
ebenfalls größere Mengen an Retardierungshilfsstoffen enthalten.
In der Patentanmeldung EP 22 17 32 werden Retardtabletten von
schwerlöslichen Wirkstoffen beansprucht, die 60 bis 80 % Wirk-
stoff neben mindestens vier Hilfsmitteln enthalten. Diese Bolus-
10 Formen sind, wie im Patent beschrieben, in ihrer Freisetzung
stark abhängig vom Granulationsverfahren und dem bei der Her-
stellung verwendeten Gerät.

Weiterhin ist allgemein bekannt, daß bei der Tablettenherstellung
15 mit einer Steigerung der Preßkraft eine Verlangsamung der Wirk-
stofffreisetzung einhergeht. Dies gilt sowohl für schnell frei-
setzende Tabletten als auch für Retardtabletten (Patentanmeldung
WO 92/00064). Da trotz modernster Maschinentechnik die Preßkräfte
schwanken, resultieren daraus unterschiedliche Freisetzungs-
20 geschwindigkeiten. Hinzu kommen ferner noch von Charge zu Charge
unterschiedliche Preßeigenschaften, die auf der Variabilität des
zu verpressenden Granulates beruhen. Unterschiede in der Korn-
größe, Porosität, Oberflächenstruktur, Benetzbarkeit usw. können
großen Einfluß auf die Preßeigenschaften und die Retardierung
25 haben.

Der Erfindung lag die Aufgabe zugrunde, die Nachteile des Standes
der Technik zu überwinden, d.h. Propafenon- und Diprafenon-
Tabletten von geringer Größe, hohem Wirkstoffgehalt, hoher Wirk-
30 stoffdichte und preßdruckunabhängiger und über einen längeren
Zeitraum gleichmäßiger Wirkstofffreigabe zu entwickeln.

Die Lösung dieser Aufgabe besteht in den Mikrotabletten nach den
Ansprüchen 1 bis 4. Es wurde nämlich überraschend gefunden, daß
35 im vorliegenden Fall die Herstellung von Retardtabletten ohne
retardierende Hilfsstoffe möglich ist. Dies ist umso überraschen-
der, als andere Arzneistoffe mit ähnlicher Wasserlöslichkeit wie
Propafenon-Hydrochlorid (0,7 %), beispielsweise Cimetidin-Hydro-
chlorid oder Paracetamol, bei gleicher Präparation bereits in
40 1 Stunde zu 90 % freigesetzt werden.

Bei Propafenon-HCl handelt es sich um eine im Vergleich zu
anderen außerordentlich schlecht preßbare Substanz. Eine Bolus-
tablette mit handelsüblichen Dosierungen von 150 bis 300 mg und
45 einem Wirkstoffgehalt über 80 % ist unter Produktionsbedingungen
nicht herstellbar. Hingegen können die erfindungsgemäßen Mikro-
tabletten überraschenderweise mit verhältnismäßig hoher Maschi-

nengeschwindigkeit ohne Probleme hinsichtlich Abrieb- und Bruch-
festigkeit hergestellt werden, und zwar mit Wirkstoffgehalten im
Bereich von 81 bis 99,9, vorzugsweise 85 bis 99,5 Gew.-% und
einer Wirkstoffdichte von über 1. So hohe Gehalte an derartigen
5 Wirkstoffen in Tabletten sind bisher unerreicht.

Die erfindungsgemäßen Mikrotabletten sind zylindrisch mit flacher
oder konvexer Ober- und Unterseite und mit unabhängig voneinander
1 bis 3, vorzugsweise 1,5 bis 2,5 mm Durchmesser und Höhe, wobei
10 beide vorzugsweise etwa gleich groß sind.

Ferner war nicht vorherzusehen, daß die Wirkstofffreisetzung im
Gegensatz zu den üblichen Erfahrungen vom Druck beim Pressen der
Tabletten und auch über einen großen Bereich vom pH des Milieus
15 praktisch unabhängig ist. "Praktisch unabhängig" heißt, daß der
Einfluß für praktische Zwecke vernachlässigt werden kann. Die
Konstanz der Freisetzung ist damit gewährleistet. Sie wird über
die Größe der Tablette sowie gegebenenfalls durch die Freisetzung
beschleunigende Zusätze so eingestellt, daß nach 3, vorzugsweise
20 5 Stunden höchstens 80, nach 24, vorzugsweise 15 Stunden höch-
stens 80 % des Wirkstoffs freigesetzt sind. Überraschenderweise
weisen die erfindungsgemäßen Mikrotabletten gegenüber herkömm-
lichen Retardformen, wie einer Bolusretardform mit ähnlicher
In-vitro-Freisetzung, auch in vivo deutliche Vorzüge auf. Trotz
25 kurzer Halbwertszeit bildet sich ein ausgeprägtes Blutspiegel-
plateau aus (Fig. 11). Die Fluktuation des Blutspiegels ist bei
den Mikrotabletten erheblich geringer. Dies wird erkennbar an dem
$t_{75\%}$-Wert (Zeitdauer im Dosierungsintervall, während der die
Plasmaspiegel mindestens 75 % des maximalen Wertes betragen), der
30 bei den erfindungsgemäßen Mikrotabletten bei 8 bis 9 Stunden
liegt, gegenüber 5 bis 6 Stunden bei der Bolusretardform, sowie
am PTF-Wert (peak to trough fluctuation; vgl. H. P. Koch und
W. A. Ritschel, Synopsis der Biopharmazie und Pharmakokinetik,
Ecomed-Verlagsgesellschaft mbH, Landsberg und München, 1986)
35

$$\text{PTF (\%)} = \frac{C_{max} - C_{min}}{\dfrac{AUC}{\Delta t}} \times 100$$

zum AUC-Wert vgl.
J.K. Aronson et al.,
Europ. J. of Clinical
Pharmacology Bd. 15 (1988),
40                                                        S. 1 bis 7.

der bei den Mikrotabletten nur etwa halb so groß wie bei den
Bolusformen ist, und zwar kleiner als 75, vorzugsweise kleiner
als 60 %. Die Mikrotabletten erbringen demnach eine erhöhte
45 Therapiesicherheit, da überhöhte Plasmaspiegelspitzen und dadurch
bedingte Nebenwirkungen nicht auftreten, der minimale, effektive
Plasmaspiegel nicht unterschritten wird und diese Form in ihrer

4

Bioverfügbarkeit durch Nahrungsaufnahme, im Gegensatz zur Bolus-
retardform, nicht beeinflußt wird.

Bei der Bolusretardform wird nüchtern ein um 50 % höherer AUC-
5   Wert gefunden.

Generell zeigen die Mikrotabletten im Vergleich zur Bolusretard-
form geringere intra- und interindividuelle Unterschiede.

10  Die erfindungsgemäßen Mikrotabletten weisen ferner den Vorzug
auf, daß sie, eingebracht in Magen- oder Darmsaft, keine Klebe-
oder Anhaftungstendenzen aufweisen. Dadurch wird gewährleistet,
daß sie als einzelne Formlinge den Magen- und Darmtrakt passieren
und sich auch nicht an der Magen- oder Darmwand festsetzen und
15  Irritationen auslösen. Solche Klebe- oder Anhaftungseigenschaften
weisen beispielsweise kleine Formlinge mit hydrophilen Retardie-
rungspolymeren auf (vgl. WO 92/04013).

Die Herstellung von Retardformen mit hydrophilen Retardierungs-
20  polymeren erfordert oft bei der Granulation den Einsatz von
organischen Lösungsmitteln, damit nicht schon bei diesem Prozeß-
schritt Quellung einsetzt. Bei der Herstellung der erfindungs-
gemäßen Mikrotabletten kann darauf vollständig verzichtet werden.

25  Darreichungsformen mit hydrophilen Retardierungspolymeren weisen
zudem den Nachteil auf, daß sie aufgrund der Sorptions- und
Quellungstendenz empfindlich gegen eine Veränderung der Luft-
feuchte bei Lagerung sind. Insbesondere hohe Luftfeuchten schaden
diesen Zubereitungen. Die erfindungsgemäßen Mikrotabletten sind
30  aufgrund der Unempfindlichkeit der Einsatzstoffe auch bei höheren
Luftfeuchten stabil. Selbst nach 21tägiger Lagerung bei 93 % rel.
Luftfeuchte liegt die Wasseraufnahme unter 1 %, und optisch ist
keine Veränderung festzustellen.

35  Die Herstellung der erfindungsgemäßen Mikrotabletten erfolgt in
pharmazeutisch üblichen Geräten und umfaßt folgende Schritte:
Granulieren, Trocknen, Mischen, Tablettieren.

Die Korngröße des Wirkstoffs spielt im pharmazeutisch üblichen
40  Rahmen bei der Herstellung der erfindungsgemäßen Mikrotabletten,
entgegen allen Erwartungen, keine oder nur eine geringe Rolle.
Dadurch ist es möglich, Propafenon-Hydrochlorid und Diprafenon-
Hydrochlorid unterschiedlicher Korngröße zu Produkten gleicher
Qualität zu verarbeiten.
45

5

Granulierung und Trocknung werden vorzugsweise im Wirbelbett durchgeführt. Die Agglomeration kann aber auch in einem horizontalen oder vertikalen Mischer durchgeführt werden.

5   Nach dem Durchgeben durch ein Sieb geeigneter Maschenweite wird das feuchte Granulat entweder im Umluft-Trockenschrank oder im Wirbelbett getrocknet. Die Korngröße des Granulates sollte unter 1 mm, bevorzugt unter 0,8 mm liegen.

10   Für die Agglomeration können alle gängigen Binde- oder Klebemittel eingesetzt werden, z.B. Polyvinylpyrrolidon, Vinylpyrrolidon-Vinylacetat-Copolymere, Gelatine, Hydroxypropylmethylzellulose, Hydroxypropylzellulose, Polymerisate aus Methacrylsäure und deren Estern. Durch die Verwendung einer Wirkstoff-
15   Lösung als Granulationsflüssigkeit kann der Einsatz eines Bindemittels entfallen. Als Granulationsflüssigkeit wird Wasser ohne Zusätze bevorzugt.

Nach der Trocknung des Granulates auf den definierten Wassergehalt werden 0,1 bis 5, vorzugsweise 0,3 bis 2 Gew.-% eines Gleit-
20   mittels für die Tablettierung homogen untergemischt. Hierfür können ebenfalls alle gängigen Stoffe zum Einsatz kommen, wie Talkum, Magnesiumstearat, Calciumstearat, Stearinsäure, Calciumbehenat, Glycerinpalmitostearat, Natriumacetat, Polyethylenglykol, Natriumstearatfumarat. Außerdem können bis zu 18,9 Gew.-%
25   weiterer üblicher Hilfsstoffe zugemischt werden, beispielsweise Farbstoffe, Stabilisatoren, Füllstoffe, Hydrophilisatoren, Fließregulierungsmittel, jedoch keine Retardierungsmittel.

30   Die Tablettierung erfolgt auf einer geeigneten, mit Mehrfach-Mikrotabletten-Stempeln bestückten Tablettenpresse. Die resultierenden Mikrotabletten besitzen eine zylindrische Form mit planer oder konvexer Oberfläche. Die Höhe und der Durchmesser können unabhängig voneinander variiert werden. Aus Gründen der
35   höheren Schüttdichte und der besseren Rieselfähigkeit ist es oft zweckmäßig, die Höhe der Mikrotabletten dem Durchmesser anzupassen.

Neben der Größe der Mikrotabletten liegt ein weiteres Steue-
40   rungselement der Freisetzung im Zusatz von Hydrophilisatoren, die die Lösungsgeschwindigkeit erhöhen. Als Hydrophilisatoren können einerseits Tenside, wie Polyoxyethylenfettsäureester, Polyoxyethylenfettalkoholether, Fettsäuresalze, Gallensäuresalze, Alkylsulfate oder Ethylenoxid-Propylenoxid-Blockpolymere, oder ande-
45   rerseits echt wasserlösliche Substanzen wie Polyethylenglykole, Harnstoff, Natriumchlorid, Sorbit, Mannit, Glycin, Nikotinamid, Zitronensäure-, Weinsäure- oder Phosphorsäuresalze verwendet

6

werden. Die Freisetzungsrate nimmt dabei parallel zum Anstieg der Hydrophilisatorkonzentration zu.

Der Hydrophilisator kann bereits in das Granulat eingearbeitet
5   oder aber erst zusammen mit dem Gleitmittel untergemischt werden. Dies ist natürlich nur bei festen Hydrophilisatoren möglich. Die Hydrophilisatorkonzentration beträgt 0,1 bis 15, in der Regel 1 bis 10 % der Gesamtmasse.

10  Zur Beschleunigung der Erosion des Wirkstoffs von der Tabletten-oberfläche und damit der Wirkstofffreisetzung können auch Sprengmittel in Konzentrationen von 0,001 bis 0,5, vorzugsweise 0,01 bis 0,1 % verwendet werden, die weit unter den üblichen Konzentrationen liegen.
15

In der Regel können die Mikrotabletten direkt mit üblichen Füll-maschinen in Gelatinekapseln abgefüllt werden. Mitunter kann es von Vorteil sein, die Mikrotabletten vor der Abfüllung mit einem leicht löslichen, die Freisetzung nicht beeinflussenden Lackfilm
20  zu versehen.

Außerdem ist es in vielen Fällen zweckmäßig, retardierte mit rasch freisetzenden oder weniger stark retardierten Mikro-tabletten zu kombinieren. Dadurch wird zunächst eine Initialdosis
25  freigesetzt, der sich die langsame Freisetzung der Erhaltungs-dosis anschließt. Moderne Kapselfüllmaschinen sind in der Lage, zwei Produkte in eine Kapsel problemlos zu dosieren.

Die rasch freisetzende (Instant-Release-)Mikrotablette unter-
30  scheidet sich von der Retard-Mikrotablette dadurch, daß sie übliche Mengen an Sprengmittel, Quellmittel, Porenbildner ent-hält, die einen raschen Zerfall der Mikrotablette in kleine Bruchstücke und eine rasche Auflösung des Wirkstoffs bewirken.

35  Die Mikrotabletten der Beispiele hatten stets je 2 mm Durchmesser und Höhe, und die Wirkstoffdichte lag stets über 1.


40


45

00949

:ieg der

7

eitet
werden.
:h. Die
gel 1

.etten-
Spreng-
0,01
nzen-

. Füll-
nn es
einem
ckfilm

it

aldosis
ngs-
Lage,

er-
e
ent-
e
ken.

hmesser

Beispiele

Beispiel 1 (Fig. 1)
Propafenon-Retardmikrotabletten

5

Zusammensetzung

| | |
|---|---|
| Propafenon-HCl | 6,25 mg (96 %) |
| Hydroxypropylmethylcellulose | 0,20 mg |
| Magnesiumstearat | 0,05 mg |
| Gesamtgewicht | 6,50 mg |

In einem Wirbelschichtgranulator wurden 30 kg Propafenon-HCl
mit 10 kg einer 10 %igen Hydroxypropylmethylcellulose-Lösung
15 (Pharmacoat® 603) granuliert und getrocknet. Nach dem Durchgeben
durch ein Sieb geeigneter Maschenweite wurde das Granulat in
einem Pflugscharmischer mit der vorgegebenen Menge Magnesium-
stearat gemischt.

20 Die Verpressung zu Mikrotabletten erfolgte auf einer mit Mehr-
fach-Mikrotabletten-Stempeln ausgerüsteten Rundläufer-Tabletten-
presse.

Die der zu verabreichenden Dosis entsprechende Anzahl Mikro-
25 tabletten wurde mit einer geeigneten Kapselfüllmaschine in Hart-
gelatinekapseln abgefüllt.

Tabelle 1

30 Ergebnisse von Probandenstudien mit Propafenon-HCl-Mikrotabletten
von Beispiel 1 und einer Bolusretardform gemäß dem Vergleichs-
versuch (n = 18, Dosis: 400 mg Propafenon-HCl, repetierte Gabe)

| | Mikrotabletten | | Bolusretardform | |
|---|---|---|---|---|
| | nüchtern | mit Nahrung | nüchtern | mit Nahrung |
| AUC $\frac{ng \cdot h}{ml}$ | 5 500 | 5 500 | 6 900 | 4 700 |
| $t_{75\%}$ (h) | 8-9 | 8-9 | 5-6 | 5-6 |
| PTF (%) | 52 | 56 | 88 | 106 |

n  = Zahl der Probanden
ng = Nanogramm
h  = Stunden

45

8

Beispiel 2 (Fig. 2)
Propafenon-Retardmikrotabletten

Zusammensetzung
5

| | |
|---|---|
| Propafenon-HCl | 5,92 mg (91 %) |
| Hydroxypropylmethylcellulose | 0,20 mg |
| Poloxamer 188 (USP) | 0,33 mg |
| Magnesiumstearat | 0,05 mg |
| 10 Gesamtgewicht | 6,5 mg |

Die Herstellung erfolgte analog Beispiel 1. Die erforderliche
Poloxamer 188-Menge wurde zusammen mit dem Magnesiumstearat in
einem Pflugscharmischer unter das Granulat gemischt.
15

Beispiel 3 (Fig. 3)
Propafenon-Retardmikrotabletten

Zusammensetzung
20

| | |
|---|---|
| Propafenon-HCl | 5,61 mg (86 %) |
| Hydroxypropylmethylcellulose | 0,19 mg |
| Poloxamer 188 | 0,65 mg |
| Magnesiumstearat | 0,05 mg |
| 25 Gesamtgewicht | 6,5 mg |

Die Herstellung erfolgte analog Beispiel 2.

Beispiel 4 (Fig. 4)
30 Propafenon-Retardmikrotabletten

Zusammensetzung

| | |
|---|---|
| Propafenon-HCl | 6,0 mg (86 %) |
| 35 Hydroxypropylmethylcellulose | 0,2 mg |
| Calciumhydrogenphosphat | 0,613 mg |
| Monoglyceride (Myvatox®) | 0,15 mg |
| Vernetztes Polyvinylpyrrolidon | 0,007 mg |
| Magnesiumstearat | 0,03 mg |
| 40 Gesamtgewicht | 7,0 mg |

Die Herstellung erfolgte analog Beispiel 2.

45

9

Beispiel 5 (Fig. 5)
Propafenon-Retardmikrotabletten

    Zusammensetzung
5
    Propafenon-HCl                    5,70 mg (81 %)
    Gelatine                          0,18 mg
    Calciumhydrogenphosphat           0,38 mg
    NaCl                              0,70 mg
10  Magnesiumstearat                  0,04 mg
    Gesamtgewicht                     7,0  mg

    Die Herstellung erfolgte analog Beispiel 1. Als Granulations-
    mittel wurde eine 10 %ige Gelatinelösung verwendet. Die NaCl-
15 Menge wurde mit dem Magnesiumstearat untergemischt.

    Beispiel 6 (Fig. 6)
    Propafenon-Retardmikrotabletten

20 Zusammensetzung

    Propafenon-HCl                    5,83 mg (83 %)
    Hydroxypropylmethylcellulose      0,17 mg
    ß-Cyclodextrin                    0,9  mg
25 Magnesiumstearat                   0,1  mg
    Gesamtgewicht                     7,0  mg

    Die Herstellung erfolgte analog Beispiel 2.

30 Beispiel 7 (Fig. 7)
    Gelatinekapseln mit Propafenon-Retardmikrotabletten und Propa-
    fenon Instant-Release-Mikrotabletten

    Zur Erzielung einer höheren initialen Freisetzung wurden auf
35 einer geeigneten Kapselfüllmaschine 14 Instant-Release-Mikro-
    tabletten und 55 Retard-Mikrotabletten in Hartgelatinekapseln
    gefüllt.

    Zusammensetzung der Instant-Release-Mikrotabletten
40
    Propafenon-HCl                    6,05 mg (93 %)
    Hydroxypropylmethylcellulose      0,20 mg
    Natriumcarboxymethylstärke        0,20 mg
    Magnesiumstearat                  0,05 mg
45 Gesamtgewicht                      6,5  mg

10

Die Herstellung der Instant-Release-Mikrotabletten erfolgte analog Beispiel 2. Die Herstellung der eingesetzten Retard-Mikrotabletten erfolgte nach Beispiel 1.

5 Beispiel 8 (Fig. 8)
Propafenon-Retardmikrotabletten

Zusammensetzung

10 Propafenon-HCl                6,48 mg (99,7 %)
Magnesiumstearat             0,02 mg
Gesamtgewicht                6,50 mg

Propafenon-Hydrochlorid und Magnesiumstearat wurden in einem
15 Pflugscharmischer gemischt und anschließend zu Mikrotabletten
verpreßt.

Die Bestimmung der In-vitro-Freisetzungskurven (Fig. 1 bis 10)
erfolgte mit einer Paddle-Apparatur nach USP, wobei in den ersten
20 beiden Stunden 0,08 molare HCl und anschließend Phosphatpuffer
pH 6,8 verwendet wurde. Die Umdrehungsgeschwindigkeit lag bei
50 rpm.

Vergleichsversuch
25

Propafenon-Retardbolusfilmtablette

Zusammensetzung

30 Propafenon-HCl                           450,0 mg
Natriumalginat                        112,0 mg
Mikrokristalline Cellulose Typ PH 101   37,0 mg
Copolymerisate aus Acryl- und
Methacrylsäureestern mit einem geringen
35 Gehalt an quartären Ammoniumgruppen
(Eudragit® RS)                         15,0 mg
Gelatine                               55,0 mg
Magnesiumstearat                        3,5 mg
Mikrokristalline Cellulose Typ PH 102   12,5 mg
40 leicht löslicher Filmüberzug           15,0 mg
Gesamtgewicht                         700,0 mg

Propafenon-Hydrochlorid, Natriumalginat, mikrokristalline Cellu-
lose (Typ PH 101) und Eudragit RS wurden in einem Vertikalmischer
45 gemischt und mit 20 %iger Gelatinelösung granuliert. Die Abtrock-
nung des feuchten Granulates erfolgte in einem Wirbelschicht-
trockner mit 60°C warmer Zuluft. Nach dem Durchgeben durch ein

11

Sieb geeigneter Maschenweite wurden Magnesiumstearat und mikro-
kristalline Cellulose (Typ PH 102) in einem Horizontalmischer
zugemischt und anschließend die Mischung auf einer Rundläufer-
Tablettenpresse zu Oblongtabletten verpreßt (Maße 18 x 8,7 mm).
5   Der leicht lösliche Überzug wurde in einem Horizontalcoater auf-
gebracht.

Die In-vitro-Freisetzungsbestimmung in einer Paddle-Apparatur bei
50 rpm ergab folgende Werte (in %):
10
1. Stunde  3,8
2. Stunde  5,5
3. Stunde 23,7
4. Stunde 43,0
15  6. Stunde 75,4
8. Stunde 89,5

Die In-vitro-Freisetzung der Retard-Bolusfilmtablette ist also
ähnlich der der erfindungsgemäßen Retard-Mikrotabletten. Dennoch
20  ist die In-vivo-Freisetzung völlig anders, und zwar erfindungs-
gemäß besser, vgl. Pharmaspiegel gem. Fig. 11.

25

30

35

40

45

12

Patentansprüche

1. Zylindrische Retardmikrotablette mit konvexer oder planer Ober- und Unterseite von ß-Phenylpropiophenonderivaten der Formel I als Wirkstoff



mit R= n-Propyl oder 1,1-Dimethylpropyl und deren pharma-kologisch unbedenklichen Salzen, dadurch gekennzeichnet, daß

a) Höhe und Durchmesser unabhängig voneinander 1 bis 3 mm betragen,

b) der Wirkstoffgehalt im Bereich von 81 bis 99,9 Gew.-% der Mikrotablette liegt, jedoch ohne Berücksichtigung des Gewichts eines gegebenenfalls vorhandenen Überzugs,

c) die Wirkstoffdichte höher als 1 ist,

d) im Paddle Modell nach USP bei 50 rpm nach 3 Stunden höchstens und nach 24 Stunden mindestens 80 % des Wirk-stoffs freigesetzt sind,

e) die Freisetzungsgeschwindigkeit praktisch unabhängig vom Druck beim Pressen der Tabletten ist, und

f) die Tablette keinen retardierenden Hilfsstoff, aber 0,1 bis 5 Gew.-% eines Gleitmittels und 0 bis 18,9 Gew.-% anderer üblicher Hilfsstoffe enthält.

2. Tablette nach Anspruch 1, dadurch gekennzeichnet, daß sich in vivo ein ausgeprägtes Plasmaspiegelplateau mit einem PTF-Wert < 75 % ergibt und die Bioverfügbarkeit unabhängig von der eingenommenen Nahrung ist.

3. Tablette nach Anspruch 1 oder 2, dadurch gekennzeichnet, daß der Wirkstoff Propafenon-hydrochlorid ist.

4. Tablette nach einem der Ansprüche 1 bis 3, dadurch gekenn-zeichnet, daß Höhe und Durchmesser etwa gleich sind.

13

5.    Gelatinekapsel, die 3 bis 200 Tabletten nach einem der
      Ansprüche 1 bis 4 mit gleicher oder unterschiedlicher
      Freisetzungsrate enthält.

5  6.    Verfahren zur Herstellung von zylindrischen Retardmikro-
      tabletten gemäß Anspruch 1, dadurch gekennzeichnet, daß man
      eine homogene Mischung von 81 bis 99,9 Gew.-% des granu-
      lierten Wirkstoffs mit einer Korngröße unter 1 mm, 0,1 bis
      5 Gew.-% eines Gleitmittels und 0 bis 18,9 Gew.-% anderer
10    üblicher, nicht retardierender Hilfsstoffe in eine zylin-
      drische Form mit je 1 bis 3 mm Höhe und Durchmesser preßt
      und entformt.

15

20

25

30

35

40

45

WO 94/22434

PCT/EP94/00949

FIG.1

1/11



Freisetzung Propafenon ret. Mikrotabl. gem. Bsp. 1
400 mg in Kapseln

WO 94/22434                                      PCT/EP94/00949

# FIG.2                              2/11



Freisetzung Propafenon ret. Mikrotabl. gem. Bsp. 2
400 mg in Kapseln

WO 94/22434

PCT/EP94/00949

# FIG.3

3/11



Freisetzung Propafenon ret. Mikrotabl. gem. Bsp. 3
400 mg in Kapseln

# FIG.4

4/11



Freisetzung Propafenon ret. Mikrotabl. gem. Bsp. 4
300 mg in Kapseln

WO 94/22434

PCT/EP94/00949

# FIG.5

5/11



Freisetzung Propafenon ret. Mikrotabl. gem. Bsp. 5
400 mg in Kapseln

WO 94/22434                                     PCT/EP94/00949

## FIG.6

6/11



Freisetzung Propafenon ret. Mikrotabl. gem. Bsp. 6
300 mg in Kapseln



PA 099

WO 94/22434                                    PCT/EP94/00949

## FIG.7

7/11



Freisetzung Propafenon ret. Mikrotabl. gem. Bsp. 7
425 mg in Kapseln

# FIG.8





Freisetzung Propafenon ret. Mikrotabl. gem. Bsp. 8
325 mg in Kapseln

WO 94/22434                                          PCT/EP94/00949

## FIG.9                          9/11



Freisetzung Propafenon ret. Mikrotabletten gem. Bsp. 1, hergestellt mit
unterschiedlichen Pressdrücken
325 mg in Kapseln



Freisetzung von Propafenon ret Mikrotabletten gem. Bsp.1
325 mg   bei verschiedenen pH - Werten

WO 94/22434                                      PCT/EP94/00949

FIG.11                              11/11



Plasmaspiegel nach 2xtäglich repetierter Gabe verschiedener
Darreichungsformen von Propafenon-HCl

-⊖-2 x 300mg FILMTABLETTE, Rytmonorm® 300 mg, n=7
-◇-2 x 450mg RETARD-FILMTABLETTE (BOLUS-FORM), gem. Vergl. Vers., n=7
-✕-2 x 400mg MIKROTABLETTEN, gem. Bsp. 1, n=18

# INTERNATIONAL SEARCH REPORT

| International Application No |
|---|
| PCT/EP 94/00949 |

**A. CLASSIFICATION OF SUBJECT MATTER**
IPC 5   A61K31/135   A61K9/20   A61K9/48

According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)
IPC 5   A61K

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

Electronic data base consulted during the international search (name of data base and, where practical, search terms used)

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| A | WO,A,92 04013 (EURAND INTERNATIONAL S.P.A.) 19 March 1992 cited in the application see claims | 1-6 |
| A | EP,A,0 334 167 (KNOLL A.G.) 27 September 1989 see claims see example 4 | 1-6 |
| A | WO,A,90 11755 (KNOLL A.G.) 18 October 1990 see claims | 1-6 |

☐ Further documents are listed in the continuation of box C.      ☒ Patent family members are listed in annex.

* Special categories of cited documents :

"A" document defining the general state of the art which is not considered to be of particular relevance

"E" earlier document but published on or after the international filing date

"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

"O" document referring to an oral disclosure, use, exhibition or other means

"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone

"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art.

"&" document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 7 June 1994 | 2 0. 06. 94 |

| Name and mailing address of the ISA | Authorized officer |
|---|---|
| European Patent Office, P.B. 5818 Patentlaan 2 NL - 2280 HV Rijswijk Tel. (+ 31-70) 340-2040, Tx. 31 651 epo nl, Fax: (+ 31-70) 340-3016 | Scarponi, U |

Form PCT/ISA/210 (second sheet) (July 1992)

## INTERNATIONAL SEARCH REPORT

Information on patent family members

Intern. ial Application No
PCT/EP 94/00949

| Patent document cited in search report | Publication date | Patent family member(s) | | Publication date |
|---|---|---|---|---|
| WO-A-9204013 | 19-03-92 | AU-A- | 8395691 | 30-03-92 |
| EP-A-0334167 | 27-09-89 | DE-A-<br>JP-A-<br>US-A- | 3809764<br>2006543<br>5230901 | 05-10-89<br>10-01-90<br>27-07-93 |
| WO-A-9011755 | 18-10-90 | DE-A-<br>DE-D-<br>EP-A- | 3911069<br>59004363<br>0484331 | 11-10-90<br>03-03-94<br>13-05-92 |

Form PCT/ISA/210 (patent family annex) (July 1992)

## INTERNATIONALER RECHERCHENBERICHT

| | |
|---|---|
| Inter... ales Aktenzeichen | P 'EP 94/00949 |

**A. KLASSIFIZIERUNG DES ANM... UNGSGEGENSTANDES**
IPK 5    A61K31/135    A61K9/20    A61K9/48

Nach der Internationalen Patentklassifikation (IPK) oder nach der nationalen Klassifikation und der IPK

**B. RECHERCHIERTE GEBIETE**

Recherchierter Mindestprüfstoff  (Klassifikationssystem und Klassifikationssymbole )
IPK 5    A61K

Recherchierte aber nicht zum Mindestprüfstoff gehörende Veröffentlichungen, soweit diese unter die recherchierten Gebiete fallen

Während der internationalen Recherche konsultierte elektronische Datenbank (Name der Datenbank  und evtl. verwendete Suchbegriffe)

**C. ALS WESENTLICH ANGESEHENE UNTERLAGEN**

| Kategorie* | Bezeichnung der Veröffentlichung, soweit erforderlich unter Angabe der in Betracht kommenden Teile | Betr. Anspruch Nr. |
|---|---|---|
| A | WO,A,92 04013 (EURAND INTERNATIONAL S.P.A.) 19. März 1992 in der Anmeldung erwähnt siehe Ansprüche ---- | 1-6 |
| A | EP,A,0 334 167 (KNOLL A.G.) 27. September 1989 siehe Ansprüche siehe Beispiel 4 ---- | 1-6 |
| A | WO,A,90 11755 (KNOLL A.G.) 18. Oktober 1990 siehe Ansprüche ------ | 1-6 |

| | | | |
|---|---|---|---|
| ☐ | Weitere Veröffentlichungen sind der Fortsetzung von Feld C zu entnehmen | ☒ | Siehe Anhang Patentfamilie |

* Besondere Kategorien von angegebenen Veröffentlichungen  :
"A" Veröffentlichung, die den allgemeinen Stand der Technik definiert, aber nicht als besonders bedeutsam anzusehen ist
"E" älteres Dokument, das jedoch erst am oder nach dem internationalen Anmeldedatum veröffentlicht worden ist
"L" Veröffentlichung, die geeignet ist, einen Prioritätsanspruch zweifelhaft erscheinen zu lassen, oder durch die das Veröffentlichungsdatum einer anderen im Recherchenbericht genannten Veröffentlichung belegt werden soll oder die aus einem anderen besonderen Grund angegeben ist (wie ausgeführt)
"O" Veröffentlichung, die sich auf eine mündliche Offenbarung, eine Benutzung, eine Ausstellung oder andere Maßnahmen bezieht
"P" Veröffentlichung, die vor dem internationalen Anmeldedatum, aber nach dem beanspruchten Prioritätsdatum veröffentlicht worden ist

"T" Spätere Veröffentlichung, die nach dem internationalen Anmeldedatum oder dem Prioritätsdatum veröffentlicht worden ist und mit der Anmeldung nicht kollidiert, sondern nur zumVerständnis des der Erfindung zugrundeliegenden Prinzips oder der ihr zugrundeliegenden Theorie angegeben ist
"X" Veröffentlichung von besonderer Bedeutung; die beanspruchte Erfindung kann allein aufgrund dieser Veröffentlichung nicht als neu oder auf erfinderischer Tätigkeit beruhend betrachtet werden
"Y" Veröffentlichung von besonderer Bedeutung; die beanspruchte Erfindung kann nicht als auf erfinderischer Tätigkeit beruhend betrachtet werden, wenn die Veröffentlichung mit einer oder mehreren anderen Veröffentlichungen dieser Kategorie in Verbindung gebracht wird und diese Verbindung für einen Fachmann naheliegend ist
"&" Veröffentlichung, die Mitglied derselben Patentfamilie ist

| Datum des Abschlusses der internationalen Recherche | Absendedatum des internationalen Recherchenberichts |
|---|---|
| 7. Juni 1994 | 2 0.03.94 |
| Name und Postanschrift der Internationale Recherchenbehörde
Europäisches Patentamt, P.B. 5818 Patentlaan 2
NL - 2280 HV Rijswijk
Tel. ( +31-70) 340-2040, Tx. 31 651 epo nl,
Fax ( +31-70) 340-3016 | Bevollmächtigter Bediensteter
Scarponi, U |

Formblatt PCT/ISA/210 (Blatt 2) (Juli 1992)

## INTERNATIONALER RECHERCHENBERICHT

Angaben zu Veröffentlichungen, die zur selben Patentfamilie gehören

Internationales Aktenzeichen

PCT/EP 94/00949

| Im Recherchenbericht angeführtes Patentdokument | Datum der Veröffentlichung | Mitglied(er) der Patentfamilie | | Datum der Veröffentlichung |
|---|---|---|---|---|
| WO-A-9204013 | 19-03-92 | AU-A- | 8395691 | 30-03-92 |
| EP-A-0334167 | 27-09-89 | DE-A- | 3809764 | 05-10-89 |
| | | JP-A- | 2006543 | 10-01-90 |
| | | US-A- | 5230901 | 27-07-93 |
| WO-A-9011755 | 18-10-90 | DE-A- | 3911069 | 11-10-90 |
| | | OE-D- | 59004363 | 03-03-94 |
| | | EP-A- | 0484331 | 13-05-92 |

Formblatt PCT/ISA/210 (Anhang Patentfamilie)(Juli 1992)

# TRANSLATION
## PATENT COOPERATION TREATY

# PCT

## INTERNATIONAL PRELIMINARY EXAMINATION REPORT

(PCT Article 36 and Rule 70)

| Applicant's or agent's file reference<br>**0480/01123** | **FOR FURTHER ACTION** | See Notification of Transmittal of International<br>Preliminary Examination Report (Form PCT/IPEA/416) |
|---|---|---|
| International application No.<br>**PCT/EP94/00949** | International filing date *(day/month/year)*<br>**24.03.1994** | Priority date *(day/month/year)*<br>**03.04.1993** |

International Patent Classification (IPC) or national classification and IPC

**A61K31/135**

Applicant

**KNOLL AKTIENGESELLSCHAFT et al.**

1. This international preliminary examination report has been prepared by this International Preliminary Examining Authority and is transmitted to the applicant according to Article 36.

2. This REPORT consists of a total of ___7___ sheets, including this cover sheet.

   [X] This report is also accompanied by ANNEXES, i.e., sheets of the description, claims and/or drawings which have been amended and are the basis for this report and/or sheets containing rectifications made before this Authority (see Rule 70.16 and Section 607 of the Administrative Instructions under the PCT).

   These annexes consist of a total of ___1___ sheets.

3. This report contains indications relating to the following items:

   I [X] Basis of the report

   II [ ] Priority

   III [ ] Non-establishment of opinion with regard to novelty, inventive step and industrial applicability

   IV [ ] Lack of unity of invention

   V [X] Reasoned statement under Article 35(2) with regard to novelty, inventive step or industrial applicability; citations and explanations supporting such statement

   VI [ ] Certain documents cited

   VII [ ] Certain defects in the international application

   VIII [X] Certain observations on the international application

| Date of submission of the demand<br><br>**14.07.1994** | Date of completion of this report<br><br>**24.02.95** |
|---|---|
| Name and mailing address of the IPEA/ EP<br><br><br>Facsimile No. | Authorized officer<br><br><br>Telephone No. |

Form PCT/IPEA/409 (cover sheet) (January 1994)

| INTERNATIONAL PRELIMINARY EXAMINATION REPORT | International application No. |
|---|---|
| | PCT/EP94/00949 |

**I.    Basis of the report**

1. This report has been drawn on the basis of *(Replacement sheets which have been furnished to the receiving Office in response to an invitation under Article 14 are referred to in this report as "originally filed" and are not annexed to the report since they do not contain amendments.):*

     ☐   the international application as originally filed.

     ☒   the description, pages    1-11   , as originally filed,

                 pages            , filed with the demand,

                 pages            , filed with the letter of                     

                 pages            , filed with the letter of                      ,

     ☒   the claims,    Nos.    5,6   , as originally filed,

                 Nos.            , as amended under Article 19,

                 Nos.            , filed with the demand,

                 Nos.    1-4   , filed with the letter of      08.02.95    ,

                 Nos.            , filed with the letter of                   

     ☒   the drawings,   sheets/fig   1/11-11/11  , as originally filed,

                 sheets/fig        , filed with the demand,

                 sheets/fig        , filed with the letter of                    ,

                 sheets/fig        , filed with the letter of                    .

2.  The amendments have resulted in the cancellation of:

     ☐   the description, pages            

     ☐   the claims,    Nos.            

     ☐   the drawings,   sheets/fig            

3.  ☒   This report has been established as if (some of) the amendments had not been made, since they have been considered to go beyond the disclosure as filed, as indicated in the Supplemental Box (Rule 70.2(c)).

4.  Additional observations, if necessary:

Form PCT/IPEA/409 (Box I) (January 1994)



| INTERNATIONAL PRELIMINARY EXAMINATION REPORT | International application No.<br>PCT/EP 94/00949 |
|---|---|

**Supplemental Box**
(To be used when the space in any of Boxes I to VIII is not sufficient)

Continuation of Box [No.]: I.3.

In the new claim 1 the condition that the density of the active substance is greater than 1 has been deleted.

In the application as originally filed this feature was described as an essential feature of the invention (see the description, page 2, lines 33-34 in conjunction with claim 1).

The deletion of this essential feature represents an amendment extending the subject of the application beyond the original disclosure.

In this connection it should be noted that the condition of density of the active substance with regard to density and content of the active substance would be superfluous only if the auxiliaries had a density that is equal to or greater than that of the active substance.

Form PCT/IPEA/409 (supplemental sheet) (July 1992)

Form PCT/IPEA/409   (July 1992)

| INTERNATIONAL PRELIMINARY EXAMINATION REPORT | International application No.<br>PCT/EP 94/00949 |
|---|---|

| V. | Reasoned statement under Article 35(2) with regard to novelty, inventive step or industrial applicability; citations and explanations supporting such statement |
|---|---|

| 1. | STATEMENT | | | | |
|---|---|---|---|---|---|

| Novelty (N) | Claims | 1-6 | YES |
|---|---|---|---|
| | Claims | | NO |
| Inventive Step (IS) | Claims | 1-6 | YES |
| | Claims | | NO |
| Industrial Applicability (IA) | Claims | 1-6 | YES |
| | Claims | | NO |

**2.    CITATIONS AND EXPLANATIONS**

1) By its claims the present application relates to delayed-action microtablets containing a high (over 81%) β-phenylpropiophenone derivate content and having the other advantageous properties defined in the claims.

2) The international serch report mentions the following documents as prior art:

D1: WO-A-90/11755
D2: EP-A-0 334 167
D3: WO-A-92/04013.

D1 describes repository forms for administering β-phenylpropiophenones in which this active substance is present in the form of single crystals. However, this document does not describe microtablets.

D2 describes repository drug forms, e.g. for administering propafenone HCl, containing an alginate and a polyacrylate. This document does not however describe microtablets containing a high concentration (>80%) of β-phenylpropiophenones.

D3 describes microtablets for delayed release of the active substance therein, the active substance residing in a matrix. In this document propafenone is mentioned as a

Form PCT/IPEA/4O9  (July 1992)

| International application No. |
|---|
| PCT/EP 94/00949 |

possible active suibstance (see page 7, line 4). However, this document does not describe specifically microtablets containing a high concentration (>80%) of active substance, propafenone in particular, as defined in the present application. The highest concentration of active substance mentioned in this document is only about 77% and pertains to ibuprofene (example I, page 8).

3) As the above analysis of the existing prior art indicates, the claimed subject matter can be considered novel over the known prior art.

According to the description in the present application (page 2, line 42 to page 4, line 2) the claimed formulation of β-phenylpropiophenones in microtablets makes it possible to produce delayed action tablets without using retardation auxiliaries and without encountering problems with regard to abrasion and breaking strength, where the delayed action tablets contain a high concentration of active substance and for that purpose provide for an excellent release of active substance that is not subject to the usual dependence on pressure in the pressing and that is practically independent over a wide range of pH.

In view of these advantages, which are surprising to a person skilled in the art, an inventive step in the newly claimed subject can also be recognized.

The industrial applicability of the claimed subject is obvious.

| INTERNATIONAL PRELIMINARY EXAMINATION REPORT | International application No.<br>PCT/EP 94/00949 |
| --- | --- |

**VIII. Certain observations on the international application**

The following observations on the clarity of the claims, description, and drawings or on the question whether the claims are fully supported by the description, are made:

In claim 1 and in the description on page 3, line 4, the density of the active substance in the claimed tablets is defined as "greater than 1". Lacking, however, is a description of the unit to which this value relates. Without an indication of this unit this value appears insufficiently defined (PCT Article 6).

Form PCT/IPEA/409  (July 1992)

PATENT COOPERATION TREATY

EO/US
PCT/EP94/00949

## PCT

### NOTIFICATION OF ELECTION

### (PCT Rule 61.2)

From the INTERNATIONAL BUREAU

To:

United States Patent and Trademark Office
Washington, D.C.

in its capacity as elected Office

| Date of mailing: 13 October 1994 (13.10.94) | |
|---|---|
| International application No. PCT/EP94/00949 | Applicant's or agent's file reference: 0480/01123 |
| International filing date: 24 March 1994 (24.03.94) | Priority date: 03 April 1993 (03.04.93) |
| Applicant: KNOLL AKTIENGESELLSCHAFT et al. | |

The designated Office is hereby notified of its election made:

[X] in the demand filed with the International Preliminary Examining Authority on:

14 July 1994 (14.07.94)

[ ] in a notice effecting later election filed with the International Bureau on:

The election [X] was
[ ] was not

made before the expiration of 19 months from the priority date or, where Rule 32 applies, within the time limit under Rule 32.2(b).

| The International Bureau of WIPO 34 chemin des Colombettes 1211 Geneva 20, Switzerland | Authorized officer |
|---|---|
| Facsimile No.: (0 22) 740 14 35 | C. Zähra Telephone No.: (41 22) 730 91 11 |

Form PCT/IB/331 (June 1992)

PCT/EP94/00949

# PATENT COOPERATION TREATY

## PCT

**NOTIFICATION CONCERNING
DOCUMENT TRANSMITTED**

From the INTERNATIONAL BUREAU

To:

**United States Patent and Trademark
Office
(Box PCT)
Washington D.C. 20231
United States of America**

| Date of mailing: | |
|---|---|
| 06 March 1995 (06.03.95) | In its capacity as elected Office |

| International application No.: | International filing date: |
|---|---|
| PCT/EP94/00949 | 24 March 1994 (24.03.94) |

Applicant:

**KNOLL AKTIENGESELLSCHAFT et al**

The International Bureau transmits herewith the following documents and number thereof:

copy of the international preliminary examination report and annexes (Article 36(3)(a))

| The International Bureau of WIPO
34, chemin des Colombettes
1211 Geneva 20, Switzerland
Facsimile No.: (41-22) 740.14.35 | Authorised officer:
I. Britel
Telephone No.: (41-22) 730.91.11 |
|---|---|

Form PCT/IB/310 (July 1992)

000681281

PATENT COOPERATION TREATY

PCT/EP94/00949

PCT

**NOTIFICATION CONCERNING
DOCUMENT TRANSMITTED**

From the INTERNATIONAL BUREAU

To:

United States Patent and Trademark
Office
(Box PCT)
Washington D.C. 20231
United States of America

DEC 13 1995

RECEIVED

in its capacity as elected Office

| Date of mailing (day/month/year) | International filing date (day/month/year) |
|---|---|
| 25 October 1995 (25.10.95) | |

| International application No. | |
|---|---|
| PCT/EP94/00949 | 24 March 1994 (24.03.94) |

Applicant

KNOLL AKTIENGESELLSCHAFT et al

The International Bureau transmits herewith the following documents and number thereof:

_____    copy of the English translation of the international preliminary examination report (Article 36(3)(a))

| The International Bureau of WIPO<br>34, chemin des Colombettes<br>1211 Geneva 20, Switzerland | Authorized officer<br>I. Britel |
|---|---|
| Facsimile No.: (41-22) 740.14.35 | Telephone No.: (41-22) 730.91.11 |

Form PCT/IB/310 (July 1992)

000887040

VERTRAG ÜBER DIE INTERNATIONALE ZUSAMMENARBEIT
AUF DEM GEBIET DES PATENTWESENS

# PCT

### INTERNATIONALER RECHERCHENBERICHT

(Artikel 18 sowie Regeln 43 und 44 PCT)

| Aktenzeichen des Anmelders oder Anwalts | **WEITERES** | siehe Mitteilung über die Übermittlung des internationalen |
| 0480/01123 | **VORGEHEN** | Recherchenberichts (Formblatt PCT/ISA/220) sowie, soweit zutreffend, nachstehender Punkt 5 |
| Internationales Aktenzeichen | Internationales Anmeldedatum *(Tag/Monat/Jahr)* | (Frühestes) Prioritätsdatum *(Tag/Monat/Jahr)* |
| PCT/EP 94/00949 | 24/03/94 | 03/04/93 |

Anmelder

KNOLL AKTIENGESELLSCHAFT et al.

Dieser internationale Recherchenbericht wurde von der Internationalen Recherchenbehörde erstellt und wird dem Anmelder gemäß Artikel 18 übermittelt. Eine Kopie wird dem Internationalen Büro übermittelt.

Dieser internationale Recherchenbericht umfaßt insgesamt ___2___ Blätter.

[X]  Darüber hinaus liegt ihm jeweils eine Kopie der in diesem Bericht genannten Unterlagen zum Stand der Technik bei.

1.  [ ]  Bestimmte Ansprüche haben sich als nicht recherchierbar erwiesen (siehe Feld I).

2.  [ ]  Mangelnde Einheitlichkeit der Erfindung (siehe Feld II).

3.  [ ]  In der internationalen Anmeldung ist ein Protokoll einer Nucleotid- und/oder Aminosäuresequenz offenbart; die internationale Recherche wurde auf der Grundlage des Sequenzprotokolls durchgeführt,

    [ ]  das zusammen mit der internationalen Anmeldung eingereicht wurde.

    [ ]  das vom Anmelder getrennt von der internationalen Anmeldung vorgelegt wurde,

        [ ]  dem jedoch keine Erklärung beigefügt war, daß der Inhalt des Protokolls nicht über den Offenbarungsgehalt der internationalen Anmeldung in der eingereichten Fassung hinausgeht.

    [ ]  das von der Internationalen Recherchenbehörde in die ordnungsgemäße Form übertragen wurde.

4.  Hinsichtlich der Bezeichnung der Erfindung

    [X]  wird der vom Anmelder eingereichte Wortlaut genehmigt,

    [ ]  wurde der Wortlaut von der Behörde wie folgt festgesetzt:

5.  Hinsichtlich der Zusammenfassung

    [X]  wird der vom Anmelder eingereichte Wortlaut genehmigt,

    [ ]  wurde der Wortlaut nach Regel 38.2b) in der Feld III angegebenen Fassung von dieser Behörde festgesetzt. Der Anmelder kann der Internationalen Recherchenbehörde innerhalb eines Monats nach dem Datum der Absendung dieses internationalen Recherchenberichts eine Stellungnahme vorlegen.

6.  Folgende Abbildung der Zeichnungen ist mit der Zusammenfassung zu veröffentlichen:

    Abb. Nr. _____  [ ]  wie vom Anmelder vorgeschlagen  [X]  keine der Abb.

    [ ]  weil der Anmelder selbst keine Abbildung vorgeschlagen hat.

    [ ]  weil diese Abbildung die Erfindung besser kennzeichnet.

Formblatt PCT/ISA/210 (Blatt 1) (Juli 1992)

# INTERNATIONALER RECHERCHENBERICHT

| | Internationales Aktenzeichen |
|---|---|
| | PC JP 94/00949 |

**A. KLASSIFIZIERUNG DES ANMELDUNGSGEGENSTANDES**

IPK 5   A61K31/135   A61K9/20   A61K9/48

Nach der Internationalen Patentklassifikation (IPK) oder nach der nationalen Klassifikation und der IPK

**B. RECHERCHIERTE GEBIETE**

Recherchierter Mindestprüfstoff (Klassifikationssystem und Klassifikationssymbole )

IPK 5   A61K

Recherchierte aber nicht zum Mindestprüfstoff gehörende Veröffentlichungen, soweit diese unter die recherchierten Gebiete fallen

Während der internationalen Recherche konsultierte elektronische Datenbank (Name der Datenbank und evtl. verwendete Suchbegriffe)

**C. ALS WESENTLICH ANGESEHENE UNTERLAGEN**

| Kategorie* | Bezeichnung der Veröffentlichung, soweit erforderlich unter Angabe der in Betracht kommenden Teile | Betr. Anspruch Nr. |
|---|---|---|
| A | WO,A,92 04013 (EURAND INTERNATIONAL S.P.A.) 19. März 1992 in der Anmeldung erwähnt siehe Ansprüche ---- | 1-6 |
| A | EP,A,0 334 167 (KNOLL A.G.) 27. September 1989 siehe Ansprüche siehe Beispiel 4 ---- | 1-6 |
| A | WO,A,90 11755 (KNOLL A.G.) 18. Oktober 1990 siehe Ansprüche ------- | 1-6 |

☐ Weitere Veröffentlichungen sind der Fortsetzung von Feld C zu entnehmen

☒ Siehe Anhang Patentfamilie

\* Besondere Kategorien von angegebenen Veröffentlichungen :
"A" Veröffentlichung, die den allgemeinen Stand der Technik definiert, aber nicht als besonders bedeutsam anzusehen ist
"E" älteres Dokument, das jedoch erst am oder nach dem internationalen Anmeldedatum veröffentlicht worden ist
"L" Veröffentlichung, die geeignet ist, einen Prioritätsanspruch zweifelhaft erscheinen zu lassen, oder durch die das Veröffentlichungsdatum einer anderen im Recherchenbericht genannten Veröffentlichung belegt werden soll oder die aus einem anderen besonderen Grund angegeben ist (wie ausgeführt)
"O" Veröffentlichung, die sich auf eine mündliche Offenbarung, eine Benutzung, eine Ausstellung oder andere Maßnahmen bezieht
"P" Veröffentlichung, die vor dem internationalen Anmeldedatum, aber nach dem beanspruchten Prioritätsdatum veröffentlicht worden ist

"T" Spätere Veröffentlichung, die nach dem internationalen Anmeldedatum oder dem Prioritätsdatum veröffentlicht worden ist und mit der Anmeldung nicht kollidiert, sondern nur zum Verständnis des der Erfindung zugrundeliegenden Prinzips oder der ihr zugrundeliegenden Theorie angegeben ist
"X" Veröffentlichung von besonderer Bedeutung; die beanspruchte Erfindung kann allein aufgrund dieser Veröffentlichung nicht als neu oder auf erfinderischer Tätigkeit beruhend betrachtet werden
"Y" Veröffentlichung von besonderer Bedeutung; die beanspruchte Erfindung kann nicht als auf erfinderischer Tätigkeit beruhend betrachtet werden, wenn die Veröffentlichung mit einer oder mehreren anderen Veröffentlichungen dieser Kategorie in Verbindung gebracht wird und diese Verbindung für einen Fachmann naheliegend ist
"&" Veröffentlichung, die Mitglied derselben Patentfamilie ist

| Datum des Abschlusses der internationalen Recherche | Absendedatum des internationalen Recherchenberichts |
|---|---|
| 7. Juni 1994 | 20. 06. 94 |

| Name und Postanschrift der internationalen Recherchenbehörde | Bevollmächtigter Bediensteter |
|---|---|
| Europäisches Patentamt, P.B. 5818 Patentlaan 2 NL - 2280 HV Rijswijk Tel. (+31-70) 340-2040, Tx. 31 651 epo nl, Fax (+31-70) 340-3016 | Scarponi, U |

Formblatt PCT/ISA/210 (Blatt 2) (Juli 1992)

1

## INTERNATIONAL SEARCH REPORT

Information on patent family members

| | International Application No |
|---|---|
| | PCT/JP 94/00949 |

| Patent document cited in search report | Publication date | Patent family member(s) | Publication date |
|---|---|---|---|
| WO-A-9204013 | 19-03-92 | AU-A- 8395691 | 30-03-92 |
| EP-A-0334167 | 27-09-89 | DE-A- 3809764 | 05-10-89 |
| | | JP-A- 2006543 | 10-01-90 |
| | | US-A- 5230901 | 27-07-93 |
| WO-A-9011755 | 18-10-90 | DE-A- 3911069 | 11-10-90 |
| | | DE-D- 59004363 | 03-03-94 |
| | | EP-A- 0484331 | 13-05-92 |

Form PCT/ISA/210 (patent family annex) (July 1992)

PA 120

PCT/EP94/00949

## PATENT COOPERATION TREATY

**PCT**

NOTIFICATION CONCERNING
SUBMISSION OF PRIORITY DOCUMENTS

(PCT Administrative Instructions, Section 411)

From the INTERNATIONAL BUREAU

To:

KARG, Jochen
BASF Aktiengesellschaft
D-67056 Ludwigshafen
ALLEMAGNE

| | |
|---|---|
| Date of mailing:<br>27 April 1994 (27.04.94) | |
| Applicant's or agent's file reference:<br>0480/01123 | **IMPORTANT NOTIFICATION** |
| International application No.:<br>PCT/EP94/00949 | International filing date:<br>24 March 1994 (24.03.94) | Priority date:<br>03 April 1993 (03.04.93) |
| Applicant:   KNOLL AKTIENGESELLSCHAFT et al | |

The applicant is hereby notified of the date of receipt by the International Bureau of the priority document(s) relating to the
following application(s):

| Priority application No. | Priority date: | Priority country: | Date of receipt of priority document: |
|---|---|---|---|
| P 43 10 963.2/ | 03 Apr 1993 (03.04.93) | DE | 27 Apr 1994 (27.04.94) |

| | |
|---|---|
| The International Bureau of WIPO<br>34, chemin des Colombettes<br>1211 Geneva 20, Switzerland<br>Facsimile No.: (41-22) 740.14.35 | Authorised officer:<br><br>C. Combaz<br>Telephone No.: (41-22) 730.91.11 |

Form PCT/IB/304 (July 1992)

000427489

PA 121

WO 94/22434
PCT/EP94/00949

## PATENT COOPERATION TREATY

| PCT | From the INTERNATIONAL BUREAU |
|---|---|

| | To: |
|---|---|
| **NOTICE INFORMING THE APPLICANT OF THE COMMUNICATION OF THE INTERNATIONAL APPLICATION TO THE DESIGNATED OFFICES** <br><br> (PCT Rule 47.1(c), first sentence) | KARG, Jochen <br> BASF Aktiengesellschaft <br> D-67056 Ludwigshafen <br> ALLEMAGNE |

**Patentabteilung**
**2 4. OKT. 1994**

| Date of mailing (day/month/year) <br> 13 October 1994 (13.10.94) | |
|---|---|
| Applicant's or agent's file reference <br> 0480/01123 | **IMPORTANT NOTICE** |

| International application No. <br> PCT/EP94/00949 | International filing date <br> 24 March 1994 (24.03.94) | Priority date <br> 03 April 1993 (03.04.93) |
|---|---|---|

| Applicant |
|---|
| KNOLL AKTIENGESELLSCHAFT et al |

1. Notice is hereby given that the International Bureau has communicated, as provided in Article 20, the international application to the following designated Offices on the date indicated above as the date of mailing of this Notice:

    AU,BR,BY,CA,CN,CZ,EP,FI,HU,JP,KR,KZ,NO,NZ,PL,RU,UA,US

2. In accordance with Rule 47.1(c), third sentence, each designated Office will accept the present Notice as conclusive evidence that the communication of the international application has duly taken place on the date of mailing indicated above and no copy of the international application is required to be furnished by the applicant to the designated Offices.

3. Enclosed with this Notice is a copy of the international application as published by the International Bureau on

    13 October 1994 (13.10.94) under No. WO 94/22434

### REMINDER REGARDING CHAPTER II (Article 31(2)(a) and Rule 54.2)

If the applicant wishes to postpone entry into the national phase until 30 months (or later in some Offices) from the priority date, a demand for international preliminary examination must be filed with the competent International Preliminary Examining Authority before the expiration of 19 months from the priority date.

It is the applicant's sole responsibility to monitor the 19-month time limit.

Note that only an applicant who is a national or resident of a PCT Contracting State which is bound by Chapter II has the right to file a demand for international preliminary examination.

### REMINDER REGARDING ENTRY INTO THE NATIONAL PHASE (Article 22 or 39(1))

If the applicant wishes to proceed with the international application in the national phase, he must, within 20 months or 30 months, or later in some Offices, perform the acts referred to therein before each designated or elected Office.

For further important information on the time limits and acts to be performed for entering the national phase, see the Annex to Form PCT/IB/301 (Notification of Receipt of Record Copy) and Volume II of the PCT Applicant's Guide.

| The International Bureau of WIPO <br> 34, chemin des Colombettes <br> 1211 Geneva 20, Switzerland | Authorized officer: <br><br> J. Zahra |
|---|---|
| Facsimile No.: (41-22) 740.14.35 | Telephone No.: (41-22) 730.91.11 |

Form PCT/IB/308 (July 1992)

555985

PA 122

VERTRAG ÜBER DIE INTERNATIONALE ZUSAMMENARBEIT
AUF DEM GEBIET DES PATENTWESENS

# PCT

INTERNATIONALER VORLÄUFIGER PRÜFUNGSBERICHT

(Artikel 36 und Regel 70 PCT)

REC'D 2 8 FEB 1995
WIPO PCT

| Aktenzeichen des Anmelders oder Anwalts | WEITERES VORGEHEN | siehe Mitteilung über die Übersendung des internationalen vorläufigen Prüfungsberichts (Formblatt PCT/IPEA/416) |
|---|---|---|
| 0480/01123 | | |

| Internationales Aktenzeichen | Internationales Anmeldedatum *(Tag/Monat/Jahr)* | Prioritätsdatum *(Tag/Monat/Jahr)* |
|---|---|---|
| PCT/EP 94/ 00949 | 24/03/1994 | 03/04/1993 |

Internationale Patentklassifikation (IPK) oder nationale Klassifikation und IPK

A61K31/135

Anmelder

KNOLL AKTIENGESELLSCHAFT et al.

1. Der internationale vorläufige Prüfungsbericht wurde von der mit der internationalen vorläufigen Prüfung beauftragten Behörde erstellt und wird dem Anmelder gemäß Artikel 36 übermittelt.

2. Dieser BERICHT umfaßt insgesamt ___7___ Blätter einschließlich dieses Deckblatts.

   [X] Außerdem liegen dem Bericht ANLAGEN bei; dabei handelt es sich um Blätter mit Beschreibungen, Ansprüchen und/oder Zeichnungen, die geändert wurden und diesem Bericht zugrunde liegen, und/oder Blätter mit vor dieser Behörde vorgenommenen Berichtigungen (siehe Regel 70.16 und Abschnitt 607 der Verwaltungsrichtlinien zum PCT)

   Diese Anlagen umfassen insgesamt ___1___ Blätter.

3. Dieser Bericht enthält Angaben und die entsprechenden Seiten zu folgenden Punkten:

   I   [X] Grundlage des Berichts

   II  [ ] Priorität

   III [ ] Keine Erstellung eines Gutachtens über Neuheit, erfinderische Tätigkeit und gewerbliche Anwendbarkeit

   IV  [ ] Mangelnde Einheitlichkeit der Erfindung

   V   [X] Begründete Feststellung nach Artikel 35(2) hinsichtlich der Neuheit, der erfinderischen Tätigkeit und der gewerblichen Anwendbarkeit; Unterlagen und Erklärungen zur Stützung dieser Feststellung

   VI  [ ] Bestimmte angeführte Unterlagen

   VII [ ] Bestimmte Mängel der internationalen Anmeldung

   VIII [X] Bestimmte Bemerkungen zur internationalen Anmeldung

| Datum der Einreichung des Antrags | Datum der Fertigstellung dieses Berichts |
|---|---|
| 14/07/1994 | 24. 02. 95 |

| Name und Postanschrift der mit der internationalen vorläufigen Prüfung beauftragten Behörde | Bevollmächtigter Bediensteter |
|---|---|
| Europäisches Patentamt D-80298 München Tel. (+49-89) 2399-0, Tx: 523656 epmu d Fax: (+49-89) 2399-4465 | M. Steendijk Tel. - 8460 |

Formblatt PCT/IPEA/409 (Deckblatt)(Januar 1994)          (31/10/1994)

**INTERNATIONALER VORLÄUFIGER PRÜFUNGSBERICHT**

prnationales Aktenzeichen
PCT/EP94/00949

I. Grundlage des Berichts

1. Dieser Bericht wurde erstellt auf der Grundlage (Ersatzblätter, die dem Anmeldeant auf eine Aufforderung nach Artikel 14 hin vorgelegt wurden, gelten in Rahmen dieses Berichts als "ursprünglich eingereicht" und sind ihm nicht beigefügt, weil sie keine Änderungen enthalten.)

[ ] der internationalen Anmeldung in der ursprünglich eingereichten Fassung.

[x] der Beschreibung, Seite/n 1-11_____, in der ursprünglich eingereichten Fassung.
   Seite/n _____, eingereicht mit dem Antrag.
   Seite/n _____, eingereicht mit Schreiben von _____.
   Seite/n _____, eingereicht mit Schreiben von _____.

[x] der Ansprüche, Nr. 5, 6_____, in der ursprünglich eingereichten Fassung.
   Nr. _____, in der nach Artikel 19 geänderten Fassung.
   Nr. _____, eingereicht mit dem Antrag.
   Nr. 1-4_____, eingereicht mit Schreiben vom 8.2.95___.
   Nr. _____, eingereicht mit Schreiben von _____.

[x] der Zeichnungen, Blatt/Abb. 1/11-11/11_____, in der ursprünglich eingereichten Fassung.
   Blatt/Abb. _____, eingereicht mit dem Antrag.
   Blatt/Abb. _____, eingereicht mit Schreiben von _____.
   Blatt/Abb. _____, eingereicht mit Schreiben von _____.

2. Aufgrund der Änderungen sind folgende Unterlagen fortgefallen:
   [ ] Beschreibung: Seite _____.
   [ ] Ansprüche: Nr. _____.
   [ ] Zeichnungen: Blatt/Abb. _____.

3. [x] Dieser Bericht ist ohne Berücksichtigung (von einigen) der Änderungen erstellt worden, da diese aus den angegebenen Gründen nach Auffassung der Behörde über den Offenbarungsgehalt in der ursprünglich eingereichten Fassung hinausgehen (Regel 70.2 c)).

   In dem neuen Anspruch 1 is die Bedingung, daß die Wirk-

Formblatt PCT/IPEA/409 (Blatt 1) (Januar 1994)

PA 124

INTERNATIONALER VORLÄUFIGER PRÜFUNGSBERICHT      PCT/EP94/00949

stoffdichte höher als 1 ist, gestrichen worden.

Dieses Merkmal wurde in der ursprungliche Fassung der
Anmeldung als ein wesentliches Merkmal der Erfindung be-
schrieben (siehe die Beschreibung Seite 2, Zeilen 33-34,
in Zusammenhang mit Anspruch 1).

Die Streichung dieses essentiellen Merkmals stellt eine
Änderung dar, die den Anmeldungsgegenstand über den In-
halt der ursprünglich eingereichten Fassung hinaus er-
weitert.

Es wird in diesem Zusammenhang darauf hingewiesen, daß
die Bedingung der Wirkstoffdichte im Hinblick auf die
Dichte des Wirkstoffs und den Wirkstoffgehalt nur über-
flüssig wäre, wenn die Hilfsstoffe eine Dichte, die
gleich oder höher als die der Wirkstoff ist, hätten.

4. Etwaige zusätzliche Bemerkungen:

INTERNATIONALER VORLÄUFIGER PRÜFUNGSBERICHT

Internationales Aktenzeichen
PCT/EP94/00949

V. Begründete Feststellung nach Artikel 35(2) hinsichtlich der Neuheit, der erfinderischen Tätigkeit und der gewerblichen Anwendbarkeit; Unterlagen und Erläuterungen zur Stützung dieser Feststellung

1. FESTSTELLUNG

| | | |
|---|---|---|
| Neuheit | Ansprüche 1-6 | JA |
| | Ansprüche | NEIN |
| Erfinderische Tätigkeit | Ansprüche 1-6 | JA |
| | Ansprüche | NEIN |
| Gewerbliche Anwendbarkeit | Ansprüche 1-6 | JA |
| | Ansprüche | NEIN |

2. UNTERLAGEN UND ERLÄUTERUNGEN

1) Die vorliegende Anmeldung bezieht sich gemäß den Ansprüchen auf Retardmikrotabletten, die einer hoher Gehalt (über 81 %) an ß-Phenylpropionphenonderivat enthalten, und die die weiteren, in den Ansprüchen definierten vorteilhaften Eigenschaften besitzen.

2) Im Internationalen Recherchenbericht wurden die folgenden Dokumenten als Stand der Technik erwähnt:

D1 : WO-A-90 11755
D2 : EP-A-0 334 167
D3 : WO-A-92 04013.

Das Dokument D1 beschreibt Depotformen zur Verabreichung von ß-Phenylpropiophenonen, in denen dieser Wirkstoff in der Form von Einkristallen vorliegt. Es wird in diesem Dokument jedoch keine Mikrotabletten beschrieben

Das Dokument D2 beschreibt Depot-Arzneiformen, z.B zur Verabreichung von Propafenon HCl, enthaltend eines

INTERNATIONALER VORLÄUFIGER PRÜFUNGSBERICHT

Alginat und eines Polyacrylat. Es wird in diesem Dokument jedoch keine Mikrotabletten enthaltend eine hohe Konzentration (>80%) an ß-Phenylpropiophenonen beschrieben.

Das Dokument D3 beschreibt Mikrotabletten zur verzögerte Freisetzung des enthaltenen Wirkstoffes, worin der Wirkstoff in einem Matrix vorliegt. In diesem Dokument wird Propafenon als möglicher Wirkstoff erwähnt (Siehe Seite 7, Zeile 4). Dieses Dokument beschreibt jedoch nicht spezifisch Mikrotabletten enthaltend eine hohe Konzentration (>80%) an Wirkstoff, insbesondere an Propafenon, wie in der vorliegenden Anmeldung definiert worden ist. Der höchste Konzentration an Wirkstoff, die in diesem Dokument erwähnt wird, is nur ca. 77% und betrifft Ibuprofen (Beispiel I, Seite 8).

3) Wie aus der obenen Analyse des vorhandenen Standes der Technik hervorgeht, ist der Anspruchsgegenstand als neu hinsichtlich des bekanntgewordenen Standes der Technik zu betrachten.

Gemäß der Beschreibung der vorliegenden Anmeldung (Seite 2, Zeile 42 bis Seite 4, Zeile 2) ermöglicht die anspruchsgemäße Formulierung von ß-Phenylpropiophenonen in Mikrotabletten die Herstellung von Retardtablettformen ohne Verwendung von retardierende Hilfstoffe und ohne Probleme hinsichtlich Abrieb- und Bruchfestigkeit, wobei die Retardtabletten eine hohe Konzentration an Wirkstoff enthalten und die dazu eine ausgezeignete Wirkstofffreisetzung ermöglichen, die nicht die übliche Abhängigkeit vom Druck beim Pressen ausgesetzt ist und über einen großen Bereich vom pH praktisch unabhängig ist.

Im Hinblick auf diese Vorteile, die dem Fachmann überraschend erscheinen, ist auch die erfinderische Tätig-

INTERNATIONALER VORLÄUFIGER PRÜFUNGSBERICHT

Inte    tionales Aktenzeichen
PCT/EP94/00949

keit des neuen banspruchten Gegenstands anzuerkennen.

Die gewerbliche Anwendbarkeit des beanspruchten Gegen-
stands ist offenbar

Formblatt PCT/IPEA/409 (Blatt 5) (Januar 1994)

INTERNATIONALER VORLÄUFIGER PRÜFUNGSBERICHT

I    nationales Aktenzeichen
PCT/EP94/00949

VIII. Bestimmte Bemerkungen zur internationalen Anmeldung

Zur Klarheit der Patentansprüche, der Beschreibung und der Zeichnungen oder zu der Frage, ob die Ansprüche in vollen Umfang durch die Beschreibung gestützt werden, ist folgendes zu bemerken:

Im Anspruch 1 und in der Beschreibung auf Seite 3, Zeile 4, wird die Wirkstoffdichte der beanspruchten Tabletten als "höher als 1" definiert. Es wird bei diesem Wert jedoch nicht die Einheit, worauf dieser Wert sich bezieht beschrieben. Ohne Angabe dieser Einheit scheint dieser Wert jedoch nicht ausreichend bestimmt (Art. 6 PCT).

Formblatt PCT/IPEA/409 (Blatt 6) (Januar 1994)

0480/01123

12

Patentansprüche

1. Zylindrische Retardmikrotablette mit konvexer oder planer
   Ober- und Unterseite von ß-Phenylpropiophenonderivaten der
   Formel I als Wirkstoff



   I

mit R= n-Propyl oder 1,1-Dimethylpropyl und deren pharma-
kologisch unbedenklichen Salzen, dadurch gekennzeichnet, daß

   a) Höhe und Durchmesser unabhängig voneinander 1 bis 3 mm
      betragen,

   b) der Wirkstoffgehalt im Bereich von 81 bis 99,9 Gew.-%
      der Mikrotablette liegt, jedoch ohne Berücksichtigung
      des Gewichts eines gegebenenfalls vorhandenen Überzugs,

   c) im Paddle Modell nach USP bei 50 rpm nach 3 Stunden
      höchstens und nach 24 Stunden mindestens 80 % des Wirk-
      stoffs freigesetzt sind,

   d) die Freisetzungsgeschwindigkeit praktisch unabhängig vom
      Druck beim Pressen der Tabletten ist, und

   e) die Tablette keinen retardierenden Hilfsstoff, aber 0,1
      bis 5 Gew.-% eines Gleitmittels und 0 bis 18,9 Gew.-%
      anderer üblicher Hilfsstoffe enthält.

2. Tablette nach Anspruch 1, dadurch gekennzeichnet, daß sich in
   vivo ein ausgeprägtes Plasmaspiegelplateau mit einem PTF-Wert
   < 75 % ergibt und die Bioverfügbarkeit unabhängig von der
   eingenommenen Nahrung ist.

3. Tablette nach Anspruch 1 oder 2, dadurch gekennzeichnet, daß
   der Wirkstoff Propafenon-hydrochlorid ist.

4. Tablette nach einem der Ansprüche 1 bis 3, dadurch gekenn-
   zeichnet, daß Höhe und Durchmesser etwa gleich sind.

GEÄNDERTES BLATT

PCT/EP94/00949

# PATENT COOPERATION TREATY

## PCT

**NOTIFICATION OF ELECTION**

(PCT Rule 61.2)

From the INTERNATIONAL BUREAU

To:

United States Patent and Trademark Office
Washington, D.C.

*in its capacity as elected Office*

| | |
|---|---|
| Date of mailing:<br>17 August 1994 (17.08.94) | |
| International application No.:<br>PCT/EP94/00949 | Applicant's or agent's file reference:<br>0480/01123 |
| International filing date:<br>24 March 1994 (24.03.94) | Priority date:<br>03 April 1993 (03.04.93) |
| Applicant:<br>KOLTER, Karl et al | |

1.  The designated Office is hereby notified of its election made:

    [X] in the demand filed with the International Preliminary Examining Authority on:

    14 July 1994 (14.07.94)

    [ ] in a notice effecting later election filed with the International Bureau on:

2.  The election    [X] was

    [ ] was not

    made before the expiration of 19 months from the priority date or, where Rule 32 applies, within the time limit under Rule 32.2(b).

| | |
|---|---|
| The International Bureau of WIPO<br>34, chemin des Colombettes<br>1211 Geneva 20, Switzerland<br>Facsimile No.: (41-22) 740.14.35 | Authorized officer<br><br>A. Bardini<br>Telephone No.: (41-22) 740.61.11 |

Form PCT/IB/331 (July 1992)

PA 131

**PCT**

WORLD INTELLECTUAL PROPERTY ORGANIZATION
International Bureau



INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

| (51) International Patent Classification 5 : | | (11) International Publication Number: | WO 92/04013 |
|---|---|---|---|
| A61K 9/48, 9/20 | A1 | (43) International Publication Date: | 19 March 1992 (19.03.92) |

(21) International Application Number: PCT/EP91/01562

(22) International Filing Date: 15 August 1991 (15.08.91)

(30) Priority data:
21338A/90    30 August 1990 (30.08.90)    IT

(71) Applicant *(for all designated States except US)*: EURAND INTERNATIONAL SPA [IT/IT]; Via M de Vizzi, 60, I-20092 Cinisello Balsamo (IT).

(72) Inventors; and
(75) Inventors/Applicants *(for US only)* : BONGIOVANNI, Giovanni [IT/IT]; Via F Brunelleschi, 9, I-20046 Biassono (IT). CALANCHI, Massimo, Maria [IT/IT]; Via Catalafimi, 12, I-20052 Monza (IT). MARCONI, Marco, Giuseppe, Raffaele [IT/IT]; Via Aurora, 6, I-20092 Cinisello Balsamo (IT).

(74) Agents: PORTER, G., R. et al.; Wyeth Laboratories, Huntercombe Lane South, Taplow, Nr Maidenhead, Berkshire SL6 0PH (GB).

(81) Designated States: AT (European patent), AU, BE (European patent), CA, CH (European patent), DE (European patent), DK (European patent), ES (European patent), FR (European patent), GB (European patent), GR (European patent), IT (European patent), JP, KR, LU (European patent), NL (European patent), SE (European patent), SU⁺,US.

Published
*With international search report.*

(54) Title: MULTIPARTICULATE SUSTAINED RELEASE MATRIX SYSTEM

(57) Abstract

The present invention relates to an oral dosage system of pharmacologically active substances consisting of different small tablets, each having a prolonged and controlled release, filled into hard gelatin capsules. Specifically the small tablets have a hydrophilic matrix made of xanthan gum, alone or mixed with other hydrophilic polymers, by which the slow release of the drug along the gastro-intestinal tract is obtained.

* See back of page

13



**+ DESIGNATIONS OF "SU"**

Any designation of "SU" has effect in the Russian Federation. It is not yet known whether any such designation has effect in other States of the former Soviet Union.

*FOR THE PURPOSES OF INFORMATION ONLY*

Codes used to identify States party to the PCT on the front pages of pamphlets publishing international applications under the PCT.

| | | | | | |
|---|---|---|---|---|---|
| AT | Austria | ES | Spain | MG | Madagascar |
| AU | Australia | FI | Finland | ML | Mali |
| BB | Barbados | FR | France | MN | Mongolia |
| BE | Belgium | GA | Gabon | MR | Mauritania |
| BF | Burkina Faso | GB | United Kingdom | MW | Malawi |
| BG | Bulgaria | GN | Guinea | NL | Netherlands |
| BJ | Benin | GR | Greece | NO | Norway |
| BR | Brazil | HU | Hungary | PL | Poland |
| CA | Canada | IT | Italy | RO | Romania |
| CF | Central African Republic | JP | Japan | SD | Sudan |
| CG | Congo | KP | Democratic People's Republic | SE | Sweden |
| CH | Switzerland | | of Korea | SN | Senegal |
| CI | Côte d'Ivoire | KR | Republic of Korea | SU+ | Soviet Union |
| CM | Cameroon | LI | Liechtenstein | TD | Chad |
| CS | Czechoslovakia | LK | Sri Lanka | TG | Togo |
| DE | Germany | LU | Luxembourg | US | United States of America |
| DK | Denmark | MC | Monaco | | |

13

PA 133

WO 92/04013                                                    PCT/EP91/01562

# MULTIPARTICULATE SUSTAINED RELEASE MATRIX SYSTEM

The present invention relates to an oral dosage system of pharmacologically active substances consisting of different small tablets, each having a prolonged and controlled release, filled into hard gelatin capsules.

5     Hydrophilic matrix tablets consist fundamentally of a homogeneous mixture of the active medicament and one or more polymers which dissolve slowly in water.

## For Example:

10    US Patent No. 4,259,341 to Lowey, US Patent No. 3,870,790 to Lowey et al and US Patent No. 4,226,849 to Schor and US Patent No 4,357,469 to Schor concern the preparation of tablets with a hydrophilic matrix of hydroxypropylmethylcellulose, alone or mixed with other cellulose derivatives, which have undergone treatments,

15    that is forced dehydration, humidification, hydrolysis aned oxidation.

US Patent No. 4,369,172 and No. 4,389,393 to Schor et al which concern the use of one or more types and well-defined quantities of hydroxypropylcellulose alone

20    or mixed with methylcellulose and/or sodium carboxymethylcellulose.

US Patent No. 4,167,448 and No. 4,126,672 to Sheth et al which concern the use of hydroxypropylmethylcellulose for the preparation of

25    tablets and especially hydrophilic matrix capsules in such a form that they float in the digestive juices of the stomach.

PA 134

- 2 -

The article entitled "A Review of Celluiose Ethers in Hydrophylic Matrices for Oral Controlled-release Dosage Forms" by D.A. Alderman, published in Int.J.Pharm.Tech and Prod.Mfr., 5 (3) 1-9, 1984, describes extensively the use of hydroxypropylmethylcellulose to prepare controlled-release hydrophilic matrix and examines the influence of various parameters characteristic of hydroxypropylmethylcellulose, such as molecular weight, degree of substitution; granulometric distribution, hydration velocity, on the release of the active medicament.

The EURO PCT Patent Application EP 261.213 (WO 87/5212) (corresponding to Italian Patent application No. 19 675 A/86) discloses hydrophilic matrix tablets in which the matrix consists of Xanthan Gum alone or in a mixtrue (50% maximum) with hydrophilic cellulose polymers such as hydroxypropylmethylcellulose and hydroxypropylcellulose.

The advantage of these large matrix polymers is their low cost, but they have various disadvantages since they tend to adhere to the stomach and intestinal walls, causing irritation of the mucosa and irregular absorption of the active medicament.

These disadvantages are overcome by the multiparticulate form as spherules composed of active medicament coated with a polymeric membrane which delays the dissolution. These spherules of controlled-release medicament are filled into hard gelatin capsules which, when ingested, dissolve to release the tens and sometimes hundreds of spherules which disperse along the gastro-intestinal tract, thus

13

- 3 -

avoiding a high local concentration of the active medicament.

With this multiparticulate form the following advantages are obtained: a more reproducible release; an improved gastro-intestinal tolerance; a more uniform concentration of the active medicament in the blood without "peaks", which often cause negative side effects, and therefore a greater acceptability for the patient. However, the methods of producing the small sustained-release spheres are very long and complex and therefore expensive. In addition the dimensions of the spherules are not equal, but since they are distributed in a large range the release of single spherules, after coating with the delaying membrane, will not be homogeneous either.

These disadvantages can be overcome by preparing the tablets with a matrix of small dimensions (also called minitablets) to fill hard gelatin capsules, so obtaining a multiparticulate form.

The production of small hydrophilic matrix tablets however is not very easy and presents two main problems. The first is due to the fact that the small dimensions, the permeability and the solubility of the polymers utilized for the hydrophilic matrix preparation do not permit to delay sufficiently the dissolution of the active medicament.

The second is due to the fact that the minitablets form gelatinous layer and stick together on contact with the gastro-intestinal juices. In fact when the gelatin capsule is ingested and dissolves, the polymer

13

WO 92/04013

PCT/EP91/01562

- 4 -

constituent of the minitablet matrix hydrates and forms a gelatinous layer. The single units stick together giving rise to a single mass which proceeds along the gastro-intestinal tract like a single large tablet so cancelling out the desired advantages of the multiparticulate form.

G.B. Patent No 2,176,999 managed to get around the first of these problems by the addition of an ionic substance to the minitablet formulation, in addition to the hydroxylalkylcellulose ethers, with a large opposite to that of the active medicament, preferably an ionic exchange resin, with the function of delaying the release of the active medicament as specified in the text of the patent and as known (see for example European Patent Appln. 0294103 A of Muneo Nonomura et al).

The object of the present invention are small hydrophilic matrix tablets which are not only slow-releasing but also do not aggregate when hydrated.

In fact we have discovered, very surprisingly, that if natural xanthan gum is used as the hydrophilic matrix, minitablets with the above-mentioned characteristics are obtained.

Once put in the capsule, these minitabs permit the administration of an economical controlled-release multiparticulate form and the units remain in single entities along the gastro-intestinal tract.

According to the invention there is provided a

PA 137

- 5 -

.nd forms
together
long the
ablet so
of the

und the
.n ionic
ition to
large
eferably
ielaying
fied in
example
mura et

small
: only
drated.

:hat if
matrix,
ristics

it the
:elease
single

pharmaceutical dosage form comprising a hard gelatin capsule containing a multiplicity of minitablets providing prolonged and regular release of the active ingredient, said tablets comprising one or more active

5     medicaments contained within a matrix which provides a sustained release effect, the matrix consisting essentially of xanthan gum or a mixture of xanthan gum and one or more natural or synthetic polymers, which hydrate and dissolve in water or gastric juices.

10    The present invention concerns the preparation of controlled-release minitablets obtained by compression of an active medicament, xanthan gum and possible other inert excipients commonly utilized for the production of tablets such as lubricants, fillers and flowing

15    agents.
We have found, very surprisingly, that if xanthan gum is used as a hydrophilic matrix, the release of the active medicament is slowed down. Moreover when the polymer is hydrated giving rise to the formation of a

20    superficial gelatinous layer the single units do not stick together therefore maintaining all the advantages of multiparticulate form.

The xanthan gum is a natural polymer with a high molecular weight or more specifically a

25    biopolysaccharide, fermentation product of the microorganism Xanthomonas campestris. The structure, the molecular weight, and the dissolution properties of this polymer are constant and reproducible in strictly controlled working conditions.

30    Xanthan gum is used in numerous fields including the pharmaceutical, cosmetic and food industries. In these

WO 92/0401~                                                PCT/EP91/01562

- 6 -

cases the thickening and stabilizing properties of emulsions or suspensions given by xanthan gum in solution are made use of.

5     With the present invention we found that it is possible to make use of xanthan gum's properties also in solid forms of medicament, using it for the preparation of the hydrophilic matrix in which xanthan gum has a retarding effect on the dissolution of the medicament.

10    The matrix can consist of xanthan gum only or as a mixture of xanthan gum always being 50% or higher with respect to the polymer.

The delaying matrix is mixed in suitable apparatus with the desired active medicament or even medicaments to be administered in a sustained-release formulation. Among
15    the active medicaments we cite as an illustrative, but not restrictive, example adrenergicamines (ethylephrine, phenylephrine, phenylpropanolamine, d-pseudoephendrin), antispasmodics (scopolamine, and other alkaloids of belladonna, papaverine and
20    derivatives), antihistamines (broncopheniramine, chlorpheniramine, diphenylpiraline, dimenhydr(in)ate), anorexics (norpsuedoephedrin, fentermine, diethylpropion, flenfuramine), antiasthmatics (theophylline, salbutamol, terbutaline), antianginous
25    (isosorbide-5-mononitrate, isosorbide dinitrate, pentaerythritol tetranitrate, nitroglycerin, nifedipin, diltiazem), anti-inflammatory and antipyretics (indomethacin, ibuprofen, ketoprofen, aspirin, paracetamol, phenacetin), antihypertensives
30    (nifedipin, idralazin, prazosin, verapamil), antidepressives (amitriptyline, lithium salts,

PA 139

- 7 -

antitussive (destromethorphan, noscapine, codeine), gastroenteric (cimetidine, ranitidine, metoclopramide) antiarrhythmic (procainamide, lidocaine, flecainide, propafenone), analgesics (morphine), vitamins (ascorbic acid) and their salts used in the pharmaceutical field.

Apart from polymers and medicaments, inert excipients commonly used by experts in the art may be present in the formulation, in order to improve its characteristics.

For example in the preparation of minitablets, lubricants, inert excipients, etc. can be added to improve the flowability of the powder, the appearance, the precision of the dose.

The quantity of matrix used to delay the release of the active medicament can vary widely depending on whether the formulation consists only of active medicament and matrix or if there are other excipients present, in various quantities according to whether the active medicament is very or not very soluble and whether the dose is high or low.

The minitablets are produced using the usual tabletting machines as for example the Ronchi rotary type AM13 equipped with punches and matrices adapted in order to obtain minitablets with a diameter less than 4 mm and preferably between 2 - 2.5 mm.

The invention also includes a method for the preparation of a pharmaceutical dosage form which method comprises mixing an active medicament with xanthan gum or a mixture of xanthan gum and one or more

WO 92/04013

PCT/EP91/01562

– 8 –

natural or synthetic polymers, which hydrate and dissolve in water or gastro-intestinal juices, forming the mixture into minitablets, filling the minitablets into hard gelatin capsules so that each capsule contains a multiplicity of minitablets, the xanthan gum or xantham gum mixture providing a matrix from which in use the active medicament has a prolonged and regular release.

The following examples which serve to better illustrate the invention must not be considered in any way as restrictive of the scope of the present invention and possible variations are obvious for experts in this field.

EXAMPLE 1

A)    Preparation of the Mixture

Transfer the following raw materials, previously sieved through a 0.5 mm sieve, in a stainless steel laboratory cube mixer

| | |
|---|---|
| ibuprofen | 219.0g |
| xanthan gum | 45.0g |
| cornstarch | 12.0g |
| glyceryl behenate | 4.5g |
| magnesium stearate | 4.5g |

mix for about 15 minutes.

B)    Preparation of the Minitablets

The mixture obtained from A) is compressed with a tabletting machine, model Ronchi AM13 equipped with

13

- 9 -

punchers (diameter 2 mm, bending radius 3 mm) giving minitablets with an average weight of 9.2 mg and each containing 6 mg of ibuprofen.

C)   Preparation of the Final Pharmaceutical Form

5    Utilizing hard gelatin capsules, type Coni Snap Supro-A, 34 of the small tablets produced in B were introduced into each capsule with a suitable capsule filling machine.

Each capsule contains 200 mg of ibuprofen.

10   D)   Analysis

The minitablets were analysed with the rotating paddle method described in the current edition of the US Pharmacopoeia (USP) using 900 ml of artificial intestinal juice with pH 6.8 and a rotation speed of 50
15   rpm.

% Release

-after 1 hour:  27.0
-after 2 hours: 44.4
-after 3 hours: 59.7
20   -after 4 hours: 73.0
-after 5 hours: 85.1
-after 6 hours: 94.5

EXAMPLE 2

A)   Preparation of the mixture

WO 92/04013                                      PCT/EP91/01562

- 10 -

Transfer 2550 g of sodium diclofenac into a laboratory blender and blend with 570 g of a solution of 15% hydroxypropylcellulose in 95% alcohol.

5    Granulate the paste obtained through a 1200 µm mesh screen and subsequently through 800 µm and 700 µm mesh screens.

The granules are dried at about 40° C for 12-15 hours in a circulating air oven and selected between 300 and 700 µm.

10   The following materials are transferred in a double cone shaped laboratory mixer:

| | |
|---|---|
| granulated sodium diclofenac (300-700 µm) | 800.0g |
| xanthan gum | 1140.0g |
| silicon dioxide | 20.0g |
| magnesium stearate | 40.0g |

15   mix for about 15 minutes.

B)    Preparation of the Minitablets

The mixture obtained from A) is compressed with a tabletting machine, model Ronchi AM13 equipped with 20   punchers (diameter 2mm, bending radius 3mm) giving minitablets with an average weight of 7.7 mg and each containing 2.9 mg of diclofenac.

C)    Preparation of the Final Pharmaceutical Form

Utilizing hard gelatin capsules, type Snap Fit size 25   1,35 of the small tablets produced in B were introduced into each capsule with a suitable capsule filling machine.

11

PA 143

- 11 -

Each capsule contains 100 mg of sodium diclofenac.

D)    Analysis

The minitablets were analysed with the rotating paddle method described in the current edition of the US Pharmacopoeia (USP) using 900 ml of artificial intestinal juice with pH 6.8 and a rotation speed of 50 rpm.

% Release
    -after 1 hour:  30.2
    -after 2 hours: 52.9
    -after 3 hours: 65.1
    -after 4 hours: 72.6
    -after 6 hours: 99.0


EXAMPLE 3

A)    Preparation of the Mixture

Transfer the following raw materials, previously sieved through a 0.5 mm sieve, in a stainless steel laboratory cube mixer

| | |
|---|---|
| granulate theophylline (200-400 μm) | 108.7g |
| xanthan gum | 14.5g |
| hydroxypropylmethylcellulose | 44.5g |
| silicone dioxide | 0.9g |
| magnesium stearate | 1.4g |
| Mix for about 15 minutes | |

B)    Preparation of the Minitablets

PA 144

WO 92/04013                                            PCT/EP91/01562

- 12 -

The mixture obtained from A) is compressed with a compressing machine, model Ronchi AM13 equipped with punchers (diameter 2 mm, bending radius 3 mm) giving minitabs with an average weight of 8.1 mg and each
5   containing 4.4 mg of theophylline.

C)   Preparation of the Final Pharmaceutical Form

Utilizing hard gelatin capsules, type Coni Snap Fit size 0,45 of the small tablets produced in B were introduced into each capsule with a suitable filling
10  machine.

Each capsule contains 200 mg of theophylline.

D)   Analysis

The minitablets were analyzed with the rotating paddle method described in the current edition of the US
15  Pharmacopoeia (USP) using 900 ml of artificial intestinal juice with pH 7.5 and a rotation speed of 50 rpm.

% Release
        -after 1 hour:  43.5
20      -after 2 hours: 68.9
        -after 3 hours: 99.0

The minitablets were analyzed as described above using 900ml of artificial gastric juice with pH 1.2

% Release
25      -after 1 hour:  53.9
        -after 2 hours: 77.7
        -after 4 hours: 100

13

PA 145

WO 92/04013                                    PCT/EP91/01562

– 13 –

CLAIMS

1.   A pharmaceutical dosage form comprising a hard gelatin capsule containing a multiplicity of minitablets providing prolonged and regular release of the active ingredient, said tablets comprising one or more active medicaments contained within a matrix which provides a sustained release effect, the matrix consisting essentially of xanthan gum or a mixture of xanthan gum and one or more natural or synthetic polymers, which hydrate and dissolve in water or gastric juices.

2.   A pharmaceutical dosage form as claimed in Claim 1, wherein the matrix comprises at least 50% of xanthan gum.

3.   A pharmaceutical dosage form as claimed in Claim 1 or Claim 2, wherein the matrix consists essentially of xanthan gum and one or both of hydroxypropylcellulose or hydroxypropylmethylcellulose .

4.   A pharmaceutical dosage form as claimed in any one of the preceding Claims wherein the minitablets also contain conventional inert excipients.

5.   A pharmaceutical dosage form as claimed in any one of the preceding claims wherein the active medicament is ibuprofen; theophylline or sodium diclofenac .

6.   A pharmaceutcal dosage form as claimed in any one of the preceding Claims wherein the capsule contains from 30 – 50 minitablets.

7.   A method for the preparation of a pharmaceutical

WO 92/04013

PCT/EP91/01562

- 14 -

dosage form which method comprises mixing an active medicament with xanthan gum or a mixture of xanthan gum and one or more natural or synthetic polymers, which hydrate and dissolve in water or gastro-intestinal juices, forming the mixture into minitablets, filling the minitablets into hard gelatin capsules so that each capsule contains a multiplicity of minitablets, the xanthan gum or xantham gum mixture providing a matrix from which in use the active medicament has a prolonged and regular release.

8.   A method as claimed in Claim 7, wherein the dosage form is as claimed in any one of Claims 1 - 6.

9.   A pharmaceutical dosage form as claimed in Claim 1, substantially as hereinbefore described in any one of Examples 1 - 3.

13

PA 147

# INTERNATIONAL SEARCH REPORT

International Application No | PCT/EP 91/01562

91562

| I. CLASSIFICATION OF SUBJECT ... TER (if several classification symbols apply, indicate all) |
|---|
| According to International Patent Classification (IPC) or to both National Classification and IPC |
| Int.Cl.5    A 61 K    9/48 ·  A 61 K    9/20 |

| II. FIELDS SEARCHED |
|---|
| Minimum Documentation Searched² |

| Classification System | Classification Symbols |
|---|---|
| Int.Cl.5 | A 61 K |

| Documentation Searched other than Minimum Documentation<br>to the Extent that such Documents are Included in the Fields Searched⁸ |
|---|
|  |

| III. DOCUMENTS CONSIDERED TO BE RELEVANT⁹ | | |
|---|---|---|
| Category* | Citation of Document, ¹¹ with indication, where appropriate, of the relevant passages¹² | Relevant to Claim No.¹³ |
| X | GB,A,2176999  (THE UNIVERSITY OF NOTTINGHAM) 14 January 1987, see claims 1,7-9; page 1, lines 58-108; page 2, lines 41-45; page 3, lines 32-37 (cited in the application) | 1,3,4,6 -9 |
| Y | --- | 2,5 |
| Y | EP,A,0234670 (THE BOOTS CO. PLC) 2 September 1987, see claims 1-3,7,9,15; page 15; example 1 | 2,5 |

° Special categories of cited documents : ¹⁰

"A" document defining the general state of the art which is not considered to be of particular relevance

"E" earlier document but published on or after the international filing date

"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

"O" document referring to an oral disclosure, use, exhibition or other means

"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step

"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art.

"&" document member of the same patent family

| IV. CERTIFICATION | |
|---|---|
| Date of the Actual Completion of the International Search | Date of Mailing of this International Search Report |
| 17-10-1991 | 1 9 NOV 1991 |
| International Searching Authority | Signature of Authorized Officer |
| EUROPEAN PATENT OFFICE | Mme N. KUIPER |

Form PCT/ISA/210 (second sheet) (January 1985)

ANNEX TO THE INTERNATIONAL SEARCH REPORT
ON INTERNATIONAL PATENT APPLICATION NO.

EP 9101562
SA    50208

This annex lists the patent family members relating to the patent documents cited in the above-mentioned international search report.
The members are as contained in the European Patent Office EDP file on 06/11/91
The European Patent Office is in no way liable for these particulars which are merely given for the purpose of information.

| Patent document cited in search report | Publication date | Patent family member(s) | Publication date |
|---|---|---|---|
| GB-A- 2176999 | 14-01-87 | None | |
| EP-A- 0234670 | 02-09-87 | AU-B- 608208 | 28-03-91 |
| | | AU-A- 6762587 | 23-07-87 |
| | | JP-A- 62181227 | 08-08-87 |

For more details about this annex : see Official Journal of the European Patent Office, No. 12/82

13

PA 149

EP0184331

**PCT**

WELTORGANISATION FÜR GEISTIGES EIGENTUM
Internationales Büro

INTERNATIONALE ANMELDUNG VERÖFFENTLICHT NACH DEM VERTRAG ÜBER DIE
INTERNATIONALE ZUSAMMENARBEIT AUF DEM GEBIET DES PATENTWESENS (PCT)

| (51) Internationale Patentklassifikation 5 : | | (11) Internationale Veröffentlichungsnummer: . WO 90/11755 |
| A61K 9/16, C30B 29/54 C07C 217/36 | A1 | (43) Internationales Veröffentlichungsdatum: 18. Oktober 1990 (18.10.90) |

(21) Internationales Aktenzeichen: PCT/EP90/00529

(22) Internationales Anmeldedatum: 4. April 1990 (04.04.90)

(30) Prioritätsdaten:
P 39 11 069.9     6. April 1989 (06.04.89)     DE

(71) Anmelder (für alle Bestimmungsstaaten ausser US): KNOLL AKTIENGESELLSCHAFT [DE/DE]; Knollstrasse, D-6700 Ludwigshafen (DE).

(72) Erfinder: und
(75) Erfinder/Anmelder (nur für US) : FRICKE, Helmut [DE/DE]; Pfalzring 159, D-6704 Mutterstadt (DE). MOEST, Thomas [DE/DE]; An der Duene 9, D-2082 Moorrege (DE). BUEHLER, Volker [DE/DE]; Liebigstrasse 2, D-7500 Karlsruhe (DE). MUELLER-PELTZER, Herbert [DE/DE]; Uferstrasse 36, D-6900 Heidelberg (DE).

(74) Anwalt: KARAU, Wolfgang; BASF Aktiengesellschaft, Carl-Bosch-Straße 38, D-6700 Ludwigshafen (DE).

(81) Bestimmungsstaaten: AT (europäisches Patent), BE (euro-
+ päisches Patent), CA, CH (europäisches Patent), DE (europäisches Patent), DK (europäisches Patent), ES (europäisches Patent), FR (europäisches Patent), GB (europäisches Patent), IT (europäisches Patent), JP, LU (europäisches Patent), NL (europäisches Patent), SE (europäisches Patent), US.

Veröffentlicht
*Mit internationalem Recherchenbericht.*
*Vor Ablauf der für Änderungen der Ansprüche zugelassenen Frist. Veröffentlichung wird wiederholt falls Änderungen eintreffen.*

(54) Title: MONOCRYSTALS OF β-PHENYLPROPIOPHENONES

(54) Bezeichnung: EINKRISTALLE VON β-PHENYLPROPIOPHENONEN

(57) Abstract

Monocrystals of β-phenylpropiophenones and their use in the manufacture of long-acting drugs are described.

(57) Zusammenfassung

Es werden Einkristalle von β-Phenylpropiophenonen und deren Verwendung zur Herstellung von Depotformen beschrieben.

+ Siehe Rückseite

# EXHIBIT 2- PART 2

### BENENNUNGEN VON "DE"

Bis auf weiteres hat jede Benennung von "DE" in einer internationalen Anmeldung, deren internationaler Anmeldetag vor dem 3. Oktober 1990 liegt, Wirkung im Gebiet der Bundesrepublik Deutschland mit Ausnahme des Gebietes der früheren DDR.

---

### *LEDIGLICH ZUR INFORMATION*

Code, die zur Identifizierung von PCT-Vertragsstaaten auf den Kopfbögen der Schriften, die internationale Anmeldungen gemäss dem PCT veröffentlichen.

| | | | | | |
|---|---|---|---|---|---|
| AT | Österreich | ES | ·Spanien | ML | Mali |
| AU | Australien | FI | Finnland | MR | Mauritanien |
| BB | Barbados | FR | Frankreich | MW | Malawi |
| BE | Belgien | GA | Gabon | NL | Niederlande |
| BF | Burkina Faso | GB | Vereinigtes Königreich | NO | Norwegen |
| BG | Bulgarien | HU | Ungarn | RO | Rumänien |
| BJ | Benin | IT | Italien | SD | Sudan |
| BR | Brasilien | JP | Japan | SE | Schweden |
| CA | Kanada | KP | Demokratische Volksrepublik Korea | SN | Senegal |
| CF | Zentrale Afrikanische Republik | KR | Republik Korea | SU | Soviet Union |
| CG | Kongo | LI | Liechtenstein | TD | Tschad |
| CH | Schweiz | LK | Sri Lanka | TG | Togo |
| CM | Kamerun | LU | Luxemburg | US | Vereinigte Staaten von Amerika |
| DE | Deutschland, Bundesrepublik | MC | Monaco | | |
| DK | Dänemark | MG | Madagaskar | | |

PA 151

WO 90/11755                                                    PCT/EP90/00529

1

Einkristalle von β-Phenylpropiophenonen

Beschreibung

5 Die vorliegende Erfindung betrifft Einkristalle von β-Phenylpropiophenonen
sowie deren Verwendung zur Herstellung von Depotformen.

Propafenon (I, R = -CH$_2$-CH$_2$-CH$_3$) ist ein pharmazeutischer Wirkstoff, der
gegen Arrythmien eingesetzt wird. Obwohl dieser Wirkstoff schon längere
10 Zeit verwendet wird, existiert bislang keine Depot-Arzneiform mit diesem
Wirkstoff. Auch für die entsprechende 1,1-Dimethylpropyl-Verbindung
existiert bislang keine Depotform.

Aus der Pharmazeutischen-Zeitung Nr. 48, Seite 9 (01.12.88) ist es be-
15 kannt, daß man durch Bildung von Makrokristallen eine langsame Wirkstoff-
auflösung erreichen kann. Wie aber am Beispiel des Nitrofurantoins gezeigt
wurde, läßt sich durch die Applikation von Kristallen lediglich das
Auftreten einer Konzentrationsspitze verhindern, nicht aber eine Depotform
erhalten, die einen deutlich späteren maximalen Blutspiegel hervorruft.
20

Es wurde nun gefunden, daß sich bestimmte Einkristalle von β-Phenylpropio-
phenonen gut zur Herstellung von Depotpräparaten mit wunschgemäßen Blut-
spiegeln eignen.

25 Gegenstand der Erfindung sind Einkristalle von β-Phenylpropiophenonen der
Formel I

$$\langle\!\!\langle\ \rangle\!\!\rangle - CH_2 - CH_2 - CO - \langle\!\!\langle\ \rangle\!\!\rangle \overset{O-CH_2-CHOH-CH_2-NH-R}{} \qquad I,$$

worin R der Rest -CH$_2$-CH$_2$-CH$_3$ oder -C(CH$_3$)$_2$-CH$_2$-CH$_3$ ist, deren Volumen im
Bereich von 0,004 bis 1,2 mm$^3$ liegt. Vorzugsweise haben die Einkristalle
30 ein Volumen von 0,1 bis 0,6 mm$^3$.

Gegenstand der Erfindung ist weiter die Verwendung der oben genannten
Einkristalle zur Herstellung von Depotpräparaten.

35 Die Einkristalle der Verbindungen I lassen sich nach bekannten Methoden
herstellen. Bevorzugt sind sphärische Kristalle, weil sich solche
Kristalle besser für die Verarbeitung zu abgeteilten Arzneiformen eignen.
Man erhält solche Kristalle nach den in der EP-OS 119 480 angegebenen
Verfahren.
40

PA 152

2

Zur Herstellung einer Applikationsform werden die Einkristalle vorzugs-
weise in eine Kapsel gefüllt. Man kann die Einkristalle aber auch in
üblicher Weise zu Dragées oder Tabletten verarbeiten.

5 Mit Hilfe der Einkristalle ist es möglich, den Plasmaspiegel über einen
längeren Zeitraum praktisch konstant zu halten, obwohl die Substanzen nur
2 x täglich appliziert werden. Das gilt insbesondere für das Propafenon.
Der Retardeffekt beruht ausschließlich auf dem physikalischen Vorgang des
zeitabhängigen Auflösens der Kristalle.
10
Beispiel 1

In einem handelsüblichen 50-l-Rührkessel mit Schrägblattrührer, Doppel-
mantel und Stromstörer wurden 40 l einer auf 65°C erwärmten, gesättigten
15 Lösung von Propafenonhydrochlorid in Methanol intensiv gerührt.

Nach Zugabe von 350 g Propafenonhydrochlorid-Kristallkeimen mit einer
Korngröße von 100 – 200 $\mu$m ließ man langsam mit einer Kühlrate von 4 K/h
unter stetigem Rühren mit einer Drehzahl von n = 100 min$^{-1}$ auf 20°C
20 abkühlen.

Das entstandene Kristallisat wurde in wenig kaltem Methanol aufgenommen,
sofort über eine Nutsche abgesaugt, mit wenig kaltem Methanol nach-
gewaschen und im Vakuumtrockenschrank bei 50°C und 250 – 400 mbar
25 getrocknet.

Das Produkt bestand aus farblosen sphärischen Kristallen mit einem
Korngrößenbereich von 0,4 – 1,2 mm, wobei ein ausgeprägtes Maximum der
Häufigkeitsverteilung im Bereich 0,6 – 0,8 mm, entsprechend einem
30 Kornvolumenbereich von 0,11 – 0,27 mm$^3$, lag.

Beispiel 2

In der Apparatur gemäß Beispiel 1 wurde die gesättigte methanolische
35 Propafenonhydrochlorid-Lösung mit einer Kühlrate von 10 K/h unter stetigem
Rühren mit einer Drehzahl von n = 100 min$^{-1}$ ohne Impfkristallzugabe auf
20°C abgekühlt. Das entstandene Kristallisat wurde gemäß Beispiel 1
abgetrennt und getrocknet.

40 Das Produkt bestand aus farblosen, mikroskopisch erkennbar gerundeten
Kristallen mit einem Korngrößenbereich von 100 – 600 $\mu$m, wobei ein Maximum
der Häufigkeitsverteilung im Bereich von 0,2 – 0,4 mm, entsprechend einem
Kornvolumenbereich von 0,004 – 0,034 mm$^3$, lag.

13

3

Beispiel 3

In einem handelsüblichen 50-l-Rührkessel mit Schrägblattrührer und Doppel-
mantel wurden 40 l einer auf 65°C erwärmten, gesättigten Lösung von
5  Propafenonhydrochlorid in Methanol intensiv gerührt und mit einer Abkühl-
rate von 20 K/h unter stetigem Rühren mit einer Drehzahl von $n = 60\ min^{-1}$
auf 20°C abgekühlt. Das entstandene Kristallisat wurde gemäß Beispiel 1
abgetrennt und getrocknet.

10  Das Produkt bestand aus farblosen bis weißlich schimmernden kantigen
Plättchen mit einer Korngrößenverteilung von 0,1 - 2,0 mm mit einem
breiten Maximum der Häufigkeitsverteilung im Bereich 0,5 - 1,2 mm.

15.

20

25

30

35

40

4

Patentansprüche

1. Einkristalle von β-Phenylpropiophenonen der Formel I

$$\bigcirc\!\!-CH_2\!-\!CH_2\!-\!CO\!-\!\bigcirc\overset{O-CH_2-CHOH-CH_2-NH-R}{} \qquad I,$$

5    worin R der Rest $-CH_2-CH_2-CH_3$ oder $-C(CH_3)_2-CH_2-CH_3$ ist, deren Volumen im Bereich von 0,004 bis 1,2 mm³ liegt.

2. Einkristalle des Propafenons gemäß Anspruch 1.

10  3. Einkristalle gemäß Anspruch 1, deren Volumen im Bereich von 0,1 bis 0,6 mm³ liegt.

4. Verwendung der Einkristalle gemäß Anspruch 1 zur Herstellung von Depotpräparaten.

15

5. Verfahren zur Herstellung von Depotpräparaten, wobei man Einkristalle von β-Phenylpropiophenonen der Formel I nach Anspruch 1 in Kapseln füllt oder in üblicher Weise zu Dragees oder Tabletten verarbeitet.

20  6. Verfahren zur Herstellung von Depotpräparaten, wobei man Einkristalle von Propafenon nach Anspruch 1 in Kapseln füllt oder in üblicher Weise zu Dragees oder Tabletten verarbeitet.

25

30

35

40

13

9

# INTERNATIONAL SEARCH REPORT

International Application No PCT/EP 90/00529

## I. CLASSIFICATION OF SUBJECT MATTER (if several classification symbols apply, indicate all) [6]

According to International Patent Classification (IPC) or to both National Classification and IPC

Int. Cl.[5] A 61 K 9/16, C 30 B 29/54, C 07 C 217/36

## II. FIELDS SEARCHED

| Minimum Documentation Searched [7] | |
|---|---|
| Classification System | Classification Symbols |
| Int. Cl.[5] | A 61 K, C 30 B, C 07 C |

Documentation Searched other than Minimum Documentation
to the Extent that such Documents are Included in the Fields Searched [8]

## III. DOCUMENTS CONSIDERED TO BE RELEVANT [9]

| Category * | Citation of Document, [11] with indication, where appropriate, of the relevant passages [12] | Relevant to Claim No. [13] |
|---|---|---|
| A | DE, A, 2001431 (HELOPHARM) 15 July 1971 | |
| A | EP, A, 0119480 (BASF AG) 26 September 1984 (cited in the application) | |
| A | WO, A, 83/00688 (HELOPHARM) 3 March 1983 | |

---

\* Special categories of cited documents: [10]

"A" document defining the general state of the art which is not considered to be of particular relevance

"E" earlier document but published on or after the international filing date

"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

"O" document referring to an oral disclosure, use, exhibition or other means

"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step

"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art.

"&" document member of the same patent family

## IV. CERTIFICATION

| Date of the Actual Completion of the International Search | Date of Mailing of this International Search Report |
|---|---|
| 2 July 1990 (02.07.90) | 29 August 1990 (29.08.90) |
| International Searching Authority | Signature of Authorized Officer |
| European Patent Office | |

Form PCT/ISA/210 (second sheet) (January 1985)

13

13

PA 156

### ANNEX TO THE INTERNATIONAL SEARCH REPORT
### ON INTERNATIONAL PATENT APPLICATION NO.

EP 9000529
SA   35792

This annex lists the patent family members relating to the patent documents cited in the above-mentioned international search report.
The members are as contained in the European Patent Office EDP file on 20/08/90.
The European Patent Office is in no way liable for these particulars which are merely given for the purpose of information.

| Patent document cited in search report | Publication date | Patent family member(s) | | Publication date |
|---|---|---|---|---|
| DE-A- 2001431 | 15-07-71 | AT-A,B | 308076 | 15-05-73 |
| | | BE-A- | 785318 | 16-10-72 |
| | | FR-A,B | 2144601 | 16-02-73 |
| | | GB-A- | 1307455 | 21-02-73 |
| | | NL-A- | 7208214 | 18-12-73 |
| EP-A= 0119480 | 26-09-84 | DE-A- | 3306250 | 23-08-84 |
| | | AU-B- | 561079 | 30-04-87 |
| | | AU-A- | 2484384 | 30-08-84 |
| | | CA-A- | 1220421 | 14-04-87 |
| | | JP-A- | 59182290 | 17-10-84 |
| | | US-A- | 4632843 | 30-12-86 |
| WO-A- 8300688 | 03-03-83 | DE-A,C | 3133814 | 10-03-83 |
| | | AT-T- | E8129 | 15-07-84 |
| | | AU-A- | 8711382 | 03-03-83 |
| | | CA-A- | 1192224 | 20-08-85 |
| | | EP-A,B | 0074014 | 16-03-83 |
| | | JP-T- | 58501324 | 11-08-83 |
| | | SU-A- | 1331424 | 15-08-87 |
| | | US-A- | 4460605 | 17-07-84 |

For more details about this annex : see Official Journal of the European Patent Office, No. 12/82

13

INTERNATIONALER RECHERCHENBERICHT

Internationales Aktenzeichen PCT/EP 90/00529

29
5792

report.

| I. KLASSIFIKATION DES ANMELDUNGSGEGENSTANDS (bei mehreren Klassifikationssymbolen sind alle anzugeben)[6] |
|---|

Nach der Internationalen Patentklassifikation (IPC) oder nach der nationalen Klassifikation und der IPC

Int.Cl[5]  A 61 K 9/16, C 30 B 29/54, C 07 C 217/36

| II. RECHERCHIERTE SACHGEBIETE |
|---|

Recherchierter Mindestprüfstoff[7]

| Klassifikationssystem | Klassifikationssymbole |
|---|---|
| Int.Cl.[5] | A 61 K, C 30 B, C 07 C |

Recherchierte nicht zum Mindestprüfstoff gehörende Veröffentlichungen, soweit diese unter die recherchierten Sachgebiete fallen[8]

| III. EINSCHLÄGIGE VERÖFFENTLICHUNGEN[9] | | |
|---|---|---|
| Art* | Kennzeichnung der Veröffentlichung[11], soweit erforderlich unter Angabe der maßgeblichen Teile[12] | Betr. Anspruch Nr.[13] |
| A | DE, A, 2001431 (HELOPHARM) 15. Juli 1971 -- | |
| A | EP, A, 0119480 (BASF AG) 26. September 1984 (In der Anmeldung erwähnt) -- | |
| A | WO, A, 83/00688 (HELOPHARM) 3. März 1983 | |

-----------------------

* Besondere Kategorien von angegebenen Veröffentlichungen[10]:
"A" Veröffentlichung, die den allgemeinen Stand der Technik definiert, aber nicht als besonders bedeutsam anzusehen ist
"E" älteres Dokument, das jedoch erst am oder nach dem internationalen Anmeldedatum veröffentlicht worden ist
"L" Veröffentlichung, die geeignet ist, eine Prioritätsanspruch zweifelhaft erscheinen zu lassen, oder durch die das Veröffentlichungsdatum einer anderen im Recherchenbericht genannten Veröffentlichung belegt werden soll oder die aus einem anderen besonderen Grund angegeben ist (wie ausgeführt)
"O" Veröffentlichung, die sich auf eine mündliche Offenbarung, eine Benutzung, eine Ausstellung oder andere Maßnahmen bezieht
"P" Veröffentlichung, die vor dem internationalen Anmeldedatum, aber nach dem beanspruchten Prioritätsdatum veröffentlicht worden ist

"T" Spätere Veröffentlichung, die nach dem internationalen Anmeldedatum oder dem Prioritätsdatum veröffentlicht worden ist und mit der Anmeldung nicht kollidiert, sondern nur zum Verständnis des der Erfindung zugrundeliegenden Prinzips oder der ihr zugrundeliegenden Theorie angegeben ist
"X" Veröffentlichung von besonderer Bedeutung; die beanspruchte Erfindung kann nicht als neu oder auf erfinderischer Tätigkeit beruhend betrachtet werden
"Y" Veröffentlichung von besonderer Bedeutung; die beanspruchte Erfindung kann nicht als auf erfinderischer Tätigkeit beruhend betrachtet werden, wenn die Veröffentlichung mit einer oder mehreren anderen Veröffentlichungen dieser Kategorie in Verbindung gebracht wird und diese Verbindung für einen Fachmann naheliegend ist
"&" Veröffentlichung, die Mitglied derselben Patentfamilie ist

| IV. BESCHEINIGUNG | |
|---|---|
| Datum des Abschlusses der internationalen Recherche 2. Juli 1990 | Absendedatum des internationalen Recherchenberichts 2 9. 08. 90 |
| Internationale Recherchenbehörde Europäisches Patentamt | Unterschrift des bevollmächtigten Bediensteten H. Daniels  H. DANIELS |

Formblatt PCT/ISA/210 (Blatt 2) (Januar 1985)

13

13

ANHANG ZUM INTERNATIONALEN RECHERCHENBERICHT
ÜBER DIE INTERNATIONALE PATENTANMELDUNG NR.

EP 9000529
SA    35792

In diesem Anhang sind die Mitglieder der Patentfamilien der im obengenannten internationalen Recherchenbericht angeführten
Patentdokumente angegeben.
Die Angaben über die Familienmitglieder entsprechen dem Stand der Datei des Europäischen Patentamts am 20/08/90
Diese Angaben dienen nur zur Unterrichtung und erfolgen ohne Gewähr.

| Im Recherchenbericht angeführtes Patentdokument | Datum der Veröffentlichung | Mitglied(er) der Patentfamilie | | Datum der Veröffentlichung |
|---|---|---|---|---|
| DE-A- 2001431 | 15-07-71 | AT-A,B | 308076 | 15-05-73 |
| | | BE-A- | 785318 | 16-10-72 |
| | | FR-A,B | 2144601 | 16-02-73 |
| | | GB-A- | 1307455 | 21-02-73 |
| | | NL-A- | 7208214 | 18-12-73 |
| EP-A- 0119480 | 26-09-84 | DE-A- | 3306250 | 23-08-84 |
| | | AU-B- | 561079 | 30-04-87 |
| | | AU-A- | 2484384 | 30-08-84 |
| | | CA-A- | 1220421 | 14-04-87 |
| | | JP-A- | 59182290 | 17-10-84 |
| | | US-A- | 4632843 | 30-12-86 |
| WO-A- 8300688 | 03-03-83 | DE-A,C | 3133814 | 10-03-83 |
| | | AT-T- | E8129 | 15-07-84 |
| | | AU-A- | 8711382 | 03-03-83 |
| | | CA-A- | 1192224 | 20-08-85 |
| | | EP-A,B | 0074014 | 16-03-83 |
| | | JP-T- | 58501324 | 11-08-83 |
| | | SU-A- | 1331424 | 15-08-87 |
| | | US-A- | 4460605 | 17-07-84 |

EPO FORM P0459

Für nähere Einzelheiten zu diesem Anhang : siehe Amtsblatt des Europäischen Patentamts, Nr.12/82

13

08/525749

53 Rec'd PCT/PTO    03 OCT 1995

524-2396-0X PCT

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF:          :

KARL KOLTER ET AL.            :    GROUP ART UNIT:

SERIAL NO:    NEW APPLN.      :

FILED:  HEREWITH              :    EXAMINER:

FOR:  DELAYED RELEASE MICRO-  :
      TABLET OR BETA-PHENYL-
      PROPIOPHENONE DERIVATIVES

PRELIMINARY AMENDMENT

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C.  20231

SIR:

Prior to examination on the merits, please amend the

above-identified application as follows:


IN THE SPECIFICATION

Page 1, before line 1, insert --TITLE OF THE INVENTION--;

after line 1, centered, insert --BACKGROUND OF

THE INVENTION--.

left justified insert --Field of the Invention--;

after line 8, left justified, insert --Discussion

of the Background--.

Page 2, after line 25, centered, insert --SUMMARY OF THE

INVENTION--;

lines 34-35, change "as claimed in Claims 1 to 4"

to --of the present invention--; and

-2-

after line 41, centered, insert --<u>DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS</u>--.

<u>IN THE CLAIMS</u>

Claim 3, line 1, delete "or 2".

Claim 4, line 1, change "any of Claims 1 to 3" to --Claim 1--.

Claim 5, line 2, change "any of Claims 1 to 4" to --Claim 1--.

<u>REMARKS</u>

Claims 1-6 remain pending in this application.

The specification has been amended to include standard headings. The claims have been amended to remove multiple claim dependency. No new matter is believed to have been introduced.

In view of the amendments made above, this application is now believed to be in condition for examination on the merits.

-3-

Early notice to this effect is earnestly solicited.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Attorney of Record
Registration No. 24,618

Timothy R. Schwartz, Ph.D.
Registration No. 32,171
(703) 412-6474

Crystal Square Five - Fourth Floor
1755 Jefferson Davis Highway
Arlington, VA 22202
(703) 412-6474
Fax #: (703) 413-2220
TRS/smi

08/525749/4

33 Rec'd PCT/PTO    03 OCT 1995

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

IN RE APPLICATION:  Karl KOLTER et al.

INTERNATIONAL
APPLICATION NO:      PCT/EP94/00949

INTERNATIONAL
FILING DATE:         24 March 1994

FOR: DELAYED RELEASE MICROTABLET OF
     ß-PHENYLPROPIOPHENONE DERIVATIVES

### REQUEST FOR PRIORITY UNDER 35 USC 119,
### AND THE INTERNATIONAL CONVENTION

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:
    In the matter of the above-identified application for
patent, notice is hereby given that the Applicant claims as a
priority:

| COUNTRY | APPLICATION NO.: | DAY/MONTH/YEAR |
|---------|------------------|----------------|
| Germany | P 43 10 963.2 | 03 April 1993 |

    Certified Copies of the corresponding Convention
Application(s) was submitted to the International Bureau in PCT
Application Number PCT/EP94/00949.  Receipt of the certified
copies by the International Bureau in a timely manner under PCT
Rule 17.1(a) has been acknowledged as evidenced by the attached
PCT/IB/304.

                          Respectfully submitted,

                          OBLON, SPIVAK, McCLELLAND,
                          MAIER & NEUSTADT, P.C.

                          Norman F. Oblon
                          Attorney of Record
                          Registration No. 24,618

                          Timothy R. Schwartz, Ph.D.
                          Registration No.: 32,171

Fourth Floor
1755 Jefferson Davis Highway
Arlington, Virginia  22202
Docket No.: 524-2396-0X PCT

PA 163

PCT/EP 9 4 / 0 0 9 4 9

# BUNDESREPUBLIK DEUTSCHLAND



REC D  2 7 APR 1994
WIPO. PCT

## Bescheinigung

Die BASF Aktiengesellschaft in 6700 Ludwigshafen hat eine
Patentanmeldung unter der Bezeichnung

"Retardtablette von ß-Phenylpropiophenonderivaten"

am 3. April 1993 beim Deutschen Patentamt eingereicht.

Die angehefteten Stücke sind eine richtige und genaue Wie-
dergabe der ursprünglichen Unterlagen dieser Patentanmel-
dung.

Die Anmeldung ist auf die Knoll AG in 67061 Ludwigshafen
umgeschrieben worden.

Die Anmeldung hat im Deutschen Patentamt vorläufig die
Symbole A 61 K 31/135, A 61 K 9/22 und A 61 K 9/52 der
Internationalen Patentklassifikation erhalten.

München, den 4. Februar 1994
Der Präsident des Deutschen Patentamts
Im Auftrag

R. Kowalin

Aktenzeichen: P 43 10 963.2

A 9161
6 92

PA 164

BASF Aktiengesellschaft        910751        O.Z. 0050/43975

Patentansprüche

1. Zylindrische Retardtabletten mit konvexer oder planer Ober-
und Unterseite von ß-Phenylpropiophenonderivaten der Formel I
als Wirkstoff

$$\begin{array}{c} O \\ \| \\ C-CH_2-CH_2- \end{array}$$

with structure:

C-CH₂-CH₂-[phenyl], O-CH₂-CHOH-CH₂-NHR        I

mit R= n-Propyl oder 1,1-Dimethylpropyl und deren pharmakolo-
gisch unbedenklichen Salzen, dadurch gekennzeichnet, daß

a)  Höhe und Durchmesser unabhängig voneinander 1 bis 3 mm
betragen,

b)  der Wirkstoffgehalt im Bereich von 81 bis 99,9 Gew.-% der
Mikrotablette liegt, jedoch ohne Berücksichtigung des Ge-
wichts eines gegebenenfalls vorhandenen Überzugs,

c)  die Wirkstoffdichte höher als 1 ist,

d)  im Paddle Modell nach USP bei 50 rpm nach 3 Stunden höch-
stens und nach 24 Stunden mindestens 80 % des Wirkstoffs
freigesetzt sind,

e)  die Freisetzungsgeschwindigkeit praktisch unabhängig vom
Druck beim Pressen der Tabletten ist, und

f)  die Tablette keinen retardierenden Hilfsstoff, aber 0,1
bis 5 Gew.-% eines Gleitmittels und 0 bis 18,9 Gew.-% an-
derer üblicher Hilfsstoffe enthält.

2.  Tablette nach Anspruch 1, dadurch gekennzeichnet, daß sich in
vivo ein ausgeprägtes Plasmaspiegelplateau mit einem PTF-Wert
< 75 % ergibt und die Bioverfügbarkeit unabhängig von der
eingenommenen Nahrung ist.

3.  Tablette nach Anspruch 1 oder 2, dadurch gekennzeichnet, daß
der Wirkstoff Propafenon-hydrochlorid ist.

751/91 BR/fr  01.04.1993                          Zeichn.

BASF Aktiengesellschaft    910751    O.Z. 0050/43975

Retardtablette von ß-Phenylpropiophenonderivaten

Beschreibung

5

Die Erfindung betrifft zylindrische Mikrotabletten von ß-Phenyl-
propiophenonderivaten mit hohem Wirkstoffgehalt, hoher Wirkstoff-
dichte und retardierter und pressdruckunabhängiger Freisetzung
ohne retardierende Hilfsstoffe.

10

Wenn oben und im folgenden von ß-Phenylpropiophenonderivaten die
Rede ist, so sind stets auch und besonders deren physiologisch
unbedenklichen Salze, vorzugsweise das Hydrochlorid, gemeint.

15 Gemäß dem Stand der Technik wird die Wirkstofffreigabe von
Tabletten entweder durch eine retardierende Matrix, in die der
Wirkstoff eingebettet ist, oder durch einen retardierenden Über-
zug, durch den die Verdauungsflüssigkeit ein- und der Wirkstoff aus-
diffundiert, verzögert.

20

Beide Prinzipien haben erhebliche Nachteile. Z.B. enthalten Ma-
trixtabletten relativ große Mengen Hilfsstoffe, so daß das
Tablettenvolumen bei gegebener Wirkstoffdosis relativ groß ist,
was für den Patient unangenehm ist. Andererseits sind Filmtablet-
25 ten aufwendig in der Herstellung und vor allem mechanisch emp-
findlich. Bei geringster Beschädigung des Lackfilms besteht die
Gefahr einer plötzlichen Freisetzung des gesamten Wirkstoffgehal-
tes ("dose dumping"), was höchst unerwünscht ist (örtliche und
zeitliche Überdosis mit schädlichen Nebenwirkungen; kurze Gesamt-
30 wirkzeit).

Sowohl Matrix- wie Film-Retardtabletten haben normalerweise
Durchmesser von etwa 6 bis 12 mm und mehr und können daher den
geschlossenen Pylorus nicht passieren. Die Freisetzung und Re-
35 sorption ihres gesamten, auf eine Stelle im Magen-Darm-Trakt kon-
zentrierten Wirkstoffgehaltes ist von den an dieser Stelle herr-
schenden Bedingungen abhängig, was eine starke interindividuelle
und intraindividuelle Streuung des Plasmaspiegels zur Folge hat.

40 Diese Streuung ist bei den "Multiple-Unit"-Retardformen kleiner,
da sich die "Units" gleichmäßig über den Magen- und Darmtrakt
verteilen und auch den geschlossenen Pylorus passieren können.
Als Multiple-Unit-Formen kommen in der Regel Pellets mit einem
Diffusionslack, abgefüllt in Gelatine-Steckkapseln, zum Einsatz.
45 Die Herstellung von Matrix-Pellets ist nur bei sehr niedrig do-
sierten Arzneistoffen möglich, da aufgrund der großen Oberfläche

BASF Aktiengesellschaft      910751      O.Z. 0050/43975

2

4.  Tablette nach einem der Ansprüche 1 bis 3, dadurch gekenn-
    zeichnet, daß Höhe und Durchmesser etwa gleich sind.

5.  Gelatinekapsel, die 3 bis 200 Tabletten nach einem der An-
    sprüche 1 bis 4 mit gleicher oder unterschiedlicher Freiset-
    zungsrate enthält.

BASF Aktiengesellschaft       910751       O.Z. 0050/43975

3

geschwindigkeit ohne Probleme hinsichtlich Abrieb- und Bruchfe-
stigkeit hergestellt werden, und zwar mit Wirkstoffgehalten im
Bereich von 81 bis 99,9, vorzugsweise 85 bis 99,5 Gew.-% und ei-
ner Wirkstoffdichte von über 1. So hohe Gehalte an derartigen
5 Wirkstoffen in Tabletten sind bisher unerreicht.

Die erfindungsgemäßen Mikrotabletten sind zylindrisch mit flacher
oder konvexer Ober- und Unterseite und mit unabhängig voneinander
1 bis 3, vorzugsweise 1,5 bis 2,5 mm Durchmesser und Höhe, wobei
10 beide vorzugsweise etwa gleich groß sind.

Ferner war nicht vorherzusehen, daß die Wirkstofffreisetzung im
Gegensatz zu den üblichen Erfahrungen vom Druck beim Pressen der
Tabletten und auch über einen großen Bereich vom pH des Milieus
15 praktisch unabhängig ist. "Praktisch unabhängig" heißt, daß der
Einfluß für praktische Zwecke vernachlässigt werden kann. Die
Konstanz der Freisetzung ist damit gewährleistet. Sie wird über
die Größe der Tablette sowie gegebenenfalls durch die Freisetzung
beschleunigende Zusätze so eingestellt, daß nach 3, vorzugsweise
20 5 Stunden höchstens 80, nach 24, vorzugsweise 15 Stunden minde-
stens 80 % des Wirkstoffs freigesetzt sind. Überraschenderweise
weisen die erfindungsgemäßen Mikrotabletten gegenüber herkömmli-
chen Retardformen, wie einer Bolusretardform mit ähnlicher In-
vitro-Freisetzung, auch in vivo deutliche Vorzüge auf. Trotz kurzer
25 Halbwertzeit bildet sich ein ausgeprägtes Blutspiegelplateau aus
(Fig. 11). Die Fluktuation des Blutspiegels ist bei den Mikrota-
bletten erheblich geringer. Dies wird erkennbar an dem $t_{75\%}$-Wert
(Zeitdauer im Dosierungsintervall, während der die Plasmaspiegel
mindestens 75 % des maximalen Wertes betragen), der bei den er-
30 findungsgemäßen Mikrotabletten bei 8 bis 9 Stunden liegt, gegen-
über 5 bis 6 Stunden bei der Bolusretardform, sowie am PTF-Wert
(peak to trough fluctuation; vgl. H. P. Koch und W. A. Ritschel,
Synopsis der Biopharmazie und Pharmakokinetik, Ecomed-Verlagsge-
sellschaft mbH, Landsberg und München, 1986)

35

$$PTF\ (\%) = \frac{C_{max} - C_{min}}{\dfrac{AUC}{\Delta t}} \times 100$$

zum AUC-Wert vgl.
J.K. Aronson et al.,
Europ. J. of Clinical
Pharmacology Bd. 35 (1988),
40                                              S. 1 bis 7.

der bei den Mikrotabletten nur etwa halb so groß wie bei den Bo-
lusformen ist, und zwar kleiner als 75, vorzugsweise kleiner als
60 %. Die Mikrotabletten erbringen demnach eine erhöhte Therapie-
45 sicherheit, da überhöhte Plasmaspiegelspitzen und dadurch be-
dingte Nebenwirkungen nicht auftreten, der minimale, effektive
Plasmaspiegel nicht unterschritten wird und diese Form in ihrer

BASF Aktiengesellschaft    910751    O.Z  0050/43975

2

noch mehr Matrixsubstanz als bei der Bolus-Retardtablette benö-
tigt würde.

Beispielsweise aus den Patentanmeldungen GB 2 176 999 und
5 WO 92/04013 sind kleine Matrix-Retardtabletten bekannt, die eben-
falls größere Mengen an Retardierungshilfsstoffen enthalten. In
der Patentanmeldung EP 22 17 32 werden Retardtabletten von
schwerlöslichen Wirkstoffen beansprucht, die 60 bis 80 % Wirk-
stoff neben mindestens vier Hilfsmitteln enthalten. Diese Bolus-
10 Formen sind, wie im Patent beschrieben, in ihrer Freisetzung
stark abhängig vom Granulationsverfahren und dem bei der Herstel-
lung verwendeten Gerät.

Weiterhin ist allgemein bekannt, daß bei der Tablettenherstellung
15 mit einer Steigerung der Preßkraft eine Verlangsamung der Wirk-
stofffreisetzung einhergeht. Dies gilt sowohl für schnell frei-
setzende Tabletten als auch für Retardtabletten (Patentanmeldung
WO 92/00064). Da trotz modernster Maschinentechnik die Preßkräfte
schwanken, resultieren daraus unterschiedliche Freisetzungsge-
20 schwindigkeiten. Hinzu kommen ferner noch von Charge zu Charge
unterschiedliche Preßeigenschaften, die auf der Variabilität des
zu verpressenden Granulates beruhen. Unterschiede in der Korn-
größe, Porosität, Oberflächenstruktur, Benetzbarkeit usw. können
großen Einfluß auf die Preßeigenschaften und die Retardierung ha-
25 ben.

Der Erfindung lag die Aufgabe zugrunde, die Nachteile des Standes
der Technik zu überwinden, d.h. Propafenon- und Diprafenon-Ta-
bletten mit geringer Größe, hohem Wirkstoffgehalt, hoher Wirk-
30 stoffdichte und preßdruckunabhängiger und über einen längeren
Zeitraum gleichmäßiger Wirkstofffreigabe zu entwickeln.

Die Lösung dieser Aufgabe besteht in den Mikrotabletten nach den
Ansprüchen 1 bis 4. Es wurde nämlich überraschend gefunden, daß
35 im vorliegenden Fall die Herstellung von Retardtabletten ohne re-
tardierende Hilfsstoffe möglich ist. Dies ist umso überraschen-
der, als andere Arzneistoffe mit ähnlicher Wasserlöslichkeit wie
Propafenon-Hydrochlorid (0,7 %), beispielsweise Cimetidin-Hydro-
chlorid oder Paracetamol, bei gleicher Präparation bereits in
40 1 Stunde zu 90 % freigesetzt werden.

Bei Propafenon-HCl handelt es sich um eine im Vergleich zu ande-
ren außerordentlich schlecht preßbare Substanz. Eine Bolusta-
blette mit handelsüblichen Dosierungen von 150 bis 300 mg und ei-
45 nem Wirkstoffgehalt über 80 % ist unter Produktionsbedingungen
nicht herstellbar. Hingegen können die erfindungsgemäßen Mikrota-
bletten überraschenderweise mit verhältnismäßig hoher Maschinen-

BASF Aktiengesellschaft    910751    O.Z. 0050/43975

4

Bioverfügbarkeit durch Nahrungsaufnahme, im Gegensatz zur Bolus-
retardform, nicht beeinflußt wird.

Bei der Bolusretardform wird nüchtern ein um 50 % höherer AUC-
5 Wert gefunden.

Generell zeigen die Mikrotabletten im Vergleich zur Bolusretard-
form geringere intra- und interindividuelle Unterschiede.

10 Die erfindungsgemäßen Mikrotabletten weisen ferner den Vorzug
auf, daß sie, eingebracht in Magen- oder Darmsaft, keine Klebe-
oder Anhaftungstendenzen aufweisen. Dadurch wird gewährleistet,
daß sie als einzelne Formlinge den Magen- und Darmtrakt passieren
und sich auch nicht an der Magen- oder Darmwand festsetzen und
15 Irritationen auslösen. Solche Klebe- oder Anhaftungseigenschaften
weisen beispielsweise kleine Formlinge mit hydrophilen Retardie-
rungspolymeren auf (vgl. WO 92/04013).

Die Herstellung von Retardformen mit hydrophilen Retardierungspo-
20 lymeren erfordert oft bei der Granulation den Einsatz von organi-
schen Lösungsmitteln, damit nicht schon bei diesem Prozeßschritt
Quellung einsetzt. Bei der Herstellung der erfindungsgemäßen Mi-
krotabletten kann darauf vollständig verzichtet werden.

25 Darreichungsformen mit hydrophilen Retardierungspolymeren weisen
zudem den Nachteil auf, daß sie aufgrund der Sorptions- und Quel-
lungstendenz empfindlich gegen eine Veränderung der Luftfeuchte
bei Lagerung sind. Insbesondere hohe Luftfeuchten schaden diesen
Zubereitungen. Die erfindungsgemäßen Mikrotabletten sind aufgrund
30 der Unempfindlichkeit der Einsatzstoffe auch bei höheren Luft-
feuchten stabil. Selbst nach 21tägiger Lagerung bei 93 % rel.
Luftfeuchte liegt die Wasseraufnahme unter 1 %, und optisch ist
keine Veränderung festzustellen.

35 Die Herstellung der erfindungsgemäßen Mikrotabletten erfolgt in
pharmazeutisch üblichen Geräten und umfaßt folgende Schritte:
Granulieren, Trocknen, Mischen, Tablettieren.

Die Korngröße des Wirkstoffs spielt im pharmazeutisch üblichen
40 Rahmen bei der Herstellung der erfindungsgemäßen Mikrotabletten,
entgegen allen Erwartungen, keine oder nur eine geringe Rolle.
Dadurch ist es möglich, z.B. Propafenon-Hydrochlorid und Diprafe-
non-Hydrochlorid unterschiedlicher Korngröße zu Produkten glei-
cher Qualität zu verarbeiten.

45

PA 170

BASF Aktiengesellschaft     910751     O.Z. 0050/43975

5

Granulierung und Trocknung werden vorzugsweise im Wirbelbett
durchgeführt. Die Agglomeration kann aber auch in einem horizon-
talen oder vertikalen Mischer durchgeführt werden.

5 Nach dem Durchgeben durch ein Sieb geeigneter Maschenweite wird
das feuchte Granulat entweder im Umluft-Trockenschrank oder im
Wirbelbett getrocknet. Die Korngröße des Granulates sollte unter
1 mm, bevorzugt unter 0,8 mm liegen.

10 Für die Agglomeration können alle gängigen Binde- oder Klebemit-
tel eingesetzt werden, z.B. Polyvinylpyrrolidon, Vinylpyrrolidon-
Vinylacetat-Copolymere, Gelatine, Hydroxypropylmethylzellulose,
Hydroxypropylzellulose, Polymerisate aus Methacrylsäure und deren
Estern. Durch die Verwendung einer Wirkstoff-Lösung als Granula-
15 tionsflüssigkeit kann der Einsatz eines Bindemittels entfallen.
Als Granulationsflüssigkeit wird Wasser ohne Zusätze bevorzugt.

Nach der Trocknung des Granulates auf den definierten Wasserge-
halt werden 0,1 bis 5, vorzugsweise 0,3 bis 2 Gew.-% eines Gleit-
20 mittels für die Tablettierung homogen untergemischt. Hierfür kön-
nen ebenfalls alle gängigen Stoffe zum Einsatz kommen, wie Tal-
kum, Magnesiumstearat, Calciumstearat, Stearinsäure, Calciumbehe-
nat, Glycerinpalmitostearat, Natriumacetat, Polyethylenglykol,
Natriumstearatfumarat. Außerdem können bis zu 18,9 Gew.-% weite-
25 rer üblicher Hilfsstoffe zugemischt werden, beispielsweise Farb-
stoffe, Stabilisatoren, Füllstoffe, Hydrophilisatoren, Fließregu-
lierungsmittel.

Die Tablettierung erfolgt auf einer geeigneten, mit Mehrfach-Mi-
30 krotabletten-Stempeln bestückten Tablettenpresse. Die resultie-
renden Mikrotabletten besitzen eine zylindrische Form mit planer
oder konvexer Oberfläche. Die Höhe und der Durchmesser können un-
abhängig voneinander variiert werden. Aus Gründen der höheren
Schüttdichte und der besseren Rieselfähigkeit ist es oft zweckmä-
35 ßig, die Höhe der Mikrotabletten dem Durchmesser anzupassen.

Neben der Größe der Mikrotabletten liegt ein weiteres Steue-
rungselement der Freisetzung im Zusatz von Hydrophilisatoren, die
die Lösungsgeschwindigkeit erhöhen. Als Hydrophilisatoren können
40 einerseits Tenside, wie Polyoxyethylenfettsäureester, Polyoxy-
ethylenfettalkoholether, Fettsäuresalze, Gallensäuresalze, Alkyl-
sulfate oder Ethylenoxid-Propylenoxid-Blockpolymere, oder ande-
rerseits echt wasserlösliche Substanzen wie Polyethylenglykole,
Harnstoff, Natriumchlorid, Sorbit, Mannit, Glycin, Nikotinamid,
45 Zitronensäure-, Weinsäure- oder Phosphorsäuresalze verwendet wer-

BASF Aktiengesellschaft        910751        O.Z. 0050/43975

6

den. Die Freisetzungsrate nimmt dabei parallel zum Anstieg der Hydrophilisatorkonzentration zu.

Der Hydrophilisator kann bereits in das Granulat eingearbeitet
5 oder aber erst zusammen mit dem Gleitmittel untergemischt werden. Dies ist natürlich nur bei festen Hydrophilisatoren möglich. Die Hydrophilisatorkonzentration beträgt 0,1 bis 15, in der Regel 1 bis 10 % der Gesamtmasse.

10 Zur Beschleunigung der Erosion des Wirkstoffs von der Tabletten-oberfläche und damit der Wirkstofffreisetzung können auch Spreng-mittel in Konzentrationen von 0,001 bis 0,5, vorzugsweise 0,01 bis 0,1 % verwendet werden, die weit unter den üblichen Konzen-trationen liegen.
15
In der Regel können die Mikrotabletten direkt mit üblichen Füll-maschinen in Gelatinekapseln abgefüllt werden. Mitunter kann es von Vorteil sein, die Mikrotabletten vor der Abfüllung mit einem leicht löslichen, die Freisetzung nicht beeinflussenden Lackfilm
20 zu versehen.

Außerdem ist es in vielen Fällen zweckmäßig, retardierte mit rasch freisetzenden oder weniger stark retardierten Mikrotablet-ten zu kombinieren. Dadurch wird zunächst eine Initialdosis frei-
25 gesetzt, der sich die langsame Freisetzung der Erhaltungsdosis anschließt. Moderne Kapselfüllmaschinen sind in der Lage, zwei Produkte in eine Kapsel problemlos zu dosieren.

Die rasch freisetzende (Instant-Release-)Mikrotablette unter-
30 scheidet sich von der Retard-Mikrotablette dadurch, daß sie übli-che Mengen an Sprengmittel, Quellmittel, Porenbildner enthält, die einen raschen Zerfall der Mikrotablette in kleine Bruchstücke und eine rasche Auflösung des Wirkstoffs bewirken.

35 Die Mikrotabletten der Beispiele hatten stets je 2 mm Durchmesser und Höhe, und die Wirkstoffdichte lag stets über 1.

40

45

BASF Aktiengesellschaft     910751     O.Z. 0050/43975

7

Beispiele

Beispiel 1 (Fig. 1)
Propafenon retard Mikrotabletten

5

Zusammensetzung

| | |
|---|---|
| Propafenon-HCl | 6,25 mg (96 %) |
| Hydroxypropylmethylcellulose | 0,20 mg |
| Magnesiumstearat | 0,05 mg |
| Gesamtgewicht | 6,50 mg |

10

In einem Wirbelschichtgranulator wurden 30 kg Propafenon-HCl mit
10 kg einer 10 %igen Hydroxypropylmethylcellulose-Lösung (Pharma-
coat® 603) granuliert und getrocknet. Nach dem Durchgeben durch
ein Sieb geeigneter Maschenweite wurde das Granulat in einem
Pflugscharmischer mit der vorgegebenen Menge Magnesiumstearat ge-
mischt.

20 Die Verpressung zu Mikrotabletten erfolgte auf einer mit Mehr-
fach-Mikrotabletten-Stempeln ausgerüsteten Rundläufer-Tabletten-
presse.

Die der zu verabreichenden Dosis entsprechende Anzahl Mikro-
25 tabletten wurde mit einer geeigneten Kapselfüllmaschine in Hart-
gelatinekapseln abgefüllt.

Tabelle 1

30 Ergebnisse von Probandenstudien mit Propafenon-HCl-Mikrotabletten
von Beispiel 1 und einer Bolusretardform gemäß dem Vergleichs-
versuch (n = 18, Dosis: 400 mg Propafenon-HCl, repetierte Gabe)

| | Mikrotabletten | | Bolusretardform | |
|---|---|---|---|---|
| | nüchtern | mit Nahrung | nüchtern | mit Nahrung |
| AUC $\frac{ng \cdot h}{ml}$ | 5 500 | 5 500 | 6 900 | 4 700 |
| $t_{75\%}$ (h) | 8-9 | 8-9 | 5-6 | 5-6 |
| PTF (%) | 52 | 56 | 88 | 106 |

n = Zahl der Probanden
ng = Nanogramm
h = Stunden

45 Beispiel 2 (Fig. 2)
Propafenon retard Mikrotabletten

BASF Aktiengesellschaft    910751    O.Z. 0050/43975

8

Zusammensetzung

| | | |
|---|---|---|
| Propafenon-HCl | 5,92 mg | (91 %) |
| Hydroxypropylmethylcellulose | 0,20 mg | |
| 5 Poloxamer 188 (USP) | 0,33 mg | |
| Magnesiumstearat | 0,05 mg | |
| Gesamtgewicht | 6,5 mg | |

Die Herstellung erfolgte analog Beispiel 1. Die erforderliche Po-
10 loxamer 188-Menge wurde zusammen mit dem Magnesiumstearat in ei-
nem Pflugscharmischer unter das Granulat gemischt.

Beispiel 3 (Fig. 3)
Propafenon retard Mikrotabletten
15

Zusammensetzung

| | | |
|---|---|---|
| Propafenon-HCl | 5,61 mg | (86 %) |
| Hydroxypropylmethylcellulose | 0,19 mg | |
| 20 Poloxamer 188 | 0,65 mg | |
| Magnesiumstearat | 0,05 mg | |
| Gesamtgewicht | 6,5 mg | |

Die Herstellung erfolgte analog Beispiel 2.
25

Beispiel 4 (Fig. 4)
Propafenon retard Mikrotabletten

Zusammensetzung
30

| | | |
|---|---|---|
| Propafenon-HCl | 6,0 mg | (86 %) |
| Hydroxypropylmethylcellulose | 0,2 mg | |
| Calciumhydrogenphosphat | 0,613 mg | |
| Monoglyceride (Myvatox®) | 0,15 mg | |
| 35 Vernetztes Polyvinylpyrrolidon | 0,007 mg | |
| Magnesiumstearat | 0,03 mg | |
| Gesamtgewicht | 7,0 mg | |

Die Herstellung erfolgte analog Beispiel 2.
40

45

PA 174

BASF Aktiengesellschaft    910751    O.Z. 0050/43975

9

Beispiel 5 (Fig. 5)
Propafenon retard Mikrotabletten

Zusammensetzung

5

| | |
|---|---|
| Propafenon-HCl | 5,70 mg (81 %) |
| Gelatine | 0,18 mg |
| Calciumhydrogenphosphat | 0,38 mg |
| NaCl | 0,70 mg |
| 10   Magnesiumstearat | 0,04 mg |
| Gesamtgewicht | 7,0 mg |

Die Herstellung erfolgte analog Beispiel 1. Als Granulationsmit-
tel wurde eine 10 %ige Gelatinelösung verwendet. Die NaCl-Menge
15 wurde mit dem Magnesiumstearat untergemischt.

Beispiel 6 (Fig. 6)
Propafenon retard Mikrotabletten

20 Zusammensetzung

| | |
|---|---|
| Propafenon-HCl | 5,83 mg (83 %) |
| Hydroxypropylmethylcellulose | 0,17 mg |
| ß-Cyclodextrin | 0,9 mg |
| 25   Magnesiumstearat | 0,1 mg |
| Gesamtgewicht | 7,0 mg |

Die Herstellung erfolgte analog Beispiel 2.

30 Beispiel 7 (Fig. 7)
Gelatinekapseln mit Propafenon retard Mikrotabletten und Propafe-
non Instant-Release-Mikrotabletten

Zur Erzielung einer höheren initialen Freisetzung wurden auf ei-
35 ner geeigneten Kapselfüllmaschine 14 Instant-Release-Mikrotablet-
ten und 55 Retard-Mikrotabletten in Hartgelatinekapseln gefüllt.

Zusammensetzung der Instant-Release-Mikrotabletten

| | |
|---|---|
| 40   Propafenon-HCl | 6,05 mg (93 %) |
| Hydroxypropylmethylcellulose | 0,20 mg |
| Natriumcarboxymethylstärke | 0,20 mg |
| Magnesiumstearat | 0,05 mg |
| Gesamtgewicht | 6,5 mg |
| 45 | |

BASF Aktiengesellschaft     910751     O.Z. 0050/43975

10

Die Herstellung der Instant-Release-Mikrotabletten erfolgte ana-
log Beispiel 2. Die Herstellung der eingesetzten Retard-Mikrota-
bletten erfolgte nach Beispiel 1.

5 Beispiel 8 (Fig. 8)
Propafenon retard Mikrotabletten

Zusammensetzung

10 Propafenon-HCl                    6,48 mg (99,7 %)
   Magnesiumstearat                  0,02 mg
   Gesamtgewicht                     6,50 mg

Propafenon-Hydrochlorid und Magnesiumstearat wurden in einem
15 Pflugscharmischer gemischt und anschließend zu Mikrotabletten
verpreßt.

Die Bestimmung der In-vitro-Freisetzungskurven (Fig. 1 bis 10)
erfolgte mit einer Paddle-Apparatur nach USP, wobei in den ersten
20 beiden Stunden 0,08 molare HCl und anschließend Phosphatpuffer
pH 6,8 verwendet wurde. Die Umdrehungsgeschwindigkeit lag bei
50 rpm.

Vergleichsversuch
25

Propafenon-retard-Bolusfilmtablette

Zusammensetzung

30 Propafenon-HCl                            450,0 mg
   Natriumalginat                           112,0 mg
   Mikrokristalline Cellulose Typ PH 101     37,0 mg
   Copolymerisate aus Acryl- und
   Methacrylsäureestern mit einem geringen
35 Gehalt an quartären Ammoniumgruppen
   (Eudragit® RS)                            15,0 mg
   Gelatine                                  55,0 mg
   Magnesiumstearat                           3,5 mg
   Mikrokristalline Cellulose Typ PH 102     12,5 mg
40 leicht löslicher Filmüberzug              15,0 mg
   Gesamtgewicht                            700,0 mg

Propafenon-Hydrochlorid, Natriumalginat, mikrokristalline Cellu-
lose (Typ PH 101) und Eudragit RS wurden in einem Vertikalmischer
45 gemischt und mit 20 %iger Gelatinelösung granuliert. Die Abtrock-
nung des feuchten Granulates erfolgte in einem Wirbelschicht-
trockner mit 60°C warmer Zuluft. Nach dem Durchgeben durch ein

BASF Aktiengesellschaft    910751    O.Z. 0050/43975

11

Sieb geeigneter Maschenweite wurden Magnesiumstearat und mikro-
kristalline Cellulose (Typ PH 102) in einem Horizontalmischer zu-
gemischt und anschließend die Mischung auf einer Rundläufer-Ta-
blettenpresse zu Oblongtabletten verpreßt (Maße 18 x 8,7 mm). Der
5 leicht lösliche Überzug wurde in einem Horizontalcoater aufge-
bracht.

Die In-vitro-Freisetzungsbestimmung in einer Paddle-Apparatur bei
50 rpm ergab folgende Werte (in %):
10
1. Stunde  3,8
2. Stunde  5,5
3. Stunde 23,7
4. Stunde 43,0
15 6. Stunde 75,4
8. Stunde 89,5

Die In-vitro-Freisetzung der Retard-Bolusfilmtablette ist also
ähnlich der der erfindungsgemäßen Retard-Mikrotabletten. Dennoch
20 ist die In-vivo-Freisetzung völlig anders, und zwar erfindungs-
gemäß besser, vgl. Pharmaspiegel gem. Fig. 11.

25

30

35

40

45

BASF Aktiengesellschaft    910751    O.Z. 005C/43975

Retardtablette von ß-Phenylpropiophenonderivaten

Zusammenfassung

5

Zylindrische Retardtabletten mit konvexer oder planer Ober- und Unterseite von ß-Phenylpropiophenonderivaten der Formel I als Wirkstoff

10



I

15

mit R= n-Propyl oder 1,1-Dimethylpropyl und deren pharmakologisch unbedenklichen Salzen, wobei

a) Höhe und Durchmesser unabhängig voneinander 1 bis 3 mm betra-
20   gen,

b) der Wirkstoffgehalt im Bereich von 81 bis 99,9 Gew.-% der Mikrotablette liegt, jedoch ohne Berücksichtigung des Gewichts eines gegebenenfalls vorhandenen Überzugs,

25

c) die Wirkstoffdichte höher als 1 ist,

d) im Paddle Modell nach USP bei 50 rpm nach 3 Stunden höchstens und nach 24 Stunden mindestens 80 % des Wirkstoffs freige-
30   setzt sind,

e) die Freisetzungsgeschwindigkeit praktisch unabhängig vom Druck beim Pressen der Tabletten ist, und

35 f) die Tablette keinen retardierenden Hilfsstoff, aber 0,1 bis 5 Gew.-% eines Gleitmittels und 0 bis 18,9 Gew.-% anderer üblicher Hilfsstoffe enthält,

und eine Gelatinekapsel, die 3 bis 200 derartiger Tabletten mit
40 gleicher oder unterschiedlicher Freisetzungsrate enthält.

45



FIG. 1

Freisetzung Propafenon ret. Mikrotaol. gem. Bsp. 1
400 mg in Kapseln

0480/751/91



FIG.2

Freisetzung Propafenon ret. Mikrotabl. gem. Bsp. 2
400 mg in Kapseln

0480/751/91



FIG.3

Freisetzung Propafenon ret. Mikrotabl. gem. Bsp. 3
400 mg in Kapseln

0480/751/91



FIG.4

Freisetzung Propafenon ret. Mikrotaul. gem. Bsp. 4
300 mg in Kapseln



FIG.5

Freisetzung Propafenon ret. Mikrotabl. gem. Bsp. 5
400 mg in Kapseln

0480/751/91



FIG.6

Freisetzung Propafenon ret. Mikrotabl. gem. Bsp. 6
300 mg in Kapseln



FIG. 7

Freisetzung Propafenon ret. Mikrotabl. gem. Bsp. 7
425 mg in Kapseln

0480/751/91







# FIG.8

Freisetzung Propafenon ret. Mikrotabl. gem. Bsp. 8

325 mg in Kapseln

0480/751/91

0480/751/91

# FIG.9



Freisetzung Propafenon ret. Mikrotabletten gem. Bsp. 1, hergestellt mit
unterschiedlichen Pressdrücken

325 mg in Kapseln

—□— P1: 305N
—◇— P2: 648N
—○— P3: 829N
—△— P3: 829N
—▽— P4: 1315N

0480/751/51



FIG. 10

Freisetzung von Propafenon ret Mikrotabletten gem. Bsp. 1

325 mg bei verschiedenen pH - Werten



FIG.11

Plasmaspiegel nach 2xtäglich repetierter Gabe verschiedener
Darreichungsformen von Propafenon-HCl

2 x 300mg FILMTABLETTE, Rytmonorm® 300 mg, n=7
2 x 450mg RETARD-FILMTABLETTE (BOLUS-FORM), gem. Vergl. Vers., n=7
2 x 400mg MIKROTABLETTEN, gem. Bsp. 1, n=18

0480/751/91

PA 189

#5

DOCKET NO: 524-2396-0X PCT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

IN RE APPLICATION OF:                    : GROUP: 1502
Karl KOLTER, et al.

SERIAL NUMBER: 08/525,749                : ATTENTION:
                                           Application Division
FILED: October 3, 1995                     Customer Corrections

FOR: DELAYED RELEASE MICROTABLET OF BETA-PHENYLPROPIOPHENONE
     DERIVATIVES

REQUEST FOR CORRECTED OFFICIAL FILING RECEIPT

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C.  20231

Sir:

    The Patent Office is requested to provide a corrected
Official Filing Receipt for the attached.  If you have any
questions, please do not hesitate to contact us.

    In light of the fact that the errors were the fault of the
Patent Office, no fees are required.  However, in the event that
a fee is required, please charge the appropriate amount to our
Deposit Account No. 15-0030.  A duplicate copy of this sheet is
enclosed.

                              Respectfully submitted,

                              OBLON, SPIVAK, McCLELLAND,
                              MAIER & NEUSTADT, P.C.


                              Norman F. Oblon
                              Attorney of Record
                              Registration Number: 24,618
                              Robert F. Gnuse
                              Registration Number 27,295

1755 S. Jefferson Davis Highway
Arlington, Virginia  22202
(703) 413-3000
Fax:  413-2220

0480/751/91

2 x 450mg RETARD-FILMTABLETTE (BOLUS-FORM), gem. Vergl. Vers., n=7
2 x 400mg MIKROTABLETTEN, gem. Bsp. 1, n=18

PTO-103X
(Rev. 8-95)
**FILING RECEIPT**



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
**ASSISTANT SECRETARY AND COMMISSIONER**
**OF PATENTS AND TRADEMARKS**
Washington, D.C. 20231

| APPLICATION NUMBER | FILING DATE | GRP ART UNIT | FIL FEE REC'D | ATTORNEY DOCKET NO. | DRWGS | TOT CL | IND CL |
|---|---|---|---|---|---|---|---|
| 08/525,749 | 10/03/95 | 1502 | $880.00 | 524-2396-OXPCT | 0 | 2 | 1 |

OBLON SPIVAK MCCLELLAND MAIER & NEUSTADT
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON VA 22202

FEB 5 1996
RECEIVED

Receipt is acknowledged of this nonprovisional Patent Application. It will be considered in its order and you will be notified as to the results of the examination. Be sure to provide the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION when inquiring about this application. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. If an error is noted on this Filing Receipt, please write to the Application Processing Division's Customer Correction Branch within 10 days of receipt. Please provide a copy of the Filing Receipt with the changes noted thereon.

Applicant(s)

KARL KOLTER, ~~SACHSENWEG,~~ FED REP GERMANY; HELMUT FRICKE, ~~SPEYERING,~~ FED REP GERMANY; VOLKER BUEHLER, ~~LERBACHSTRASSE,~~ FED REP GERMANY; HERBERT MUELLER-PELTZER, ~~OPELSTRASSE,~~ FED REP GERMANY.

CONTINUING DATA AS CLAIMED BY APPLICANT—
THIS APPLN IS A 371 OF  PCT/EP94/00949 03/24/94

FOREIGN/PCT APPLICATIONS—FED REP GERMANY      P 43 10 963.2      04/03/93

TITLE
DELAYED RELEASE MICROTABLET OF ~~BETA-PHENYLPROPIOPHENONE~~ DERIVATIVES

PRELIMINARY CLASS: 424

PLEASE NOTE THAT THE TITLE IS INCORRECT, IT SHOULD READ AS FOLLOWS:

DELAYED RELEASE MICROTABLET OF BETA-PHENYLPROPIOPHENONE
DERIVATIVES

~~PLEASE NOTE THAT THE APPLICANTS' CITY ADDRESSES ARE INCORRECT, THEY SHOULD READ AS FOLLOWS:~~

(1) KARL KOLTER, <u>LIMBURGERHOF</u>, FED REP GERMANY
(2) HELMUT FRICKE, <u>MUTTERSTADT</u>, FED REP GERMANY
(3) VOLKER BUEHLER, <u>KARLSRUHE</u>, FED REP GERMANY
(4) HERBERT MUELLER-PELTZER, <u>HEIDELBERG</u>, FED REP GERMANY

DEC 1 8 1995

OBLON, SPIVAK, McCLELLAND
MAIER & NEUSTADT, P.C.

(see reverse)

DOCKET NO: 524-2396-0X PCT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

IN RE APPLICATION OF:          : GROUP: 1502
Karl KOLTER, et al.

SERIAL NUMBER: 08/525,749      : ATTENTION:
                                 Application Division
FILED: October 3, 1995         Customer Corrections

FOR: DELAYED RELEASE MICROTABLETS OF BETA-PHENYLPROPIOPHENONE
      DERIVATIVES

### REQUEST FOR CORRECTED OFFICIAL FILING RECEIPT

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C.   20231

Sir:

     The Patent Office is requested to provide a corrected
Official Filing Receipt for the attached.   If you have any
questions, please do not hesitate to contact us.

     In light of the fact that the errors were the fault of the
Patent Office, no fees are required.   However, in the event that
a fee is required, please charge the appropriate amount to our
Deposit Account No. 15-0030.   A duplicate copy of this sheet is
enclosed.

                          Respectfully submitted,

                          OBLON, SPIVAK, McCLELLAND,
                          MAIER & NEUSTADT, P.C.

                          Norman F. Oblon
                          Attorney of Record
                          Registration Number: 24,618
                          Robert F. Gnuse
                          Registration Number 27,295

1755 S. Jefferson Davis Highway
Arlington, Virginia   22202
(703) 413-3000
Fax:   413-2220



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 08/525,749 | 10/03/95 | KOLTER | K    524-2396-OXP |

| EXAMINER |
|---|
| BENSTON JR,W |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1502 | 6 |

15M1/1017
OBLON SPIVAK MCCLELLAND MAIER & NEUSTADT
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON VA 22202

DATE MAILED:
10/17/96

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

## OFFICE ACTION SUMMARY

☒ Responsive to communication(s) filed on _10-3-95_

☐ This action is FINAL.

☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 D.C. 11; 453 O.G. 213.

A shortened statutory period for response to this action is set to expire _3_ month(s), or thirty days, whichever is longer, from the mailing date of this communication. Failure to respond within the period for response will cause the application to become abandoned. (35 U.S.C. § 133). Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

**Disposition of Claims**

☒ Claim(s) _1-6_ is/are pending in the application.

Of the above, claim(s) _____ is/are withdrawn from consideration.

☐ Claim(s) _____ is/are allowed.

☒ Claim(s) _1-6_ is/are rejected.

☐ Claim(s) _____ is/are objected to.

☐ Claims _____ are subject to restriction or election requirement.

**Application Papers**

☐ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.

☐ The drawing(s) filed on _____ is/are objected to by the Examiner.

☐ The proposed drawing correction, filed on _____ is ☐ approved ☐ disapproved.

☐ The specification is objected to by the Examiner.

☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119**

☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

☐ All ☐ Some* ☐ None of the CERTIFIED copies of the priority documents have been

☐ received.

☐ received in Application No. (Series Code/Serial Number) _____.

☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

*Certified copies not received: _____

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

**Attachment(s)**

☒ Notice of Reference Cited, PTO-892

☐ Information Disclosure Statement(s), PTO-1449, Paper No(s). _____

☐ Interview Summary, PTO-413

☒ Notice of Draftsperson's Patent Drawing Review, PTO-948

☐ Notice of Informal Patent Application, PTO-152

-- SEE OFFICE ACTION ON THE FOLLOWING PAGES --

PTOL-326 (Rev. 10/96)

☆ U.S. GPO: 1996-409-290/40023

Serial Number: 08/525,749                                          -2-

Art Unit: 1502

15.

Receipt of preamendment dated October 3, 1995 is acknowledged.

16.

Claims 1-6 are rejected under 35 U.S.C. § 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

The phrase "from 81 to 99.9% of the weight of the micro-tablet, but not taking into account the weight of any coating which is present" is vague, indefinite and may be unnecessary as it is not known if said phrase is important. If so, said percentage of the coating should be included into said claim language. A correction/deletion is requested.

17.

The following is a quotation of 35 U.S.C. § 103 which forms the basis for all obviousness rejections set forth in this Office action:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention

Serial Number: 08/525,749                                    -3-

Art Unit: 1502

were, at the time the invention was made, owned by the same
person or subject to an obligation of assignment to the same
person.

18.

Claims 1-6 are rejected under 35 U.S.C. § 103 as being

unpatentable over Davidson in view of Franke.

Cited claims read on a cylindrical delayed release tablet

with an active agent.

Davidson teaches a delayed release microtubule (col. 1,

lines 43-46; col. 2, lines 43-45; col. 3, lines 21-28) and active

agent (see examples 1-8). While Davidson does not teach said

preferred active agent, Franke teaches said parameter (col. 1,

lines 5-22; col, 2, lines 29-37).

It would have been obvious to one of ordinary skill in the

art at the time of the invention to use the teachings of Davidson

in view of Franke who teaches as conventional a novel tablet

composition comprising propaferone HCL.

The motivation to combine is provided by the fact that both

cited references read on a tablet comprising an active agent.

The intended purpose is to provide a delayed release specific

active agent tablet.

No claim is allowed.

19.

The prior art made of record and not relied upon

is considered pertinent to applicant's disclosure.

Serial Number: 08/525,749                                    -4-

Art Unit: 1502

20.

    Any inquiry concerning this communication or earlier
communications from the examiner should be directed to
William E. Benston, Jr. whose telephone number is (703) 308-4429.
The examiner can normally be reached on Monday-Friday from
9:30a.m. to 6:00p.m.

    If attempts to reach the examiner by telephone are
unsuccessful, the examiner's supervisor, T.K. Page, can be
reached on (703) 308-2927.  The fax phone number for this Group
is (703) 305-5408.

    Any inquiry of a general nature or relating to the status of
this application or proceeding should be directed to the Group
receptionist whose telephone number is (703) 308-2351.

Benston:css
October 16, 1996



PA 196

TO SEPARATE, HOLD TOP AND BOTTOM EDGES, SNAP—APART AND DISCARD CARBON

| FORM PTO-892 (REV. 3–78) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | | SERIAL NO. 08/535, 749 | GROUP ART UNIT 1502 | ATTACHMENT TO PAPER NUMBER 6 |
|---|---|---|---|---|---|
| | NOTICE OF REFERENCES CITED | | APPLICANT(S) KOLTER et al | | |

**U.S. PATENT DOCUMENTS**

| * | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| A | | 3 9 5 1 8 2 1 | 4-1976 | Davidson | 252 | 1 | |
| B | | 1 9 7 4 9 8 6 | 10-1984 | Lietz | 564 | 349 | |
| C | | 4 9 3 9 1 1 4 | 7-1990 | Franke | 514 | 652 | |
| D | | 1 9 5 4 3 4 7 | 9-1990 | Kristen et al | 424 | 456 | |
| E | | | | | | | |
| F | | | | | | | |
| G | | | | | | | |
| H | | | | | | | |
| I | | | | | | | |
| J | | | | | | | |
| K | | | | | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS. DWG | PP. SPEC. |
|---|---|---|---|---|---|---|---|---|---|
| L | | | | | | | | | |
| M | | | | | | | | | |
| N | | | | | | | | | |
| O | | | | | | | | | |
| P | | | | | | | | | |
| Q | | | | | | | | | |

**OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)**

| R | |
|---|---|
| S | |
| T | |
| U | |

| EXAMINER | DATE 9-28-96 | |
|---|---|---|

* A copy of this reference is not being furnished with this office action.
(See Manual of Patent Examining Procedure, section 707.05 (a).)

# United States Patent [19]

Davidson

[11]    **3,951,821**

[45]    **Apr. 20, 1976**

[54] **DISINTEGRATING AGENT FOR TABLETS**

[75] Inventor:   William G. Davidson, Carmel, Ind.

[73] Assignee:   The Dow Chemical Company, Midland, Mich.

[22] Filed:      Sept. 20, 1974

[21] Appl. No.: 508,025

**Related U.S. Application Data**

[63] Continuation of Ser. No. 271,829, July 14, 1972, abandoned.

[52] **U.S. Cl.**.................................. 252/1; 424/15;
424/362; 252/134; 252/363.5

[51] **Int. Cl.²**.................................. C09K 3/00

[58] **Field of Search**...................... 424/15, 361, 362;
252/1

[56]          **References Cited**
**UNITED STATES PATENTS**

R27,679    6/1973    Bentholm et al. ................. 424/362

| | | | |
|---|---|---|---|
| 3,181,998 | 5/1965 | Kanig | 424/361 |
| 3,622,677 | 11/1971 | Short | 424/321 |

*Primary Examiner*—Benjamin R. Padgett
*Assistant Examiner*—Josephine Lloyd
*Attorney, Agent, or Firm*—Maynard R. Johnson

[57]          **ABSTRACT**

Disintegration of tablets is improved by the incorporation therein of a plurality of small tubules. The tubules can be prepared by subdivision of hollow fibers such as cellulose or cellulose acetate hollow fibers having inside diameters on the order of 50–300 microns into segments 100–1000 microns in length. Tablets and methods for their preparation are disclosed.

**5 Claims, No Drawings**

PA 198

3,951,821

1

## DISINTEGRATING AGENT FOR TABLETS

### CROSS-REFERENCE TO RELATED APPLICATION

This is a continuation of application Serial No. 271,829 filed July 14, 1972 now abandoned.

### BACKGROUND OF THE INVENTION

A number of materials have been used to enhance or control disintegration of tablets on exposure to a liquid medium. For example, U.S. Pat. No. 3,383,283 discloses stearic acid-talc mixtures; U.S. Pat. No. 3,629,393 discloses water-swellable granules; and U.S. Pat. No. 3,435,110 describes a collagen matrix to enhance disintegration.

### SUMMARY OF THE INVENTION

The present invention provides a novel tablet disintegrant for tablets in the form of small tubular particles incorporated within the tablet structure. The tubular particles are fabricated of a material which is compatible with the other ingredients of the tablet, and which has character strength to maintain the hollow, tubular structure of the particles without complete occlusion through the compression of the tablet. Incorporation of such tubular segments in a tablet provides a tablet with a plurality of small open-ended chambers (internally of the segments) and a plurality of openings in the face of the tablet.

The term "tablet" is employed herein in its usual sense to refer to a compressed or molded mass of solid material comprising an active ingredient such as a drug, a soap, a disinfectant, a fertilizer, an insecticide, a dye, a foodstuff, etc., which active ingredient is intended in use to be ultimately dispersed or dissolved in a liquid such as water, gastric fluid, oil, emulsions, chemical solutions, etc. For the purposes of the invention, the shape and size of a tablet can vary considerably from the conventional rounded disk shape or capsule shape associated with pharmaceutical tablets, to irregularly shaped masses, bars, pellets, balls, beads, cakes, or the like.

The tubular segments of the invention are hereinafter referred to as "tubules" to reflect both their hollow, open-ended tubular character, and their small size in relation to the size of the ultimate tablet. The tubules are generally more or less cylindrical in shape. Their cross-sectional dimensions are most conveniently expressed in terms of inside diameter (I.D.), it being understood that the tubules can have circular, ellipsoidal, oval, polygonal or irregular in cross-section and that inside diameter is employed as a convenient expression of internal area. The length of the tubules is likewise conveniently expressed as the axial length of a cylindrical segment, it being understood that the tubules may also be curved or bent, and that the ends thereof need not be in a plane normal to an axis, or even precisely planar. The wall thickness of the tubules is conveniently expressed in terms of outside diameter.

In general, the tubules have an inside diameter on the order of from about 5, to about 10, to about 25, to about 100, to about 1000 microns. Tubule length will generally be from about 50 microns to 2 to 3 millimeters. The wall thickness should be sufficient to maintain the tubular form of the tubules in a compressed tablet, and is preferably thin enough to be readily water-permeable. The tubules can have outside diameters ranging from about 10 to about 50 microns to about

2

300 to about 1100 microns, preferably having an outside diameter of about 5 to 10 to 50 to about 300 microns greater than the inside diameter. Axial length can be as low as 0.5 microns, but is preferably at least as great as the inside diameter, and is preferably about 100–1000 microns.

In general, the tubules are fabricated of a synthetic organic polymeric material having a density less than 1 gram per cubic centimeter. In quantity, such organic polymeric tubules will generally have a bulk density on the order of 0.1 to about 0.6 grams per cubic centimeter, or from about 1000 to about 45,000 tubules per cubic centimeter.

#### Preparation of the Tubules

The tubule disintegrating agents of the invention can be conveniently prepared by cutting or otherwise subdividing hollow fibers into segments of the desired length. The hollow fibers of a desired material, dimensions and shape can in turn be prepared by well-known procedures. For example, hollow fibers can be prepared by coating a filamentous core, and thereafter dissolving the core material, as taught by Snelling, U.S. Pat. No. 1,713,679, by drawing a relatively large tube, or by extrusion or melt spinning, as disclosed, for example, in U.S. Pat. Nos. 3,616,928; 3,536,611; 3,492,698; 3,228,456; 3,494,121 and 3,423,491. Hollow fibers of various types are also commercially available for use in permeation separatory devices such as hemodialysis or desalinization devices or heat exchange devices. These commercially available hollow fibers can be segmented to form tubules. The tubules employed in the present invention are much shorter in length than the hollow fibers employed in applications such as reverse osmosis devices. Accordingly, broken or imperfect fibers prepared for other uses can be segmented for use in the present invention. Also, the manufacture of hollow fibers for preparation of tubules can be greatly simplified, since the length of the hollow fiber starting material is much less critical.

#### Disintegratable Tablets

The invention provides tablets containing the tubules as disintegrating agents. The tubules are incorporated in a tablet in an amount effective to enhance disintegration of the tablet, and can be employed over a wide range of concentrations, from about 0.1 to about 90 or more percent by weight of the ultimate tablet. In addition to their function as disintegrating agents, the tubules can be dyed a color which contrasts with the other tablet ingredients, to aid in tablet identification, and the longer tubules, e.g. 500–3000 microns in length, add strength to the tablet structure.

When a tablet of the invention is contacted with a liquid, the tubules in the tablet face can draw liquid rapidly into the tablet by capillary action. Within the tablet local dissolution of ingredients can occur at the internal ends of tubules, thus providing additional channels for the liquid to move from tubule to tubule within the tablet. The increase in disintegration rate is thus dependent in part upon factors having to do with capillary attraction, such as wettability of the tubules, dimensions of tubules, and surface tension. When the tubules are fabricated from a material which is permeable to the liquid, the tubule walls can serve as dialysis membranes through which the liquid can migrate. In such an embodiment, the disintegration rate is also influenced by factors having to do with osmotic pres-

3,951,821

3

sure, such as tubule wall permeability, electrolyte concentrations, pressure and the like. The tubules can also be fabricated of materials such as water-swellable polymers which imbibe or react with the liquid and swell, in which case enhancement of disintegration is further related to mechanical disruptive forces generated in such swelling. Additionally, the tubule material may itself be soluble in the liquid, in which case additional factors contribute to disintegration.

It will thus be apparent that the disintegration mechanisms involved in the invention can be quite complex from a theoretical standpoint. Accordingly, particular theories or combination of theories should not be considered as controlling. It will also be apparent that the invention provides a high degree of practical flexibility for adaptation of the invention to a variety of environments.

### Quantity of Tubules

Due to their small size, the disintegrant tubules of the invention are most conveniently measured in bulk by weight or by volume. In most applications it is desirable to measure the ingredients and the final tablets in terms of weight. Accordingly, quantities of tubules are also most conveniently expressed in terms of weight. It is understood that for a given type of tubule, weight is also an indication of volume, and of number of tubules.

In the preparation of tablets of the invention, the material to be formed into tablets is mixed together in accordance with conventional procedures for formulating and mixing a solid mass to be tabletted. A plurality of tubules is mixed with the other ingredients prior to tablet formation, and the mass is then compressed into tablets (or granules) of the desired size and shape, according to conventional techniques. Sufficient tubules should be employed to enhance the disintegration of the final tablet or granule. The exact quantity of tubules to be employed in a given case can vary considerably depending upon such factors as the tablet ingredients, liquid intended for disintegration in ultimate use, the manner in which the tablets are formed, size of tablets, the particular type of tubules employed, and disintegration rate desired. The quantity of tubules to be employed in a given case can be readily selected by determining disintegration rates for tablets or granulations prepared with different quantities of tubules using conventional equipment and procedures.

In general, excellent results have been obtained with tablet formulations in which the tubules amount to from about 0.1 to about 1 to about 20 percent by weight of the tablet formulation. The tubules can be employed in higher amounts, such as from 1 to 50 to 85 to 90 percent by weight of the total tablet. In most instances, however, an amount of tubules in excess of 10 to 15 percent of the tablet weight provides little additional increase in disintegration rate, while the active ingredient concentration as a percentage of tablet weight correspondingly is reduced. For most pharmaceutical tablets and granulations the tubules preferably comprise from about 1 to about 10 percent by weight of the tablet or granule, and outstanding results can be obtained with amounts of about 5 to 7 percent. Depending upon the size of the ultimate tablet and the size of tubules employed the absolute number of tubules per tablet can be as low as one in the case of "micro" tablets or "beadlets" more generally regarded as granules, to hundreds, thousands or millions, or more, individual tubules per tablet.

4

### Preparation of Tablets

In a convenient tabletting procedure, the active ingredient or ingredients and any other ingredients (other than the tubules) such as binders, stabilizers, flavors, antioxidants, lubricants, delayed release coatings, running powder, dyes, buffers, etc. are intimately mixed together to form a mass ready for compression or molding into tablets. The ingredients may be granulated by conventional "wet" or "dry" granulation techniques, for example, or portions of the ingredients may be coated according to known procedures to provide for delayed or timed dissolution of the coated ingredients. The disintegrant tubules are then mixed with the dry mixture of ingredients. If a wet granulation procedure is employed, or when a liquid coating is applied, the resulting wet granulate or coated material is preferably dried prior to addition of the tubules although the tubules can be employed in wet granulation techniques as well. The resulting mixture is then compressed into tablets.

The exact type of tubule to be employed depends on the desired use of the ultimate tablet. For most applications with tablets for disintegration in water, tubules are preferably fabricated of a material such as, carboxy methyl cellulose, ethyl cellulose, cellulose, cellulose acetate, gelatin or hydroxypropyl methyl cellulose; and have an inside diameter of about 30 to about 300 microns, a wall thickness of about 5 to about 50 microns and a length of about 100 to 700 microns.

The tablets can be coated according to known procedures for spray coating or press coating, for example, or they can be left uncoated, as may be desired. Coating can be employed advantageously to control disintegration time. In such embodiments, the tubule disintegrants ensure positive rapid disintegration of the tablet once the coating material has been removed.

## DESCRIPTION OF PREFERRED EMBODIMENTS

The following examples illustrate the invention:

### EXAMPLE 1

Hollow cellulose acetate dialysis fibers having an inside diameter of 200 microns and a wall thickness of about 50 microns are cut into roughly cylindrical segments approximately 0.5 – 1 millimeter in length. 50 Parts by weight of the tubular fiber segments are mixed thoroughly with 700 parts by weight of crystalline aspirin. The mixture is compressed into tablets using a 0.5 inch standard curvature punch and die on a Manesty F-3 tablet machine. The tablets are compressed to a tablet hardness, of about 8–10 Strong-Cobb-Arner Units (corresponding to about 2000–3000 psi compression pressure). Disintegration time in 0.1 normal hydrochloric acid is determined according to U.S.P. procedures and found to be less than 2 minutes. Tablets of similar hardness compressed from the same crystalline aspirin alone have a disintegration time in excess of two hours.

### EXAMPLE 2

In a similar procedure, tablets are prepared using 700 parts by weight of the same crystalline aspirin, with 50 or 30 parts by weight of the tubular segments, or with 50 parts by weight of a microcrystalline cellulose disintegrant. Two drops of aqueous methylene blue dye are placed on a tablet of each type and the tablets are observed. The tablets containing the hollow tubule

3,951,821

**5**

disintegrant are found to fracture and disintegrate into moist segments within about one to two minutes. The tablet containing the solid cellulose disintegrant is observed to absorb the dye solution while retaining its physical integrity.

#### EXAMPLE 3

750 Parts by weight of a rifampin tablet granulation containing 600 parts by weight of rifampin and 146 parts by weight of starch and 4 parts by weight of magnesium stearate is mixed with 50 parts by weight of cellulose acetate tubules prepared as described in Example 1. Tablets weighing 750 milligrams are compressed to equal hardness from this mixture, and from the granulation alone. The tablets containing the tubules are found to disintegrate in about 5 minutes in 0.1 normal hydrochloric acid with corresponding dissolution of the active ingredient, while the corresponding tablets without the tubule disintegrant are found to remain intact after 30 minutes.

Similar results are obtained with cellulose tubules of similar dimensions.

#### EXAMPLE 4

90 Grams of sodium bisulfite are mixed with 15 grams of ethyl cellulose as a solution in ethanol, (about 5 percent by weight) and the wet mass is passed through a screen having 8 meshes to the inch. The wet granulate is dried at room temperature, then passed through a screen having 12 meshes to the inch. The dry granulation is then spray coated with shellac applied in alcohol solution.

40 Grams of sodium iodide are mixed with 15 grams of ethyl cellulose dissolved in sufficient ethanol to give a wet granulation, and the wet mixture is wet-screened through a screen having 8 meshes to the inch, then dried.

The two foregoing granulates are mixed thoroughly with 20 grams of solid 2,2-dibromo-3-nitrilopropionamide and 25 grams of starch. The resulting dry mixture is then blended with a 20 gram quantity of hollow tubules of hydroxypropyl ethyl cellulose having an average inside diameter of 225 microns and an average length of 0.3 – 0.8 millimeters. The mixture is compressed into tablets weighing about 10 grams each. The tablets are adapted for use as disinfectants of aqueous systems such as water closets, humidifier tanks, wading pools and the like. In use the tablet disintegrates to provide an initial release of the 2,2-dibromo-3-nitrilo-propionamide disinfectant and sodium iodide synergist, followed by a later gradual release of sodium bisulfite which detoxifies the disinfectant to permit safe discharge of the disinfected water.

#### EXAMPLE 5

A series of different hollow fibers of cellulose acetate containing varying amounts of a tetramethyl sulfone plasticizer, and of various sizes, are cut into substantially cylindrical segments. The resulting tubules, substantially all of which are between 500 and 2000 microns in length, are then evaluated for agglomeration on a scale of 1 to 5, with 1 representing free flowing tubules with substantially no agglomeration and 5 representing clumping. The fibers in each series are examined microscopically dry, after wetting with water; and after redrying. The observations are set out below, the O.D. measurements being in microns. With the excep-

**6**

tion of series 8, the inside diameter is about 200 microns, series 8 being about 50–60 microns I.D.

| Series | Agglomeration | Dry O.D. | Wet O.D. | Redried O.D. |
|--------|---------------|----------|----------|--------------|
| 1 | 1 | 210 | 290–300 | 220 |
| 2 | 1 | 230 | 240–265 | 230–240 |
| 3 | 1 | 240 | 250 | 160 |
| 4 | 4 | 220 | 240–265 | 160–165 |
| 5 | 4 | 260–275 | 280 | 270–280 |
| 6 | 3 | 260 | 265–270 | 170 |
| 7 | 5 | 240–250 | 250–270 | 160–170 |
| 8 | 5 | 70 | 70 | 65 |
| 9 | 1 | 210–220 | 250–260 | 190–200 |

During wetting, water is observed to flow into the tubules, indicating capillary action. With the exception of tubule series 8, significant expansion of tubules is observed indicating that both capillary attraction of water and mechanical disruption of tablet structure will take place. On redrying, shrinkage is generally uniform, the tubules retaining the same shape throughout wetting and drying.

#### EXAMPLE 6

Tubules from series 9 of Example 5 are screened to give a batch of tubules, substantially all of which are between 60 and 700 microns in length. Two batches of tubules are separately dyed with about two drops of aqueous F. D. & C. Blue No. 1 to about 5 cc. of tubules. One batch is dried in air at room temperature, the second is oven dried at about 45°C. The resulting blue tubules are mixed with aspirin and tablets are prepared following the procedure described in Example 1. Visually the tablets have a distinctive blue and white speckled or mottled appearance. Under microscopic examination, tubules lying along the faces of the tablet are seen to be flattened. Tubules at the face, but extending axially into the tablet are seen to retain a substantially circular cross section, presenting a large number of relatively uniform capillary sized openings in the tablet face.

Disintegration studies with these tablets show dramatic reductions in disintegration time, with results similar to those set out in Examples 1 and 2.

#### EXAMPLE 7

A tablet granulation is prepared containing 600 parts rifampin, 150 parts starch, 40 parts calcium carbonate, 8 parts magnesium stearate and 2 parts sodium lauryl sulfate, 400 parts by weight of the granulation is mixed with 25 parts by weight of tubules. The tubules employed are of regenerated cellulose plasticized with glycerine, the glycerine also serving as a wetting agent to enhance capillarity. The tubules have an I.D. of about 200 microns, an O.D. of 225 microns and substantially all (over 95 percent) are between 60 and 700 microns in length.

One lot of 425 milligram tablets is compressed from the resulting tubule granulation to a hardness of 10 Strong-Cobb-Arner units. A similar lot of 400 milligram control tablets are prepared from the granulation alone. The tablets containing 6.25 percent by weight of tubules have a disintegration time in artificial gastric juice of 3–5.3 minutes, as compared to 43–55 minutes for the control tablets.

The "tubule tablets" and control tablets are orally administered to separate groups of dogs, five dogs per group. Blood samples are withdrawn at timed intervals

3,951,821

**7**

and assayed for serum drug levels. The average serum levels of rifampin in the control group at 0,1,2,4,6 and 24 hours after dosing, are 0,0.4,1.2,1.2,1.2, and 0.5 micrograms per milliliter. The blood levels in the test group at the same time periods are 0, 5.1, 7.4, 7.3, 7.0 and 1.9 micrograms per milliliter of serum, indicating that much higher blood levels of the active ingredient are obtained by the use of the tubule disintegrant.

EXAMPLE 8

A mixture of 200 parts (by weight) quinidine sulfate, 35 parts starch, 2.5 parts magnesium stearate and 1.25 parts lubricant (Sterotex) is granulated. Tablets are compressed to a hardness of about 5–7 Strong-Cobb-Arner units, sized to contain 200 milligrams quinidine sulfate per tablet. One lot is from the granulation alone and one lot from a mixture containing 7 percent by weight regenerated cellulose tubules plasticized with glycerine, 200 microns I.D., 60–700 microns long, 225 microns O.D. The tablets containing the tubule disintegrant have a disintegration time of about 3 minutes, as compared to 17 minutes for tablets without the tubules.

**8**

I claim:

1. In a compressed tablet comprising an active ingredient and an effective amount of a disintegrating agent to facilitate disintegration of the tablet in contact with a liquid, the improvement wherein the disintegrating agent comprises a tubule, said tubule having an internal cross-sectional area corresponding to an inside diameter of from about 5 microns to about 2,000 microns, and a length corresponding to an axial length of from about 0.5 micron to about 3 millimeters, said tubule being wettable by the liquid.

2. The tablet of claim 1 wherein the tablet contains a plurality of said tubules.

3. The tablet of claim 2 wherein the tubules are of a liquid permeable material.

4. The tablet of claim 2 wherein the tubules are of a material adapted to swell on contact with the liquid.

5. The tablet of claim 2 wherein the tubules are of a material selected from the group consisting of ethyl cellulose, cellulose acetate, gelatin, cellulose, hydroxypropyl methyl cellulose.

* * * * *

# United States Patent [19]

## Lietz

[11] Patent Number: 4,474,986

[45] Date of Patent: Oct. 2, 1984

[54] PREPARATION OF PROPAFENONE

[75] Inventor: Helmut Lietz, Neustadt, Fed. Rep. of Germany

[73] Assignee: BASF Aktiengesellschaft, Fed. Rep. of Germany

[21] Appl. No.: 476,575

[22] Filed: Mar. 18, 1983

[30] Foreign Application Priority Data

Mar. 19, 1982 [DE] Fed. Rep. of Germany ........ 3210061

[51] Int. Cl.$^3$ ............................................ C07C 85/08
[52] U.S. Cl. .................................................. 564/349
[58] Field of Search .................................... 564/349

[56] References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,178,420 | 4/1965 | Palopoli et al. | 564/349 X |
| 3,542,872 | 11/1970 | Koppe et al. | 564/349 |
| 3,864,390 | 2/1975 | Le Count et al. | 564/349 X |
| 3,876,802 | 4/1975 | Brändström et al. | 564/349 X |

FOREIGN PATENT DOCUMENTS

2001431   5/1974   Fed. Rep. of Germany ...... 564/349

Primary Examiner—Paul F. Shaver
Attorney, Agent, or Firm—Keil & Witherspoon

[57]        ABSTRACT

A process for the preparation of propafenone wherein
1. 2'-hydroxyacetophenone is reacted with epichlorohydrin,
2. the resulting 2-(2',3'-epoxypropoxy)-acetophenone is reacted with propylamine,
3. the resulting 2-(2'-hydroxy-3'-propylaminopropoxy)-acetophenone is reacted with benzaldehyde, accompanied by elimination of water, and
4. the resulting 2-(2'-hydroxy-3'-propylaminopropoxy)-benzalacetophenone is hydrogenated.

1 Claim, No Drawings

4,474,986

1

## PREPARATION OF PROPAFENONE

The invention relates to a novel process for the preparation of propafenone.

Propafenone (2'-hydroxy-3-propylaminopropoxy)-3-phenylpropiophenone hydrochloride, German Pat. No. 2,001,431) is a substance having an anti-arrhythmic action. According to the said German patent, it is obtained by reacting 2-hydroxy-omega-phenylpropiophenone (as the sodium salt) with 1-chloro-2,3-epoxypropane and then reacting the resulting 2-(2',3'-epoxypropyl)-omega-phenylpropiophenone with n-propylamine and converting the product to the hydrochloride. This process gives a yield of only about 65%. Moreover, the starting material (2-hydroxy-omega-phenylpropiophenone) required for the reaction can only be obtained with difficulty from 2-hydroxyacetophenone by condensing with benzaldehyde and then hydrogenating the reaction product.

The present invention provides a process for the preparation of propafenone, wherein

1. 2'-hydroxyacetophenone is reacted with epichlorohydrin,
2. the resulting 2-(2',3'-epoxypropoxy)-acetophenone is reacted with propylamine,
3. the resulting 2-(2'-hydroxy-3'-propylaminopropoxy)-acetophenone is reacted with benzaldehyde, accompanied by elimination of water, and
4. the resulting 2-(2'-hydroxy-3'-propylaminopropoxy)-benzalacetophenone is hydrogenated.

The first reaction step is as a rule carried out in epichlorohydrin as the solvent. However, it is also possible to dissolve the epichlorohydrin in a different solvent, such as toluene or acetone, and to employ it in a slight excess (a molar ratio of from 1:1 to 2:1). The reaction is advantageously carried out at 50°–150° C., preferably at the boiling point of the solvent used, in the presence of a base, such as sodium hydroxide or potassium carbonate. The product of the first reaction step does not have to be specially purified for the next stage. It is not necessary to isolate the sodium salt of 2'-hydroxy-acetophenone.

The second stage is carried out by adding the substances mentioned and refluxing the mixture for several hours. Advantageously, propylamine is used as the solvent, but alcohols (isopropanol and ethanol) may also be used. For further processing, the reaction product obtained is converted to a salt, for example the hydrochloride or oxalate. The oxalate has proved particularly advantageous. This conversion is advantageously carried out in alcoholic solution.

Elimination of water and reaction with benzaldehyde in the 3rd stage are carried out in a solvent, such as an aqueous lower alcohol, in the presence of a base, such as sodium hydroxide or potassium hydroxide, at 50°–150° C., preferably at the boiling point of the solvent.

The product obtained in stage 3 is used direct for the hydrogenation in stage 4. For this purpose, further solvent and a catalyst, such as palladium/charcoal or Raney nickel are added and the calculated amount, or a slight excess, of hydrogen is passed in. The hydrogenation is as a rule carried out at room temperature.

From the reaction solution thus obtained, the propafenone can be isolated after it has been converted to a salt. Suitable acids for forming such a salt include the hydrohalic acids, oxalic acid and tartaric acid, hydrochloric acid being preferred.

2

The novel process has the following advantages:

1. It gives very pure propafenone.
2. It is easy to carry out. The intermediates as a rule do not have to be isolated in a pure form, contrary to what is necessary in the conventional processes.
3. For the reaction of the 2'-hydroxyacetophenone with the epichlorohydrin, it is not necessary to employ the sodium salt of the former. Instead, 2'-hydroxyacetophenones can be employed direct.
4. The process gives a substantially better yield of propafenone, based on 2'-hydroxyacetophenone employed. In the conventional process, the yield is about 45%, whilst in the novel process it is, overall, 55%.

## EXAMPLE

Stage 1
Preparation of 2-(2',3'-epoxypropoxy)-acetophenone
27.2 g of 2'-hydroxyacetophenone and 8 g of sodium hydroxide were suspended in 200 ml of epichlorohydrin. The yellowish white suspension was refluxed for 4 hours and cooled, and the crystals were filtered off. The filtrate was concentrated. The residue, 38.8 g=180.9 millimoles (90.5%, based on 2'-hydroxyacetophenone) was employed, without additional purification, for the next stage.
Stage 2
34.8 g of 2-(2',3'-epoxypropoxy)-acetophenone and 150 ml of propylamine were refluxed for 4 hours, with stirring. When the mixture had cooled, the excess propylamine was distilled off. The residue (57.9 g) was dissolved in 100 ml of methanol and 30 g of oxalic acid dissolved in 250 ml of methanol were added to this solution. The mixture was heated, and after it had cooled, the crystals formed (23 g) were filtered off. The filtrate was concentrated. The residue was dissolved in 350 ml of a hot 20/80 methanol/acetone mixture. Overnight, crystals separated out and these were filtered off. The total yield was 52.2 g (84.6%, based on the "epoxide" employed); melting point 159° C.
Stages 3 + 4
Preparation of propafenone hydrochloride
20 g of 2-(2'-hydroxy-3'-propylaminopropoxy)-acetophenone oxalate were dissolved in 450 ml of hot methanol. 16 g of sodium hydroxide, dissolved in 30 ml of distilled water, and 10.6 g of benzaldehyde were added to this solution and the mixture was refluxed for 4 hours. When it had cooled, 2 g of 10% strength Pd/C and 500 ml of methanol were added. The reaction product was hydrogenated under atmospheric pressure (hydrogen absorption: 1,350 ml). The catalyst was filtered off and thoroughly washed with methanol. The filtrate was concentrated. The residue was dissolved in 500 ml of hot 1 N HCl. On cooling, the solution deposited crystals, which were filtered off (crystals I). The filtrate was rendered alkaline and extracted with 3×70 ml of chloroform. The organic phases were combined and concentrated. The residue was brought to pH 2 with 1 N HCl and again concentrated. This new residue was recrystallized from about 250 ml of an 80/20 acetone/methanol mixture. The resulting crystals (II) were filtered off and dried.
The yield was 14.9 g=39.4 millimoles (12.1 g of crystals I, and 2.8 g of crystals II), amounting to 67.2% of theory based on 2-(2'-hydroxy-3'-propylaminopropoxy)-acetophenone oxalate employed. The hydrochloride melted at 172° C.
We claim:

4,474,986

3

1. A process for the preparation of propafenone, wherein
1. 2'-hydroxyacetophenone is reacted with epichlorohydrin,
2. The resulting 2-(2',3'-epoxypropoxy)-acetophenone is reacted with propylamine,
3. The resulting 2-(2'-hydroxy-3'-propylamino-

4

propoxy)-acetophenone is reacted with benzaldehyde, accompanied by elimination of water, and
4. The resulting 2-(2'-hydroxy-3'-propylaminopropoxy)-benzalacetophenone is hydrogenated.

* * * * *

# United States Patent [19]

## Franke, deceased et al.

[11] Patent Number: **4,945,114**

[45] Date of Patent: **Jul. 31, 1990**

[54] THERAPEUTIC AGENTS CONTAINING ENANTIOMERS OF PROPAFENONE

[75] Inventors: Albrecht Franke, deceased, late of Wachenheim, by Renate E. Franke, Catharina Franke, legal representatives; Rainer Schlecker, Bissersheim; Josef Gries, Wachenheim; Gerda Von Philipsborn, Weinheim; Liliane Unger, Ludwigshafen, all of Fed. Rep. of Germany

[73] Assignee: BASF Aktiengesellschaft, Ludwigshafen, Fed. Rep. of Germany

[21] Appl. No.: 225,756

[22] Filed: Jul. 29, 1988

[30]     Foreign Application Priority Data

Jul. 30, 1987 [DE]  Fed. Rep. of Germany ....... 3725273

[51] Int. Cl.⁵ ................................. A61K 31/135

[52] U.S. Cl. ............................... 514/652; 514/821

[58] Field of Search ..................... 514/652, 821

[56]           References Cited

### U.S. PATENT DOCUMENTS

4,460,605  7/1984  Petrik et al. ................... 514/652
4,571,409  2/1986  Frank et al. ................... 514/652

### OTHER PUBLICATIONS

Liebigs Ann. Chem., 1987, pp. 561–563, Blaschke, et al., Racemattrennung von Propafenon und Diprafenon, Konfiguration . . .

Primary Examiner—Frederick E. Waddell
Attorney, Agent, or Firm—Oblon, Spivak, McClelland, Maier & Neustadt

[57]           ABSTRACT

Therapeutic agents containing enantiomers of propafenone, the preparation of the said agents and their use for certain groups of patients.

7 Claims, No Drawings

4,945,114

1

## THERAPEUTIC AGENTS CONTAINING ENANTIOMERS OF PROPAFENONE

The present invention relates to drugs prepared from the propafenone enantiomers.

Propafenone (INN for 2'-(2-hydroxy-3-propylamino-propoxy)-3-phenylpropiophenone), with the structural formula



is successfully used in the form of the hydrochloride for the therapy of cardiovascular disorders, in particular of cardiac arrhythmias.

In addition to the antiarrhythmic action, propafenone has an additional $\beta$-sympatholytic action.

Propafenone has a center of asymmetry at carbon atom 2 of the aminopropanol side chain and has been used to date only in the form of the racemate. Although the racemate has already been resolved (G. Blaschko and B. Walther, Liebigs Ann. Chem. 1987, 561–563), the pharmacological properties of the enantiomers have not been investigated.

This investigation has now been carried out and surprising results were obtained, with considerable practical consequences, as will be described below.

The propafenone enantiomers can be obtained by stereospecific synthesis. In this procedure, the known phenol I is reacted with an optically active $C_3$ building block to give an intermediate (IV).



Examples of suitable $C_3$ building blocks are glycidol II or one of its derivatives III. In the formula III



X is a nucleofugic leaving group (which can be displaced by nucleophiles), such as $CF_3SO_3$, $CH_3SO_2$, $CH_3$—$C_6H_4$—$SO_3$ or Br. Glycidol is obtainable in both enantiomeric forms (JOC 51 (1986), 3710), and the derivatives III can be prepared therefrom by known processes (JOC 43 (1978), 4876). These $C_3$ building blocks can also be prepared from natural substances, such as mannitol (Eur. J. Med. Chem. 17 (1982), 69 and TH 42 (1986), 447).

The reaction of I with II or III is carried out by processes known from the literature (Heterocycles 20 (1983), 1975; Eur. J. Med. Chem. 17 (1982), 69; JOC 51 (1986), 3710 and European Patent No. 6,615). Thus, glycidol can be etherified under the conditions of the Mitsunobu method, and the compounds III are reacted

2

under the conditions of the Williamson synthesis. The reaction gives the optically active epoxide



which is converted into (R)- or (S)-propafenone in a conventional manner.

As expected, the $\beta$-blocking action of (R,S)-propafenone is attributable to the (S)-enantiomer.

Table 1 shows that $^3$H-dihydroalprenolol binding (heart, lung) is inhibited to a significantly greater extent by the (S)-enantiomer and to a significantly smaller extent by the (R)-enantiomer compared with (R,S)-propafenone.

On the other hand, the enantiomers surprisingly do not differ from one another with respect to the antiarrhythmic action (Table 2). This finding was unexpected because the therapeutic effect of a racemate is usually due more or less substantially to one enantiomer. For example, the parent compound of the class I antiarrhythmics, quinidine, is effective only in the form of the 8(R),9(S)-enantiomer.

Thus, the propafenone enantiomers comprise two compounds which, because of their different action profile, are suitable for the selective therapy of cardiac arrhythmias of different groups of patients.

(S)-propafenone, with a more powerful $\beta$-blocking action than propafenone, is indicated for the following: for tachycardiac arrhythmias accompanied by high catecholamine levels and for patients who have not yet been treated with $\beta$-blockers.

The (R)-enantiomer, with a weaker $\beta$-blocking action than propafenone, is indicated for the following: for patients who are already under $\beta$-blocker therapy and for older patients (over about 50) and/or patients suffering from hypotension and/or cardiac insufficiency, in each of which cases $\beta$-blockers are contraindicated.

The present invention accordingly relates to therapeutic agents for systemic use which contain a propafenone enantiomer as the active compound, in addition to conventional pharmaceutical auxiliaries, and the preparation of a drug using a propafenone enantiomer.

The therapeutic agents or formulations are prepared using the conventional liquid or solid carriers or diluents and the conventional pharmaceutical auxiliaries, in accordance with the desired route of administration and in a dose suitable for use, preparation being effected in a conventional manner, for example by mixing the active compound with the solid and liquid carriers and auxiliaries conventionally used in such preparations.

The agents can be administered perorally or parenterally. Examples of formulations of this type are tablets, film tablets, coated tablets, capsules, pills, powders, solutions and suspensions as well as infusion or injection solutions.

Examples of conventionally used pharmaceutical auxiliaries are mannitol, lactose, propylene glycol and ethanol, gelatine, starch, talc, stearic acid and polyvinylpyrrolidone. Flavor improvers, stabilizers, emulsifiers, etc. can, if required, be added to the preparations. It is essential that all substances used in the preparation of the pharmaceutical formulations are toxicologically

PA 207

4,945,114

3

acceptable and compatible with the active compounds used.

If necessary, the novel enantiomers obtained are converted into an addition salt with a physiologically tolerated acid. A list of conventional physiologically tolerated acids is given in Fortschritte der Arzneimittelforschung 1966, Birkhäuser-Verlag, Vol. 10, pages 224–285, Germany, Switzerland. Hydrochloric acid is preferred.

The addition salts with acids are, as a rule, obtained in a conventional manner by mixing the free base or a solution thereof with the appropriate acid or a solution thereof in an organic solvent, for example a lower alcohol, such as methanol, ethanol or propanol, or a lower ketone, such as acetone, methyl ethyl ketone or methyl isobutyl ketone, or an ether, such as diethyl ether, tetrahydrofuran or dioxane. To improve deposition of crystals, mixtures of the stated solvents may be used. Furthermore, pharmaceutically acceptable aqueous solutions of addition compounds of the propafenone enantiomers with acids can be prepared by dissolving the free bases in an aqueous acid solution.

The contents of active compound in the novel pharmaceutical preparations are in the conventional range for propafenone preparations, i.e. from 0.1 to 50, preferably from 0.2 to 20, in particular from 1 to 5, mg per kg of body weight for a single dose in the form of the hydrochloride; i.e. for a patient weighing 70 kg, the content of active compound is from 7 to 3,500, preferably from 14 to 1,400, in particular from 70 to 350, mg.

## METHODS

1. In vitro determination of the affinity to the $\beta_1$- and $\beta_2$-receptor subtype by competitive experiments

For this purpose, mixtures with bovine heart membranes (90% of $\beta_1$, 10% of $\beta_2$) or rat lung membranes (25% of $\beta_1$, 75% of $\beta_2$) in tris-HCl (50 mM)/0.1% ascorbic acid (pH 7.4) were prepared with increasing concentrations of test substance and a fixed concentration (1 nM) of the radioligand $^3$H-dihydroalprenolol. The unspecific binding was determined with $10^{-4}$ M isoproterenol.

After incubation for 60 minutes at 25° C., the mixtures were diluted with buffer and immediately filtered over glass filters (GF/F, Whatman), and the amount of the radioligand retained on the filter was determined by means of liquid scintillation measurement. Two experiments were carried out with three batches.

The competition constants (Ki values in nM) were calculated by nonlinear regression analysis on an IBM computer using the program ligand due to Munson and Rodbard (Anal. Biochem. 107 (1980), 220).

TABLE 1

Inhibition of the specific $^3$H-dihydroalprenolol binding in bovine heart membranes (90% of $\beta_1$ and 10% of $\beta_2$) or rat lung membranes (25% of $\beta_1$, 75% of $\beta_2$) Competition constants (Ki) with confidence limits (CL), determined by simultaneous fitting of the competition curves

| | Heart | Lung |
|---|---|---|
| Substance | Ki(nM) | Ki(nM) |
| (R,S)-propafenone | 74 (70–77) | 32 (31–34) |
| (R)-propafenone | 788 (708–868) | 257 (237–276) |
| (S)-propafenone | 59 (53–64) | 14 (13–15) |

2. Determination of the antiarrhythmic action in aconitine-induced arrhythmia of the rat
The experimental animals used were male Sprague-Dawley rats weighing from 180 to 300 g. Anaesthesia was effected intraperitoneally with 100 mg/kg of thiobuta-

4

TABLE 1-continued

Inhibition of the specific $^3$H-dihydroalprenolol binding in bovine heart membranes (90% of $\beta_1$ and 10% of $\beta_2$) or rat lung membranes (25% of $\beta_1$, 75% of $\beta_2$) Competition constants (Ki) with confidence limits (CL), determined by simultaneous fitting of the competition curves

| | Heart | Lung |
|---|---|---|
| Substance | Ki(nM) | Ki(nM) |

barbital. To induce arrhythmias, aconitine was infused at a rate of 5 μg per kg per minute. The test substances were administered intravenously 2 minutes before the beginning of the aconitine infusion. The parameter measured was the duration of the aconitine infusion when the first arrhythmias (loss of P, ventricular extrasystoles and tachycardias) appeared in the ECG of the animals. In untreated animals, the aconitine-induced arrhythmia occurred after 3.3 ±0.11 minutes (n = 120). The ED 50% was determined from the linear relationship between log dose (mg/kg) of the test substances and the relative prolongation of aconitine infusion duration (Δ%).

2. Determination of the antiarrhythmic action in aconitine-induced arrhythmia of the rat

The experimental animals used were male Sprague-Dawley rats weighing from 180 to 300 g. Anaesthesia was effected intraperitoneally with 100 mg/kg of thiobutabarbital. To induce arrhythmias, aconitine was infused at a rate of 5 μg per kg per minute. The test substances were administered intravenously 2 minutes before the beginning of the aconitine infusion. The parameter measured was the duration of the aconitine infusion when the first arrhythmias (loss of P, ventricular extrasystoles and tachycardias) appeared in the ECG of the animals. In untreated animals, the aconitine-induced arrhythmia occurred after 3.3±0.11 minutes (n=120). The ED 50% was determined from the linear relationship between log dose (mg/kg) of the test substances and the relative prolongation of aconitine infusion duration (Δ%).

TABLE 2

Antiarrhythmic effect of (R,S)-propafenone and its enantiomers on aconitine-induced arrhythmias in anesthetized rats 5 minutes after intravenous administration; ED 50%; 95% confidence limit

| | Antiarrhythmic effect on aconitine-induced arrhythmias ED 50% |
|---|---|
| Substance | mg/kg |
| (R,S)-propafenone | 0.724 (0.56–0.935) |
| (R)-propafenone | 0.801 (0.44–1.46) |
| (S)-propafenone | 0.676 (0.412–1.11) |

The Examples which follow illustrate the invention

## EXAMPLE 1

### (R)-propafenone · HCl

19 ml (0.12 mole) of diethyl azodicarboxylic acid were added dropwise at 0°–5° C. to a solution of 22.6 g (0.1 mole) of 2'-hydroxy-3-phenylpropiophenone (I), 8.9 g (0.12 mole) of (S)-glycidol and 31.6 g (0.12 mole) of triphenylphosphine. The mixture was stirred overnight at room temperature and the solvent was distilled off. The oily residue was refluxed with 100 ml of propylamine for 8 hours, after which the excess propylamine was distilled off. 50 ml of 5 N HCl were added, and the mixture was then heated for 1 hour at 50° C. and filtered. Crystals were precipitated on cooling, and were filtered off under suction, washed with ethanol

4,945,114

5

and dried. 19.7 g (52%) of (R)-propafenone . HCl, mp. 177°–178° C., $[\alpha]_D^{23} = +6.4°$ (C=1, CH$_3$OH), were obtained.

### EXAMPLE 2

#### (S)-propafenone . HCl

0.8 g of 2′-hydroxy-3-phenylpropiophenone was added at 0° C. to a suspension of 3.7 millimoles of NaH in 10 ml of tetrahydrofuran. A clear solution was formed. 0.7 g (3.3 millimoles) of glycidyl (S)-trifluoromethanesulfonate was added dropwise at −30° C., and the solution was left to stand at −20° C. The mixture was poured onto ice and extracted with CH$_2$Cl$_2$. The organic phase was dried and the solvent was distilled off. The oily residue was stirred overnight in 5 ml of n-propylamine. Excess amine was distilled off, the residue was dissolved in 5 ml of ethanol and HCl in ether was added. Colorless crystals formed and were filtered off under suction and dried. 0.6 g of (S)-propafenone . HCl, mp. 178°–179° C., $[\alpha]_D^{23} = -6.3°$ (C=1, CH$_3$OH), was obtained.

6

We claim:

1. A method for the treatment of arrhythmias in an older patient or a patient suffering from hypotension and cardiac insufficiency, for whom β-blockers are contraindicated, by administering to said patient an effective amount of (R)-propafenone alone.

2. The method of claim 1, wherein arrhythmias in an older patient is treated.

3. The method of claim 1, wherein a patient suffering from hypotension and cardiac insufficiency is treated.

4. The method of claim 2, comprising administering to said patient from 14 to 1400 mg of said (R)-propafenone alone.

5. The method of claim 2, comprising administering to said patient from 14 to 1400 mg of said (R)-propafenone per single dose.

6. The method of claim 2, comprising administering to said patient from 14 to 1400 mg of said (R)-propafenone.

7. The method of claim 2, comprising administering to said patient from 14 to 1400 mg of said (R)-propafenone per single dose.

* * * * *

# United States Patent [19]

**Kristen et al.**

[11] Patent Number: **4,954,347**

[45] Date of Patent: **Sep. 4, 1990**

[54] **LONG LASTING COMPOSITION OF PROPAFENONE AND QUINIDINE FOR TREATMENT OF CARDIAC CONDITIONS**

[75] Inventors: Edward B. Kristen, Nutley, N.J.; Juan R. Guerrero, Durham, N.C.

[73] Assignee: BASF K & F Corp., Whippany, N.J.

[21] Appl. No.: 189,544

[22] Filed: May 3, 1988

[51] Int. Cl.³ .............................................. A61K 9/20
[52] U.S. Cl. ............................... 424/456; 424/464
[58] Field of Search ............ 424/456, 459, 474, 475

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 4,460,605 | 7/1984 | Petrik et al. | 514/651 |
| 4,557,934 | 10/1985 | Cooper et al. | 514/223.5 |
| 4,612,220 | 9/1986 | Finmke et al. | 514/327 |

**OTHER PUBLICATIONS**

Connolly et al., "Clin. Efficacy & Electrophysiology of Oral Propafenone for Vent. Tachycardia", Am. J. Card., vol. 52, pp. 1208–1213, (Dec. 1983).
Siddoway et al., "Polymorphic Oxidative Metabolism of Propafenone in Man", Circulation 68, (Supp. III), p. 64, (Oct. 1983).
Otton et al., "Competitive Inhibition of Sparteine Oxidation in Human Liver . . . ", Life Sciences, vol. 34, pp. 73–80, (1984).
Leeman et al., "Single-Dose Quinidine Treatment Inhibits Metoprolol Oxidation in Extensive Metabolizers", Eur. J. Clin. Pharmacol., 29:739–741, (1986).
Klein et al., "Enhanced Antiarrhythmic Efficacy of Propafenone When Used in Combination with Procainamide or Quinidine", Am. Heart J., (Sep. 1987), pp. 551–558.

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—Leon R. Horne
*Attorney, Agent, or Firm*—Kenyon & Kenyon

[57] **ABSTRACT**

A pharmaceutical composition for the treatment of cardiac arrhythmia comprising an effective amount of propafenone in combination with a subtherapeutic amount of quinidine, such that the quinidine potentiates the elimination half-life of the propafenone.

The invention also comprises a method for treating patients with cardiac arrhythmia by means of administering said pharmaceutical composition.

**13 Claims, 6 Drawing Sheets**



PROPAFENONE

PPF  = PROPAFENONE PLASMA LEVELS (ng/mL) DURING PROPAFENONE ADMINISTRATION
PPFQ = PROPAFENONE PLASMA LEVELS (ng/mL) DURING CO-ADMINISTRATION OF PROPAFENONE PLUS QUINIDINE FOR ONE DOSING INTERVAL (8 HOURS)



FIG. 1

PROPAFENONE

-□- PPF
-◆- PPFQ

CONC. (ng/ml)

HOURS

PPF  = PROPAFENONE PLASMA LEVELS (ng/mL) DURING PROPAFENONE ADMINISTRATION
PPFQ = PROPAFENONE PLASMA LEVELS (ng/mL) DURING CO-ADMINISTRATION OF
       PROPAFENONE PLUS QUINIDINE FOR ONE DOSING INTERVAL (8 HOURS)

FIG. 2

PROPAFENONE PLASMA CONCENTRATIONS

| | HOURS | PPF | PPFQ |
|---|---|---|---|
| 1 | 0 | 709 | 929 |
| 2 | .5 | 648 | 990 |
| 3 | 1 | 819 | 1314 |
| 4 | 1.5 | 960 | 1577 |
| 5 | 2 | 1020 | 1656 |
| 6 | 2.5 | 1020 | 1582 |
| 7 | 3 | 953 | 1540 |
| 8 | 4 | 1020 | 1491 |
| 9 | 6 | 672 | 1253 |
| 10 | 8 | 471 | 960 |

PPF  = PROPAFENONE PLASMA LEVELS (ng/mL) DURING PROPAFENONE ADMINISTRATION
PPFQ = PROPAFENONE PLASMA LEVELS (ng/mL) DURING CO-ADMINISTRATION OF
       PROPAFENONE PLUS QUINIDINE FOR ONE DOSING INTERVAL (8 HOURS)



FIG. 3

5-HYDROXYPROPAFENONE PLASMA CONCENTRATIONS

5OHP = 5-HYDROXYPROPAFENONE PLASMA LEVELS (ng/mL) DURING PROPAFENONE ADMINISTRATION

5OHPQ = 5-HYDROXYPROPAFENONE PLASMA LEVELS (ng/mL) DURING CO-ADMINISTRATION OF PROPAFENONE PLUS QUINIDINE FOR ONE DOSING INTERVAL (8 HOURS)

FIG. 4

5-HYDROXYPROPAFENONE PLASMA CONCENTRATIONS

| | HOURS | 5OHP | 5OHPQ |
|---|---|---|---|
| 1 | 0 | 126 | 92 |
| 2 | .5 | 122 | 92 |
| 3 | 1 | 131 | 105 |
| 4 | 1.5 | 122 | 101 |
| 5 | 2 | 126 | 101 |
| 6 | 2.5 | 126 | 92 |
| 7 | 3 | 147 | 92 |
| 8 | 4 | 160 | 109 |
| 9 | 6 | 156 | 122 |
| 10 | 8 | 118 | 118 |

5OHP = 5-HYDROXYPROPAFENONE PLASMA LEVELS (ng/ml) DURING PROPAFENONE ADMINISTRATION

5OHPQ = 5-HYDROXYPROPAFENONE PLASMA LEVELS (ng/ml) DURING CO-ADMINISTRATION OF PROPAFENONE PLUS QUINIDINE FOR ONE DOSING INTERVAL (8 HOURS)



FIG. 5

N-DEPROPYLPROPAFENONE PLASMA CONCENTRATIONS

NDPP = N-DEPROPYLPROPAFENONE PLASMA LEVELS (ng/mL) DURING PROPAFENONE ADMINISTRATION

NDPPQ = N-DEPROPYLPROPAFENONE PLASMA LEVELS (ng/mL) DURING CO-ADMINISTRATION OF PROPAFENONE PLUS QUINIDINE FOR ONE DOSING INTERVAL (8 HOURS)

FIG. 6

N-DEPROPYLPROPAFENONE PLASMA CONCENTRATIONS

| | HOURS | NDPP | NDPPQ |
|---|---|---|---|
| 1 | 0 | 134 | 146 |
| 2 | .5 | 122 | 146 |
| 3 | 1 | 134 | 187 |
| 4 | 1.5 | 140 | 201 |
| 5 | 2 | 152 | 213 |
| 6 | 2.5 | 155 | 195 |
| 7 | 3 | 180 | 198 |
| 8 | 4 | 180 | 195 |
| 9 | 6 | 161 | 213 |
| 10 | 8 | 128 | 173 |

NDPP = N-DEPROPYLPROPAFENONE PLASMA LEVELS (ng/mL) DURING PROPAFENONE ADMINISTRATION

NDPPQ = N-DEPROPYLPROPAFENONE PLASMA LEVELS (ng/mL) DURING CO-ADMINISTRATION OF PROPAFENONE PLUS QUINIDINE FOR ONE DOSING INTERVAL (8 HOURS)

4,954,347

1

## LONG LASTING COMPOSITION OF PROPAFENONE AND QUINIDINE FOR TREATMENT OF CARDIAC CONDITIONS

### Field of the Invention

This invention is concerned with a pharmaceutical composition used in the treatment of cardiac arrhythmia. In particular, the invention relates to a pharmaceutical composition using the antiarrhythmic drug propafenone, in combination with other substances, such that the oxidative metabolism of propafenone in the liver is inhibited. The invention is also concerned with a method for administering such a pharmaceutical composition.

### BACKGROUND

Cardiac arrhythmias are disorders involving the electrical impulse generating system of the heart. The disorders include premature contractions (extrasystoles) originating in abnormal foci in atria or ventricles, paroxysmal supraventricular tachycardia, atrial flutter, atrial fibrillation, ventricular fibrillation, and ventricular tachycardia. For further discussion, see, for example, C. S. Goodman and A. Gillman, eds. *The Pharmacological Basis of Therapeutics* Sixth Edition, New York: Macmillan Publishing Co., 1980, pp. 761-767.

One means of treating cardiac arrhythmia is with the drug propafenone. Propafenone has been shown to be effective in suppressing both supraventricular and ventricular arrhythmias. (Michael A. Brodsky and Byron J. Allen. "Ventricular tachycardia in patients with impaired left ventricular function: the role of propafenone." *Clin. Prog. in Electrophysical and Pacing.* 4:546, 1986.) The antiarrhythmic action of propafenone appears to be due to its propensity to depress conduction and prolong the refractory period in myocardium. (Shen, et al., "Electrophysiologic and hemodynamic effects of intravenous propafenone in patients with recurrent ventricular tachycardia" *JACC* 3: 1291-1307, 1984)

Propafenone undergoes oxidative metabolism by hepatic microsomal enzymes. However, from person to person there are marked genetically determined differences in the rate of hepatic propafenone metabolism. About 10% of the U.S. Caucasian population are considered "poor metabolizers" and 90% are considered "extensive metabolizers". Variations between racial groups have also been reported in the distribution of poor and extensive metabolizers.

Extensive metabolizers of propafenone have lower blood levels and experience a shorter duration of effect than poor metabolizers. These extensive metabolizers may require more frequent dosages of higher amounts of propafenone to control their arrhythmia.

Consequently, current formulations of propafenone are metabolized too quickly by many individuals. Also, ideal blood levels may not be reached or may not be maintained for a long enough period of time to provide efficient control of cardiac arrhythmia.

The object of the present invention is to provide a formulation of propafenone and a means of administering this formulation which modulates propafenone oxidative metabolism. Other objectives are to decrease interindividual variations of propafenone metabolism; to uniformly raise blood levels among the total population taking propafenone; and to increase the duration of effect among these individuals. Achievement of these

2

objectives would result in increased intervals between administration, improved medical management of patients with cardiac arrhythmia, and greater success in the treatment of this condition.

### SUMMARY OF THE INVENTION

These and other objects are achieved by the present invention which relates to a pharmaceutical composition suitable for the treatment of a patient having cardiac arrhythmia. The composition comprises, in unit dosage form, an effective amount of propafenone in combination with a subtherapeutic amount of quinidine, such that the quinidine prolongs the elimination half-life of the propafenone in the same formulation. The bioavailability of propafenone will also increase during concomitant administration of propafenone plus quinidine so less propafenone is metabolized and more reaches the systemic circulation. Such a composition may be in the form of a tablet, capsule, or caplet, preferably with an enteric coating. A preferred composition comprises from about 50 mg to about 600 mg propafenone hydrochloride and about 25 mg to about 200 mg quinidine such that from about 1 unit dose to about 2 unit doses per day would be administered. An especially preferred composition is formulated from about 300 mg propafenone and about 100 mg quinidine with the remainder being either a pharmaceutical carrier such as lactose sugar, gum binder, and an inert polymeric extender which is calculated to provide about a 5 to 10 grain tablet, capsule, or caplet.

The invention as well relates to a method for treating patients with cardiac arrhythmia which comprises orally administering to a patient, at unit dosage levels, therapeutic amounts of propafenone in combination with subtherapeutic amounts of quinidine such that the quinidine potentiates the elimination half-life of propafenone.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a graph of plasma levels of propafenone following administration of the claimed composition compared to administration of a propafenone standard.

FIG. 2 is a table of the data represented in FIG. 1.

FIG. 3 is a graph of plasma levels of 5-hydroxy-propafenone, a metabolite of propafenone, following administration of the chemical composition compared to administration of a propafenone standard.

FIG. 4 is a table of the data represented in FIG. 3.

FIG. 5 is a graph of plasma levels of N-depropyl-propafenone, a metabolite of propafenone, following administration of the claimed composition compared to administration of a propafenone standard.

FIG. 6 is a table of the data represented in FIG. 5.

### DETAILED DESCRIPTION OF THE INVENTION

Propafenone is an antiarrhythmic drug available for oral and intravenous administration. The structural formula and chemical name for propafenone is:



3                    4,954,347                    4



PROPAFENONE

↓

3-OH PROPAFENONE



HYDROXY-METHOXY METABOLITES

Propafenone is extensively metabolized in the liver, where it undergoes oxidative metabolism to form 5-hydroxy and hydroxy-methoxy metabolites.

The oxidation of propafenone appears to occur at the site of the hepatic microsomal mono-oxygenase cytochrome P450. Other substances which are oxidized by cytochrome P450 isozymes include debrisoquin, sparteine, and metoprolol.

The pharmacokinetic and pharmacodynamic characteristics of propafenone are striking in their great interindividual variability. Some individuals can be considered "extensive propafenone metabolizers," characterized by a relatively short elimination half-life, low plasma concentration, high oral clearance, disproportionate dose-concentration relationship, and detectable quantities of the metabolite 5-hydroxypropafenone. Others are "poor propafenone metabolizers," characterized by a long elimination half-life, high plasma concentration, low oral clearance, proportionate dose-concentration relationship, and absence of detectable 5-hydroxypropafenone. (Siddoway, et al. "Polymorphic oxidative metabolism of propafenone in man," Circ. 68;64, 1987.)

Approximately 90% of the American population are extensive metabolizers of propafenone, while only 10% are poor metabolizers. This invention is intended to provide an improved formulation and means of administration of propafenone for the vast majority of individuals who are extensive metabolizers.

2'-[3-(propylamino)-2-(hydroxy)-(propoxy)-3-phenyl-propiophenone hydrochloride

Molecular formula: $C_{21}H_{27}NO_3.HCl$

Molecular weight: 377.92

Propafenone blocks fast inward sodium channels. It is also a weak beta-blocker with weak calcium antagonist activity. It is effective against recurrent supraventricular and ventricular arrhythmias, premature ventricular contractions, and ventricular tachycardia.

Propafenone can be successfully utilized in both the short-term and long-term treatment of arrhythmia. Administered intravenously, it is an effective treatment for ventricular arrhythmias, and supraventricular arrhythmias. Oral propafenone is an effective agent in the management of premature ventricular complexes and chronic recurrent supraventricular tachycardia. It does not appear to cause significant hemodynamic changes or life-threatening toxic side effects.

5

Quinidine is the isomer of quinine, found naturally in cinchona bark. The structural formula of quinidine is:



Quinidine is a class I antiarrhytmic drug. It is generally regarded as a myocardial depressant. It depresses cardiac irritability, conduction velocity, and contractility. In experimental animals, quinidine has been shown to raise the threshold for electrically induced arrhythmias, prevent or terminate the "late" ventricular tachycardias following coronary artery occlusion, and terminate or prevent circus-movement flutter. The major clinical uses of quinidine are for the prevention and abolition of certain cardiac arrhythmias. These would include ventricular tachycardia, atrial flutter, atrial fibrillation, and premature systole.

Quinidine has been shown to inhibit the oxidation of certain drugs which are believed to be metabolized via the P450 cytochrome system. For example, the in vitro oxidation of sparteine has been shown to be markedly inhibited in combination with quinidine. This is thought to be due to competition with the catalytic enzyme site(s) that oxidize sparteine.

Another in vivo study measured the effect of quinidine on the oxidative metabolism of metoprolol. Two hours after ingestion of 50 mg. of quinidine sulfate, 100 mg. of metoprolol was administered. Under this regimen the single dose of quinidine in extensive metabolizers produced a threefold increase of total metoprolol and the active (—) metoprolol isomer plasma concentration.

The oxidized metabolite of metoprolol is alpha-hydroxymetoprolol. The oxidized metabolite of propafenone is 5-hydroxypropafenone. These oxidation products are significantly different. In the case of metoprolol, oxidation occurs on the aliphatic alpha carbon, whereas in the case of propafenone, oxidation occurs on C-5 of an aromatic ring. The inhibition of propafenone metabolism by quinidine, therefore, would not be expected based on the effect of quinidine metabolism on metoprolol.

Furthermore, the drugs are structurally different, with unique physical and pharmacological properties. The half-life of metoprolol is approximately 3 to 7 hours. The half-life of propafenone is between two and 30 hours. Metoprolol is primarily a beta-adrenergic blocking agent. Propafenone is only a weak beta-blocker. Its primary electrophysiological effect is the blockade of the fast sodium channel of cardiac cells. The two drugs also have significantly different levels of bioavailability. Systemic bioavailability of metoprolol is 40–50%, whereas systemic bioavailability of propafenone is only 5–12%.

As described in greater detail below, it was surprising to find therefore that when a pharmaceutical composi-

6

tion of the present invention was administered to a patient, the oxidative metabolism of propafenone was modulated, causing the maximum plasma concentration, elimination half-life, and steady state levels of plasma propafenone to be increased.

The invention also discloses that a means of administering this pharmaceutical composition also improved treatment efficiency, safety, and patient compliance.

The components of the present invention can be formulated into a tablet, capsule, caplet, suspension or liquid, administered orally. The effective dose of the present invention is the amount required to successfully treat cardiac arrhythmia, and is readily ascertainable by one skilled in the art. Propafenone hydrochloride is administered in doses from 450 mg/day (150 mg every 8 hours) to 900 mg/day (300 mg every 8 hours). Quinidine gluconate is administered in 325 mg tablets either two or three times daily.

For oral administration, the pharmaceutical composition in the form of a tablet, capsule, or caplet is preferably made in the form of a dosage unit containing a particular amount of the active ingredients. The tablet, capsule, or caplet is made by combining the compounds of the present invention with excipients such as sodium citrate, calcium carbonate, and dicalcium phosphate, disintegrants such as starch, alginic acid, and certain complex silicates, together with binding agents such as polyvinylpyrrolidone, gelatin and acacia. Lubricating agents such as magnesium stearate, sodium lauryl sulfate, and talc are often very useful for tableting purposes. Solid compositions of a similar type may also be employed as fillers in soft and hard-filled gelatin capsules. Preferred materials would include lactose as well as high molecular weight polyethylene glycols. The tablet, capsule, or caplet is then formed according to means known to one of ordinary skill in the art.

The invention also includes a tablet, capsule, or caplet with an enteric coating. This is an acid-resistant film that renders the tablet, capsule, or caplet resistant to dissolution by gastric juice. The enteric-coating process is carried out by dissolving a film-coating material which is resistant to gastric dissolution in a volatile solvent. This solution is then sprayed onto filled tablets, capsules, or caplets.

It is also possible to select a material for the capsule wall that is resistant to gastric dissolution but capable of dissolution in the intestine. For example, it is possible to select certain types of gelatin that do not dissolve at the pH of the stomach but can dissolve at the pH of the intestine.

Alternatively, the active ingredients may be dissolved in an aqueous medium for oral administration and the appropriate agents added to mask the unpalatable taste of the propafenone and quinidine.

### EXAMPLES

#### Example 1

A dry solid pharmaceutical composition is prepared by blending the following materials together in the proportions by weight specified below:

Propafenone: 300
Quinidine: 100
Carboxylic Acid: 50
Sodium Citrate: 25
Alginic Acid: 10
Polyvinylpyrrolidone: 10
Magnesium Stearate: 5

7

4,954,347

8

After the dried composition is thoroughly blended, tablets are punched from the resulting mixture, each tablet being of such size that it contains 300 mg. of the active ingredient. Other tablets are also prepared in a similar fashion containing 150 and 225 mg. of the active ingredient, respectively, by using the appropriate amount of the propafenone and quinidine in each case.

## EXAMPLE II

A dry solid pharmaceutical composition is prepared by combining the following materials together in the proportions by weight indicated below:

Propafenone: 300
Quinidine: 100
Carboxylic Acid: 50
Calcium Carbonate: 20
Polyethylene glycol, average molecular weight 4000: 30

The dried solid mixture so prepared is then thoroughly agitated so as to obtain a powdered product that is completely uniform in every respect. Soft elastic and hard-filled gelatin capsules containing this pharmaceutical composition are then prepared, employing a sufficient quantity of material in each instance so as to provide each capsule with 200-550 mg. of the active ingredients.

## EXAMPLE III

A pharmacokinetic evaluation of the interaction between quinidine and propafenone hydrochloride was conducted. Subjects were males and females over age 21 with a history of clinically significant ventricular arrhythmia defined as Lown Grade 2 (>30 PVCs/hr.) or higher. Only patients requiring propafenone therapy were evaluated. An open-label design was used.

In Phase I of the study, patients on a q8 hr. dosage regimen had their optimal dosage continued every eight hours for at least four days, at which time, plasma propafenone levels were measured for one eight hour dosing interval. Immediately following Phase I, patients were administered 80 mg. quinidine gluconate every eight hours concomitantly with their dose of propafenone. After at least four days of concomitant administration, propafenone levels were measured for one eight hour dosing interval. All drug doses were administered with about 180 mL tap water. The last dose of each study phase was administered after a minimum of eight hours fasting following by an additional three hour fasting period. Water was allowed ad lib. Ten mL blood samples for propafenone assay were obtained at hours 0, 0.5, 1, 1.5, 2, 2.5, 3, 4, 6 and 8. Blood samples for quinidine assay were obtained at hours 0 and 8 ("trough" levels). All blood samples were collected in heparinized tubes. Samples were promptly centrifuged to separate plasma and RBC's, frozen, and stored prior to analysis.

## RESULTS

The results from one patient indicate that administration of quinidine concomitantly with propafenone has a very pronounced effect on the blood levels of propafenone. Co-administration of quinidine with propafenone results in propafenone plasma concentrations which are about 150% more than those observed when propafenone is administered alone.

FIG. 1 is a graph that compares propafenone plasma levels (ng/mL) during propafenone administration (PPF) and propafenone plasma levels (ng/mL) during

co-administration of propafenone plus quinidine for one 8 hour dosing interval (PPFQ).

FIG. 2 is a table of the data represented in FIG. 1 that compares propafenone plasma levels (ng/mL) during propafenone administration (PPF) and propafenone plasma levels (ng/mL) during co-administration of propafenone plus quinidine for one 8 hour dosing interval (PPFQ).

FIG. 3 is a graph that compares 5-hydroxypropafenone plasma levels (ng/mL) during propafenone administration (50HP) and 5-hydroxypropafenone plasma levels (ng/mL) during co-administration of propafenone plus quinidine for one 8 hour dosing interval (50HPQ).

FIG. 4 is a table of the data represented in FIG. 3 that compares 5-hydroxypropafenone plasma levels (ng/mL) during propafenone administration (50HP) and 5-hydroxypropafenone plasma levels (ng/mL) during co-administration of propafenone plus quinidine for one 8 hour dosing interval (50HPQ).

FIG. 5 is a graph that compares n-depropylpropafenone plasma levels (ng/mL) during propafenone administration (NDPP) and n-depropylpropafenone plasma levels (ng/mL) during co-administration of propafenone plus quinidine for one 8 hour dosing interval (NDPQ).

FIG. 6 is a table of the data represented in FIG. 5 that compares n-depropylpropafenone plasma levels (ng/mL) during propafenone administration (NDPP) and n-depropylpropafenone plasma levels (ng/mL) during co-administration of propafenone plus quinidine for one 8 hour dosing interval (NDPQ).

What is claimed is:

1. A pharmaceutical composition suitable for the treatment of a patient having cardiac arrhythmia comprising: an antiarrhythmic therapeutically effective amount of propafenone of 50-600 mg and a subtherapeutic amount of quinidine effective for prolonging the elimination half-life of the propafenone, in combination with a pharmaceutical carrier therefor.

2. A pharmaceutical composition according to claim 1, wherein the quinidine is present in an amount from about 25-200 mg/tablet.

3. A pharmaceutical composition according to claim 1, comprising propafenone in the amount from about 50-600 mg/tablet and quinidine in a subtherapeutic amount from about 25-200 mg/tablet.

4. A pharmaceutical composition according to claim 1 in the form of a tablet, a hard or soft-gelatin capsule, or a suspension or a syrup for oral administration.

5. A pharmaceutical composition according to claim 5, wherein the tablet, capsule, or caplet are coated with an enteric coating.

6. A pharmaceutical composition according to claim 1, wherein the pharmaceutical carrier is selected from a group consisting of a sugar, a starch, a gum, corn syrup, water and mixtures thereof.

7. A pharmaceutical composition according to claim 1, comprising propafenone in the amount from about 50-600 mg/tablet; quinidine in a subtherapeutic amount from about 25-200 mg/tablet; a pharmaceutical carrier selected from a group consisting of a sugar, a starch, a gum, corn syrup and mixtures thereof and wherein said composition is in the form of an enteric coated tablet.

8. A pharmaceutical composition according to claim 1 comprising propafenone in the amount from about 150-900 mg/tablet; quinidine in a subtherapeutic amount from about 25-200 mg/tablet; a pharmaceutical

4,954,347

9

carrier selected from a group consisting of a sugar, a starch, a gum, corn syrup and mixtures thereof and wherein said composition is in the form of an enteric coated tablet for administration once per day.

9. A method of treating cardiac arrhythmia comprising: administering to a patient having cardiac arrhythmia a pharmaceutical composition comprising an antiarrhythmic therapeutic effective amount of propafenone of 50-600 mg and a subtherapeutic amount of quinidine effective for prolonging the elimination half-life of the propafenone in combination with pharmaceutical carriers therefor.

10

10. A method of treating cardiac arrhythmia according to claim 7, wherein the effective dose is about 50 mg-600 mg dosage unit administered one or two times per

11. A method of treating cardiac arrhythmia according to claim 7, wherein the effective dose produces minimum blood levels of about 200 ng/ml and maximum blood levels of about 2000 ng/ml of propafenone.

12. A pharmaceutical composition in accordance with claim 1 wherein the composition is in the form of a table.

13. A pharmaceutical carrier comprises starch.

* * * * *

Form PTO 948 (Rev. 10-94)    U.S. DEPARTMENT OF COMMERCE - Patent and Trademark Office    Application No. 525749

## NOTICE OF DRAFTSPERSON'S PATENT DRAWING REVIEW

PTO Draftpersons review all originally filed drawings regardless of whether they are designated as formal or informal. Additionally, patent Examiners will review the drawings for compliance with the regulations. Direct telephone inquiries concerning this review to the Drawing Review Branch, 703-305-8404.

The drawings filed (insert date) 10 3 95 are
A. ____ not objected to by the Draftsperson under 37 CFR 1.84 or 1.152.
B. ____ objected to by the Draftsperson under 37 CFR 1.84 of 1.152 as indicated below. The Examiner will require submission of new, corrected drawings when necessary. Corrected drawings must be submitted according to the instructions on the back of this Notice.

1. DRAWINGS. 37 CFR 1.84(a): Acceptable categories of drawings:
Black ink. Color.
____ Not black solid lines. Fig(s)
____ Color drawings are not acceptable until petition is granted.

2. PHOTOGRAPHS. 37 CFR 1.84(b)
____ Photographs are not acceptable until petition is granted.
____ Photographs not properly mounted (must use bristol board or photographic double-weight paper). Fig(s)
____ Poor quality (half-tone). Fig(s)

3. GRAPHIC FORMS. 37 CFR 1.84(h)
____ Chemical or mathematical formula not labeled as separate figure. Fig(s)
____ Group of waveforms not presented as a single figure, using common vertical axis with time extending along horizontal axis. Fig(s)
____ Individuals waveform not identified with a separate letter designation adjacent to the vertical axis. Fig(s)

4. TYPE OF PAPER. 37 CFR 1.84(e)
____ Paper not flexible, strong, white, smooth, nonshiny, and durable. Sheet(s)
____ Erasures, alterations, overwritings, interlineations, cracks, creases, and folds copy machine marks not accepted. Fig(s)
____ Mylar, velum paper is not acceptable (too thin). Fig(s)

5. SIZE OF PAPER. 37 CFR 1.84(f): Acceptable sizes:
21.6 cm. by 35.6 cm. (8 1/2 by 14 inches)
21.6 cm. by 33.1 cm. (8 1/2 by 13 inches)
21.6 cm. by 27.9 cm (8 1/2 by 11 inches):
21.0 cm. by 29.7 cm. (DIN size A4)
All drawing sheets not the same size. Sheet(s)
____ Drawing sheet not an acceptable size. Sheet(s)

6. MARGINS. 37 CFR 1.84(g): Acceptable margins:

| Paper size | | | |
|---|---|---|---|
| | 21.6 cm X 35.6 cm 21.6 cm X 33.1 cm 21.6cm. X 27.9 cm, 21.0 cm. X 29.7 cm. (8 1/2 X 14 inches) (8 1/2 X 13 inches) (8 1/2 X 11 inches) (DIN Size A4) | | |
| T | 5.1 cm. (2") | 2.5 cm. (1") | 2.5 cm. (1") | 2.5cm. |
| L | .64 cm. (1/4") | .64 cm. (1/4") | .64 cm. (1/4") | 2.5 cm. |
| R | .64 cm. (1/4") | .64 cm. (1/4") | .64 cm. (1/4") | 1.5 cm. |
| B | .64 cm. (1/4") | .64 cm. (1/4") | .64 cm. (1/4") | 1.0 cm. |

Margins do not conform to chart above.
____ Top (T) ____ Left (L) ____ Right (R) ____ Bottom (B)

7. VIEWS. 37 CFR 1.84(h)
REMINDER: Specification may require revision to correspond to drawing changes.
____ All views not grouped together. Fig(s)
____ Views connected by projection lines or lead lines. Fig(s)
____ Partial views. 37 CFR 1.84(h) 2

____ View and enlarged view not labled separately or properly. Fig(s)
____ Sectional views. 37 CFR 1.84 (h) 3
____ Hatching not indicated for sectional portions of an object. Fig(s)
____ Cross section not drawn same as view with parts in cross section with regularly spaced parallel oblique strokes. Fig(s)

8. ARRANGEMENT OF VIEWS. 37 CFR 1.84(i)
____ Words do not appear on a horizontal, left-to-right fashion when page is either upright or turned so that the top becomes the right side, except for graphs. Fig(s)

9. SCALE. 37 CFR 1.84(k)
____ Scale not large enough to show mechanism with crowding when drawing is reduced in size to two-thirds in reproduction. Fig(s)
____ Indication such as "actual size" or scale 1/2" not permitted. Fig(s)

10. CHARACTER OF LINES, NUMBERS, & LETTERS. 37 CFR 1.84(l)
____ Lines, numbers & letters not uniformly thick and well defined, clean, durable, and black (except for color drawings). Fig(s)

11. SHADING. 37 CFR 1.84(m)
____ Solid black shading areas not permitted. Fig(s)
____ Shade lines, pale, rough and blurred. Fig(s)

12. NUMBERS, LETTERS, & REFERENCE CHARACTERS. 37 CFR 1.84(p)
____ Numbers and reference characters not plain and legible. 37 CFR 1.84(p)(l) Fig(s)
____ Numbers and reference characters not oriented in same direction as the view. 37 CFR 1.84(p)(l) Fig(s)
____ English alphabet not used. 37 CFR 1.84(p)(2) Fig(s)
____ Numbers, letters, and reference characters do not measure at least .32 cm. (1/8 inch) in height. 37 CFR(p)(3) Fig(s)

13. LEAD LINES. 37 CFR 1.84(q)
____ Lead lines cross each other. Fig(s)
____ Lead lines missing. Fig(s)

14. NUMBERING OF SHEETS OF DRAWINGS. 37 CFR 1.84(t)
____ Sheets not numbered consecutively, and in Arabic numerals, beginning with number 1. Sheet(s)

15. NUMBER OF VIEWS. 37 CFR 1.84(u)
____ Views not numbered consecutively, and in Arabic numerals, beginning with number 1. Fig(s)
____ View numbers not preceded by the abbreviation Fig. Fig(s)

16. CORRECTIONS. 37 CFR 1.84(w)
____ Corrections not made from prior PTO-948. Fig(s)

17. DESIGN DRAWING. 37 CFR 1.152
____ Surface shading shown not appropriate. Fig(s)
____ Solid black shading not used for color contrast. Fig(s)

COMMENTS:

ATTACHMENT TO PAPER NO. 6    REVIEWER _____    DATE 12 18 95
PTO Copy

PA 222

---

**REMINDER**

Drawing changes may also require changes in the specification, e.g., if Fig. 1 is changed to Fig. 1A, Fig. 1B, Fig. 1C, etc., the specification, at the Brief Description of the Drawings, must likewise be changed. Please make such changes by 37 CFR 1.312 Amendment at the time of submitting drawing changes.

---

## INFORMATION ON HOW TO EFFECT DRAWING CHANGES

### 1. Correction of Informalities—37 CFR 1.85

File new drawings with the changes incorporated therein. The application number or the title of the invention, inventor's name, docket number (if any), and the name and telephone number of a person to call if the Office is unable to match the drawings to the proper application, should be placed on the back of each sheet of drawings in accordance with 37 CFR 1.84(c). Applicant may delay filing of the new drawings until receipt of the Notice of Allowability (PTOL-37). Extensions of time may be obtained under the provisions of 37 CFR 1.136. The drawing should be filed as a separate paper with a transmittal letter addressed to the Drawing Review Branch.

### 2. Timing of Corrections

Applicant is required to submit acceptable corrected drawings within the three-month shortened statutory period set in the Notice of Allowability (PTOL-37). If a correction is determined to be unacceptable by the Office, applicant must arrange to have acceptable correction resubmitted within the original three-month period to avoid the necessity of obtaining an extension of time and paying the extension fee. Therefore, applicant should file corrected drawings as soon as possible.

Failure to take corrective action within set (or extended) period will result in ABANDONMENT of the Application.

### 3. Corrections other than Informalities Noted by the Drawing Review Branch on the Form PTO-948

All changes to the drawings, other than informalities noted by the Drawing Review Branch, MUST be approved by the examiner before the application will be allowed. No changes will be permitted to be made, other than correction of informalities, unless the examiner has approved the proposed changes.

524-2396-OX PCT

## IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF:

KARL KOLTER ET AL.                    : GROUP ART UNIT: 1502

SERIAL NO.   08/525,749

FILED: OCTOBER 3, 1995               : EXAMINER:  BENSTON

FOR:   DELAYED RELEASE MICRO-
       TABLET OF BETA-PHENYL
       PROPIOPHENONE DERIVATIVES

## AMENDMENT AND REQUEST FOR RECONSIDERATION

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C.   20231

SIR:

Responsive to the Official Action of October 17, 1996,
Applicants respectfully request reconsideration of the above-
identified application in view of the following amendments and
remarks.

## IN THE CLAIMS

Claim 1, lines 9-10 (not counting the structure of
formula I) delete "but not taking into account the weight of
any coating which is present,".

## REMARKS

Claims 1-6 are active in this application.  The above
amendment is supported by Claim 1 as originally filed and the
specification.  No new matter has been added by these
amendments.

The present invention relates to a cylindrical delayed

release microtablet having a convex or flat upper side and lower side, which contains a β-phenylpropiophenone derivative of formula I



I

where R is n-propyl or 1, 1-dimethylpropyl, and its pharmaceutically acceptable salts. In particular, the cylindrical delayed release microtablet of the present invention is required to have a height and diameter that are each, independently, 1-3 mm, must contain the active ingredient in the range from 81-99.9% of the weight of the microtablet, and have an active ingredient density that is greater than 1. Further, the microtablet of the present invention must have a release rate which is virtually independent of the pressure when compressing the tablets and contains no release-delaying ancillary substance but can contain specified amounts of a lubricant or other conventional ancillary substances. The release of the active ingredient in the present microtablet according to the U.S.P. paddle method at 50 rpm is required to be a maximum of 80% after 3 hours and a minimum of 80% after 24 hours.

Applicants have found that by preparing a microtablet having the required size and shape, active ingredient content and active ingredient density, containing the β-phenylpropio-

— 2 —

PA 225

phenone derivative of formula I as its active ingredient, it is possible to provide a microtablet that has surprisingly improved delayed release characteristics compared to other delayed release formats. This is especially surprising in view of the fact that the present microtablet contains no other release delaying additives.

A further surprising result achieved with the present microtablet formulation is that the release of the active ingredient is virtually independent of the pressure used to compress the tablet and independent of the pH. These results are unexpected in view of the fact that it is generally accepted that increases in the compressive force used in tablet production provides a slowing of the release of active ingredient (see specification at page 2 beginning at line 14). A common problem with this feature is that fluctuations in the compressive force in a single machine can result in tablets being produced that have a wide range of delay release times. Yet another surprising result achieved by the present invention is that other medicinal substances having a similar water solubility to that of propafenone hydrochloride (one of the compounds encompassed by the present formula I) are 90% released after one hour, when produced in the same type of microtablet. However, the present microtablets provide no more than 80% release after 3 hours and no less than 80% release after 24 hours.

The claims stand rejected under 35 U.S.C. §103 over Davidson in view of Franke. Davidson discloses a

- 3 -

disintegrating agent for tablets which improves the disintegration of tablets by incorporating therein a plurality of small tubules (see abstract). The Examiner appears to have misinterpreted the thrust of the Davidson invention, since Davidson is specifically looking toward *instant* release and *speeding up the disintegration* of tablets by inserting the tubules described therein. In fact, as shown in the examples of Davidson, the tablets prepared by insertion of their tubules have disintegration times (i.e., release times) of no more than about 5 minutes. In fact, the longest release time disclosed by Davidson is 17 minutes for tablets without the tubules (see column 7, lines 22-23).

This patent cannot suggest the present invention, which is drawn to a delayed release microtablet which is required by the claim to have no more than 80% release of the active ingredient after 3 hours and no less than 80% after 24 hours. While it is true that the present invention can contain a disintegrant, the claims still require that the release of active ingredient be delayed to meet the requirements of part (d) of Claim 1. Thus any disintegrant used in the present invention cannot remove that requirement of the claims. Davidson cannot suggest such a microtablet.

The Examiner has used the Franke et al reference to suggest modifying the Davidson composition by the use of propafenone hydrochloride. While it is true that Franke et al disclose propafenone, there is no disclosure nor suggestion of a microtablet having the required delayed release

- 4 -

PA 227

characteristics of the present invention nor the required shape, size or active ingredient content.

If one were to modify Davidson by the teachings of Franke et al, one would obtain a propafenone hydrochloride tablet containing the disintegration tubules of Davidson. The expected result of such a composition would be relatively instant release, certainly within five minutes or less, as taught by Davidson.

This is not the present invention. Applicants have shown in the present application that by preparing the microtablets of the present invention to meet the size, shape and active ingredient content requirements, one obtains a microtablet having remarkable delayed release characteristics. This is especially surprising in view of the behavior of other medicinal substances having water solubilities similar to that of propafenone hydrochloride as described at page 2, lines 34-41 of the present application. Such medicinal substances having a similar water solubility to that of propafenone hydrochloride, when prepared in the same type of microtablet as in the present invention, end up showing a 90% release after one hour. Why would one of ordinary skill in the art expect the compounds of formula I of the present invention to give such surprisingly delayed release when prepared in the microtablet form required by the present invention, especially in view of the rapid release which is seen with other compounds having similar water solubilities?

The references cited by the Examiner simply do not

- 5 -

present a prima facie case of obviousness, since the
combination of the references would only be expected to result
in an instant release tablet containing propafenone
hydrochloride.  There is no suggestion within either reference
that the compounds of formula I of the present invention would
have surprisingly delayed release characteristics when
compressed into the tablet form required by the present
invention.  There could be no expectation by one of ordinary
skill in the art of the delayed relatively uniform release of
active ingredient using the compounds of Formula I of the
present invention in a microtablet having the required size,
shape and other characteristics as required by the present
claims.  Accordingly, the references cannot render the present
invention obvious and the rejection should be withdrawn.

The claims further stand rejected under 35 U.S.C. §112,
second paragraph.  This rejection has been obviated by the
above amendment.

- 6 -

Applicants submit that the application is now in condition for allowance, and early notification of such action is earnestly solicited.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Attorney of Record
Registration No. 24,618

J. Derek Mason, Ph.D.
Registration No. 35,270

Crystal Square Five – Fourth Floor
1755 South Jefferson Davis Highway
Arlington, VA   22202
(703) 413-3000
NFO:JDM/smi

I:\DJM\05242396.am

- 7 -

OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.

ATTORNEYS AT LAW

FOURTH FLOOR

1755 JEFFERSON DAVIS HIGHWAY

ARLINGTON, VIRGINIA 22202 U.S.A.

PATENT, TRADEMARK AND COPYRIGHT LAW
AND RELATED FEDERAL AND ITC LITIGATION

NORMAN F. OBLON
MARVIN J. SPIVAK
C. IRVIN McCLELLAND
GREGORY J. MAIER
ARTHUR I. NEUSTADT
RICHARD D. KELLY
JARED D. HAMILTON
EDWARD H. KULESTERS
ROBERT T. POUS
DAVID J. KERA
CHARLES L. GHOLZ
VINCENT J. SUNDERDICK*
WILLIAM E. BEAUMONT
STEVEN B. KELBER*
ROBERT F. GNUSE,
JEAN-PAUL LAVALLEYE, PH.D.
JEFFREY H. KAUFMAN
BRIAN D. ANDERSON
ROBERTA S. BREN
TIMOTHY R. SCHWARTZ, PH.D.
JOHN M. WEBER
STEPHEN G. BAXTER, PH.D.
MARTIN M. ZOLTICK
JOSEPH W. HAHL, PH.D.
RICHARD L. TREANOR, PH.D.
WM. D. GREENSTON
STEVEN P. WEIHROUCH
JOHN T. GOOLKASIAN*
MARC R. LABGOLD, PH.D.*
WILLIAM J. HEALEY, PH.D.*
RICHARD L. CHINN, PH.D.
STEVEN E. LIPMAN
JACQUES M. DULIN

SAMUEL H. BLECH*
JOHN O. TRESANSKY*
ALTON D. ROLLINS
JAMES A. BOLEN*
HARRIS A. PITLICK*
JOHN C. BROSKY
HASAYASU MORI*

DAVID A. NOVAIS
CARL E. SCHLIER
P. JAY HINES
SURINDER SACHAR
JAMES J. KULBASKI
CATHERINE B. RICHARDSON*
JONATHAN HUDIS
RICHARD A. NEIFELD, PH.D.
ELAINE T.L. WU*
ANTOINNE E. JUVELIS.
LINDSEY A. DODSON*
FRANK J. WEST*
B. ALLISON HOPPERT*
SHARON E. CRANE, PH.D.*
BRADLEY D. LYTLE
ROBERT P. PARKER*
FREDERICK J. ZUSTAK*
F. ERIC SAUNDERS*
RANDI S. KREMER*
JOHN W. CARPENTER
FREDERICK D. VASTINE, PH.D.*
J. DEREK MASON, PH.D.*
RALPH L. SHANNON, PH.D.*
PAUL C. RAUCH, PH.D.*
ROUGET F. HENSCHEL, PH.D.*
JOSEPH V. COLAIANNI,
MICHAEL H. CASEY, PH.D.*

TELEPHONE
(703) 413-3000

FACSIMILE
(703) 412-2220

INTERNET
OBLONPAT@OBLON.COM

MCI MAIL
367-8411

TELEX
248855 OPAT UR

ROBERT C. MILLER
1843-1994

SILICON VALLEY OFFICE
224 AIRPORT PARKWAY, SUITE 300
SAN JOSE, CALIFORNIA 95110
TELEPHONE
(408) 436-2070.
FACSIMILE
(408) 436-2075
INTERNET
OBLONPAT@OBLONCA.COM

*BAR MEMBERSHIP OTHER THAN VIRGINIA
*REGISTERED PATENT AGENT
*JAPANESE BENRISHI

Docket No.: 524-2396-0X PCT

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C.   20231

RE:  Application Serial No.: 08/525,749
     Applicants:  KARL KOLTER ET AL.
     Filing Date: OCTOBER 3, 1995
     For:   DELAYED RELEASE MICROTABLET OF BETA-
            PHENYLPROPIOPHENONE DERIVATIVES
     Group Art Unit: 1502
     Examiner: BENSTON

SIR:

Attached hereto for filing are the following papers:

**AMENDMENT AND REQUEST FOR RECONSIDERATION**

Our check in the amount of $0.00 is attached covering any required
fees.  In the event any variance exists between the amount enclosed and
the Patent Office charges for filing the above-noted documents, includ-
ing any fees required under 37 CFR 1.136 for any necessary Extension of
Time to make the filing of the attached documents timely, please charge
or credit the difference to our Deposit Account No. 15-0030.  Further,
if these papers are not considered timely filed, then a petition is
hereby made under 37 C.F.R. 1.136 for the necessary extension of time.
A duplicate copy of this sheet is enclosed.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Attorney of Record
Registration No. 24,618

J. Derek Mason, Ph.D.
Registration No. 35,270

OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.

ATTORNEYS AT LAW

FOURTH FLOOR

1755 JEFFERSON DAVIS HIGHWAY

ARLINGTON, VIRGINIA 22202 U.S.A.

TELEPHONE
(703) 413-3000

FACSIMILE
(703) 413-2220

INTERNET
OBLONPAT@OBLON.COM

MCI MAIL
367-6411

TELEX
248855 OPAT UR

PATENT, TRADEMARK AND COPYRIGHT LAW
AND RELATED FEDERAL AND ITC LITIGATION

ROBERT C. MILLER
1941-1984

SILICON VALLEY OFFICE
224 AIRPORT PARKWAY, SUITE 300
SAN JOSE, CALIFORNIA 85110
TELEPHONE
(408) 436-2070
FACSIMILE
(408) 436-2075
INTERNET:
OBLONPAT@OBLONCA.COM
*BAR MEMBERSHIP OTHER THAN VIRGINIA
*REGISTERED PATENT AGENT
*JAPANESE BENRISHI

Docket No.: 524-2396-0X PCT

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C.  20231

RE:  Application Serial No.: 08/525,749
     Applicants:  KARL KOLTER ET AL.
     Filing Date: OCTOBER 3, 1995
     For:  DELAYED RELEASE MICROTABLET OF BETA-
           PHENYLPROPIOPHENONE DERIVATIVES
     Group Art Unit: 1502
     Examiner: BENSTON

SIR:

Attached hereto for filing are the following papers:

AMENDMENT AND REQUEST FOR RECONSIDERATION

Our check in the amount of $0.00 is attached covering any required
fees.  In the event any variance exists between the amount enclosed and
the Patent Office charges for filing the above-noted documents, includ-
ing any fees required under 37 CFR 1.136 for any necessary Extension of
Time to make the filing of the attached documents timely, please charge
or credit the difference to our Deposit Account No. 15-0030.  Further,
if these papers are not considered timely filed, then a petition is
hereby made under 37 C.F.R. 1.136 for the necessary extension of time.
A duplicate copy of this sheet is enclosed.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Attorney of Record
Registration No. 24,618

J. Derek Mason, Ph.D.
Registration No. 35,270



UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 08/525,749 | 10/03/95 | KOLTER | K | 524-2396-OXP |

┌─ 15M1/0401 ─┐
OBLON SPIVAK MCCLELLAND MAIER & NEUSTADT
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON VA 22202

| EXAMINER |
|---|
| BENSTON JR,W |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1502 | 8 |

DATE MAILED: 04/01/97

## NOTICE OF ALLOWABILITY

PART I.
1. ☑ This communication is responsive to *AMENDMENT DATED 1-9-97*
2. ☑ All the claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice Of Allowance And Issue Fee Due or other appropriate communication will be sent in due course.
3. ☑ The allowed claims are *1-6*.
4. ☐ The drawings filed on _____ are acceptable.
5. ☐ Acknowledgement is made of the claim for priority under 35 U.S.C. 119. The certified copy has [...] been received. [...] not been received. [...] been filed in parent application Serial No. _____ filed on _____
6. ☐ Note the attached Examiner's Amendment.
7. ☐ Note the attached Examiner Interview Summary Record, PTOL-413.
8. ☐ Note the attached Examiner's Statement of Reasons for Allowance.
9. ☐ Note the attached NOTICE OF REFERENCES CITED, PTO-892.
10. ☐ Note the attached INFORMATION DISCLOSURE CITATION, PTO-1449.

PART II.
A SHORTENED STATUTORY PERIOD FOR RESPONSE to comply with the requirements noted below is set to EXPIRE THREE MONTHS FROM THE "DATE MAILED" indicated on this form. Failure to timely comply will result in the ABANDONMENT of this application. Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

1. ☐ Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL APPLICATION, PTO-152, which discloses that the oath or declaration is deficient. A SUBSTITUTE OATH OR DECLARATION IS REQUIRED.
2. ☑ APPLICANT MUST MAKE THE DRAWING CHANGES INDICATED BELOW IN THE MANNER SET FORTH ON THE REVERSE SIDE OF THIS PAPER.
   a. ☑ Drawing informalities are indicated on the NOTICE RE PATENT DRAWINGS, PTO-948, attached hereto or to Paper No. ____. CORRECTION IS REQUIRED.
   b. ☐ The proposed drawing correction filed on _____ has been approved by the examiner. CORRECTION IS REQUIRED.
   c. ☐ Approved drawing corrections are described by the examiner in the attached EXAMINER'S AMENDMENT. CORRECTION IS REQUIRED.
   d. ☐ Formal drawings are now REQUIRED.

Any response to this letter should include in the upper right hand corner, the following information from the NOTICE OF ALLOWANCE AND ISSUE FEE DUE: ISSUE BATCH NUMBER, DATE OF THE NOTICE OF ALLOWANCE, AND SERIAL NUMBER.

Attachments:
__ Examiner's Amendment                    __ Notice of Informal Application, PTO-152
__ Examiner Interview Summary Record, PTOL-413    ☑ Notice re Patent Drawings, PTO-948
__ Reasons for Allowance                   __ Listing of Bonded Draftsman
__ Notice of References Cited, PTO-892      __ Other
__ Information Disclosure Citation, PTO-1449

THURMAN K. PAGE
SUPERVISORY PATENT EXAMINER
ART UNIT 152

PTOL-37 (REV. 2-85)                                              USCOMM-DC 85-3744

# File History Report

> [ ]   Paper number _____ is missing from the United States Patent and Trademark Office's original copy of the file history. No additional information is available.

> [ ]   The following page(s) _____ of paper number _____ is/are missing from the United States Patent and Trademark Office's original copy of the file history. No additional information is available

> [✓]   The following checked item(s) of paper number __8__ is/are missing from the United States Patent and Trademark Office's original copy of the file history. No additional information is available
> [ ]   PTO 892
> [✓]   PTO 948
> [ ]   PTO 1449
> [ ]   PTO 1474
> [ ]   Assignment

**Additional comments**

_____



UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office

Address:  Box ISSUE FEE
          ASSISTANT COMMISSIONER FOR PATENTS
          WASHINGTON, D.C. 20231

## NOTICE OF ALLOWANCE AND ISSUE FEE DUE

15M1/0401
OBLON SPIVAK MCCLELLAND MAIER & NEUSTADT
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON VA 22202

| APPLICATION NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | | DATE MAILED |
|---|---|---|---|---|---|
| 08/525,749 | 10/03/95 | 006 | BENSTON JR, W | 1502 | 04/01/97 |

| First Named Applicant | KOLTER, | | KARL |
|---|---|---|---|

TITLE OF INVENTION DELAYED RELEASE MICROTABLET OF BETA-PHENYLPROPIOPHENONE DERIVATIVES

| ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|
| 1 | 524-2396-OXP | 424-464.000 | L39 | UTILITY | NO | $1290.00 | 07/01/97 |

*THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT.
PROSECUTION ON THE MERITS IS CLOSED.*

*THE ISSUE FEE MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS
APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.*

### HOW TO RESPOND TO THIS NOTICE:

I. Review the SMALL ENTITY status shown above.
   If the SMALL ENTITY is shown as yes, verify your
   current SMALL ENTITY status:

   A. If the status is changed, pay twice the amount of the
      FEE DUE shown and notify the Patent and
      Trademark Office of the change in status, or
   B. If the status is the same, pay the FEE DUE shown
      above.

If the SMALL ENTITY is shown as NO:

   A. Pay FEE DUE shown above, or

   B. File verified statement of Small Entity Status before, or with,
      payment of 1/2 the FEE DUE shown above.

II. Part B of this notice should be completed and returned to the Patent and Trademark Office (PTO) with your ISSUE FEE.
    Even if the ISSUE FEE has already been paid by charge to deposit account, Part B should be completed and returned.
    If you are charging the ISSUE FEE to your deposit account, section "3b" of Part B should be completed.

III. All communications regarding this application must give application number and batch number.
     Please direct all communication prior to issuance to Box ISSUE FEE unless advised to the contrary.

*IMPORTANT REMINDER: Patents issuing on applications filed on or after Dec. 12, 1980 may require payment of
                     maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance
                     fees when due.*

PTOL-85 (REV. 05-96)(0651-0033)                    **3. PATENT AND TRADEMARK OFFICE COPY**

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

In re application of: Karl KOLTER, et al.

Serial No:08/525,749                Group:    1502
                                    Batch:    L39
Filed:  10/03/95                    Examiner:  BENSON JR, JW

For: DELAYED RELEASE MICROTABLET OF BETA-PHENYLPROPIOPHENONE
DERIVATIVES

REQUEST FOR PRIORITY ACKNOWLEDGEMENT UNDER 35 U.S.C. 119
         AND THE INTERNATIONAL CONVENTION

Assistant Commissioner for Patents
Washington, D.C.    20231

Sir:
     In the matter of the above-identified application for
patent, notice is hereby given that the Applicant(s) claim as
priority:

Country              Application No.          Month/Day/Year
GERMANY              P 43 10 963.2            04/03/93


     Certified copies of the corresponding Convention
Application(s) were submitted to the International Bureau in
PCT Application Number PCT/EP94/00949 filed on 03/24/94.

                          Respectfully submitted,

                          OBLON, SPIVAK, McCLELLAND,
                          MAIER & NEUSTADT, P.C.


                          Norman F. Oblon
                          Attorney of Record
                          Registration No. 24,618

Fourth Floor
1755 Jefferson Davis Highway
Arlington, VA   22202
(703) 413-3000                      John K. Pike, Ph.D.
Fax: 413-2220                       Registration No. 41,253
Docket No:   524-2396-0XPCT

Date:  April 9, 1997

524-2396-0X PCT

## IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF:                    :

KARL KOLTER ET AL                        : GROUP ART UNIT: 1502

SERIAL NO.  08/525,749                   :

FILED: OCTOBER 3, 1995                   : EXAMINER: BENSTON

FOR: DELAYED RELEASE MICROTABLET
     OF BETA-PHENYLPROPIOPHENONE
     DERIVATIVES

## SUPPLEMENTAL AMENDMENT

RECEIVED
MAR 27 1997
MATRIX CUSTOMER
SERVICE CENTER

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C.   20231

SIR:

Responsive to the discussion held on March 26, 1997 between Examiner Benston and

Applicants' representative, Applicants respectfully request that the above-identified application

be amended as follows in order to place the application into condition for allowance.

## IN THE ABSTRACT

Please cancel the abstract found on page 14 of the specification in its entirety and

replace it by the abstract found on the attached sheet.

## REMARKS

The new abstract provided herewith is supported by the abstract as originally filed.  No

new matter has been added by these amendments.

Applicants' representative would like to thank Examiner Benston for the courteous

and helpful discussion of the present application on March 26, 1997.  Based upon that

discussion, the present application has now been amended to address the Examiner's concerns regarding the abstract. Applicants would like to thank Examiner Benston for the indication that the application contains allowable subject matter.

Applicants submit that the application is now in condition for allowance, and early notification of such action is earnestly solicited.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Attorney of Record
Registration No. 24,618

J. Derek Mason, Ph.D.
Registration No. 35,270

Crystal Square Five - Fourth Floor
1755 Jefferson Davis Highway
Arlington, VA 22202
(703) 413-3000
Fax #: (703)413-2220
JDM/rac



RECEIVED

MAR 27 1997

MATRIX CUSTOMER
SERVICE CENTER

- 2 -

PA 238

4100    4-1-97

**OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.**

ATTORNEYS AT LAW

FOURTH FLOOR
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON, VIRGINIA 22202 U.S.A.

(703) 413-3000
(703) 413-2220 FACSIMILE
OBLONPAT@OBLON.COM

SILICON VALLEY OFFICE
224 AIRPORT PARKWAY, SUITE 300
SAN JOSE, CALIFORNIA 95110
(408) 436-2070
(408) 436-2075 FACSIMILE
OBLONPAT@OBLON.COM

PATENT, TRADEMARK AND COPYRIGHT LAW
AND RELATED FEDERAL AND ITC LITIGATION

WWW.OBLON.COM        Docket No.: 524-2396-0X PCT

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C. 20231

RECEIVED
MAR 27 1997

RE:  Application Serial No.: 08/525,749
     Applicants: KARL KOLTER ET AL.
     Filing Date: OCTOBER 3, 1995
     For: DELAYED RELEASE MICROTABLET OF BETA-
          PHENYLPROPIOPHENONE DERIVATIVES
     Group Art Unit: 1502
     Examiner: BENSTON

SIR:

Attached hereto for filing are the following papers:

**SUPPLEMENTAL AMENDMENT**
**ABSTRACT OF THE DISCLOSURE**

Our check in the amount of $0.00 is attached covering any required fees. In the event any variance exists between the amount enclosed and the Patent Office charges for filing the above-noted documents, including any fees required under 37 CFR 1.136 for any necessary Extension of Time to make the filing of the attached documents timely, please charge or credit the difference to our Deposit Account No. 15-0030. Further, if these papers are not considered timely filed, then a petition is hereby made under 37 C.F.R. 1.136 for the necessary extension of time. A duplicate copy of this sheet is enclosed.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Attorney of Record
Registration No. 24,618

J. Derek Mason, Ph.D.
Registration No. 35,270

PA 239

**OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.**

ATTORNEYS AT LAW

FOURTH FLOOR
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON, VIRGINIA 22202 U.S.A.

(703) 413-3000

(703) 413-2220 FACSIMILE

OBLONPAT@OBLON.COM

SILICON VALLEY OFFICE
224 AIRPORT PARKWAY, SUITE 300
SAN JOSE, CALIFORNIA 95110
(408) 436-2070
(408) 436-2075 FACSIMILE
OBLONHO@OBLONCA.COM

PATENT, TRADEMARK AND COPYRIGHT LAW
AND RELATED FEDERAL AND ITC LITIGATION

WWW.OBLON.COM

Docket No.: 524-2396-0X PCT

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C. 20231

RE: Application Serial No.: 08/525,749
Applicants: KARL KOLTER ET AL.
Filing Date: OCTOBER 3, 1995
For: DELAYED RELEASE MICROTABLET OF BETA-
PHENYLPROPIOPHENONE DERIVATIVES
Group Art Unit: 1502
Examiner: BENSTON

SIR:

Attached hereto for filing are the following papers:

**SUPPLEMENTAL AMENDMENT**
**ABSTRACT OF THE DISCLOSURE**

Our check in the amount of $0.00 is attached covering any required fees. In the event any variance exists between the amount enclosed and the Patent Office charges for filing the above-noted documents, including any fees required under 37 CFR 1.136 for any necessary Extension of Time to make the filing of the attached documents timely, please charge or credit the difference to our Deposit Account No. 15-0030. Further, if these papers are not considered timely filed, then a petition is hereby made under 37 C.F.R. 1.136 for the necessary extension of time. A duplicate copy of this sheet is enclosed.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Attorney of Record
Registration No. 24,618

J. Derek Mason, Ph.D.
Registration No. 35,270



**UNITED STAT..s DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 08/525,749 | 10/03/95 | KOLTER | K      524-2396-DXP |

|  |
|---|
| EXAMINER |
| BENSTON JR,W |
| ART UNIT | PAPER NUMBER |
| 1502 | 11 |

15M1/0625
OBLON SPIVAK MCCLELLAND MAIER & NEUSTADT
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON VA 22202

DATE MAILED: 06/25/97

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

*Supplemental* **NOTICE OF ALLOWABILITY**

All claims being allowable PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance and Issue Fee Due or other appropriate communication will be mailed in due course.

☒ This communication is responsive to *AMENDMENT DATED 3-27-97*

☒ The allowed claim(s) is/are *1-6*

☐ The drawings filed on _____ are acceptable.

☒ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

☐ All ☐ Some* ☐ None of the CERTIFIED copies of the priority documents have been

☐ received.

☒ received in Application No. (Series Code/Serial Number) *PCT/EP94/00949*

☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

*Certified copies not received: _____

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

A SHORTENED STATUTORY PERIOD FOR RESPONSE to comply with the requirements noted below is set to EXPIRE THREE MONTHS FROM THE "DATE MAILED" of this Office action. Failure to timely comply will result in ABANDONMENT of this application. Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

☐ Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL APPLICATION, PTO-152, which discloses that the oath or declaration is deficient. A SUBSTITUTE OATH OR DECLARATION IS REQUIRED.

☒ Applicant MUST submit NEW FORMAL DRAWINGS

☐ because the originally filed drawings were declared by applicant to be informal.

☒ including changes required by the Notice of Draftsperson's Patent Drawing Review, PTO-948, attached hereto as Paper No. *6*.

☐ including changes required by the proposed drawing correction filed on _____, which has been approved by the examiner.

☐ including changes required by the attached Examiner's Amendment/Comment.

Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the reverse side of the drawings. The drawings should be filed as a separate paper with a transmittal letter addressed to the Official Draftsperson.

☐ Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

Any response to this letter should include, in the upper right hand corner, the APPLICATION NUMBER (SERIES CODE/SERIAL NUMBER). If applicant has received a Notice of Allowance and Issue Fee Due, the ISSUE BATCH NUMBER and DATE of the NOTICE OF ALLOWANCE should also be included.

**Attachment(s)**

☐ Notice of References Cited, PTO-892

☐ Information Disclosure Statement(s), PTO-1449, Paper No(s). _____

☐ Notice of Draftsperson's Patent Drawing Review, PTO-948

☐ Notice of Informal Patent Application, PTO-152

☐ Interview Summary, PTO-413

☐ Examiner's Amendment/Comment

☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

☐ Examiner's Statement of Reasons for Allowance

THURMAN K. PAGE
SUPERVISORY PATENT EXAMINER
ART UNIT 152

PTOL-37 (Rev. 10/95)                                                ★ U.S. GPO: 1998-404-496/40507

#12
n/d

**OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.**

ATTORNEYS AT LAW

FOURTH FLOOR
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON, VIRGINIA 22202 U.S.A.

(703) 413-3000

(703) 413-2220 FACSIMILE

OBLONPAT@OBLON.COM

SILICON VALLEY OFFICE
224 AIRPORT PARKWAY, SUITE 300
SAN JOSE, CALIFORNIA 95110
(408) 436-2070
(408) 436-2075 FACSIMILE
OBLONPAT@ORLONCA.COM

PATENT, TRADEMARK AND COPYRIGHT LAW
AND RELATED FEDERAL AND ITC LITIGATION

WWW.OBLON.COM

Docket No.: 524-2396-0X PCT

NORMAN F. OBLON
MARVIN J. SPIVAK
C. IRVIN McCLELLAND
GREGORY J. MAIER
ARTHUR I. NEUSTADT
RICHARD D. KELLY
JAMES D. HAMILTON
RICHARD M. KLOESTERS
ROBERT C. LOUIS
DAVID J. KERA
DANIEL S. GROSZ
VINCENT J. SUNDERICK*
WILLIAM R. BEAUMONT
STEPHEN H. FELBER*
ROBERT F. GNUSE
JEAN-PAUL LAVALLEUR, PH.D.
JEFFREY H. KAUFMAN
BRIAN D. ANDERSON
ROBERTA S. BREN
JOHN H. WEBER
STEPHEN G. BAXTER, PH.D.
MARTIM M. ZOLTICK
EDMITD W. VANE, PH.D.
RICHARD L. TREANOR, PH.D.
NEIL D. GREENSTEIN
STEVEN P. WEIHROUCH
JOHN T. GOOLKASIAN*
MARC B. LARGOLD, PH.D.*
WILLIAM J. HEALEY, PH.D.*
RICHARD C. ONNN, PH.D.
STEVEN E. LIPMAN
JACQUES M. DULIN
CARL E. SCHLIER
R. JAY JONES
JAMES J. KULBASKI
CATHERINE B. RICHARDSON*
RICHARD A. NEIFELD, PH.D.
J. DEREK MASON, PH.D.

GERALD J. MOSSINGHOFF
MILTON STURMAN
SAMUEL H. BLECH*
JOHN D. TRESANSKY*
ALTON D. ROLLINS
JAMES R. ROLLER*
HARRIS A. PITLICK*
JOHN C. BROSKY
MASAYUKI MORI*

DAVID A. HOVIAS
SURINDER SACHAR
JONATHAN HUDIS
CLAIRE Z. WU*
GREGORY A. DODSON*
FRANK J. WEST*
R. NELSON HOPPER*
SHARON E. CRANE, PH.D.*
BRADLEY B. LYLE
ROBERT P. SABATH*
E. ERIC SAUNDERS*
JOHN M. CARPENTER
CHRISTINA M. GARRANO
KARL D. ROVACH*
RAYMOND E. CRAIGLIO, JR.
EDWARD A. WELTER*
MICHAEL R. JACOBS*
THOMAS M. RIZZO, PH.D.*
FREDERICK O. VASSIMIL, PH.D.*
PAUL E. BAUGH, PH.D.*
MICHAEL A. CASEY, PH.D.*

* BAR MEMBERSHIP OTHER
  THAN VIRGINIA
* REGISTERED PATENT AGENT
† JAPANESE BENRISHI

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C. 20231

RE:  Application Serial No.: 08/525,749
     Applicant(s): Karl KOLTER ET AL.
     Filing Date: OCTOBER 3, 1995
For:  DELAYED RELEASE MICROTABLET OF BETA-
      PHENYLPROPIOPHENONE DERIVATIVES
      Group No. 1502
      Examiner: BENSTON JR., W.
      Notice of Allowance Date: APRIL 1, 1997
      Batch No: L39

SIR:

Attached hereto for filing are the following papers:
LETTER TO THE OFFICIAL DRAFTSMAN
ELEVEN (11) SHEETS OF FORMAL DRAWINGS
Our check in the amount of $ -0- is enclosed covering any required fees. In the event of any
variance between the amount enclosed and the Patent Office charges, please charge or credit the
difference to our Deposit Account No. 15-0030. A duplicate copy of this sheet is enclosed.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Registration No. 24,618
Attorney of Record

DOCKET NO: 524-2396-0X PCT

## IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF:            : GROUP: 1502

Karl KOLTER ET AL.               : EXAMINER: BENSTON JR., W.

SERIAL NO: 08/525,749            : BATCH NO: L39

FILED: OCTOBER 3, 1995           : NOTICE OF ALLOWANCE DATE:
                                 : APRIL 1, 1997

FOR: DELAYED RELEASE MICROTABLET OF BETA-
PHENYLPROPIOPHENONE DERIVATIVES

### LETTER TO OFFICIAL DRAFTSMAN

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C. 20231

SIR:

It is requested that the enclosed ELEVEN (11) sheets of Formal Drawings be entered to

replace the Informal Drawings originally filed with the application.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Registration No. 24,618
Attorney of Record

Fourth Floor
1755 Jefferson Davis Highway
Arlington, VA 22202
Tele #: (703) 413-3000
Fax # : (703) 413-2220

OBLON I          (703) 413-3000
DOCKET     .4-2396-0X PCT SHEET 1 OF 11      USSN 08/625,74
                                            BATCH NO.139

5681588



FIG. 1

JUL 1 2007
RECEIVED

APPROVED T.O.G. FIG.
DETAILED

OBLON ET AL (    ) 413-3000    USSN 08/525,749
DOCKET # 524-2596-0X PCT SHEET 2 OF 11    BATCH NO:139



FIG.2



OBLON E. AL (703) 413-3000                    USSN 08/525,749
DOCKET # 524-2396-0X PCT SHEET 3 OF 11       BATCH NO.139



FIG.3



OBLON ET AL ( . . . . . 413-3000          USSN 08/525,749
DOCKET # 524-2396-0X PCT SHEET 4 OF 11     BATCH NO.L39



FIG. 4

JUL 1 1987
RECEIVED



FIG. 5

JUL 1 1997
RECEIVED

OBLON ET AL.    .5) 413-3000                    USSN 08/525,749
DOCKET # 524-2396-0X PCT SHEET 6 OF 11          BATCH NO.139



FIG. 6

PA 255

RECEIVED
JUL 1 1997

OBLON ET     33) 413-3000
DOCKET # 52xx-326-0X PCT SHEET 7 OF 11    USSN 08/525,749
BATCH NO. L39



FIG. 7



*FIG. 8*

OBLON ET AL (703) 413-3000
DOCKET # 524-2396-0X PCT SHEET 9 OF 11     USSN 08/525,749
BATCH NO L39



FIG. 9

JUL 1 1997
RECEIVED



OBLON ET AL (703) 413-3000
DOCKET # 574-2396-9X PCT SHEET 10 OF 11
USSN 08/525,749
BATCH NO.139

FIG. 10

JUL 1 1997
RECEIVED



FIG. 11

MAIL ROOM
JUN 27
1997
58  PAT. & TRADEMARK

JUL 1 1997
RECEIVED

OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.

ATTORNEYS AT LAW

FOURTH FLOOR
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON, VIRGINIA 22202 U.S.A.

(703) 413-3000

(703) 413-2220 FACSIMILE

OBLONPAT@OBLON.COM

SILICON VALLEY OFFICE
224 AIRPORT PARKWAY, SUITE 300
SAN JOSE, CALIFORNIA 95110
(408) 436-2070
(408) 436-2075 FACSIMILE
OBLONPAT@OBLONCA.COM

PATENT, TRADEMARK AND COPYRIGHT LAW
AND RELATED FEDERAL AND ITC LITIGATION

WWW.OBLON.COM

*MAIL ROOM JUN 27 1997 PAT. & TRADEMARK OFF.* 39

*JUL 1 1997 WED*

Docket No.: 524-2396-0X PCT

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C. 20231

RE: Application Serial No.: 08/525,749
    Applicant(s): Karl KOLTER ET AL.
    Filing Date: OCTOBER 3, 1995
For: DELAYED RELEASE MICROTABLET OF BETA-
    PHENYLPROPIOPHENONE DERIVATIVES
    Group No.: 1502
    Examiner: BENSTON JR., W.
    Notice of Allowance Date: APRIL 1, 1997
    Batch No: L39

SIR:

Attached hereto for filing are the following papers:
LETTER TO THE OFFICIAL DRAFTSMAN
ELEVEN (11) SHEETS OF FORMAL DRAWINGS
Our check in the amount of $ -0-  is enclosed covering any required fees. In the event of any variance between the amount enclosed and the Patent Office charges, please charge or credit the difference to our Deposit Account No. 15-0030. A duplicate copy of this sheet is enclosed.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

*[signature]* 27,013

Norman F. Oblon
Registration No. 24,618
Attorney of Record

PA 266

**PART B—ISSUE FEE TRANSMITTAL**

*142 - 1290*

*MAILING INSTRUCTIONS:* This form should be used for transmitting the ISSUE FEE. Blocks 2 through 6 should be completed where appropriate. All further correspondence including the Issue Fee Receipt, the Patent, advance orders and notification of maintenance fees will be mailed to addresses entered in Block 1 unless you direct otherwise, by (a) specifying a new correspondence address in Block 3 below; or (b) providing the PTO with a separate "FEE ADDRESS" for maintenance fee notifications with the payment of Issue Fee or thereafter. See reverse for Certificate of Mailing, below.

*Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.*

*Burden Hour Statement:* This form is estimated to take 0.2 hours to complete. Time will vary depending on the needs of the individual case. Any comments on the amount of time required to complete this form should be sent to the Chief Information Officer, Patent and Trademark Office, Washington, D.C. 20231.
DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Box Issue Fee, Assistant Commissioner for Patents, Washington D.C. 20231

| 2. INVENTOR'S ADDRESS CHANGE *(Complete only if there is a change)* |
|---|
| INVENTOR'S NAME |
| Street Address |
| City, State and Zip Code |
| CO-INVENTOR'S NAME |
| Street Address |
| City, State and Zip Code |
| ☐ Check if additional changes are enclosed |

RECEIVED
PETITIONS Division
JUN 20 1997
04

**1. CORRESPONDENCE ADDRESS**

15M1/0401

OBLON SPIVAK MCCLELLAND MAIER & NEUSTADT
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON VA 22202

| APPLICATION NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | DATE MAILED |
|---|---|---|---|---|
| 08/525,749 | 10/03/95 | 006 | BENSTON JR, W          1502 | 04/01/97 |

| First Named Applicant | KOLTER,          KARL |
|---|---|

| TITLE OF INVENTION | DELAYED RELEASE MICROTABLET OF BETA-PHENYLPROPIOPHENONE DERIVATIVES |
|---|---|

| ATTY'S DOCKET NO. | CLASS/SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|
| 1    524-2396-OIP | 424-464.000 | L39 | UTILITY | NO | $1290.00 | 07/01/97 |

**3. Correspondence address change** (Complete only if there is a change)

07/31/1997 KOPERA    00000045 08525749
01 FC:142                    1290.00 OP

**4.** For printing on the patent front page, list the names of not more than 3 registered patent attorneys or agents OR, alternatively, the name of a firm having as a member a registered attorney or agent. If no name is listed, no name will be printed.

1. OBLON, SPIVAK,

2. MCCLELLAND, MAIER

3. & NEUSTADT, P.C.

**5. ASSIGNMENT DATA TO BE PRINTED ON THE PATENT** *(print or type)*

(1) NAME OF ASSIGNEE: BASF Aktiengesellschaft.

(2) ADDRESS: (CITY & STATE OR COUNTRY) Ludwigshafen, Rheinland Pfalz, FEDERAL REPUBLIC OF GERMANY

A. ☐ This application is NOT assigned.

☒ Assignment previously submitted to the Patent and Trademark Office.
☐ Assignment is being submitted under separate cover. Assignment should be directed to Box ASSIGNMENTS.

*PLEASE NOTE:* Unless an assignee is identified in Block 5, no assignee data will appear on the patent. Inclusion of assignee data is only appropriate when an assignment has been previously submitted to the PTO or is being submitted under separate cover. Completion of this form is NOT a substitute for filing an assignment.

| 6a. The following fees are enclosed: |
|---|
| ☒ Issue Fee   ☐ Advance Order - # of Copies ___0___ |
| 6b. The following fees should be charged to: |
| DEPOSIT ACCOUNT NUMBER ___15-0030___ |
| (ENCLOSE A COPY OF THIS FORM) |
| ☐ Issue Fee   ☐ Advance Order - # of Copies ___ |
| ☒ Any Deficiencies in Enclosed Fees |

The COMMISSIONER OF PATENTS AND TRADEMARKS is requested to apply the Issue Fee to the application identified above.

(Authorized Signature)                          (Date)

*NOTE: The Issue Fee will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the Patent and Trademark Office.*

**Certificate of Mailing**

*Note:* If this certificate of mailing is used, it can be used to transmit the Issue Fee. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing.

I hereby certify that this correspondence is being deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to:    Box ISSUE FEE
Assistant Commissioner for Patents
Washington, D.C. 20231

on: _____ (Date)
_____ (Name of person making deposit)
_____ (Signature)
_____ (Date)

PTOL-85B (REV. 05-96) Approved for use through 06/30/99. OMB 0651-0033    1. TRANSMIT THIS FORM WITH FEE    Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

In re application of: Karl KOLTER, et al.

  Serial No.: 08/525,749                Group: 1502
                                        Batch: L39
  Filed: 10/03/95                       Examiner: BENSTON JR, W

  For: DELAYED RELEASE MICROTABLET OF BETA-PHENYLPROPIOPHENONE
  DERIVATIVES

SECOND REQUEST FOR PRIORITY ACKNOWLEDGEMENT
UNDER 35 U.S.C. 119 AND THE INTERNATIONAL CONVENTION

Assistant Commissioner of
  Patents & Trademarks
Washington, D.C.  20231

Sir:

        In the matter of the above-identified application for patent,
notice is hereby given that the Applicant(s) claim as priority:

| Country | Application No. | Month/Day/Year |
|---------|-----------------|----------------|
| GERMANY | P 43 10 963.2   | 04/03/93       |

        Certified copies of the corresponding Convention Application(s)
were submitted to the International Bureau in PCT Application
Number PCT/EP94/00949 filed on 03/24/94.

                              Respectfully submitted,

                              OBLON, SPIVAK, McCLELLAND,
                              MAIER & NEUSTADT, P.C.

                              C. Irvin McClelland
                              Attorney of Record
                              Registration No.  21,124
                              Robert F. Gnuse
                              Registration Number 27,295

Fourth Floor
1755 S. Jefferson Davis Hwy.
Arlington, Virginia  22202
(703) 413-3000
Fax:  (703) 413-2220

Docket No.: 524-2396-0X PCT

RECEIVED
Publication Division
JUN 20 1997
04



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:    COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 08/525,749 | 10/03/95 | KOLTER | K | 524-2396-OXP |

```
                    7512/0813
OBLON SPIVAK MCCLELLAND MAIER & NEUSTADT
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON VA 22202
```

| EXAMINER |  |
|---|---|
| BENSTON JR,W | |
| ART UNIT | PAPER NUMBER |
| 1502 | 15 |

08/13/97

DATE MAILED:

## PRIORITY ACKNOWLEDGMENT

☒ 1. Receipt is acknowledged of papers submitted under 35 U.S.C. 119. The papers have been placed of record in the file.

☐ 2. Applicant's claim for priority, based on papers filed in parent application Serial No. _____ submitted under 35 U.S.C. 119, is acknowledged.

☐ 3. The priority papers, submitted _____, are not acknowledged since they were filed later than the date on which the issue fee was paid. To have the priority papers considered for entry, a petition must be filed in accordance with 37 CFR 1.55(b) requesting their entry together with the fee set forth in 37 CFR 1.17(i).

*for Theusen*

Manager, Publishing Division
Office of Patent Publication

Form PTOL-147 (REV. 11-95)



PTO UTILITY GRANT
Paper Number ___16___

## The Commissioner of Patents and Trademarks

*Has received an application for a patent for a new and useful invention. The title and description of the invention are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the invention shall be granted under the law.*

*Therefore, this*

### United States Patent

*Grants to the person(s) having title to this patent the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States of America or importing the invention into the United States of America for the term set forth below, subject to the payment of maintenance fees as provided by law.*

*If this application was filed prior to June 8, 1995, the term of this patent is the longer of seventeen years from the date of grant of this patent or twenty years from the earliest effective U.S. filing date of the application, subject to any statutory extension.*

*If this application was filed on or after June 8, 1995, the term of this patent is twenty years from the U.S. filing date, subject to an statutory extension. If the application contains a specific reference to an earlier filed application or applications under 35 U.S.C. 120, 121 or 365(c), the term of the patent is twenty years from the date on which the earliest application was filed, subject to any statutory extension.*

*Commissioner of Patents and Trademarks*

*Attest*

**The United States of America**

Form PTO-1594 (Rev. 2/97)

US005681588A

# United States Patent [19]

## Kolter et al.

[11] Patent Number: 5,681,588

[45] Date of Patent: Oct. 28, 1997

[54] **DELAYED RELEASE MICROTABLET OF β-PHENYLPROPIOPHENONE DERIVATIVES**

[75] Inventors: **Karl Kolter**, Limburgerhof; **Helmut Fricke**, Mutterstadt; **Volker Buehler**, Karlsruhe; **Herbert Mueller-Peltzer**, Heidelberg, all of Germany

[73] Assignee: **Knoll Aktiengesellschaft**, Ludwigshafen, Germany

[21] Appl. No.: **525,749**

[22] PCT Filed: **Mar. 24, 1994**

[86] PCT No.: **PCT/EP94/00949**

§ 371 Date: **Oct. 3, 1995**

§ 102(e) Date: **Oct. 3, 1995**

[87] PCT Pub. No.: **WO94/22434**

PCT Pub. Date: **Oct. 3, 1994**

[30] **Foreign Application Priority Data**

Apr. 3, 1993 [DE] Germany ............... 43 10 963.2

[51] Int. Cl.⁶ ........................................ A61K 9/20

[52] U.S. Cl. ............... 424/464; 424/469; 424/461; 424/468; 424/458

[58] Field of Search ...................... 424/464, 456; 252/1; 514/652

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,951,821 | 4/1976 | Davidson | 252/1 |
| 4,474,986 | 10/1984 | Lietz | 564/349 |
| 4,945,114 | 7/1990 | Franke | 514/652 |
| 4,954,347 | 9/1990 | Kristen et al. | 424/456 |

Primary Examiner—Thurman K. Page
Assistant Examiner—William E. Benston, Jr.
Attorney, Agent, or Firm—Oblon, Spivak, McClelland, Maier & Neustadt, P.C.

[57] **ABSTRACT**

A cylindrical delayed release tablet with a convex or flat upper side and lower side is provided, along with a method for its production and a gelatin capsule containing 3–200 tablets of the same having identical or different release rates, wherein the tablet if made of β-phenylpropiophenone derivatives of the formula I as active ingredient



where R is n-propyl or 1,1-dimethylpropyl, and their pharmacologically acceptable salts, wherein the tablet has a height and diameter that are both, independently of one another, 1–3 mm, the active ingredient content is in the range from 81–99.9% of the weight of the microtablet, (but not taking into account the weight of any coating which is present, the active ingredient density is greater than 1, the release of active ingredient in the USP paddle method at 50 rpm is 80% as a maximum after 3 hours and as a minimum after 24 hours, the release rate is virtually independent of the pressure when compressing the tablets, and the tablet contains no release-delaying ancillary substance but can contain 0.1–5% by weight of a lubricant and 0–18.9% by weight of other conventional ancillary substances.

**6 Claims, 11 Drawing Sheets**

EXAMPLE 1

HOURS (h)



*FIG. 1*



FIG.2



FIG. 3



**FIG. 4**



FIG. 5

1,588



FIG. 6



FIG. 7



FIG. 8



*FIG. 9*



FIG. 10



□ 2x300mg FILM-COATED TABLET, RYTMONORM® 300mg, n=7

◇ 2x450mg SLOW-RELEASE FILM-COATED TABLET (BOLUS FORM) ACCORDING TO A COMPARATIVE TEST, n=7

✕ 2x400mg MICROTABLETS OF EXAMPLE 1, n=18

TIME (h) AFTER ADMINISTRATION

C (ng/ml)

*FIG. 11*

588

5,681,588

1

## DELAYED RELEASE MICROTABLET OF β-PHENYLPROPIOPHENONE DERIVATIVES

This application is a 35USC371 of PCT/HP94/00049 filed Mar. 24, 1994.

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

The present invention relates to cylindrical microtablets of β-phenylpropiophenone derivatives with a high content and density of active ingredient and a delayed release which is independent of the compressive force, with no release-delaying ancillary substances.

#### 2. Discussion of the Background

Reference to β-phenylpropiophenone derivatives hereinbefore and hereinafter always includes and particularly means their physiologically acceptable salts, preferably the hydrochloride.

In the prior art the release of active ingredient from tablets is delayed either by a release-delaying matrix in which the active ingredient is embedded, or by a release-delaying coating through which the digestive fluid diffuses in and the active ingredient diffuses out.

Both principles have considerable disadvantages. For example, matrix tablets contain relatively large amounts of ancillary substances so that the volume of the tablet for a given dose of active ingredient is relatively large, which is unpleasant for the patient. On the other hand, film-coated tablets are elaborate to produce and, in particular, mechanically sensitive. The slightest damage to the lacquer film leads to the risk of sudden release of the entire content of active ingredient (dose dumping), which is extremely undesirable (local and temporal overdose with adverse side effects; short total action time).

Both matrix and film-coated delayed release tablets normally have diameters of about 6 to 12 mm or more and are therefore unable to pass through the closed pylorus. The release and absorption of their total content of active ingredient concentrated at one site in the gastrointestinal tract depends on the conditions prevailing at this site, which results in wide interindividual and intraindividual variation in the plasma level.

This variation is less with multiple unit delayed release forms because the units are distributed uniformly along the gastrointestinal tract and can also pass through the closed pylorus. Usually employed as multiple unit forms are pellets with a diffusion lacquer packed into hard gelatin capsules. It is possible to produce matrix pellets only with very low doses of medicinal substances because, owing to the large surface area, even more matrix substance would be required than for the bolus delayed release tablet.

For example, the Patent Applications GB 2 176 999 and WO 92/04013 disclose small matrix delayed release tablets which likewise contain relatively large amounts of release-delaying ancillary substances. The Patent Application EP 22 17 32 claims delayed release tablets of active ingredients with low solubility, which contain 60–80% active ingredient in addition to at least four auxiliaries. The release from these bolus forms is, as described in the patent, highly dependent on the granulation process and the equipment used for manufacture.

It is furthermore generally known that an increase in the compressive force in tablet production is associated with a slowing of the release of active ingredient. This applies both to fast release tablets and to delayed release tablets (Patent

2

Application WO 92/00064). Since the compressive forces fluctuate, despite the most up to date machine engineering, the resulting release rates vary. An additional factor is the variation between batches in the compression properties, which derives from the variability in the granules to be compressed. Differences in the particle size, porosity, surface structure, wettability etc. may have a large effect on the compression properties and the delaying of release.

### SUMMARY OF THE INVENTION

It is an object of the present invention to overcome the disadvantages of the prior art, ie. to develop propafenone and diprafenone tablets with a small size, high content and density of active ingredient and release of active ingredient which is independent of the compressive force and uniform over a lengthy period.

We have found that this object is achieved by the microtablets of the present invention. This is because it has been found, surprisingly, that it is possible in the present case to produce delayed release tablets without release-delaying ancillary substances. This is all the more surprising because other medicinal substances with a water solubility similar to that of propafenone hydrochloride (0.7%), for example cimetidine hydrochloride or paracetamol, are 90% released in 1 hour from the same preparation.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

By comparison with other substances, propafenone HCl is extremely difficult to compress. A bolus tablet with commercial dosages of 150–300 mg and an active ingredient content above 80% cannot be produced under production conditions. By contrast, the microtablets according to the invention can, surprisingly, be produced at a relatively high machine speed without problems concerning friability and hardness, and specifically with active ingredient contents in the range from 81 to 99.9, preferably 85 to 99.5, % by weight and with an active ingredient density above 1. Such high contents of active ingredients of this type in tablets have not previously been reached.

The microtablets according to the invention are cylindrical with a flat or convex upper side and lower side and with a diameter and height which are preferably approximately equal and, independently of one another, from 1 to 3, preferably 1.5 to 2.5 mm.

It was furthermore not predictable that the release of active ingredient is, in contrast to usual experience, virtually independent of the pressure when compressing the tablets and, moreover, over a wide range of pH of the medium. "Virtually independent" means that the effect can be neglected for practical purposes. This ensures release at a constant rate. It is adjusted via the size of the tablet and possibly by additives which increase the release rate so that the release of active ingredient after 3, preferably 5, hours is not more than 80 and after 24, preferably 15, hours is not less than 80%. Surprisingly, the microtablets according to the invention also display distinct advantages in vivo unlike conventional delayed release forms such as a bolus delayed release form with similar in vitro release. Despite the short half-life, a pronounced blood level plateau develops (FIG. 11). The fluctuations in the blood level are considerably less with the microtablets. This is evident from the $t_{75\%}$ (period in the dosage interval during which the plasma levels are at least 75% of the maximum level), which is 8 to 9 hours with the microtablets according to the invention compared with 5 to 6 hours with the bolus delayed release form, and from the

PA 283

5,681,588

3

PTF (peak to trough fluctuation; cf. H. P. Koch and W. A. Ritschel, Synopsis der Biopharmazie und Pharmakokinetik, Econmed-Verlagsgesellschaft mbH, Landsberg und München, 1986)

$$PTF (\%) = \frac{c_{max} - c_{min}}{\frac{AUC}{M}} \times 100$$

for the AUC, cf. J. K. Aronson et al., Europ. J. of Clinical Pharmacology 35 (1988), 1–7.

which has a value for the microtablets which is only about half that for the bolus forms, in particular less than 75, preferably less than 60, %. The microtablets accordingly increase therapeutic safety because excessive peaks of plasma levels and the side effects caused thereby do not occur, the plasma level does not fall below the minimum effective level, and the bioavailability of this form is unaffected by food intake, in contrast to the bolus delayed release form.

The AUC found for the bolus delayed release form is 50% higher when fasting.

In general, the microtablets show smaller intra- and inter-individual differences by comparison with the bolus delayed release form.

The microtablets according to the invention furthermore have the advantage that when introduced into gastric or intestinal fluid they show no tendency to stick or adhere. This ensures that they pass as individual articles through the gastrointestinal tract and, moreover, do not become attached to the wall of the stomach or intestine and induce irritation. Sticking or adhesion properties of this type are displayed, for example, by small tablets with hydrophilic release-delaying polymers (cf. WO 92/00013).

The production of delayed release forms with hydrophilic release-delaying polymers often requires the use of organic solvents during granulation so that swelling does not start even during this process. It is possible entirely to dispense with this in the production of the microtablets according to the invention.

Presentations with hydrophilic release-delaying polymers additionally have the disadvantage that, because of the tendency to sorption and swelling, they are sensitive to a change in humidity during storage. These formulations are damaged by high humidities in particular. The microtablets according to the invention are stable even at relatively high humidities because of the insensitivity of the materials used. Even after storage at 93% rel. humidity for 21 days the water uptake is less than 1%, and no visible change is detectable.

The microtablets according to the invention are produced in conventional pharmaceutical equipment by the following steps: granulation, drying, mixing, tableting.

The particle size of the active ingredient is, within the conventional pharmaceutical range, of only minor or no importance in the production of the microtablets according to the invention, against all expectations. This means that it is possible to convert propafenone hydrochloride and diprafenone hydrochloride of different particle sizes into products of the same quality.

Granulation and drying are preferably carried out in a fluidized bed. However, the agglomeration can also be carried out in a horizontal or vertical mixer.

After the wet granules have been passed through a screen of suitable mesh width they are dried either in a circulating air dryer or in a fluidized bed. The particle size of the granules should be below 1 mm, preferably below 0.8 mm.

It is possible to employ all conventional binders or adhesives for the agglomeration, eg. polyvinylpyrrolidone,

4

vinylpyrrolidone/vinyl acetate copolymers, gelatin, hydroxypropylmethylcellulose, hydroxypropylcellulose, polymers of methacrylic acid and its esters. It is possible to dispense with the use of a binder by using a solution of active ingredient as granulation liquid. Water without additives is preferred as granulation liquid.

After the granules have been dried to the defined water content, 0.1–5, preferably 0.3–2, % by weight of a lubricant for the tabletting are mixed in homogeneously. It is likewise possible to use for this purpose all conventional substances such as talc, magnesium stearate, calcium stearate, stearic acid, calcium behenate, glycerin palmitostearate, sodium acetate, polyethylene glycol, sodium stearate [sic] fumarate. In addition, up to 18.9% by weight of other conventional ancillary substances can be added, for example colorants, stabilizers, fillers, wetting agents, flow regulators but no release-delaying agents.

The tabletting takes place in a suitable tabletting machine equipped with multiple microtablet punches. The resulting microtablets have a cylindrical shape with flat or convex surface [sic]. The height and the diameter can be varied independently of one another. It is often expedient, to increase the apparent density and improve flowability, to match the height of the microtablets to the diameter.

Another element in the control of release besides the size of the microtablets is the addition of wetting agents which increase the rate of dissolution. Wetting agents which can be used are, on the one hand, surfactants such as polyoxyethylene fatty acid esters, polyoxyethylene fatty alcohol ethers, fatty acid salts, bile acid salts, alkyl sulfates or ethylene oxide/propylene oxide block copolymers or, on the other hand, genuinely water-soluble substances such as polyethylene glycols, urea, sodium chloride, sorbitol, mannitol, glycine, nicotinamide, or salts of citric acid, tartaric acid or phosphoric acid. In this case the rate of release increases in parallel with the rise in the wetting agent concentration.

The wetting agent can have been incorporated into the granules or else be subsequently mixed in together with the lubricant. This is, of course, possible only with solid wetting agents. The wetting agent concentration is 0.1–15, as a rule 1–10, % of the total mass.

To increase the rate of erosion of the active ingredient from the tablet surface, and thus the release of active ingredient, it is also possible to use disintegrants in concentrations of 0.001–0.5, preferably 0.01–0.1, %, which are far below the conventional concentrations.

As a rule, the microtablets can be packed into gelatin capsules directly using conventional filling machines. It may occasionally be advantageous for the microtablets, before the packing, to be provided with a readily soluble film coating which does not influence the release.

In addition, it is in many cases expedient to combine delayed release with instant release or not so delayed release microtablets. This results in release of an initial dose at once, followed by the slow release of the maintenance dose. Modern capsule filling machines are able to meter two products into one capsule without problems.

The instant release microtablet differs from the delayed release microtablet in that it contains conventional amounts of disintegrant, swelling agent, pore former, which bring about rapid disintegration of the microtablet into small fragments and rapid dissolution of the active ingredient.

The microtablets of the examples always had a diameter and height each of 2 mm, and the density of active ingredient was always more than 1.

5,681,588

| 5 | 6 |

EXAMPLES

### Example 1 (FIG. 1)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 6.25 mg (96%) |
| Hydroxypropylmethylcellulose | 0.20 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.50 mg |

30kg of propafenone HCl were granulated with 10 kg of a 10% strength hydroxypropylmethylcellulose solution (Pharmacoat® 603) and dried in a fluidized bed granulator. The granules were passed through a screen of suitable mesh width and then mixed in a plowshare mixer with the stated amount of magnesium stearate.

The microtablets were produced in a rotary tabletting machine equipped with multiple microtablet punches.

The number of microtablets corresponding to the dose to be administered was packed into hard gelatin capsules using a suitable capsule filling machine.

#### TABLE 1

| Results of studies on volunteers with propafenone HCl microtablets of Example 1 and a bolus delayed release form according to the comparative test (n = 18, dose 400 mg of propafenone HCl, repeated administration) | | | | |
|---|---|---|---|---|
| | Microtablets | | Bolus delayed release form | |
| | fasting | non-fasting | fasting | non-fasting |
| AUC ng·h ml | 5 500 | 5 500 | 6 900 | 4 700 |
| t½ (h) | 8-9 | 8-9 | 5-6 | 5-6 |
| PTF (%) | 52 | 56 | 88 | 106 |

n = number of volunteers
ng = nanogram
h = hours

### Example 2 (FIG. 2)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 5.92 mg (91%) |
| Hydroxypropylmethylcellulose | 0.20 mg |
| Poloxamer 188 (USP) | 0.33 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.5 mg |

Production took place as in Example 1. The required amount of poloxamer 188 together with the magnesium stearate were mixed with the granules in a plowshare mixer.

### Example 3 (FIG. 3)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 5.61 mg (86%) |
| Hydroxypropylmethylcellulose | 0.19 mg |
| Poloxamer 188 | 0.65 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.5 mg |

Production took place as in Example 2.

### Example 4 (FIG. 4)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 6.0 mg (86%) |
| Hydroxypropylmethylcellulose | 0.2 mg |
| Calcium hydrogen phosphate | 0.613 mg |
| Monoglyceride (Myvatex ®) | 0.25 mg |
| Crosslinked polyvinylpyrrolidone | 0.007 mg |
| Magnesium stearate | 0.03 mg |
| Total weight | 7.0 mg |

Production took place as in Example 2.

### Example 5 (FIG. 5)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 5.70 mg (81%) |
| Gelatin | 0.18 mg |
| Calcium hydrogen phosphate | 0.38 mg |
| NaCl | 0.70 mg |
| Magnesium stearate | 0.04 mg |
| Total weight | 7.0 mg |

Production took place as in Example 1. A 10% strength gelatin solution was used as granulating agent. The amount of NaCl was mixed in with the magnesium stearate.

### Example 6 (FIG. 6)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 5.83 mg (83%) |
| Hydroxypropylmethylcellulose | 0.17 mg |
| β-Cyclodextrin | 0.9 mg |
| Magnesium stearate | 0.1 mg |
| Total weight | 7.0 mg |

Production took place as in Example 2.

### Example 7 (FIG. 7)

Gelatin capsules with propafenone delayed release microtablets and propafenone instant release microtablets

To achieve a higher initial release, 14 instant release microtablets and 55 delayed release microtablets were

PA 285

5,681,588

7

packed into hard gelatin capsules in a suitable capsule filling machine.

| Composition of the instant release microtablets | |
|---|---|
| Propafenone HCl | 6.05 mg (93%) |
| Hydroxypropylmethylcellulose | 0.20 mg |
| Sodium carboxymethylstarch | 0.20 mg |
| Magnesium stearate | 0.05 mg |
| Total weight | 6.5 mg |

The instant release microtablets were produced as in Example 2.

The delayed release microtablets were produced as in Example 1.

Example 8 (FIG. 8)

Propafenone delayed release microtablets

| Composition | |
|---|---|
| Propafenone HCl | 6.48 mg (99.7%) |
| Magnesium stearate | 0.02 mg |
| Total weight | 6.50 mg |

Propafenone hydrochloride and magnesium stearate were mixed in a plowshare mixer and subsequently compressed to microtablets.

The in vitro release plots (FIGS. 1 to 10) were determined using a USP paddle apparatus with 0.08 molar HCl in the first two hours and then phosphate buffer pH 6.8. The paddle rotated at 50 rpm.

Comparative test

Propafenone delayed release bolus film-coated tablet

| Composition | |
|---|---|
| Propafenone HCl | 450.0 mg |
| Sodium alginate | 112.0 mg |
| Microcrystalline cellulose type PH 101 | 37.0 mg |
| Copolymers of acrylic and methacrylic esters with a small content of quaternary ammonium groups (Eudragit ®.RS) | 15.0 mg |
| Gelatin | 55.0 mg |
| Magnesium stearate | 3.5 mg |
| Microcrystalline cellulose type PH 102 | 12.5 mg |
| Readily soluble film coating | 15.0 mg |
| Total weight | 700.0 mg |

Propafenone hydrochloride, sodium alginate, microcrystalline cellulose (type PH 101) and Eudragit RS were mixed in a vertical mixer and granulated with 20% strength gelatin solution. The wet granules were dried in a fluidized bed dryer with inlet air at 60° C. After passing through a screen of suitable mesh width, magnesium stearate and microcrystalline cellulose (type PH 102) were admixed in a horizontal mixer and subsequently the mixture was compressed to oblong tablets (dimensions 18×8.7 mm) in a rotary tabletting machine. The readily soluble coating was applied in a horizontal coater.

8

Determination of in vitro release in a paddle apparatus at 50 rpm produced the following results (in %):

| | |
|---|---|
| 1st hour | 3.8 |
| 2nd hour | 5.5 |
| 3rd hour | 23.7 |
| 4th hour | 43.0 |
| 6th hour | 75.4 |
| 8th hour | 89.5 |

The in vitro release from the delayed release bolus film-coated tablet is thus similar to that of the delayed release microtablets according to the invention. Nevertheless, the in vivo release is entirely different and, in fact, better according to the invention, cf. drug levels shown in FIG. 11.

We claim:

1. A cylindrical delayed release microtablet with a convex or flat upper side and lower side of β-phenylpropiophenone derivatives of the formula I as active ingredient



where R is n-propyl or 1,1-dimethylpropyl, and their pharmacologically acceptable salts, wherein

a) the height and diameter are, independently of one another, 1–3 mm,

b) the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet,

c) the active ingredient density is greater than 1,

d) the release of active ingredient in the USP paddle method at 50 rpm is 80% as a maximum after 3 hours and as a minimum after 24 hours,

e) the release rate is virtually independent of the pressure when compressing the tablets, and

f) the tablet contains no release-delaying ancillary substance but 0.1–5% by weight of a lubricant and 0–18.9% by weight of other conventional ancillary substances.

2. A tablet as claimed in claim 1, which in vivo results in a pronounced plasma level with a PTF<75%, and whose bioavailability does not depend on the intake of food.

3. A tablet as claimed in claim 1, wherein the active ingredient is propafenone hydrochloride.

4. A tablet as claimed in claim 1, wherein the height and diameter are approximately the same.

5. A gelatin capsule which contains 3–200 tablets as claimed in claim 1 with identical or different release rates.

6. A process for producing cylindrical delayed release microtablets as claimed in claim 1, which comprises a homogeneous mixture of 81–99.9% by weight of the granulated active ingredient with a particle size below 1 mm, 0.1–5% by weight of a lubricant and 0–18.9% by weight of other conventional ancillary substances which do not delay release being compressed in a cylindrical mold with a height and diameter each of 1–3 mm and being removed from the mold.

* * * * *

**OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.**

ATTORNEYS AT LAW

FOURTH FLOOR
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON, VIRGINIA 22202 U.S.A.

(703) 413-3000

(703) 413-2220 FACSIMILE

OBLONPAT@OBLON.COM

WWW.OBLON.COM

PATENT, TRADEMARK AND COPYRIGHT LAW
AND RELATED FEDERAL AND ITC LITIGATION



NORMAN F. OBLON
MARVIN J. SPIVAK
C. IRVIN McCLELLAND
GREGORY J. MAIER
ARTHUR I. NEUSTADT
RICHARD D. KELLY
JAMES D. HAMILTON
EDWARD M. KUESTERS
ROBERT T. POUS
DAVID J. KERA
CHARLES L. GHOLZ
VINCENT J. SUNDERICK*
WILLIAM E. BEAUMONT
STEVEN B. KELBER*
ROBERT E. GREISE
JEAN-PAUL LAVALLEYE, PH.D.
JEFFREY H. KAUFMAN
BRIAN D. ANDERSON
ROBERTA S. BREN
JOHN H. WEBER
STEPHEN G. BAXTER, PH.D.
MARTIN M. ZOLTICK
ROBERT W. HAHL, PH.D.
RICHARD L. TRAVERSO, PH.D.
STEVEN P. WEIHROUCH
JOHN T. GOOLKASIAN*
MARC R. LANGOLD, PH.D.*
WILLIAM J. HEALEY, PH.D.*
RICHARD L. CHINN, PH.D.
STEVEN B. KINNAM
CARL E. SCHLIER
R. JAY MINES
JAMES E. KUIBASKI
CARRETHANE R. RICHARDSON*
RICHARD A. NEIFELD, PH.D.
J. DEREK MASON, PH.D.

GERALD J. MOSSINGHOFF
MELTON STEINMAN
SAMUEL H. ELITCH*
JOHN O. TRESANSKY*
ALTON D. ROLLINS
JAMES R. BOLEFF
HARRIS A. PITLICK*
RAYMOND E. CARDOZO, PH.
MASAYASU MONI‡

SURINDER SACHAR
JONATHAN RIKISS
LINDSEY A. DODSON*
FRANK J. WEST*
SHANON E. CRANE, PH.D.*
BRADLEY O. DITRE*
JOHN W. CARPENTER
CHRISTINA M. GAITANO
KARL R. KOVACS*
MICHAEL H. JACOBS
THOMAS M. MIZO, PH.D.*
JEFFREY R. PROTTIYE*
KATHLEEN COONEYPORTER*
ANDREW M. OILS
MARISO LINESAK, PH.D.*
FREDRICK D. VASTINE, PH.D.*
PAUL E. RAUCH, PH.D.*
MICHAEL H. CASEY, PH.D.*

*BAR MEMBERSHIP OTHER
   THAN VIRGINIA
†REGISTERED PATENT AGENT
‡JAPANESE BENGSHI

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.    20231

                                    GROUP ART UNIT: 1502    BATCH NO.: L39
                                    EXAMINER:    W. BENSTON JR.
                            RE:     INVENTOR:    Karl KOLTER et al.
                                    PATENT NO: 5,681,588
                                    ISSUED: October 28, 1997
                                    FOR:    DELAYED RELEASE MICROTABLETS
                                            OF BETA-PHENYLPROPIOPHENONE
                                            DERIVATIVES

SIR:

        Attached hereto for filing are the following papers:

            REQUEST FOR CERTIFICATE OF CORRECTION
            CERTIFICATE OF CORRECTION FORM PTO 1050

        Our check in the amount of $ -0- is attached covering any
    required fees.  In the event any variance exists between the amount
    enclosed and the Patent Office charges for filing the above-noted
    documents, including any fees required under 37 CFR 1.136 for any
    necessary Extension of Time to make the filing of the attached
    documents timely, please charge or credit the difference to our
    Deposit Account No.15-0030.  A duplicate of this sheet is enclosed.

                            Respectfully submitted,

                            OBLON, SPIVAK, McCLELLAND,
                            MAIER & NEUSTADT, P.C.

                            Norman F. Oblon
                            Attorney of Record
                            Registration No: 24,618

                                            John K. Pike, Ph.D.
                                            Registration No. 41,253

DOCKET NO: 0524-2396-0X PCT

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 5,681,588

DATED      : October 28, 1997

INVENTOR(S) : Karl KOLTER et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the title page, Item [87], the PCT Pub. Date should read:

-- Oct. 13, 1994 --

MAILING ADDRESS OF SENDER:
OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.
1755 Jefferson Davis Highway, 4th Floor
Arlington, VA 22202
(703) 413-3000

No. of add'l copies
@ 50¢ per page

OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.

ATTORNEYS AT LAW

FOURTH FLOOR
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON, VIRGINIA 22202 U.S.A.

(703) 413-3000

(703) 413-2220 FACSIMILE

OBLONPAT@OBLON.COM

WWW.OBLON.COM

PATENT, TRADEMARK AND COPYRIGHT LAW
AND RELATED FEDERAL AND ITC LITIGATION



HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.   20231

RE:

GROUP ART UNIT: 1502   BATCH NO: L39
EXAMINER:  W. BENSTON JR.
INVENTOR:  Karl KOLTER et al.
PATENT NO: 5,681,588
ISSUED: October 28, 1997
FOR:   DELAYED RELEASE MICROTABLET
       OF BETA-PHENYLPROPIOPHENONE
       DERIVATIVES

SIR:

Attached hereto for filing are the following papers:

REQUEST FOR CERTIFICATE OF CORRECTION
CERTIFICATE OF CORRECTION FORM PTO 1050

Our check in the amount of $ -0- is attached covering any required fees. In the event any variance exists between the amount enclosed and the Patent Office charges for filing the above-noted documents, including any fees required under 37 CFR 1.136 for any necessary Extension of Time to make the filing of the attached documents timely, please charge or credit the difference to our Deposit Account No.15-0030. A duplicate of this sheet is enclosed.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Attorney of Record
Registration No: 24,618

John K. Pike, Ph.D.
Registration No. 41,253

DOCKET NO: 0524-2396-0X PCT

PA 289

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF:                :

Karl KOLTER et al.                   :  EXAMINER: W. BENSON JR.

PATENT NO. 5,681,588                 :

ISSUED: October 28, 1997             :  GROUP: 1502

FOR: DELAYED RELEASE MICROTABLET OF BETA-PHENYLPROPIOPHENONE
DERIVATIVES

REQUEST FOR CERTIFICATE OF CORRECTION

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.   20231

SIR:

The following is a request for a certificate of correction
in Serial Number 08/525,749, now Patent Number 5,681,588.

In accordance with the Provisions of Rule 322 of the Rules
Practice, which implement 35 USC 254, the Patent Office is
respectfully requested to issue a certificate of correction in
the above-identified patent.

In light of the fact that the errors were the fault of the
Patent Office, no fees are required. The requested corrections
are attached on FORM P.T.O. 1050.

Respectfully submitted,

APPROVED

JAN 7 1997

FOR THE COMMISSIONER OF PAT. & T.M.

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Attorney of Record
Registration No: 24,618

0524-2396-0X PCT
Fourth Floor
1755 Jefferson Davis Highway
Arlington, Virginia  22202
(703) 413-3000

John K. Pike, Ph.D.
Registration No. 41,253

PA 290

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. :  5,681,588

DATED       :  October 28, 1997

INVENTOR(S):  Karl KOLTER et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the title page, Item [87], the PCT Pub. Date should read:

-- Oct. 13, 1994 --

Signed and Sealed this

Tenth Day of February, 1998

Attest:

*Bruce Lehman*

**BRUCE LEHMAN**

*Attesting Officer*                *Commissioner of Patents and Trademarks*

MISC.

papers

```
FILE 'USPAT' ENTERED AT 15:39:44 ON 29 SEP 96
 * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
 *                W E L C O M E   T O   T H E              *
 *          U. S.   P A T E N T   T E X T   F I L E        *
 * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
=> s dementia
L1        1627 DEMENTIA
=> s nabumeton
L2           0 NABUMETON
=> s nabumetone
L3         160 NABUMETONE
=> s l1 and l3
L4           1 L1 AND L3
=> d l4
```

1.  5,476,944, Dec. 19, 1995, Derivatives of cyclic phenolic thioethers;
Richard A. Partis, et al., 514/357, 512, 513, 546, 576, 579, 617, 618,
678; 546/337; 558/239, 243, 248; 560/17, 61, 129, 174; 562/426, 465;
564/161, 162 [IMAGE AVAILABLE]

```
=> s microtablet
L5          19 MICROTABLET
=> s micro
L6       63093 MICRO
=> s tablet
L7       30501 TABLET
=> s l6 and l7
L8        1832 L6 AND L7
=>
=> s l6 and l7
L9        1832 L6 AND L7
=> s cylindrical
L10     440137 CYLINDRICAL
=> s l8 and l10
L11        181 L8 AND L10
=> s propafenone
L12         37 PROPAFENONE
=> s l11 and l12
L13          0 L11 AND L12
=> s l11 and l12
L14          0 L11 AND L12
=> s l12 and hydrochloride
        55197 HYDROCHLORIDE
L15         22 L12 AND HYDROCHLORIDE
=> s l12 and l15
L16         22 L12 AND L15
=> s l11 and l16
```

```
L17          0 L11 AND L16
=> s l9 and l12
L18          0 L9 AND L12
=> s l9 and l16
L19          0 L9 AND L16
=> d l16-1-22
'L19' HAS NO ANSWERS
L6       63093 SEA FILE=USPAT MICRO
L7       30501 SEA FILE=USPAT TABLET
L9        1832 SEA FILE=USPAT L6 AND L7
L12         37 SEA FILE=USPAT PROPAFENONE
L15         22 SEA FILE=USPAT L12 AND HYDROCHLORIDE
L16         22 SEA FILE=USPAT L12 AND L15
L19          0 SEA FILE=USPAT L9 AND L16
=> s l8 and l10
L20        181 L8 AND L10
=> d l9 and l11
'L11' IS NOT VALID HERE
=> s l9 and l11
L21        181 L9 AND L11
=> s l9 and l11
L22        181 L9 AND L11
=> s l9 and l10
L23        181 L9 AND L10
=> d l16 1-22
```

1.  5,504,116, Apr. 2, 1996, Lidocaine for the management of preterm labor; Chien-Yuan Kao, et al., 514/626, 821, 935 [IMAGE AVAILABLE]

2.  5,498,422, Mar. 12, 1996, Sustained release capsule; Kouichi Nakamichi, et al., 424/451, 452, 455, 457, 458; 514/772.6, 781, 783, 964 [IMAGE AVAILABLE]

3.  5,456,923, Oct. 10, 1995, Method of manufacturing solid dispersion; Kouichi Nakamichi, et al., 424/489, 452, 455, 465; 514/772.2, 772.3, 774, 778, 779, 781, 937 [IMAGE AVAILABLE]

4.  5,446,070, Aug. 29, 1995, Compositions and methods for topical administration of pharmaceutically active agents; Juan A. Mantelle, 514/772.6; 424/485, 486, 487, 488; 514/781, 782 [IMAGE AVAILABLE]

5.  5,439,914, Aug. 8, 1995, Spirocycles; David A. Claremon, et al., 514/278; 546/17 [IMAGE AVAILABLE]

6.  5,403,846, Apr. 4, 1995, Spirocycles; John J. Baldwin, et al., 514/278, 456; 546/15; 549/15, 23, 331, 336, 345 [IMAGE AVAILABLE]

7.  5,382,587, Jan. 17, 1995, Spirocycles; John J. Baldwin, et al., 514/278; 546/17 [IMAGE AVAILABLE]

8.  5,334,602, Aug. 2, 1994, Aryloxalkylamine derivatives and uses thereof; Bernhard Lotz, et al., 514/317, 326, 422, 428, 445, 448, 652, 821; 546/213; 548/527, 571; 549/64; 560/27; 564/349 [IMAGE AVAILABLE]

9.  5,264,432, Nov. 23, 1993, 5-(1-aminoacyl)-5,10-dihydro-11H-dibenzo[b,e](1,4)diazepin-11-ones; Carla Ruger, et al., 514/220; 540/495 [IMAGE AVAILABLE]

10.  5,166,142, Nov. 24, 1992, Use of type IA antiarrhythmic agents to lower blood lipids; Arthur J. Moss, et al., 514/54; 424/440, 455; 514/57, 60, 210, 357 [IMAGE AVAILABLE]

11.  5,118,685, Jun. 2, 1992, Aminopropanol derivatives of substituted 2-hydroxy-propiophenones, and therapeutic agents containing these compounds; Albrecht Franke, et al., 514/235.5, 235.8, 252, 326, 331, 406, 427; 544/140, 141, 173, 366, 371, 399; 546/208, 211, 232; 548/376.1, 562 [IMAGE AVAILABLE]

12.  5,118,511, Jun. 2, 1992, Aqueous or pulverulent, water-dispersible preparation of a sparingly water-soluble pharmaceutical active compound and its preparation; Dieter Horn, et al., 424/502, 484, 485, 486, 488, 489; 514/937, 938 [IMAGE AVAILABLE]

13.  5,116,974, May 26, 1992, 3-carbalkoxyamino-5-aminoacyl-5H-dibenz[b,f]azepines, and methods for making; Helmut Wunderlich, et al., 540/591, 589 [IMAGE AVAILABLE]

14.  4,954,347, Sep. 4, 1990, Long lasting composition of **propafenone** and quinidine for treatment of cardiac conditions; Edward B. Kristen, et al., 424/456, 464 [IMAGE AVAILABLE]

15.  4,945,114, Jul. 31, 1990, Therapeutic agents containing enantiomers of **propafenone**; Albrecht Franke, deceased, et al., 514/652, 821 [IMAGE AVAILABLE]

16.  4,935,245, Jun. 19, 1990, Pulverulent, water-dispersible preparation of a sparingly water-soluble pharmaceutical active compound and its preparation; Dieter Horn, et al., 424/489, 499, 500, 501, 502 [IMAGE AVAILABLE]

17.  4,843,085, Jun. 27, 1989, Pyridine derivatives, process for production thereof and pharmaceutical compositions useful as anti-arhytmics; Takashi Fujikura, et al., 514/356; 546/321 [IMAGE AVAILABLE]

18.  4,612,320, Sep. 16, 1986, Aminopropanol derivatives of
1-(2-hydroxyphenyl)-3-phenylpropanols and therapeutic agents containing
these compounds; Albrecht Franke, et al., 514/317, 327, 652, 821;
544/162, 177, 401; 546/217, 240; 564/349 [IMAGE AVAILABLE]

19.  4,571,409, Feb. 18, 1986, Aminopropanol derivatives of
2-hydroxy-.beta.-phenyl-propiophenones, their preparation and therapeutic
agents containing these compounds; Albrecht Franke, et al., 514/652;
564/349 [IMAGE AVAILABLE]

20.  4,540,697, Sep. 10, 1985, Aminopropanol derivatives of
2-hydroxy-.beta.-phenyl-propiophenones, pharmaceutical compositions and
use; Albrecht Franke, et al., 514/255, 652; 544/399; 564/349 [IMAGE
AVAILABLE]

21.  4,474,986, Oct. 2, 1984, Preparation of **propafenone**; Helmut
Lietz, 564/349 [IMAGE AVAILABLE]

22.  4,460,605, Jul. 17, 1984, 2-[2'-Hydroxy-3'-(1,1-dimethylpropylamino)-
propoxy]-.beta.-phenylpropiophenone, its physiologically acceptable acid
addition salts, and pharmaceutical compositions; Gerd Petrik, et al.,
514/651; 564/349 [IMAGE AVAILABLE]
=> d l15 1-22

1.  5,504,116, Apr. 2, 1996, Lidocaine for the management of preterm
labor; Chien-Yuan Kao, et al., 514/626, 821, 935 [IMAGE AVAILABLE]

2.  5,498,422, Mar. 12, 1996, Sustained release capsule; Kouichi
Nakamichi, et al., 424/451, 452, 455, 457, 458; 514/772.6, 781, 783, 964
[IMAGE AVAILABLE]

3.  5,456,923, Oct. 10, 1995, Method of manufacturing solid dispersion;
Kouichi Nakamichi, et al., 424/489, 452, 455, 465; 514/772.2, 772.3, 774,
778, 779, 781, 937 [IMAGE AVAILABLE]

4.  5,446,070, Aug. 29, 1995, Compositions and methods for topical
administration of pharmaceutically active agents; Juan A. Mantelle,
514/772.6; 424/485, 486, 487, 488; 514/781, 782 [IMAGE AVAILABLE]

5.  5,439,914, Aug. 8, 1995, Spirocycles; David A. Claremon, et al.,
514/278; 546/17 [IMAGE AVAILABLE]

6.  5,403,846, Apr. 4, 1995, Spirocycles; John J. Baldwin, et al.,
514/278, 456; 546/15; 549/15, 23, 331, 336, 345 [IMAGE AVAILABLE]

7.  5,382,587, Jan. 17, 1995, Spirocycles; John J. Baldwin, et al.,

514/278; 546/17 [IMAGE AVAILABLE]

8.  5,334,602, Aug. 2, 1994, Aryloxalkylamine derivatives and uses thereof; Bernhard Lotz, et al., 514/317, 326, 422, 428, 445, 448, 652, 821; 546/213; 548/527, 571; 549/64; 560/27; 564/349 [IMAGE AVAILABLE]

9.  5,264,432, Nov. 23, 1993, 5-(1-aminoacyl)-5,10-dihydro-11H-dibenzo[b,e](1,4)diazepin-11-ones; Carla Ruger, et al., 514/220; 540/495 [IMAGE AVAILABLE]

10.  5,166,142, Nov. 24, 1992, Use of type IA antiarrhythmic agents to lower blood lipids; Arthur J. Moss, et al., 514/54; 424/440, 455; 514/57, 60, 210, 357 [IMAGE AVAILABLE]

11.  5,118,685, Jun. 2, 1992, Aminopropanol derivatives of substituted 2-hydroxy-propiophenones, and therapeutic agents containing these compounds; Albrecht Franke, et al., 514/235.5, 235.8, 252, 326, 331, 406, 427; 544/140, 141, 173, 366, 371, 399; 546/208, 211, 232; 548/376.1, 562 [IMAGE AVAILABLE]

12.  5,118,511, Jun. 2, 1992, Aqueous or pulverulent, water-dispersible preparation of a sparingly water-soluble pharmaceutical active compound and its preparation; Dieter Horn, et al., 424/502, 484, 485, 486, 488, 489; 514/937, 938 [IMAGE AVAILABLE]

13.  5,116,974, May 26, 1992, 3-carbalkoxyamino-5-aminoacyl-5H-dibenz[b,f]azepines, and methods for making; Helmut Wunderlich, et al., 540/591, 589 [IMAGE AVAILABLE]

14.  4,954,347, Sep. 4, 1990, Long lasting composition of **propafenone** and quinidine for treatment of cardiac conditions; Edward B. Kristen, et al., 424/456, 464 [IMAGE AVAILABLE]

15.  4,945,114, Jul. 31, 1990, Therapeutic agents containing enantiomers of **propafenone**; Albrecht Franke, deceased, et al., 514/652, 821 [IMAGE AVAILABLE]

16.  4,935,245, Jun. 19, 1990, Pulverulent, water-dispersible preparation of a sparingly water-soluble pharmaceutical active compound and its preparation; Dieter Horn, et al., 424/489, 499, 500, 501, 502 [IMAGE AVAILABLE]

17.  4,843,085, Jun. 27, 1989, Pyridine derivatives, process for production thereof and pharmaceutical compositions useful as anti-arhytmics; Takashi Fujikura, et al., 514/356; 546/321 [IMAGE AVAILABLE]

18.  4,612,320, Sep. 16, 1986, Aminopropanol derivatives of 1-(2-hydroxyphenyl)-3-phenylpropanols and therapeutic agents containing these compounds; Albrecht Franke, et al., 514/317, 327, 652, 821; 544/162, 177, 401; 546/217, 240; 564/349 [IMAGE AVAILABLE]

19.  4,571,409, Feb. 18, 1986, Aminopropanol derivatives of 2-hydroxy-.beta.-phenyl-propiophenones, their preparation and therapeutic agents containing these compounds; Albrecht Franke, et al., 514/652; 564/349 [IMAGE AVAILABLE]

20.  4,540,697, Sep. 10, 1985, Aminopropanol derivatives of 2-hydroxy-.beta.-phenyl-propiophenones, pharmaceutical compositions and use; Albrecht Franke, et al., 514/255, 652; 544/399; 564/349 [IMAGE AVAILABLE]

21.  4,474,986, Oct. 2, 1984, Preparation of **propafenone**; Helmut Lietz, 564/349 [IMAGE AVAILABLE]

22.  4,460,605, Jul. 17, 1984, 2-[2'-Hydroxy-3'-(1,1-dimethylpropylamino)-propoxy]-.beta.-phenylpropiophenone, its physiologically acceptable acid addition salts, and pharmaceutical compositions; Gerd Petrik, et al., 514/651; 564/349 [IMAGE AVAILABLE]
=>

# United States Patent [19]

**Davidson**

[11] **3,951,821**

[45] **Apr. 20, 1976**

[54] **DISINTEGRATING AGENT FOR TABLETS**

[75] Inventor: **William G. Davidson, Carmel, Ind.**

[73] Assignee: **The Dow Chemical Company, Midland, Mich.**

[22] Filed: **Sept. 20, 1974**

[21] Appl. No.: **508,025**

### Related U.S. Application Data

[63] Continuation of Ser. No. 271,829, July 14, 1972, abandoned.

[52] U.S. Cl. .................................... 252/1; 424/15; 424/362; 252/134; 252/363.5

[51] Int. Cl.² ............................................. C09K 3/00

[58] Field of Search ..................... 424/15, 361, 362; 252/1

[56] **References Cited**

### UNITED STATES PATENTS

R27,679    6/1973    Bentholm et al. ................ 424/362

3,181,998    5/1965    Kanig ................................ 424/361
3,622,677    11/1971    Short ................................ 424/321

*Primary Examiner*—Benjamin R. Padgett
*Assistant Examiner*—Josephine Lloyd
*Attorney, Agent, or Firm*—Maynard R. Johnson

[57]    **ABSTRACT**

Disintegration of tablets is improved by the incorporation therein of a plurality of small tubules. The tubules can be prepared by subdivision of hollow fibers such as cellulose or cellulose acetate hollow fibers having inside diameters on the order of 50–300 microns into segments 100–1000 microns in length. Tablets and methods for their preparation are disclosed.

**5 Claims, No Drawings**

3,951,821

**1**

DISINTEGRATING AGENT FOR TABLETS

CROSS-REFERENCE TO RELATED APPLICATION

This is a continuation of application Serial No. 271,829 filed July 14, 1972 now abandoned.

BACKGROUND OF THE INVENTION

A number of materials have been used to enhance or control disintegration of tablets on exposure to a liquid medium. For example, U.S. Pat. No. 3,383,283 discloses stearic acid-talc mixtures; U.S. Pat. No. 3,629,393 discloses water-swellable granules; and U.S. Pat. No. 3,435,110 describes a collagen matrix to enhance disintegration.

SUMMARY OF THE INVENTION

The present invention provides a novel tablet disintegrant for tablets in the form of small tubular particles incorporated within the tablet structure. The tubular particles are fabricated of a material which is compatible with the other ingredients of the tablet, and which has character strength to maintain the hollow, tubular structure of the particles without complete occlusion through the compression of the tablet. Incorporation of such tubular segments in a tablet provides a tablet with a plurality of small open-ended chambers (internally of the segments) and a plurality of openings in the face of the tablet.

The term "tablet" is employed herein in its usual sense to refer to a compressed or molded mass of solid material comprising an active ingredient such as a drug, a soap, a disinfectant, a fertilizer, an insecticide, a dye, a foodstuff, etc., which active ingredient is intended in use to be minutely dispersed or dissolved in a liquid such as water, gastric fluid, oil, emulsions, chemical solutions, etc. For the purposes of the invention, the shape and size of a tablet can vary considerably from the conventional rounded disk shape or capsule shape associated with pharmaceutical tablets, to irregularly shaped masses, bars, pellets, balls, beads, cakes, or the like.

The tubular segments of the invention are hereinafter referred to as "tubules" to reflect both their hollow, open-ended tubular character, and their small size in relation to the size of the ultimate tablet. The tubules are generally more or less cylindrical in shape. Their cross-sectional dimensions are most conveniently expressed in terms of inside diameter (I.D.), it being understood that the tubules can have circular, ellipsoidal, oval, polygonal or irregular in cross-section and that inside diameter is employed as a convenient expression of internal area. The length of the tubules is likewise conveniently expressed as the axial length of a cylindrical segment, it being understood that the tubules may also be curved or bent, and that the ends thereof need not be in a plane normal to an axis, or even precisely planar. The wall thickness of the tubules is conveniently expressed in terms of outside diameter.

In general, the tubules have an inside diameter on the order of from about 5, to about 10, to about 25, to about 100, to about 1000 microns. Tubule length will generally be from about 50 microns to 2 to 3 millimeters. The wall thickness should be sufficient to maintain the tubular form of the tubules in a compressed tablet, and is preferably thin enough to be readily water-permeable. The tubules can have outside diameters ranging from about 10 to about 50 microns to about

**2**

300 to about 1100 microns, preferably having an outside diameter of about 5 to 10 to 50 to about 300 microns greater than the inside diameter. Axial length can be as low as 0.5 microns, but is preferably at least as great as the inside diameter, and is preferably about 100–1000 microns.

In general, the tubules are fabricated of a synthetic organic polymeric material having a density less than 1 gram per cubic centimeter. In quantity, such organic polymeric tubules will generally have a bulk density on the order of 0.1 to about 0.6 grams per cubic centimeter, or from about 1000 to about 45,000 tubules per cubic centimeter.

Preparation of the Tubules

The tubule disintegrating agents of the invention can be conveniently prepared by cutting or otherwise subdividing hollow fibers into segments of the desired length. The hollow fibers of a desired material, dimensions and shape can in turn be prepared by well-known procedures. For example, hollow fibers can be prepared by coating a filamentous core, and thereafter dissolving the core material, as taught by Snelling, U.S. Pat. No. 1,713,679, by drawing a relatively large tube, or by extrusion or melt spinning, as disclosed, for example, in U.S. Pat. Nos. 3,616,928; 3,536,611; 3,492,698; 3,228,456; 3,494,121 and 3,423,491. Hollow fibers of various types are also commercially available for use in permeation separatory devices such as hemodialysis or desalinization devices or heat exchange devices. These commercially available hollow fibers can be segmented to form tubules. The tubules employed in the present invention are much shorter in length than the hollow fibers employed in applications such as reverse osmosis devices. Accordingly, broken or imperfect fibers prepared for other uses can be segmented for use in the present invention. Also, the manufacture of hollow fibers for preparation of tubules can be greatly simplified, since the length of the hollow fiber starting material is much less critical.

Disintegratable Tablets

The invention provides tablets containing the tubules as disintegrating agents. The tubules are incorporated in a tablet in an amount effective to enhance disintegration of the tablet, and can be employed over a wide range of concentrations, from about 0.1 to about 90 or more percent by weight of the ultimate tablet. In addition to their function as disintegrating agents, the tubules can be dyed a color which contrasts with the other tablet ingredients, to aid in tablet identification, and the longer tubules, e.g. 500–3000 microns in length, add strength to the tablet structure.

When a tablet of the invention is contacted with a liquid, the tubules in the tablet face can draw liquid rapidly into the tablet by capillary action. Within the tablet local dissolution of ingredients can occur at the internal ends of tubules, thus providing additional channels for the liquid to move from tubule to tubule within the tablet. The increase in disintegration rate is thus dependent in part upon factors having to do with capillary attraction, such as wettability of the tubules, dimensions of tubules, and surface tension. When the tubules are fabricated from a material which is permeable to the liquid, the tubule walls can serve as dialysis membranes through which the liquid can migrate. In such an embodiment, the disintegration rate is also influenced by factors having to do with osmotic pres-

3,951,821

3

sure, such as tubule wall permeability, electrolyte concentrations, pressure and the like. The tubules can also be fabricated of materials such as water-swellable polymers which imbibe or react with the liquid and swell, in which case enhancement of disintegration is further related to mechanical disruptive forces generated in such swelling. Additionally, the tubule material may itself be soluble in the liquid, in which case additional factors contribute to disintegration.

It will thus be apparent that the disintegration mechanisms involved in the invention can be quite complex from a theoretical standpoint. Accordingly, particular theories or combination of theories should not be considered as controlling. It will also be apparent that the invention provides a high degree of practical flexibility for adaptation of the invention to a variety of environments.

### Quantity of Tubules

Due to their small size, the disintegrant tubules of the invention are most conveniently measured in bulk by weight or by volume. In most applications it is desirable to measure the ingredients and the final tablets in terms of weight. Accordingly, quantities of tubules are also most conveniently expressed in terms of weight. It is understood that for a given type of tubule, weight is also an indication of volume, and of number of tubules.

In the preparation of tablets of the invention, the material to be formed into tablets is mixed together in accordance with conventional procedures for formulating and mixing a solid mass to be tabletted. A plurality of tubules is mixed with the other ingredients prior to tablet formation, and the mass is then compressed into tablets (or granules) of the desired size and shape, according to conventional techniques. Sufficient tubules should be employed to enhance the disintegration of the final tablet or granule. The exact quantity of tubules to be employed in a given case can vary considerably depending upon such factors as the tablet ingredients, liquid intended for disintegration in ultimate use, the manner in which the tablets are formed, size of tablets, the particular type of tubules employed, and disintegration rate desired. The quantity of tubules to be employed in a given case can be readily selected by determining disintegration rates for tablets or granulations prepared with different quantities of tubules using conventional equipment and procedures.

In general, excellent results have been obtained with tablet formulations in which the tubules amount to from about 0.1 to about 1 to about 20 percent by weight of the tablet formulation. The tubules can be employed in higher amounts, such as from 1 to 50 to 85 to 90 percent by weight of the total tablet. In most instances, however, an amount of tubules in excess of 10 to 15 percent of the tablet weight provides little additional increase in disintegration rate, while the active ingredient concentration as a percentage of tablet weight correspondingly is reduced. For most pharmaceutical tablets and granulations the tubules preferably comprise from about 1 to about 10 percent by weight of the tablet or granule, and outstanding results can be obtained with amounts of about 5 to 7 percent. Depending upon the size of the ultimate tablet and the size of tubules employed the absolute number of tubules per tablet can be as low as one in the case of "micro" tablets or "beadlets" more generally regarded as granules, to hundreds, thousands or millions, or more, individual tubules per tablet.

4

### Preparation of Tablets

In a convenient tabletting procedure, the active ingredient or ingredients and any other ingredients (other than the tubules) such as binders, stabilizers, flavors, antioxidants, lubricants, delayed release coatings, running powder, dyes, buffers, etc. are intimately mixed together to form a mass ready for compression or molding into tablets. The ingredients may be granulated by conventional "wet" or "dry" granulation techniques, for example, or portions of the ingredients may be coated according to known procedures to provide for delayed or timed dissolution of the coated ingredients. The disintegrant tubules are then mixed with the dry mixture of ingredients. If a wet granulation procedure is employed, or when a liquid coating is applied, the resulting wet granulate or coated material is preferably dried prior to addition of the tubules although the tubules can be employed in wet granulation techniques as well. The resulting mixture is then compressed into tablets.

The exact type of tubule to be employed depends on the desired use of the ultimate tablet. For most applications with tablets for disintegration in water, tubules are preferably fabricated of a material such as, carboxy methyl cellulose, ethyl cellulose, cellulose, cellulose acetate, gelatin or hydroxypropyl methyl cellulose; and have an inside diameter of about 30 to about 300 microns, a wall thickness of about 5 to about 50 microns and a length of about 100 to 700 microns.

The tablets can be coated according to known procedures for spray coating or press coating, for example, or they can be left uncoated, as may be desired. Coating can be employed advantageously to control disintegration time. In such embodiments, the tubule disintegrants ensure positive rapid disintegration of the tablet once the coating material has been removed.

### DESCRIPTION OF PREFERRED EMBODIMENTS

The following examples illustrate the invention:

#### EXAMPLE 1

Hollow cellulose acetate dialysis fibers having an inside diameter of 200 microns and a wall thickness of about 50 microns are cut into roughly cylindrical segments approximately 0.5 – 1 millimeter in length. 50 Parts by weight of the tubular fiber segments are mixed thoroughly with 700 parts by weight of crystalline aspirin. The mixture is compressed into tablets using a 0.5 inch standard curvature punch and die on a Manesty F-3 tablet machine. The tablets are compressed to a tablet hardness of about 8-10 Strong-Cobb-Arner Units (corresponding to about 2000-3000 psi compression pressure). Disintegration time in 0.1 normal hydrochloric acid is determined according to U.S.P. procedures and found to be less than 2 minutes. Tablets of similar hardness compressed from the same crystalline aspirin alone have a disintegration time in excess of two hours.

#### EXAMPLE 2

In a similar procedure, tablets are prepared using 700 parts by weight of the same crystalline aspirin, with 50 or 30 parts by weight of the tubular segments, or with 50 parts by weight of a microcrystalline cellulose disintegrant. Two drops of aqueous methylene blue dye are placed on a tablet of each type and the tablets are observed. The tablets containing the hollow tubule

**5**

disintegrant are found to fracture and disintegrate into moist segments within about one to two minutes. The tablet containing the solid cellulose disintegrant is observed to absorb the dye solution while retaining its physical integrity.

### EXAMPLE 3

750 Parts by weight of a rifampin tablet granulation, containing 600 parts by weight of rifampin and 146 parts by weight of starch and 4 parts by weight of magnesium stearate is mixed with 30 parts by weight of cellulose acetate tubules prepared as described in Example 1. Tablets weighing 750 milligrams are compressed to equal hardness from this mixture, and from the granulation alone. The tablets containing the tubules are found to disintegrate in about 5 minutes in 0.1 normal hydrochloric acid with corresponding dissolution of the active ingredient, while the corresponding tablets without the tubule disintegrant are found to remain intact after 30 minutes.

Similar results are obtained with cellulose tubules of similar dimensions.

### EXAMPLE 4

90 Grams of sodium bisulfite are mixed with 15 grams of ethyl cellulose as a solution in ethanol, (about 5 percent by weight) and the wet mass is passed through a screen having 8 meshes to the inch. The wet granulate is dried at room temperature, then passed through a screen having 12 meshes to the inch. The dry granulation is then spray coated with shellac applied in alcohol solution.

40 Grams of sodium iodide are mixed with 15 grams of ethyl cellulose dissolved in sufficient ethanol to give a wet granulation, and the wet mixture is wet-screened through a screen having 8 meshes to the inch, then dried.

The two foregoing granulates are mixed thoroughly with 20 grams of solid 2,2-dibromo-3-nitrilopropionamide and 25 grams of starch. The resulting dry mixture is then blended with a 20 gram quantity of hollow tubules of hydroxypropyl ethyl cellulose having an average inside diameter of 225 microns and an average length of 0.3 – 0.8 millimeters. The mixture is compressed into tablets weighing about 10 grams each. The tablets are adapted for use as disinfectants of aqueous systems such as water closets, humidifier tanks, wading pools and the like. In use the tablet disintegrates to provide an initial release of the 2,2-dibromo-3-nitrilo-propionamide disinfectant and sodium iodide synergist, followed by a later gradual release of sodium bisulfite which detoxifies the disinfectant to permit safe discharge of the disinfected water.

### EXAMPLE 5

A series of different hollow fibers of cellulose acetate containing varying amounts of a tetramethyl sulfone plasticizer, and of various sizes, are cut into substantially cylindrical segments. The resulting tubules, substantially all of which are between 500 and 2000 microns in length, are then evaluated for agglomeration on a scale of 1 to 5, with 1 representing free flowing tubules with substantially no agglomeration and 5 representing clumping. The fibers in each series are examined microscopically dry, after wetting with water; and after redrying. The observations are set out below, the O.D. measurements being in microns. With the excep-

**6**

tion of series 8, the inside diameter is about 200 microns, series 8 being about 50–60 microns I.D.

| Series | Agglomeration | Dry O.D. | Wet O.D. | Redried O.D. |
|---|---|---|---|---|
| 1 | 1 | 210 | 290-300 | 220 |
| 2 | 2 | 250 | 260-265 | 230-240 |
| 3 | 2 | 240 | 250 | 160 |
| 4 | 3 | 220 | 260-265 | 160-165 |
| 5 | 4 | 260-275 | 280 | 270-280 |
| 6 | 3 | 260 | 265-270 | 170 |
| 7 | 3 | 240-250 | 260-270 | 160-170 |
| 8 | 5 | 70 | 70 | 65 |
| 9 | 1 | 210-220 | 250-260 | 190-200 |

During wetting, water is observed to flow into the tubules, indicating capillary action. With the exception of tubule series 8, significant expansion of tubules is observed indicating that both capillary attraction of water and mechanical disruption of tablet structure will take place. On redrying, shrinkage is generally uniform, the tubules retaining the same shape throughout wetting and drying.

### EXAMPLE 6

Tubules from series 9 of Example 5 are screened to give a batch of tubules, substantially all of which are between 60 and 700 microns in length. Two batches of tubules are separately dyed with about two drops of aqueous F. D. & C. Blue No. 1 to about 5 cc. of tubules. One batch is dried in air at room temperature, the second is oven dried at about 45°C. The resulting blue tubules are mixed with aspirin and tablets are prepared following the procedure described in Example 1. Visually the tablets have a distinctive blue and white speckled or mottled appearance. Under microscopic examination, tubules lying along the faces of the tablet are seen to be flattened. Tubules at the face, but extending axially into the tablet are seen to retain a substantially circular cross section, presenting a large number of relatively uniform capillary-sized openings in the tablet face.

Disintegration studies with these tablets show dramatic reductions in disintegration time, with results similar to those set out in Examples 1 and 2.

### EXAMPLE 7

A tablet granulation is prepared containing 600 parts rifampin, 150 parts starch, 40 parts calcium carbonate, 8 parts magnesium stearate and 2 parts sodium lauryl sulfate, 400 parts by weight of the granulation is mixed with 25 parts by weight of tubules. The tubules employed are of regenerated cellulose plasticized with glycerine, the glycerine also serving as a wetting agent to enhance capillarity. The tubules have an I.D. of about 200 microns, an O.D. of 225 microns and substantially all (over 95 percent) are between 60 and 700 microns in length.

One lot of 425 milligram tablets is compressed from the resulting tubule granulation to a hardness of 10 Strong-Cobb-Arner units. A similar lot of 400 milligram control tablets are prepared from the granulation alone. The tablets containing 6.25 percent by weight of tubules have a disintegration time in artificial gastric juice of 3–5.5 minutes, as compared to 43–55 minutes for the control tablets.

The "tubule tablets" and control tablets are orally administered to separate groups of dogs, five dogs per group. Blood samples are withdrawn at timed intervals

3,951,821

**7**

and assayed for serum drug levels. The average serum levels of rifampin in the control group at 0,1,2,4,6 and 24 hours after dosing, are 0,0.4,1.2,1.2,1.2, and 0.5 micrograms per milliliter. The blood levels in the test group at the same time periods are 0, 5.1, 7.4, 7.3, 7.0 and 1.9 micrograms per milliliter of serum, indicating that much higher blood levels of the active ingredient are obtained by the use of the tubule disintegrant.

EXAMPLE 8

A mixture of 200 parts (by weight) quinidine sulfate, 35 parts starch, 2.5 parts magnesium stearate and 1.25 parts lubricant (Sterotex) is granulated. Tablets are compressed to a hardness of about 5–7 Strong-Cobb Amer units, sized to contain 200 milligrams quinidine sulfate per tablet. One lot is from the granulation alone and one lot from a mixture containing 7 percent by weight regenerated cellulose tubules plasticized with glycerine, 200 microns I.D., 60–700 microns long. 225 microns O.D. The tablets containing the tubule disintegrant have a disintegration time of about 3 minutes, as compared to 17 minutes for tablets without the tubules.

**8**

I claim:

1. In a compressed tablet comprising an active ingredient and an effective amount of a disintegrating agent to facilitate disintegration of the tablet in contact with a liquid, the improvement wherein the disintegrating agent comprises a tubule, said tubule having an internal cross-sectional area corresponding to an inside diameter of from about 5 microns to about 2,000 microns, and a length corresponding to an axial length of from about 0.5 micron to about 3 millimeters, said tubule being wettable by the liquid.

2. The tablet of claim 1 wherein the tablet contains a plurality of said tubules.

3. The tablet of claim 2 wherein the tubules are of a liquid permeable material.

4. The tablet of claim 2 wherein the tubules are of a material adapted to swell on contact with the liquid.

5. The tablet of claim 2 wherein the tubules are of a material selected from the group consisting of ethyl cellulose, cellulose acetate, gelatin, cellulose, hydroxypropyl methyl cellulose.

* * * * *

# United States Patent [19]

## Lietz

[11] Patent Number: **4,474,986**

[45] Date of Patent: **Oct. 2, 1984**

[54] **PREPARATION OF PROPAFENONE**

[75] Inventor: Helmut Lietz, Neustadt, Fed. Rep. of Germany

[73] Assignee: BASF Aktiengesellschaft, Fed. Rep. of Germany

[21] Appl. No.: 476,575

[22] Filed: Mar. 18, 1983

[30] Foreign Application Priority Data

Mar. 19, 1982 [DE] Fed. Rep. of Germany ....... 3210051

[51] Int. Cl.³ ........................................... C07C 85/00
[52] U.S. Cl. ........................................................ 564/349
[58] Field of Search ........................................ 564/349

[56] **References Cited**

### U.S. PATENT DOCUMENTS

3,178,420  4/1965  Palopoli et al. ................. 564/349 X
3,542,872  11/1970  Koppe et al. ..................... 564/349
3,864,350 · 2/1975  Le Count et al. ............... 564/349 X

3,876,802  4/1975  Brändström et al. ........... 564/349 X

### FOREIGN PATENT DOCUMENTS

2001431  5/1974  Fed. Rep. of Germany ....... 564/349

*Primary Examiner*—Paul F. Shaver
*Attorney, Agent, or Firm*—Keil & Witherspoon

[57] **ABSTRACT**

A process for the preparation of propafenone wherein
1. 2'-hydroxyacetophenone is reacted with epichlorohydrin,
2. the resulting 2-(2',3'-epoxypropoxy)-acetophenone is reacted with propylamine,
3. the resulting 2-(2'-hydroxy-3'-propylaminopropoxy)-acetophenone is reacted with benzaldehyde, accompanied by elimination of water, and
4. the resulting 2-(2'-hydroxy-3'-propylaminopropoxy)-benzalacetophenone is hydrogenated.

**1 Claim, No Drawings**

4,474,986

1

# PREPARATION OF PROPAFENONE

The invention relates to a novel process for the preparation of propafenone.

Propafenone (2'-(2-hydroxy-3-propylaminopropoxy)-3-phenylpropiophenone hydrochloride, German Pat. No. 2,001,431) is a substance having an anti-arrhythmic action. According to the said German patent, it is obtained by reacting 2-hydroxy-omega-phenylpropiophenone (as the sodium salt) with 1-chloro-2,3-epoxypropane and then reacting the resulting 2-(2',3'-epoxypropyl)-omega-phenylpropiophenone with n-propylamine and converting the product to the hydrochloride. This process gives a yield of only about 66%. Moreover, the starting material (2-hydroxy-omega-phenylpropiophenone) required for the reaction can only be obtained with difficulty from 2-hydroxyacetophenone by condensing with benzaldehyde and then hydrogenating the reaction product.

The present invention provides a process for the preparation of propafenone, wherein

1. 2'-hydroxyacetophenone is reacted with epichlorohydrin,

2. the resulting 2-(2',3'-epoxypropoxy)-acetophenone is reacted with propylamine,

3. the resulting 2-(2'-hydroxy-3'-propylaminopropoxy)-acetophenone is reacted with benzaldehyde, accompanied by elimination of water, and

4. the resulting 2-(2'-hydroxy-3'-propylaminopropoxy)-benzalacetophenone is hydrogenated.

The first reaction step is as a rule carried out in epichlorohydrin as the solvent. However, it is also possible to dissolve the epichlorohydrin in a different solvent, such as toluene or acetone, and to employ it in a slight excess (a molar ratio of from 1:1 to 2:1). The reaction is advantageously carried out at 50°–150° C., preferably at the boiling point of the solvent used, in the presence of a base, such as sodium hydroxide or potassium carbonate. The product of the first reaction step does not have to be specially purified for the next stage. It is not necessary to isolate the sodium salt of 2'-hydroxy-acetophenone.

The second stage is carried out by adding the substances mentioned and refluxing the mixture for several hours. Advantageously, propylamine is used as the solvent, but alcohols (isopropanol and ethanol) may also be used. For further processing, the reaction product obtained is converted to a salt, for example the hydrochloride or oxalate. The oxalate has proved particularly advantageous. This conversion is advantageously carried out in alcoholic solution.

Elimination of water and reaction with benzaldehyde in the 3rd stage are carried out in a solvent, such as an aqueous lower alcohol, in the presence of a base, such as sodium hydroxide or potassium hydroxide, at 50°–150° C., preferably at the boiling point of the solvent.

The product obtained in stage 3 is used direct for the hydrogenation in stage 4. For this purpose, further solvent and a catalyst, such as palladium/charcoal or Raney nickel are added and the calculated amount, or a slight excess, of hydrogen is passed in. The hydrogenation is as a rule carried out at room temperature.

From the reaction solution thus obtained, the propafenone can be isolated after it has been converted to a salt. Suitable acids for forming such a salt include the hydrohalic acids, oxalic acid and tartaric acid, hydrochloric acid being preferred.

2

The novel process has the following advantages:

1. It gives very pure propafenone.

2. It is easy to carry out. The intermediates as a rule do not have to be isolated in a pure form, contrary to what is necessary in the conventional processes.

3. For the reaction of the 2'-hydroxyacetophenone with the epichlorohydrin, it is not necessary to employ the sodium salt of the former. Instead, 2'-hydroxyacetophenone can be employed direct.

4. The process gives a substantially better yield of propafenone, based on 2'-hydroxyacetophenone employed. In the conventional process, the yield is about 45%, whilst in the novel process it is, overall, 55%.

## EXAMPLE

### Stage 1

Preparation of 2-(2',3'-epoxypropoxy)-acetophenone

27.2 g of 2'-hydroxyacetophenone and 8 g of sodium hydroxide were suspended in 200 ml of epichlorohydrin. The yellowish white suspension was refluxed for 4 hours and cooled, and the crystals were filtered off. The filtrate was concentrated. The residue, 38.8 g=180.9 millimoles (90.5%, based on 2'-hydroxyacetophenone) was employed, without additional purification, for the next stage.

### Stage 2

34.8 g of 2-(2',3'-epoxypropoxy)-acetophenone and 150 ml of propylamine were refluxed for 4 hours, with stirring. When the mixture had cooled, the excess propylamine was distilled off. The residue (57.9 g) was dissolved in 100 ml of methanol and 30 g of oxalic acid dissolved in 250 ml of methanol were added to this solution. The mixture was heated, and after it had cooled, the crystals formed (23 g) were filtered off. The filtrate was concentrated. The residue was dissolved in 350 ml of a hot 20/80 methanol/acetone mixture. Overnight, crystals separated out and these were filtered off. The total yield was 52.2 g (84.6%, based on the "epoxide" employed); melting point 159° C.

### Stages 3+4

Preparation of propafenone hydrochloride

20 g of 2-(2'-hydroxy-3'-propylaminopropoxy)-acetophenone oxalate were dissolved in 450 ml of hot methanol. 16 g of sodium hydroxide, dissolved in 30 ml of distilled water, and 10.6 g of benzaldehyde were added to this solution and the mixture was refluxed for 4 hours. When it had cooled, 2 g of 10% strength Pd/C and 500 ml of methanol were added. The reaction product was hydrogenated under atmospheric pressure (hydrogen absorption: 1,350 ml). The catalyst was filtered off and thoroughly washed with methanol. The filtrate was concentrated. The residue was dissolved in 500 ml of hot 1 N HCl. On cooling, the solution deposited crystals, which were filtered off (crystals I). The filtrate was rendered alkaline and extracted with 3×70 ml of chloroform. The organic phases were combined and concentrated. The residue was brought to pH 2 with 1 N HCl and again concentrated. This new residue was recrystallized from about 250 ml of an 80/20 acetone/methanol mixture. The resulting crystals (II) were filtered off and dried.

The yield was 14.9 g=39.4 millimoles (12.1 g of crystals I, and 2.8 g of crystals II), amounting to 67.2% of theory based on 2-(2'-hydroxy-3'-propylaminopropoxy)-acetophenone oxalate employed. The hydrochloride melted at 172° C.

We claim:

4,474,986

**3**

1. A process for the preparation of propafenone, wherein

1. 2'-hydroxyacetophenone is reacted with epichlorohydrin,

2. The resulting 2-(2',3'-epoxypropoxy)-acetophenone is reacted with propylamine,

3. The resulting 2-(2'-hydroxy-3'-propylamino-

**4**

propoxy)-acetophenone is reacted with benzaldehyde, accompanied by elimination of water, and

4. The resulting 2-(2'-hydroxy-3'-propylamino-propoxy)-benzalacetophenone is hydrogenated.

* * * * *



# United States Patent [19]

**Franke, deceased et al.**

| | |
|---|---|
| [11] | Patent Number: **4,945,114** |
| [45] | Date of Patent: **Jul. 31, 1990** |

[54] **THERAPEUTIC AGENTS CONTAINING ENANTIOMERS OF PROPAFENONE**

[75] Inventors: Albrecht Franke, deceased, late of Wachenheim, by Renate E. Franke, Catharina Franke, legal representatives; Rainer Schlecker, Dissersheim; Josef Gries, Wachenheim; Gerda Von Philipsborn, Weinheim; Liliane Unger, Ludwigshafen, all of Fed. Rep. of Germany

[73] Assignee: BASF Aktiengesellschaft, Ludwigshafen, Fed. Rep. of Germany

[21] Appl. No.: 225,756

[22] Filed: Jul. 29, 1988

[30] **Foreign Application Priority Data**

Jul. 30, 1987 [DE]  Fed. Rep. of Germany ....... 3725273

[51] Int. Cl.⁵ .......................................... A61K 31/135

[52] U.S. Cl. ................................. 514/652; 514/821

[58] Field of Search ......................... 514/652, 821

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

4,460,605  7/1984  Petrik et al. ...................... 514/652
4,571,409  2/1986  Frank et al. ...................... 514/652

**OTHER PUBLICATIONS**

Liebigs Ann. Chem., 1987, pp. 561–563, Blaschke, et al., Racematrennung von Propafenon und Diprafenon, Konfiguration . . .

Primary Examiner—Frederick E. Waddell
Attorney, Agent, or Firm—Ohlon, Spivak, McClelland, Maier & Neustadt

[57] **ABSTRACT**

Therapeutic agents containing enantiomers of propafenone, the preparation of the said agents and their use for certain groups of patients.

**7 Claims, No Drawings**

4,945,114

**1**

## THERAPEUTIC AGENTS CONTAINING ENANTIOMERS OF PROPAFENONE

The present invention relates to drugs prepared from the propafenone enantiomers.

Propafenone (INN for 2'-(2-hydroxy-3-propylamino-propoxy)-3-phenylpropiophenone), with the structural formula



is successfully used in the form of the hydrochloride for the therapy of cardiovascular disorders, in particular of cardiac arrhythmias.

In addition to the antiarrhythmic action, propafenone has an additional β-sympatholytic action.

Propafenone has a center of asymmetry at carbon atom 2 of the aminopropanol side chain and has been used to date only in the form of the racemate. Although the racemate has already been resolved (G. Blaschke and B. Walther, Lichigs Ann. Chem. 1987, 561–563), the pharmacological properties of the enantiomers have not been investigated.

This investigation has now been carried out and surprising results were obtained, with considerable practical consequences, as will be described below.

The propafenone enantiomers can be obtained by stereospecific synthesis. In this procedure, the known phenol I is reacted with an optically active $C_3$ building block to give an intermediate (IV).



Examples of suitable $C_3$ building blocks are glycidol II or one of its derivatives III. In the formula III





X is a nucleofugic leaving group (which can be displaced by nucleophiles), such as $CF_3SO_3$, $CH_3SO_3$, $CH_3—C_6H_4—SO_3$ or Br. Glycidol is obtainable in both enantiomeric forms (JOC 51 (1986), 3710), and the derivatives III can be prepared therefrom by known processes (JOC 43 (1978), 4876). These $C_3$ building blocks can also be prepared from natural substances, such as mannitol (Eur. J. Med. Chem. 17 (1982), 69 and TH 42 (1986), 447).

The reaction of I with II or III is carried out by processes known from the literature (Heterocycles 20 (1983), 1975; Eur. J. Med. Chem. 17 (1982), 69; JOC 51 (1986), 3710 and European Patent No. 6,615). Thus, glycidol can be etherified under the conditions of the Mitsunobu method, and the compounds III are reacted

**2**

under the conditions of the Williamson synthesis. The reaction gives the optically active epoxide



which is converted into (R)- or (S)-propafenone in a conventional manner.

As expected, the β-blocking action of (R,S)-propafenone is attributable to the (S)-enantiomer.

Table 1 shows that $^3$H-dihydroalprenolol binding (heart, lung) is inhibited to a significantly greater extent by the (S)-enantiomer and to a significantly smaller extent by the (R)-enantiomer compared with (R,S)-propafenone.

On the other hand, the enantiomers surprisingly do not differ from one another with respect to the antiarrhythmic action (Table 2). This finding was unexpected because the therapeutic effect of a racemate is usually due more or less substantially to one enantiomer. For example, the parent compound of the class I antiarrhythmics, quinidine, is effective only in the form of the 8(R),9(S)-enantiomer.

Thus, the propafenone enantiomers comprise two compounds which, because of their different action profile, are suitable for the selective therapy of cardiac arrhythmias of different groups of patients.

(S)-propafenone, with a more powerful β-blocking action than propafenone, is indicated for the following: for tachycardiac arrhythmias accompanied by high catecholamine levels and for patients who have not yet been treated with β-blockers.

The (R)-enantiomer, with a weaker β-blocking action than propafenone, is indicated for the following: for patients who are already under β-blocker therapy and for older patients (over about 50) and/or patients suffering from hypotension and/or cardiac insufficiency, in each of which cases β-blockers are contraindicated.

The present invention accordingly relates to therapeutic agents for systemic use which contain a propafenone enantiomer as the active compound, in addition to conventional pharmaceutical auxiliaries, and the preparation of a drug using a propafenone enantiomer.

The therapeutic agents or formulations are prepared using the conventional liquid or solid carriers or diluents and the conventional pharmaceutical auxiliaries, in accordance with the desired route of administration and in a dose suitable for use, preparation being effected in a conventional manner, for example by mixing the active compound with the solid and liquid carriers and auxiliaries conventionally used in such preparations.

The agents can be administered perorally or parenterally. Examples of formulations of this type are tablets, film tablets, coated tablets, capsules, pills, powders, solutions and suspensions as well as infusion or injection solutions.

Examples of conventionally used pharmaceutical auxiliaries are mannitol, lactose, propylene glycol and ethanol, gelatine, starch, talc, stearic acid and polyvinylpyrrolidone. Flavor improvers, stabilizers, emulsifiers, etc. can, if required, be added to the preparations. It is essential that all substances used in the preparation of the pharmaceutical formulations are toxicologically

PA 308

4,945,114

3

acceptable and compatible with the active compounds used.

If necessary, the novel enantiomers obtained are converted into an addition salt with a physiologically tolerated acid. A list of conventional physiologically tolerated acids is given in Fortschritte der Arzneimittelforschung 1966, Birkhäuser-Verlag, Vol. 10, pages 224–285, Germany, Switzerland. Hydrochloric acid is preferred.

The addition salts with acids are, as a rule, obtained in a conventional manner by mixing the free base or a solution thereof with the appropriate acid or a solution thereof in an organic solvent, for example a lower alcohol, such as methanol, ethanol or propanol, or a lower ketone, such as acetone, methyl ethyl ketone or methyl isobutyl ketone; or an ether, such as diethyl ether, tetrahydrofuran or dioxane. To improve deposition of crystals, mixtures of the stated solvents may be used. Furthermore, pharmaceutically acceptable aqueous solutions of addition compounds of the propafenone enantiomers with acids can be prepared by dissolving the free bases in an aqueous acid solution.

The contents of active compound in the novel pharmaceutical preparations are in the conventional range for propafenone preparations, i.e. from 0.1 to 30, preferably from 0.2 to 20, in particular from 1 to 5, mg per kg of body weight for a single dose in the form of the hydrochloride; i.e. for a patient weighing 70 kg, the content of active compound is from 7 to 3,500, preferably from 14 to 1,400, in particular from 70 to 350, mg.

## METHODS

### 1. In vitro determination of the affinity to the $\beta_1$- and $\beta_2$-receptor subtype by competitive experiments

For this purpose, mixtures with bovine heart membranes (90% of $\beta_1$, 10% of $\beta_2$) or rat lung membranes (25% of $\beta_1$, 75% of $\beta_2$) in tris-HCl (50 mM)/0.1% ascorbic acid (pH 7.4) were prepared with increasing concentrations of test substance and a fixed concentration (1 nM) of the radioligand $^3$H-dihydroalprenolol. The unspecific binding was determined with $10^{-4}$ M isoproterenol.

After incubation for 60 minutes at 25° C., the mixtures were diluted with buffer and immediately filtered over glass filters (GF/F, Whatman), and the amount of the radioligand retained on the filter was determined by means of liquid scintillation measurement. Two experiments were carried out with three batches.

The competition constants (KI values in nM) were calculated by nonlinear regression analysis on an IBM computer using the program ligand due to Munson and Rodbard (Anal. Biochem. 107 (1980), 220).

### TABLE 1

Inhibition of the specific $^3$H-dihydroalprenolol binding in bovine heart membranes (90% of $\beta_1$) and rat lung membranes (25% of $\beta_1$, 75% of $\beta_2$), determined by simultaneous fitting of the competition curves

| Substance | Heart $K_I$ (nM) | Lung $K_I$ (nM) |
| --- | --- | --- |
| (R,S)-propafenone | 74 (70–77) | 32 (31–34) |
| (R)-propafenone | 788 (708–868) | 257 (237–276) |
| (S)-propafenone | 59 (53–64) | 14 (13–15) |

2. Determination of the antiarrhythmic action in aconitine-induced arrhythmia of the rat

The experimental animals were male Sprague-Dawley rats weighing from 180 to 300 g. Anaesthesia was effected intraperitoneally with 100 mg/kg of thiobarbital.

4

### TABLE 1-continued

Inhibition of the specific $^3$H-dihydroalprenolol binding in bovine heart membranes (90% of $\beta_1$) and rat lung membranes (25% of $\beta_1$, 75% of $\beta_2$)
Competition constants ($K_I$) with confidence limits (CL), determined by simultaneous fitting of the competition curves

| Substance | Heart $K_I$ (nM) | Lung $K_I$ (nM) |
| --- | --- | --- |

barbital. To induce arrhythmia, aconitine was infused at a rate of 5 μg per kg per minute. The test substances were administered intravenously 2 minutes before the beginning of the aconitine infusion. The parameter measured was the duration of the aconitine infusion when the first arrhythmias (loss of P, ventricular extrasystoles and tachycardias) appeared in the ECG of the animals. In untreated animals, the aconitine-induced arrhythmia occurred after 3.3 ± 0.11 minutes (n = 120). The ED 50% was determined from the linear relationship between log dose (mg/kg) of the test substances and the relative prolongation of aconitine infusion duration (Δ%).

### 2. Determination of the antiarrhythmic action in aconitine-induced arrhythmia of the rat

The experimental animals used were male Sprague-Dawley rats weighing from 180 to 300 g. Anaesthesia was effected intraperitoneally with 100 mg/kg of thiobutabarbital. To induce arrhythmia, aconitine was infused at a rate of 5 μg per kg per minute. The test substances were administered intravenously 2 minutes before the beginning of the aconitine infusion. The parameter measured was the duration of the aconitine infusion when the first arrhythmias (loss of P, ventricular extrasystoles and tachycardias) appeared in the ECG of the animals. In untreated animals, the aconitine-induced arrhythmia occurred after 3.3±0.11 minutes (n=120). The ED 50% was determined from the linear relationship between log dose (mg/kg) of the test substances and the relative prolongation of aconitine infusion duration (Δ%).

### TABLE 2

Antiarrhythmic effect of (R,S)-propafenone and its enantiomers on aconitine-induced arrhythmia in anaesthetized rats 5 minutes after intravenous administration; ED 50%; 95% confidence limit

| Substance | Antiarrhythmic effect on aconitine-induced arrhythmia ED 50% mg/kg |
| --- | --- |
| (R,S)-propafenone | 0.724 (0.56–0.935) |
| (R)-propafenone | 0.801 (0.44–1.46) |
| (S)-propafenone | 0.676 (0.412–1.11) |

The Examples which follow illustrate the invention.

## EXAMPLE 1

(R)-propafenone . HCl

19 ml (0.12 mole) of diethyl azodicarboxylic acid were added dropwise at 0°–5° C. to a solution of 22.6 g (0.1 mole) of 2'-hydroxy-3-phenylpropiophenone (I), 8.9 g (0.12 mole) of (S)-glycidol and 31.6 g (0.12 mole) of triphenylphosphine. The mixture was stirred overnight at room temperature and the solvent was distilled off. The oily residue was refluxed with 100 ml of propylamine for 8 hours, after which the excess propylamine was distilled off. 50 ml of 5 N HCl were added, and the mixture was then heated for 1 hour at 50° C. and filtered. Crystals were precipitated on cooling, and were filtered off under suction, washed with ethanol

4,945,114

5

and dried. 19.7 g (52%) of (R)-propafenone . HCl, mp. 177°–178° C., $[\alpha]_D{}^{23} = +6.4°$ (C=1, CH$_3$OH), were obtained.

### EXAMPLE 2

#### (S)-propafenone . HCl

0.8 g of 2'-hydroxy-3-phenylpropiophenone was added at 0° C. to a suspension of 3.7 millimoles of NaH in 10 ml of tetrahydrofuran. A clear solution was formed. 0.7 g (3.3 millimoles) of glycidyl (S)-trifluoromethanesulfonate was added dropwise at −30° C., and the solution was left to stand at −20° C. The mixture was poured onto ice and extracted with CH$_2$Cl$_2$. The organic phase was dried and the solvent was distilled off. The oily residue was stirred overnight in 5 ml of n-propylamine. Excess amine was distilled off, the residue was dissolved in 5 ml of ethanol and HCl in ether was added. Colorless crystals formed and were filtered off under suction and dried. 0.6 g of (S)-propafenone . HCl, mp. 178°–179° C., $[\alpha]_D{}^{23} = -6.3°$ (C=1, CH$_3$OH), was obtained.

6

We claim:

1. A method for the treatment of arrhythmias in an older patient or a patient suffering from hypotension and cardiac insufficiency, for whom β-blockers are contraindicated, by administering to said patient an effective amount of (R)-propafenone alone.

2. The method of claim 1, wherein arrhythmias in an older patient is treated.

3. The method of claim 1, wherein a patient suffering from hypotension and cardiac insufficiency is treated.

4. The method of claim 2, comprising administering to said patient from 14 to 1400 mg of said (R)-propafenone alone.

5. The method of claim 2, comprising administering to said patient from 14 to 1400 mg of said (R)-propafenone per single dose.

6. The method of claim 2, comprising administering to said patient from 14 to 1400 mg of said (R)-propafenone.

7. The method of claim 2, comprising administering to said patient from 14 to 1400 mg of said (R)-propafenone per single dose.

* * * * *

# United States Patent [19]

Kristen et al.

[11]    **Patent Number:**    **4,954,347**

[45]    **Date of Patent:**    **Sep. 4, 1990**

[54]    **LONG LASTING COMPOSITION OF PROPAFENONE AND QUINIDINE FOR TREATMENT OF CARDIAC CONDITIONS**

[75]    Inventors:    Edward B. Kristen, Nutley, N.J.; Joan R. Guerrero, Durham, N.C.

[73]    Assignee:    BASF K & F Corp., Whippany, N.J.

[21]    Appl. No.:    189,544

[22]    Filed:    May 3, 1988

[51]    Int. Cl.⁵ ............................................ A61K 9/20
[52]    U.S. Cl. ................................ 424/456; 424/464
[58]    Field of Search ............ 424/456, 459, 474, 475

[56]    **References Cited**

**U.S. PATENT DOCUMENTS**

4,460,605   7/1984   Petrik et al. ........................ 514/651
4,557,934  10/1985   Cooper et al. .................... 514/223.5
4,612,320   9/1986   Franke et al. ...................... 514/327

**OTHER PUBLICATIONS**

Connolly et al., "Clin. Efficacy & Electrophysiology of Oral Propafenone for Vent. Tachycardia", Am. J. Card., vol. 52, pp. 1208–1213, (Dec. 1983).
Siddoway et al., "Polymorphic Oxidative Metabolism

of Propafenone in Man", Circulation 68, (Supp. III), p. 64, (Oct. 1983).
Otton et al., "Competitive Inhibition of Spartine Oxidation in Human Liver . . . ", Life Sciences, vol. 34, pp. 73–80, (1984).
Leeman et al., "Single-Dose Quinidine Treatment Inhibits Metaprolol Oxidation in Extensive Metabolizers", Eur. J. Clin. Pharmocol., 29:739–741, (1986).
Klein et al., "Enhanced Antiarrhythmic Efficacy of Propafenone When Used in Combination with Procainamide or Quinidine", Am. Heart J., (Sep. 1987), pp. 551–558.

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—Leon R. Horne
*Attorney, Agent, or Firm*—Kenyon & Kenyon

[57]    **ABSTRACT**

A pharmaceutical composition for the treatment of cardiac arrhythmia comprising an effective amount of propafenone in combination with a subtherapeutic amount of quinidine, such that the quinidine potentiates the elimination half-life of the propafenone.

The invention also comprises a method for treating patients with cardiac arrhythmia by means of administering said pharmaceutical composition.

**13 Claims, 6 Drawing Sheets**



PPF  = PROPAFENONE PLASMA LEVELS (ng/mL) DURING PROPAFENONE ADMINISTRATION
PPFQ = PROPAFENONE PLASMA LEVELS (ng/mL) DURING CO-ADMINISTRATION OF PROPAFENONE PLUS QUINIDINE FOR ONE DOSING INTERVAL. (8 HOURS)

**U.S. Patent**    Sep. 4, 1990    Sheet 1 of 6    **4,954,347**



FIG. 1

PPF = PROPAFENONE PLASMA LEVELS (ng/mL) DURING PROPAFENONE ADMINISTRATION
PPFQ = PROPAFENONE PLASMA LEVELS (ng/mL) DURING CO-ADMINISTRATION OF
PROPAFENONE PLUS QUINIDINE FOR ONE DOSING INTERVAL (8 HOURS)

FIG. 2

PROPAFENONE PLASMA CONCENTRATIONS

| | HOURS | PPF | PPFQ |
|---|---|---|---|
| 1 | 0 | 709 | 929 |
| 2 | .5 | 648 | 990 |
| 3 | 1 | 819 | 1314 |
| 4 | 1.5 | 960 | 1577 |
| 5 | 2 | 1020 | 1656 |
| 6 | 2.5 | 1020 | 1582 |
| 7 | 3 | 953 | 1540 |
| 8 | 4 | 1020 | 1491 |
| 9 | 6 | 672 | 1253 |
| 10 | 8 | 471 | 960 |

PPF  = PROPAFENONE PLASMA LEVELS (ng/mL) DURING PROPAFENONE ADMINISTRATION
PPFQ = PROPAFENONE PLASMA LEVELS (ng/mL) DURING CO-ADMINISTRATION OF
       PROPAFENONE PLUS QUINIDINE FOR ONE DOSING INTERVAL (8 HOURS)



F I G. 3

5-HYDROXYPROPAFENONE PLASMA CONCENTRATIONS

5OHP = 5-HYDROXYPROPAFENONE PLASMA LEVELS (ng/ml) DURING PROPAFENONE ADMINISTRATION

5OHPQ = 5-HYDROXYPROPAFENONE PLASMA LEVELS (ng/ml) DURING CO-ADMINISTRATION OF PROPAFENONE PLUS QUINIDINE FOR ONE DOSING INTERVAL (8 HOURS)

FIG. 4

| 5-HYDROXYPROPAFENONE PLASMA CONCENTRATIONS | | |
|---|---|---|
| HOURS | 5OHP | 5OHPQ |
| 0 | 126 | 92 |
| .5 | 122 | 92 |
| 1 | 131 | 105 |
| 1.5 | 122 | 101 |
| 2 | 126 | 101 |
| 2.5 | 126 | 92 |
| 3 | 147 | 92 |
| 4 | 160 | 109 |
| 6 | 156 | 122 |
| 8 | 118 | 118 |

5OHP = 5-HYDROXYPROPAFENONE PLASMA LEVELS (ng/mL) DURING PROPAFENONE
ADMINISTRATION

5OHPQ = 5-HYDROXYPROPAFENONE PLASMA LEVELS (ng/mL) DURING CO-ADMINISTRATION
OF PROPAFENONE PLUS QUINIDINE FOR ONE DOSING INTERVAL (8 HOURS)

FIG. 5

N-DEPROPYLPROPAFENONE PLASMA CONCENTRATIONS

NDPP = N-DEPROPYLPROPAFENONE PLASMA LEVELS (ng/mL) DURING PROPAFENONE
ADMINISTRATION

NDPPQ = N-DEPROPYLPROPAFENONE PLASMA LEVELS (ng/mL) DURING CO-ADMINISTRATION
OF PROPAFENONE PLUS QUINIDINE FOR ONE DOSING INTERVAL (8 HOURS)

FIG. 6

| N-DEPROPYLPROPAFENONE PLASMA CONCENTRATIONS | | |
|---|---|---|
| HOURS | NDPP | NDPPQ |
| 0 | 134 | 146 |
| .5 | 122 | 146 |
| 1 | 134 | 187 |
| 1.5 | 140 | 201 |
| 2 | 152 | 213 |
| 2.5 | 155 | 195 |
| 3 | 180 | 198 |
| 4 | 180 | 195 |
| 6 | 161 | 213 |
| 8 | 128 | 173 |

NDPP = N-DEPROPYLPROPAFENONE PLASMA LEVELS (ng/mL) DURING PROPAFENONE ADMINISTRATION

NDPPQ = N-DEPROPYLPROPAFENONE PLASMA LEVELS (ng/mL) DURING CO-ADMINISTRATION OF PROPAFENONE PLUS QUINIDINE FOR ONE DOSING INTERVAL (8 HOURS)

PA 317

4,954,347

1

### LONG LASTING COMPOSITION OF PROPAFENONE AND QUINIDINE FOR TREATMENT OF CARDIAC CONDITIONS

#### Field of the Invention

This invention is concerned with a pharmaceutical composition used in the treatment of cardiac arrhythmia. In particular, the invention relates to a pharmaceutical composition using the antiarrhythmic drug propafenone, in combination with other substances, such that the oxidative metabolism of propafenone in the liver is inhibited. The invention is also concerned with a method for administering such a pharmaceutical composition.

#### BACKGROUND

Cardiac arrhythmias are disorders involving the electrical impulse generating system of the heart. The disorders include premature contractions (extrasystoles) originating in abnormal foci in atria or ventricles, paroxysmal supraventricular tachycardia, atrial flutter, atrial fibrillation, and ventricular tachycardia. For further discussion, see, for example, C. S. Goodman and A. Gillman, eds. *The Pharmacological Basis of Therapeutics,* Sixth Edition, New York: Macmillan Publishing Co., 1980; pp. 761–767.

One means of treating cardiac arrhythmia is with the drug propafenone. Propafenone has been shown to be effective in suppressing both supraventricular and ventricular arrhythmias. (Michael A. Brodsky and Byron J. Allen. "Ventricular tachycardia in patients with impaired left ventricular function: the role of propafenone." *Clin. Prog. in Electrophysiol and Pacing,* 4:546, 1986.) The antiarrhythmic action of propafenone appears to be due to its propensity to depress conduction and prolong the refractory period in myocardium. (Shen, et al., "Electrophysiologic and hemodynamic effects of intravenous propafenone in patients with recurrent ventricular tachycardia" *JACC* 3: 1291–1307, 1984)

Propafenone undergoes oxidative metabolism by hepatic microsomal enzymes. However, from person to person there are marked genetically determined differences in the rate of hepatic propafenone metabolism. About 10% of the U.S. Caucasian population are considered "poor metabolizers" and 90% are considered "extensive metabolizers." Variations between racial groups have also been reported in the distribution of poor and extensive metabolizers.

Extensive metabolizers of propafenone have lower blood levels and experience a shorter duration of effect than poor metabolizers. These extensive metabolizers may require more frequent dosages of higher amounts of propafenone to control their arrhythmia.

Consequently, current formulations of propafenone are metabolized too quickly by many individuals. Also, ideal blood levels may not be reached or may not be maintained for a long enough period of time to provide efficient control of cardiac arrhythmia.

The object of the present invention is to provide a formulation of propafenone and a means of administering this formulation which modulates propafenone oxidative metabolism. Other objectives are to decrease interindividual variations of propafenone metabolism; to uniformly raise blood levels among the total population taking propafenone; and to increase the duration of effect among these individuals. Achievement of these

2

objectives would result in increased intervals between administration, improved medical management of patients with cardiac arrhythmia, and greater success in the treatment of this condition.

#### SUMMARY OF THE INVENTION

These and other objects are achieved by the present invention which relates to a pharmaceutical composition suitable for the treatment of a patient having cardiac arrhythmia. The composition comprises, in unit dosage form, an effective amount of propafenone in combination with a subtherapeutic amount of quinidine, such that the quinidine prolongs the elimination half-life of the propafenone in the same formulation. The bioavailability of propafenone will also increase during concomitant administration of propafenone plus quinidine so less propafenone is metabolized and more reaches the systemic circulation. Such a composition may be in the form of a tablet, capsule, or caplet, preferably with an enteric coating. A preferred composition comprises from about 50 mg to about 600 mg propafenone hydrochloride and about 25 mg to about 200 mg quinidine such that from about 1 unit dose to about 2 unit doses per day would be administered. An especially preferred composition is formulated from about 300 mg propafenone and about 100 mg quinidine with the remainder being either a pharmaceutical carrier such as lactose sugar, gum binder, and an inert polymeric extender which is calculated to provide about a 5 to 10 grain tablet, capsule, or caplet.

The invention as well relates to a method for treating patients with cardiac arrhythmia which comprises orally administering to a patient, at unit dosage levels, therapeutic amounts of propafenone in combination with subtherapeutic amounts of quinidine such that the quinidine potentiates the elimination half-life of propafenone.

#### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a graph of plasma levels of propafenone following administration of the claimed composition compared to administration of a propafenone standard.

FIG. 2 is a table of the data represented in FIG. 1.

FIG. 3 is a graph of plasma levels of 5-hydroxy-propafenone, a metabolite of propafenone, following administration of the chemical composition compared to administration of a propafenone standard.

FIG. 4 is a table of the data represented in FIG. 3.

FIG. 5 is a graph of plasma levels of N-depropyl-propafenone, a metabolite of propafenone, following administration of the claimed composition compared to administration of a propafenone standard.

FIG. 6 is a table of the data represented in FIG. 5.

#### DETAILED DESCRIPTION OF THE INVENTION

Propafenone is an antiarrhythmic drug available for oral and intravenous administration. The structural formula and chemical name for propafenone is:

PA 318

4,954,347

3                                                4

Propafenone is extensively metabolized in the liver,
where it undergoes oxidative metabolism to form 5-
hydroxy and hydroxy-methoxy metabolites.



PROPAFENONE

3-OH PROPAFENONE

HYDROXY-METHOXY METABOLITES

The oxidation of propafenone appears to occur at the
site of the hepatic microsomal mono-oxygenase cyto-
chrome P450. Other substances which are oxidized by
cytochrome P450 isozymes include debrisoquin, sparte-
ine, and metoprolol.

The pharmacokinetic and pharmacodynamic charac-
teristics of propafenone are striking in their great in-
terindividual variability. Some individuals can be con-
sidered "extensive propafenone metabolizers," charac-
terized by a relatively short elimination half-life, low
plasma concentration, high oral clearance, dispropor-
tionate dose-concentration relationship, and detectable
quantities of the metabolite 5-hydroxypropafenone.
Others are "poor propafenone metabolizers," charac-
terized by a long elimination half-life, high plasma con-
centration, low oral clearance, proportionate dose-con-
centration relationship, and absence of detectable 5-
hydroxypropafenone. (Siddoway, et al. "Polymorphic
oxidative metabolism of propafenone in man," Circ.
68;64, 1987.)

Approximately 90% of the American population are
extensive metabolizers of propafenone, while only 10%
are poor metabolizers. This invention is intended to
provide an improved formulation and means of adminis-
tration of propafenone for the vast majority of individu-
als who are extensive metabolizers.

2'-[3-(prophylamino)-2-(hydroxy)-(propoxy)-3-phenyl-
proplophenone hydrochloride
  Molecular formula: $C_{21}H_{27}NO_3 \cdot HCl$
  Molecular weight: 377.92
  Propafenone blocks fast inward sodium channels. It is
also a weak beta-blocker with weak calcium antagonist
activity. It is effective against recurrent supraventricu-
lar and ventricular arrhythmias, premature ventricular
contractions, and ventricular tachycardia.

  Propafenone can be successfully utilized in both the
short-term and long-term treatment of arrhythmia. Ad-
ministered intravenously, it is an effective treatment for
ventricular arrhythmias, and supraventricular arrhyth-
mias. Oral propafenone is an effective agent in the man-
agement of premature ventricular complexes and
chronic recurrent supraventricular tachycardia. It does
not appear to cause significant hemodynamic changes
or life-threatening toxic side effects.

PA 319

4,954,347

5

Quinidine is the isomer of quinine, found naturally in cinchona bark. The structural formula of quinidine is:



Quinidine is a class I antiarrhytmic drug. It is generally regarded as a myocardial depressant. It depresses cardiac irritability, conduction velocity, and contractility. In experimental animals, quinidine has been shown to raise the threshold for electrically induced arrhythmias, prevent or terminate the "late" ventricular tachycardias following coronary artery occlusion, and terminate or prevent circus-movement flutter. The major clinical uses of quinidine are for the prevention and abolition of certain cardiac arrhythmias. These would include ventricular tachycardia, atrial flutter, atrial fibrillation, and premature systole.

Quinidine has been shown to inhibit the oxidation of certain drugs which are believed to be metabolized via the P450 cytochrome system. For example, the in vitro oxidation of sparteine has been shown to be markedly inhibited in combination with quinidine. This is thought to be due to competition with the catalytic enzyme site(s) that oxidize sparteine.

Another in vivo study measured the effect of quinidine on the oxidative metabolism of metoprolol. Two hours after ingestion of 50 mg. of quinidine sulfate, 100 mg. of metoprolol was administered. Under this regimen the single dose of quinidine in extensive metabolizers produced a threefold increase of total metoprolol and the active (−) metoprolol isomer plasma concentration.

The oxidized metabolite of metoprolol is alpha-hydroxymetoprolol. The oxidized metabolite of propafenone is 5-hydroxypropafenone. These oxidation products are significantly different. In the case of metoprolol, oxidation occurs on the aliphatic alpha carbon, whereas in the case of propafenone, oxidation occurs on C-5 of an aromatic ring. The inhibition of propafenone metabolism by quinidine, therefore, would not be expected based on the effect of quinidine metabolism on metoprolol.

Furthermore, the drugs are structurally different, with unique physical and pharmacological properties. The half-life of metoprolol is approximately 3 to 7 hours. The half-life of propafenone is between two and 30 hours. Metoprolol is primarily a beta-adenergic blocking agent. Propafenone is only a weak beta-blocker. Its primary electrophysiological effect is the blockade of the fast sodium channel of cardiac cells. The two drugs also have significantly different levels of bioavailability. Systemic bioavailability of metoprolol is 40–50%, whereas systemic bioavailability of propafenone is only 5–12%.

As described in greater detail below, it was surprising to find therefore that when a pharmaceutical composi-

6

tion of the present invention was administered to a patient, the oxidative metabolism of propafenone was modulated, causing the maximum plasma concentration, elimination half-life, and steady state levels of plasma propafenone to be increased.

The invention also discloses that a means of administering this pharmaceutical composition also improved treatment efficiency, safety, and patient compliance.

The components of the present invention can be formulated into a tablet, capsule, caplet, suspension or liquid, administered orally. The effective dose of the present invention is the amount required to successfully treat cardiac arrhythmia, and is readily ascertainable by one skilled in the art. Propafenone hydrochloride is administered in doses from 450 mg/day (150 mg every 8 hours) to 900 mg/day (300 mg every 8 hours). Quinidine gluconate is administered in 325 mg tablets either two or three times daily.

For oral administration, the pharmaceutical composition in the form of a tablet, capsule, or caplet is preferably made in the form of a dosage unit containing a particular amount of the active ingredients. The tablet, capsule, or caplet is made by combining the compounds of the present invention with excipients such as sodium citrate, calcium carbonate, and dicalcium phosphate, disintegrants such as starch, alginic acid, and certain complex silicates, together with binding agents such as polyvinylpyrrolidone, gelatin and acacia. Lubricating agents such as magnesium stearate, sodium lauryl sulfate, and talc are often very useful for tableting purposes. Solid compositions of a similar type may also be employed as fillers in soft and hard-filled gelatin capsules. Preferred materials would include lactose as well as high molecular weight polyethylene glycols. The tablet, capsule, or caplet is then formed according to means known to one of ordinary skill in the art.

The invention also includes a tablet, capsule, or caplet with an enteric coating. This is an acid-resistant film that renders the tablet, capsule, or caplet resistant to dissolution by gastric juice. The enteric-coating process is carried out by dissolving a film-coating material which is resistant to gastric dissolution in a volatile solvent. This solution is then sprayed onto filled tablets, capsules, or caplets.

It is also possible to select a material for the capsule wall that is resistant to gastric dissolution but capable of dissolution in the intestine. For example, it is possible to select certain types of gelatin that do not dissolve at the pH of the stomach but can dissolve at the pH of the intestine.

Alternatively, the active ingredients may be dissolved in an aqueous medium for oral administration and the appropriate agents added to mask the unpalatable taste of the propafenone and quinidine.

EXAMPLES

Example 1

A dry solid pharmaceutical composition is prepared by blending the following materials together in the proportions by weight specified below:

Propafenone: 300
Quinidine: 100
Carboxylic Acid: 50
Sodium Citrate: 25
Alginic Acid: 10
Polyvinylpyrrolidone: 10
Magnesium Stearate: 5

4,954,347

7

After the dried composition is thoroughly blended, tablets are punched from the resulting mixture, each tablet being of such size that it contains 300 mg. of the active ingredient. Other tablets are also prepared in a similar fashion containing 150 and 225 mg. of the active ingredient, respectively, by using the appropriate amount of the propafenone and quinidine in each case.

## EXAMPLE II

A dry solid pharmaceutical composition is prepared by combining the following materials together in the proportions by weight indicated below:

Propafenone: 300
Quinidine: 100
Carboxylic Acid: 50
Calcium Carbonate: 20
Polyethylene glycol, average: molecular weight 4000: 30

The dried solid mixture so prepared is then thoroughly agitated so as to obtain a powdered product that is completely uniform in every respect. Soft elastic and hard-filled gelatin capsules containing this pharmaceutical composition are then prepared, employing a sufficient quantity of material in each instance so as to provide each capsule with 200–550 mg. of the active ingredients.

## EXAMPLE III

A pharmacokinetic evaluation of the interaction between quinidine and propafenone hydrochloride was conducted. Subjects were males and females over age 21 with a history of clinically significant ventricular arrhythmia defined as Lown Grade 2 (>30 PVCs/hr.) or higher. Only patients requiring propafenone therapy were evaluated. An open-label design was used.

In Phase I of the study, patients on a q8 hr. dosage regimen had their optimal dosage continued every eight hours for at least four days, at which time, plasma propafenone levels were measured for one eight hour dosing interval. Immediately following Phase I, patients were administered 80 mg. quinidine gluconate every eight hours concomitantly with their dose of propafenone. After at least four days of concomitant administration, plasma propafenone levels were measured for one eight hour dosing interval. All drug doses were administered with about 180 mL. tap water. The last dose of each study phase was administered after a minimum of eight hours fasting following by an additional three hour fasting period. Water was allowed ad lib. Ten mL blood samples for propafenone assay were obtained at hours 0, 0.5, 1, 1.5, 2, 2.5, 3, 4, 6 and 8. Blood samples for quinidine assay were obtained at hours 0 and 8 ("trough" levels). All blood samples were collected in heparinized tubes. Samples were promptly centrifuged to separate plasma and RBC's, frozen, and stored prior to analysis.

## RESULTS

The results from one patient indicate that administration of quinidine concomitantly with propafenone has a very pronounced effect on the blood levels of propafenone. Co-administration of quinidine with propafenone results in propafenone plasma concentrations which are about 150% more than those observed when propafenone is administered alone.

FIG. 1 is a graph that compares propafenone plasma levels (ng/mL) during propafenone administration (PPF) and propafenone plasma levels (ng/mL) during

8

co-administration of propafenone plus quinidine for one 8 hour dosing interval (PPFQ).

FIG. 2 is a table of the data represented in FIG. 1 that compares propafenone plasma levels (ng/mL) during propafenone administration (PPF) and propafenone plasma levels (ng/mL) during co-administration of propafenone plus quinidine for one 8 hour dosing interval (PPFQ).

FIG. 3 is a graph that compares 5-hydroxypropafenone plasma levels (ng/mL) during propafenone administration (5OHP) and 5-hydroxypropafenone plasma levels (ng/mL) during co-administration of propafenone plus quinidine for one 8 hour dosing interval (5OHPQ).

FIG. 4 is a table of the data represented in FIG. 3 that compares 5-hydroxypropafenone plasma levels (ng/mL) during propafenone administration (5OHP) and 5-hydroxypropafenone plasma levels (ng/mL) during co-administration of propafenone plus quinidine for one 8 hour dosing interval (5OHPQ).

FIG. 5 is a graph that compares n-depropylpropafenone plasma levels (ng/mL) during propafenone administration (NDPP) and n-depropylpropafenone plasma levels (ng/mL) during co-administration of propafenone plus quinidine for one 8 hour dosing interval (NDPQ).

FIG. 6 is a table of the data represented in FIG. 5 that compares n-depropylpropafenone plasma levels (ng/mL) during propafenone administration (NDPP) and n-depropylpropafenone plasma levels (ng/mL) during co-administration of propafenone plus quinidine for one 8 hour dosing interval (NDPQ).

What is claimed is:

1. A pharmaceutical composition suitable for the treatment of a patient having cardiac arrhythmia comprising: an antiarrhythmic therapeutically effective amount of propafenone of 50-600 mg and a subtherapeutic amount of quinidine effective for prolonging the elimination half-life of the propafenone, in combination with a pharmaceutical carrier therefor.

2. A pharmaceutical composition according to claim 1, wherein the quinidine is present in an amount from about 25–200 mg/tablet.

3. A pharmaceutical composition according to claim 1, comprising propafenone in the amount from about 50-600 mg/tablet and quinidine in a subtherapeutic amount from about 25–200 mg/tablet.

4. A pharmaceutical composition according to claim 1 in the form of a tablet, a hard or soft-gelatin capsule, or a suspension or a syrup for oral administration.

5. A pharmaceutical composition according to claim 5, wherein the tablet, capsule, or caplet are coated with an enteric coating.

6. A pharmaceutical composition according to claim 1, wherein the pharmaceutical carrier is selected from a group consisting of a sugar, a starch, a gum, corn syrup, water and mixtures thereof.

7. A pharmaceutical composition according to claim 1, comprising propafenone in the amount from about 50–600 mg/tablet; quinidine in a subtherapeutic amount from about 25–200 mg/tablet; a pharmaceutical carrier selected from a group consisting of a sugar, a starch, a gum, corn syrup and mixtures thereof and wherein said composition is in the form of an enteric coated tablet.

8. A pharmaceutical composition according to claim 1 comprising propafenone in the amount from about 150-900 mg/tablet; quinidine in a subtherapeutic amount from about 25–200 mg/tablet; a pharmaceutical

4,954,347

9

carrier selected from a group consisting of a sugar, a starch, a gum, corn syrup and mixtures thereof and wherein said composition is in the form of an enteric coated tablet for administration once per day.

9. A method of treating cardiac arrhythmia comprising: administering to a patient having cardiac arrhythmia a pharmaceutical composition comprising an antiarrhythmic therapeutic effective amount of propafenone of 50–600 mg and a subtherapeutic amount of quinidine effective for prolonging the elimination half-life of the propafenone in combination with pharmaceutical carriers therefor.

10

10. A method of treating cardiac arrhythmia according to claim 7, wherein the effective dose is about 50 mg–600 mg dosage unit administered one or two times per

11. A method of treating cardiac arrhythmia according to claim 7, wherein the effective dose produces minimum blood levels of about 200 ng/ml and maximum blood levels of about 2000 ng/ml of propafenone.

12. A pharmaceutical composition in accordance with claim 1 wherein the composition is in the form of a table.

13. A pharmaceutical carrier comprises starch.

* * * * *



No. 25,197/*35.*

EXAMINER'S COPY
DIV 2.0

APPLICATION DATED

### 9th November, 1935.

| | | |
|---|---|---|
| *Applicant (Actual Inventor)* .. | .. | JOHN GEORGE ROBINSON. |
| Application and Provisional Specification .. | | Accepted, 10th December, 1935. |
| *Complete Specification after Provisional Specification.* | | Lodged, 8th April, 1936. |
| *Complete Specification* .. .. | .. | Accepted, 9th November, 1936. |
| *Acceptance Advertised (Sec. 60)* .. | .. | 19th November, 1936. |

### Class 81.9.

*Drawing attached.*

---

## COMPLETE SPECIFICATION.

### "Improved latch lifting device for gate fasteners."

I, JOHN GEORGE ROBINSON, Coronation Street, Kurri Kurri, New South Wales, Carpenter, hereby declare this invention, and the manner in which it is to be per-
5 formed, to be fully described and ascertained in and by the following statement:—

This invention relates to an improved latch lifting device for gate fasteners.

It has been found in practice that gate
10 fasteners which are commonly fixed to one side of a gate and latch post, this side being in most cases the inner side of an enclosure, and not provided with means whereby the position of the fastener could be detected,
15 or means whereby the latch could be lifted from the opposite side of the post to where they are positioned, present considerable inconvenience to persons wishing to enter an inclosure. The inconveniences incurred
20 thereby are that a person wishing to enter an inclosure has first to distinguish by various indirect methods the latch post of a gate and secondly by having to reach over a gate or through a latch access hole in
25 order to reach the fastener to apply means of lifting the latch, the inconvenience of which is increased in cases where a person's hands are both full.

The object of this invention is to simplify (1) the distinguishing of the latch post of a gate; (2) the latch lifting. It has been specially devised that the latch post of a gate is more easily recognisable and that 5 the lifting movements of the latch is controlled from the opposite side of the post to where the fastener is positioned.

This is made possible by applying special modification to gate fasteners to enable their 10 co-operation with this specially designed latch lifting device.

According to the invention a gate fastener of the type referred to herein is to be positioned on a latch post say at the inner side 15 of an inclosure, modifications are made to the latch and casing of the fastener to provide for, and provide access to an extra hole in the latch and an extra hole in the fixing flange of the latch casing, to provide 20 means of co-operating the specially bent rod of the latch lifting device with the fastener. In consideration of the latch being at right-angles to the fixing flange of the latch casing and the latch in its moving 25 action having circular movements, a round metal rod is bent to form one short straight

1

2

25,197/35.                                                                9 Nov.,

side and one longer straight side at right-angles to each other the short side of the said rod is passed squarely through the extra hole in the latch and the longer side passed squarely through the extra hole in the fixing flange of the latch casing and passed through a hole bored squarely through a latch post to the opposite side at which side and at which end of the bored hole a sunken metal cup exterior post fitting is fitted having a hole formed in the centre through which the rod also passes. The rod is then fitted with a press knob of metal or other suitable composition having a side screw arrangement to enable its attachment to the end of the rod after any necessary length adjustment. The said metal cup exterior post fitting is sunken sufficiently to allow the housing of the press knob when pressed and has a fixing flange suitable to allow of reasonably conspicuous letters PRESS. The rod thus being fixed to the end of the rod and surrounded evenly by the fixing flange of the cup, makes the latch post of a gate more easily detected. The rod being co-operated with the latch and held in its correct working position jointly by the hole in the fixing flange of the latch casing and the hole in the centre of the cup and fitted externally with the press knob, allows the latch to be lifted by a light pressure to the press knob by the finger or indirectly for instance by the back of the hand, a parcel, or a handbag.

And in order that this invention may be more effectively carried out in practice same will now be described with reference to the drawing accompanying.

Fig. 1 gives an overhead view of the specially designed improved latch lifting device showing also a face view of the metal cup exterior post fitting. In consideration of latches of gate fasteners of the types particularly referred to, and which are shown in the succeeding figures of the drawings, being at right-angles to the fixing flanges of the latch casing, and that the latches have circular movements, a round metal rod having near to one end a bend and having a short straight side C, and a longer straight side A, the both sides A and C being at right-angles to each other is so designed that the long side of the rod A can be passed squarely through the fixing flanges of the latch casing and the short side C passed squarely through the latch. The

short side C is long enough to allow the bend of the rod to stand clear of the latch so that when the latch is being lifted the rod is thus allowed to automatically turn in following the circular movements of the latch. The long side of the rod A is of sufficient length to pass via the fixing flange of the latch casing at B through a hole squarely bored through the latch post to the opposite side at which side of the post and at which end of the bored hole the specially designed metal cup exterior post fitting E is fitted through which the rod also passes as at F. The rod is then fitted with a suitable press knob G of metal or other suitable composition having a specially designed fixing arrangement viz. a hole drilled endways partway through to slip over and cover the end of the rod, and bored and threaded at the side to receive a metal thread screw H to allow its attachment to the end of the rod after any length adjustment. The specially designed sunken metal cup exterior post fitting E is sunken sufficiently to allow the housing of the press knob G when pressed having a hole pressed in the centre F in a manner which distributes the metal from the hole evenly forming a cylindrically shaped hole for the bearing of the rod. The said cup has a fixing flange large enough to allow of reasonably conspicuous letters "PRESS".

In the following figures of the drawings old structure latch casings and latches are lettered "O" while modified latch casings and latches are lettered "M".

Fig. 2 illustrates the latch and latch casing as in common use and those parts are embodied in my invention. An additional hole B is inserted in the fixing flange of the latch casing duplicated on either side to provide means of reversible co-operation with the said latch lifting device, and is designed to admit the passing of the long side of the rod A forming a rod guide and bearing, and is in such a position as keeps the bend of the rod clear of the latch, and locks the rod in correct co-operation and working position when the long side of the rod A is passed squarely through a latch post. The lower jaw of the latch casing is removed the removed portion being clearly shown in dotted lines to enable the co-operation of the short side of the rod C with the latch at D. The hole D is inserted in the

3

4

tongue of the latch close to and approximately directly below the rivet hole to admit the passing of portion of the short end of the rod C at a point which necessitates only
5 a short movement of the press knob G of the latch lifting device to lift the latch from its closed to its open position.

Fig. 3 shows views similar to Figure 2
10 but of a modified form of my invention. Additions to fastening flanges of the latch casing are made solidly or by way of a detached metal plate to allow the insertion of the hole B duplicated on either side to
15 permit reversible co-operation with the said improved latch lifting device and is designed to admit the passing of the long side of the rod A forming a guide hole and bearing, and is in such a position as keeps
20 the bend of the rod clear of the latch, and locks the rod in correct co-operation and working position when the long side of the rod A is passed squarely through a latch post. Additions are made to the top
25 of the latch close to, and approximately directly above the rivet hole of the latch, having a hole D to accept portion of the short side of the rod C at a point necessitating only a short movement of the press
30 knob G of the improved latch lifting device to lift the latch from its closed to its open position.

Fig. 4 shows in three positions the improved latch lifting device, or portions
35 necessary to show clearly the points of co-operation with the specially modified gate fastener referred to in Figure 2 and detailing the automatic turning movements of the rod as the latch operates.

Fig. 5 shows portion of the improved
40 latch lifting device detailing its points of co-operation with the specially modified gate fastener referred to in Fig. 3 showing in dotted lines the position of the latch when lifted.

45 Respecting the common position of the latch casing and latch of gate fasteners referred to herein shown in the drawings, this position being on a latch post of a gate opening and at the inner side of
50 an inclosure, such position being selected to enable the engagement of the latch member commonly used and fixed to the edge of a gate corresponding with the said post. The long side of the rod A is passed through
55 hole B furthest from the gate, and a portion of the short side of the rod C passed through

D of the latch. After a mark is taken from hole B referred to, a suitable hole is bored squarely through the post to the opposite side at which side of the post, and at which
5 end of the bored hole the metal cup E is fitted and secured by its fixing flange to the face of the post. The long side of the rod A is then passed through the bored hole in the post via the hole F of the
10 cup E. The fastener is then fixed to the latch post by its fixing flanges. After making any necessary adjustments to the projection of the rod the press knob G is slipped over the end of the rod and fastened
15 by tightening up the metal thread screw H. As the press knob G is pressed the rod moves forward and while doing so automatically turns giving way to the circular movements of the latch as it is being lifted.
20 As the pressure is taken off the press knob G the action of the rod is reversed as the latch automatically returns to its closed position by the force of gravity.

Having now fully described and ascer-
25 tained my said invention and the manner in which it is to be performed I declare that what I claim is:—

1. The combination of a latch lifting device (comprising of a bent round metal
30 rod having one short straight side and one longer straight side at right-angles to each other, and of a detachable press knob rod fitting having a side screw fixing device and of a sunken round metal cup exterior
35 post fitting having a cylindrically pressed hole in the centre and having a fixing flange) with a gate fastener provided with means to enable the latch lifting device to co-operate with it, for the purposes set
40 forth substantially as herein described and explained.

2. The combination of a latch lifting device (comprising of a round metal rod bent, having one short straight side and
45 one longer straight side at right-angles to each other and of a detachable press knob rod fitting having a side screw fixing device and of round sunken metal cup exterior post fitting having a cylindrically pressed
50 hole in the centre and having a fixing flange) with the arrangement of a gate fastener having an additional hole in the tongue of the latch close to, and approximately directly below the rivet hole and having the
55 lower jaw of the latch casing removed and

5

6

25,197.35.                                      9 Nov., 1935.

an additional hole duplicated through either side of the fixing flanges, for the purposes set forth substantially as herein described and explained, and as illustrated in Figs. 1, 2 and 4 of the drawings.

3. The combination of a latch lifting device (comprising of a round metal rod bent having one short straight side and one longer straight side at right-angles to each other and of a detachable press knob rod fitting having a side screw fixing device, and of a round sunken metal cup exterior post fitting having a cylindrically pressed hole in the centre and having a fixing flange) with the arrangement of a gate fastener having additions to the fixing flanges

7

of the latch casing either solidly or by way of a detachable metal plate carrying a hole duplicated on either side and having an addition to the top of the latch containing an additional hole near to, and approximately directly above the rivet hole of the latch, for the purposes set forth substantially as herein described and explained and as illustrated in Figures 1, 3 and 5 of the drawings.          10

Dated this fourteenth day of September, A.D. 1936.

J. G. ROBINSON.

Witness—Rowland James, M.P.

8

Printed and Published for the DEPARTMENT OF PATENTS, COMMONWEALTH OF AUSTRALIA, by L. F. JOHNSTON, Commonwealth Government Printer, Canberra.

PA 326



Europäisches Patentamt
European Patent Office
Office européen des brevets

⑪ Veröffentlichungsnummer: **0 334 167 A1**

⑫ **EUROPÄISCHE PATENTANMELDUNG**

㉑ Anmeldenummer: 89104502.3

㉒ Anmeldetag: 14.03.89

㉕ Int. Cl.⁴: **C08L 5/04 , C08L 33/04 , A61K 9/22**

Patentansprüche für folgenden Vertragsstaat: ES.

㉚ Priorität: 23.03.88 DE 3809764

㊸ Veröffentlichungstag der Anmeldung:
27.09.89 Patentblatt 89/39

㉺ Benannte Vertragsstaaten:
AT BE CH DE ES FR GB IT LI NL SE

⑪ Anmelder: KNOLL AKTIENGESELLSCHAFT
Knollstrasse
D-6700 Ludwighafen(DE)

⑫ Erfinder: Einig, Heinz, Dr.
Aspenweg 12
D-6730 Neustadt 13(DE)
Erfinder: Stieren, Baerbel, Dr.
Goethestrasse 10
D-6800 Mannheim 1(DE)
Erfinder: Buehler, Volker, Dr.
Liebigstrasse 2
D-7500 Karlsruhe(DE)
Erfinder: Hollmann, Matthias, Dr.
Westring 32
D-6714 Weisenheim am Sand(DE)

㉔ Vertreter: Karau, Wolfgang Dr. et al
BASF Aktiengesellschaft Carl-Bosch-Strasse
38
D-6700 Ludwigshafen(DE)

㉞ Mischung aus Alginaten und Polyacrylaten und deren Verwendung.

㉝ Es wird eine Mischung aus einem Alginat und einem Polyacrylat im Verhältnis von 15:1 bis 1:2 beschrieben, die sich zur Herstellung von Depot-Arzneiformen eignet.

EP 0 334 167 A1

Xerox Copy Centre

12

PA 328

EP 0 334 167 A1

## Mischung aus Alginaten und Polyacrylaten und deren Verwendung

Die vorliegende Erfindung betrifft eine Mischung aus Alginaten und Polyacrylaten sowie deren Verwendung bei der Herstellung von Depot-Arzneimitteln.

Es ist bereits bekannt, daß man Alginate zur Herstellung von Depot-Arzneimitteln verwenden kann (Pharm. Ind. 33, 296 (1971)). Die Verwendung von Alginaten für diesen Zweck bereitet jedoch oft Schwierigkeiten. So erreichen die Formulierungen beim Tablettieren häufig keine genügende Härte. Ihr Abrieb ist daher sehr groß, was bei einem anschließenden Filmcoating stört. Mangelnde Härte führt beim Konfektionieren auf Abfüllmaschinen zu Bruch. Weiter absorbieren Alginate leicht Wasser, was zum Quellen der Tabletten oder bei Filmtabletten zum Platzen der Filme führt, wenn nicht durch eine aufwendige und teure Verpackung ein vollkommener Schutz vor Feuchtigkeit gewährleistet ist.

Konventionelle Retardtabletten auf Alginatbasis zeigen trotz einer in-vitro-Freisetzung nullter Ordnung keine Plasmaspiegel mit ausgeprägtem Plateaucharakter, und trotz deutlicher Verzögerung des Zeitpunkts der maximalen Plasmakonzentration gegenüber Arzneiformen, die den Wirkstoff schnell freisetzen, immer noch einen ausgeprägten und nicht immer erwünschten Plasmapeak.

Es wurde nun gefunden, daß sich diese Schwierigkeiten vermeiden lassen, wenn man den Alginaten Polyacrylate bzw. Polymethacrylate zumischt.

Gegenstand der Erfindung ist eine Mischung aus einem Alginat und einem Polyacrylat, Polymethacrylat oder Copolymerisaten aus Acryl- und Methacrylsäure im Verhältnis von 15:1 bis 1:2, vorzugsweise 9:1 bis 2:1 und deren Verwendung zur Herstellung von Depot-Arzneimitteln.

Als Alginate eignen sich besonders: Propylenglykolalginate, sowie Akali-und Erdalkalialginate, insbesondere die Natrium-, Kalium-, Ammonium- und Calciumalginate. Diese Alginate sind beispielsweise beschrieben in dem Buch von Roy L. Whistler "Industrial Gums", New York, 1973, Unterkapitel McNeely and Pettitt "über Alginate". Sie finden hauptsächlich Verwendung als Gelbildner oder Verdickungsmittel in der Lebensmitteltechnologie, Druck-, Textil- und Papierindustrie sowie bei Schweißelektroden.

Als Polyacrylate eignen sich besonders solche der Formel

$$\left[ -CH_2-\underset{\underset{\underset{R^3}{O}}{\overset{CO}{|}}}{\overset{R^1}{\underset{|}{C}}}-CH_2-\underset{\underset{\underset{R^4}{O}}{\overset{CO}{|}}}{\overset{R^2}{\underset{|}{C}}}- \right]_m$$

worin

$R^1$ und $R^2$   Wasserstoffatome oder $C_1-C_4$-Alkylgruppen,

$R^3$   ein Wasserstoffatom, eine $C_1-C_4$-Alkylgruppe oder einen Rest $-(CH_2)_n-NR^5R^6$ oder $-(CH_2)_n-NR^5R^6R^7$ Cl$\ominus$ mit n in der Bedeutung von 1 bis 4 und $R^5$, $R^6$ und $R^7$ von Wasserstoffatomen oder $C_1-C_4$-Alkylgruppen,

$R^4$   ein Wasserstoff oder eine $C_1-C_4$-Alkylgruppe und

$m$   eine Zahl von 500 bis 1500,

bedeuten.

Solche Polyacrylate bzw. Methacrylate und Copolymerisate sind beispielsweise beschrieben in Houben-Weyl, Methoden der organischen Chemie, Thieme-Verlag, Stuttgart, 1961. Besonders eignen sich Produkte, die unter der Bezeichnung Eudragit® auf dem Markt erhältlich sind.

Setzt man das Polyacrylat in Form des Ammoniumsalzes ein ($R^3 = -(CH_2)_n-NR^5R^6R^7$ Cl$\ominus$), so liegt der Wert für m vorzugsweise bei 7000 bis 11000 und insbesondere bei 8000 bis 10000. In den übrigen Fällen liegt m vorzugsweise bei 700 bis 1000.

Die erfindungsgemäße Mischung eignet sich besonders zur Herstellung von oralen Depotformen von Propafenon, Barucainid, Nesapidil, Gallopamil und Biperiden.

Die Verwendung der erfindungsgemäßen Mischung bietet folgende Vorteile:

1. Die Wirkstofffreisetzung aus den Arzneiformen läuft weitgehend linear ab.

2

12

PA 329

EP 0 334 167 A1

2. Die Tablettenkerne sind sehr hart und abriebfest, so daß sie ohne Schwierigkeiten weiterverarbeitet werden können.

3. Die Hygroskopizität der Alginate wirkt sich nicht mehr nachteilig bei der Tablettenherstellung aus. Die Tablettiermischungen können direkt ohne Granulierung verpreßt werden, und die aufwendige und komplizierte Naßgranulierung läßt sich vermeiden. Filmtabletten benötigen keinen besonderen Feuchtigkeitsschutz mehr und platzen nicht mehr bei kurzfristiger offener Lagerung.

4. Nach Gabe der neuen Arzneiformen zeigen die Wirkstoff-Plasmaspiegel einen ausgeprägten Plateaucharakter und einen wesentlich flacheren Verlauf als nach Gabe von Arzneiformen, die nur auf Alginatbasis hergestellt sind.

Die folgenden Beispiele sollen die Erfindung näher erläutern.

Die darin verwendeten ®Eudragit-Produkte sind in den Broschüren "Eudragit, E, L/S, RS, RL/RS, NED, LD der Firma Röhm Pharma GmbH, Darmstadt beschrieben.

Beispiel 1

Es wurden in üblicher Weise Tabletten folgender Zusammensetzung (in mg) hergestellt:

|  | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| Gallopamil•HCl | 100 | 100 | 100 | 100 | 100 | 100 |
| Na-Alginat | 300 | 240 | 200 | 166 | 132 | 332 |
| ®Eudragit E | 32 | 92 | 132 | 166 | 200 | 0 |
| PVP | 13 | 13 | 13 | 13 | 13 | 13 |
| Mg-Stearat | 4 | 4 | 4 | 4 | 4 | 4 |
| Cellulosepulver | 31 | 31 | 31 | 31 | 31 | 31 |

Dazu wurden Gallopamil•HCl, Na-Alginat und ®Eudragit E trocken in einem Mischer gemischt, unter Rühren mit einer wäßrigen Lösung von PVP oder PVP/PVA-Copolymerisaten (®Kollidon 30, ®Kollidon 25- oder ®Kollidon VA 64) befeuchtet, durch ein Sieb getrieben und in einem Wirbelschichttrockner getrocknet, erneut über ein Sieb gegeben und mit Mg-Stearat und Cellulosepulver vermischt. Die Mischungen wurden zu Tabletten mit einem Gewicht von 480 mg verpreßt.

Analog wurde Barucainid verarbeitet.

Die Tabletten wurden auf Härte mit dem ®Pharmatest-Härtetester und auf Abrieb mit dem ®Pharmatest-Friabilator (400 Umdrehungen in 13 min) untersucht.

Dabei wurden folgende Ergebnisse erhalten:

| Tabletten | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| Härte (N) | 104 | 122 | 137 | 103 | 84 | 61 |
| Abrieb (%) | 0,1 | 0,1 | 0,1 | 1,0 | 1,0 | 3,8 |

Entsprechende Werte wurden erhalten, wenn man das Gallopamil gegen einen anderen Wirkstoff, z.B. Barucainid, austauschte oder anstelle von ®Eudragit E ein anderes ®Eudragit (z.B. ®Eudragit RS) verwendete.

Beispiel 2

Preßt man die Mischungen A bis F des Beispiels 1 direkt ohne Granulierung zu Tabletten, so erhält man Preßlinge, deren Härte zwischen 70 und 110 N liegt. Die Mischung F liefert jedoch unbrauchbare Preßlinge mit einer Härte von nur 10 N.

Beispiel 3

3

PA 330

EP 0 334 167 A1

Es wurden analog Beispiel 1 Tabletten folgender Zusammensetzung (in mg) hergestellt:

|  | G | H |
|---|---|---|
| Gallopamil | 100 | 100 |
| Na-Alginat | 267 | 267 |
| ®Eudragit RS | 67 | - |
| PVP | 13 | 13 |
| Mg-Stearat | 4 | 4 |
| Cellulosepulver | 29 | 36 |

Die Tabletten G besaßen eine Härte von 120 N, die Tabletten H von 76 N. Die entsprechenden Werte für die Friabilität betrugen 0,05 % bzw. 2,1 %.
Preßt man die Tabletten direkt, d.h. ohne Granulierung, so erhält man Tabletten mit der Härte 100 N (G) bzw. 13 N (H).

Testung der Tabletten

Testpersonen erhielten entweder je 1 Tablette G oder H (vgl. Beispiel 3). Anschließend wurden in bestimmten Zeitabständen Blutproben entnommen und der Gehalt an Gallopamil darin ermittelt:

| Zeit (h) | 0,5 | 1 | 2 | 3 | 4 | 6 | 8 | 10 | 12 |
|---|---|---|---|---|---|---|---|---|---|
| G (ng/ml Plasma) | 0,7 | 0,9 | 4,6 | 6,8 | 10 | 9,0 | 8,9 | 8,2 | 5,9 |
| H (ng/ml Plasma) | 3,8 | 10 | 29 | 33 | 36 | 17 | 10 | 6,4 | 6,9 |

Im Gegensatz zu H zeigt G einen wesentlich flacheren Verlauf der Plasmawerte.

Beispiel 4

Es wurden Tabletten folgender Zusammensetzung (in mg) hergestellt:

|  | J | K |
|---|---|---|
| Propafenon•HCl | 600 | 600 |
| Na-Alginat | 253 | 253 |
| ®Eudragit RS | 53 | - |
| Cellulose | 11 | 11 |
| PVP | 20 | 20 |
| Mg. Stearat | 3 | 3 |

Die Herstellung erfolgte durch Feuchtgranulierung einer Mischung von Propafenon, Alginat (im Falle J zusätzlich mit ®Eudragit) mit einer wäßrigen PVP-Lösung und anschließende Zugabe von Cellulose und Mg-Stearat zum abgetrockneten Granulat. Das Granulat wurde analog Beispiel 1 zu Tabletten verarbeitet.
Im Falle J wurden Tabletten mit der Härte von 165 N erhalten, deren Friabilität praktisch nicht meßbar war. Im Falle K waren keine brauchbaren Tabletten zu erhalten, die einem anschließenden Filmcoating, ohne Erhalt von größerem Bruchanteil, standhielten. Ein Überzug eines schnell löslichen Films ist zur Geschmacksmaskierung des extrem bitteren Propafenons unbedingt erforderlich.

Ansprüche

1. Mischung aus einem Alginat und einem Polyacrylat, Polymethacrylat oder Copolymerisaten aus Acryl- und Methacrylsäure im Verhältnis von 15:1 bis 1:2.
2. Mischung gemäß Anspruch 1, dadurch gekennzeichnet, daß das Polyacrylat die Formel

4

12

PA 331

EP 0 334 167 A1

$$\left[ -CH_2-\underset{\underset{\underset{R^3}{O}}{\overset{\overset{R^1}{|}}{\underset{|}{CO}}}}{\overset{|}{C}}-CH_2-\underset{\underset{\underset{R^4}{O}}{\overset{\overset{R^2}{|}}{\underset{|}{CO}}}}{\overset{|}{C}}- \right]_m$$

worin

R¹ und R²  Wasserstoffatome oder $C_1$-$C_4$-Alkylgruppen,

R³  ein Wasserstoffatom, eine $C_1$-$C_4$-Alkylgruppe oder einen Rest -$(CH_2)_n$-$NR^5R^6$ oder -$(CH_2)_n$-$NeR^5R^6R^7$ CIe mit n in der Bedeutung von 1 bis 4 und $R^5$,$R^6$ und $R^7$ von Wasserstoffatomen oder $C_1$-$C_4$-Alkylgruppen,

R⁴  ein Wasserstoff oder eine $C_1$-$C_4$-Alkylgruppe und

m  eine Zahl von 500 bis 10000

darstellen, besitzt.

3. Verwendung der Mischung gemäß Anspruch 1 zur Herstellung von Arzneiformen mit Depotwirkung.

4. Feste Arzneiformen, enthaltend eine Mischung gemäß Anspruch 1.


Patentansprüche für folgenden Vertragsstaat: SP:

1. Verfahren zur Herstellung einer Mischung aus einem Alginat und einem Polyacrylat, Polymethacrylat oder Copolymerisaten aus Acryl- und Methacrylsäure, dadurch gekennzeichnet, daß man die Bestandteile im Verhältnis von 15:1 bis 1:2 miteinander mischt.

2. Verfahren gemäß Anspruch 1, dadurch gekennzeichnet, daß das Polyacrylat die Formel

$$\left[ -CH_2-\underset{\underset{\underset{R^3}{O}}{\overset{\overset{R^1}{|}}{\underset{|}{CO}}}}{\overset{|}{C}}-CH_2-\underset{\underset{\underset{R^4}{O}}{\overset{\overset{R^2}{|}}{\underset{|}{CO}}}}{\overset{|}{C}}- \right]_m$$

worin

R¹ und R²  Wasserstoffatome oder $C_1$-$C_4$-Alkylgruppen,

R³  ein Wasserstoffatom, eine $C_1$-$C_4$-Alkylgruppe oder einen Rest -$(CH_2)_n$-$NR^5R^6$ oder -$(CH_2)_n$-$NeR^5R^6R^7$ CIe mit n in der Bedeutung von 1 bis 4 und $R^5$,$R^6$ und $R^7$ von Wasserstoffatomen oder $C_1$-$C_4$-Alkylgruppen,

R⁴  ein Wasserstoff oder eine $C_1$-$C_4$-Alkylgruppe und

m  eine Zahl von 500 bis 10000

darstellen, besitzt.

5

PA 332



Abstract
Q.6.
4-4-97

J. Q. 02/23/96.

12

**MULTIPLE DEPENDENT CLAIM**
**FEE CALCULATION SHEET**
*(FOR USE WITH FORM PTO-875)*

SERIAL NO.

FILING DATE

APPLICANT(S) 08/325744

CLAIMS

| | AS FILED | | AFTER 1st AMENDMENT | | AFTER 2nd AMENDMENT | | | | * | | * | | * | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | IND. | DEP. | IND. | DEP. | IND. | DEP. | | | IND. | DEP. | IND. | DEP. | IND. | DEP. |

(Claims numbered 1–50 in left table, 51–100 in right table, mostly blank)

TOTAL IND. / TOTAL DEP. / TOTAL CLAIMS

PTO-1360 (3-78)   *MAY BE USED FOR ADDITIONAL CLAIMS OR AMENDMENTS   U.S. DEPARTMENT of COMMERCE Patent and Trademark Office

PA 334

Staple Issue Slip Here

| POSITION | ID NO. | DATE | |
|---|---|---|---|
| CLASSIFIER | 6 | 12-7-85 | |
| EXAMINER | J. Wallace | 02NOV95 | |
| TYPIST | SPW | 3/8 | 12/8 | 977 |
| VERIFIER | | | |
| CORPS CORR. | | | |
| SPEC. HAND | | | |
| FILE MAINT. | | | |
| DRAFTING | | | |

## INDEX OF CLAIMS

| Claim Final | Original | Date | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | (1) | | | | | | |
| 2 | 2 | | | | | | |
| 3 | 3 | | | | | | |
| 4 | 4 | | | | | | |
| 5 | 5 | | | | | | |
| 6 | 6 | | | | | | |
| | 7 | | | | | | |
| | 8 | | | | | | |
| | 9 | | | | | | |
| | 10 | | | | | | |
| | 11 | | | | | | |
| | 12 | | | | | | |
| | 13 | | | | | | |
| | 14 | | | | | | |
| | 15 | | | | | | |
| | 16 | | | | | | |
| | 17 | | | | | | |
| | 18 | | | | | | |
| | 19 | | | | | | |
| | 20 | | | | | | |
| | 21 | | | | | | |
| | 22 | | | | | | |
| | 23 | | | | | | |
| | 24 | | | | | | |
| | 25 | | | | | | |
| | 26 | | | | | | |
| | 27 | | | | | | |
| | 28 | | | | | | |
| | 29 | | | | | | |
| | 30 | | | | | | |
| | 31 | | | | | | |
| | 32 | | | | | | |
| | 33 | | | | | | |
| | 34 | | | | | | |
| | 35 | | | | | | |
| | 36 | | | | | | |
| | 37 | | | | | | |
| | 38 | | | | | | |
| | 39 | | | | | | |
| | 40 | | | | | | |
| | 41 | | | | | | |
| | 42 | | | | | | |
| | 43 | | | | | | |
| | 44 | | | | | | |
| | 45 | | | | | | |
| | 46 | | | | | | |
| | 47 | | | | | | |
| | 48 | | | | | | |
| | 49 | | | | | | |
| | 50 | | | | | | |

| Claim Final | Original | Date | | | | | |
|---|---|---|---|---|---|---|---|
| | 51 | | | | | | |
| | 52 | | | | | | |
| | 53 | | | | | | |
| | 54 | | | | | | |
| | 55 | | | | | | |
| | 56 | | | | | | |
| | 57 | | | | | | |
| | 58 | | | | | | |
| | 59 | | | | | | |
| | 60 | | | | | | |
| | 61 | | | | | | |
| | 62 | | | | | | |
| | 63 | | | | | | |
| | 64 | | | | | | |
| | 65 | | | | | | |
| | 66 | | | | | | |
| | 67 | | | | | | |
| | 68 | | | | | | |
| | 69 | | | | | | |
| | 70 | | | | | | |
| | 71 | | | | | | |
| | 72 | | | | | | |
| | 73 | | | | | | |
| | 74 | | | | | | |
| | 75 | | | | | | |
| | 76 | | | | | | |
| | 77 | | | | | | |
| | 78 | | | | | | |
| | 79 | | | | | | |
| | 80 | | | | | | |
| | 81 | | | | | | |
| | 82 | | | | | | |
| | 83 | | | | | | |
| | 84 | | | | | | |
| | 85 | | | | | | |
| | 86 | | | | | | |
| | 87 | | | | | | |
| | 88 | | | | | | |
| | 89 | | | | | | |
| | 90 | | | | | | |
| | 91 | | | | | | |
| | 92 | | | | | | |
| | 93 | | | | | | |
| | 94 | | | | | | |
| | 95 | | | | | | |
| | 96 | | | | | | |
| | 97 | | | | | | |
| | 98 | | | | | | |
| | 99 | | | | | | |
| | 100 | | | | | | |

SYMBOLS
— Rejected
= Allowed
(Through numbers) Canceled
+ Restricted
N Non-elected
I Interference
A Appeal
O Objected

(LEFT INSIDE)

PA 335



08/525 749

PQ/EPM/00900
APPROVED FOR LICENSE ☐
INITIALS _DEC 0 1 9528_

Date
Entered
or
Counted

PATENT APPLICATION
‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
08525749

Date
Received
or
Mailed

DEC 21 2005
RECEIVED

| | | |
|---|---|---|
| 1. | Application _____ papers. | |
| 2. | 903 | 09 Nov 95 |
| 3. | Pre Amdt A | 10-03-95 |
| 4. | Priority Document | 10-03-95 |
| 5. | Req. for Cont. FR | 1-18-96 |
| 6. | Res (3) | 10/17/96 |
| 7. | Amdt B | Jan 6 1997 |
| 8. | Notice of Allowance | 4-1-97 |
| 9. | Req for Corr... | 4/9/97 |
| 10. | Suppl Amdt C | 3/27/97 |
| 11. | Suppl Notice of Allowance | 6-26-97 |
| 12. | Formal Drawings ( 11 shts) sat ) | 6-27-97 |
| 13. | Drawings | 6/20/97 |
| 14. | Req for Extension | 6/20/97 |
| 15. | Extension Request | 8/13/97 |
| 16. | PTO Grant OCT 28 1997 | |
| 17. | Req. for CofC | 11/5/97 |
| 18. | | |
| 19. | | |
| 20. | | |
| 21. | | |
| 22. | | |
| 23. | | |
| 24. | | |
| 25. | | |
| 26. | | |
| 27. | | |
| 28. | | |
| 29. | | |
| 30. | | |
| 31. | | |
| 32. | | |

(FRONT)

# EXHIBIT 2A

**Reliant v. Par**
**C.A. No. 06-774 -JJF (D. Del.)**

**U.S. Patent No. 5,681,588 File History Contents**

Paper No.          Document

                   File Wrapper Certification ........................................................ PA 001

1                  Application Transmittal Papers .................................................. PA 002

                   Application ............................................................................. PA 008

                   Declaration, Power of Attorney ................................................ PA 023

                   Figures 1 – 11 (multiple sets) ................................................... PA 027

2                  Notification of Acceptance of Application  (Form 903) .............. PA 074

                   PCT International Application Papers ........................................ PA 079

                   PCT International Search Report .............................................. PA 105

                   PCT International Preliminary Examination Report
                   (English Translation) ............................................................... PA 109

                   PCT Notification of Election, etc. ............................................. PA 115

                   PCT International Preliminary Examination Report (German) ................... PA 123

                   WO 92/04013 ......................................................................... PA 132

                   WO 90/11755 ......................................................................... PA 150

3                  Preliminary Amendment .......................................................... PA 160

                   Request for Priority under 35 U.S.C. 119 ................................. PA 163

4                  Priority Document (German Patent P 43 10 963.2) .................... PA 164

5                  Request for Corrected Filing Receipt ........................................ PA 190

6                  Office Action Summary ............................................................ PA 193

                   Notice of References Cited & References .................................. PA 197

7                  Amendment and Request for Reconsideration ........................... PA 224

8      Notice of Allowability ................................................................ PA 233

9      Request for Priority Acknowledgment ........................................ PA 236

10     Supplemental Amendment ........................................................... PA 237

11     Supplemental Notice of Allowability ........................................... PA 241

12     Letter to Official Draftsman, Formal Drawings Submission ....................... PA 242

13     Issue Fee Transmittal ................................................................ PA 267

14     Second Request for Priority Acknowledgment............................................ PA 268

15     Priority Acknowledgment ........................................................... PA 269

16     PTO Utility Grant, U.S. Patent No. 5,681,588 ............................................. PA 270

17     Request for Certificate of Correction
       Form PTO 1050 ..................................................................... PA 287

       Miscellaneous Papers ................................................................ PA 292

00527653.DOC