IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RELIANT PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 06-774-JJF |
| PAR PHARMACEUTICAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF RELIANT PHARMACEUTICALS, INC.'S**
**ANSWERING CLAIM CONSTRUCTION BRIEF**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

OF COUNSEL:

John Desmarais                          *Attorneys for Plaintiff*
Gerald J. Flattmann, Jr.
Christine Willgoos
KIRKLAND & ELLIS, LLP
Citigroup Center
153 E. 53rd Street
New York, NY  10022
(212) 446-4800

March 19, 2008

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION .......................................................................................................... 1

ARGUMENT .................................................................................................................. 1

I.     PAR'S PROPOSED CONSTRUCTIONS VITIATE WELL-RECOGNIZED
      PRINCIPLES OF CLAIM CONSTRUCTION ..................................................... 1

II.    RELIANT'S PROPOSED CONSTRUCTIONS ARE CONSISTENT WITH THE
      INTRINSIC AND EXTRINSIC EVIDENCE ....................................................... 4

      A.    "Delayed Release Microtablet" ............................................................. 4

      B.    "Cylindrical" .......................................................................................... 8

      C.    "A Convex Or Flat Upper Side And Lower Side" ................................ 11

      D.    "The Tablet Contains No Release-Delaying Ancillary Substance" ...... 13

      E.    "Lubricant" .......................................................................................... 17

      F.    "Other Conventional Ancillary Substances" ....................................... 18

      G.    "Release Rate Is Virtually Independent Of The Pressure When
          Compressing The Tablets" .................................................................... 20

      H.    "Active Ingredient Density" ................................................................. 21

      I.    "A Pronounced Plasma Level Plateau With A PTF<75%" .................. 22

      J.    "Bioavailability Does Not Depend On The Intake Of Food" ............... 23

      K.    "Cylindrical Mold" .............................................................................. 25

      L.    The Term "The Active Ingredient Content Is In The Range From 81 To
          99.9% Of The Weight Of The Microtablet" Does Not Need Construction .......... 26

CONCLUSION .............................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003)...................................................................................... 7

*Brown v. Huger*,
  21 How. 305 (1859) .......................................................................................................... 2

*Burke, Inc. v. Bruno Indep. Living Aids*,
  183 F.3d 1334 (Fed. Cir. 1999)....................................................................................... 3

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
  388 F.3d 858 (Fed. Cir. 2004)......................................................................................... 2

*Envtl. Designs, Ltd. v. Union Oil Co.*,
  713 F.2d 693 (Fed. Cir. 1983)................................................................................. 3, 6, 7

*Gummow v. Splined Tools Corp.*,
  No. 3-03-CV-1428-L, 2004 WL 893436 (N.D. Tex. Apr. 26, 2004) ............................... 9

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004)....................................................................................... 4

*John Mezzalingua Assocs., Inc. v. Arris Int'l, Inc.*,
  No. 03-C-353-C, 2003 WL 23282752 (W.D. Wis. Nov. 14, 2003) ................................. 9

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996)......................................................................................................... 2

*NeoMagic Corp. v. Trident Microsystems, Inc.*,
  287 F.3d 1062 (Fed. Cir. 2002)....................................................................................... 8

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)........................................................................... 2, 3, 12

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
  775 F.2d 1107 (Fed. Cir. 1985)................................................................................... 7, 8

*SuperGuide Corp. v. DirecTV Enters., Inc.*,
  358 F.3d 870 (Fed. Cir. 2004)......................................................................................... 7

*Synthes (USA) v. Smith & Nephew, Inc.*, No. 03-CV-0084, 2008 WL 343114 (E.D. Pa.
  Feb. 4, 2008) ................................................................................................................. 27

*U.S. Phillips Corp. v. Iwasaki Elec. Co., Ltd.*,
  505 F.3d 1371 (Fed. Cir. 2007)..................................................................26

*U.S. Surgical v. Ethicon, Inc.*,
  103 F.3d 1554 (Fed. Cir. 1997)..................................................................27

*Xerox Corp. v. 3Com Corp.*,
  267 F.3d 1361 (Fed. Cir. 2001)....................................................................7

**INTRODUCTION**

The terms of a patent claim are properly construed according to their ordinary and customary meaning – the meaning that one of skill in the art at the time of the invention would ascribe to them. Par, however, rather than relying on the plain meaning of the claims and supportive intrinsic evidence, attempts to import limitations from the specification of the patent into the claims, read in limitations from extrinsic evidence, and even goes so far as to propose limitations that have no support in either the intrinsic or extrinsic evidence. More importantly, Par's proposed construction simultaneously reads such limitations into the claims, and at the same time reads out of the claims not only the preferred embodiments of the invention, but also every example in the specification. Accordingly, Par's proposed constructions cannot be correct.

In contrast, each of Reliant's proposed claim constructions is supported by the plain meaning of the terms in the context of the claims, the specification, and the prosecution history of the '588 patent. In addition, two experts skilled in the art of the invention confirm that Reliant's proposed constructions reflect the understanding of one of ordinary skill in the art at the time of the invention.

**ARGUMENT**

**I.    PAR'S PROPOSED CONSTRUCTIONS VITIATE WELL-RECOGNIZED PRINCIPLES OF CLAIM CONSTRUCTION**

Par's proposed claim constructions set forth in its opening *Markman* brief ignore well-settled principles of claim construction and turn Federal Circuit precedent on its head. Rather than rely on the ***intrinsic evidence*** – the patent claims, the specification (including the examples of the invention), and the file history of the patent – Par instead relies on extrinsic evidence having no bearing on the patent claims, including documents from its own

1

manufacturing and supply chain. *See, e.g.*, Def. Br. at 24.[1]  But well-established Supreme Court and Federal Circuit case law make clear that intrinsic evidence establishes the meaning of claim terms used in a patent. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 383 n.8 (1996) ("[T]he patent itself must be taken as evidence of its meaning") (quoting *Brown v. Huger*, 21 How. 305, 318 (1858))); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (*en banc*) ("[W]hile extrinsic evidence 'can shed useful light on the relevant art,' we have explained that it is 'less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004))).

Par also purports to define terms of art – words and phrases that would be readily understood by those skilled in the art of pharmaceutical formulation – by their "plain meaning," using no fewer than six separate dictionaries.  In doing so, Par ignores the clear meaning of the terms to one of skill in the art, and introduces ambiguity into otherwise clear terms.  But the Federal Circuit has warned against using dictionary definitions when the claim terms are clear from the specification and known in the art. *See, e.g.*, *Phillips*, 415 F.3d at 1321 ("The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent.").  Par's proposed constructions abstract the claim terms to meanings not found in, and contradicted by, the intrinsic evidence.

Even more troubling, Par urges the Court to construe several claim terms in a manner that would effectively read out of the claims the preferred embodiments explicitly set

---

[1]  "Def. Br." as used herein refers to Defendant Par Pharmaceutical, Inc.'s Opening Claim Construction Brief. *See* D.I. 197.

forth in the specification. *See infra* Section II.D ("The Tablet Contains No Release-Delaying Ancillary Substances"), Section II.E ("Lubricant"), Section II.F ("Other Conventional Ancillary Substance"), and Section II.H ("Active Ingredient Density"). Such constructions are impermissible under Federal Circuit law. *See, e.g., Burke, Inc. v. Bruno Indep. Living Aids*, 183 F.3d 1334, 1341 (Fed. Cir. 1999) ("The district court's claim interpretation … would exclude the preferred embodiment described in the specification and, thus, cannot be sustained.").

In addition, Par proposes reading into the independent composition claim a single (and non-limiting) embodiment disclosed in the specification and claimed in a dependent claim of the patent. *See infra* Section II.A ("Delayed Release Microtablet"). Yet again, Par's proposed construction ignores Federal Circuit law to the contrary. *See, e.g., Burke*, 183 F.3d at 1340 ("[W]e have often held that limitations cannot be read into the claims from the specification or the prosecution history."); s*ee Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 699 (Fed. Cir. 1983) ("It is improper for courts to read into an independent claim a limitation explicitly set forth in another claim.").

Thus, far from "adher[ing] to the well-established principles of claim construction" (Def. Br. at 2), Par's proposed claim constructions turn those well-established principles upside down. In contrast, Reliant's proposed constructions are supported by and consistent with the patent claims, specification, and file history, and comport with the plain and ordinary meaning that would be ascribed to the terms by one of ordinary skill in the art. *Phillips*, 415 F.3d at 1313 ("The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." (citing

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004))).

## II.    RELIANT'S PROPOSED CONSTRUCTIONS ARE CONSISTENT WITH THE INTRINSIC AND EXTRINSIC EVIDENCE

### A.    "Delayed Release Microtablet"

Reliant requests that the court construe the term "delayed release microtablet" to mean "a small unit of solid medicament prepared by compaction in which the release of active ingredient after 3 hours is not more than 80% and after 24 hours is not less than 80%." Par proposes that the term be construed as two separate terms, "delayed release" and "microtablet." *See* Def. Br. at 16, 18. As set forth in Reliant's opening brief, these terms are not properly separable. The patent does not disclose or claim any "microtablet" other than a "delayed release microtablet." *See* Pl. Br. at 9, n. 4.[2] Therefore, the Court should construe "delayed release microtablet" as a single term.

Par goes to great lengths, using two dictionaries and three foreign patents, to set forth a definition of the term "delayed release" that serves only to add uncertainty to a term clearly defined within the first claim of the '588 patent. Par's proposed construction – "prolonged diffusion of an active ingredient" – merely substitutes the words "prolonged" and "diffusion" for "delayed" and "release," without giving any real meaning to the term. *See* Def. Br. at 16-18. In contrast, the relevant portion of Reliant's construction contains a clear set of parameters: "the release of active ingredient after 3 hours is not more than 80% and after

---

[2] "Pl. Br." as used herein refers to Plaintiff Reliant Pharmaceuticals, Inc.'s Opening Claim Construction Brief. *See* D.I. 194.

24 hours is not less than 80%." These same parameters are set forth within Claim 1 of the patent:

> "the release of active ingredient in the USP paddle method at 50 rpm is 80% as a maximum after 3 hours and as a minimum after 24 hours" (Ex. 3 at Claim 1);

within the specification:

> "the release of active ingredient after 3, preferably 5, hours is not more than 80[%] and after 24, preferably 15, hour is not less than 80%" (Ex. 3 at Col. 2:55-57);

and several times within the file history:

> "the present microtablets provide no more than 80% release after 3 hours and no less than 80% release after 24 hours" (Ex. 5 at 3);

> "the present invention … is drawn to a delayed release microtablet which is required by the claim to have no more than 80% release of the active ingredient after 3 hours and no less than 80% after 24 hours" (Ex. 5 at 4); and

> "the claims . . . require that the release of active ingredient be delayed to meet the requirements of part (d) of claim 1" (Ex. 5 at 4).

Thus, it is unnecessary to resort to any extrinsic evidence to define the term "delayed release."

Par's proposed construction of the term "microtablet" similarly looks beyond the '588 patent claims, specification, and file history – and even beyond the extrinsic references Par uses to support its construction – to improperly narrow the claim term. Par proposes that the Court construe the word "microtablet" within the claim term "delayed release microtablet" to mean "a small compressed solid dosage form of precise shape and dimensions." Def. Br. at 18. Yet nowhere in the intrinsic or extrinsic evidence does the phrase "of precise shape and dimensions" appear.

Par's blatant attempt to impermissibly narrow the claim term is plain from even a cursory review of its argument. Par first sets forth the basic definition of the components of the word, *i.e.*, "micro" and "tablet." These basic definitions as set forth by Par – "micro" means

"small" and "tablet" means "a solid pharmaceutical dosage form containing drug substance with or without suitable diluents and prepared by either compression or molding methods" – comport with the intrinsic evidence, the understanding of one skilled in the art of the invention, and Reliant's proposed construction, *i.e.*, "a small unit of solid medicament prepared by compaction…" *See* Pl. Br. at 10; Rhodes Decl.[3] at ¶ 44; Hubbell Decl.[4] at ¶ 25; Def. Br. at 18. Had Par's definition stopped here, there might have been no need for the Court to construe the term, as the parties would likely have come to agreement over the small semantic differences in what is substantively the same definition.

Par, however, adds the phrase "of precise shape and dimensions" to its proposed construction. This phrase does not appear anywhere in the intrinsic or extrinsic evidence. Par purports to divine this phrase from the patent specification, pointing to several embodiments described in the specification: one embodiment describes a punch, another a mold. Par then unilaterally concludes that these embodiments have "precise shape and dimensions" and attempts to read this limitation into its proposed construction to narrow the invention. But Par's made-up limitation – even if it were supported by the specification – cannot form the definition of the claim term "microtablet" because it is improper to read an embodiment, even a preferred embodiment, into the claims.[5] *See Envtl. Designs*, 713 F.2d at 699 ("The claim, not the

---

[3]  "Rhodes Decl." as used herein refers to the Declaration of Dr. Christopher T. Rhodes In Support of Reliant Pharmaceutical, Inc.'s Opening Claim Construction Brief. *See* D.I. 195.

[4]  "Hubbell Decl." as used herein refers to the Declaration of Dr. Jeffrey A. Hubbell In Support of Reliant Pharmaceutical, Inc.'s Opening Claim Construction Brief. *See* D.I. 196.

[5]  In addition, Par's alleged support for its improper limitation, that Claim 6 of the patent comprises a "mold," (Def. Br. at 18) cuts against adding Par's proposed limitation to the term "microtablet." Basic principles of claim differentiation hold that a dependent claim is presumed to be narrower than the claim from which it depends. *See Xerox Corp. v. 3Com*
(Continued…)

specification, measures the invention.… [Defendant's] argument that claim 1 must include a limitation found in the specification is thus legally unsound.") (internal citations omitted). *See also Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed. Cir. 2003) ("Because the claims are best understood in light of the specification of which they are a part, however, courts must take extreme care when ascertaining the proper scope of the claims, lest they simultaneously import into the claims limitations that were unintended by the patentee.")

Par's attempt to narrow the definition of "microtablet" is also evident from its self-serving statement that the patent does not cover "ground or milled granules of compressed solid material…."[6] Def. Br. at 19. But no such exclusion appears anywhere in the patent claims, specification or file history, and the specification need not disclose every embodiment of the claimed invention. *See SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 880 (Fed. Cir. 2004) ("The law 'does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention.'" (quoting *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (*en banc*))). Indeed, Par confuses a question of infringement, *i.e.*, whether "ground or milled granules of compressed solid material" are encompassed by the term "microtablet" as that term is described in the patent and understood in the art, with a question of claim construction, *i.e.*, what the claim term "microtablet" means.

---

*Corp.*, 267 F.3d 1361, 1366 (Fed. Cir. 2001); *see also AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1242 (Fed. Cir. 2003) ("Under the doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the independent claims from which they depend." (internal citations omitted)). Par's use of the embodiment comprising a "mold" to support its narrow definition of "microtablet" as having "precise shape and dimensions" is improper because it attempts to read a dependent limitation into an independent claim. *See Envtl. Designs, Ltd.*, 713 F.2d at 699 ("It is improper for courts to read into an independent claim a limitation explicitly set forth in another claim.").

6    Not surprisingly, this is exactly what Par purports that its formulation comprises.

*See NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002) ("[C]laims are not construed 'to cover' or 'not to cover' the accused device…. It is only after the claims have been construed without reference to the accused device that the claims, as so construed, are applied to the accused device to determine infringement." (quoting *SRI*, 775 F.2d at 1118)).

Moreover, the claims of the '588 patent themselves contain sufficient disclosure of the physical characteristics necessary for a person skilled in the art to understand what is meant by the term "delayed release microtablet." For example, Claim 1 discloses an acceptable range of shapes ("cylindrical … with a convex or flat upper side and lower side"); sizes ("the height and diameter are … 1-3 mm"); densities ("greater than 1"); and compositions ("no release-delaying ancillary substance but 0.1-5% by weight of a lubricant and 0-18.9% by weight of other conventional ancillary substances") of the claimed delayed release microtablet. *See* Ex. 3 at Claim 1. Notably, nowhere in the claims is the invention limited to a "precise shape" or "precise dimensions."

Par's proposed constructions of the claim term "delayed release" and "microtablet" contradict both established Federal Circuit law and the plain language of the patent claims. Accordingly, the Court should construe the term "delayed release microtablet" to mean "a small unit of solid medicament prepared by compaction in which the release of active ingredient after 3 hours is not more than 80% and after 24 hours is not less than 80%."

**B.      "Cylindrical"**

Reliant proposes that the claim term "cylindrical" be construed to mean "a three-dimensional shape which includes a flat or convex surface in which the height and diameter are, independently of one another, 1-3 mm." Par, in contrast, seeks a very narrow construction of "cylindrical" as "having the form of a cylinder, *i.e.*, the solid figure traced out when a rectangle

8

rotates around one of its sides as the axis of rotation, with two parallel circles of equal size at the ends." Def. Br. at 15.

Unlike Reliant's construction, Par's proposed construction is not consistent with the use of the term "cylindrical" in the claims of the '588 patent and finds no support in either the specification or the file history of the '588 patent. Instead, Par relies solely on the dictionary definitions of the terms "cylindrical" and "cylinder."[7] Par's proposed construction, however, encompasses only one type of cylinder, a ***right circular cylinder***.[8] But there is nothing in the '588 patent that limits the "cylindrical" shape of the invention to a cylinder with right angles or a cylinder which is defined by a rectangle. Thus, Par narrows the term "cylindrical" far beyond any reasonable interpretation that can be made in the context of the '588 patent and its claims.[9]

A person of ordinary skill in the art need only look at Claim 1 of the '588 patent to understand that the term "cylindrical" cannot have Par's narrow meaning within the context of the invention. Claim 1 recites a "cylindrical delayed release microtablet with a convex or flat upper side and lower side." A person of ordinary skill in the art would readily understand that

---

[7] Par uses three different dictionaries to define a one-word term, "cylindrical," changing references whenever a definition suits its purpose.

[8] *See* Ex. 6 (attached hereto) ("Right circular cylinder, *Geom.*, a cylinder generated by the revolution of a rectangle about one of its sides.").

[9] Other courts have rejected Par's narrow definition of similar claim terms. *See, e.g.*, *Gummow v. Splined Tools Corp.*, No. 3-03-CV-1428-L, 2004 WL 893436, at *4 (N.D. Tex. Apr. 26, 2004) ("Although this definition [of 'cylinder'] references a circular cylinder by way of example, it does not necessarily limit a cylinder to such a shape. To the contrary, at least two geometry treatises make clear that such a limitation is not inherent in the definition of a cylinder."); *John Mezzalingua Assocs., Inc. v. Arris Int'l, Inc.*, No. 03-C-353-C, 2003 WL 23282752, at *9 (W.D. Wis. Nov. 14, 2003) ("Even if the ordinary meaning of 'cylindrical' required a perfect cylinder, it is clear that the patentee did not intend this definition to apply in the context of the '194 patent.").

the claimed invention includes, as one embodiment, a delayed release microtablet having at least one convex upper side or lower side. *See* Rhodes Decl. at ¶ 64; Hubbell Decl. at ¶ 34. Par's definition, however – a "figure traced out when a rectangle rotates around one of its sides as the axis of rotation" – necessarily has both a flat upper side and a flat lower side. Par's proposed construction of the claim term "cylindrical," therefore, reads out ***any*** embodiment that has a convex upper side or a convex lower side. Those embodiments, however, are explicitly set forth in the claims. Thus, Par's construction cannot be correct.

Par's proposed construction also reads out other preferred embodiments of the claimed cylindrical delayed release microtablet. The patent specification states that "[t]he microtablets according to the invention are cylindrical with a flat or convex upper side and lower side and ***with a diameter and height which are preferably approximately equal***…." *See* Ex. 3 at Col. 2:42-45. Accordingly, one embodiment with the preferred height and diameter is a delayed release microtablet in the shape of a sphere – a sphere is a cylindrical shape of the invention with a convex upper side and a convex lower side in which the height and diameter are equal. A spherical delayed release microtablet is within the scope of the patent claims and is, indeed, one of the preferred embodiments described in the specification of the patent. *Id.* Yet, a sphere is not "a solid figure traced out when a rectangle rotates around one if its sides as the axis of rotation, with two parallel circles of equal size at the ends." Reliant's definition, however, would include an embodiment of the delayed release microtablet with a convex upper side and a convex lower side in which the height and diameter are approximately equal.

Par's construction of the term "cylindrical" is also inconsistent with both the specification and the file history of the '588 patent. As set forth in Reliant's opening brief, the specification discloses that "[t]he microtablets according to the invention are cylindrical with a

flat or convex upper side and lower side" and that "[t]he resulting microtablets have a cylindrical shape with flat or convex surface [sic]." *See* Ex. 3 at Col. 2:42-46, 4:19-22. For example, during prosecution of the '588 patent, the applicants stated, consistent with the patent claims and specification, that "[t]he present invention relates to a cylindrical delayed release microtablet having a convex or flat upper side and lower side" *See* Ex. 5 at 1, 2. These statements contradict Par's proposed construction of the term "cylindrical" as having a cross-section of a rectangle, *i.e.*, a flat upper side and a flat lower side.

Further, as explained by Dr. Rhodes in his declaration in support of Reliant's opening brief, a person skilled in the art at the time of the invention would know that cylindrical tablets do not necessarily have circular upper or lower sides. For instance, widely used solid dosage drugs Lipitor® and Tylenol® have elliptical and rounded rectangular cross-sections, respectively. *See* Rhodes Decl. at ¶ 57. Therefore, in the context of the '588 patent, any closed surface would satisfy the definition of a cylinder, not only the right circular cylinder that Par defines. *Id.*

Thus, the Court should adopt Reliant's proposed construction of the term "cylindrical" as "a three-dimensional shape which includes a flat or convex surface in which the height and diameter are, independently of one another, 1-3 mm."

C.    **"A Convex Or Flat Upper Side And Lower Side"**

Reliant proposes that the Court construe the term "a convex or flat upper side and lower side" to mean that "each of the upper side and lower side has a surface that is without marked projections or depressions ('flat') or is curved or rounded outward ('convex')." Par argues that this term means "the two ends of the cylindrical microtablet are ***both*** curved or rounded outward, like the exterior of a sphere, or ***both*** have a continuous horizontal surface

without peaks or depressions." *See* Def. Br. at 19 (emphasis added). Par's proposed definition finds no support in the claims of the patent, the specification, or the file history.

Par's definition unreasonably narrows the scope of the claims to a meaning that would not logically occur to a person of ordinary skill of the art, or to anyone else, reading the patent claims. Par does not, and cannot, cite to even a single sentence in the claims, specification, or file history – or any other document produced in this case – in support of its proposed construction. There is simply nothing in the intrinsic evidence that states that the invention is limited to a delayed release microtablet wherein both the upper side and lower side are convex or both are flat. Nor has Par cited to any scientific literature or other prior art in support of its proposed construction.

Indeed, without support in either the claims or the specification for its proposed definition, Par instead purports to rely on the rules of English grammar in support of its argument. *See* Def. Br. at 20. But even under its own test, Par fails. Par's proposed construction is based in the illogical supposition that the phrase "*a* convex or flat upper side and lower side" is somehow plural. But Par's interpretation is unsupported by anything other than its own purported grammar lesson. Par's grammar, however, includes re-writing the claim term to change its meaning. The Federal Circuit has warned against such attempts to "focus[] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *See Phillips*, 415 F.3d at 1321.

Reliant's construction focuses on the plain meaning of the claim terms in light of the specification. Moreover, Reliant has provided two expert declarations that demonstrate that one of skill in the art would understand the claim term to mean that each of the upper side and

lower side of the claimed delayed release microtablet has a surface that is convex or flat.  *See* Rhodes Decl. at ¶ 64; Hubbell Decl. at ¶ 34.

Thus, Reliant's proposed construction of the term "a convex or flat upper side and lower side" to mean "each of the upper side and lower side has a surface that is without marked projections or depressions ('flat') or is curved or rounded outward ('convex')" is not only consistent with the language of the '588 patent and its file history, but also reflects the understanding of the plain meaning of this term by one skilled in the art.

**D.      "The Tablet Contains No Release-Delaying Ancillary Substance"**

Reliant requests that the Court construe the term "the tablet contains no release-delaying ancillary substance" to mean "the tablet contains no excipient that forms a release-delaying coating or matrix."  Par, in contrast, proposes that the term be construed to mean "the claimed microtablet includes no amount of any chemical element or compound other than the active ingredient that prolongs the diffusion of the active ingredient to any degree."  *See* Def. Br. at 25-26.  Par's proposed construction, however, simultaneously reads into the claims a limitation that is not found in the intrinsic or extrinsic evidence and reads out of the claims preferred embodiments in the patent.

In support of its proposed construction, Par separately parses the meanings of no less than six of the seven words in the claim phrase and then adds another phrase – "to any degree" – that does not appear anywhere in the intrinsic evidence, the several extrinsic dictionaries that Par cites, or the definitions of any word that Par sets forth.  *See* Def. Br. at 26. Instead, Par coins its own term and adds that phrase to its construction in an attempt to narrow the claims.  But Par's proposed construction is directly contradicted by the intrinsic evidence, the knowledge of one of skill in the art, and the prior art.

13

The '588 patent claims a delayed release microtablet with certain characteristics and compositions. Specifically, the claimed delayed-release microtablet comprises an active ingredient of specific formulas and 0.1-5% by weight of a lubricant, and may also comprise 0-18.9% by weight of other conventional ancillary substances. *See* Ex. 3 at Claim 1. Further, the specification teaches that "[i]t is possible to employ all conventional binders or adhesives…" as the "other conventional ancillary substances." *See* Ex. 3 at Col. 3:66-67. It was well known in the art at the time of invention that lubricants and other excipients, including binders, acted to delay or prolong release of the active ingredient from a tablet. *See* Rhodes Decl. at ¶¶ 70-71.

For example, it was well known that lubricants often delayed release of an active ingredient from a tablet. *See* Rhodes Decl. at ¶ 70. Similarly, it was well known in the art that binders, whose primary function is to hold together the tablet, may also impact the release rate of the tablet and slow dissolution of the active ingredient. *See* Rhodes Decl. at ¶ 71.

Significantly, Par's definition narrows the claims such that it **reads out** not only the **preferred embodiments**, but **each and every example of the invention** set forth in the specification. For example, not only is magnesium stearate set forth as the preferred lubricant in the specification, *see* Ex. 3 at Col. 4:7-13, but it is the lubricant used in every example in the patent. Yet, magnesium stearate, at the time of the invention, was a lubricant known to delay release of an active drug. *See* Rhodes Decl. at ¶ 70 (citing the *Handbook of Pharmaceutical Excipients*) ("**Magnesium stearate** is hydrophobic and **may retard the dissolution of drug** from a solid dosage form."). Par's proposed construction of the term "the tablet does not contain a release-delaying ancillary substance," however, would read out the use of magnesium stearate as a lubricant in the claimed microtablets because magnesium stearate will act in some degree to prolong diffusion of the active ingredient. *See* Rhodes Decl. at ¶ 70.

14

Similarly, the patent specification and examples include the binder hydropropylmethylcellulose ("HPMC") as a preferred embodiment of the invention that contains "other ancillary substances" such as binders. *See* Ex. 3 at Cols. 3:66-4:3. HPMC is used as a binder in six of the eight examples in the patent. Ex. 3 at Examples 1-4, 6, 7. In its function as a binder, however, it is inevitable that HPMC will slow dissolution of the active ingredient to some extent. *See* Rhodes Decl. at ¶ 71. This was well known to the skilled artisan at the time of the invention. *See* Rhodes Decl. at ¶ 71. Par's proposed construction of the term "the tablet does not contain a release-delaying ancillary substance," however, would read out HPMC as a binding agent because HPMC will act in some degree to prolong dissolution. *See* Rhodes Decl. at ¶ 71.

Accordingly, Par's proposed construction of "the tablet contains no release-delaying agent" to mean "the claimed microtablet includes no amount of any chemical element or compound other than the active ingredient that prolongs the diffusion of the active ingredient to any degree" cannot be correct. Par's construction does not allow for the preferred embodiments and examples of the invention to fall within the scope of the claims because it excludes any substance, such as the preferred lubricant magnesium stearate and the preferred binder HPMC, "that prolongs the diffusion of the active ingredient *to any degree*." Par's construction, moreover, excludes not only the preferred embodiment, but also excludes every example of the invention included in the '588 patent.

In contrast, Reliant's proposed construction comports with the understanding of one of skill in the art and is supported by the specification and file history of the patent. As set forth in Reliant's opening brief, the intrinsic evidence demonstrates that "the tablet contains no release-delaying ancillary substance" means that "the tablet contains no excipient that forms a release-delaying coating or matrix." *See* Pl. Br. at 13-16.

15

Indeed, the patent specification specifically and repeatedly distinguishes the invention from the prior art release-delaying tablets that contained release-delaying matrices and release-delaying coatings. *See, e.g.*, Ex. 3 at Col. 1:20-24 ("***In the prior art the release of active ingredient from tablets is delayed either by a release-delaying matrix in which the active ingredient is embedded, or by a release-delaying coating*** through which the digestive fluid diffuses in and the active ingredient diffuses out") (emphasis added); *id*. at 8:11-16 (Comparing film-coated delayed release bolus tablets and the microtablets of the invention and reporting that "***the in vivo release is entirely different and, in fact, better according to the invention***, cf. drug levels shown in FIG. 11") (emphasis added); *id.* at Col. 3:13-19 ("***The microtablets accordingly increase therapeutic safety*** … and the bioavailability of this form is unaffected by food intake, ***in contrast to the bolus delayed release [coated] form***") (emphasis added). The prosecution history similarly distinguishes the invention from the prior art release-delaying forms. *See* Ex. 5 at 3 (claimed delayed release microtablets have "surprisingly improved delayed release characteristics compared to other delayed release formats.").

Moreover, at the time of invention, the two primary and well known release delaying excipients were release-delaying matrices and release-delaying coatings. *See* Rhodes Decl. at ¶ 68; Hubbell Decl. at ¶ 42. Accordingly, one of skill in the art at the time of invention would have understood in the context of the invention that a "release-delaying ancillary substance" was a release-delaying coating or a release-delaying matrix. *See* Rhodes Decl. at ¶ 76; Hubbell Decl. at ¶¶ 38, 45.

For all of these reasons, the Court should construe the claim term "the tablet contains no release-delaying ancillary substance" to mean "the tablet contains no excipient that forms a release-delaying coating or matrix."

16

E.    "Lubricant"

Reliant requests that the Court construe the claim term "lubricant" to mean "a pharmaceutical ingredient that reduces friction and prevents tablet adhesion, *e.g.*, talc or magnesium stearate." Par initially sets forth this well-accepted definition, but then adds its own made-up limitation that the lubricant "does not prolong the diffusion of the active ingredient to any degree." Def. Br. at 28. Par's limitation is not found in any of the intrinsic or extrinsic evidence it cites. Accordingly, the Court should reject Par's proposed construction of "lubricant" as "a chemical element or compound that lessens or prevents friction and that does not prolong the diffusion of the active ingredient to any degree" in favor of Reliant's clear construction that comports with the plain meaning of the term to one of skill in the art.

As set forth above in Section II.D, at the time of invention, it was well known to one of skill in the art that lubricants delayed release of an active ingredient from a solid dosage form. *See* Rhodes Decl. at ¶ 70. Yet the claims of the patent recite delayed release microtablets that include a lubricant.

Indeed, the preferred lubricant taught in the '588 patent is magnesium stearate. *See* Ex. 3 at Col. 4:19-13, Examples 1-8. Magnesium stearate is a hydrophobic (low-water-solubility) material and will tend, to some extent, to retard dissolution of the active ingredient from the claimed delayed release microtablets. *See* Rhodes Decl. at ¶ 70. Magnesium stearate is used as a lubricant in every example in the patent. Accordingly, Par's proposed construction reads out the preferred embodiment of the claims and every example of the patent. If Par's construction was adopted, the claims would allow only lubricants that "do[] not prolong the diffusion of the active ingredient to any degree." Def. Br. at 28. That construction cannot be correct.

Thus, the Court should adopt the plain meaning of the term "lubricant" as "a pharmaceutical ingredient that reduces friction and prevents tablet adhesion, *e.g.*, talc or magnesium stearate."

**F.    "Other Conventional Ancillary Substances"**

Reliant requests that the Court construe the term "other conventional ancillary substances" to mean "commonly used pharmaceutical ingredients other than an active pharmaceutical ingredient, a lubricant, or a 'release-delaying ancillary substance' as defined above, *e.g.*, binders, adhesives, colorants, stabilizers, fillers, wetting agents, and flow regulators." Consistent with its pattern of reading into the claims limitations that it has coined itself, Par proposes a construction that unduly narrows the claim term and contradicts the plain meaning of the term to one of skill in the art. Par's proposed construction of "other conventional ancillary substances" to mean a "chemical element or compound, other than a lubricant or the active ingredient, that does not prolong the diffusion of the active ingredient to any degree" (Def. Br. at 28) should be rejected because it reads out of the claims a preferred embodiment of the invention set forth in the specification and examples of the patent.

Both Par and Reliant set forth the meaning of the term "other conventional ancillary substances" to one of skill in the art in the context of the patent claims, *i.e.*, a commonly used compound other than a lubricant, an active ingredient, or a release-delaying agent. Par, however, urges that the Court further read the phrase "does not prolong the diffusion of the active ingredient *to any degree*" into the common definition known to one of skill in the art. As in the case of the claim terms "the tablet contains no release-delaying ancillary substance" and "lubricant," Par is effectively asking the Court to adopt a construction that reads into the claim a limitation that is found nowhere in the specification or prosecution history and that is contrary to the teachings of the '588 specification.

18

As set forth above in Section II.D, as of the time of the invention, one of ordinary skill in the art would have known that conventional pharmaceutical excipients such as binders act, to some extent, to delay the release of active ingredient from a solid dosage form. *See* Rhodes Decl. at ¶ 75. Indeed, the binder HPMC was known to delay release when acting as a binder. *See* Rhodes Decl. at ¶ 71. The claims of the patent, however, explicitly allow for the addition of between 0-18.9% of "other conventional ancillary substances." The specification states that such substances include binders. Ex. 3 at Col. 3:66-67. Moreover, the delayed release microtablets set forth in six of the eight Examples in the '588 patent use HPMC as the "other conventional ancillary substance." Ex. 3 at Examples 1-4, 6, 7.

Accordingly, Par's construction of the claim term "other conventional ancillary substances" to include the phrase "does not prolong the diffusion of the active ingredient *to any degree*" cannot be correct because it reads out of the claims the patent's preferred "other conventional ancillary substance," HPMC.

As set forth in Reliant's opening brief, the plain ordinary meaning of the term "other conventional ancillary substances" in the context of the patent is "commonly used pharmaceutical ingredients other than an active pharmaceutical ingredient, a lubricant, or a 'release-delaying ancillary substance' as defined above, *e.g.*, binders, adhesives, colorants, stabilizers, fillers, wetting agents, and flow regulators." As stated above, "release-delaying ancillary substance" in the context of the patent means a release-delaying coating or a release-delaying matrix. Reliant's proposed construction comports with the understanding of one of skill in the art. *See* Rhodes Decl. at ¶ 86; Hubbell Decl. at ¶ 51.

19

G.    **"Release Rate Is Virtually Independent Of The Pressure When Compressing The Tablets"**

Reliant proposes that the claim term "release rate is virtually independent of the pressure when compressing the tablets" be construed to mean "within the ordinary range of compression used in the formulation of pharmaceutical tablets, the effect of the pressure when compressing the tablets on the release rate of the active ingredient can be neglected for practical purposes." Par proposes that the Court construe this term to mean "the effect of differences in force per area exerted to form the claimed microtablet on the percent diffusion of the active ingredient from the microtablet over time can be neglected for practical purposes." Def. Br. at 24. Par's proposed construction is unnecessarily complex and adds confusion to an otherwise clear term. Accordingly, the Court should adopt Reliant's straightforward, plain-meaning construction.

Par, by defining terms such as "pressure" and "release rate" obfuscates the clear meaning of the claim term that is set forth in the patent claims and specification using words that are readily understood by one in the art. A person of ordinary skill in the art, having experience in formulation and evaluation of pharmaceutics, is able to understand these terms without the aid of a dictionary. *See* Rhodes Decl. at ¶ 88; Hubbell Decl. at ¶ 57.

Therefore, the Court should adopt Reliant's more straightforward construction, reflecting the plain and ordinary meaning of the term "release rate is virtually independent of the pressure when compressing the tablets." Accordingly, the term should be construed to mean "within the ordinary range of compression used in the formulation of pharmaceutical tablets, the effect of the pressure when compressing the tablets on the release rate of the active ingredient can be neglected for practical purposes."

H.     **"Active Ingredient Density"**

Reliant requests that the Court construe "active ingredient density" to refer to the "density of the active ingredient in the delayed release microtablet." Par, in contrast, contends that the claim term refers to the density of the active ingredient "used to make the claimed microtablet." Def. Br. at 23. Notably, only Reliant cites intrinsic evidence in support of its proposed construction.

As set forth in Reliant's opening brief, the context of the patent claims, specification and prosecution history make clear that "active ingredient density" refers to an attribute or characteristic of the *microtablet*. For example, Claim 1 recites "A cylindrical delayed release microtablet … *wherein* … (c) the active ingredient density is greater than 1." Ex. 3 at Claim 1. Thus, "the active ingredient density" refers to a characteristic of the microtablet. *See* Rhodes Decl. at ¶ 95; Hubbell Decl. at ¶ 62.

Consistent with the claims, the specification and file history make clear that the density refers to the density of the microtablet. *See, e.g.*, Ex. 3 at Col. 1:9-12 ("The present invention relates to cylindrical *microtablets* of β-phenylpropiophenone derivatives *with a high content and density of active ingredient*") (emphasis added); Ex. 5 at 2 ("The cylindrical delayed release microtablet of the present invention is required to … *have an active ingredient density* that is greater than 1") (emphasis added); *id.* at 2-3 ("Applicants have found that by preparing a *microtablet having the required … active ingredient density*, containing the β-phenylpropiophenone derivative of formula I as its active ingredient, it is possible to provide a microtablet that has surprisingly improved delayed release characteristics compared to other delayed release formats.") (emphasis added). *See also* Rhodes Decl. at ¶ 97; Hubbell Decl. at ¶ 64.

Par ignores the plain language of the claims, the specification and the file history, instead citing to its own supply chain of generic propafenone, in a misguided attempt to construe the term to mean the bulk density used to make the microtablet. *See* Def. Br. at 24. But Par's proposition is illogical. The delayed release microtablets of the invention are made by compression of the active ingredient. This compression "squeezes out most of the air" from the bulk mixture. Rhodes Decl. at ¶ 19. Since density is a measure of mass per unit volume, the compression of the bulk dosage form necessarily increases the density by compressing the same mass into a smaller volume. The '588 patent claims a delayed release ***microtablet*** wherein the active ingredient density is greater than 1; it does not claim a bulk mixture wherein the active ingredient density is greater than 1. Thus, pursuant to the patent claims themselves, the density must be measured by reference to the microtablet.

Accordingly, the Court should construe the claim term "active ingredient density" to mean "the density of the active ingredient in the delayed release microtablet."

## I.    "A Pronounced Plasma Level Plateau With A PTF<75%"

Reliant requests that the Court construe "a pronounced plasma level plateau with a PTF<75%" to mean "a plasma level plateau with a peak to trough fluctuation (PTF) of less than 75%, where peak to trough fluctuation is defined as $PTF(\%) = \dfrac{C_{\max} - C_{\min}}{\dfrac{AUC}{\Delta t}} \times 100$." Par agrees that PTF is specifically defined in the specification by the above formula but introduces ambiguity into the otherwise clear claim term by adding two extraneous phrases that require that the plateau be "markedly level" during an undefined "relevant time interval." *See* Def. Br. at 29. Par's proposed construction should be rejected.

22

As set forth in Reliant's opening brief, the specification expressly provides that a pronounced blood level plateau was evidenced by the PTF and exemplified in Figure 11 of the patent:

> Despite the short half-life, a pronounced blood level plateau develops (FIG. 11). The fluctuations in the blood level are considerably less with the microtablets. This is evident from the $t_{75\%}$ (period in the dosage interval during which the plasma levels are at least 75% of the maximum level), which is 8 to 9 hours with the microtablets according to the invention compared with 5 to 6 hours with the bolus delayed release form, and from the PTF …
>
> $$PTF(\%) = \dfrac{\dfrac{C_{max} - C_{min}}{AUC}}{\Delta t} \times 100$$
>
> for the AUC … which has a value for the microtablets which is only about half that for the bolus forms, in particular less than 75[%], preferably less than 60%.

Ex. 3 at Col. 2:60-3:13 (citations omitted), Fig. 11. *See also* Rhodes Decl. at ¶ 101; Hubbell Decl. at ¶ 69.

One of skill in the art need only read the specification to have an understanding of a term that is defined by a clear mathematical formula. Accordingly, the Court should construe "a pronounced plasma level plateau with a PTF<75%" to mean a plasma level plateau with a peak to trough fluctuation of less than 75%, where PTF is defined by the formula set forth in the specification. Rhodes Decl. at ¶ 102; Hubbell Decl. at ¶ 67.

### J.    "Bioavailability Does Not Depend On The Intake Of Food"

Reliant requests that the Court construe the claim term "bioavailability does not depend on the intake of food" to mean "bioavailability of the active pharmaceutical ingredient is unaffected by food intake for practical purposes." As set forth in Reliant's opening brief, this construction is consistent with the patent claims and specification.

23

Par's proposed definition, "the ingestion of food has no effect on the rate and amount of the active ingredient in the claimed microtablet that reaches the blood" (Def. Br. at 31) obfuscates the meaning of the term. For example, "bioavailability" is a term of art that needs no definition to a skilled artisan. Par's definition adds uncertainty by defining the term without describing how or when the "rate and amount" of drug "that reaches the blood" should be measured, or if it intends its definition to be different from the term as used in the art. *See* Def. Br. at 31.

Similarly, Par's addition of the phrase "no effect" is a masked attempt to improperly limit the claim term. Par seeks to impose a negative limitation where one does not exist in the claims. Moreover, Par's limitation is unclear: does it mean "no effect" in the absolute sense; "no effect" that can be measured on standard equipment; "no effect" that can be determined to be statistically significant; "no effect" clinically; "no effect" upon single administration or repeated administration? Any of these are possible interpretations of Par's proposed construction that make an otherwise clear phrase equivocal.

In contrast, Reliant's proposed construction comports with the patent claims and specification. Specifically, the specification states that "the bioavailability of this form [*i.e.*, the delayed release microtablet of the invention] is unaffected by food intake, in contrast to the bolus delayed release form. The AUC found for the bolus delayed release form is 50% higher when fasting." *See* Ex. 3 at Col. 3:17-21. *See also* Hubbell Decl. at ¶ 72. The specification describes studies on volunteers that demonstrate that upon repeated administration of the claimed delayed release microtablets, the bioavailability of the active ingredient was similar in the fasting and non-fasting states. *See* Ex. 3 at Table 1; Rhodes Decl. at ¶ 104. One of skill in the art would understand this claim term to mean that the bioavailability of the active pharmaceutical

ingredient is unaffected by food intake for practical purposes.  Rhodes Decl. at ¶ 105; Hubbell Decl. at ¶ 71.

Accordingly, the Court should construe the claim term "bioavailability does not depend on the intake of food" to mean "bioavailability of the active pharmaceutical ingredient is unaffected by food intake for practical purposes."

**K.     "Cylindrical Mold"**

Reliant proposes that the Court construe the term "cylindrical mold" to mean "die and punch in which a formulation is formed into a 'cylindrical' shape (as defined above)."  Par's proposed construction of this term is "a cavity for forming a substance into the shape of a cylinder, a solid figure traced out when a rectangle rotates around one of its sides as the axis of rotation, with two parallel circles of equal size at the ends."  Def. Br. at 32.

The Court should adopt the construction of the term "cylindrical mold" proposed by Reliant.  Par's proposed construction is contradicted by the claims of the '588 patent, the specification, and the file history.  For all of the reasons set forth above regarding the claim term "cylindrical," Par's definition of "cylindrical mold" should be rejected.  *See supra* Section II.B.

Instead of looking to the field of the invention, Par relies only on a dictionary to define the term "mold."  *See* Def. Br. at 33.  Reliant's construction of this term as die and punch in which a formulation is formed is preferable because it comports with the plain meaning of the term "mold" as understood by a person of ordinary skill in the art at the time of the invention.  *See* Hubbell Decl. at ¶ 76; Rhodes Decl. at ¶ 109.  In addition, Reliant's proposed construction is consistent with the '588 patent specification, which discloses a non-limiting example of tooling that comprises "a suitable tabletting machine equipped with multiple microtablet punches."  Ex. 3 at Col. 4:19-20.

Accordingly, the Court should construe the term "cylindrical mold" to mean "a die and punch in which a formulation is formed into a 'cylindrical' shape."

**L.    The Term "The Active Ingredient Content Is In The Range From 81 To 99.9% Of The Weight Of The Microtablet" Does Not Need Construction**

There is no need to construe the claim language "the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet" because the meaning of the phrase is clear on its face. Neither party disputes, for example, what the "active ingredient" is, what "content" means and that a range is recited in the claims. However, to the extent that the Court believes a construction is necessary, the Court should reject Par's urging that the "applicants intended 81% and 99.9% to be precise end points for the claimed range." *See* Def. Br. at 22. Indeed, by inserting the word "precise" into the claim construction analysis, as with the case of many of its other proposed constructions, Par actually makes the claim less clear.

For example, the claim phrase recites "the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet." Par does not – and cannot – explain why the language of the phrase is not clear on its face. Instead, Par proposes that the claim be defined as a "precise" lower limit of 81 and a "precise" upper limit of 99.9%. Yet, Par does not explain what it means by the term "precise," and indeed, numbers by their nature are only as precise as their significant figures allow. *See U.S. Philips Corp. v. Iwasaki Elec. Co., Ltd.*, 505 F.3d 1371, 1377 (Fed. Cir. 2007) ("We emphasize that the claim construction we affirm today should not be read to state the endpoints of the claimed range with greater precision than the claim language warrants. In some scientific contexts, '1' represents a less precise quantity than '1.0,' and '1' may encompass values such as 1.1 that '1.0' may not").

Thus, Par's proposal to cloud the meaning of the claim should be rejected. *See Synthes (USA) v. Smith & Nephew, Inc.*, No. 03-CV-0084, 2008 WL 343114, at *18 (E.D. Pa.

Feb. 4, 2008) ("Neither party has explained how its proffered definition would be any clearer for a juror than the plain language of term in the claim itself . . . in fact, the ambiguity of 'generally' may actually make its meaning ***less clear***" (emphasis in original)).  *See also U.S. Surgical v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

    In any event, Par's citation of the '588 patent specification as supporting its proposed construction is a red herring.  Neither party disputes that the terms "about" or "approximately" do not appear in the claim phrase.  Moreover, far from reciting precise figures, each and every Example in the '588 patent employs rounding.  *See*, *e.g.*, Ex. 3 at Example 1 (propafenone content, calculated by dividing 6.25 by 6.50 is listed as 96%); *id.* at Example 5 (propafenone content is listed as 86%).

    Accordingly, the claim language "the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet" does not need to be construed at all, let alone construed pursuant to Par's proposed "precise upper and lower limit."  Should the Court decide to construe the claim term, it should be defined to mean "the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet."

<u>**CONCLUSION**</u>

    For all of the foregoing reasons, Reliant requests that the claim terms of the '588 patent be construed as follows:

    (1)    Delayed release microtablet:  a small unit of solid medicament prepared by compaction in which the release of active ingredient after 3 hours is not more than 80% and after 24 hours is not less than 80%;

    (2)    Cylindrical:  a three-dimensional shape which includes a flat or convex surface in which the height and diameter are, independently of one another, 1-3 mm;

(3)    Convex or flat upper side and lower side:  each of the upper side and lower side has a surface that is without marked projections or depressions ("flat") or is curved or rounded outward ("convex");

(4)    The tablet contains no release-delaying ancillary substance:  the tablet contains no excipient that forms a release-delaying coating or matrix;

(5)    Lubricant:  a pharmaceutical ingredient that reduces friction and prevents tablet adhesion, *e.g.*, talc or magnesium stearate;

(6)    Other conventional ancillary substances:  commonly used pharmaceutical ingredients other than an active pharmaceutical ingredient, a lubricant, or a "release-delaying ancillary substance" as defined above, *e.g.*, binders, adhesives, colorants, stabilizers, fillers, wetting agents, and flow regulators;

(7)    Release rate is virtually independent of the pressure when compressing the tablets:  within the ordinary range of compression used in the formulation of pharmaceutical tablets, the effect of the pressure when compressing the tablets on the release rate of the active pharmaceutical ingredient can be neglected for practical purposes;

(8)    Active ingredient density:  the density of the active ingredient in the delayed release microtablet;

(9)    A pronounced plasma level plateau with a PTF<75%:  a plasma level plateau with a peak to trough fluctuation of less than 75%, where peak to trough fluctuation is defined as $PTF(\%) = \dfrac{\dfrac{C_{max} - C_{min}}{AUC}}{\Delta t} \times 100$;

(10)    Bioavailability does not depend on the intake of food:  bioavailability of the active pharmaceutical ingredient is unaffected by food intake for practical purposes;

28

(11)    Cylindrical mold:  die and punch in which a formulation is formed into a "cylindrical" shape (as defined above); and

(12)    The active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet:  the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiff*

OF COUNSEL:

John M. Desmarais
Gerald J. Flattmann, Jr.
Christine Willgoos
KIRKLAND & ELLIS LLP
Citigroup Center
153 E. 53rd Street
New York, NY  10022
(212) 446-4800

March 19, 2008
2163015

29

### CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2008 I electronically filed the foregoing with

the Clerk of the Court using CM/ECF, which will send notification of such filing to:

Josy W. Ingersoll, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR

I further certify that I caused to be served copies of the foregoing document on

March 19, 2008 upon the following in the manner indicated:

Josy W. Ingersoll, Esquire                          *VIA ELECTRONIC MAIL*
YOUNG, CONAWAY, STARGATT & TAYLOR                          *and HAND DELIVERY*
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

John G. Taylor, Esquire                             *VIA ELECTRONIC MAIL*
James K. Stronski, Esquire
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, NY  10151


*/s/ Jack B. Blumenfeld*

_____
Jack B. Blumenfeld (#1014)

# Exhibit 6

# Webster's Encyclopedic Unabridged Dictionary of the English Language

RECEIVED LIBRARY

JAN 1 2 2003

KIRKLAND & ELLIS LLP
NEW YORK OFFICE



**PORTLAND HOUSE • NEW YORK**

ACKNOWLEDGMENTS AND PERMISSIONS:

The "A Dictionary of the English Language" section of this book *(Webster's Encyclopedic Unabridged Dictionary)* is based on the first edition of *The Random House Dictionary of the English Language, the Unabridged Edition*, copyright © 1983.

*Atlas of the World*, copyright © 1984 by John Bartholomew & Son Limited. Reprinted by arrangement with John Bartholomew & Son Limited.

*A Manual of Style*, copyright © 1986 by Crown Publishers, Inc. Excerpted and reprinted by arrangement with Crown Publishers, Inc.

Krevisky, Joseph and Jordan L. Linfield—*The Bad Speller's Dictionary*, copyright © 1967, 1963 by Innovation Press. Reprinted by arrangement with Random House, Inc.

Stein, Jess, Ed.—*Rhyming Dictionary*, copyright © 1960 by Random House, Inc. Reprinted by arrangement with Random House, Inc.

Weiman, Ralph—*Living Language ™ Common Usage Dictionary, French-English/English-French*, copyright 1946, 1955, © 1968, 1974, 1983, 1985 by Crown Publishers, Inc. Reprinted by arrangement with Crown Publishers, Inc.

Martin, Genevieve A. and Theodor Bertram—*Living Language ™ Common Usage Dictionary, German-English/English-German*, copyright © 1956, 1985 by Crown Publishers, Inc. Reprinted by arrangement with Crown Publishers, Inc.

Martin, Genevieve A. and Mario Ciatti—*Living Language ™ Common Usage Dictionary, Italian-English/English-Italian*, copyright © 1956, 1985 by Crown Publishers, Inc. Reprinted by arrangement with Crown Publishers, Inc.

Weiman, Ralph and O. A. Succar—*Living Language ™ Common Usage Dictionary, Spanish-English/English-Spanish*, copyright 1946, © 1955, 1968, 1974, 1983, 1985 by Crown Publishers, Inc. Reprinted by arrangement with Crown Publishers, Inc.

*Webster's Crossword Puzzle Dictionary*, 1986 edition, copyright © 1963 by Fawcett Publications, Inc. and copyright © 1964 by Ottenheimer Publishers, Inc. Reprinted by arrangement with Ottenheimer Publishers, Inc.

Copyright © 1989 by dilithium Press, Ltd.
All rights reserved.

This 1989 edition is published by Portland House, a division of dilithium Press, Ltd., distributed by Crown Publishers, Inc., 225 Park Avenue South, New York, New York 10003.

Printed and Bound in the United States of America

Library of Congress Cataloging-in-Publication Data

Webster's encyclopedic unabridged dictionary of the English language.
1. English language—Dictionaries.
PE1625.W46 1989
423—dc19 89-3785
CIP

ISBN 0-517-68781-X

h g f e d c b

Case 1:06-cv-00774-JJF     Document 205-2     Filed 03/19/2008     Page 4 of 4

*to riffle through a book.* **7.** *Cards:* to shuffle by dividing the deck in two, raising the corners slightly, and allowing them to fall alternately together. [b. RIPPLE¹ and RUF-FLE¹]

**riff·raff** (rif′raf′), *n.* **1.** the worthless or disreputable element of society; rabble: *the riffraff of the city.* **2.** worthless or low persons: *a pack of riffraff.* **3.** trash; rubbish. [ME *rif and raf* every particle, things of small value < OF *rif et raf*, formed on *riffer* to spoil (see RIFLE²), *raffler* to ravage, snatch away]

**ri·fle¹** (rī′fəl), *n., v.,* **-fled, -fling.** —*n.* **1.** a shoulder firearm with spiral grooves cut in the inner surface of the gun barrel to give the bullet a rotatory motion and thus render its flight more accurate. **2.** one of the grooves. **3.** a cannon with such grooves. **4. rifles,** (*often cap.*) any of certain military units or bodies equipped with rifles. —*v.t.* **5.** to cut spiral grooves within (a gun barrel, pipe, etc.). **6.** *Informal.* to propel (a ball) at high speed, as by throwing or hitting with a bat. [< LG *rifel(n)* (to) groove, deriv. of *rive, riefe* groove, flute, furrow; akin to OE *rifelede* wrinkled, *rīf* violent]

**Rifle (Garand)**

**ri·fle²** (rī′fəl), *v.t.,* **-fled, -fling.** **1.** to ransack and rob (a place, receptacle, etc.). **2.** to search and rob (a person). **3.** to plunder or strip bare. **4.** to steal or take away. [ME *rifel* < OF *rifler*(to) scrape, graze, plunder < D *riffel(en)* (to) scrape; c. RIFLE¹] —**ri′fler,** *n.* —Syn. **1.** See **rob.**

**ri·fle bird,** any of several birds of paradise having a long bill, dark plumage, and elaborate courtship displays, as *Craspedophora magnifica* (**magnificent rifle bird**).

**ri·fled slug′,** a shotgun projectile with helical grooves on its sides for imparting a spin to it when it is fired through the smooth bore of the shotgun.

**ri·fle grenade′,** *Mil.* a grenade designed to be fired from a grenade launcher attached to the muzzle of a rifle or carbine.

**ri·fle·man** (rī′fəl mən), *n., pl.* **-men.** **1.** a soldier armed with a rifle. **2.** an expert in the use of the rifle. [RIFLE¹ + MAN¹] —**ri′fle·man·ship′,** *n.*

**ri·fle pit′,** a pit or short trench affording shelter to riflemen in firing at an enemy.

**ri·fle range′,** **1.** a firing range for practice with rifles. **2.** the range of, or distance coverable by, a bullet fired from a rifle: *The enemy was within rifle range.*

**ri·fle·ry** (rī′fəl rē), *n.* the art, practice, or sport of shooting at targets with rifles. [RIFLE¹ + -RY]

**ri·fling** (rī′fling), *n.* **1.** the act or process of cutting spiral grooves in a gun barrel, pipe, etc. **2.** the system of spiral grooves so cut. [RIFLE¹ + -ING²]

**rift** (rift), *n.* **1.** an opening made by splitting, cleaving, etc.; fissure; cleft; chink. **2.** an open space, as in a forest or cloud mass, or a clear interval. **3.** a break in friendly relations: *a rift between two people; a rift between two nations.* **4.** a difference in opinion, belief, or interest that causes such a break in friendly relations. [b. Geol. **a.** a fault. **b.** a valley along the trace of a fault. **6.** the plane or direction along which a log or mass of granite can most easily be split. **7.** wood or a piece of wood than has been split radially from a log. —*v.t.,* *v.i.* **8.** to burst open; split. [ME < Scand; cf. Dan *rift* cleft; akin to RIVE] —**rift′less,** *adj.*

**rift³** (rift), *n.t.* *Dial.* **1.** to belch. **2.** to break wind. [ME *riften* < ON *ryfta;* cf. root *rop* to belch]

**rift′ saw′,** a saw used for cutting wood radially from a log.

**rift′-sawed** (rift′sôd′), *adj.* **1.** (of lumber) sawed radially so that the broader sides of the boards or timbers are approximately perpendicular to the annual rings. **2.** quartersawed. Also, **rift′-sawn** (rift′sôn′).

**rig** (rig), *v.,* **rigged, rig·ging,** *n.* —*v.t.* **1.** *Chiefly Naut.* **a.** to put in proper order for working or use. **b.** to fit (a vessel, a mast, etc.) with the necessary shrouds, stays, etc. **c.** to fit (shrouds, stays, sails, etc.) to the mast, yard, or the like. **2.** to furnish or provide with equipment, clothing, etc.; fit (usually *fol.* by *out* or *up*). **3.** to assemble, install, or prepare (often *fol.* by *up*). **4.** to manipulate fraudulently: *to rig prices.* **5.** *rig down, Naut.* to place in an inactive state, stowing all lines, tackles, and other removable parts: *to rig down a donkey engine.* **6. rig up,** to equip or set up for use: *to rig up a donkey engine.* —*v.i.* **7.** the arrangement of the masts, spars, sails, etc., on a boat or ship. **8.** apparatus for some purpose; equipment; outfit; gear: *a hi-fi rig; a fishing rig.* **9.** *Informal.* costume or dress, esp. when outlandish: *What strange rig is that!* **10.** *Informal.* a vehicle with its horse or horses than draw it. **11.** the equipment used in drilling an oil well. **12.** *Informal.* a tractor-trailer rig. **13.** *Informal.* a plan or trick, esp. when dishonest or malicious; swindle. —*v. fol.* by *out.* **14.** *Informal.* a particular purpose: *That was quite a rig she wore to the party. He looks quite nifty in a butler's rig.* [ME *riggen?* < Scand; cf Dan *rigge,* Sw *rigga* (på) to fasten]

**rig²** (rig), *n. Scot. and North Eng.* ridge. [ME (north), OE *hrycg* RIDGE]

**rig³** (rig), *n. Brit. Dial.* a tempest; storm. [ME *rig(e)* < Scand; cf. OIcel *hregg* storm, blast]

**Rī·ga** (rē′gə), *n.* **1.** a seaport in and the capital of the Latvian Republic, in the W Soviet Union in Europe, on the Gulf of Riga. 657,000 (1965). **2. Gulf of,** an arm of the Baltic between the Latvian and Estonian republics of the Soviet Union. 90 mi. long.

**rig·a·doon** (rig′ə dōōn′), *n.* **1.** a lively dance, formerly popular, for one couple, characterized by a peculiar jumping step and usually in quick duple meter. **2.** a piece of music for this dance or in the rhythm. Also, **rigaudon.** [< F *rigaudon,* perh. from name *Rigaud*]

**rig·a·ma·role** (rig′ə mə rōl′), *n.* rigmarole.

**rig·a·ree** (rig′ə rē′, rig′ə rē′), *n. Glassmaking.* decoration consisting of glass filaments applied to a glass vessel in parallel vertical lines and bent into contiguous bands. [?]

**rig·a·to·ni** (rig′ə tō′nē), *n. Italian Cookery.* a tubular pasta in short, ribbed pieces. [< It (sing.), equiv. to *rigato* furrowed, lined, striped (ptp. of *rigare,* deriv. of *riga* a line)]

**Ri·gau·don** (Fr. rē gō dōn′), *n., pl.* **-dons** (Fr. -dōn′). rigoudon.

**Ri·gel** (rī′jəl, -gəl), *n. Astron.* a first-magnitude star in the constellation Orion. [< Ar *rijl* foot, so called from its position in the left foot of the figure of Orion]

**rigged′ oar′,** *Naut.* an oar mounted in an oarlock, as at the stern of a small boat for sculling or steering.

**rig·ger** (rig′ər), *n.* **1.** one who rigs. **2.** one whose occupation is the fitting of the rigging of ships. **3.** one who works with hoisting tackle, cranes, scaffolding, etc. **4.** a protective structure around a construction site. **5.** *Aeron.* a mechanic skilled in the assembly, adjustment, and alignment of aircraft control surfaces, wings, and the like. [RIG¹ + -ER¹]

**rig·ging** (rig′ing), *n.* **1.** the ropes, chains, etc., employed to support and work the masts, yards, sails, etc., on a ship. **2.** lifting or hauling tackle. **3.** *Informal.* clothing. [RIG¹ + -ING¹]

**rig·ging** (rig′ing), *n. Scot. and North Eng.* ridge. [ME (north); see RIG², -ING¹]

**rig·ging bat′ten,** *Naut.* a batten seized to a shroud or stay to prevent chafing. Also called **scotch-man.**

**rig·ging loft′,** a covered area where the rigging of vessels is prepared.

**rig·ging plan′,** *Naval Archit.* a side elevation of a vessel showing all standing and running rigging, all booms, yards, etc., as it set directly fore-and-aft: often combined with a sail plan.

**Riggs′ disease′** (rigz), *Dentistry.* pyorrhea (def. 2). [named after John M. Riggs (1810–85), American dentist]

**right** (rīt), *adj.* **1.** in accordance with what is good, proper, or just: *right conduct.* **2.** in conformity with fact, reason, or some standard or principle; correct: *the right solution.* **3.** correct in judgment, opinion, or action. **4.** sound or normal, as the mind: *to be in one's right mind.* **5.** sane, as persons: *She wasn't right in her head when she made the will.* **6.** in good health or spirits: *He is all right again.* **7.** in a satisfactory state; in good order: *to put things right.* **8.** principal, front, or upper: *the right side of cloth.* **9.** most convenient, desirable or favorable: *Chicago is the right location for a meatpacking firm.* **10.** fitting or appropriate; suitable: *to say the right thing at the right time.* **11.** genuine; authentic: *the right owner.* **12.** noting, of, near, or pertaining to the side of a person or thing that is turned toward the east when the face is toward the north (opposed to *left*). **13.** (*often cap.*) noting, of, or pertaining to political conservatives and their beliefs. **14.** straight: *a right line.* **15.** formed or placed so as to be perpendicular: *a right angle.* **16.** *Geom.* having an axis perpendicular to the base: *a right cone.* **17.** *Math.* pertaining to an element of a set which has a given property when placed on the right of an element or set of elements of the given set; *a right identity.* **18.** too right, *Australian Slang.* **a.** (used as an expression of emphatic agreement.) **b.** okay: *"Can we meet tonight?"* *—"Too right."*

**—n. 19.** a just claim or title, whether legal, prescriptive, or moral: *He has a right to say what he pleases.* **20.** Sometimes, **rights.** that which is due to anyone by just claim, legal guarantees, moral principles, etc.: *Freedom of speech is a right of all Americans.* **21.** adherence or obedience to moral and legal principles and authority. **22.** that which is morally, legally, or ethically proper: *He was taught to do right.* **23.** a moral, ethical, or legal principle considered as an underlying cause of truth, justice, morality, or ethics. **24.** Sometimes, **rights.** the interest or ownership a person, group, or business has by property: *He has a 50-percent right in a silver mine. The author controls the screen rights for the book.* **25.** the property itself or its value.

**26.** *Finance.* **a.** the privilege, usually preemptive, that accrues to the owners of the stock of a corporation to subscribe to additional shares of stock or securities convertible into stock at an advantageous price. **b.** Often, **rights,** the privilege of subscribing to a specified amount of a stock or bond issue, or the document certifying this privilege. **27.** that which is correct with fact, reason, propriety, the correct way of thinking, etc. **28.** the state or quality of an instance of being correct. **29.** the side that is normally opposite to that where the heart is; the direction toward that side: *to turn to the right.* **30.** a right-hand turn: *Make a right at the top of the hill.* **31.** the movement toward the right, as of troops in battle formation: *Our right crumbled.* **32.** (in a pair) the member that is shaped for, used by, or situated on the right side: *To throw a left or a right.* **33.** the right hand: *Jab with your left and punch with your right.* **34.** (*usually cap.*) the part of a legislative assembly, esp. in continental Europe, that is situated on the right side of the presiding officer and that is customarily assigned to members of the legislature who hold more conservative or reactionary views than the rest of the members. **35.** the members of such an assembly who sit on the Right. **36.** the **Right, a.** the complex of individuals or organized groups espousing any change in a liberal direction and usually advocating rigid maintenance of the established social, political, or economic order, often by authoritarian means. **b.** the position held by these people: *The Depression led to a movement away from the Right.* Cf. **left** (defs. 7a, b). **c.** See **right wing** (def. 3). **37.** *Boxing.* a blow delivered by the right hand: *a right to the jaw.* **38.** *Baseball.* See **right field. 39.** by rights, in fairness; justly: *The people should by rights have been given a voice in their government.* **40.** in one's own right, by reason of one's own ability, ownership, etc.; in or of oneself, as independent of others: *He is a rich man in his own right.* **41.** in the right, having the support of reason or law; correct: *It pays to be stubborn when one is in the right.* **42.** *Mil., rights.* **a.** the suitable man for a woman to marry: *She'll know what to do when Mr. Right comes along.* **43.** to rights, into proper condition or order: *to set a room to rights.* —*adv.* **44.** in a straight line; straightly; directly: *right to the bottom; to come right home.* **45.** quite; completely; all the way: *His hat was knocked right off.* **46.** immediately; promptly: *right after dinner.* **47.** exactly; precisely: *right here.* **48.** uprightly; righteously: *to obey one's conscience and live right.* **49.** correctly or accurately: *to guess right.* **50.** properly or fittingly: *to behave right.* **51.** advantageously, favorably, or

**well: to turn out right. 52.** toward the right hand; on or to the right: *to keep right; to turn right.* **53.** *Chiefly Dial.* extremely: *I was right glad to be there.* **54.** very (used in certain titles): *the right reverend.* **55.** right and left, on every side; in all directions: *throwing his clothes left, on every side; in all directions: throwing his clothes right and left; members resigning right and left.* **56. right away** or **off,** without hesitation; immediately: *She made a bad impression right off.*

**—t. 57.** to put in or restore to an upright position: *to right a fallen lamp.* **58.** to put in proper order, condition, or relationship: *to right a crookedly hung picture.* **59.** to bring into conformity with justice or right; *to bring one's point of view.* **60.** to do justice to; avenge: *to be righted in court.* **61.** to redress, as a wrong.

**—t. 62.** to resume an upright or the proper position: *After the storm the saplings righted.* [ME *reht, riht;* c. D, G *recht,* Icel *rétt(r),* Goth *raiht(s);* akin to L *rectus*]

—**Syn. 1.** equitable, fair, honest, lawful. **2.** accurate, true. **8.** obverse. **9.** proper. **10.** fit, seemly. **11.** rightful. **22.** morality, virtue, justice, fairness, integrity, equity, rectitude. **48.** rightfully, lawfully, rightly, justly, fairly, equitably. **50.** appropriately, suitably. —**Ant. 1.** wrong.

**right-a·bout** (rīt′ə bout′), *n.* **1.** the position assumed by turning about to the right so as to face in the opposite direction. **2.** the act of turning so as to face the opposite direction. —*adv.* **3.** facing or in the opposite direction: *More than their rightabout.* Also, **right′-a-bout′.** [RIGHT + ABOUT]

**right′ about′ face′, 1.** *Mil.* **a.** a command, given to a soldier or soldiers at attention, to turn the body about toward the right so as to face in the opposite direction. **b.** the act of so turning in a prescribed military manner. **2.** rightabout (def. 2). —*v. complete reversal,* as of conduct, opinion, etc. Also, **right′-a-bout′-face′, right′-a-bout′-face′.**

**right′ an′gle,** the angle formed by two radii of a circle than are drawn to the extremities of an arc equal to one quarter of the circle; an angle of 90°. —**right′-an′gled,** *adj.*

**right′ ascen·sion,** *Astron.* the arc of the celestial equator measured eastward from the vernal equinox to the foot of the great circle passing through the celestial poles and a given point on the celestial sphere, expressed in degrees or hours.

**Right′ Bank′,** a part of Paris, France, on the N bank of the Seine. Cf. **Left Bank.**

**right′ cir′cular cone′,** *Geom.* a cone whose surface is generated by lines joining a fixed point to the points of a circle, the fixed point lying on a perpendicular through the center of the circle. Also called **circular cone.**

**right′ cir′cular cyl′inder,** *Geom.* a cylinder generated by the revolution of a rectangle about one of its sides. Cf. **oblique circular cylinder.**

**right-eous** (rī′chəs), *adj.* **1.** characterized by uprightness or morality: *a righteous observance of the law.* **2.** morally right or justifiable: *righteous indignation.* **3.** acting in an upright, moral way; virtuous. —*adv.* **4.** the **righteous,** (*construed as pl.*) righteous persons collectively (usually prec. by *the*). [earlier *rightuous, rightwous* (remodeled with *-ous*), OE *rihtwīs.* See RIGHT, WISE²] —**right′eous·ly,** *adv.* —**Syn. 3.** good, honest, fair, right. —**Ant. 3.** evil, wicked.

**right-eous·ness** (rī′chəs nis), *n.* **1.** the quality or state of being righteous. **2.** righteous conduct. **3.** the quality or state of being just or rightful: *They came to realize the righteousness of his position on the matter.* [ME *rihtwīsnes;* OE *rihtwīsnes.* See RIGHTEOUS, -NESS]

**right·er** (rī′tər), *n.* one who rights or redresses: *a righter of wrongs.* [ME *rightar* executioner. OE *rihtere* one who regulates. See RIGHT, -ER¹]

**right′-eyed floun·der** (rī′tīd′), any of several flatfishes of the family *Pleuronectidae,* having both eyes on the right side of the head. Also, **right′-eye floun′der.**

**right′ face′,** *Mil.* **1.** a command, given to a soldier or soldiers at attention, to turn the body 90° toward the right. **2.** the act of so turning in a prescribed military manner.

**right′ field′,** *Baseball.* **1.** the area of the outfield to the right of center field, as viewed from home plate. **2.** the position of the player covering this area.

**right′ field′er,** *Baseball.* the player whose position is right field.

**right·ful** (rīt′fəl), *adj.* **1.** having a valid or just claim, as to some property or position; legitimate: *The rightful owner of the farm.* **2.** belonging or held by a just claim: *one's rightful property.* **3.** equitable or just, as actions, a cause, etc. [ME; see RIGHT, -FUL] —**right′ful·ly,** *adv.* —**right′ful·ness,** *n.*

**right′-hand′** (rīt′hand′), *adj.* **1.** on the right side, or the side opposite that where the heart is. **2.** the right side, as if a person, etc., facing a certain direction. **3.** most efficient or useful, as a helper or assistant. **4.** plain-laid. [adj. use of RIGHT HAND]

**right′-hand buoy′,** *Navig.* a distinctive buoy marking the side of a channel regarded as the right, or starboard, side.

**right-hand·ed** (rīt′han′did), *adj.* **1.** having the right hand or arm more serviceable than the left; using the right hand by preference: *a right-handed printer.* **2.** adapted to or performed by the right hand: *a right-handed lever; right-handed penmanship.* **3.** *Mach.* a. rotating clockwise. **b.** noting a helical, or spiral, member, as a gear tooth or screw thread, that twists clockwise as it recedes from an observer. **4.** *Building Trades.* **a.** (of a door) having the hinges on the right when seen from the exterior of the building, room, closet, etc., to which the doorway leads. **b.** (of a casement sash) having the hinges on the right when seen from inside the window. —*adv.* Also, **right′-hand′.** **5.** in a right-handed manner or fashion: *The door opens right-*