# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RELIANT PHARMACEUTICALS, INC., | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 06-774-JJF |
| PAR PHARMACEUTICAL, INC., | : | |
| Defendant. | : | |

## DEFENDANT PAR PHARMACEUTICAL, INC.'S
## REPLY CLAIM CONSTRUCTION BRIEF

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Tel: (302) 571-6600

- and -

**FROMMER LAWRENCE & HAUG LLP**
Edgar H. Haug
James K. Stronski
John G. Taylor
745 Fifth Avenue
New York, New York 10151
Tel: (212) 588-0800

*Attorneys for Defendant Par Pharmaceutical, Inc.*

March 19, 2008

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ...................................................................................................... 2

      A.    The Term "cylindrical" in Claims 1 and 6 ......................................... 2

      B.    The Terms "delayed release" and "microtablets" in Claims 1 and 6 ..... 4

            1.    The Term "delayed release" in Claims 1 and 6 ....................... 4

            2.    The Term "microtablet" in Claims 1 and 6 ............................ 5

      C.    The Phrase "a convex or flat upper side and lower side" in Claim 1 ..... 7

      D.    The Phrase "the active ingredient content is in the range  from 81
            to 99.9% of the weight of the microtablet" in Claim 1 .......................... 7

      E.    The Phrase "the active ingredient density is greater than 1" in
            Claim 1 ............................................................................................... 9

      F.    The Phrase "release rate is virtually independent of the pressure
            when compressing the tablets" in Claim 1 ........................................... 10

      G.    The Phrase "the tablet contains no release-delaying ancillary
            substance" in Claim 1 ......................................................................... 11

      H.    The Term "lubricant" in Claims 1 and 6 ............................................. 14

      I.    The Phrase "other conventional ancillary substances" in Claims 1
            and 6    ............................................................................................... 14

      J.    The Phrase "a pronounced plasma level plateau with a PTF<75%"
            in Claim 2 .......................................................................................... 15

      K.    The Phrase "bioavailability does not depend on the intake of food"
            in Claim 2 .......................................................................................... 16

      L.    The Phrase "cylindrical mold" in Claim 6 ......................................... 17

III.  CONCLUSION .................................................................................................. 18

# TABLE OF AUTHORITIES

## Cases

*Alloc, Inc. v. ITC,*
    342 F.3d 1361 (Fed. Cir. 2003) ..................................................................................6

*AllVoice Computing PLC v. Nuance Communs., Inc.,*
    504 F.3d 1236 (Fed. Cir. 2007) ...............................................................................17

*Ballard Medical Prods. v. Allegiance Healthcare Corp.,*
    268 F.3d 1352 (Fed. Cir. 2001) .................................................................................8

*Becton Dickinson & Co. v. C.R. Bard, Inc.,*
    922 F.2d 792 (Fed. Cir. 1990) ...................................................................................8

*BOC Health Care v. Nellcor Inc.,*
    892 F. Supp. 598 (D. Del. 1995) ...............................................................................1

*Cephalon, Inc. v. Barr Labs., Inc.,*
    389 F. Supp. 2d 602 (D. Del. 2005) .......................................................................6, 9

*Comark Communs., Inc. v. Harris Corp.,*
    156 F.3d 1182 (Fed. Cir. 1998) ...............................................................................17

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.,*
    438 F.3d 1374 (Fed. Cir. 2006) ...............................................................................17

*Disabled Am. Veterans v. Gober,*
    234 F.3d 682 (Fed. Cir. 2000) ...................................................................................8

*Elektra Instrument S.A. v. O.U.R. Sci. Int'l, Inc.,*
    214 F.3d 1302 (Fed. Cir. 2000) .................................................................................4

*Eli Lilly & Co. v. Aradigm Corp.,*
    376 F.3d 1352 (Fed. Cir. 2004) .................................................................................9

*Hilton Davis Chem. Co. v. Warner-Jenkinson Co.,*
    62 F.3d 1512 (Fed. Cir. 1995) ...................................................................................1

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.,*
    177 F.3d 968 (Fed. Cir. 1999) .................................................................................17

*London v. Carson Pirie Scott & Co.,*
    946 F.2d 1534 (Fed. Cir. 1991) .................................................................................1

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ...................................................................................3, 5, 10

*PC Connector Solutions LLC v. Smart Disk Corp.*,
    406 F.3d 1359 (Fed. Cir. 2005) ..............................................................................................5

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................................................5, 17

*United States v. Quillen*,
    335 F.3d 219 (3d Cir. 2003) ...................................................................................................8

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ..............................................................................................17

*Wyeth v. Impax Labs., Inc.*,
    526 F. Supp. 2d 474 (D. Del. 2007) ......................................................................................12

## Statutes

35 U.S.C. § 112 ...............................................................................................................................1

35 U.S.C. § 273 ...............................................................................................................................5

35 U.S.C. § 365 ...............................................................................................................................5

35 U.S.C. § 371 ...............................................................................................................................5

## I.    INTRODUCTION

The definitions proposed by defendant Par Pharmaceutical, Inc. ("Par") in its opening

claim construction brief comport with well-settled claim construction principles. Par's

definitions are consistent with the plain and ordinary meanings of the disputed claim terms and

phrases, except where the inventors expressly defined a claim term or demonstrated a clear

intention to deviate from the plain meaning of a term.  In contrast, plaintiff Reliant

Pharmaceuticals, Inc.'s ("Reliant") litigation-inspired definitions are a transparent attempt—

under the guise of claim construction—to rewrite its patent's very narrow claims to encompass

subject matter that the inventors failed to claim during the prosecution of the patent.  This

contravenes one of the most basic functions of a patent:  public notice.[1]

This is a case where Par has successfully completed an extensive design-around program

to formulate a generic propafenone hydrochloride drug product that achieves the twice-daily

dosing regimen of Reliant's brand-name drug product Rythmol® SR without infringing Reliant's

narrow formulation patent.[2]  The practice of designing around a patent is strongly encouraged in

U.S. patent law.[3]  Reliant now tries to capture Par's proposed generic product within the scope of

---

[1] *See London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991) ("claims must be 'particular and distinct,' as required by 35 U.S.C. § 112, so that the public has fair notice of what the patentee and the Patent and Trademark Office have agreed constitute the metes and bounds of the claimed invention.  Notice permits other parties to avoid actions which infringe the patent and to design around the patent."); *BOC Health Care v. Nellcor Inc.*, 892 F. Supp. 598, 602 (D. Del. 1995) (citing *London*, 946 F.2d at 1538 and stating that "[t]he importance of claims of a patent stems from the fact that claims define the metes and bounds of the protected invention. Thus, it is the claims which apprise the public as to what conduct in which it may engage vis-a-vis the patent at issue").

[2] Par was able to develop its own unique product and process with certain advantages over Reliant's claimed invention. Indeed, Par's formulators have applied for a patent (U.S. Patent Application Serial No. 11/486/375) on their newly developed solid dosage form and the method for manufacturing the product.

[3] *See Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1520 (Fed. Cir. 1995), *rev'd and remanded on other grounds*, 520 U.S. 17 (1997) ("[t]he ability of the public successfully to design around—to use the patent disclosure to design a product or process that does not infringe, but like the claimed invention, is an improvement over the prior art—is one of the important public benefits that justify awarding the patent owner exclusive rights to his invention").

its patent claims by broadly construing claim terms in ways that are far beyond what a person of ordinary skill in the art would have understood.

Reliant violates a number of fundamental rules of claim construction, including claim differentiation and interpreting claim limitations in ways that render other limitations superfluous. Reliant also selectively ignores the intrinsic evidence of the patent and its prosecution history when it suits its purposes and instead relies on the ultimate extrinsic evidence—the opinions of its paid experts—to offer strained and, in some cases, illogical, definitions of common terms that are contradicted by the very intrinsic evidence Reliant and its experts cite in support of their proposed definitions.

The Court should reject Reliant's attempt to pervert the meanings of familiar terms and should adopt the conventional definitions put forth by Par.

## II.  ARGUMENT

### A.  The Term "cylindrical" in Claims 1 and 6

Par defines the claim term "cylindrical" to mean *having the form of a cylinder, i.e., the solid figure traced out when a rectangle rotates around one of its sides as the axis of rotation, with two parallel circles of equal size at the ends*. (Par Open. Br.[4] at § V.C.1.) This is the term's conventional meaning and there is nothing in the '588 patent to indicate that the inventors intended the term to have a different meaning.

Reliant remarkably contends that "cylindrical" means "a three-dimensional shape which includes a flat or convex surface in which the height and diameter are, independently of one another, 1-3 mm." (Reliant Open. Br.[5] at § IV.B.) This construction is clearly litigation driven to

---

[4] "Par Open. Br." refers to Defendant Par Pharmaceutical, Inc.'s Opening Claim Construction Brief, dated March 5, 2008 (D.I. 197).

[5] "Reliant Open. Br." refers to Plaintiff Reliant Pharmaceuticals, Inc.'s Opening Claim Construction Brief, dated March 5, 2008 (D.I. 194).

try to capture Par's proposed product—which cannot be reasonably be considered a cylinder in any sense (*see* Par Ex. 26[6])—and violates basic tenets of claim construction.

Under Reliant's proposed construction, *any* "three dimensional shape" that has a flat or convex surface would be considered "cylindrical." That would include cubes, cones, pyramids, etc. Indeed, Reliant's expert, Dr. Rhodes explicitly states that "any closed surface will satisfy the definition of a cylinder." (Rhodes Decl.[7] at ¶ 57.) In support of this strained definition, Reliant's expert notes that some common tablet drug products are not strictly cylindrical in a "rigid" sense. (Rhodes Decl. at ¶¶53, 57.) That may be true, but throughout the '588 patent and its prosecution history, the inventors refer only to a "cylindrical" microtablet and—as Reliant's experts acknowledge—the inventors consistently stress the critical importance of the precise size and *shape* of the claimed microtablets. (*See* Rhodes Decl. at ¶¶ 73, 97; Hubbell Decl.[8] at ¶¶ 44, 64.) Accordingly, one of skill in the art would interpret the term "cylindrical" to have its conventional meaning, as proposed by Par.

Moreover, Reliant's proposed claim construction incorporates other, separately-defined claim limitations—"flat or convex surface" and "the height and diameter are, independently of one another, 1-3 mm"[9]—into the definition of "cylindrical." Such an approach is disfavored because a "claim construction that gives meaning to *all of the terms* of the claim is preferred over one that does not do so." *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) (citing *Elektra Instrument S.A. v. O.U.R. Sci. Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed.

---

[6] Par Exhibits 1 through 25 are contained in Volumes 1 and 2 of Par's Appendix of Exhibits in Support of Claim Construction, dated March 5, 2008, which were submitted with Par's opening claim construction brief. *See* D.I. 198, 199. Par Exhibits 26 through 30 are contained in Volume 3 of Par's Appendix of Exhibits in Support of Claim Construction, dated March 19, 2008, which is being submitted herewith.

[7] "Rhodes Decl." refers to the Declaration of Dr. Christopher T. Rhodes in Support of Reliant Pharmaceuticals, Inc.'s Opening Claim Construction Brief, dated March 5, 2008 (D.I. 195).

[8] "Hubbell Decl." refers to the Declaration of Dr. Jeffrey A. Hubbell in Support of Reliant Pharmaceuticals, Inc.'s Opening Claim Construction Brief, dated March 5, 2008 (D.I. 196).

[9] Par Ex. 1 at col. 8, ll. 18-19 and col. 8, ll. 30-31.

Cir. 2000) (construing claim to avoid rendering the 30 degree claim limitation superfluous)) (emphasis added). Reliant's proposed construction of "cylindrical," by incorporating the definitions of other, separately-defined claim limitations, renders those other claim limitations superfluous.

Accordingly, the Court should reject Reliant's litigation-inspired definition of "cylindrical" and adopt Par's conventional meaning.

### B.    The Terms "delayed release" and "microtablets" in Claims 1 and 6

Reliant asserts that "delayed release microtablet" should "properly be construed as a single claim term" because the "inventions of the patent are directed to delayed release microtablets that have specific properties and characteristics." (Reliant Open. Br. at 9 n.4.) By this logic, the entirety of independent claim 1 should be construed as a single claim term since the inventions of the patent are directed to the subject matter recited in claim 1. In further support of its assertion, Reliant states that "[n]o 'microtablet' other than a delayed release microtablet is described or claimed by the patent." *Id.* This is plainly wrong. The patent contains numerous references to "instant release" microtablets. (*See, e.g.,* Par Ex. 1 at col. 4, ll. 54–56; col. 4, ll. 60–64; col. 6, ll. 62–65; col. 6, l. 66–col. 7, l. 2; col. 7, l. 5; and col. 7, ll. 13–15.) Thus, although construing these two terms separately or as a single term may make little or no meaningful difference, Par submits that a separate construction of the two terms is proper.

### 1.    The Term "delayed release" in Claims 1 and 6

Par defines "delayed release" to mean *prolonged diffusion of an active ingredient*. (Par Open. Br. at § V.C.2.) This definition is consistent with the plain and ordinary meaning of the term and the intrinsic evidence. *Id.*

As discussed in Par's opening claim construction brief, the inventors of the '588 patent referred to a number of inventions in the prior art as examples of "delayed release" products.

(Par Open. Br. at § V.C.2.)  Each of these prior art references uses the term "sustained release" in describing the claimed dosage formulation.  Thus, the skilled artisan in the 1993-94 timeframe[10] would have understood the term "delayed release" in the '588 patent to mean *prolonged diffusion of an active ingredient*, as proposed by Par.  (*See* Par Ex. 27 at 183 (drug products "designed to release the drug slowly for more **prolonged drug release** and **sustained** drug action ... are commonly referred to as *controlled-release, sustained-release, prolonged-release, timed-release, slow-release, sustained-action, prolonged-action*, or extended-action tablets or capsules.") (emphasis added).)

Reliant defines "delayed release" to mean "the release of active ingredient **after 3 hours is not more than 80% and after 24 hours is not less than 80%.**"[11]  (Reliant Open. Br. at § IV.A. (emphasis added).)  As with its definition of "cylindrical," Reliant's definition of "delayed release" improperly repeats another, separate claim term—claim element 1(d)[12]—rendering this other, recited claim element superfluous.  *See Merck*, 395 F.3d at 1372.

### 2.    The Term "microtablet" in Claims 1 and 6

Par defines "microtablet" to mean *a small compressed solid dosage form of precise shape and dimensions*.  (Par Open, Br. at § V.C.3.)  This construction comports with the

---

[10]  Claim language is construed as of the "effective filing date" of the relevant United States patent application.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (quoting *PC Connector Solutions LLC v. Smart Disk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005)).  For the '588 patent, the effective filing date is March 24, 1994, the date the PCT application was filed.  *See* 35 U.S.C. §§ 273, 365, 371; Par Ex. 1.  Accordingly, the applicable date for the claim construction inquiry is March 24, 1994, not "the earliest filing date of the patent specification, *i.e.* April 3, 1993," as alleged by Reliant.  (*See* Rhodes Decl. at ¶ 16; Hubbell Decl. at ¶ 17.)  Par, however, is not aware of any differences in the way one of ordinary skill in the art would have construed the claims in the '588 patent in 1993 as opposed to 1994.

[11]  Reliant construes the phrase "delayed release microtablet" to mean "a small unit of solid medicament prepared by compaction in which the release of active ingredient after 3 hours is not more than 80% and after 24 hours is not less than 80%." (Reliant Open. Br. at § IV.A.)  The portion of that definition that relates to the term "delayed release" is "the release of active ingredient after 3 hours is not more than 80% and after 24 hours is not less than 80%."  The remaining language in Reliant's proposed construction—"a small unit of solid medicament prepared by compaction"—relates to the term "microtablet."

[12]  Par Ex. 1 at col. 8, ll. 36-38.

conventional meanings of the terms "micro" and "tablet" and the '588 patent's intrinsic evidence. Reliant construes "microtablet" merely as "small unit of solid medicament prepared by compaction." (Reliant Open. Br. at § IV.A.)

Par's construction includes "precise shape and dimensions" to describe what the skilled artisan would have understood the term "microtablet" to mean in the context of the '588 patent. Indeed, Reliant itself acknowledges that the inventions of the patent are directed to microtablets "that have specific properties and characteristics" (See, e.g., Reliant Open. Br. at 9 n.4.) A "tablet" is a solid dosage form that has been individually compressed or compacted in a die that determines the tablet's size and shape. (Chambliss Decl.[13] ¶20-22.) Thus, a tablet has precise shape and dimensions that are defined by the die. Both the '588 patent specification and the prosecution history demonstrate that the microtablets described and claimed in the '588 patent have precise shape and dimensions. (See Par Open. Br. at 18–19.) The applicants do not discuss anywhere in the claims, the specification, or the prosecution history the possibility of microtablets that do not have "precise shape and dimensions," i.e., that have uneven shape or non-uniform dimensions. This is an instance "where 'the specification read as a whole suggests that the very character of the invention requires the limitations to be a part of every embodiment.'" Cephalon, Inc. v. Barr Labs., Inc., 389 F. Supp. 2d 602, 606 (D. Del. 2005) (Farnan, J.) (quoting Alloc, Inc. v. ITC, 342 F.3d 1361, 1369 (Fed. Cir. 2003)).

While Reliant's proposed construction is not inconsistent with Par's, it should be noted that pellets, for example, could be described as "small unit form of solid medicament prepared by compaction" as Reliant defines "microtablet." (Chambliss Decl. ¶ 35.) The '588 patent applicants, however, use the term "pellets" when they were referring to solid dosage forms other

---

[13] "Chambliss Decl." refers to the Declaration of Walter G. Chambliss, Ph.D. in Opposition to Reliant's Claim Construction and In Support of Par's Claim Construction, dated March 19, 2008.

than tablets. (Ex. 1, col. 1., ll. 48–50.) Likewise, granules, microspheres (e.g., in Contac®) are not "microtablets." Accordingly, the Court should adopt Par's definition of "microtablet" as *a small compressed solid dosage form of precise shape and dimensions*.

### C.    The Phrase "a convex or flat upper side and lower side" in Claim 1

Par defines "a convex or flat upper side and lower side" to mean *the two ends of a cylindrical microtablet are either both curved or rounded outward, like the exterior of a sphere, or both have a continuous horizontal surface without peaks or depressions*. (Par Open. Br. at § V.C.4.) Reliant similarly defines the phrase to mean "each of the upper side and lower side have a surface that is without marked projections or depressions ('flat') or is curved or rounded outward ('convex')." (Reliant Open. Br. at § IV.C.)

Both parties define the terms "flat" and "convex" similarly, but Reliant unhelpfully resorts to using words to be defined—"upper side and lower side"—as part of its definition. Reliant's proposed definition also is less precise as to whether the two ends must be the same, *i.e.*, both flat or both convex. Reliant's expert, Dr. Rhodes, however, agrees that one of ordinary skill in the art would have understood that the ends of the claimed microtablets must both be either flat or convex. (Rhodes Decl. at ¶¶ 54-56.) Par's proposed definition expressly states that both ends must be either flat or convex, as those terms are defined, and this definition is preferable for the sake of clarity. Because there appears to be little, if any, substantive dispute on this language, Par requests that the Court adopt its proposed construction due to its greater clarity.

### D.    The Phrase "the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet" in Claim 1

Par defines "the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet" to mean *the amount of propafenone, diprafenoene, or their*

*pharmacologically acceptable salts contained in the claimed microtablet is no less than 81%*
*and no more than 99.9% by weight of the total weight of the microtablet.* (Par Open. Br. at §
V.C.5.)  In its opening claim construction papers, Reliant failed to propose a construction for this
phrase even though it was *Reliant* that identified this as a phrase that required construction.
Accordingly, the Court should:  (1) rule that Reliant has waived its right to propose a
construction for this phrase; (2) disregard any arguments advanced by Reliant in its reply brief or
at the Markman hearing concerning the construction of this phrase; and (3) adopt Par's
unopposed construction of this phrase.

The parties agreed to a procedure for addressing claim construction issues in this case.
The parties agreed that they would exchange lists of claim terms and phrases that are in need of
construction on February 20, 2008.  Reliant identified the phrase "the active ingredient content is
in the range from 81 to 99.9% of the weight of the microtablet," among others, as a phrase it
would ask the Court to construe.  (Par Ex. 28.)  In its opening brief, however, Reliant did not
propose a construction for this phrase.

The law is clear that Reliant should now be precluded from construing the claim language
it failed to construe in its opening brief.  *See Ballard Med. Prods. v. Allegiance Healthcare*
*Corp.*, 268 F.3d 1352, 1363 (Fed. Cir. 2001) (where a party presents no argument in its brief
regarding the construction of a particular claim, "the question of the proper construction of that
claim has been waived") (citing *Disabled Am. Veterans v. Gober*, 234 F.3d 682, 688 n.3 (Fed.
Cir. 2000)); *cf. United States v. Quillen*, 335 F.3d 219, 224 (3d Cir. 2003) ("arguments not raised
in an . . . opening brief are deemed waived"); *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922
F.2d 792, 800 (Fed. Cir. 1990) ("[a]n issue not raised by an appellant in its opening brief . . . is

waived"); *Cephalon*, 389 F. Supp. 2d at 605 (Farnan, J.) (adopting defendant's definition where plaintiffs had taken no position).

Accordingly, the Court should not consider any arguments raised in Reliant's reply brief—or at any other point in these proceedings—concerning the construction of the phrase "the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet." The Court should instead adopt Par's unopposed construction of this phrase as set forth in its principal brief: *the amount of propafenone, diprafenoene, or their pharmacologically acceptable salts contained in the claimed microtablet is no less than 81% and no more than 99.9% by weight of the total weight of the microtablet.* (Par Open. Br. at § V.C.5.) At the very least, Reliant's failure to construe this phrase in its opening brief constitutes a concession by Reliant that this language has its plain meaning, as proposed by Par. *See Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1360 (Fed. Cir. 2004).

E.    The Phrase "the active ingredient density is greater than 1" in Claim 1

Par defines "the active ingredient density is greater than 1" to mean *propafenone, diprafenone, or their pharmacologically acceptable salts used to make the claimed microtablets has a bulk density greater than 1 gram/milliliter.* This is the conventional meaning of the phrase as it would have been understood by one of ordinary skill in the art at the time of the invention reading the '588 patent and its prosecution history. (*See* Par Open. Br. at § V.C.6.)

Reliant defines "active ingredient density" to mean "the density of the active ingredient in the delayed release microtablet." (Reliant Open. Br. at § IV.H.) This definition is meaningless as it does not explain how one would measure the density of an active ingredient within a tablet as Reliant proposes, or even specify the units one would use to express such a density. Reliant and its experts do not cite any references in which the density of an active

ingredient is expressed in this manner. (Chambliss Decl. ¶ 46.) Moreover, Reliant's proposed definition is a way of expressing the amount of the active ingredient in the claimed microtablet. The preceding phrase in claim 1 of the patent, however, already specifies the amount of the active ingredient in the claimed microtablet: "the active ingredient content is in the range from 81 to 99.9% of the weight of the microtablet." (Par Ex. 1 at col. 8, ll. 32-33.) Accordingly, under Reliant's definition, the phrase "active ingredient density" becomes superfluous. (Chambliss Decl. ¶ 52.) This is disfavored in claim construction. *See Merck*, 395 F.3d at 1372.

The bulk density of the active ingredient used to make the claimed microtablet, as Par defines the phrase, would have had practical meaning to the skilled artisan at the time of the invention. This is because bulk density has practical implications in the tabletting process, such as flowability (*i.e.*, how well a powder flows into a tablet die) and compressability of a powder. (Chambliss Decl. ¶ 50.) Low density material requires greater compression force in order to produce a non-friable tablet, *i.e.*, one that does not break apart easily. (Chamblis Decl. ¶ 34.) Particles with high density tend to be free-flowing, while poorly flowing powders tend to cause tablet weight variation. (Chambliss Decl. ¶ 50.) Also, the bulk density relates to the size of mixing vessel (and feed into die) that can be used. This is why active ingredient suppliers include the bulk density on a certificate of analysis. (Chambliss Decl. ¶¶ 49, 51.) For these reasons, the skilled artisan would have understood "active ingredient density" to refer to the bulk density of the active ingredient used to make the claimed microtablet.

**F.    The Phrase "release rate is virtually independent of the pressure when compressing the tablets" in Claim 1**

Par defines "release rate is virtually independent of the pressure when compressing the tablets" to mean *the effect of the difference in force per area exerted to form the claimed microtablet on the percent diffusion of the active ingredient from the microtablet over time can*

*be neglected for practical purposes*. (Par Open. Br. at § V.C.7.) Reliant similarly defines the phrase to mean "within the ordinary range of compression used in the formulation of pharmaceutical tablets, the effect of the pressure when compressing the tablets on the release rate of the active pharmaceutical ingredient can be neglected for practical purposes." (Reliant Open. Br. at § IV.G.)

Both parties agree that the patent defines "virtually independent" as meaning "can be neglected for practical purposes." Reliant, however, improperly resorts to using terms to be defined—"pressure" and "release rate"—as part of the definition. Reliant also adds a qualifying phrase—*i.e.*, "within the ordinary range of compression used in the formulation of pharmaceutical tablets"—which unnecessarily adds limitations, such as "ordinary range of compression," that are not defined in the patent or by Reliant. Not only does the patent not teach what such an "ordinary range" might be, but it does not otherwise state that the relationship that is described between the pressure of compression and the release rate is limited to a specific range of compression pressures. Because there is no basis in the intrinsic evidence to add Reliant's additional limitation, Par's proposed construction should be adopted.

### G.    The Phrase "the tablet contains no release-delaying ancillary substance" in Claim 1

Par defines "the tablet contains no release-delaying ancillary substance" to mean *the claimed microtablet includes no amount of any chemical element or compound other than the active ingredient that prolongs the diffusion of the active ingredient to any degree*. (Par Open. Br. at § V.C.8.) This definition comports with the plain and ordinary meaning of the phrase and is consistent with the intrinsic evidence. Reliant improperly imports limitations from the patent specification and defines the phrase to mean "the tablet contains no excipient that forms a release-delaying coating or matrix." (Reliant Open. Br. at § IV.D.)

At issue is what "release-delaying ancillary substance" means in this context. The skilled person would understand its plain meaning to be: any substance that delays or prolongs the release. But Reliant argues that a "release-delaying ancillary substance" must also form a "release-delaying coating or matrix." The '588 patent and the prosecution nowhere require such a restrictive interpretation. It plainly does not define "release-delaying ancillary substance" to be limited to a release-delaying matrix and coating or otherwise indicate any intent "to depart from the ordinary and customary meaning" of that phrase. *Wyeth v. Impax Labs., Inc.*, 526 F. Supp. 2d 474, 479 (D. Del. 2007) (Farnan, J.) (finding that no specific ingredients are required to define the term "extended release formulation").

Moreover, any definition limiting the means of delaying release to a "matrix" or a "coating" is too restrictive in the 1993-94 timeframe because there were several other well-known ways to accomplish delayed release in the art at that time. For example, the skilled artisan would be well aware of binding a drug to an excipient to slow its dissolution in the body, e.g. albumins, pectins, absorbents, ion-exchange resins, etc. (*See* Chambliss Decl. ¶ 40.) The skilled artisan would, accordingly, understand "release-delaying ancillary substance" to include these and other substances too, regardless of whether the "matrix" or "coating" means were used.

Release delaying substances were also well known to those of ordinary skill in the art at the relevant time as excipients that are added to a formulation to intentionally delay the release of the drug from a tablet. (*See* Chambliss Decl. ¶ 43.) Excipients that are commonly used to provide a delayed release function include ingredients such as ethylcellulose, or sodium alginate and Eudragit RS as used in Example 8 of the '588 patent. *See Handbook of Pharmaceutical Excipients* 186-190, 428-430, 362-366 (Ainley Wade & Paul J. Weller eds., 2d ed. 1994) (Exhibit I hereto).

Reliant's experts, Drs. Rhodes and Hubbell, rely on the fact that certain ancillary substances such as lubricants and wetting agents can have an effect on the release rate in support of their contention that the "matrix" and "coating" means should be imported. (Rhodes Decl. ¶¶ 70-71, 75; Hubbell Decl. ¶ 42. The '588 patent lists several conventional excipients such as talc, magnesium stearate, hydoxypropylmethylcellulose, alkyl sulfates, etc. that can be used in the formulation. (Par Ex. 1, col. 3, ll. 66 - col. 4, l. 18; col. 4, ll. 28-36.) The skilled artisan would recognize, however, that some of these excipients could slow down the release of the drug from a microtablet whereas others could speed up the release. Whether a particular excipient actually slows down or speeds up the release of the drug depends on its specific properties (e.g., low versus high viscosity grade and water solubility of a polymer) and the amount present in the dosage form in relation to the amount of active ingredient contained. Therefore, the skilled artisan would recognize that these ancillary substances can be used in the claimed microtablet as long as they do not prolong the release of the drug from the microtablet. (*See* Chambliss Decl. ¶ 44.)

In furtherance of Reliant's litigation-inspired construction—because Par formulates its product with a well known release-delaying substance—Reliant now would have this Court import two prior art examples of means of delaying release (by coating and matrix) that are mentioned in the specification and graft them onto otherwise plain claim language. That claim language plainly excludes formulations containing "release-delaying ancillary substance" regardless of the means (coating, matrix or otherwise) in which they work. To graft such "coating" and "matrix" means onto this claim language would violate basic rules of claim construction and do violence to the important public notice function of the claims.

### H.     The Term "lubricant" in Claims 1 and 6

Par defines "lubricant" to mean *a chemical element or compound that lessens or prevents friction and that does not prolong the diffusion of the active ingredient to any degree.* This accords with the plain meaning of the term and the intrinsic evidence. (Par Open. Br. at § V.C.9.) Reliant construes this term to mean "a pharmaceutical ingredient that reduces friction and prevents tablet adhesion, e.g., talc or magnesium stearate." (Reliant Open. Br. at § IV.E.)

The substantive difference between the parties' constructions is that Par's definition specifies that the lubricant "does not prolong the diffusion of the active ingredient to any degree." This merely makes explicit what is evident from reading the entirety of claim element 1(f):

> f) the tablet contains no release-delaying ancillary substance **but** 0.1-5% by weight of a lubricant and 0-18.9% by weight of other conventional ancillary substances.

(Par Ex. 1 at col. 8, ll. 41–44 (emphasis added).) It is clear from this language that the "lubricant" is to be distinguished from a "release-delaying ancillary substance," which, as discussed above and in Par's opening brief (Par Open. Br. at § V.C.8.) is a substance that "prolong[s] the diffusion of the active ingredient to any degree." Accordingly, the Court should adopt Par's definition for completeness and clarity.

### I.     The Phrase "other conventional ancillary substances" in Claims 1 and 6

Par defines "other conventional ancillary substances" to mean *any commonly used pharmaceutical chemical element or compound, other than a lubricant or the active ingredient, that does not prolong the diffusion of the active ingredient to any degree.* (Par Open. Br. at § V.C.10.) Reliant defines the phrase to mean "commonly used pharmaceutical ingredients other than an active pharmaceutical ingredient, a lubricant, or a 'release-delaying

ancillary substance' as defined above, e.g., binders, adhesives, colorants, stabilizers, fillers, wetting agents, and flow regulators." (Reliant Open. Br. at § IV.F.)

As with the parties' proposed definitions of "lubricant," Par's proposed definition is more complete in that it makes clear what is evident in the language of claim element 1(f)—that the "other conventional ancillary substances" are to be distinguished from a "release-delaying ancillary substance" (*i.e.*, substances that "prolong the diffusion of the active ingredient to any degree.") Accordingly, the Court should adopt Par's definition for completeness and clarity.

### J. The Phrase "a pronounced plasma level plateau with a PTF<75%" in Claim 2

Par defines the phrase "a pronounced plasma level plateau with a PTF<75%" to mean *a markedly level concentration of the active ingredient in the blood plasma, with a less than 75% fluctuation between the maximum and minimum blood plasma concentrations during the relevant time interval, measured as ($C_{max} - C_{min}$) divided by ($AUC/\Delta t$) times 100.* (Par Open. Br. at § V.C.11; Taft Decl.[14] at ¶¶ 13-23.) This definition is consistent with the plain and ordinary meaning of the phrase "pronounced plasma level plateau" and the '588 patent's explicit definition of the term "PTF."

Reliant defines the phrase "a pronounced plasma level plateau with a PTF<75%" to mean "a plasma level plateau with a peak to trough fluctuation of less that 75%, where peak to trough fluctuation is defined as 
$$PTF(\%) = \frac{C_{max} - C_{min}}{\frac{AUC}{\Delta t}} \times 100 \quad .\text{"}$$

(Reliant Open. Br. at § IV.I.)

---

[14] "Taft Decl." refers to the Declaration of David R. Taft, Ph.D. in Opposition to Reliant's Claim Construction and In Support of Par's Claim Construction, dated March 19, 2008.

While Par does not find Reliant's definition to be incorrect, Reliant's proposed construction is deficient in that it does not define some of the individual terms within the phrase and instead simply incorporates the terms into the definition. For example, "plasma level plateau," "peak to trough fluctuation," and "Δt." (*See* Par Open. Br. at § V.C.11; Taft Decl. at ¶¶ 13-23.) Accordingly, the Court should adopt Par's more complete definition.

### K.    The Phrase "bioavailability does not depend on the intake of food" in Claim 2

Par defines the phrase "bioavailability does not depend on the intake of food" to mean that *the ingestion of food has no effect on the rate and amount of the active ingredient in the claimed microtablet that reaches the blood.* (Par Open. Br. at § V.C.12.; Taft Decl. at ¶¶ 24-30.) This definition is consistent with the common meanings of the individual terms within the phrase and the intrinsic evidence, including data that shows that the bioavailability of propafenone hydrochloride in the claimed microtablets is **identical** in fasting and non-fasting states. (Par Ex. 1 at col. 5, ll. 32-47.)

Reliant, unsurprisingly, proposes a broader meaning for the phrase, namely: "bioavailiability of the active pharmaceutical ingredient is **unaffected** by the food intake **for practical purposes.**" (*See* Reliant Open. Br. at § IV.J. (emphasis added).) Reliant's proposed construction of the negative limitation "does not depend" to mean "unaffected . . . for practical purposes" is a transparent attempt by Reliant to capture subject matter that it never claimed and that one of ordinary skill would not have understood to be within the scope of the patent. Reliant's definition contravenes one of the most basic functions of a patent—to provide public notice—and violates a fundamental rule of claim construction—claim differentiation.

In construing claims, a court should consider the other claims in the same patent, whether or not the patentee asserts them. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.

Cir. 1996); *see also, Phillips*, 415 F.3d at 1314. Under the doctrine of claim differentiation, "different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999); *see also AllVoice Computing PLC v. Nuance Communs., Inc.*, 504 F.3d 1236 (Fed. Cir. 2007) ("'claim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous'") (quoting *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006)). Absent persuasive evidence that a dependent claim should be regarded as redundant with an independent claim, a court should preserve a difference in their meaning and scope. *See, e.g., Comark Communs., Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998).

Here, the inventors have explicitly defined the term "virtually independent" in claim 1 of the patent to mean "can be neglected for practical purposes. (Par Ex. 1 at col. 2, ll. 51-52.) Reliant now urges that the far more restrictive negative limitation "does not depend" in claim 2 means the same thing as "virtually independent" in claim 1. Had the inventors intended the phrase "does not depend" to mean the same thing as "virtually independent" they could have used the phrase "virtually independent." By using the more restrictive negative limitation "does not depend" instead of "virtually independent," the inventors put the public on notice that the claimed invention requires that the ingestion of food *has no effect* on the bioavailability of the active ingredient.

### L.    The Phrase "cylindrical mold" in Claim 6

Par defines "cylindrical mold" to mean "a cavity for forming a substance into the shape of *a cylinder, a solid figure traced out when a rectangle rotates around one of its sides as the axis of rotation, with two parallel circles of equal size at the ends*." (Par Open. Br. at § V.C.13.) This accords with the plain meaning of the phrase. Reliant construes this phrase to

mean "die and punch in which a formulation is formed into a 'cylindrical' shape." (Reliant Open. Br. at § IV.K.).

The substantive difference between the parties' proposed definitions is in how they define the term "cylindrical." As discussed above, *see supra* § II.A., Par's definition comports with the conventional meaning of "cylindrical" while Reliant's definition is blatantly litigation inspired. Accordingly, the Court should adopt Par's proposed definition.

## III.    CONCLUSION

For the reasons set forth above and is Par's opening claim construction brief, Par respectfully requests that the Court enter an order construing the terms and phrases of the '588 patent as proposed by Par.

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

March 19, 2008

Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Tel.: (302) 571-6600

- and -

FROMMER LAWRENCE & HAUG LLP
Edgar H. Haug
James K. Stronski
John G. Taylor
745 Fifth Avenue
New York, New York 10151
Tel: (212) 588-0800
*Attorneys for Defendant, Par Pharmaceutical, Inc.*

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on March 19, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jack B. Blumenfeld [jbbefiling@mnat.com]
> Maryellen Noreika [menefiling@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200

I further certify that on March 19, 2008, I caused a copy of the foregoing document to be served on the above-listed counsel and on the following non-registered participants in the manner indicated:

> ### By E-Mail and Hand Delivery
>
> Jack B. Blumenfeld [jblumenfeld@mnat.com]
> Maryellen Noreika [mnoreika@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200
>
> ### By E-Mail
>
> John Desmarais [jdesmarais@kirkland.com]
> Gerald J. Flattmann, Jr. [gflattmann@kirkland.com]
> Christine Willgoos [cwillgoos@kirkland.com]
> William T. Vuk [wvuk@kirkland.com]
> KIRKLAND & ELLIS LLP
> Citigroup Center
> 153 E. 53rd Street
> New York, NY 10022
> (212) 446-4800

Steven C. Cherny [steven.cherny@lw.com]
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834
(212) 906-1200

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391

*Attorneys for Defendant-Counterclaimant,*
*Par Pharmaceutical, Inc.*

2