## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| RELIANT PHARMACEUTICALS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No. 06-774-JJF |
| v. | : | |
| | : | |
| PAR PHARMACEUTICAL, INC., | : | |
| | : | |
| Defendant. | : | |

## DECLARATION OF DAVID R. TAFT, Ph.D. IN OPPOSITION
## TO RELIANT'S CLAIM CONSTRUCTION AND IN SUPPORT
## OF PAR'S CLAIM CONSTRUCTION

YOUNG CONAWAY STARGATT & TAYLOR LLP
Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Tel.: (302) 571-6600
Fax: (302) 571-1253

- and -

FROMMER LAWRENCE & HAUG LLP

Edgar H. Haug
James K. Stronski
John G. Taylor
H. Sarah Park
745 Fifth Avenue
New York, New York 10151
Tel: (212) 588-0800
Fax: (212) 588-0500

*Attorneys for Defendant, Par Pharmaceutical, Inc.*

March 19, 2008

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RELIANT PHARMACEUTICALS, INC., | : |
| | : |
| Plaintiff, | : |
| | :    C.A. No. 06-774-JJF |
| v. | : |
| | : |
| PAR PHARMACEUTICAL, INC., | : |
| | : |
| Defendant. | : |

**DECLARATION OF DAVID R. TAFT, Ph.D. IN OPPOSITION**
**TO RELIANT'S CLAIM CONSTRUCTION AND IN SUPPORT**
**OF PAR'S CLAIM CONSTRUCTION**

I, David R. Taft, Ph.D., declare as follows:

I.    **INTRODUCTION AND BACKGROUND**

1. I am the Director of the Division of Pharmaceutical Sciences and an Associate Professor (with tenure) of Pharmaceutics at the Arnold & Marie Schwartz College of Pharmacy and Health Sciences, Long Island University, Brooklyn, New York ("LIU"). For the past fourteen years, I have taught courses and conducted research in pharmaceutics, with an emphasis on pharmacokinetics. I teach both graduate and undergraduate courses in such areas as pharmacokinetics, pharmaceutical calculations, mathematical modeling, and pharmaceutical compounding. Currently, I maintain two research laboratories at LIU, and am supervising eight Ph.D. and five Master's candidates.

2. I received my Bachelor of Science degree in Pharmacy, with Highest Distinction, from the University of Rhode Island in 1987. Subsequently, I was awarded a Ph.D. in Pharmaceutical Science from the University of Connecticut, School of Pharmacy, in 1993. I was

1

a postdoctoral fellow in pharmacokinetics at the University of North Carolina, School of Pharmacy, from 1993-94.

3. I have received honors and awards for both research and teaching. These accomplishments include the American Association of Pharmaceutical Scientists New Investigator Award in Pharmacokinetics, Pharmacodynamics, and Drug Metabolism (1998) and the David Newton Award for Excellence in Teaching from Long Island University (1997). I am also a member of several professional societies, including the American Association of Pharmaceutical Scientists and the American Association of Colleges of Pharmacy. Additionally, I am on the editorial advisory board of several professional journals, including *Journal of Pharmaceutical Sciences* (from 2003 to present) and *Drug Development and Industrial Pharmacy* (from 2005 to present). Beyond publishing a number of peer-reviewed articles, I have also edited two books: Robert O. Williams, David R. Taft, and Jason McConville eds., *Advanced Drug Formulation Design to Optimize Therapeutic Outcomes* (2007) and Mark C. Rogge and David R. Taft eds., *Preclinical Drug Development* (2005).

4. My principal research activities are directed to mechanisms of drug disposition (i.e., drug absorption, distribution, metabolism, and excretion). I have ongoing collaborations with several companies in projects such as characterizing renal drug excretion using the isolated perfused rat-kidney model and drug formulation development and evaluation in animal models. My research has been published in leading journals in the fields of pharmaceutics and pharmacokinetics (e.g., *Journal of Pharmacology and Experimental Therapeutics* and *Pharmaceutical Research*).

5. In addition, I am a Principal in a consulting company called Two River Pharmaceuticals LLC.

2

6.  My education, professional background, publications, and abstracts are set forth in my current curriculum vitae, which is attached hereto as Exhibit A.

7.  I have been retained by counsel for defendant Par Pharmaceutical, Inc. ("Par") as an expert consultant in connection with this lawsuit. In connection with this declaration, I have been asked to give my opinions concerning the meanings of certain terms and/or phrases in the claims of U.S. Patent No. 5,681,588 ("the '588 patent").

II.    **BASES FOR OPINION**

8.  I base my opinions on my education, training, experience, and knowledge gained from my work in connection with this lawsuit.

9.  In forming my opinions, I have reviewed the '588 patent and its file history, as well as Par's and Reliant Pharmaceuticals, Inc.'s ("Reliant") opening claim construction briefs and the declarations of Dr. Christopher T. Rhodes and Dr. Jeffrey A. Hubbell. I have also consulted various dictionaries, treatises and other scientific publications, as set forth herein.

10. I understand that in construing claim language, a court considers the meaning it would have to a person having ordinary skill in the relevant art at the time of the invention. I have been advised by counsel to assume that the date of invention here was in the 1993-94 timeframe.

11. In my opinion, a person having ordinary skill in the art of controlled-release, compressed solid dosage formulations and pharmacokinetics in the 1993-94 timeframe would have had either (1) a doctoral or masters degree in pharmaceutics and one year experience in the development and/or evaluation of controlled-release, compressed solid dosage formulations; or (2) a bachelors degree in pharmacy or a related field (e.g., chemistry) and four years experience in the development and/or evaluation of controlled-release, compressed solid dosage

3

formulations. When I refer to a person having ordinary skill in the art in this declaration, I will mean a person as discussed above in the 1993-94 timeframe.

12. I may supplement or amend my opinions if I become aware of new and pertinent information. I may also provide an additional declaration or testimony in response or rebuttal to any additional expert opinions provided by Reliant in support of its proposed claim constructions.

## II.    OPINIONS

### A.    The Meaning of the Phrase "a pronounced plasma level plateau with a PTF < 75%" in Claim 2

13. Reliant contends that the phrase "a pronounced plasma level plateau with a PTF < 75 %" means "a plasma level plateau with a peak to trough fluctuation of less than 75 %, where

peak to trough fluctuation is defined as $PTF(\%) = \left( \dfrac{C_{max} - C_{min}}{\dfrac{AUC}{\Delta t}} \right) \times 100$". (Reliant's Opening

Claim Construction Brief ("Rel. Open. Br.") at § IV.I.) While I do not disagree with this meaning, Reliant fails to define the individual terms within the phrase with enough specificity. For example, Reliant includes as part of its definition the words "plasma level plateau" and "peak to trough fluctuation," language included in the phrase the parties are construing.

14. It is my opinion that one of ordinary skill in the art would have understood the phrase "a pronounced plasma level plateau with a PTF < 75%" to mean *a markedly level concentration of the active ingredient in the blood plasma, with a less than 75% fluctuation between the maximum and minimum blood plasma concentrations during the relevant time interval, measured as (Cmax – Cmin) divided by (AUC/Δt) times 100.*

4

15. As stated in Par's opening claim construction brief, the '588 patent does not expressly define the phrase "pronounced plasma level plateau." (Defendant Par's Opening Claim Construction Brief ("Par Open. Br.") at § V.C.11.) I agree that a person of ordinary skill in the art would interpret the terms "pronounced" and "plateau" within this phrase to have their plain and ordinary dictionary meanings (i.e., "markedly level"). *Id.*

16. Par's opening claim construction brief also defines the phrase "plasma level" to mean *concentration of the active ingredient in the blood plasma*, based on the specification of the '588 patent. *Id.* I agree that a person of ordinary skill in the art would interpret this phrase in this way.

17. Therefore, a person of ordinary skill in the art would have understood the phrase "pronounced plasma level plateau" to mean *a markedly level concentration of the active ingredient in the blood plasma*.

18. The '588 patent expressly defines "PTF" as "peak to trough fluctuation," which is further defined by the equation:

$$PTF(\%) = \left( \frac{C_{max} - C_{min}}{\frac{AUC}{\Delta t}} \right) \times 100$$

(Par Ex. 1[1] at col. 3, ll. 1-11.)

19. Claim 2 of the '588 patent and the patent specification further require that the PTF should be less than 75 %. (Par Ex. 1 at col. 3, ll. 13-14 and col. 8, l. 46.)

20. Therefore, one skilled in the art would have understood the phrase "a pronounced plasma level plateau with a PTF < 75%" to mean *a markedly level concentration of the active*

---

[1] "Par Ex. ___" refers to the exhibits contained in Par's Appendices of Exhibits in Support of Claim Construction, dated March 5, 2008.

*ingredient in the blood plasma, with a less than 75% fluctuation between the maximum and minimum blood plasma concentrations during the relevant time interval, measured as (Cmax – Cmin) divided by (AUC/Δt) times 100.*

21. While the concept of fluctuation in blood plasma concentrations would have been known to the skilled artisan, the PTF equation recited in the '588 patent was not a commonly known pharmacokinetic parameter, as claimed by Reliant's expert, Dr. Rhodes. (Declaration of Dr. Christopher T. Rhodes in Support of Reliant's Opening Claim Construction Brief ("Rhodes Decl.") at ¶ 100.) Moreover, the PTF equation in the '588 patent is ambiguous concerning the meaning of the parameter "Δt." Specifically, the PTF equation in the '588 patent fails to clearly define the time interval (Δt) over which AUC[2] is calculated. Accordingly, I would like to clarify for the Court the proper interpretation of Δt in the PTF equation.

22. The more common way of expressing the fluctuation in blood plasma concentrations was and is through the concept of "fluctuation index." *See, e.g.,* Milo Gibaldi, *Biopharmaceutics and Clinical Pharmacokinetics,* 124-25 (4th ed. 1991) (Exhibit B hereto); Henry Caldwell, *Steady-State Lithium Blood Level Fluctuations in Man Following Administration of a Lithium Carbonate Conventional and Controlled-Release Dosage* Form, 21 J. Clin. Pharmacol. 106 (1981) (Exhibit C hereto). In the literature, fluctuation index is calculated as $(C_{max} - C_{min})$ divided by the average concentration $(C_{avg})$, where $C_{avg}$ is defined as AUC divided by the time interval over which the AUC is measured. *See* Ex. B at 130-31; Ex. C at 108-09. Accordingly, the person of ordinary skill in the art would have understood Δt in the PTF equation in the '588 patent to be the time interval over which the AUC is measured.

---

[2] "AUC" is the "area under the curve" and is a measure of the rate and amount of active ingredient that reaches the general circulation.

6

23. For the reasons noted above, I believe that one of ordinary skill in the art would have understood the phrase "a pronounced plasma level plateau with a PTF<75%" to mean *a markedly level concentration of the active ingredient in the blood plasma, with a less than 75% fluctuation between the maximum and minimum blood plasma concentrations during the relevant time interval, measured as (Cmax – Cmin) divided by (AUC/Δt) times 100,* where Δt is the time interval over which the AUC is measured.

**B.    The Meaning of the Phrase "bioavailability does not depend on the intake of food" in Claim 2**

24. Reliant contends that the phrase "bioavailability does not depend on the intake of food" means "bioavailability of the active pharmaceutical ingredient is unaffected by food intake for practical purposes." (Rel. Open. Br. at § IV.J.) In my opinion, the inclusion of the phrase "for practical purposes" is unwarranted. There is nothing in the '588 patent to justify the incorporation of "for practical purposes" into claim 2. On the contrary, Table 1 of the '588 patent shows *absolutely no difference* in AUC in the fasting and non-fasting states (i.e., AUC = 5500 ng·h/ml under both conditions). (Par Ex. 1 at col. 5, ll. 32-47.)

25. It is my opinion that one of ordinary skill in the art would have understood the phrase "bioavailability does not depend on the intake of food" to mean *the ingestion of food has no effect on the rate and amount of the active ingredient in the claimed microtablet that reaches the blood.*

26. As stated in Par's opening claim construction brief, the '588 patent does not expressly define the phrase "bioavailability does not depend on the intake of food". (Par Open. Br. at V.C.12.) I agree that a person of ordinary skill in the art would interpret the terms in this phrase to have their plain and ordinary meanings. *Id.*

7

27. Specifically, "bioavailability" means "a measurement of the rate and extent (amount) of therapeutically active drug that reaches the general circulation." *Id.* The phrase "intake of food" means "ingestion of food." *Id.*

28. The term "depend" means "to be influenced" by (Webster's New Twentieth Century Dictionary, 2d ed., 1979, p. 487 (Exhibit D hereto)), and "influence" means "to modify or affect in some way". *Id.* at 940. Moreover, the '588 patent states that bioavailability of the microtablet dosage form is "unaffected by food intake." (Par Ex. 1 at col. 3, ll. 17-21.) Table 1 of the '588 patent provides data showing no difference in the AUC for the microtablet dosage form between fasting and non-fasting states. (Par Ex. 1 at col. 5, ll. 31-47.) AUC is commonly known as a parameter used to assess bioavailability. Thus, to a skilled artisan, the phrase "does not depend" would have meant *has no effect* on bioavailability of the active ingredient in the claimed microtablet.

29. Therefore, one skilled in the art would have interpreted "bioavailability does not depend on the intake of food" in claim 2 of the '588 patent to mean *the ingestion of food has no effect on the rate and amount of the active ingredient in the claimed microtablet that reaches the blood.*

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 19th day of March 2008, at Brooklyn, New York.

David R. Taft, Ph.D.

8

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on March 19, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jack B. Blumenfeld [jbbefiling@mnat.com]
> Maryellen Noreika [menefiling@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200

I further certify that on March 19, 2008, I caused a copy of the foregoing document to be served on the above-listed counsel and on the following non-registered participants in the manner indicated:

> ### *By E-Mail and Hand Delivery*
>
> Jack B. Blumenfeld [jblumenfeld@mnat.com]
> Maryellen Noreika [mnoreika@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200
>
> ### *By E-Mail*
>
> John Desmarais [jdesmarais@kirkland.com]
> Gerald J. Flattmann, Jr. [gflattmann@kirkland.com]
> Christine Willgoos [cwillgoos@kirkland.com]
> William T. Vuk [wvuk@kirkland.com]
> KIRKLAND & ELLIS LLP
> Citigroup Center
> 153 E. 53rd Street
> New York, NY  10022
> (212) 446-4800

Steven C. Cherny [steven.cherny@lw.com]
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY  10022-4834
(212) 906-1200

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

_____

Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391

*Attorneys for Defendant-Counterclaimant,
Par Pharmaceutical, Inc.*

2

# EXHIBIT A

# CURRICULUM VITAE
## David R. Taft, Ph.D.

**CONTACT INFORMATION:**  Division of Pharmaceutical Sciences
Long Island University
Brooklyn, NY 11201
TEL:  718-488-1632
FAX:  718-780-4586
EMAIL:  dtaft@liu.edu

## EDUCATION

University of Rhode Island, College of Pharmacy, Kingston, RI 02881.
Bachelor of Science, Pharmacy, With Highest Distinction, May 1987.

University of Connecticut, School of Pharmacy, Storrs, CT 06269.
Doctor of Philosophy, Pharmaceutical Science, May 1993.
Advisor:  Kevin R. Sweeney, Ph.D.

University of North Carolina, School of Pharmacy, Chapel Hill, NC 27599.
Postdoctoral Fellow, Pharmacokinetics, 1993-1994.
Advisors:  Gary M. Pollack, Ph.D.
    Kim L.R. Brouwer Pharm.D., Ph.D.

## ACADEMIC EXPERIENCE

January 2008 to present, Director, Division of Pharmaceutical Sciences, Arnold & Marie
Schwartz College of Pharmacy, Long Island University, Brooklyn, NY 11201

September, 2005 to present. Associate Professor with Tenure, Division of Pharmaceutical
Sciences, Arnold & Marie Schwartz College of Pharmacy, Long Island University,
Brooklyn, NY 11201.

September, 2000 to August 2005. Associate Professor with Tenure, Division of
Pharmaceutics and Industrial Pharmacy, Arnold & Marie Schwartz College of
Pharmacy, Long Island University, Brooklyn, NY 11201.

June, 1994 to September, 2000.  Assistant Professor, Division of Pharmaceutics and
Industrial Pharmacy ,Arnold & Marie Schwartz College of Pharmacy, Long Island
University, Brooklyn, NY 11201.

## HONORS AND AWARDS

American Association of Colleges of Pharmacy Academic Leadership Fellow, 2004-2005

Founders Award for Faculty, Arnold & Marie Schwartz College of Pharmacy, Long Island University, 2002

American Association of Pharmaceutical Scientists New Investigator Award in Pharmacokinetics, Pharmacodynamics and Drug Metabolism, 1998

David Newton Award for Excellence in Teaching, Long Island University, 1997

American Foundation for Pharmaceutical Education (AFPE) Fellow, 1989-1992

## PROFESSIONAL ASSOCIATIONS

American Association of Pharmaceutical Scientists

American Association of Colleges of Pharmacy

Phi Lambda Sigma Pharmacy Leadership Society

Rho Chi Pharmacy Honor Society

## EDITORIAL BOARD APPOINTMENTS

Journal of Pharmaceutical Sciences (2003 – present)

Drug Development and Industrial Pharmacy (2005- present)

Current Drug Discovery Technologies (2007-present)

Current Medical Research and Opinion (International Advisory Board, 2007-present)

## GRANTS/CONTRACTS

Genzyme Oncology Inc, "Pharmacokinetic Studies with Clofarabine and Other Nucleoside Analogs: In Vivo and Isolated Perfused Kidney Studies", $70,000, 2007

Onconova Therapeutics Inc, "Preclinical Studies with Novel Therapeutic Compounds", $68,550, 2007

Genzyme Oncology Inc, "Renal Excretion of Clofarabine in the Isolated Perfused Rat Kidney: Assessment of Dose Linearity and Role of Renal Transport Systems on Drug Excretion", $44,000, 2007

Onconova Therapeutics Inc, "Preclinical Studies with Novel Therapeutic Compounds", $68,894, 2006

Vertex Pharmaceuticals Inc, "Renal Excretion of a Novel Compound in the Isolated Perfused Rat Kidney: Assessing Potential Interaction with Methotrexate", $18,000, 2006

Onconova Therapeutics Inc, "Preclinical Studies with Novel Therapeutic Compounds", $60,000, 2005

Shire Pharmaceutical Development, "Assessment of Dose Linearity of the Renal Clearance of SPD-754 and its Metabolite BCH335 in the Isolated Perfused Rat Kidney", $29,975, 2004.

Shire Pharmaceutical Development, "Effect of Potential Interactants on the Renal Disposition of SPD-754 and BCH-355 in the Isolated Perfused Rat Kidney", $24,706, 2004.

Shire Pharmaceutical Development, "Effect of Trimethoprim on the Renal Disposition of BCH-335 in the Isolated Perfused Rat Kidney", $21,670, 2003.

Shire Pharmaceutical Development, "Effect of Trimethoprim on the Renal Disposition of SPD-754 and 3TC in the Isolated Perfused Rat Kidney", $42,600, 2003.

1996-1997 New Investigators Program Grant, American Association of Colleges of Pharmacy, "Investigation of a Facilitative Role of Albumin in Renal Clearance", $10,000.

## PUBLICATIONS

1. Tomoko Nakatani-Freshwater and <u>David R. Taft</u>. Renal Excretion of Emtricitabine II. Effect of Trimethoprim on Emtricitabine Excretion: In Vitro and In Vivo Studies. *Journal of Pharmaceutical Sciences* (In Press).

2. Tomoko Nakatani-Freshwater and <u>David R. Taft</u>. Renal Excretion of Emtricitabine I. Effects of Organic Anion, Organic Cation, and Nucleoside Transport Inhibitors on Emtricitabine Excretion. *Journal of Pharmaceutical Sciences* (In Press).

3. <u>David R. Taft</u>, Ishani A. Savant, Aruna Dontabhaktuni, Mariana Babayeva and Tomoko Nakatani-Freshwater. Application of the Isolated Perfused Rat Kidney Model to Assess Gender Effects on Drug Excretion. *Drug Development and Industrial Pharmacy* 32(8):919-28, 2006.

4. Tomoko Nakatani-Freshwater, Mariana Babayeva,, Aruna Dontabhaktuni, and <u>David R. Taft</u>. Effects Of Trimethoprim On The Clearance Of Apricitabine, A Deoxycytidine Analog Reverse Transcriptase Inhibitor, And Lamivudine In The Isolated Perfused Rat Kidney. *Journal of Pharmacology and Experimental Therapeutics* 319(2):941-947, 2006.

5. Madiha B. Sidhom, Nadya Rivera, Hassan Almoazen, Harold L. Kirschenbaum, and <u>David R. Taft</u>. Stability of Sotalol Hydrochloride in Extemporaneously Prepared Oral Suspension Formulations. *International Journal of Pharmaceutical Compounding* 9(5):402-406, 2005.

6. Roda Plakogiannis, Henry Cohen, and <u>David Taft</u>. Effects Of Morning Versus Evening Administration Of Atorvastatin In Patients With Hyperlipidemia. *American Journal of Health Systems Pharmacy* 62(23):2491-2494, 2005.

7. Mohammed A. Kabir, <u>David R. Taft</u>, Cecil K. Joseph, and Robert A Bellantone. Measuring Drug Concentrations Using Pulsatile Microdialysis: Theory and Method Development In Vitro. *International Journal of Pharmaceutics*, 293:171-182, 2005.

8. <u>David R. Taft</u>. The Isolated Perfused Rat Kidney Model: A Useful Tool for Drug Discovery and Development. *Current Drug Discovery Technologies,*1:97-111, 2004.

9. Nagaraju R. Poola, Michelle Kalis, Fotios Plakogiannis and <u>David R. Taft</u>. Characterization of Pentamidine Excretion in the isolated Perfused Rat Kidney. *Journal of Antimicrobial Chemotherapy* 52(3):397-404, 2003.

10. Mohammed Nasser Ali Christy, Robert A. Bellantone, <u>David R. Taft</u> and Fotios .M. Plakogiannis. In Vitro Evaluation Of The Release Of Albuterol Sulfate From Polymer

Gels: Effect Of Fatty Acids On Drug Transport Across Biological Membranes. *Drug Development and Industrial Pharmacy 28:1221-1229*, 2002..

11. Malaz AbuTarif, Ganesh R. Iyer, Vidya Sankaragarayanan, Robert A. Bellantone and David R. Taft. Erythrocyte Distribution Kinetics of the Carbonic Anhydrase Inhibitor Methazolamide: Application of *In Vitro* Studies to Predict *In Vivo* Drug Disposition. In: SG Pandalai (Ed) *Recent Developments in Drug Metabolism Vol 1, pp:117-131*, 2002.

12. Nagaraju R. Poola, Dider Bhuiyan, Michelle Kalis, Stephan Ortiz, Ishani A. Savant, Harold Kirschenbaum, Madiha Sidhom and David R. Taft. A Novel HPLC Assay for Pentamidine: Comparative Effects of Creatinine and Inulin on GFR Estimation and Pentamidine Renal Excretion in the Isolated Perfused Rat Kidney. *Journal of Pharmacy and Pharmaceutical Sciences* 5(2):130-140, 2002.

13. Malaz A. AbuTarif and David R. Taft. Simulation of the Pharmacokinetic Profile of Methazolamide in Blood: Effect of Carbonic Anhydrase Binding on Drug Disposition. *Pharmaceutical Research* 19:551-555, 2002.

14. Ishani A. Savant, Michelle Kalis, Hassan Almoazen, Stephan R. Ortiz, Malaz AbuTarif and David R. Taft. Alternative High-Performance Liquid Chromatographic Assay for p-Aminohippuric Acid (PAH): Effect of Aging on PAH Excretion in the Isolated Perfused Rat Kidney. *Journal of Pharmaceutical and Biomedical Analysis* 26:687-699, 2001.

15. Ganesh R. Iyer, Robert A. Bellantone and David R. Taft. *In Vitro* Characterization of the Erythrocyte Distribution of Methazolamide: A Model of Erythrocyte Transport and Binding Kinetics. *Journal of Biopharmaceutics and Biopharmaceutics* 27,45-66, 1999.

16. David R. Taft, Sean Nordt, Ganesh R. Iyer, and Michael H. Schwenk. Blood Disposition and Urinary Excretion Kinetics of Methazolamide Following Oral Administration to Human Subjects. *Biopharmaceutics and Drug Disposition* 19(6):373-380, 1998.

17. David R. Taft. One-Compartment Model with Zero-Order Input: The Constant Rate Intravenous Infusion. *American Journal of Pharmaceutical Education* 62(2):170-176, 1998.

18. Ganesh R. Iyer and David R. Taft. Determination of Methazolamide Concentrations in Human Biological Fluids by High Performance Liquid Chromatography. *Journal of Pharmaceutical and Biomedical Analysis* 16(6):1019-1024, 1998.

19. David R. Taft, Ganesh R. Iyer, Leon Behar and Robert V. DiGregorio. Application of a First-Pass Effect Model to Characterize the Pharmacokinetic Disposition of Venlafaxine Following Oral Administration to Human Subjects. *Drug Metabolism and Disposition* 25:1215-1218, 1997.

20. Christopher J. Matheny, David R. Taft, Kim L.R. Brouwer and Gary M. Pollack. Evidence for Reversible Sequestration of Morphine in Rat Liver. *Biochemical Pharmacology* 52:535-541, 1996.

21. David R. Taft, Donna J. Fournier, Dennis J. Chapron and Kevin R. Sweeney. Concentration Dependent Tubular Secretion of Acetazolamide and its Inhibition by Salicylic Acid in the Isolated Perfused Rat Kidney. *Drug Metabolism and Disposition* 24(4):456-451, 1996.

22. Kevin R. Sweeney, Poe-Hirr Hsyu, Paul Statkevich, and David R. Taft. Renal Disposition and Drug Interaction Screening of (-)-2′-Deoxy-3′-Thiacytidine (3TC) in the Isolated Perfused Rat Kidney. *Pharmaceutical Research* 12(12):1958-1963, 1995.

23. <u>David R. Taft</u> and Kevin R. Sweeney.   The Influence of Protein Binding on the Elimination of Acetazolamide by the Isolated Perfused Rat Kidney:   Evidence of Albumin-Mediated Tubular Secretion. *Journal of Pharmacology and Experimental Therapeutics* 274:752-760, 1995.

## EDITED WORKS

Robert O. Williams III, David R. Taft and Jason T. McConville (Eds), *Advanced Drug Formulation Design to Optimize Therapeutic Outcomes*, New York, Informa Heathcare, 2007.

Mark C. Rogge and David R. Taft (Eds), *Preclinical Drug Development*, New York, Informa Heathcare, 2005.

## RESEARCH ABSTRACTS (2000-PRESENT)

1. Dontabhaktuni, <u>D.R. Taft</u> and W. Zarycranski. Effect of Urinary Alkalinization and Cimetidine Co-Administration on Gentamicin Excretion in The Isolated Perfused Rat Kidney: Strategies to Limit Kidney Accumulation Of A Nephrotoxic Compound. *The AAPS Journal* 8(S2), Abstract T3327, 2006.

2. T. Nakatani-Freshwater, <u>D.R. Taft</u>, and B. Kearney. Renal Excretion of Emtricitabine In the Isolated Perfused Rat Kidney. *The AAPS Journal* 8(S2), Abstract W5306, 2006.

3. T. Nakatani-Freshwater, <u>D.R. Taft</u>, and B. Kearney. Effect of Trimethoprim on the Renal Disposition of Emtricitabine in the Isolated Perfused Rat Kidney. The AAPS Journal 8(S2), Abstract T3333, 2006.

4. R.E. Freshwater, M. Maniar and <u>D.R. Taft</u>. Cross-Species Pharmacokinetic Comparison of a Novel Anticancer Agent, ON.01910.Na. *The AAPS Journal* 8(S2), Abstract W4355, 2006.

5. R.E. Freshwater, M. Maniar and <u>D.R. Taft</u>. Preclinical Pharmacokinetics of Ex-RAD™, a Novel Radioprotective Agent. *The AAPS Journal* 8(S2), Abstract W4356, 2006.

6. R.E. Freshwater, M. Maniar, and <u>D.R. Taft</u>. Effect Of Route Of Administration and Formulation on the Plasma Exposure Of Ex-RAD™ in Rats. *The AAPS Journal* 8(S2), Abstract W4178, 2006.

7. T. Nakatani-Freshwater, M. Slugocki, S. Sivakumar, E. Freshwater, M. Babayeva, and <u>D.R. Taft.</u> Effect of Tenofovir on the Renal Excretion of Didanosine in the Isolated Perfused Rat Kidney. *The AAPS Journal* 7(S2), Abstract T3313, 2005

8. A Dontabhaktuni and <u>D.R. Taft</u>. Renal Excreiton of Gentamicin in the Isolated Perfused Rat Kidney. *The AAPS Journal* 7(S2), Abstract T3268, 2005

9. A Dontabhaktuni, M. B. Sidhom and <u>D.R. Taft</u>. An Alternative HPLC Assay for Gentamicin. *The AAPS Journal* 7(S2), Abstract T3037, 2005

10. I.A. Savant, S.R. Ortiz and <u>D.R. Taft</u>. Gender Differences in Organic Anion Excretion in the Isolated Perfused Rat Kidney. *AAPS PharmSci* 5(4), Abstract R6181, 2003.

11. S.R. Ortiz, I.A. Savant, A. Dontabhaktuni, and <u>D.R. Taft</u>. Effects of Hypoalbuminemia and Protein Binding Displacement on Furosemide Excretion in the Isolated Perfused Rat Kidney. *AAPS PharmSci* 4(4), Abstract W5280, 2002.

12. N.R. Poola and D.R. Taft. A Mathematical Model of Pentamidine Excretion in the Isolated Perfused Rat Kidney. *AAPS PharmSci* 4(4), Abstract W5281, 2002.
13. M.A. Abutarif and D.R. Taft. Non-Instantaneous Complexation Kinetics Between Methazolamide and CA Enzymes I and II. *AAPS PharmSci* 4(4), Abstract W5250, 2002.
14. M.A. Abutarif and D.R. Taft. Plasma Protein Binding Determination of Genestein, a Major Ingredient in Soy. *AAPS PharmSci* 3(3), Abstract, 2001.
15. N.R. Poola, S.R. Ortiz, I.A. Savant, and D.R. Taft. Pentamidine Renal Excretion in the Isolated Perfused Rat Kidney. *AAPS PharmSci* 3(3), Abstract, 2001.
16. M.A. Abutarif, R.A. Bellantone, S.R. Ortiz, I.A. Savant, and D.R. Taft. Simulation of the Pharmacokinetic Profile of Methazolamide in Blood. Effect of Carbonic Anhydrase on Drug Disposition. *AAPS PharmSci* 3(3), Abstract, 2001.
17. N. Poola, S Ortiz, I. Savant, M. AbuTarif and D.R. Taft. Renal Disposition of Pentamidine in the Isolated Perfused Rat Kidney: Differential Effects of Creatinine and Inulin on Drug Excretion. *AAPS PharmSci*, Abstract 1112, 2000.

# EXHIBIT B

# Biopharmaceutics and Clinical Pharmacokinetics

## FOURTH EDITION

### MILO GIBALDI

# Biopharmaceutics and Clinical Pharmacokinetics

## MILO GIBALDI, Ph.D.

*Dean, School of Pharmacy*
*Associate Vice President,*
*Health Sciences*
*University of Washington*
*Seattle, Washington*

## FOURTH EDITION



LEA & FEBIGER  •  Philadelphia  •  London  •  1991

Lea & Febiger
200 Chester Field Parkway
Malvern, Pennsylvania   19355-9725
U.S.A. .
(215) 251-2230
1-800-444-1785

Lea & Febiger (UK) Ltd.
145a Croydon Road
Beckenham, Kent BR3 3RB
U.K.

Library of Congress Cataloging-in-Publication Data

Gibaldi, Milo.
    Biopharmaceutics and clinical pharmacokinetics / Milo Gibaldi.—
4th ed.
      p.        cm.
    Includes bibliographical references.
    ISBN 0-8121-1346-2
    1. Biopharmaceutics. 2. Pharmacokinetics. I. Title
    [DNLM: 1. Biopharmaceutics. 2. Pharmacokinetics. QV 38 G437b]
RM301.4.G53   1990
615'.7—dc20
DNLM/DLC
for Library of Congress                           90-5614
                                                      CIP

First Edition, 1971
      Reprinted 1973, 1974, 1975
Second Edition, 1977
      Reprinted 1978, 1979, 1982
Third Edition, 1984
      Reprinted 1988
Fourth Edition, 1991
    First Spanish Edition, 1974
    First Japanese Edition, 1976
    Second Japanese Edition, 1981
    Second Turkish Edition, 1981

The use of portions of the text of USP XX-NF XV is by permission of the USP Convention. The Convention is not responsible for any inaccuracy of quotation or for false or misleading implication that may arise from separation of excerpts from the original context or by obsolescence resulting from publication of a supplement.

Reprints of chapters may be purchased from Lea & Febiger in quantities of 100 or more.

Copyright © 1991 by Lea & Febiger. Copyright under the International Copyright Union. All Rights Reserved. This book is protected by copyright. No part of it may be reproduced in any manner or by any means without written permission from the publisher.

PRINTED IN THE UNITED STATES OF AMERICA

Print no.:  4  3  2  1

# 7

# Prolonged-Release Medication

## PHARMACOKINETIC THEORY

The duration of drug effect is a function of the pharmacokinetics of the drug molecule in an individual patient. The clearance and apparent volume of distribution of a drug determine the degree of persistence of the molecule in the body. This persistence is characterized in terms of half-life or mean residence time (MRT). Because the duration of drug action is related to the distribution and elimination kinetics of a drug, the frequency of dosing must also bear some relationship to the drug's half-life or MRT.

We often find that the frequency of dosing needed to maximize the benefit-to-risk ratio of a drug is unreasonable. For example, in most patients, procainamide must be given every 3 to 4 hr around the clock to assure continuous suppression of irregular cardiac rhythms. The same dosing requirements apply to the use of the bronchodilator theophylline in children. The optimum use of idoxuridine eye drops for herpetic keratitis calls for hourly administration.

A particularly conscientious patient may be able to comply with these requirements during the waking hours, but even he is confounded during the sleep period. Excessively frequent dosing requirements do not encourage compliance to the prescribed drug regimen, particularly when the drug is used prophylactically or to treat a silent disease such as hypertension.

The alternative solutions to this important therapeutic problem include giving the drug less frequently and accepting a less favorable therapeutic outcome, seeking new drugs with similar pharmacologic effects but more favorable pharmacokinetic characteristics, or developing a prolonged-release dosage form. In most cases, experience

dictates that the pharmaceutical solution be examined first.

### Drug Absorption and Duration of Effect

Prolonged-release medication is a dosage form containing more drug than a conventional dosage form but releasing the drug far more slowly, over a period of hours or even days rather than seconds or minutes. In essence, we seek a situation where the duration of drug action is substantially determined by the duration of drug release from the dosage form rather than the drug molecule's pharmacokinetic properties.

This idea can be expressed mathematically by considering the intravenous and oral administration of a drug that distributes rapidly from the bloodstream. After intravenous bolus administration, drug concentration in the blood is given by:

$$C = C_o \exp(-kt) \qquad (7-1)$$

where $C_o$ is the initial drug concentration and k is the first-order elimination rate constant. Under these conditions, MRT is given by:

$$MRT_{iv} = 1/k \qquad (7-2)$$

The persistence of drug in the body and the duration of drug effect is a function of drug elimination kinetics.

Following oral administration of the drug, assuming first-order absorption, concentration in the blood is given by:

$$C = C^*F[\exp(-kt) - \exp(-k_a t)] \qquad (7-3)$$

where $C^*$ is a complex constant, F is the fraction of the oral dose reaching the systemic circulation, and $k_a$ is the first-order absorption rate constant. The MRT is given by the following equation:

$$MRT_{oral} = MRT_{iv} + 1/k_a \qquad (7-4)$$

124

The time course of drug concentration in the blood is affected by the absorption process, i.e., $MRT_{oral} > MRT_{iv}$. But, for most drugs, absorption from conventional dosage forms is so rapid that $MRT_{oral}$ is not substantially greater than $MRT_{iv}$. Accordingly, even after oral administration the duration of effect is largely a function of the elimination kinetics of the drug.

However, if the release rate of drug from the dosage form is decreased (i.e., decrease $k_a$), we simultaneously increase $MRT_{oral}$. The MRT becomes more dependent on the release rate and less dependent on the drug molecule's kinetics. Using this approach, a situation is reached where the MRT and the duration of effect are largely controlled by the release rate of drug from the dosage form.

### Frequency of Dosing and Therapeutic Index

The *therapeutic index* of a drug is most usefully defined in man as the ratio of the maximum drug concentration in blood that can be tolerated to the minimum drug concentration needed to produce a satisfactory clinical response. Therapeutic concentration ranges for certain drugs in man have been identified. In some cases, these ranges are narrow, resulting in small therapeutic indices.

The average therapeutic range of theophylline concentration in blood is about 8 to 20 $\mu g/ml$; the therapeutic index of theophylline is 2.5. Estimates of therapeutic index for other drugs are 2.0 for digoxin and valproic acid, 2.7 for procainamide, and 4.0 for lidocaine. We seek to maintain drug concentrations in blood well within the therapeutic range during drug therapy. This requires not only the selection of an appropriate daily dose; the drug must also be given with sufficient frequency so as to minimize the range of blood concentrations that are produced. The ratio of maximum to minimum drug concentrations at steady state should not exceed the therapeutic index of the drug. This concentration ratio is a function of the half-life of a drug and the frequency of dosing.

For drugs that are both absorbed and distributed rapidly, Theeuwes and Bayne[1] have demonstrated the following relationship:

$$\tau < t_{\frac{1}{2}} (\ln TI)/(\ln 2) \qquad (7\text{--}5)$$

where $\tau$ is the dosing interval, $t_{\frac{1}{2}}$ is the half-life, and TI is the therapeutic index. A drug with a therapeutic index of 2 and a half-life of 3 hr must be given no less frequently than every 3 hr to avoid excessive or subtherapeutic concentrations. A drug with a similar half-life but a therapeutic index of 4 may be given every 6 hr.

When drug effects are directly related to concentration in blood but distribution is slow, the drug must be given even more frequently than suggested by Equation 7–5. In such cases, a better estimate of dosing interval may be obtained by replacing $t_{\frac{1}{2}}$ with 0.693(MRT) where MRT is the mean residence time.

### Steady-State Concentrations and Release Rate

Dosing regimens for rapidly absorbed drugs are a function of the pharmacodynamic and pharmacokinetic characteristics of the drug molecule; they must be based on the therapeutic index and half-life or MRT of the drug itself. Reducing the absorption rate of a drug by controlling its release rate from the dosage form, however, can dramatically affect drug concentrations at steady state. For a given dosage regimen, the slower the release rate of drug, the smaller is the ratio of maximum to minimum drug concentrations at steady state. Under these conditions, we can give larger doses at less frequent intervals and still stay within the therapeutic concentration range of the drug; this is the rationale for prolonged-release medication.

Prolonged-release medication offers obvious advantages for drugs with short half-lives and small therapeutic indices. These specialized dosage forms permit such drugs to be given at more reasonable intervals throughout the day; implications include more optimal therapy, patient convenience, and improved patient compliance with the prescribed regimen. The application of prolonged-release medication, however, is not limited to such drugs. Since these dosage forms offer the potential of reducing the peak-to-trough drug concentration ratio, they may be useful for many more drugs.[2]

Reducing the peak-to-trough concentration ratio has been found to improve the benefit-to-risk ratio of some drugs. The potassium-depleting effect of hydrochlorothiazide disappears, while its diuretic effect is slightly enhanced, when the drug is given every 3 hr rather than once a day.[3] The nephrotoxicity of gentamicin is substantially reduced when steady-state concentrations are maintained in a narrow range of about 1 to 4 $\mu g/ml$.[4] The safety of certain anticancer drugs, including bleomycin[5] and methotrexate,[6] is increased when given continuously by infusion rather than intermittently.

126                    Biopharmaceutics and Clinical Pharmacokinetics

By minimizing fluctuations in blood levels we may be able to reduce the dosage required, improve the effectiveness, and decrease the adverse effects of a drug. For instance, pilocarpine administered continuously by an ocular insert reduces elevated intraocular pressure in patients with glaucoma without the marked myopia commonly seen in patients using pilocarpine eyedrops every six hours.

White[7] compared intraoperative and postoperative effects of fentanyl and ketamine administered by continuous intravenous infusion with those produced by intermittent iv bolus doses. Continuous infusion minimized the peaks and valleys of drug concentration in blood and, presumably, brain that ordinarily result from intermittent dosage.

Women scheduled for elective outpatient gynecologic surgery received either fentanyl or ketamine as an intravenous adjunct to nitrous oxide for maintenance of general anesthesia after induction with thiopental. The drugs were given either by continuous iv infusion or intermittent iv bolus. The method of drug administration resulted in important differences.

Only about one-half the dosage of fentanyl or ketamine was needed to maintain anesthesia when the drugs were given by continuous infusion rather than by intermittent bolus. The use of less drug resulted in more rapid recovery from anesthesia and in substantially less postoperative sedation, and minimized postoperative psychomotor dysfunction. Excessive sedation was noted in about 50% of the patients in the bolus groups but in less than 10% of the patients in the infusion groups.

Continuous infusion also improved intraoperative conditions. Respiratory depression and muscular rigidity occurred less frequently with continuous rather than intermittent administration of fentanyl. Hypertension and tachycardia occurred less frequently with continuous rather than intermittent ketamine.

### Zero-Order Release

Continuous, constant-rate intravenous infusion leads to constant blood levels. Under these conditions, blood levels are invariant with time; there are no peaks or troughs. Provided that the constant drug concentration is within the therapeutic range, this is an ideal situation for many drugs. The only way to achieve constant blood levels is to administer the drug at a constant (zero-order) rate over the entire dosing interval. The concentration of drug at steady state is given by the following equation:

$$C_u = k_o/Cl \qquad (7-6)$$

where $k_o$ is the zero-order delivery or release rate of drug, and Cl is the clearance of the drug. Fluctuations in blood levels do occur under these conditions, because of temporal variations in clearance or in the delivery rate, but they are usually small.

Until recently, constant rate intravenous infusion, by means of a carefully controlled drip or mechanical pump, was the only way to attain constant blood or tissue levels of drug. Today, there are dosage forms intended for oral, ocular, intravaginal, or intramuscular administration that release drug in a zero-order or near zero-order fashion. These dosage forms are discussed in other sections of this chapter.

### ORAL MEDICATION

Most prolonged-release dosage forms are intended for oral administration. A prolonged-release dosage unit contains more drug than a conventional dosage unit but is intended to be given less frequently. A drug that is ordinarily given at a dose of 250 mg 4 times a day in a conventional tablet or capsule may be given at a dose of 500 mg twice a day, or 1 g once a day, in a prolonged-release dosage form. The ultimate criteria for evaluating such dosage forms are: (1) the amount of drug intended to be absorbed is indeed absorbed in a predictable and consistent manner; and (2) the steady-state ratio of maximum to minimum drug concentrations is no greater than or, optimally, less than that produced by the more frequently administered conventional dosage form.

The early history of the prolonged-release oral dosage form is probably best forgotten. Products were developed empirically, often with little rationale, and bioavailability problems were common. Many people viewed these dosage forms as little more than marketing inducements. Today, the situation has improved; many of the available products are well designed drug delivery systems and have a defined therapeutic goal. In some cases, the prolonged-release dosage form is the most important and most frequently used form of the drug.

A wide variety of techniques have been used to develop prolonged-release oral dosage forms. These techniques include the use of drug substances of decreased solubility or dissolution rate, accomplished by increasing particle size or substi-

tuting less soluble salts or complexes, ion exchange resins to bind the drug substance, porous, nondisintegrating, inert carriers as matrices for the drug, slowly eroding coatings or matrices, and coatings that serve as membranes for drug diffusion.

Most oral prolonged-release dosage forms can be characterized as either subdivided or single units. Subdivided prolonged-release dosage forms, exemplified by the hard gelatin capsule containing numerous drug-impregnated beads, present the drug to the gastrointestinal tract in the form of many slowly-dissolving particles or granules. Often, several kinds of beads are found in the capsule, some releasing the drug rapidly, others releasing the drug over a period of several hours, still others releasing the drug at intermediate rates. Spansule is a trade name historically associated with this dosage form. More details of these and other formulations can be found in a recent review by Longer and Robinson.[8] Phenothiazines, antihistamines, iron, and many other drugs are available in this kind of dosage form. In general, the release and absorption of drugs from slow-release beads can be described by first-order kinetics.

The single-unit prolonged-release dosage form remains more or less intact throughout the gastrointestinal tract, releasing the drug continuously during its passage down the tract. An example of this dosage form is the inert plastic matrix, a dosage form that has been used widely in Europe. The drug is mixed with inert, insoluble, powdered matrix material consisting of plastic resins and is compressed. In the gastrointestinal tract, drug particles from the surface of the matrix system dissolve and leave pores through which drug from within the tablet leaches out. The matrix retains its shape during the leaching process and is eliminated in the feces. The release rate of drug decreases with time and, in this sense, resembles a first-order process.[9]

The steady-state plasma levels and pharmacologic effects of a daily dose of 0.2-g metoprolol, a cardioselective β-blocker, in a prolonged-release matrix tablet and in regular 0.1-g tablets were studied in healthy subjects. The following dosing regimens were used: (1) one prolonged-release tablet once a day; (2) two 0.1-g regular tablets once a day; and (3) one 0.1-g regular tablet every 12 hr. The peak-to-trough concentration ratio of metoprolol was, on the average, about 10 for the matrix tablet and the twice-a-day regimen and about 40 for the once-a-day administration of the regular

tablets (Fig. 7–1). Metoprolol in the matrix tablet produced a more uniform effect on heart rate and systolic blood pressure during exercise than the corresponding daily dose of metoprolol given as two 0.1-g tablets once daily or as one 0.1-g tablet twice a day.[10] Although metoprolol has a relatively short half-life, about 3 hr, a once-a-day regimen can be developed with a prolonged-release dosage form. The same is true for propranolol.[11]

Some pharmaceutical scientists judge subdivided prolonged-release dosage forms to be potentially safer than intact or single-unit dosage forms because a mechanical failure of the coating or matrix would result in the immediate release of only a small fraction of the entire dose. Mechanical failure is unlikely to occur with the matrix tablet, but it may occur in those single-unit dosage forms that rely on a continuous membrane to control release. A failure in this case may result in the immediate dumping of the entire dose, a quantity of drug that is 2 or 3 times the amount given as a single dose in a conventional dosage form.

Because prolonged-release products are complex dosage forms, substantial differences in performance among different products of the same drug may occur. Although the prolonged-release matrix tablet of metoprolol, previously described, has a longer duration of effect than the same dose of the drug given as regular tablets,[12] this is not true for a different prolonged-release product of metoprolol.[13,14] One product shows a significant improvement over conventional metoprolol whereas the other does not.

Considerable differences among prolonged-release products of theophylline have also been reported. Studies in adult subjects indicate that theophylline is slowly but completely and consistently absorbed from three of six prolonged-release formulations. Theophylline absorption from the other three products is more erratic and less complete.[15] In another study, theophylline absorption from three commercial products labeled as prolonged-release was compared to the absorption from a standard uncoated tablet. Two of the prolonged-release products showed considerably slower absorption of theophylline than did the regular tablet, but the third product did not.[16]

To determine whether clinically important changes in serum theophylline concentrations occur when patients switch their brand of prolonged-release theophylline, 10 subjects with asthma were given the same dose of four different

128                          Biopharmaceutics and Clinical Pharmacokinetics



**Fig. 7–1.** Mean steady-state plasma concentrations of metoprolol after repetitive dosing of a prolonged-release tablet (0.2 g) once a day (●), two 0.1 g regular tablets once a day (○), and one 0.1 g regular tablet every 12 hr (□). (From Johnsson, G., et al.[10])

commercially available products for 2-week periods in a random, double-blinded, crossover fashion.[17]

On at least one occasion in every subject, switching between brands of theophylline resulted in serum theophylline levels outside the accepted therapeutic range, and this was associated with toxic symptoms in 5 of the subjects. Worsening pulmonary function was observed in two subjects when switching resulted in lowered theophylline levels. Many of the changes in theophylline concentrations on switching from one brand to another could not be predicted by the bioavailability differences between the products. The investigators concluded that "these results argue against the open substitution of these formulations and suggest that if patients are switched between different brands of SR theophylline, their serum theophylline concentration needs to be closely monitored."

Much has been published concerning prolonged-release theophylline during the past 10 years. The drug has a relatively short half-life, particularly in children, and a small therapeutic index. Clinical studies suggest that 40% of all children receiving conventional products of theophylline in the usual every 6-hr manner will have excessive or subtherapeutic blood levels of the drug.[18]

Although no well-controlled clinical trials have been published showing that prolonged-release theophylline preparations are more effective than plain theophylline tablets or solutions, many clinicians report that the long-acting formulations are more effective in controlling symptoms, especially during the night. Furthermore, compliance is likely to improve when patients take medication only twice a day, rather than 3 or 4 times a day. On the other hand, some clinicians have found that when adverse effects occur with prolonged-release theophylline, they persist longer. Some patients taking the long-acting preparations complain of insomnia, a known adverse effect of theophylline.

Adult smokers and children, who metabolize theophylline rapidly, may benefit most from treatment with prolonged-release preparations. In many patients, it may be necessary to individualize the daily dose and, in some patients, it may be necessary to give the product more frequently than twice a day.

Individual variability in dosing requirements is clearly seen in the results of a study evaluating one of the more commonly prescribed prolonged-release theophylline preparations, Theodur.[19] In a panel of 20 asthmatic patients, 6 to 18 years of age, receiving the long-acting theophylline product twice a day, the daily doses needed to produce an average blood level of about 15 µg/ml ranged from 6.1 to 16.3 mg/kg. The blood levels resulting from these individualized regimens, as estimated from 4 to 5 blood samples taken over the course of each of 2 consecutive steady-state dosing intervals, showed surprisingly little fluctuation. Peak and trough values and peak-to-trough ratios for the 20

Table 7–
of Theop
Children
a Day in

Patient

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
*Data fro

patients
levels a
doses of
average
these pa
trough c

A cir

Fig. 7–2
in a prolc
preparatic
American

Prolonged-Release Medication    **129**

**Table 7–1.** Peak and Trough Serum Concentrations of Theophylline During 24 hr at Steady State in Children Receiving, on the Average, 10 mg/kg Twice a Day in a Prolonged-Release Product.*

| Patient | Peak concn. (μg/ml) | Trough concn. (μg/ml) | Peak-to-trough ratio |
|---|---|---|---|
| 1 | 17.6 | 10.3 | 1.7 |
| 2 | 22.7 | 12.7 | 1.8 |
| 3 | 17.0 | 12.0 | 1.4 |
| 4 | 22.9 | 14.8 | 1.5 |
| 5 | 16.4 | 11.2 | 1.5 |
| 6 | 18.9 | 12.4 | 1.5 |
| 7 | 17.2 | 7.0 | 2.5 |
| 8 | 21.8 | 16.3 | 1.3 |
| 9 | 13.7 | 8.7 | 1.6 |
| 10 | 15.5 | 12.6 | 1.2 |
| 11 | 20.3 | 16.6 | 1.2 |
| 12 | 18.5 | 9.0 | 2.1 |
| 13 | 18.4 | 10.6 | 1.7 |
| 14 | 19.7 | 12.1 | 1.6 |
| 15 | 17.6 | 10.5 | 1.7 |
| 16 | 20.3 | 15.4 | 1.3 |
| 17 | 17.5 | 11.8 | 1.5 |
| 18 | 23.5 | 16.7 | 1.4 |
| 19 | 14.5 | 7.6 | 1.9 |
| 20 | 16.8 | 10.4 | 1.6 |

*Data from Kelly, H.W., and Murphy, S.[19]

patients are shown in Table 7–1. Average blood levels are shown in Figure 7–2. If twice-a-day doses of regular theophylline, sufficient to produce average levels of about 15 μg/ml, were given to these patients we would expect to find peak-to-trough concentration ratios of about 10.

A circadian variation in theophylline levels in serum is quite evident during treatment with certain twice-a-day slow-release theophylline products. Steady-state theophylline concentrations for the 12-hr period following the morning dose are different from those following the evening or night dose. In one study, peak concentration at steady state after an 11 AM dose occurred at about 3 hr after dosing, whereas peak level was observed at about 9 hr following the 11 PM dose, which was taken immediately before retiring.[20] The area under the concentration-time curve during a dosing interval at steady state was also smaller after the night dose than following the morning dose. These differences reflect a circadian variation in theophylline absorption rather than in theophylline metabolism.

A change in posture could be a simple explanation of the circadian variation in theophylline pharmacokinetics.[21] This was examined in healthy human subjects who took 450 mg slow-release aminophylline orally at the same time of day on two separate occasions. On one day the subjects remained standing and on the other, they lay supine throughout the study. Theophylline levels in plasma were measured hourly for 6 hr after the dose.

At each sampling time, theophylline levels were higher during the standing experiment than during the supine study. Peak concentration of theophylline with the subjects standing occurred at 5 hr and was 6.4 mg/L. Theophylline levels were ascending for the entire 6-hr study period in the supine group;



**Fig. 7–2.** Mean steady-state serum concentrations of theophylline in children receiving an average dosage of 10 mg/kg in a prolonged-release product every 12 hr. (From Kelly, H.W., and Murphy, S.: Efficacy of a 12-hour sustained-release preparation in maintaining therapeutic serum theophylline levels in asthmatic children. Pediatrics, 66:100, 1980. Copyright American Academy of Pediatrics 1980.)

130                         Blopharmaceutics and Clinical Pharmacokinetics



Fig. 7–3.  Mean steady-state serum levels of lithium in healthy subjects who received a 300-mg capsule 3 times a day or a 450-mg prolonged-release tablet twice a day. (From Caldwell, H.C., et al.[24])

mean concentration at 6 hr was 5.4 mg/L. The investigators concluded that the supine position assumed at bedtime may be an adequate explanation for the diurnal variation seen with twice-a-day prolonged-release theophylline products.

Theophylline is widely used in children, so it is not surprising that slow-release tablets are sometimes chewed or crushed to facilitate swallowing. This practice may result in a loss of the prolonged-release characteristic of the product. To examine this question, Theo-Dur, a widely used formulation, was given to healthy adult subjects on three occasions, at least 1 week apart.[22] On the first day, subjects were randomly allocated to either swallow intact or chew, and then swallow, a 300 mg tablet. Subjects were then crossed over for the second dose. The effects of crushing the tablet prior to ingestion were studied at the third dose. Swallowing the tablets intact resulted in a significantly longer time to peak concentration compared with chewing or crushing (i.e., 6 hr *vs* about 3 hr) and the peak concentration was somewhat lower, 35.6 μmol/L, compared with chewing (43.1 μmol/L) or crushing (41.9 μmol/L). Area under the curve, however, was about the same for all three modes of administration. Chewing or crushing Theo-Dur tablets does not appear to have a substantial effect on the bioavailability characteristics of the product, suggesting that it may be a suitable preparation for use in young children.

A prolonged-release liquid theophylline preparation, aimed at the pediatric population and designed for twice-daily administration, is under investigation.[23] The suspension was compared with aminophylline solution (administered every 8 hr) in 27 asthmatic children less than 12 years of age. Average steady-state levels of theophylline were about 10% lower during treatment with the suspension than with the solution. Peak levels were also lower (11.2 vs 14.2 μg/ml) and the difference between $C_{max}$ and $C_{min}$ was smaller (6.9 vs 10.0 μg/ml) with the suspension. The investigators concluded that the slow-release suspension should prove to be useful in patients who require maintenance theophylline therapy, but who cannot take solid oral dosage forms.

Lithium carbonate is the drug of choice in treating certain phases of manic depression. Although the drug has a long half-life, about 24 hr, it also has a narrow therapeutic index and must be given 3 or 4 times a day. Steady-state serum level fluctuations of lithium were compared following regular capsules (300 mg 3 times a day) or prolonged-release tablets (450 mg every 12 hr) of lithium carbonate.[24] Average blood levels are shown in Figure 7–3. The degree of fluctuation (Fl) of serum levels was assessed by the following equation:

$$Fl = (C_{max} - C_{min})/\overline{C} \qquad (7\text{–}7)$$

where $C_{max}$ and $C_{min}$ are the maximum and minimum drug concentrations over the 24-hr steady-state dosing cycle, and $\overline{C}$ is the mean concentration

over th
area un
tuation
iation;
release
than the
could b
for sma
was 0.4
and 0.6
gesting
40% m
the slow

Fluct
to the r
and the
val), b
Steady-
ophylli
tween
ance in

Weir
percent
theophy
longed-
57% in
= 7.7
olizers

Seve
the und
narrow
ample;
toxic c
tions i
μg/ml
toxicity
the reg
every

Stea
mined
in the
the dru
levels
patient
level o
the 9 p
imum l
have b
proved
26 pati
more tl
a lowe

over the cycle. $\overline{C}$ is estimated from the ratio of area under the curve to dosing interval. This fluctuation index is analogous to the coefficient of variation; small values are desired for the prolonged-release preparation. This index may be more stable than the peak-to-trough concentration ratio, which could be highly unstable in the presence of error for small values of $C_{min}$. In this study, the index was 0.46 for the prolonged-release tablet regimen and 0.66 for the regular capsule regimen, suggesting that the regular product produces about 40% more fluctuation in serum lithium levels than the slow-release formulation.

Fluctuations in serum levels are related not only to the release rate of drug from the dosage form and the frequency of administration (dosage interval), but also vary with drug elimination rate. Steady-state studies with a prolonged-release theophylline product found a linear relationship between percent fluctuation and theophylline clearance in individual subjects.[25]

Weinberger and Hendeles[26] also calculated the percent fluctuation in steady-state serum levels of theophylline for different products. With one prolonged-release product, percent fluctuation was 57% in slow metabolizers of theophylline (half-life = 7.7 hr) but increased to 154% in rapid metabolizers (half-life = 3.7 hr).

Several antiarrhythmic drugs are plagued with the undesirable characteristics of short half-life and narrow therapeutic index. Procainamide is an example; its half-life is about 3 hr. Therapeutic and toxic effects have been related to drug concentrations in plasma. The therapeutic range is 4 to 8 $\mu g/ml$ but can often extend to 10 $\mu g/ml$ without toxicity. To maintain safe, adequate blood levels, the regular tablet form of the drug must be given every 3 to 4 hr.

Steady-state levels of procainamide were determined in patients receiving about 20 mg/kg per day in the form of prolonged-release matrix tablets of the drug every 8 hr.[27] Mean procainamide blood levels are plotted in Figure 7–4. In 17 of the 26 patients, blood levels were maintained above a level of 4 $\mu g/ml$ for at least 75% of the time. Of the 9 patients showing blood levels below the minimum level for more than 25% of the time, 8 would have benefited from an increased daily dose or improved compliance with the regimen. In 4 of the 26 patients, blood levels were above 10 $\mu g/ml$ for more than 10% of the time. All 4 patients required a lower daily dose and, possibly, more frequent

administration. The results suggest that this prolonged-release form of procainamide, given every 8 hr, would benefit most patients if the daily dose were individualized.

Disopyramide is another orally effective antiarrhythmic; its electrophysiologic properties are similar to those of quinidine and procainamide. A therapeutic range of 2 to 4 $\mu g/ml$ has been suggested for the drug. Because of its short half-life, disopyramide must be given 4 times a day to maintain safe and effective concentrations in plasma. Disopyramide concentrations were determined in plasma following repeated doses of regular capsules (150 mg every 6 hr) or prolonged-release matrix tablets (300 mg every 12 hr) to patients with various kinds of arrhythmia.[28] A level of 4 $\mu g/ml$ with regular capsules was exceeded by 2 patients, and 1 patient exceeded this level with the matrix tablet. None of the patients had a level below 2 $\mu g/ml$. The average steady-state peak-to-trough concentration ratio was 1.4 for the capsules and 1.6 for the prolonged-release tablets. The average fluctuation index was 0.36 for the regular product and 0.43 for the prolonged-release preparation. Although the matrix tablet was given only half as frequently as the regular capsules, little difference in blood levels of disopyramide was noted between products. The matrix tablet of disopyramide appears to be a useful prolonged-release form of the drug.

Drugs absorbed by specialized, capacity-limited transport processes are ordinarily not good candidates for prolonged-release dosage forms. Facilitated absorption is often site-specific and drug released beyond this site in the intestine is usually poorly absorbed. Iron may be an exception. A prolonged-release preparation containing 100 mg of ferrous iron, given twice daily, was compared to a conventional tablet containing 50 mg of ferrous sulfate, given 4 times daily. In patients with iron deficiency anemia, more iron was absorbed from the slow-release preparation.[29]

Prolonged-release forms of drugs such as nitrofurantoin[30] or lithium[31] have been investigated for reducing the incidence of nausea and vomiting resulting from gastrointestinal irritation or high blood concentration peaks. Studies with lithium in human subjects show that rapidly disintegrating tablets generally produce more nausea than do prolonged-release tablets. The incidence of this side effect appears to correlate with high concentrations of lithium in the stomach and proximal intestine.

132                          Biopharmaceutics and Clinical Pharmacokinetics





Fig. 7–4.   Mean levels of procainamide during repetitive dosing of a prolonged-release tablet every 8 hr. (From Cunningham, T., Sloman, G., and Nyberg, G.[27])

Fig. 7–6.  Me
metoprolol (ng/
ing of an EOP
conventional p
(Data from Ker



Fig. 7–5.   Cross section of an elementary osmotic pump (EOP) designed to release drug in a zero-order (constant-rate) manner. (From Theeuwes, F.[33] Reproduced with permission of the copyright owner.)

On the other hand, the slower the release of lithium from a dosage form, the higher is the incidence of diarrhea. This adverse effect seems to be related to high concentrations of lithium in the distal intestine, a situation found only with prolonged-release products.[31] More recent studies confirm these results.[32]

### Zero-Order Release

The ideal approach to minimizing blood level fluctuations of a drug is to use zero-order release from the dosage form. A system, termed the elementary osmotic pump (EOP), is now available to achieve this goal. Figure 7–5 shows a diagram of this dosage form, which resembles a coated tablet. The EOP tablet contains a solid core of drug and adjuvants coated with a polymer membrane, permeable to water and interrupted only by a single small orifice with a diameter of 0.1 to 0.4 mm.[33] After the tablet is swallowed, the membrane se-

lectively admits water from the gastrointestinal tract; drug within the membrane is gradually dissolved. The internal pressure produced by entry of the water forces the drug solution out of the orifice. Since the volume of the system is fixed, constant-rate release is achieved. Typically, 60 to 80% of drug content is delivered at a constant rate; the rest of the dose is released in a pseudo-first-order fashion. The depleted membrane sac is excreted intact. Release rates as high as 60 mg/hr may be achieved with this dosage form. Drug release is independent of pH or motility.

The duration of drug delivery is controlled by the permeability of the membrane and the composition of the core. At a given rate of drug delivery, the duration of controlled release is determined by the amount of drug in the core. In practice, however, the duration of release is limited by intestinal transit time and probably cannot exceed 8 to 12 hr without compromising the extent of absorption.

The hemodynamic effects and plasma levels of metoprolol have been determined after single and multiple doses of EOP tablets or more conventional prolonged-release tablets of the drug.[37] Both dosage forms were given once a day for 8 days to healthy subjects. The prolonged-release tablets contained 200 mg metoprolol tartrate; the EOP tablets contained 190-mg metoprolol fumarate (equivalent to 200 mg of the tartrate) with a 19 mg/hr zero-order release rate. Both formulations reduced exercise heart rate and exercise systolic blood pressure for the entire 24-hr steady-state dosing interval, but the EOP tablets elicited a more uniform response. Mean steady-state plasma profiles of me-

toprolol are :
concentratior
prolonged-re
lets. Fluctua
longed-relea:
Both hemod
support the s

The steady
the EOP tabl
the dosing i
proximated 2
took place o
of 24 hr) of t
blood levels
over the enti
more closel:
azolamide, a
in EOP tabl
of acetazola
12 hr with E
an 8-hr perio
interval.

Bayne et
stant release
based on th
and intendec
is usually gi
of rheumato

Steady-st
mined in pl
ceived 150

Prolonged-Release Medication 133



Fig. 7–6. Mean steady-state plasma concentrations of metoprolol (ng/ml) in healthy subjects after repetitive dosing of an EOP prolonged-release product (●) or a more conventional prolonged-release product (○), once a day. (Data from Kendall, M.J., et al.[34])



Fig. 7–7. Schematic representation of the filling and operation of the osmotic pump. (From Eckenhoff, B., and Yum, S.I.[38] By permission of the publishers, Butterworth & Co. Ltd. Copyright 1981.)

toprolol are shown in Figure 7–6. Peak-to-trough concentration ratios were 4.5 for the conventional prolonged-release tablets and 2.6 for the EOP tablets. Fluctuation indices were 1.31 for the prolonged-release tablets and 0.88 for the EOP tablets. Both hemodynamic and pharmacokinetic criteria support the superiority of the EOP tablet.

The steady-state metoprolol levels produced by the EOP tablets show considerable fluctuation over the dosing interval even though release rate approximated zero-order. This occurs because release took place over a relatively small fraction (10 out of 24 hr) of the dosing interval. To obtain constant blood levels, there must be constant-rate release over the entire dosing interval. This situation was more closely approximated in studies with acetazolamide, a drug that reduces intraocular pressure, in EOP tablets.[35] Relatively constant blood levels of acetazolamide were obtained by dosing every 12 hr with EOP tablets that release the drug over an 8-hr period, or about three quarters of the dosing interval.

Bayne et al.[36] described the evaluation of constant release rate dosage forms of indomethacin, based on the elementary osmotic pump principle and intended to be taken twice a day. Indomethacin is usually given 3 or 4 times a day in the treatment of rheumatoid arthritis and osteoarthritis.

Steady-state levels of indomethacin were determined in plasma of healthy subjects who had received 150 mg/day for 5 days according to the following regimens: (a) controlled-release tablet delivering drug over 8 hr, given twice a day; (b) controlled-release tablet delivering drug over 11 hr, given twice a day; (c) regular capsules of indomethacin given 4 times a day; (d) regular capsules given 3 times a day.

Average indomethacin levels in plasma at steady state were similar for all four regimens, but subjects taking the prolonged-release dosage forms showed much less fluctuation in plasma levels of drug than subjects taking regular capsules. Also, trough levels of indomethacin before the morning dose were significantly higher during treatment with controlled-release tablets than with regular capsules. This difference may be important for the relief of morning stiffness often seen in arthritics.

Generic osmotic pumps are also available as experimental tools for animal or clinical studies. They are useful for, but not limited to, oral administration.[9,37,38] A diagram of this dosage form is shown in Figure 7–7. The reservoir is filled with a drug solution. The wall of the reservoir is inert, impermeable, and flexible. A sleeve of osmotically active agent is placed between the reservoir wall and the rigid semipermeable membrane.

Water from the surroundings is imbibed through the outer membrane into the osmotic sleeve at a rate controlled by the permeability of the membrane and the osmotic pressure difference across the membrane. The incoming water squeezes the reservoir and drug solution is expelled in a constant-volume per-unit-time fashion. Delivery of

134                              Biopharmaceutics and Clinical Pharmacokinetics

drug solution continues at a constant rate until the drug reservoir is completely collapsed.

### Limitations of Prolonged-Release Medication

A factor that circumscribes the use of oral prolonged-release medication is the limited residence time of the dosage form in the small intestine. Absorption from the colon may be poor or unpredictable. Hence, small intestine transit time is often of paramount importance in determining the bioavailability of the drug from this dosage form.

The gastrointestinal transit of a radiolabeled osmotic tablet (elementary osmotic pump) has been monitored in groups of young and elderly healthy human subjects.[39] Gastric emptying and small intestine transit were similar for both groups of subjects. Gastric emptying of the tablet when given after a light breakfast (orange juice, cornflakes, and milk) averaged about 3 hr; the tablets arrived at the cecum, on average, about 7 hr after dosing.

In another study, the position in the gastrointestinal tract of an orally administered osmotic tablet containing a radiolabel and oxprenolol, a beta-blocker available in Europe, was followed in fasted subjects by gamma scintigraphy.[40] Gastric emptying times (about 1 hr) and the time to arrival in the colon (about 4 hr) were relatively consistent from one subject to another.

On the other hand, there were wide individual variations in colonic transit with values ranging from 2.5 to 27.5 hr. Accordingly, total transit time ranged from 6 to 32 hr. In the individual with the most rapid colonic transit and total transit, the bioavailability of oxprenolol was only 14%, and 79% of the administered dose was recovered in the stool. In the two individuals with the slowest colonic transit, bioavailability was 40% and 54%.

External gamma scintigraphy was also used to monitor the gastrointestinal transit of radiolabeled prolonged-release tablets containing 800 mg ibuprofen in fasted healthy subjects.[41] The tablet was formulated using an erodible polymer matrix system.

The gastric retention time of the tablets ranged from 10 to 60 min, with a mean value of 35 min. Transit time of a tablet through the small intestine was calculated by subtracting gastric residence time from the time at which the tablet was observed to enter the large bowel. Small bowel transit time ranged from about 2 to 8 hr, with a mean value of 4.7 hr. Again, total transit time was variable (8 to

18 hr) and largely dependent on large bowel residence time, which ranged from 6 to 14 hr.

A statistically significant correlation ($r = 0.89$) was observed between the area under the curve for 24 hr after administration of ibuprofen and total gastrointestinal transit time. Area under the curve for the subject with the most rapid total transit time (8 hr) was only 94 μg-hr/ml compared with a mean value for the group of 180 μg-hr/ml.

For dosage forms like the matrix tablet or the elementary osmotic pump, which remain intact in the gastrointestinal tract, we usually assume an average effective absorption time of 9 to 12 hr after administration. The release rate of drug from the dosage form must be programmed accordingly. Slower release rates run the risk of poor bioavailability. For dosage forms with similar transit times that release drugs in an apparent first-order manner, release half-lives should not exceed 3 to 4 hr.

Since there is a limit to how much we can reduce the release rate of a drug from certain prolonged-release dosage forms without compromising bioavailability, there is also a limit as to how much we can prolong the duration of drug action by these oral dosage forms. Mathematical simulations of the time course of drug in the blood on multiple dosing of slow-release dosage forms suggest that ordinarily drugs with relatively short half-lives (i.e., less than or equal to 6 hr), and low therapeutic indices (i.e., less than or equal to 3) should be given no less frequently than every 12 hr.[2]

Prolonged-release dosage forms that consist of beads, pellets, or particulates, or that disintegrate into particulates, may be retained in the small intestine for longer periods. The small intestine transit time of pellets depends on size, density, and composition. One study found that increasing the density of standardized pellets from 1.0 to 1.6 increased the average transit time from 7 to 25 hr,[42] but these results could not be confirmed.[43]

We still cannot predict the effect of food on the bioavailability of drugs given in prolonged-release dosage forms. Investigators recently studied the effect of food-related changes in gastric emptying on the absorption of procainamide from a nondisintegrating wax-matrix sustained-release tablet. Gastric residence time was greater in fed than in fasted subjects (3.5 vs 1 hr), but food had no effect on the time required to detect procainamide in plasma, on the time to reach peak concentration of procainamide, or on the extent of absorption of procainamide.[44] A standard meal also had little ef-

fect on the
slow-release
using both
coating.[45]

The effec
may differ
formulation
point. Foo
profile for
Theo-Dur,
slow-release
version of t
completely
than half th
breakfast.[47]

Scandina
study with
single dose
preparation
and later aft
matically r
phylline (se
but it had n

About tw
absorbed af
slow-release
85% of the
a meal.[49]
availability
rate of abs
once-a-day
pletely abso
uct, howev
of absorptic

Fig. 7–8.  T
and fed (O)

fect on the absorption of pseudoephedrine from a slow-release capsule formulation based on a system using both ion exchange technology and a wax coating.[45]

The effect of food on drug absorption kinetics may differ markedly from one prolonged-release formulation to another. Theophylline is a case in point. Food has little effect on the absorption profile for theophylline after administration of Theo-Dur, a well-absorbed and widely prescribed slow-release theophylline product.[46] The pediatric version of this product, Theo-Dur Sprinkle, is also completely absorbed in fasting subjects but less than half the dose is absorbed when it is taken after breakfast.[47]

Scandinavian scientists reported the results of a study with children and adults who were given a single dose of a prolonged-release theophylline preparation (Theolair-SR) after an overnight fast and later after a standardized breakfast.[48] Food dramatically reduced the absorption rate of theophylline (see Fig. 7–8), particularly in the children, but it had no effect on the extent of absorption.

About two-thirds of the dose of theophylline is absorbed after administration of Uniphyl, another slow-release product, to fasted subjects, whereas 85% of the dose is absorbed when it is given after a meal.[49] Although there is an increase in bioavailability with food, there is little effect on the rate of absorption of theophylline. Theo-24, a once-a-day theophylline product, is also incompletely absorbed in fasting subjects. With this product, however, food not only increases the extent of absorption, but also greatly increases the rate of

absorption with about half the daily dose absorbed in a 4-hr period, giving rise to excessively high blood levels of theophylline.[50]

Exposure of the distal small intestine and colon to drug is far more likely when a prolonged-release formulation rather than a conventional tablet or capsule is taken. In some cases, this may result in a higher incidence of lower bowel toxicity. Microorganisms in the lower bowel may enzymatically reduce a drug, leading to metabolites that are not ordinarily seen after administration of the drug in conventional dosage forms. Bacterial metabolism may decrease bioavailability or result in toxic metabolites.

Drugs that are metabolized and inactivated by the gastrointestinal mucosa during absorption may show a higher availability after administration in conventional dosage forms than in slow-release forms, because of capacity-limited biotransformation. This may explain why the apparent bioavailability of chlorpromazine in man is significantly less after administration of a prolonged-release capsule than after administration of a liquid or tablet dosage form of the drug.[49]

Drugs that are efficiently absorbed only in the proximal intestine should not be administered in a prolonged-release product. The consequence of this approach would be incomplete absorption.

## PARENTERAL MEDICATION

### Intramuscular Injections

There has been interest for many years in using the slow absorption of insoluble material in a muscle depot as a means of attaining prolonged drug



**Fig. 7–8.** Theophylline concentrations in serum (μmol/L) after a single dose of a prolonged-release product to fasted (●) and fed (○) children. (Data from Pedersen, S.[48])

136                    Biopharmaceutics and Clinical Pharmacokinetics

action. Unlike oral prolonged-release dosage forms, parenteral therapy is not restricted in frequency of administration to once or twice a day. Therefore, these dosage forms can be administered weekly, monthly, or even less frequently. Sterile aqueous suspensions of insoluble salts of penicillin G, such as procaine penicillin G and benzanthine penicillin G, are available for intramuscular injection. These preparations are administered less frequently than injectable solutions of potassium penicillin G. Another long-acting intramuscular penicillin G preparation consists of procaine penicillin G suspended in peanut or sesame oil, thickened with aluminum monostearate. Poorly water-soluble esters of prednisolone, testosterone, estradiol, medroxyprogesterone, and fluphenazine are also given as intramuscular injections in the form of aqueous suspensions.

Desoxycorticosterone (DOC) is a mineralocorticoid used as replacement therapy in chronic primary adrenocortical insufficiency. Therapy is initiated with intramuscular DOC acetate (DOCA). Once the maintenance dosage is established, a long-acting, microcrystalline, aqueous suspension of DOC pivalate may be used. The usual intramuscular dose of the pivalate is 25 mg for each mg of the daily maintenance dose of DOCA, repeated at 4-week intervals.

Dexamethasone is a fluorinated derivative of prednisolone used primarily in inflammatory or allergic conditions. Dexamethasone acetate is available as a long-acting repository suspension for intramuscular injection. Long-acting intramuscular formulations of methylprednisolone acetate, prednisolone acetate, triamcinolone acetonide, and triamcinolone diacetate are also available.

Androgens are used for replacement therapy in hormone-deficiency states in men and for certain gynecologic conditions and metastatic breast cancer in women. Androgens or anabolic steroids are also used in certain cases to increase growth.

Testosterone itself is not suitable for therapeutic use, except perhaps topically or by means of subcutaneous implants, because it is subject to rapid hepatic metabolism. This problem is overcome by using testosterone esters that are hydrolyzed to testosterone in the body. The esters are dissolved in oil and injected intramuscularly.

In general, the longer the hydrocarbon chain of the ester substituent, the more slowly is testosterone released into the systemic circulation. The most common esters of testosterone are the pro-

prionate, cypionate, and enanthate. Testosterone propionate is usually injected several times a week, but the longer-acting cypionate and enanthate esters need be given every 2 to 4 weeks. These longer-acting esters are drugs of choice for hypogonadism, which requires long-term therapy.

A slow-release intramuscular preparation of a luteinizing-hormone releasing-hormone (LHRH) agonist, formulated in microcapsules designed to release 100 μg/day, has also been described.[52] This preparation, administered once a month, was effective in patients with advanced ovarian and advanced prostatic carcinoma.

Failure to take medication frequently complicates the management of chronic schizophrenia. Fluphenazine decanoate and enanthate are injectable phenothiazine esters that can be administered at intervals of 1 to 3 weeks or longer for treatment of schizophrenia. In contrast, fluphenazine hydrochloride is given orally, 1 to 4 times a day. These poorly water soluble esters are prodrugs and are converted to fluphenazine upon dissolution in the body. The times required, after intramuscular injection in the dog, for 50% of the dose to be excreted in the urine and feces is 7.8 days for the enanthate ester and 22.6 days for the decanoate ester.[53] Dogs were protected against the emetic effects of a 40 μg/kg iv dose of apomorphine for 46 days after being given fluphenazine enanthate and for 105 days after a single dose of the decanoate.[53] Studies in human subjects indicate that absorption from the muscle depot occurs with a half-life of about 3 to 4 days for the decanoate ester.[54] Clinical studies with fluphenazine decanoate indicate that long-acting antipsychotic medication significantly reduces the tendency of chronic psychotic patients to discontinue treatment.[55]

The usual practice of giving fluphenazine decanoate every 2 weeks is primarily based on custom; several lines of evidence suggest that it may be given less frequently. Investigators have studied the persistence of fluphenazine levels in plasma in patients stabilized for at least 1 year on fluphenazine decanoate, 12.5 mg intramuscularly every 2 weeks.[56] Patients were randomized to either continued treatment or placebo injections every 2 weeks for 12 weeks.

No patient relapsed during the study. Mean plasma fluphenazine at baseline for all subjects was 0.86 ng/ml. For the first 6 weeks after withdrawal of the depot medication there was no statistically significant difference in fluphenazine levels be-

tween the continued treatment and placebo groups. The investigators suggested that 2-week intervals between injections of fluphenazine decanoate are excessive and that wider intervals (e.g., 3 to 4 weeks) may achieve similar clinical results.

Haloperidol decanoate, a depot form of the most widely used antipsychotic drug, is also available. The preparation is a sesame oil solution containing the equivalent of 50 mg haloperidol per ml. It is administered by deep injection into the gluteus muscle, usually at monthly intervals. After injection there is slow transfer of the ester from the lipid carrier to the aqueous medium of the tissue. Esterases in muscle tissue and plasma split the ester, releasing haloperidol.

The apparent half-life of haloperidol after depot injection is about 3 weeks. Half-life in this case reflects the release rate of the drug from the muscle depot rather than the rate of metabolism of haloperidol. Steady state occurs after 3 to 4 months of treatment. Short periods of oral haloperidol supplementation may be needed to treat reemergent psychotic symptoms until steady state is reached.

Haloperidol decanoate is intended to be used in patients stabilized on oral haloperidol. An important issue is the relationship between the intramuscular dose and the daily oral dose. As with all neuroleptics, the lowest effective dose is sought to avoid extrapyramidal side effects.

After oral administration, haloperidol is subject to first-pass metabolism; bioavailability is estimated at 60 to 70%. The bioavailability of the intramuscular depot form is probably complete. Based on relative bioavailability and frequency of dosing, a 20-fold conversion is appropriate when switching from oral haloperidol (daily dose) to haloperidol decanoate (dosed every 28 days). Clinical studies suggest that the depot form of the drug may allow even greater dose sparing.[57]

Patients with chronic schizophrenia, stabilized on oral halperidol, were switched to haloperidol decanoate, administered every 4 weeks. The first dose was determined by psychiatric history and the oral dose of haloperidol needed to stabilize the patient. Thereafter, the patient's dose could be adjusted upward or downward at 4-week intervals. For the 30 patients completing the study, the ratio of haloperidol decanoate to oral haloperidol required to achieve equal efficacy ranged from 10:1 to 15:1, lower than the 20:1 ratio needed to maintain equivalent blood levels of haloperidol. These results suggest that by reducing the variability in

blood level of a drug, we may be able to achieve equal efficacy with less drug.

Estrogens and progestins are prescribed to mimic or accentuate the biologic effects of endogenous hormones: to supplement inadequate endogenous production, to correct hormonal imbalance, to reverse an abnormal process, and for contraception. Estradiol is the principal and most biologically potent ovarian estrogenic hormone. It is usually given intramuscularly in the form of an ester (benzoate, cypionate, or valerate) in oil or in an aqueous suspension. Duration of effect varies from several days to several weeks depending on the ester and formulation.

Intramuscular progestin products include a sesame-oil solution of hydroxyprogesterone caproate, used for menstrual disorders (duration of action is about 9 to 17 days), and an aqueous suspension of medroxyprogesterone acetate (MPA), used for endometriosis and injected every 3 months.

Several intramuscular depot preparations are under investigation for use as contraceptives. One preparation that is widely used throughout the world (but not in the U.S.) is depot MPA. The contraceptive use of depot MPA has been controversial for more than a decade. The drug is used in 80 countries and its use in developing nations is endorsed by scientific panels of the World Health Organization and other international agencies. The U.S. Food and Drug Administration has repeatedly denied approval of a 3-month depot MPA product for use as a contraceptive, concluding that the potential adverse effects (carcinogenicity and teratogenicity) of the drug outweigh its benefits.

Another depot progestin, norethindrone enanthate, is also used outside the U.S. for contraceptive purposes. An injection schedule calling for the first four injections to be given at 8-week intervals and subsequent injections to be given at 12-week intervals produced no pregnancies in 295 women over about 1,600 women months.[58]

### Implants

The technology supporting the use of drug implants is well established but commercially successful clinical applications have been slow in coming. Numerous devices have been described for the diffusion of steroids through silicone rubber. For example, contraceptive devices in the form of silicone-rubber capsules containing progesterone have been implanted subcutaneously. Silicone-rubber capsules containing ethinyl estradiol have

138                    Biopharmaceutics and Clinical Pharmacokinetics

been used in the treatment of patients with prostate cancer. Certain disorders of male reproductive function can be treated with long-acting implants of testosterone.

Many investigators are now applying the principles of prolonged release from silicone rubber and other polymers for long-term drug treatment. Examples include systems for narcotic antagonists, such as naloxone, in the treatment of opiate addiction, chemotherapeutic agents for the treatment of cancer, and heparin in the treatment of abnormal blood clotting.

A subdermal silastic implant containing levonorgestrel has been described. The capsules are implanted into a woman's upper or lower arm with a hypodermic needle. Within 24 hr, enough drug is released from the invisible yet palpable implant to prevent pregnancy. The capsules are said to be effective for 5 years. They can be removed if the woman wishes to become pregnant.

The generic osmotic pump, described earlier in this chapter, is a particularly useful implant for experimental drug studies in animals. The device can be implanted in the subcutaneous tissue, muscle, or peritoneal cavity. A catheter can be attached for localized administration to areas remote from the site of implantation. Commercially available pumps permit constant-rate drug delivery over 1 or 2 weeks. Publications to date have illustrated the use of the generic osmotic pumps for delivering many drugs and chemicals in various animals including mice, rats, rabbits, dogs, monkeys, sheep, and cows.[9]

Refillable implants have also been described.[59] These devices have been used in patients prone to thrombophlebitis and pulmonary embolism who require heparin. Ordinarily, heparin is given to outpatients by subcutaneous injection 4 to 6 times a day. One refillable implant delivers heparin solution continuously over 45 days before refilling is necessary. These implants have also been used to provide an intra-arterial infusion of 5-fluorouracil for the treatment of hepatoma and primary liver cancer. Recent reports describe refillable implants for the delivery of insulin[60] and antiarrhythmic drugs.[61]

A patient with refractory congestive heart failure was treated, on an outpatient basis, with intermittent dobutamine using a totally implantable infusion pump. Dobutamine was infused for 48 hr every week and resulted in sustained clinical improvement.[62]

The Food and Drug Administration has approved the use of an implantable pump to deliver the aminoglycoside antibiotic amikacin directly to the site of an osteomyelitis infection.

Battery-powered pumps were implanted in patients for phase I and II trials of low-dose continuous-infusion doxorubicin or vinblastine. The median duration of pump function was 145 days. The systems infused drugs for about 60% of their patient implant time. During 27.5 patient-years of implantation, no failure of pump mechanism was observed and pump accuracy was within 2% of stated standards. Complications requiring a second surgical procedure occurred in 24% of the patients.[63]

Remote-controlled insulin pumps were implanted into insulin dependent type I diabetics for a 1-year feasibility trial in four centers.[64] The total observation time was about 18 patient-years. Only 3 of 20 pumps had to be removed prematurely. Patients self-monitored blood glucose levels with a mean of 5.5 measurements per day. About 63% of these measurements were in the normal range. On the average, 3.25 glucose measurements per patient-month were in the hypoglycemic range and 2.6 episodes of hypoglycemia with symptoms were reported per patient-month, but very few of these episodes required medical attention. The investigators concluded that despite some technical and clinical problems, the pump, when used with a stable insulin preparation, was an effective means of treating insulin-dependent patients.

## OCULAR MEDICATION

Drug effects in the eye tend to be short-lived because of the eye's efficient mechanisms to maintain homeostasis. Ocular inserts intended to release drug slowly, in a controlled fashion, offer the potential benefits of a dramatic decrease in the frequency of dosing, more uniform clinical response, and a decrease in adverse effects.

One device, called the Ocusert, containing pilocarpine, is used for lowering elevated ocular pressure. The patient places the insert under the eyelid, where it remains for 7 days, slowly and continuously delivering pilocarpine. In contrast, pilocarpine eye drops are usually instilled 3 or 4 times daily; high concentrations of the drug after dosing may produce blurring or dimming of vision for as long as 1 hr.

The Ocusert consists of the drug enclosed by a dense membrane. The detailed physical chemistry

of this system
dissolves in
the eye. The
Ocusert system
eighth of the
drops of pilo
   Studies in
in ocular tiss
terval betwee
stant over a
system (Fig
pilocarpine e
parable redu
of the 40 pat
comparative
locarpine sys
a desirable n
glaucoma.[68]
apeutic effec
tion, less mi
Some disadv
and encoura
culties, occa

## INTRAUTE

Intrauterin
purposes are
cated forms.
contraceptiv

Fig. 7–9.  P
panel) or with
D., and Urqu
Copyright by

of this system is described elsewhere.[65] Pilocarpine dissolves in the membrane and diffuses slowly to the eye. The total dosage delivered by a single Ocusert system over its 7-day lifetime is about one eighth of the amount provided by the usual 2% eye drops of pilocarpine.

Studies in the rabbit show that pilocarpine levels in ocular tissue rise and fall within each 6-hr interval between eye drops but remain relatively constant over a 2- to 8-day period with the Ocusert system (Fig. 7–9).[66] Clinical studies comparing pilocarpine eye drops with the Ocusert found comparable reductions in intraocular pressure, but 36 of the 40 patients preferred the Ocusert.[67] Another comparative study concluded that the Ocusert pilocarpine system presents many advantages and is a desirable method of therapy in selected cases of glaucoma.[68] Advantages of the device include therapeutic effectiveness, less effect on accommodation, less miosis, and convenience for the patient. Some disadvantages were the need for instruction and encouragement of the patient, retention difficulties, occasional discomfort, and higher cost.

## INTRAUTERINE DEVICES

Intrauterine devices (IUDs) for contraceptive purposes are available in medicated and unmedicated forms. Medicated devices contain a diffusible contraceptive agent and are claimed to provide greater efficacy than an unmedicated device of the same size and design.

A device containing progesterone (Progestasert) releases small quantities of hormone at a uniform rate (65 µg/day) into the endometrial cavity, resulting in glandular atrophy and a chronic decidual reaction that is unfavorable for implantation; progesterone may also directly inhibit sperm. The device requires yearly replacement but devices containing a larger amount of progesterone have been found to produce effective contraception for 2 years or more.[49] Progestasert contains an amount of progesterone equivalent to the progestational agent contained in merely a half a dozen birth control pills. The product clearly illustrates the principle of using controlled-release technology to determine duration of drug effect; progesterone itself has a half-life of less than 1 hour.

## TRANSDERMAL MEDICATION

Transdermal medication is intended to be applied to the skin but to elicit systemic effects. Compared to oral drug therapy, transdermal therapy has the potential advantages of avoiding biochemical degradation in the gastrointestinal tract and presystemic metabolism in the gut wall and liver, and of being able to provide long periods of drug action for relatively short-acting drugs.

Certain factors limit the application of rate-controlled transdermal drug delivery. The most im-



Fig. 7–9.  Pilocarpine concentrations in cornea with eye-drop administration of 2% pilocarpine nitrate every 6 hr (left panel) or with a 20 µg/hr membrane-controlled pilocarpine delivery system (right panel). (From Sandelbeck, L., Moore, D., and Urquhart, J.[66] Published with permission from The American Journal of Ophthalmology, 80:274–283, 1975. Copyright by the Ophthalmic Publishing Company.)

**Biopharmaceutics and Clinical Pharmacokinetics**

portant one is the need for potent drugs. Existing technology is limited to drugs active at daily parenteral doses of 15 mg or less.

Transdermal scopolamine was the first transdermal system approved in the U.S. with label specifications of rate-controlled delivery. It is indicated for the prevention of motion sickness. The transdermal system is contained in a thin disk that the patient places on intact skin, usually behind the ear. The unit has multiple layers including a backing membrane, a drug reservoir consisting of solid drug suspended in a liquid vehicle, a microporous rate-controlling membrane, and a skin contact adhesive.

Scopolamine is a well-known antiemetic drug; however, it causes undesirable side effects when given in conventional tablets. These side effects appear to be related to the wide fluctuations in scopolamine concentrations in blood that occur between doses. The transdermal scopolamine system is applied only once every 3 days and provides relatively constant blood levels of scopolamine over this period.

The transdermal product delivers 0.5-mg scopolamine over 3 days. A priming quantity of 140 $\mu$g of drug is released at an asymptomatically declining rate over 6 hr, stabilizing at a maintenance rate of 5 $\mu$g/hr for the remainder of the 3-day period.

Efficacy of transdermal scopolamine has been compared with oral dimenhydrinate and placebo.[70] The transdermal device was applied 13.5 to 15 hr before exposure to motion; oral medication was given 1.5 hr before motion, and again 2.5 hr after motion began. In one study, directly comparing transdermal scopolamine with oral dimenhydrinate, the transdermal medication protected 79% of the subjects from motion sickness, whereas the oral drug protected 58%; in a second study, protection rates of 68% and 41% were found for the scopolamine and dimenhydrinate therapy, respectively. No patient was protected by the placebo.

Another study examined the influence of the time between application and exposure to motion on the efficacy of the transdermal system. Application 16 hr before motion resulted in a 100% protection rate; application 4 hr before motion protected 74% of the participants. Dry mouth, drowsiness, and blurred vision, typical side effects of scopolamine, were minimal with the transdermal system.

Other investigators have found that transdermal scopolamine is significantly more effective in preventing motion sickness induced by a ship-motion simulator than is placebo or orally administered meclizine (25 mg), a commonly used antihistamine/antinauseant.[71] A patch containing either placebo or active drug was applied behind the ear 12 hr before exposure to the simulator, and meclizine or placebo tablet was taken 2 hr before exposure. The trial lasted 90 min or until vomiting was imminent.

About two-thirds of the patients receiving transdermal scopolamine had no symptoms compared with 33% given oral meclizine and 39% given placebo. Dryness of mouth was reported more frequently with scopolamine than with meclizine or placebo. No other side effects were notable. Transdermal scopolamine may be the treatment of choice for motion sickness, but the patch must be applied at least several hours before motion to obtain optimal effect.

Several transdermal nitroglycerin systems have been marketed for the treatment of angina pectoris. These systems are more convenient to use than nitroglycerin ointment, permit more precise dosing, and need be applied less frequently than the ointment. All are intended to be applied to the upper arm or chest once a day. They should not be applied to the distal part of the extremities because bioavailability may be decreased.

Chien et al.[72] applied three commercially available nitroglycerin patches to freshly excised abdominal skin from young hairless mice and determined skin-penetration kinetics. They found that the amount of nitroglycerin delivered through the skin over 24 hr was similar for each transdermal system, ranging from 3.3 to 3.5 mg.

Other investigators measured the bioavailability of nitroglycerin from a reformulated transdermal system (Nitro-Dur II) relative to the original product (Nitro-Dur) in healthy male subjects.[73] The apparent dose of nitroglycerin delivered to each subject by each formulation was calculated from the difference between the original content of the patch and the residual nitroglycerin content after 24 hr of skin contact.

The mean total amounts of nitroglycerin delivered by the original product (I) and Nitro-Dur II were similar, 9.8 mg and 10.7 mg, respectively. Large differences in delivery, however, were observed in individual subjects; only 2.5 mg nitroglycerin was delivered from the original formulation in one subject, whereas in another subject the same formulation delivered 19.3 mg. The new for-

mulation in the same two subjects delivered 7.4 and 14.4 mg nitroglycerin, respectively. Transport through the skin rather than release from the dosage form is the rate-limiting step in the transdermal absorption of nitroglycerin. Differences among subjects reflect differences in skin permeability.

Transdermal nitroglycerin was conditionally approved by the Food and Drug Administration for the prevention and treatment of angina pectoris due to coronary artery disease. Blood level measurements demonstrating nitroglycerin concentrations in plasma similar to concentrations produced by nitroglycerin ointment, a product with established efficacy, was largely the basis for approval. According to the FDA, conditional approval reflects a determination that the drug may be marketed, while further investigations of its effectiveness are undertaken. At this time, the FDA has not made a final determination.

The evidence to date suggests rather serious shortcomings of the once-a-day nitroglycerin patch mostly related to nitrate tolerance, a well-known phenomenon. Many studies using transdermal nitroglycerin in patients with angina or congestive heart failure that have demonstrated effectiveness within several hours of application of the transdermal system, have also documented the attenuation or absence of effects within 12 to 24 hr. Other studies have suggested that complete tolerance may develop in a short time during continuous once-a-day administration of a nitroglycerin patch.[74]

A comprehensive analysis of the published clinical literature on transdermal nitroglycerin systems for the treatment of angina concluded that the patch delivering 10 mg per 24 hr is not effective at 24 hr after application.[75] This conclusion supports the hypothesis that nitroglycerin's effect on exercise tolerance is attenuated by nitrate tolerance even though blood levels persist.

A randomized controlled trial in more than 400 men with chronic stable angina showed that continuous use of transdermal nitroglycerin 5 mg/24 hr had no advantage over placebo in terms of efficacy (anginal attack rates and sublingual nitroglycerin consumption) or quality of life (as measured by a sickness impact profile and a health index of disability).[76] Patients receiving nitroglycerin reported headaches more frequently than patients on placebo and a higher proportion of them withdrew from the trial for this reason.

The future of transdermal nitroglycerin is uncertain. Current trends suggest that the dosage form

will continue to be used but in doses of 10 mg/24 hr or higher, applied intermittently with a nitrate-free period (e.g., 12 hr on, 12 hr off) rather than continuously. A rest period between applications may restore sensitivity and overcome tolerance. Several studies have produced results supporting this hypothesis.[74]

Clonidine is an effective centrally-acting antihypertensive drug, but oral therapy requires administration 2 to 4 times a day and is associated with a relatively high incidence of adverse effects. Transdermal clonidine was developed with the aim of reducing frequency of administration to once weekly and with the hope of reducing side effects.

One multicenter trial evaluated weekly application of transdermal clonidine patches in patients with mild essential hypertension (diastolic blood pressure in the range of 91 to 104 mm Hg).[77] Of the 85 patients completing the trial, 54 responded (diastolic pressure < 90 mm Hg or a decrease in diastolic pressure of at least 10 mm Hg). Among the responders, 31% required one patch (releasing clonidine at a rate of 0.1 mg/day), 54% required two patches, and the other 19% needed three.

Dry mouth and drowsiness, typical side effects of clonidine, occurred in about one-third of the patients, but these symptoms were usually mild and only two subjects had to be dropped because of side effects. Of far greater concern, erythematous skin reactions were observed in 8 patients. This report and others suggest a frequency of skin reactions considerably higher than that encountered with oral clonidine. This problem may limit the use of transdermal clonidine.[78]

Most postmenopausal women who require estrogen-replacement therapy use oral medication. With this approach, however, the liver is exposed to relatively high concentrations of estrogen; increased production of coagulation factors, renin substrate, and bile acids may occur. These changes may account for the increased incidence of venous thrombosis and pulmonary embolism, hypertension, and gallstones in women treated with estrogens. This concern stimulated interest in the administration of estrogens in a way that minimizes hepatic exposure and led to the development of transdermal estradiol.

A patch releasing either 50 or 100 µg estradiol per day was approved in the U.S. for the treatment of postmenopausal symptoms but not for the prevention of osteoporosis. Transdermal estradiol may

be useful in this regard but the evidence is not yet available. The advantages claimed for the patch over oral estrogens are that estradiol goes directly to the blood (avoiding gastrointestinal effects, first-pass hepatic metabolism, and stimulation of hepatic enzymes), doses are much lower, and serum concentrations more closely resemble those found naturally before menopause.[79]

The dosage unit consists of a drug reservoir, a rate-controlling membrane, and an adhesive layer. It is intended to be applied to the trunk (but not the breasts) twice weekly. Like other estrogens for postmenopausal symptoms, the patches are generally used in cycles such as 3 weeks on and 1 week off and require the additional administration of a progestin to reduce the risk of endometrial hyperplasia and subsequent complications.

Transdermal estradiol appears to be as effective as much higher doses of oral estrogen in treating postmenopausal vasomotor symptoms, but whether the patches will be safer remains to be determined. The most common adverse effect observed with transdermal therapy has been mild to moderate erythema at the application site. This may be related to the formulation rather than to the drug itself because the problem occurs with both active and placebo patches.

## BUCCAL MEDICATION

A transmucosal controlled-release formulation, containing 1, 2, or 3 mg of nitroglycerin, is available in the U.S. for both acute treatment and long-term control of angina pectoris. The product contains nitroglycerin impregnated in an inert cellulose polymer matrix. When the tablet is placed in the buccal cavity between the upper lip and gum, or between the cheek and gum, a gel forms that makes the tablet adhere to the mucosal surface, and drug slowly diffuses from the formulation to saliva and across the mucosal membranes to the systemic circulation.[80]

Onset of effects occurs in minutes and nitroglycerin continues to be absorbed as long as the tablet remains intact, usually about 4 to 5 hours. Treadmill studies in patients with angina found beneficial effects for up to 5 hours. If continuous nitroglycerin therapy is desired, the next tablet should be taken within 1 hour after the previous tablet dissolves. Tolerance has not been reported with up to 2 weeks' use of transmucosal nitroglycerin, possibly because intermittent use pro-

duces a rapid rise and fall in plasma and tissue nitroglycerin levels with a nitrate-free interval at night when no medication is taken.[80]

The analgesic effects of buccal and intramuscular morphine were compared in patients who experienced pain after elective orthopedic surgery.[81] Each patient simultaneously received a buccal tablet and an injection, only one of which contained morphine. Tablets were moistened, to facilitate adherence to the mucosa, and placed between the upper lip and gum. They dissolved slowly, over about 6 hr. Efficacy was evaluated over an 8-hr period.

Seven of the 20 patients given buccal morphine required a second dose within 8 hours of the first dose; 10 of the 20 patients receiving intramuscular morphine required a second dose. As judged by the reduction in pain score, both preparations produced a similar degree of postoperative analgesia. Concentrations of morphine in plasma were lower after buccal morphine but persisted for a longer time than morphine levels after injection. The investigators suggested that this may be a useful dosage form in the management of postoperative pain.

## RECTAL MEDICATION

No prolonged-release rectal dosage forms are commercially available. The generic osmotic pump, described earlier in this chapter, however, has been administered rectally in several pharmacokinetic studies in human subjects.

In one study,[82] healthy subjects inserted an osmotic pump containing antipyrine. The system remained in place in the lower rectum with a small thread attached to it and fixed to the buttock, unless there was a need to defecate. In this case, the system was pulled out, cleaned, and reinserted immediately after defecation. After 38 hr, the first system was replaced by a second which stayed in the rectum for an additional 60 hr. The constant-release rate from the osmotic pump gave rise to constant blood levels of antipyrine over a 24- to 90-hr period. This approach may be an alternative to constant rate intravenous infusion for steady state studies.

The effects of relatively constant plasma levels of triazolam, a rapidly eliminated benzodiazepine, were studied in young healthy male subjects to determine whether tolerance to certain effects may develop over a relatively short period of time.[83] The drug was given over a period of 30 hr (2 days

and 1 nigh osmotic pu experiment of toleranc

The utili system as interaction cimetidine given by m the drug at 30 hr. By c antipyrine hr after th had been a orally follc metidine d cluded that is a useful t ies becaus centrations course of c

REFEREN

1. Theeuwe objective delivery
2. Gibaldi, trations ( in oral s\ 2:167, 1!
3. Murphy, dosage n in huma 1961.
4. Trollfors tamicin i
5. Sikic, B. when adr Treat. R
6. Bleyer, \ new app
7. White, P bolus ad patient a
8. Longer, delivery ences. 1644–1€
9. Theeuwe 13:149,
10. Johnsson effects ( (Durules J. Clin.
11. Leahey, mucokin preparat 1980.
12. Harron, duration formulat macol.,

Prolonged-Release Medication

**143**

and 1 night) at a zero-order rate using a rectal osmotic pump. The investigators concluded that the experimental design might prove useful in the study of tolerance to drugs.

The utility of an osmotic rectal drug delivery system as a tool in steady-state pharmacokinetic interaction studies has been investigated using the cimetidine-antipyrine interaction.[84] Antipyrine was given by means of a rectal osmotic pump releasing the drug at a zero-order rate of 15 mg/hr for about 30 hr. By consecutive use of three of these systems, antipyrine was administered for 90 hr. Forty-eight hr after the start of the study, when steady state had been achieved, 400 mg cimetidine was given orally followed by three consecutive 200-mg cimetidine doses every 2 hr. The investigators concluded that the osmotic rectal drug delivery system is a useful tool in pharmacokinetic interaction studies because it provides constant steady-state concentrations, permitting investigation of the time course of drug interactions.

## REFERENCES

1. Theeuwes, F., and Bayne, W.: Dosage form index: An objective criterion for evaluation of controlled-release drug delivery systems. J. Pharm. Sci., 66:1388, 1977.
2. Gibaldi, M., and McNamara, P.J.: Steady-state concentrations of drugs with short half-lives when administered in oral sustained release formulations. Int. J. Pharmacol., 2:167, 1979.
3. Murphy, J., Casey, W., and Lasagna, L.: The effect of dosage regimen on the diuretic efficacy of chlorothiazide in human subjects. J. Pharmacol. Exp. Ther., 134:286, 1961.
4. Trollfors, B., et al.: Quantitative nephrotoxicity of gentamicin in nontoxic doses. J. Infect. Dis., 141:306, 1980.
5. Sikic, B.I., et al.: Improved therapeutic index of bleomycin when administered by continuous infusion in mice. Cancer Treat. Rep., 62:2011, 1978.
6. Bleyer, W.A.: The clinical pharmacology of methotrexate: new applications of an old drug. Cancer, 41:36, 1978.
7. White, P.F.: Use of continuous infusion versus intermittent bolus administration of fentanyl or ketamine during outpatient anesthesia. Anesthesiol., 59:294, 1983.
8. Longer, M.A., and Robinson, J.R.: Sustained-release drug delivery systems. In Remington's Pharmaceutical Sciences. Easton, Pa., Mack Publishing, 1985, pp. 1644–1661.
9. Theeuwes, F.: Drug delivery systems. Pharmacol. Ther., 13:149, 1981.
10. Johnsson, G., et al.: Plasma levels and pharmacological effects of metoprolol administered as controlled release (Durules) and ordinary tablets in healthy volunteers. Int. J. Clin. Pharmacol. Ther. Toxicol., 18:292, 1980.
11. Leahey, W.J., et al.: Comparison of the efficacy and pharmacokinetics of conventional propranolol and a long acting preparation of propranolol. Br. J. Clin. Pharmacol., 9:33, 1980.
12. Harron, D.W.G., and Shanks, R.G.: Comparison of the duration of effect of metoprolol and a sustained release formulation of metoprolol (Betaloc-SA). Br. J. Clin. Pharmacol., 11:518, 1981.
13. Quarterman, C.P., Kendall, M.J., and Welling, P.G.: Plasma levels and negative chronotropic effect of metoprolol following single doses of a conventional and sustained-release formulation. Eur. J. Clin. Pharmacol., 15:97, 1979.
14. Kendall, M.J., et al.: A single and multiple dose pharmacokinetic and pharmacodynamic comparison of conventional and slow-release metoprolol. Eur. J. Clin. Pharmacol., 17:87, 1980.
15. Weinberger, M., Hendeles, L., and Bighley, L.: The relation of product formulation to absorption of oral theophylline. N. Engl. J. Med., 299:852, 1978.
16. Upton, R.A., et al.: Evaluation of the absorption from some commercial sustained-release theophylline products. J. Pharmacokinet. Biopharm., 8:131, 1980.
17. Baker, J.R., et al.: Clinical relevance of the substitution of different brands of sustained-release theophylline. J. Allergy Clin. Immunol., 81:664, 1988.
18. Ginchansky, E., and Weinberger, M.: Relationship of theophylline clearance to oral dosage in children with chronic asthma. J. Pediatr., 91:655, 1977.
19. Kelly, H.W., and Murphy, S.: Efficacy of a 12-hour sustained-release preparation in maintaining therapeutic serum theophylline levels in asthmatic children. Pediatrics, 66:97, 1980.
20. Jackson, S.H.D., et al.: Circadian variation in theophylline absorption during chronic dosing with a slow release theophylline preparation and the effect of clock time on dosing. Br. J. Clin. Pharmacol., 26:73, 1988.
21. Warren, J.B., Cuss, F., and Barnes, P.J.: Posture and theophylline kinetics. Br. J. Clin. Pharmacol., 19:707, 1985.
22. MacKintosh, D.A., Baird-Lambert, J., and Buchanan, N.: Theo-Dur: no loss of sustained-release effect with chewing or crushing. Aust. N.Z. J. Med., 15:351, 1985.
23. Guill, M.F., et al.: Clinical and pharmacokinetic evaluation of a sustained-release liquid theophylline preparation. J. Allergy Clin. Immunol., 82:281, 1988.
24. Caldwell, H.C., et al.: Steady-state lithium blood level fluctuations in man following administration of a lithium carbonate conventional and controlled-release dosage form. J. Clin. Pharmacol., 21:106, 1981.
25. Jackson, S.H.D., and Wright, J.M.: Sustained serum theophylline concentrations obtained during chronic twice daily administration of a slow release preparation. Eur. J. Clin. Pharmacol., 24:205, 1983.
26. Weinberger, M., and Hendeles, L.: Slow-release theophylline. Rationale and basis for product selection. N. Engl. J. Med., 308:760, 1983.
27. Cunningham, T., Sloman, G., and Nyberg, G.: Procainamide blood levels after administration of a sustained-release preparation. Med. J. Aust., 1:370, 1977.
28. Forssell, G., et al.: Comparative bioavailability of disopyramide after multiple dosing with standard capsules and controlled-release tablets. Eur. J. Clin. Pharmacol., 17:209, 1980.
29. Nielson, J.B., et al.: Absorption of iron from sustained release and rapidly disintegrating tablets. Influence of daily numbers of administrations. Acta Med. Scand., 194:123, 1973.
30. Kalowski, S., Radford, N., and Kincaid-Smith, P.: Crystalline and macrocrystalline nitrofurantoin in the treatment of urinary-tract infections. N. Engl. J. Med., 240:385, 1974.
31. Borg, K.O., Jeppsson, J., and Sjögren, J.: Influence of the dissolution rate of lithium tablets on side effects. Acta Pharm. Suec., 11:133, 1974.
32. Edström, A., and Persson, G.: Comparison of side effects with coated lithium carbonate tablets and lithium sulphate

**144**                                    Biopharmaceutics and Clinical Pharmacokinetics

preparations giving medium-slow and slow-release. Acta Psychiat. Scand., 55:153, 1977.

33. Theeuwes, F.: Elementary osmotic pump. J. Pharm. Sci., 64:1987, 1975.

34. Kendall, M.J., et al.: Comparison of the pharmacokinetic and pharmacodynamic profiles of single and multiple doses of a commercial slow-release metoprolol formulation with a new Oros® delivery system. Br. J. Clin. Pharmacol., 13:393, 1982.

35. Theeuwes, F., Bayne, W., and McGuire, J.: Gastrointestinal therapeutic system (acetazolamide) 15/125: efficacy and side effects. Arch. Ophthalmol., 96:2219, 1978.

36. Bayne, W., et al.: Kinetics of osmotically controlled indomethacin delivery systems after repeated dosing. Clin. Pharmacol. Ther., 32:270, 1982.

37. Theeuwes, F., and Yum, S.I.: Principles of the design and operation of generic osmotic pumps for the delivery of semisolid or liquid drug formulations. Ann. Biomed. Eng., 4:343, 1976.

38. Eckenhoff, B., and Yum, S.I.: The osmotic pump: novel research tool for optimizing drug regimens. Biomaterials, 2:89, 1981.

39. Wilson, C.G., and Hardy, J.G.: Gastrointestinal transit of an osmotic tablet drug delivery system. J. Pharm. Pharmacol., 37:573, 1985.

40. Davis, S.S., et al.: Relationship between the rate of appearance of oxprenolol in the systemic circulation and the location of an oxprenolol Oros 16/260 drug delivery system within the gastrointestinal tract as determined by scintigraphy. Br. J. Clin. Pharmacol., 26:435, 1988.

41. Parr, A.F., et al.: Correlation of ibuprofen bioavailability with gastrointestinal transit by scintigraphic monitoring of ⁱⁱⁱEr-labeled sustained-release tablets. Pharm. Res., 4:486, 1987.

42. Bechgaard, H., and Ladefoged, K.: Distribution of pellets in the gastrointestinal tract: The influence on transit time exerted by the density and diameter of pellets. J. Pharm. Pharmacol., 30:690, 1978.

43. Bechgaard, H., et al.: Gastrointestinal transit of pellet systems in ileostomy subjects and the effect of density. J. Pharm. Pharmacol., 37:718, 1985.

44. Rocci, M.L., et al.: Food-induced gastric retention and absorption of sustained-release procainamide. Clin. Pharmacol. Ther., 42:45, 1987.

45. Wecker, M.T., et al.: Influence of a standard meal on the absorption of controlled-release pseudoephedrine capsules. J. Pharm. Sci., 76:29, 1987.

46. Welling, P.G.: Interactions affecting drug absorption. Clin. Pharmacokin., 9:404, 1984.

47. Pederson, S., and Moeller-Petersen, J.: Erratic absorption of a slow-release theophylline product caused by food. Pediatrics, 74:534, 1984.

48. Pederson, S., and Moeller-Petersen, J.: Influence of food on the absorption rate and bioavailability of a sustained release theophylline preparation. Allergy, 37:531, 1982.

49. Milavetz, G., et al.: Relationship between rate and extent of absorption of oral theophylline from Uniphyl brand of slow-release theophylline and resulting serum concentrations during multiple dosing. J. Allergy Clin. Immunol., 80:723, 1987.

50. Hendeles, L., et al.: Food-induced dose-dumping from a once-a-day theophylline product as a cause of theophylline toxicity. Chest, 87:758, 1985.

51. Hollister, L.E., et al.: Studies of delayed-action medication. V. Plasma levels and urinary excretion of four different dosage forms of chlorpromazine. Clin. Pharmacol. Ther., 11:49, 1970.

52. Parmar, H., et al.: Randomised controlled study of orchid-ectomy vs long-acting D-trp-6-LHRH microcapsules in advanced prostatic carcinoma. Lancet, 2:1201, 1985.

53. Dreyfuss, J., et al.: Release and elimination of ¹⁴C-fluphenazine enanthate and decanoate esters administered in sesame oil to dogs. J. Pharm. Sci., 65:505, 1976.

54. Curry, S.H., et al.: Kinetics of fluphenazine after fluphenazine dihydrochloride, enanthate and decanoate administration to man. Br. J. Clin. Pharmacol., 7:325, 1979.

55. Devito, R.A., et al.: Fluphenazine decanoate vs oral antipsychotics. A comparison of their effectiveness in the treatment of schizophrenia as measured by a reduction in hospital readmissions. J. Clin. Psychiatry, 39:26, 1978.

56. Gitlin, M.J., et al.: Persistence of fluphenazine in plasma after decanoate withdrawal. J. Clin. Psychopharmacol., 8:53 1988.

57. Nair, N.P.V., et al.: A clinical trial comparing intramuscular haloperidol decanoate and oral haloperidol in chronic schizophrenic patients: efficacy, safety, and dosage equivalence. J. Clin. Psychopharmacol., 6:30S, 1986.

58. Giwa-Osagie, O.F., Savage, J., and Newtar, J.R.: Norethisterone oenanthate as an injectable contraceptive: use of a modified dose schedule. Br. Med. J., 1:1660, 1978.

59. Blackshear, P.J.: Implantable drug-delivery systems. Sci. Am., 241:66, 1979.

60. Rupp, W.M., et al.: The use of an implantable insulin pump in the treatment of Type II diabetes. N. Engl. J. Med., 307:265, 1982.

61. Anderson, J.L., et al.: Long-term intravenous infusion of antiarrhythmic drugs using a totally implanted drug delivery system. Am. J. Cardiol., 49:1954, 1982.

62. Berger, M., and McSherry, C.K.: Outpatient dobutamine infusion using a totally implantable infusion pump for refractory congestive heart failure. Chest, 88:295, 1985.

63. Vogelzang, N.J., et al.: A programmable and implantable pumping system for systemic chemotherapy: a performance analysis in 52 patients. J. Clin. Oncol., 5:1968, 1987.

64. Point Study Group: One-year trial of a remote-controlled implantable insulin infusion system in Type I diabetic patients. Lancet, 2:866, 1988.

65. Chandrasekaran, S.K., Benson, H., and Urquhart, J.: Methods to achieve controlled drug delivery: The biomedical engineering approach. In Sustained and Controlled Release Drug Delivery Systems. New York, Marcel Dekker, 1978, pp. 557–593.

66. Sandelbeck, L., Moore, D., and Urquhart, J.: Comparative distribution of pilocarpine in ocular tissues of the rabbit during administration by eyedrop or by membrane-controlled delivery systems. Am. J. Ophthalmol., 80:274, 1975.

67. Worthen, D.M., Zimmerman, T.J., and Wind, C.A.: An evaluation of the pilocarpine Ocusert. Invest. Ophthalmol., 13:296, 1974.

68. Pollack, I.P., Quigley, H.A., and Harbin, T.S.: The Ocusert pilocarpine system: advantages and disadvantages. South. Med. J., 69:1296, 1976.

69. Mishell, D.R., Jr., and Martinez-Mannautou, J. (eds.): Proceedings of the Symposium on Clinical Experience with the Progesterone Uterine Therapeutic System, Acapulco, Oct. 15–16, 1976. Amsterdam, Excerpta Medica, 1978.

70. Price, N.M., et al.: Transdermal scopolamine in the prevention of motion sickness at sea. Clin. Pharmacol. Ther., 29:414, 1981.

71. Dahl, E., et al.: Transdermal scopolamine, oral meclizine, and placebo in motion sickness. Clin. Pharmacol. Ther., 36:116, 1984.

72. Chien, Y.W., Keshary, P.R., Sarpotdar, P.P.: Comparative controlled skin permeation of nitroglycerin from marketed transdermal delivery systems. J. Pharm. Sci., 72:968, 1983.

73. Noonan, P.: transdermal 75:688, 198

74. Gibaldi, M.: Pharm., 6:5

75. Colditz, G.: Randomized tems for th Heart J., 11

76. Fletcher, A. on angina th dermal glyc 1988.

77. Weber, M./ idine for tr Med., 144:

Noonan, P.K., et al.: Relative bioavailability of a new transdermal nitroglycerin delivery system. J. Pharm. Sci., 75:688, 1986.

Gibaldi, M.: Drug administration: tolerance. Persp. Clin. Pharm., 6:57, 1988.

Colditz, G.A., Halvorsen, K.T., and Goldhaber, S.Z.: Randomized clinical trials of transdermal nitroglycerin systems for the treatment of angina: a meta-analysis. Am. Heart J., 116:174, 1988.

Fletcher, A., McLoone, P., and Bulpitt, C.: Quality of life on angina therapy: a randomised controlled trial of transdermal glyceryl trinitrate against placebo. Lancet, 2:4, 1988.

Weber, M.A., et al.: Transdermal administration of clonidine for treatment of high blood pressure. Arch. Intern. Med., 144:1211, 1984.

78. Transdermal antihypertensive drugs. Lancet, 1:79, 1987.
79. Transdermal estrogen. Med. Lett. Drugs Ther., 28:119, 1986.
80. Transmucosal controlled-release nitroglycerin. Med. Lett. Drugs Ther., 29:39, 1987.
81. Bell, M.D.D., et al.: Buccal morphine—a new route for analgesia? Lancet, 1:71, 1985.
82. deLeede, L.G.J., deBoer, A.G., and Breimer, D.D.: Rectal infusion of the model drug antipyrine with an osmotic delivery system. Biopharm. Drug Dispos., 2:131, 1981.
83. Breimer, D.D., et al.: Central effects during the continuous osmotic infusion of a benzodiazepine (triazolam). Br. J. Clin. Pharmacol., 19:807, 1985.
84. Teunissen, M.W.E., et al.: Influence of cimetidine on steady state concentration and metabolite formation from antipyrine infused with a rectal osmotic mini pump. Eur. J. Clin. Pharmacol., 28:681, 1985.

# EXHIBIT C

*J Clin Pharmacol.* 1981; 21:106–109.

# Steady-State Lithium Blood Level Fluctuations in Man Following Administration of a Lithium Carbonate Conventional and Controlled-Release Dosage Form

**HENRY C. CALDWELL, Ph.D., WILFRED J. WESTLAKE, Ph.D.,
ROBERT C. SCHRIVER, M.S., and EDGAR E. BUMBIER, M.S.** Philadelphia, Penn.

**Abstract:** A controlled-release lithium carbonate tablet was compared to an immediate-release lithium carbonate capsule in normal volunteers. These crossover studies at steady state showed that the tablet produced a smoother serum curve than the capsule with no loss of total bioavailability. Quantitatively, the capsule produced about 1.4 times more fluctuation in serum lithium values than the tablet.

Lithium carbonate is indicated in the treatment of manic episodes in manic depressives, or affective illness. Maintenance therapy prevents or diminishes the intensity in subsequent episodes in those manic depressive patients with a history of mania. The therapeutic index of the drug is narrow, and side effects are not uncommonly seen in patients whose serum lithium levels are maintained within the "therapeutic" range. It is suspected that some of these unwanted effects may be related to peak blood levels and/or the slope of a rapidly ascending blood level curve.

Lithium carbonate is commercially available in several immediate-release dosage forms, including capsules, tablets, and syrup. All of these forms make the drug immediately available for absorption and, as a result, rapidly produce relatively high peak blood levels. To avoid this wide blood level variation, controlled-release tablets have been developed, and these have been studied in several laboratories.[1-6] Essentially, these tablets are designed to release the drug more slowly, thereby avoiding the high, and rapidly achieved, peak serum values associated with the immediate-release forms. In addition, since patient compliance can be a problem, especially during maintenance therapy, controlled-release tablets have the further potential advantage of twice-daily dosing as against the three or four times daily dosing required by the conventional immediate-release forms.

Previously, we have shown that a controlled-release tablet gave the expected smooth serum lithium curve, but at the expense of total lithium bioavailability, since only about 75 per cent was absorbed.[1] After this benchmark study, we redesigned the formulation to achieve both the desired dissolution characteristics and full bioavailability.

Results of bioavailability tests with this tablet in human volunteers are described in this report.

From the Research and Development Division, Smith Kline and French Laboratories, Philadelphia, Penn. 19101.

106

The Journal of Clinical Pharmacology

Downloaded from http://www.jclinpharm.org by guest on March 18, 2008
© 1981 American College of Clinical Pharmacology. All rights reserved. Not for commercial use or unauthorized distribution.

LITHIUM BLOOD LEVEL FLUCTUATIONS

**TABLE I**

**Protocol and Description of Volunteers**

| Subject no. | Age (yrs) | Body weight (kg) | Formulation taken* Days 1-7 | Days 15-21 |
|---|---|---|---|---|
| 1 | 19 | 68.1 | T | C |
| 2 | 24 | 74.9 | T | C |
| 3 | 21 | 77.1 | T | C |
| 4 | 22 | 63.5 | T | C |
| 5 | 21 | 68.1 | T | C |
| 6 | 20 | 90.7 | C | T |
| 7 | 19 | 83.9 | C | T |
| 8 | 30 | 69.9 | C | T |
| 9 | 20 | 74.9 | C | T |
| 10 | 20 | 77.1 | C | T |
| 11 | 22 | 61.3 | T | C |
| 12 | 19 | 75.8 | C | T |
| 13 | 19 | 65.8 | C | T |
| 14 | 23 | 93.0 | T | C |
| 15 | 20 | 71.7 | T | C |
| 16 | 20 | 70.3 | C | T |

* T = Tablet; C = capsule.

**Material and Methods**

Two lithium carbonate formulations were compared. Capsule A, which contained 300 mg of drug, was the standard. It had previously been shown to be equivalent to a water solution of lithium carbonate. Tablet B, which contained 450 mg of drug, was designed to dissolve slowly.

These formulations were administered to normal volunteers in a two-way crossover study (Table I). Capsules were given at 0, 6, and 12 hours daily for seven consecutive days, and tablets were given at 0 and 12 hours for the same length of time. No drug was given on days 8 through 14. On days 15 through 21, the volunteers received the alternate formulation.

Blood samples (8–10 ml) were taken at zero time on days 1, 4, 5, 6, and 7 of dosing. Then, following the first dose on day 7, additional blood samples were collected at 1, 1.5, 2, 3, 4, 6, 7, 7.5, 8, 9, 10, 12, 13, 13.5, 14, 16, 18, and 24 hours. The blood samples, which were allowed to clot, were centrifuged and the serum specimens were saved.

Serum lithium levels were determined by diluting samples to a suitable level with 0.1$N$ HCl and assaying on an atomic absorption spectrophotometer equipped with a Fastac autosampler (Instrumentation Laboratory, Inc., Model IL 157).

**Results**

Mean serum levels for the controlled-release tablet and immediate-release capsules are shown on Fig. 1. Note that the



Fig. 1. Mean serum lithium levels (meq/liter) in volunteers at steady state.

Downloaded from http://www.jcpnharm.org by guest on March 18, 2008
© 1981 American College of Clinical Pharmacology. All rights reserved. Not for commercial use or unauthorized distribution.

## TABLE II

### Areas Under Serum Lithium Curves on Day 7

| Volunteer no. | Lithium formulation Week | Area under curve AUC |
|---|---|---|
| | **B:** 450 mg Controlled-Release Tablet | |
| 1 | 1 | 15.06 |
| 2 | 1 | 12.79 |
| 3 | 1 | 10.10 |
| 4 | 1 | 13.33 |
| 5 | 1 | 13.64 |
| 6 | 2 | 9.96 |
| 7 | 2 | 18.37 |
| 8 | 2 | 16.76 |
| 9 | 2 | 13.52 |
| 10 | 2 | 12.91 |
| 11 | 1 | 13.38 |
| 12 | 2 | 13.89 |
| 13 | 2 | 12.63 |
| 14 | 1 | 10.17 |
| 15 | 1 | 17.6 |
| 16 | 2 | 12.83 |
| | **A:** 300 mg Immediate-Release Capsule | |
| 1 | 2 | 15.62 |
| 2 | 2 | 13.50 |
| 3 | 2 | 11.21 |
| 4 | 2 | 12.43 |
| 5 | 2 | 12.51 |
| 6 | 1 | 10.88 |
| 7 | 1 | 15.55 |
| 8 | 1 | 16.54 |
| 9 | 1 | 12.51 |
| 10 | 1 | 12.24 |
| 11 | 2 | 14.10 |
| 12 | 1 | 15.71 |
| 13 | 1 | 15.42 |
| 14 | 2 | 10.54 |
| 15 | 2 | 19.42 |
| 16 | 1 | 14.25 |

tablet produced a much smoother curve than the capsule.

Areas under serum level curves for each volunteer and regimen calculated from the serum levels on day 7 are shown in Table II.

Three major parameters of the steady-state blood level sequence were subjected to the appropriate analysis of variance: area under the blood level curve (AUC) (logarithmically transformed) and minimum ($C_{min}$) and maximum ($C_{max}$) serum levels over the 24-hour day 7 cycle. Means for the capsule and tablet regimens are shown in Table III.

The ratio of the area (tablet/capsule) is 0.976, and the conventional 95 per cent confidence interval is 0.922 to 1.032. Thus, with the 95 per cent confidence coefficient, the true mean amount of drug absorbed from the controlled-release tablet lies within 92.2 and 103.2 per cent of that absorbed from the capsule. As a measure of the performance of a formulation in providing a sustained release effect we propose a way to quantitate the fluctuations of the blood-level profile,

$$F = \frac{C_{max} - C_{min}}{\overline{C}}$$

where $C_{max}$ and $C_{min}$ are the maximum and minimum concentrations over the steady-state cycle and $\overline{C}$ is the mean concentration during the cycle. This index is analogous to the coefficient of variation, and small values are desirable in a controlled-release formulation.

The index seems intuitively reasonable and would appear to have the advantage of greater stability than the index $C_{max}/C_{min}$ proposed by Theeuwes and Bayne.[8] This

## TABLE III

### A Way to Quantify the Fluctuations of the Blood-Level Profile

| | AUC (antilog) (meq/liter · hr) | $C_{min}$ (meq/liter) | $C_{max}$ (meq/liter) |
|---|---|---|---|
| Capsule, 300 mg | 14.18 | 0.472 | 0.846 |
| Tablet, 450 mg | 13.84 | 0.455 | 0.719 |

Downloaded from http://www.jclinpharm.org by guest on March 18, 2008
© 1981 American College of Clinical Pharmacology. All rights reserved. Not for commercial use or unauthorized distribution.

*LITHIUM BLOOD LEVEL FLUCTUATIONS*

latter index could be unstable in the presence of error for small values of $C_{min}$. An estimate of $\overline{C}$ required in the denominator of the proposed index can be readily obtained by dividing the area under the blood level curve by the length of the cycle. In the present case, if we use mean values for $C_{max}$, $C_{min}$, and $\overline{C}$, the index is 0.458 for the tablet regimen and 0.633 for the capsule regimen. The index can also be computed individually for each subject and the mean index obtained by averaging over all 16 subjects. In this case, the values increase slightly to 0.475 and 0.664, respectively. Thus, roughly stated, the capsule produces about 1.4 times more fluctuation in serum lithium levels than the tablet.

## Acknowledgments

The authors are pleased to acknowledge Sol Glassman, M.D., Institute for Applied Pharmaceutical Research Ltd. of Merion, Penn., for providing blood samples and Garth Graham, M.D., for his continued support.

## References

1. Caldwell HC, Westlake WJ, Connor SM, Flanagan T. A pharmacokinetic analysis of lithium carbonate absorption from several formulations in man. *J Clin Pharmacol.* 1971; 11:349.
2. Cooper TB, Simpson GM, Lee JH, Bergner PE. Evaluation of a slow-release lithium carbonate formulation. *Am J Psychiat.* 1978; 135:917.
3. Gaillot J, Steimer JJ, Mallet AJ, Thebault JJ, Bieder A. A priori lithium drug regimen using population characteristics of pharmacokinetic parameters. *J Pharmacokinet Biopharm.* 1979; 7:579.
4. Coppen A, Bailey JE, White SR. Slow-release lithium carbonate. *J Clin Pharmacol.* 1969; 9:160.
5. Amdisen A, Sjogren J. Lithium absorption from sustained-release tablets (Duretter). *Acta Pharm Suecica.* 1968; 5:465.
6. Thornhill DP. Pharmacokinetics of ordinary and sustained release lithium carbonate in manic patients after acute dosage. *Eur J Clin Pharmacol.* 1978; 14:267.
7. Marini JL, Sheard MH. Sustained-release lithium carbonate in a double-blind study: serum lithium levels, side effects, and placebo response. *J Clin Pharmacol.* 1976; 16:276–283.
8. Otto U, Paalzow L, Suren J. Lithium absorption from ordinary and sustained-release tablets. *Acta Pharm Suecica.* 1972; 9:595.
9. Theeuwes F, Bayne W. Dosage form index: an objective criterion for evaluation of controlled-release drug delivery systems. *J Pharm Sci.* 1977; 66:1388.

Downloaded from http://www.jclinpharm.org by guest on March 18, 2008
© 1981 American College of Clinical Pharmacology. All rights reserved. Not for commercial use or unauthorized distribution.

# EXHIBIT D

# WEBSTER'S

## NEW TWENTIETH CENTURY

# DICTIONARY

## UNABRIDGED

### SECOND EDITION-DELUXE COLOR

# WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY

## Second Edition

Copyright © 1979 by Simon & Schuster, a Division of Gulf & Western Corporation
All rights reserved
including the right of reproduction
in whole or in part in any form
Published by New World Dictionaries/Simon and Schuster
A Simon & Schuster Division of Gulf & Western Corporation
Simon & Schuster Building
Rockefeller Center
1230 Avenue of the Americas
New York, New York 10020
SIMON AND SCHUSTER, TREE OF KNOWLEDGE and colophon are trademarks
of Simon & Schuster.

Manufactured in the United States of America

1 2 3 4 5 6 7 8 9 10

ISBN 0-671-41819-X

Previous editions of this book were pub-
lished by The World Publishing Company.
William Collins +World Publishing Co., Inc.
and William Collins Publishers, Inc.

PRINTED IN THE UNITED STATES OF AMERICA

... of teeth; especially, a partial or ... of artificial teeth.

... divested of a nucleus.

dē-nūde′, v.t.; denudated, pt., ... [L. denudatus, pp. of ...; de-, off, from, and nud-...; to strip; to denude.

dē-nūd′ā-ted (or den′ū-), a. ... denuded.

... 1. the act of stripping off ... bare.

... condition of being denuded.

... denuded, pt., pp.; denuding, ... to make bare, strip off.]

... divest of all covering; to ...

... to lay bare by erosion.

... L. denumerans, ppr. of de-...; de, down, from, and ...; in mathematics, the ... how many solutions are ... system of equations.

... in law, a down payment.

... [Sp., from denunciar, ... Mexico and Spanish American ... proceedings necessary to ... a similar method essam-...

... (or -shi-), a. denunciatory.

... (-shi-āt), v.t.; denunciated, ... ppr. to denounce.

... n. [L. denuntiatio, an an- ... warning, from denuntiatus, ... to announce, to denounce; ... nuntiare, to announce.] ... proclamation. [Obs.]

... warning of evil, punishment, ...

... against (someone) or the ... accusation.

... a nation of its intention to ... armistice, etc.

... law, the act by which a per- ... is outlawed or a rebel.

... (or -shi-), a. denunciatory.

... n. [L. denuntiatio, an ... denuntiare, to announce.] ... denouncers or the threatens. ... one who accuses another. ... (-ā-tōr-y, a. relating to or implying ... containing a public threat; ...

... lack of nutrition.

... pt., pp.; denying, ppr. [ME. ... to deny, from de-, intens., ... deny.]
... to gainsay; to declare (a ... notion) not to be true; as, to ...
... grant; to withhold; as, to ...
... accept as true or right; to re- ... unreal, etc.
... to disown; to refuse to re- ... as, to deny one's friends. ... access to. ... a person who makes a request).

... to decline the gratification ... desires; also, to refrain from;

... to refuse access to (visi- ... refuse.

... to give a negative answer; to main- ... n. in a manner indicating de-

... a. deobstructed, pt., pp.; de- ... to remove obstructions or ... as, to deobstruct the pores

... 3. removing obstructions; ... clear or open the natural ... ducts and secretions of the body, ... aperient.

... a medicine having the ... removing obstructions.

... n. [L. deodandum, a thing to ... God, Deo, dat. of Deus, God, and ... dandum, gerundive of dare, ... in English law, a personal chat- ... instrumental in the death of a ... for that reason, forfeited to the ... used for some pious purpose. ... deodara, from Sans. devadāru, ... divine, and dāru, wood.]

---

1. a kind of cedar tree with durable, light-red wood, native to the Himalayas.
2. its wood.

dē′ō-dāte, n. An offering or gift from God. [Obs.]

dē-ō′dōr-ănt, a. [de- priv., and odorans, ppr. of odorare, to remove from odor, a smell.] having the power of destroying or counteracting undesired odors.

dē-ō′dōr-ănt, n. any deodorant substance or preparation.

dē-ō′dōr-ĭ-zā′tion, n. the act of removing odor; the condition of being deodorized.

dē-ō′dōr-īze, v.t.; deodorized, pt., pp.; deodorizing, ppr. to remove or counteract the odor of.

dē-ō′dōr-ī-zēr, n. a deodorizing agent.

Dē′ō grā′tĭ-ās (-shĭ-ǎs), [L.] thanks to God.

dē-on′ē-rāte, v.t. to unload. [Obs.]

dē-on-tŏ-lŏğ′ĭc-ǎl, a. relating to deontology.

dē-on-tŏl′ō-ğist, n. one versed in deontology.

dē-on-tŏl′ō-ğy, n. [Gr. deon, that which is binding, proper, from dein, to bind, and logos, description.] the theory of duty or moral obligation; ethics.

dē-ō-pẽr′cū-lāte, a. [de- priv., and L. operculum, a lid, covering.] in botany, pertaining to mosses having an operculum that does not separate spontaneously from the spore cases.

dē-op′pĭ-lāte, v.t. to free from obstruction. [Obs.]

dē-op-pĭ-lā′tion, n. the removal of obstruction. [Obs.]

dē-op′pĭ-lā-tĭve, a. deobstruent; removing obstruction. [Obs.]

dē-or′dĭ-nā′tion, n. disorder. [Obs.]

dē-or′găn-īze, v.t.; deorganized, pt., pp.; deorganizing, ppr. to destroy the organic character of.

dē-os′cū-lāte, v.t. to kiss. [Obs.]

dē-os-cū-lā′tion, n. a kissing [Obs.]

dē-os′sĭ-fy, v.t.; deossified, pt., pp.; deossifying, ppr. to deprive of bones or bony structure; to make weak.

Dē′ō vŏl′en′tē, [L.] (if) God is willing.

dē-ox′ĭ-dāte, v.t.; deoxidated, pt., pp.; deoxidating, ppr. to deoxidize.

dē-ox-ĭ-dā′tion, n. the act or process of deoxidizing.

dē-ox′ĭ-dĭ-zā′tion, n. deoxidation.

dē-ox′ĭ-dīze, v.t.; deoxidized, pt., pp.; deoxidizing, ppr. to remove oxygen, especially chemically combined oxygen, from.

dē-ox′ĭ-dī-zēr, n. any agent that removes oxygen.

dē-ox′y-ğen-āte, v.t. to remove oxygen, especially free oxygen, from (water, air, etc.).

dē-ox′y-ğen-ā′tion, n. the act or operation of removing oxygen.

dē-ox′y-ğen-īze, v.t. to deoxygenate.

dē-pāint′, v.t. [ME. depeynten; OFr. depeint, from L. depingere, to paint; de, and pingere, to paint.] to depict or portray, either by painting or by words. [Rare or Obs.]

dē-pāint′ẽr, n. a painter. [Obs.]

dē-pārt′, v.i.; departed, pt., pp.; departing, ppr. [ME. departen; L. dispartire or dispartire, to divide, separate; dis-, apart, and partire, to divide, from pars (partis), a part, share.]
1. to share. [Obs.]
2. to separate; to part; to withdraw; to go away (from).
He which hath no stomach to this fight
Let him depart. —Shak.
Depart from me. ye cursed, into everlasting fire. —Matt. xxv. 41.
3. to start; to set out.
4. to turn aside (from something); as, we cannot depart from our rules.
I have not departed from thy judgments. —Ps. cxix. 102.
5. in law, to forsake or abandon the ground assumed in a former pleading and assume a new one.
6. to die.
Lord, now lettest thou thy servant depart in peace, according to thy word. —Luke ii. 29.

to depart with; to yield. [Obs.]
Syn.—leave, retire, go, desert, apostatize, deviate, vary, decease, die.

dē-pārt′, v.i. 1. to divide. [Obs.]
2. to separate; as, till death us depart. [Obs.]
3. to retire from; to leave; to quit: now only in depart this life. [Archaic.]

dē-pārt′, n. 1. division, as of a compound into its elements. [Obs.]
2. a departure. [Obs.]

dē-pārt′ă-ble, a. divisible; separable. [Obs.]

---

dē-pārt′ed, a. 1. gone away; past; bygone.
2. dead.
the departed; (a) the dead person; (b) dead persons; the dead.

dē-pārt′er, n. one who departs.

dē-pārt′ment, n. [OFr. departement, a division, department, from L. dispartire, dispartire, to divide, depart.]
1. the act of departing; departure. [Obs.]
2. a separate part, division, or branch, as of a government or business; a section or subdivision; as, the accounting department, the police department.
3. a field of knowledge or activity; as, rewriting is his department.
4. a government administrative district in France.
5. in education, a subdivision of a college or school, for the teaching and studying of a branch of knowledge; as, the department of sociology.
department store; a large retail store not confined to one kind of goods but handling various kinds arranged in departments.

dē-pārt-men′tal, a. 1. pertaining to a department or departments.
2. arranged into or according to departments; as, departmental instruction in grammar schools.

dē-pārt-men′tal-ĭsm, n. 1. strict following of departmental rules, practices, etc.
2. bureaucracy.

dē-pār′ture, n. [OFr. departeure, from departir, to depart.]
1. a separating or parting. [Obs.]
2. the act of going away; a moving from or leaving a place; as, a departure from San Francisco.
3. death. [Archaic.]
4. a starting out, as on a trip or new course of action; as, political action is a new departure for labor.
5. a deviation or turning aside (from something).
6. in nautical usage, (a) the distance of a ship due east or west from the meridian of its starting point; (b) a ship's position in latitude and longitude at the start of a voyage, from which the dead reckoning is begun.
7. in law, the abandonment of the ground taken in a former pleading, and the adoption of another.

dē-pas′cent, a. [L. depascens, ppr. of depascere, to feed upon; de, and pasci, to feed.] feeding. [Rare.]

dē-pas′ture, v.t. 1. to eat up; to consume the herbage of (a piece of land): said of cattle, etc.
2. to pasture (cattle, etc.); to graze.

dē-pas′ture, v.i. to feed; to graze.

dē-pa′tri-āte, v.i. to leave one's country. [Obs.]

dē-pau′pẽr-āte, v.t.; depauperated, pt., pp.; depauperating, ppr. [de-, and L. pauperare, to make poor, from pauper, poor.] to make poor; to impoverish; to deprive of fertility or richness.

dē-pau′pẽr-āte, a. impoverished; made poor; specifically, in botany, imperfectly developed.

dē-pau′pẽr-īze, v.t.; depauperized, pt., pp.; depauperizing, ppr. to raise from a condition of poverty or pauperism; to free from pauperism.

dē-pēach′, v.t. to dispatch. [Obs.]

dē-pec-ū-lā′tion, n. a robbing or embezzlement. [Obs.]

dē-pēinct′ (-pānt′), v.t. to paint. [Obs.]

dē-pend′, v.i.; depended, pt., pp.; depending, ppr. [ME. dependen; OFr. dependre; L. dependere, to hang down from, to depend; de-, down, and pendere, to hang.]
1. to be influenced or determined by something else; be contingent (on).
2. to rely; to rest with confidence; to trust; to confide; to have full confidence or belief; as, we depend on the word or assurance of our friends; we depend on the arrival of the mail.
3. to rely on for support or aid.
4. to be in suspense; to be undetermined; as, the suit is still depending in court.
5. to hang down; to be sustained by being fastened or attached to something above. [Archaic.]
6. to impend. [Obs.]

dē-pend-a-bĭl′ĭ-ty, n. the quality of being dependable.

dē-pend′a-ble, a. that can be depended on; reliable; trustworthy.

dē-pend′a-ble-ness, n. the quality of being dependable.

dē-pend′a-bly, adv. in a dependable manner.

dē-pend′ance, n. same as dependence.

dē-pend′an-cy, n. same as dependency.

dē-pend′ant, a. same as dependent.

tûrn, up; cry, myth; çat, machine, ace, church, chord; gem, añger, (Fr.) boñ, aş; this, thin; azure

487

against, to strike on; *in*, on, against, and *figere*, to strike.]
1. to give or cause (pain, wounds, blows, etc.) by or as by striking; to cause to be borne.
2. to impose (a punishment, disagreeable task, etc.).
in·flict′er, *n*. one who inflicts.
in·flic′tion, *n*. [LL. *inflictio* (-*onis*), from L. *inflictus*, pp. of *infligere*, to strike on or against, to inflict.]
1. an inflicting.
2. that which is inflicted, as pain or punishment.
in·flict′ive, *a*. of or characterized by infliction.
in·flo·res′cence, *n*. [LL. *inflorescens* (-*entis*), ppr. of *inflorescere*, to begin to blossom; L. *in*, in, and *florescere*, incept. of *florere*, to blossom.]
1. a flowering; the unfolding of blossoms.
2. the arrangement of flowers on a stem or axis.
3. a flower cluster on a common axis.
4. flowers collectively.
5. a single flower.
in·flo·res′cent, *a*. [LL. *inflorescens*; see *inflorescence*.] in flower; flowering.
in·flow′, *v.t.*; inflowed, *pt., pp.*; inflowing, *ppr.* to flow from without toward a center or interior: opposed to *outflow*.
in′flow, *n*. 1. that which flows in.
2. the act of flowing in or into.
in·flow′er·ing, *n*. the process of extracting the aroma of flowers for use in the making of perfumes.
in′flu·ence, *n*. [ME. *influence*; OFr. *influence*; LL. *influentia*, a flowing in, from L. *influens* (-*entis*), ppr. of *influere*, to flow in; in, in, and *fluere*, to flow.]
1. an influx. [Obs.]
2. originally, the supposed flowing of an ethereal fluid or power from the stars, thought to affect the characters and actions of people.
3. (a) the power of persons or things to affect others, seen only in its effects; (b) the action or effect of such power.
4. the power of a person or group to produce effects without the exertion of physical force or authority, based on wealth, social position, ability, etc.
5. a person or thing that has influence.
6. in physics, induction.
Syn.—power, control, sway, authority, weight.
in′flu·ence, *v.t.*; influenced, *pt., pp.*; influencing, *ppr.* to exercise or have influence on; to modify or affect in some way; to act on; to bias; to sway; as, the sun *influences* the tides; to *influence* a person by fears or hopes.
in′flu·en·cer, *n*. one who or that which influences.
in·flu·en′cive, *a*. having influencing qualities or properties. [Rare.]
in′flu·ent, *a*. [OFr. *influent*, influential, lit., flowing in, from L. *influens* (-*entis*), ppr. of *influere*, to flow in.]
1. flowing in.
2. having influence. [Obs.]
in′flu·ent, *n*. anything flowing in, as a tributary.
in·flu·en′tial (-shal), *a*. 1. exerting influence; possessing influence.
2. having great influence; powerful; effective.
Syn.—potent, powerful, efficacious, forcible, persuasive, controlling, guiding, authoritative, leading.
in·flu·en′tial·ly, *adv*. in an influential manner; so as to incline, move, or direct.
in·flu·en′za, *n*. [It. *influenza*, influenza, lit., an influence, so called because formerly attributed by astrologers to the influence of the stars, from LL. *influentia*, an influence, lit., a flowing in, from L. *influens* (-*entis*), ppr. of *influere*, to flow in.] an acute, contagious, infectious disease, caused by any of several viruses and characterized by inflammation of the respiratory tract, fever, muscular pain, and, often, intestinal disorders: also called *grippe, flu*.
in·flu·en′zal, *a*. of influenza.
in′flux, *n*. [L. *influxus*, a flowing in, properly pp. of *influere*, to flow in; *in*, in, and *fluere*, to flow.]
1. (a) a flowing in; an inpouring; inflow, as of a liquid, gas, etc.; (b) a continual coming in of persons or things; as, an *influx* of customers.
2. the point where a river joins another body of water.
3. influence; power. [Obs.]

in·flux′ion (-fluk′shun), *n*. influx. [Rare.]
in·flux′ious (-fluk′shus), *a*. influential. [Obs.]
in·flux′ive, *a*. having influence. [Rare.]
in·flux′ive·ly, *adv*. by influence. [Rare.]
in·fold′, *v.t.*; infolded, *pt., pp.*; infolding, *ppr.*
1. to wrap up or enwrap; to enclose.
2. to clasp with the arms; to embrace.
Also spelled *enfold*.
in·fold′ment, *n*. the act of infolding; also, the state of being infolded.
in·fo′li·ate, *v.t.* to cover or overspread with leaves. [Rare.]
in·form′, *v.t.*; informed, *pt., pp.*; informing, *ppr.* [ME. *informen*; OFr. *informer*; L. *informare*, to shape, fashion, represent, instruct; in, in, and *formare*, to form, from *forma*, form, shape.]
1. (a) to give form or character to; to be the formative principle of; (b) to give, imbue, or inspire with some specific quality or character; to animate.
2. to form or shape (the mind); to teach. [Rare.]
3. to give knowledge of something to; to tell; to acquaint with a fact, etc.
Syn.—acquaint, apprise, instruct, notify, tell, teach, enlighten.
in·form′, *v.i.* 1. to take shape; to become manifest. [Obs.]
2. to give information, especially information laying blame or accusation upon another.
in′form′, *a*. without regular form; shapeless; formless.
in·form′al, *a*. [L. *in- priv*. and *forma*, form.]
1. not formal; specifically, (a) not according to prescribed or fixed customs, rules, ceremonies, etc.; (b) casual, easy, unceremonious, or relaxed; (c) designed for use or wear on everyday occasions; (d) not requiring formal dress; (e) colloquial.
2. deranged in mind. [Obs.]
in·for·mal′i·ty, *n*. 1. the condition or quality of being informal; lack of customary formality.
2. pl. in·for·mal′i·ties, an informal act.
in·form′al·ly, *adv*. in an informal manner; without the usual forms.
in·form′ant, *n*. [L. *informans* (-*antis*), ppr. of *informare*, to inform.]
1. one who gives information.
2. one who offers an accusation against a person; an informer.
3. a native speaker who repeats the forms, correct sounds, etc. of his language for the benefit of linguists, teachers, translators, etc.
Syn.—informer.—An *informer* is one who, for selfish ends, volunteers accusations with a view to having others punished; an *informant* is one who simply acquaints us with something we had not known before.
in·for·ma′tion, *n*. [OFr. *information*; L. *informatio* (-*onis*), a representation, an outline, sketch, from *informare*, to give form to, to represent, inform.]
1. an informing or being informed; especially, a telling or being told of something.
2. something told; news; intelligence; word.
3. knowledge acquired in any manner; facts; data; learning; lore.
4. a person or agency answering questions as a service to others.
5. in law, an accusation of criminal offense, not by indictment of a grand jury, but by a public officer, such as a prosecutor.
Syn.—intelligence, notice, advice, counsel, instruction, news.
in·for·ma′tive, *a*. of or giving information.
in·form′a·tive, *a*. 1. having power to animate. [Obs.]
2. giving information; instructive.
in·form′a·to·ry, *a*. informative.
in·formed′ (-formd′), *a*. 1. having much information, knowledge, or education.
2. ill-formed; misshapen. [Obs.]
in·form′er, *n*. 1. one who animates. [Obs.]
2. one who makes an accusation against, or gives evidence of the guilt of, another.
3. one who informs; an informant.
*common informer*: one who makes a business of giving information of violations of law, for the purpose of obtaining a portion of the fine imposed.
in·for′mi·da·ble, *a*. not formidable. [Rare.]
in·form′i·ty, *n*. [LL. *informitas*, unshapeliness; L. *informis*, unshapely; *in- priv*. and *forma*, form, shape.] lack of regular form; shapelessness. [Obs.]
in·form′ous, *a*. of no regular form or figure; shapeless. [Obs.]
in·for′tu·nate, *a*. unfortunate. [Obs.]
in·for′tu·nate·ly, *adv*. unfortunately.[Obs.]
in·for′tune, *n*. [OFr. *infortune*; L. *infortunium*, an

in·flux′ion (-fluk′shun), *n*. influx. [Rare.]
misfortune, punishment, from *in- priv*. and *fortuna*, chance, fortune.]
1. misfortune. [Obs.]
2. in astrology, any of the evil auguries; Mars, or Mercury, or Saturn, influence.
in·for′tuned, *a*. unfortunate. [Obs.]
in·found′, *v.t.* to infuse. [Obs.]
in·fra, *adv*. and *prep*. [L. *infra*.] below; on the under side, below; under or after: abbreviated *inf.* [See *infra*.] below; beneath: used in phrases.
in′fra-, [from L. *infra*.] a prefix meaning underneath, as in *infrared*, *infracostal*.
in·fra·ax′il·la·ry, *a*. [*infra-* and *axil*.]
1. in botany, below the axil.
2. in zoology, below the gills.] situated beneath the gills.
in·fra·bran′chi·al, *a*. [*infra-* and *branchial*.] situated beneath or below the branchiae.
in·fra·buc′cal, *a*. [*infra-* and *buccal*.] situated beneath or below the cheek, mouth.
in·fra·cos′tal, *a*. [from *infra-* and *costal*.] situated beneath or below the ribs.
in·fract′, *a*. unbroken. [Obs.]
in·fract′, *v.t.* infracted; [L. *infractus*, pp. of *infringere*, to infringe; L. *in*, in, *frangere*, to break, bruise.] to break, pledge, etc.).
in·fract′ed, *a*. in zoology, undulate.
in·frac′ti·ble, *a*. breakable.
in·frac′tion, *n*. [L. *infractio* (-*onis*), a breaking, from *infractus*, pp. of *infringere*, to infringe.] the act of breaking; breach; violation; observance; as, an *infraction* of a pact, agreement, or law.
in·frac′tor, *n*. one who breaks a law, etc.
in′fra dig (in′tä′tem, [L. *infra dignity.]
in·fra′grant, *a*. not fragrant.
in·fra·hy′oid, *a*. [*infra-* and hy′oid.] beneath the hyoid.
in·fra·lab′i·al, *a*. [*infra-* and labial.] beneath the lower lip; as, an *infralabial* plate.
in·fra·lap·sa′ri·an, *a*. [*infra-* and L. *lapsus*, a fall.] of or pertaining to the infralapsarians, or to their doctrine.
in·fra·lap·sa′ri·an, *n*. any of the Calvinists who held that God's foreknowledge of the fall of man for some people followed as a consequence of the fall of man: opposed to *supralapsarian*.
in·fra·mar′gin·al, *a*. [*infra-* and L. *marginalis*] infralapsarian.
in·fra·mar′gin·al, *a*. [*infra-* and (-*inis*), border, margin.]
1. below the outer edge or convolutions of the brain.
2. in entomology, posterior cell.
in·fra·max′il·la·ry, *a*. [*infra-* and jaw.] in anatomy, situated belonging to the lower jaw.
in·fra·me′di·an, *a*. [*infra-* and middle.] designating those of bottom region of depth from to six hundred feet.
in·fra·mun′dane, *a*. [*infra-* and the world.] lying or being beneath.
in·fran′chise·ment, *n*. same ment.
in·fran·gi·bil′i·ty, *n*. the condition of infrangible.
in·fran′gi·ble, *a*. [Fr. *infrangible* and *frangere*, to break.]
1. that cannot be broken or parts.
2. that cannot be violated or an *infrangible* vow.
in·fran′gi·ble·ness, *n*. infrangibility.
in·fra′or·bi·tar, *a*. [*infra-* and in zoology, located beneath the antennae of certain insects.
in·fra·o′ral, *a*. [*infra-* and mouth.] in zoology, located mouth.
in·fra·or′bit·al, *a*. [*infra-* and in anatomy, located beneath eye.
in·fra·pose′, *v.t.* to put below or in·fra·po·si′tion (-zish′un), *n*. in·fra·po·si′tion (-*onis*), position.] neath.
in·fra·red′, *a*. [*infra-*, and red] of those invisible rays just be

fāte, fär, fåst, fôll, fìnâl, câre, at; mēte, prey, hēr, met; pīne, marine, bìrd, pin; nōte, môve, for, atôm,